# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:09–cv–08081
## *Internal Use Only*

Jimenez v. City Of Chicago et al

Assigned to: Honorable Matthew F. Kennelly

Demand: $9,999,000

Case in other court: 12–02779

Cause: 42:1983 Civil Rights Act

Date Filed: 12/31/2009

Date Terminated: 01/24/2012

Jury Demand: Both

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/10/2011 | 111 | 4 | MINUTE entry before Honorable Matthew F. Kennelly: Plaintiff's motion for extension of time is granted, but only in part. The due date for plaintiff's response brief is extended to 9/2/11. The due date for defendants' reply brief is extended to 9/30/11. Mailed notice (mb, ) (Entered: 08/11/2011) |
| 08/30/2011 | 112 | 5 | MOTION by Plaintiff Thaddeus Jimenez for leave to file excess pages *and Other Relief* (Chanen, Stuart) (Entered: 08/30/2011) |
| 08/31/2011 | 114 | 9 | MINUTE entry before Honorable Matthew F. Kennelly: Plaintiff's unopposed motion for leave to permit: motion to be heard with 2 days notice to file a 35 page memorandum, and to file up to 80 paragraphs under LR 56.1(b)(3) is granted (112) Mailed notice (mb, ) (Entered: 09/01/2011) |
| 09/03/2011 | 115 | 10 | RESPONSE by Thaddeus Jimenezin Opposition to MOTION by Defendants F. Montilla, Jerome Bogucki, Lawrence Ryan, Robert Whiteman, Mark Sanders, Raymond Schalk for summary judgment 104 (Chanen, Stuart) (Entered: 09/03/2011) |
| 09/03/2011 | 116 | 48 | RULE 56 (e)(2) Statement by Thaddeus Jimenez regarding motion for summary judgment 104 ; *Statement Under LR56.1(b)(3)(C)* (Chanen, Stuart) (Entered: 09/03/2011) |
| 09/03/2011 | 117 | 72 | RESPONSE by Thaddeus Jimenezin Opposition to MOTION by Defendants F. Montilla, Jerome Bogucki, Lawrence Ryan, Robert Whiteman, Mark Sanders, Raymond Schalk for summary judgment 104 *CORRECTED* (Chanen, Stuart) (Entered: 09/03/2011) |
| 09/03/2011 | 119 | 107 | RULE 56 (e)(2) Statement by Thaddeus Jimenez regarding motion for summary judgment 104 *Plaintiff's Response to Defs.' Rule 56 Statement of Facts* (Chanen, Stuart) (Entered: 09/03/2011) |
| 09/19/2011 | 120 | 142 | MOTION by Defendants Jerome Bogucki, Mark Sanders, Raymond Schalk for extension of time to file response/reply (Ahn, Joan) (Entered: 09/19/2011) |
| 09/21/2011 | 122 | 145 | MINUTE entry before Honorable Matthew F. Kennelly: Agreed motion for extension of time is granted. Due date for reply brief is extended to 10/7/11. Mailed notice (mb, ) (Entered: 09/22/2011) |

| 09/23/2011 | [123](#) | 146 | MOTION by Plaintiff Thaddeus Jimenez to supplement *the Summary Judgment Record* (Attachments: #[1](#) Exhibit Exhibit 1)(Loevy, Jonathan) (Entered: 09/23/2011) |
|---|---|---|---|
| 09/26/2011 | [125](#) | 165 | RESPONSE by Defendants Jerome Bogucki, Mark Sanders, Raymond Schalk to motion to supplement [123](#) (Kamionski, Avi) (Entered: 09/26/2011) |
| 09/27/2011 | [126](#) | 167 | MINUTE entry before Honorable Matthew F. Kennelly: Plaintiff's motion to supplement the summary judgment record [123](#) is granted. The motion is taken as plaintiff's supplemental submission. Any response by defendants must be filed by no later than 10/4/11. (mk) (Entered: 09/27/2011) |
| 09/28/2011 | [128](#) | 168 | RESPONSE by Thaddeus Jimenezin Opposition to MOTION by Defendants F. Montilla, Jerome Bogucki, Lawrence Ryan, Robert Whiteman, Mark Sanders, Raymond Schalk for summary judgment [104](#) (Chanen, Stuart) (Entered: 09/28/2011) |
| 09/28/2011 | [129](#) | 203 | RULE 56 (e)(2) Statement by Thaddeus Jimenez regarding motion for summary judgment [104](#) *Amended Index of Plaintiff's Exhibits* (Attachments: #[1](#) Exhibit 67, #[2](#) Exhibit 72)(Chanen, Stuart) (Entered: 09/28/2011) |
| 10/03/2011 | [130](#) | 216 | MOTION by Plaintiff Thaddeus JimenezFor Leave To Contact Tueffel for Expert Interviews (Chanen, Stuart) (Entered: 10/03/2011) |
| 10/05/2011 | [132](#) | 219 | MINUTE entry before Honorable Matthew F. Kennelly: Plaintiff's agreed motion requesting permission to contact Lawrence Tueffel is granted subject to the terms and conditions stated in the motion. Mailed notice (mb, ) (Entered: 10/06/2011) |
| 10/07/2011 | [133](#) | 220 | REPLY by Jerome Bogucki, Mark Sanders, Raymond Schalk to response in opposition to motion [128](#) (Attachments: #[1](#) Exhibit, #[2](#) Exhibit, #[3](#) Exhibit)(Ahn, Joan) (Entered: 10/07/2011) |
| 10/07/2011 | [135](#) | 262 | NOTICE by Jerome Bogucki, Mark Sanders, Raymond Schalk re reply to response to motion [133](#) , Response,, [134](#) (Ahn, Joan) (Entered: 10/07/2011) |
| 10/07/2011 | [136](#) | 264 | RULE 56.1(a)(3) Statement by Jerome Bogucki, Mark Sanders, Raymond Schalk regarding motion for summary judgment [104](#) (Attachments: #[1](#) Exhibit Corrected Ex. 3 to Defs' 56.1(a)(3) Statement, #[2](#) Exhibit Corrected Ex. 4 to Defs' 56.1(a)(3) Statement, #[3](#) Exhibit Corrected Ex. 7 to Defs' 56.1(a)(3) Statement, #[4](#) Exhibit Corrected Ex. 21 to Defs' 56.1(a)(3) Statement, #[5](#) Exhibit Corrected Ex. 37 to Defs' 56.1(a)(3) Statement)(Ahn, Joan) (Entered: 10/07/2011) |
| 10/25/2011 | [137](#) | 396 | MOTION by Plaintiff Thaddeus Jimenez for a scheduling order (Liskow, Samantha) (Entered: 10/25/2011) |
| 10/26/2011 | [139](#) | 398 | MINUTE entry before Honorable Matthew F. Kennelly: The final pretrial order is to be filed by 11/21/11. The final pretrial conference is set for 11/28/11 at 3:00 p.m. Counsel are advised to consult Judge Kennelly's web page regarding requirements for the final pretrial order and motions in limine. Plaintiff's motion for a scheduling conference [137](#) is terminated as moot. (mk) (Entered: 10/26/2011) |
| 10/28/2011 | [140](#) | 399 | MOTION by Plaintiff Thaddeus Jimenez for rule to show cause *with Respect to Third–Party Witness Juan Carlos Torres* (Chanen, Stuart) (Entered: |

| | | | |
|---|---|---|---|
| | | | 10/28/2011) |
| 10/28/2011 | 142 | 406 | MOTION by Plaintiff Thaddeus Jimenez for rule to show cause *with Respect to Third−Party Witness Juan Carlos Torres (including exhibit)* (Attachments: #1 Exhibit A)(Chanen, Stuart) (Entered: 10/28/2011) |
| 11/02/2011 | 143 | 417 | Motion to Quash Subpoena for Deposition by Juan Carlos Torres (Solock, Mark) (Docket Text Modified by Clerk's Office on 11/3/2011) (mb, ). (Entered: 11/02/2011) |
| 11/02/2011 | 145 | 424 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752−6530737. (Solock, Mark) (Entered: 11/02/2011) |
| 11/03/2011 | 146 | 426 | RESPONSE by Plaintiff Thaddeus Jimenez to other 143 *Juan Carlos Torres' Motion to Quash Subpoena* (Chanen, Stuart) (Entered: 11/03/2011) |
| 11/03/2011 | 147 | 432 | *Plaintiff Thaddeus Jimenez's Opposition to Juan Carlos Torres' Motion to Quash Subpoena 146* NOTICE of Motion by Stuart Jay Chanen for presentment of before Honorable Matthew F. Kennelly on 11/7/2011 at 09:30 AM. (Chanen, Stuart) (Entered: 11/03/2011) |
| 11/03/2011 | 149 | 433 | MOTION by Plaintiff Thaddeus Jimenez for leave of court under Rule 39(a)(B) to re−issue subpoena (Chanen, Stuart) (Docket Text Modified by Clerk's Office on 11/4/2011) (mb, ). (Entered: 11/03/2011) |
| 11/10/2011 | 151 | 435 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 11/10/11. For the reasons stated in the accompanying Memorandum Opinion and Order, the Court grants summary judgment in favor of all defendants on the due process claim to the extent it relates to the alleged failure to produce the complete inventory list and the picture of Jimenez and in favor of defendant Schalk on the due process, failure to intervene, and section 1983 conspiracy claims in their entirety. The Court denies the remainder of the summary judgment motion. In addition, plaintiff's claims against defendants Whiteman, Ryan, and Montilla are dismissed. The case is set for a status hearing on 11/14/11 at 9:30 a.m., for the purpose of addressing what discovery and disclosures remain to be completed before the 12/5/11 trial date. (mk) (Entered: 11/10/2011) |
| 11/14/2011 | 153 | 469 | MOTION by Defendants Jerome Bogucki, Mark Sanders, Raymond Schalk to bar Kent Gibson, MOTION by Defendants Jerome Bogucki, Mark Sanders, Raymond Schalk to continue *trial* (Attachments: #1 Exhibit)(Ahn, Joan) (Entered: 11/14/2011) |
| 11/15/2011 | 155 | 480 | MOTION by Defendants Jerome Bogucki, Mark Sanders, Raymond Schalkin limine (Ahn, Joan) (Entered: 11/15/2011) |
| 11/15/2011 | 156 | 495 | MOTION by Plaintiff Thaddeus Jimenezin limine *No. 2 re: Mark Levy* (Attachments: #1 Exhibit A, #2 Exhibit B)(Chanen, Stuart) (Entered: 11/15/2011) |

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 8081 | **DATE** | 8/10/2011 |
| **CASE TITLE** | Jimenez vs. City of Chicago, et al. | | |

**DOCKET ENTRY TEXT**

Plaintiff's motion for extension of time is granted, but only in part.  The due date for plaintiff's response brief is extended to 9/2/11.  The due date for defendants' reply brief is extended to 9/30/11.

Docketing to mail notices.

| | Courtroom Deputy | DS |
|---|---|---|

09C8081 Jimenez vs. City of Chicago, et al.

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| Plaintiff, | ) | No. 09 C 8081 |
| v. | ) | |
| | ) | Judge Kennelly |
| CITY OF CHICAGO, et al., | ) | |
| Defendants. | ) | |

**PLAINTIFF JIMENEZ'S UNOPPOSED MOTION FOR LEAVE TO PERMIT:
(1) THIS MOTION TO BE HEARD WITH 2-DAYS NOTICE INSTEAD OF THREE;
(2) A 35-PAGE DOUBLE-SPACED MEMORANDUM INSTEAD OF 20; AND
(3) <u>80 PARAGRAPHS UNDER LOCAL RULE 56.1(b)(3) instead of 40</u>**

Plaintiff Thaddeus Jimenez respectfully requests this Court to expand the number of pages and responsive factual paragraphs he is permitted to use to respond to the Police Officer Defendants' motion for summary judgment. In support of the motion, Jimenez states as follows:

1. Jimenez's counsel failed to provide the Court and counsel with the three-day notice required by Your Honor's rules. We apologize to the Court and counsel for failing to timely complete and file this motion and seek leave to have it heard on two-days' notice. Defendants' counsel has no objection to this portion of the motion.

2. Jimenez's counsel have worked diligently to limit his responsive brief to 20-pages (which was set by the Court at the time that Defendants filed their 20-page memorandum in support of their motion) and to limit his responsive factual statements under Local Rule 56.1(b)(3)(C) to 40 (which is set by local rule). Jimenez and his counsel cannot meet these limits for the following reasons:

(a) Defendants' brief is 20 pages long and the line spacing is only 1.5 lines, notwithstanding that Local Rule 5.2(c) requires that "line spacing will be at least 2.0 lines." We don't say this to criticize defendants, but simply to point out that their brief is effectively 26 pages long.

(b)     This case for all practical purposes is more than 18 years old in the sense that the murder at issue took place in February 1993.  The relevant facts include information from the Defendants' 1993 murder investigation, a 1994 murder trial, a 1997 murder trial, a lengthy 2008-2009 exoneration investigation by the Cook County State's Attorney, a 2009 new indictment of the real murderer, documents produced by 25 different individuals and entities; over 40 depositions taken in this case, and countless legal arguments raised by defendants (both real and imagined) to which Plaintiff must respond.  In addition, several key facts have been completely omitted from Defendants' presentation of facts.  In order to present the court with material facts that are not raised *at all* by Defendants, Plaintiff requests additional opportunities to present Rule 56.1(b)(3)(C) statements.

(c)     Several legal concepts require a thorough discussion of the precedents, including precedents from other jurisdictions in certain sections.   By way of example only, while Defendants cite to Seventh Circuit cases that discuss the impact on a plaintiff of knowing the facts surrounding his own confession, in this case, there was no confession by plaintiff, and contrary to the inference requested by Defendants, Plaintiff was unaware at the time of his trials of the significant facts that led to suggestive and coerced identifications in the case.

(d)     Counsel has endeavored to be as succinct as possible in presenting its arguments, while at the same time meeting its obligation to its client and this Court to get across its central arguments.  Plaintiff's counsel sincerely believe that they require additional memorandum pages and responsive fact paragraphs to prepare an appropriate presentation.

(e)     The Defenadnts will not be prejudiced by these additional pages and paragraphs. In addition to the effective 26-page brief they have already filed, they will be permitted an additional 15-page brief in reply.  They will therefore still have several more pages to make their

arguments than Plaintiff. (We acknowledge that the longer brief is also more work for the Court, but we believe that the additional discussion of the cases will ultimately assist the Court, not simply add pages to its workload.)

(f)     Defendants have no objection to Plaintiff's request for the 35-page limit, and Defendants have no objection to Plaintiff's request for the 80-paragraph limit. (By so agreeing, Defendants are not agreeing to all the statements made in this motion.)   Defendants request, however, that if the Court grants Plaintiff's motion that you also permit them a 20-page reply brief.

For all these reasons, Plaintiff requests this Court to grant Plaintiff leave as follows:

(1) To have this motion heard on Thursday, September 1, notwithstanding our failure to
   meet the 3-day notice requirement;

(2) To have a limit of 35 pages in his summary judgment response memorandum; and

(3) To have a limit of 80 paragraphs in his Rule 56.1(b)(3)(C) Statement.

(Defendants request a 20-page reply brief if the Court grants the relief requested above.)

Dated:    August 30, 2011

Respectfully Submitted,

 /s/ Stuart J. Chanen
One of Thaddeus Jimenez's Attorneys

Stuart Chanen
Lisa R. Carter
Valorem Law Group
35 E. Wacker Drive, 30th Floor
Chicago, IL 60601
312-676-5480
Stuart.Chanen@valoremlaw.com

3

## <u>CERTIFICATE OF SERVICE</u>

I, Stuart J. Chanen, an attorney, certify that on August 30, 2011, I delivered through this Court's Electronic Court Filing ("ECF") system a copy of this **NOTICE OF MOTION** to each counsel of record.

Respectfully Submitted,

 /s/ Stuart J. Chanen
One of Thaddeus Jimenez's Attorneys

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 8081 | **DATE** | 8/31/2011 |
| **CASE TITLE** | Jimenez vs. City of Chicago | | |

**DOCKET ENTRY TEXT**

Plaintiff's unopposed motion for leave to permit: motion to be heard with 2 days notice; to file a 35 page memorandum, and to file up to 80 paragraphs under LR 56.1(b)(3) is granted (112).

Docketing to mail notices.

| | Courtroom Deputy Initials: | OR |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THADDEUS JIMENEZ, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 09-cv-8081 |
| | ) The Hon. Matthew F. Kennelly |
| CITY OF CHICAGO, *et al.,* | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE TO THE DEFENDANT**
**OFFICERS' MOTION FOR SUMMARY JUDGMENT**

Based on the case put together by the Defendant Officers, the Cook County State's Attorney's Office (" CCSAO" ) twice prosecuted and secured the conviction of Thaddeus Jimenez (" Jimenez"  or " TJ" ) for the murder of Eric Morro.  More than sixteen years later, following its own extensive re-investigation, the CCSAO *joined* TJ's motion to vacate his conviction and release him from prison. Cook County Chief Criminal Judge Paul Biebel has since issued Jimenez a Certificate of Innocence, an award which, by statute, requires an affirmative showing of actual innocence by clear and convincing evidence. 20 ILCS 2630/5(c-6). Meanwhile, on the same day Jimenez walked out of prison, the CCSAO arrested the real killer, Juan Carlos Torres, who was soon after indicted by a Cook County grand jury for the Morro murder.

As the CCSAO and the criminal court now acknowledge, Jimenez did not shoot Eric *Morro*, and the Defendant Detectives are the only ones left still maintaining that he did.  They have no choice.  Eighteen years ago, inside a span of less than 24 hours, Defendants somehow managed to build a rather elaborate case that Jimenez supposedly shot *Morro*, complete with multiple corroborating " eyewitness"  statements and identifications.   The problem for the Defendants is that the case they manufactured, and everything about it, is completely false.  As

1

everyone except the Defendants now acknowledge, Jimenez had nothing to do with crime.

As the evidence establishes, Defendants' efforts to squeeze the proverbial square peg into the round hole crossed over the line from legitimate investigation and into the realm of outright witness coercion and manipulation.  In the process, Defendants withheld evidence, destroyed evidence, and fabricated evidence, all violations of Jimenez's constitutional right to a fair trial.

Compounding the injustice is the fact that to ensure their concocted conviction against Jimenez, Defendants permitted the real culprit, Juan Carlos Torres, to remain free during the 16 years of this injustice. This is so even though at the time of the murder, the available evidence against Juan was overwhelming. Co-defendant Victor Romo insisted that Torres was his co-perpetrator and that he had never even met Jimenez.  Moreover, Torres confessed to having committed the murder, which confession was surreptitiously captured on tape by Romo's father.  (One-way taping was not illegal at that time.)   By time Defendants received the taped confession, however, they had already " solved"  the crime. Since 2006, every eyewitness questioned has revealed police coercion and manipulation as the direct cause of Jimenez's wrongful conviction.

Defendants' motion relies throughout on the premise that Jimenez is in fact guilty, with Defendants directing the Court to the incriminating " evidence"  that they themselves created. However, because the evidence is overwhelming that Jimenez did *not* commit the murder, the tightness of the case Defendants hastily assembled at the time is nothing but proof of their own misconduct.  With all reasonable inferences drawn in Jimenez's favor, the factual disputes surrounding how all of the witnesses came to implicate an innocent man are not the proper subject of a summary judgment motion; they can only be resolved by a jury.

### SUMMARY OF THE FACTS
### Juan Carlos Torres Murdered Eric Morro

On February 3, 1993, two friends, Victor Romo and Juan Carlos Torres, approached two other boys, Eric Morro and Larry Tueffel, in front of 3018 West Belmont Avenue.  Plaintiff's Rule 56.1 Statement of Facts (P. Stmt. ¶ 1).  (Because several witnesses share the same last name, this memorandum adopts Defendants' use of witness first names for ease of reference.) Victor questioned Eric about money that Eric apparently owed to a "Leo."   Eric told Victor to mind his own business.  *Id.*  A scuffle ensued, and at some point Juan pulled a gun.  *Id.* ¶¶  2.  A moment later, when Eric took a swing at Juan, Juan shot Eric in the chest.  *Id.*  Victor and Juan fled the scene, running west.  Larry also ran after the shot was fired, but then returned to check on his friend Eric.  *Id.* ¶ 3.  At the time of the shooting, Jimenez was at his Grandmother's house, playing video games with his cousins and doing homework with his uncle.   Jimenez was nowhere near Belmont and Sacramento and had absolutely nothing to do with Eric's murder.  *Id.* ¶ 4.

### The Witnesses' Original Story

Sometime that evening, Defendant Ryan questioned Larry Tueffel at the scene and then took him to the station for a few hours, where he was further questioned and then brought home. *Id.* ¶ 5.  During that initial round of questioning, Larry told Ryan, Bogucki, and one or more of the other Defendants everything he knew, describing the confrontation that led to the shooting. *Id.*  ¶  6.   Larry  also  provided  a  contemporaneous  physical  description  of  the  shooter (memorialized in the police report) as being a 13-14 year old male Hispanic, 5'4 to 5'5, with curly black hair, wearing a purple " Purple Jacket with Yellow Lettering and/or #'s"  and baggy blue jeans.  *Id.*  Larry's original description did not match Jimenez, who did not have curly hair. *Id.* ¶ 7.  Jimenez also never had a purple jacket with yellow lettering; instead, he had a brand new blue and white Duke Starter jacket, which Defendants used to frame Jimenez and then discarded

when Jimenez's mother demanded that the jacket be tested.  *Id.*

Phil Torres was also interviewed at the scene.  *Id.* ¶ 8.  Phil did not actually see the shooting and did not claim to have seen it; he was not an eyewitness.  *Id.*  As with Larry, Phil made no claim to have been able to identify the perpetrator by name.  *Id.*

### Defendants' Version

Defendant Detective Bogucki was put in charge of the investigation, assisted primarily by Defendant Detectives Saunders and Schalk.  *Id.* ¶ 9.  In Defendants' telling, Phil called the police in the early morning hours after the shooting to report that he just happened to be looking out the window at the time of the incident.  According to Defendants, Phil reported that he witnessed Thaddeus Jimenez shoot Eric, who Phil supposedly identified by name as someone known to him and supposedly identified as wearing a Duke jacket during the shooting.  *Id.* ¶¶ 10, 11.  Defendants further claimed that Phil supplied a motive, an altercation that Jimenez supposedly had with the victim earlier that day.  *Id.* ¶ 11.  The main police report memorialized those " facts,"  as well as Phil's subsequent selection of Jimenez out of a lineup.  *Id.*

Defendants also assert that they next went to Larry's home and that, there, Larry readily provided them a new account that, in contrast to his contemporaneous interview, now matched Phil's identification of Jimenez, including both the alleged argument with the victim earlier in the day and the fact that the shooter was wearing a Duke jacket.  *Id.* ¶¶ 12.  Larry's identification of Jimenez (as someone known to him by name) was then supplied to the prosecutors in Defendants' police report.  *Id.* ¶ 13.  Both Larry and Phil testified consistently *with Defendants' version of the facts* at both of Jimenez's criminal trials.

### Phil's Version: Never Even Claimed To Be A Witness

In the course of the re-investigation that led to Jimenez's exoneration, new evidence

came to light. Specifically, both Phil and Larry disavowed the story memorialized in the police documents, insisting instead that they had been improperly pressured to go along with it. According to Phil, the police came to his mother's house at 1:00 a.m. in the morning after the shooting. *Id.* ¶ 17. He was high on drugs and would not have spoken with the police if he had had a choice. *Id.* **Phil told Defendants he did not know who shot Eric, which was true. *Id.*** Phil doesn't recall reaching out to the police that night (as they claim) and believes now that he would have had no interest in doing so at the time. *Id.* ¶ 18.

Even assuming Phil did initiate re-contact with the police late that night (rather than the other way around), the most he could or would have told them was that he heard a rumor about a possible altercation hours before the murder involving Jimenez and the victim. *Id.* ¶ 19. Namely, Phil believes he heard from his sister that Jimenez might have gotten into an argument with the victim earlier in the day of the shooting, though Phil does not claim to have personal knowledge of any of that. *Id.* ¶ 20. Phil allows that he might have passed on to the police the hearsay tip that his sister believed Jimenez might have been involved. *Id.* Indeed, Phil is clear that this is the only conceivably relevant information he had. *Id.* ¶ 21.

During his interrogation, Phil never claimed to have been certain about the shooter's identity. *Id.* The police kept telling Phil that other people (including his sister) were claiming that Jimenez was the shooter, and finally, Phil agreed to say it was Jimenez. *Id.* Although he eventually testified at the trial that he saw Jimenez wearing a Duke jacket, at his deposition he revealed for the first time that it was the police who brought up the Duke jacket to him first, not the other way around. *Id.* ¶ 49. At bottom, Phil has admitted that, contrary to the police version, he truthfully told the police that he did not know who shot Eric. *Id.* ¶ 8. He never claimed to be

a witness and did not want to be a witness.  _Id._ ¶¶ 8, 21, 22.[1]

### Larry's Version: Unduly Coercive Interrogation

Sometime near 3:30 a.m., Defendant Bogucki went, by himself, to Larry's family's apartment.  Bogucki began banging on the door, insisting that Larry, who was asleep, needed to come back to the station.  _Id._ ¶ 26.  According to Larry, " they just grabbed me and took me" without a parent or guardian.  _Id._

Larry, who was only 14 at the time, had been crying and " in shock" over having witnessed the death of his friend.  He is a high school dropout and as Defendants' own expert concedes, "_he appears to be susceptible to being influenced by leading questions_" and has "difficulty in trying to make sense out of disparate and confusing information."  _Id_. ¶ 27 (emphasis in original).  In response to the Defendants' questioning, Larry explained that he knew the shooter by sight from the neighborhood, but did not know his name. (At the time, the real shooter was known to Larry with the nickname Crazy.  Larry now knows Crazy's real name to be Juan Carlos Torres.  _Id._ ¶¶ 38, 39.)

Defendants told Larry that Jimenez was the shooter, and also that there were other witnesses stating that it was TJ who shot Eric.  _Id._ ¶¶ 29, 30.  Defendants proceeded to put substantial pressure on Larry to say the killer was Jimenez, calling Larry  a " liar"  and accusing

---

[1]     Phil was 31 years old at that time, 18 years older than TJ, and they were not friends.  In fact, Phil claims to have seen TJ only a few times in his life and cannot describe him at all.  P. Stmt. ¶ 23.  At his deposition, Phil could not even be certain he had ever actually seen TJ before.  _Id_.  While Defendants try to discredit Phil on statements they do not like, that does not advance Defendants' motion, as TJ is the one entitled to all reasonable inferences at this stage. Moreover, the fact that Phil allowed Defendants' counsel at deposition to press certain admissions out of him through persistent questioning only shows, if anything, how suggestible and arguably subject to manipulation their star witness really is. As is often true in these types of cases, the Defendants urged the courts to believe this dubious witness back when he was pointing the finger at TJ, and yet they are stuck with him now that he is pointing the finger back at them.

him of " trying to cover up for TJ." *Id.* ¶¶ 29-33.  They were yelling and screaming at him.  *Id.* In response to the Defendants' assertion that the shooter was Jimenez, Larry was " very clear" with them that the shooter was " not" Jimenez. *Id.* ¶ 30.  Larry knew Jimenez and used to hang out with him sometimes, so he knew him by sight. *Id.* ¶¶ 28, 30.  Thus, Larry knew Jimenez had not been present for the shooting, and repeatedly told the Defendants: " no, no, no, it's not him, it wasn't him." *Id.* ¶ 30.

When Larry refused to implicate Jimenez, the detectives threatened to arrest Larry and send him to jail.  *Id.* ¶ 31.  They would " not leave him alone," and would " not let him go home" despite his request.  *Id.*  Larry was very afraid, particularly when the police were accusing him of lying.  *Id.* ¶ 32. They were screaming at him " real bad," but he " just kept saying, no, it's not him and trying to tell the truth and tell them [about the real shooter].  I don't know the name, but I was giving a description." *Id.*  Larry was practically falling asleep, and by the end, had broken down crying.  *Id.* ¶ 33.  Eventually, Larry " just got exhausted after a long time and I just kept saying, 'no, no, no.' ... It took me a long time to just say -- I gave up, you know.  I was exhausted. . . . I was in shock, you know, and finally I just gave up and said okay. . . . I know it was wrong to do that, but you know, I didn't know what else to do." *Id.*

Larry has also now made clear that he would never have said Jimenez was the shooter but for Defendants' coercion. *Id.* ¶ 34.  He regretted having become a " witness" against Jimenez and knew it was wrong to go through with it when he knew Jimenez was not the shooter. *Id.* ¶ 35.  So guilt-ridden was Larry about testifying falsely against Jimenez that when it came time to testify in Court, Larry tried to hide from prosecutors, but the police arrested him on a bench warrant and "had to drag [him] out of [his] apartment to take [him] in handcuffs" to juvenile jail

for a few days.  From there the police took him straight to Jimenez's criminal trial to testify.  *Id.*[2]

### Jimenez's Arrest

At 4:00 a.m. the morning after the shooting, Defendants Bogucki and Sanders went to Jimenez's grandmother's home and arrested him.  *Id.* ¶ 14.  Jimenez denied any knowledge of the murder and provided a detailed alibi.  *Id.*  In the course of the arrest, Defendants learned that Jimenez had a blue and white Duke (Blue Devils) jacket.  *Id.*

### Tina Elder

Once Defendants had coerced Phil and Larry into saying that the shooter was Jimenez, the next step was to get them to view a lineup.  In addition to Phil and Larry, Defendants summoned two other people to view a lineup, Tina and Sandra Elder.  Instead of providing transportation for the Elders, Defendants allowed them to travel to the lineup with Phil.[3]  Tina Elder testified that by time she had come to the station she had already discussed the murder and the lineup with Phil and Sandra. P. Stmt. ¶ 51.

At the moment of the shooting, Tina Elder was with her 4-year old daughter, was trying to get her daughter into the car, was several months pregnant, and was simultaneously speaking to Phil Torres, who was in a third-story window above her.  As Tina describes the scene, it was nighttime and she saw the two people fighting with Eric only for a few seconds.  *Id*. ¶ 52.  Although she testified at the trial that the shooter was Jimenez, she has since recanted that testimony and stated that she cannot be certain who it was.  Tina has further testified that she did

---

[2]    The guilt over having borne false witness against TJ has been very difficult for Larry; he eventually attempted suicide, at least in part from this guilt.  *Id.* ¶ 36 (" My intentions were never for this to get this far like that, you know, and it's just terrible.  I mean, it was a terrible thing, that the wrong -- the other guy was scot-free too, and that was on me too." ).

[3]    This of course renders meaningless the Defendants' current claim that when they arrived at the station, they separated them to wait in different areas.  *Cf*. Defendants Mot. at 11.

not know Jimenez at that time, but when she got to the police station, one of the officers told her that Thaddeus Jimenez was the primary suspect and placed her at a desk, which described as follows:

> [T]he police placed me at a desk.  On the desk was a photo of Eric and [a] photo of Thaddeus Jimenez.  I did not see and was not shown any other photos.  I looked at both photos prior to viewing the lineup.  My recollection of the shooter was of someone light-skinned, with hair that was short on the sides and wavy on the top.  I do not recall seeing a Duke jacket.

*Id.*  Tina has testified that the picture of Jimenez that the police placed her in front of was a square Polaroid.  *Id.* ¶ 53.  That Polaroid was never turned over by the police or prosecutors to the defendant, either before his 1994 or 1997 trial.  The police reports make no reference to Defendants taking a Polaroid picture of Jimenez and using it in the case to show to Tina Elder.  *Id.*  (The first time that Jimenez received this Polaroid was in January 2011.  *Id.* ¶ 64.)

The police did not take a statement from Tina until after they had told her that Jimenez was the primary suspect, until after they had placed her at a desk with TJ's photograph, and until after she had picked TJ out of the lineup.  *Id.* ¶ 54.   Tina never told another person – police or non-police – that the shooter was wearing a Duke jacket, and she states that she " does not recall seeing a Duke jacket" at the time of the shooting.  *Id.*  Defendants' police report nevertheless states that Tina positively identified TJ as " the offender wearing the 'Duke' jacket and as the one who shot the victim."  *Id.*

### Victor Romo Comes Forward, Confesses, and Admits Unequivocally That Juan Was the Co-Perpetrator

On February 10, 1993, exactly one week after the murder, but after the Defendants had already " cleared and closed"  the case against TJ, Victor Romo turned himself into Defendants Bogucki and Schalk and fully confessed to having been at the scene during the shooting.  *Id.* ¶ 55. Victor made clear to the Defendants that he did not know Jimenez, had never met him or seen him at any time, and was not with him at the time of the shooting or any other time that night.  *Id.* ¶ 56. Victor told the police that his friend Juan was the triggerman who murdered Eric.  *Id.* He told Bogucki and Schalk that he had met Juan at the Burger King on Belmont and

California, that Juan had asked Eric about some money, and that a struggle began.   *Id*. Independently, Victor's father, Ezequiel Romo, confirmed that Juan had confessed to him to shooting Eric.   *Id.*   Victor and Ezequiel provided Defendants Juan's specific address and even provided a map. *Id.* ¶ 57.

### Juan's Confession

Just two to three days after the murder, Ezequiel secretly tape-recorded Juan confessing to the crime. *Id.* ¶ 58.  Ezequiel wanted to make the tape to gather evidence that would exculpate his son by establishing that he was not the shooter and had no pre-knowledge Juan was carrying a gun.   *Id.*  Juan can be heard on the tape stating that: " when he hit me and I wanted to shoot him"  and " when I fired the shot, I ran."   *Id.* ¶ 59.  Juan also says on the tape that he is not worried about getting caught because " they pinned the other blame on the, the other gang boy" *Id.*  At one of Victor's first hearings, Victor's defense lawyer presented Defendants with the tape recording of Juan's confession. *Id.* ¶ 60.

### Defendants Fail To Genuinely Investigate Juan's Involvement

There was no reason to disbelieve Victor (who was admitting against self-interest to participating in the crime) or to discredit Juan's confession on the tape, but, at this point, Defendants had a big problem:  they had spent the first 24 hours of the investigation locking in various witnesses to the story that Jimenez was the shooter. It was " too late"  to start the investigation all over again.  Even if Juan were charged, the witnesses Defendants had already developed (pointing the finger at someone else) would likely have allowed Juan to escape conviction.  Therefore, Defendants opted to abandon their obligation to search for the truth and instead go with the case they already had, or more accurately, the case they had manufactured against the grain. In particular, as set forth in detail in Jimenez's Statement of Facts ¶ 80,

Defendants declined to take any genuine steps to confirm whether Victor was telling the truth about Juan being the shooter.   As for the taped confession, Defendants made a record of receiving the tape, but never logged it into evidence.   *Id.* ¶ 61.   Incredibly, the lead investigators, Bogucki and Schalk, assert that to this day they have never even listened to the tape, never had it translated into English, and never had a Spanish speaker from their Department listen to it, even though that was a common practice within the department at the time.   *Id.*

**Jimenez Is Twice Convicted For Morro's Murder
Based On the Case Put Together by Defendants**

Notwithstanding the evidence of Juan's guilt, the criminal case against Jimenez proceeded.   Although he was only 13 at the time of his purported involvement in the murder, Jimenez was tried as an adult.   *Id.* ¶ 67. Prior to the trial, the State successfully blocked the admission of Juan's taped confessions.   *Id.* ¶ 68.   At trial, the State put on the case built by the Defendants, including the "eyewitness" testimony of Phil, Larry, and Tina.   *Id.*   On October 4, 1994, the jury convicted Jimenez of first-degree murder, and he was sentenced to 50 years in prison.   *Id.* ¶ 72.   Jimenez served his time in juvenile facilities until he turned 17, whereupon he was transferred to maximum security with fully-grown adult criminals.   *Id.*

The appellate court eventually reversed Jimenez's first conviction based on a *voir dire* problem.   *Id.* ¶ 73.   The State again moved successfully to exclude Juan's taped confession and re-tried Jimenez based on the same evidence.   *Id.*   On November 11, 1997, the jury convicted Jimenez; later that month, the judge sentenced him to 45 years in prison.   *Id.*

**Jimenez's Exoneration**

For more than 16 years, TJ languished in prison for a crime he did not commit.   From the day of his arrest, Jimenez vigorously professed his innocence.   He wrote to anyone and everyone he thought might help him, including the Northwestern Center on Wrongful Convictions

("CWC"), which, assisted by several lawyers from Katten Muchin, investigated and pursued his case for four years.  _Id._ ¶ 74.  By June 2008, CWC persuaded the CCSAO that there was sufficient justification to re-open and re-investigate the case.  _Id._ ¶ 75.  From approximately June 2008 to May 2009, the CCSAO undertook a full re-investigation.  _Id._

In doing so, the CCSAO did exactly what Defendants should have done when they began their investigation in 1993: they followed the actual evidence.  Among other things, the CCSAO located a man named Leo Robles, the person to whom the victim owed money at the time of his death.  _Id._ ¶ 76.  During questioning, Leo admitted to having tossed the _Morro_ murder weapon into the Chicago River, and he even took the CCSAO investigators to the spot on the Belmont Avenue bridge where he had thrown the weapon in, the very night of the murder more than 15 years earlier.  _Id._  According to Leo, he was handed the gun by Luis Hernandez, who, like Leo and Juan, was a member of the Triangles street gang.  Luis later told Leo (after he had already ditched it) that he had received the gun from Juan who had confessed to Luis that he had used the gun to shoot Eric _Morro_.  _Id._

The CCSAO interviewed Juan on December 29, 2008, and unlike the interview conducted by Bogucki and Schalk, this was an actual interview.  _Id._ ¶ 77.  Juan denied even knowing Victor or Ezequiel Romo, a verifiable lie.  _Id._  When the investigators asked him to listen to Ezequiel's tape containing Juan's confession, Juan did not want to do so at that time and indicated he would get back to the CCSAO through counsel.  _Id._  Instead, Juan pulled his children from school, quit his job, abandoned his family home, and fled the State.  _Id._

On May 1, 2009, the CCSAO took a very unusual step:  it informed Jimenez through his counsel that they would agree to a motion to vacate his conviction.  _Id._ ¶ 78.  The Honorable Joseph M. Claps proceeded to enter an Order vacating Jimenez's conviction and sentence, and

then immediately noted the State's motion to dismiss (*nolle pros*) the case against Jimenez in its entirety. *Id.* Later that same day, Jimenez walked out of Hill Correctional a free man. *Id.* Four weeks later, June 3, 2009, Chief Judge Paul Biebel granted Jimenez a Certificate of Innocence, which the CCSAO did not oppose. *Id.* On the same day that TJ was released, the authorities arrested Juan Carlos Torres, who had fled to Indiana. *Id.* ¶ 79. On May 18, 2009, a Cook County grand jury indicted Torres for Eric Morro's murder. *Id.*

## ARGUMENT

### I.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON JIMENEZ'S DUE PROCESS CLAIMS.

The Due Process Clause of the Fourteenth Amendment guarantees criminal defendants the right to a fair trial. *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001). Indeed, this fundamental protection is one of the most cherished and precious rights in our democratic system. *E.g., Patterson v. Burge*, 328 F. Supp. 2d 878, 889 (N.D. Ill. 2004) (" The due process clause safeguards the liberty of citizens. . . particularly in cases where the state 'has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury. . . .'" ) (citations omitted). Here, Defendants violated Jimenez's due process rights by concealing evidence of their manipulation and coercion of witnesses and by concealing exculpatory physical evidence. Defendants fabricated false evidence—a due process violation that is independent of Defendants' *Brady* violations. And Defendants perjured themselves at trial in order to push forward the false story that was created during their sham investigation.

### A.  Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Concealment of Exculpatory Evidence.

The Seventh Circuit made clear in *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir.

2001) ("*Newsome I*") and 319 F.3d 301, 304 (7th Cir. 2003)("*Newsome II*") that Section 1983 claims have always existed where a police officer's actions in withholding material exculpatory information (including exculpatory information about the manipulation of a witness's testimony) results in a denial of a defendant's right to a fair trial. 256 F.3d at 749-53; 319 F.3d at 304-05. *Newsome II* held that the defendants were liable " under the due process clause because [the defendant officers] concealed exculpatory evidence -- *the details about how they induced the witnesses to finger [the civil rights plaintiff]*." *Id.* at 304 (emphasis added). In *Newsome*, as here, "[Plaintiff's] lawyers needed, but did not receive, information vital to probe whether manipulation [of witnesses] occurred." *Id.* at 305. The facts present here fall squarely within *Newsome*.

Since *Newsome,* a number of other cases in this Circuit have confirmed that Section 1983 liability will attach to a police officer who has manipulated a witness into identifying a suspect and then withheld material details surrounding how that witness came to identify a suspect. In *Ienco v. City of Chicago,* 286 F.3d 994, 1000 (7th Cir. 2002), the court relied on its intervening decision in *Newsome I* to reverse the district court's summary judgment in favor of officers on immunity grounds. The court held that an officer can be liable directly under the due process clause for withholding exculpatory information and lying to federal prosecutors who indicted Ienco. Citing *Brady* and *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), the court concluded that there was no absolute immunity for such conduct, and further held that if the plaintiff proved his due process claim on remand, the officers would also not be entitled to qualified immunity. 286 F.3d at 1000-01.[4]

---

[4]     The Seventh Circuit's opinion in *Jones* stands for two additional important propositions:  (1) that " information undermining the credibility of a government witness is within the scope of Brady's rule"  and (2) that certain intervening causes, such as " a prosecutor's

The Seventh Circuit followed *Ienco* with *Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004), in which the court of appeals affirmed this Court's denial of summary judgment on absolute and qualified immunity grounds. The Seventh Circuit acknowledged that Manning's allegations went beyond perjury and conspiracy to commit perjury and included " inducing [a witness] to create a false story" and " inducing a witness to falsely identify Manning in a line-up." *Id*. at 1032-33. The court held that the fact that Manning was also complaining of perjury (for which there was testimonial immunity) did " not foreclose his *Brady* claim." Significantly, the court held that qualified immunity was also not available to the defendants because in 1990, when the misconduct allegedly occurred, it was already " well established that investigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process right." *Id*. at 1034, citing *U.S. v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985).

Finally, in *Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008), another case in which plaintiff asserted that the "defendant officers violated his right to due process by manipulating or tampering with identification and testimonial evidence" and then " back[ed] up these allegations with [false] evidence at the trial," the court again affirmed, holding that the court properly instructed the jury that in order to find for plaintiff Dominguez, it had to find that Hendley caused Dominguez's criminal trial to be unfair through any of three specified courses of conduct: (1) withholding material, exculpatory evidence in violation of *Brady*; (2) causing an unreliable identification procedure to be used at his trial; or (3) fabricating evidence. *Id*. at 589. *See also Id*. at 590 (because the officer's defense was primarily that he denied that any evidence was fabricated, procured through suggestive procedures, or withheld, " the jury therefore had to

---

decision to charge, a grand jury's decision to indict, [and] a prosecutor's decision not to drop charges but to proceed to trial" will <u>not</u> " shield a police officer who deliberately supplied misleading information that influenced the decision." 856 F.2d at 994 and 995.

decide who was telling the truth on these points, and ultimately whether [Officer] Hendley misled the prosecution and caused Dominguez to receive an unfair criminal trial" ).  The court rejected defendant's claims of qualified immunity on the same basic grounds as the cases cited above, giving special emphasis to the point that the officer was not claiming immunity on the ground of "legal uncertainty,"  but rather was, as in this case, asserting factual defenses such as denial of the accusations, insufficient proximate cause, and superseding causation, all factual issues that do not relate to " legal uncertainty," and in any event do not lend themselves to pretrial resolution on immunity grounds.  Id. at 589-90.

In this long line of cases, the Seventh Circuit has repeatedly held that where, as here, the gist of the constitutional allegation is that the defendant induced witnesses to give a false identification of or make false statements about the suspect and then withheld the facts about how those witnesses were induced, defendants are not entitled to summary judgment (or post-trial reversal for that matter) on the grounds of failure to state a constitutional claim, or absolute immunity, or qualified immunity.

The facts in this case fit comfortably within these authorities.  Lacking any physical evidence, a confession, or anything else linking Jimenez to the crime, the State built its case solely on the purported eyewitness accounts that Defendants Bogucki, Sanders, and Schalk forged (double meaning intended) in a locked room inside the police station in the hours shortly after the murder. When Larry and Phil walked out of that room and were presented to the prosecutors, their testimony was virtually insurmountable: they were eyewitnesses who claimed: (a) to know Jimenez personally, (b) to have seen Jimenez shoot Eric, and (c) to have seen Jimenez wearing the very Duke jacket that the police seized from Jimenez, no less.  That testimony amply sufficed to convict Jimenez -- twice, as Defendants are quick to point out.  The

problem, however, is there a lot more to the story that was never told because it was never

disclosed to the prosecutors or to the defense.  Defendants' version of the story, as transmitted to

the prosecutors via their original police reports, critically withholds the following exculpatory

material:

- That Bogucki and Sanders threatened, coerced, and intimidated Larry into naming Jimenez as the shooter, as well as the means they used to induce Larry's testimony and the fact that prior to naming Jimenez, Larry had repeatedly insisted for hours that Jimenez *was not the shooter.*[5]

- That Phil Torres did not actively seek out police in order to share his belief that Jimenez was the shooter and that, in truth Phil never told police he saw Jimenez shoot Eric, but rather only disclosed Jimenez's name based on a hearsay rumor from his sister that Jimenez might have been involved.

- That Defendants created a suggestive " Polaroid Show-Up Procedure"  with Tina Elder and told her that Thaddeus Jimenez was the leading suspect at the time in order to influence her line-up identification.

- That they had induced witnesses to give false testimony (and in some cases simply wrote statements into their reports attributed to witnesses that were false), including but not limited to the statement that the shooter was wearing a Duke Jacket at the time of the murder. (Numerous witnesses have testified that the police, not they, inserted the wearing of a Duke Jacket into their witness statements.  These false statements were in turn not disclosed to the State or defense, and the " shooter wore a Duke Jacket"  theme was a major theme at both of Jimenez's trials.)

- That the following pieces of physical evidence existed:  (a) Eric's handwritten note with Leo's name, telephone number and the amount of money Eric owed to Leo; (b) the square Polaroid photo of Jimenez used with Tina Elder; (c) until discovery in this case, the full inventory list of evidence that had been created in 1993.

None of this information was known to Jimenez at his criminal trial, and taken together,

---

[5]    It is true that Defendants' police report discloses that Larry did not originally identify TJ.  (They had to include that fact because the beat officers had already created a report of their on-scene interview with Larry in which he described but did not identify, the shooter.)  But the critical missing/withheld fact is that Larry not only failed to name TJ (purportedly out of fear) but that he was affirmatively insisting to his interrogators that the killer was known to him and *was not TJ.*

these facts would have made for devastating impeachment. *See Giglio v. United States*, 405 U.S. 150 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*]" ). For summary judgment purposes, a reasonable jury could certainly conclude that these withheld details were sufficiently material to give rise to a constitutional violation, which requires only that they " might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104 (1976).

1. **The Purported Failure to Exercise Diligence Is Not a Basis for Summary Judgment on Plaintiff's Concealment of Evidence Claim.**

Relying almost exclusively on *Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011), Defendants argue that Jimenez's *Brady* claim should fail because Jimenez and his criminal defense counsel did not meet their responsibility to uncover the withheld facts. This argument should be rejected. According to Defendants, *Holland* essentially stands for a rule that coercion of material witnesses cannot give rise to actionable *Brady* violations because any criminal defense attorney can simply interview the witness for himself. Such a reading would effectively overrule *Newsome* (and the cases that follow it discussed above) because one could always argue that material witnesses could have been interviewed *better*. But that is simply not the law. As the Seventh Circuit explained clearly in *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001),

> We are of the view, however, that the state's argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence. We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for Brady purposes. . . . To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement.

Id. at 740. (emphasis added). (This court should especially note that the Seventh Circuit is discussing limits on a defense counsel's ability to extract favorable evidence from "defense

witnesses," while in this case, this caution is doubly, if not triply, true as it applies to defense counsel's ability to extract favorable evidence from *prosecution witnesses*.)

In reality, *Holland* is easily distinguishable and its holding is thus far narrower than Defendants assert. Unlike here (and in the series of *Newsome* cases discussed above), the police in *Holland* specifically disclosed to the criminal defendant that the witness had told them *three times* that Holland was not the rapist and then later said that he was. 643 F.3d at 256. The Court mused that the " first thought to pop into the mind" would be the question "[w]hat (if anything) happened between the three times [the witness] said that Holland was not the rapist and the time she finally said that he was?" That question pops up in *Holland's* facts (where the government *had disclosed* to the defense what the witness had initially said), but not in this case. Here, Defendants never disclosed Larry's initial specific and repeated denials that Jimenez was the perpetrator. *See* PX15 at TRJ0044 (no mention of denials).

Moreover, Holland's defense lawyer had indeed interviewed the witness, who told the lawyer that the sole reason she didn't identify Holland initially was because she was afraid. She did not tell him at that time, as she did later, that it was because of pressure from the police. The court in *Holland* points out that while the witness may have been lying to Holland's lawyer that was not the fault *of the police*, so Holland could not hold the police responsible for the witness's failure to share that information. The court further stated that the police neither coerced the witness to lie nor were they " otherwise withholding exculpatory evidence on this point from the defense." 643 F.3d at 256. That is what makes this case so completely different from *Holland*. Here, Defendants did *not* disclose in the original police reports that Larry had repeatedly told the officers that they had the wrong guy and that it was not Jimenez.

The point of *Holland* is that *as long as the police officers do disclose* that the witness had

repeatedly said that the defendant did not do it before changing her story and saying he did, then there is no *Brady* violation. Once the shifting story is disclosed, however, the burden shifts to the criminal defense counsel to ferret out why the witness changed her story. Here, Defendants nowhere disclosed that Larry had repeatedly insisted, in response to their accusations about Jimenez, that he (Larry) knew Jimenez, and that Jimenez was *not* the shooter. In *Boss*, the Seventh Circuit explained how to evaluate a defense counsel's diligence:

> We also find it significant that a defense witness's knowledge is quite different from the type of evidence typically found to be available to defense counsel through the exercise of reasonable diligence. In the typical reasonable diligence case, the question is whether defense counsel had access to the document containing the *Brady* material, through an open file policy, for example. In cases like the present one, the question is whether defense counsel had access to Brady material *contained in a witness's head*. Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document. But, the position the state advances would require a defense witness's knowledge to be treated exactly as information in a document the defense possesses. *This stretches the concept of reasonable diligence too far*.

263 F.3d at 741. (citations omitted, emphasis added). This is precisely what the defendants ask this Court to do in this case – stretch the concept of reasonable diligence too far.

Applying this *Boss* standard to the facts at bar, Defendants have failed to meet their burden of establishing what Jimenez's defense counsel "likely did obtain" and "likely could have obtained" by speaking with witnesses before trial. And, in any event, the question of what the defense counsel "likely could have obtained" is a disputed question of fact that may not be decided on Defendants' motion. For one thing, the Defendants' manipulation of Larry was not uncovered by the prosecutors either. They, too, were fooled, and they had every opportunity to interview him. There is no justification for holding defense counsel to a higher standard.[6]

---

[6]     Defendants take out of context a phrase from Larry's statement that he lied because he "did not think anyone would believe him." (Def. Mem. at 9) There is no disputing that Larry did try to tell the truth to the Defendants: he repeatedly told them that TJ was not the shooter, as described at length only a few paragraphs earlier in that very same affidavit that

Furthermore, as the Defendants in this case concede, defense counsel *repeatedly did probe* Larry about the account he provided at trial, Def.'s SOF ¶¶ 42, 45, 46, 54, 56, 57, an account that was on the record, while Larry was under oath, no less. *Id.* Unfortunately, Larry did not budge from the false account, and declined to divulge the exculpatory details. *Id.* No amount of probing inquiry by defense counsel was able to change Larry's story, leaving one wondering what more Defendants are suggesting counsel should have asked to get to the truth. *Compare* Def. Mem. at 8 (faulting Jimenez for supposedly failing to ask the question: "why did Tueffel change his identification of the shooter?").

Finally, there is evidence that Larry had his own reasons for not exposing the Defendants' manipulations. As Larry stated, after he was pressured into the false account and was released by the police, he came to believe that the real shooter, who he knew by the name "Crazy," would retaliate against him if he exposed the police's frame-up of Jimenez. (P. Stmt. ¶¶ 38, 39.) Larry decided to keep his mouth shut in court, and Defendants have not presented any probative evidence to suggest that TJ would have obtained a different result with so-called "greater diligence." At one point, Larry went to St. Genevieve's Church with the intention of telling a priest the truth about his false testimony against TJ, but he lost his nerve and did not go through with it. (*Id*. ¶ 40.) If he was too afraid to share the truth with an anonymous priest, a jury could reasonably conclude that the cause of TJ's injuries was not inadequate interviews by the defense.

## 2. *Gauger* and Other Confession Cases Do Not Furnish a Basis for Summary Judgment on Plaintiff's Concealment of Evidence Claim.

Defendants reference. *See* PX23. In fact, Defendants flip the "nobody would believe me" reference on its head: it actually describes Larry's motive for going along with the Defendants' subterfuge *once he had to deal with the lawyers,* a fact that undermines, not supports, Defendants' *Holland* argument.

In a related vein, Defendants argue that this Court should apply false confession cases – *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006); and *Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2005) – for the proposition that Jimenez may not state a *Newsome* claim because he was aware that Tueffel was subjected to pressure from police. These three cases, however – *Gauger*, *Sornberger*, and *Kuba* – stand for a narrow and limited proposition. In all three of those cases (as Defendants concede), the court basically ruled that when police improperly coerce a false confession from an accused party, the party may not assert a *Newsome* claim that the police's misconduct violated his rights, because the accused party was obviously aware of the coercion to which he was subjected. In other words, a plaintiff may not assert a *Newsome* claim in relation to *his own confession* because the suppression part of a *Newsome* claim is wholly lacking.

Defendants now try to stretch that principle, asserting it is enough to foreclose a plaintiff's *Newsome* claim if the plaintiff was aware that one or more of the witnesses against him was subjected to "pressure." This proposed extension of *Gauger*, *Sornberger*, and *Kuba* is untenable, not the least because Jimenez and his counsel – and the prosecutors, for that matter – never learned many (indeed never learned any) of the critical details needed for impeachment. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (*Brady* encompasses impeachment evidence affecting the credibility of prosecution witnesses). Even if Jimenez knew that Larry was young, or knew that the police had yelled, or even threatened, that does not alter the fact that the police *failed to disclose* what Larry had repeatedly *stated* to them about Jimenez's innocence.[7]

---

[7] At the underlying trial, both the prosecutors and the defense needed a reason for why when Larry was interviewed by the officers, he failed to name TJ. In this case, as in others, they went with a "fear of gangs" explanation, which Larry dutifully reported to the jury – never explaining why, if he was so afraid of gangs, he turned around and implicated an alleged gang

### 3.     Judicial Estoppel Does Not Furnish a Basis for Summary Judgment.

Defendants assert that Jimenez is " judicially estopped"  from asserting that the witness's misidentification was caused by the police because at his criminal defense trial his attorney asserted that they testified against him falsely because of gang pressure.  Def. Mem. at 10.   The essence of the doctrine is the prevention of litigants from manipulating the legal system by prevailing based on one position, only to turn around and take the contrary position later.  There are two reasons that judicial estoppel simply does not apply to these facts.

First, it is a fundamental element of judicial estoppel that the party who the movant seeks to estop must have been successful with the first argument (statements during his criminal trial that gang pressure caused the false testimony).  In other words, in order to be estopped in a subsequent proceeding, the party " must have enjoyed the fruits"  of the argument in the initial proceeding.  *E.g., New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (" Absent success in a prior proceeding, a party's later inconsistent position introduces 'no risk of inconsistent court determinations,' and thus poses little threat to judicial integrity."  )  Obviously, Jimenez lost at both of his trials – to the tune of 50 years and 45 years respectively.  While Jimenez was later exonerated of those convictions, it was not because of the gang pressure argument, it was because Larry had finally disclosed his true motive for lying (police coercion). Put simply, police coercion, not gang retaliation, was the foundation for Jimenez's exoneration, and he thus is not estopped.

Second, if the litigant did not know certain facts at the time he made an argument in the first proceeding, he cannot be judicially estopped from asserting the newly-learned facts in the subsequent proceeding.  *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir.

member once the Defendants got ahold of him.

1993) (" [T]he doctrine of judicial estoppel is not an absolute bar to obtaining legal relief on the basis of new information even if inconsistent old information had gotten the party an advantage in some other proceeding." ). This exception is particularly applicable here. The very reason Jimenez was not in a position to raise police coercion earlier was because these same Defendants withheld those facts, in violation of *Brady* and *Newsome*. *Jimenez* is hardly the party in this case that is "play[ing] fast and loose" with the court system (to borrow Defendants' phrase).

4.      **Attacks on Larry's Credibility Do Not Furnish a Basis for Summary Judgment.**

Defendants spend a substantial portion of their brief trying to discredit both Larry personally and the facts surrounding his recantation. There are two major reasons that these attempts to discredit are immaterial on this motion. First, the Court is not to resolve credibility disputes on summary judgment; those are to be left to the jury. And, second, even if the Court were to take on the issue of Larry's credibility for purpose of this motion (solely for sake of argument), the fact remains that Larry's recantation testimony has been strikingly consistent.

Taking the second point first, once Larry recanted and told the truth, Larry has never wavered from any of the details of the true story, providing a consistent account of how he was pressured into testifying falsely, what methods the police used to do so, why he ultimately broke down, how he tried to get out from under his lies by not going to Court, and how he finally came to recant. *See*, *e.g.*, PX23 (7/31/06 Tueffel Statement); PX69 (3/20/08 Harrigan Memo re: Larry's Meeting With CCSAO); PX70 (2/9/09 CCSAO Investigative Report re: Meeting with Larry); PX2 (3/3/11 and 3/7/11Tueffel Dep.). Larry has explained these central controlling facts in the same way to the Center on Wrongful Convictions, to the Morro family, to the State's Attorney's Office, in his affidavit, in his videotape statement, and at his deposition.

The only time he has ever deviated was when Defendants' counsel interviewed him at his

home with a policeman, did not take any notes of their encounter, went back to his office to type an affidavit that he wanted Larry to sign, and then sent a policeman over get Larry to sign it the next day.  (It is true that that affidavit is not consistent with the facts as Larry has consistently told them since July 2006, but that fact represents an indictment of the affidavit obtained, not an endorsement of its value as a tool of impeachment.)  Moreover, even the affidavit that Defendants' counsel prepared makes perfectly clear that Jimenez is innocent and that Larry's testimony at the criminal trial was false.  While it also states that Larry was not subject to "police coercion,"  Larry has since testified that those were Mr. Hale's words, not his; that he does not know what the word " coercion" even means, that the part about not " blaming" the police is an untrue over-simplification; and that he basically felt tricked into signing that statement (all over again, as it were).  At his deposition Larry could not explain why he signed it, other than that he was " trying to be cooperative."   P. Stmt. ¶¶ 41-43.  His testimony also made clear, however, that he now regretted signing it and the manner in which it was presented to him.  *Id*. ¶ 42 ("He just asked me to sign it.  I just did.  I shouldn't have." ).   And while the statement does say that he is not " blaming"  the police, Larry clarified that as well: "I said I had nothing against them.  That doesn't mean that what they did was right."   *Id*. ¶ 43 (" I said I'm not blaming anybody, I just wanted to get this fixed . . .." ).[8]

Taking a step back, Jimenez's core theory is that the Defendants were able to pressure a weak person into knowingly implicating an innocent man.  In the bigger picture, the fact that Larry is still willing to accommodate authority figures by signing whatever was put in front of

---

[8]       In Larry's words: " I didn't mean it like that.  I said I have nothing against the police.  He asked me a question do you blame anybody.  I said, well, they kind of made -- I mean, police are supposed to do their job.  And he was trying to ask me do I hate police because -- I didn't mean -- It was wrong -- I don't know right now.  Hold on a minute."  P. Stmt. ¶ 43.

him in order to avoid conflict is hardly helpful to the Defendants.  In any event, it will ultimately be for the jury to decide whether to credit or discredit Larry's testimony.  It goes without saying that it has no place in this motion as an undisputed issue of material fact.[9]

Fundamentally, though, these are not questions for resolution by summary judgment. Even though Larry is mentally ill, his credibility must be judged based on his demeanor while testifying at trial.  *Cf., e.g., U.S. v. Snyder*, 189 F.3d 640, 645 (7th Cir. 1999) (" As long as a witness has the capacity to testify truthfully, it is best left to the fact-finder to determine whether he in fact did so." ).  There can be no reasonable dispute that Larry Tueffel is perfectly capable of understanding and answering questions and perceiving or reporting events.   P. Stmt.    xx. This Court had the opportunity to personally observe Larry at his depositions, and thus is in a position to conclude that a reasonable jury could find him credible notwithstanding the attempt of Defendants' expert (who has never even met Larry) to assert that his mental illness wholly

---

[9]      It turns out that it is not at all difficult for police officers to get Larry to sign things. Defendants' legal team (including an off-duty police officer they hired) managed to persuade Larry to sign a HIIPA release for his confidential medical records (which he also now regrets) by explaining that they just needed to "have a paper signed so they could see my background or whatever, do whatever they're trying to do.  I don't know."  *Id.* ¶ 44.  After having Larry sign the release, Defendants then used Larry's psychological records to prepare a comprehensive expert witness report, *which they then put into the public record with their summary judgment filing*, about how his alleged " paranoid schizophrenia"  supposedly makes him an unreliable witness.  *See* Defendants' Exhibit 58. Indeed, Defendants filed this report publicly even after receiving an internal memo among TJ's former exoneration lawyers, in which Larry asked that his diagnosis and medications not be widely circulated.  *See* PX69 (after Larry told Patrick Harrigan, one of TJ's exoneration lawyers that he had fully disclosed his mental health issues to the CCSAO, "Larry asked that [TJ's counsel] not share his mental health diagnoses and medications with TJ or anyone else.")

Defendants' willingness to put Larry's highly embarrassing and confidential mental health history into the public record runs conspicuously counter to the City's unwavering fixation on the privacy rights of police officers accused of misconduct and the need for a protective order on everything about them, from a 20-year old photograph to the date they left active service of the police force.

discredits his testimony.

In sum, Larry's testimony creates a triable issue, and Defendants' attacks on his credibility do not justify summary resolution.   The same is true for Phil Torres's and Tina Elder's testimony. Jimenez states a valid *Newsome* claim based on the testimony of all three witnesses, individually and collectively, and Defendants' summary judgment motion should be summarily denied.

**B.      Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Creation of False and Fabricated Evidence.**

Separate and apart from Defendants' suppression of material exculpatory evidence in violation of *Brady* and *Newsome*, Defenadnts may be held liable for the simple act of fabrication, without more.   Jimenez has a constitutional right not to be deprived of liberty on the basis of fabricated evidence. As the court stated in *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002), a policeman's "intentional creation of damaging facts"  against a person under investigation "shocks the conscience and violates the decencies of a civilized society." *Id*. at 646-48.  *See also Wilson v. Lawrence County*, 260 F.3d 946, 957 (8th Cir. 2001) (" If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated." ); *Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir.1999); *Devereaux v. Abbey,* 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc); *Castellano v. Fragozo,* 311 F.3d 689, 704-705 (5th Cir. 2002); *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004) (and cases cited within these cases).

For example, in *Spurlock*, police officers fabricated evidence and manufactured probable cause.   The Sixth Circuit found both that a constitutional right to be free from fabricated evidence and also rejected a qualified immunity claim, holding that on the basis of the Court's prior holdings in *Brady* and *Pyle* " [the defendant] cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights." *I*d. at 1005-06.  *See also Richardson v. City of New York,* No. 02 Civ. 3651(JG), 2006 WL 2792768, at *5 (E.D.N.Y. Sept.26, 2006) (court holds it is a disputed issue of fact whether plaintiff suffered a constitutional injury where police officers fabricated evidence, passed that evidence along to the District Attorney's office, and Richardson was indicted and prosecuted as a result); *cf. also Landrigan v. City of Warwick,* 628 F.2d 736, 744-45 (1st Cir.1980) (dissemination of a false report may violate a plaintiff's

29

rights).

Here, the summary judgment record is rife with evidence that was fabricated. Of course, Defendants coerced and manipulated Tueffel, Torres and Tina Elder into their false identifications of Jimenez. They prepared police reports falsely suggesting that Larry Tueffel readily named Jimenez as the shooter during in an interview in Larry's home before Jimenez was arrested. They used a one-photograph show up to manipulate Tina Elder into her identification of TJ. And they prepared a false report stating that Phil Torres had identified Jimenez as the shooter, when he had not done so. Even without the false reports, the manipulation of these witnesses' identifications—whether or not concealed—violates due process. *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (due process "is violated if unduly suggestive identification techniques are allowed to taint the trial").

Defendants also fabricated evidence that Eric Morro's murderer was wearing a Duke jacket. At the scene, Larry described the shooter's jacket as purple with yellow lettering – a description that matched the jacket Juan was wearing at the time of the murder. When Bogucki arrested Jimenez (and he walked out of his grandmother's apartment with a Duke jacket), Bogucki simply decided that it was would be better for the witnesses just to say that the shooter was wearing a Duke jacket. He did this by suborning witnesses to say that they had seen the shooter in a Duke jacket and by outright fabrication of witness statements in his police reports.

Defendants do not proffer an argument as to how they might be entitled to summary judgment with respect to this due process claim.

## C. Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Use of False Testimony.

The Supreme Court has long recognized that due process is denied where the state has "contrived a conviction through the pretense of a trial which in truth is but used as a means of

depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (such conduct is " inconsistent with the rudimentary demands of justice"). Knowing use of false evidence or perjured testimony deprives a defendant of due process and a fair trial when the evidence is material to guilt or punishment. *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001), citing *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) ("[W]e do not employ the term of perjury in a technical, legal sense in these types of cases, but rather as a term of art that describes the knowing use of false testimony."). An accused's right to a fair trial is violated " if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942).

As the Seventh Circuit has explained, " [t]he *Agurs* standard [for perjury] is different from that in *Bagley* [for *Brady* violations] and sets a lower threshold for determining materiality." *Braun v. Powell*, 227 F.3d 908, 920 & n.11 (7th Cir. 2000), citing, among others, *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) ("different standards of materiality apply to *Brady* claims and claims that the prosecution has knowingly used perjured testimony or false evidence" and the standard for the latter is "considerably less onerous").

Jimenez's Complaint alleges that the Defendants testified falsely at Jimenez's trial about Jimenez's purported guilt and the veracity of the witness statements they procured. (Dkt. No. 40 ¶ 30.) The evidentiary record bears this out. Ordinarily, absolute immunity might bar the claim, but the Agreed Stipulation attached as PX42 moots that question. Defendants make no argument to defeat this due process claim and it therefore survives their motion for summary judgment.[10]

_____

[10]        On September 1, 2011, Jimenez and the City entered into a *Monell* stipulation

whereby the City agreed to be liable for " any constitutional violation"  proven with respect to the individual defendants.

## II.   QUALIFIED IMMUNITY DOES NOT ENTITLE THE DEFEDANTS TO SUMMARY JUDGMENT.

Defendants make two half-hearted qualified immunity arguments, but these are both nonstarters.  They state they have found no case that prohibited defendants from using loud voices with Larry when they thought he was lying to them, nor have they found any case that required them to provide Tina "a special room without any paperwork" in order to avoid the risk of her seeing the picture of Jimenez that she saw.  If Jimenez's evidence is credited on this motion (as it must be), these qualified immunity arguments must fail.

Defendants do not, and cannot, dispute the premise that Section 1983 liability for withholding exculpatory evidence was well-established in February 1993.  The Seventh Circuit has repeatedly stated that the a police officer's duty to disclose *Brady* material (including material that falls within the confines of *Newsome*) was clearly established not later than 1985 when the Seventh Circuit decided *U.S. v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) and at the very latest by 1988 when the court decided *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), if not all the way back to *Brady* itself (1977).  *See also supra at* pages 14-16 the *Ienco*, *Manning*, and *Dominguez* immunity cases extensively discussed above.

Defendants may also not claim in good faith that they are entitled to immunity for fabricating evidence, including fabricating evidence through an unduly suggestive identification procedure.  As an initial matter, it is well-established that a policeman's fabrication of evidence against an accused is a violation of his constitutional rights, and numerous courts have already rejected defendants' claims that the state of the law did not give them a fair warning that fabricating evidence for the purpose of charging or trying a defendant was unconstitutional.  As an *en banc* panel stated in *Devereaux* in 2001, "Perhaps because the proposition [that police may

not fabricate evidence in order to charge someone with a crime] is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right.  Rather, what is required is that government officials have 'fair and clear warning' that their conduct is unlawful."  The court went on to hold that the officers had a " fair and clear warning"  in 1994 that it was unconstitutional to use false or fabricated evidence to charge or try a defendant.  *Id*. at 1075.  See also *Pierce,* at 1297-98 (court of appeals affirms the district court's denial of qualified immunity to a forensic chemist who fabricated evidence in 1986 that led to plaintiff's conviction and fifteen years in a state prison).  Here, there can be no reasonable dispute that the Defendants were on notice in 1993 that Defendants had a constitutional right not to be charged or tried based on evidence that was fabricated by the police.

As to the more specific fabrication issue related suggestive identification procedures, the law has been clear since at least *Manson v. Brathwaite* that it is unconstitutional to utilize unduly suggestive identification procedures.  Numerous cases have so held.  *See*, *e.g.*, *Rojas v. Iannatto*, 2003 WL 169798, *4 (S.D.N.Y. Jan. 24, 2003) ("a criminal defendant's right not to be subjected to unduly suggestive identifications has been the law since [*Brathwaite* in] 1977.").

But the gist of Defendants' qualified immunity arguments is not so much to take issue with the clearly established law as it is to claim that they did not do what Larry, Phil, and Tina have said they did. Such arguments must await another day.  What happened during Defendants' interactions with Larry, why and with what intention Tina came to be sitting in a room with the Morro file opened to a picture of Jimenez, and whether Phil called Bogucki or Bogucki just showed up, are all questions that can only be resolved at trial.  But summary judgment on the

immunity grounds asserted is simply not available. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[11]

## III. SUMMARY JUDGMENT IS NOT AVAILABLE ON JIMENEZ'S MALICIOUS PROSECUTION CLAIM.

### A. Whether The Officers Had Probable Cause Is A Question Of Fact.

The question of probable cause is typically "a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006). Similarly, applying Illinois law, the issue of "whether a statement bears sufficient indicia of reliability to support a finding of probable cause in a malicious prosecution case is a question of fact to be resolved by the jury." *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, xxx (1st Dist. 2002); *Howard v. Firmand*, 378 Ill. App. 3d 147, 151 (**X** Dist. **YEAR**) ("It is only when the circumstances alleged to show probable cause are not disputed that the cause can be decided as a matter of law").

As discussed at length above, all of the evidence that could give rise to probable cause to believe Jimenez committed murder has allegedly been falsified by the Defendants themselves. Summary judgment is unavailable where probable cause is alleged to be based on fabricated evidence. *Tully v. Del Re*, 2002 WL 31175983, at *5 (N.D. Ill. Oct. 1, 2002) (probable cause properly left to the jury where defendants " implicitly importuned witness to manufacture a basis for charges" and "thus could not reasonably have relied on what [the witness] told them"); *Finwall v. City of Chicago*, 490 F. Supp. 2d 918, 923 (N.D. Ill. 2007) (same). *See also Smith v.*

---

[11] Defendants assert in Section IV of their Memorandum that Jimenez's claims for failure to intervene, conspiracy, intentional infliction of emotional distress, and *respondeat superior* all fail for want of an underlying violation. Because TJ has shown such a violation or at a minimum that a determination with respect to such violations requires a trial, Defendants' request for summary judgment on Counts II, III, V, and VI should also be denied.

*City of Chicago*, 913 F.2d 469, 473 (7th Cir. 1990); *Kincaid v. Ames Dept. Stores, Inc.*, 283 Ill. App. 3d 555, 565 (1st Dist. 1996) (" Defendants rely on the written statements by Smallwood and Jennings to establish probable cause. However . . . [those witnesses] both specifically detailed how defendants told them to accuse plaintiff in their statements, even though plaintiff had done nothing wrong. Sufficient reliability must support any statement used to help establish probable cause."); *Mack v. First Sec. Bank of Chicago*, 158 Ill. App. 3d 497, 503-504 (1st Dist. 1987) (sufficient evidence of lack of probable cause for malicious prosecution claim where eyewitness identification allegedly lacked integrity); *Howard*, 378 Ill.App.3d at 151 ("Because the truth of Defendant's abuse allegations are disputed, [malicious prosecution] summary judgment, based on a finding of probable cause as a matter of law, should not have been granted" ).

### B. Whether the Officers Acted With Malice Is Also A Question Of Fact

As with probable cause, the presence of malice *vel non* is highly disputed, and can only be properly decided by a trier of fact. Paragraph 80 in our Statement of Facts, as well as others, sets forth in great detail ample evidence from which a reasonable jury could reasonably infer that the Defendants were not genuinely interested in solving this crime, but rather were interested in clearing and closing a case as fast as possible and without looking back. *See, e.g., Turner v. City of Chicago*, 91 Ill. App. 3d 931, 937 (1st Dist. 1980) ("Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith . . . and where the want of probable cause has been clearly proved."). Not only were Defendants working overtime to make the evidence fit the suspect, Jimenez, but they then also deliberately ignored the evidence that Juan was the real killer. This evidence is obviously sufficient to warrant a reasonable jury in finding the existence of malice.

## IV.   JIMENEZ VOLUNTARILY DISMISSES DEFENDANTS WHITEMAN, RYAN, AND MONTILLA.

The City's agreement to stipulate to judgment against it if Jimenez can prove the constitutional violation of any of Officers Bogucki, Sanders, Schalk, Montilla, Ryan, or Whiteman eliminates the need to sort out exactly who did what.  See PX42.  In light of the stipulation, Jimenez is content to pursue the primary detectives.  If those Defendants decide to point the finger at trial at others who seemed more peripheral earlier in the litigation (which has sometimes been a defense at other trials involving these same sets of lawyers), then Jimenez still recover under the Stipulation with the City.  In the meantime, there is no need for the Court to decide liability for any Defendants except the three main detectives who built the case and interacted with the witnesses.  Those Defendants do not make arguments about lack of personal involvement, so Defendants' summary judgment argument on that point is moot.

### CONCLUSION

For these reasons, Jimenez respectfully requests that summary judgment be denied.

Respectfully submitted,

**THADDEUS JIMENEZ**

By:   /s/   Stuart J. Chanen
One of his Attorneys

Arthur Loevy
Jon Loevy
Russell Ainsworth
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

Stuart J. Chanen
Lisa Castle
VALOREM LAW GROUP
35 East Wacker Dr.
30th Floor
Chicago, IL 60601

Locke E. Bowman
RODERICK MACARTHUR
JUSTICE CENTER
Northwestern University
School of Law
357 E. Chicago Ave.
Chicago, IL 60611

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-8081 |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | The Hon. Matthew F. Kennelly |
| Defendants. | ) | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS
PURSUANT TO RULE 56 AND LOCAL RULE 56.1(B)(3)(C)**

**THE ERIC MORRO MURDER**

1.     **On February 3, 1993, two friends, Victor Romo and Juan Carlos Torres approached two other boys, Eric Morro and Larry Tueffel, in front of 3018 West Belmont Avenue.**  *PX1: V. Romo Dep. at 79:13-80:13; PX2: Tueffel Dep. at 10:17-2; and PX21: Transcript of Tueffel Witness Interview of 07/31/06 at 5:7-12.*  **Victor questioned Eric about money that Eric apparently owed to a "Leo."** *PX1: V. Romo Dep. at 85:21-86:1; PX2: Tueffel Dep. at 11:3-4; and, PX21: Transcript of Tueffel Witness Interview of 07/31/06 at 5:13-16.*  **Eric told Victor to mind his own business.**  *PX1: V. Romo Dep. at 86:2-10; and, PX2: Tueffel Dep. at 11:3-7.*

2.     **A scuffle ensued, and at some point Juan pulled a gun.**  *PX1: V. Romo Dep. at 86:11-14; PX2: Tueffel Dep. at 16:12-23; and, PX21: Transcript of Tueffel Witness Interview of 07/31/06 at 5:16-6:2.*  **When Eric took a swing at Juan, the latter shot Eric dead.**  *PX1: V. Romo Dep. at, 88:2-12.*

1

3.      **Victor and Juan fled the scene, running westbound on Belmont.** *PX1: V. Romo Dep. at 88:21-24.* **Larry also ran after the shot was fired, but then returned to check on his friend Eric.** *PX2: Tueffel Dep. at 19:12-16, 20:23-21:4.*

4.      **At the time of the shooting, Plaintiff was at his Grandmother's house, playing video games with his cousins and doing homework with his uncle.** *PX10: Angela Jimenez 1994 Criminal Trial Testimony at C175:14-C176:8, C177:4-20; and, PX3: Thaddeus Jimenez Dep. at 159:7-14.*

**THE WITNESSES' ORIGINAL DESCRIPTIONS**

5.      **The district beat police officers (not Defendants) questioned Larry Tueffel at the scene, took him to the station for a few hours, and then brought him home.** *PX15: CPD Supplementary Report re: Field Investigation (JIM 00013 - 00020) at JIM 00017; PX2: Tueffel Dep. at 23:21-24:12; and, PX21: Tueffel Statement at 12:8-22.*

6.      **During that initial round of questioning, Larry told the officers everything he knew, describing the scuffle referenced above that led to the shooting.** *PX16: CPD General Progress Report re: Notes of Tueffel Interview at TRJ 00255 – TRJ 00256.* **Larry also provided a contemporaneous physical description of the shooter (memorialized by Officers Whiteman and Ryan in a police report) as being a 13-14 year old male Hispanic, 5'4-5'5 tall, with curly black hair, wearing a "purple Jacket with yellow lettering and/or #'s" and baggy blue jeans.** *PX17: CPD General Offense Case Report at JIM004-005.*

7.      **Larry's original description did not match Plaintiff, who did not, and never has had, curly hair.** *PX18: CPD Polaroid of 13-Year Old Thaddeus Jimenez (TRJ00259).* **On the date of the murder, Jimenez had a brand new blue and white Duke Starter jacket.** *PX3: Thaddeus Jimenez Dep. at 131:24-133:2.*

8.     **Phil Torres was also interviewed by Defendant Ryan at the scene.  Phil did not actually see the shooting, and did not claim to have seen it; he was not an eyewitness.**  *PX5: Phil Torres Dep. 34:13-18,* 72:24-73:3.  **As with Larry, Phil made no claim to have been able to identify the perpetrator by name.**  *PX5: Phil Torres Dep. 22:15-18, 40:3-6.*

**DEFENDANTS' VERSION**

9.     **Defendant Detective Jerome Bogucki was put in charge of the investigation, assisted primarily by Defendant Detectives Sanders and Schalk.**  *PX4: Bogucki Dep. at 55:1-5 and PX15: CPD Supplementary Report at JIM00016*; *PX4: Bogucki Dep. at 185:14-186:2; 36:1-9 and 253:6-258:23.*

10.    **According to Defendants, Phil called the police after the shooting in the early morning hours of February 4th to report that he just happened to be looking out the window at the time of the incident.**  *PX4: Bogucki Dep. at 124:14-17, 126: 16-127:4 and 141:11 – 142:12; and, PX19: CPD General Progress Report re: Notes of Torres Interview (JIM0033 and JIM0036, TRJ257 –58).*

11.    **According to Defendants, Phil reported that he witnessed Eric being shot by Plaintiff, who Phil supposedly identified by name as someone known to him, wearing a Duke jacket.**  *PX4: Bogucki Dep. at 146:23-147:6, 155:10-156:7.*  **Defendants further claimed that Phil supplied a motive, an altercation that Plaintiff supposedly had with the victim earlier that day.**  *PX4: Bogucki Dep. at 147:7-11.*  **The main police report memorialized those "facts," as well as Phil's subsequent selection of Plaintiff out of a lineup.**  *PX15: CPD Supplementary Report (JIM 00013 – 00020) at JIM 00017 - 00019.*

12.    **After speaking to Phil, Defendant Bogucki went to Larry's home (purportedly by himself), who, according to Bogucki provided a new account that, in**

3

contrast to the interview he gave at the scene and to Bogucki earlier, now matched Phil's identification that Plaintiff was the shooter. Bogucki also claimed that Larry, like Phil, had asserted that the shooter was wearing a Duke jacket and that Larry, like Phil, had now repeated a story that Bogucki had heard earlier about TJ throwing gang signs at a bus of school children. Bogucki did not take any notes of this interview of Larry. In addition, Bogucki insists this entire conversation took place in Larry's home, took only 15 minutes, and that he did not take Larry from his home and to Area 5 at that time. *PX15: CPD Supplementary Report (JIM 00013 – 00020) at JIM 00018 – 00019*; *PX4: Bogucki Dep. at 165:24-170:22; 172:17-174:10; 184:3-184:11; 185:4-17.*

13.     **Larry's identification of Plaintiff was then supplied to the prosecutors via the Defendants' police report.** *PX15: CPD Supplementary Report at JIM 00018.*

PLAINTIFF'S ARREST

14.     **At 4:00 a.m. in the morning hours after the murder, Defendants Bogucki and Sanders went to Plaintiff's grandmother's home and arrested him.** *PX20: CPD Arrest Report JIM 00046 and TRJ 00052.* **Plaintiff denied any knowledge of the murder, and provided an alibi.** *PX3: Thaddeus Jimenez Dep. at 182:2-10.* **While Defendants removed Jimenez from his grandmother's apartment at 4:00 a.m., Jimenez took with him his new Duke (Blue Devils) jacket.** *PX4: Bogucki Dep. at 201:4-12; PX63: Testimony of Jerome Bogucki at 1994 Criminal Trial at D54:14-24; PX3: Thaddeus Jimenez Dep. at 131:24-133:2.*

PHIL TORRES

15.     **According to the Defendants' version, Phil called the police very late that night to report that, from the window that he just happened to be looking out at the time of the incident, he witnessed Eric being shot by Plaintiff, who Phil supposedly identified by**

4

name as someone known to him, wearing a Duke jacket. *PX12: Testimony of Phil Torres at 1994 Criminal Trial B71:19 – B72:4 (JIM 01826 – 01827); PX13: Testimony of Phil Torres at 1997 Criminal Trial R122:17 - R123:12 (JIM 03059 –03060); PX15: CPD Supplementary Report at JIM0018.*

16.     **According to Phil, he told the Defendants he never even saw the shooter and did not know who he was, which was true.** *PX5: Phil Torres Dep. 22:15-18, 68:4-9; PX2: Tueffel Dep. 124:21-24.* **Phil never claimed to be a witness, and did not want to be a witness.** *PX5: Phil Torres Dep. at 22:15-18, 34:13-18, 44:18-21, 72:24-73:5.*

17.     **The police came to Phil's mother's house sometime around 1:00 a.m.** *PX13: Phil Torres Testimony at 1997 Criminal Trial at R123:7-9 (JIM 03060); PX4: Bogucki Dep. at 80:22 – 81:1.* **He was high, and would not have gone with the police if he had a choice.** *PX5: Phil Torres Dep. 41:10-12, 42:23-43:2, 43:6-8, 71:19-22* (**"I told you I was high man. Fuck."**).

18.     **At the scene, Phil told the beat officer he had no real knowledge.  Moreover, he does not recall calling the police that night (as they claim), and certainly believes now that he would have had no interest in doing so at the time.** *PX5: Phil Torres Dep.19:10– 20:10, 22:19-24, 34:13-18, 42:23 – 43:2, 43:6-8; PX59: Ryan Dep. at 19:9-16.*

19.     **Assuming Phil did initiate re-contact with the police late that night (rather than the other way around), the most he could or would have told them was that he heard about a possible altercation hours before the murder involving Plaintiff and the victim.** *PX5: Phil Torres Dep. 19:20 – 20:1, 34:19 – 35:23, 37:4 – 38:5, 55:22 – 56:9.*

20.     **In particular, Phil believes he heard from his sister that Plaintiff might have gotten into an argument with the victim, but Phil does not claim to have personal**

knowledge of any of that -- nor does he believe that his sister has any personal knowledge of the shooting. *PX5: Phil Torres Dep. 19:20 – 20:1, 34:19 – 35:23, 37:4 – 38:5, 55:22 – 56:9, 73:6-17.* **According to Phil, he "might have" passed on to the police the hearsay tip that his sister believed Plaintiff might have been involved.** *Id. at 36:7-16, 61:5-16, 91:11-14.*

21. **During the Defendants' interrogation of Phil, he never claimed to have been certain about the shooter's identity.** *PX5: Phil Torres Dep. 44:18-21, 78:10-16.* **At most, he explained his sister's theory that the shooter might have been Plaintiff.** *PX5: Phil Torres Dep. 90:20 – 91:14.* **The police kept telling Phil that other people (including his sister) were claiming that the shooter was in fact Plaintiff, and finally, Phil agreed to say it was Plaintiff.** *Id. at 87:10-18.*

22. **Phil did not want to testify at either of Plaintiff's trials.** *PX5: Phil Torres Dep. 6:22 – 7:3.* **Each time he did so, he was promised he would never have to do it again.** *Id. at 23:21 – 26:20, 66:24 – 67:17.*

23. **Because Phil was 18 years older than Plaintiff at the time, they were not friends; Phil claims to have seen Plaintiff only a few times in his life, and cannot describe him at all.** *PX5: Phil Torres Dep. 7:11-20, 14:11 – 15:8.* **At his deposition, Phil could not even be certain he had ever actually seen Plaintiff before.** *Id. at 33:1-24. See also Id. at 70:6–71:5.*

### LARRY TUEFFEL

24. **Sometime around 9:30 p.m., Defendant Bogucki questioned Larry Tueffel at the station for a few hours, and then an officer took Larry home.** *PX4: Bogucki Dep. at 90:7-15, 109:8-10; PX21: Tueffel Statement at 12:18-22; PX2: Tueffel Dep. at 34:7-12.* **During that initial round of questioning, Larry was fully cooperative, telling the police what he**

6

knew and describing the aforementioned scuffle that led to the shooting.  *Id.*

25.     **Larry also provided a contemporaneous physical description (memorialized in the police report) of a 13-14 year old male Hispanic, 5'4-5'5, with curly black hair, wearing a "purple jacket with yellow lettering and/or #'s" and baggy blue jeans.**  *Id. at 28:6 – 29:6*; *PX17: CPD General Offense Case Report at JIM 00004 – JIM 00005.*  **Larry's original description of the shooter did not match Plaintiff, who did not, and never has had, curly hair.**  *PX18: CPD Polaroid re: 13-Year Old Thaddeus Jimenez at TRJ 000259; PX23: 7/31/06 Handwritten Tueffel Statement at 8.*

26.     **Hours after Larry had been brought back home from the police station, Bogucki went to Larry's family's apartment (sometime near 3:30 a.m.) and began banging on the door, insisting that Larry, who was asleep, needed to come back to the station.**  *PX4: Bogucki Dep. at 166:12-19, 167:4-11*; *PX2: Tueffel Dep. 36:4-18, 39:4-5*.  **According to Larry, the police "grabbed me and took me back to the station" without a parent or guardian.**  *Id.*

27.     **Larry, who was only 14 at the time, had been crying and "in shock" over having witnessed the death of his friend.**  *PX2: Tueffel Dep. at 25:8-22.*  **Larry is a high school dropout.**  *PX2: Tueffel Dep. at 175:1-10, 176:17-20.*  **As Defendants' own expert concedes, Larry is "susceptible to being influenced by leading questions" and has "difficulty in trying to make sense out of disparate and confusing information."**  *PX22: Dr. Mark I. Levy Report re Larry Tueffel at 6, 7.*

28.     **In response to the Defendants' questioning, Larry explained that he knew the shooter by sight from the neighborhood, but didn't know his name.**  *PX23: 7/31/06 Tueffel Handwritten Statement at 2.*  **At some point Larry specifically told Bogucki that he had previously seen the shooter at a second hand store near J&V Video.**  *PX16: Bogucki's*

*handwritten note of his first Tueffel interview, TRJ00255.*

29.     **The Defendants told Larry that there were other witnesses who saw Plaintiff shoot Eric.** *PX2: Tueffel Dep. 39:13-14, 41-42.* **Defendants proceeded to put substantial pressure on Larry to say the killer was Plaintiff, calling him a "liar" and accusing him of "trying to cover up for TJ."** *PX2: Tueffel Dep. 39:12-13*. **They were yelling and screaming at him.** *PX2: Tueffel Dep. 40:16-17, 412-13*; *PX23: 7/31/06 Tueffel Handwritten Statement at 4-6.*

30.     **In response to the Defendants' assertion that the shooter was Plaintiff, Larry was "very clear" with them that the shooter was not Plaintiff.** *PX2: Tueffel Dep. 38:1-4; 39:12-19, 141 (**Larry repeatedly told "no, no, no, it's not him, it wasn't him"**); PX23: 7/31/06 Tueffel Handwritten Statement at 2.* **Larry knew Plaintiff, was friends with him, and used to hang out with him sometimes.** *PX24: Tueffel 8/20/10 Affidavit at ¶ 4; PX3: Thaddeus Jimenez Dep. at 92:2-16; PX2: Tueffel Dep. at 266:5-7.*

31.     **When Larry refused to implicate Plaintiff, they told this 14-year old that he was going to go be arrested and sent to jail.** *PX2: Tueffel Dep. 39:13-18, 134:19-24.* **They would not leave him alone, and would not let him go home despite his request.** *Id. at 46:7-14, 136:3-9.*

32.     **Larry was very afraid, particularly when the police were accusing him of lying.** *PX2: Tueffel Dep. at 39:10-40:9.* **They were screaming at him and interrogating him "real bad," but he "just kept saying, no, it's not him and trying to tell the truth and tell them ... I don't know the name, but I was giving a description."** *PX2: Tueffel Dep. at 40:17-20.*

33.     **Larry was practically falling asleep, and by the end, had broken down**

8

crying. *PX2: Tueffel Dep. 133:9-17*. **Eventually, Larry "just got exhausted after a long time and I just kept saying, 'no, no, no.' ... It took me a long time to just say -- I gave up, you know. I was exhausted. ... I was in shock, you know, and finally I just gave up and said okay. .... I know it was wrong to do that, but you know, I didn't know what else to do."** *PX2: Tueffel Dep. 40:16-41:7, 42:15-21, 46:7-14; PX23: 7/31/06 Tueffel Handwritten Statement at 4-7.*

34. **Larry would never have said Plaintiff was the shooter but for the pressure put on him by Defendants.** *PX2: Tueffel Dep. 164:21—165:1.*

35. **Larry regretted having become a "witness" against Plaintiff, and knew it was wrong to go through with it when he knew Plaintiff was not the shooter; he tried to hide when it was time for court, but the police arrested him on a bench warrant and had to "drag [him] out of [his] apartment to take [him] in handcuffs" to juvenile jail for a few days before he was taken straight to Plaintiff's criminal trials to testify.** *PX2: Tueffel Dep. at 51:4-23, 52:23-53:2, 54:6-21, 60:11-20; PX23: 7/31/06 Tueffel Handwritten Statement at 9.*

36. **The guilt over having borne false witness against Plaintiff has been very difficult for Larry; he eventually attempted suicide, at least in part from this guilt.** *PX2: Tueffel Dep. at 119:15-22, 180:21-81:10.* See also *Id. at 67:9-11* (**"My intentions were never for this to get this far like that, you know, and it's just terrible. I mean, it was a terrible thing that the wrong -- the other guy was scot-free too, and that was on me too."**).

37. **When he turned 18, Larry tried to tell the police officer who came to get him to testify against Plaintiff that they had the wrong guy, but that officer did not accept the truth.** *PX2: Tueffel Dep. 52:19-53:1, 53:23-54:21; PX23: 7/31/06 Tueffel Handwritten Statement at 9-10.*

38. **Larry knew the shooter from the neighborhood and later learned that his nickname was "Crazy."** *PX2: Tueffel Dep. at 57:17-58:9.* **Larry now knows Crazy's real name to be Juan Carlos Torres.** *PX2: Tueffel Dep. 211:3-10; PX24: Tueffel 8/20/10 Affidavit at Nos. 5 & 14.*

39. **Larry later came to believe that "Crazy" wanted to shoot Larry because of Larry's knowledge.** *PX2: Tueffel Dep. 58:2-9.* **Larry feared that if he told the truth about Plaintiff's innocence, the real killer would retaliate.** *Id. at 69:2-6, 421:22-423:22.* **Larry decided to keep his mouth shut, and did not tell the judge the truth.** *Id. at 69:11-19.*

40. **At one point, Larry went to St. Genevieve's Church with the intention of telling a priest the truth about his false testimony against Plaintiff, but he lost his nerve and did not go through with it.** *Id. 66:7-67:3.*

41. **When he was in court being questioned, Larry wanted to tell the truth, but did not have the courage.** *PX23: 7/31/06 Tueffel Handwritten Statement at 10-11.*

### LARRY TUEFFEL'S AFFIDAVIT

41. **The typed statement that was presented to Larry for his signature on August 20, 2010 (PX24) had been prepared by defense counsel based on counsel's prior conversation with Larry, although neither defense counsel nor the policeman they brought with them took no notes of that prior conversations.** *PX25: Defendant Officers Responses to Third Set of Interrogatories at Interrogatory Nos. 3 - 6, PX2: Tueffel Dep. 167:1-168:10, 410:22-412:2.*

42. **Larry could not explain why he signed the pre-typed statement, other than that he was "trying to be cooperative."** *Id. at 155:22-156:11, 168:2-8.* ("He just asked me to sign it. I just did. I shouldn't have."). **Larry was not given a copy of the statement he had**

**signed.**  *Id. at 157:19-22.*

43.      **The statement prepared by defense counsel and then signed by Tueffel says that the police never threatened or coerced him, but that is not true.**  *PX2: Tueffel Dep. 164:9-12* (Larry does not know the meaning of the word "coercive").  **Although the statement says he is not "blaming the police," Larry clarified that "I said I'm not blaming anybody, I just wanted to get this fixed..."**  *PX2: Tueffel Dep. 153:3-7.*  **According to Larry: "I didn't mean it like that.  I said I have nothing against the police.  He asked me a question do you blame anybody.  I said, well, they kind of made -- I mean, police are supposed to do their job.  And he was trying to ask me do I hate police because -- I didn't mean -- It was wrong -- I don't know right now.  Hold on a minute."**  *PX2: Tueffel Dep. 166:18-24.*    **In fact, Larry does believe that what the officers did to coerce him to say it was TJ was wrong.**  *PX2: Tueffel Dep. 172:14-173:1* ("[This sentence] is wrong. . . . This sentence is all screwed up saying I don't blame them for . . .  I said I had nothing against them.  That doesn't mean that what they did was right.") and 172:23-173:1 (**Q. "And as you sit her today, do you believe that what they did was wrong? A. Was wrong, yes.").**

44.      **After having Larry sign the release, Defendants then used Larry's psychological records to prepare an expert report, which they then put into the public record with their summary judgment filing, about how his schizophrenia supposedly makes him an unreliable witness.**  *See* Defendants' Exhibit 58; *see also* PACER for *Jimenez v. City of Chicago*, No. 09-CV-8081 [Doc. 107, Exh. 58].  **In reality, Larry is perfectly capable of accurate testimony when, as now, he's medicated.**  *PX2: Tueffel Dep. 176:23-177:18, 440:3-6.*

## THE DUKE JACKET

47.     **Larry explained to the Defendants that the shooter had either a purple or maroon jacket with yellow lettering**.  *PX2: Tueffel Dep. 38:1-13, 132:6-133:6*.  **Larry never said anything about the shooter wearing a Duke jacket.**  *Id.*

48.     **The police, not Larry, kept talking about and asking about a Duke jacket**.  *Id.*  **When the police asked about the Duke jacket, Larry was "very clear" that the shooter was not wearing a Duke jacket.**  *PX2: Tueffel Dep. 141:7-13.*

49.     **According to Phil, the police were the ones who first used the description "Duke jacket" after he allegedly described colors.**  *PX5: Phil Torres Dep. at 39* ("I believe I mentioned the colors, and they came back and told me it was a Duke jacket.") *and 77* ("The police were talking about a Duke jacket").

## SANDRA ELDER

50.     **Sandra Elder has previously stated that she in fact did not come out of the bar until after the shooting.**  *PX26: Luke Netzel Affidavit [(SAO) 0103 – 0105] at ¶3.*  **Larry also says that Sandra was not present for the shooting.**  *PX2: Tueffel Dep. at 129:6-130:23*; *PX23: 7/31/06 Tueffel Handwritten Statement at SAO13-14.*  **Sandra has changed her story about where she was before, during, and after the shooting on several occasions.  In fact, the initial story she gave to the police was itself contradictory.  She said that she was standing on the "south side of Belmont"** *and* **that she was "standing in the middle of Belmont."**  *PX15: CPD Supplemental Report at JIM 00017.*  **In her initial story, she told police that she observed the perpetrators walking westbound on the north side of Belmont when they passed the other two boys who were traveling eastbound.**  *PX15: CPD Supplemental Report at JIM 00017.*  **At trial, she changed her story to conform to that of**

other witnesses and stated that the perpetrators were traveling eastbound prior to the attack, the same direction as Eric and Larry. *PX14: Sandra Elder 1997 Trial Testimony at A10:3-12.*

## TINA ELDER

51.     Defendants summoned Tina Elder and her mother Sandra to a lineup procedure but instead of providing transportation for them, Defendants allowed them to travel to the lineup with Phil. *PX6: Tina Elder Dep. at 22:7-14.* When they arrived at the police station, all three took a smoke break outside before going inside to view the lineup. *Id. at 23:3-8.* Tina Elder testified that by time she had come to the station she had already discussed the murder and the lineup with Phil and Sandra. *PX27: Tina Elder Affidavit at ¶ 8; PX6: Tina Elder Dep. at 18:5-10.* (For her part, having not seen the shooting, *see* above ¶ 50, when Sandra Elder was placed in the lineup she was not able to identify someone she believed to have committed the murder, although she did pick two of the five people in the lineup as possibilities. *PX28: CPD Supplementary Report re: Field Investigation Line-up Report (TRJ 00049- 00051) at TRJ00051.*

52.     At the moment of the shooting, Tina Elder was several months pregnant, had with her on the street her 4-year old daughter, was trying to get her daughter into the car, and was simultaneously speaking to Phil Torres, who was in a third-story window above her. *PX6: Tina Elder Dep. at 33:9-11, 31:12-18, 36:5-23; PX27: Tina Elder Affidavit [(SAO) 0020 – 0021] at ¶¶ 4, 7.* As Tina describes the scene, it was nighttime and she saw only for a few seconds the two people fighting with Eric. *PX27: Tina Elder Affidavit [(SAO) 0021 – 0021] at ¶¶ 5-7.* Although she testified at the trial that the shooter was Jimenez, she has since recanted that testimony and stated that she cannot be certain who it was. *PX27: Tina*

*Elder Affidavit [(SAO) 0020 – 0021] at ¶¶ 2-3*.  **Tina has further testified that she did not**

**know Thaddeus Jimenez at that time.**  *PX6: Tina Elder Dep. at 26:10-12*.  **When she got to**

**the police station, one of the officers told her that Thaddeus Jimenez was the primary**

**suspect and placed her at a desk, which she has described as follows:**

> **[T]he police placed me at a desk.  On the desk was a photo of Eric and [a]**
> **photo of Thaddeus Jimenez.  I did not see and was not shown any other**
> **photos.  I looked at both photos prior to viewing the lineup.  My recollection**
> **of the shooter was of someone light-skinned, with hair that was short on the**
> **sides and wavy on the top.  I do not recall seeing a Duke jacket.**

*PX27: Tina Elder Affidavit  at ¶¶ 9-10*; *PX6: Tina Elder Dep. at 28:16-18.*

53.     **At her deposition, Tina stated that the picture of Jimenez that the police**

**placed her in front of was a square Polaroid and the picture of Eric was of his dead body***.*

*PX6: Tina Elder Dep. at 108:7-17; 46:7-17*.  **Significantly, that square Polaroid of Jimenez**

**was never turned over by the police or prosecutors to the defendant, either before his 1994**

**or his 1997 trials.  In addition, there is no reference anywhere in their police reports that**

**Defendants took a Polaroid picture of TJ or that it had been shown to Tina Elder.** *PX6:*

*Tina Elder Dep. at 108:7-17; PX18: CPD Polaroid Photograph re: Thaddeus Jimenez a/k/a*

*Tina Elder Dep. Exhibit 2 (TRJ 00259)*.

54.     **The police did not interview Tina until after they had told her that Jimenez**

**was the primary suspect, until after they had placed her at a desk with TJ's photograph,**

**and until after she had picked TJ out of the lineup.**  *PX6: Tina Elder Dep. at 48:24-49:19*.

**Tina never told another person – police or non-police -- that the shooter was wearing a**

**Duke jacket, and she states that she "does not recall seeing a Duke jacket" at the time of**

**the shooting***.  PX27: Tina Elder Affidavit at ¶ 10.*  **Defendants' police reports nevertheless**

**states that Tina "positively identified Jimenez as the offender wearing the "Duke" jacket**

and as the one who shot the victim." *PX15: CPD Supplementary Report at 7. See also PX28: CPD Supplementary Report re: Field Investigation Lineup Report (TRJ 00049-51)*.

**VICTOR ROMO**

55.     **On February 10, 1993, exactly one week after the murder, but after the Defendants had already "cleared and closed" the case against TJ, Victor Romo turned himself into CPD and fully confessed to having been at the scene during the shooting**. *PX29: CPD Supplementary Report dated 02/10/93 re: Victor and Ezequiel Romo (JIM 00021-00024).*

56.     **Victor quite directly informed Defendants Bogucki and Schalk that they had the wrong guy as the shooter.** *PX29: CPD Supplementary Report (JIM 00021-00024).* **Victor made clear to the Defendants that he did not even know Plaintiff, much less was with him that night.** *PX29: CPD Supplementary Report at JIM 00023.* **Instead, Victor told the police that his good friend Juan was the triggerman who murdered Eric.** *PX29: CPD Supplementary Report at JIM 00023.* **Independently, Victor's father, Ezequiel Romo, confirmed that Juan had confessed to him to shooting Eric.** *PX29: CPD Supplementary Report at JIM 00023.*

57.     **Victor and Ezequiel provided Defendants the specific address where they could find Juan, and even a map of how to get to Juan's home**. *PX29: CPD Supplementary Report at JIM 00023*; *PX30: Hand drawn Map (JIM 00039); PX31: CPD General Progress Report at JIM 00040.* **Juan matched the contemporaneous description that Larry had immediately given to the police at the scene.**

### JUAN'S CONFESSION

58.    **Several days after the murder, Ezequiel secretly tape-recorded Juan confessing to the crime.**  *PX32: E. Romo Affidavit at ¶ 4.*  **Ezequiel's purpose in making the tape was to gather evidence that would exculpate his son, Victor, by proving that he was not the shooter and had no pre-knowledge that Juan was carrying a gun.**  *PX7: E. Romo Dep. at 44:4-6.*  **One-way taping was not illegal in Illinois at that time**.  *See* 720 ILCS 5/14-1 *et. seq.* **(a January 1994 amendment to this provision made one-way taping illegal in Illinois but the amendment did not apply retroactively and prior to the amendment, Illinois courts interpreted the statute as permitting one party to record a conversation without the other party's consent)**.

59.    **Juan can be heard on the tape stating that: "when he hit me and I wanted to shoot him" and "when I fired the shot, I ran."**  *PX33: Translation of Taped Confession (JIM 00253-JIM 00262), at JIM00261.*  **Juan also says on the tape that he is not worried about getting caught because "they pinned the other blame on the, the other gang boy"**  *Id.*

60.    **On February 10, 1993, Victor's defense lawyer, David Weiner, presented Defendants Bogucki and Schalk, and ASA Gina Savini, with the tape recording on which Torres confesses to shooting Eric and running away**.  *PX34: CPD Supplementary Report dated 03/08/93 (JIM 00025 – 00026).*

61.    **Defendants made a record of receiving the tape, but never logged it into evidence.**  *PX4: Bogucki Dep. at, 159:10-18; see PX35, PX37* (evidence logs, both the one produced and the one withheld, show no reference to the tape).  **Bogucki and Schalk, claim to have never even listened to the tape, never had it translated into English, and never had a Spanish speaking officer from their Department listen to it, even though that was a**

**common practice within the department at the time.** *PX4: Bogucki Dep. at, 159:5-9 (never listened to tape and never had it translated); PX8: Schalk Dep. at 21:8-17 (never listened to tape and never requested an English translation); PX9: Montilla Dep. at 53:18-54:7 (was never asked by Bogucki or Schalk to translate the tape into English though Spanish to English translation was something he did for the police department quite often; he had in fact done so for Bogucki and Schalk on prior occasions)*.

62.     **The sole thing Defendants did do upon receiving the tape was go back and re-interview Juan; the following is the full extent of Bogucki and Schalk's interview report after being handed a tape in which Torres confesses to the murder:**

> **The R/Dets. went to the home of Juan Carlos TORRES where he was re-interviewed in the presence of his father. TORRES denied ever making any such admission as purported by the ROMO family. TORRES further stated that he has never had a telephone conversation with Victor ROMO's father, Ezequiel ROMO. Again, Torres stated that he had not seen Victor ROMO for months.**

*PX34: CPD Supplementary Report dated 03/08/93 (JIM 00025-26).*

### THE EVIDENCE INVENTORY

63.     **At the time of Plaintiff's trials in 1993 and 1997, the sole inventory of evidence that Defendants provided to the prosecutors to provide to defense counsel is attached hereto** as *PX35: Investigative File Inventory (JIM 00030).*

64.     **In or about January 2011 -- and over eight months after plaintiff had requested it in discovery -- the City finally produced the actual inventory of evidence that existed in 1993, but which the police had never turned over to the prosecution or the defense.** *PX36: Plaintiff's First Set of Requests for Production to Defendant City of Chicago at No. 3.* **This far more fulsome list is attached** as *PX37: Investigative File Inventory (TRJ 00254).* **Plaintiff's counsel has created** PX38**, which places the inventory list produced to**

Jimenez's defense counsel in 1994 and 1997 (PX35) **next to the inventory list produced to Jimenez and his counsel in 2011** (PX37), **and counsel has highlighted in yellow that portion of the evidence in inventory that was never until this lawsuit brought to the attention of Jimenez and his counsel.**

65.     **PX39 is photo of a handwritten note recovered from by CPD from the pocket of the victim's clothing.  The note states: "LEO" with the phone number "509-7805" and the number "40."** *PX39: Picture of Note Located Under Inventory No. 1058724.* **This note was never turned over to Jimenez and his defense counsel; in addition, the inventory list turned over to Jimenez and his defense counsel omits any reference to the fact that this handwritten note had been received into evidence with respect to Jimenez's case.** PX38.

66.     **Plaintiff had no connection whatsoever with Leo, the $40 that the victim Eric owed to Leo, or the Triangle gang, to which Juan Carlos Torres, Leo Robles, and Luis Hernandez all belonged.** *PX3: Thaddeus Jimenez Dep. at 72:1-11* (*only heard the name Leo after he was arrested*)*; 66:14-16* (*did not know anyone who was a member of the Triangles*). See also below at ¶ 76.

### PLAINTIFF'S TRIALS

67.     **The State tried Plaintiff for Eric's murder.** *PX40: 10/4/94 Verdict Form (JIM 00118).* **Plaintiff was only 13 at the time of his purported involvement in the murder, but was tried as an adult.** *PX41: Order Permitting Prosecution of a Minor (JIM 00079 - 00080).*

68.     **Prior to Plaintiff's criminal trial, the State successfully moved to exclude Juan's taped confessions.**[1]   **Thereafter, the case was tried over the course of three days in the Fall of 1994; the State put on the case built by the Defendants (and described above)**

---

[1]     See Defendants' Exhibit 33 re: Hearing on Offer of Proof at Plaintiff's First Criminal Trial.

including the "eyewitness" testimony of Phil, Larry, and Tina. *PX12: Phil Torres 1994 Criminal Trial Testimony at B62:15-21, B65:12-24; PX11: Tueffel 1994 Criminal Trial Testimony at B124:6-11, B129:19-24;  PX61: Tina Elder 1994 Criminal Trial Testimony at B27:6-20, B30:2-7.*

69.     **The State's theory of the case at trial was that Plaintiff shot the victim due to an alleged altercation between them that supposedly took place earlier that day.** *PX62: 10//4/94 State's Closing Argument at D112:19 – D113:15.* **There was contrary evidence, however, that the real killer was a member of an organization called the Triangles who shot Eric over a confrontation about a debt to someone named Leo**. *PX16: CPD General Progress Report Notes of Tueffel Interview (TRJ 00255 - 00256) at TRJ00255; PX29: CPD Supplementary Report dated 02/10/93 (JIM 00021 - 00024) at JIM 00023.; PX1: V. Romo Dep. at 82:2-4.*

70.     **At trial, defense counsel cross-examined Larry about his identification of Plaintiff.** *PX11: Tueffel Testimony on 9/30/94 at B140-B158.* **In response to defense counsel's questions, Larry hewed to the version in the police reports, and did not reveal any of the facts described above in paragraphs 24-33 of this Statement.** *Id.*

71.     **On October 4, 1994, the jury convicted Plaintiff of first-degree murder, and he was sentenced to 50 years in prison.** *PX40: Verdict Form dated 10/04/94.* **Because he was so young, Plaintiff served his time in juvenile facilities until he turned 17, whereupon he was transferred to maximum security prison with fully-grown adult criminals.** *PX45: Letter from the IDC re: Transferring Jimenez to Adult Facility (JIM 01199 - 01202)*

72.     The appellate court eventually reversed Plaintiff's first conviction based on a problem with the *voir dire.*   *PX46: Appellate Opinion #1.*   **The State again moved successfully to exclude Juan's taped confession, and re-tried Plaintiff based on the same evidence.**   *PX43: 1997 Motion in Limine Seeking to Use Out-of-Court Admission Against Penal Interest by a Third Party, Non-Defendant.*   **On November 11, 1997, the jury convicted Jimenez; later that month, the judge sentenced him to 45 years in prison.**

PLAINTIFF'S EXONERATION

74.     From the day of his arrest, Plaintiff vigorously professed his innocence.  He wrote to anyone and everyone he thought might help him, **including the Northwestern Center on Wrongful Convictions ("CWC"), which, assisted by several lawyers from Katten Muchin, investigated and pursued his case for four years.**   *PX47: Letter from Jimenez Requesting Legal Assistance (JIM05859 – 05864 a/k/a Ex. 17 to Jimenez Dep.)*

75.     By June 2008, CWC persuaded the CCSAO (and most specifically, the head of its post-conviction unit, ASA Celeste Stack) that there was sufficient justification to re-open and re-investigate the case and from approximately June 2008 to May 2009, the CCSAO undertook a full re-investigation of the case.   (The CCSAO's full 12-month investigation is documented in documents marked SAO001-00233.  For now, Plaintiff has spared the court and the trees a full filing of those documents, but if there is any dispute that the CCSAO conducted such an investigation, we will readily produce the documents.)

76.     **Among other things, the CCSAO located a man named Leo Robles, the person to whom the victim owed money (with a fair inference being it was $40) at the time of his death.**   *PX48: Investigative Report dated 01/08/09 re: Interview of Rosa Wiszo-Waty (sister of Victor Romo) (SAO 00042-00043), at 00043.*   **During questioning by CCSAO**

investigators in January 2009, Leo admitted to having tossed the Morro murder weapon into the Chicago River, and he even took the CCSAO investigators to the spot on the Belmont Avenue Bridge from where he threw it. *PX49: Investigative Report dated 01/24/09 re: Interview of Leo Robles and Attempts to locate Phil Torres (SAO 00055-00057), at 00056.* According to Leo, he received the gun from Luis Hernandez, who received it directly from Juan. At the time of that handoff, according to Leo, Juan admitted to Hernandez that he had used the gun to kill Eric. *PX49: Investigative Report dated 01/24/09 re: Interview of Leo Robles and Attempts to locate Phil Torres (SAO 00055-00057), at 00056.*

77. **The CCSAO interviewed Larry on March 20, 2008 and February 3, 2009. Larry informed the CCSAO that he had not been threatened to change his story, that he had always been eager to tell the truthful story, that the police had interrogated him pretty hard in the middle of the night and that he was still in shock from Eric's death. Larry told them specifically that he would be willing to take a lie detector test. Larry fully disclosed his mental health situation, including several of the medications he was on.** *PX71: Investigative Report dated 02/03/2009 re:Interview of Larry Tueffel SAO0059 - 0062; PX69: March 20, 2008 Patrick Harrigan E-mail re: Celeste Stack Interview of Larry Tueffel; PX44 Patrick Harrigan Dep. at 49:7-50:14; PX2: Larry Tueffel Dep. at 106:11-113:11.* **The CCSAO also interviewed Juan Carlos Torres on December 29, 2008.** *PX50: Investigative Report dated 12/29/08.* **Juan denied even knowing Victor Romo, a verifiable lie.** *PX51: Investigative Report dated 12/29/08 re: Attempts to locate Juan Carlos Torres at ESPN Zone and Palmer Street address SAO0039.* **When the investigators asked him to listen to Ezequiel's tape containing Juan's confession, Juan indicated he would get back to the CCSAO through counsel.** *PX50: Investigative Report dated 12/29/08 re: Attempts to locate Juan Carlos Torres*

21

*at ESPN Zone and Palmer Street address at SAO0039.* **Instead, Juan pulled his children from school, quit his job, abandoned his family home, and fled the State.** *PX52: Investigative Report dated 01/13/09; PX53: Investigative Report dated 05/08/09 re: Interview of Mark Nhoddenbach (Landlord at Palmer Street Address).*

78. **On May 1, 2009, the CCSAO informed Plaintiff through his counsel that they would agree to a motion to vacate his conviction.** *PX54: CCSAO Press Release dated 05/04/09 (JIM 06057).* **The Honorable Joseph M. Claps proceeded to enter an Order vacating Plaintiff's conviction and sentence, and then immediately noted the People's motion to dismiss (*nolle pros*) the case against Plaintiff in its entirety.** *PX55: Order Vacating Conviction and Sentence (JIM 05245).* **Later that same day, Plaintiff was released from Hill Correctional.** *PX54: CCSAO Press Release dated 05/04/09 (JIM06057).* **On June 3, 2009, Chief Judge Paul Biebel granted Jimenez a Certificate of Innocence, which the CCSAO did not oppose.** *PX56: Certificate of Innocence (JIM 04351).* **The award required a finding that Plaintiff was factually innocent of the crime.** 20 ILCS 2630/5(c-6).

79. **On the same day that the CCSAO agreed to release TJ, the authorities arrested Juan in Indiana.** *PX57: Arrest Report re: Juan Carlos Torres. [(SAO) 00088-00092]; PX54: CCSAO Press Release dated 05/04/09 (JIM 06057).* **About three weeks later, May 18, 2009, a Cook County grand jury indicted Juan for Eric's murder.** *PX58: Indictment re; Juan Carlos Torres.*

## DEFENDANTS' MALICE

80. **Defendants Bogucki and Schalk did not take any of the following investigative steps:**

- • **never brought Juan Carlos Torres to the police station for questioning as they had with Larry and TJ;**

22

- **never interviewed Juan Carlos Torres outside the presence of one or more of his parents as they did with Larry and TJ;**

- **never took notes of their two interviews of Torres, as they did with Larry and others;**

- **never asked Torres to identify the individuals who he claimed to be with "across the street" at the time of the murder; they do not ask him to identify which apartment "across the street" he "believes" he was visiting; they did nothing to follow up in any way on Torres's purported alibi;**

- **never asked Torres if he was a member of the Triangles or if he knew or was friends with any members of the Triangles;**

- **never asked if Torres knew "Leo";**

- **never asked if Torres owned a gun or whether he had recently fired someone else's gun or if he had a gun in the house; they didn't search his home for a gun;**

- **never asked Victor what his friend Juan Carlos Torres was wearing when the murder occurred;**

- **never asked Torres if they could search the apartment for clothing, including but not limited to any clothes that matched the description that Larry had given to Defendant Ryan at the scene;**

- **never requested that Torres hand over to them the Chicago White Sox Starter jacket he stated he owned, so that they could look it and/or test it for potential evidence;**

- **never showed Torres's Chicago White Sox Starter jacket to Larry or any other witness (as they had with TJ's Duke Jacket to during the lineup);**

- **never took any step to corroborate Torres's claim that he had not seen Victor in months (despite Victor's claim that they had been together just one week earlier);**

- **never looked at either Victor's or Juan's phone records as a way to determine whether Torres was being truthful about not having spoken to Victor in months;**

- **never took any step to corroborate Torres's claim he had not seen Ezequiel Romo in months (even though Ezequiel had described him as having seen**

him recently and having provided Defendants with Torres's address and a map to get there);

•       never took a Polaroid of Torres to show to witnesses (as they had of TJ) and never showed Larry or any other witness a picture of Torres;

•       never placed Torres in a lineup;

•       never checked Mr. Torres criminal history, nor obtained his mug shot from the CPD mug shot system;

•       never compared Torres's features to the description that Larry had originally given to the police and which was memorialized in General Offense Case Report (JIM004-007);  and

•       never investigated nor established any conceivable motivation that either Victor or Ezequiel had to lie about Torres, not Jimenez, being the shooter.

Respectfully submitted,

Dated: September 2, 2011

**THADDEUS JIMENEZ**

By:   /s/   Stuart J. Chanen
                One of his Attorneys

| | | |
|---|---|---|
| Mr. Jon Loevy | Mr. Stuart J. Chanen | Mr. Locke E. Bowman |
| Mr. Russell Ainsworth | Ms. Lisa R. Carter | RODERICK MACARTHUR |
| Mr. Joel Feldman | VALOREM LAW GROUP LLC | JUSTICE CENTER |
| LOEVY& LOEVY | 35 E. Wacker Dr. | Northwestern University |
| 312 North May St. | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | (312) 676-5480 | Chicago, IL 60611 |
| (312) 243-5900 | | (312) 503-0844 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 09-cv-8081 |
| | ) | The Hon. Matthew F. Kennelly |
| CITY OF CHICAGO, *et al.,* | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO THE DEFENDANT
OFFICERS' MOTION FOR SUMMARY JUDGMENT**

Based on the case put together by the Defendant Officers, the Cook County State's Attorney's Office (" CCSAO" ) twice prosecuted and secured the conviction of Thaddeus Jimenez (" Jimenez"  or " TJ" ) for the murder of Eric Morro.  More than sixteen years later, following its own extensive re-investigation, the CCSAO *joined* TJ's motion to vacate his conviction and release him from prison. Cook County Chief Criminal Judge Paul Biebel has since issued Jimenez a Certificate of Innocence, an award which, by statute, requires an affirmative showing of actual innocence by clear and convincing evidence. 20 ILCS 2630/5(c-6).  Meanwhile, on the same day Jimenez walked out of prison, the CCSAO arrested the real killer, Juan Carlos Torres, who was soon after indicted by a Cook County grand jury for the Morro murder.

As the CCSAO and the criminal court now acknowledge, Jimenez did not shoot Eric *Morro*, and the Defendant Detectives are the only ones left still maintaining that he did.  They have no choice.  Eighteen years ago, inside a span of less than 24 hours, Defendants somehow managed to build a rather elaborate case that Jimenez supposedly shot *Morro*, complete with multiple corroborating " eyewitness"  statements and identifications.  The problem for the Defendants is that the case they manufactured, and everything about it, is completely false.  As everyone except the Defendants now acknowledge, Jimenez had nothing to do with crime.

As the evidence establishes, Defendants' efforts to squeeze the proverbial square peg into the round hole crossed over the line from legitimate investigation and into the realm of outright witness coercion and manipulation.   In the process, Defendants withheld evidence, destroyed evidence, and fabricated evidence, all violations of Jimenez's constitutional right to a fair trial.

Compounding the injustice is the fact that to ensure their concocted conviction against Jimenez, Defendants permitted the real culprit, Juan Carlos Torres, to remain free during the 16 years of this injustice. This is so even though at the time of the murder, the available evidence against Juan was overwhelming. Co-defendant Victor Romo insisted that Torres was his co-perpetrator and that he had never even met Jimenez.  Moreover, Torres confessed to having committed the murder, which confession was surreptitiously captured on tape by Romo's father. (One-way taping was not illegal at that time.)  By time Defendants received the taped confession, however, they had already " solved"  the crime. Since 2006, every eyewitness questioned has revealed police coercion and manipulation as the direct cause of Jimenez's wrongful conviction.

Defendants' motion relies throughout on the premise that Jimenez is in fact guilty, with Defendants directing the Court to the incriminating " evidence"  that they themselves created. However, because the evidence is overwhelming that Jimenez did *not* commit the murder, the tightness of the case Defendants hastily assembled at the time is nothing but proof of their own misconduct.   With all reasonable inferences drawn in Jimenez's favor, the factual disputes surrounding how all of the witnesses came to implicate an innocent man are not the proper subject of a summary judgment motion; they can only be resolved by a jury.

### SUMMARY OF THE FACTS
### Juan Carlos Torres Murdered Eric Morro

On February 3, 1993, two friends, Victor Romo and Juan Carlos Torres, approached two other boys, Eric Morro and Larry Tueffel, in front of 3018 West Belmont Avenue.  Plaintiff's

Rule 56.1 Statement of Facts (P. Stmt. ¶ 1).  (Because several witnesses share the same last name, this memorandum adopts Defendants' use of witness first names for ease of reference.) Victor questioned Eric about money that Eric apparently owed to a "Leo."   Eric told Victor to mind his own business.  *Id.*  A scuffle ensued, and at some point Juan pulled a gun.  *Id.* ¶¶ 2.  A moment later, when Eric took a swing at Juan, Juan shot Eric in the chest.  *Id.*  Victor and Juan fled the scene, running west.  Larry also ran after the shot was fired, but then returned to check on his friend Eric.  *Id.* ¶ 3.  At the time of the shooting, Jimenez was at his Grandmother's house, playing video games with his cousins and doing homework with his uncle.  Jimenez was nowhere near Belmont and Sacramento and had absolutely nothing to do with Eric's murder.  *Id.* ¶ 4.

### The Witnesses' Original Story

Sometime that evening, Defendant Ryan questioned Larry Tueffel at the scene and then took him to the station for a few hours, where he was further questioned and then brought home. *Id.* ¶ 5.  During that initial round of questioning, Larry told Ryan, Bogucki, and one or more of the other Defendants everything he knew, describing the confrontation that led to the shooting. *Id.* ¶ 6.  Larry also provided a contemporaneous physical description of the shooter (memorialized in the police report) as being a 13-14 year old male Hispanic, 5'4 to 5'5, with curly black hair, wearing a purple " Purple Jacket with Yellow Lettering and/or #'s"  and baggy blue jeans.  *Id.* Larry's original description did not match Jimenez, who did not have curly hair.  *Id.* ¶ 7.  Jimenez also never had a purple jacket with yellow lettering; instead, he had a brand new blue and white Duke Starter jacket, which Defendants used to frame Jimenez and then discarded when Jimenez's mother demanded that the jacket be tested.  *Id.*

Phil Torres was also interviewed at the scene.  *Id.* ¶ 8.  Phil did not actually see the shooting and did not claim to have seen it; he was not an eyewitness.  *Id.*  As with Larry, Phil

made no claim to have been able to identify the perpetrator by name.  *Id.*

## Defendants' Version

Defendant Detective Bogucki was put in charge of the investigation, assisted primarily by Defendant Detectives Saunders and Schalk.  *Id.* ¶ 9.  In Defendants' telling, Phil called the police in the early morning hours after the shooting to report that he just happened to be looking out the window at the time of the incident.  According to Defendants, Phil reported that he witnessed Thaddeus Jimenez shoot Eric, who Phil supposedly identified by name as someone known to him and supposedly identified as wearing a Duke jacket during the shooting.  *Id.* ¶¶ 10, 11. Defendants further claimed that Phil supplied a motive, an altercation that Jimenez supposedly had with the victim earlier that day.  *Id.* ¶ 11.  The main police report memorialized those " facts," as well as Phil's subsequent selection of Jimenez out of a lineup.  *Id.*

Defendants also assert that they next went to Larry's home and that, there, Larry readily provided them a new account that, in contrast to his contemporaneous interview, now matched Phil's identification of Jimenez, including both the alleged argument with the victim earlier in the day and the fact that the shooter was wearing a Duke jacket.  *Id.* ¶¶ 12.  Larry's identification of Jimenez (as someone known to him by name) was then supplied to the prosecutors in Defendants' police report.  *Id.* ¶ 13.  Both Larry and Phil testified consistently *with Defendants' version of the facts* at both of Jimenez's criminal trials.

## Phil's Version: Never Even Claimed To Be A Witness

In the course of the re-investigation that led to Jimenez's exoneration, new evidence came to light.  Specifically, both Phil and Larry disavowed the story memorialized in the police documents, insisting instead that they had been improperly pressured to go along with it. According to Phil, the police came to his mother's house at 1:00 a.m. in the morning after the

shooting.  _Id._ ¶ 17.  He was high on drugs and would not have spoken with the police if he had had a choice.  _Id._  Phil told Defendants he did not know who shot Eric, which was true.  _Id._  Phil doesn't recall reaching out to the police that night (as they claim) and believes now that he would have had no interest in doing so at the time.  _Id._ ¶ 18.

Even assuming Phil did initiate re-contact with the police late that night (rather than the other way around), the most he could or would have told them was that he heard a rumor about a possible altercation hours before the murder involving Jimenez and the victim.  _Id._ ¶ 19.  Namely, Phil believes he heard from his sister that Jimenez might have gotten into an argument with the victim earlier in the day of the shooting, though Phil does not claim to have personal knowledge of any of that.  _Id._ ¶ 20.  Phil allows that he might have passed on to the police the hearsay tip that his sister believed Jimenez might have been involved.  _Id._  Indeed, Phil is clear that this is the only conceivably relevant information he had.  _Id._ ¶ 21.

During his interrogation, Phil never claimed to have been certain about the shooter's identity.  _Id._  The police kept telling Phil that other people (including his sister) were claiming that Jimenez was the shooter, and finally, Phil agreed to say it was Jimenez.  _Id._  Although he eventually testified at the trial that he saw Jimenez wearing a Duke jacket, at his deposition he revealed for the first time that it was the police who brought up the Duke jacket to him first, not the other way around.  _Id._ ¶ 49.  At bottom, Phil has admitted that, contrary to the police version, he truthfully told the police that he did not know who shot Eric.  _Id._ ¶ 8.  He never claimed to be a witness and did not want to be a witness.  _Id._ ¶¶ 8, 21, 22.[1]

---

[1]       Phil was 31 years old at that time, 18 years older than TJ, and they were not friends.  In fact, Phil claims to have seen TJ only a few times in his life and cannot describe him at all.  P. Stmt. ¶ 23.  At his deposition, Phil could not even be certain he had ever actually seen TJ before.  _Id._  While Defendants try to discredit Phil on statements they do not like, that does not advance Defendants' motion, as TJ is the one entitled to all reasonable (footnote continues)

### Larry's Version: Unduly Coercive Interrogation

Sometime near 3:30 a.m., Defendant Bogucki went, by himself, to Larry's family's apartment. Bogucki began banging on the door, insisting that Larry, who was asleep, needed to come back to the station. _Id._ ¶ 26. According to Larry, " they just grabbed me and took me" without a parent or guardian. _Id._

Larry, who was only 14 at the time, had been crying and " in shock" over having witnessed the death of his friend. He is a high school dropout and as Defendants' own expert concedes, "_he appears to be susceptible to being influenced by leading questions_" and has "difficulty in trying to make sense out of disparate and confusing information." _Id_. ¶ 27 (emphasis in original). In response to the Defendants' questioning, Larry explained that he knew the shooter by sight from the neighborhood, but did not know his name. (At the time, the real shooter was known to Larry with the nickname Crazy. Larry now knows Crazy's real name to be Juan Carlos Torres. _Id._ ¶¶ 38, 39.)

Defendants told Larry that Jimenez was the shooter, and also that there were other witnesses stating that it was TJ who shot Eric. _Id._ ¶¶ 29, 30. Defendants proceeded to put substantial pressure on Larry to say the killer was Jimenez, calling Larry a " liar" and accusing him of " trying to cover up for TJ." _Id._ ¶¶ 29-33. They were yelling and screaming at him. _Id._ In response to the Defendants' assertion that the shooter was Jimenez, Larry was " very clear" with them that the shooter was " not" Jimenez. _Id._ ¶ 30. Larry knew Jimenez and used to hang

---

inferences at this stage. Moreover, the fact that Phil allowed Defendants' counsel at deposition to press certain admissions out of him through persistent questioning only shows, if anything, how suggestible and arguably subject to manipulation their star witness really is. As is often true in these types of cases, the Defendants urged the courts to believe this dubious witness back when he was pointing the finger at TJ, and yet they are stuck with him now that he is pointing the finger back at them.

out with him sometimes, so he knew him by sight.  *Id.* ¶¶ 28, 30.  Thus, Larry knew Jimenez had

not been present for the shooting, and repeatedly told the Defendants: " no, no, no, it's not him, it

wasn't him."  *Id.* ¶ 30.

 When Larry refused to implicate Jimenez, the detectives threatened to arrest Larry and

send him to jail.  *Id.* ¶ 31.  They would " not leave him alone," and would " not let him go home"

 despite his request.  *Id.*  Larry was very afraid, particularly when the police were accusing him of

lying.  *Id.* ¶ 32. They were screaming at him " real bad," but he " just kept saying, no, it's not him

and trying to tell the truth and tell them [about the real shooter].  I don't know the name, but I

was giving a description."  *Id.*  Larry was practically falling asleep, and by the end, had broken

down crying.  *Id.* ¶ 33.  Eventually, Larry " just got exhausted after a long time and I just kept

saying, 'no, no, no.' ... It took me a long time to just say -- I gave up, you know.  I was exhausted.

. . . I was in shock, you know, and finally I just gave up and said okay. . . .  I know it was wrong

to do that, but you know, I didn't know what else to do."  *Id.*

 Larry has also now made clear that he would never have said Jimenez was the shooter but

for Defendants' coercion. *Id.* ¶ 34.  He regretted having become a " witness" against Jimenez and

knew it was wrong to go through with it when he knew Jimenez was not the shooter.  *Id.* ¶ 35.

So guilt-ridden was Larry about testifying falsely against Jimenez that when it came time to testify

in Court, Larry tried to hide from prosecutors, but the police arrested him on a bench warrant and

"had to drag [him] out of [his] apartment to take [him] in handcuffs" to juvenile jail for a few

days.  From there the police took him straight to Jimenez's criminal trial to testify.  *Id.*[2]

---

[2] The guilt over having borne false witness against TJ has been very difficult for Larry; he eventually attempted suicide, at least in part from this guilt.  *Id.* ¶ 36 (" My intentions were never for this to get this far like that, you know, and it's just terrible.  I mean, it was a terrible thing, that the wrong -- the other guy was scot-free too, and that was on me too." ).

### Jimenez's Arrest

At 4:00 a.m. the morning after the shooting, Defendants Bogucki and Sanders went to Jimenez's grandmother's home and arrested him.  *Id.* ¶ 14.  Jimenez denied any knowledge of the murder and provided a detailed alibi.  *Id.*  In the course of the arrest, Defendants learned that Jimenez had a blue and white Duke (Blue Devils) jacket.  *Id.*

### Tina Elder

Once Defendants had coerced Phil and Larry into saying that the shooter was Jimenez, the next step was to get them to view a lineup.  In addition to Phil and Larry, Defendants summoned two other people to view a lineup, Tina and Sandra Elder.  Instead of providing transportation for the Elders, Defendants allowed them to travel to the lineup with Phil.[3]  Tina Elder testified that by time she had come to the station she had already discussed the murder and the lineup with Phil and Sandra. P. Stmt. ¶ 51.

At the moment of the shooting, Tina Elder was with her 4-year old daughter, was trying to get her daughter into the car, was several months pregnant, and was simultaneously speaking to Phil Torres, who was in a third-story window above her.  As Tina describes the scene, it was nighttime and she saw the two people fighting with Eric only for a few seconds.  *Id*. ¶ 52. Although she testified at the trial that the shooter was Jimenez, she has since recanted that testimony and stated that she cannot be certain who it was.  Tina has further testified that she did not know Jimenez at that time, but when she got to the police station, one of the officers told her that Thaddeus Jimenez was the primary suspect and placed her at a desk, which described as follows:

---

[3]      This of course renders meaningless the Defendants' current claim that when they arrived at the station, they separated them to wait in different areas.  *Cf*. Defendants Mot. at 11.

[T]he police placed me at a desk.  On the desk was a photo of Eric and [a] photo of Thaddeus Jimenez.  I did not see and was not shown any other photos.  I looked at both photos prior to viewing the lineup.  My recollection of the shooter was of someone light-skinned, with hair that was short on the sides and wavy on the top.  I do not recall seeing a Duke jacket.

*Id.*  Tina has testified that the picture of Jimenez that the police placed her in front of was a square Polaroid.  *Id.* ¶ 53.  That Polaroid was never turned over by the police or prosecutors to the defendant, either before his 1994 or 1997 trial. The police reports make no reference to Defendants taking a Polaroid picture of Jimenez and using it in the case to show to Tina Elder. *Id.* (The first time that Jimenez received this Polaroid was in January 2011. *Id.* ¶ 64.)

The police did not take a statement from Tina until after they had told her that Jimenez was the primary suspect, until after they had placed her at a desk with TJ's photograph, and until after she had picked TJ out of the lineup. *Id.* ¶ 54.  Tina never told another person – police or non-police – that the shooter was wearing a Duke jacket, and she states that she " does not recall seeing a Duke jacket" at the time of the shooting. *Id.* Defendants' police report nevertheless states that Tina positively identified TJ as " the offender wearing the 'Duke' jacket and as the one who shot the victim." *Id.*

### Victor Romo Comes Forward, Confesses, and Admits Unequivocally That Juan Was the Co-Perpetrator

On February 10, 1993, exactly one week after the murder, but after the Defendants had already " cleared and closed"  the case against TJ, Victor Romo turned himself into Defendants Bogucki and Schalk and fully confessed to having been at the scene during the shooting. *Id.* ¶ 55. Victor made clear to the Defendants that he did not know Jimenez, had never met him or seen him at any time, and was not with him at the time of the shooting or any other time that night. *Id.* ¶ 56. Victor told the police that his friend Juan was the triggerman who murdered Eric. *Id.* He told Bogucki and Schalk that he had met Juan at the Burger King on Belmont and California, that

Juan had asked Eric about some money, and that a struggle began.  *Id.*  Independently, Victor's father, Ezequiel Romo, confirmed that Juan had confessed to him to shooting Eric.  *Id.*  Victor and Ezequiel provided Defendants Juan's specific address and even provided a map.  *Id.* ¶ 57.

### Juan's Confession

Just two to three days after the murder, Ezequiel secretly tape-recorded Juan confessing to the crime. *Id.* ¶ 58.  Ezequiel wanted to make the tape to gather evidence that would exculpate his son by establishing that he was not the shooter and had no pre-knowledge Juan was carrying a gun.  *Id.*  Juan can be heard on the tape stating that: " when he hit me and I wanted to shoot him" and " when I fired the shot, I ran." *Id.* ¶ 59.  Juan also says on the tape that he is not worried about getting caught because " they pinned the other blame on the, the other gang boy" *Id.*  At one of Victor's first hearings, Victor's defense lawyer presented Defendants with the tape recording of Juan's confession.  *Id.* ¶ 60.

### Defendants Fail To Genuinely
### Investigate Juan's Involvement

There was no reason to disbelieve Victor (who was admitting against self-interest to participating in the crime) or to discredit Juan's confession on the tape, but, at this point, Defendants had a big problem:  they had spent the first 24 hours of the investigation locking in various witnesses to the story that Jimenez was the shooter. It was " too late" to start the investigation all over again.  Even if Juan were charged, the witnesses Defendants had already developed (pointing the finger at someone else) would likely have allowed Juan to escape conviction.  Therefore, Defendants opted to abandon their obligation to search for the truth and instead go with the case they already had, or more accurately, the case they had manufactured against the grain. In particular, as set forth in detail in Jimenez's Statement of Facts ¶ 80, Defendants declined to take any genuine steps to confirm whether Victor was telling the truth

about Juan being the shooter.  As for the taped confession, Defendants made a record of receiving the tape, but never logged it into evidence.  *Id.* ¶ 61.  Incredibly, the lead investigators, Bogucki and Schalk, assert that to this day they have never even listened to the tape, never had it translated into English, and never had a Spanish speaker from their Department listen to it, even though that was a common practice within the department at the time.  *Id.*

## Jimenez Is Twice Convicted For Morro's Murder
## Based On the Case Put Together by Defendants

Notwithstanding the evidence of Juan's guilt, the criminal case against Jimenez proceeded.  Although he was only 13 at the time of his purported involvement in the murder, Jimenez was tried as an adult.  *Id.* ¶ 67. Prior to the trial, the State successfully blocked the admission of Juan's taped confessions.  *Id.* ¶ 68.  At trial, the State put on the case built by the Defendants, including the "eyewitness" testimony of Phil, Larry, and Tina.  *Id.*  On October 4, 1994, the jury convicted Jimenez of first-degree murder, and he was sentenced to 50 years in prison.  *Id.* ¶ 72.  Jimenez served his time in juvenile facilities until he turned 17, whereupon he was transferred to maximum security with fully-grown adult criminals.  *Id.*

The appellate court eventually reversed Jimenez's first conviction based on a *voir dire* problem.  *Id.* ¶ 73.  The State again moved successfully to exclude Juan's taped confession and re-tried Jimenez based on the same evidence.  *Id.*  On November 11, 1997, the jury convicted Jimenez; later that month, the judge sentenced him to 45 years in prison.  *Id.*

## Jimenez's Exoneration

For more than 16 years, TJ languished in prison for a crime he did not commit.  From the day of his arrest, Jimenez vigorously professed his innocence.  He wrote to anyone and everyone he thought might help him, including the Northwestern Center on Wrongful Convictions ("CWC"), which, assisted by several lawyers from Katten Muchin, investigated and pursued his

11

case for four years.  *Id.* ¶ 74.  By June 2008, CWC persuaded the CCSAO that there was sufficient justification to re-open and re-investigate the case.  *Id.* ¶ 75.  From approximately June 2008 to May 2009, the CCSAO undertook a full re-investigation.  *Id.*

In doing so, the CCSAO did exactly what Defendants should have done when they began their investigation in 1993: they followed the actual evidence.  Among other things, the CCSAO located a man named Leo Robles, the person to whom the victim owed money at the time of his death.  *Id.* ¶ 76.  During questioning, Leo admitted to having tossed the *Morro* murder weapon into the Chicago River, and he even took the CCSAO investigators to the spot on the Belmont Avenue bridge where he had thrown the weapon in, the very night of the murder more than 15 years earlier.  *Id.*  According to Leo, he was handed the gun by Luis Hernandez, who, like Leo and Juan, was a member of the Triangles street gang.  Luis later told Leo (after he had already ditched it) that he had received the gun from Juan who had confessed to Luis that he had used the gun to shoot Eric *Morro*.  *Id.*

The CCSAO interviewed Juan on December 29, 2008, and unlike the interview conducted by Bogucki and Schalk, this was an actual interview.  *Id.* ¶ 77.  Juan denied even knowing Victor or Ezequiel Romo, a verifiable lie.  *Id.*  When the investigators asked him to listen to Ezequiel's tape containing Juan's confession, Juan did not want to do so at that time and indicated he would get back to the CCSAO through counsel.  *Id.*  Instead, Juan pulled his children from school, quit his job, abandoned his family home, and fled the State.  *Id.*

On May 1, 2009, the CCSAO took a very unusual step:  it informed Jimenez through his counsel that they would agree to a motion to vacate his conviction.  *Id.* ¶ 78.  The Honorable Joseph M. Claps proceeded to enter an Order vacating Jimenez's conviction and sentence, and then immediately noted the State's motion to dismiss (*nolle pros*) the case against Jimenez in its

entirety.  *Id.* Later that same day, Jimenez walked out of Hill Correctional a free man.  *Id.*  Four weeks later, June 3, 2009, Chief Judge Paul Biebel granted Jimenez a Certificate of Innocence, which the CCSAO did not oppose.  *Id.*  On the same day that TJ was released, the authorities arrested Juan Carlos Torres, who had fled to Indiana.  *Id.* ¶ 79.  On May 18, 2009, a Cook County grand jury indicted Torres for Eric Morro's murder.  *Id.*

## ARGUMENT

## I.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON JIMENEZ'S DUE PROCESS CLAIMS.

The Due Process Clause of the Fourteenth Amendment guarantees criminal defendants the right to a fair trial.  *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001).  Indeed, this fundamental protection is one of the most cherished and precious rights in our democratic system.  *E.g., Patterson v. Burge*, 328 F. Supp. 2d 878, 889 (N.D. Ill. 2004) (" The due process clause safeguards the liberty of citizens. . . particularly in cases where the state 'has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury. . . .'" ) (citations omitted).  Here, Defendants violated Jimenez's due process rights by concealing evidence of their manipulation and coercion of witnesses and by concealing exculpatory physical evidence.  Defendants fabricated false evidence—a due process violation that is independent of Defendants' *Brady* violations.  And Defendants perjured themselves at trial in order to push forward the false story that was created during their sham investigation.

### A.   Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Concealment of Exculpatory Evidence.

The Seventh Circuit made clear in *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001) ("*Newsome I*") and 319 F.3d 301, 304 (7th Cir. 2003)("*Newsome II*") that Section 1983

claims have always existed where a police officer's actions in withholding material exculpatory information (including exculpatory information about the manipulation of a witness's testimony) results in a denial of a defendant's right to a fair trial.  256 F.3d at 749-53; 319 F.3d at 304-05. *Newsome II* held that the defendants were liable " under the due process clause because [the defendant officers] concealed exculpatory evidence -- *the details about how they induced the witnesses to finger [the civil rights plaintiff]*." *Id*. at 304 (emphasis added). In *Newsome*, as here, "[Plaintiff's] lawyers needed, but did not receive, information vital to probe whether manipulation [of witnesses] occurred."  *Id*. at 305.  The facts present here fall squarely within *Newsome*.

Since *Newsome,* a number of other cases in this Circuit have confirmed that Section 1983 liability will attach to a police officer who has manipulated a witness into identifying a suspect and then withheld material details surrounding how that witness came to identify a suspect.  In *Ienco v. City of Chicago,* 286 F.3d 994, 1000 (7th Cir. 2002), the court relied on its intervening decision in *Newsome I* to reverse the district court's summary judgment in favor of officers on immunity grounds. The court held that an officer can be liable directly under the due process clause for withholding exculpatory information and lying to federal prosecutors who indicted Ienco. Citing *Brady* and *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), the court concluded that there was no absolute immunity for such conduct, and further held that if the plaintiff proved his due process claim on remand, the officers would also not be entitled to qualified immunity.  286 F.3d at 1000-01.[4]

---

[4]     The Seventh Circuit's opinion in *Jones* stands for two additional important propositions:  (1) that " information undermining the credibility of a government witness is within the scope of Brady's rule"  and (2) that certain intervening causes, such as " a prosecutor's decision to charge, a grand jury's decision to indict, [and] a prosecutor's decision not to drop charges but to proceed to trial" will <u>not</u> " shield a police officer who deliberately supplied misleading information that influenced the decision."  856 F.2d at 994 and 995.

The Seventh Circuit followed *Ienco* with *Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004), in which the court of appeals affirmed this Court's denial of summary judgment on absolute and qualified immunity grounds.  The Seventh Circuit acknowledged that Manning's allegations went beyond perjury and conspiracy to commit perjury and included " inducing [a witness] to create a false story"  and " inducing a witness to falsely identify Manning in a line-up." *Id.* at 1032-33. The court held that the fact that Manning was also complaining of perjury (for which there was testimonial immunity) did " not foreclose his *Brady* claim."   Significantly, the court held that qualified immunity was also not available to the defendants because in 1990, when the misconduct allegedly occurred, it was already " well established that investigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process right."  *Id.* at 1034, citing *U.S. v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985).

Finally, in *Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008), another case in which plaintiff asserted that the "defendant officers violated his right to due process by manipulating or tampering with identification and testimonial evidence"  and then " back[ed] up these allegations with [false] evidence at the trial," the court again affirmed, holding that the court properly instructed the jury that in order to find for plaintiff  Dominguez, it had to find that Hendley caused Dominguez's criminal trial to be unfair through any of three specified courses of conduct: (1) withholding material, exculpatory evidence in violation of *Brady*; (2) causing an unreliable identification procedure to be used at his trial; or (3) fabricating evidence.  *Id.* at 589. *See also Id.* at 590 (because the officer's defense was primarily that he denied that any evidence was fabricated, procured through suggestive procedures, or withheld, " the jury therefore had to decide who was telling the truth on these points, and ultimately whether [Officer] Hendley misled the prosecution and caused Dominguez to receive an unfair criminal trial" ).  The court rejected

defendant's claims of qualified immunity on the same basic grounds as the cases cited above, giving special emphasis to the point that the officer was not claiming immunity on the ground of "legal uncertainty,"  but rather was, as in this case, asserting factual defenses such as denial of the accusations, insufficient proximate cause, and superseding causation, all factual issues that do not relate to " legal uncertainty," and in any event do not lend themselves to pretrial resolution on immunity grounds.  Id. at 589-90.

In this long line of cases, the Seventh Circuit has repeatedly held that where, as here, the gist of the constitutional allegation is that the defendant induced witnesses to give a false identification of or make false statements about the suspect and then withheld the facts about how those witnesses were induced, defendants are not entitled to summary judgment (or post-trial reversal for that matter) on the grounds of failure to state a constitutional claim, or absolute immunity, or qualified immunity.

The facts in this case fit comfortably within these authorities.  Lacking any physical evidence, a confession, or anything else linking Jimenez to the crime, the State built its case solely on the purported eyewitness accounts that Defendants Bogucki, Sanders, and Schalk forged (double meaning intended) in a locked room inside the police station in the hours shortly after the murder. When Larry and Phil walked out of that room and were presented to the prosecutors, their testimony was virtually insurmountable: they were eyewitnesses who claimed: (a) to know Jimenez personally, (b) to have seen Jimenez shoot Eric, and (c) to have seen Jimenez wearing the very Duke jacket that the police seized from Jimenez, no less.  That testimony amply sufficed to convict Jimenez -- twice, as Defendants are quick to point out.  The problem, however, is there a lot more to the story that was never told because it was never disclosed to the prosecutors or to the defense.  Defendants' version of the story, as transmitted to the prosecutors via their original

police reports, critically withholds the following exculpatory material:

- That Bogucki and Sanders threatened, coerced, and intimidated Larry into naming Jimenez as the shooter, as well as the means they used to induce Larry's testimony and the fact that prior to naming Jimenez, Larry had repeatedly insisted for hours that Jimenez *was not the shooter*.[5]

- That Phil Torres did not actively seek out police in order to share his belief that Jimenez was the shooter and that, in truth Phil never told police he saw Jimenez shoot Eric, but rather only disclosed Jimenez's name based on a hearsay rumor from his sister that Jimenez might have been involved.

- That Defendants created a suggestive "Polaroid Show-Up Procedure" with Tina Elder and told her that Thaddeus Jimenez was the leading suspect at the time in order to influence her line-up identification.

- That they had induced witnesses to give false testimony (and in some cases simply wrote statements into their reports attributed to witnesses that were false), including but not limited to the statement that the shooter was wearing a Duke Jacket at the time of the murder. (Numerous witnesses have testified that the police, not they, inserted the wearing of a Duke Jacket into their witness statements. These false statements were in turn not disclosed to the State or defense, and the "shooter wore a Duke Jacket" theme was a major theme at both of Jimenez's trials.)

- That the following pieces of physical evidence existed: (a) Eric's handwritten note with Leo's name, telephone number and the amount of money Eric owed to Leo; (b) the square Polaroid photo of Jimenez used with Tina Elder; (c) until discovery in this case, the full inventory list of evidence that had been created in 1993.

None of this information was known to Jimenez at his criminal trial, and taken together, these facts would have made for devastating impeachment. *See Giglio v. United States*, 405 U.S. 150 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*]"). For summary

---

[5]     It is true that Defendants' police report discloses that Larry did not originally identify TJ. (They had to include that fact because the beat officers had already created a report of their on-scene interview with Larry in which he described but did not identify, the shooter.) But the critical missing/withheld fact is that Larry not only failed to name TJ (purportedly out of fear) but that he was affirmatively insisting to his interrogators that the killer was known to him and *was not TJ.*

judgment purposes, a reasonable jury could certainly conclude that these withheld details were sufficiently material to give rise to a constitutional violation, which requires only that they " might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104 (1976).

### 1. The Purported Failure to Exercise Diligence Is Not a Basis for Summary Judgment on Plaintiff's Concealment of Evidence Claim.

Relying almost exclusively on *Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011), Defendants argue that Jimenez's *Brady* claim should fail because Jimenez and his criminal defense counsel did not meet their responsibility to uncover the withheld facts.  This argument should be rejected.  According to Defendants, *Holland* essentially stands for a rule that coercion of material witnesses cannot give rise to actionable *Brady* violations because any criminal defense attorney can simply interview the witness for himself. Such a reading would effectively overrule *Newsome* (and the cases that follow it discussed above) because one could always argue that material witnesses could have been interviewed *better*.   But that is simply not the law.  As the Seventh Circuit explained clearly in *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001),

> We are of the view, however, that the state's argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence.  We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for Brady purposes. . . .  To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses.  Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement.

Id. at 740. (emphasis added). (This court should especially note that the Seventh Circuit is discussing limits on a defense counsel's ability to extract favorable evidence from "defense witnesses," while in this case, this caution is doubly, if not triply, true as it applies to defense counsel's ability to extract favorable evidence from *prosecution witnesses*.)

In reality, *Holland* is easily distinguishable and its holding is thus far narrower than Defendants assert.  Unlike here (and in the series of *Newsome* cases discussed above), the police in *Holland* specifically disclosed to the criminal defendant that the witness had told them *three times* that Holland was not the rapist and then later said that he was.  643 F.3d at 256.  The Court mused that the " first thought to pop into the mind" would be the question "[w]hat (if anything) happened between the three times [the witness] said that Holland was not the rapist and the time she finally said that he was?"  That question pops up in *Holland's* facts (where the government *had disclosed* to the defense what the witness had initially said), but not in this case.  Here, Defendants never disclosed Larry's initial specific and repeated denials that Jimenez was the perpetrator.  *See* PX15 at TRJ0044 (no mention of denials).

Moreover, Holland's defense lawyer had indeed interviewed the witness, who told the lawyer that the sole reason she didn't identify Holland initially was because she was afraid.  She did not tell him at that time, as she did later, that it was because of pressure from the police.  The court in *Holland* points out that while the witness may have been lying to Holland's lawyer that was not the fault *of the police*, so Holland could not hold the police responsible for the witness's failure to share that information.  The court further stated that the police neither coerced the witness to lie nor were they " otherwise withholding exculpatory evidence on this point from the defense."  643 F.3d at 256.  That is what makes this case so completely different from *Holland*.  Here, Defendants did *not* disclose in the original police reports that Larry had repeatedly told the officers that they had the wrong guy and that it was not Jimenez.

The point of *Holland* is that *as long as the police officers do disclose* that the witness had repeatedly said that the defendant did not do it before changing her story and saying he did, then there is no *Brady* violation.  Once the shifting story is disclosed, however, the burden shifts to the

criminal defense counsel to ferret out why the witness changed her story.   Here, Defendants

nowhere disclosed that Larry had repeatedly insisted, in response to their accusations about

Jimenez, that he (Larry) knew Jimenez, and that Jimenez was *not* the shooter.   In *Boss*, the

Seventh Circuit explained how to evaluate a defense counsel's diligence:

> We also find it significant that a defense witness's knowledge is quite different from the type
> of evidence typically found to be available to defense counsel through the exercise of
> reasonable diligence.   In the typical reasonable diligence case, the question is whether
> defense counsel had access to the document containing the *Brady* material, through an open
> file policy, for example.   In cases like the present one, the question is whether defense
> counsel had access to Brady material *contained in a witness's head.*   Because mind-reading
> is beyond the abilities of even the most diligent attorney, such material simply cannot be
> considered available in the same way as a document.   But, the position the state advances
> would require a defense witness's knowledge to be treated exactly as information in a
> document the defense possesses. *This stretches the concept of reasonable diligence too far.*

263 F.3d at 741. (citations omitted, emphasis added).   This is precisely what the defendants ask

this Court to do in this case – stretch the concept of reasonable diligence too far.

Applying this *Boss* standard to the facts at bar, Defendants have failed to meet their

burden of establishing what Jimenez's defense counsel "likely did obtain" and "likely could have

obtained" by speaking with witnesses before trial.   And, in any event, the question of what the

defense counsel "likely could have obtained" is a disputed question of fact that may not be

decided on Defendants' motion.   For one thing, the Defendants' manipulation of Larry was not

uncovered by the prosecutors either.   They, too, were fooled, and they had every opportunity to

interview him.   There is no justification for holding defense counsel to a higher standard.[6]

---

[6]   Defendants take out of context a phrase from Larry's statement that he lied
because he "did not think anyone would believe him."   (Def. Mem. at 9)   There is no disputing
that Larry did try to tell the truth to the Defendants:   he repeatedly told them that TJ was not the
shooter, as described at length only a few paragraphs earlier in that very same affidavit that
Defendants reference. *See* PX23.   In fact, Defendants flip the "nobody would believe me"
reference on its head:   it actually describes Larry's motive for going along with the Defendants'
subterfuge *once he had to deal with the lawyers,* a fact that undermines, not supports,
Defendants' *Holland* argument.

Furthermore, as the Defendants in this case concede, defense counsel *repeatedly did probe* Larry about the account he provided at trial, Def.'s SOF ¶¶ 42, 45, 46, 54, 56, 57, an account that was on the record, while Larry was under oath, no less. *Id.* Unfortunately, Larry did not budge from the false account, and declined to divulge the exculpatory details. *Id.* No amount of probing inquiry by defense counsel was able to change Larry's story, leaving one wondering what more Defendants are suggesting counsel should have asked to get to the truth. *Compare* Def. Mem. at 8 (faulting Jimenez for supposedly failing to ask the question: "why did Tueffel change his identification of the shooter?").

Finally, there is evidence that Larry had his own reasons for not exposing the Defendants' manipulations. As Larry stated, after he was pressured into the false account and was released by the police, he came to believe that the real shooter, who he knew by the name "Crazy," would retaliate against him if he exposed the police's frame-up of Jimenez. (P. Stmt. ¶¶ 38, 39.) Larry decided to keep his mouth shut in court, and Defendants have not presented any probative evidence to suggest that TJ would have obtained a different result with so-called "greater diligence." At one point, Larry went to St. Genevieve's Church with the intention of telling a priest the truth about his false testimony against TJ, but he lost his nerve and did not go through with it. (*Id.* ¶ 40.) If he was too afraid to share the truth with an anonymous priest, a jury could reasonably conclude that the cause of TJ's injuries was not inadequate interviews by the defense.

### 2. *Gauger* and Other Confession Cases Do Not Furnish a Basis for Summary Judgment on Plaintiff's Concealment of Evidence Claim.

In a related vein, Defendants argue that this Court should apply false confession cases – *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006); and *Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2005) – for the proposition that Jimenez may not state a *Newsome* claim because he was aware that Tueffel was subjected to

21

pressure from police. These three cases, however – *Gauger*, *Sornberger*, and *Kuba* – stand for a narrow and limited proposition. In all three of those cases (as Defendants concede), the court basically ruled that when police improperly coerce a false confession from an accused party, the party may not assert a *Newsome* claim that the police's misconduct violated his rights, because the accused party was obviously aware of the coercion to which he was subjected. In other words, a plaintiff may not assert a *Newsome* claim in relation to *his own confession* because the suppression part of a *Newsome* claim is wholly lacking.

Defendants now try to stretch that principle, asserting it is enough to foreclose a plaintiff's *Newsome* claim if the plaintiff was aware that one or more of the witnesses against him was subjected to "pressure." This proposed extension of *Gauger*, *Sornberger*, and *Kuba* is untenable, not the least because Jimenez and his counsel – and the prosecutors, for that matter – never learned many (indeed never learned any) of the critical details needed for impeachment. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (*Brady* encompasses impeachment evidence affecting the credibility of prosecution witnesses). Even if Jimenez knew that Larry was young, or knew that the police had yelled, or even threatened, that does not alter the fact that the police *failed to disclose* what Larry had repeatedly *stated* to them about Jimenez's innocence.[7]

### 3. Judicial Estoppel Does Not Furnish a Basis for Summary Judgment.

Defendants assert that Jimenez is "judicially estopped" from asserting that the witness's misidentification was caused by the police because at his criminal defense trial his attorney asserted that they testified against him falsely because of gang pressure. Def. Mem. at 10. The

---

[7] At the underlying trial, both the prosecutors and the defense needed a reason for why when Larry was interviewed by the officers, he failed to name TJ. In this case, as in others, they went with a "fear of gangs" explanation, which Larry dutifully reported to the jury – never explaining why, if he was so afraid of gangs, he turned around and implicated an alleged gang member once the Defendants got ahold of him.

essence of the doctrine is the prevention of litigants from manipulating the legal system by prevailing based on one position, only to turn around and take the contrary position later.  There are two reasons that judicial estoppel simply does not apply to these facts.

First, it is a fundamental element of judicial estoppel that the party who the movant seeks to estop must have been successful with the first argument (statements during his criminal trial that gang pressure caused the false testimony). In other words, in order to be estopped in a subsequent proceeding, the party " must have enjoyed the fruits"  of the argument in the initial proceeding.  *E.g., New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (" Absent success in a prior proceeding, a party's later inconsistent position introduces 'no risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." )  Obviously, Jimenez lost at both of his trials – to the tune of 50 years and 45 years respectively.  While Jimenez was later exonerated of those convictions, it was not because of the gang pressure argument, it was because Larry had finally disclosed his true motive for lying (police coercion). Put simply, police coercion, not gang retaliation, was the foundation for Jimenez's exoneration, and he thus is not estopped.

Second, if the litigant did not know certain facts at the time he made an argument in the first proceeding, he cannot be judicially estopped from asserting the newly-learned facts in the subsequent proceeding.  *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) (" [T]he doctrine of judicial estoppel is not an absolute bar to obtaining legal relief on the basis of new information  even if inconsistent old information had gotten the party an advantage in some other proceeding." ).  This exception is particularly applicable here.  The very reason Jimenez was not in a position to raise police coercion earlier was because these same Defendants withheld those facts, in violation of *Brady* and *Newsome*.  *Jimenez* is hardly the party in this case that is "play[ing] fast and loose" with the court system (to borrow Defendants' phrase).

4.      **Attacks on Larry's Credibility Do Not Furnish a Basis for Summary Judgment.**

Defendants spend a substantial portion of their brief trying to discredit both Larry personally and the facts surrounding his recantation. There are two major reasons that these attempts to discredit are immaterial on this motion.  First, the Court is not to resolve credibility disputes on summary judgment; those are to be left to the jury.  And, second, even if the Court were to take on the issue of Larry's credibility for purpose of this motion (solely for sake of argument), the fact remains that Larry's recantation testimony has been strikingly consistent.

Taking the second point first, once Larry recanted and told the truth, Larry has never wavered from any of the details of the true story, providing a consistent account of how he was pressured into testifying falsely, what methods the police used to do so, why he ultimately broke down, how he tried to get out from under his lies by not going to Court, and how he finally came to recant. *See*, *e.g.*, PX23 (7/31/06 Tueffel Statement); PX69 (3/20/08 Harrigan Memo re: Larry's Meeting With CCSAO); PX70 (2/9/09 CCSAO Investigative Report re: Meeting with Larry); PX2 (3/3/11 and 3/7/11Tueffel Dep.).  Larry has explained these central controlling facts in the same way to the Center on Wrongful Convictions, to the Morro family, to the State's Attorney's Office, in his affidavit, in his videotape statement, and at his deposition.

The only time he has ever deviated was when Defendants' counsel interviewed him at his home with a policeman, did not take any notes of their encounter, went back to his office to type an affidavit that he wanted Larry to sign, and then sent a policeman over get Larry to sign it the next day.  (It is true that that affidavit is not consistent with the facts as Larry has consistently told them since July 2006, but that fact represents an indictment of the affidavit obtained, not an endorsement of its value as a tool of impeachment.)   Moreover, even the affidavit that Defendants' counsel prepared makes perfectly clear that Jimenez is innocent and that Larry's

24

testimony at the criminal trial was false. While it also states that Larry was not subject to "police coercion," Larry has since testified that those were Mr. Hale's words, not his; that he does not know what the word "coercion" even means, that the part about not "blaming" the police is an untrue over-simplification; and that he basically felt tricked into signing that statement (all over again, as it were). At his deposition Larry could not explain why he signed it, other than that he was "trying to be cooperative." P. Stmt. ¶¶ 41-43. His testimony also made clear, however, that he now regretted signing it and the manner in which it was presented to him. *Id*. ¶ 42 ("He just asked me to sign it. I just did. I shouldn't have."). And while the statement does say that he is not "blaming" the police, Larry clarified that as well: "I said I had nothing against them. That doesn't mean that what they did was right." *Id*. ¶ 43 ("I said I'm not blaming anybody, I just wanted to get this fixed . . .").[8]

Taking a step back, Jimenez's core theory is that the Defendants were able to pressure a weak person into knowingly implicating an innocent man. In the bigger picture, the fact that Larry is still willing to accommodate authority figures by signing whatever was put in front of him in order to avoid conflict is hardly helpful to the Defendants. In any event, it will ultimately be for the jury to decide whether to credit or discredit Larry's testimony. It goes without saying that it has no place in this motion as an undisputed issue of material fact.[9]

---

[8]    In Larry's words: " I didn't mean it like that. I said I have nothing against the police. He asked me a question do you blame anybody. I said, well, they kind of made -- I mean, police are supposed to do their job. And he was trying to ask me do I hate police because -- I didn't mean -- It was wrong -- I don't know right now. Hold on a minute." P. Stmt. ¶ 43.

[9]    It turns out that it is not at all difficult for police officers to get Larry to sign things. Defendants' legal team (including an off-duty police officer they hired) managed to persuade Larry to sign a HIIPA release for his confidential medical records (which he also now regrets) by explaining that they just needed to "have a paper signed so they could see my background or whatever, do whatever they're trying to do. I don't know." *Id*. ¶ 44. After having Larry sign the release, Defendants then used Larry's psychological records (footnote continues)

Fundamentally, though, these are not questions for resolution by summary judgment. Even though Larry is mentally ill, his credibility must be judged based on his demeanor while testifying at trial. *Cf., e.g., U.S. v. Snyder*, 189 F.3d 640, 645 (7th Cir. 1999) (" As long as a witness has the capacity to testify truthfully, it is best left to the fact-finder to determine whether he in fact did so." ). There can be no reasonable dispute that Larry Tueffel is perfectly capable of understanding and answering questions and perceiving or reporting events. P. Stmt. □ xx. This Court had the opportunity to personally observe Larry at his depositions, and thus is in a position to conclude that a reasonable jury could find him credible notwithstanding the attempt of Defendants' expert (who has never even met Larry) to assert that his mental illness wholly discredits his testimony.

In sum, Larry's testimony creates a triable issue, and Defendants' attacks on his credibility do not justify summary resolution. The same is true for Phil Torres's and Tina Elder's testimony. Jimenez states a valid *Newsome* claim based on the testimony of all three witnesses, individually and collectively, and Defendants' summary judgment motion should be summarily denied.

---

to prepare a comprehensive expert witness report, *which they then put into the public record with their summary judgment filing*, about how his alleged " paranoid schizophrenia" supposedly makes him an unreliable witness. *See* Defendants' Exhibit 58. Indeed, Defendants filed this report publicly even after receiving an internal memo among TJ's former exoneration lawyers, in which Larry asked that his diagnosis and medications not be widely circulated. *See* PX69 (after Larry told Patrick Harrigan, one of TJ's exoneration lawyers that he had fully disclosed his mental health issues to the CCSAO, "Larry asked that [TJ's counsel] not share his mental health diagnoses and medications with TJ or anyone else.")

Defendants' willingness to put Larry's highly embarrassing and confidential mental health history into the public record runs conspicuously counter to the City's unwavering fixation on the privacy rights of police officers accused of misconduct and the need for a protective order on everything about them, from a 20-year old photograph to the date they left active service of the police force.

**B.      Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Creation of False and Fabricated Evidence.**

Separate and apart from Defendants' suppression of material exculpatory evidence in violation of *Brady* and *Newsome*, Defenadnts may be held liable for the simple act of fabrication, without more.   Jimenez has a constitutional right not to be deprived of liberty on the basis of fabricated evidence. As the court stated in *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002), a policeman's "intentional creation of damaging facts"  against a person under investigation "shocks the conscience and violates the decencies of a civilized society."  *Id*. at 646-48.  *See also Wilson v. Lawrence County*, 260 F.3d 946, 957 (8th Cir. 2001) (" If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated." ); *Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir.1999); *Devereaux v. Abbey,* 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc); *Castellano v. Fragozo,* 311 F.3d 689, 704-705 (5th Cir. 2002); *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004) (and cases cited within these cases).

For example, in *Spurlock*, police officers fabricated evidence and manufactured probable cause.  The Sixth Circuit found both that a constitutional right to be free from fabricated evidence and also rejected a qualified immunity claim, holding that on the basis of the Court's prior holdings in *Brady* and *Pyle* " [the defendant] cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights." *I*d. at 1005-06.  *See also Richardson v. City of New York,* No. 02 Civ. 3651(JG), 2006 WL 2792768, at \*5 (E.D.N.Y. Sept.26, 2006) (court holds it is a disputed issue of fact whether plaintiff suffered a constitutional injury where police officers fabricated evidence, passed that evidence along to the District Attorney's office, and Richardson was indicted and prosecuted as a result); *cf. also Landrigan v. City of Warwick,* 628 F.2d 736, 744-45 (1st Cir.1980) (dissemination of a false report may violate a plaintiff's rights).

Here, the summary judgment record is rife with evidence that was fabricated. Of course, Defendants coerced and manipulated Tueffel, Torres and Tina Elder into their false identifications of Jimenez. They prepared police reports falsely suggesting that Larry Tueffel readily named Jimenez as the shooter during in an interview in Larry's home before Jimenez was arrested. They used a one-photograph show up to manipulate Tina Elder into her identification of TJ. And they prepared a false report stating that Phil Torres had identified Jimenez as the shooter, when he had not done so. Even without the false reports, the manipulation of these witnesses' identifications— whether or not concealed—violates due process. *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (due process "is violated if unduly suggestive identification techniques are allowed to taint the trial").

Defendants also fabricated evidence that Eric Morro's murderer was wearing a Duke jacket. At the scene, Larry described the shooter's jacket as purple with yellow lettering – a description that matched the jacket Juan was wearing at the time of the murder. When Bogucki arrested Jimenez (and he walked out of his grandmother's apartment with a Duke jacket), Bogucki simply decided that it was would be better for the witnesses just to say that the shooter was wearing a Duke jacket. He did this by suborning witnesses to say that they had seen the shooter in a Duke jacket and by outright fabrication of witness statements in his police reports.

Defendants do not proffer an argument as to how they might be entitled to summary judgment with respect to this due process claim.

### C.   Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Use of False Testimony.

The Supreme Court has long recognized that due process is denied where the state has "contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the

28

presentation of testimony known to be perjured." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (such conduct is "inconsistent with the rudimentary demands of justice"). Knowing use of false evidence or perjured testimony deprives a defendant of due process and a fair trial when the evidence is material to guilt or punishment. *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001), citing *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) ("[W]e do not employ the term of perjury in a technical, legal sense in these types of cases, but rather as a term of art that describes the knowing use of false testimony."). An accused's right to a fair trial is violated "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942).

As the Seventh Circuit has explained, "[t]he *Agurs* standard [for perjury] is different from that in *Bagley* [for *Brady* violations] and sets a lower threshold for determining materiality." *Braun v. Powell*, 227 F.3d 908, 920 & n.11 (7th Cir. 2000), citing, among others, *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) ("different standards of materiality apply to *Brady* claims and claims that the prosecution has knowingly used perjured testimony or false evidence" and the standard for the latter is "considerably less onerous").

Jimenez's Complaint alleges that the Defendants testified falsely at Jimenez's trial about Jimenez's purported guilt and the veracity of the witness statements they procured. (Dkt. No. 40 ¶ 30.) The evidentiary record bears this out. Ordinarily, absolute immunity might bar the claim, but the Agreed Stipulation attached as PX42 moots that question. Defendants make no argument to defeat this due process claim and it therefore survives their motion for summary judgment.[10]

---

[10] On September 1, 2011, Jimenez and the City entered into a *Monell* stipulation whereby the City agreed to be liable for "any constitutional violation" proven with respect to the individual defendants.

## II.    QUALIFIED IMMUNITY DOES NOT ENTITLE THE DEFENDANTS TO SUMMARY JUDGMENT.

Defendants make two half-hearted qualified immunity arguments, but these are both nonstarters.  They state they have found no case that prohibited defendants from using loud voices with Larry when they thought he was lying to them, nor have they found any case that required them to provide Tina "a special room without any paperwork" in order to avoid the risk of her seeing the picture of Jimenez that she saw.  If Jimenez's evidence is credited on this motion (as it must be), these qualified immunity arguments must fail.

Defendants do not, and cannot, dispute the premise that Section 1983 liability for withholding exculpatory evidence was well-established in February 1993.  The Seventh Circuit has repeatedly stated that the a police officer's duty to disclose *Brady* material (including material that falls within the confines of *Newsome*) was clearly established not later than 1985 when the Seventh Circuit decided *U.S. v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) and at the very latest by 1988 when the court decided *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), if not all the way back to *Brady* itself (1977).  *See also supra* at pages 14-16 the *Ienco*, *Manning*, and *Dominguez* immunity cases extensively discussed above.

Defendants may also not claim in good faith that they are entitled to immunity for fabricating evidence, including fabricating evidence through an unduly suggestive identification procedure.  As an initial matter, it is well-established that a policeman's fabrication of evidence against an accused is a violation of his constitutional rights, and numerous courts have already rejected defendants' claims that the state of the law did not give them a fair warning that fabricating evidence for the purpose of charging or trying a defendant was unconstitutional.  As an *en banc* panel stated in *Devereaux* in 2001, "Perhaps because the proposition [that police may not fabricate evidence in order to charge someone with a crime] is virtually self-evident, we are

not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right. Rather, what is required is that government officials have 'fair and clear warning' that their conduct is unlawful." The court went on to hold that the officers had a " fair and clear warning" in 1994 that it was unconstitutional to use false or fabricated evidence to charge or try a defendant. *Id*. at 1075. See also *Pierce,* at 1297-98 (court of appeals affirms the district court's denial of qualified immunity to a forensic chemist who fabricated evidence in 1986 that led to plaintiff's conviction and fifteen years in a state prison). Here, there can be no reasonable dispute that the Defendants were on notice in 1993 that Defendants had a constitutional right not to be charged or tried based on evidence that was fabricated by the police.

As to the more specific fabrication issue related suggestive identification procedures, the law has been clear since at least *Manson v. Brathwaite* that it is unconstitutional to utilize unduly suggestive identification procedures. Numerous cases have so held. *See*, *e.g.*, *Rojas v. Iannatto*, 2003 WL 169798, *4 (S.D.N.Y. Jan. 24, 2003) ("a criminal defendant's right not to be subjected to unduly suggestive identifications has been the law since [*Brathwaite* in] 1977.").

But the gist of Defendants' qualified immunity arguments is not so much to take issue with the clearly established law as it is to claim that they did not do what Larry, Phil, and Tina have said they did. Such arguments must await another day. What happened during Defendants' interactions with Larry, why and with what intention Tina came to be sitting in a room with the Morro file opened to a picture of Jimenez, and whether Phil called Bogucki or Bogucki just showed up, are all questions that can only be resolved at trial. But summary judgment on the immunity grounds asserted is simply not available. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[11]

---

[11]     Defendants assert in Section IV of their Memorandum that Jimenez's claims for failure to intervene, conspiracy, intentional infliction of emotional distress, and *respondeat superior* all fail for want of an underlying violation. Because TJ has shown (footnote continues)

III.    **SUMMARY JUDGMENT IS NOT AVAILABLE ON JIMENEZ'S MALICIOUS PROSECUTION CLAIM.**

A.    **Whether The Officers Had Probable Cause Is A Question Of Fact.**

The question of probable cause is typically  "a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006).  Similarly, applying Illinois law, the issue of "whether a statement bears sufficient indicia of reliability to support a finding of probable cause in a malicious prosecution case is a question of fact to be resolved by the jury."  *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, xxx (1st Dist. 2002); *Howard v. Firmand*, 378 Ill. App. 3d 147, 151 (1st Dist. 2007) ("It is only when the circumstances alleged to show probable cause are not disputed that the cause can be decided as a matter of law").

As discussed at length above, all of the evidence that could give rise to probable cause to believe Jimenez committed murder has allegedly been falsified by the Defendants themselves. Summary judgment is unavailable where probable cause is alleged to be based on fabricated evidence. *Tully v. Del Re*, 2002 WL 31175983, at *5 (N.D. Ill. Oct. 1, 2002) (probable cause properly left to the jury where defendants " implicitly importuned witness to manufacture a basis for charges" and "thus could not reasonably have relied on what [the witness] told them"); *Finwall v. City of Chicago*, 490 F. Supp. 2d 918, 923 (N.D. Ill. 2007) (same). *See also Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir. 1990); *Kincaid v. Ames Dept. Stores, Inc.*, 283 Ill. App. 3d 555, 565 (1st Dist. 1996) (" Defendants rely on the written statements by Smallwood and Jennings to establish probable cause.  However . . . [those witnesses] both specifically detailed

---

such a violation or at a minimum that a determination with respect to such violations requires a trial, Defendants' request for summary judgment on Counts II, III, V, and VI should also be denied.

how defendants told them to accuse plaintiff in their statements, even though plaintiff had done nothing wrong. Sufficient reliability must support any statement used to help establish probable cause."); *Mack v. First Sec. Bank of Chicago*, 158 Ill. App. 3d 497, 503-504 (1st Dist. 1987) (sufficient evidence of lack of probable cause for malicious prosecution claim where eyewitness identification allegedly lacked integrity); *Howard*, 378 Ill.App.3d at 151 ("Because the truth of Defendant's abuse allegations are disputed, [malicious prosecution] summary judgment, based on a finding of probable cause as a matter of law, should not have been granted").

### B.     Whether the Officers Acted With Malice Is Also A Question Of Fact

As with probable cause, the presence of malice *vel non* is highly disputed, and can only be properly decided by a trier of fact.  Paragraph 80 in our Statement of Facts, as well as others, sets forth in great detail ample evidence from which a reasonable jury could reasonably infer that the Defendants were not genuinely interested in solving this crime, but rather were interested in clearing and closing a case as fast as possible and without looking back.  *See, e.g., Turner v. City of Chicago*, 91 Ill. App. 3d 931, 937 (1st Dist. 1980) ("Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith . . . and where the want of probable cause has been clearly proved.").  Not only were Defendants working overtime to make the evidence fit the suspect, Jimenez, but they then also deliberately ignored the evidence that Juan was the real killer. This evidence is obviously sufficient to warrant a reasonable jury in finding the existence of malice.

## IV.   JIMENEZ VOLUNTARILY DISMISSES DEFENDANTS WHITEMAN, RYAN, AND MONTILLA.

The City's agreement to stipulate to judgment against it if Jimenez can prove the constitutional violation of any of Officers Bogucki, Sanders, Schalk, Montilla, Ryan, or Whiteman eliminates the need to sort out exactly who did what.  See PX42.  In light of the stipulation,

Jimenez is content to pursue the primary detectives.  If those Defendants decide to point the finger at trial at others who seemed more peripheral earlier in the litigation (which has sometimes been a defense at other trials involving these same sets of lawyers), then Jimenez still recover under the Stipulation with the City.  In the meantime, there is no need for the Court to decide liability for any Defendants except the three main detectives who built the case and interacted with the witnesses.  Those Defendants do not make arguments about lack of personal involvement, so Defendants' summary judgment argument on that point is moot.

## CONCLUSION

For these reasons, Jimenez respectfully requests that summary judgment be denied.

Respectfully submitted,

**THADDEUS JIMENEZ**

By:   /s/   Stuart J. Chanen
One of his Attorneys

Dated:   September 2, 2011

| | | |
|---|---|---|
| Mr. Jon Loevy | Mr. Stuart J. Chanen | Mr. Locke E. Bowman |
| Mr. Russell Ainsworth | Ms. Lisa R. Carter | Roderick MacArthur Justice |
| Mr. Joel Feldman | Valorem Law Group LLC | Center |
| Loevy& Loevy | 35 E. Wacker Dr. | Northwestern University |
| 312 North May St. | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | (312) 676-5480 | Chicago, IL 60611 |
| (312) 243-5900 | | (312) 503-0844 |

**CERTIFICATE OF SERVICE**

I, Stuart J. Chanen, certify that on September 3, 2011, I served all counsel of record by filing the attached Response Brief with the Court's ECF system.


By:   /s/   Stuart J. Chanen

In the United States District Court
For the Northern District of Illinois
Eastern Division

| | | |
|---|---|---|
| Thaddeus Jimenez | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-CV-8081 |
| | ) | |
| City of Chicago, et. al. | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1(B)(3)

Plaintiff, Thaddeus Jimenez, through his attorneys, Loevy & Loevy, Roderick MacArthur Justice Center at Northwestern University School of Law, and Valorem Law Group, LLC, respectfully submits the following Response to Defendant Officers' Statement of Undisputed Facts Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.

### JURISDICTION

1.      Jurisdiction and venue are proper in this Court because Thaddeus Jimenez ("Plaintiff"), brings claims pursuant to 42 U.S.C. § 1983, as well as state law claims pursuant to 28 U.S.C. § 1367, and the events giving rise to the lawsuit took place in this District. At all times relevant to this case, Defendant Officers were working under color of law and in the course and scope of their employment as homicide detectives and/or police officers for the Police Department of the City of Chicago. Pl.'s Complaint, ¶¶ 3-4, 7-10, Docket Entry ("D.E.") 1, attached hereto as Exhibit 1.

       **Response:      Admit.**

**THE MURDER AT ISSUE**

*2.*      At approximately 6:25 p.m., on February 3, 1993, Eric Morro, a 19-year-old man, was walking Westbound on the 3000 block of West Belmont with his 14-year old friend, Larry Tueffel. Ex. 1 at ¶14.

    **Response:**     **Admit.**

3.      As two youths walked past Eric, at approximately 3018 W. Belmont, the youths pushed Morro against a wall and one of the youths shot Morro in the chest with a low caliber handgun. Dep. of Larry Tueffel at 10:15-16:23, attached hereto as Exhibit 2. Morro was declared dead upon his arrival at Illinois Masonic Hospital. Dep. of Det. Bogucki at 56:13-22, attached hereto as Exhibit 3.

    **Response:**     **Admit.**

**THE INITIAL INVESTIGATION**

4.      Officers Lawrence Ryan and Robert Whiteman were the first police officers on the scene. Dep. of Officer Ryan Dep. 5:3-6:8, attached hereto as Exhibit 4. They observed Sandra Elder (43 years old) cradling Eric, with Larry and Phil Torres (30 years old) nearby. Ex. 4 at 7:1-9:13, 32:1-19; General Offense Case Report at TRJ 56, attached hereto as Exhibit 5.

    **Response:**     **Admit.**

5.      Phil and Larry indicated that they were planning on leaving the scene, so Officer Ryan put Phil and Larry in his police car while he processed the scene.  Ex. 4 at 11:7-12:13,  101:19-102:13;  Trial  Testimony  of  Phil  Testimony  at  1st  Trial  at JIM1862:16-1863:17, attached hereto as Exhibit 6.

    **Response:**     **Admit.  Stating further, however, neither of these citations support the proposition that Officer Ryan put Phil and Larry in his police car or that he processed the scene.  In addition,**

**Defendants omit that before Larry stated he wanted to leave the scene, Larry had already given a description of the shooter and of the accomplice and that Ryan believed Larry's description was reliable enough to put out on the police radio.** *PX59: Ryan Deposition at 16:1-19:6, 32:24-35:5.*

6.      In the police car, Phil asked Larry if the shooter was Thaddeus Jimenez ("Plaintiff."). Larry responded that he was not. Deposition of Phil Torres at 30:2-31:6, attached hereto as Exhibit 7.  This conversation was documented in Detective Bogucki's report and brought out in Plaintiffs criminal trials. Detective's Supplementary Report Dated Feb. 4, 1993, TRJ39-46 at 44, attached hereto as Exhibit 8; Ex. 6 at JIM1823:8-1824:3, 1850:21-1851:7; Trial Testimony of Phil Torres at 2nd Trial at JIM3058, attached hereto as Exhibit 9; Trial Testimony of Larry Tueffel at 1st Trial at JIM1888:15-1889:12, attached hereto as Exhibit 10.

> **Response:**      **Plaintiff admits that Phil asked Larry if the shooter was Thaddeus Jimenez and admits that Larry said it was not, admits that this conversation made it into both Bogucki's report and Phil Torres's testimony at the first trial and both Phil and Larry's testimony at the second trial.   Stating further, however, Phil stated incorrectly at the trials that he said to Tueffel in the squad car, "this was TJ."**
>
> **To the contrary, as defendants concede above, and as Tueffel has otherwise stated consistently, Phil *asked* if it was TJ, and Larry said, "No."  See *PX5; Phil Torres Deposition at 30:2-31:6; PX11 Tueffel 1994 Trial Testimony at JIM1888:15-1889:5; PX64: Tueffel 1997 Trial Testimony at JIM3102:1-3; PX2: Tueffel Dep. at 23:4-7, 37:21-24.***

7.      While still on the scene, Officer Ryan received a description of the incident and suspects from Larry and Phil. This description was documented in Ryan's case report later that same evening, and was primarily based on what Larry told Officer Ryan. Ex. 4 at 18:3-19:20, 57:11-14.

> **Response:      Admit.**

8.     Officer Ryan's case report describes the shooter as: Male/White-Hispanic, 5"4-5"5, 13-14 years-old, curly black hair, purple jacket with yellow lettering and/or numbers, baggy blue jeans, and armed with small caliber silver handgun. It describes the accomplice as: Male/White-Hispanic, 13-14 years-old, 5"6-5"7, partially shaved black hair, wearing blue Georgetown Starter jacket. Ex. 4 at 34:12-38:24; Ex. 5 at 56.

**Response:     Admit.**

9.     After Officer Ryan provided the information in his report to Detective Bogucki and showed him the scene, he and his partner, Officer Whiteman, had no further involvement in the case, except for possibly transporting Larry and Phil to the police station, having a brief conversation with Detective Bogucki regarding the case report at the hospital, and providing testimony. Ex. 4 at 66:24-67:18, 68:13-17; Ex. 3 at 58:5-24, 69:15-70:22.

**Response:     Admit.**

10.     Detective Bogucki was the detective first assigned to the Morro murder case. Ex. 3 at 52:20-54:12. He went to Illinois Masonic Hospital and learned that Morro was pronounced dead on arrival. Ex. 4 at 54:8-9, 56:23-57:8; Ex. 3 at 68:24-69:7.

**Response:     Admit.**

11.     At the hospital, Detective Bogucki interviewed Sandra, who told him that she and her daughter, Tina, had witnessed the shooting. Sandra told Detective Bogucki that Tina was actually closer to the shooting than she was. Dep. of Sandra Elder at 61:21-62:17, attached hereto as Exhibit 11; Ex. 3 at 62:23-65:22; Ex. 8 at JIM00043.   In fact, Tina was within 20 feet of the shooting. Dep. of Tina Elder at 64:15-23, attached hereto as Exhibit 12.

**Response:     Plaintiff admits that Detective Bogucki interviewed Sandra at the hospital and that she told Detective Bogucki that she had witnessed the shooting, but Plaintiff denies that Sandra Elder actually saw the shooting.   See P. Stmt. ¶ 50.**

4

**Plaintiff further denies Tina was within 20 feet of the shooting. She originally told the police she was within 5 feet of the shooting. *PX72: TRJ0061*. While she stated at her deposition that she was within 20 feet, *PX6: Tina Elder Deposition at 64:22-23*, she is in fact incorrect. Plaintiff's counsel measured from the spot where she stated she was standing (in front of Phil Torres's building, looking up to a third floor window to speak with Phil) to the spot in front of the Honey Baked Ham where the shooting occurred, and Tina was in fact approximately 40' 8" from the shooting, not 20 feet as she stated at her deposition. See *PX66: Affidavit of Lisa Carter.***

12.     Although Tina was at the hospital, Detective Bogucki was unable to interview Tina at that time because she was vomiting.   Tina was pregnant at the time. Trial Testimony of Tina Elder at 1st Trial at JIM1799:6-20, attached hereto as Exhibit 13; Trial Testimony of Tina Elder at 2nd Trial at JIM3045:18-21, attached hereto as Exhibit 14; Trial Testimony of Sandra Elder at 1st Trial at JIM1926:17-1927:21, attached hereto as Exhibit 15; Ex. 11 at 61:21-62:17.

**Response:     Admit.**

13.     Detective Bogucki interviewed Larry for the first time on February 3, 1993, at approximately 9:30 p.m. Ex. 3 at 90:7-15. During that interview at Area 5, Tueffel told Bogucki that he was walking with Morro on Belmont when they were confronted by two Hispanic youths. He described the shooter as male Hispanic, 13-14 years old, 5 feet 2 inches to 5 feet 3 inches, 110 pounds, wearing a turquoise jacket with yellow lettering and jeans. He described the accomplice as male Hispanic, 13-14 years old, 5 feet 3 inches, 100 pounds, shaved head with a black spike on top, having an earring in his left ear, and wearing a ¾ length Georgetown University jacket. Ex. 3 at 96:7-22; General Progress Report ("GPR") at TRJ53, attached hereto as Exhibit 16. Following this interview, Larry went home. Ex. 3 at 106:9-14.

**Response:** **Plaintiff admits that Bogucki interviewed Larry that evening. Plaintiff denies that Bogucki's recollection of 9:30 is correct, and states further that Bogucki failed to place the date or the time or the location of any of his interviews on his General Progress Reports or in his official reports.** *PX16: TRJ 255-56, PX19: JIM 00033, 00036, and TRJ 00257 – 00258; PX15: JIM 00013 - 00020.*

**Stating further, Defendants omit that Larry also specifically told Bogucki that the shooter was clean-shaven and light-skinned and that Larry had previously seen the shooter before at a "2d Hand Store" near J&V Video, but that he did not know the shooter's name.** *PX16: TRJ 00255- 000256.  PX2: Tueffel Dep. at 38:3-13.*

**Plaintiff admits that following this interview, Larry went home.**

14.    Detective Bogucki also interviewed Phil for the first time on February 3, 1993, at Area 5 at approximately 9:30 p.m. Ex. 3 at 90:7-15, 109:11-15. In that interview, Phil stated that he had seen the shooting from his 3rd floor apartment window at 3012 W. Belmont and that the shooter had been over to his mother's home. As of this time, Phil had not told any police officers that Plaintiff was the shooter. Ex. 3 at 110:9-111:6; Ex. 6 at JIM1850:1-15; Ex. 7 at 30:3-19.

**Response:** **Plaintiff admits only that Bogucki interviewed Larry that evening. Plaintiff denies that Bogucki's recollection of 9:30 is correct.   See Resp. to SOF #13 above.**

**Plaintiff denies that Phil told Bogucki he had seen the shooting. Rather, Phil told Bogucki that he had seen some of the scene beneath his third-story window, and that he heard a shot.   PX19.**

**Plaintiff denies that Phil told Bogucki who the shooter was or that he saw or could identify the shooter. P. Stmt. ¶¶ 8, 15-23.**

**Plaintiff admits that Phil did not tell Bogucki at that time and had not told any police officer that Jimenez was the shooter.   This is because Phil had not seen the shooting and could not identify the shooter.** *PX19: JIM0033, 00036, and TRJ00257–00258; PX5: Phil Torres Deposition at 22:15-18; 34:13-18; 40:3-6;* **P. Stmt. ¶¶ 8, 15-23.**

15.     Detective Montilla's only involvement in this case was he did a canvass on the scene for potential witnesses and possibly participated as a secondary interviewer or observer during Phil's 9:30 p.m. interview. Deposition of Det. Montilla at 25:9-17, attached hereto as Exhibit 17; Ex. 3 at 110:9-15.

**Response:     Admit.**

16.     On February 4, 1993, at approximately 1:00 a.m., Phil called Detective Bogucki and told him that he had additional information. During that phone call, Phil told Detective Bogucki that the shooter was Plaintiff. Ex. 6 at JIM1826:19-1827:4; JIM 3059:17-3060:12; Ex. 7 at 79:21-80:21; Ex. 9 at R-122:17-123:6.

> **Response:     Plaintiff denies that Phil called the police. *PX05: Phil Torres Dep. at 20, 22, 34, 43.*  If there was a phone call between Bogucki and Phil, Plaintiff denies that Phil told Bogucki that Plaintiff was the shooter.  *PX5: Phil Torres Dep. at 21-22, 34, 44-45, 68, 72-73.* Plaintiff further states that the most that Phil told Bogucki on that call was that he heard second-hand about a possible altercation between Plaintiff and the victim that happened earlier, but that he had no personal knowledge about the alleged altercation.  *Id. at 20, 34, 37, 40.***
>
> **Stating further, the testimony of Phil Torres at the Plaintiff's Second Criminal Trial upon which Defendants rely is not credible for numerous reasons, including but not limited to, it was manipulated by the police and prosecution to fit the story that Defendants concocted.  In addition, the testimony is contradicted by so many additional facts, including but not limited to Phil Torres's deposition testimony, that the statements on which Defendants rely above are strongly disputed. See P. Stmt. ¶¶ 8, 15-23.**

17.    Detective Bogucki then went to Phil's mother's house in order to interview him in person. During this interview, Torres added that Plaintiff was wearing a blue and white Duke University jacket.   Ex. 8 at TRJ43-44; Ex. 3 at 80:22-81:1, 155:10-22; Ex. 7 at 50:5-12, 60:19-24; Ex. 9 at R-123:7-12. This account was relayed without any prompting by the police. Ex. 7 at 52:2-12; Ex. 6 at B-94:22-95:15.

> **Response:    Plaintiff admits that Bogucki went to Phil's mother's house, but denies that Phil ever stated in that interview that Plaintiff was wearing a blue and white Duke jacket and denies that Phil Torres at any time ever mentioned a Duke jacket with specific prompting from Defendant Bogucki and/or Sanders.   Defendants Bogucki and Sanders inserted the Duke jacket into their conversation with Phil, not the other way around, and they did not bring it up until after they had arrested Plaintiff, who was in possession of a Duke jacket at the time of his arrest.   At no time did any person identify a Duke jacket to any Defendant or any other police officer prior to Defendant Bogucki's and Sander's arrest of Plaintiff. *PX5: Phil Torres Dep. at 39:13-17; PX15 at JIM 00019* (indicating that after TJ's arrest, Phil was interviewed). *See also* P. Stmt. ¶¶ 47-49, 52, 54.**

18.    Phil's stepbrother and sister, Shawn and Donna Cosmen were also at Phil's mother's house when Detective Bogucki came by.   They told Detective Bogucki that they witnessed Eric and Plaintiff in an argument earlier that day where Eric told Plaintiff to stop throwing gang signs at school bus.   Donna Cosmen also testified in her deposition that she saw Plaintiff running from the scene. Ex. 3 at 163:4-165:18; Testimony of Shawn Cosmen at 2nd Trial at JIM 2410:1-5, attached hereto as Exhibit 18; Deposition of Shawn Cosmen at 110:14-16, attached hereto as Exhibit 19; Exhibit 8; Deposition of Donna Cosmen at 19:22-24,20:1-9,21:19-24,52:13-53:3, attached hereto as Exhibit 20.

> **Response:    Plaintiff admits that either Shawn and Donna Cosmen spoke with Bogucki that evening or that Phil Torres described to Bogucki statements that Shawn and/or Donna had said to him. Stating further, however, Donna Cosmen has no recollection of being interviewed by any police officers on February 3rd. She does not remember an Officer Bogucki.   She does not remember the police talking to her about what she believes she saw.   *PX60: D. Cosmen***

*Dep. at 33:9–23* (Q. Around that time, February 4, did the police ever talk to you and Shawn and Kevin and other people about what you guys saw? A. I don't remember the police talking to me.)

With respect to PX15, she has no reason to doubt that the police interviewed her, but the information purportedly provided by Donna and her brothers, Kevin and Shawn, is in regards to an incident that occurred in 1992.  If Donna indeed saw Thaddeus running from the scene, it was not information that she conveyed to Detective Bogucki on February 3 or 4th, 1993, prior to his arrest of Thaddeus.  *Id.*

According to Shawn Cosmen, *two* detectives came to the Cosmen's apartment at approximately 8:00 or 9:00 p.m. the night of the shooting (Bogucki stated that he had gone alone).  Cosmen further stated that the two detectives that did come by already knew about the "school bus incident."  *PX65: S. Cosmen Dep. at 109: 2 – 12, 110:14 - 17.*

19.     Finally, Phil told Detective Bogucki that Larry told Phil that Plaintiff was not present at the shooting. Phil explained that he believed that Larry was trying to throw Phil off.   Ex. 3 at 149:23-150:3; Ex. 6 at JIM1824:13-1825:12.

Response:     Plaintiff admits that Phil told Bogucki that Larry had told him in the squad car that TJ was not present at the shooting.  Plaintiff denies that Larry was trying to throw Phil off, and Plaintiff further denies that Phil at any time told Bogucki that Larry told him TJ was not present in order "to throw Phil off."

### LARRY TUEFFEL IS RE-INTERVIEWED

20.     At approximately 3 a.m. on February 4, 1993, Detectives Bogucki and Sanders went to Larry's home and asked him to come back to Area 5.   Ex. 10 at JIM1891:9-1892:14.

Response:     Plaintiff admits that Larry went back to Area 5 and was interrogated there by Defendants Bogucki and Sanders.

Plaintiff, however, denies that these Defendants "asked Larry" to come back to Area 5.  To the contrary, they dragged him out of his bed sometime between 3:00 and 4:00 a.m. and told him that they had to come to the police station with them.  Moreover, they refused to allow a parent to come with him and later refused to allow his parents to see him.  *PX2; Tueffel Dep. 38:24-39:1.*  See also P. Stmt. ¶¶

As to the specific time that they went to Larry's home, the evidence suggests that it was later than 3:00 a.m.  First, Bogucki intentionally omitted from all of his reports and all of his notes any reference to the times that various events occurred.  In addition, Larry's variously recalls that Bogucki and another officer arrived at his home "at 4:00 o'clock in the morning," "around 3:30," "around 3:00, 3:30," "somewhere [between] 3:00 or 4:00."  *PX2: Tueffel Dep. 33:15, 39:4-5, 133:20-21; PX11: Larry Tueffel 1st Trial Tr. at JIM1907, line 7* ("you said about one or 3:30 the police came by your house?  I said around 3:30, yeah, in the morning").

Given that the police did not even arrive at Larry's house until around 3:30, and given the fact that the distance between Larry's (3214 N. Whipple) and Area 5 (5555 W. Grand) is, as Bogucki concedes, another 15-20 minutes *PX4: Bogucki Dep. 121:9-122:24*, and given that after TJ was arrested and taken to Area 5, he could hear the officers questioning and yelling at Larry, *PX3: Thaddeus Jimenez Dep. at 420:12-21* (which Defendants concede in their Motion for Summary Judgment), and given that the officer interrogated him for several hours before he finally gave in and told the officers what they were demanding to hear, it becomes immediately clear that the police began their interview of Larry at Area 5 headquarters *after* they had already arrested TJ at 4:00 a.m. and that Larry did not "identify" TJ as the shooter until well after Defendants had already arrested TJ.

Quite simply, Larry was picked up around 3:30 and driven to Area 5, but Defendant Bogucki and a slew of other officers immediately went to arrest TJ – even though Larry had yet to state one word about TJ.

This is important because, as the Court will see, Defendants and their counsel repeatedly attempt to push Bogucki's and Sander's interview of Tueffel as close to 3:00 a.m. as possible, when in fact the interrogation of Larry at Area 5 did not even begin (let alone finish 2-3 hours later) until Bogucki came back from having arrested TJ at 4:00 a.m.

21.    Detective Bogucki informed Larry of what Phil said. Larry then told Bogucki that the shooter was in fact Plaintiff. Ex. 10 at JIM1891:9-1892:14; Ex. 8 at TRJ44.

Response:    **Plaintiff admits that Bogucki told Larry at some point that Phil Torres was now stating that TJ was the shooter. Plaintiffs deny that Larry "then" told Bogucki the shooter was in fact TJ.  To the contrary, Larry repeatedly told Bogucki that TJ was not the shooter, which was never disclosed in Bogucki's notes or reports:**

As Larry describes it himself,

> "I said no -- I said no, it's not him.  I just kept telling them that no, no, no, it's not him [TJ].  And I couldn't say nothing about the shooter because I didn't know his name, and I just gave the best description of him that I could because I didn't really know the guy, you know, and I just kept on telling them -- giving them the description and telling them look, the guy had on a maroon jacket with yellow lettering, his pants were dark, dark curly hair, he was pale, you know. And I told them, you know, real white looking, light skinned.  And that was it."

*PX2:  Tueffel Dep. at 38:3-13.*

22.    Larry told Detective Bogucki that he knew Plaintiff to have a low caliber handgun.  Ex. 10 at JIM1883:3-12; Ex. 8. Larry also told the detectives about the incident with Plaintiff throwing gang signs. Ex. 10 at Tr. 1 JIM1913:19-24.

**Response:**    **Denied for the reasons stated below.  Before addressing each sentence, however, the Court should note that they cite only to Larry Tueffel's original trial testimony.  It is ludicrous to assert that that trial testimony is "undisputed" since Larry Tueffel has repeatedly and consistently recanted that testimony.** *PX23: Larry Tueffel's 7/31/06 Handwritten Statement. PX2: Tueffel Dep. at 243:2-5* **(Hale: But at the first criminal trial, you were testifying that TJ was the shooter, correct?   Tueffel: I was testifying -- I was forced to testify that, yes.").**

**Plaintiff denies the first sentence because there is no reference at all in the citation supporting it as to what Tueffel did or did not say to Bogucki.   While there may be other evidence in the record that Larry told Bogucki that he knew TJ had a low caliber handgun, Plaintiff is not aware of any such evidence.  Stating further, Larry has repeatedly made clear that the only gun he had ever been shown by TJ in the past was a revolver, and the gun used in the shooting was an automatic.** *PX2: Tueffel Dep. at 199:24-200:10.*

**Plaintiff denies that at any time Larry Tueffel told the detectives about any incident that involved TJ throwing gang signs near the corner of Belmont & Sacramento.  The citation Defendants provide for this proposition does not support it all.  First of all, during his first trial to which Defendants cite, Larry never testified at all about the so-called gang sign incident that purportedly occurred earlier that day.  (The sole reference to a "gang sign" during his testimony was purportedly to a "gang sign"**

that TJ threw up shortly before shooting Eric in the chest. Tueffel has since recanted this testimony.)   The citation Defendants provide is to Jimenez's lawyer cross-examining Larry about his claim at trial "TJ" threw up a gang sign right before shooting Eric.  It has nothing at all to do with the so-called "gang signs incident" to which Defendants refer.

While Larry was aware that other witnesses had described such an incident, there is no evidence that he ever described such an incident to Bogucki, Sanders, or any other detective.

### PLAINTIFF'S ARREST

23.    At approximately 4:00 a.m. on February 4, 1993, Detectives Bogucki and Sanders went to Plaintiffs home. Ex. 1 at ¶ 13. When they asked him to get his coat, he put on a Duke jacket. Deposition of Plaintiff at 166:1-167:23, attached hereto as Exhibit 21. This was the only jacket that Plaintiff owned. Ex. 21 at 131:24-132:22.

> **Response:    Admits.**

24.    The detectives never threatened Plaintiff in any way.   Ex. 21 at 206:2-8.

> **Response:    Admits.   Stating further, however, this is not a relevant fact because this is not a "confession" case.   Defendants repeatedly treat this case as a confession case in error.   Defendants' constitutional violation, among others, was not that they threatened TJ into falsely confessing, but rather that they threatened, coerced, cajoled, and tricked Larry Tueffel, Phil Torres, and other witnesses into falsely identifying Plaintiff and then failed to disclose those facts to Plaintiff and his counsel.**

### THE LINE UP IDENTIFICATION

25.    Later in the morning on February 4, 1993, Plaintiff participated as a subject in lineup. Because of Plaintiff s age, the detectives obtained teen-aged volunteers to act as fillers for the lineup.  Ex. 3 at 230:1-20.

> **Response:    Admits.**

26.     Detectives Bogucki and Sanders took care to make sure that the lineup witnesses - Tina, Sandra, Phil, and Larry - did not communicate with each other while viewing the lineup.   Ex. 2 at 49:3-12; Ex. 11 at 39:20-40:2; Ex. 15 at JIM1929:17-22.

**Response:**     **Plaintiff admits that the Detectives Bogucki and Sanders took care to make sure that the four line-up witnesses did not communicate with each other "while viewing the lineup;" but, stating further, Detectives did not take any care to make sure that these witnesses did not speak with each other about the shooting and the line-up "prior to coming into the police station."   Indeed, Bogucki and Sanders took no steps whatsoever to ensure that Phil, Tina, and Sandra would not discuss the case prior to viewing the lineup, and those witnesses did extensively speak with each other about the shooting and the impending lineup procedure, both while they drove together to the police station and in the police station parking lot while they were having a smoke. This fact, coupled with the suggestive placement of a picture of Plaintiff in front of Tina Elder and the manner in which they questioned the witnesses during the lineup, rendered the line-up wholly suggestive and unconstitutional.   See P. Stmt. ¶ 51.**

27.     At the lineup, Tina, Phil, and Larry identified Plaintiff as Eric's shooter. Ex. 12 at 65:21-24; Ex. 7 at 56:10-12; 65:18-66:5; Ex. 2 at 46:15-23.   Sandra picked Plaintiff and one other lineup participant as someone who could "possibly" be the shooter. Ex. 11 at 81:14-18; Ex. 15at JIM1930:9-24.

**Response:**     **Plaintiff denies that Phil and Larry identified Plaintiff as the shooter.   Rather, Phil and Larry identified Plaintiff as being Thaddeus Jimenez and nothing more.   Plaintiff admits that Tina identified Jimenez as the shooter but for no other reason than that the police had placed in front of her a picture of a deceased Eric Morro and a picture of Thaddeus Jimenez, which made her identification of Jimenez unconstitutionally suggestive.**

**The Defendants did not record in any of their reports that they had taken a Polaroid picture of Jimenez, even though they did report expressly that they had taken a Polaroid picture of Victor Romo. P23 at JIM0024.   In order to cover-up the "Polaroid show-up procedure" that Defendants used with Tina Elder, Defendants did not produce to the prosecutors the Polaroid picture of Jimenez at any time prior to his 1994 and 1997 trials,**

nor did the Defendants produce that Polaroid in this case until over six months after it was requested.

Moreover, the Polaroid was produced solely after Plaintiff's counsel repeatedly pushed for one specific missing page from the police file.  *See* PX16: TRJ256 (the page missing that was demanded).  It was solely serendipitous that at that same time counsel for the City of Chicago produced this page that Jimenez's counsel knew was missing that City counsel also produced three additional pieces of evidence that had never been produced at any time to Thaddeus Jimenez or his criminal counsel.  *See* PX18 (photograph of Jimenez); PX37 (*complete* inventory list); and PX73 (Eric Morro's handwritten note with information on Leo).

Plaintiff admits that Sandra picked Plaintiff and one other lineup participant as someone who could "possibly" be the shooter.

28.     No one ever told the lineup witnesses - Tina, Sandra, Phil, or Larry - whom to pick from the lineup. Ex. 12 at 48:3-6,48:17-19,66:1-2,70:11-13,93:2-24; Ex. 11 at 83:22-24; Ex. 7 at 65:22-66:5,88:23-89; Ex. 2 at 46:18-23; Ex. 13 at JIM 1808:11-13.

**Response:**     **Plaintiff denies that Defendants never told Larry to whom to pick from the lineup.  Defendants told Larry that Plaintiff was the shooter, not the other way around.  Larry repeatedly told Detectives that Plaintiff was not the shooter.  Only after they broke his will and only after he agreed to go along with what the Defendants were demanding did he identify Plaintiff in the lineup. While it is true that no Defendant said to Larry words to the effect of "please pick out #X from the lineup OR please pick out TJ from the lineup," they did not have to since they already coerced Larry earlier in the morning hours of February 4 to falsely identify Plaintiff.  See *PX2: Tueffel Dep. 39, 41-42.***

**Plaintiff denies that Defendants never told Phil who to pick from the lineup. Rather, Defendants manipulated the lineup by not asking Phil to identify the shooter during the lineup.  Rather, they asked him to identify Plaintiff, and he obliged by identifying which person in the lineup was Plaintiff.   Cite.**

**Plaintiff admits that Defendants never told Sandra who to pick from the lineup, but Sandra Elder never saw the shooting, so it is not a material point.  *PX2: Tueffel Dep. at 129-131* and *PX23: Tueffel 7/31/06 Statement at 13-14.***

**Plaintiff denies that Defendants never told Tina who to pick from the lineup. Rather, Defendants used an unconstitutional "Polaroid**

14

**show-up procedure" (see P. Stmt. ¶¶ 52-53) to create a lineup in which she would identify Plaintiff.   While it is true that no Defendant said to Tina words to the effect of "please pick out #X from the lineup" or "please pick out TJ from the lineup," they did not have to since they already coerced and manipulated her lineup response when they sat her at a desk with pictures solely of the decedent and the Plaintiff.**

29.     The day following the lineup, on February 5, 1993, Sandra told either Detective Bogucki or Sanders that there was a rumor that Plaintiff stole a Duke jacket from someone and Eric tried getting the jacket back.   Ex. 11 at 100:3-101:18.

> **Response:     Plaintiff denies.   Sandra Elder makes stuff up as she goes along. There is not a single piece of contemporaneous evidence to support this fact.   It is not in Bogucki's handwritten notes.   It is not in any of Sanders notes. It is not in Bogucki's and Sander's case report for that date.   Not a single other witness has ever testified to this fact. Plaintiff submits that the alleged statement to Bogucki and Sanders about a rumor that Plaintiff stole a Duke jacket is a complete fabrication.   See P. Stmt. ¶ 50.**

### VICTOR ROMO & JUAN CARLOS TORRES

30.     Detective Schalk's first involvement with the case was on February 8, 1993. Deposition of Raymond Schalk at 66:21-67:2, attached hereto as Exhibit 22.   On February 10, 1993, Detectives Bogucki and Schalk interviewed Victor Romo, then 12 years old, as a suspected accomplice of the shooter. Ex. 3 at 256:6-8; 258:20-22; Ex. 22 at 91:24-92:2. Before the interview with Victor, they spoke with his father, Ezequiel Romo.   Ex. 22 at 113:14-20.   Ezequiel stated that he spoke with a boy named Carlos, who told him that he shot Eric Morro in self-defense after he was punched in the face and sustained a bruise.   Ex. 22 at 118:2-5, 125:8- 22; Detective's Supplementary Report Dated Feb. 10, 1993 at p. 3, attached hereto as Exhibit 23.

> **Response:     Plaintiff admits.**

31.     Victor told Detectives Bogucki and Schalk that he was in the vicinity of the shooting, and the shooter was his friend, named Juan Carlos.   Ex. 3 at 260:7-18; Ex. 22 at 132:22-24.   Victor further told the detectives that Juan Carlos was wearing a gold jacket at the time of the shooting.   Ex. 22 at 133:12-13.

>    **Response:**     **Plaintiff admits.   Stating further, Victor in fact told Bogucki Juan Carlos's full name.   In addition, he and his father also provided Detectives Bogucki and Schalk with Torres's address and a map of how they could get to Torres's apartment.**

32.     Detectives Bogucki and Schalk located and interviewed Juan Carlos Torres after Victor identified him as the shooter. Ex. 3 at 268:24-269:3.   This was documented in a police report. Ex. 23 at p. 4.

>    **Response:**     **Plaintiff admits, *but see also* Pl. Statement at ¶ 80.**

33.     On March 8, 1993, Detectives Bogucki and Schalk were at court in connection with the proceedings against Victor and learned that Victor's attorney claimed to have a copy of an audiotape [in Spanish] of Juan Carlos confessing to shooting Eric in Spanish [sic].   Ex. 3 at 285:16-23; Ex. 22 at 8:2-9:3, 19:24-20:4. This was documented in a police report. Detective's Supplementary Report Dated March 8, 1993, attached hereto as Exhibit 24. Detectives Bogucki and Schalk never had possession of the tape. Ex. 3 at 287:23.

>    **Response:**     **Plaintiff admits, but challenges the passive voice wording used by Defendants' counsel.   It is not that they "learned that Victor's attorney claimed to have a copy of an audiotape of Juan Carlos confessing to shooting Eric."   Rather, it is more accurate to state that Victor's attorney walked up to Bogucki and Schalk (who was standing at that time with Assistant State's Attorney Gina Savini) and handed them a copy of the audiotape.   Victor's attorney specifically told them that the tape was in Spanish and that on the tape Juan Carlos confessed to shooting Eric Moro."**
>
>    **Stating further, Bogucki and Schalk's failure to take possession of the tape and log into evidence violated CPD procedure.   The ASA Gina Savini took possession of the tape; she was not on the Eric Morro murder case but she believes she gave the tape to the ASA who was in charge of the Victor Romo prosecution at that time.**

16

> **In addition, Bogucki's and Schalk's failure to take possession of the tape and their failure to place the tape into evidence, Bogucki and Schalk also refused to undertake any investigation of the tape on which Juan Carlos confessed, is further evidence of malicious intent.** *See* **Pl. Stmt. ¶¶ 61-62, 80.**

34.     Detectives Bogucki and Schalk interviewed Juan Carlos after they learned about the existence of the tape described above but he denied that his voice was on the tape. Ex. 3 at 289:15-24,290:10-12. This was documented in a police report. Ex. 24.

> **Response:**     **Plaintiff admits everything stated here, but disputes the way it is worded.  Again, the extremely passive voice ("learned about the existence of the tape") distances Bogucki and Schalk from the true fact, which is that Victor's lawyer gave it to them at the courthouse and told them specifically what was on it.  At a minimum, they should have taken possession of the tape, logged it into evidence, had it translated by one of their fellow-Spanish-speaking colleagues (which was a common practice in Area 5 at that time), and played it for Juan Carlos and/or his parents.  It would have been a simple task – at that time – to establish whether that it was in fact Juan Carlos Torres on the tape.** *See* **PX9:  Montilla Dep. at 53:14 – 54:7**
>
> **Instead, Defendants took no steps whatsoever other than ask Juan Carlos, "Did you murder Eric?"  "Did you confess to murdering Eric on a tape-recording?"  Because Juan Carlos answered "no" to both of those questions, the Detectives dropped any investigation.  This is so even though Detective Schalk admitted that Juan Carlos was a suspect at that time. P. Stmt. ¶¶ 61-62, 80.**

### THE JUDICIAL PROCEEDINGS

35.     On May 21, 1993, Judge Durkin-Roy found Victor Romo delinquent for his role in the murder of Eric Morro. Victor Romo Juvenile Trial Transcript Dated May 21, 1993 at 21:7-10, attached hereto as Exhibit 25.

> **Response:     Plaintiff admits.**

36.     Larry, Tina, and Mary Morro (Eric's mother) testified at Victor's juvenile trial on May 7, 1993. Victor Romo Juvenile Trial Transcript Dated May 7, 1993 at 1-2, attached hereto as Exhibit 26. Larry testified that he identified Plaintiff as the shooter after the police

told him there was another witness and he was not telling the truth.  Ex. 26 at 23:8-16, 25:10-20. Cynthia Leyh, one of Plaintiff s criminal defense attorneys, was present for the witnesses' testimony. Ex. 26 at 1; Deposition of Kendall Hill at 15:5-12, attached hereto as Exhibit 27. Ms. Leyh discussed her intent to call Victor at Plaintiffs trial with the Court. Ex. 26 at 73:10-78:16.

> **Response:**     **Plaintiff admits.**

37.     Victor testified at his juvenile trial on May 14, 1993. Victor Romo Juvenile Trial Transcript Dated May 14, 1993 at 11:16-19, attached hereto as Exhibit 28. Victor testified that Juan Carlos, not Plaintiff, had shot Eric. Ex. 28 at 20.

> **Response:**     **Plaintiff admits.**

38.     On June 24, 1993, Plaintiff was indicted by a grand jury. Grand Jury Indictment, attached hereto as Exhibit 29.

> **Response:**     **Plaintiff admits.**

39.     Kendall Hill represented Plaintiff at his first criminal trial and was the primary attorney on the case. Ex. 27 at 16:8-9. He had been a public defender since 1982 and had served on the homicide task force for two years. Ex. 27 at 7:4-7, 18-22. He was a supervisor in the juvenile division and oversaw three delinquency courtrooms. Ex. 27 at 8:4-13. Today, he is deputy of criminal operations in charge of almost four hundred attorneys and investigators. Ex. 27 at 9:4-14.

> **Response:**     **Plaintiff admits.**

40.     At Plaintiffs first criminal trial, Larry, Tina and Phil identified him as the shooter of Eric Morro.  Ex. 6 at 865:15-24; Ex. 10 at B129:19-24; Ex. 13 at B27:6-20, B30:4-7. Larry testified under a bench warrant. Ex. 10 at B135: 1-20.

> **Response:**     **Plaintiff admits. Stating further, the testimony of Larry Tueffel at the Plaintiff's First Criminal Trial upon which**

> **Defendants rely is not credible for numerous reasons, including, but not limited to, it was manipulated by the police and prosecution to fit the story that Defendants concocted. In addition, it is contradicted by so many additional facts, including Larry's deposition testimony cited above, that the statements from that trial are disputed and do not constitute undisputed facts.**

41.    Larry and Phil testified that Phil asked Larry in a police car at the scene if Plaintiff was the shooter and that Larry told Phil that Plaintiff was not the shooter. Ex. 6 at B68:16-B69: 1; Ex. 10 at B133:18-B134:5. Larry also testified that he identified "Frankie" as the shooter at 9:30 p.m. on February 3, 1993. Ex. 10 at B150:6-20.

> **Response:    Plaintiff admits in part and denies in part. Plaintiff admits that Larry and Phil both testified that Phil asked Larry if TJ was the shooter and Larry said no. Plaintiff admits that Larry testified that he identified Frankie as the shooter, but denies that Larry in fact identified "Frankie" as the shooter at 9:30 p.m. on February 3, 1993. This is a manipulation of what Larry said to Bogucki. What Larry specifically told Bogucki was that he believed the accomplice might be named Frankie, not the shooter. *PX16: CPD General Progress Report (TRJ00255-TRJ00256) at TRJ00255.***

42.    Mr. Hill cross-examined Larry regarding his initial denials and eventual identification of Plaintiff. Ex. 10 at B152:20-B155:6. Mr. Hill also cross-examined Det. Bogucki regarding his 3:00 a.m. interview of Larry. Testimony of Jerome Bogucki at 1st Trial at C29:13-30:9, attached hereto as Exhibit 30.

> **Response:    Plaintiff admits that such cross-examination occurred, but denies that the interview of Larry took place at 3:00 a.m. Plaintiff submits that it took place substantially after 3:00 a.m. The pick-up of Larry at his house occurred sometime between 3:00 and 4:00 a.m. *PX2: Tueffel Dep. at 38:21 – 39:5, 133:18-21; PX11: Tueffel 1994 Trial Testimony at B136:9-14* ("they came back to my house around 3:00, 3:30 in the morning").**
>
> **The pickup of Jimenez occurred at 4:00 a.m. *PX20: Jimenez Arrest Report at JIM00046.* Larry Tueffel has testified that the interrogation took place over two hours. *PX2: Tueffel Dep. at 244:15-18.* This timeline establishes that Defendant Bogucki and Sanders had arrested Jimenez before they ever coerced and manipulated Tueffel into stating that Jimenez was the shooter.**

43.     Larry testified that the police brought him to the station around 3:00 a.m.; that

he began telling them the same story; that they told him that he was lying and they had other

witnesses; and that he then identified Plaintiff as the shooter.   Ex. 10 at B136:13-B137:14,

B152:20-B153:10. Det. Bogucki testified that he told Larry that Phil had identified Plaintiff;

Larry denied this.   Ex. 10 at B154:24-B155:6; Ex. 30 at C29:24-C30:9. Larry explained that

he did not identify Plaintiff before because he was afraid of implicating a fellow member of

the Simon City Royals. Ex. 10 at B134:6-22, B135:21-136:5.

> **Response:**     **Plaintiff denies that Larry testified that the police brought him to
> the station around 3:00 a.m.  His actual testimony was that the
> police "came back to my house around 3:00, 3:30 a.m. in the
> morning."** *PX11:   Tueffel 1994 Trial Testimony at B136:9-14.*
> **He corroborates this testimony specifically in his deposition when
> he states that the police "came to pick [him] up that same night at
> 4:00 o'clock in the morning …or was it around 3:00."** *PX2:
> Tueffel Dep. at 33:10-19.*
>
> **There is a reason that the Defendants' counsel are intentionally
> (and falsely) trying to get Tueffel to the station earlier than the
> facts actually show.  It is because the police arrested Jimenez for
> Eric Morro's murder before they ever re-interviewed Larry, and
> then Bogucki and Sanders lied about in the police reports to make
> it look like they had Larry's corroborating testimony before they
> arrested Plaintiff.  See also** *PX3: Jimenez Dep. at 420:12-21.* **(TJ
> heard the police yelling at Larry from one room in the
> stationhouse to the one next door).**
>
> **Plaintiff admits that these individuals gave this testimony at the
> trial identified, but stating further, Plaintiff submits that Larry's
> trial testimony was coerced, and that this version of the events was
> invented by the police and prosecution to cover up numerous
> pieces of evidence related to the interview of Larry Tueffel that
> were never disclosed in violation of Plaintiff's rights to a fair trial.**

44.     Judge Berkos excluded evidence supporting Plaintiffs theory that Larry identified him as the shooter because he had "disrespected" a senior member of the Simon City Royals. Plaintiffs Brief and Argument Appealing First Conviction at pp. 19-21, attached hereto as Exhibit 31.

**Response:      Plaintiff admits.**

45.     Mr. Hill cross-examined Larry regarding his descriptions of the jacket worn by the shooter. Ex. 10 at B145:10-B146: 1, B150:6-151:23.

**Response:      Plaintiff admits.**

46.     Mr. Hill cross-examined Tina regarding her lineup identification of Plaintiff. Ex. 13 at 841:8-842:7,848:11-21.

**Response:      Plaintiff admits.     Stating further, Defendants coerced and suggested an identification by Tina Elder of Plaintiff and then never disclosed the suggestive procedure that was employed.  In fact, they not only never disclosed the suggestive procedure, but they specifically excluded the Polaroid and the taking of the Polaroid, and that they had placed her in front of the Polaroid of Plaintiff (and decedent) immediately before the lineup.**

**The fact that Plaintiff's lawyer cross-examined Tina about her lineup identification does not alter this constitutional violation nor does it establish that Plaintiff knew or could have learned of this unconstitutional conduct back at the time.   Indeed, Mr. Hill used during the cross-examination the only picture that had been produced to him regarding the lineup – the picture of the five boys in the lineup. Had he also been made aware of the Polaroid of Plaintiff it that had been withheld from him and had he been told that the picture was shown to Tina immediately before the lineup, he would have been able to use both the Polaroid and the suggestive procedure to actually cross-examine Tina about the suggestive lineup. Instead, the State represented to the jury that Tina was "the best example of a recognition witness that you will see" reasoning that since she had never met Plaintiff she would have no reason to pick him out of a lineup other than if she witnessed him commit this crime.   *PX62:  Closing Statement 1994 at D95:5-20.* Tina, however, stated in her deposition that when Mr. Jimenez stepped forward in the lineup, she recognized him from**

**the picture she had seen on the desk.** *PX6: Tina Elder Dep. at 47:13-17.*

47.     Mr. Hill called Victor, who testified that Juan Carlos - not Plaintiff- shot Eric. Testimony of Victor Romo at 1st Trial at D12:22-D13:8, attached hereto as Exhibit 32. Judge Berkos excluded Ezequiel's testimony regarding the tape alleged to contain Juan Carlos's confession. Hearing on Offer of Proof at 1st Trial at C91:16-C92:6, attached hereto as Exhibit 33.

> **Response:      Admits.**

48.     Despite Victor's testimony, on October 4, 1994, Plaintiff was convicted of the murder of Eric Morro. Certified Statement of Conviction at p. 4, attached hereto as Exhibit 34.

> **Response:      Admits.**

49.     Plaintiff appealed his conviction. Ex. 34 at p. 5. On appeal, Plaintiff argued that the trial court committed reversible error by excluding evidence supporting his gang retaliation explanation for Larry's identification. Ex. 31 at pp. 19-21.

> **Response:      Admits.**

50.     On November 1, 1996, the Illinois Appellate Court granted Plaintiffs appeal with guidance to the trial court on evaluating Plaintiffs gang retaliation evidence. Opinion on Plaintiffs Appeal of First Conviction at pp. 8, 11, attached hereto as Exhibit 35.

> **Response:      Plaintiff admits.**

51.     Charles Murphy represented Plaintiff at his second criminal trial. Deposition of Charles Murphy at 5:5-13, attached hereto as Exhibit 36. Mr. Murphy had been practicing exclusively in the area of criminal defense since approximately 1974. Ex. 36 at 4:21-5:2.

> **Response:      Plaintiff admits.**

52.     At Plaintiffs second criminal trial, Larry, Tina and Phil again all identified him

as the shooter of Eric Morro. Ex. 9 at R118:23-R119:3; Ex. 14 at R84:9-13; Testimony of

Larry Tueffel at 2nd Trial at R159:10-13, attached hereto as Exhibit 37.

> **Response:     Plaintiff admits.  Stating further, Larry, Tina, and Phil have all
> recanted their testimony from Plaintiff's second criminal trial (as
> well as the first).**

53.     Larry and Phil again testified that Phil asked Larry in a police car at the scene

if Plaintiff was the shooter and that Larry told Phil that Plaintiff was not the shooter. Ex. 9 at

R121:6-7; Ex. 37 at R164:23-R165:3.  Det. Bogucki also testified that Larry identified

"Frankie" as the shooter at 9:30 p.m. on February 3, 1993. Testimony of Jerome Bogucki at

2nd Trial at S23:11-18, attached hereto as Exhibit 38.

> **Response:     Plaintiff admits that Detective Bogucki testified to this effect, but
> Plaintiff further states that Detective Bogucki intentionally
> mis-stated this testimony.  At no time did Tueffel state that the
> shooter may have been named "Frankie;" rather, he told Bogucki
> that the accomplice may have been named "Frankie."  Bogucki's
> own notes of his interview with Larry make this crystal clear.
> *PX16:  TRJ255*.  Bogucki intentionally misrepresented what
> Tueffel had told him as a way to try legitimize that Tueffel
> changed his story.   While that testimony was subject to
> cross-examination by the Plaintiff at that time, because of certain
> information that was unconstitutionally withheld from Plaintiff
> and his criminal defense counsel, they were not in a position to do
> any meaningful cross-examination of that subject.**

54.     Mr. Murphy cross-examined Larry regarding his initial denials and eventual

identification of Plaintiff. Ex. 37 at R182:12-R183:3, R184:11-R186:12. Mr. Murphy also

examined Det. Bogucki regarding his 3:00 a.m. interview of Larry. Ex. 38 at S24:4-S27:5.

> **Response:     Plaintiff admits. As to the fact that the interview of Larry did not
> take place at 3:00a.m., see Response to Def. Stmt. No. 43.**

55.     Larry again testified that the police brought him to the station around 3:00

a.m.; that they told him that he was lying and they had other witnesses; and that he then

identified Plaintiff as the shooter. Ex. 37 at R169:6-24. Det. Bogucki testified that he told

Larry that Phil had identified Plaintiff; Larry denied this. Ex. 37 at Rl70:1-3, R182:17-24; Ex. 38 at S24:24-S25:3, S25:10-14, S27:4-8. Larry explained that he did not identify Plaintiff before because he was afraid of implicating a fellow member of the Simon City Royals. Ex. 37 at R166:23-R167:11.

> **Response:**     **Plaintiff denies that Larry testified that the police brought him to the station around 3:00 a.m.  His actual testimony was that the police "they came back to [his] house around 3:00, 3:30 in the morning"** *PX11:  Tueffel 1994 Trial Testimony at B136:9-14.*
>
> **Defendants' counsel misstates the transcript that they cite, moving the time from a 3:30 arrival at Larry's house to a 3:00 o'clock arrival at the police station.  See SOF 42, above.  There is a reason that the Defendants' counsel are repeatedly trying to get Tueffel to the station earlier than the facts actually show.  It is because the police arrested Jimenez for Eric Morro's murder** *before* **they ever re-interviewed Larry, and then Bogucki and Sanders lied about that fact in their police reports to make it look like they had Larry's corroborating testimony occurred before they arrested Plaintiff.   See also** *PX3: Jimenez Dep. at 420:12-21.* **(TJ heard the police yelling at Larry from one room in the stationhouse to the one next door).**
>
> **Plaintiff admits that Det. Bogucki told Larry that Phil had identified Plaintiff and Plaintiff also admits that Det. Bogucki testified to that effect at trial.  Plaintiff denies that after Bogucki told Larry that Phil had identified TJ, Larry "then" told Bogucki that Plaintiff was the shooter.  To the contrary, Larry was "very clear" with them that the shooter was not Plaintiff.** *PX2: Tueffel Dep. 38:1-4; 39:12-19, 141* **(Larry repeatedly told "no, no, no, it's not him, it wasn't him");** *PX23:  7/31/06 Tueffel Statement at p. 2.* **Larry only succumbed to Defendants' insistence that Plaintiff was the shooter after hours of undue coercion.  See** *P. Stmt. at ¶¶ 29-34, and the record citations therein.*

56.     Mr. Murphy cross-examined Larry regarding his initial description of the jacket worn by the shooter. Ex. 37 at R180:19-23.

> **Response:**     **Plaintiff admits.**

57.     Mr. Murphy cross-examined Tina regarding her lineup identification of Plaintiff. Ex. 14 at R99:6-R100:14, R102:3-R105:14.

**Response:** **Plaintiff admits.** **Stating further, see Response to SOF No. 46, above.**

58.     Mr. Murphy called Victor, who testified Juan Carlos - not Plaintiff- shot Eric. Testimony of Victor Romo at 2nd Trial at C28:4-14, attached hereto as Exhibit 39. Judge Sacks denied Mr. Murphy's motion in *limine* to admit the Ezequiel Romo audiotape. Hearing on Motion in *Limine* at 2nd Trial at P78:16-20, attached hereto as Exhibit 40; Motion in *Limine*, attached hereto as Exhibit 41.

**Response:** **Plaintiff admits.**

59.     Despite Victor's testimony, on November 11, 1997, Plaintiff was again convicted of the murder of Eric Morro. Ex. 34 at p. 10.

**Response:** **Plaintiff admits.**

60.     Many of the prosecution witnesses were threatened in connection with their testimony against Plaintiff. Larry moved out of the neighborhood after being threatened and beat up. Ex. 2 at 55:14-21, 59:1-7. Tina was told to keep her mouth shut and hit in the head with a brick. Ex. 12 at 67:16-23. Her mother's garage was burned down and her father was beaten up. Ex. 12 at 67:22, 68:18-23. Tina moved out of the neighborhood in 1995 because she was sick of being harassed, and her family followed. Ex. 12 at 91:1-11. Phil's apartment was burned down. Ex. 7 at 81:22-82:7. Shawn was threatened by members of Plaintiff s family, including threats on his life. Ex. 19 at 36:3-12, 37:2-16, 39:19-20.

**Response:** **Plaintiff denies on the ground that any witnesses' statement of allegedly being threatened are unsubstantiated, speculation, bereft of detail, and contrary to the evidence.**

- **There exists in this record no CPD, CFD or Medical Report that corroborates any of these alleged incidents of threats or threatening actions.**

- **Shawn Cosmen, Sandra Elder, Tina Elder Phil Torres and Larry Tueffel all testified at both criminal trials.**

25

- **Despite being threatened by "all the Royals" which would include members of his own family (Kevin and Phil) and his best friend, "D," Shawn fails to name anyone by name.** *PX65: Cosmen Dep. @ 26: 21-22; 16:23 – 17:11; 37:2-5*

- **Shawn Cosmen perceived Mr. Jimenez's family, ten to fifteen strong, to be waiting for him in front of the courthouse, but does not recall any of their names. Indeed, only one of them "always threatened me."** *PX65: Cosmen Dep. @ 37:3-16.* **The only "encounter" that Shawn Cosmen is able to recall with any specificity occurred after Mr. Jimenez's second conviction.**

- **The Jimenez family's "threats" were "pointing and talking" while "we were doing the trial."** *PX65: Cosmen Dep. @ 38:16-24* **and "all standing outside" when "we got to the front doors."** *PX65: Cosmen Dep. @ 39:5-9.*

- **The threats purportedly occurred around the time of the trials, including a non-existent third trial at which Mr. Cosmen refused to testify.** *PX65: Cosmen Dep. @ 40: 19-24.*

## POST CONVICTION INVESTIGATION AND PROCEEDINGS

### LARRY TUEFFEL

61.     About a week before July 31, 2006, Luke Netzel visited Larry at Somerset Place. Deposition of Alison Flaum at 30:12-18, attached hereto as Exhibit 42. After Mr. Netzel identified himself, Larry "immediately" told him that Plaintiff was innocent. Ex. 2 at 341:20-342:6.

     **Response:     Plaintiff admits.**

62.     On July 31, 2006, Steve Drizin, Alison Flaum and Mr. Netzel visited Larry at Somerset Place. Ex. 42 at 34:23-35:22.   They obtained written and videotaped statements from Larry in which he recanted his identification of Plaintiff as the shooter; claimed that the police took him to the station in the early hours of the morning and yelled at him until he identified Plaintiff as the shooter; and identified Juan Carlos as the shooter.   Larry Tueffel

Written Statement at pp. 4-8, attached hereto as Exhibit 43; Larry Tueffel Transcribed

Statement at pp. 11-15, attached hereto as Exhibit 44.   Larry stated that he told the police

that Plaintiff was the shooter because "I figured they're not going to believe me ... I just went

along with the story what the other people said."   Ex. 44 at 15:9-13.

> **Response:**   **Plaintiff admits the majority of this statement with the sole**
> **exception that before identifying Jimenez as the shooter, he tried**
> **long and hard to get the police to accept his insistence that**
> **Jimenez was not the shooter. It was only after they refused to**
> **allow him to leave, threatened him with jail, deprived him of sleep,**
> **and mentally broke him down that he finally figured that no one**
> **was going to believe him so he "just went along with what the**
> **other people were saying."**   *PX2: Tueffel Dep. at 217:13-19, PX23:*
> *Tueffel Handwritten Statement at p. 11.*

63.     Larry was first diagnosed as a paranoid schizophrenic in 2001 or 2002. Ex. 2

at 190:19-21. He was being treated for schizophrenia at Somerset Place at the time that

Plaintiffs attorneys obtained his recantation. Ex. 2 at 363:11-364:2. He is still diagnosed as a

paranoid schizophrenic today. Ex. 2 at 190:22-24. Plaintiff declined to respond to an

interrogatory question seeking information on when his attorneys learned that Larry had a

mental health disorder. PL's Resp. to Def. Sanders' Fourth Set of Interrogatories at f 2,

attached hereto as Exhibit 45; Fed. R. 26(a)(2) Report of Dr. Mark Levy regarding Larry

Tueffel's Condition, submitted to the Court and counsel under separate cover as Exhibit 58.

> **Response:**   **Plaintiff admits that Mr. Tueffel has been diagnosed as a paranoid**
> **schizophrenic in 2001 or 2002.   Plaintiff further states that when**
> **Plaintiff's lawyers came to visit Mr. Tueffel at Somerset in 2006**
> **Mr. Tueffel "was stabilized" and was not hearing things or having**
> **delusions.**   *PX2: Tueffel Dep. at 364:3-21.*
>
> **Plaintiff further denies that Mr. Tueffel "is still" diagnosed as a**
> **paranoid schizophrenic today. There is no evidence to support**
> **that statement.   Defendants do not cite to any.**
>
> **In any event, the Defendants remain free to attack Larry's ability**
> **to testify about his experience at the hands of police, the falsity of**
> **his testimony at trial, his subsequent recantation of that testimony,**
> **the affidavit that Defense counsel prepared for him, and his**

current desire to right the wrong that occurred.  They certainly intend to cross-examine him on these topics and to attempt to include expert testimony to discredit him.  None of this, however, alters the fact that Larry is perfectly capable of accurate testimony when, as now, he's properly medicated.  *PX2: Tueffel Dep. at 177:14-178:8 and 440:3-20.*

Moreover, none of this has any bearing at all on summary judgment, as the Court, as it well knows, is directed to make all reasonable inferences in favor of the Plaintiff on this motion.

Plaintiff admits that he declined to respond to an interrogatory question seeking information on when his attorneys learned that Larry had a mental health disorder.

64.    On February 3, 2009, State's Attorney's Office Investigator Brian Killacky reported that Larry told him and Assistant State's Attorney Darren O'Brien that "he was never threatened by prosecutors or the police into identifying or providing testimony into what he is now contending to be a false identification of the person who shot Eric." SAO Report at pp. 2-3, attached hereto as Exhibit 46.

**Response:**    **Plaintiff objects to this Statement of Fact on the ground that it is inadmissible hearsay.  Moreover, Plaintiff denies that this statement accurately reflects what Larry stated to Investigator Killacky and ASA O'Brien; and, in any event, it is not consistent with numerous statements that Larry made under oath at his deposition.  *PX2: Tueffel Dep. 39:13-18, 40:17-20, 134:19-24* Respectfully, for purposes of this motion, the Court must credit Larry's statements under oath and not credit the hearsay statement that Defendants put forward in their SOF No. 64.**

### Tina Elder

65.    On May 14, 2007, Plaintiffs attorneys traveled with Larry approximately 150 miles from Chicago, IL to Thompson, IL. Ex. 45 at ¶ 1. In Thompson, IL, they visited Mary Morro's house. PL's Resp. to Def. Whiteman's Second Set of Interrogatories at ¶¶ 2-3, attached hereto as Exhibit 47. Mary called Tina and asked Tina to come to her house. Ex. 12 at 76:16-77:3.

**Response:** **Plaintiff admits. Stating further, however, the request to the lawyers to bring Larry to Thompson for a visit was made jointly by Larry and the Morro family and was not initiated by Plaintiff's lawyers. The lawyers agreed to include Larry on their own trip to Thompson to speak with Tina and Sandra Elder, and they dropped Larry off at Mary Morro's home and left him there to visit with the Morros for a while.** *PX22: Flaum Dep., at 130:8-10; PX44: Harrigan Dep., at 31:24-32:2, 33:19-22.*

**Larry has testified that he visited with Mary Morro for a few hours, just the two of them.** *PX2: Tueffel Dep., at 105:1-2.* **Plaintiff's attorneys were not present for the meeting between Larry and Mary,** *Id.,* **nor were they present during the time Larry spent with Nathan Morro while on that trip.** *PX44: Harrigan Dep. at 34:8 – 35:2.*

66.     On or before May 14, 2007, Plaintiffs attorneys played Larry's videotaped recantation for Tina. Ex. 12 at 78:5-13; Notes from Post-Conviction Interview of Tina Elder, attached hereto as Exhibit 48. They did not disclose to Tina that Larry was at Somerset Place or had been diagnosed with a mental health disorder at the time they obtained his recantation. Ex. 12 at 78:20-79:3. Tina "took [the video] at face value." Ex. 12 at 81:14-17.

        **Response:      Admits.**

67.     Plaintiff's attorneys then interviewed Tina regarding the circumstances of the lineup. Deposition of Patrick Harrigan at 38:18-39:3, attached as Exhibit 49. She volunteered that, prior to the lineup, she had been placed at a desk with a bunch of papers, a photograph of Plaintiff, and a photograph of Eric. Ex. 12 at 46:4-11; Ex. 49 at 38:18-39:3. It had not occurred to her that the photographs and lineup were related. Ex. 12 at 48:17-19, 93:4-8.

        **Response:      Admits.**

68.     On May 15, 2007, Tina signed an affidavit regarding the photographs. Tina Elder Affidavit, attached hereto as Exhibit 50. Despite the affidavit, in her deposition Tina maintained that she still believed that Plaintiff shot Eric Morro. Ex. 12 at 104:23-105:2.

**Response:** **Plaintiff admits that Tina Elder signed an affidavit regarding the photographs on May 15, 2007.**

**Plaintiff denies that Tina Elder still believes that Plaintiff shot Eric Morro. Plaintiff admits that at one point in the deposition Defendants' counsel got Elder to admit that the person she saw shoot Eric was Plaintiff, but at other parts of her deposition Elder was clear that she is not sure who the shooter was. *PX6: Tina Elder Dep. at 53:3-7, 105:6- 106:16.***

**Just like the sometime contradictory statements of Mr. Tueffel, these factual disputes may not be resolved on summary judgment, and Plaintiff is confident that when presented to a jury under Court supervision Ms. Elder will make her position -- about both her identification of Plaintiff and the suggestive methods used prior to the lineup – clear to the jury.**

69.    The first time Tina recalled speaking with anyone regarding the photographs was to Plaintiffs post-conviction attorneys. Ex. 12 at 10:6-12, 92:12-18. She did not recall Plaintiffs criminal defense attorneys ever asking her about it. Ex. 12 at 19:23-20:9.

**Response:** **Plaintiff admits; but, stating further, Charles Murphy asked her during cross at the 1997 trial if any of the police officers led her to believe that one of the suspects was going to be in the lineup that she was about to view. Tina responded "No." *PX68: 1997 Trial Testimony of Tina Elder R-99:19-22***

**Tina was asked by the prosecution if anyone indicated to her "one way or another" who the person was in the lineup who did the shooting, she responded "No." *PX68: 1997 Trial Testimony of Tina Elder R-106:10-14***

70.    Tina did not know who placed her at the desk. Ex. 12 at 91:24-92:5. She did not speak with any police officer regarding the photographs. Ex. 12 at 48:3-6, 93:11-16.

**Response:** **Plaintiff admits. Stating further, however, she does remember that it was a police officer who placed her at the desk where Jimenez's picture lay, and there is substantial other evidence, including admissions by Defendant Bogucki that he handled the witnesses prior to the lineup. *PX4: Bogucki Dep. at 228:18 –229:21; PX70: Sanders Dep. at 98:7-9. See also* TRJ0069-71.**

71.    Phil maintains to this day that he believes that Plaintiff shot Eric Morro. Ex. 7 at 82:8-11.

> **Response:**   **Plaintiff denies.   It is true that Defendants' counsel, through the use of leading questions, got Torres to state this at his deposition. On cross-examination, however, Mr. Torres made it clear that he told the Defendants he never even saw the shooter and did not know who he was, which was true.   *PX5: Phil Torres Dep. 22:15-18, 34:13-18, 40:3-6, 68:4-9, 72:24-73:3*   Phil never claimed to be a witness, and did not want to be a witness.   *Id. at 22:15-18, 34:13-18, 44:18-21, 72:24-73:3.*   As far as Defendants' assertion that Phil "believes" that Plaintiff was the shooter, at best that is based on the hearsay rumor he heard from his sister.   *PX5: Phil Torres Dep. 19:20 – 20:1, 34:19 – 35:23, 37:4 – 38:5, 55:22 – 56:9, 73:6-17, 90:20 – 91:14..*   Even now, Phil makes no claim to be certain about the shooter's identity.   *Id at 44:18-21, 65:18-66:12, 78:10-16.***

### POST-CONVICTION PETITION AND PROCEEDINGS

72.   On April 4, 2008, Plaintiff filed a Verified Petition for Post-Conviction Relief based on Larry's recantation and Tina's statement regarding the photographs. Verified Petition at ¶¶ 47-58, attached hereto as Exhibit 51. His Petition did not disclose that Larry gave his recantation while he was at Somerset Place or Larry's history of mental illness. Ex. 51 at ¶¶ 47-53.

> **Response:**   **Plaintiff admits.   Stating further, the Verified Petition raises other bases for Plaintiff's claims other than just Larry's recantation and Tina's statements regarding the photographs.**

73.   On June 26, 2008, Judge Stanley Sacks dismissed Plaintiffs Petition for Post-Conviction Relief in a nineteen-page order, finding it "frivolous and patently without merit."   Order on Verified Petition at p. 19, attached hereto as Exhibit 52.

> **Response:**   **Plaintiff admits.**

74.   On May 1, 2009, Plaintiff and the State's Attorney's Office filed a Joint Emergency Petition for Relief from Judgment and Motion for New Trial based on Larry Tueffel and Tina Elder. Joint Petition at ^ 5-6, attached hereto as Exhibit 53. Again, the Petition did not disclose the circumstances of Larry's recantation. Ex. 53 at ¶ 5.

**Response:**   **Plaintiff admits the first sentence.  Stating further, the bases for the State's and the Plaintiff's joint motion included evidence other than just statements of Larry Tueffel and Tina Elder.  They include, by way of example only, a witness who Defendants never went to look for and who the State found easily (and found credible) who told the State that the night of the murder he threw the murder weapon into the Chicago River.  There are additional witnesses and evidence on which both Plaintiff and the State relied in filing their joint motion that are omitted by Defendants.**

**Plaintiff admits that the Petition did not disclose the circumstances of Larry's recantation; but, stating further, denies the inference that he failed to disclose anything material about the "circumstances of Larry's recantation" or any other subject to the Court.  Stating further, one of the reasons that the joint Petition did not include the so-called "circumstances of Larry's recantation" is that the State's Attorney's Office, which was fully aware of Larry's medical condition and had fully interviewed Larry Tueffel about his recantation, wholly believed and accepted Larry's recantation of his testimony that Jimenez was the shooter.**

75.     The same day, and without an evidentiary hearing, Judge Claps granted the Joint Petition based on the representations therein. Hearing on Joint Petition at 4:2-3, attached hereto as Exhibit 54. Judge Claps vacated Plaintiffs conviction and sentence, and ordered his release from prison. Order on Joint Petition, attached hereto as Exhibit 55.

**Response:**   **Plaintiff admits.**

### CIVIL LAWSUIT

76.     On August 20, 2010, Larry signed an affidavit prepared by the Defendant Officers' civil attorneys stating that "the police never threatened or coerced me to say TJ was the shooter."   Larry Tueffel Affidavit at ¶9, attached hereto as Exhibit 56.

**Response:**   **Plaintiff admits,** *but see P. Stmt. ¶¶ 41-43.*

**Plaintiff admits that a Chicago Police Officer had Larry sign the pre-typed affidavit, which had been previously prepared by defense counsel.   *PX25: Defendant Officers Responses to Third Set of Interrogatories, at Interrogatory Nos. 3 – 6, PX2: Tueffel Dep. 167:1-168:10, 410:22-412:2.***

32

**Plaintiff also admits that the statement says that the police never threatened or coerced him, but clarifies both that Larry does not know the meaning of the word "coercive," and that this statement is not true.** *PX2: Tueffel Dep. 164:9-12.* **Although the statement says he is not "blaming the police," Larry clarified that "I said I'm not blaming anybody, I just wanted to get this fixed..."** *Id at 153:3-7.* **According to Larry: "I didn't mean it like that. I said I have nothing against the police.  he asked me a question do you blame anybody.  I said, well, they kind of made -- I mean, police are supposed to do their job.  And he was trying to ask me do I hate police because -- I didn't mean -- It was wrong -- I don't know right now.  Hold on a minute."** *Id at 166:18-24.* **Larry does blame the police for the fact that Plaintiff was prosecuted on the basis of his (Larry's) testimony.** *Id at 172:14-73:1.* **("I said I had nothing against them.  That doesn't mean that what they did was right.")**

**Plaintiff denies the second sentence.  Defendants put substantial pressure on Larry to say the killer was Plaintiff.** *PX2: Tueffel Dep. 39:12-13, 40:16-17, 412:18 - 413:17.*

77.     Larry testified in his deposition that the police took him to the station in the early hours of the morning and yelled at him until he identified Plaintiff as the shooter. Ex. 2 at 131:23-141:13,320:12-322:1. He testified that the police did not tell him that they wanted him to identify Plaintiff as the shooter. Ex. 2 at 138:6-18.

**Response:**     **Admits. Stating further, in addition to yelling at him the police also threatened to jail him and would not let him go home, despite repeated requests.** *PX2: Tueffel Dep. 39:13-18, 46:7-14, 134:19-24, 136:3-9.*

**Plaintiff denies the second sentence.  Defendants put substantial pressure on Larry to say the killer was Plaintiff.** *Id at 39:12-13, 40:16-17, 412:18 - 413:17.*

**See also Plaintiff's Response to SOF Nos. 42, 43 and 55, above on the issue of the time that he was taken to the station.**

78.     Mr. Hill testified in his deposition that it was his practice to interview eyewitnesses and that "I'd be crazy to" take police reports at face value. Ex. 27 at 25:16-22, 32:2-11, 35:19-36:17. Mr. Murphy testified in his deposition that he did not believe that he interviewed Larry. Ex. 36 at 13:2-15.

>   **Response:**     **Plaintiff admits.**

79.     Plaintiff testified in his deposition that he overheard the police yelling at Larry at the station prior to his lineup. Ex. 21 at 420:1-422:16. Plaintiff also testified that Larry told him prior to his first criminal trial that "they made me" identify him as the shooter of Eric Morro. Ex. 21 at 226:15-17,229:17-19,230:8-231:6. Plaintiff testified that, at the time of the shooting, he and Larry were friends and fellow Pee Wee members of the Simon City Royals. Ex. 21 at 92:2-16.

>   **Response:**     **Plaintiff admits.**

80.     Plaintiff has identified the specific misconduct he claims was committed by Defendants in response to Defendants' Interrogatories.   Pl.'s Resp. to Def. Montilla, Ryan, Sanders and Whiteman's First Set and Def. Bogucki and Schalk's Second Set of Interrogatories, attached hereto as Exhibit 57.

>   **Response:**     **Plaintiff denies. While it is true that as of the date this interrogatory was signed, Plaintiff listed evidence in support of his claims, Plaintiff was unaware at that time that Defendants had withheld the Eric Morro Handwritten Note (PX39); withheld the Polaroid Photograph of Jimenez (PX18); withheld the fact of the Polaroid Photograph of Jimenez from their reports; withheld a more detailed inventory report that had never been turned over to the Plaintiff in 1994 or 1997 (PX37).   In addition, due to difficulty in serving a subpoena on Phil Torres and certain scheduling issues, Phil was not deposed until June 22, 2011. Phil's deposition disclosed many additional facts that support Plaintiff's claims. Therefore, to the extent that some of plaintiff's claims rely on facts not disclosed at the time Plaintiff responded to these interrogatories, the interrogatories do not establish the entire scope of Plaintiff's claims.   To the extent that Plaintiff has not**

**previously supplemented this answer, discovery is still ongoing between the parties, and Plaintiff will now further supplement his interrogatory responses.**

Dated:  September 3, 2011

Respectfully submitted,

THADDEUS JIMENEZ

By:      /s/ Stuart J. Chanen
                  One of his attorneys

Mr. Jon Loevy
Mr. Russell Ainsworth
Mr. Joel Feldman
LOEVY& LOEVY
312 North May St.
Suite 100
Chicago, IL 60607
(312) 243-5900

Mr. Stuart J. Chanen
Ms. Lisa Carter
VALOREM LAW GROUP LLC
35 E. Wacker Dr.
30th Floor
Chicago, IL 60601
(312) 676-5480

Mr. Locke E. Bowman
RODERICK MACARTHUR JUSTICE CENTER
Northwestern University School of Law
357 E. Chicago Ave.
Chicago, IL 60611
(312) 503-0844

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-08081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' AGREED MOTION FOR EXTENSION OF TIME TO FILE THEIR**
**REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Jerome Bogucki, Raymond Schalk, and Mark Sanders ("Defendants"), by their undersigned attorney, hereby respectfully move this Court for a one-week extension of time to file their Reply in Further Support of their Motion for Summary Judgment. In support of this motion, Defendants state as follows:

1. On July 15, 2011, Defendants filed their Motion for Summary Judgment.

2. On July 19, 2011, this Court set a Response deadline of August 16, 2011 and a Reply deadline of September 9, 2011.

3. On August 10, 2011, this Court granted Plaintiff's motion for extension of time to file their Response, pushing Defendants' Reply deadline to September 30, 2011.

4. Shneur Nathan, one of the primary drafters of Defendants' Reply, will be observing Rosh Hashanah from September 28-30, 2011, and is expecting to be out of town most of that week.

5. Therefore, Defendants respectfully request that this Court grant a one-week extension of time for the filing of their Reply.

6. Plaintiff does not oppose this motion.

WHEREFORE, Defendants respectfully request that this Court extend the deadline for the filing of Defendants' Reply in Further Support of their Motion for Summary Judgment to October 7, 2011.

Respectfully Submitted,

DEFENDANTS

BY:

/s/ Joan E. Ahn
Andrew M. Hale and Associates, LLC
53 W. Jackson Street, Suite 1800
Chicago, IL 60604
(312) 341-9646
Atty. No. 6302283

## <u>CERTIFICATE OF SERVICE</u>

     I, Joan E. Ahn, an attorney, hereby certify that on September 19, 2011, I caused DEFENDANTS' AGREED MOTION FOR EXTENSION OF TIME TO FILE THEIR REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT to be served upon all counsel of record by filing the same before the Court via the ECF system.


<u>/s/ Joan E. Ahn</u>

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 8081 | **DATE** | 9/21/2011 |
| **CASE TITLE** | Jimenez vs. City of Chicago | | |

**DOCKET ENTRY TEXT**

Agreed motion for extension of time is granted.  Due date for reply brief is extended to 10/7/11.

Docketing to mail notices.

| | Courtroom Deputy Initials: | DS |
|---|---|---|

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, Chicago Police | ) | Case No. 09-cv-8081 |
| Detectives JEROME BOGUCKI, MARK | ) | |
| SANDERS, RAYMOND SCHALK, | ) | |
| F. MONTILLA, Chicago Police | ) | Judge Kennelly |
| Officers LAWRENCE RYAN and | ) | |
| ROBERT WHITEMAN, and as-yet | ) | |
| unknown City of Chicago | ) | |
| Employees, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## NOTICE OF MOTION

TO:        All Counsel of Record

Please take notice that on September 28, 2011 at 9:30 a.m. I will appear before JUDGE KENNELLY in the courtroom usually occupied by him at 219 South Dearborn, Chicago, IL and then and there present Plaintiffs' Motion For Leave To Supplement The Summary Judgment Record.

s/Jon Loevy

LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, certify that on September 23, 2011, I sent by electronic means a copy of the attached Notice to all counsel of record.

s/Jon Loevy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | Jury Trial Demanded |

### PLAINTIFF'S MOTION FOR LEAVE
### TO SUPPLEMENT THE SUMMARY JUDGMENT RECORD

Plaintiff, THADDEUS JIMENEZ, by his attorneys, LOEVY &
LOEVY, THE VALOREM LAW GROUP, and THE MacARTHUR JUSTICE CENTER,
respectfully moves to supplement the record on Defendants'
pending summary judgment motion, stating in support as follows.

#### Introduction

1.    Defendants' counsel have recently taken a step
unlike anything that any of Plaintiff's counsel have ever
heard of or seen.  Specifically, Defendants' counsel have filed a
motion in an active criminal case with a wherefore clause that
demands the immediate release from jail of the criminal defendant
who is presently being prosecuted for the same murder for which
Plaintiff was previously wrongfully convicted and imprisoned.

2.    The impetus behind Defendants' motion is that this
particular prosecution, and the possible conviction of the real
culprit (who is not in fact Plaintiff), is extremely adverse to
Defendants' position in this civil litigation.

3.    In affirmatively seeking to impede the criminal
proceedings, Defendants have further demonstrated the type of

malice required to establish malicious prosecution. On that basis, Plaintiff seeks to supplement the record on Defendants' pending summary judgment motion. Before explaining that position, a brief review of the factual background is necessary in order to appreciate the significance of this development.

### Factual Background

4. On February 3, 1993, Eric Morro was shot and killed. Within 24-hours of the murder, the Defendant Chicago Police Detectives had "solved" the crime and arrested Plaintiff. The case built by the Defendants against Plaintiff (then a 13-year old boy) included multiple corroborating witness statements and purported eyewitness identifications.[1]

5. Several weeks after the Defendants had already finished "solving" the crime, a man delivered to the Defendant Officers an audiotape containing a confession to the Morro murder by the real culprit, Juan Carlos Torres. The man who delivered this recording (the father of the other person responsible for the shooting) had surreptitiously captured Juan Carlos' confession on tape.

6. Unfortunately, however, by the time they received this taped confession, the Defendants had already completed their investigation, "solved" the crime, and initiated charges against Plaintiff. Plaintiff's prosecution was already in motion, and he was convicted and imprisoned based on the witness statements and eyewitness "identifications" created by the Defendants.

---

[1] The facts set forth in this Motion, and all of the supporting record citations, are drawn from Plaintiff's recently-filed response to Defendants' summary judgment motion.

2

7.     Some fifteen years later, Northwestern's Center on Wrongful Convictions conducted an investigation that uncovered the truth: witnesses, including Larry Teuffel (the man who was deposed in your Honor's jury room) revealed that they had been improperly pressured to identify the police's suspect -- the Plaintiff -- notwithstanding the lack of any genuine knowledge of Plaintiff's guilt.

8.     In 2008 and 2009, the Cook County State's Attorneys' Office (CCSAO) conducted an extensive re-investigation of its own, re-interviewing the primary witnesses against Plaintiff.  Among others, the CCSAO interviewed Juan Carlos Torres, after which he proceeded to quit his job, pull his kids from school, abandon his family home, and flee the State.

9.     When their re-investigation was complete, the CCSAO took the unusual step of joining Plaintiff's motion to vacate his conviction.  Plaintiff's motion was granted, his conviction was *nolle'd,* and he was released from prison. Plaintiff has since obtained a Certificate of Innocence from Chief Judge Biebel, an award which, by statute, required an affirmative showing of actual innocence.

10.     On the day that Plaintiff was released from prison sixteen years after the crime, Juan Carlos was arrested; soon after, he was indicted by a Cook County grand jury for the same murder for which Plaintiff had already served more than 16 years.

11.     The criminal case against Juan Carlos is pending. Our understanding is that the CCSAO plans to try him sometime next year, *i.e.,* after this Court's December 6, 2011 trial date.

## Recent Developments

12.   On September 16, 2011, one of Plaintiff's attorneys (Lisa Carter) appeared with Defendants' counsel in state court before Judge Biebel on a motion to secure certain grand jury testimony of witnesses in the case.  At the hearing, Judge Biebel made reference to not just one, but two pending motions, before transferring Plaintiff's motion to Judge Gainer.

13.   Plaintiff's counsel had only been aware of one pending motion, the one concerning grand jury testimony.

14.   It turned out that Defendants' counsel had filed a motion of their own in Juan Carlos' criminal case, yet never served it on Plaintiff's counsel.

15.   After Plaintiff's side discovered the existence of this motion in the fortuitous manner described herein, Defendants' counsel provided Plaintiff with a copy.  The motion at issue is attached hereto as Exhibit A.  As the Court will see, the motion is extraordinary.  It is relevant to the instant civil case for the following reasons.

### Defendants' Motion To Exonerate Juan Carlos

16.   Purporting to be acting as attorneys for Chicago Police Officers Bogucki, Schalk and Sanders (the Defendant Officers sued in this case), defense counsel have filed a motion seeking to "apprise" the criminal court of "exonerating" evidence, and seeking the "immediate[]" release of Juan Carlos Torres from jail.  The motion suggests it is motivated by Defendants' counsels' conscience.  See Exhibit A at 5 ("We don't want to see an innocent man remain in jail.").

4

17. Defendants' motion also seeks disqualification of the Public Defender's office on the theory that the PD previously represented Plaintiff at his criminal trial. Defendants apparently believe that Juan Carlos would have a better chance of beating the charges with private counsel, and perhaps even intend to assist in selection of new counsel. But see Exhibit A, Motion at 5 n.1 ("To be clear, we do not seek to represent Torres and have no intention of doing so. We are not criminal lawyers.").

18. A remarkable feature of this motion is that it is unabashed advocacy -- advocacy on the part of lawyers for police officers, whose bills are being paid by the City of Chicago, asking the criminal judge to immediately release and "exonerate" the man who the CCSAO is trying to bring to justice for murder. Because Juan Carlos' prosecution (and possible conviction) puts the lie to their defense in the civil case, they have made the strategic decision to try to block a criminal conviction in order to help their position in related civil litigation.

19. To be clear, the motion is by no means a dispassionate summary of recent events. It is completely one-sided. It attaches not complete deposition transcripts, but rather only those few pages of the deposition transcripts that support their position.

20. For example, in representing to the criminal court that Phil Torres is sticking to his story that he voluntarily implicated Plaintiff as the shooter, Defendants attached a single page of Mr. Torres' deposition. Defendants have neglected to bring to the criminal court's attention the rest of this

5

deposition wherein Mr. Torres testified that he: did not actually see the shooting; did not claim to have seen it; made no claim to have been able to identity the perpetrator by name; and was high on drugs and would not have gone with the police for an interrogation voluntarily. Indeed, Mr. Torres admitted at his deposition that, contrary to the police version, he truthfully told the police that he did not know who shot Eric Morro. See Plaintiff's Resp. to S.J. at 4-5, and record citations therein.

21. Defendants' counsel's motion also attaches two expert reports that they created in this civil litigation. The first attached report is from Defendants' psychiatrist expert who opines that Larry Tueffel's present testimony (that he implicated Plaintiff only after having been improperly pressured by the police) is supposedly unworthy of belief because he suffers from schizophrenia.[2] Instead, Defendants urge the state criminal court to consider only the testimony that Larry gave as a teenager, testimony that Larry has since repeatedly explained was coerced by the Defendant Officers.

22. In advocating for Juan Carlos' release purportedly in the interests of justice, Defendants' motion hardly provides the complete picture. See Exh. A (Defendants' motion, attaching

---

[2] Defense counsel accessed all of Larry's confidential mental health records by getting him to sign a HIPAA waiver, and then utilized subpoenas from this Court in this civil case. It remains unclear whether the terms of Larry's waiver were broad enough to justify attaching the resulting expert report and characterizations about Larry's purported mental illness to their public summary judgment and criminal court filings, and if they are, (a) whether defense counsel explained as much to Larry; and (b) whether Larry could even be capable of making a truly knowing waiver given Defendants' opinion about his mental state.

only pages 190 and 363-64 of Tueffel's deposition). They fail, for instance, to apprise Judge Gainer of Larry's deposition testimony stating in no uncertain terms that his mental condition does not affect his perception or cognition when he is medicated, as he now is, as well as Larry's explanation of how the Defendants forced him to implicate someone he knew was innocent.[3]

### Argument

23. It is terribly inconvenient for Defendants, and detrimental to their position in this civil litigation, that the CCSAO is prosecuting someone other than Plaintiff for the Morro murder. As stated, Defendants created an elaborate case -- albeit devoid of any physical evidence or corroboration -- consisting of eyewitness statements and identifications suggesting that Plaintiff committed this crime. Defendants' witnesses are now pointing the finger at the Defendants, accusing them of having improperly forced a square peg into a round hole.

24. As the Court will see when it reviews Defendants' Rule 56 submissions, the police respond to these allegations by insisting that their suspect, the Plaintiff, really is guilty. They continue to this day to take steps to try to implicate him in a crime he did not commit, long after the CCSAO, the judge, and everyone else has accepted that the wrong man was prosecuted.

---

[3] Defendants' motion attaches another expert report, also created and paid for at the behest of the City of Chicago in this civil litigation, which purports to poke holes in Juan Carlos' tape-recorded confession. At best, that opinion is fodder for cross-examination, creating the unusual situation where the Police Department has paid its retained counsel to use federal civil discovery to create an expert report which they now seek to use to assist a criminal defendant avoid a conviction.

25. In that context, Defendants' motion to free Juan Carlos bears on malice, one of the elements Plaintiff must prove at trial. Under familiar principles, the case law requires Plaintiff to establish a malicious intent, a not-insubstantial hurdle. In many cases, where the police investigators simply followed along wherever the evidence led them, the malice element is not satisfied, and the claim has not been proved.

26. In this case, by contrast, Defendants should not be able to claim that they simply followed where the evidence led them. Having been confronted with evidence that the real perpetrator is Juan Carlos Torres, Defendants continue to be active promoters of the assertion that Plaintiff is supposedly guilty. And they do so to the point that they have now sought to thwart the prosecution of Mr. Torres, long after everyone stopped asking for their input.

27. At the end of the day, the jury will never be able to get into the Defendants' brain or search their hearts to see whether malice is present. That is something that can only be proved through inference, based on the parties' actions and the circumstances. E.g., Frye v. O'Neill, 520 N.E.2d 1233, 1242 (Ill. App. 1988) ("In order to create a question for the trier of fact, it is not incumbent upon the plaintiff to present direct affirmative evidence of lack of good faith on the part of the defendant. Rather, circumstantial evidence which would support an inference of malice is sufficient.").

28. Moreover, recent Illinois cases are explicit that evidence that comes to light after a police investigation is

8

admissible to show that the police acted with malice during the investigation, so long as there is some link between the later-developed evidence and the police investigation that permits an inference of malice. Gauger v. Hendle, 2011 WL 2578186, at *23-27 (Ill. App. June 28, 2011); Porter v. City of Chicago, 912 N.E.2d 1262, 1272-74 (Ill. App. 2009); Aguirre v. City of Chicago, 887 N.E.2d 656, 663-65 (Ill. App. 2008).

29. Against that backdrop, Defendants' recent motion is probative. Drawing all reasonable inferences in Plaintiff's favor, Defendants' advocacy on behalf of Juan Carlos is motivated not by any legitimate desire to see justice done, but rather as a part of an ongoing pattern to protect their own interests and defend their actions, even at the risk of harming/thwarting the CCSAO's ability to convict the true perpetrator.

### Under The Law, The Motion Is
### Attributable To Defendants Officers

30. Obviously anticipating that the motion to "apprise the court of evidence exonerating Juan Carlos Torres of any involvement in the murder of Eric Morro" might (if discovered by Plaintiff's counsel) be used against the Defendant Officers, Defendants' counsel have attempted to insulate their clients by moving in the name of "attorneys for Defendant Chicago Police Officers ... in Jimenez v. City of Chicago, Case No. 09 C 8081."

31. This maneuver is unavailing. Defendants' cannot take a position in state court through the lawyer-agents responsible for their representation in this civil action, and then turn around and claim that it was their lawyers' position and not theirs for purposes of this civil litigation. Even

9

assuming *arguendo* that the Defendants were not technically involved, the Supreme Court has repeatedly stated in the context of civil litigation that "clients must be held accountable for the acts and omissions of their attorneys." <u>Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd.</u>, 507 U.S. 380, 398 (1993). As the Supreme Court explained in <u>Link v. Wabash Railway Co.</u>, the client voluntarily chooses the attorney as his or her representative in the action and cannot later "avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" 370 U.S. 626, 633-34 (1962).

WHEREFORE, Plaintiff respectfully requests leave to supplement his opposition to Defendants' summary judgment motion on the malicious prosecution claim with: (a) the evidence attached hereto as Exhibit A, as well as the (b) all of the arguments made herein about how this evidence supports the inference of malice for Rule 56 purposes.

RESPECTFULLY SUBMITTED:

_____
Attorneys for Plaintiff

Jon Loevy
LOEVY & LOEVY
312 North May St.
Chicago, IL 60607

Stuart Channen
VALOREM LAW GROUP
35 East Wacker
Chicago, IL 60601

Locke Bowman
MacARTHUR JUSTICE CENTER
375 East Chicago
Chicago, IL 60611

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| People of the State of Illinois, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10300221401 |
| | ) | 09-CR-09111 |
| vs. | ) | |
| | ) | Judge Paul P. Biebel, Jr. |
| Juan Carlos Torres | ) | |
| | ) | |
| Defendant. | ) | |

FILED

SEP 15 2011

### NOTICE OF MOTION

TO:   Assistant Public Defender Cindy Brown
      2650 S. California Ave., 8th floor
      Chicago, IL 60657

      Assistant State's Attorney Michelle Popielewski
      2650 S. California Ave.
      Chicago, IL 60657

      PLEASE TAKE NOTICE that on September 22, 2011 at 9:00 a.m., or as soon thereafter as counsel may be heard, we shall appear before the Honorable Paul P. Biebel, Jr., or judge sitting in his stead, in **Courtroom 101** of the Criminal Court of Cook County, 2600 South California, Chicago, Illinois, and shall then and there present the following **CHICAGO POLICE OFFICERS' ATTORNEY'S MOTION TO APPRISE THE COURT OF EVIDENCE EXONERATING JUAN CARLOS TORRES OF ANY INVOLVEMENT IN THE MURDER OF ERIC MORRO,** a copy of which is hereby served upon you.

Respectfully Submitted,

Attorney for Defendant Officers

Andrew M. Hale
Avi T. Kamionski
Andrew M. Hale & Associates
53 W. Jackson Blvd., Suite 1800
Chicago, IL 60604
(312) 341-9646
Firm No. #45018

## CERTIFICATE OF SERVICE

I, Avi. T. Kamionski, an attorney, hereby certify that I have caused a copy of the foregoing **NOTICE OF MOTION** and **CHICAGO POLICE OFFICERS' ATTORNEY'S MOTION TO APPRISE THE COURT OF EVIDENCE EXONERATING JUAN CARLOS TORRES OF ANY INVOLVEMENT IN THE MURDER OF ERIC MORRO** to be served upon counsel for the parties by sending a copy of the same via *hand delivery* to the below individuals:

Assistant Public Defender Cindy Brown
2650 S. California Ave., 8th floor
Chicago, IL 60657

Assistant State's Attorney Michelle Popielewski
2650 S. California Ave.
Chicago, IL 60657

Respectfully Submitted,

Attorney for Defendant Officers

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

People of the State of Illinois,　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　Plaintiff,　　　　　　　　）　　No. 10300221401
　　　　　　　　　　　　　　　　　　　）　　09-CR-09111
　　　　vs.　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）　　Judge Paul P. Biebel, Jr.
Juan Carlos Torres　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　Defendant.　　　　　　　　）

## CHICAGO POLICE OFFICERS' ATTORNEY'S MOTION TO APPRISE THE COURT OF EVIDENCE EXONERATING JUAN CARLOS TORRES OF ANY INVOLVEMENT IN THE MURDER OF ERIC MORRO

Andrew M. Hale & Avi T. Kamionski, attorneys for Defendant Chicago Police Officers

Jerome Bogucki, Raymond Schalk & Mark Sanders in *Jimenez v. City of Chicago, et al.*, Case

No. 09 C 8081 (N.D. Ill.) ("Defendant Officers"), hereby bring this motion to disclose to the

State, Defense and this Court evidence exonerating Juan Carlos Torres of the murder of Eric

Morro and state as follows:

### Introduction

Juan Carlos Torres is currently in Cook County Jail and is charged with the murder of

Eric Morro. Torres has been in jail for over two years for a crime he did not commit. Prior to

prosecuting Torres, the State of Illinois prosecuted Thaddeus Jimenez for this murder. Jimenez

was convicted twice by a jury and spent 16 years in prison until he was released in 2009. That

same year, Jimenez filed a Section 1983 lawsuit against Defendant Officers making several

misconduct allegations. After Jimenez was released the State arrested and charged Torres with

the murder.

The State's case against Torres consists of two main pieces of evidence: 1. An alleged

audiotaped confession of Torres taken by Ezequiel Romo, father of Victor Romo, Jimenez's co-

defendant in 1994 and 1997; 2. The new story of Larry Tueffel – who testified twice that Jimenez was the shooter – that Torres committed the murder.

We represent the Defendant Officers in connection with the Section 1983 lawsuit. As a part of discovery we have uncovered evidence that Jimenez was the actual shooter of Morro as opposed to Torres. We also investigated the so-called audio tape confession and Tueffel's extensive psychiatric background. The tape was analyzed by a forensic audio expert. Tueffel's extensive medical records were reviewed and analyzed by a psychiatrist. Both the audio tape and Tueffel are not reliable. Here is a brief explanation why:

## Discussion

### A.     Audio Tape

As explained in the attached expert report, the audio tape – which was found inadmissible at both of Jimenez's criminal trials – is not consistent with the account of the taping presented by Ezequiel Romo. Forensic Audio Tape Report, attached hereto as Exhibit 1. On multiple occasions, including under oath at a motion *in limine* hearing before Jimenez's second trial, Ezequiel Romo has stated that he recorded Torres's alleged confession using a voice-activated tape recorder hidden in his jacket pocket and that the conversation took place in a restaurant with only himself and Torres present. Motion *in Limine* Testimony at 10:16-11:12, 17:13-16, attached hereto as Exhibit 2. Every one of these claims is completely inconsistent with the audiotape. Forensic evaluation of the tape has also uncovered that the tape was a complete set up. Although recorded in Spanish, at the beginning of the tape you can clearly hear a voice in English state "going to tape now." Moreover, as explained in the second attached expert report, the speaker alleged to be Torres has a Mexican dialect. Dialect Expert Report, attached hereto as Exhibit 3.

The Torres family is Puerto Rican. State's Attorney Reinvestigation Report, attached hereto as Exhibit 4.

### B. Larry Tueffel

Larry Tueffel identified Jimenez as the shooter at both of Jimenez's criminal trials. In 2006, he gave a new story to Jimenez's post-conviction attorneys and claimed that Juan Carlos Torres shot Eric Morro. Tueffel was diagnosed as a paranoid schizophrenic in 2001 or 2002. Larry Tueffel Deposition at 190:19-24, attached hereto as Exhibit 5. This diagnosis was made several years after his testimonies at Jimenez's criminal trials, but before his 2006 recantation. In fact, Tueffel recanted his testimonies while he was being treated for schizophrenia at Somerset Place. Ex. 5 at 363:11-364:2. As explained in the attached expert report, Tueffel's paranoid schizophrenia makes him a highly unreliable reporter. Forensic Psychiatric Report, attached hereto as Exhibit 6. For example, Tueffel's paranoid schizophrenia causes him to have problems distinguishing fantasy from reality, and makes him especially susceptible to suggestion. Ex. 6 at pp. 54-56.

### C. Several Witnesses Saw Thaddeus Jimenez Kill Eric Morro

In addition, many witnesses still maintain that Thaddeus Jimenez committed the murder. Phil Torres: Phil Torres testified in 1994 and again in 1997 that Jimenez shot Eric Morro. To this day, Phil Torres maintains that he witnessed Jimenez shoot Eric Morro. Phil Torres Deposition at 82:8-11, attached hereto as Exhibit 7.

Tina Elder: Tina Elder testified in 1994 and again in 1997 that Jimenez shot Eric Morro. To this day, Tina Elder maintains that she witnessed Jimenez shoot Eric Morro. Tina Elder Deposition at 104:23-105:2, attached hereto as Exhibit 8.

<u>Sandra Elder</u>: Sandra Elder maintains that she witnessed Jimenez shoot Eric Morro. Sandra Elder Deposition at 82:21-83:1, attached hereto as Exhibit 9.

<u>Donna Cosmen</u>: Donna Cosmen has testified that she witnessed Jimenez running from the scene of the shooting. Donna Cosmen Deposition at 19:22-20:1, 21:19-22, attached hereto as Exhibit 10.

### D. Public Defender's Office Is In A Conflict Relationship with Juan Carlos Torres

Additionally, we also feel compelled to bring to this Court's attention both the *per se* and actual conflict with the Public Defender's office representing Juan Carlos Torres. Rule of Professional Conduct 1.10 explains that "[n]o lawyer associated with a firm shall represent a client when the lawyer knows or reasonably should know that another lawyer associated with that firm would be prohibited from doing so by Rules 1.7, 1.8(c) or 1.9 . . ." Under Rule 1.9 a "lawyer who has formerly represented a client in a matter shall not thereafter: (1) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after disclosure; or (2) use information relating to the representation to the disadvantage of the former client."

In 1994, the Public Defender's office represented Thaddeus Jimenez in his first criminal trial. At the time, Jimenez was accused of the murder of Morro. In fact, Jimenez, through the Public Defender's office, argued that Torres committed the murder. Now, after Jimenez's release, this same office is representing Torres. This time around the Public Defender's office must make the exact opposite argument: namely, Torres is innocent and Jimenez is guilty. Under Rule 1.9 and 1.10, the Public Defender's office cannot represent a client whose interests are materially adverse to a former client. Here, Torres and Jimenez are pointing fingers at each other. Their

defense of Torres is materially adverse to Jimenez – specifically his financial interests in his civil suit. An acquittal of Torres will hurt Jimenez's claim that Torres did it. It also puts Torres in a bad spot. How is he comforted knowing that his lawyers are partners with lawyers who once argued that Torres killed Morro. To avoid this issue, the rules prohibit even lawyers from the same office to represent clients who have adverse interests. *See* Rule 1.10.

Moreover, even if this court does not believe there is an actual conflict, there is unquestionably a *per se* conflict. The Appellate Court's discussion in *People v. Munson*, 265 Ill. App. 3d 765, 769 (3rd Dist. 1994) is helpful in explaining *per se* conflicts:

> In cases of *per se* conflicts, defense counsel had some tie to a person or entity-either a client, employer or counsel's own previous commitments-which would benefit from an unfavorable verdict for the defendant. Defense counsel's knowledge that a favorable result would conflict with the interests of his client, employer or self could subliminally affect counsel's performance in ways difficult to detect and demonstrate. In addition, a *per se* conflict created the possibility that an attorney would be unnecessarily subjected to later charges that his representation was not completely faithful.

*See also In re Darius G.*, 406 Ill. App. 3d 727, 738 (2d Dist. 2010) ("the *same* attorney may not during the proceedings appear on behalf of *different* clients"). When the same attorney appears on behalf of different clients, "[p]rejudice is presumed and respondent need not demonstrate that the conflict contributed to the judgments entered against her." *Id.* Under the clear rule set forth in *Darius G.*, given the Public Defender's office's representation of an adverse client (Jimenez) and interests (Torres is guilty), prejudice is presumed. Therefore, given the actual and/or *per se* conflict, Torres should be assigned his own private counsel[1].

## Conclusion

We don't want to see an innocent man remain in jail. The above evidence demonstrates

---

[1] To be clear, we do not seek to represent Torres and have no intention of doing so. We are not criminal lawyers.

that the case against Juan Carlos Torres is extremely weak. The audiotape is clearly not a confession by Torres. There are, at least, four witnesses who will eventually testify in support of Torres that they saw Jimenez commit the murder. The State's witness, Tueffel, has been diagnosed as a paranoid schizophrenic and previously testified under oath – at two trials – that Jimenez committed the murder. His testimony is unreliable.

Based on the evidence we are providing to the Court and all parties in this case, it is clear the State will be unable to meet their burden and therefore, Juan Carlos Torres should be released from jail immediately. Additionally, Juan Carlos Torres should be provided with private outside counsel who can advocate on his behalf clear of any conflicts.

Respectfully Submitted,

Attorney for Defendant Officers

Andrew M. Hale
Avi T. Kamionski
Andrew M. Hale & Associates
53 W. Jackson Blvd., Suite 1800
Chicago, IL 60604
(312) 341-9646

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT OFFICERS' RESPONSE TO PLAINTIFF'S MOTION TO SUPPLEMENT**
**THE SUMMARY JUDGMENT RECORD**

Defendants, Mark Sanders, Jerome Bugucki, and Raymond Schalk, by and through their attorneys, Andrew M. Hale & Associates, hereby submit their response to plaintiff's motion to supplement the summary judgment record and state as follows:

1.      Plaintiff seeks to supplement the summary judgment record based on a filing defense counsel made in Juan Carlos Torres's criminal case.

2.      Defendants have **NO OBJECTION** to plaintiff's motion.

3.      Defendants will address the merits of plaintiff's supplement in their reply brief which will be filed on or before October 7, 2011.

Respectfully Submitted,

/s/ Avi T. Kamionski

Andrew M. Hale
Avi T. Kamionski
Joan Ahn
Andrew M. Hale & Associates
53 West Jackson, Suite 1800
Chicago, Illinois 60604
(312) 341-9646

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above mentioned documents were served on the above mentioned parties on **September 26, 2011** via the Northern District of Illinois, Eastern Division, ECF Filing System.


/s/ Avi T. Kamionski

Andrew M. Hale
Avi T. Kamionski
Joan Ahn
Andrew M. Hale & Associates
53 West Jackson, Suite 1800
Chicago, Illinois 60604
(312) 341-9646

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

Thaddeus Jimenez

                        Plaintiff,

v.                                              Case No.: 1:09−cv−08081
                                                Honorable Matthew F. Kennelly

City Of Chicago, et al.

                        Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, September 27, 2011:

        MINUTE entry before Honorable Matthew F. Kennelly: Plaintiff's motion to supplement the summary judgment record [123] is granted. The motion is taken as plaintiff's supplemental submission. Any response by defendants must be filed by no later than 10/4/11. (mk)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **www.ilnd.uscourts.gov**.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 09-cv-8081 |
| | ) | The Hon. Matthew F. Kennelly |
| CITY OF CHICAGO, *et al.,* | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO THE DEFENDANT
OFFICERS' MOTION FOR SUMMARY JUDGMENT**

Based on the case put together by the Defendant Officers, the Cook County State's Attorney's Office ("CCSAO") twice prosecuted and secured the conviction of Thaddeus Jimenez ("Jimenez" or "TJ") for the murder of Eric Morro.  More than sixteen years later, following its own extensive re-investigation, the CCSAO *joined* TJ's motion to vacate his conviction and release him from prison.  Cook County Chief Criminal Judge Paul Biebel has since issued Jimenez a Certificate of Innocence, an award which, by statute, requires an affirmative showing of actual innocence by clear and convincing evidence. 20 ILCS 2630/5(c-6).  Meanwhile, on the same day Jimenez walked out of prison, the CCSAO arrested the real killer, Juan Carlos Torres, who was soon after indicted by a Cook County grand jury for the Morro murder.

As the CCSAO and the criminal court now acknowledge, Jimenez did not shoot Eric Morro, and the Defendant Detectives are the only ones left still maintaining that he did.  They have no choice.  Eighteen years ago, inside a span of less than 24 hours, Defendants somehow managed to build a rather elaborate case that Jimenez supposedly shot Morro, complete with multiple corroborating "eyewitness" statements and identifications.  The problem for the Defendants is that the case they manufactured, and everything about it, is completely false.  As everyone except the Defendants now acknowledge, Jimenez had nothing to do with crime.

As the evidence establishes, Defendants' efforts to squeeze the proverbial square peg into the round hole crossed over the line from legitimate investigation and into the realm of outright witness coercion and manipulation.   In the process, Defendants withheld evidence, destroyed evidence, and fabricated evidence, all violations of Jimenez's constitutional right to a fair trial.

Compounding the injustice is the fact that to ensure their concocted conviction against Jimenez, Defendants permitted the real culprit, Juan Carlos Torres, to remain free during the 16 years of this injustice. This is so even though at the time of the murder, the available evidence against Juan was overwhelming. Co-defendant Victor Romo insisted that Juan was his co-perpetrator and that he had never even met Jimenez.   Moreover, Juan confessed to having committed the murder, which confession was surreptitiously captured on tape by Romo's father. (One-way taping was not illegal at that time.)  By time Defendants received the taped confession, however, they had already "solved" the crime. Since 2006, every eyewitness questioned has revealed police coercion and manipulation as the direct cause of Jimenez's wrongful conviction.

Defendants' motion relies throughout on the premise that Jimenez is in fact guilty, with Defendants directing the Court to the incriminating "evidence" that they themselves created. However, because the evidence is overwhelming that Jimenez did *not* commit the murder, the tightness of the case Defendants hastily assembled at the time is nothing but proof of their own misconduct.   With all reasonable inferences drawn in Jimenez's favor, the factual disputes surrounding how all of the witnesses came to implicate an innocent man are not the proper subject of a summary judgment motion; they can only be resolved by a jury.

### SUMMARY OF THE FACTS
### Juan Carlos Torres Murdered Eric Morro

On February 3, 1993, two friends, Victor Romo and Juan Carlos Torres, approached two other boys, Eric Morro and Larry Tueffel, in front of 3018 West Belmont Avenue.  Plaintiff's

Rule 56.1 Statement of Facts (P. Stmt. ¶ 1).   (Because several witnesses share the same last name, this memorandum adopts Defendants' use of witness first names for ease of reference.) Victor questioned Eric about money that Eric apparently owed to a "Leo."  Eric told Victor to mind his own business.  *Id.*  A scuffle ensued, and at some point Juan pulled a gun.  *Id.* ¶¶ 2.  A moment later, when Eric took a swing at Juan, Juan shot Eric in the chest.  *Id.*  Victor and Juan fled the scene, running west. Larry also ran after the shot was fired, but then returned to check on his friend Eric.  *Id.* ¶ 3.  At the time of the shooting, Jimenez was at his Grandmother's house, playing video games with his cousins and doing homework with his uncle. Jimenez was nowhere near Belmont and Sacramento and had absolutely nothing to do with Eric's murder.  *Id.* ¶ 4.

## The Witnesses' Original Story

Sometime that evening, Defendant Ryan questioned Larry Tueffel at the scene and then took him to the station for a few hours, where he was further questioned and then brought home.  *Id.* ¶ 5.  During that initial round of questioning, Larry told Ryan, Bogucki, and one or more of the other Defendants everything he knew, describing the confrontation that led to the shooting.  *Id.* ¶ 6.   Larry also provided a contemporaneous physical description of the shooter (memorialized in the police report) as being a 13-14 year old male Hispanic, 5'4 to 5'5, with curly black hair, wearing a purple "Purple Jacket with Yellow Lettering and/or #'s" and baggy blue jeans.  *Id.*  Larry's original description did not match Jimenez, who did not have curly hair.  *Id.* ¶ 7.  Jimenez also never had a purple jacket with yellow lettering; instead, he had a brand new blue and white Duke Starter jacket, which Defendants used to frame Jimenez and then discarded when Jimenez's mother demanded that the jacket be tested.  *Id.*

Phil Torres was also interviewed at the scene.  *Id.* ¶ 8.  Phil did not actually see the shooting and did not claim to have seen it; he was not an eyewitness.  *Id.*  As with Larry, Phil

made no claim to have been able to identify the perpetrator by name.  *Id.*

**Defendants' Version**

Defendant Detective Bogucki was put in charge of the investigation, assisted primarily by Defendant Detectives Saunders and Schalk.  *Id.* ¶ 9.  In Defendants' telling, Phil called the police in the early morning hours after the shooting to report that he just happened to be looking out the window at the time of the incident.  According to Defendants, Phil reported that he witnessed Thaddeus Jimenez shoot Eric, who Phil supposedly identified by name as someone known to him and supposedly identified as wearing a Duke jacket during the shooting.  *Id.* ¶¶ 10, 11.  Defendants further claimed that Phil supplied a motive, an altercation that Jimenez supposedly had with the victim earlier that day.  *Id.* ¶  11.  The main police report memorialized those "facts," as well as Phil's subsequent selection of Jimenez out of a lineup.  *Id.*

Defendants also assert that they next went to Larry's home and that, there, Larry readily provided them a new account that, in contrast to his contemporaneous interview, now matched Phil's identification of Jimenez, including both the alleged argument with the victim earlier in the day and the fact that the shooter was wearing a Duke jacket.  *Id.* ¶¶ 12.  Larry's identification of Jimenez (as someone known to him by name) was then supplied to the prosecutors in Defendants' police report.  *Id.* ¶ 13.  Both Larry and Phil testified consistently *with Defendants' version of the facts* at both of Jimenez's criminal trials.

**Phil's Version: Never Even Claimed To Be A Witness**

In the course of the re-investigation that led to Jimenez's exoneration, new evidence came to light.  Specifically, both Phil and Larry disavowed the story memorialized in the police documents, insisting instead that they had been improperly pressured to go along with it.  According to Phil, the police came to his mother's house at 1:00 a.m. in the morning after the

4

shooting.  *Id.* ¶ 17.  He was high on drugs and would not have spoken with the police if he had

had a choice.  *Id.*  Phil told Defendants he did not know who shot Eric, which was true.  *Id.*  Phil

doesn't recall reaching out to the police that night (as they claim) and believes now that he would

have had no interest in doing so at the time.  *Id.* ¶ 18.

Even assuming Phil did initiate re-contact with the police late that night (rather than the

other way around), the most he could or would have told them was that he heard a rumor about a

possible altercation hours before the murder involving Jimenez and the victim.  *Id.* ¶ 19. Namely,

Phil believes he heard from his sister that Jimenez might have gotten into an argument with the

victim earlier in the day of the shooting, though Phil does not claim to have personal knowledge

of any of that.  *Id.* ¶ 20.  Phil allows that he might have passed on to the police the hearsay tip

that his sister believed Jimenez might have been involved.  *Id.*  Indeed, Phil is clear that this is

the only conceivably relevant information he had.  *Id.* ¶ 21.

During his interrogation, Phil never claimed to have been certain about the shooter's

identity.  *Id.*  The police kept telling Phil that other people (including his sister) were claiming

that Jimenez was the shooter, and finally, Phil agreed to say it was Jimenez.  *Id.*  Although he

eventually testified at the trial that he saw Jimenez wearing a Duke jacket, at his deposition he

revealed for the first time that it was the police who brought up the Duke jacket to him first, not

the other way around.  *Id.* ¶ 49.  At bottom, Phil has admitted that, contrary to the police version,

he truthfully told the police that he did not know who shot Eric.  *Id.* ¶ 8.  He never claimed to be

a witness and did not want to be a witness.  *Id.* ¶¶ 8, 21, 22.[1]

---

[1]       Phil was 31 years old at that time, 18 years older than TJ, and they were not
friends.  In fact, Phil claims to have seen TJ only a few times in his life and cannot describe him
at all.  P. Stmt. ¶ 23.  At his deposition, Phil could not even be certain he had ever actually seen
TJ before.  *Id*.  While Defendants try to discredit Phil on statements they do not like, that does
not advance Defendants' motion, as TJ is the one entitled to all reasonable (footnote continues)
inferences at this stage. Moreover, the fact that Phil allowed Defendants' counsel at deposition to

### Larry's Version: Unduly Coercive Interrogation

Sometime near 3:30 a.m., Defendant Bogucki went, by himself, to Larry's family's apartment.  Bogucki began banging on the door, insisting that Larry, who was asleep, needed to come back to the station.  *Id.* ¶ 26.  According to Larry, "they just grabbed me and took me" without a parent or guardian.  *Id.*

Larry, who was only 14 at the time, had been crying and "in shock" over having witnessed the death of his friend.  He is a high school dropout and as Defendants' own expert concedes, "*he appears to be susceptible to being influenced by leading questions*" and has "difficulty in trying to make sense out of disparate and confusing information."  *Id*. ¶ 27 (emphasis in original).  In response to the Defendants' questioning, Larry explained that he knew the shooter by sight from the neighborhood, but did not know his name. (Larry later learned that, the real shooter went by the nickname Crazy.  Larry now knows Crazy's real name to be Juan Carlos Torres.  *Id.* ¶¶ 38, 39.)

Defendants told Larry that Jimenez was the shooter, and also that there were other witnesses stating that it was TJ who shot Eric.  *Id.* ¶¶ 29, 30.  Defendants proceeded to put substantial pressure on Larry to say the killer was Jimenez, calling Larry  a "liar" and accusing him of "trying to cover up for TJ."  *Id.* ¶¶ 29-33.  They were yelling and screaming at him.  *Id.* In response to the Defendants' assertion that the shooter was Jimenez, Larry was "very clear" with them that the shooter was "not" Jimenez.  *Id.* ¶ 30.  Larry knew Jimenez and used to hang out with him sometimes, so he knew him by sight.  *Id.* ¶¶ 28, 30.  Thus, Larry knew Jimenez had not

---

press certain admissions out of him through persistent questioning only shows, if anything, how suggestible and arguably subject to manipulation their star witness really is. As is often true in these types of cases, the Defendants urged the courts to believe this dubious witness back when he was pointing the finger at TJ, and yet they are stuck with him now that he is pointing the finger back at them.

been present for the shooting, and repeatedly told the Defendants: "no, no, no, it's not him, it wasn't him." *Id.* ¶ 30.

When Larry refused to implicate Jimenez, the detectives threatened to arrest Larry and send him to jail. *Id.* ¶ 31. They would "not leave him alone," and would "not let him go home" despite his request. *Id.* Larry was very afraid, particularly when the police were accusing him of lying. *Id.* ¶ 32. They were screaming at him "real bad," but he "just kept saying, no, it's not him and trying to tell the truth and tell them [about the real shooter]. I don't know the name, but I was giving a description." *Id.* Larry was practically falling asleep, and by the end, had broken down crying. *Id.* ¶ 33. Eventually, Larry "just got exhausted after a long time and I just kept saying, 'no, no, no.' ... It took me a long time to just say -- I gave up, you know. I was exhausted. . . . I was in shock, you know, and finally I just gave up and said okay. . . . I know it was wrong to do that, but you know, I didn't know what else to do." *Id.*

Larry has also now made clear that he would never have said Jimenez was the shooter but for Defendants' coercion. *Id.* ¶ 34. He regretted having become a "witness" against Jimenez and knew it was wrong to go through with it when he knew Jimenez was not the shooter. *Id.* ¶ 35. So guilt-ridden was Larry about testifying falsely against Jimenez that when it came time to testify in Court, Larry tried to hide from prosecutors, but the police arrested him on a bench warrant and "had to drag [him] out of [his] apartment to take [him] in handcuffs" to juvenile jail for a few days. From there the police took him straight to Jimenez's criminal trial to testify. *Id.*[2]

### Jimenez's Arrest

At 4:00 a.m. the morning after the shooting, Defendants Bogucki and Sanders went to

---

[2] The guilt over having borne false witness against TJ has been very difficult for Larry; he eventually attempted suicide, at least in part from this guilt. *Id.* ¶ 36 ("My intentions were never for this to get this far like that, you know, and it's just terrible. I mean, it was a terrible thing, that the wrong -- the other guy was scot-free too, and that was on me too.").

Jimenez's grandmother's home and arrested him.  *Id.* ¶ 14.  Jimenez denied any knowledge of the murder and provided a detailed alibi.  *Id.*  In the course of the arrest, Defendants learned that Jimenez had a blue and white Duke (Blue Devils) jacket.  *Id.*

### Tina Elder

Once Defendants had coerced Phil and Larry into saying that the shooter was Jimenez, the next step was to get them to view a lineup.  In addition to Phil and Larry, Defendants summoned two other people to view a lineup, Tina and Sandra Elder.  Instead of providing transportation for the Elders, Defendants allowed them to travel to the lineup with Phil.  Tina Elder testified that by time she had come to the station she had already discussed the murder and the lineup with Phil and Sandra. P. Stmt. ¶ 51. [3]

At the moment of the shooting, Tina Elder was with her 4-year old daughter, was trying to get her daughter into the car, was several months pregnant, and was simultaneously speaking to Phil Torres, who was in a third-story window above her.  As Tina describes the scene, it was nighttime and she saw the two people fighting with Eric only for a few seconds.  *Id*. ¶ 52.  Although she testified at the trial that the shooter was Jimenez, she has since recanted that testimony and stated that she cannot be certain who it was.  Tina has further testified that she did not know Jimenez at that time, but when she got to the police station, one of the officers told her that Thaddeus Jimenez was the primary suspect and placed her at a desk, which she described as follows:

---

[3]     This of course renders meaningless the Defendants' current claim that when they arrived at the station, they separated them to wait in different areas.  *Cf*. Defendants Mot. at 11.

[T]he police placed me at a desk.  On the desk was a photo of Eric and [a] photo of Thaddeus Jimenez.  I did not see and was not shown any other photos.  I looked at both photos prior to viewing the lineup.  My recollection of the shooter was of someone light-skinned, with hair that was short on the sides and wavy on the top.  I do not recall seeing a Duke jacket.

*Id.*  Tina has testified that the picture of Jimenez that the police placed her in front of was a square Polaroid.  *Id.* ¶ 53.  That Polaroid was never turned over by the police or prosecutors to the defendant, either before his 1994 or 1997 trial.  The police reports make no reference to Defendants taking a Polaroid picture of Jimenez and using it in the case to show to Tina Elder.  *Id.*  (The first time that Jimenez received this Polaroid was in January 2011.  *Id.* ¶ 64.)

The police did not take a statement from Tina until after they had told her that Jimenez was the primary suspect, until after they had placed her at a desk with TJ's photograph, and until after she had picked TJ out of the lineup.  *Id.* ¶ 54.  Tina never told another person – police or non-police – that the shooter was wearing a Duke jacket, and she states that she "does not recall seeing a Duke jacket" at the time of the shooting.  *Id.*  Defendants' police report nevertheless states that Tina positively identified TJ as "the offender wearing the 'Duke' jacket and as the one who shot the victim."  *Id.*

### Victor Romo Comes Forward, Confesses, and Admits Unequivocally That Juan Was the Co-Perpetrator

On February 10, 1993, exactly one week after the murder, but after the Defendants had already "cleared and closed" the case against TJ, Victor Romo turned himself into Defendants Bogucki and Schalk and fully confessed to having been at the scene during the shooting. *Id.* ¶ 55. Victor made clear to the Defendants that he did not know Jimenez, had never met him or seen him at any time, and was not with him at the time of the shooting or any other time that night. *Id.* ¶ 56. Victor told the police that his friend Juan was the triggerman who murdered Eric. *Id.* He told Bogucki and Schalk that he had met Juan at the Burger King on Belmont and California, that

Juan had asked Eric about some money, and that a struggle began.  *Id*.  Independently, Victor's father, Ezequiel Romo, confirmed that Juan had confessed to him to shooting Eric.  *Id.*  Victor and Ezequiel provided Defendants Juan's specific address and even provided a map.  *Id.* ¶ 57.

### Juan's Confession

Just two to three days after the murder, Ezequiel secretly tape-recorded Juan confessing to the crime.  *Id.* ¶ 58.  Ezequiel wanted to make the tape to gather evidence that would exculpate his son by establishing that he was not the shooter and had no pre-knowledge Juan was carrying a gun.  *Id*.  Juan can be heard on the tape stating that: "when he hit me and I wanted to shoot him" and "when I fired the shot, I ran."  *Id.* ¶ 59.  Juan also says on the tape that he is not worried about getting caught because "they pinned the other blame on the, the other gang boy."  *Id.*  At one of Victor's first hearings, Victor's defense lawyer presented Defendants with the tape recording of Juan's confession.  *Id.* ¶ 60.

### Defendants Fail To Genuinely
### Investigate Juan's Involvement

There was no reason to disbelieve Victor (who was admitting against self-interest to participating in the crime) or to discredit Juan's confession on the tape, but, at this point, Defendants had a big problem:  they had spent the first 24 hours of the investigation locking in various witnesses to the story that Jimenez was the shooter.  It was "too late" to start the investigation all over again.  Even if Juan were charged, the witnesses Defendants had already developed (pointing the finger at someone else) would likely have allowed Juan to escape conviction.  Therefore, Defendants opted to abandon their obligation to search for the truth and instead go with the case they already had, or more accurately, the case they had manufactured against the grain. In particular, as set forth in detail in Jimenez's Statement of Facts ¶ 80, Defendants declined to take any genuine steps to confirm whether Victor was telling the truth

10

about Juan being the shooter.   As for the taped confession, Defendants made a record of receiving the tape, but never logged it into evidence.  *Id.* ¶ 61.  Incredibly, the lead investigators, Bogucki and Schalk, assert that to this day they have never even listened to the tape, never had it translated into English, and never had a Spanish speaker from their Department listen to it, even though that was a common practice within the department at the time.  *Id.*

**Jimenez Is Twice Convicted For Morro's Murder
Based On the Case Put Together by Defendants**

Notwithstanding the evidence of Juan's guilt, the criminal case against Jimenez proceeded.  Although he was only 13 at the time of his purported involvement in the murder, Jimenez was tried as an adult.  *Id.* ¶ 67. Prior to the trial, the State successfully blocked the admission of Juan's taped confessions.  *Id.* ¶ 68.  At trial, the State put on the case built by the Defendants, including the "eyewitness" testimony of Phil, Larry, and Tina.  *Id.*  On October 4, 1994, the jury convicted Jimenez of first-degree murder, and he was sentenced to 50 years in prison.  *Id.* ¶ 72.  Jimenez served his time in juvenile facilities until he turned 17, whereupon he was transferred to maximum security with fully-grown adult criminals.  *Id.*

The appellate court eventually reversed Jimenez's first conviction based on a *voir dire* problem.  *Id.* ¶ 73.  The State again moved successfully to exclude Juan's taped confession and re-tried Jimenez based on the same evidence.  *Id.*  On November 11, 1997, the jury convicted Jimenez; later that month, the judge sentenced him to 45 years in prison.  *Id.*

**Jimenez's Exoneration**

For more than 16 years, TJ languished in prison for a crime he did not commit.  From the day of his arrest, Jimenez vigorously professed his innocence.  He wrote to anyone and everyone he thought might help him, including the Northwestern Center on Wrongful Convictions ("CWC"), which, assisted by several lawyers from Katten Muchin, investigated and pursued his

case for four years.  *Id.* ¶ 74.  By June 2008, CWC persuaded the CCSAO that there was sufficient justification to re-open and re-investigate the case.  *Id.* ¶ 75.  From approximately June 2008 to May 2009, the CCSAO undertook a full re-investigation.  *Id.*

In doing so, the CCSAO did exactly what Defendants should have done when they began their investigation in 1993: they followed the actual evidence.  Among other things, the CCSAO located a man named Leo Robles, the person to whom the victim owed money at the time of his death.  *Id.* ¶ 76.  During questioning, Leo admitted to having tossed the *Morro* murder weapon into the Chicago River, and he even took the CCSAO investigators to the spot on the Belmont Avenue bridge where he had thrown the weapon in, the very night of the murder more than 15 years earlier.  *Id.*  According to Leo, he was handed the gun by Luis Hernandez, who, like Leo and Juan, was a member of the Triangles street gang.  Luis later told Leo (after he had already ditched it) that he had received the gun from Juan who had confessed to Luis that he had used the gun to shoot Eric Morro.  *Id.*

The CCSAO interviewed Juan on December 29, 2008, and unlike the interview conducted by Bogucki and Schalk, this was an actual interview.  *Id.* ¶ 77.  Juan denied even knowing Victor or Ezequiel Romo, a verifiable lie.  *Id.*  When the investigators asked him to listen to Ezequiel's tape containing Juan's confession, Juan did not want to do so at that time and indicated he would get back to the CCSAO through counsel.  *Id.*  Instead, Juan pulled his children from school, quit his job, abandoned his family home, and fled the State.  *Id.*

On May 1, 2009, the CCSAO took a very unusual step:  it informed Jimenez through his counsel that they would agree to a motion to vacate his conviction.  *Id.* ¶ 78.  The Honorable Joseph M. Claps proceeded to enter an Order vacating Jimenez's conviction and sentence, and then immediately noted the State's motion to dismiss (*nolle pros*) the case against Jimenez in its

entirety.  *Id.* Later that same day, Jimenez walked out of Hill Correctional a free man.  *Id.*  Four weeks later, June 3, 2009, Chief Judge Paul Biebel granted Jimenez a Certificate of Innocence, which the CCSAO did not oppose.  *Id.*  On the same day that TJ was released, the authorities arrested Juan Carlos Torres, who had fled to Indiana.  *Id.* ¶ 79.  On May 18, 2009, a Cook County grand jury indicted Torres for Eric Morro's murder.  *Id.*

## ARGUMENT

## I.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON JIMENEZ'S DUE PROCESS CLAIMS.

The Due Process Clause of the Fourteenth Amendment guarantees criminal defendants the right to a fair trial.  *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001).  Indeed, this fundamental protection is one of the most cherished and precious rights in our democratic system. *E.g., Patterson v. Burge*, 328 F. Supp. 2d 878, 889 (N.D. Ill. 2004) ("The due process clause safeguards the liberty of citizens. . . particularly in cases where the state 'has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury. . . .'") (citations omitted). Here, Defendants violated Jimenez's due process rights by concealing evidence of their manipulation and coercion of witnesses and by concealing exculpatory physical evidence. Defendants fabricated false evidence—a due process violation that is independent of Defendants' *Brady* violations.  And Defendants perjured themselves at trial in order to push forward the false story that was created during their sham investigation.

### A.   Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Concealment of Exculpatory Evidence.

The Seventh Circuit made clear in *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001)("*Newsome I*") and 319 F.3d 301, 304 (7th Cir. 2003)("*Newsome II*") that Section 1983

claims have always existed where a police officer's actions in withholding material exculpatory information (including exculpatory information about the manipulation of a witness's testimony) results in a denial of a defendant's right to a fair trial. 256 F.3d at 749-53; 319 F.3d at 304-05. *Newsome II* held that the defendants were liable "under the due process clause because [the defendant officers] concealed exculpatory evidence -- *the details about how they induced the witnesses to finger [the civil rights plaintiff]*." *Id*. at 304 (emphasis added). In *Newsome*, as here, "Plaintiff's lawyers needed, but did not receive, information vital to probe whether manipulation [of witnesses] occurred." *Id*. at 305. The facts present here fall squarely within *Newsome*.

Since *Newsome,* a number of other cases in this Circuit have confirmed that Section 1983 liability will attach to a police officer who has manipulated a witness into identifying a suspect and then withheld material details surrounding how that witness came to identify a suspect. In *Ienco v. City of Chicago,* 286 F.3d 994, 1000 (7th Cir. 2002), the court relied on its intervening decision in *Newsome I* to reverse the district court's summary judgment in favor of officers on immunity grounds. The court held that an officer can be liable directly under the due process clause for withholding exculpatory information and lying to federal prosecutors who indicted Ienco. Citing *Brady* and *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), the court concluded that there was no absolute immunity for such conduct, and further held that if the plaintiff proved his due process claim on remand, the officers would also not be entitled to qualified immunity. 286 F.3d at 1000-01.[4]

---

[4] The Seventh Circuit's opinion in *Jones* stands for two additional important propositions: (1) that " information undermining the credibility of a government witness is within the scope of Brady's rule" and (2) that certain intervening causes, such as " a prosecutor's decision to charge, a grand jury's decision to indict, [and] a prosecutor's decision not to drop charges but to proceed to trial" will <u>not</u> " shield a police officer who deliberately supplied misleading information that influenced the decision." 856 F.2d at 994 and 995.

The Seventh Circuit followed *Ienco* with *Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004), in which the court of appeals affirmed this Court's denial of summary judgment on absolute and qualified immunity grounds.  The Seventh Circuit acknowledged that Manning's allegations went beyond perjury and conspiracy to commit perjury and included "inducing [a witness] to create a false story" and "inducing a witness to falsely identify Manning in a line-up." *Id*. at 1032-33. The court held that the fact that Manning was also complaining of perjury (for which there was testimonial immunity) did "not foreclose his *Brady* claim."   Significantly, the court held that qualified immunity was also not available to the defendants because in 1990, when the misconduct allegedly occurred, it was already "well established that investigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process right." *Id*. at 1034, citing *U.S. v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985).

Finally, in *Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008), another case in which plaintiff asserted that the "defendant officers violated his right to due process by manipulating or tampering with identification and testimonial evidence"  and then "back[ed] up these allegations with [false] evidence at the trial," the court again affirmed, holding that the court properly instructed the jury that in order to find for plaintiff Dominguez, it had to find that Hendley caused Dominguez's criminal trial to be unfair through any of three specified courses of conduct: (1) withholding material, exculpatory evidence in violation of *Brady*; (2) causing an unreliable identification procedure to be used at his trial; or (3) fabricating evidence.  *Id*. at 589. *See also Id*. at 590 (because the officer's defense was primarily that he denied that any evidence was fabricated, procured through suggestive procedures, or withheld, "the jury therefore had to decide who was telling the truth on these points, and ultimately whether [Officer] Hendley misled the prosecution and caused Dominguez to receive an unfair criminal trial.").  The court

rejected defendant's claims of qualified immunity on the same basic grounds as the cases cited above, giving special emphasis to the point that the officer was not claiming immunity on the ground of "legal uncertainty," but rather was, as in this case, asserting factual defenses such as denial of the accusations, insufficient proximate cause, and superseding causation, all factual issues that do not relate to "legal uncertainty," and in any event do not lend themselves to pretrial resolution on immunity grounds.  Id. at 589-90.

In this long line of cases, the Seventh Circuit has repeatedly held that where, as here, the gist of the constitutional allegation is that the defendant induced witnesses to give a false identification of or make false statements about the suspect and then withheld the facts about how those witnesses were induced, defendants are not entitled to summary judgment (or post-trial reversal for that matter) on the grounds of failure to state a constitutional claim, or absolute immunity, or qualified immunity.

The facts in this case fit comfortably within these authorities.  Lacking any physical evidence, a confession, or anything else linking Jimenez to the crime, the State built its case solely on the purported eyewitness accounts that Defendants Bogucki and Sanders forged (double meaning intended) in a locked room inside the police station in the hours shortly after the murder. When Larry and Phil walked out of that room and were presented to the prosecutors, their testimony was virtually insurmountable: they were eyewitnesses who claimed: (a) to know Jimenez personally, (b) to have seen Jimenez shoot Eric, and (c) to have seen Jimenez wearing the very Duke jacket that the police seized from Jimenez, no less.  That testimony amply sufficed to convict Jimenez -- twice, as Defendants are quick to point out.  The problem, however, is there a lot more to the story that was never told because it was never disclosed to the prosecutors or to the defense.  Defendants' version of the story, as transmitted to the prosecutors via their original

police reports, critically withholds the following exculpatory material:

- That Bogucki and Sanders threatened, coerced, and intimidated Larry into naming Jimenez as the shooter, as well as the means they used to induce Larry's testimony and the fact that prior to naming Jimenez, Larry had repeatedly insisted for hours that Jimenez *was not the shooter*.[5]

- That Phil Torres did not actively seek out police in order to share his belief that Jimenez was the shooter and that, in truth Phil never told police he saw Jimenez shoot Eric, but rather only disclosed Jimenez's name based on a hearsay rumor from his sister that Jimenez might have been involved.

- That Defendants created a suggestive "Polaroid Show-Up Procedure" with Tina Elder and told her that Thaddeus Jimenez was the leading suspect at the time in order to influence her line-up identification.

- That they had induced witnesses to give false testimony (and in some cases simply wrote statements into their reports attributed to witnesses that were false), including but not limited to the statement that the shooter was wearing a Duke Jacket at the time of the murder. (Numerous witnesses have testified that the police, not they, inserted the wearing of a Duke Jacket into their witness statements. These false statements were in turn not disclosed to the State or defense, and the "shooter wore a Duke Jacket" theme was a major theme at both of Jimenez's trials.)

- That the following pieces of physical evidence existed: (a) Eric's handwritten note with Leo's name, telephone number and the amount of money Eric owed to Leo; (b) the square Polaroid photo of Jimenez used with Tina Elder; (c) until discovery in this case, the full inventory list of evidence that had been created in 1993.

None of this information was known to Jimenez at his criminal trial, and taken together, these facts would have made for devastating impeachment. *See Giglio v. United States*, 405 U.S. 150 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*]"). For summary

---

[5] It is true that Defendants' police report discloses that Larry did not originally identify TJ. (They had to include that fact because the beat officers had already created a report of their on-scene interview with Larry in which he described but did not identify, the shooter.) But the critical missing/withheld fact is that Larry not only failed to name TJ (purportedly out of fear) but that he was affirmatively insisting to his interrogators that the killer was known to him and *was not TJ*.

judgment purposes, a reasonable jury could certainly conclude that these withheld details were sufficiently material to give rise to a constitutional violation, which requires only that they "might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104 (1976).

### 1. The Purported Failure to Exercise Diligence Is Not a Basis for Summary Judgment on Plaintiff's Concealment of Evidence Claim.

Relying almost exclusively on *Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011), Defendants argue that Jimenez's *Brady* claim should fail because Jimenez and his criminal defense counsel did not meet their responsibility to uncover the withheld facts.  This argument should be rejected.  According to Defendants, *Holland* essentially stands for a rule that coercion of material witnesses cannot give rise to actionable *Brady* violations because any criminal defense attorney can simply interview the witness for himself. Such a reading would effectively overrule *Newsome* (and the cases that follow it discussed above) because one could always argue that material witnesses could have been interviewed *better*.  But that is simply not the law.  As the Seventh Circuit explained clearly in *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001),

> We are of the view, however, that the state's argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence.  We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for Brady purposes. . . .  To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement.

Id. at 740. (emphasis added). (This court should especially note that the Seventh Circuit is discussing limits on a defense counsel's ability to extract favorable evidence from "defense witnesses," while in this case, this caution is doubly, if not triply, true as it applies to defense counsel's ability to extract favorable evidence from *prosecution witnesses*.)

18

In reality, *Holland* is easily distinguishable and its holding is thus far narrower than Defendants assert. Unlike here (and in the series of *Newsome* cases discussed above), the police in *Holland* specifically disclosed to the criminal defendant that the witness had told them *three times* that Holland was not the rapist and then later said that he was. 643 F.3d at 256. The Court mused that the "first thought to pop into the mind" would be the question "[w]hat (if anything) happened between the three times [the witness] said that Holland was not the rapist and the time she finally said that he was?" That question pops up in *Holland's* facts (where the government *had disclosed* to the defense what the witness had initially said), but not in this case. Here, Defendants never disclosed Larry's initial specific and repeated denials that Jimenez was the perpetrator. *See* PX15 at TRJ0044 (no mention of denials).

Moreover, Holland's defense lawyer had indeed interviewed the witness, who told the lawyer that the sole reason she didn't identify Holland initially was because she was afraid. She did not tell him at that time, as she did later, that it was because of pressure from the police. The court in *Holland* points out that while the witness may have been lying to Holland's lawyer that was not the fault *of the police*, so Holland could not hold the police responsible for the witness's failure to share that information. The court further stated that the police neither coerced the witness to lie nor were they "otherwise withholding exculpatory evidence on this point from the defense." 643 F.3d at 256. That is what makes this case so completely different from *Holland*. Here, Defendants did *not* disclose in the original police reports that Larry had repeatedly told the officers that they had the wrong guy and that it was not Jimenez.

The point of *Holland* is that *as long as the police officers do disclose* that the witness had repeatedly said that the defendant did not do it before changing her story and saying he did, then there is no *Brady* violation. Once the shifting story is disclosed, however, the burden shifts to the

criminal defense counsel to ferret out why the witness changed her story.   Here, Defendants

nowhere disclosed that Larry had repeatedly insisted, in response to their accusations about

Jimenez, that he (Larry) knew Jimenez, and that Jimenez was *not* the shooter.   In *Boss*, the

Seventh Circuit explained how to evaluate a defense counsel's diligence:

> We also find it significant that a defense witness's knowledge is quite different from the
> type of evidence typically found to be available to defense counsel through the exercise of
> reasonable diligence.   In the typical reasonable diligence case, the question is whether
> defense counsel had access to the document containing the *Brady* material, through an open
> file policy, for example.   In cases like the present one, the question is whether defense
> counsel had access to Brady material *contained in a witness's head.*   Because mind-reading
> is beyond the abilities of even the most diligent attorney, such material simply cannot be
> considered available in the same way as a document.   But, the position the state advances
> would require a defense witness's knowledge to be treated exactly as information in a
> document the defense possesses. *This stretches the concept of reasonable diligence too far*.

263 F.3d at 741. (citations omitted, emphasis added).   This is precisely what the defendants ask

this Court to do in this case – stretch the concept of reasonable diligence too far.

Applying this *Boss* standard to the facts at bar, Defendants have failed to meet their

burden of establishing what Jimenez's defense counsel "likely did obtain" and "likely could have

obtained" by speaking with witnesses before trial.   And, in any event, the question of what the

defense counsel "likely could have obtained" is a disputed question of fact that may not be

decided on Defendants' motion.   For one thing, the Defendants' manipulation of Larry was not

uncovered by the prosecutors either.   They, too, were fooled, and they had every opportunity to

interview him.   There is no justification for holding defense counsel to a higher standard.[6]

---

[6]      Defendants take out of context a phrase from Larry's statement that he lied
because he "did not think anyone would believe him."   (Def. Mem. at 9)   There is no disputing
that Larry did try to tell the truth to the Defendants:   he repeatedly told them that TJ was not the
shooter, as described at length only a few paragraphs earlier in that very same affidavit that
Defendants reference. *See* PX23. In fact, Defendants flip the "nobody would believe me"
reference on its head:   it actually describes Larry's motive for going along with the Defendants'
subterfuge *once he had to deal with the lawyers,* a fact that undermines, not supports,
Defendants' *Holland* argument.

Furthermore, as the Defendants in this case concede, defense counsel *repeatedly did probe* Larry about the account he provided *at trial*, Def.'s SOF ¶¶ 42, 45, 46, 54, 56, 57, an account that was on the record, while Larry was under oath, no less. *Id.* Unfortunately, Larry did not budge from the false account, and declined to divulge the exculpatory details. *Id.* No amount of probing inquiry by defense counsel was able to change Larry's story, leaving one wondering what more Defendants are suggesting counsel should have asked to get to the truth. *Compare* Def. Mem. at 8 (faulting Jimenez for supposedly failing to ask the question: "why did Tueffel change his identification of the shooter?").

Finally, there is evidence that Larry had his own reasons for not exposing the Defendants' manipulations. As Larry stated, after he was pressured into the false account and was released by the police, he came to believe that the real shooter, who he knew by the name "Crazy," would retaliate against him if he exposed the police's frame-up of Jimenez. (P. Stmt. ¶¶ 38, 39.) Larry decided to keep his mouth shut in court, and Defendants have not presented any probative evidence to suggest that TJ would have obtained a different result with so-called "greater diligence." At one point, Larry went to St. Genevieve's Church with the intention of telling a priest the truth about his false testimony against TJ, but he lost his nerve and did not go through with it. (*Id*. ¶ 40.) If he was too afraid to share the truth with an anonymous priest, a jury could reasonably conclude that the cause of TJ's injuries was not inadequate interviews by the defense.

2.      ***Gauger*** **and Other Confession Cases Do Not Furnish a Basis for Summary Judgment on Plaintiff's Concealment-of-Evidence Claim.**

In a related vein, Defendants argue that this Court should apply false confession cases – *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006); and *Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2005) – for the proposition that Jimenez may not state a *Newsome* claim because he was aware that Tueffel was subjected to

21

pressure from police. These three cases, however – *Gauger*, *Sornberger*, and *Kuba* – stand for a narrow and limited proposition. In all three of those cases (as Defendants concede), the court basically ruled that when police improperly coerce a false confession from an accused party, the party may not assert a *Newsome* claim that the police's misconduct violated his rights, because the accused party was obviously aware of the coercion to which he was subjected. In other words, a plaintiff may not assert a *Newsome* claim in relation to *his own confession* because the suppression part of a *Newsome* claim is wholly lacking.

Defendants now try to stretch that principle, asserting it is enough to foreclose a plaintiff's *Newsome* claim if the plaintiff was aware that one or more of the witnesses against him was subjected to "pressure." This proposed extension of *Gauger*, *Sornberger*, and *Kuba* is untenable, not the least because Jimenez and his counsel – and the prosecutors, for that matter – never learned many (indeed never learned any) of the critical details needed for impeachment. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (*Brady* encompasses impeachment evidence affecting the credibility of prosecution witnesses). Even if Jimenez knew that Larry was young, or knew that the police had yelled, or even threatened, that does not alter the fact that the police *failed to disclose* what Larry had repeatedly *stated* to them about Jimenez's innocence.[7]

### 3. Judicial Estoppel Does Not Furnish a Basis for Summary Judgment.

Defendants assert that Jimenez is "judicially estopped" from asserting that the witness's misidentification was caused by the police because at his criminal defense trial his attorney asserted that they testified against him falsely because of gang pressure. Def. Mem. at 10. The

---

[7] At the underlying trial, both the prosecutors and the defense needed a reason for why when Larry was interviewed by the officers, he failed to name TJ. In this case, as in others, they went with a "fear of gangs" explanation, which Larry dutifully reported to the jury – never explaining why, if he was so afraid of gangs, he turned around and implicated an alleged gang member once the Defendants got ahold of him.

essence of the doctrine is the prevention of litigants from manipulating the legal system by prevailing based on one position, only to turn around and take the contrary position later.  There are two reasons that judicial estoppel simply does not apply to these facts.

First, it is a fundamental element of judicial estoppel that the party who the movant seeks to estop must have been successful with the first argument (statements during his criminal trial that gang pressure caused the false testimony).  In other words, in order to be estopped in a subsequent proceeding, the party "must have enjoyed the fruits" of the argument in the initial proceeding.  *E.g., New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) ("Absent success in a prior proceeding, a party's later inconsistent position introduces 'no risk of inconsistent court determinations,' and thus poses little threat to judicial integrity.")  Obviously, Jimenez lost at both of his trials – to the tune of 50 years and 45 years respectively.   While Jimenez was later exonerated of those convictions, it was not because of the gang pressure argument; it was because Larry had finally disclosed his true motive for lying (police coercion).  Put simply, police coercion, not gang retaliation, was the foundation for Jimenez's exoneration, and he thus is not estopped.

Second, if the litigant did not know certain facts at the time he made an argument in the first proceeding, he cannot be judicially estopped from asserting the newly-learned facts in the subsequent proceeding.  *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) ("[T]he doctrine of judicial estoppel is not an absolute bar to obtaining legal relief on the basis of new information  even if inconsistent old information had gotten the party an advantage in some other proceeding.").  This exception is particularly applicable here.  The very reason Jimenez was not in a position to raise police coercion earlier was because these same Defendants withheld those facts, in violation of *Brady* and *Newsome*.  *Jimenez* is hardly the party in this case that is "play[ing] fast and loose" with the court system (to borrow Defendants' phrase).

23

### 4.    Attacks on Larry's Credibility Do Not Furnish a Basis for Summary Judgment.

Defendants spend a substantial portion of their brief trying to discredit both Larry personally and the facts surrounding his recantation. There are two major reasons that these attempts to discredit are immaterial on this motion.  First, the Court is not to resolve credibility disputes on summary judgment; those are to be left to the jury.  And, second, even if the Court were to take on the issue of Larry's credibility for purpose of this motion (solely for sake of argument), the fact remains that Larry's recantation testimony has been strikingly consistent.

Taking the second point first, once Larry recanted and told the truth, Larry has never wavered from any of the details of the true story, providing a consistent account of how he was pressured into testifying falsely, what methods the police used to do so, why he ultimately broke down, how he tried to get out from under his lies by not going to Court, and how he finally came to recant. *See*, *e.g.*, PX23 (7/31/06 Tueffel Statement); PX69 (3/20/08 Harrigan Memo re: Larry's Meeting With CCSAO); PX70 (2/9/09 CCSAO Investigative Report re: Meeting with Larry); PX2 (3/3/11 and 3/7/11Tueffel Dep.).  Larry has explained these central controlling facts in the same way to the Center on Wrongful Convictions, to the Morro family, to the State's Attorney's Office, in his affidavit, in his videotape statement, and at his deposition.

The only time he has ever deviated was when Defendants' counsel interviewed him at his home with a policeman, did not take any notes of their encounter, went back to his office to type an affidavit that he wanted Larry to sign, and then sent a policeman over to get Larry to sign it the next day.  (It is true that that affidavit is not consistent with the facts as Larry has consistently told them since July 2006, but that fact represents an indictment of the affidavit obtained, not an endorsement of its value as a tool of impeachment.)  Moreover, even the affidavit that Defendants' counsel prepared makes perfectly clear that Jimenez is innocent and that Larry's

testimony at the criminal trial was false.  While it also states that Larry was not subject to "police coercion,"  Larry has since testified that those were Mr. Hale's words, not his; that he does not know what the word "coercion" even means, that the part about not "blaming" the police is an untrue over-simplification; and that he basically felt tricked into signing that statement (all over again, as it were).  At his deposition Larry could not explain why he signed it, other than that he was "trying to be cooperative."  P. Stmt. ¶¶ 41-43.  His testimony also made clear, however, that he now regretted signing it and the manner in which it was presented to him.  *Id.* ¶ 42 ("He just asked me to sign it.  I just did.  I shouldn't have.").  And while the statement does say that he is not "blaming" the police, Larry clarified that as well: "I said I had nothing against them.  That doesn't mean that what they did was right."  *Id.* ¶ 43 ("I said I'm not blaming anybody, I just wanted to get this fixed . . ..").[8]

Taking a step back, Jimenez's core theory is that the Defendants were able to pressure a weak person into knowingly implicating an innocent man.  In the bigger picture, the fact that Larry is still willing to accommodate authority figures by signing whatever was put in front of him in order to avoid conflict is hardly helpful to the Defendants.  In any event, it will ultimately be for the jury to decide whether to credit or discredit Larry's testimony.  It goes without saying that it has no place in this motion as an undisputed issue of material fact.[9]

---

[8]    In Larry's words: " I didn't mean it like that.  I said I have nothing against the police.  He asked me a question do you blame anybody.  I said, well, they kind of made -- I mean, police are supposed to do their job.  And he was trying to ask me do I hate police because -- I didn't mean -- It was wrong -- I don't know right now.  Hold on a minute."  P. Stmt. ¶ 43.

[9]    It turns out that it is not at all difficult for police officers to get Larry to sign things. Defendants' legal team (including an off-duty police officer they hired) managed to persuade Larry to sign a HIPAA release for his confidential medical records (which he also now regrets) by explaining that they just needed to "have a paper signed so they could see my background or whatever, do whatever they're trying to do.  I don't know."  *Id.* ¶ 44.  After having Larry sign the release, Defendants then used Larry's psychological records (footnote continues) to prepare a comprehensive expert witness report, *which they then put into the public record with*

Fundamentally, though, these are not questions for resolution by summary judgment. Even if the jury were to conclude Larry is mentally ill, his credibility must be judged based on his demeanor while testifying at trial. *Cf., e.g., U.S. v. Snyder*, 189 F.3d 640, 645 (7th Cir. 1999) ("As long as a witness has the capacity to testify truthfully, it is best left to the fact-finder to determine whether he in fact did so."). There can be no reasonable dispute that Larry Tueffel is perfectly capable of understanding and answering questions and perceiving or reporting events. P. Stmt. ¶¶ 41-46. See also *Id.* ¶¶ 24-41. This Court had the opportunity to personally observe Larry at his deposition, and thus is in a position to conclude that a reasonable jury could find him credible notwithstanding the attempt of Defendants' expert (who has never even met Larry) to assert that mental illness wholly discredits his testimony.

In sum, Larry's testimony creates a triable issue, and Defendants' attacks on his credibility do not justify summary resolution. The same is true for Phil Torres's and Tina Elder's testimony. Jimenez states a valid *Newsome* claim based on the testimony of all three witnesses, individually and collectively, and Defendants' summary judgment motion should be summarily denied.

---

*their summary judgment filing*, about how his alleged " paranoid schizophrenia" supposedly makes him an unreliable witness. *See* Defendants' Exhibit 58. Indeed, Defendants filed this report publicly even after receiving an internal memo among TJ's former exoneration lawyers, in which Larry asked that his diagnosis and medications not be widely circulated. *See* PX69 (after Larry told Patrick Harrigan, one of TJ's exoneration lawyers that he had fully disclosed his mental health issues to the CCSAO, "Larry asked that [TJ's counsel] not share his mental health diagnoses and medications with TJ or anyone else.")

Defendants' willingness to put Larry's highly embarrassing and confidential mental health history into the public record runs conspicuously counter to the City's unwavering fixation on the privacy rights of police officers accused of misconduct and the need for a protective order on everything about them, from a 20-year old photograph to the date they left active service of the police force.

**B.   Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Creation of False and Fabricated Evidence.**

Separate and apart from Defendants' suppression of material exculpatory evidence in violation of *Brady* and *Newsome*, Defenadnts may be held liable for the simple act of fabrication, without more.   Jimenez has a constitutional right not to be deprived of liberty on the basis of fabricated evidence. As the court stated in *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002), a policeman's "intentional creation of damaging facts" against a person under investigation "shocks the conscience and violates the decencies of a civilized society." *Id*. at 646-48.  *See also Wilson v. Lawrence County*, 260 F.3d 946, 957 (8th Cir. 2001) ("If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated."); *Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir.1999); *Devereaux v. Abbey,* 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc); *Castellano v. Fragozo,* 311 F.3d 689, 704-705 (5th Cir. 2002); *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004) (and cases cited within these cases).

For example, in *Spurlock*, police officers fabricated evidence and manufactured probable cause.   The Sixth Circuit found both that a constitutional right to be free from fabricated evidence and also rejected a qualified immunity claim, holding that on the basis of the Court's prior holdings in *Brady* and *Pyle* "[the defendant] cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights."  167 F.3d at 1005-06.  *See also Richardson v. City of New York,* No. 02 Civ. 3651, 2006 WL 2792768, at *5 (E.D.N.Y. Sept.26, 2006) (court holds it is a disputed issue of fact whether plaintiff suffered a constitutional injury where police officers fabricated evidence, passed that evidence along to the District Attorney's office, and Richardson was indicted and prosecuted as a result); *cf. also Landrigan v. City of Warwick,* 628 F.2d 736, 744-45 (1st Cir.1980) (dissemination of a false report may violate a plaintiff's rights).

27

Here, the summary judgment record is rife with evidence that was fabricated.  Of course, Defendants coerced and manipulated Larry, Phil and Tina into their false identifications of Jimenez.  They prepared police reports falsely suggesting that Larry Tueffel readily named Jimenez as the shooter during in an interview in Larry's home before Jimenez was arrested. They used a one-photograph show up to manipulate Tina Elder into her identification of TJ.  And they prepared a false report stating that Phil Torres had identified Jimenez as the shooter, when he had not done so.  Even without the false reports, the manipulation of these witnesses' identifications—whether or not concealed—violates due process.  *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (due process "is violated if unduly suggestive identification techniques are allowed to taint the trial").

Defendants also fabricated evidence that Eric Morro's murderer was wearing a Duke jacket. At the scene, Larry described the shooter's jacket as purple with yellow lettering – a description that matched the jacket Juan was wearing at the time of the murder.  When Bogucki arrested Jimenez (and he walked out of his grandmother's apartment with a Duke jacket), Bogucki simply decided that it was would be better for the witnesses just to say that the shooter was wearing a Duke jacket. He did this by suborning witnesses to say that they had seen the shooter in a Duke jacket and by outright fabrication of witness statements in his police reports.

Defendants do not proffer an argument as to how they might be entitled to summary judgment with respect to this due process claim.

**C.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Use of False Testimony.**

The Supreme Court has long recognized that due process is denied where the state has "contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the

presentation of testimony known to be perjured." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (such conduct is "inconsistent with the rudimentary demands of justice"). Knowing use of false evidence or perjured testimony deprives a defendant of due process and a fair trial when the evidence is material to guilt or punishment. *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001), citing *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) ("[W]e do not employ the term of perjury in a technical, legal sense in these types of cases, but rather as a term of art that describes the knowing use of false testimony."). An accused's right to a fair trial is violated "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942).

As the Seventh Circuit has explained, "[t]he *Agurs* standard [for perjury] is different from that in *Bagley* [for *Brady* violations] and sets a lower threshold for determining materiality." *Braun v. Powell*, 227 F.3d 908, 920 & n.11 (7th Cir. 2000), citing, among others, *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) ("different standards of materiality apply to *Brady* claims and claims that the prosecution has knowingly used perjured testimony or false evidence" and the standard for the latter is "considerably less onerous").

Jimenez's Complaint alleges that the Defendants testified falsely at Jimenez's trial about Jimenez's purported guilt and the veracity of the witness statements they procured. (Dkt. No. 40 ¶ 30.) The evidentiary record bears this out. Ordinarily, absolute immunity might bar the claim, but the Agreed Stipulation attached as PX42 moots that question. Defendants make no argument to defeat this due process claim and it therefore survives their motion for summary judgment.[10]

## II.    QUALIFIED IMMUNITY DOES NOT ENTITLE THE DEFENDANTS TO

---

[10]    On September 1, 2011, Jimenez and the City entered into a *Monell* stipulation whereby the City agreed to be liable for " any constitutional violation" proven with respect to the individual defendants.

**SUMMARY JUDGMENT.**

Defendants make two half-hearted qualified immunity arguments, but these are both nonstarters. They state they have found no case that prohibited defendants from using loud voices with Larry when they thought he was lying to them, nor have they found any case that required them to provide Tina "a special room without any paperwork" in order to avoid the risk of her seeing the picture of Jimenez that she saw. If Jimenez's evidence is credited on this motion (as it must be), these qualified immunity arguments must fail.

Defendants do not, and cannot, dispute the premise that Section 1983 liability for withholding exculpatory evidence was well-established in February 1993. The Seventh Circuit has repeatedly stated that the a police officer's duty to disclose *Brady* material (including material that falls within the confines of *Newsome*) was clearly established not later than 1985 when the Seventh Circuit decided *U.S. v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) and at the very latest by 1988 when the court decided *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), if not all the way back to *Brady* itself (1977). *See also supra at* pages 14-16 the *Ienco*, *Manning*, and *Dominguez* immunity cases extensively discussed above.

Defendants may also not claim in good faith that they are entitled to immunity for fabricating evidence, including fabricating evidence through an unduly suggestive identification procedure. As an initial matter, it is well-established that a policeman's fabrication of evidence against an accused is a violation of his constitutional rights, and numerous courts have already rejected defendants' claims that the state of the law did not give them a fair warning that fabricating evidence for the purpose of charging or trying a defendant was unconstitutional. As an *en banc* panel stated in *Devereaux* in 2001, "Perhaps because the proposition [that police may not fabricate evidence in order to charge someone with a crime] is virtually self-evident, we are

not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right.  Rather, what is required is that government officials have 'fair and clear warning' that their conduct is unlawful."  The court went on to hold that the officers had a "fair and clear warning" in 1994 that it was unconstitutional to use false or fabricated evidence to charge or try a defendant.  *Id.* at 1075.  See also *Pierce,* at 1297-98 (court of appeals affirms the district court's denial of qualified immunity to a forensic chemist who fabricated evidence in 1986 that led to plaintiff's conviction and fifteen years in a state prison).  Here, there can be no reasonable dispute that the Defendants were on notice in 1993 that Defendants had a constitutional right not to be charged or tried based on evidence that was fabricated by the police.

As to the more specific fabrication issue related to suggestive identification procedures, the law has been clear since at least *Manson v. Brathwaite* that it is unconstitutional to utilize unduly suggestive identification procedures.  Numerous cases have so held.  *See*, *e.g.*, *Rojas v. Iannatto*, 2003 WL 169798, *4 (S.D.N.Y. Jan. 24, 2003) ("a criminal defendant's right not to be subjected to unduly suggestive identifications has been the law since [*Brathwaite* in] 1977.").

But the gist of Defendants' qualified immunity arguments is not so much to take issue with the clearly established law as it is to claim that they did not do what Larry, Phil, and Tina have said they did. Such arguments must await another day.  What happened during Defendants' interactions with Larry, why and with what intention Tina came to be sitting in a room with the Morro file opened to a picture of Jimenez, and whether Phil called Bogucki or Bogucki just showed up, are all questions that can only be resolved at trial.  But summary judgment on the immunity grounds asserted is simply not available. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[11]

---

[11]     Defendants assert in Section IV of their Memorandum that Jimenez's claims for failure to intervene, conspiracy, intentional infliction of emotional distress, and *respondeat superior* all fail for want of an underlying violation.  Because TJ has shown (footnote continues) such a violation or at a minimum that a determination with respect to such violations requires a

III.   **SUMMARY JUDGMENT IS NOT AVAILABLE ON JIMENEZ'S MALICIOUS PROSECUTION CLAIM.**

   A.   **Whether The Officers Had Probable Cause Is A Question Of Fact.**

   The question of probable cause is typically "a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006).  Similarly, applying Illinois law, the issue of "whether a statement bears sufficient indicia of reliability to support a finding of probable cause in a malicious prosecution case is a question of fact to be resolved by the jury."  *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, xxx (1st Dist. 2002); *Howard v. Firmand*, 378 Ill. App. 3d 147, 151 (1st Dist. 2007) ("It is only when the circumstances alleged to show probable cause are not disputed that the cause can be decided as a matter of law").

   As discussed at length above, all of the evidence that could give rise to probable cause to believe Jimenez committed murder has allegedly been falsified by the Defendants themselves. Summary judgment is unavailable where probable cause is alleged to be based on fabricated evidence. *Tully v. Del Re*, 2002 WL 31175983, at *5 (N.D. Ill. Oct. 1, 2002) (probable cause properly left to the jury where defendants "implicitly importuned witness to manufacture a basis for charges" and "thus could not reasonably have relied on what [the witness] told them"); *Finwall v. City of Chicago*, 490 F. Supp. 2d 918, 923 (N.D. Ill. 2007) (same). *See also Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir. 1990); *Kincaid v. Ames Dept. Stores, Inc.*, 283 Ill. App. 3d 555, 565 (1st Dist. 1996) ("Defendants rely on the written statements by Smallwood and Jennings to establish probable cause.  However . . . [those witnesses] both specifically detailed how defendants told them to accuse plaintiff in their statements, even though plaintiff had done

---

trial, Defendants' request for summary judgment on Counts II, III, V, and VI should also be denied.

nothing wrong. Sufficient reliability must support any statement used to help establish probable cause."); *Mack v. First Sec. Bank of Chicago*, 158 Ill. App. 3d 497, 503-504 (1st Dist. 1987) (sufficient evidence of lack of probable cause for malicious prosecution claim where eyewitness identification allegedly lacked integrity); *Howard*, 378 Ill.App.3d at 151 ("Because the truth of Defendant's abuse allegations are disputed, [malicious prosecution] summary judgment, based on a finding of probable cause as a matter of law, should not have been granted").

### B.     Whether the Officers Acted With Malice Is Also A Question Of Fact

As with probable cause, the presence of malice *vel non* is highly disputed, and can only be properly decided by a trier of fact.  Paragraph 80 in our Statement of Facts, as well as others, sets forth in great detail ample evidence from which a reasonable jury could reasonably infer that the Defendants were not genuinely interested in solving this crime, but rather were interested in clearing and closing a case as fast as possible and without looking back.  *See, e.g., Turner v. City of Chicago*, 91 Ill. App. 3d 931, 937 (1st Dist. 1980) ("Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith . . . and where the want of probable cause has been clearly proved.").  Not only were Defendants working overtime to make the evidence fit the suspect, Jimenez, but they then also deliberately ignored the evidence that Juan was the real killer. This evidence is obviously sufficient to warrant a reasonable jury in finding the existence of malice.

### IV.    JIMENEZ VOLUNTARILY DISMISSES DEFENDANTS WHITEMAN, RYAN, AND MONTILLA.

The City's agreement to stipulate to judgment against it if Jimenez can prove the constitutional violation of any of Officers Bogucki, Sanders, Schalk, Montilla, Ryan, or Whiteman eliminates the need to sort out exactly who did what.  *See* PX42.  In light of the stipulation, Jimenez is content to pursue the primary detectives.  If those Defendants decide to

point the finger at trial at others who seemed more peripheral earlier in the litigation (which has sometimes been a defense at other trials involving these same sets of lawyers), then Jimenez can still recover under the Stipulation with the City.  In the meantime, there is no need for the Court to decide liability for any Defendants except the three main detectives who built the case and interacted with the witnesses.  Those Defendants do not make arguments about lack of personal involvement, so Defendants' summary judgment argument on that point is moot.

## CONCLUSION

For these reasons, Jimenez respectfully requests that summary judgment be denied.

Respectfully submitted,

**THADDEUS JIMENEZ**

By: _/s/_ Stuart J. Chanen
One of his Attorneys

Dated:   September 2, 2011

| Mr. Jon Loevy | Mr. Stuart J. Chanen | Mr. Locke E. Bowman |
|---|---|---|
| Mr. Russell Ainsworth | Ms. Lisa R. Carter | Roderick MacArthur Justice |
| Mr. Joel Feldman | Valorem Law Group LLC | Center |
| Loevy& Loevy | 35 E. Wacker Dr. | Northwestern University |
| 312 North May St. | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | (312) 676-5480 | Chicago, IL 60611 |
| (312) 243-5900 | | (312) 503-0844 |

**CERTIFICATE OF SERVICE**

I, Stuart J. Chanen, certify that on September 28, 2011, I served all counsel of record by filing the attached CORRECTED Response Brief with the Court's ECF system.


By:   /s/   Stuart J. Chanen

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | No. 09-CV-8081 |
| | ) | |
| CITY OF CHICAGO, ET. AL. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**PLAINTIFF'S AMENDED INDEX OF EXHIBITS CITED IN HIS STATEMENT OF FACTS AND/OR PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENTS OF FACTS**

| EXH.NO. | DESCCRIPTION | |
|---|---|---|
| | **DEPOSITION TESTIMONY RE: *JIMENEZ V. CITY, ET.AL.*** | |
| PX 01 | Cited pages from the deposition of Victor Romo | |
| PX 02 | Cited pages from the deposition of Larry Tueffel | |
| PX 03 | Cited pages from the deposition of Thaddeus Jimenez | |
| PX 04 | Cited pages from the deposition of Jerome Bogucki | |
| PX 05 | Cited pages from the deposition of Phil Torres | |
| PX 06 | Cited pages from the deposition of Tina Elder | |
| PX 07 | Cited pages from the deposition of Ezequiel Romo | |
| PX 08 | Cited pages from the deposition of Raymond Schalk | |
| PX 09 | Cited pages from the deposition of Fernando Montilla | |
| PX 22 | Cited pages from the deposition of Allison Flaum | |
| PX 44 | Cited pages from the deposition of Patrick Harrigan | |
| PX 59 | Cited pages from the deposition of Lawrence Ryan | |
| PX 60 | Cited pages from the deposition of Donna Cosmen | |
| PX 65 | Cited pages from the deposition of Shawn Cosmen | |
| PX 70 | Cited pages from the deposition of Mark Sanders | |
| PX 72 | Cited pages form the deposition of Victoria Jimenez in support of Plaintiff's Statement of Fact No. 80. | |
| | | |
| | ***PEOPLE V. JIMENEZ* TRIAL** | |
| PX 10 | Cited pages from the 1994 testimony of Angela Jimenez | |
| PX 11 | Cited pages from the 1994 testimony of Larry Tueffel | |
| PX 12 | Cited pages from the 1994 testimony of Phil Torres | |
| PX 13 | Cited pages from the 1997 testimony of Phil Torres | |
| PX 14 | Cited pages from the 1997 testimony of Sandra Elder | |
| | | |
| PX 61 | Cited pages from the 1997 testimony of Tina Elder | |

| Exh.No. | Desccription | |
|---------|--------------|---|
| | *People v. Jimenez* Trial (cont'd.) | |
| PX 62 | Cited pages from the 1994 State's Closing Argument | |
| PX 63 | Cited pages from the 1994 testimony of Jerome Bogucki | |
| PX 64 | Cited pages from the 1997 testimony of Larry Tueffel | |
| PX 68 | Cited pages from the 1997 testimony of Tina Elder | |
| | | |
| | | |
| | Documents | |
| PX 15 | CPD Supplementary Report re: Field Investigation | JIM 00013 – 00020 TRJ 00039 – 00046 |
| PX 16 | CPD General Progress Report re: Notes of Tueffel Interview | TRJ 00255 - 00256 |
| PX 17 | CPD General Offense Case Report re: RD No. X-051839 | JIM 00004 - 00007 |
| PX 18 | CPD Polaroid Photograph re: Thaddeus Jimenez | TRJ 00259; T. Elder Dep. 2 |
| PX 19 | CPD General Progress Report re: Notes of Torres Interview | JIM 00033, JIM 0036; TRJ 00257 - 00258 |
| PX 20 | CPD Arrest Report | JIM 00046 TRJ 00052 |
| PX 21 | Transcript of Witness Interview re: Larry Tueffel dated 07/31/06 | [SAO] 0106 - 0128 |
| | | |
| PX 23 | Handwritten Statement re: Larry Tueffel dated 07/31/06 | [SAO] 0004 – 0019 |
| PX 24 | Affidavit of Larry Tueffel dated 08/20/10 | |
| PX 25 | Defendants' Responses to Third Set of Interrogatories | |
| PX 26 | Affidavit of Luke Netzel dated 09/09/07 | [SAO] 0103 – 0105 |
| PX 27 | Affidavit of Tina Elder dated 05/15/07 | [SAO] 0020 – 0021 |
| PX 28 | CPD Supplementary Report re: Field Investigation Lineup Report | TRJ 00049 - 00051 |
| PX 29 | CPD Supplementary Report re: Victor & Ezequiel Rome dated 02/10/93 | JIM 00021 – 00024 |
| PX 30 | Hand drawn map | JIM 00039 |
| PX 31 | General Progress Report re: Ezequiel Romo | JIM 00040 |
| PX 32 | Affidavit of Ezequiel Romo dated 02/28/07 | [SAO] 0001 – 0003 |
| PX 33 | Translation of Taped Confession | JIM 00253 – 00262 |
| PX 34 | CPD Supplementary Report re: Re-Interview of Juan Torres | JIM 00025 – 00026 |
| PX 35 | CPD Investigative File Inventory | JIM 00030 |
| PX 36 | Plaintiff's First Set of Requests for Production to Defendant | |
| PX 37 | CPD Investigative File Inventory | TRJ 00254 |
| PX 38 | Comparison of JIM 00030 and TRJ 00254 | |
| PX 39 | CPD Photo re: Inventory Item No. 1058724: Note found in the victim's pocket | |
| PX 40 | Verdict Form dated 10/04/94 re: Thaddeus Jimenez | JIM 00118 |
| PX 41 | Order Permitting Prosecution of a Minor re: *People v.* | |

| EXH. NO. | DESCCRIPTION | |
|---|---|---|
| | *Jimenez* | |
| PX 42 | Stipulation and Waiver of Requirement of Proof re: *Jimenez v. City, et.al.* | |
| PX 43 | *People v. Jimenez* – 09/17/97 Motion in *Limine* Seeking to Use Out-of-Court Admission Against Penal Interest by a Third Party, Non-Defendant | |
| | | |
| PX 45 | Letter from the IDC re: Transferring Jimenez to and Adult Facility. | JIM 01199 - 01202 |
| PX 46 | People v. Jimenez re: Appellate Opinion | |
| PX 47 | Letter written by Thaddeus Jimenez requesting legal assistance | JIM 0589 - 05864 |
| PX 48 | Investigative Report re: Interview of Rosa Wiszo-Waty (sister of Victor Romo); and Ms. Medina (Juan Carlos Torres neighbor) | [SAO] 0042 – 0043 |
| PX 49 | Investigative Report re: Interview of Leo Robles and Attempts to locate Phil Torres. | [SAO] 0055 – 0057 |
| PX 50 | Investigative Report re: Interview of Juan Carlos Torres at ESPN Zone. | [SAO] 0038 – 0039 |
| PX 51 | Investigative Report re: Attempts to locate Juan Carlos Torres at ESPN Zone and Palmer Street address. | [SAO] 0036 – 0037 |
| PX 52 | Investigative Report re: Interview of Ernie Ritchie (Facility Manager of ESPN Zone.) | [SAO] 0045 – 0046 |
| PX 53 | Investigative Report re: Interview of Mark Nhoddenbach (Landlord at Palmer Street address). | [SAO] 0093 – 0095 |
| PX 54 | Press Release dated 05/05/09 re: State's Attorney Alvarez Vacates Conviction in 1993. | JIM 06057 |
| PX 55 | Order re: People v. Jimenez entered by Hon. J. Claps on 05/01/09 | JIM 05245 |
| PX 56 | Certificate of Innocence re: People v. Jimenez entered by Hon. P. Biebel on 06/03/09 | JIM 04351 |
| PX 57 | Arrest Report re: Juan Carlos Torres | [SAO] 0088 – 0092 |
| PX 58 | Indictment re: Juan Carlos Torres filed on 05/19/09 | |
| | | |
| PX 66 | Affidavit of Lisa Carter dated 9/2/2011 | |
| PX 67 | General Progress Report re: Eric Morro and Tina Elder | JIM 00032 TRJ 00061 |
| | | |
| PX 69 | 03/20/09 E-mail from Harrigan re: State's Attorney 3-20-08 Interview of Larry Tueffel. | JIM 06317 - 06319 |
| | | |
| PX 71 | Investigative Report re: Interview of Larry Tueffel. | [SAO] 0219 – 0222 |

Respectfully submitted,

**THADDEUS JIMENEZ**
By:    /s/   Stuart J. Chanen
         One of his Attorneys

Dated: September 28, 2011

| | | |
|---|---|---|
| Mr. Jon Loevy | Mr. Stuart J. Chanen | Mr. Locke E. Bowman |
| Mr. Russell Ainsworth | Ms. Lisa R. Carter | RODERICK MACARTHUR |
| Mr. Joel Feldman | VALOREM LAW GROUP LLC | JUSTICE CENTER |
| LOEVY& LOEVY | 35 E. Wacker Dr. | Northwestern University |
| 312 North May St. | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | (312) 676-5480 | Chicago, IL 60611 |
| (312) 243-5900 | | (312) 503-0844 |

4

## CERTIFICATE OF SERVICE

I, Stuart J. Chanen, certify that on September 28, 2011, I served all counsel of record by filing the attached **PLAINTIFF'S AMENDED INDEX OF EXHIBITS CITED IN HIS STATEMENT OF FACTS AND/OR PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENTS OF FACTS** and copies of **PX 67 and PX 72** with the Court's ECF system.

By:    /s/   Stuart J. Chanen
          One of Plaintiff's Attorneys

PX 67

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION/CHICAGO POLICE

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|---|
| | DAY    MONTH    YEAR | DAY   MONTH   YEAR   WATCH |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

MORRO, ERIC M/W/19       OR. JERIUS 1911 hrs,
3251 N. ALBANY  604-8733      FATHER 862-4988
10-1-73

F/W/21           JOHN SZYMO 1763
ECKER TINA A  12-4-71
3020 N NEENAH 1st FL, 622-3445
SS# 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   UNEMP.

─ about 5' away                    3618 1st
                                    N. BELMONT

TRJ00061

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO. | DAY-MO.-YR. | TIME |
|---|---|---|---|

D-23.122 (Rev. 2/83)

PX 72

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

THADDEUS JIMENEZ,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　 )
　　　　　　　　　　　　　　　　　　)
　　　　　vs.　　　　　　　　　　　 )Case No. 09-cv-8081
　　　　　　　　　　　　　　　　　　)
CITY OF CHICAGO, Chicago Police　 )
Detectives JEROME BOGUCKI, MARK　 )
SANDERS, RAYMOND SCHALK, F.　　　　)
MONTILLA, Chicago Police　　　　　 )
Officers LAWRENCE RYAN and　　　　 )
ROBERT WHITEMAN, and as-yet　　　　)
unknown City of Chicago　　　　　　)
Employees,　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　 )

STATE OF ILLINOIS　　　)
　　　　　　　　　　　　)　 SS.
COUNTY OF COOK　　　　　)

　　　　　The deposition of VICTORIA JIMENEZ taken

before Monica Kim, Certified Shorthand Reporter and

Notary Public, taken pursuant to the provisions of the

Illinois Code of Civil Procedure and the Rules of the

Supreme Court thereof pertaining to the taking of

depositions for the purpose of discovery at 53 West

Jackson Boulevard, Suite 1800, Chicago, Illinois,

commencing at 10:11 a.m. on November 12, 2010.

```
 1    APPEARANCES:

 2         VALOREM LAW GROUP
           MR. STUART J. CHANEN
 3         35 East Wacker Drive
           30th Floor
 4         Chicago Illinois 60601
           Phone:  (312) 676-5480
 5         E-mail: stuart.chanen@valoremlaw.com

 6              On behalf of the Plaintiff;

 7         DYKEMA GOSSETT, PLLC
           MR. HARRY N. ARGER
 8         10 South Wacker Drive
           Suite 2300
 9         Chicago, Illinois 60606
           Phone:  (312) 627-2127
10         E-mail: harger@dykema.com

11              On behalf of the Defendant City of Chicago;

12         ANDREW M. HALE & ASSOCIATES
           MR. ANDREW M. HALE
13         MS. JOAN AHN
           53 West Jackson Boulevard
14         Suite 1800
           Chicago, Illinois 60604
15         Phone:  (312) 341-9646
           E-mail: ahale@ahalelaw.com
16
                On behalf of the Defendants Chicago Police
17              Detectives Jerome Bogucki, Mark Sanders,
                Raymond Schalk, F. Montilla, Chicago Police
18              Officers Lawrence Ryan and Robert Whiteman.

19

20

21

22

23

24
```

1                          I N D E X

2    WITNESS                                        PAGE

3    VICTORIA JIMENEZ

4          Examination by Mr. Hale ..................   4

5          Examination by Mr. Arger ................ 199

6          Further Examination by Mr. Hale ......... 204

7          Examination by Mr. Chanen ............... 207

8          Further Examination by Mr. Arger ........ 208

9          Further Examination by Mr. Hale ......... 209

10

11                        E X H I B I T S

12   JIMENEZ DEPOSITION EXHIBIT                      PAGE

13         No. 1 ................................... 155

14         No. 2 ................................... 156

15         No. 3 ................................... 159

16         No. 4 ................................... 163

17         No. 5 ................................... 166

18

19

20

21

22

23

24

```
 1    Northwestern attorneys where T.J. was present?

 2         A.   No.

 3         Q.   You never attended a meeting with T.J. and any

 4    of the Northwestern attorneys?

 5         A.   No.

 6         Q.   How about with Stuart?

 7         A.   Uh-uh.

 8         Q.   No?

 9         A.   Just -- No.

10         Q.   Okay.

11         A.   They would see T.J. different.  I mean, they

12    would go by themselves and see him.

13         Q.   What is your understanding of the evidence

14    that led to T.J. being released from prison?

15         MR. CHANEN:  I'm sorry.  I got this --

16    BY MR. HALE:

17         Q.   Let me ask it -- That was a bad question.

18         MR. CHANEN:  Go ahead.

19    BY MR. HALE:

20         Q.   T.J. was released from prison May 1st, 2009.

21    What is your understanding of the primary evidence that

22    led the State to release T.J.?

23         A.   That the police made witnesses lie; they

24    wanted T.J. bad, the police did; and that -- about the
```

```
 1    tape; they never tested the jacket, which I asked them

 2    to do; they never -- they didn't -- just that, that all

 3    the evidence I knew that it was already there for all

 4    these years, they finally got somebody to listen to

 5    them.

 6         Q.    When you said they never tested the jacket,

 7    what are you -- what did you want done?

 8         A.    I told Bogucki to test his jacket.

 9         Q.    Test whose jacket?

10         A.    It was a brand-new jacket.

11         Q.    T.J.'s jacket?

12         A.    Yes.

13         Q.    Test it for?

14         A.    Gun powder.

15         Q.    What did he say to that?

16         A.    He -- "No," he didn't need to.  I told him,

17    "Test his hands and the jacket."

18         Q.    And is it your understanding that Larry

19    Tueffel is now saying that Juan Carlos Torres was the

20    shooter?

21         A.    Yes.

22         Q.    When did you first learn that?

23         A.    From Northwestern.

24         Q.    And who specifically contacted you and told
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 09-cv-8081 |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | The Hon. Matthew F. Kennelly |
| Defendants. | ) | |

**PLAINTIFF'S AGREED MOTION REQUESTING
PERMISSION TO CONTACT LAWRENCE TUEFFEL**

Plaintiff Thaddeus Jimenez, by his undersigned attorneys, respectfully requests this Court to permit Plaintiff's counsel (and Defendants' counsel) to contact Lawrence Tueffel for the purpose of arranging a meeting with Plaintiff's and Defendants' expert witnesses.  In support of the motion, Mr. Jimenez states as follows:

1. In January 2011, Plaintiff's counsel requested an order that "no party nor representative of any party is to contact Mr. Tueffel without a specific Order by this Court permitting such contact."  [Dkt. #70].

2. On January 26, 2011, Your Honor granted that request.  [Dkt. #72]

3. The Defendant Officers have provided Plaintiff with an expert report prepared by Dr. Mark Levy in connection with this litigation.  Dr. Levy makes several assertions regarding Mr. Tueffel's mental illness, his current mental condition, his reliability as a witness, etc.

4. Based on the report, it appears that Dr. Levy has never met Mr. Tueffel and reached his conclusions solely after reviewing Mr. Tueffel's medical records and deposition transcripts.

5.      Plaintiff would like to provide an expert report in rebuttal to Dr. Levy's report. Plaintiff's expert, Dr. Steven H. Dinwiddie, has requested the opportunity for an in-person interview of Mr. Tueffel.  Defendants' counsel and expert recently requested and were granted the opportunity to interview Plaintiff Thaddeus Jimenez.

6.      In accordance with Dr. Dinwiddie's request to assess Mr. Tueffel in-person, Plaintiff requests permission from this Court to have limited contact with Mr. Tueffel for the sole and limited purpose of arranging a meeting between Mr. Tueffel and Dr. Dinwiddie.  If Mr. Tueffel consents to such a meeting, Plaintiff requests permission for a three-hour meeting between Dr. Dinwiddie and Mr. Tueffel.

7.      The defendants are also requesting permission from this Court to have limited contact with Mr. Tueffel to arrange a meeting between Mr. Tueffel and Defendants' expert.  If Mr. Tueffel consents to such a meeting, Defendants also request permission for a three-hour meeting between Defendants' expert and Mr. Tueffel.

8.      As noted above in paragraph 7, we have raised this motion with opposing counsel, and provided that the motion was made mutual, as it now has been, they have no objection to the motion.

## **RELIEF REQUESTED**

A.      That this Court permit Plaintiff's counsel to contact Mr. Tueffel to inquire whether Mr. Tueffel is willing to meet with Dr. Stephen H. Dinwiddie;

B.      That if Mr. Tueffel consents to the meeting, that this Court permit Dr. Dinwiddie to meet with Mr. Tueffel for three hours;

C.      That this Court permit Defendants' counsel to contact Mr. Tueffel to inquire whether Mr. Tueffel is willing to meet with Defendants' expert;

D.      That if Mr. Tueffel consents to the meeting, that this Court permit Defendants'
        expert to meet with Mr. Tueffel for three hours;  and

E.      For any other relief that this Court deems just and proper.


Dated:    October 3, 2011

                                        Respectfully Submitted,


                                        /s/ Lisa R. Carter

| Stuart J. Chanen | Arthur Loevy | Locke E. Bowman |
| Lisa R. Carter | Jon Loevy | Roderick MacArthur Justice Center |
| Valorem Law Group | Loevy & Loevy | Northwestern U. School of Law |
| 35 E. Wacker Drive | 312 North May Street | 357 E. Chicago Avenue |
| 30th Floor | Suite 100 | Chicago, IL 60611 |
| Chicago, IL 60601 | Chicago, IL 60607 | |

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 8081 | **DATE** | 10/5/2011 |
| **CASE TITLE** | Jimenez vs. City of Chicago | | |

**DOCKET ENTRY TEXT**

Plaintiff's agreed motion requesting permission to contact Lawrence Tueffel is granted subject to the terms and conditions stated in the motion.

Docketing to mail notices.

| | Courtroom Deputy Initials: | DS |
|---|---|---|

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN FURTHER**
**SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Jerome Bogucki, Raymond Schalk, and Mark Sanders ("Defendants"), through their attorneys, Andrew M. Hale & Associates, hereby submit their reply in further support of their motion for summary judgment.[1]

**INTRODUCTION**

After a reading of the parties' respective statements of fact, it is evident that Plaintiff's guilt or innocence is actually hotly contested. But his actual guilt or innocence is immaterial to the claims before the Court on summary judgment. The facts relevant to these issues, despite Plaintiff's attempts to mischaracterize them, remain undisputed. It is undisputed that:

- Plaintiff was aware before his trials of the fact that Larry provided a description of the shooter to the police that was inconsistent with Plaintiff before he identified Plaintiff as Eric Morro's shooter (Def.'s Statement of Uncontested Facts, Dkt. No. 105, "SOF," at ¶¶6, 13, 21)[2]
- Plaintiff overheard police officers yelling at Larry while he was in the police station (SOF ¶79)
- Larry was not diagnosed as a schizophrenic at the time he identified Plaintiff as the shooter to the police and when he testified at trial (SOF ¶63)
- Larry and Plaintiff were fellow members of the Simon City Royals gang and knew each other well before Larry identified him as the shooter (SOF ¶79)
- Tina identified Plaintiff as the shooter and maintains this position until today even though she says that she saw a polaroid photo of Plaintiff before identifying him in a lineup (SOF ¶¶67-68)

---

[1] Plaintiff voluntarily dismissed Detective Frank Montilla, and Officers Lawrence Ryan and Robert Whiteman. (Pl.'s Resp. Br. at 33).

[2] Defendants continue to use first names, as they did in their previous memorandum, in order to avoid confusion due to individuals who share last names.

1

- It is unknown which detective or officer seated Tina at the desk where she claims she viewed Plaintiff's photo (SOF ¶70)
- The detectives administering the lineup on February 4, 1993 took care to ensure that the witnesses did not communicate with each other during the lineup (SOF ¶25)
- Larry, Tina, and Phil were all known to Plaintiff's criminal defense attorneys as State witnesses that viewed a lineup of Plaintiff and identified him
- Tina also told the police that he was wearing a Duke jacket at the time of the shooting (SOF ¶27)
- Before Plaintiff's arrest, Phil Torres told Detective Bogucki that the shooter was wearing a Duke jacket (SOF ¶¶16-17)
- After Plaintiff's arrest, Sandra told Detective Bogucki that there was a rumor that Plaintiff stole a Duke jacket from someone and Eric tried getting the jacket back (SOF ¶29)
- The only jacket Plaintiff owned at all relevant times was a Duke jacket (SOF ¶23)
- Defendants not only documented the witnesses' descriptions of the Duke jacket, but also documented other descriptions of the jackets seen on scene, including a description of turquoise with yellow lettering and Georgetown (SOF ¶¶8, 13)

I.     **THERE IS NO ISSUE OF MATERIAL FACT REGARDING PLAINTIFF'S** *BRADY V. MARYLAND* **DUE PROCESS CLAIM.**

In Plaintiff's response brief, he identifies five items that he claims were withheld from him in violation of his *Brady* due process rights. (Pl.'s Resp. to Def.'s Motion for Summary Judgment, Dkt. No. 117, "Pl.'s Resp." at p. 17). Defendants will examine each of these topics below and explain why they are entitled to summary judgment.

A.  **Larry Tueffel**

i.  *Gauger v. Hendle Applies to This Case*

Plaintiff's *Brady* claim premised on the changing story of Larry Tueffel can be quickly dispensed with under *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003). Where information is known to a criminal defendant, "the duty to disclose falls out." *Id.* According to Plaintiff's own testimony, he heard the police yelling at Larry. SOF ¶79. In addition, Plaintiff testified that Larry told him before his first trial that "they made me" identify him as the shooter. SOF ¶79. Thus, under *Gauger* and its progeny, Plaintiff's personal knowledge forecloses any *Brady* claim based upon alleged police coercion in Larry's identification.

In an effort to avoid the plain application of *Gauger*, Plaintiff tries to limit the case to its facts concerning a plaintiff's own confession. (Pl.'s Resp. at pp. 21-22). But this is a gross understatement of the rule: a plaintiff cannot bring a *Brady* claim based on known information. For example, in *Harris v. Kuba*, 486 F.3d 1010, 1015-1017 (7th Cir. 2007), the court relied on *Gauger* and held that a criminal defendant's alibi and his relationship with another defendant

could not be withheld for *Brady* purposes because it was information plaintiff knew about. *See also U.S. v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005) (prosecution did not suppress defendant's own pants). Thus, Plaintiff's own professed knowledge that Larry's identification was the product of the police yelling at him dooms his claim.

### ii.   *Holland v. City of Chicago Controls on the Issue of Reasonable Diligence*

Even assuming for the sake of argument that Plaintiff can get beyond *Gauger*'s bar, he cannot establish a *Brady* claim based upon the circumstances of Larry's identification because he failed to exercise reasonable diligence in interviewing Larry. This has nothing to do with Larry's actual credibility – even though Plaintiff dedicates three pages of his response to this unrelated question. (Pl.'s Resp. at pp. 24-26). The facts of *Holland* and the instant case are analogous in all material respects and, as such, *Holland* controls on the reasonable diligence issue. *Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011). In *Holland*, the victim-witness denied that Holland was her attacker three times before identifying him. The Seventh Circuit held that reasonable diligence required the plaintiff in *Holland* to investigate why the victim-witness changed her story. In Plaintiff's own phrasing of the *Holland* rule, "[o]nce the shifting story is disclosed, however, the burden shifts to the criminal defense counsel to ferret out why the witness changed [his] story." (Pl. Resp. at pp. 19-20).

The *Holland* rule directly applies to this case. Here, Plaintiff knew that he and Larry were friends; that Larry denied that Plaintiff was the shooter when Phil asked him on the scene; that Larry earlier told the police that the shooter was named "Frankie"; that Larry failed to identify him to the police on three separate occasions (at the scene, during his 9:30 p.m. interview, and at the beginning of his 3:30 a.m. interview); that Larry identified him only after Detective Bogucki told Larry that he was lying and that there were other witnesses; and that, according to Plaintiff's version of events, the police made Larry identify him as the shooter by yelling at him. Under *Holland*, reasonable diligence required Plaintiff to investigate why Larry changed his story, especially in light of Plaintiff's admitted knowledge that detectives yelled at Larry and that Larry identified Plaintiff immediately after Detective Bogucki confronted him. Once Plaintiff knew of Larry's denial to Phil, his multiple failures to identify Plaintiff to the police, and the fact that he identified Plaintiff immediately after being confronted by Detective Bogucki, the "burden shifted" to Plaintiff to "ferret out" why Larry changed his story. Therefore, the details of Larry's third interview were not suppressed.

Plaintiff claims that the "shifting story" occurred during Larry's third interview. (Pl.'s Resp. at p. 20). That is, he claims that Defendants were obligated to disclose the exact number of times Larry uttered "no" before identifying Plaintiff as the shooter. *Holland* rejected this very argument. Because Holland knew of the victim-witness's prior denials, the details of the interview where she finally identified Holland were available through the exercise of reasonable diligence. Similarly, in this case, because Plaintiff knew of Larry's prior denials and/or inconsistent identifications, the details of the interview where he finally identified Plaintiff were available through the exercise of reasonable diligence. Moreover, Plaintiff's interpretation of *Holland* would require that the police maintain transcripts of every interview they conduct. *Brady* does not require this. *U.S. v. Lockhart*, 956 F.2d 1418, 1425-26 (7th Cir. 1992). That is, *Brady* does not relieve a criminal defendant of the responsibility of conducting his own investigation, including interviewing eyewitnesses regarding the circumstances of their identifications. The information known to Plaintiff's criminal defense attorneys about Larry's identification imposed a duty upon them to investigate the basis for Larry's changed position in order to satisfy the requirements of reasonable diligence. *Holland*, 643 F.3d at 256.

Unable to meaningfully distinguish *Holland*, Plaintiff launches into a diatribe about the history of civil claims under *Brady* since the Seventh Circuit decided *Newsome v. McCabe* and argues that application of the *Holland* rule to this case would cause the sky to fall in. (Pl.'s Resp. at pp. 13-16). But the Seventh Circuit's jurisprudence is entirely consistent with *Holland*, and its application to the facts here requires the entry of summary judgment in favor of Defendants. Quite simply, the cases Plaintiff relies on – *Newsome v. McCabe*, *Ienco v. City of Chicago*, *Manning v. Miller*, and *Dominguez v. Hendley* – are not helpful because they do NOT address the issue of reasonable diligence. Instead, these cases examine the availability of immunity for alleged *Brady* violations or involve unique procedural postures that do not apply here.

In *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001), *rehearing denied*, 260 F.3d 824 (2001)("*Newsome I*"), the court held that defendant police officers were not entitled to qualified immunity when they suppressed exculpatory fingerprint evidence and the fact that eyewitnesses previously identified photographs other than Newsome. *Id.* at 749. In *Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003) ("*Newsome II*"), the Seventh Circuit affirmed a jury verdict in favor of Newsome after an eyewitness testified that the police defendants threatened him with imprisonment if he told prosecutors that they coached him at a lineup to identify

Newsome.[3] *Id.* at 303-304. Contrary to Plaintiff's contention, the facts of this case in no way "fall squarely within *Newsome*." (Pl.'s Resp. at p. 14). First, unlike *Newsome I*, in this case, the police DID disclose Larry's prior inconsistent identifications. In *Newsome* they did not. Second, the *Newsome* decisions did not address the issue of reasonable diligence. To the contrary, the witness in *Newsome* claimed the police threatened him with imprisonment if he ever revealed the coercive circumstances of his identification so that even a reasonably diligent defense attorney would not be able to uncover it. *Newsome II* at 303-304; *compare with Holland*, 643 F.3d at 256 (fact that witness might lie does not change the reasonable diligence analysis). That did not happen here. Plaintiff himself explains that he believes Larry testified against him because he was afraid of a gang member named "Crazy." (Pl.'s Resp. at p. 21).

The case of *Ienco v. City of Chicago*, 286 F.3d 994, 1000 (7th Cir. 2002) truly has no bearing here and it is puzzling why Plaintiff even cites it. In *Ienco*, there was a "unique procedural posture" because plaintiff appealed the district court's summary judgment ruling that was decided against him on his federal malicious prosecution claim before *Newsome I* clarified that no such claim existed. *Id.* at 998. Plaintiff in *Ienco* was provided the opportunity to take advantage of the intervening *Newsome I* decision and plead a *Brady* claim. *Id.* at 999. Like the *Newsome* decisions, the *Ienco* court did not address the issue of the instant matter – reasonable diligence. As such, the fact that the plaintiff in *Ienco* was permitted to amend his pleading to include a due process allegation is not instructive on the issues raised in this case.

Plaintiff's erroneous reliance on cases with unique procedural postures continues in his citation to *Manning v. Miller*, 355 F.3d 1028, 1032-34 (7th Cir. 2004). Although *Manning* technically was an appeal from summary judgment, as Plaintiff is quick to point out, the Seventh Circuit explained that "[b]ecause discovery has not yet occurred in this case, we will treat the motion as a motion to dismiss, rather than a motion for summary judgment." *Id.* at 1031. According to the pleadings, apparently the only facts the court relied upon, Manning was a former police officer that alleged he was framed by federal agents who induced a jailhouse informant to select Manning from a lineup by promising him a sentence reduction. *Id.* at 1030. The court denied the agents' immunity arguments and allowed the case to proceed to discovery. *Id.* at 1033. It further observed that "[w]hether Manning will ultimately succeed will depend on

---

[3] The more famous holding of *Newsome I* is that "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution." *Newsome I*, 256 F.3d at 750.

the merits of his *Brady* claim." *Id*. The Seventh Circuit never weighed in on whether the claimed *Brady* material was available through the exercise of reasonable diligence. *See U.S. v. Manning*, 546 F.3d 430, 438 (7th Cir. 2008)(affirming this Court's ruling vacating judgment based on application of the Federal Tort Claims Act).

Finally, Plaintiff grossly overstates the holding of *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008). Plaintiff claims that the *Dominguez* court held that "the court properly instructed the jury that in order to find for plaintiff Dominguez, it had to find that Hendley caused Dominguez's criminal trial to be unfair through any of three specified courses of conduct: (1) withholding material, exculpatory evidence in violation of *Brady*; (2) causing an unreliable identification procedure to be used at his trial; or (3) fabricating evidence." (Pl.'s Resp. at p. 15). This is not a statement of the Seventh Circuit's holding; it is merely a recitation of the jury instruction given in the district court. *Dominguez*, 545 F.3d at 590. In actuality, the Seventh Circuit analyzed the case by considering whether the evidence at trial was sufficient to support a *Brady* claim in general. *Id*. It did not address the second two components of the instruction as distinct claims. *Id.*

It is also noteworthy that the jury instruction in *Dominguez* was worded the way it was because defense counsel agreed to the instruction. (*See* Oct. 13, 2006 Trans. in *Dominguez v. Hendley* 04 C 2907 at pp. 1638-1640, attached hereto as Exhibit A). In fact, as was quite clear after the trial, the defense team regretted their decision, but was forced to live with it on appeal. (*See* Dec. 21, 2007 Trans. in *Dominguez v. Hendley* 04 C 2907 at pp. 2-6 and 16-18, attached hereto as Exhibit B). Judge Shadur, who presided at the trial, still dealing with the jury instructions over a year later, explained the defendants' agreement to an erroneous instruction as follows: "Unlike Contracts 101 in law school, silence connotes acquiescence." (*See* January 11, 2008 Court Transcript in *Dominguez v. Hendley* 04 C 2907 at p. 12, attached hereto as Exhibit C). Accordingly, *Dominguez* probably stands best for the proposition that, if the parties agree to proceed under bad law, then bad law governs the case. At bottom, however, contrary to Plaintiff's assertion that *Dominguez* bears on the reasonable diligence issue, the court never analyzed this issue.

The single case Plaintiff cites that deals with the issue of reasonable diligence is *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001), but the alleged *Brady* material in that case was fundamentally different than the circumstances surrounding Larry's identification of Plaintiff. In

*Boss*, the court held that criminal defense counsel could not be expected, under the guise of reasonable diligence, to interview a witness about facts they could not reasonably have expected that witness to know about. Specifically, reasonable diligence did not demand that defense counsel interview an alibi witness to obtain impeachment information about another witness. *Id*. at 741, 743. On the other hand, the court made it equally clear that "[d]efense counsel can certainly be expected to ask witnesses (defense *and otherwise*) questions relevant to what counsel understands the witness's role to be in the case." *Id*. at 741 (emphasis added).

In contrast with the alibi witness from *Boss*, Larry is, like the eyewitness in *Holland*, the primary eyewitness to the crime at issue. Plaintiff knew of Larry's initial denial, inconsistent identification, and even the alleged "pressure" placed on Larry by Detective Bogucki well in advance of his trial. As early as May 7, 1993, almost a year and a half before Plaintiff's first trial, Cynthia Leyh, one of Plaintiff's defense attorneys, attended Victor's juvenile hearing. SOF ¶36. At this hearing, Larry testified that: (1) he failed to identify Plaintiff to Officer Ryan at the scene; (2) he then failed to identify Plaintiff to detectives at the police station; (3) he told the police that "Frankie" was the shooter; and (4) he identified Plaintiff only after "the detectives told me that [ ] I wasn't telling the story right the first time." Def.'s Resp. to Pl.'s Stmt ¶¶6, 24. Larry's changing story was reiterated by Larry, Phil and Detective Bogucki at the trial in 1994 and Plaintiff's attorneys cross-examined him on this point. SOF ¶41.

Plaintiff was fully aware of Larry's specific role, his "shifting story," and even the point in the investigation when his story "shifted." Therefore, under *Holland*, *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008), *Badelle v. Correll*, 452 F.3d 648, 658-60 (7th Cir. 2006), *Lockhart*, and even *Boss*, reasonable diligence required defense counsel to probe the reason for the "shift." As such, the details of Larry's interview were not suppressed.

### B. Tina Elder

#### i. *Reasonable Diligence*

The above reasonable diligence analysis applies with equal force to the circumstances surrounding Tina's lineup identification. That is, the alleged presence of a Polaroid photo of Plaintiff on a desk prior to Tina's lineup identification was available through a routine witness interview. Plaintiff's post-conviction attorneys proved this when they interviewed Tina in May of 2007. In response to general questions regarding the lineup, Tina "volunteered" that she viewed two photographs on a desk before the lineup. If this information was available to Plaintiff

in 2007 through a simple interview, it was no different in 1994, when the information was even fresher in Tina's mind. As with Larry, Plaintiff suggests that reasonable diligence was exercised but unsuccessful based on a single question asked by Charles Murphy on cross-examination. Pl.'s Resp. to Def.'s SOF, Dkt. No. 119, at ¶69. Again, this argument goes nowhere. Like Larry, Tina has always occupied the single role of being an eyewitness to the shooting. It was well known that Tina identified Plaintiff as the shooter in a police lineup on February 4, 1993. Reasonable diligence required Plaintiff to interview Tina regarding the circumstances of her lineup identification. The fact that Tina did not tell anyone where she was placed before the lineup does not mean that this information was suppressed. Rather, it means that Plaintiff failed to exercise reasonable diligence. Because the details of Tina's lineup identification were available through the exercise of reasonable diligence under *Holland*, *Carvajal* and *Boss*, those details were not suppressed in violation of *Brady*.

### ii. Personal Responsibility

"Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a §1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). *See also Marshall v. Buckley*, 696 F. Supp. 2d 964, 968-69 (N.D. Ill. 2010); *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *5 (N.D. Ill. Jan. 26, 2009).

In *Rodriguez v. Peters*, 63 F.3d 546, 554-55 (7th Cir. 1995), a witness claimed that he viewed a photograph of the criminal defendant on a desk in the State's Attorney's Office before making an in-court identification. Because the witness did not speak with anyone in the State's Attorney's Office regarding the photograph, the prosecutor had no *Brady* duty to disclose this information. *Id.* The same rule applies in the instant case.

There is no evidence that Detectives Bogucki or Sanders placed Tina at the desk. To begin with, Tina cannot recall who met her at the station, let alone who placed her at the desk. When asked specifically about Detective Bogucki in her deposition, Tina denied asking for him upon arrival and could not identify him as the officer who placed her at the desk, despite identifying him earlier as the officer who called her regarding the lineup. Def.'s Resp. to Pl.'s Stmt ¶52, Ex. 11 at 109:2-18. Plaintiff can only speculate as to who placed Tina at the desk. For example, Sergeant John Nalepa was in the station and photographed the lineup. Def.'s Resp. to Pl.'s Stmt ¶52, Ex. 12 at 11:17-12:3, Ex. 13. He or any other officer at the station at 10:00 a.m.

on February 4, 1993 could have encountered Tina at the station entrance and escorted her to the desk. Plaintiff claims that "substantial [ ] evidence" establishes that Detective Bogucki placed Tina at the desk. Pl.'s Resp. to Def.'s SOF at ¶70. All his evidence shows, however, is that Detective Bogucki knew that Tina was placed in the homicide office. It does not establish any of the things Plaintiff must establish to show personal liability: that Detective Bogucki placed Tina in the office, that he was ever in the office with her, that he knew where she was situated in the office, or that he knew what paperwork was on top of the desks in the office at that particular time.

There is also no evidence that Detectives Bogucki or Sanders were even aware that Tina viewed photographs on a desk before the lineup. Tina did not speak with any police officers regarding the photographs. Detectives Bogucki and Sanders "could not be expected to tell the defense that [Tina] had inadvertently seen the photograph[s] for [they] had no such knowledge to convey to the defendant." *Peters*, 63 F.3d at 555. Because there is no evidence of the requisite personal liability or knowledge, Plaintiff's *Brady* claim fails as a matter of law with respect to Tina Elder.

### C.  Phil Torres

#### i.  It Is Undisputed That Phil Identified Plaintiff as the Shooter

Phil Torres consistently testified at both trials and his deposition in this case that he was leaning out of his third story apartment window when he observed Plaintiff shoot Eric Morro. (SOF Ex. 9 at p. 3:6-24, Dkt. No. 105-9). Despite Phil's initial reluctance to cooperate with the beat officers on the scene for fear of retaliation, he testified at both trials and his deposition that he told the police Plaintiff was the shooter. (SOF Ex. 6 at p. 8:2-6, 13:9-17, Dkt. No. 105-6; SOF Ex. 9 at p. 7:2-6, 13:9-17; SOF Ex. 7 at p. 7:7-12, 9:11-17, Dkt. No. 105-7; PX5 at 55:1-21; Def.'s Resp. to Pl.'s Stmt ¶8, Ex. 2 at 54:10-56:24). Phil then picked Plaintiff out of a lineup the next day. (SOF Ex. 7 at p. 9:11-17, Dkt. No. 105-7; Def.'s Resp. to Pl.'s Stmt ¶11). Despite this clear, consistent testimony, Plaintiff attempts to create a fact dispute by misquoting Phil's deposition testimony and cherry picking a few out-of-context and vague responses. This is disingenuous and should not be countenanced.

In evaluating whether anything in Phil's deposition testimony creates a genuine issue of fact, the Seventh Circuit explains that "context is critical." *Stockwell v. City of Harvey*, 597 F.3d 895, 905 n.6 (7th Cir. 2010); *see also Parrillo v. Commercial Union Ins. Co.*, 85 F.3d 1245, 1250

(7th Cir. 1996). Plaintiff cannot manufacture disputed facts simply by selecting a few out-of-context quotes from the deposition or testimony as a whole. *Mosley v. City of Chicago*, 614 F.3d 391, 398 (7th Cir. 2010) (interpretation of testimony in light of context is not assignment of credibility but a "necessary interpretive step to give meaning to that testimony"). By the time of Phil's deposition – eighteen years after the incident – Phil began with the caveat that he did not have a good recollection of 1993. (Def.'s Resp. to Pl.'s Stmt ¶8, Ex. 2 at 5:23-24). He was frustrated by having to testify again and explained that he did not want to be present for the deposition because the State's Attorney promised him he would not have to "go through this no more since they burnt down my house from the first time this happened." (Def.'s Resp. to Pl.'s Stmt ¶8, Ex. 2 at 6:4-14). He further explained that he was not of a sound mind at the time of his deposition "because I get high." (Def.'s Resp. to Pl.'s Stmt ¶8, Ex. 2 at 12:6-10). Because of this intoxication at the time of the deposition, Phil explained that he forgets things. (Def.'s Resp. to Pl.'s Stmt ¶8, Ex. 2 at 13:1-9).

The material facts are that Phil called Detective Bogucki around 1:00 a.m. on February 4, 1993 and identified Plaintiff as the person he saw shoot Eric Morro, and that Phil again identified Plaintiff as the shooter at a lineup conducted around 10:00 a.m. that day. Those facts are undisputed. (SOF ¶¶14, 16-17; Def.'s Resp. to Pl.'s Stmt ¶¶8, 11). Plaintiff claims that Phil "told the Defendants he never even saw the shooter and did not know who he was, which was true." (Pl.'s Rule 56.1 Statement of Facts, Dkt. No. 117 ("Pl.'s Stmt") ¶16.) This is a complete distortion of the record. Plaintiff supports this statement with portions of Phil's deposition where Phil describes his interactions with non-party officers at the scene. Tellingly, Plaintiff omits the surrounding testimony, which makes it clear that Phil is only describing statements he made while still on the scene of the shooting. (Def.'s Resp. to Pl.'s Stmt ¶16.) Plaintiff's attempt to conflate Phil's statements to non-party officers with his statements to Detective Bogucki should be identified as sleight of hand.

Plaintiff also attempts to paint a false picture that that the police somehow coerced Phil's identification by citing his own leading deposition question where Phil responded, "Yes. Okay. All Right. Whatever. I'm done. Okay. Been more than an hour." (Def.'s Resp. to Pl.'s Stmt ¶21.) But Phil repeatedly testifies at his deposition that he voluntarily identified Plaintiff. (Def.'s Resp. to Pl.'s Stmt ¶20, Ex. 2 at 56:10-12, 88:23-89:1.) The testimony speaks for itself. Another example of false insinuation is Plaintiff's suggestion that Phil never called Detective Bogucki.

(Pl.'s Stmt ¶¶18-19.) Plaintiff cites Phil's deposition testimony where he has difficulty remembering whether there was a phone call. *Id.* But Phil's memory was refreshed about the 1:00 a.m. phone call to Bogucki, even if Plaintiff chooses to close his eyes to this portion of the testimony. (Def.'s Resp. to Pl.'s Stmt ¶8, Ex. 2 at 80:11-18, 81:18-21.)

Plaintiff attempts to discredit Phil's identification by lifting out-of-context testimony that Phil did not "claim to be a witness" or "claim to be certain who shot" Eric Morro. (Pl.'s Stmt ¶¶ 8, 16, 21.) This deceit should also be recognized and rejected. To begin with, Phil's testimony that he did not "claim to be a witness," again, only refers to the period in time when Phil was still on the scene and reluctant to come forward during his interactions with the non-party beat officers. Additionally, the fact that Phil does not claim 100 percent certainty to this day does not equate with actual uncertainty, much less to him expressing that uncertainty to Detective Bogucki. When Phil had the chance to explain what he meant by his earlier deposition testimony, he said that Plaintiff "looked like" the shooter. (Def.'s Resp. to Pl.'s Stmt ¶¶8, 11, Ex. 2 at 66:1-16). And to be clear – contrary to Plaintiff's obstinate refusal to even admit that Plaintiff identified him as the shooter – Phil did in fact identify Plaintiff as the shooter. (Pl.'s Resp. to SOF ¶27; Def.'s Resp. to Pl.'s Stmt ¶¶8, 11, Ex. 2 at 54:10-56:24, 65:11-66:5, 69:7-15.) In any event, Phil stated that he never expressed doubt in his identification to the police. (Def.'s Resp. to Pl.'s Stmt ¶21, Ex. 2 at 44:22-24.)

Finally, Plaintiff claims that, at most, Phil told Detective Bogucki that his sister believed Plaintiff was the shooter. (Pl.'s Stmt ¶19.) Although Defendants do not dispute that Phil's sister told him about Plaintiff and Eric Morro's altercation before Phil called Detective Bogucki, there is no evidence that Phil gave any indication to Defendants that his identification was not based upon personal knowledge. Rather, it is undisputed that Phil told Detective Bogucki that Plaintiff was the shooter around 1:00 a.m. on February 4, 1993, and then later that morning at the lineup.

### ii. The Details of Phil's Identification Were Available Through the Exercise of Reasonable Diligence

All of the significant facts regarding Phil's identification were disclosed. First, Phil and Officer Ryan both testified that Phil failed to identify Plaintiff at the scene. Moreover, Officer Ryan testified that Phil stated "I don't want anything to do with it" and attempted to walk away

"several times."[4] Second, Phil and Detective Bogucki both testified that Phil failed to identify Plaintiff later that evening at the station. Third, Phil testified that he spoke with his siblings before calling Detective Bogucki around 1:00 a.m. The Cosmens testified to witnessing the altercation and to their relationship with Phil. At Plaintiff's first trial, Phil was not permitted to testify regarding what the Cosmens told him because public defender Kendall Hill's hearsay objection was sustained. (Def.'s Resp. to Pl.'s Stmt ¶¶8, 19, 68.)

Any remaining, undisclosed details regarding Phil's identification of Plaintiff were available through the exercise of reasonable diligence. The familiar analysis applies. Phil was always only an eyewitness to the shooting. Plaintiff knew that Phil failed to identify him twice before he called Detective Bogucki; that he spoke with his siblings before making the call; and that his siblings claimed to have witnessed him arguing with Eric Morro hours before the shooting. Reasonable diligence required Plaintiff to conduct a simple witness interview of Phil and to investigate the reasons for his alleged "shifting story." Any undisclosed details regarding Phil's identification were available through the exercise of reasonable diligence. Therefore, the details of Phil's identification were not suppressed and there was no *Brady* violation with respect to Phil.

### D.  Matters Raised For the First Time in Plaintiff's Response Memorandum

Defendants specifically asked Plaintiff in an interrogatory to identify the misconduct he alleges against each of them. SOF ¶80. Plaintiff still has not amended his interrogatory response, but alleges for the first time in response to Defendants' Motion for Summary Judgment that Defendants withheld:

- That the following pieces of physical evidence existed: (a) Eric's handwritten note with Leo's name, telephone number and the amount of money Eric owed to Leo; (b) the square polaroid photo of Jimenez used with Tina Elder; (c) until discovery in this case, the full inventory list of evidence that had been created in 1993.

(Pl.'s Resp. at p. 17). As a threshold matter, this Court should disregard the above bullet point because it is improper for Plaintiff to raise a claim for the first time in response to summary judgment. *E.E.O.C v. Lee's Log Cabin*, *Inc.*, 546 F.3d 438, 443 (7th Cir. 2008)(citing cases). On

---

[4] To the extent that Plaintiff claims Defendants were obligated to disclose the details of Phil's conversation with non-party officers at the scene, there is no evidence that the officers relayed those details to Defendants. At most, Officer Ryan shared his report with Detective Bogucki and they briefly discussed matters unrelated to Phil. Def.'s Resp. to Pl.'s Stmt ¶8. In any event, those details were available through the exercise of reasonable diligence.

a substantive level, this argument goes nowhere because it is undeveloped, unsupported by the record, and actually completely false.

### i.   The Note In Eric's Pocket was Properly Inventoried

The handwritten note that was in Eric's coat pocket at the time of his death was properly inventoried as part of Eric's murder investigation file. Plaintiff argues in his statement of additional facts that Defendants withheld "the fact that this handwritten note had been received into evidence with respect to Jimenez's case." (Pl.'s Stmt ¶65.) This is a silly argument because the face of the inventory report documents that it was properly filed and maintained in the ordinary course of business of the Chicago Police Department under Record Division ("RD") No. X0051839, Inventory No. 1058724. (Def.'s Resp. to Pl.'s Stmt ¶63, 65, Ex. 22.) It further documents that it was created by an Officer Richard Maher, Star No. 1478, on February 4, 1993, and that the victim's coat was recovered from 2121 W. Harrison, Chicago, Illinois, which is the Cook County Medical Examiner's Office. *Id*. This was always available to counsel and in fact was jointly viewed by the parties' attorneys (Lisa Carter for the Plaintiff) at the City of Chicago's Evidence and Recovered Property Section on January 31, 2011. (Def.'s Resp. to Pl.'s Stmt ¶65, Ex. 23-24.) Accordingly, it cannot be legitimately argued that an appropriately inventoried note was suppressed. *See Bullock v. City of Chicago*, 118 F. App'x 75, 77 (7th Cir. 2004)(evidence listed on impoundment order cannot be considered suppressed).

### ii.   The Polaroid Photograph Is Part of the Record Division File

As for Plaintiff's Polaroid photograph, he argues in his statement of additional facts that this photograph was never turned over to his criminal defense attorneys. (Pl.'s Stmt ¶53). This assertion is unsupported, and actually contrary to the evidence. Notably, Plaintiff does not attach an affidavit or any sworn testimony from his criminal defense attorneys claiming that they failed to receive a copy of the photograph. That is because the Polaroid photograph was part of the official investigative file, and it was always available to Plaintiff as such. (Def.'s Resp. to Pl.'s Stmt ¶63, Ex. 14.) Defendants satisfied their *Brady* duty by making sure that all material exculpatory or impeachment evidence was in the official file so that the prosecutor may turn it over to the defense. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)(*Brady* requires prosecutors to establish system to obtain information from police); *Palmer v. City of Chicago*, 755 F.2d 560, 568 (7th Cir. 1985) (preliminary injunction creating system whereby police are to put all investigative materials into official file); *see also Bullock*, 118 F. App'x at 77; *Anderson v. South*

13

*Carolina*, 542 F. Supp. 725, 738 (D.C.S.C. 1982)("the presence of officers' reports in police files constructively placed them in the hands of the prosecutor"). Because the photograph was properly made part of the official file, it was readily available to be produced by the City of Chicago in response to a simple production request in this civil matter. (PX 36.) Nothing in the record suggests that the result was or would have been different when the documents were requested in the underlying criminal proceeding.

### iii.    The Inventory Log Sheet Was Also in The Area File

Finally, Plaintiff makes an unsupported claim that the full inventory log sheet was withheld from him. While no argument on this subject is made in Plaintiff's memorandum of law, he makes a self-serving argument in his statement of additional facts and asks the Court to compare two inventory logs attached as PX 38. (Pl.'s Stmt ¶¶63-64). But the very documents Plaintiff points to demonstrate that the full inventory sheet WAS made part of the permanent file as of June 15, 1993, well in advance of Plaintiff's 1994 trial. As could be expected, the investigative file was not complete at the time the inventory log was started on February 4, 1993. *See* PX 38. This log was updated as new evidence came in and is dated accordingly. *Id.* The completed log was then made part of the official file and routinely produced in discovery. (Def.'s Reps. to Pl.'s Stmt ¶63, Ex. 14.)

To illustrate this point, the final entry on the completed log (PX37) refers to a progress supplementary report entered on June 15, 1993. This was created after Detective Bogucki received letters written by Plaintiff to his girlfriend threatening Larry. We know that this supplementary report was in fact disclosed because the letters were introduced as evidence at Plaintiff's trial. (Def.'s Resp. to Pl.'s Stmt ¶64.) Thus, Plaintiff's self-serving allegation that the completed inventory log was not disclosed is contrary to the evidence and insufficient to overcome Defendants' properly supported motion for summary judgment.

## II.    PLAINTIFF'S ONLY COGNIZABLE DUE PROCESS CLAIM IS UNDER *BRADY V. MARYLAND*.

### A. There is No Such Thing as A Federal Malicious Prosecution Claim in the Seventh Circuit

Without citation to a single case from the Seventh Circuit, Plaintiff argues that he has a distinct due process claim "for creation of false and fabricated evidence." (Pl.'s Resp. at p. 27.) This Court should not accept Plaintiff's thinly veiled attempt at asserting a federal malicious prosecution claim. In fact, the Seventh Circuit has declined to accept such an invitation.

*Newsome I*, 256 F.3d at 751 (the existence of a state law claim for malicious prosecution bars any constitutionally based claim for malicious prosecution); *Parish v. City of Chicago*, 594 F.3d 551, 553 (7th Cir. 2009) (reaffirming this holding of *Newsome I*); *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2010)(same).

Even if fabrication of evidence was a cognizable claim in the Seventh Circuit, and it is not, Plaintiff cannot point to any such thing that existed in this case. The one example that Plaintiff points to is the fact that the police reports include information about witnesses claiming the shooter was wearing a Duke jacket. (Pl.'s Resp. at p. 28). But this was put in the reports because it was true. At Tina Elder's deposition, she testified:

> Q: Well, your memory is refreshed that you saw Eric swing at a kid who was wearing a Duke jacket; correct?
> A: Yes.

(SOF ¶27, at Ex. 12, p. 64:6-9; Def.'s Resp. to Pl.'s Stmt ¶54.)

...

> Q: Who did you identify in court as being the wearer of the Duke jacket?
> A: At that time, it would be TJ.
> Q: Mr. Jimenez?
> A: Yes.

(SOF ¶27, at Ex. 12, p. 65:13-17; Def.'s Resp. to Pl.'s Stmt ¶54.) Similarly, Phil Torres recalled at his deposition:

> Q: Okay. And who is the person you saw shoot the gun?
> A: The one in the Duke jacket.
> Q: All right. And did you tell the police that the shooter had a Duke jacket on?
> A: I believe so.
> Q: You were the one that mentioned that to the police, correct?
>     Mr. Loevy: Objection, leading, you are testifying for him.
> A: Yes.

(SOF ¶27, at Ex. 7, pp. 52:2-52:12; Def.'s Resp. to Pl.'s Stmt ¶49.) As such, Plaintiff's fabrication of evidence argument is belied by the record. In any event, it is not a cognizable claim in the Seventh Circuit. *Parish*, 594 F.3d at 553.

### B. A Federal Claim Cannot be Predicated on Alleged Perjured Testimony

While Plaintiff fails to point to any specific false testimony, he attempts to assert a federal claim for alleged perjured testimony by Defendants. But as the Seventh Circuit repeatedly taught, "'[T]he Constitution does not require that police testify truthfully.'" *Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007)(quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006)); *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008); *see also*

*Briscoe v. LaHue*, 460 U.S. 325 (1983)(absolute immunity for testimony). Ignoring this authority entirely, Plaintiff relies upon cases applying the standard from *U.S. v. Agurs*, 427 U.S. 97, 103 (1976). But even Plaintiff recognizes that "the Seventh Circuit has explained, 'the *Agurs* standard [for perjury] is different from that in *Bagley* [for *Brady* violations] and sets a lower threshold for determining materiality.'" (Pl.'s Resp. at p. 29 quoting *Braun v. Powell*, 227 F.3d 908, 920 (7th Cir. 2000).

In a last ditch attempt to avoid summary judgment, Plaintiff alleges that the City of Chicago agreed to be held liable for "any constitutional violation" proved against the individual defendants.[5] (Pl.'s Resp. at p. 29 n. 10). This does not put Plaintiff in any better of a position because he failed to produce evidence from which a jury could reasonably infer such a violation against current or former individual Defendants. For all of these reasons, summary judgment should be granted in favor of Defendants on Count I of Plaintiff's complaint.

### III.  PROBABLE CAUSE AND THE ABSENCE OF MALICE BAR PLAINTIFF'S MALICIOUS PROSECUTION CLAIM.

Probable cause as supplied by any one of the statements of Larry, Tina, or Phil is a complete bar to Defendants' malicious prosecution claim. (See Def.'s Memo, Dkt. No. 106, at pp. 16-18 (citing cases)). It was then enhanced by physical evidence when Plaintiff was arrested in possession of a Duke jacket and then identified in a lineup by Larry, Phil, Tina, and tentatively identified by Sandra. Plaintiff focuses on later learned information in an effort to negate the undisputed probable cause to prosecute. Specifically, Plaintiff points to a triple hearsay statement from a man named Leo Robles who supposedly told an investigator from the CCSAO that someone else told him that Juan Carlos gave him the murder weapon. (Pl.'s Stmt ¶76). But later learned information does not change the calculus. (See Def.'s Memo at pp. 16-18 (citing cases)).

Similarly, Plaintiff claims that Defendants did not sufficiently investigate the possibility of Juan Carlos's involvement, even though Defendants Bogucki and Schalk made a record of the audiotape that purported to contain a confession of Juan Carlos in Spanish and interviewed Juan Carlos twice. The fact that Defendants may not have asked Juan Carlos every question Plaintiff's civil counsel thinks of now does not negate probable cause because Defendants adequately documented and followed up on the Juan Carlos investigative lead. *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524 (no need to investigate after probable cause is

---

[5] Defendants understand that the City disputes Plaintiff's allegations, and the City only agreed to be held liable for any constitutional violations proved against named individual defendants.

established but cannot turn a blind eye to known facts); *Purvis v. Oest*, 614 F.3d 713, 725 (7th Cir. 2010) (criminal defendant not entitled to a perfect investigation).

In addition, Defendants are also entitled to summary judgment on the malicious prosecution claim because there is no evidence that they possessed the requisite malicious state of mind. Seeking to avoid summary judgment, Plaintiff supplemented his response to include a recent filing by Defendants' counsel in the criminal prosecution of Juan Carlos Torres now pending in the Circuit Court of Cook County. (See Dkt. No. 123, ¶25). Given that Plaintiff's criminal matter has long been over, this so called supplemental argument is a testament to how weak Plaintiff must believe his case really is.

It is no secret that dismissal of the criminal charges against Juan Carlos would be consistent with Defendants' theory in this case that Plaintiff is actually guilty and Juan Carlos is now being wrongfully prosecuted for the murder Plaintiff committed. Plaintiff of course maintains Juan Carlos is guilty, but as noted in the introduction to this filing, the guilt/innocence dispute is immaterial for summary judgment purposes. As investigating detectives of the Eric Morro murder, Defendants have a constitutional obligation to disclose information known to them that may be exculpatory to a charged criminal defendant – now Juan Carlos Torres. The fact that Plaintiff is now thumbing his nose at this obligation by saying it is "long after anyone stopped asking for their input" while simultaneously claiming his own *Brady* rights were violated is unfortunate. (See Dkt. No. 123, ¶26). Defendants' counsel are in possession of key evidence that tends to exculpate Juan Carlos, evidence that Plaintiff is quick to point out can arguably be imputed to Defendants' own possession. (See Dkt. No. 123, ¶31). The evidence exculpatory to Juan Carlos includes an expert report that establishes that Plaintiff's co-defendant, Victor Romo, and his father may have set out to frame Juan Carlos for Eric Morro's murder by staging a sham audiotaped confession to Victor's father. (See Def.'s Resp. to Pl.'s Stmt ¶58, Ex. 15.)

Defendants are continuing to comply with their *Brady* obligations in the case, as they did when Plaintiff was a criminal defendant. It is twisted indeed that Plaintiff suggests that Defendants' *Brady* disclosure to Juan Carlos is evidence of malicious intent. This argument should be rejected. Defendants made their partisan bias very clear in their disclosure to the Circuit Court but that did not relieve them of their obligation to produce the evidence for consideration.

**IV.      THERE IS NO EVIDENCE THAT DETECTIVES SANDERS OR SCHALK
WERE PERSONALLY INVOLVED IN ANY ALLEGED WRONGFUL ACT.**

In Defendants' motion, they pointed out that Officers Whiteman and Ryan, as well as
Detectives Schalk, Sanders, and Montilla were not personally involved in any of the events
Plaintiff attempts to portray as wrongful conduct. In response, Plaintiff dismissed Whiteman,
Ryan and Montilla. However, Plaintiff still failed to point to any evidence that could establish
liability for Detectives Sanders and Schalk. In addition to the reasons described through this
filing, lack of personal involvement is another reason to dismiss Detectives Sanders and Schalk
from this lawsuit.

**CONCLUSION**

For the reasons described in Defendants' motion for summary judgment, memorandum in
support of their motion for summary judgment, and this reply memorandum in further support of
defendants' motion for summary judgment, this Honorable Court should enter summary
judgment in favor of Defendants on all counts.

Respectfully Submitted,

DEFENDANTS

BY:

/s/ *Shneur Nathan*

/s/ *Joan Ahn*

Andrew M. Hale
Avi T. Kamionski
Shneur Nathan
Joan Ahn
Andrew M. Hale & Associates
53 West Jackson, Suite 1800
Chicago, Illinois 60604
(312) 341-9646
Att. No. 6294495

# EXHIBIT A

07-1004     07-1005

FILED                                                                      1563

CLERK'S FILE COPY
MICHAEL W. DOBBINS
JUL 3 1 2007                                                                NR
CLERK, U.S. DISTRICT COURT

1

2                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
3                             EASTERN DIVISION

4
    S. ALEJANDRO DOMINGUEZ,            )  DOCKET NO. 04 C 2907
5                                      )
                         Plaintiff,)                              DOCKETED
6                                      )                          AUG  1 2007
       vs.                             )
7                                      )
    PAUL HENDLEY, et al.,              )  Chicago, Illinois
8                                      )  October 13, 2006
                        Defendants.)  10:00 o'clock a.m.
9

10

11          TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
                 MILTON I. SHADUR, Judge and a jury
12
    APPEARANCES:                                    U.S.C.A. — 7th Circuit
13                                                       FILED
    For the Plaintiff:
14                       MR. JON LOEVY,              AUG 0 2 2007  DW
                         MR. MARK REYES and
15                       MS. DANIELLE LOEVY          GINO J. AGNELLO
                                                         CLERK
16  For the Defendants:
                         MR. MICHAEL K. NOONAN       DOC.#
17                       MS. ELIZABETH KNIGHT and
                         MR. JONATHAN CIFONELLI
18

19
                         JESSE ANDREWS
20       Official Court Reporter - U. S. District Court
                       219 S. Dearborn Street
21                     Chicago, Illinois  60604
                         (312) 435-6899
22

23              *       *       *       *       *

206-8

1638

1 one should be worded used an unnecessarily suggestive

2 identification procedure that resulted in an unreliable

3 identification, period.  And then it's modified lower by in

4 which no fair trial can take place.

5         MS. KNIGHT:  I agree that fair trial is the issue.

6         THE COURT:  I do, too.  I'm not quarreling with that.

7 Let me try again for a second.

8     (Brief pause)

9         THE COURT:  As I would get this then, what you are

10 essentially saying is that it would read, Dominguez must -- you

11 know, to succeed and so on -- Dominguez must prove by a

12 preponderance of the evidence that Hendley did one of the

13 following things.  Okay.  The first one is the unnecessarily

14 suggestive identification procedure.

15         MR. LOEVY:  Period.

16         THE COURT:  Wait.  The next is, withheld material

17 evidence.  And then having said those, then saying instead of

18 thus causing, in any event thus causing a situation in which no

19 fair trial could take place.

20         MR. LOEVY:  Right.  Although you've captured created

21 false evidence, too.

22         THE COURT:  That's what I'm saying, you have to have

23 all three.

24         MR. LOEVY:  Yes.  That's the way we think it should

25 go, your Honor.  That's the claim we would like to present to

1639

1 the jury.

2          THE COURT:  Everybody understand that one now?

3          MS. KNIGHT:  Is this created false evidence that was

4 introduced at trial?

5          MR. NOONAN:  Is the created false evidence the

6 identification?

7          MR. LOEVY:  It could be, yes.  It could be the

8 identification.  It could be police reports.  [The Seventh

9 Circuit creation of false police reports qualified as false

10 evidence.  You have a due process right not to have false

11 evidence created.

12          THE COURT:  That's true.  Okay.  So basically then

13 what's being suggested is that it's, did any of the following

14 things -- and there would be three items -- make it -- well,

15 no, let's say did any or all of the following things.  Then we

16 don't have to have both down at the bottom.

17          MS. KNIGHT:  All right.

18          THE COURT:  Did any or all of the following things:

19 1, used the unnecessarily suggestive identification that

20 resulted in the unreliable identification or 2, withheld

21 material evidence and so on and so on or 3, created false

22 evidence and so on and so on.  And then back flush, in any

23 event thus causing a situation in which no fair trial could

24 take place.  Basically what you're saying is the fair trial is

25 the key or the absence of a fair trial is the key, and that

1640

1  they have to find one or all of these items.  That's fine with

2  me.

3         MR. LOEVY:  That works for us.

4         MS. KNIGHT:  Except that I don't believe there is

5  evidence of these things to send this to the jury.

6         THE COURT:  Well, I understand that's your view but,

7  you know, the jury may draw inferences from what's there.

8         MS. KNIGHT:  I'm still inquiring as to number three,

9  is false evidence introduced at trial or somewhere else?

10        MR. NOONAN:  I think there has to be some evidence in

11  order to get an issue instruction, created false evidence or

12  statements.

13        MR. LOEVY:  Well, the police reports are false.

14        MS. KNIGHT:  If -- they weren't introduced at the

15  criminal trial.

16        MR. LOEVY:  Isn't the Jones case -- the Jones case

17  said created false evidence that induced the prosecutor

18  actually.  I guess there is some question if that's still good

19  law.  But if that's the case I would cite in the summary

20  judgment briefs about creating false evidence, they said

21  created false police reports.

22        MS. KNIGHT:  Well, I think I have some Brady

23  instruction here, but I have lost it for the moment.

24        THE COURT:  All right.  Well, before we go farther,

25  then let's deal with this one.  So it would -- let me have

1641

1  Wendy come in and I'll have her type the thing up and it will
2  be better for all of us.
3      (Brief pause)
4          THE COURT:  Okay.  Now in that form that means that
5  we would continue to give the instructions that we have talked
6  about in terms of the standards for identification because
7  those are part of that.  The ones that we had discussed.
8          MS. KNIGHT:  I don't know, is there a number on that
9  because I --
10         MR. REYES:  Plaintiff's I, J and K, right?
11         THE COURT:  Yeah.
12         MS. KNIGHT:  Plaintiff's I, J and K?
13         THE COURT:  Right.
14         MS. KNIGHT:  Did I object to those?  I have to go
15 back and find them, Judge.  I can't keep numbers in my head.
16 Well, if I objected, and I probably still do.
17         THE COURT:  Well, these are all taken, as we talked
18 about, from case law that defines what constitutes
19 unnecessarily suggestive identification and the procedures
20 involved.
21         MS. KNIGHT:  Oh, right.  I object.
22         MR. NOONAN:  And the procedure after you made that
23 determination?
24         THE COURT:  Yeah, right.
25         MR. NOONAN:  Because there were those five on that,

# EXHIBIT B

07 - 1004
07 - 1005

DOCKETED
JAN 2 3 2009

07 - 3020   CLERK'S FILE COPY

1

1
2      IN   STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
3            EASTERN DIVISION

4
S. ALEJANDRO DOMINGUEZ,            ) DOCKET NO. 04 C 2907
5                                  )
                   Plaintiff,)
6                                  )
     vs.                           )
7                                  )
PAUL HENDLEY, et al.,              ) Chicago, Illinois
8                                  ) December 21, 2007
                   Defendants.) 9:00 o'clock a.m.
9

10

11

12   TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
            MILTON I. SHADUR, JUDGE
13                                     U.S.C.A. — 7th Circuit
APPEARANCES:                          FILED
14
For the Plaintiff:                    JAN 2 4 2008  SK
15              MR. JON LOEVY
                                      GINO J. AGNELLO
16                                        CLERK

17 For the Defendants:
18              MR. STEVEN D. PEARSON,
                MR. ERIC E. NEWMAN and
19              MR. DANIEL FIELD

20              JESSE ANDREWS
     Official Court Reporter - U. S. District Court
21           219 S. Dearborn Street
          Chicago, Illinois  60604
22           (312) 435-6899                    FILED

23       *    *    *    *    *    *

24                                     JAN 2 2 2008
                                      MICHAEL W. DOBBINS
25                                    CLERK, U.S. DISTRICT COURT
                                              242

2

1          THE CLERK:   04 C 2907, Dominguez vs. Hendley.

2          MR. PEARSON:   Good morning, your Honor.   Steve

3   Pearson and Eric Newman on behalf of Officer Hendley.

4          MR. FIELD:   Daniel Field on behalf of the City.   I

5   don't see anyone from the office of Jon Lovey.

6          THE COURT:   Well, I am not sure.   You know the only

7   reason I think for putting this over was the point that I made

8   about jury instructions, and the fact that the delivery of a

9   package that included everything when virtually all of them

10  were withdrawn as a result of running through the instructions

11  one by one, that the sensible thing to do was to carve it

12  down.   Now have you had chance to do that?

13         MR. PEARSON:   We have tried that.   And we tried that

14  without success, because in our view we have not received the

15  appropriate cooperation from the Lovey firm in that regard.

16  We have prepared a brief, Judge, at this time --

17         THE COURT:   Let me ask you a question for a second.

18  Did you have the instruction conference written up?

19         MR. PEARSON:   Yes.

20         MR. FIELD:   Yes.

21         THE COURT:   Well, why do you need cooperation of the

22  Loevy firm for?   You can read --

23         MR. PEARSON:   Here, Judge.   Because our position

24  with respect to anything that is part of the record as long as

25  it can be authenticated as part of the record --

3

1           THE COURT:  I am sorry.  I really have to differ

2 with you.

3           MR. PEARSON:  I understand, Judge.

4           THE COURT:  Wait a minute.  You know the procedure

5 that I followed, and I am sure I followed there, is I ticked

6 them off one by one.  At each point that there was something

7 in which -- for example, you know the parties delivering two

8 sets of instructions very often they are replicative -- very

9 often what happens is that I would build in a portion of one

10 of the defense instructions into one that had been tendered by

11 the plaintiff, all you have to do is to read that.

12           Now the point is that when somebody says

13 "withdrawn," that's not part of the record.  Somehow you know

14 because those things were simply tendered, and they are

15 tendered tentatively, that's how it works at least in my

16 dealing with jury cases.  So what happens is that people

17 deliver a package, we then go down the line.  And when

18 something is withdrawn it's withdrawn.  It's not then part of

19 the record.

20           That's what -- if somebody had a pleading that was

21 literally withdrawn or a motion that was literally withdrawn,

22 that's not in the record in any case.  And so I am not -- oh,

23 here is Mr. Loevy.

24           MR. LOEVY:  Good morning, your Honor.  John Loevy.

25 It was call for 9:15, I apologize because you have started.

4

1          THE COURT:  Counsel was complaining that you have

2  not been cooperating in connection with this business of

3  carving back the instructions in the manner that I had

4  instructed the last time.   And I have just been telling

5  counsel that unless this -- you know I don't have a total

6  recall obviously of each one of these tendered instructions.

7  But I know that the procedure that was followed was one in

8  which as I would pass on a particular instruction the

9  corresponding one would be withdrawn, and that was on both

10  sides of the coin.   And I was just telling counsel that a

11  withdraw tendered instruction is not properly part of the

12  record.

13          MR. LOEVY:  Absolutely, your Honor.  And furthermore

14  as your Honor may recall, we had agreed on instructions.  You

15  used the term "horse trading" was my recollection at the time.

16  The critical instruction was the product of an agreement by

17  the of the day.   We compromised on some of our language and

18  it was submitted by agreement.   There were no alternatives

19  proposed on the issue instructions.

20          MR. PEARSON:   Judge, we have a very practical

21  problem that your Honor --

22          THE COURT:  Listen.   You had your practical problem

23  the other day.   I told you what to do, and apparently it

24  didn't get done.   Now you know you can't -- one thing that is

25  inappropriate is to deliver something to the Court of Appeals

5

1 that's misleading.  Because I commented the last time that all

2 too often you know we get volunteered things from the Court of

3 Appeals that are for lack of a better term are either dicta or

4 worse, and that gets invited by something along these lines.

5       I mean you know I can just visualize a comment

6 somewhere in the Court of Appeals, "Well, how come this didn't

7 get done?", when in fact the reason for something was that

8 nobody pursued an issue in that fashion, or as Mr. Loevy has

9 said, the result of a particular instructions resulted from

10 the parties having negotiated with each other and coming up

11 with an agreed one.

12       Now I don't think that it's fair to anybody -- and

13 this cuts both ways -- and it's certainly not fair to the

14 Court -- that creates the potential that someone upstairs can

15 make a comment about "How come this didn't get in here," and

16 did that then mislead people.  It's wrong.  And you know I've

17 got to tell you I don't have a lot of patience with your

18 telling me that you are caught between a rock and a hard

19 place.  That was not my doing in terms of when you came in.

20       MR. PEARSON:  Judge, I did not get a chance to

21 finish, and if I could be heard on this, please.

22       THE COURT:  Yes.

23       MR. PEARSON:  My point about a practical problem as

24 you know, neither myself or counsel for the City were here.

25       THE COURT:  I know that.

6

1          MR. PEARSON:  -- for this trial.  There are

2 malpractice claims that are being evaluated by the City.  If

3 we do not pursue these issues, and the law on this issue, with

4 all due respect to your Honor, I know your position, you've

5 made it very clear, but the law as we see it is not that

6 clear.  If we do not pursue this argument it will later be

7 argued that all of these matters should be -- anything that we

8 can authenticate as part of the record needs to go to the

9 Seventh Circuit.  And we have a brief that we would like to

10 submit to have your Honor consider.  Obviously if your Honor

11 disagrees --

12          THE COURT:  Suppose you had put a piece of toilet

13 paper into the thing --

14          MR. PEARSON:  Of course.

15          THE COURT:  -- and it then gets withdrawn.

16          MR. PEARSON:  Of course.

17          THE COURT:  You expect that you are entitled somehow

18 to include that?

19          MR. PEARSON:  Of course not.

20          THE COURT:  Well, that's essentially the equivalent

21 of what happened.

22          MR. PEARSON:  I disagree, Judge.  We had two lawyers

23 at trial that were quibbling amongst themselves on the defense

24 side of this case.

25          THE COURT:  Well, that's their problem in those

16

1          THE COURT:   I want to make sure that Mr. Pearson is
2   paid.   You are not paid, yet, right?
3          MR. PEARSON:   I have been paid the initial $50,000
4   for back payment.   Thank you for asking, your Honor.
5          MR. LOEVY:   We moved quickly from the jury
6   instruction to the exhibits without really finishing what we
7   are doing on the jury instruction, you know, because the
8   discussion shifted.   I think we have an idea --
9          THE COURT:   Jury instructions, I don't understand.
10   If you have any nonfrivolous argument for differing with the
11   point that I made about how the jury instructions operate in
12   which -- I will be glad to take a look at that.   Because it
13   seems to me that the sensible way to go with the jury
14   instruction issue is simply to read the part of the transcript
15   that covers the jury instruction conference.   That would
16   define for you the instructions, both those that ultimately
17   will get given and those on which a party has somehow
18   preserved its issue on an instruction that is not given.   And
19   that's really what it should consist of on that.   I really
20   think there is any room for a difference on that.
21          MR. FIELD:   I wish the record were that clear.   Part
22   of our problem continues to be the conflict between defense
23   counsel on some of these issues.
24          THE COURT:   Well, you know fear of a malpractice
25   action is not something that should drive the engine on appeal

17

1   on substantive matters.

2           MR. PEARSON:  It isn't so much fear of a malpractice

3   action, as much as this is a different situation whereby what

4   steps we take in this litigation by not preserving our

5   arguments can come back to haunt the City later.  And it is

6   the City's claim and Detective Hendley's claim against

7   Mr. Noonan.  And we do not want to do anything that would

8   provide ammunition to a defense counsel in that context,

9   arguing that somehow the issue did not get properly presented

10  to the Court of Appeals.

11          MR. LOEVY:  I think the Court has properly

12  recognized the record is what it is.  What they preserved, the

13  preserved, what they didn't, they didn't.  You can't come in a

14  year later and say, "Here are 50 jury instructions.  We would

15  like the record to reflect they were all preserved," because

16  they weren't all preserved.

17          THE COURT:  I've got to tell you, you've lost me on

18  that, and you are really mixing two things together.  You know

19  lawyers ought to be concerned about potential malpractice they

20  might be, because remember that the place to do that is -- for

21  example, this question of saying, "Well, what they should have

22  done is to continue to insist on defendant's Jury Instruction

23  No. 7."  The place to do that and for that to be part of the

24  record is in the malpractice action, not in this one.  And

25  somehow you just don't seem to be registering that.

18

1          MR. PEARSON:  Judge, I have no intention of making
2  any frivilous arguments, nor have I ever.

3          THE COURT:  You are approaching it.  But anyway if
4  you want to tender your brief, I will look at it.  I don't
5  know what the issues are frankly.  Tender your brief.

6          MR. PEARSON:  We will be prepared to file that
7  today, your Honor.

8          THE COURT:  Okay.

9          MR. LOEVY:  We haven't seen it.  I don't know if
10 your Honor wants a response.

11         THE COURT:  All right.  I don't know either.  Why
12 don't you come in after you have had a chance to digest it or
13 find it indigestible and we sell see about setting up a
14 schedule.

15         MR. FIELD:  Judge, as we do proceed up to the top
16 floor, can we assume then any exhibit for which there is in
17 Mr. Newman's log a page number in the record it will be in the
18 supplemental record?

19         THE COURT:  I assume, unless the nature of the
20 reference is one that --

21         MR. FIELD:  Where it was refused, and I don't
22 believe that's the case on any of them.

23         THE COURT:  No.  Obviously can't totally recall on
24 that.  But certainly that's exactly right.  That should be the
25 approach taken in terms of identifying the exhibits that would

19

1  constitute part of the record.

2          MR. LOEVY:  That's what we are prepared to continue

3  on.

4          THE COURT:  Yes.  So do that.

5          MR. PEARSON:  Thank you, your Honor.

6      (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
       THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)

7                      C E R T I F I C A T E

8  I HEREBY CERTIFY that the foregoing is a true and correct

9  transcript from the report of proceedings in the
   above-entitled cause.

10

11  JESSE ANDREWS, CSR
    OFFICIAL COURT REPORTER
12  UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
13  EASTERN DIVISION
    DATED: December 27, 2007

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

07 - 3030

CLERK'S FILE COPY

DOCKETED
JAN 17 2008

1

2          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION

4
S. ALEJANDRO DOMINGUEZ,          ) DOCKET NO. 04 C 2907
5                                )
                     Plaintiff,)
6                                )
      vs.                        )
7                                )
PAUL HENDLEY, et al.,            ) Chicago, Illinois
8                                ) January 11, 2008
                     Defendants.) 9:00 o'clock a.m.
9

10

11

12      TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
                 MILTON I. SHADUR, Judge
13

14  APPEARANCES:

   For the Plaintiff:
15                    MR. JON LOEVY

16

17  For the Defendants:
                    MR. DANIEL FIELD and
18                  MR. ERIC NEWMAN

19
                    JESSE ANDREWS
20   Official Court Reporter - U. S. District Court
                 219 S. Dearborn Street
21              Chicago, Illinois  60604
                    (312) 435-6899
22

23        *     *     *     *     *     *

24

25

FILED
JAN 14 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

U.S.C.A. — 7th Circuit
FILED
JAN 18 2008   DW
GINO J. AGNELLO
CLERK
DOC. #

2

1              THE CLERK:   06 C 6885, Hendley vs. the City of
2  Waukegan.
3              [All of the hearing actually dealt with the ealier
4  case, 04 C 2907, Dominguez vs. Hendley].
5              MR. NEWMAN:   Good morning, your Honor.   Eric Newman
6  on behalf of Paul Hendley.
7              MR. FIELD:   Daniel Field for the City.
8              MR. LOEVY:   Good morning, your Honor.   Jon Loevy for
9  Alejandro Dominguez.
10             MR. FIELD:   Judge, the first issue is the letter of
11  credit.  As I told you one of the last times we were here, we
12  actually got a draft of one from the bank in early December,
13  which I e-mailed to Mr. Loevy and Mr.  Pearson's office to
14  solicit comments from them on it.  Another attorney in Loevy &
15  Loevy and I discussed this matter on Wednesday.  He had been
16  in contact with the District Court's Clerk's Office and got
17  some helpful information that's already been sent to the bank.
18  So we are woking on that.  We are in communication.
19             THE COURT:   Okay.
20             MR. FIELD:   Apparently it should be paid to the
21  United States of America.
22             THE COURT:   Not surprising.
23             MR. FIELD:   Anyway, I think we can represent that we
24  are actually making progress on that.
25             MR. LOEVY:   I think that's accurate.

3

1          THE COURT:  I am glad to hear that.  And when that

2 gets done, what's going to happen?  You know we had one action

3 that's been sort of a pending matter that I think is hinging

4 really on that.  When are we going to be able to deal with

5 that?

6          MR. LOEVY:  That's the only piece.  I will call

7 today.  Obviously that's the one that's sort of waiting.

8          THE COURT:  Yes.

9          MR. LOEVY:  That's one on the indemnification.

10          THE COURT:  Well, look.  When you finish up here I

11 will give you a date.

12          As you might guess, I have put you at the end here

13 with malice aforethought, because there are a lot of things

14 that I thought had to be dealt with.  My first question of you

15 is what happened to the efforts that you said you were

16 engaging in terms of dealing with this question of what

17 properly goes into the court record?

18          MR. LOEVY:  It is disappointing, your Honor.  We can

19 each put on our version.  But I talked to Mr. Pearson.

20 Obviously they are lead counsel on that side.  And we reached

21 an agreement they were going to do what we said in court:

22 They were going to send me a list of both the jury

23 instructions and the exhibits that they thought should be part

24 of the record.

25          I called Mr. Pearson when we didn't get it.  We

10

```
1   exhibit.  If it's before the Court, if it's something -- I
2   would assume at this trial that you were given an exhibit
3   booklet that had all of the proposed exhibits, that you had an
4   opportunity to look at that.  I think anything that this
5   Court, anything that was in this courtroom that this Court had
6   an opportunity to review is part of the record.  And the Court
7   of Appeals should have the opportunity to look at that.  Now
8   as far as --
9              THE COURT:  That's not the law.
10             MR. NEWMAN:  -- the scope of the record that's for
11  the Court of Appeals to make the determination.
12             THE COURT:  I recognize that's part of the record.
13  And I am going to ask that a copy of this, of today's
14  transcript, be supplied to the Court of Appeals so they will
15  understand the predicate of what I have indicated.
16             MR. NEWMAN:  And we intend to do that, your Honor.
17  We have ordered all of the transcripts that have dealt with
18  the motion to supplement the record, and those will also be --
19             THE COURT:  I am planning to go on.
20             Now I keep quite meticulous trial notes.  Every
21  exhibit that's referred to in the course of the trial -- you
22  can be seated -- is reflected in red for highlighting.  And I
23  keep a separate entry in which I use the final pretrial order
24  that has this laundry list of all potential exhibits.  I use
25  that to enter the page of my trial notes where an exhibit is
```

11

1  first referred to.  And that's exactly what I was doing at the

2  bottom of that page that you included here.

3          And notice again I made it plain I was not talking

4  there about what exhibits go to the jury, because that may be

5  a separate subject.  There may be things, although in

6  evidence, for one good reason or another may not be sent back.

7  What I was talking about was what was in evidence.  And I

8  was -- that was solely the question of the exhibits, which

9  exhibits by reason of having been referred to in testimony,

10 were there.  So as I began by saying, that's just an

11 inaccurate statement.

12         Now let me turn, if I may, to the jury instructions

13 on which the essential point is that it's really quits

14 misleading to be tendering as parts of the record on appeal

15 jury instructions that were voluntarily withdrawn by counsel.

16 Now that's only thing that I want to focus on for a moment.

17         Jesse gave me a copy of the transcript of the pages

18 that covered the very lengthy and detailed jury instruction

19 conference.  I note that regrettably there were a lot of

20 errors in the transcription, but my hope is that the reader

21 who wasn't present, as I was, is not going to find that any of

22 those obscure what I think of as the fundamental issue that I

23 want to address here.

24         Although I believe that it emerges from the

25 discussion that took place during the conference, let me just

12

1 by way of background explain the procedure that preceded the

2 conference.  Each side had delivered to me its set of draft

3 instructions.  And as I always do, what I did was to mark up

4 the sets with grammatical and cosmetic changes.  But in

5 addition to that, when it came to such critical instructions

6 as the elements instruction, what I also did on that and those

7 was to edit them carefully with handwritten deletions and

8 insertions.  And then I distributed to each side a photocopy

9 of the marked-up instructions so that we have could use that

10 at the beginning of our conference.

11         And then what I did was to go, as always, right down

12 the line and explained at the outset that -- I will always say

13 something like, "Unlike Contracts 101 in law school, silence

14 connotes acquiescence."  That is, that an objection had to be

15 noted when I said that an instruction would be given, or that

16 it would be given as modified, or that the instruction would

17 be treated as nonobjectionable.  And as you can see, I dealt

18 with the defense submissions that corresponded to the

19 plaintiff's submissions at the same time.

20         Now it strikes me as quite ironic in a way that the

21 purported support that is supplied for the current possition

22 advanced by the defendant is the affidavit of Ms. Knight.

23 Because in candor and regrettably, her principal role in these

24 proceedings in some respects tended to be that of either an

25 obstructionist or spoiler.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-08081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

TO:    All Counsel of Record

       **PLEASE TAKE NOTICE** that I have e-filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, **DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** and **DEFENDANTS' RESPONSE TO PLAINTIFF'S L.R. 56.1(B)(3)(C) STATEMENT OF ADDITIONAL FACTS**.

       **DATED** at Chicago, Illinois this 7th day of October, 2011.

                                        /s/ Joan E. Ahn
                                        One of the Attorneys for Defendants

Andrew M. Hale
Avi T. Kamionski
Shneur Z. Nathan
Joan E. Ahn
Andrew M. Hale & Associates
53 West Jackson
Suite 1800
Chicago, Illinois 60604
312-341-9646

## <u>CERTIFICATE OF SERVICE</u>

I, Joan E. Ahn, an attorney, hereby certify that on October 7, 2011, I caused **DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** and **DEFENDANTS' RESPONSE TO PLAINTIFF'S L.R. 56.1(B)(3)(C) STATEMENT OF ADDITIONAL FACTS** to be served upon all counsel of record by filing the same before the Court via the ECF system.

<u>/s/ Joan E. Ahn</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | Case No.: 1:09 C 8081 |
| Plaintiff, | ) | |
| | ) | Judge Kennelly |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | Jury Demanded |

<u>**DEFENDANT OFFICERS' STATEMENT OF UNDISPUTED FACTS
PURSUANT TO LOCAL RULE 56.1(a)(3)**</u>

Detectives Jerome Bogucki, Mark Sanders, Raymond Schalk and Fernando Montilla and

Officers Lawrence Ryan and Robert Whiteman ("Defendant Officers"), through their attorneys,

Andrew M. Hale & Associates, hereby submit the following statement of material undisputed

facts pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.[1]

### *JURISDICTION*

1.      Jurisdiction and venue are proper in this Court because Thaddeus Jimenez

("Plaintiff"), brings claims pursuant to 42 U.S.C. § 1983, as well as state law claims pursuant to

28 U.S.C. § 1367, and the events giving rise to the lawsuit took place in this District. At all times

relevant to this case, Defendant Officers were working under color of law and in the course and

scope of their employment as homicide detectives and/or police officers for the Police

Department of the City of Chicago.  **Pl.'s Complaint, ¶¶ 3-4, 7-10, Docket Entry ("D.E.") 1,**

**attached hereto as Exhibit 1.**

---

[1] The facts described herein are set forth for the purpose of Defendant's motion for summary judgment
only. Because Defendant Officers are required to take the facts in a light most favorable to plaintiff for
summary judgment purposes, the factual statements made herein should not be taken as admissions by
Defendant Officers for any other purpose.

### *THE MURDER AT ISSUE*

2.     At approximately 6:25 p.m., on February 3, 1993, Eric Morro, a 19-year-old man, was walking Westbound on the 3000 block of West Belmont with his 14-year old friend, Larry Tueffel.[2] **Ex. 1 at ¶14.**

3.     As two youths walked past Eric, at approximately 3018 W. Belmont, the youths pushed Morro against a wall and one of the youths shot Morro in the chest with a low caliber handgun. **Dep. of Larry Tueffel at 10:15-16:23, attached hereto as Exhibit 2.** Morro was declared dead upon his arrival at Illinois Masonic Hospital. **Dep. of Det. Bogucki at 56:13-22, attached hereto as Exhibit 3.**

### *THE INITIAL INVESTIGATION*

4.     Officers Lawrence Ryan and Robert Whiteman were the first police officers on the scene. **Dep. of Officer Ryan Dep. 5:3-6:8, attached hereto as Exhibit 4.** They observed Sandra Elder (43 years old) cradling Eric, with Larry and Phil Torres (30 years old) nearby. **Ex. 4 at 7:1-9:13, 32:1-19; General Offense Case Report at TRJ 56, attached hereto as Exhibit 5.**

5.     Phil and Larry indicated that they were planning on leaving the scene, so Officer Ryan put Phil and Larry in his police car while he processed the scene.  **Ex. 4 at 11:7-12:13, 101:19-102:13; Trial Testimony of Phil Testimony at 1st Trial at JIM1862:16-1863:17, attached hereto as Exhibit 6.**

6.     In the police car, Phil asked Larry if the shooter was Thaddeus Jimenez ("Plaintiff."). Larry responded that he was not. **Deposition of Phil Torres at 30:2-31:6, attached hereto as Exhibit 7.** This conversation was documented in Detective Bogucki's report and brought out in Plaintiff's criminal trials. **Detective's Supplementary Report Dated Feb. 4,**

---

[2] For the sake of clarity, Defendant Officers will at times refer to witnesses by their first names only.

1993, TRJ39-46 at 44, attached hereto as Exhibit 8; Ex. 6 at JIM1823:8-1824:3, 1850:21-

1851:7; Trial Testimony of Phil Torres at 2nd Trial at JIM3058, attached hereto as Exhibit

9; Trial Testimony of Larry Tueffel at 1st Trial at JIM1888:15-1889:12, attached hereto as

Exhibit 10.

7.      While still on the scene, Officer Ryan received a description of the incident and

suspects from Larry and Phil. This description was documented in Ryan's case report later that

same evening, and was primarily based on what Larry told Officer Ryan. **Ex. 4 at 18:3-19:20,**

**57:11-14.**

8.      Officer Ryan's case report describes the shooter as: Male/White-Hispanic, 5"4-

5"5, 13-14 years-old, curly black hair, purple jacket with yellow lettering and/or numbers, baggy

blue jeans, and armed with small caliber silver handgun. It describes the accomplice as:

Male/White-Hispanic, 13-14 years-old, 5"6-5"7, partially shaved black hair, wearing blue

Georgetown Starter jacket. **Ex. 4 at 34:12-38:24; Ex. 5 at 56.**

9.      After Officer Ryan provided the information in his report to Detective Bogucki

and showed him the scene, he and his partner, Officer Whiteman, had no further involvement in

the case, except for possibly transporting Larry and Phil to the police station, having a brief

conversation with Detective Bogucki regarding the case report at the hospital, and providing

testimony. **Ex. 4 at 66:24-67:18, 68:13-17; Ex. 3 at 58:5-24, 69:15-70:22.**

10.     Detective Bogucki was the detective first assigned to the Morro murder case. **Ex.**

**3 at 52:20-54:12.** He went to Illinois Masonic Hospital and learned that Morro was pronounced

dead on arrival. **Ex. 4 at 54:8-9, 56:23-57:8; Ex. 3 at 68:24-69:7.**

11.     At the hospital, Detective Bogucki interviewed Sandra, who told him that she and

her daughter, Tina, had witnessed the shooting. Sandra told Detective Bogucki that Tina was

actually closer to the shooting than she was. **Dep. of Sandra Elder at 61:21-62:17, attached hereto as Exhibit 11; Ex. 3 at 62:23-65:22; Ex. 8 at JIM00043.** In fact, Tina was within 20 feet of the shooting. **Dep. of Tina Elder at 64:15-23, attached hereto as Exhibit 12.**

12.     Although Tina was at the hospital, Detective Bogucki was unable to interview Tina at that time because she was vomiting. Tina was pregnant at the time. **Trial Testimony of Tina Elder at 1st Trial at JIM1799:6-20, attached hereto as Exhibit 13; Trial Testimony of Tina Elder at 2nd Trial at JIM3045:18-21, attached hereto as Exhibit 14; Trial Testimony of Sandra Elder at 1st Trial at JIM1926:17-1927:21, attached hereto as Exhibit 15; Ex. 11 at 61:21-62:17.**

13.     Detective Bogucki interviewed Larry for the first time on February 3, 1993, at approximately 9:30 p.m. **Ex. 3 at 90:7-15.** During that interview at Area 5, Tueffel told Bogucki that he was walking with Morro on Belmont when they were confronted by two Hispanic youths. He described the shooter as male Hispanic, 13-14 years old, 5 feet 2 inches to 5 feet 3 inches, 110 pounds, wearing a turquoise jacket with yellow lettering and jeans. He described the accomplice as male Hispanic, 13-14 years old, 5 feet 3 inches, 100 pounds, shaved head with a black spike on top, having an earing in his left ear, and wearing a ¾ length Georgetown University jacket. **Ex. 3 at 96:7-22; General Progress Report ("GPR") at TRJ53, attached hereto as Exhibit 16.** Following this interview, Larry went home. **Ex. 3 at 106:9-14.**

14.     Detective Bogucki also interviewed Phil for the first time on February 3, 1993, at Area 5 at approximately 9:30 p.m. **Ex. 3 at 90:7-15, 109:11-15.** In that interview, Phil stated that he had seen the shooting from his 3rd floor apartment window at 3012 W. Belmont and that the shooter had been over to his mother's home. As of this time, Phil had not told any police officers that Plaintiff was the shooter. **Ex. 3 at 110:9-111:6; Ex. 6 at JIM1850:1-15; Ex. 7 at 30:3-19.**

15.     Detective Montilla's only involvement in this case was he did a canvass on the scene for potential witnesses and possibly participated as a secondary interviewer or observer during Phil's 9:30 p.m. interview. **Deposition of Det. Montilla at 25:9-17, attached hereto as Exhibit 17; Ex. 3 at 110:9-15.**

16.     On February 4, 1993, at approximately 1:00 a.m., Phil called Detective Bogucki and told him that he had additional information. During that phone call, Phil told Detective Bogucki that the shooter was Plaintiff. **Ex. 6 at JIM1826:19-1827:4; JIM 3059:17-3060:12; Ex. 7 at 79:21-80:21; Ex. 9 at R-122:17-123:6.**

17.     Detective Bogucki then went to Phil's mother's house in order to interview him in person. During this interview, Torres added that Plaintiff was wearing a blue and white Duke University jacket. **Ex. 8 at TRJ43-44; Ex. 3 at 80:22-81:1, 155:10-22; Ex. 7 at 50:5-12, 60:19-24; Ex. 9 at R-123:7-12.** This account was relayed without any prompting by the police. **Ex. 7 at 52:2-12; Ex. 6 at B-94:22-95:15.**

18.     Phil's stepbrother and sister, Shawn and Donna Cosmen were also at Phil's mother's house when Detective Bogucki came by. They told Detective Bogucki that they witnessed Eric and Plaintiff in an argument earlier that day where Eric told Plaintiff to stop throwing gang signs at school bus. Donna Cosmen also testified in her deposition that she saw Plaintiff running from the scene. **Ex. 3 at 163:4-165:18; Testimony of Shawn Cosmen at 2nd Trial at JIM2410:1-5, attached hereto as Exhibit 18; Deposition of Shawn Cosmen at 110:14-16, attached hereto as Exhibit 19; Exhibit 8; Deposition of Donna Cosmen at 19:22-24, 20:1-9, 21:19-24, 52:13-53:3, attached hereto as Exhibit 20.**

19.     Finally, Phil told Detective Bogucki that Larry told Phil that Plaintiff was not present at the shooting. Phil explained that he believed that Larry was trying to throw Phil off. **Ex. 3 at 149:23-150:3; Ex. 6 at JIM1824:13-1825:12.**

### *LARRY TUEFFEL IS RE-INTERVIEWED*

20.     At approximately 3 a.m. on February 4, 1993, Detectives Bogucki and Sanders went to Larry's home and asked him to come back to Area 5. **Ex. 10 at JIM1891:9-1892:14.**

21.     Detective Bogucki informed Larry of what Phil said. Larry then told Bogucki that the shooter was in fact Plaintiff. **Ex. 10 at JIM1891:9-1892:14; Ex. 8 at TRJ44.**

22.     Larry told Detective Bogucki that he knew Plaintiff to have a low caliber handgun. **Ex. 10 at JIM1883:3-12; Ex. 8**. Larry also told the detectives about the incident with Plaintiff throwing gang signs. **Ex. 10 at Tr.1 JIM1913:19-24.**

### *PLAINTIFF'S ARREST*

23.     At approximately 4:00 a.m. on February 4, 1993, Detectives Bogucki and Sanders went to Plaintiff's home. **Ex. 1 at ¶13.** When they asked him to get his coat, he put on a Duke jacket. **Deposition of Plaintiff at 166:1-167:23, attached hereto as Exhibit 21.** This was the only jacket that Plaintiff owned. **Ex. 21 at 131:24-132:22.**

24.     The detectives never threatened Plaintiff in any way. **Ex. 21 at 206:2-8.**

### *THE LINEUP IDENTIFICATION*

25.     Later in the morning on February 4, 1993, Plaintiff participated as a subject in a lineup. Because of Plaintiff's age, the detectives obtained teen-aged volunteers to act as fillers for the lineup. **Ex. 3 at 230:1-20.**

26.     Detectives Bogucki and Sanders took care to make sure that the lineup witnesses – Tina, Sandra, Phil, and Larry – did not communicate with each other while viewing the lineup. **Ex. 2 at 49:3-12; Ex. 11 at 39:20-40:2; Ex. 15 at JIM1929:17-22.**

27.     At the lineup, Tina, Phil, and Larry identified Plaintiff as Eric's shooter. **Ex. 12 at 65:21-24; Ex. 7 at 56:10-12; 65:18-66:5; Ex. 2 at 46:15-23.** Sandra picked Plaintiff and one other lineup participant as someone who could "possibly" be the shooter. **Ex. 11 at 81:14-18; Ex. 15 at JIM1930:9-24.**

28.     No one ever told the lineup witnesses – Tina, Sandra, Phil, or Larry – whom to pick from the lineup.  **Ex. 12 at 48:3-6, 48:17-19, 66:1-2, 70:11-13, 93:2-24; Ex. 11 at 83:22-24; Ex. 7 at 65:22-66:5, 88:23-89; Ex. 2 at 46:18-23; Ex. 13 at JIM 1808:11-13.**

29.     The day following the lineup, on February 5, 1993, Sandra told either Detective Bogucki or Sanders that there was a rumor that Plaintiff stole a Duke jacket from someone and Eric tried getting the jacket back. **Ex. 11 at 100:3-101:18.**

### *VICTOR ROMO & JUAN CARLOS TORRES*

30.     Detective Schalk's first involvement with the case was on February 8, 1993. **Deposition of Raymond Schalk at 66:21-67:2, attached hereto as Exhibit 22.** On February 10, 1993, Detectives Bogucki and Schalk interviewed Victor Romo, then 12 years old, as a suspected accomplice of the shooter. **Ex. 3 at 256:6-8; 258:20-22; Ex. 22 at 91:24-92:2.** Before the interview with Victor, they spoke with his father, Ezequiel Romo. **Ex. 22 at 113:14-20.** Ezequiel stated that he spoke with a boy named Carlos, who told him that he shot Eric Morro in self-defense after he was punched in the face and sustained a bruise. **Ex. 22 at 118:2-5, 125:8-22; Detective's Supplementary Report Dated Feb. 10, 1993 at p. 3, attached hereto as Exhibit 23.**

31.     Victor told Detectives Bogucki and Schalk that he was in the vicinity of the shooting, and the shooter was his friend, named Juan Carlos. **Ex. 3 at 260:7-18; Ex. 22 at 132:22-24.** Victor further told the detectives that Juan Carlos was wearing a gold jacket at the time of the shooting. **Ex. 22 at 133:12-13.**

32.     Detectives Bogucki and Schalk located and interviewed Juan Carlos Torres after Victor identified him as the shooter. **Ex. 3 at 268:24-269:3.** This was documented in a police report. **Ex. 23 at p. 4.**

33.     On March 8, 1993, Detectives Bogucki and Schalk were at court in connection with the proceedings against Victor and learned that Victor's attorney claimed to have a copy of an audiotape of Juan Carlos confessing to shooting Eric in Spanish. **Ex. 3 at 285:16-23; Ex. 22 at 8:2-9:3, 19:24-20:4.** This was documented in a police report. **Detective's Supplementary Report Dated March 8, 1993, attached hereto as Exhibit 24.** Detectives Bogucki and Schalk never had possession of the tape. **Ex. 3 at 287:23.**

**34.**     Detectives Bogucki and Schalk interviewed Juan Carlos after they learned about the existence of the tape described above but he denied that his voice was on the tape. **Ex. 3 at 289:15-24, 290:10-12.** This was documented in a police report. **Ex. 24.**

### *THE JUDICIAL PROCEEDINGS*

35.     On May 21, 1993, Judge Durkin-Roy found Victor Romo delinquent for his role in the murder of Eric Morro. **Victor Romo Juvenile Trial Transcript Dated May 21, 1993 at 21:7-10, attached hereto as Exhibit 25.**

36.     Larry, Tina, and Mary Morro (Eric's mother) testified at Victor's juvenile trial on May 7, 1993. **Victor Romo Juvenile Trial Transcript Dated May 7, 1993 at 1-2, attached hereto as Exhibit 26.** Larry testified that he identified Plaintiff as the shooter after the police

told him there was another witness and he was not telling the truth. **Ex. 26 at 23:8-16, 25:10-20.**
Cynthia Leyh, one of Plaintiff's criminal defense attorneys, was present for the witnesses'
testimony. **Ex. 26 at 1; Deposition of Kendall Hill at 15:5-12, attached hereto as Exhibit 27.**
Ms. Leyh discussed her intent to call Victor at Plaintiff's trial with the Court. **Ex. 26 at 73:10-78:16.**

37.     Victor testified at his juvenile trial on May 14, 1993. **Victor Romo Juvenile**
**Trial Transcript Dated May 14, 1993 at 11:16-19, attached hereto as Exhibit 28.** Victor
testified that Juan Carlos, not Plaintiff, had shot Eric. **Ex. 28 at 20.**

38.     On June 24, 1993, Plaintiff was indicted by a grand jury. **Grand Jury**
**Indictment, attached hereto as Exhibit 29.**

39.     Kendall Hill represented Plaintiff at his first criminal trial and was the primary
attorney on the case. **Ex. 27 at 16:8-9.** He had been a public defender since 1982 and had served
on the homicide task force for two years. **Ex. 27 at 7:4-7, 18-22.** He was a supervisor in the
juvenile division and oversaw three delinquency courtrooms. **Ex. 27 at 8:4-13.** Today, he is
deputy of criminal operations in charge of almost four hundred attorneys and investigators. **Ex.**
**27 at 9:4-14.**

40.     At Plaintiff's first criminal trial, Larry, Tina and Phil identified him as the shooter
of Eric Morro. **Ex. 6 at B65:15-24; Ex. 10 at B129:19-24; Ex. 13 at B27:6-20, B30:4-7.** Larry
testified under a bench warrant. **Ex. 10 at B135:1-20.**

41.     Larry and Phil testified that Phil asked Larry in a police car at the scene if
Plaintiff was the shooter and that Larry told Phil that Plaintiff was not the shooter. **Ex. 6 at**
**B68:16-B69:1; Ex. 10 at B133:18-B134:5.** Larry also testified that he identified "Frankie" as
the shooter at 9:30 p.m. on February 3, 1993. **Ex. 10 at B150:6-20.**

42.     Mr. Hill cross-examined Larry regarding his initial denials and eventual identification of Plaintiff. **Ex. 10 at B152:20-B155:6.** Mr. Hill also cross-examined Det. Bogucki regarding his 3:00 a.m. interview of Larry. **Testimony of Jerome Bogucki at 1st Trial at C29:13-30:9, attached hereto as Exhibit 30.**

43.     Larry testified that the police brought him to the station around 3:00 a.m.; that he began telling them the same story; that they told him that he was lying and they had other witnesses; and that he then identified Plaintiff as the shooter. **Ex. 10 at B136:13-B137:14, B152:20-B153:10.** Det. Bogucki testified that he told Larry that Phil had identified Plaintiff; Larry denied this. **Ex. 10 at B154:24-B155:6; Ex. 30 at C29:24-C30:9.** Larry explained that he did not identify Plaintiff before because he was afraid of implicating a fellow member of the Simon City Royals. **Ex. 10 at B134:6-22, B135:21-136:5.**

44.     Judge Berkos excluded evidence supporting Plaintiff's theory that Larry identified him as the shooter because he had "disrespected" a senior member of the Simon City Royals. **Plaintiff's Brief and Argument Appealing First Conviction at pp. 19-21, attached hereto as Exhibit 31.**

45.     Mr. Hill cross-examined Larry regarding his descriptions of the jacket worn by the shooter. **Ex. 10 at B145:10-B146:1, B150:6-151:23.**

46.     Mr. Hill cross-examined Tina regarding her lineup identification of Plaintiff. **Ex. 13 at B41:8-B42:7, B48:11-21.**

47.     Mr. Hill called Victor, who testified that Juan Carlos – not Plaintiff – shot Eric. **Testimony of Victor Romo at 1st Trial at D12:22-D13:8, attached hereto as Exhibit 32.** Judge Berkos excluded Ezequiel's testimony regarding the tape alleged to contain Juan Carlos's

confession. **Hearing on Offer of Proof at 1ˢᵗ Trial at C91:16-C92:6, attached hereto as Exhibit 33.**

48.     Despite Victor's testimony, on October 4, 1994, Plaintiff was convicted of the murder of Eric Morro. **Certified Statement of Conviction at p. 4, attached hereto as Exhibit 34.**

49.     Plaintiff appealed his conviction. **Ex. 34 at p. 5.** On appeal, Plaintiff argued that the trial court committed reversible error by excluding evidence supporting his gang retaliation explanation for Larry's identification. **Ex. 31 at pp. 19-21.**

50.     On November 1, 1996, the Illinois Appellate Court granted Plaintiff's appeal with guidance to the trial court on evaluating Plaintiff's gang retaliation evidence. **Opinion on Plaintiff's Appeal of First Conviction at pp. 8, 11, attached hereto as Exhibit 35.**

51.     Charles Murphy represented Plaintiff at his second criminal trial. **Deposition of Charles Murphy at 5:5-13, attached hereto as Exhibit 36.** Mr. Murphy had been practicing exclusively in the area of criminal defense since approximately 1974. **Ex. 36 at 4:21-5:2.**

52.     At Plaintiff's second criminal trial, Larry, Tina and Phil again all identified him as the shooter of Eric Morro. **Ex. 9 at R118:23-R119:3; Ex. 14 at R84:9-13; Testimony of Larry Tueffel at 2ⁿᵈ Trial at R159:10-13, attached hereto as Exhibit 37.**

53.     Larry and Phil again testified that Phil asked Larry in a police car at the scene if Plaintiff was the shooter and that Larry told Phil that Plaintiff was not the shooter. **Ex. 9 at R121:6-7; Ex. 37 at R164:23-R165:3.** Det. Bogucki also testified that Larry identified "Frankie" as the shooter at 9:30 p.m. on February 3, 1993. **Testimony of Jerome Bogucki at 2ⁿᵈ Trial at S23:11-18, attached hereto as Exhibit 38.**

11

54.     Mr. Murphy cross-examined Larry regarding his initial denials and eventual identification of Plaintiff. **Ex. 37 at R182:12-R183:3, R184:11-R186:12.** Mr. Murphy also examined Det. Bogucki regarding his 3:00 a.m. interview of Larry. **Ex. 38 at S24:4-S27:5.**

55.     Larry again testified that the police brought him to the station around 3:00 a.m.; that they told him that he was lying and they had other witnesses; and that he then identified Plaintiff as the shooter. **Ex. 37 at R169:6-24.** Det. Bogucki testified that he told Larry that Phil had identified Plaintiff; Larry denied this. **Ex. 37 at R170:1-3, R182:17-24; Ex. 38 at S24:24-S25:3, S25:10-14, S27:4-8.** Larry explained that he did not identify Plaintiff before because he was afraid of implicating a fellow member of the Simon City Royals. **Ex. 37 at R166:23-R167:11.**

56.     Mr. Murphy cross-examined Larry regarding his initial description of the jacket worn by the shooter. **Ex. 37 at R180:19-23.**

57.     Mr. Murphy cross-examined Tina regarding her lineup identification of Plaintiff. **Ex. 14 at R99:6-R100:14, R102:3-R105:14.**

58.     Mr. Murphy called Victor, who testified Juan Carlos – not Plaintiff – shot Eric. **Testimony of Victor Romo at 2nd Trial at C28:4-14, attached hereto as Exhibit 39.** Judge Sacks denied Mr. Murphy's motion in limine to admit the Ezequiel Romo audiotape. **Hearing on Motion in Limine at 2nd Trial at P78:16-20, attached hereto as Exhibit 40; Motion in Limine, attached hereto as Exhibit 41.**

59.     Despite Victor's testimony, on November 11, 1997, Plaintiff was again convicted of the murder of Eric Morro. **Ex. 34 at p. 10.**

60.     Many of the prosecution witnesses were threatened in connection with their testimony against Plaintiff. Larry moved out of the neighborhood after being threatened and beat

up. **Ex. 2 at 55:14-21, 59:1-7.** Tina was told to keep her mouth shut and hit in the head with a

brick. **Ex. 12 at 67:16-23.** Her mother's garage was burned down and her father was beaten up.

**Ex. 12 at 67:22, 68:18-23.** Tina moved out of the neighborhood in 1995 because she was sick of

being harassed, and her family followed. **Ex. 12 at 91:1-11.** Phil's apartment was burned down.

**Ex. 7 at 81:22-82:7.** Shawn was threatened by members of Plaintiff's family, including threats

on his life. **Ex. 19 at 36:3-12, 37:2-16, 39:19-20.**

### POST-CONVICTION INVESTIGATION AND PROCEEDINGS

#### LARRY TUEFFEL

61.     About a week before July 31, 2006, Luke Netzel visited Larry at Somerset Place.

**Deposition of Alison Flaum at 30:12-18, attached hereto as Exhibit 42.** After Mr. Netzel

identified himself, Larry "immediately" told him that Plaintiff was innocent. **Ex. 2 at 341:20-**

**342:6.**

62.     On July 31, 2006, Steve Drizin, Alison Flaum and Mr. Netzel visited Larry at

Somerset Place. **Ex. 42 at 34:23-35:22.** They obtained written and videotaped statements from

Larry in which he recanted his identification of Plaintiff as the shooter; claimed that the police

took him to the station in the early hours of the morning and yelled at him until he identified

Plaintiff as the shooter; and identified Juan Carlos as the shooter. **Larry Tueffel Written**

**Statement at pp. 4-8, attached hereto as Exhibit 43; Larry Tueffel Transcribed Statement**

**at pp. 11-15, attached hereto as Exhibit 44.** Larry stated that he told the police that Plaintiff

was the shooter because "I figured they're not going to believe me . . . I just went along with the

story what the other people said." **Ex. 44 at 15:9-13.**

63.     Larry was first diagnosed as a paranoid schizophrenic in 2001 or 2002. **Ex. 2 at**

**190:19-21.** He was being treated for schizophrenia at Somerset Place at the time that Plaintiff's

attorneys obtained his recantation. **Ex. 2 at 363:11-364:2.** He is still diagnosed as a paranoid schizophrenic today. **Ex. 2 at 190:22-24.** Plaintiff declined to respond to an interrogatory question seeking information on when his attorneys learned that Larry had a mental health disorder. **Pl.'s Resp. to Def. Sanders' Fourth Set of Interrogatories at ¶2, attached hereto as Exhibit 45; Fed. R. 26(a)(2) Report of Dr. Mark Levy Regarding Larry Tueffel's Condition, submitted to the Court and counsel under separate cover as Exhibit 58.**

64.     On February 3, 2009, State's Attorney's Office Investigator Brian Killacky reported that Larry told him and Assistant State's Attorney Darren O'Brien that "he was never threatened by prosecutors or the police into identifying or providing testimony into what he is now contending to be a false identification of the person who shot Eric." **SAO Report at pp. 2-3, attached hereto as Exhibit 46.**

*TINA ELDER*

65.     On May 14, 2007, Plaintiff's attorneys traveled with Larry approximately 150 miles from Chicago, IL to Thompson, IL. **Ex. 45 at ¶ 1.** In Thompson, IL, they visited Mary Morro's house. **Pl.'s Resp. to Def. Whiteman's Second Set of Interrogatories at ¶¶ 2-3, attached hereto as Exhibit 47.** Mary called Tina and asked Tina to come to her house. **Ex. 12 at 76:16-77:3.**

66.     On or before May 14, 2007, Plaintiff's attorneys played Larry's videotaped recantation for Tina. **Ex. 12 at 78:5-13; Notes from Post-Conviction Interview of Tina Elder, attached hereto as Exhibit 48.** They did not disclose to Tina that Larry was at Somerset Place or had been diagnosed with a mental health disorder at the time they obtained his recantation. **Ex. 12 at 78:20-79:3.** Tina "took [the video] at face value." **Ex. 12 at 81:14-17.**

67.     Plaintiff's attorneys then interviewed Tina regarding the circumstances of the lineup. **Deposition of Patrick Harrigan at 38:18-39:3, attached hereto as Exhibit 49.** She volunteered that, prior to the lineup, she had been placed at a desk with a bunch of papers, a photograph of Plaintiff, and a photograph of Eric. **Ex. 12 at 46:4-11; Ex. 49 at 38:18-39:3.** It had not occurred to her that the photographs and lineup were related. **Ex. 12 at 48:17-19, 93:4-8.**

68.     On May 15, 2007, Tina signed an affidavit regarding the photographs. **Tina Elder Affidavit, attached hereto as Exhibit 50.** Despite the affidavit, in her deposition Tina maintained that she still believed that Plaintiff shot Eric Morro. **Ex. 12 at 104:23-105:2.**

69.     The first time Tina recalled speaking with anyone regarding the photographs was to Plaintiff's post-conviction attorneys. **Ex. 12 at 10:6-12, 92:12-18.** She did not recall Plaintiff's criminal defense attorneys ever asking her about it. **Ex. 12 at 19:23-20:9.**

70.     Tina did not know who placed her at the desk. **Ex. 12 at 91:24-92:5.** She did not speak with any police officer regarding the photographs. **Ex. 12 at 48:3-6, 93:11-16.**

71.     Phil maintains to this day that he believes that Plaintiff shot Eric Morro. **Ex. 7 at 82:8-11.**

### POST-CONVICTION PETITION AND PROCEEDINGS

72.     On April 4, 2008, Plaintiff filed a Verified Petition for Post-Conviction Relief based on Larry's recantation and Tina's statement regarding the photographs. **Verified Petition at ¶¶ 47-58, attached hereto as Exhibit 51.** His Petition did not disclose that Larry gave his recantation while he was at Somerset Place or Larry's history of mental illness. **Ex. 51 at ¶¶ 47-53.**

73. On June 26, 2008, Judge Stanley Sacks dismissed Plaintiff's Petition for Post-Conviction Relief in a nineteen-page order, finding it "frivolous and patently without merit." **Order on Verified Petition at p. 19, attached hereto as Exhibit 52.**

74. On May 1, 2009, Plaintiff and the State's Attorney's Office filed a Joint Emergency Petition for Relief from Judgment and Motion for New Trial based on Larry Tueffel and Tina Elder. **Joint Petition at ¶¶ 5-6, attached hereto as Exhibit 53.** Again, the Petition did not disclose the circumstances of Larry's recantation. **Ex. 53 at ¶ 5.**

75. The same day, and without an evidentiary hearing, Judge Claps granted the Joint Petition based on the representations therein. **Hearing on Joint Petition at 4:2-3, attached hereto as Exhibit 54.** Judge Claps vacated Plaintiff's conviction and sentence, and ordered his release from prison. **Order on Joint Petition, attached hereto as Exhibit 55.**

### CIVIL LAWSUIT

76. On August 20, 2010, Larry signed an affidavit prepared by the Defendant Officers' civil attorneys stating that "the police never threatened or coerced me to say TJ was the shooter." **Larry Tueffel Affidavit at ¶ 9, attached hereto as Exhibit 56.**

77. Larry testified in his deposition that the police took him to the station in the early hours of the morning and yelled at him until he identified Plaintiff as the shooter. **Ex. 2 at 131:23-141:13, 320:12-322:1.** He testified that the police did not tell him that they wanted him to identify Plaintiff as the shooter. **Ex. 2 at 138:6-18.**

78. Mr. Hill testified in his deposition that it was his practice to interview eyewitnesses and that "I'd be crazy to" take police reports at face value. **Ex. 27 at 25:16-22, 32:2-11, 35:19-36:17.** Mr. Murphy testified in his deposition that he did not believe that he interviewed Larry. **Ex. 36 at 13:2-15.**

79. Plaintiff testified in his deposition that he overheard the police yelling at Larry at the station prior to his lineup. **Ex. 21 at 420:1–422:16.** Plaintiff also testified that Larry told him prior to his first criminal trial that "they made me" identify him as the shooter of Eric Morro. **Ex. 21 at 226:15-17, 229:17-19, 230:8-231:6.** Plaintiff testified that, at the time of the shooting, he and Larry were friends and fellow PeeWee members of the Simon City Royals. **Ex. 21 at 92:2-16.**

80. Plaintiff has identified the specific misconduct he claims was committed by Defendants in response to Defendants' Interrogatories. **Pl.'s Resp. to Def. Montilla, Ryan, Sanders and Whiteman's First Set and Def. Bogucki and Schalk's Second Set of Interrogatories, attached hereto as Exhibit 57.**

## INDEX OF EXHIBITS USED IN DEFENDANTS' LOCAL RULE 56.1(a)(3) STATEMENT

1. Plaintiff's Complaint
2. Deposition of Larry Tueffel
3. Deposition of Jerome Bogucki
4. Deposition of Lawrence Ryan
5. General Offense Case Report
6. Testimony of Phil Torres at Plaintiff's First Criminal Trial
7. Deposition of Phil Torres
8. Detective's Supplementary Report Dated February 4, 1993
9. Testimony of Phil Torres at Plaintiff's Second Criminal Trial
10. Testimony of Larry Tueffel at Plaintiff's First Criminal Trial
11. Deposition of Sandra Elder
12. Deposition of Tina Elder
13. Testimony of Tina Elder at Plaintiff's First Criminal Trial
14. Testimony of Tina Elder at Plaintiff's Second Criminal Trial
15. Testimony of Sandra Elder at Plaintiff's First Criminal Trial
16. General Progress Report
17. Deposition of Fernando Montilla
18. Testimony of Shawn Cosmen at Plaintiff's Second Criminal Trial
19. Deposition of Shawn Cosmen
20. Deposition of Donna Cosmen
21. Deposition of Thaddeus Jimenez
22. Deposition of Raymond Schalk
23. Detective's Supplementary Report Dated February 10, 1993

24. Detective's Supplementary Report Dated March 8, 1993
25. Victor Romo Juvenile Trial Transcript Dated May 21, 1993
26. Victor Romo Juvenile Trial Transcript Dated May 7, 1993
27. Deposition of Kendall Hill
28. Victor Romo Juvenile Trial Transcript Dated May 14, 1993
29. Grand Jury Indictment
30. Testimony of Jerome Bogucki at Plaintiff's First Criminal Trial
31. Plaintiff's Brief and Argument Appealing First Conviction
32. Testimony of Victor Romo at Plaintiff's First Criminal Trial
33. Hearing on Offer of Proof at Plaintiff's First Criminal Trial
34. Certified Statement of Conviction
35. Opinion on Plaintiff's Appeal of First Conviction
36. Deposition of Charles Murphy
37. Testimony of Larry Tueffel at Plaintiff's Second Criminal Trial
38. Testimony of Jerome Bogucki at Plaintiff's Second Criminal Trial
39. Testimony of Victor Romo at Plaintiff's Second Criminal Trial
40. Hearing on Motion in Limine at Plaintiff's Second Criminal Trial
41. Motion in Limine To Use Out of Court Admission Against Penal Interest by a Third Party Non-Defendant
42. Deposition of Alison Flaum
43. Larry Tueffel Written Statement Dated July 31, 2006
44. Larry Tueffel Transcribed Statement Dated July 31, 2006
45. Plaintiff's Objections and Responses to Defendant Mark Sanders' Fourth Set of Interrogatories
46. State's Attorney's Office Investigative Report Dated February 3, 2009
47. Plaintiff's Objections and Responses to Defendant Robert Whiteman's Second Set of Interrogatories
48. Notes from Post-Conviction Interview of Tina Elder Dated November 15, 2006
49. Deposition of Patrick Harrigan
50. Tina Elder Affidavit Dated May 15, 2007
51. Verified Petition for Post-Conviction Relief
52. Order on Verified Petition for Post-Conviction Relief
53. Joint Emergency Petition for Relief from Judgment and Motion for New Trial
54. Hearing on Joint Emergency Petition
55. Order on Joint Emergency Petition
56. Larry Tueffel Affidavit Dated August 20, 2010
57. Plaintiff's Objections and Responses to Defendants' First Set of Interrogatories
58. Fed. R. Civ. P. 26(a)(2) Report of Dr. Levy Concerning Larry Tueffel's Mental Condition

Respectfully Submitted,

/s/ *Shneur Nathan*

Andrew M. Hale
Avi T. Kamionski          /s/ *Joan Ahn*
Shneur Nathan
Joan Ahn

Andrew M. Hale & Associates
53 West Jackson, Suite 1800
Chicago, Illinois 60604
(312) 341-9646

## CERTIFICATE OF SERVICE

I, Shneur Nathan, an attorney, hereby certify that I have caused true and correct copies of the above and foregoing **DEFENDANTS' LOCAL RULE 56.1(a)(3) STATEMENT OF FACTS** to be served upon all attorneys of record via the Court's electronic case filing system, in accordance with the rules of electronic filing of documents, on this 15th day of July, 2011.


/s/ *Shneur Nathan*
Shneur Nathan

# EXHIBIT 3

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


THADDEUS JIMENEZ,           )
                           )
       Plaintiff,      )
                          )
    vs.          )   No. 09 CV 8081
                          )
CITY OF CHICAGO, et al.,     )
                          )
       Defendants.     )


The deposition of JEROME BOGUCKI, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Carmella T. Fagan, C.S.R., R.P.R., Notary Public within and for the County of Cook and State of Illinois, at 357 East Chicago Avenue, in the City of Chicago, Cook County, Illinois, commencing at 9:50 a.m. on the 20th day of September, 2010.

52

1       A       -- investigation?  During this

2   investigation, I had inquired of 17th District

3   officers, if they ever heard of Triangles.  They said

4   they had not.

5       Q       Okay.  So --

6       A       I had never heard of them; neither did

7   they.

8       Q       So the answer to my question is, no,

9   you never found out what they might be?

10      A       I think one person, and I cannot

11  remember who it was, but someone told me that they

12  thought it might have been a dance group.

13      Q       Okay.  Other than the Royals, can you

14  identify any other gangs that operated in the area of

15  Belmont and Sacramento?

16      MR. HALE:  Same time frame?

17      MR. BOWMAN:  Yes, sir.

18      THE WITNESS:  Not that I can recall.

19  BY MR. BOWMAN:

20      Q       Okay.  How were you assigned to the

21  Eric Morro murder investigation?

22      A       I believe one of my sergeant (sic)

23  that was working at the time just assigned me.

24      Q       Okay.  Did you get the assignment at

53

1    the Area headquarters or were you --

2        A    Yes.

3        Q    -- out?  In person?

4        A    I believe so.  Yes.

5        Q    Do you remember who gave you the --

6        A    You know --

7        Q    -- assignment?

8        A    -- what?  I -- you know what?  I

9    should -- I -- I'm going to go back.  I'm not sure if

10   I got it if I was in the office or not.

11       Q    Okay.  Do you remember who -- who the

12   sergeant was who gave you the assignment?

13       A    I believe I read in the report that it

14   could have been Sergeant Kuhn.

15       Q    My question was, just to be clear,

16   whether you remembered, and you've referred to what

17   you read in the report.  Do you have a recollection

18   independent of --

19       A    No.

20       Q    -- the report?

21       A    I'm sorry.  I'm -- are you done?  No.

22   I'm sorry.

23       Q    Okay.  Do you have a recollection of

24   what information you were given about the murder at

54

1    the time of the assignment?

2         A    I don't know for sure if it was even

3    said to be a murder yet.

4         Q    It was a --

5         A    It might --

6         Q    -- shooting?

7         A    -- have been a serious shooting.  Yes.

8         Q    And that's all you heard?

9         A    To my recollection, yes.

10        Q    Okay.  Were you working solo at that

11   time?

12        A    I was.

13        Q    Okay.  And was anyone else assigned to

14   the shooting other than yourself?

15        A    Eventually Detective Montilla went out

16   to try and canvass the area to see if there were

17   additional witnesses, and also I believe Detective

18   Mohan also went out there to do the same.

19        Q    Was this -- were -- were these guys

20   assigned initially or did they get assigned to this

21   case subsequently?

22        A    I think sub -- subsequently.  I --

23        Q    So initially it was your case?

24        A    Yes.

56

1      A      I -- I -- I did not.  I paused long

2      enough to see that there was no one there.

3      Q      Just -- was there --

4      A      I continued on, because if there was

5      no one there to tell me what was happening, there was

6      little I could do there.

7      Q      All right.  Was there yellow tape at

8      the scene?

9      A      No.

10     Q      It was completely free of any

11     investigative activity?

12     A      I saw nothing.

13     Q      All right.  And what -- how long is

14     the drive from Belmont and Sacramento to the

15     hospital?

16     A      I'm not sure.

17     Q      Approximately.

18     A      Fifteen minutes maybe.

19     Q      And what did you do at the hospital?

20     A      I talked to the 17th District

21     officers, first of all.  I observed the -- the body

22     of the victim, and I found out that he had indeed

23     died, and I talked to Sandra Elder.

24     Q      Let's start with your -- your

58

1    Officer Whiteman provide you with a copy of their

2    general offense case report at that time?

3        A     I don't -- I can't say that, because I

4    don't know if they had it completed yet.

5        Q     All right.  At some point in the

6    investigation, did you get the original case report?

7        A     Yes.

8        Q     Was it that evening?

9        A     I believe so.

10       Q     And you have no memory of what you

11   learned from Ryan and Whiteman about the case?

12       A     Not independent recollection.  No.

13       Q     Do you recall whether or not Ryan and

14   Whiteman gave you descriptions of the two suspected

15   individuals?

16       A     I don't -- I don't know.

17       Q     Okay.  Do you recall whether they gave

18   you any information about the identity of possible

19   eyewitnesses?

20       A     I believe they gave me the information

21   that was on their report.

22       Q     Do -- do you think they read their

23   report to you or handed you a copy?

24       A     I don't know.

62

1      not sure what would be my recollection or -- or that

2      of -- if -- if I had any in -- independent

3      recollection, I'm not sure before I read the reports.

4           Q      In other words --

5           A      If that makes any sense at all.

6           Q      Well, let me make sure I understand.

7      In terms of what you now believe you recall about the

8      interview of Sandra Elder, whether it's an

9      independent recollection from the reports or whether

10     it -- it's just something that's in the reports, it's

11     muddled together in your mind and you can't be sure?

12          A      I would say I -- I can't be sure.

13          Q      All right.  Can you -- as you reflect

14     back on the events of February 1993, can you bring up

15     a mental image of Sandra Elder?

16          A      I can bring up an image.  I don't know

17     if it's correct or not.

18          Q      Okay.  Do you recall what color hair

19     she had, whether she had -- wore eyeglasses or not?

20          A      I can recall she -- if -- she was in

21     her 40s maybe.  That's -- not very tall.  That's

22     about it.

23          Q      Okay.  Do you have an understanding

24     from the reports and your attempts to refresh your

63

1    recollection about this investigation of whether

2    Sandra Elder had been interviewed prior to the

3    interview that you did of her at the hospital the

4    evening of the shooting?

5         A      I don't know if she was or not.

6         Q      Can you tell me who was present for

7    the interview of Sandra -- Sandra Elder?

8         A      I know I was, but I don't know if

9    anyone else was.

10        Q      Can you tell me why it is that she

11   came to be in the hospital?

12        A      I believe because she was a friend of

13   the person that got shot.

14        Q      She was a friend of Eric Morro's?

15        A      Yes.

16        Q      Okay.

17        A      Um-hum.  A family-type friend.

18        Q      A family friend?

19        A      I believe so.  A family type of

20   friend.

21        Q      Okay.  What -- what was the nature of

22   her relationship with the Morro family?

23        A      I -- I don't know.

24        Q      Can you tell me independent of the

64

1    reports what Sandra Elder said concerning her

2    whereabouts at the time of the shooting?

3         A    Independent of the report?  No.

4         Q    Okay.  Can you tell me independent of

5    the report what Sandra Elder said happened?

6         A    No.

7         Q    Can you tell me independent of the

8    report what description Sandra Elder gave you of the

9    two offenders?

10        A    No.

11        Q    Can you tell me independent of the

12   report how she described the offenders' jackets, if

13   at all?

14        A    Independent of a report or notes or

15   all written documents?  Is -- is that what you're

16   asking?

17        Q    Yes.

18        A    No.

19        Q    Okay.  You would have to rely on your

20   reports for that?

21        A    I would think so.  Yes.

22        Q    All right.  Can -- independent of the

23   report, can you tell me what Sandra Elder said, if

24   anything, about the whereabouts of her daughter Tina

65

1    at the time of the shooting?

2        A      That, I do remember.

3        Q      What did she say?

4        A      She said that -- the whereabouts of

5    her?

6        Q      Of Tina.  Right.

7        A      Right.  She said -- she said that --

8    the whereabouts.  Hmmm.  No.  I can't say I can

9    answer that.  No.

10       Q      All right.  What do you remember her

11   saying about Tina?

12       A      I remember her saying that her

13   daughter Tina was a witness and that she -- she was

14   sick, and really she'd -- she'd talk to us at a later

15   time.  I asked -- I asked if I could talk to her and

16   I talk -- you know, she said, "You could talk to her

17   later.  She's very sick right now."

18       Q      All right.  Was Tina present in the

19   hospital when you spoke with Sandra Elder?

20       A      I don't know if I knew that.  That's

21   why I couldn't answer that question before.  I don't

22   know if I knew she was actually there.

23       Q      I'm not sure I understand your answer.

24       A      Sandra Elda -- Elder told me about

66

1    Tina and that she was a witness, but I don't recall

2    if Sandra told me she was in the hospital.

3         Q      Okay.  Did you form an impression of

4    Sandra Elder's reliability as a witness?

5         A      You know, I -- I liked her as a

6    witness.

7         Q      Why?

8         A      I thought she was straightforward.

9    She didn't hesitate in the -- in the things she was

10   saying.  I -- I did -- I did think she would be a

11   reliable witness.

12        Q      All right.  Over the course of your

13   dealings with Sandra Elder, did you find her to be

14   consistent in her account of the events that she

15   observed on the street on the night of the shooting?

16        A      I don't recall.

17        Q      Well, that would be important in

18   assessing her reliability as a witness, wouldn't it?

19        A      Well, that's -- that's my impression

20   as we sit here today.  Again, I don't recall

21   independent further conversations.

22        Q      Right.  My colleague has -- has

23   pointed out to me that -- that we didn't get a clear

24   answer to the question.  Let me restate the question

67

1   and ask you if you can answer this with a "yes" or

2   "no," if possible.  If you can't, you can't.  We'll

3   move on.

4            Would it be fair to say that in order

5   to assess the reliability of a witness, it is

6   important to evaluate their consistency in their

7   accounts of what they tell you about their

8   observations?

9        A    Within reason.  Yes.

10       Q    Why do you say, "Within reason"?

11       A    Because my experience tells me that

12   witnesses change in little ways at times, and I've

13   experienced that.  It meant nothing, it's just what

14   they're envisioning sometimes changes a lit -- in

15   small parts.  So the main -- the main parts would

16   be -- if they're consistent, I would be okay with the

17   witness.

18       Q    Well, let me see if I understand what

19   you're saying.  As far as rely -- strike that.  I'll

20   start over.

21            As far as evaluating the reliability

22   of an eyewitness, you would agree that the witness's

23   consistency in describing events is important within

24   reason, fair?

68

1      A      Yes.

2      Q      If there are minor differences in the

3   account, you would chalk that up to human nature,

4   human fallibility, right?

5      A      I would say that would be a fair

6   evaluation.  Yes.

7      Q      On the other hand, if there are

8   substantial differences in the eyewitness's account,

9   then that would raise a question, a legitimate

10  question, about that eyewitness's reliability, right?

11     A      Yes.

12     Q      For example, if an eyewitness totally

13  changed her account of where she was when she made

14  her observations, that would -- that would affect

15  your assessment of her reliability, fair?

16     MR. HALE:  I'm would object just for lack of

17  foundation, incomplete hypothetical.

18         You can answer.

19     THE WITNESS:  Every -- every single witness as

20  in every single case can be different.  You have to

21  make a judgment as far as our involvement in any

22  case.

23  BY MR. BOWMAN:

24     Q      As you sit here today, can you

69

1    estimate the time that you arrived at the hospital

2    where Eric Morro had been taken?

3    A    About 7:30 at night.

4    Q    All right.  And how long did you

5    remain at the hospital approximately?

6    A    I can't re -- I can't recall at this

7    point.

8    Q    Was it a matter of an hour?

9    A    I can't recall.

10    Q    Was it a matter of three hours?

11    A    My answer is I can't recall.

12    Q    Okay.  You're just completely unable

13    to tell me?

14    A    Not within -- not within reason.  No.

15    Q    After whenever it was that you left

16    the hospital, after you left, what is the very next

17    thing that you did in relation to this investigation?

18    A    I -- I asked the 17th District

19    officers to have the witnesses brought over to Area 5

20    that I could talk to.

21    Q    Which witnesses were these?

22    A    They were Philip Torres and Larry

23    Toufal.

24    Q    And how did you know that Philip

70

1      Torres and Larry Toufal were witnesses?

2          A      17th District officers.

3          Q      Was it your understanding that the

4      17th District officers had already spoken to Philip

5      Torres and Larry Toufal?

6          A      Yes.

7          Q      And did you make this request of

8      Whiteman and Ryan?

9          A      Yes.

10         Q      And did you make this request in

11     person at the hospital or after you left?

12         A      At the hospital.

13         Q      And they indicated that they would

14     undertake to do that; is that fair?

15         A      Yes.

16         Q      Then what did you do?

17         A      I went to the scene with -- I believe

18     with the 17th District officers so they could show me

19     where things were and how things were.

20         Q      Did you get out of your cars at the

21     scene?

22         A      Yes.

23         Q      And describe for me what you did

24     there.

80

1    look for somebody or something.

2         Q    All right.  And what about page 3?

3    Are these also your notes?

4         A    Yes.

5         Q    Okay.  When did you make these notes?

6         A    I'm not sure.

7         Q    Where did you --

8         A    It would be --

9         Q    Sorry.  Go ahead.

10        A    -- I think -- I think this is -- this

11   is from my interview with Phil Torres at -- at his

12   mother's apartment.

13        Q    All right.  And what -- what leads you

14   to think that?

15        A    It's just my recollection.

16        Q    Are you sure of that?

17        A    Yes.  Now -- now that I'm reading it,

18   I'm quite sure.

19        Q    All right.  And let's look at page 4.

20   What are -- are these also yours?

21        A    Yes.

22        Q    Where did you make these notes?

23        A    I believe this probably was in the

24   hospital, on the 3rd.

81

1  Q Are these notes that you made of your

2 interview with Sandra Elder in the hospital on the

3 3rd of February of 1993?

4  A I believe that's what it is.

5  Q Are you sure?

6  A I believe.

7  Q Can you be sure?

8  MR. HALE:  He just answered that.  He said --

9  MR. BOWMAN:  He says he believes, and I'm

10 ask -- I get that.

11 BY MR. BOWMAN:

12  Q I'm asking can you be sure?  Yes or

13 no.

14  A Well, if we had a video of it at the

15 time, I'd be absolutely sure, right, because I

16 don't -- I don't have that kind of knowledge.

17  Q Okay.  Let's take a look at the next

18 page.  What is this?  This is page 5, for the record.

19  MR. HALE:  Objection to form.

20  THE WITNESS:  These are notes that I took.

21 BY MR. BOWMAN:

22  Q When did you take them?

23  A Well, it could be at different times.

24 I can tell that since I've got it marked as first

90

1    those --

2        A    No.

3        Q    -- interviews.

4        A    It would not have mattered.

5        Q    It wouldn't have mattered?

6        A    No.

7        Q    What was the first thing that you did

8    at 9:30 when you arrived back at Area 5?

9        A    I don't know what the first thing I

10   did was.

11       Q    Okay.  Can you tell me what you did at

12   Area 5 without regard to sequence, just a list of the

13   things you did at that stage of your investigation?

14       A    Talked to Larry Toufal and Phil

15   Torres.

16       Q    Do you recall doing anything else in

17   relation to this investigation at Area 5 on the

18   evening of February 3, 19 --

19       A    I don't recall.

20       Q    -- '93?  I forgot to ask you this

21   before, and it just popped into my mind.  Since your

22   retirement from the police department, have you been

23   employed?

24       A    I've -- I've had part-time work.

96

1       Q      Any other reason?

2       A      No.

3       Q      All right.  What did you say to Toufal

4    and what did he say to you?

5       A      I don't have any independent

6    recollection of that.

7       Q      Okay.  So apart from what appears in

8    reports and notes, you have no independent

9    recollection of the conversation that you had with

10   Toufal at Area 5 on the evening of February 3, 1993;

11   is that accurate?

12      A      Not completely.  I can say that he,

13   Larry Toufal, basically told me what he had told the

14   17th District officers.

15      Q      And -- and why -- how can you say

16   that?  Based on memory?

17      A      Yes.

18      Q      Okay.  What do you remember that he

19   said?

20      A      I don't remember exactly what he said,

21   but I remember it matched what the 17th District

22   officers had reported.

23      Q      Okay.  At the point when you sat down

24   with Larry Toufal at Area 5 that evening, had you

106

1      A      I would have to surmise that.  Yes.

2      Q      All right.  And in general terms, as

3    you listened to Toufal, it was your conclusion that

4    what he was telling you was consistent with what he

5    had earlier said to the 17th District officers and --

6    and what they had written down on their general

7    offense case report?

8      A      In essence, it was.

9      Q      How long did you meet with Mr. Toufal?

10     A      Don't remember.

11     Q      What did you do at the end of the

12   meeting?

13     A      I believe whoever took him, brought

14   him home.

15     Q      Okay.  Did -- did you leave before you

16   spoke with Torres?

17     A      I don't know.

18     Q      Did you feel, after you spoke with

19   Larry Toufal, that he was concealing information from

20   you?

21     A      I don't think I had any reason to

22   doubt him at that time.

23     Q      So, in other words, you had no reason,

24   after speaking with Larry Toufal, to believe that he

109

1    don't know if they were notified or not at this

2    point, but I would certainly have notified them if it

3    was a very late hour.

4        Q    Okay.  In -- and, to the best of your

5    recollection, you talked to Larry Toufal shortly

6    after 9:30 p.m.?

7        A    Yes.

8        Q    Okay.  Was it a police officer who

9    took Toufal home?

10       A    To my best recollection, yes.

11       Q    Okay.  And then you went to talk with

12   Torres?

13       A    Yes.

14       Q    How old a man was Phil Torres?

15       A    I think he was in his upper 20s.

16       Q    Okay.  Was Torres somebody you had

17   encountered before in your police work?

18       A    No.

19       Q    Did you pull his criminal history

20   report before talking with him?

21       A    I doubt it.

22       Q    When you spoke with Torres, did you

23   speak with him in a police interview room?

24       A    Yes.

110

1      Q      And it was similar to the room that

2    you spoke with Toufal in?

3      A      Yes.

4      Q      So bare, white walls, wood door with a

5    window?

6      A      Same type of room.  Yes.

7      Q      Steel bench, handcuff ring?

8      A      Yes.

9      Q      Was anyone else present other than

10   yourself and Phil Torres?

11     A      Possibly Detective Montilla.  I know

12   he was around.  He was a helper at that point.

13     Q      Okay.  But you're not sure one way or

14   the other?

15     A      No.

16     Q      How long had Phil Torres been in this

17   Area 5 interview room before you went in to talk with

18   him?

19     A      I have no idea.

20     Q      Can you tell me with respect to

21   Mr. Torres, was the door open or shut when you went

22   in to talk to him?

23     A      If it was open, I would have closed it

24   before talking to him.

111

1       Q       Okay.  And what was the conversation

2   between yourself and Mr. Torres?

3       A       I have no independent recollection

4   right now.

5       Q       None whatsoever?

6       A       No.

7       Q       As you sit here today, can you pull up

8   a mental image of how Larry Toufal appeared on the

9   evening of February 3, 1993, and on February 4, 1993,

10  when you spoke with him?

11      A       In what way are you referring to?

12      Q       Can you see his face in your mind's

13  eye?

14      A       Not really.

15      Q       Okay.  Do you remember anything about

16  his mannerisms?

17      A       Not in particular.

18      Q       What about Larry Toufal?  Did you form

19  an impression that he was a --

20      MR. HALE:  Wait, wait.  I thought you were

21  just talking about Larry Toufal.

22      THE WITNESS:  Yes, you were.

23  BY MR. BOWMAN:

24      Q       I -- I was just talking about Larry

149

1      Q      And in that conversation, Torres had

2   asked Toufal if the shooter was T.J.?

3          MR. HALE:  Objection, mischaracterizes what he

4   said.

5            But go ahead.

6          MR. BOWMAN:  I wasn't attempting to

7   characterize --

8          MR. HALE:  I know.

9          MR. BOWMAN:  -- anything.

10         MR. HALE:  I know.  I'm making my record.

11         MR. BOWMAN:  Sure.

12         THE WITNESS:  I wasn't there, so I can't tell

13  you exactly the wording that was said.

14  BY MR. BOWMAN:

15     Q      I -- I'm not interested in the wording

16  of that conversation.  There are other witnesses to

17  testify --

18     A      Okay.

19     Q      -- about that.  What I'm interested in

20  hearing is what Torres told you about the

21  conversation.

22     A      Well, he -- he basically told me that

23  he -- he thought it was T.J., he -- and he told

24  Toufal it was T.J., and Toufal returned the

150

1    conversation saying, "No, it wasn't T.J."

2        Q    It was not T.J.?

3        A    Right.

4        Q    And now Torres was telling you it --

5    it was T.J.?

6        A    Yes.

7        Q    Okay.  So what had changed to cause

8    Torres to call you on the phone and say it was T.J.?

9        A    I don't know.  He had a change of --

10   change of heart --

11       Q    Did you --

12       A    -- apparently.

13       Q    He had a change of heart?

14       A    Well, that's only my -- my impression.

15       Q    That -- that's speculation on your

16   part?

17       A    Yes.

18       Q    Did you ask him, "Mr. Torres, I asked

19   you earlier about this offense and you told me you --

20   you couldn't identify the offender.  How come you're

21   now saying it was T.J.?"  Did you ask him that?

22       A    He said he talked about it with his

23   family and he decided to call me.

24       Q    And when he said he talked about it

155

1      A     I doubt it, but it's a long time ago.

2    Maybe.

3      Q     Possible?

4      A     I guess it's possible.  I don't think

5    so.  Typically after someone's name and identifiers,

6    if a phone -- if a phone number is there and it's not

7    their own phone number, I would put that in

8    parentheses, that that's her grandmother's phone

9    number.  I mean, that would be typical for me.

10     Q     Did somebody tell you something in

11   this conversation at Phil Torres's mother's house

12   about a Duke jacket?

13     A     Yes.

14     Q     Who said that?

15     A     Phil Torres.

16     Q     Phil Torres?

17     A     Yes.

18     Q     Said that T.J. has a Duke jacket?

19     A     Yes.

20     Q     Okay.  Is that what he said, "T.J. has

21   a Duke jacket"?

22     A     I don't know what his words were.

23     Q     Okay.  Is that how you interpret this?

24     A     I interpret that he was wearing a Duke

163

1    BY MR. BOWMAN:

2         Q      Or failed to take.

3         A      No.  I think I did everything right.

4         Q      Now, what were you told about Eric

5    Morro and Thaddeus Jimenez that happened earlier in

6    the day on February 3, on this occasion at Phil

7    Torres's mother's house?

8         A      Independent recollection?

9         Q      Yes.

10        A      I recall that Thaddeus Jimenez was

11   making gang signs at a school -- at a school bus

12   going by, and that Eric Morro took exception to that,

13   and told him so, and said, "Your gang is" -- in

14   essence, "Your gang is nothing."  And -- and, again,

15   this is --

16               (WHEREUPON, there was an

17                off-the-record discussion had by

18                Mr. Loevy and Mr. Chanen.)

19            I'm sorry.

20        MR. LOEVY:  I'm sorry.  I was just asking

21   Stuart a question.

22        THE WITNESS:  Again, this is a summary of what

23   I recalled, and that Eric Morro took exception to it

24   and basically told him his gang was nothing, and --

164

1    and T.J. responded with some type of threat of

2    something to the effect of "You'll get yours," or

3    something like that.

4    BY MR. BOWMAN:

5        Q      This is all your independent rel --

6    recollection?

7        A      Yes.

8        Q      And who told you this?

9        A      This would be a -- the group that was

10   at the Torres residence at 1:00 in the morning.

11       Q      Did you learn which of this group had

12   witnessed this exchange between Morro and T.J.?

13       A      I did, but I can't -- whether it be

14   all of them or some of them, I can't recall at this

15   point.

16       Q      Did Phil Torres witness the exchange

17   between Eric Morro and T.J.?

18       A      I think he did, but I'm not sure.

19       Q      Okay.  What about the Cosmens?  Did

20   they?

21       A      I thought I answered that.  I'm not

22   sure how many of them actually did.

23       Q      And you specifically now remember them

24   telling you something to the effect of T.J. said,

1    "You'll get yours" to Eric?

2        A    I don't specifically -- it's -- again,

3    it's a summary of what I interpreted what they said.

4        Q    Okay.  And forgive me.  What else was

5    discussed at Phil Torres's mother's house at this

6    time?

7        A    There was an occasion, I think the

8    previous Christmas, that T.J., or Thaddeus Jimenez,

9    T.J., they were calling him "T.J." at the time,

10   showed them, showed one or part of the group, a .25

11   caliber automatic pistol.  So they -- they wanted to

12   share that with me.

13       Q    What did you learn about that

14   occasion?

15       A    Just what I said.

16       Q    Is there anything else that you recall

17   that you learned about it?

18       A    That's what I recall right now.

19       Q    At any point in this investigation,

20   did you ever attempt to track down an individual who

21   might be known by the name Frankie in room 203 at the

22   Linne School?

23       A    No.

24       Q    What did you do after you had the

230

1      A      I believe it was from Prosser High

2   School.  I think I had gotten the help from the

3   school officer.

4      Q      The school officer?

5      A      I believe so.

6      Q      Who is the school officer?

7      A      I -- I don't know, somebody from the

8   school patrol.  I -- I don't think it was anybody

9   that I knew.

10     Q      These were volunteers --

11     A      Yes.

12     Q      -- these four freshmen at the school?

13     A      I don't know.  I don't know.

14     Q      So these fillers come over, and what

15  did you do with them?

16     A      They were placed in the participant

17  end of the lineup room.

18     Q      Okay.  So you put them directly into

19  the lineup room --

20     A      Correct.

21     Q      -- on the -- we'll call it the -- the

22  mirror side or right we'll call it -- right.  We'll

23  call it the mirror side.

24     A      They would be looking at the mirror.

256

1    necessary.

2        Q     Why not?

3        A     Because I didn't think it was

4    necessary.  I just didn't think it was necessary.

5        Q     Okay.  So then what happened?

6        A     On the 10th, I was contacted by -- I

7    think by the father, and he said that they would

8    bring him in, and they did.

9        Q     Okay.  Did you have a conversation

10   with the father at that point?

11       A     Yes.

12       Q     Okay.  What did the father tell you?

13       A     The father told me that he had a

14   conversation with his son, and his son said that this

15   Juan Carlos Torres did the shooting and his son was

16   running away at the time of the shooting.

17   Essentially that's what he said.  I don't re --

18   specifically remember the words.

19       Q     And what did you do with that

20   information?

21       A     We went and talked to Victor Romo.

22       Q     I thought they brought Victor Romo

23   into the police station.

24       A     They did.

258

1    open area in the middle, and you have the young man

2    in one of the interview rooms?

3        A    That's what I recall.

4        Q    Okay.  And then Ezequiel Romo tells

5    you that he has learned that his son was involved,

6    right?

7        A    Essentially, yes.

8        Q    And he's told you the name of the

9    other offender?

10       A    He told me that his son told him that.

11   Yes.

12       Q    Right.  And it's not T.J.?

13       A    Correct.

14       Q    So what did you do with that

15   information?

16       A    Myself and Detective Schalk, after

17   finishing talking to his son and the -- the Romo

18   family, we -- we went to the -- the home of Juan

19   Carlos Torres.

20       Q    All right.  Now, before we get to the

21   home of Juan Carlos Torres, you and Schalk had an

22   interview with Victor Romo?

23       A    Yes.

24       Q    Okay.  And was that behind closed

260

1     Q    And it was you and Schalk?

2     A    Yes.

3     Q    And tell me everything you remember

4   about that conversation.

5     A    Pretty much he was straightforward

6   with what he said, except for the fact of one -- one

7   part of it.  But he said that -- if I remember

8   correctly, he said that he and Juan Carlos Torres

9   were walking down the street, and Juan Carlos Torres

10  mentioned something about owing money as they passed

11  Eric Morro and -- and the -- the person he was with.

12          And, with that, he says that Eric

13  Morro took a -- a swing and started beating up --

14  if -- if -- if I recall correctly, he started beating

15  up Juan Carlos Torres, at which time he, Victor Romo,

16  then said he ran when the struggle ensued.  As he was

17  running away and he was some distance away, he said

18  that he heard a shot.

19    Q    Now, you said that Victor Romo

20  appeared to you to be straightforward with one

21  exception.  Can you explain what you meant by that?

22    A    The exception is what all the

23  witnesses put the second offender, his -- what all --

24  what all the witnesses said the second offender's

268

1      A      Not sure.

2      Q      And what was the upshot of your

3   conversation with Tina Elder?

4      A      Tina Elder also stated that she did

5   not get a good enough look at the second offender to

6   make an identification.

7      Q      Okay.  And whether it was on the phone

8   or in person, you came to the conclusion, based on

9   that statement, that it was not even worth showing a

10   photo array of the second off -- with the second

11   offender in it to Tina Elder because she wouldn't be

12   in a position to make an ID, fair?

13      A      Yes.

14      Q      Okay.  And what about Sandra Elder?

15   Did you speak with her in person or over the phone?

16      A      I don't recall which way it was.

17      Q      And did you display the photo array to

18   her?

19      A      No.

20      Q      And was it for the same reason;

21   namely, that she told you she would not be in a

22   position to make an ID?

23      A      Yes.

24      Q      Okay.  What did you do next?

269

1      A      Myself and Detective Schalk at some

2    point, I believe the same day, went to the home of

3    Juan Carlos Torres.

4      Q      Okay.  Where was that?

5      A      Where was it?  I would have to look at

6    the reports.  I believe it was on Nelson.

7      Q      You've got your -- you've got your

8    notes in front of you still.

9      A      Okay.

10     Q      And one of the pages you explained to

11   us earlier in this deposition was the map that

12   Ezequiel Romo drew for you?

13     A      Yes.  It's here.

14     Q      And can you just tell us the page

15   number in the lower right-hand corner of that?

16     A      Nine.

17     Q      Okay.  And am I correct in my

18   understanding that the -- that the sketch on page 9

19   of Group Exhibit 1 was made by Ezequiel Romo at some

20   point during the day on February 10 when you were

21   speaking with him about the Eric Morro murder?

22     A      Yes.

23     Q      And this is his representation to you

24   of where you might find Juan Carlos Torres?

285

1    a loose end or something we need you to do for us"?

2        A    It -- it happens, from time to time.

3    I -- not very often, but it does happen.

4        Q    In this particular case, something did

5    come to your attention, right?

6        A    Yes.

7        Q    And this was in March of the following

8    year?

9        A    No.  The same year.

10       Q    The same -- I'm sorry -- the same

11   year, March of 1993.

12       A    I believe it's March 8th, you're

13   referring to.

14       Q    March 8?

15       A    I -- I believe.

16       Q    Okay.  What happened on March 8?

17       A    Myself and Detective Schalk made an

18   appearance, I bel -- in juvenile court.  I believe it

19   was for Victor Romo.  We -- we were approached by

20   a -- a defense attorney, I think it was Dave -- Dave

21   Wiener, and he had in his possession -- and along

22   with Assistant State's Attorney Gina Savini, Wiener

23   had in his possession a -- a cassette tape that he

24   said was taped on the telephone by Victor Romo's

287

1      A      I believe so.

2      Q      This is a woman?

3      A      Yes.

4      Q      And Savini, S-a-v-i-n-i?

5      A      I believe that's it.

6      Q      Okay.  So was this a conversation

7      involving yourself and Schalk and Ms. Savini?

8      A      Which conversation?

9      Q      The conversation about the Juan Carlos

10     Torres tape.

11     A      Yes.

12     Q      And where did it take place?

13     A      In the juvenile court.

14     Q      This is on the same --

15     A      In the hallway or somewhere there.

16     Q      Okay.  It's in the same -- the same

17     day the report reflects that the tape was turned over

18     to -- to her?

19     A      Yes.

20     Q      And she gave you the tape?

21     A      No.

22     Q      She kept it?

23     A      We never had possession of the tape.

24     Q      And did she say, "I want you to go

289

1        Q        Okay.  So it was out --

2        A        They were doing what they were doing

3     with the tape.

4        Q        So it was out of your hands?

5        A        Pretty much.

6        Q        They did ask you to go and talk to

7     Juan Carlos Torres?

8        A        Yes.

9        Q        All right.  And --

10                (Whereupon, Mr. Chanen's cellular

11                 telephone rang.)

12        MR. CHANEN:  Sorry.  That's really kind of

13     loud.

14     BY MR. BOWMAN:

15        Q        And did you go and talk to Juan Carlos

16     Torres that same day?

17        A        I believe it was the same day.  Yes.

18        Q        Where did you find him?

19        A        At his home.

20        Q        This was you and Schalk?

21        A        Yes.

22        Q        And you had another conversation with

23     him?

24        A        Yes.

290

1      Q      Were his parents present for this

2    conversation, too?

3      A      At least -- I think at least one of

4    his parents was.

5      Q      Did you make a point of having the

6    parent present?

7      A      No.

8      Q      And tell me about this conversation.

9      A      Again, not -- not in the exact words,

10   but a summary was that he, again, said that he hadn't

11   seen Victor Romo in months, he denied ever talking to

12   his father.  That's it.

13     Q      That was the whole thing?

14     A      Pretty much.  I mean, that's -- in

15   essence, that was it.

16     Q      A short conversation?

17     A      Yes.

18     Q      And you prepared a report on this,

19   right?

20     A      I believe there's a report.  Yes.

21     Q      And did you make a phone call to Gina

22   Savini?

23     A      I don't know.  I don't know -- I don't

24   know if there was -- what further steps were made to

EXHIBIT 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

THADDEUS JIMENEZ,         )
                           )
            Plaintiff,   )
                           )
      vs.             )  No. 09-cv-8081
                           )
CITY OF CHICAGO, Chicago   )
Police Detectives JEROME   )
BOGUCKI, MARK SANDERS,     )
RAYMOND SCHALK, F. MONTILLA, )
Chicago Police Officers    )
LAWRENCE RYAN and ROBERT    )
WHITEMAN, and as-yet unknown )
City of Chicago Employees,  )
                           )
           Defendants.  )

STATE OF ILLINOIS   )
                 )  SS.
COUNTY OF COOK      )

        The deposition of OFFICER LAWRENCE RYAN, called by the Plaintiff for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Margaret Maggie Orton, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public, at 35 East Wacker Drive, 30th Floor, Chicago, Illinois, commencing at 11:39 a.m. on January 31, 2011.

**JENSEN REPORTING**
205 West Randolph Street
5th Floor
Chicago, Illinois 60606
Phone:(312) 236-6936
Fax:(312) 236-6968
www.jensenreporting.com



*Whenever you need it. Whatever it takes.*

1    that correct?

2        **A.**   Mm-hmm.  Correct.

3        **Q.**   All right.  On February 3rd, 1993 you were

4    involved with the investigation of the murder of Eric

5    Morro; is that correct?

6        **A.**   That's correct.

7        **Q.**   And how did you come to be assigned to that

8    murder investigation?

9        **A.**   Working a beat car in the area, that was our

10   beat; we were assigned to a man shot --

11       **Q.**   And --

12       **A.**   -- on Belmont and Sacramento.

13       **Q.**   You were in a marked car at that time?

14       **A.**   Yes, sir.

15       **Q.**   And you were with your partner, Officer

16   Whiteman, at that time?

17       **A.**   Correct.

18       **Q.**   And how long had Officer Whiteman been your

19   partner?

20       **A.**   Let's see.  We came to 17 in 1980; so, what,

21   13 years.

22       **Q.**   And what did you first observe when you came

23   upon the scene?

24       **A.**   Observed a lady cradling a male that was down

1   on the -- down on the sidewalk right next to the curb.

2       **Q.**   Okay.  And did you establish pretty quickly

3   that that individual had been shot?

4       **A.**   Yes, I did.

5       **Q.**   All right.  And then what did you do next?

6       **A.**   Looked for vital signs, checked the vital

7   signs.  Didn't find any vital signs, immediately called

8   for an ambulance.

9       **Q.**   Okay.  And when you say "called for an

10  ambulance," did you have a shoulder radio at that time?

11      **A.**   Correct, mm-hmm.

12      **Q.**   All right.

13      **A.**   Sure.

14      **Q.**   And Officer Whiteman also had a shoulder

15  radio?

16      **A.**   I don't believe he did.

17      **Q.**   Okay.

18      **A.**   No, at that time we just -- the paper man, or

19  the passenger, would be the one that would have the

20  radio, just one radio.

21      **Q.**   Okay.  So Officer Whiteman was driving, and

22  you were the passenger at that time, and you were the

23  one holding the radio?

24      **A.**   Correct, mm-hmm.

1      **Q.**   Okay.  So you called for an ambulance, and

2   what did you do next?

3      **A.**   Said on the radio that the shooting was

4   bona fide, called for an ambulance, called for another

5   car, and called for a supervisor.

6      **Q.**   Okay.  And what did you do next?

7      **A.**   The woman that was cradling the young man, we

8   knew her from the area, from the neighborhood; asked

9   her, "Did anybody see anything?"

10     **Q.**   What did she say?

11     **A.**   Well, she was hysterical, and she pointed at

12   two individuals that were standing nearby.

13     **Q.**   At the time that you recognized her as a woman

14   from the neighborhood, did you actually know her by

15   name?

16     **A.**   Just knew her as Sandy.  Didn't really know

17   her --

18     **Q.**   You didn't know her --

19     **A.**   -- last name.

20     **Q.**   You didn't know her formal name, but you

21   did --

22     **A.**   No, just as Sandy.

23     **Q.**   But you knew her enough to call her Sandy?

24     **A.**   Sure.  Sure.  We had seen her at community

1    meetings and whatnot.

2         Q.    Okay.  Had you seen her at the bar where she

3    worked?

4         A.    No.

5         Q.    Okay.  And Sandy pointed to two individuals?

6         A.    Mm-hmm.

7         Q.    And did she say something, or she just --

8         A.    "They did."

9         Q.    What did they say?

10        A.    They didn't say anything until I approached

11   them.  She said, "They did."

12        Q.    Oh, they?  I'm sorry.

13        A.    Yeah.

14        Q.    I'm sorry.

15        A.    "Did anybody see anything?"

16              "They did."

17        Q.    That's my mistake.

18        A.    It's okay.

19        Q.    My mistake; I misunderstood your answer.

20              So you then approached those two individuals?

21        A.    Correct.

22        Q.    What were the two individuals doing when you

23   approached them?

24        A.    Just standing, like I said, nearby.

1    **Q.**    Okay.  Did they seem concerned for the young

2    man?

3    **A.**    Yeah, they definitely did.  They were shook

4    up.

5    **Q.**    Did they express to you that they knew the

6    young man?

7    **A.**    You know, I can't remember exactly if they

8    said they knew him.  Yeah, I honestly can't remember

9    that.

10    **Q.**    Okay.  What did -- What did the first one --

11    What did the first one tell you?

12    **A.**    Well, the first one was Phil -- What's his

13    last name?  Was it Torres?

14    **Q.**    Okay.

15    **A.**    He basically was throwing up his hands,

16    saying, you know, "I don't want any part of this.  I'm

17    out of here, man," and he started to walk away.

18    **Q.**    Okay.  Did he tell you why he wanted no part

19    of it?

20    **A.**    No.  He just, you know, "I'm out of here.  I

21    don't want anything to do with this," started walking

22    away.

23    **Q.**    Had you seen him before in the neighborhood?

24    **A.**    Over the years, sure.  And it was one of those

1    things you just -- you see the individual but you don't

2    really know who they are.

3        Q.   Okay.  You didn't associate him at all with

4    being a drug dealer at that time?

5        A.   No, absolutely not.

6        Q.   Did you at any time learn that he was a drug

7    dealer?

8        A.   No, I did not.

9        Q.   Did you do anything to run his criminal

10   history?

11       A.   No.

12       Q.   All right.  I'm going to show you what's been

13   marked as Ryan Exhibit No. 5.  Take as long as you like

14   to look at it.  I have one for your counsel.

15       MR. CHANEN:  I'm sorry.  I don't have two for you.

16   Well, maybe I do.  Okay.  I don't have one for Officer

17   Whiteman.

18   BY MR. CHANEN:

19       Q.   Okay.  Looking at the picture on the

20   right-hand side, is that the individual who you -- I

21   know it's not a great quality picture --

22       A.   Yeah.

23       Q.   -- but does that look like the individual you

24   interviewed that night?

1      **A.**   It could very well be.  Mm-hmm.

2      **Q.**   Well, let's put it this way:  Do you have any

3   reason to believe that wasn't the individual who you --

4      **A.**   No.

5      **Q.**   -- interviewed?

6      **A.**   I do not.

7      **Q.**   Okay.  Did it trouble you that he said to you

8   "I'm out of here.  I don't want anything to do with

9   this"?

10     **A.**   Did it trouble me?

11     **Q.**   Yeah.

12     **A.**   Sure.  He was a potential witness.  Of course.

13     **Q.**   Okay.  And you considered him a potential

14   witness because Sandra Elder --

15     **A.**   Pointed at him.

16     **Q.**   -- had pointed at him?

17     **A.**   Said, "They did."

18     **Q.**   Okay.  Well, what did you do to get Phil to

19   talk to you?

20     **A.**   I grabbed him by the arm.

21     **Q.**   Okay.

22     **A.**   Walked him back to where we -- the other

23   individual was standing.

24     **Q.**   Okay.

1      **A.**    Told him "Phil" -- or told him, you know,

2     "You've got to stay here.  You can't go walking away.  I

3     might need you."

4      **Q.**    Okay.  And where did this -- Where -- When you

5     brought him back to -- standing to the second

6     individual, where were the -- And Officer Whiteman was

7     still with you at that time?

8      **A.**    No.  He was by the body.

9      **Q.**    Okay.

10     **A.**    The victim.

11     **Q.**    All right.  So it's you, Mr. Torres, and the

12    third gentleman -- What was his name?

13     **A.**    Tueffel.

14     **Q.**    Okay.  So you, Mr. Torres, and Mr. Tueffel,

15    where were you standing?

16     **A.**    Maybe -- I don't know -- one storefront down.

17     **Q.**    To the east?

18     **A.**    From -- From the HoneyBaked Ham, so just a

19    storefront down east.

20     **Q.**    East or west?

21     **A.**    East of the HoneyBaked --

22     **Q.**    Okay.

23     **A.**    -- where the crime scene was.

24     **Q.**    All right.

1      **A.**   You know, if I think of it, sure, sure.  I

2   mean, it's not something that I catalog or keep, no.

3      **Q.**   Okay.

4      **A.**   Yeah.

5      **Q.**   And at what point then do you transfer the

6   information from the spiral notebook to the general case

7   report?  Like, right within your first moment when you

8   get back to the police station?

9      **A.**   No.  No, no, no.  No.  We had to go to the

10   hospital, follow the ambulance to the hospital, so I

11   wrote my report, formal report, at the hospital.  This

12   was the -- the notebook was a general outline.

13      **Q.**   Okay.

14      **A.**   So I wouldn't forget things and have to ask

15   them over and over and over again.

16      **Q.**   Okay.

17      **A.**   And that being -- We would have been separated

18   from Torres and Tueffel.  You know, we went to the

19   hospital; they would go with detectives or other units.

20      **Q.**   Okay.

21      **A.**   So in case, you know, I had to ask them again,

22   well, I have my notes.

23      **Q.**   Got it.

24      **A.**   That's all.

1      **Q.**   Got it.  Okay.

2      **A.**   Very simple.

3      **Q.**   So he gave you this description on the

4   sidewalk.

5      **A.**   Mm-hmm.

6      **Q.**   And we'll get back to the description because

7   we're going to look at your general case report.

8      **A.**   Mm-hmm.

9      **Q.**   After Larry was done giving the description --

10      **A.**   Mm-hmm.

11      **Q.**   -- did you then get a description from Phil

12   Torres?

13      **A.**   Nothing -- Nothing formal like Larry.  Larry

14   was the talker; Phil was the mumbler.  Larry would look

15   at Phil every so often, but it was -- it was mostly

16   Larry.

17      **Q.**   And did you at least determine whether Phil

18   had or had not seen what happened at the -- at the

19   incident, at the shooting?

20      **A.**   Oh, I determined that he had seen.

21      **Q.**   Okay.

22      **A.**   Definitely had seen.

23      **Q.**   Did he tell you where he had seen the --

24      **A.**   He was up in his apartment nearby looking out

1      Q.   And then you called an ambulance?

2      A.   Right.

3      Q.   Then after you --

4      A.   And said that the incident was bona fide --

5      Q.   Right.

6      A.   -- to let the cars know "Come on."

7      Q.   Right.

8      A.   "Start coming."

9      Q.   So bona fide, more cars, supervisor, and an

10   ambulance?

11     A.   Correct.

12     Q.   All right.  Then you said to Sandy, "Did

13   anyone see anything"?

14     A.   "Did anybody see this?"

15     Q.   And she points to Tueffel and Torres?

16     A.   "They did."

17     Q.   Okay.  And after "They did," you go and you

18   start talking to Tueffel and Torres --

19     A.   Mm-hmm.

20     Q.   -- and all the testimony you already gave

21   about that subject?

22     A.   Sure.

23     Q.   Okay.

24     A.   Mm-hmm.  At that point I would have left the

1    opportunity to look at everything on the first and

2    second page and third page, if you need to, although I

3    think by the time we get into the third page, we're onto

4    a different subject.  But take as long as you like to

5    look at it, and my question is going to be what you

6    remember putting out on the radio.

7         A.    Okay.

8         Q.    All right.  Let's just start with the shooter.

9    Did you put a description out of the shooter over the

10   radio?

11        A.    Yes, I did.

12        Q.    All right.  Can you tell me, the best of your

13   memory as refreshed by this document, what you put out

14   over the radio about the shooter?

15        A.    Okay.  That he was a male, white Hispanic --

16   Now, this isn't verbatim, and this isn't exact quotes.

17   Remember that, Counsel; this is an over- -- this is an

18   outline.

19        Q.    Okay.

20        A.    This is an outline.

21        Q.    Thank you.

22        A.    So we have a male, white Hispanic, 5, 4; 5, 5;

23   13 to 14 years of age, curly black hair, wearing a

24   purple jacket with yellow lettering or numbers, baggy

1    blue jeans.  And he was the one armed with the small

2    caliber silver handgun.

3        **Q.**   Okay.  And is it fair to say that most of that

4    information came from Larry Tueffel?

5        **A.**   Most of it, sure.

6        **Q.**   Okay.  As you sit here today, of the

7    information you just provided, is there any that was

8    specifically provided or corroborated by Phil Torres?

9        **A.**   I -- I couldn't tell you that, and I don't

10   normally put that in my report, you know.  That was ...

11       **Q.**   All right.  One of the things you just

12   described was a purple jacket with yellow lettering or

13   numbering.

14       **A.**   Mm-hmm.

15       **Q.**   Were you able to, either before or after

16   putting that out on the radio, get any further

17   description of the shooter's jacket from either

18   Mr. Tueffel or Mr. Torres?

19       **A.**   Not that I recall.

20       **Q.**   All right.  Did Mr. Tueffel or Mr. Torres

21   indicate whether that was a Starter -- Starter jacket,

22   meaning -- Let me rephrase it.  It was a team jacket of

23   some kind?

24       **A.**   I honestly don't remember if they said

1    anything about that particular jacket, if it was a teen

2    jacket or not.

3         Q.   Okay.

4         A.   And I couldn't tell you.

5         Q.   Did the Minnesota Vikings come to mind?

6         A.   I never think about the Minnesota Vikings,

7    Counsel, unless I absolutely have to.  No.

8         Q.   All right.  That's a fair answer.  All right.

9              And then did you also almost instantaneously

10   or almost immediately thereafter put out a description

11   for the second individual, second assailant?

12        A.   Correct.

13        Q.   All right.  And to the best of your memory

14   with the assistance of having it refreshed with this

15   report --

16        A.   Mm-hmm.

17        Q.   -- what did you put out over the radio

18   regarding the second assailant?

19        A.   That he was a male, white Hispanic, 13 to 14,

20   a little taller 5, 6; 5, 7, partially shaved black hair

21   wearing a blue Georgetown Starter jacket.

22        Q.   Okay.  And that you got from Larry Tueffel,

23   correct, the blue Georgetown Starter jacket?

24        A.   I believe so, yeah.

1      **Q.**   Okay.  And that was a pretty specific

2   description from Mr. Tueffel, correct?

3      MR. KAMIONSKI:  Objection to the form of the

4   question.

5           You can answer.

6   BY THE WITNESS:

7      **A.**   Yeah.  As far as -- As far as I can recall,

8   that's what was told to me.

9      **Q.**   Okay.  Now, sometime shortly after you put

10  this out on the radio, some of your fellow officers

11  stopped an individual in a park nearby with a Georgetown

12  jacket on.

13     **A.**   Mm-hmm.

14     **Q.**   Were you aware that evening and apparent --

15  and the testimony from the trial was that this person

16  was brought back to the scene.  Did you become aware

17  that evening that other fellow officers had brought in

18  an individual in a Georgetown jacket back to the

19  scene --

20     **A.**   No.

21     **Q.**   -- that evening?

22     **A.**   No.

23     **Q.**   Okay.  If you had become aware of that, where

24  would -- Would you have written that down?

1      **A.**   It would depend if he was picked out by the

2    witnesses.

3      **Q.**   Okay.

4      **A.**   If he wasn't picked out by the witnesses,

5    there would be no need.  It was just another individual

6    with a Georgetown jacket.  Remember, this is a brief

7    history.

8      **Q.**   No, I understand.

9      **A.**   You know, we don't really go into that much

10    detail.

11      **Q.**   Okay.  What about the officers who picked up

12    the individual?

13      **A.**   Mm-hmm.

14      **Q.**   If they picked up someone as a suspect, they

15    would be required in some report -- supplemental report

16    to write it down, correct?

17      **A.**   Supplemental report, no.  No.

18      **Q.**   Okay.  What would they -- What would they be

19    required to do in that regard?

20      **A.**   Required to do?  If he wasn't picked out,

21    absolutely nothing.

22      **Q.**   Okay.

23      **A.**   A good idea to do would be to make what's

24    called a field contact card.

1    **Q.**   Okay.

2    **A.**   We don't -- We did not protect the crime

3    scene, no.

4    **Q.**   So the last time we left you, you and Officer

5    Whiteman were in the car with Mr. Tueffel and

6    Mr. Torres?

7    **A.**   Mm-hmm.

8    **Q.**   Where did you go from there?

9    **A.**   Illinois Masonic.  We followed the ambulance.

10   **Q.**   And did you go with Mr. Torres and Tueffel in

11   the car with you, or were they released from the car and

12   taken someplace else?

13   **A.**   They were taken out of the car by another

14   unit.

15   **Q.**   Okay.  So when you were done questioning

16   them --

17   **A.**   Mm-hmm.

18   **Q.**   -- you got -- you requested assistance from

19   another unit to take them, or how does that work?

20   **A.**   No.  I mean, somebody came over.

21   **Q.**   And you said "Take these guys" --

22   **A.**   No, they would have said, you know, "We're

23   supposed to take them" wherever.

24   **Q.**   Okay.

1    **Q.**   Does it refresh your memory of somebody

2    else -- in your mind of someone else being the

3    supervisor that night?

4         **A.**   No.  It's too long ago, Counsel.

5         **Q.**   Okay.

6         **A.**   Too long ago.

7         **Q.**   When you got to the hospital, what happened?

8         **A.**   We went into the police room, and I think I

9    probably started writing the report, and I think

10   probably Officer Whiteman went to -- brought up a

11   doctor's name for us for the report.

12        **Q.**   Okay.  Was Bogucki on the scene when you

13   arrived, or did you arrive --

14        **A.**   No.

15        **Q.**   Okay.  He arrived sometime after the two of

16   you?

17        **A.**   Correct.

18        **Q.**   Okay.  Had you determined -- At that point

19   that you started writing your report, had you yet been

20   notified internally within the hospital that indeed the

21   victim had died?  Let me rephrase it.

22        **A.**   Yeah, go ahead.

23        **Q.**   At some point while you were in the police

24   room, you learned that the victim died --

1      **A.**   Correct.  That he'd been --

2      **Q.**   -- putting aside whether it was before or

3    after?

4      **A.**   That he had been pronounced, yes.

5      **Q.**   Okay.  And you don't -- As you sit here now,

6    you don't remember precisely at what point in your

7    report-writing process you learned; is that fair?

8      **A.**   It would have been pretty quick.

9      **Q.**   All right.  I'm going to jump up and get a

10   bottle of water.

11           All right.  And then did you -- So you -- Is

12   it fair to say you wrote this entire report, Ryan

13   Exhibit No. 1, inside the hospital?

14     **A.**   Yes.

15     **Q.**   And after you were done writing it, you gave

16   it to -- showed it to Defendant Bogucki, correct?

17     **A.**   I would have made a Xerox copy to give it to

18   him.

19     **Q.**   All right.  Did you make a photo co- -- a

20   Xerox copy right there at the hospital?

21     **A.**   I can't remember if we did or not.  I'm

22   assuming we did.

23     **Q.**   It's your belief that you did?

24     **A.**   Usually we do.  We try to get a Xerox to them,

1      again after he got taken out of your squad car and taken

2      by other officers?

3              **A.**    That night?

4              **Q.**    At any time in relation to this investigation.

5              **A.**    No.

6              **Q.**    Okay.

7              **A.**    No.

8              **Q.**    Did you ever see him again out on the street

9      or with respect to a separate matter?

10             **A.**    Possibly.

11             **Q.**    Okay.

12             **A.**    I don't recall.

13             **Q.**    You don't have any specific -- Like, for

14     example, if I asked you did you ever arrest him

15     afterwards, you have no memory of that?

16             **A.**    Not that I can recall.

17             **Q.**    Okay.

18             **A.**    No.

19             **Q.**    Did you ever see him at a community meeting

20     the way you would see Sandra Elder from time to time?

21             **A.**    I don't believe so, no.

22             **Q.**    Okay.  What about Larry Tueffel?  Did you ever

23     see Larry Tueffel again after that night in relation

24     specifically to this investigation?

1      **A.**   No.

2      **Q.**   Did you ever see Larry Tueffel again in any

3      other context?

4      **A.**   It's possible.  I don't recall.  It's

5      possible.

6      **Q.**   Did you have any involvement whatsoever in --

7      with respect to Larry Tueffel's testimony at either of

8      the criminal trials for Thaddeus Jimenez?

9      **A.**   What do you mean by "involvement"?

10     **Q.**   Did you ever pick him up at his -- Were you

11     ever the shuttle driver to make sure that he got to the

12     trial --

13     **A.**   No.

14     **Q.**   -- to testify?

15     **A.**   No.

16     **Q.**   Okay.  Did you have any contact with him at

17     all as a witness in this case?

18     **A.**   None.

19     **Q.**   Were you aware that Larry Tueffel was picked

20     up by police officers and brought to testify in 1994

21     against Thaddeus Jimenez?

22     **A.**   No, I wasn't aware of that.

23     **Q.**   Okay.

24     **A.**   No.

 1      **Q.**   Were you aware that he was held two nights in

 2      the Audi Home immediately preceding his testimony?

 3      **A.**   No.

 4      **Q.**   What do you understand that this lawsuit is

 5      about?

 6      **A.**   It's a good question.  We were flabbergasted

 7      when -- when I got it.

 8      **Q.**   Okay.  I mean, do you -- But what's your

 9      understanding of what the claims are against you?

10      **A.**   That there was some type of conspiracy

11      involved in framing this individual.  I mean, that's the

12      only thing I could gather from the text of the lawsuit.

13      **Q.**   Did you ever testify in any proceedings

14      against Mr. Jimenez?

15      **A.**   Twice.

16      **Q.**   Once in '94 and once in '97?

17      **A.**   Mm-hmm.

18      **Q.**   Have you reviewed your testimony from those

19      two trials?

20      **A.**   Yes, I have.

21      **Q.**   And you did that within the last 48 hours in

22      preparation of your deposition?  Well, let me -- I

23      shouldn't -- Let me rephrase it.

24              When did you review the transcripts?

1       **A.**   I honestly can't remember.  What's today?

2  Today is Monday.  I looked at it Friday.

3       **Q.**   Mm-hmm.  Those were provided to you by defense

4  counsel?

5       **A.**   Yes.

6       **Q.**   Did you ever meet face to face with defense

7  counsel to prepare for today's deposition?

8       **A.**   Yes.

9       **Q.**   And when did that occur, also on Friday?

10      **A.**   Friday, mm-hmm.

11      **Q.**   That's right.  And are you aware that

12  Mr. Jimenez is no longer serving -- Well, let's back up.

13  Were you aware that Mr. Jimenez was twice convicted for

14  this murder?

15      **A.**   Yes.

16      **Q.**   And were you aware that in May of 2009 his

17  conviction was vacated?

18      **A.**   Yes.

19      **Q.**   And how did you first become aware of that?

20      **A.**   That's a good question.  I think it was after

21  I picked up the lawsuits.  I had a federal lawsuit at

22  35th Street.

23      **Q.**   Okay.  So you had --

24      **A.**   I didn't know anything before that, no.

1    review this transcription, does it help refresh your

2    recollection as to the demeanor of Larry Tueffel when

3    you first saw him in '93?

4        A.   Yes.

5        Q.   Okay.  And can you tell us what -- Can you

6    tell us how your memory is now refreshed?

7        A.   Well, that he -- When I first confronted them,

8    that he tried to walk away.

9        Q.   And let's be specific.  When you say "he," who

10   are you referring to?

11       A.   Larry Tueffel.

12       Q.   Okay.  And you were saying he tried to walk

13   away?

14       A.   He tried to walk away.

15       Q.   Okay.

16       A.   Then I went, and I assume that I would put my

17   hand on his -- on his arm and bring him back toward me,

18   but that he was really nervous, really scared.

19       Q.   And you mentioned in your testimony at line 18

20   of your answer on page 2979 -- you characterize Larry as

21   hyper, evasive.

22       A.   Mm-hmm.

23       Q.   What's your understanding of -- Why did you

24   use the term "hyper, evasive"?

1       **A.**    Hyper was -- It just -- He was shaking.  Maybe

2   "hyper" wasn't a good word.  As far as evasive, he did

3   try to walk away at first, so that's -- I'm sure that's

4   why I put that in there or testified to that.  That's

5   basically it, that he did try to walk away.

6       **Q.**    And that was the same thing with Phil Torres

7   as well?

8       **A.**    Phil was more demonstrative.  Phil was "I'm

9   out of here, man.  I want nothing to do with this," that

10   type of thing (gesturing).  Whereas Larry was not.  I

11   believe Larry was the -- you know, more frightened than

12   Phil was, and Larry would have been turning around just

13   kind of, you know, Feet, don't fail me now.

14       MR. CHANEN:  All right.  I just --

15       THE WITNESS:  I'm out of here.

16       MR. CHANEN:  I have just one follow-up, sir.

17       MR. KAMIONSKI:  Okay.

18       MR. CHANEN:  Other than -- I'm sorry.  Were you --

19   I'm sorry.  I thought you were done, Avi.  I apologize.

20       MR. KAMIONSKI:  No.  I have no further questions.

21   I just wanted -- I have no further questions.

22       MR. CHANEN:  Okay.

23

24

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| THADDEUS JIMENEZ | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No.09 CV 8081 |
| | ) |
| CITY OF CHICAGO, CHICAGO POLICE | ) |
| DETECTIVES JEROME BOGUCKI, MARK | ) |
| SANDERS, RAYMOND SCHALK, F. | |
| MONTILLA, CHICAGO POLICE | |
| OFFICERS, LAWRENCE RYAN AND | |
| ROBERT WHITEMAN, and as-yet | |
| unknown City of Chicago | |
| Employees, | |
| | |
| Defendants. | |

The VIDEOTAPED deposition of

PHILLIP TORRES, taken under oath at

312 North May, Chicago, Illinois, at 1:13 P.M.

on Wednesday, June 22, 2011 pursuant to the

Rules of the United States District Court,

Northern District of Illinois, before Carol M.

Siebert-LaMonica, C.S.R. in and for the County

of Cook and State of Illinois, pursuant to

notice.

1           MR. LOEVY: I will go until 2:20. You

2    will tell me when.

3         Q.   All right.  Take a look at your trial

4    testimony, page C69, I've highlighted it in

5    yellow.

6         A.   I don't know.  I can't see without my

7    glasses.

8         Q.   All right.

9         A.   Read it to me.

10        Q.   All right.

11             "And when you talked to the

12   police at the scene that night, did you tell

13   the police that T.J. was the shooter?

14             Answer:  No, I didn't."

15             Did you give that answer at the

16   trial?

17        A.   I believe so.

18        Q.   Okay. Was it true?

19        A.   I believe so, yes.

20        Q.   All right.  Now at some point you were

21   in a car with Larry Tueffel?

22        A.   Yes, in the police car.

23        Q.   All right.  And there was some

24   discussion in that car about who might or might

1    not have been the shooter?

2          A.   I believe I asked Larry if it was T.J.

3          Q.   You asked Larry who the shooter was?

4          A.   I asked Larry if it was T.J., right.

5          Q.   And he said no, it wasn't?

6          A.   I'm pretty sure he said yes.

7          Q.   Okay. T.J. is someone you barely knew,

8    right?

9          A.   I seen him that same day at my ma's

10   house. It looked like him that night, too.

11         Q.   All right.  When you say "looked like

12   him" that's not certainty, is it, sir?

13         A.   I guess not.

14         Q.   Was it nighttime?

15         A.   Yes.  I was in the window, yes.

16         Q.   All right.  What did you happen to be

17   looking out the window for?

18         A.   Just looking out.

19         Q.   Are you sure you were looking out the

20   window, sir?

21         A.   Yes.

22         Q.   All right.

23         A.   I was waiting for John, he was suppose

24   to come over.

1      Q.   Was he with Larry?

2      A.   No.

3      Q.   Did you see Eric walk with another

4  guy?

5      A.   No.

6           MR. LOEVY:   Objection, asked and

7  answered.

8  BY MR. HALE:

9      Q.   Did you see Eric walking with another

10 guy?

11     A.   No, he was by himself.

12     Q.   And what did you see?

13     A.   Two guys coming up from behind Eric,

14 and I seen Larry turn Eric around, and then --

15 I assumed it was T.J. that put the gun in his

16 chest.

17     Q.   This happened in 1993, correct?

18     A.   Correct.

19     Q.   It is 2011. Do you remember exactly

20 what happened today?

21     A.   That part, yes.

22     Q.   And are there other parts you don't

23 remember?

24     A.   About talking to the cops, this and

Page 51

1    that, yes.

2         Q.   Do you remember every single thing you

3    said to the police?

4         A.   No.

5         Q.   And do you remember every single

6    question the police asked you?

7         A.   No.

8         Q.   All right. When you said you saw Larry

9    spin him around?

10        A.   Yes.

11        Q.   You said Larry?

12        A.   Right.

13        Q.   Who did you see, Larry is Larry

14   Tueffel?

15        A.   Yes.

16        Q.   So who is Larry with?

17        A.   The guy in the Duke jacket.

18        Q.   All right. You saw a guy in a Duke

19   jacket?

20        A.   Yes.

21        Q.   So the people you remember seeing were

22   Larry, Eric and a guy in a Duke jacket?

23        A.   Right.

24        Q.   Is that right?

Page 52

1      A.   Yes.

2      Q.   Okay.  And who is the person you saw

3  shoot the gun?

4      A.   The one in the Duke jacket.

5      Q.   All right.  And did you tell the

6  police that the shooter had on a Duke jacket?

7      A.   I believe so.

8      Q.   You were the one who mentioned that to

9  the police, correct?

10         MR. LOEVY: Objection, leading, you

11  are testifying for him.

12         THE WITNESS:  Yes.

13  BY MR. HALE:

14      Q.   And when -- at the scene the police

15  asked you questions, correct?

16      A.   Right.

17      Q.   And you cooperated, right?

18      A.   Right.

19      Q.   You told the police what you saw?

20         MR. LOEVY: Objection, leading.

21         THE WITNESS:  Right.

22         MR. HALE:  Right?

23         THE WITNESS:  Right.

24          MR. HALE:  This is cross-examination.

1        A.    No.

2        Q.    That's something you heard about

3   from --

4        A.    My sister.

5        Q.    -- your sister?

6        A.    And my brother, yes.

7        Q.    Okay.  And the police --

8        A.    But I was over there, and I seen T.J.

9   had the gun.

10        Q.    Did the police ever make you say T.J.

11   was the shooter?

12        A.    No.

13        Q.    And the police didn't hold you at the

14   police station against your will, did they?

15        A.    I don't believe so.

16        Q.    And are you aware that at both

17   criminal trials Larry also said T.J. was the

18   shooter?

19        A.    I don't remember.

20        Q.    Did you also tell the police that you

21   were upstairs on the 3rd Floor with your

22   girlfriend Beth Johnson, John Elder and two

23   daughters?

24        A.    Yes.

1       Q.   And Mr. Loevy asked you some questions

2   about you weren't -- you know, were you sure

3   when you called the police.

4               When you called the police the

5   night of the shooting --

6               MR. LOEVY: Objection to foundation he

7   called the police.

8   BY MR. HALE:

9       Q.   Did you call the police the night of

10  the shooting?

11      A.   I don't remember if I did or my

12  sister.

13      Q.   Do you remember telling the police the

14  night of the shooting that --

15      A.   Later that night.

16      Q.   Right.

17      A.   Yes, I might have. After I talked to

18  my sister, yes.

19      Q.   Right. And is it fair to say -- it

20  sounds like what you said, you saw somebody in

21  a blue and white Duke coat shoot Eric, right?

22      A.   Right.

23      Q.   You thought it was T.J., correct?

24      A.   Yes.

1      A.   No.

2      Q.   There was something about a couple of

3  hours.  Is it possible you were at the police

4  station for a very brief period of time?

5      A.   Might have been.

6      Q.   Would you just be guessing today if

7  you are estimating how long you were at the

8  police station?

9      A.   Yes.  I don't remember how long

10 exactly.

11     Q.   Did you voluntarily tell the police

12 what you saw?

13     A.   Yes.

14     Q.   And when you described the blue and

15 white Duke jacket, were you giving that

16 information to the police voluntarily?

17     A.   Yes.

18     Q.   The day after the shooting, did you

19 actually view a lineup?  Do you remember

20 viewing a lineup?

21     A.   Yes.

22     Q.   And do you recall picking somebody out

23 of the lineup?

24     A.   Yes, T.J., I believe.

1      Q.   And you picked out T.J., why?

2      A.   Because it looked like the shooter.

3      Q.   He was the person you identified as

4   being the shooter?

5      A.   Yes.

6           MR. LOEVY: Objection, he said "looked

7   like" but --

8   BY MR. HALE:

9      Q.   Did you tell the police that it looked

10  like he was the shooter or that was the guy who

11  was the shooter?

12     A.   Looked like. I don't --

13     Q.   Do you remember testifying at the

14  trial, the criminal trial that you picked T.J.

15  out of a lineup?

16     A.   Yes.

17     Q.   And do you recall testifying that when

18  you saw T.J. you said "that's him"?

19     A.   I probably did, yes.

20     Q.   Did you know anybody -- did you ever

21  talk to any other Simon City Royals besides

22  John Spaw, do you remember?

23     A.   I don't remember.

24     Q.   And you were talking about how there

1      Q.   All right.  But the police told you in

2    response to Mr. Hale's questions, didn't you

3    say the police told you that other people were

4    saying it was T.J.?

5      A.   I don't know.

6      Q.   Did the police tell you that Sandra

7    said it was T.J. and all of the people said it

8    was T.J.?

9      A.   I don't remember.

10     Q.   All right.  Is that when you changed

11   to being supposedly certain it was T.J.?

12     A.   Might have been.

13          MR. HALE: Objection.  No foundation.

14          MR. LOEVY: All right.  I don't have

15   any other questions.

16          MR. HALE: I just -- give me a couple

17   of minutes, and I will be done.

18

19          E X A M I N A T I O N (CONT'D)

20   BY MR. HALE:

21     Q.   Did you testify at the criminal trial

22   that you called the police about 1:00 in the

23   morning?

24     A.   I don't remember if I called.

1        Q.   Let's see if can refresh your

2   recollection.

3        A.   I called them --

4        Q.   Page 122, if you can read --

5        A.   You have to read it.

6        Q.   Question:  After you spoke to the

7   people in your family, could you describe what

8   you did?

9               Answer:  I went and called the

10   police, the detective.

11               Question:  Approximately what

12   time did you call the police?

13               Answer:  About 1:00 o'clock in

14   the morning.

15               Does that refresh your

16   recollection that you called the police about

17   1:00 o'clock in the morning?

18        A.   I believe so.

19        Q.   And did you tell the police that you

20   now knew it was T.J.?

21        A.   I believe so.

22        Q.   And at that point after you talked to

23   the police on the phone, the police came to

24   your mother's house to talk to you, correct?

1        A.   I believe so.

2        Q.   All right. You also testified that you

3   actually knew this kid, the kid with the Duke

4   jacket you saw, you knew his name was T.J., is

5   that right?

6        A.   Yes.

7        Q.   All right. And when you said here in

8   answer to Mr. Loevy's questions, you seen --

9   you said seen what I seen, is that -- you told

10  the police what you saw, correct?

11       A.   Yes.

12            MR. LOEVY: Objection, asked and

13  answered.  No foundation.

14  BY MR. HALE:

15       Q.   And you told the police what the

16  shooter was wearing, correct?

17       A.   Correct.

18       Q.   All right.  And you told the police

19  when you called them at 1:00 in the morning the

20  shooter was T.J., right?

21       A.   Right.

22       Q.   Mr. Loevy asked you about threats, but

23  didn't you say something about your apartment

24  getting burnt?

1      A.   Yes, my whole back, yes, got burnt up.

2      Q.   When was that?

3      A.   Shortly after this. The Court.

4      Q.   After -- was it after --

5      A.   I don't remember.

6      Q.   After you talked to the police?

7      A.   Yes, must have been, yes.

8      Q.   And is it your belief, sir, as you sit

9   here today the person saw shoot Eric Morro was

10   T.J.?

11      A.   I believe so. I believe it was him.

12          MR. HALE:  All right.  We agree we

13   are done.

14          MR. LOEVY: We are done.

15          MR. HALE: Off the record.

16          (Discussion had off the record.)

17          MR. LOEVY: You had no right to ask

18   questions.

19          MR. HALE:  I agreed to let you ask

20   questions.

21          MR. LOEVY:  The deal was 15/15/5.

22          MR. HALE:  Let's go off the record.

23          MR. LOEVY: Let's finish.  Because I

24   have more questions.

1          MR. HALE: Last question.

2          MR. LOEVY: No, if you ask question --

3          MR. HALE: You got him to walk out.

4          THE WITNESS:  Wait.

5          MR. HALE: Last question.

6          MR. LOEVY:  I'm going to ask a

7  question, Andy.

8          THE WITNESS:  He asks me a question

9  I'm done.

10          MR. LOEVY: If you answer his

11  question, you have to answer my question.

12

13          E X A M I N A T I O N (CONT'D)

14  BY MR. HALE:

15     **Q.   What you already told me was, from the**

16  **trial transcript, you called the police at**

17  **1:00 in the morning than a told them it was**

18  **T.J.?**

19     **A.   After --**

20     **Q.   He was trying to get you to say that**

21  **the police made you say**

22     **A.   No.**

23     **Q.   Did the police make you say it was**

24  **T.J.?**

# EXHIBIT 21

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THADDEUS JIMENEZ,                    )
                                     )
            Plaintiff,               )
                                     )
     vs.                             ) No. 09-cv-8081
                                     )
CITY OF CHICAGO, Chicago             )
Police Detectives JEROME             )
BOGUCKI, MARK SANDERS, RAYMOND       )
SCHALK, F. MONTILLA, Chicago         )
Police Officers LAWRENCE RYAN        )
and ROBERT WHITEMAN, and             )
as-yet unknown City of Chicago       )
Employees,                           )
                                     )
            Defendants.              )


        The videotaped deposition of THADDEUS

JIMENEZ, called by the Defendants for examination,

taken pursuant to notice and pursuant to the

Federal Rules of Civil Procedure for the United

States District Courts pertaining to the taking of

depositions, taken before Rachel F. Gard, Certified

Shorthand Reporter, Registered Professional

Reporter, at 2700 South California Avenue, Chicago,

Illinois, commencing at 10:14 a.m. on the 13th day

of September, A.D., 2010.

Page 92

1        A.     Okay.

2        Q.     Larry was also -- Larry was a friend

3    of yours, correct?

4        A.     Yeah.

5        Q.     Larry was another member of the

6    Peewee Royals, correct?

7        A.     Correct.

8        Q.     Larry was a year older than you or

9    same age?

10        A.     I don't know.

11        Q.     Did you ever go to the same school

12    as Larry?

13        A.     No.

14        Q.     But you would frequently hang out

15    with Larry?

16        A.     Yes.

17        Q.     Larry lived on Whipple Street,

18    right?

19        A.     Yeah.

20        Q.     He only lived maybe what, a block or

21    so from Belmont and Sacramento?

22        A.     A little over a block.

23        Q.     Did Larry have any brothers or

24    sisters?

Page 131

```
 1              MR. CHANEN:  Just -- Go ahead.

 2    BY THE WITNESS:

 3         A.    That was it, just us four.

 4         Q.    Okay.  And you actually played

 5    basketball, all four of you?

 6         A.    Yeah.

 7         Q.    All right.  Did you see anybody at

 8    the Linne Playground that you knew?

 9         A.    Besides us?

10         Q.    Yeah.

11         A.    No.

12         Q.    Were there other people at the park,

13    at the playground?

14         A.    At the Linne Play Lot?

15         Q.    Yeah.

16         A.    I don't remember.

17         Q.    How long would you estimate you

18    played basketball at the Linne Playground?

19         A.    It's too far back to remember the

20    exact time.

21         Q.    Do you remember what you were

22    wearing?

23         A.    Not exactly.

24         Q.    You had a Duke starter jacket at the
```

Page 132

1    time, right?

2         A.    Yeah.

3         Q.    Was that kind of your favorite

4    jacket?

5         A.    No.

6         Q.    Would you frequently wear it,

7    though?

8         A.    Yeah.

9         Q.    Now, that jacket -- The Royals

10   colors were blue and white; am I right?

11        A.    No.

12        Q.    What were the Royals colors?

13        A.    Blue and black.

14        Q.    And not white?

15        A.    Not white.

16        Q.    Did having a Duke jacket have

17   anything to do with the Royals colors?

18        A.    No.

19        Q.    Did you have any jackets that were

20   blue and black?

21        A.    The Duke jacket is the only jacket I

22   owned.

23        Q.    Did you own a Georgetown jacket at

24   the time?

Page 166

```
 1                 All right.  So your grandmother

 2     answers the door, and then what happens?

 3         A.    The police, they come in.

 4         Q.    How many police come in?

 5         A.    I don't remember.

 6         Q.    Was it more than one?

 7         A.    Yes.  It was more than one.

 8         Q.    Were the police that came in wearing

 9     uniforms?

10         A.    No, no.

11         Q.    The police that first came in were

12     not wearing uniforms?

13         A.    No, they weren't wearing no

14     uniforms.

15         Q.    What were they wearing?

16         A.    Street clothes.

17         Q.    All right.  And what do those police

18     officers say?

19         A.    They asked -- They asked for TJ.

20         Q.    Asked your grandmother for TJ?

21         A.    Yeah.

22         Q.    You heard that?

23         A.    Yeah.

24         Q.    What did your grandmother say?
```

Page 167

1       A.    She didn't do nothing.

2       Q.    What did you do, if anything?

3       A.    I told them I was TJ.

4       Q.    And then what happened?

5       A.    And then they told me to put my

6    shoes and my jacket on.

7       Q.    What were you wearing already?

8       A.    I had my clothes on.  I was sleeping

9    in my clothes.

10       Q.    Were you wearing the same clothes

11    you had been wearing playing basketball?

12       A.    Yeah.

13       Q.    So you just put on shoes and the

14    Duke jacket?

15       A.    Yeah.

16       Q.    Did the police say anything else to

17    you inside the house?

18       A.    They told me to turn around, put my

19    hands behind my back.

20       Q.    Which you did?

21       A.    Yeah.

22       Q.    And they handcuffed you?

23       A.    Yeah.

24       Q.    And then what happened?

Page 206

1        A.    No.

2        Q.    Okay.  And am I correct, none of the

3     three officers threatened you in any way,

4     correct?

5        A.    Correct.

6        Q.    And the youth officer didn't

7     threaten you, correct?

8        A.    Correct.

9        Q.    Now, I just want to go back to the

10    question I just asked you a minute ago about

11    when you first found out that Larry, your

12    friend Larry, had told the police that you shot

13    Eric Morro.  I think you said maybe at the Audy

14    Home?

15       A.    No, I didn't say that.

16       Q.    All right.  Let's do it over again.

17             As you sit here today, you know that

18    Larry did tell the police you shot Eric Morro,

19    correct?

20       A.    Correct.

21       Q.    All right.  What I want to know is

22    when did you first learn that Larry, it was

23    Larry who told the police that you shot Eric

24    Morro?

Page 226

```
1        record at 1:34.

2                  (A short break was had.)

3             THE VIDEOGRAPHER:  Beginning of

4        Videotape No. 4.  Going back on the record

5        at 1:49.

6   BY MR. HALE:

7        Q.    Okay.  I saw some interrogatory

8   answers where I asked the question of

9   whether -- identify all contacts you've had

10  with Larry Tueffel since your arrest; and the

11  answer was September 29, 1994, in person.  Do

12  you remember providing an interrogatory

13  response that said that?

14       A.    Yeah.

15       Q.    And do you remember seeing Larry

16  Tueffel on September 29, 1994?

17       A.    Yeah, I believe it was that day.

18       Q.    Where was that at?

19       A.    In one of the holding bullpens at

20  the Cook County criminal court building.

21       Q.    That's where you were?

22       A.    Yeah.

23       Q.    And where was Larry?

24       A.    He was there too.
```

Page 229

1    down in his lap.

2         Q.    So then you see him.  You sit down

3    next to him, and you spoke first?

4         A.    Yeah.

5         Q.    You said, "Why are doing this?"

6         A.    At first I said, "What's up?"  He

7    said, "What's up?" back to me.

8         Q.    The first thing you say is, "What's

9    up?"

10        A.    Yeah, I said, "What's going on?"

11   because I had no idea that he was there.  I

12   didn't know -- He didn't come with us when we

13   got transported to the court building from the

14   Audy Home, he wasn't on our transportation with

15   us.  So I had no idea that he was there.

16        Q.    Let's pause.  At this point, at this

17   point has -- I'm not sure the chronology.  Has

18   he already testified at your criminal trial?

19        A.    At trial, no.

20        Q.    Okay.

21        A.    He was scheduled to testify that

22   day.

23        Q.    So you knew he was going to testify

24   that day?

Page 230

1        A.     Yeah, he was scheduled to.

2        Q.     Did you know from your lawyers that

3    he was going to testify that you shot Eric

4    Morro?

5        A.     Yes.

6        Q.     Your lawyers told you that?

7        A.     Yes.

8        Q.     So after you say, "What's up?" what

9    does he say?

10        A.     He told me, "What's up?"  He

11    responded with the same way.  He said, "What's

12    up?"

13        Q.     All right.  And you say what?

14        A.     I said, "What's going on?  Why are

15    you doing this?"

16        Q.     What kind of tone do you say it in?

17        A.     Just like that.  I was -- more of an

18    understanding.  I was trying to get an

19    understanding what's going on.

20        Q.     Okay.

21        A.     And I asked him, I told him, "What's

22    going on, man?  Why are you doing this?"

23        Q.     What did he say?

24        A.     He said, "They told him to."  That

Page 231

1    was his exact response, "They told him to."

2    They made him.

3         Q.    "They made me"?

4         A.    "They made me" or "They told me to."

5         Q.    And did he say who "they" was?

6         A.    No.  We got interrupted.  Right at

7    that point, we got interrupted.

8         Q.    What did you take it to mean?

9         A.    Somebody made him.  I didn't know --

10   I had no idea who he was talking about.

11        Q.    Okay.  And that's all the

12   conversation was?

13        A.    We were separated right there, and

14   then immediately ...

15        Q.    Okay.  Did you tell your attorney

16   that, "Hey, I just had a conversation with

17   Larry Tueffel in the bullpen"?

18        A.    I don't remember specifically

19   telling my lawyer that, but it was something I

20   would have done.  I believe I would have told

21   my lawyer that.

22        Q.    And you would have told your lawyer

23   that "I asked Larry why he's doing this" and

24   Larry said, "They made me"?

Page 420

1          Q.    Let me say, you never heard any

2     conversation between the police and Larry

3     Tueffel?

4          A.    Yes, I did.

5          Q.    When?

6          A.    When I was in the holding bullpen at

7     the police station.  I don't know the -- After

8     I was arrested, I don't know the contents of

9     the conversation.  I couldn't hear specific

10    words, but I heard their voices.

11         Q.    What did you hear?

12         A.    I heard the police talking to

13    someone.  At first I didn't know who it was,

14    but I heard them talking to someone.  And then

15    I heard them yelling.  And then I heard Larry's

16    responses.  That's when I knew.  That's when I

17    recognized Larry's voice.

18         Q.    This is after you first get

19    arrested?

20         A.    Yeah, this is when I was in the

21    police station.

22         Q.    Where were you?

23         A.    I was in the bullpen room.

24         Q.    That room where you said you were

Page 421

1   locked to a wall?

2        A.     Yeah.

3        Q.     Did that room have any windows?

4        A.     I don't remember.  I don't remember.

5        Q.     The door was shut, though, wasn't

6   it?

7        A.     The door was shut, yeah.

8        Q.     You're saying you still heard this?

9        A.     Yes.

10       Q.     Did you ever tell anybody that

11  before today?

12       A.     Before today?  Yeah, I believe.

13  Yeah, most definitely.

14       Q.     Did you ever tell your attorneys at

15  your two criminal trials?

16       A.     I'm certain I have.  I don't have

17  any specific conversations where I did, but I'm

18  certain I have because this is something that I

19  remember from the very beginning.

20       Q.     All right.  And the door is shut.

21  And you hear the police yelling, and you hear

22  Larry say what?

23       A.     They were yelling at him saying he

24  was lying.  I don't remember -- Like I said, I

Page 422

1    don't remember what they were talking about

2    before that.  But I know the police started

3    yelling, "You're lying.  You're lying."

4              And he started saying, "I'm not

5    lying.  I'm not lying.  I'm not.  No, I'm not."

6         Q.    What else did you hear?

7         A.    That's it, just that going back and

8    forth.

9         Q.    For how long?

10        A.    Less than a minute, few seconds

11   maybe.

12        Q.    And you recognized Larry's voice?

13        A.    Yes.

14        Q.    Was this before you participated in

15   the lineup?

16        A.    Yes.

17        Q.    And was it before you talked to

18   Officer No. 3?

19        A.    I don't know.  I don't know at what

20   point in the interviews or the interrogations

21   it was.

22        Q.    Okay.  Did you recognize the voice

23   of the -- the police officer you heard yelling

24   at Larry, did that person ever talk to you?

# EXHIBIT 37

```
 1    STATE OF ILLINOIS  )
                         )  SS:
 2    COUNTY OF COOK     )

 3              IN THE CIRCUIT COURT OF COOK COUNTY
                COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
      THE PEOPLE OF THE  )
 5    STATE OF ILLINOIS  )
                         )
 6                       )  Indictment No. 93 14710
          VS             )
 7                       )  Charge:  Murder
                         )
 8    THADDEUS JIMENEZ   )

 9                  REPORT OF PROCEEDINGS

10          BE IT REMEMBERED that on the 5th day of

11    November A.D., 1997, this cause came on for trial

12    before the Honorable STANLEY SACKS, Judge of said

13    court, and a jury, upon the indictment herein, the

14    defendant having entered a plea of not guilty.

15          APPEARANCES:

16                 HON. RICHARD DEVINE,
                   State's Attorney of Cook County, by
17                 MESSRS. JOHN MURPHY and DAVID GAUGHAN,
                   Assistant State's Attorneys,
18                    appeared for the People;

19                 MR. CHARLES MURPHY,
                      appeared for the Defendant.
20

21

22
      Brenda D. Hayes, CSR
23    Official Court Reporter          FILED
      2650 S. California
24    Chicago, Illinois  60608         JUN 3 0 1998

                                       AURELIA PUCINSKI
                                       CLERK OF CIRCUIT COURT
```

JIM02938

1    away?

2        A    We were walking and when we got by Honey

3    Baked Ham and Eric turned around and Victor pushed

4    Eric up against the wall and Eric took a swing at him,

5    he missed and then I seen the defendant pull out the

6    gun.

7        Q    When you say the defendant, you're referring

8    to T. J.?

9        A    Yes, sir.

10       Q    When the defendant pulled out the gun what

11   happened?

12       A    He pulled it up to Eric's chest and he shot

13   him.

14       Q    Where was Eric when the defendant put the gun

15   up to his chest?

16       A    Up against the wall on the Honey Baked Ham.

17       Q    When you say he put it up to his chest, would

18   you please describe for the ladies and gentlemen of

19   the jury exactly what he.

20       A    Eric took a swing at Victor and he missed and

21   then the gun came out and he put it directly on his

22   chest.

23           MR. GAUGHAN:  Indicating for the record, your

24   Honor, that the witness is touching his hand against

                                              JIM03096

1      BY MR. GAUGHAN:

2          Q    Now, you testified that after you saw the

3      defendant and Victor Romo running you went back onto

4      Belmont?

5          A    Yes.

6          Q    Did you run through the same lot?

7          A    I ran through the same lot.  I just turned

8      around and ran back to where he was at.

9          Q    Okay you can sit down again, Larry.  After

10     you ran back to where everybody was at did the police

11     arrive?

12         A    Yes, sir.  They were the first ones that

13     arrived.

14         Q    The police were the first ones that arrived?

15         A    Yes.

16         Q    Did an ambulance arrive?

17         A    Right after that.

18         Q    And did the ambulance take Eric away?

19         A    Yes.

20         Q    Now, when the police arrived did you talk to

21     the police at that time?

22         A    No, not until we got to the station.

23         Q    Were you put in a car with Phil Torres?

24         A    Yes.

JIM03101

R-164.

1    Q    At the time you were put in the car with Phil

2    Torres did Phil Torres say anything to you?

3    A    He asked if T. J. did it and I told him no.

4    Q    Why did you tell him no?

5    A    Because I was scared.

6    Q    Why were you scared?

7    A    Because I just seen a murder.

8    Q    Eventually -- Did the police take you down to

9    the police station that night?

10   A    Yes, sir.

11   Q    And when the police took you down to the

12   police station at that time did you indicate to them

13   that it was T. J.?

14   A    No, sir.

15   Q    Why didn't you tell them that it was T. J.?

16   A    I don't know.

17        THE COURT:  Keep your voice up.

18        THE WITNESS:  I was scared.

19   BY MR. GAUGHAN:

20   Q    Again why were you scared, Larry?

21   A    Because I was thinking about what would

22   happen to my family and stuff because I lived right in

23   the neighborhood where it happened.

24   Q    Why were you worried about what would happen

JIM03102

R-165

1    to your family?

2            MR. CHARLES MURPHY:  Objection, your Honor.

3            THE COURT:  Overruled.  He can answer the

4    question.

5            THE WITNESS:  Because it's a gang and --

6    BY MR. GAUGHAN:

7        Q    You're going to have to speak up.

8        A    I'm afraid they might hurt my family next.

9        Q    When you say they, who are you referring to?

10       A    The gang that was in the neighborhood.

11       Q    Was that the Simon City Royals?

12       A    Yes.

13       Q    Was there any ramifications -- Let me

14   rephrase that.

15            How would the gang look upon you in

16   pointing out a fellow Simon City Royal on a murder?

17            MR. CHARLES MURPHY:  Objection, your Honor.

18            THE COURT:  How someone else would perceive

19   something.  Sustained.

20   BY MR. GAUGHAN:

21       Q    You said you were afraid of the gang, right?

22       A    Yes.

23       Q    What was your perception at that time, being

24   in the same gang, the Simon City Royals, as Thaddeus

JIM03103

1   Jimenez, in your head what did you believe the gang

2   would do if you pointed out a fellow gang member as a

3   shooter in a murder case?

4           MR. CHARLES MURPHY: Objection, your Honor.

5   It's been asked and answered. I'll let him answer

6   again. Overruled.

7           THE WITNESS: I'll probably end up like my

8   friend did.

9   BY MR. GAUGHAN:

10      Q   Your friend being?

11      A   Eric Morro.

12      Q   Incidentally you said you were fourteen at

13  that time, right?

14      A   Yes, sir.

15      Q   Now, as a matter of fact, Larry, back in

16  September of 1994 you were subpoenaed to appear to

17  testify in a matter concerning this case, weren't you?

18      A   Yes.

19      Q   And at that time back in September of 1994

20  did you come to court on that subpoena?

21      A   Can you repeat it, please.

22      Q   Did you initially come to court the day you

23  were subpoenaed to be in court?

24      A   No, sir.

JIM03104

R-167

1      A    Yes.

2      Q    Now, Larry, I want to -- after you talked to

3  the police at the station that night eventually you

4  went home, right?

5      A    Yes, sir.

6      Q    Later on that evening did the police come to

7  your house about 3:00 or 3:30 in the morning.

8      A    Yes, sir.

9      Q    At that time what happened when the police

10  came to your house?

11     A    They picked me back up and they said they had

12  to ask me some more questions.

13     Q    Did you go back down to Area Five?

14     A    Yes.

15     Q    When you went back down to Area Five what

16  happened?

17     A    They said that I was lying and they had other

18  witnesses.

19     Q    When they told you they had other witnesses

20  and you were lying what did you tell them at that

21  time?

22     A    I told them the truth.

23     Q    And what was the truth?

24     A    That it was Victor Romo and T. J.

JIM03106

1          Q     Did the police ever tell you the name T. J.

2     at that time?

3          A     No.

4          Q     That following morning at about 10:00 o'clock

5     in the morning did you view a lineup?

6          A     Yes.

7          Q     Just so we're clear, this would be like about

8     10:00 o'clock in the morning going from the day this

9     happened until the --

10         A     Yes.

11         Q     Did you view a lineup down at Area Five,

12    Grand and Central?

13         A     Yes.

14         Q     At that time did you pick anybody out in that

15    lineup?

16         A     Yes.

17         Q     You have to do better than that.

18         A     Yes.

19         Q     Who was the person you picked out in the

20    lineup?

21         A     T. J.

22         Q     What did you pick out T. J. as doing when you

23    picked him out in that lineup?

24         A     Can you repeat it.  I don't understand.

JIM03107

1        A    Yes.

2        Q    You agree?

3        A    Yes.

4        Q    You did not tell the officer who arrived at

5   the scene of the shooting -- He was wearing a uniform,

6   wasn't he, right?

7        A    The officers that came to the scene?

8        Q    Yeah?

9        A    After it happened, yeah, they were in the

10  blue suits.

11       Q    They were in uniform?

12       A    Yeah, uniform.

13       Q    And they asked you what happened, right?

14       A    Not until I got to the station.

15       Q    Did you tell uniformed police officers the

16  night that the shooting took place that the shooter

17  had curly black hair did you say that?

18       A    No, I don't remember saying that.

19       Q    Did you tell the officers in uniform the

20  night of the shooting that the guy who did the

21  shooting was wearing a purple jacket with yellow

22  lettering, do you remember that?

23       A    Yes, I remember that.

24       Q    You said here today that after you decided to

JIM03117

1  you then tell the officers the reason I know his guy

2  is I go to school with him, did you do that?

3      A    I seen him at school before. I didn't go to

4  school with him.

5      Q    Did you tell the officers that the reason you

6  knew his name is you had seen him at school?

7      A    Yes.

8      Q    And you gave the name Victor?

9      A    Yes.

10     Q    Not just male white, right?

11     A    Right.

12     Q    You've said here today that the reason you

13  decided to tell the truth is they told you that there

14  were other witnesses who said you were lying; is that

15  correct?

16     A    Yes.

17     Q    They told you exactly what Phil Torres had

18  told them before you recollected the truth, didn't

19  they?

20          MR. JOHN MURPHY:  Objection.

21          THE COURT:  If he understands the question he

22  can attempt to answer it.  Overruled.

23          THE WITNESS:  No.

24

JIM03119

R-182

1    BY MR. CHARLES MURPHY:

2        Q    No?

3        A    No.

4        Q    You had no reason to believe that Victor Romo

5    was a gang member, did you?

6        A    I didn't know much about him.  All I did was

7    see him at school.  I didn't know him personally.

8            MR. CHARLES MURPHY:  Page one sixty.

9    BY MR. CHARLES MURPHY:

10       Q    You also testified on September 30, 1994 in

11   this building during prior court proceedings, did you

12   not?

13       A    Yes.

14       Q    And do you remember this question asked of

15   you and this answer by you:

16               "Was Victor Romo a Royal?

17               Your answer, "no, sir."

18               Do you remember that question asked of

19   you and that answer by you?

20       A    No, I don't remember.

21       Q    You said here today that when you first

22   noticed T. J. and Victor the night of the shooting at

23   least they were behind you; is that correct?

24       A    Yes.

JIM03120

R-183

1      Q    They never passed you heading in the opposite

2  direction on the sidewalk, did they?

3      A    No. No, sir.

4      Q    When you were at the police station talking

5  to the detectives did you tell the detectives at the

6  police station that you and Eric were walking

7  eastbound and the other two men were walking westbound

8  and they passed by you and then turned around and then

9  came behind you, did you tell that to the detectives?

10     A    No.

11     Q    You said that the reason that you were

12  reluctant to tell the truth about who shot and killed

13  your friend was your concern about what would happen

14  to you; is that correct?

15     A    Not only that it's because Eric was my

16  friend. I couldn't just keep on going and not say

17  anything. I had to turn around.

18     Q    You said that the reason that you didn't tell

19  the truth initially was because of your concern for

20  yourself and your family; isn't that correct?

21     A    Yes, sir.

22     Q    And you testified you have testified on two

23  prior occasions that we just talked about; is that

24  correct?

JIM03121

1  A Yes, sir.

2  Q No one has ever hurt you, have they,

3 concerning this; isn't that correct?

4  A Well, I've got threatened a lot.

5  Q By my client?

6  A No, not by him.

7  Q By Victor Romo?

8  A No.

9  Q Has anyone laid a hand on you?

10  A No.

11  Q You were talking to police investigators not

12 only at the scene of the shooting but then you were

13 taken directly from the scene to the police station,

14 that was Area Five; is that correct?

15  A Yes.

16  Q When you got to Area Five at about -- You

17 tell me what time did you get there?

18  A I'm not sure what time it was.

19  Q The shooting took place at 6:30, give us an

20 estimate?

21  A It was later on in the afternoon around --

22  Q Around 9:00 or 9:30 you were there?

23  A Yes, probably.  I told them I seen what

24 happened as soon as the squad car came on the scene.

JIM03122

R-185

1       Q    You were still lying to the police, if I

2  understand your testimony correctly, when they took

3  you down to the police station and spoke to you for

4  the first time, right?

5       A    Yes.  I gave them false information.

6       Q    You didn't give them your version of the

7  truth until 3:30 or 4:00 a.m. of the next day, right?

8            MR. JOHN MURPHY:  Objection to the form of

9  that question.

10           THE COURT:  Overruled.  If he understands the

11  question he can answer it.

12           THE WITNESS:  Right.  That's right.

13  BY MR. CHARLES MURPHY:

14      Q    When you testified on September 30th of

15  1994 here in this building again you were asked

16  questions concerning this incident.  I'm going to ask

17  you if you remember these questions and these answers:

18           "Now, you also knew Victor, right?"

19            You said "yes."

20           "Did you tell the officer that you knew

21            one of the offenders from school that

22            day named Victor?

23           "Yes.

24      "Q    You did?

JIM03123

R-186

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

THADDEUS JIMENEZ,            )
                            )
            Plaintiff,       )    09 C 8081
                            )
            v.               )    Judge Kennelly
                            )
CITY OF CHICAGO, et al.      )
                            )
            Defendants.      )


**PLAINTIFF'S MOTION FOR SCHEDULING CONFERENCE**


        Plaintiff, by his counsel, respectfully requests that the Court enter a scheduling order setting forth pretrial dates. In support, Plaintiff states as follows.

        1.   This Court previously set the trial in this matter for December 5, 2011, with that date subject to the Court's possible unavailability due to commitments with a judicial technology committee.

        2.   To the best of counsels' collective knowledge, there are presently no dates for final pretrial order or conference, or motions *in limine*.  If the case is going to be tried in December, it makes sense to get dates in place for those events.

        3.   Counsel for Plaintiff and the Defendants have discussed possible dates, and would welcome the Court's input and guidance in the process.

Wherefore, Plaintiff respectfully requests a scheduling
conference with the Court to set a schedule for pretrial filings.


RESPECTFULLY SUBMITTED:


/s/ Jon Loevy
_____


Arthur Loevy
Jon Loevy
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900


CERTIFICATE OF SERVICE


I, Jon Loevy, an attorney, certify that on October 25, 2011,
I served the foregoing motion on all counsel of record by means of
the Court's ECF system.


/s/ Jon Loevy
_____

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2
### Eastern Division

Thaddeus Jimenez

                          Plaintiff,

v.                                        Case No.: 1:09–cv–08081
                                          Honorable Matthew F. Kennelly

City Of Chicago, et al.

                          Defendant.

---

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 26, 2011:

     MINUTE entry before Honorable Matthew F. Kennelly: The final pretrial order is to be filed by 11/21/11. The final pretrial conference is set for 11/28/11 at 3:00 p.m. Counsel are advised to consult Judge Kennelly's web page regarding requirements for the final pretrial order and motions in limine. Plaintiff's motion for a scheduling conference [137] is terminated as moot. (mk)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | | |
|---|---|---|---|
| THADDEUS JIMENEZ, | ) | | |
| Plaintiff, | ) | No. 09 C 8081 | |
| v. | ) | | |
| | ) | Judge Kennelly | |
| CITY OF CHICAGO, et al., | ) | | |
| Defendants. | ) | | |

**PLAINTIFF THADDEUS JIMENEZ'S MOTION FOR A RULE TO SHOW CAUSE
WITH RESPECT TO THIRD-PARTY WITNESS JUAN CARLOS TORRES**

Pursuant to Federal Rule of Civil Procedure 37(a), Plaintiff Thaddeus Jimenez, by his undersigned attorneys, respectfully requests this Court for a Rule To Show Cause why third-party witness Juan Carlos Torres should not be held in contempt.  In support of the motion, Mr. Jimenez states as follows:

1.      As this Court is well aware by now, Mr. Jimenez asserts that on February 3, 1993, Juan Carlos Torres and his friend Victor Romo approached Eric Morro and Lawrence Tueffel on Belmont Avenue, demanding that Morro pay money that was purportedly owed to a drug dealer named "Leo."  When a scuffle broke out, Torres killed Morro with a single bullet to his chest. The evidence that Torres – not Jimenez – shot Morro is overwhelming.

- Victor Romo has repeatedly testified that he was involved in the altercation with Morro, that the person he was with at that time was his friend Torres, and that he specifically saw Torres shoot Morro.

- Victor Romo has admitted that he and Torres were shooting the murder weapon in a nearby alley immediately prior to Torres using it against Morro.

- Victor Romo has repeatedly testified that at the time of the shooting he had never met Thaddeus Jimenez.  (Jimenez has testified that he did not know Victor Romo at the time of the shooting.)

- Victor and TJ have both testified to meeting each other in the Audie Home – where, as "co-defendants" to a murder charge – they met for the very first time.

- Victor's sister Rosa Wiszo-Waty has twice testified under oath that Torres called her home the night of the Morro murder and told her that he had shot Eric Morro.

- Torres was a member of the "Triangles" party crew, and Eric Morro shouted "Triangle killers" moments before Torres shot him.  Jimenez was never a Triangle.

- Leo Robles was also a Triangle, and it was in "Leo's" name that Torres and Victor Romo had approached Morro about a debt that Morro owed Leo.  Robles told the Cook County State's Attorney's Office that after the murder, Torres (a Triangle) passed the weapon to Luis Hernandez (a Triangle), who in turned directed Robles (a Triangle) to ditch the weapon.  Robles in fact did ditch the murder weapon later that same night, in the Chicago River, off the Belmont Avenue bridge.

- At the time he was murdered, Eric Morro had a piece of paper in his pocket with Leo's name, phone number, and a reference to "40."  The note from Eric's pocket is wholly consistent with Tueffel's response to police questions *at the scene* that the perpetrators confronted Eric Morro about a debt he purportedly owed to "Leo."  Defendants never pursued the Leo $40 angle, however, and the State never turned over the note from Eric's pocket to Jimenez's criminal defense counsel.

- Victor's father, Ezequiel Romo, has repeatedly testified that within days of the murder he secretly tape-recorded a conversation with Torres in which Torres admitted that he fired a shot into Morro that night and that he was not concerned about being caught because the police had already pinned the blame on another gang boy.

- In 2009, when the Cook County State's Attorney's Office confronted Torres with questions about the murder and a request that he listen to the Ezequiel Romo tape, Torres quit his job and fled the state, establishing Torres's consciousness of guilt.

It is the Ezequiel Romo tape-recording that brings us before the Court on this motion.

2.      As the Court is aware, the Defendant Officers deny that Torres killed Morro; they insist that Jimenez is the murderer.  To support this theory the Defendant Officers hired two expert witnesses to attack the *bona fides* of the Ezequiel Romo recording.  The first purported expert asserts that she played the tape for five independent contractors she retains from time to time and that they concluded that the person on the tape sounds Mexican, while Torres's father asserts that the family is not Mexican, but Puerto Rican.  The second purported expert asserts that he enhanced the tape and conducted a careful and thorough review, and then concluded that Ezequiel Romo's testimony about where the tape was made, how the machine was turned on and off, and how many people were present at the taping are not correct.  Neither expert chose to do

2

any actual voice-recognition comparison, even though such technology is available. Jimenez's counsel, however, has retained an expert that desires to engage in such scientific voice comparison, and he has requested that Jimenez's counsel retain voice exemplars from Torres.

3.      On October 17, 2011, Jimenez's counsel approached Torres's counsel, Al Maldonado and Cindy Brown of the Cook County Public Defender's Office, and requested informally that Torres agree to provide voice exemplars.  The same day, Jimenez's counsel provided Torres's counsel with a summary of Supreme Court case law (also set forth in paragraphs 4-7 below) that overwhelmingly supports the proposition that voice exemplars, like blood samples, handwriting, and fingerprints, capture an individual's "physical characteristics" only and are not "testimonial in nature."  On October 26, 2011, Torres's counsel indicated (1) that Torres would not voluntarily agree to provide voice exemplars, (2) that they would accept a subpoena on Torres's behalf, and (3) that they desired the opportunity to argue the issue before this Court.  On October 27, 2011, having been unable to resolve the dispute by agreement, Jimenez's counsel served a subpoena for voice exemplars on Torres's counsel and on October 28, 2011, served a revised subpoena.  Despite reasonable efforts to resolve the dispute, both in person and by telephone, the parties have not been able to reach agreement.  This motion therefore seeks to enforce the attached subpoena.

4.      The law on voice exemplars is straightforward.  There is no Fifth Amendment protection in the sound of one's voice.  Numerous Supreme Court cases have held that when used *as an identifying physical characteristic* and not as a testimonial admission, compelled voice exemplars do not violate the Fifth Amendment. *United States v. Dionisio,* 410 U.S. 1, 5-7 (1973); *United States v. Wade,* 388 U.S. 218, 222-23 (1967).  *See also Schmerber v. California,*

384 U.S. 757, 764 (1966) (the Fifth Amendment "offers no protection against compulsion . . . *to write or speak for identification* . . . ."). *Id.* (emphasis added).

5.      In *Wade*, the Court held that "compelling Wade to speak within hearing distance of the witnesses, *even to utter words purportedly uttered by the robber*, was not compulsion to utter statements of a 'testimonial' nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt" or to disclose any particular fact that is known to him.  388 U.S. at 222 (emphasis added).  The subpoena request in this case is the same as in *Wade*.  Torres will be compelled to speak words "purportedly uttered by the [murderer]," but not to speak his guilt or to disclose any particular fact that is known to him.  Indeed, the request in this case is less onerous than in *Wade*, because he is not being asked to do it in open court, nor during his actual criminal case.

6.      The law is constant that voice exemplars are no different from any other "physical evidence," and the Supreme Court has repeatedly pointed out that its voice exemplar rule is consistent with its rulings that a defendant "may also be asked to 'appear in court,' to 'stand,' to 'assume a stance,' to 'walk,' or to 'make a particular gesture.'"  *Schmerber*, 384 U.S. at 764.

> "It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by the privilege against compulsory self-incrimination. . . . [Our precedents] definitively refute any contention that the compelled production of the voice exemplars in this case would violate the Fifth Amendment.

*Dionisio*, 410 U.S. at 5-7 (citations omitted).  *See also Pennsylvania v. Muniz,* 496 U.S. 582, 592 (1990) ("[r]equiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, . . . does not, without more, compel him to provide a 'testimonial' response for purposes of the privilege"); *U.S. v. Rogers*, 475 F.2d 821, 826 (7th Cir. 1973) (the Supreme Court has repeatedly "dealt with [voice and handwriting] exemplars interchangeably and without constitutional differentiation").

7.     Finally, Judge Milton Shadur was presented with this exact question more than 20 years ago in *U.S. ex rel. Dunmore v. Camp*, 698 F. Supp. 715 (N.D. Ill. 1988), a *habeas* case in which Dunmore asserted that the state court violated his Fifth Amendment rights by improperly admitting his voice exemplars into evidence.  Judge Shadur rejected this argument, stating:

> Acts involved in the production of evidence are not testimonial merely because they give rise to a series of inferences which may lead to identifying a witness as the perpetrator of a crime. . . .  Here too the evidence of Dunmore's voice exemplars was admitted along with testimony as to how it was prepared.  Here too there was no indication that the jury was misled as to how the exemplars were taken. And here too the fact that the exemplars, when compared with the [threatening] taped conversations, led to inferences that Dunmore and [the] "George Kramer" [identified on the threatening tapes] were one and the same does not render them testimonial.

*Id*. at 716-17.  Again, compelling exemplars in this civil rights case is even less onerous than in *Dunmore*, where the exemplars were used in Dunmore's actual criminal trial.  In sum, Jimenez may invoke this Court's subpoena power to compel Torres to make specific statements on an audio recording in order to compare Torres's voice to the voice on the Ezequiel Romo recording.

8.     In conclusion, Mr. Jimenez has served a proper subpoena to obtain recordings of Mr. Torres's voice.  Those recordings will be turned over to Jimenez's retained expert witness to compare the voice on the exemplars to the voice on the Ezequiel Romo recording – a voice that admits killing Eric Morro.  Victor and Ezequiel Romo insist (and have repeatedly insisted) that that the voice in question belongs to Juan Carlos Torres.  The Defendant Officers assert – without any credible evidence – that it is not.  Compelling these voice exemplars should resolve that issue once and for all.[1]

---

[1]     Actually, the Defendant Officers never come right out and state "this is not Torres's voice." Rather, they are coy, suggesting through their tendered experts that: (1) Ezequiel Romo made the tape in a different place and manner than as he testified he did; and (2) the speaker on the tape sounds of Mexican ancestry, while Mr. Torres is of Puerto Rican ancestry.  Based on these "facts," they want the jury *to infer* that it is not Torres on the tape.  But neither of these purported experts have opined or appear willing to opine, to any degree of scientific certainty, that the voice on the Ezequiel Romo tape is not in fact Juan Carlos Torres.

9.      WHEREFORE, Plaintiff Thaddeus Jimenez respectfully requests this Court to issue a Rule to Show Cause why Mr. Juan Carlos Torres should not be held in contempt for refusing to provide the voice exemplars requested.

Dated:    October 28, 2011

Respectfully Submitted,

/s/ Stuart J. Chanen

| | | |
|---|---|---|
| Stuart J. Chanen | Arthur Loevy | Locke E. Bowman |
| Lisa R. Carter | Jon Loevy | Roderick MacArthur Justice Center |
| Valorem Law Group | Russell Ainsworth | Northwestern U. School of Law |
| 35 E. Wacker Drive | Rachel Steinback | 357 E. Chicago Avenue |
| 30th Floor | LOEVY & LOEVY | Chicago, IL 60611 |
| Chicago, IL 60601 | 312 North May Street | |
| | Suite 100 | |
| | Chicago, IL 60607 | |

## <u>CERTIFICATE OF SERVICE</u>

I, Stuart J. Chanen, an attorney, certify that on October 28, 2011, I delivered through this Court's Electronic Court Filing ("ECF") system a copy of the attached **PLAINTIFF THADDEUS JIMENEZ'S MOTION FOR A RULE TO SHOW CAUSE IN RELATION TO THIRD-PARTY WITNESS JUAN CARLOS TORRES**, to each counsel of record.

<u>/s/ Stuart J. Chanen</u>
An Attorney for Thaddeus Jimenez

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | | |
|---|---|---|---|
| THADDEUS JIMENEZ, | ) | | |
| Plaintiff, | ) | No. 09 C 8081 | |
| v. | ) | | |
| | ) | Judge Kennelly | |
| CITY OF CHICAGO, et al., | ) | | |
| Defendants. | ) | | |

### PLAINTIFF THADDEUS JIMENEZ'S CORRECTED MOTION FOR A RULE TO SHOW CAUSE WITH RESPECT TO THIRD-PARTY WITNESS JUAN CARLOS TORRES

Pursuant to Federal Rule of Civil Procedure 37(a), Plaintiff Thaddeus Jimenez, by his undersigned attorneys, respectfully requests this Court for a Rule To Show Cause why third-party witness Juan Carlos Torres should not be held in contempt.  In support of the motion, Mr. Jimenez states as follows:

1.      As this Court is well aware by now, Mr. Jimenez asserts that on February 3, 1993, Juan Carlos Torres and his friend Victor Romo approached Eric Morro and Lawrence Tueffel on Belmont Avenue, demanding that Morro pay money that was purportedly owed to a drug dealer named "Leo."  When a scuffle broke out, Torres killed Morro with a single bullet to his chest. The evidence that Torres – not Jimenez – shot Morro is overwhelming.

- Victor Romo has repeatedly testified that he was involved in the altercation with Morro, that the person he was with at that time was his friend Torres, and that he specifically saw Torres shoot Morro.

- Victor Romo has admitted that he and Torres were shooting the murder weapon in a nearby alley immediately prior to Torres using it against Morro.

- Victor Romo has repeatedly testified that at the time of the shooting he had never met Thaddeus Jimenez.  (Jimenez has testified that he did not know Victor Romo at the time of the shooting.)

- Victor and TJ have both testified to meeting each other in the Audie Home – where, as "co-defendants" to a murder charge – they met for the very first time.

- Victor's sister Rosa Wiszo-Waty has twice testified under oath that Torres called her

1

home the night of the Morro murder and told her that he had shot Eric Morro.

- Torres was a member of the "Triangles" party crew, and Eric Morro shouted "Triangle killers" moments before Torres shot him. Jimenez was never a Triangle.

- Leo Robles was also a Triangle, and it was in "Leo's" name that Torres and Victor Romo had approached Morro about a debt that Morro owed Leo. Robles told the Cook County State's Attorney's Office that after the murder, Torres (a Triangle) passed the weapon to Luis Hernandez (a Triangle), who in turned directed Robles (a Triangle) to ditch the weapon. Robles in fact did ditch the murder weapon later that same night, in the Chicago River, off the Belmont Avenue bridge.

- At the time he was murdered, Eric Morro had a piece of paper in his pocket with Leo's name, phone number, and a reference to "40." The note from Eric's pocket is wholly consistent with Tueffel's response to police questions *at the scene* that the perpetrators confronted Eric Morro about a debt he purportedly owed to "Leo." Defendants never pursued the Leo $40 angle, however, and the State never turned over the note from Eric's pocket to Jimenez's criminal defense counsel.

- Victor's father, Ezequiel Romo, has repeatedly testified that within days of the murder he secretly tape-recorded a conversation with Torres in which Torres admitted that he fired a shot into Morro that night and that he was not concerned about being caught because the police had already pinned the blame on another gang boy.

- In 2009, when the Cook County State's Attorney's Office confronted Torres with questions about the murder and a request that he listen to the Ezequiel Romo tape, Torres quit his job and fled the state, establishing Torres's consciousness of guilt.

It is the Ezequiel Romo tape-recording that brings us before the Court on this motion.

2.      As the Court is aware, the Defendant Officers deny that Torres killed Morro; they insist that Jimenez is the murderer. To support this theory the Defendant Officers hired two expert witnesses to attack the *bona fides* of the Ezequiel Romo recording. The first purported expert asserts that she played the tape for five independent contractors she retains from time to time and that they concluded that the person on the tape sounds Mexican, while Torres's father asserts that the family is not Mexican, but Puerto Rican. The second purported expert asserts that he enhanced the tape and conducted a careful and thorough review, and then concluded that Ezequiel Romo's testimony about where the tape was made, how the machine was turned on and

3.     On October 17, 2011, Jimenez's counsel approached Torres's counsel, Al Maldonado and Cindy Brown of the Cook County Public Defender's Office, and requested informally that Torres agree to provide voice exemplars.  The same day, Jimenez's counsel provided Torres's counsel with a summary of Supreme Court case law (also set forth in paragraphs 4-7 below) that overwhelmingly supports the proposition that voice exemplars, like blood samples, handwriting, and fingerprints, capture an individual's "physical characteristics" only and are not "testimonial in nature."   On October 26, 2011, Torres's counsel indicated (1) that Torres would not voluntarily agree to provide voice exemplars, (2) that they would accept a subpoena on Torres's behalf, and (3) that they desired the opportunity to argue the issue before this Court.  On October 27, 2011, having been unable to resolve the dispute by agreement, Jimenez's counsel served a subpoena for voice exemplars on Torres's counsel and on October 28, 2011, served a revised subpoena.  Despite reasonable efforts to resolve the dispute, both in person and by telephone, the parties have not been able to reach agreement.  This motion therefore seeks to enforce the attached subpoena.

4.     The law on voice exemplars is straightforward.  There is no Fifth Amendment protection in the sound of one's voice.  Numerous Supreme Court cases have held that when used *as an identifying physical characteristic* and not as a testimonial admission, compelled voice exemplars do not violate the Fifth Amendment. *United States v. Dionisio,* 410 U.S. 1, 5-7 (1973); *United States v. Wade,* 388 U.S. 218, 222-23 (1967).  *See also Schmerber v. California,*

384 U.S. 757, 764 (1966) (the Fifth Amendment "offers no protection against compulsion . . . *to write or speak for identification . . . .*").  *Id.* (emphasis added).

5.      In *Wade*, the Court held that "compelling Wade to speak within hearing distance of the witnesses, *even to utter words purportedly uttered by the robber*, was not compulsion to utter statements of a 'testimonial' nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt" or to disclose any particular fact that is known to him.  388 U.S. at 222 (emphasis added).  The subpoena request in this case is the same as in *Wade*.  Torres will be compelled to speak words "purportedly uttered by the [murderer]," but not to speak his guilt or to disclose any particular fact that is known to him.  Indeed, the request in this case is less onerous than in *Wade*, because he is not being asked to do it in open court, nor during his actual criminal case.

6.      The law is constant that voice exemplars are no different from any other "physical evidence," and the Supreme Court has repeatedly pointed out that its voice exemplar rule is consistent with its rulings that a defendant "may also be asked to 'appear in court,' to 'stand,' to 'assume a stance,' to 'walk,' or to 'make a particular gesture.'"  *Schmerber*, 384 U.S. at 764.

> "It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by the privilege against compulsory self-incrimination. . . . [Our precedents] definitively refute any contention that the compelled production of the voice exemplars in this case would violate the Fifth Amendment.

*Dionisio*, 410 U.S. at 5-7 (citations omitted).  *See also Pennsylvania v. Muniz,* 496 U.S. 582, 592 (1990) ("[r]equiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, . . . does not, without more, compel him to provide a 'testimonial' response for purposes of the privilege"); *U.S. v. Rogers*, 475 F.2d 821, 826 (7th Cir. 1973) (the Supreme Court has repeatedly "dealt with [voice and handwriting] exemplars interchangeably and without constitutional differentiation").

7.      Finally, Judge Milton Shadur was presented with this exact question more than 20 years ago in *U.S. ex rel. Dunmore v. Camp*, 698 F. Supp. 715 (N.D. Ill. 1988), a *habeas* case in which Dunmore asserted that the state court violated his Fifth Amendment rights by improperly admitting his voice exemplars into evidence.  Judge Shadur rejected this argument, stating:

> Acts involved in the production of evidence are not testimonial merely because they give rise to a series of inferences which may lead to identifying a witness as the perpetrator of a crime. . . .  Here too the evidence of Dunmore's voice exemplars was admitted along with testimony as to how it was prepared.  Here too there was no indication that the jury was misled as to how the exemplars were taken. And here too the fact that the exemplars, when compared with the [threatening] taped conversations, led to inferences that Dunmore and [the] "George Kramer" [identified on the threatening tapes] were one and the same does not render them testimonial.

*Id*. at 716-17.  Again, compelling exemplars in this civil rights case is even less onerous than in *Dunmore*, where the exemplars were used in Dunmore's actual criminal trial.  In sum, Jimenez may invoke this Court's subpoena power to compel Torres to make specific statements on an audio recording in order to compare Torres's voice to the voice on the Ezequiel Romo recording.

8.      In conclusion, Mr. Jimenez has served a proper subpoena to obtain recordings of Mr. Torres's voice.  Those recordings will be turned over to Jimenez's retained expert witness to compare the voice on the exemplars to the voice on the Ezequiel Romo recording – a voice that admits killing Eric Morro.  Victor and Ezequiel Romo insist (and have repeatedly insisted) that that the voice in question belongs to Juan Carlos Torres.  The Defendant Officers assert – without any credible evidence – that it is not.  Compelling these voice exemplars should resolve that issue once and for all.[1]

---

[1]      Actually, the Defendant Officers never come right out and state "this is not Torres's voice." Rather, they are coy, suggesting through their tendered experts that: (1) Ezequiel Romo made the tape in a different place and manner than as he testified he did; and (2) the speaker on the tape sounds of Mexican ancestry, while Mr. Torres is of Puerto Rican ancestry.  Based on these "facts," they want the jury *to infer* that it is not Torres on the tape.  But neither of these purported experts have opined or appear willing to opine, to any degree of scientific certainty, that the voice on the Ezequiel Romo tape is not in fact Juan Carlos Torres.

9.      WHEREFORE, Plaintiff Thaddeus Jimenez respectfully requests this Court to issue a Rule to Show Cause why Mr. Juan Carlos Torres should not be held in contempt for refusing to provide the voice exemplars requested.

Dated:    October 28, 2011

Respectfully Submitted,

/s/ Stuart J. Chanen

| | | |
|---|---|---|
| Stuart J. Chanen | Arthur Loevy | Locke E. Bowman |
| Lisa R. Carter | Jon Loevy | Roderick MacArthur Justice Center |
| Valorem Law Group | Russell Ainsworth | Northwestern U. School of Law |
| 35 E. Wacker Drive | Rachel Steinback | 357 E. Chicago Avenue |
| 30th Floor | LOEVY & LOEVY | Chicago, IL 60611 |
| Chicago, IL 60601 | 312 North May Street | |
| | Suite 100 | |
| | Chicago, IL 60607 | |

## <u>CERTIFICATE OF SERVICE</u>

I, Stuart J. Chanen, an attorney, certify that on October 28, 2011, I delivered through this Court's Electronic Court Filing ("ECF") system a copy of the attached **PLAINTIFF THADDEUS JIMENEZ'S CORRECTED MOTION FOR A RULE TO SHOW CAUSE IN RELATION TO THIRD-PARTY WITNESS JUAN CARLOS TORRES**, to each counsel of record.

<u>/s/ Stuart J. Chanen</u>
An Attorney for Thaddeus Jimenez

# EXHIBIT A

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

| Thaddeus Jimenez | ) | |
|---|---|---|
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   09-CV-8081 |
| | ) | |
| City of Chicago, et.al. | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | ) |

## AMENDED SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Juan Carlos Torres, Jail I.D. No. 2009-0035624; Cook County Department of Corrections; 2700 S. California Avenue; Chicago, IL 60608

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

This deposition is for the purpose of taking of voice exemplars only.

| Place: | Cook County Department of Corrections 2700 S. California Avenue Chicago, IL 60608 | Date and Time: 11/02/2011 1:00 pm |
|---|---|---|

The deposition will be recorded by this method:   court reporter and videographer

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:    10/28/2011

| _CLERK OF COURT_ | OR | |
|---|---|---|
| _____ | | _____ |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____

_____ , who issues or requests this subpoena, are:

## CERTIFICATE OF SERVICE

The undersigned attorney certifies under penalty of perjury that on October 28, 2011 he

served this AMENDED SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION upon Alfredo

Maldonado Assistant Cook County Public Defender and attorney for Juan Carlos Torres pursuant

to Mr. Maldonado's consent to accept service on Mr. Torres' behalf.  Service was made via

electronic transmission to Mr. Maldonado at the e-mail listed below.

> Mr. Alfredo Maldonado
> Assistant Cook County Public Defender
> 2650 S. California Avenue
> 8th Floor
> Chicago, Illinois 60608
> al.maldonado@cookcountyil.gov

By: _____

An Attorney for Thaddeus Jimenez

Stuart J. Chanen
Lisa R. Carter
VALOREM LAW GROUP LLC
35 East Wacker Drive, Suite 3000
Chicago, IL  60601
(312) 676-5480
(312) 676-5499—fax
Firm ID No. 44328

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
|     **Plaintiff,** | ) | **No. 09 C 8081** |
| **v.** | ) | |
| | ) | **Judge Kennelly** |
| CITY OF CHICAGO, et al., | ) | |
|     **Defendants.** | ) | |

**NON-PARTY WITNESS JUAN CARLOS TORRES' MOTION TO QUASH SUBPOENA
TO GIVE A VOICE EXEMPLAR IN A DEPOSITION IN A CIVIL ACTION PURSUANT
TO RULE 45(c)(3)**

JUAN CARLOS TORRES, and his attorney, HON. ABISHI C. CUNNINGHAM, JR.

(RET.), Public Defender of Cook County, by and through his assistants, Alfredo Maldonado and

Cynthia Brown, respectfully requests that the subpoena served by the Plaintiff for testimony in a

deposition in a civil action be quashed pursuant to Rule 45(c)(3) of the Federal Rules of Civil

Procedure. In support of the motion, Mr. Torres states as follows:

1.      Juan Carlos Torres is a defendant in a pending Cook County criminal case [09 CR

9111] where Mr. Torres is accused of committing first degree murder in the 1993 death of Eric

Moro.  The allegations in the pending Cook County criminal case are the subject of the above

captioned federal court litigation.  However, Mr. Torres is a non-party to the above captioned

matter.

2.      The Office of the Cook County Public Defender represents Juan Carlos Torres in

the pending Cook County criminal case.  Juan Carlos Torres is currently an inmate in the Cook

County Jail awaiting trial on his criminal case.

3.      On October 28, 2011, the Plaintiff served counsel for Mr. Torres via email with a

subpoena to testify in a deposition in a civil action.  Per the subpoena, the deposition is

scheduled for November 2, 2011 at 1:00 p.m. at the Cook County Jail, and the testimony is solely

for purposes of obtaining a voice exemplar.  While Plaintiff, a private party not associated with

the United States government, served the subpoena on counsel for Mr. Torres, witness fees for

Juan Carlos Torres pursuant to Federal Rules of Civil Procedure 45(b)(1) have not been tendered.

4.      Anticipating non-compliance by Juan Carlos Torres regarding the requested voice

exemplar, Plaintiff served a motion for a rule to show cause upon counsel for Mr. Torres via

email on October 28, 2011.  A hearing on Plaintiff's motion for a rule to show cause is scheduled

on November 3, 2011 before this Court.

5.      Pursuant to Rule 30(a)(2)(B) of the Federal Rules of Civil Procedure, a party

seeking the deposition of a person confined in a prison must seek leave of court.  Juan Carlos

Torres is such a person confined, and no such leave of court appears to have been granted to

authorize Plaintiff's request to take Mr. Torres' deposition at the Cook County Jail.

6.      Rule 45 of the Federal Rules of Civil Procedure governs the discovery of

materials from non-parties to a civil suit via a subpoena.  Rule 45(a)(1)(A)(iii) states a subpoena

may "command each person to whom it is directed to do the following at a specified time and

place: attend and testify; produce designated documents, electronically stored information, or

tangible things in that person's possession, custody or control; or permit the inspections of

premises..."  The Plaintiff's requested voice exemplar falls outside of the scope of materials

covered by Rule 45(a)(1)(A)(iii).  The U.S. District Court for the District of Minnesota has

explained:

> Defendants have also moved for an order to compel female children of plaintiffs over
> the age of 12 to speak into a tape recorder to produce a voice exemplar for defendants'
> use. The apparent intent is to prove that some individual who had ready access to the
> Haaf telephone was responsible for the calls allegedly made to defendant Grams and
> therefore to prove good faith and probable cause for defendants' actions. The motion
> will be denied. A motion to compel non-parties to this suit to engage in any
> production of this type of evidence for the benefit of a party is not contemplated by
> the Federal Rules of Civil Procedure…Rule 45 involving subpoenas to non-parties
> also requires only the production of documents. There is no provision in the rules

2

requiring non-parties to produce evidence of the type requested. The situation is all the more delicate because of the possible consequences. It is not inconceivable that a subsequent criminal action might be instituted following the introduction of the voice recording requested if testimony were to link the recorded voice with the one responsible for the harassing telephone calls. Given the limited provisions of the rules the court will not enter the order as requested in this civil action.

Haff v. Grams, 355 F.Supp. 542, 546-47 (D.Minn. 1973).

Further, Federal Rule of Civil Procedure 30(d)(3)(A) states that, "the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith…" In this case, the "deposition" is being sought in bad faith.  The "deposition" is a charade – not a "deposition" at all, but rather an attempt to circumvent the rules and obtain a voice exemplar under false pretenses by having the defendant answer completely irrelevant questions. Therefore, Plaintiff has no legal basis to compel a voice exemplar from Juan Carlos Torres.

7.      Plaintiff seeks a voice exemplar from Mr. Torres in an effort to authenticate a purported tape recorded conversation from 1993[1] when Mr. Torres was a fourteen year old boy. Today, Mr. Torres is a thirty-two year old man.  The voice of a teenage boy is not the same as when that boy becomes a fully grown man.  Plaintiff has made no showing that any authentication is even possible given the wide age discrepancies in this instance.

8.      Both the United States and State of Illinois constitutions protect an individual from being compelled to incriminate himself in any criminal case.  U.S. Const. Amend V.; Ill. State Const. Article I §10.  The privilege against self-incrimination applies not just "to answers that would in themselves support a conviction... but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute a claimant."  Hoffman v. United

---

1       Our position is that the tape recording was fraudulently made in 1993, and our client's voice is not on the recording.  Assuming the tape recording's legitimacy arguendo, the recording on its face violated the Illinois eavesdropping statute 720 ILCS 5/14-1 et seq. because all the parties to the conversation did not consent to any recording.  Accordingly, the 1993 tape recording would be inadmissible in any Illinois proceedings like the pending criminal case against Juan Carlos Torres.  720 ILCS 5/14-5 (1993).

States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed.2d 1118 (1951).  The privilege against self-incrimination is not confined to criminal cases and may also be invoked in civil matters.  *See* Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).  Where civil and criminal litigation run parallel to each other, courts have granted stays on civil litigation to prevent depositions and other discovery tools from infringing upon the privilege against self-incrimination.  *See, e.g.*, Wehling v. Columbia Broadcasting System, 608 F.2d 1084 (5th Cir. 1979).  In this instance, the civil matter is not collateral or ancillary to the criminal case but intertwined with the facts underlying the prosecution against Juan Carlos Torres.

9.      Under the unique facts of this case, a compelled voice exemplar would violate Mr. Torres' rights under the under the Fifth Amendment to the U.S. Constitution and under section 10 of Article One of the Illinois Constitution.  Federal Rule of Civil Procedure 45 does not permit subpoena authority to be extended for the purpose of a voice exemplar.  The only authority granted under Rule 45 would be for counsel to ask relevant questions during a deposition.  Given the relationship between the civil and criminal litigation in this matter, any relevant deposition question would inherently violate Juan Carlos Torres' rights under the Fifth Amendment to the U.S. Constitution and under section 10 of Article One of the Illinois Constitution.

10.     The 1993 tape recording directly relates to the murder charge which Juan Carlos Torres is facing in state court, and the recording purportedly contains incriminatory statements attributed to Mr. Torres.  The conversation in the 1993 tape recording was in the Spanish language, and the Plaintiff wants Mr. Torres to utter phrases from the recording in Spanish.

11.     While the 1993 tape recording should be inadmissible in the criminal matter against Juan Carlos Torres, the State's Attorney may still be able to introduce the substance of the conversation in another fashion.  If so, the issue of Juan Carlos Torres' inability to speak Spanish would be a central issue in the criminal matter even if the tape recording itself is inadmissible in

Mr. Torres' criminal trial.

12.     In the criminal matter, the prosecution must prove that Juan Carlos Torres spoke Spanish in 1993, and, by asking Mr. Torres to provide a voice exemplar in Spanish to authenticate the 1993 tape recording, Plaintiff is asking Mr. Torres to make a statement that could be considered as an incriminatory testimonial statement on the issue of his ability to speak Spanish. *Cf.* United States v. Hubbell, 530 U.S. 27, 120 S.Ct. 2037, 2047, 147 L.Ed.2d 24 (2000) (producing documents may have a compelled testimonial aspect where production could be an admission that such documents existed or were authentic).

13.     In his rule to show cause, Plaintiff cites cases to support his contention that a voice exemplar for identification purposes does not violate the Fifth Amendment, and Plaintiff even goes so far as to say "the request in this case is less onerous... because he is not being asked to do it in open court, nor during his actual criminal case." *See* Paragraph 5 of Plaintiff' Thaddeus Jimenez's Motion for Rule to Show Cause With Respect to Third Party Witness Juan Carlos Torres.  However, Plaintiff's request for a voice exemplar is not merely for identification purposes because it seeks an incriminatory testimonial statement from Mr. Torres for use in a civil proceeding arising out of the allegations supporting the criminal charges against Mr. Torres. Moreover, this civil litigation does not exist in a vacuum, and the voice exemplar could furnish a crucial link in the chain of evidence needed by the State's Attorney to prosecute Mr. Torres in the criminal matter.  Therefore, pursuant to Federal Rule of Civil Procedure 45(c)(3)(iii), Plaintiff's subpoena should be quashed because it seeks to compel privileged information in violation of United States and Illinois constitutional protections against self-incrimination.

14.     The civil and criminal litigation regarding the 1993 death of Eric Moro have become intertwined, as evidenced by our appearance before this Court on behalf of our client, and the voice exemplar sought by the Plaintiff will surely have monumental ramifications against

Juan Carlos Torres in his pending criminal trial.  Consequently, for all the reasons stated in this

motion, this Court should quash the Plaintiff's subpoena to obtain a voice exemplar from Juan

Carlos Torres because:

     a.     Plaintiff's subpoena upon Juan Carlos Torres fails to comply with Rule

           30(a)(2)(B).

     b.     Plaintiff's request for production of a voice exemplar from Juan Carlos Torres is

           not authorized by Rule 45(a)(1)(A)(iii).

     c.     Plaintiff's request for production of a voice exemplar from Juan Carlos Torres

           would violate Mr. Torres constitutional rights against self-incrimination.

     d.     Plaintiff's request for a deposition violates Juan Carlos Torres' constitutional

           rights.

     WHEREFORE, Juan Carlos Torres requests that this Court quash the subpoena served by

the Plaintiff for testimony in a deposition in a civil action be quashed pursuant to Rule 45(c)(3)

of the Federal Rules of Civil Procedure.

           RESPECTFULLY SUBMITTED
           HON. ABISHI C. CUNNINGHAM, JR. (RET.)
           PUBLIC DEFENDER OF COOK COUNTY
           Attorney Code: 30295

           By:

           _____

           CYNTHIA BROWN
           Assistant Public Defender

           _____

           ALFREDO MALDONADO
           Assistant Public Defender

Office of the Cook County Public Defender
Attorneys for Juan Carlos Torres
2650 S. California – 8th Flr.
Chicago, Illinois 60608
(773) 674-6869

## CERTIFICATE OF SERVICE

I, Alfredo Maldonado, an attorney, certify that on November 2, 2011, I delivered through this Court's Electronic Court Filing ("ECF") system a copy of the attached **PLAINTIFF THADDEUS JIMENEZ'S MOTION FOR A RULE TO SHOW CAUSE IN RELATION TO THIRD-PARTY WITNESS JUAN CARLOS TORRES**, to each counsel of record.

/s/ Alfredo Maldonado – Assistant Public Defender
An Attorney for Juan Carlos Torres

# United States District Court  Northern District of Illinois
## MOTION FOR LEAVE TO APPEAR PRO HAC VICE

| Case Title: | Plantiff(s) |
|---|---|
| VS. | |
| | Defendant(s) |

| Case Number: | Judge: |
|---|---|

I, _____ hereby apply to the Court

under Local Rule 83.14 for permission to appear and participate in the above-entitled action on behalf of

_____ by whom I have been retained.

I am a member in good standing and eligible to practice before the following courts:

| Title of Court | Date Admitted |
|---|---|
| | |
| | |
| | |
| | |

I have currently, or within the year preceding the date of this application, made pro hac vice applications to this Court in the following actions:

| Case Number | Case Title | Date of Application (Granted or Denied)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

*If denied, please explain:
(Attach additional form if necessary)

Pursuant to Local Rule 83.15(a), applicants who do not have an office within the Northern District of Illinois must designate, at the time of filing their initial notice or pleading, a member of the bar of this Court having an office within this District upon who service of papers may be made.

**Has the applicant designated local counsel?     Yes** ○          **No** ○

If you have not designated local counsel, Local Rule 83.15(b) provides that the designation must be made within thirty (30) days.

Has the applicant ever been:

**censured, suspended, disbarred, or otherwise disciplined by any court?**          Yes ○          No ○

**or is the applicant currently the subject of an investigation of the applicant's professional conduct?**          Yes ○          No ○

**transferred to inactive status, voluntarily withdrawn, or resigned from the bar of nay court?**          Yes ○          No ○

**denied admission to the bar of any court?**          Yes ○          No ○

**held in contempt of court?**          Yes ○          No ○

NOTE: If the answer to *any* of the above questions is yes, please attach a brief description of the incident(s) and the applicant's current status before any court, or any agency thereof, where disciplinary sanctions were imposed, or where an investigation or investigations of the applicant's conduct may have been instituted.

I have read the Rules of Professional Conduct for the Northern District of Illinois, effective November 12, 1991 (Local Rules 83.50 through 83.58), and the Standards for Professional Conduct within the Seventh Federal Judicial Circuit, effective December 15, 1992, and will faithfully adhere to them.  I declare under penalty of perjury that the foregoing is true and correct.

S/

| Date | Electronic Signature of Applicant |

| Applicant's Name | Last Name | First Name | Middle Name/Initial |
|---|---|---|---|
| Applicant's Law Firm | | | |
| Applicant's Address | Street Address | | Room/Suite Number |
| | City | State | ZIP Code | Work Phone Number |

**(The pro hac vice admission fee is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date, and shall be paid to the Clerk.  No admission under Rule 83.14 is effective until such time as the fee has been paid.)**

**NOTE:**  Attorneys seeking to appear pro hac vice may wish to consider filing a petition for admission to the general bar of the Court.  The fee for admission to the General Bar is $150.00  The fee for pro hac vice admission is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date.  Admission to the general bar permits an attorney to practice before this Court.  Pro hac vice admission entitles an attorney to appear in a particular case only.  Application for such admission must be made in each case; and the admission fee must be paid in each case.

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| Plaintiff, | ) | No. 09 C 8081 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| CITY OF CHICAGO, et al., | ) | |
| Defendants. | ) | |

**PLAINTIFF THADDEUS JIMENEZ'S OPPOSITION TO
JUAN CARLOS TORRES' MOTION TO QUASH SUBPOENA**

Plaintiff Thaddeus Jimenez respectfully opposes Juan Carlos Torres's Motion to Quash Subpoena on the following grounds:

1.      Torres complains in paragraph 3 that he was not served with witness fees under Rule 45(b)(1).  Incarcerated witnesses may not receive attendance fees, mileage fees or subsistence allowances for testimony.  28 U.S.C. § 1821(f).

2.      Torres complains in paragraph 6 that a Rule 45 subpoena may not be used to demand voice exemplars, and he relies on a _1973_ district court case for that proposition.  Torres, however, must be unaware that Rule 45 was amended in _1991_, and that the Advisory Committee Notes accompanying the amended rule make clear that a "non-party witness is subject to the same scope of discovery under [Rule 45] as that person would be as a party to whom a request is addressed pursuant to Rule 34." Amendments to Federal Rules of Civil Procedure, 134 F.R.D. 525, 670 (April 30, 1991) (emphasis added).  Put another way, the Rule amendment specifically overruled the 1973 Minnesota case, _Haff v. Grams_, on which Torres relies.  Several cases (all of which are less than 38 years old) have specifically held that a party may obtain voice exemplars or similar physical characteristic evidence from a third-party.  _See Beare v. Millington_, 2010 WL 234771, at *1 (E.D.N.Y. 2010) (specifically citing the Advisory Committee Note and holding that rules of civil discovery permit the taking of handwriting exemplars of a non-

party); *Dachman v. Shalala*, 950 F. Supp 708, 709 (D. Md. 1997) (ordering Plaintiff's co-worker, a non-party, to provide a voice exemplar so that Plaintiff's expert could compare the co-worker's voice with that on a recording).  *See also Harris v. Athol-Royalston Regional School Dist. Committee*, 206 F.R.D. 30, 33 (D. Mass. 2002) (a party may obtain fingerprints of another party, but also stating in dicta that the same holding would apply to any "party or person;" also stating in *dicta* that fingerprints and voice exemplars are to be treated the same for purposes of this rule).

3.      Torres complains in paragraph 6 that "the deposition" is being conducted in bad faith as an attempt "to circumvent the rules" and to obtain a "voice exemplar under false pretenses" by having "*the defendant* answer completely irrelevant questions."  This is not only incorrect, but fairly offensive.  First, Mr. Torres is not the defendant in this case; he is a third-party witness.  Second, we will not be putting any questions to Torres, and the subpoena makes perfectly clear that the subpoena is for "voice exemplars only."  Third, there has been no bad faith, no circumvention of the rules, no false pretenses, and no charade.  To the contrary, Jimenez's counsel could not have been more direct and courteous with Torres's counsel. On October 17, 2011, we approached Torres's two public defenders and told them very directly that Jimenez was requesting voice exemplars.  Jimenez followed the request by providing to them the extensive case law supporting the request. After ten days had passed, Torres's counsel indicated that Torres would not comply with the informal request and that he would oppose and not comply with a subpoena for voice exemplars.  Mr. Torres's counsel, however, agreed to accept service of the subpoena. We then promptly served the subpoena and noticed it for November 2. That date, which was just a placeholder, was chosen for no other reason than so that the disagreement could be heard by this Court on November 3.

As evidenced above, Jimenez's counsel has been completely above board with Torres's counsel and does not appreciate this baseless accusation of bad faith.

4.    Torres argues in paragraph 7 that the voice comparison analysis cannot be authenticated because Torres was a boy when he confessed on tape, but he is being asked to give voice exemplars as a "grown man." While the change in age may or may not create voice comparison problems for our expert, that cannot be determined until we obtain the voice exemplars and make the comparison.

5.    Torres argues in paragraph 7, footnote 1, that the tape is inadmissible in this case because it violates the Illinois Eavesdropping Act, 720 ILCS 5/14-1, which *currently* prohibits taping of another party in Illinois without his or her consent. But in February 1993, that was not the law. The law in February 1993 permitted a party to a conversation to tape another person in the conversation without his or her consent. *People v. Beardsley*, 115 Ill.2d 47, 56 (1986). The Legislature changed the law during 1993, and the change in law became effective on January 1, 1994.

6.    Torres argues in paragraph 8 and 9 that permitting us to ask Mr. Torres questions would violate his Fifth Amendment rights. That is correct. His effort, however, to then extend that argument to provide Fifth Amendment protection to voice exemplars in this case simply collapses. He provides no case to counter the numerous Supreme Court cases that clearly indicate that voice exemplars, even for a criminal defendant, do not implicate Fifth Amendment rights (cases provided to Torres's counsel on October 17 and to this Court on October 28). The constitutional argument should be rejected.

7.    Torres makes an additional constitutional argument in paragraph 11 and 12 that should also be rejected. Torres asserts that in his criminal case, "the prosecution must prove that

3

Torres spoke Spanish in 1993." This is not true. The state must prove that Torres shot and killed Eric Morro. They will do so through the eyewitness testimony of Victor Romo (standing about 2-3 feet away), the eyewitness testimony of Larry Tueffel (standing about 2-3 feet away), the ear witness testimony of Rosa Wiszo-Waty (to whom Torres confessed on the night of the murder), Torres's blatant flight after being confronted by the State's Attorney's Office, including quitting his job and, it appears, pulling his children from school, a strong case of consciousness of guilt. Torres then tries to build on this false premise regarding the State's need to "prove Spanish" by asserting that the mere demand that Torres read aloud in Spanish is "an incriminatory testimonial statement." This is wrong for at least two reasons. First, any person can read phonetically the Spanish words that he will be asked to read – so reading from the card provides indication that he does or does not speak Spanish *currently*. Equally importantly, even if an inference could be drawn that someone reading Spanish phonetically off a paper spoke Spanish, that does not mean nor create an inference that they spoke Spanish almost 19 years ago. (It is worth noting that the Defendants in *Jimenez* have argued that the Spanish speaker on the Ezequiel Romo tape cannot be Torres because the person on the tape sounds like a Puerto Rican Spanish-speaker, while Mr. Torres grew up in a home of Mexican Spanish-speakers.) In sum, the exemplars requested are not testimonial.

8.      Finally, Torres's constitutional argument fails for another reason. While Torres has jeopardy in *State v. Torres*, he has no jeopardy in *Jimenez v. City of Chicago*. It is no answer for Torres to assert that the Court should block a valid subpoena in *Jimenez* because evidence gathered here may someday be used against him in *State v. Torres*. Torres will have plenty of opportunity in that case to argue that the overwhelming evidence against him should not be admitted. Those arguments, however, are not a basis to block the valid subpoena in this case.

Moreover, should this Court believe it is necessary, it may, under Federal Rule of Civil Procedure 26(c)(1)(F), issue a protective order by which the exemplars are sealed, the expert report is sealed, and an order that no party to this case may use or disclose the exemplars for any purpose other than for this case. While Jimenez submits that even this protection is unnecessary as Torres maintains all of his rights to attempt to exclude evidence from his criminal trial, it can nevertheless serve as additional protection for Torres, if the Court is so inclined.

9.      Torres's final argument (in paragraph 5) is that Rule 30(a)(2)(B) required Jimenez's counsel to obtain leave of this Court prior to issuing the Rule 45 subpoena and that we failed to do so. Torres is correct. We did fail to follow that rule in our haste to get the already stated disagreement before this Court. It was not done to circumvent the rules or in bad faith. It was, rather, a simple mistake, and one that can be easily rectified. We have separately and contemporaneously filed a motion seeking leave to re-issue the Torres subpoena, and we have noticed it for Monday, November 7, when we are scheduled to be before Your Honor.

WHEREFORE, Plaintiff Thaddeus Jimenez respectfully requests this Court to deny Torres's motion to quash and to grant leave to Plaintiff Jimenez to re-issue to Torres the previously issued subpoena for voice exemplars.

Dated: November 3, 2011

Respectfully Submitted,

 /s/ Stuart J. Chanen_____
One of Thaddeus Jimenez's Attorneys

| | | |
|---|---|---|
| Stuart J. Chanen | Arthur Loevy | Locke E. Bowman |
| Lisa R. Carter | Jon Loevy | RODERICK MACARTHUR JUSTICE CENTER |
| VALOREM LAW GROUP LLC | Russell Ainsworth | Northwestern University |
| 35 E. Wacker Drive | LOEVY & LOEVY | School of Law |
| 30th Floor | 312 North May Street | 357 E. Chicago Avenue |
| Chicago, IL 60601 | Suite 100 | Chicago, IL 60611 |
| | Chicago, IL 60607 | |

## <u>CERTIFICATE OF SERVICE</u>

I, Stuart J. Chanen, an attorney, certify that on November 3, 2011, I delivered through this Court's Electronic Court Filing ("ECF") system a copy of this **PLAINTIFF THADDEUS JIMENEZ'S OPPOSITION TO JUAN CARLOS TORRES' MOTION TO QUASH SUBPOENA** to each counsel of record.

Dated: November 3, 2011

Respectfully Submitted,

_/s/ Stuart J. Chanen_____
One of Thaddeus Jimenez's Attorneys

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| Plaintiff, | ) | No. 09 C 8081 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| CITY OF CHICAGO, et al., | ) | |
| Defendants. | ) | |

**NOTICE OF MOTION**

TO: All Counsel of Record

PLEASE TAKE NOTICE that on Monday, November 7, 2011 at 9:30 a.m., or as soon thereafter as counsel may be heard, I shall appear before the Honorable Judge Matthew F. Kennelly to present **Plaintiff Thaddeus Jimenez's Opposition to Juan Carlos Torres' Motion to Quash Subpoena,** which motion has been separately served upon you through the Court's Electronic Filing System.

Dated: November 3, 2011

Respectfully Submitted,

 /s/ Stuart J. Chanen
One of Thaddeus Jimenez's Attorneys

| | | |
|---|---|---|
| Stuart J. Chanen | Arthur Loevy | Locke E. Bowman |
| Lisa R. Carter | Jon Loevy | RODERICK MACARTHUR JUSTICE CENTER |
| VALOREM LAW GROUP LLC | Russell Ainsworth | Northwestern University |
| 35 E. Wacker Drive | LOEVY & LOEVY | School of Law |
| 30th Floor | 312 North May Street | 357 E. Chicago Avenue |
| Chicago, IL 60601 | Suite 100 | Chicago, IL 60611 |
| | Chicago, IL 60607 | |

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | | |
|---|---|---|---|
| THADDEUS JIMENEZ, | ) | | |
| Plaintiff, | ) | No. 09 C 8081 | |
| v. | ) | | |
| | ) | Judge Matthew F. Kennelly | |
| CITY OF CHICAGO, et al., | ) | | |
| Defendants. | ) | | |

**JIMENEZ'S MOTION FOR LEAVE OF COURT
UNDER RULE 30(a)(2)(B) TO RE-ISSUE SUBPOENA**

Plaintiff Thaddeus Jimenez respectfully moves, pursuant to Federal Rule of Civil Procedure 30(a)(2)(B), for leave to serve a subpoena on a third-party, Juan Carlos Torres, who is currently housed at the Cook County Jail. Respectfully, Jimenez requests this Court to grant this motion for all of the reasons already extensively briefed in support of Jimenez's Rule to Show Cause Motion [142] and in opposition to Torres's Motion to Quash Subpoena filed today.

Dated:    November 3, 2011

Respectfully Submitted,

/s/ Stuart J. Chanen

| | | |
|---|---|---|
| Stuart J. Chanen | Arthur Loevy | Locke E. Bowman |
| Lisa R. Carter | Jon Loevy | RODERICK MACARTHUR JUSTICE CENTER |
| VALOREM LAW GROUP LLC | Russell Ainsworth | Northwestern University |
| 35 E. Wacker Drive | LOEVY & LOEVY | School of Law |
| 30th Floor | 312 North May Street | 357 E. Chicago Avenue |
| Chicago, IL 60601 | Suite 100 | Chicago, IL 60611 |
| | Chicago, IL 60607 | |

## <u>CERTIFICATE OF SERVICE</u>

I, Stuart J. Chanen, an attorney, certify that on November 3, 2011, I delivered through this Court's Electronic Court Filing ("ECF") system a copy of this **NOTICE OF MOTION** to each counsel of record.

Dated: November 3, 2011

Respectfully Submitted,

 /s/ Stuart J. Chanen
One of Thaddeus Jimenez's Attorneys

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **THADDEUS JIMENEZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 09 C 8081** |
| ) | |
| **CITY OF CHICAGO, JEROME BOGUCKI,** ) | |
| **MARK SANDERS, RAYMOND SCHALK,** ) | |
| **FERNANDO MONTILLA, LAWRENCE RYAN,** ) | |
| **and ROBERT WHITEMAN,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Thaddeus Jimenez has sued the City of Chicago and six Chicago police

detectives and officers for claims arising from his wrongful conviction of the murder of

Eric Morro.[1]  Jimenez asserts due process, failure to intervene, and conspiracy claims

under 42 U.S.C. § 1983 and state law claims for malicious prosecution, intentional

infliction of emotional distress, conspiracy, respondeat superior, and indemnification.

The police officer defendants have moved for summary judgment.  For the reasons

stated below, the Court grants the summary judgment motion in part and denies it in

part.

---

[1] In his response to defendants' motion for summary judgment, Jimenez
voluntarily dismissed his claims against defendants Montilla, Ryan, and Whiteman.  The
Court therefore considers only the three Chicago police detectives who remain,
Bogucki, Sanders, and Schalk.

**Background**

A.     **The shooting**

On the evening of February 3, 1993, nineteen-year-old Eric Morro was walking

west on Belmont Avenue in Chicago with fourteen-year-old Larry Tueffel.  On the street

they passed two boys, one of whom was Victor Romo.  Romo confronted Morro about

money he owed to someone named Leo, and a scuffle resulted.  The other boy who

was with Victor pulled a gun and shot Morro.  The two boys fled.  Tueffel initially ran as

well but returned to check on Morro.  Morro was taken to a hospital but was pronounced

dead on arrival.

At the scene, Tueffel and Phil Torres,[2] who lived near the scene of the crime,

described the incident to police.  Tueffel also provided a description of the shooter,

stating that he was thirteen or fourteen, five feet and four or five inches tall, and curly

black hair; was wearing a purple jacket with yellow lettering, baggy blue jeans; and was

carrying a small-caliber silver handgun.  This description did not match Jimenez, who

did not have curly hair and owned a blue and white Duke University jacket.  Phil

likewise did not identify Jimenez as the shooter when he spoke to police at the scene.

At one point, however, Phil and Tueffel were seated in the back of a squad car

together, and Phil asked Tueffel if Jimenez had shot Morro.  Tueffel denied that

Jimenez had been the shooter.

Detective Jerome Bogucki was assigned to the case and began his investigation

on the night of the shooting at the hospital where Morro had been taken.  He spoke to

---

[2] For the sake of convenience and clarify, the Court will refer to Phil Torres as
"Phil" and to Juan Carlos Torres (referenced in a few moments) as "Juan Carlos."

2

Sandra Elder, who stated that she and her daughter Tina[3] had witnessed the shooting. Bogucki was not able to interview Tina at the time. Bogucki also interviewed Tueffel and Phil at a police station on the night of the shooting. Again, neither identified Jimenez as the shooter.

## B.    Phil Torres

The parties dispute the next events. The defendants contend that at 1:00 a.m. on February 4, Phil called Bogucki to change his story. Phil stated that he had seen the shooting from his third-floor apartment window and that Jimenez was the shooter. Defendants say that Bogucki then went to the home of Phil's mother, where Phil said that he knew Jimenez and that he saw the shooter wearing a blue and white Duke jacket. According to defendants, Phil told Bogucki that Tueffel had denied that Jimenez shot Morro but explained that he suspected that Tueffel was trying to protect Jimenez. Bogucki also talked to Phil's younger siblings, Shawn and Donna Cosman, who provided a motive for the shooting by telling the detective of an altercation earlier in the day between Jimenez and Morro.

Jimenez's version of the events is different. He asserts that Phil saw only part of the incident from his window and did not actually see the shooting occur. Jimenez contends that Phil did not call the police to change his story but rather that Bogucki showed up without invitation at 1:00 a.m. to talk with him. Jimenez also asserts that the police took Phil to a police station to interview him and did not simply talk to Phil at his mother's house. According to Jimenez, Phil did not want to be a witness and was high

---

[3] For the sake of convenience, the Court will refer to Sandra Elder as "Sandra" and to Tina Elder as "Tina."

that night, so he would not have willingly contacted the police or gone with them. Jimenez contends that because Phil had not been an eyewitness to the shooting, the only thing he could have told the police was that his siblings knew of a possible motive for Jimenez to attack Morro. Additionally, Jimenez argues, Phil did not mention a Duke jacket but instead described the colors of the jacket; he says the police were the first to say that the jacket had a Duke inscription. Finally, Jimenez asserts that the police pressured Phil to say that Jimenez had been the shooter by telling him "that other people (including his sister) were claiming that the shooter was in fact [Jimenez], and finally, [Phil] agreed to say it was [Jimenez]." Pl. Stat. of Undisputed Facts ¶ 21.

## C.    Larry Tueffel

During Larry Tueffel's initial interview with Bogucki on the night of February 3, he did not identify Jimenez as the shooter and instead told the detective that a person named Frankie had shot Morro. Tueffel was then driven home. After Bogucki and Detective Mark Sanders talked to Phil, they went to Tueffel's house, arriving between 3:00 and 4:00 a.m. on February 4. Jimenez contends that they gave Tueffel no choice but to accompany them to the police station and did not allow Tueffel's parents to accompany him even though he was only fourteen years old. It is undisputed that Tueffel was awakened and taken to a police station without his parents.

At the station, Tueffel told the police that he knew the shooter by sight but not by name. Tueffel was friends with Jimenez and sometimes spent time with him. The police told Tueffel that other witnesses had identified Jimenez as the shooter, and they accused him of lying and covering up for Jimenez. They also asked Tueffel if the shooter had been wearing a Duke jacket, contrary to Tueffel's earlier description.

4

Although Tueffel was scared because the police were yelling and screaming at him, he repeatedly stated that Jimenez had not shot Morro.  The police told Tueffel that he would go to jail and continued to interrogate him for two hours, even though he asked to be taken home.  After two hours, exhausted and crying, Tueffel broke down and told the police that Jimenez had been the shooter.

In deposition testimony, Jimenez stated that he was able to overhear Tueffel's interview for less than one minute.  Def. Ex. 21 at 420–22.  He was able to identify Tueffel's voice and could tell that the police were yelling and accusing Tueffel of lying.

Bogucki and Sanders arrested Jimenez around 4:00 a.m. that morning.

**D.     The lineup**

Later on the morning of February 4, Jimenez was placed in a lineup to be viewed by Larry Tueffel, Phil Torres, Sandra Elder, and Tina Elder.  The Elders and Phil drove together to the police station to view the lineup.  They also smoked outside of the station before going in to see the lineup.  Pl. Ex. 6 at 22–23.  During the ride and while smoking, they discussed Morro's death.

After entering the police station, the witnesses were kept separate.  Phil and Tueffel identified Jimenez in the lineup.  Jimenez contends that the police manipulated the lineup by asking them to pick him out rather than asking them to pick out the shooter.  Sandra Elder picked out Jimenez and another one of the lineup participants and said that both looked like the shooter.

Before Tina Elder viewed the lineup, a police officer seated her at a desk.  On the desk, she saw two Polaroid pictures sitting next to each other, one of Morro's body

and one of Jimenez.  No police officer discussed the photos with Tina.  Jimenez
contends, however, that a police officer told Tina that Jimenez was the primary suspect.
When Tina was taken to view the lineup, she identified Jimenez as the shooter.  She
was not interviewed by police until after she had seen the photo and had picked
Jimenez in the lineup.

Sandra Elder testified at a deposition that she saw the picture of Jimenez as she
was walking out of the lineup room and thought that everyone else had seen it as well.
Def. Ex. 12 at 35–36.  Sandra also said, however, that Tina did not tell her that she had
seen the picture before viewing the lineup.  Tina did not tell anyone she had seen the
picture until 2007.

### E.    Victor Romo and Juan Carlos Torres

On February 10, Victor Romo turned himself in and confessed to Bogucki and
Detective Raymond Schalk that he had been at the scene of the shooting.  This was six
days after the authorities had already arrested and charged Jimenez for the murder.
Romo stated that Jimenez was not the shooter and that he did not even know Jimenez.
Instead, he claimed that the shooter was Juan Carlos Torres and that Juan Carlos was
wearing a gold jacket at the time.

Victor's father, Ezequiel Romo, told the detectives that Victor had first confessed
to him.  Ezequiel said that he then spoke to Juan Carlos and that Juan Carlos had
admitted shooting Morro after Morro had punched him in the face.  The Romos
provided detectives with Juan Carlos's address and a map of how to get to his home.
Bogucki and Schalk located Juan Carlos and interviewed him.

6

Later, Victor Romo's defense attorney presented Bogucki, Schalk, and Assistant State's Attorney Gina Savini with a tape recording that he said included a confession by Juan Carlos, in Spanish, to Ezequiel Morro. Savini took possession of the tape, but the detectives made a copy. They did not list the tape as evidence in Jimenez's case. Nor did they listen to the tape, have it translated, or request that a Spanish-speaking officer listen to it. Bogucki and Schalk did interview Juan Carlos again on March 8. He denied that he had confessed to Ezequiel Morro.

Jimenez claims that on the recording, Juan Carlos stated, "when he hit me and I wanted to shoot him," "when I fired the shot, I ran," and "they pinned the other blame on the, the other gang boy." Pl. Stat. of Undisputed Facts ¶ 59. Defendants contend that an expert they have retained has determined that the recording is fraudulent.

Victor Romo was tried as a juvenile for his part in the shooting. He testified at his trial that Juan Carlos was the shooter. Larry Tueffel also testified at Romo's trial. He stated that Jimenez was the shooter and that he had told the police this after they confronted him with the fact that there was another witness and that he was not telling the truth. The court found Romo delinquent—the equivalent of a finding of guilt.

## F.    Thaddeus Jimenez's trials

Jimenez was indicted on June 24, 1993 for Morro's murder. At his trial, Larry Tueffel, Phil Torres, and Tina Elder identified Jimenez as the shooter. Tueffel and Phil also testified about their conversation in the squad car at the scene of the crime. Jimenez's lawyer cross-examined Tueffel about the different stories he had told the police. Both Bogucki and Tueffel testified about the early morning interview, but neither

7

revealed (either before or at the trial) that the police had threatened and yelled at Tueffel for two hours before he implicated Jimenez.  Instead, in his testimony at the trial, Tueffel explained that he had initially not identified Jimenez as the shooter because they were members of the same gang and he was afraid of implicating a fellow gang member.  Victor Romo testified that the person who shot Morro was Juan Carlos Torres, not Jimenez.

Jimenez was convicted on October 4, 1994 and was sentenced to a fifty-year prison term.  The Illinois Appellate Court overturned his conviction because the trial court had not asked prospective jurors whether Jimenez's gang affiliation would affect their opinions of the case.

At Jimenez's second trial, Tueffel, Phil Torres, and Tina Elder again identified Jimenez as the shooter.  Tueffel and Phil again testified about their conversation in the squad car.  Bogucki and Tueffel again testified about the early morning interview without testifying to the length of the interview, the yelling, or the threats.  Tueffel explained again that he feared pointing the finger at a fellow gang member.  Victor Romo again testified that Juan Carlos, not Jimenez, was the shooter.  At both trials, Jimenez attempted to introduce the taped confession of Juan Carlos to Ezequiel Romo, but the court refused to admit it or Ezequiel's related testimony.  Jimenez was convicted again on November 11, 1997 and was sentenced to forty-five years' imprisonment.

## G.    Thaddeus Jimenez's exoneration

Jimenez maintained his innocence after his second conviction and obtained assistance from the Northwestern Law School's Center on Wrongful Convictions.

In 2006, an investigator working on Jimenez's case visited Larry Tueffel, who

8

had been diagnosed as a paranoid schizophrenic in 2001 or 2002, in the residential facility where he was living and being treated. "Larry immediately told him that [Jimenez] was innocent." Def. Stat. of Undisputed Facts ¶ 61 (internal quotation marks omitted). Lawyers and investigators met with Tueffel and obtained written and video statements in which he recanted his testimony identifying Jimenez as the shooter; identified Juan Carlos Torres as the actual shooter; and detailed his treatment by the police during his early morning interview on February 4, 1993.

Attorneys for Jimenez then showed the videotaped recantation to Tina Elder in May 2007. They did not tell her that Tueffel had been diagnosed with a mental illness or was in a residential treatment facility at the time of the recantation. Tina informed the lawyers that she had seen a picture of Jimenez before being shown the lineup and signed an affidavit to that effect. In her deposition testimony, Tina stated that she still believed that Jimenez was the shooter but that Tueffel's recantation had given her more doubts.

In June 2008, attorneys for Jimenez convinced the Cook County State's Attorney's Office to reinvestigate his conviction. Jimenez contends that county investigators located a man Leo Robles, to whom Morro had owed money and who admitted throwing the murder weapon into the Chicago River. Jimenez asserts that Robles received the gun from a man who received it from Juan Carlos Torres. Investigators also spoke to Juan Carlos, who denied knowing Victor Romo. They asked Juan Carlos to listen to the tape that Ezequiel Romo claimed contained his confession. Juan Carlos said that he would do so after obtaining counsel, but instead he fled the state.

On May 1, 2009, Jimenez and the State's Attorney jointly asked a Cook County judge to vacate Jimenez's conviction.  Judge Joseph M. Claps vacated the conviction and then granted the State's Attorney's motion to dismiss the charges.  On June 3, 2009, Cook County Criminal Court Chief Judge Paul Biebel granted Jimenez a certificate of innocence, which required a finding that he was factually innocent.  735 ILCS 5/2-702(g)(3).

Also in May 2009, Juan Carlos was arrested in Indiana and was indicted for the murder of Morro.  He is currently awaiting trial.

## Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Thus a court may grant the motion "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Defendants make five arguments in support of their motion for summary judgment:  (1) Jimenez's due process claim fails on the merits; (2) they are entitled to qualified immunity; (3) Jimenez cannot satisfy the elements of his state-law malicious prosecution claim; (4) the remaining claims are contingent and will fail if the Court grants summary judgment on the due process and malicious prosecution claims; and (5) Jimenez has not shown personal involvement by Sanders or Schalk in the alleged

10

wrongdoing.

## A.    Due process claim

Jimenez contends that the defendants violated his due process rights by "deliberately with[holding] exculpatory evidence—such as the police manipulation of witnesses that resulted in fabricated witness testimony—and fabricat[ing] false reports and other evidence . . . .  The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of [Jimenez], thereby denying him his constitutional right to a fair trial."  Compl. ¶¶ 45–46.

The Constitution's Due Process Clause guarantees a fair trial, and Jimenez can sue under section 1983 for a violation of that guarantee.  *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006); *Newsome v. McCabe*, 256 F.3d 747, 751–52 (7th Cir. 2001).  In particular, police officers are liable if they withhold material exculpatory evidence.   *Newsome*, 256 F.3d at 752; *see Brady v. Maryland*, 373 U.S. 83, 87 (1963).

> A *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, materiality.  Evidence is suppressed when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) evidence was not otherwise available to the defendant through the exercise of reasonable diligence.  Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008) (citations and internal quotation marks omitted).

Beyond withholding evidence, Jimenez claims that the defendants created false evidence and testified falsely against him.  The Seventh Circuit has held that section 1983 does not provide a remedy for claims of malicious prosecution or violation of substantive due process rights, if state law provides an adequate remedy.  *See Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010); *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002).  Illinois recognizes the tort of malicious prosecution.  *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) (no section 1983 claim when plaintiff alleged that police planted drugs in her car but she was not prosecuted).  Section 1983 does, however, "provide[ ] a remedy for certain forms of trial-based government misconduct based on violations of due process," because a "fair and impartial trial [is] guaranteed by the U.S. Constitution."  *Ienco*, 286 F.3d at 998–99; *see Tully v. Barada*, 599 F.3d 591, 594–95 (7th Cir. 2010).

A plaintiff can bring a section 1983 claim when the government withheld exculpatory evidence or used unduly suggestive identification procedures and the plaintiff's right to a fair trial was violated.  *See Newsome*, 256 F.3d at 752; *Alexander*, 433 F.3d at 555.  Similarly, when police induce false testimony, create false evidence, and commit perjury, this gives rise to a claim under section 1983.  *See Manning v. Miller*, 355 F.3d 1028, 1032–33 (7th Cir. 2004).  This is true even though the Seventh Circuit has stated that "[t]he Constitution does not require that police testify *truthfully*," *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006), and even though all witnesses who testify at trial, including police but excepting complaining witnesses who instigate the prosecution, are "granted absolute immunity from civil liability."

12

*Manning*, 355 F.3d at 1031; *see Gauger v. Hendle*, 349 F.3d 354, 358 (7th Cir. 2003)

*overruled in part on other grounds by Wallace v. City of Chicago*, 440 F.3d 421, 423

(7th Cir. 2006).[4]  "[T]he constitutional rule is that the defendant is entitled to a trial that

will enable jurors to determine where the truth lies," and the *Brady* analysis governs

whether a plaintiff has shown that he did not have such a trial.  *Sornberger*, 434 F.3d at

1029; *see Manning*, 355 F.3d at 1032–33.

The Court therefore must assess, using the *Brady* framework, whether a

reasonable jury could find that the misconduct Jimenez describes deprived him of a fair

trial.  Jimenez argues that the police violated his right to a fair trial by withholding or

tampering with five different categories of evidence:  (1) the circumstances leading up

to and surrounding Larry Tueffel's eventual identification of Jimenez as the shooter; (2)

evidence regarding whether Phil Torres was a witness and whether he voluntarily

contacted the police and identified Jimenez as the shooter; (3) the circumstances

leading up to and surrounding Tina Elder's identification of Jimenez in the lineup; (4)

evidence that the police induced key witnesses to give false statements including that

---

[4] Jimenez argues that absolute immunity is not a consideration here because knowing use of false testimony violates a criminal defendant's due process rights, and the City has agreed that it will be liable if one of the police officer defendants has violated his constitutional rights.  *See Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001); Pl. Ex. 42 ¶ 4.  But the agreement between the City and Jimenez does not state that the City will pay damages even if the officers are immune from suit.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  That said, defendants did not make an absolute immunity argument in their summary judgment motion or opening brief, nor does the Court understand Jimenez to ground his claim on false testimony by one or more of the defendants.  As in *Manning*, the fact that Jimenez cites allegedly false testimony by one or more of the defendants does not insulate them from liability for their non-testimonial actions.  *Manning*, 355 F.3d at 1033 (citing *Ienco*, 286 F.3d at 1000).  Any contrary argument would be frivolous.

the shooter was wearing a Duke jacket and failed to disclose that they had mentioned a Duke jacket before the witnesses did; and (5) three pieces of physical evidence that police withheld from Jimenez and his attorneys.

### 1. Larry Tueffel's identification

Defendants did not disclose the circumstances of the late-night interview during which Tueffel allegedly identified Jimenez as the shooter only after police repeatedly called him a liar and yelled at and threatened him for two hours. Defendants argue that this information was not suppressed because it was otherwise known to Jimenez or available through reasonable diligence. They note that Jimenez heard part of Tueffel's late-night interview and that Tueffel admitted at Jimenez's trials that he had initially not identified Jimenez as the shooter. They contend that any parts of Tueffel's story that Jimenez did not know about could have been obtained by interviewing Tueffel or through cross-examination.

But Jimenez did not know much about Tueffel's interview with the police. Jimenez stated that he heard less than one minute of Tueffel's interview. Def. Ex. 21 at 420–22. He heard only the police yelling and accusing Tueffel of lying and Tueffel stating that he was not lying. *Id.* at 421–22. Jimenez did not know that before Tueffel implicated him, this went on for two hours, police told Tueffel they had other witnesses contradicting him, and they threatened him with arrest. Jimenez also did not know that Tueffel had been taken from his home in the middle of the night, that he felt that he had no choice but to go with them, or that he was brought to the police station without his parents. Pl. Ex. 2 at 36–37.

Defendants cite cases concluding that the circumstances of a criminal

14

defendant's allegedly coercive interrogation are not *Brady* material because the defendant knows those circumstances.  *E.g.*, *Sornberger*, 434 F.3d at 1028–29; *Gauger*, 349 F.3d at 360; *see Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) (police had no obligation to disclose alibi because defendant was aware of his own alibi); *United States v. Dawson*, 425 F.3d 389, 393 (7th Cir. 2005) (conversations that defendant was a part of are not *Brady* material).  That, however, is not what this case involves.  Unlike the plaintiffs in those cases, Jimenez did not have within his own knowledge significant portions of the material facts concerning the alleged coercion of Tueffel.  And, just as importantly, no Seventh Circuit case extends *Gauger* in this context.  In any event, even if these cases extend to the circumstances of an interview of a witness other than a defendant, Jimenez had knowledge of only a small part of the allegedly coercive circumstances of Tueffel's middle-of-the-night interview.

Defendants also contend that Jimenez's defense attorneys could have questioned Tueffel to learn about the circumstances of his interview.  If Jimenez did not learn of those circumstances, defendants argue, it is only for lack of reasonable diligence.  Defendants note that Jimenez was aware that Tueffel had initially not identified him as the shooter and heard the police call Tueffel a liar and that Tueffel told Jimenez before the first trial that "they made me do it."  Pl. Stat. of Undisputed Facts ¶ 79.  Defendants argue that *Brady* did not obligate them to provide Jimenez with what would amount to a transcript of Tueffel's late-night interview or to describe exactly what tone they used when questioning him.

To support their argument, defendants cite *United States v. Lockhart*, 956 F.2d

1418, 1426 (7th Cir. 1992).  In that case, the Seventh Circuit stated that "[w]e simply find no merit in the contention that the government was required to transcribe the recantation of a witness available to the defendant."  Defendants also cite *Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011), in which the court held that it was not a violation of *Brady* for police not to disclose pressure they put upon a witness to change her story in a case in which the accused knew that the witness had changed her story.

These cases are nothing like this one.  *Lockhart* involved a witness who had recanted statements that implicated the defendant.  *Lockhart*, 956 F.2d at 1422.  The prosecution did not call the witness at trial but did inform the defendant and the court of the recantation.  The defendant declined to call the witness.  *Id.*  Given these circumstances, the court did not accept the defendant's contention that the government was required to disclose specific details of the recantation.  *Id.* at 1426.  A key distinction between *Lockhart* and the present case is that, in *Lockhart*, the core exculpatory evidence (the recantation) was disclosed; here, a jury reasonably could find it was not.

In *Holland*, the police showed Holland to the victim of a rape three times, and each time she denied that he was her attacker.  *Holland*, 643 F.3d at 251–52.  She later claimed that the police then pressured her to identify Holland as the perpetrator, telling her that they had other evidence that Holland was her attacker and that she could go home once she made a positive identification.  *Id.* at 252.  During a fourth show-up, the victim identified Holland as the attacker.  *Id.*  After DNA evidence exonerated him, the

court rejected Holland's claim that the police had violated *Brady* by failing to disclose the pressure they had put on the victim. *Id.* at 256. The court reasoned that a defendant "has the responsibility to probe the witnesses and investigate their versions of the relevant events." *Id.* (internal quotation marks omitted). Because Holland knew that the victim had not identified him as the attacker three times, the court concluded that it was his responsibility to ask what had happened before she finally did identify him. *Id.*

Again, however, this case is different. First, a reasonable jury could find that Jimenez did not know, and was never told, that Larry had repeatedly refused to identify him in the late-night interview. By contrast, the plaintiff in *Holland* had been told by the police that the victim had three times denied that he was her attacker before changing her story. Second, Tueffel was not exclusively in police custody from the time that he initially failed to identify Jimenez to the time when he did. Unlike the victim in *Holland*, he had time to go home and have an unforced change of heart. Without disclosure of what the police had done in the late night interview, Jimenez could not know that Tueffel changed his story due to coercive tactics by the police. Finally, Tueffel actually testified about his change-of-story at trial and provided a reason other than police pressure—an inculpatory reason at that (fear of implicating a fellow gang member). Although Tueffel has since stated that he changed his story because of police pressure, a reasonable jury could find that there is no basis to believe that, if interviewed, even intensively, by Jimenez's defense lawyers at the time of Jimenez's criminal trials, Tueffel would have told them anything different from what he testified at those trials.

17

More generally, the Seventh Circuit has stated that:

> We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes. To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement. Or, as may have been the case here, the defense witness learned of certain evidence in the time between when she spoke with defense counsel and the prosecution.

*Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001) (citations omitted). The court went on to say in *Boss* that in cases like that one (and the present one):

> the question is whether defense counsel had access to *Brady* material contained in a witness's head. Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document. But, the position the state advances would require a defense witness's knowledge to be treated exactly as information in a document the defense possesses. *This stretches the concept of reasonable diligence too far.*

*Id.* at 741.

Judge Williams' sage comments on the court's behalf in *Boss* apply equally here. Defendants' argument seems to assume the existence of a *Perry Mason*-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question

would defy common sense. And just as importantly, it would effectively render *Brady* and its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972), a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information.

All of that aside, if one draws reasonable inferences in Jimenez's favor as required on summary judgment, a reasonable jury could find that he could not have obtained the circumstances of Tueffel's interview through reasonable diligence. The evidence suggests that Tueffel felt he had no choice but to testify against Jimenez; when the police came to pick him up after he tried to avoid coming to court, there is evidence that he said that "you guys have the wrong guy," but he nonetheless testified and named Jimenez as the shooter. Pl. Stat. of Undisputed Facts ¶¶ 35, 37. Further, as the Court has noted, Tueffel was directly asked at trial the reason for his changed story. In response, he said not that he had been pressured to inculpate Jimenez, but rather that he had initially feared implicating Jimenez because they were in the same gang. A reasonable jury could find there is no basis to believe that Tueffel would have said anything different had Jimenez's attorneys interviewed him before trial.[5]

Defendants also argue that the doctrine of judicial estoppel should preclude Jimenez from now arguing that Tueffel was pressured by police. They base this

---

[5] It is worth noting that defendants' legal theory also assumes that prosecution witnesses like Tueffel are always willing to submit to a pretrial interview by defense counsel or investigators, another belief that is not borne out in real-life experience.

argument on the fact that at the criminal trial and on appeal, Jimenez argued that Tueffel had changed his version of the events due to pressure from his gang and that Jimenez should have been able to introduce evidence to that effect. This argument is entirely lacking in merit. Jimenez did not succeed with his gang pressure argument. As a result, the doctrine of judicial estoppel does not apply. *See Levinson v. United States*, 969 F.2d 260, 264–65 (7th Cir. 1992) ("a litigant is not forever bound to a losing argument"). Even were this not enough by itself to take estoppel out of the picture, the information about the amount of police pressure applied to Tueffel is new, and use of new information is not barred by judicial estoppel. *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) ("judicial estoppel is not an absolute bar to obtaining legal relief on the basis of new information, even if inconsistent old information had gotten the party an advantage in some other proceeding").

## 2. Phil Torres's identification

Defendants argues that Jimenez knew about the circumstances surrounding Phil Torres's identification of him, such as the fact that Phil had not identified him at the scene of the crime, or that Jimenez could have found this out through reasonable diligence. What was available through reasonable diligence, however, is very much in dispute.

Phil was a reluctant witness who stated several times during his deposition that he did not want to be a witness and would not have talked with the police voluntarily. Def. Resp., Ex. 2 at 34, 42–43. During his deposition, he attempted to walk out before the lawyers had finished questioning him, and they were able to get him to answer

20

questions only by promising that there would be only fifteen minutes of questions per side. *Id.* at 27–30. Further, Phil stated that he used drugs at the time of the criminal investigation as well as subsequently, and he blamed his faulty memory on this. *Id.* at 5, 12, 41, 71. Based on this evidence, there is a genuine issue of fact regarding what Jimenez would have obtained through a pretrial interview with an uncooperative and intoxicated or addicted witness.

Defendants also contend that it is undisputed that Phil identified Jimenez as the shooter. But Phil's deposition testimony is contradictory and does not clearly indicate whether he was actually a witness to the shooting or whether, instead, the police pressured him into identifying Jimenez. At one point, Phil said he saw Jimenez shoot Morro. *Id.* at 18. At another, he stated that he was not a witness, although he may have simply been indicating he did not want to testify at either trial. *Id.* at 34. He also stated that he did not know the shooter was Jimenez until his sister told him about the earlier altercation between Jimenez and Morro. *Id.* at 18–20. Phil was not sure if he had called the police at 1:00 a.m. on February 4 initially, but after being reminded of previous testimony, he claimed he remembered calling the police. *Id.* at 38–39, 80. At one point, he testified that he was taken to a police station in the middle of the night and that the police interviewed him for at least two hours and that he would not have gone voluntarily. *Id.* at 40–41, 42–43. Later, he stated that he might have only been at the police station for a very brief time and that he was not held at the police station against his will. *Id.* at 56, 65. During examination by Jimenez's attorney, Phil stated that he never claimed to be certain about his identification of Jimenez, *id.* at 44–45, but

during examination by the defendants' attorney, he stated that he still believed that the shooter he saw was Jimenez. *Id.* at 82. Phil also stated that the police might have told him they had other witnesses who identified Jimenez, including Sandra Elder, and that this might have influenced him. *Id.* at 79.

Based on Phil's own testimony alone, there are genuinely disputed issues of fact regarding whether he voluntarily talked to police early in the morning of February 4, whether the police took him to the station and how long the interview was, and whether he actually saw Jimenez or rather acted on suggestions from his sister or from the police.

**3.    Tina Elder's lineup identification**

Defendants argue that the allegedly exculpatory or impeaching facts surrounding Tina Elder's identification of Jimenez in the lineup were available to Jimenez through the exercise of reasonable diligence, were not material, and were not known to any of the police officer defendants.

Defendants argue that because Tina volunteered when questioned by Jimenez's attorneys in 2007 that she had seen a picture of Jimenez before identifying him in the lineup, she would have done the same years earlier if questioned by Jimenez's criminal defense attorneys. Tina stated at her deposition that she would have mentioned the photo if she had been asked at the time of the criminal trials. Def. Ex. 12 at 19–20. But during the 1997 trial, Jimenez's attorney asked Tina if the police had done anything to suggest to her that one of the suspects would be in the lineup. Pl. Ex. 68 at 99. She responded no, and she gave a similar response to a prosecutor's question by stating

that no one had indicated to her who in the lineup was the shooter.  *Id.* at 106.  Given

this testimony, a reasonable jury easily could find that, if interviewed around the time of

the criminal trial, Tina would not have volunteered that she had seen a photo of

Jimenez (a fact otherwise unknown to him or his attorneys).  Rather, Tina volunteered

that she had seen the picture only after watching Larry Tueffel's taped recantation of his

testimony, which she testified increased her doubt that Jimenez was the shooter.  Pl.

Ex. 6 at 106.

Defendants cite *United States v. Senn*, 129 F.3d 886 (7th Cir. 1997), in which

the court held that there had been no suppression of *Brady* material simply because the

prosecution had not provided a witness's complete criminal record.  *Id.* at 892–93.  In

that case, however, the defendants knew that the witness had a criminal record and

were later easily able to obtain documentation of this themselves.  *Id.*  That is nothing

like the situation in this case.  Here the question is whether Tina would have admitted, if

asked at the time of the criminal trials, that she had seen a photo of Jimenez before the

lineup, not whether (as in *Senn*) a criminal defendant could have obtained from a

government agency more detail regarding information of which he was already aware.

A reasonable jury could also find that the fact that Tina saw the photograph of

Jimenez before the lineup was material.  The prosecution's case against Jimenez was

built on a motive and a few eyewitnesses.  Thus discrediting the identification of one of

the witnesses would have helped Jimenez significantly.  Further, the defense could

have used the photo incident to argue that Elder was deliberately seated at the desk by

police, which in turn could have called into question whether the police were attempting

23

to manipulate her testimony.  Had the jury believed that the police had tried to concoct an identification, they might also have viewed the testimony of Tueffel and Phil Torres more skeptically, because each had identified Jimenez in a late-night interview after initially failing to identify him.  In short, a reasonable jury could find that Jimenez's defense attorneys could have used the photo incident to discredit the only three eyewitnesses who were able to pick Jimenez out of a lineup.  A reasonable jury similarly could find that the result of the criminal trial would have been different had the police disclosed that Tina saw the photo before viewing the lineup.

Finally, defendants argue that none of them was personally responsible for failing to disclose that Elder saw the photo because they did not know she had seen it. *See Rodriguez v. Peters*, 63 F.3d 546, 555 (7th Cir. 1995).  But there is an issue of material fact regarding what the defendants knew.  At her deposition, Tina could not specifically identify who had placed her at the desk where the photo was sitting, but she testified that it was a police officer.  Def. Ex. 12 at 91–92; Pl. Ex. 6 at 27–28.  In light of her testimony that police specifically placed her away from the other witnesses so they would not communicate, a reasonable jury could find that a police officer had put some thought into where to seat her.  Pl. Ex. 6 at 28.  Bogucki testified that he and Sanders conducted the lineup and that he (Bogucki) was the one handling the witnesses, and Tina testified at the 1997 trial that she met Bogucki when she arrived at the station.  Pl. Ex. 4 at 229; Pl. Ex. 68 at 99.  A reasonable jury could conclude from this evidence that the defendants knew that Elder had seen the photo.

Further, Sandra Elder testified that she saw the photo of Jimenez as she was

24

leaving the lineup, stating, "There was a photo sitting on the desk that you glanced at as you walked by."  Def. Ex. 11 at 32–35.  Sandra believed it likely that everyone who participated in the lineup had seen the picture, because "[t]he desk was right there."  *Id.* at 36.  Given that several of the witnesses may have seen the photo, there is certainly a genuine factual dispute regarding whether Bogucki or Sanders saw it and knew that Tina Elder sat at the same desk.

**4.      The Duke jacket**

Defendants do not separately address the Duke jacket.  A reasonable jury could find that information on whether police first mentioned the jacket to Larry Tueffel, Phil Torres, and Tina Elder was not available to Jimenez with reasonable diligence for the same reasons that the details of Tueffel and Phil's interviews and Elder's lineup identification were not.  Further, a reasonable jury could find from the evidence that it was the police who first mentioned the Duke jacket to each witness.  Tueffel testified that the police mentioned a Duke jacket first.  Def. Ex. 2 at 132.  Phil testified that he saw the shooter wearing a Duke jacket, but at another point, he said that he could not remember whether the police first brought up the Duke jacket (Phil later settled on the story that he told the police the colors and they asked if it was a Duke jacket).  Def. Ex. 2 at 39, 51–52.  Elder testified that at the lineup the police had each lineup participant put on a Duke jacket, and she was not interviewed until after she viewed the lineup. Def. Ex. 12 at 71.

**5.      Physical evidence**

Jimenez claims that the police withheld three pieces of physical evidence from

his lawyers and him at the time of the criminal trials: (1) a note written by Morro and found in his coat stating that he owed forty dollars to a "Leo" and listing a telephone number; (2) the Polaroid picture of Jimenez that Tina Elder saw; and (3) a complete inventory list of the evidence gathered by police. Defendants argue that these items were disclosed to Jimenez and that he makes these contentions too late by asserting them in his response to their motion for summary judgment.

Defendants provide an affidavit from a sergeant in the Records Division of the Chicago Police Department who states that the complete inventory list and the photograph were within the department's file for the Morro case. Def. Ex. 14 at 2; *see Boss*, 263 F.3d at 741. Jimenez has not provided any evidence to suggest that the inventory and picture were not in the file or that, if there, they were not accessible to his criminal defense attorneys. Defendants are entitled to summary judgment to the extent that Jimenez claims a *Brady* violation based on the alleged non-disclosure of these items.

Defendants have also offered evidence that an inventory report related to Morro's note was in their files. Def. Resp. Ex. 14 at 5. The inventory sheet, however, shows only that the police had possession of a coat of Morro's. Though the note was in the coat pocket, the inventory report does not reflect that there was a note. A reasonable jury could find that reasonable diligence did not require Jimenez's defense counsel to rifle the pockets of the victim's coat absent some indication that evidence might be found there.

Defendants argue that the Court should not consider any *Brady* claims related to the physical evidence because Jimenez first made these contentions in his response to

the summary judgment motion.  In *EEOC v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443

(7th Cir. 2008), the court noted that a change in legal theory was made too late,

because "[f]ederal pleading rules require the plaintiff to give the defendant fair notice of

what the claim is and the grounds upon which it rests."  *Id.* (ellipses omitted).  In this

case, however, defendants received adequate notice and were able to present

evidence to attempt to counter Jimenez's claims.  They have suffered no unfair

prejudice by the purportedly late nature of the claims.

**B.     Qualified immunity**

Defendants argue that they are entitled to qualified immunity with regard to using

loud voices during the interview of Larry Tueffel on the early morning on February 4 and

seating Tina Elder in a room that contained paperwork related to the Morro case.

Determining whether a government official has qualified immunity is a two-step process.

> First, a court must decide whether the facts that a plaintiff has alleged or
> shown make out a violation of a constitutional right.  Second, if the plaintiff
> has satisfied this first step, the court must decide whether the right at
> issue was clearly established at the time of defendant's alleged
> misconduct.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations and internal quotation marks

omitted).  A court may consider either step first.  *Id.* at 236.  The Court has already

concluded that Jimenez has shown enough to make out a violation of his due process

rights on these claims.

In a *Brady* case, the qualified immunity question is not "whether a law

enforcement officer would clearly know that he had to disclose impeaching or

exculpatory information."  *Carvajal*, 542 F.3d at 569.  Instead, the question is whether it

27

was clearly established that the information that Jimenez claims they failed to disclose had to be disclosed as exculpatory or impeaching. *Id.* Because "[t]he *Brady* principle was announced in 1963," the only question is whether the defendants should have recognized the information as exculpatory or impeaching. *See Newsome*, 256 F.3d at 752–53.

It is abundantly clear, and would have been clear to any reasonable police officer at the time, that the information that defendants failed to disclose was clearly impeaching or exculpatory. Defendants do not contend otherwise. Rather, they argue that they did not know they were not allowed to use loud voices when interviewing Tueffel. This argument completely misses the point, and it is frivolous as a basis for a defense of qualified immunity. The wrong Jimenez alleges is not that police yelled at Tueffel. Rather, it is that police did not disclose that Tueffel repeatedly stated that Jimenez had not shot Morro and that it was not until after they yelled at, lied to, and threatened Tueffel for two hours in the early morning that he changed his story. Similarly, Jimenez's claim with regard to Tina Elder is not that the police should have seated her in a place where she could never see any paperwork related to the Morro case. Defendants' qualified immunity argument, which assumes that this is Jimenez's claim, is again legally frivolous. It is abundantly clear that Jimenez's actual claim is that the defendants failed to disclose that Tina had seen a picture of Jimenez next to a picture of Morro's corpse just a few minutes before being asked to pick Morro's killer out of a lineup. No reasonable police officer could fail to see this episode as highly impeaching of Elder's identification and later testimony. If defendants knew that Elder

28

had seen a picture of Jimenez before the lineup—and a reasonable jury could find they did—it was clearly established at the time that this was materially impeaching and had to be disclosed.

## C. Malicious prosecution

The elements of a malicious prosecution claim under Illinois law are:

(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.

*Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996) (internal quotation marks omitted). Defendants argue that Jimenez's malicious prosecution claim fails because there was probable cause and because Jimenez has not shown malice.

Probable cause is a complete defense to a malicious prosecution claim. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001). "Probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Id.* (internal quotation marks omitted). A single credible witness is enough to create probable cause. *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007) (false arrest claim). When there is a disagreement about facts, however, courts "adopt[ ] the plaintiff's version of the disputed facts for which there is some support in the record." *Logan*, 246 F.3d at 926 (internal quotation marks omitted).

Defendants argue that even if one discredits Larry Tueffel and Tina Elder's

29

statements, probable cause still existed based on Phil Torres's identification of Jimenez as the shooter.  As discussed earlier, however, there are genuinely disputed facts regarding whether Phil was actually saw the shooting and whether he was pressured by police in a manner similar to Tueffel.  *See Kincaid v. Ames Dep't Stores*, 283 Ill. App. 3d 555, 565, 670 N.E.2d 1103, 1110 (1996) (witness statements supporting probable cause must be reliable and not induced by police).  Additionally, Tueffel testified at his deposition that he told the police that there were no other witnesses on the street at the time of the shooting.  This too, calls calling into question whether Phil actually saw the shooting from his window.  Pl. Ex. 2 at 130–31.  In short, under Jimenez's version of the facts, which a reasonable jury could adopt, Phil's statements are unreliable and thus cannot be a basis for a finding that probable cause existed as a matter of law.

Without the statements of Tueffel, Phil, and Elder, there were no witnesses who could identify Jimenez.  The only other evidence against him was the existence of an alleged motive.  In sum, there is far less evidence to support probable cause than in the Illinois cases defendants cite.  In one of those cases, a witness had seen a previous altercation between the defendant and the victim, and other witnesses heard the gunman say "I told you so."  *People v. Williams*, 137 Ill. App. 3d 736, 742, 484 N.E.2d 1191, 1196 (1985).  In another, a witness who knew both the defendant and the victim saw the shooting and an argument between the defendant and victim over money and drugs earlier in the day.  *People v. Kidd*, 180 Ill. App. 3d 1065, 1072, 536 N.E.2d 816, 820 (1989).

"The question of probable cause is typically a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be

30

drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013–14 (7th Cir. 2006) (internal quotation marks omitted).  That is the case here.

"Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice." *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 349, 733 N.E.2d 835, 842 (2000).  "Lack of probable cause does not itself establish malice, but the trier of fact may infer malice from lack of probable cause if there is no other credible evidence which refutes the inference." *Id.*  Defendants argue that the fact that they did not investigate Juan Carlos Torres as extensively as Jimenez would have preferred does not establish malice.

The Court concludes that there is sufficient evidence to give rise to a genuine factual issue regarding whether defendants acted with malice.  Victor Romo told police, against his own interest, that Juan Carlos Torres had shot Morro, and defendants received a tape recording that allegedly contained a confession by Juan Carlos.  But the evidence suggests defendants did little to investigate further.  They interviewed Juan Carlos but did not pursue the matter beyond accepting his statements that he had not seen Romo recently and had not confessed to the murder in front of Ezequiel Romo.  There is no evidence that they attempted to put any pressure on Juan Carlos (as they are alleged to have previously pressured Larry Tueffel), and there is no indication that they made any attempt to locate Leo Robles, the man to whom Morro owed money.  In addition, as discussed earlier, the evidence would permit a reasonable jury to find that the defendants pressured Tueffel and Phil Torres to change their stories and implicate Jimenez and that they sought to influence Tina Elder to identify him.  A reasonable jury could find from this evidence that the defendants acted with malice.

31

**D.     Contingent claims**

Defendants argue that the contingent claims of failure to intervene, conspiracy, intentional infliction of emotional distress, and respondeat superior all fail because Jimenez's due process and malicious prosecution claims fail.  Because the Court has declined summary judgment on the majority of the due process and malicious prosecution claims, the Court similarly denies summary judgment on the contingent claims.

**E.     Personal involvement of Sanders and Schalk**

Defendants final argument is that Detectives Sanders and Schalk were not personally involved in any violation of Jimenez's rights.  To the contrary, there are genuine issues of fact regarding their participation.

Sanders participated in two of the most important events giving rise to Jimenez's due process and malicious prosecution claims.  He and Bogucki picked up Larry Tueffel early in the morning of February 4 and arguably required him to come to the police station with them.  Def. Stat. of Undisputed Facts ¶ 20.  Defendants state that Tueffel was interviewed by more than one detective, making it reasonable to infer, favorably to Jimenez, that the second detective was Sanders.  *Id.* ¶ 22.  Sanders also helped Bogucki conduct the lineup in which Tina Elder saw the photo of Jimenez just before identifying him.  Although Bogucki testified that Sanders did not deal with the witnesses and stayed with the lineup participants, there is a genuine question of fact regarding whether he had knowledge of the alleged use of the photo.

Schalk did not begin work on case until February 8 and thus was not involved in

32

the earliest stages of the case. But he was involved in obtaining Victor Romo's confession and in the subsequent interview with Juan Carlos Torres. Schalk was also present when Romo's attorney gave police a tape purporting to be Juan Carlos's Spanish-language confession, and he went with Bogucki to interview Juan Carlos again after receiving the tape. Although Schalk could not have played a part in the initial arrest of Jimenez, a reasonable jury could find that he was involved in the continuation of the case even as more evidence arose that Jimenez had not shot Morro. *See Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 73–74, 791 N.E.2d 1206, 1220 (2003) (considering malicious prosecution claim at the time of arrest, commencement of prosecution, and continuation of prosecution).

Jimenez has not provided any evidence, however, that Schalk was aware of any of the exculpatory and impeachment evidence that he contends the police concealed. All of the events surrounding that evidence took place before Schalk began to work on the case. For these reasons, the Court grants summary judgment in favor of Schalk on the due process claim and the section 1983 failure to intervene and conspiracy claims, but declines to grant summary judgment in his favor on the malicious prosecution, intentional infliction of emotional distress, and state law conspiracy claims.

### Conclusion

For the reasons stated above, the Court grants in part and denies in part defendants' motion for summary judgment [docket no. 104]. Specifically, the Court grants summary judgment in favor of all defendants on the due process claim to the extent it relates to the alleged failure to produce the complete inventory list and the

picture of Jimenez and in favor of Schalk on the due process, failure to intervene, and section 1983 conspiracy claims in their entirety.  The Court denies the remainder of the summary judgment motion.  In addition, plaintiff's claims against defendants Whiteman, Ryan, and Montilla are dismissed, and the Clerk is directed to terminate them as defendants.  The case is set for a status on Monday, November 14, 2011 at 9:30 a.m., for the purpose of addressing what discovery and disclosures remain to be completed before the December 5 trial date.

MATTHEW F. KENNELLY
United States District Judge

Date:  November 10, 2011

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO BAR PLAINTIFF'S VOICE COMPARISON EXPERT OR, IN THE ALTERNATIVE, TO CONTINUE THE TRIAL DATE

Defendants Jerome Bogucki, Raymond Schalk, and Mark Sanders ("Defendants"), through their attorneys, Andrew M. Hale & Associates, hereby move to bar Plaintiff's voice comparison expert, Kent Gibson, from testifying at trial, or, in the alternative, to continue the trial by sixty (60) days from when Plaintiff discloses his voice comparison expert's Rule 26(a)(2) Report. In support of this motion, Defendants state as follows:

1. On June 24, 2011, Defendants disclosed two expert reports regarding the Ezequiel Romo audiotape alleged to contain the confession of Juan Carlos Torres ("Romo tape"). Disclosures, attached hereto as Exhibit 1.

2. The first report, by Arlo West, analyzed whether the forensic audio evidence was consistent with Mr. Romo's account of the taping. The second report, by Lilliana Ward, analyzed the dialect of the person on the tape alleged to be Juan Carlos Torres.

3. Arlo West and Lilliana Ward's Reports made it clear that Defendants were contending that the Romo tape was a fabrication and that Juan Carlos Torres was not the person allegedly confessing on the tape.

4. Plaintiff then waited until October 28, 2011 – a full four months after Defendants disclosed Arlo West and Lilliana Ward's Reports – to file a Motion for Rule to Show Cause with Respect to Third-Party Witness Juan Carlos Torres. The motion sought to obtain a voice exemplar from Juan Carlos Torres in order to conduct a voice comparison.

5. On November 7, 2011, Plaintiff's counsel mentioned for the first time that he had received a video of Juan Carlos Torres from the State's Attorney's Office ("SAO video") on November 4, 2011. Defendants did not receive the SAO video until after the close of business on November 7, 2011.

6. On November 8, 2011, Plaintiff's counsel advised that his expert, Kent Gibson, had conducted a voice comparison using the SAO video and concluded that Juan Carlos Torres is the second person on the Romo tape.

7. The issue of voice comparison was not raised in either of Defendants' Reports regarding the Romo tape. As such, Kent Gibson's Report is properly considered an initial, rather than a response, expert disclosure.

8. The question of whether Juan Carlos Torres is the second person on the Romo tape is one of central importance in this case. Plaintiff intends to argue at trial that Juan Carlos Torres is the second person on the tape and that he confessed to shooting Eric Morro. Defendants, on the other hand, intend to argue that the Romo tape is a fabrication and that Juan Carlos Torres is not the second person on the tape and never confessed to shooting Eric Morro.

9. At this time, Defendants still have not received Kent Gibson's voice comparison report. Plaintiff should not be allowed to submit a new expert report with trial only three weeks

away. Defendants would be prejudiced by such a belated submission by not having adequate time to properly respond to such a crucial issue in the case.

10. Therefore, Defendants respectfully request that this Court bar Plaintiff's voice comparison expert, Kent Gibson, from testifying at trial.

11. In the alternative, Defendants respectfully request that this Court continue the trial by sixty days from the date that Plaintiff discloses Kent Gibson's Rule 26(a)(2) Report.

12. As soon as Defendants learned of Kent Gibson's findings, Defendants sought out potential experts to respond to those findings. Defendants are in discussions with potential experts.

13. Defendants have learned that voice comparison is a very specialized technique and that not just any person who has experience with audio-visual equipment can conduct such an analysis.

14. This Court's original and amended scheduling orders allow sixty days for response expert disclosures and thirty days for rebuttal expert disclosures. D.E. 67, 98.

15. The expert disclosures completed so far are the following:

    a. May 23, 2011: Plaintiff disclosed Dr. Kavanaugh's Report

    b. May 24, 2011: Defendants disclosed Dr. Levy's Report

    c. June 24, 2011: Defendants disclosed Arlo West and Lilliana Ward's Reports

    d. October 7, 2011: Plaintiff disclosed Gregg McCrary's Report

16. The expert disclosures and discovery remaining to be completed are the following:

    a. November 15, 2011: Defendants to disclose Dr. Obolsky's Report (response to Dr. Kavanaugh) and Dr. Levy's Supplemental Report

    b. November 16, 2011: Plaintiff to disclose Kent Gibson's Report

    c.   November 30, 2011: Defendants to disclose Mike Bumcrot's Report (response to Gregg McCrary)

    d.   After November 15, 2011: Plaintiff to disclose Steve Dinwiddie's Report (response to Dr. Levy)

    e.   Depositions of: Dr. Levy (part 2), Dr. Obolsky, Gregg McCrary, Kent Gibson, and Steve Dinwiddie

17. Both parties have generally had well over sixty days to prepare their response expert disclosures.

18. As discussed, Mr. Gibson's Report is properly considered an initial, rather than a response, expert disclosure. Under this Court's current scheduling order, parties are given sixty days to respond to expert reports. There is no reason this expert report should be treated any differently. Defendants should not be penalized for Plaintiff not disclosing his voice comparison report until less than three weeks before trial.

19. Defendants have reached out to some potential experts and have been apprised that it will take approximately thirty to forty-five days to complete a voice comparison analysis and accompanying expert report. Since this time falls well within the sixty days allotted under the scheduling order, Defendants should be given this time to properly respond to Plaintiff's voice comparison report. Again, this is a very critical issue in the case and Defendants should not have to rush to submit a response when it was Plaintiff's delay that has caused this issue.

WHEREFORE, Defendants respectfully request that this Court bar Plaintiff's voice comparison expert, Kent Gibson, from testifying at trial. In the alternative, Defendants

respectfully request that this Court continue the trial by sixty (60) days from the date that

Plaintiff discloses Kent Gibson's Rule 26(a)(2) Report.

Respectfully Submitted,

DEFENDANTS

BY:

/s/ Joan E. Ahn
Andrew M. Hale and Associates, LLC
53 W. Jackson Street, Suite 1800
Chicago, IL 60604
(312) 341-9646
Atty. No. 6302283

## <u>CERTIFICATE OF SERVICE</u>

I, Joan E. Ahn, an attorney, hereby certify that on November 14, 2011, I caused DEFENDANTS' MOTION TO BAR PLAINTIFF'S VOICE COMPARISON EXPERT OR, IN THE ALTERNATIVE, TO CONTINUE THE TRIAL DATE to be served upon all counsel of record by filing the same before the Court via the ECF system.

<u>/s/ Joan E. Ahn</u>

# EXHIBIT 1

From: Avi Kamionski <akamionski@ahalelaw.com>
Subject: **Defendants 26(a)(2) expert disclosure as to the Romo Tape - First Expert**
Date: June 24, 2011 2:49:35 PM CDT
To: Stuart Chanen <Stuart.Chanen@valoremlaw.com>, Locke Bowman <l-bowman@law.northwestern.edu>, Jon Loevy <jon@loevy.com>
Cc: "Andrew M. Hale" <ahale@ahalelaw.com>, "Joan E. Ahn" <jahn@ahalelaw.com>, "Harry N. Arger" <HArger@dykema.com>
8 Attachments, 2.5 MB

Counsel -

Attached please find an expert report of Arlo West on the Romo Tape.  I have also included the audio tracks referenced in his report.

Mr. West's CV, fee schedule and list of cases are included in the report and the other attached document.

Please let me know if you would like physical copies of the report or the audio files.


Fee schedule (49.6 KB)

Avi



Expert Repor...ape (932 KB)

**Avi T. Kamionski**
Andrew M. Hale & Associates
53 W. Jackson Blvd., Ste.1800 | Chicago IL 60604
Direct: 312.870.6928 | Main: 312.341.9646 | Fax: 312.341.9656
akamionski@ahalelaw.com | www.ahalelaw.com | www.dontblamethecops.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s).  Any unauthorized use or disclosure of this communication is prohibited.  If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

From: Avi Kamionski <akamionski@ahalelaw.com>
Subject: **Defendants 26(a)(2) expert disclosure as to the Romo Tape - Second Expert**
Date: June 24, 2011 2:53:32 PM CDT
To: Locke Bowman <l-bowman@law.northwestern.edu>, Stuart Chanen <Stuart.Chanen@valoremlaw.com>, Jon Loevy <jon@loevy.com>
Cc: "Andrew M. Hale" <ahale@ahalelaw.com>, "Joan E. Ahn" <jahn@ahalelaw.com>, "Harry N. Arger" <HArger@dykema.com>
  4 Attachments, 11.5 MB

Counsel -

Attached please find an expert report, CV and fee schedule of Lilliana Ward on the Romo Tape.

Please let me know if you would like physical copies as well.

Avi


Hale.TTI.Opi....pdf (4.3 MB)


Hale.TTI.App....pdf (6.9 MB)



*CURRICULUM VITAE*

**LILIANA ESTEVEZ WARD**

108 N. Virginia Ave
Falls Church, VA 22046
Phone: 202-409-0298
E-mail: lward@trustedtranslations.com
Website: www.trustedtranslations.com

**EDUCATION**

University of Richmond, T.C. Williams School of Law - Juris Doctor 1993

Cambridge University, Emmanuel College – International Law Course – Summer 1991

College of William and Mary – B.A., Government - 1990

**EXPERIENCE**

**General Counsel and Director of Operations**, 2004-present
Trusted Translations, Inc., Falls Church, VA 22046

*Relevant duties and experience*: Review translations for certification on behalf of Trusted Translations; provide translation services to law firms in cases involving Spanish language testimony or materials.

**Associate**, 2000-2004
Fletcher, Heald and Hildreth, P.L.C., Arlington, VA

*Relevant duties and experience*: Represent Puerto Rican clients (Radio and TV Stations) in proceedings in front of the F.C.C.; Conduct transactions and negotiations in Spanish with and on behalf of Puerto Rican clients; Represent clients in front of tribunals within Puerto Rico; Translate materials for presentation to the F.C.C. regarding renewal of licenses and indecency complaints.

**Associate**, 1996-2000
Jackson & Campbell, P.C., Washington, D.C.



*Duties and experience:* Litigation Associate defending a major U.S. insurance carrier in coverage cases involving environmental claims.

**Judicial Law Clerk,** 1993-1996
Circuit Court of Arlington, VA – Chief Judge William L. Winston, Chief Judge Paul F. Sheridan, Judge Benjamin N.A. Kendrick and Judge William T. Newman

*Relevant duties and experience:* translate court proceedings; translate for visiting judges and officials when they came to the Courthouse.

**Other Experience:** Summer Litigation Associate, Clement & Wheatley, Danville, VA; Intern, Danville Commonwealth's Attorney's Office, Danville, VA

*Relevant duties and experience:* translate and interpret for court proceedings, as needed.

---

108 North Virginia Avenue 3rd Floor Falls Church, VA 22046   Toll Free (US): 1 (877) 255 0717  Fax: 202 351 0512
www.trustedtranslations.com                                        sales@trustedtranslations.com



Trusted
Translations
LEADER IN SPANISH TRANSLATIONS

November 10, 2010

QUOTE FOR CONSULTING SERVICES

Client: Andrew Hale & Associates

Duration: November 1, 2010 to date of trial or settlement

Rates:  $225.00 per hour for the following tasks:
      In-office document preparation time
      In-office translation time
      In-office phone calls
      In-office file review/analysis
      Travel time

      $350 per hour for the following tasks:
      Preparation for hearings or depositions
      Participation in hearings or depositions, including waiting time on site

      Reimbursement for actual expenses, including meals, during travel times
      Reimbursement for actual cost of mailing and miscellaneous office expenses

Retainer: $5000.00

Payable to:    Trusted Translations, Inc.
            108 N. Virginia Ave.
            Falls Church, VA 22312

Quote Accepted: _____
Print Name: _____
Client or Reference No.: _____
Date: _____

 108 North Virginia Avenue 3rd Floor Falls Church, VA 22046  Toll Free (US): 1 (877) 255 0717  Fax:  202 351 0512
www.trustedtranslations.com                                        sales@trustedtranslations.com

**Avi T. Kamionski**
Andrew M. Hale & Associates
53 W. Jackson Blvd., Ste.1800 | Chicago IL 60604
Direct: 312.870.6928 | Main: 312.341.9646 | Fax: 312.341.9656
akamionski@ahalelaw.com | www.ahalelaw.com | www.dontblamethecops.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s).  Any unauthorized use or disclosure of this communication is prohibited.  If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THADDEUS JIMENEZ,                    )
                                     )
              Plaintiff,             )        Case No. 1:09-cv-8081
                                     )
       v.                            )        Judge Kennelly
                                     )
CITY OF CHICAGO, et al.,             )
                                     )
Defendants.                          )

## DEFENDANTS' MOTIONS *IN LIMINE*

Defendants Jerome Bogucki, Raymond Schalk, and Mark Sanders ("Defendants"), by their undersigned attorneys and pursuant to the Federal Rules of Evidence and Federal Rules of Civil Procedure, hereby move this Court *in limine* for an order precluding the plaintiff, his attorneys, witnesses or others from introducing evidence and mentioning in the presence of the jury the following matters:

## MEET-AND-CONFER PROCESS

Defendants have conferred with plaintiff on the following issues addressed in defendants' motions *in limine*. Plaintiff has indicated that he intends to offer this evidence at trial and defendants oppose the introduction of such evidence and therefore have filed the following motions *in limine*.

**1. Evidence of Indemnification Should be Barred, and as Such, the City of Chicago Should be Removed from the Caption and Verdict Form.**

Evidence or argument that the Defendant Officers are indemnified by the City of Chicago should be barred because this evidence is irrelevant and highly prejudicial to the issue of liability. *See* Fed. R. Evid. 411 (West 2011).

1

Courts routinely bar evidence and argument of indemnification because such evidence and argument is "too prejudicial to survive the Rule 403 balancing test." S*ee Townsend v. Benya,* 287 F.Supp.2d 863. 874 (N.D. Ill. 2003) (barring mention of indemnification of defendants by municipality because information is too prejudicial to survive the Rule 403 balancing test."); *see also Maldonado v. Stinar,* 08 C 1954, 2010 WL 307568 at *3 (N.D. Ill. Aug. 5, 2010) (Nolan, J.) (granting "Defendants' motion to bar Plaintiff from arguing, implying, or mentioning directly that the City will indemnify the Defendant Officers for any award of compensatory damages"); *Green v. Baron*, 879 F.2d 305, 310 (8th Cir. 1989) (stating that instructions concerning indemnification are extremely prejudicial); *Griffin v. Hillke*, 804 F.2d 1052, 1057 (8th Cir. 1986) (declaring indemnification instructions to constitute reversible error).

Courts have explained that, if argument of indemnity is allowed, "instead of focusing the jury's attention on the injury actually suffered by the plaintiff, we would be subjecting the jury to a flurry of largely irrelevant assertions and counter-assertions concerning who may or may not be financially harmed by a particular award." *Larez v. Holeomb*, 16 F.3d 1513, 1519 (9th Cir. 1994). Compensatory damages are designed to compensate a plaintiff for injury and that alone should be the jury's consideration in determining such an award.

In this case, Plaintiff could use an argument that Defendants Officers will be indemnified by the City to inflate the compensatory award, by arguing that the City, and not the Defendant Officers, will pay any compensatory damages award in this case. Thus, the jury's attention could be taken away from assessing actual harm, and could result in an inflated award because the City of Chicago would be acting as an "insurance policy" for the defendants. A distraction like that would be unduly prejudicial to the Defendant Officers and should not be allowed.

In addition, the Defendant Officers are not indemnified for any punitive damages.  Any argument concerning indemnification therefore could result in juror confusion.  A jury could reasonably believe that because the Defendant Officers are indemnified for one type of award—compensatory damages—they are indemnified for other types of awards—punitive damages.  Consequently, a jury could be led to believe the Defendant Officers would not have to pay anything if found liable on Plaintiff's claims when, in reality, any award of punitive damages would come out of the Defendant Officers' pockets.  For the foregoing reasons, Defendants respectfully request this Court to bar any argument regarding their indemnification.

Finally, in light of the fact that the City has entered into a *Monell* stipulation and that evidence of indemnification is inadmissible, there is no legitimate purpose in having the City listed on the caption or verdict form. If it were listed on those documents, the jury would be prone to speculate as to the reason why. Most sophisticated jurors would come to the obvious conclusion that the City is indemnifying the Defendant Officers. For this reason, the City should be removed from the caption and verdict form. *See Betts v. City of Chicago*, 784 F.Supp.2d 1020,1030 (N.D. Ill. 2011)(Gottchall, J.)(granting motion to bar indemnification and removing City from verdict form).

**2.  The Question of Punitive Damages Should Be Bifurcated from the Trial.**

The individual defendants recognize that the rule that indemnification evidence is inadmissible becomes more complicated in a case, like this one, that involves a claim of punitive damages. If an individual defendant claims poverty or inability to pay punitive damages, courts have held that this "opens the door" to indemnification evidence. *Betts*, 784 F.Supp.2d at 1030. The reasoning behind such a ruling is that it would be unfair and confusing to allow the individuals to claim poverty, which poses a risk of appealing to juror sympathy, when in fact the

individual is not going to pay any compensatory damages assessed. But this argument presumes a false choice because there is no need to try the compensatory and punitive damages aspects of the case at the same time.

Federal Rule of Civil Procedure 42(b) provides that: "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). If one of these criteria is met-preventing prejudice to a party or promoting judicial economy-a district court may order bifurcation as long as doing so will not prejudice the non-moving party or violate the Seventh Amendment. *Chlopek v. Fed. Ins. Co.,* 499 F.3d 692, 700 (7th Cir.2007). "The district court has considerable discretion to order the bifurcation of a trial." *Krocka v. City of Chicago,* 203 F.3d 507, 516 (7th Cir. 2000).

If punitive damages are bifurcated and tried separately, it benefits all parties and minimizes the risk of juror nullification. It benefits the plaintiff because it eliminates the need for evidence of the individual defendants' inability to pay, and any attendant risk of juror sympathy. At the same time, bifurcation would preserve the individual defendants' ability to introduce inability to pay evidence as relevant to Plaintiff's claim for punitive damages, while eliminating the presumed prejudice associated with the introduction of indemnification evidence. Finally, the City (on or off of the caption) would be prejudiced if the punitive damages aspect of the case is not bifurcated.

Bifurcation of punitive damages will also not unduly delay or complicate the trial. The three defendant officers are the only individuals who would testify in a punitive damage phase and their testimony would be extremely limited in scope. Based on counsel's own experience in other cases, the punitive damages phase of the trial, assuming liability is found, would

commence right after the jury's verdict and would last for a couple hours. If there is no liability found, there will be no need for the punitive damages testimony. In fact, defense counsel has tried bifurcated punitive damage claims against plaintiff's firm in two other cases, *Booker v. City of Chicago* (Holderman, J.) and *Lopez v. City of Chicago* (Circuit Court of Cook County).

Therefore, the Court should bifurcate the trial so that the issues of liability, and punitive damages, if any, could be addressed separately. Fed. R. Civ. P. 42(b).

### 3. Motion To Bar Prior Bad Acts (Internal Complaints Or Lawsuits) Of Defendant Officers Or Witness Officers.

In March 2010 defendants Shalk and Bogucki were defendants in *Warfield v. City of Chicago*. The events underlying *Warfield* took place in June of 2004. This was a suit brought by plaintiff's law firm, Loevy & Loevy.  In that suit, several teenage girls alleged that they were taken to a police station, held and questioned about witnessing a shooting. Plaintiff ultimately prevailed at trial.  After the verdict was entered, the defendants appealed the findings and the case ultimately settled on appeal.  The parties entered into the City of Chicago standard release and settlement agreement.  Plaintiff's counsel signed a release and settlement agreement acknowledging that they would not use the settlement as an admission of liability and the settlement specifically called for vacating the judgments against them.  Accordingly, plaintiff's counsel should not introduce any evidence related to *Warfield*.

### 1. No 404(b) witnesses disclosed

For starters, although this case has been litigated for over a year, plaintiff has not disclosed a single 404(b) witness against the defendants. As such, plaintiff will not have a single witness at trial to support any 404(b) argument.

### 2. The *Warfield* case is overly prejudicial

Defendants move to bar any mention or questioning of Defendants Shalk and Bogucki regarding *Warfield* because the sole purpose of questioning them on this case is to smear them with improper character and propensity evidence. *See* Fed.R.Evid. 404(b).  Propensity evidence, however, is inadmissible to prove that a party acted on the occasion in question consistent with his alleged other bad act. Fed.R.Evid. 404(b); *See Huddleston v. U.S.,* 485 U.S. 681, 685 (1988); *U.S. v. Shriver*, 842 F.2d 968, 974 (7th Cir. 1988).  Before evidence is allowed under Rule 404(b), the party seeking admission must satisfy the following requirements: (1) the proposed evidence must be directed toward establishing a matter in issue other than propensity; (2) the evidence must be similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence must be sufficient to support a jury finding that the defendant actually committed the similar act; and (4) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *U.S. v. Zapata*, 871 F.2d 616, 620 (7th Cir. 1989). Plaintiff's propensity evidence does not satisfy the *Zapata* prerequisites for admissibility.

In this case, plaintiff intends to introduce the allegations and findings in *Warfield* for no purpose other than propensity. There is no dispute as to the identities or roles of the officers involved in the allegations at issue here.  Intent is similarly not a legitimate issue for purposes of the 404(b) analysis because the crux of Plaintiff's claim is that Defendants falsely arrested him. Rather, the only purpose in Plaintiffs' introduction of the *Warfield* case is to convince the jury that it is more likely that defendants engaged in misconduct in this case because of other allegations of misconduct. This type of smear evidence of course is not permitted. Fed.R.Evid. 404(b); *Okai v. Veruth*, 275 F.3d 606, 610-12 (7th Cir. 2001) (affirming exclusion of prison guard suspensions not relevant to matter in issue).

Moreover, evidence related to the *Warfield* case should be excluded because any probative value they might offer is overwhelmingly outweighed by the danger of unfair prejudice, confusion, and delay.   Fed. R. Evid. 403; *See Zapata*, 871 F.2d at 620; *see also*, *Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2nd Cir. 1991) (holding that the admission of evidence of other complaints against officers was irrelevant and overwhelmingly prejudicial to the defendant); *Lataille v. Ponte*, 754 F.2d 33, 34 (1st Cir. 1985) (prejudicial error to admit past disciplinary record).

Besides lawsuits, plaintiff may seek to introduce evidence of prior or subsequent unrelated internal complaints, or unrelated lawsuits against the Defendant Officers or other police officer witnesses.   Such evidence is not relevant.   Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* Fed. R. Evid. 401 (West 2010). Evidence or testimony that does not directly relate to Plaintiff's allegations is wholly irrelevant to the questions raised by plaintiff's claims.

Moreover, any evidence or testimony regarding any alleged misconduct attributed to certain police officers in other instances would be barred as inadmissible under Rule 404(b). Even if this Court finds that this evidence does have minimal relevancy (a point Defendant Officers do not concede), Rule 404(b) of the Federal Rules of Evidence provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *See* Fed. R. Evid. 404(b) (West 2010).   Plaintiff will use the prior or subsequent complaints to allege that they make it more likely that the Officers committed the conduct in question.   This clearly violates Rule 404(b) and cannot be allowed.

Also, the evidence is unduly prejudicial, and will risk confusion of the issues for the jury. *See* Fed. R. Evid. 403.

Seventh Circuit case law supports barring this evidence from introduction at trial.   In *Estate of Keys v. City of Harvey,* No. 92 C 2177, 1996 WL 34422 (N.D. Ill. 1996) (Nordberg, J.), a police sergeant was being sued by the estate of a man who was killed for a violation of §1983. The City moved to bar evidence of other acts, including disciplinary records and personnel files. The court held that the evidence amounted to nothing more than prior bad acts being used to prove actions in conformity.  *Id.* The court rejected an argument that this evidence was of habit, and it rejected an argument that this evidence met a 404 exception. *Id.*   In addition, the court found that even if the evidence had not been clearly impermissible under 404, the court still would have excluded the evidence as unfairly prejudicial under 403.  *Id.* at \*2; *see Moore v. City of Chicago,* 2008 WL 4549137 at \*5 (N.D. Ill. 2008) (Moran, J.)(unrelated internal complaints were inadmissible character evidence); *Heflin v. City of Chicago,* No. 95 C 1990, 1996 WL 28238 (N.D. Ill. 1996) (Conlon, J.)(unrelated complaints against police barred under 401, 403); *Jones v. Hamelman,* 869 F. 2d 1023, 1027 (7th Cir. 1989) (Seventh Circuit held in §1983 suit against correctional officers that evidence of prior bad act was not probative of officers' modus operandi, it was impermissible under 404(b), and even if probative, it was unfairly prejudicial); *Aguilar v. Dixon,* No. 93 C 1936, 1995 WL 319621 (N.D. Ill. 1995); *see also Akbar v. City of Chicago,* 06 C 3685, 2009 WL 3335364 (N.D. Ill. Oct. 14, 2009) (holding complaint registers against Chicago Police officers inadmissible); *Gadison v. McGuire,* 09 C 0001, 2010 WL 346143 (N.D. Ill. Jan. 22, 2010) (granting Defendant's motion *in limine* regarding prior complaints against officers); *Falk v. Clarke,* No 88 C 7293, 1990 WL 43581 (N.D. Ill. Apr. 3, 1990) (barring use of prior allegation against officer because propensity evidence and unduly

prejudicial); *see also Gonzalez v. City of Elgin,* 2010 WL 3271272 (N.D. Ill. 2010) (St. Eve, J.)(prior lawsuits against officers barred.).

The case law in the Seventh Circuit makes it clear that alleged prior bad acts such as internal complaints or lawsuits are inadmissible at trial. Evidence of prior complaints or lawsuits (which are unrelated to this case) are not relevant, not reliable, impermissible character evidence, and unduly prejudicial. Lastly, the party seeking to offer the evidence has the burden of making an affirmative showing of how the evidence is anything other than propensity evidence. *See Treece v. Hochstetler,* 213 F.3d 360, 363-64 (7th Cir. 2000). Plaintiff cannot do so here. As such, all of the aforementioned evidence and testimony regarding any other unrelated internal complaint or unrelated lawsuit should be barred.

Therefore, references to Defendants' other civil lawsuits and citizen complaints, including *Warfield*, should be barred as impermissible propensity evidence.

**4. Generalized References to Police Misconduct Should Be Barred.**

In recent years, allegations of misconduct by members of the Chicago Police Department have received, and at times even dominated media coverage in the city's major newspapers, local news broadcasts, and on the internet. These allegations include the Anthony Abbate attacking of a bartender, and the recent perjury conviction of Jon Burge this past summer. Defendants have absolutely nothing to do with these publicized incidents and they have no probative value to the issues in this case. Therefore, reference to these, or any other generalized allegations of misconduct by members of the Chicago Police Department should be barred. Fed. R. Evid. 401, 402, & 403.

**5. References to Northwestern's "Center on Wrongful Convictions," the CWC's Mission, And Its Other Post-Conviction Cases Should Be Barred.**

References to Northwestern's "Center on Wrongful Convictions," the CWC's mission, and its other post-conviction cases should be barred as irrelevant and unduly prejudicial. Fed. R. Evid. 401, 402, 403. Instead, Defendants respectfully request that the CWC simply be referred to as "Northwestern." Plaintiff should not be permitted to bolster his claim that he was wrongfully convicted by using the CWC's name, introducing testimony regarding the CWC's mission, or referring to other post-conviction cases the CWC has handled. To begin with, such evidence is wholly irrelevant to Plaintiff's claims. The CWC's mission, its process for determining which cases to take, and its other post-conviction victories have no bearing on whether the defendants in this case did or did not commit misconduct. Moreover, such evidence invites the jury to conclude that, because the "Center on Wrongful Convictions," with its history of successfully fighting "wrongful convictions," intervened on Plaintiff's behalf, he must in fact have been wrongfully convicted. Therefore, references to the CWC, its mission, and its other post-conviction cases should be barred as irrelevant and unduly prejudicial.

6. **Evidence or Argument Regarding the Current Prosecution of Juan Carlos Torres Should Be Barred.**

Evidence or argument regarding the current prosecution of Juan Carlos Torres should be barred as unduly prejudicial. Fed. R. Evid. 403. Although Plaintiff intends to argue that Mr. Torres murdered Eric Morro, and should be permitted to do so, any probative value of Mr. Torres's current prosecution is overwhelmingly outweighed by its prejudicial effect.

The probative value of Mr. Torres's prosecution, given the other evidence that Plaintiff intends to introduce regarding his guilt, is difficult to identify. Plaintiff already intends to introduce various evidence that Mr. Torres murdered Eric Morro, including, but not limited to: Victor Romo and Larry Tueffel's testimony that he committed the murder; the Ezequiel Romo audiotape; and, via his expert Gregg McCrary, evidence discovered during the State's Attorney's

Office's reinvestigation of the shooting. The only possible purpose of introducing evidence of Mr. Torres's current prosecution is to impermissibly convince the jury that, because the State's Attorney's Office has stamped it with its imprimatur, Mr. Torres must be guilty.

In our justice system, criminal defendants are presumed innocent until proven guilty beyond a reasonable doubt. Mr. Torres, despite being charged with the murder of Eric Morro in May of 2009, still awaits trial. Given the substantial evidence, even today, that Plaintiff committed the murder, the chances that Mr. Torres can ever be convicted are vanishingly slim. Nevertheless, if Plaintiff is allowed to introduce evidence of Mr. Torres's current prosecution, the jury will inevitably be invited to conclude that the State's Attorney's Office is vouching for his guilt and that, for this reason, he is in fact guilty. Allowing evidence of the current prosecution against Mr. Torres will also create a mini-trial, risking confusing and distracting the jury, as well as consuming undue amounts of trial time.

In *Porter v. City of Chicago*, 912 N.E.2d 1262, 1272 (1st Dist. 2009), the Illinois appellate court upheld the trial court's barring of evidence that someone other than the plaintiff committed the crime. Significantly, the court observed that Mr. Simon, like Mr. Torres, maintained that he was innocent, rendering the evidence plaintiff sought to introduce unreliable. *See also Gauger v. Hendle*, 954 N.E.2d 307, 332-38 (2d Dist. 2011) (upholding the trial court's barring of evidence regarding how the "real killers" committed the crime and how the "real killers" were discovered).

Therefore, evidence or argument regarding Mr. Torres's current prosecution should be barred because any probative value is overwhelmingly outweighed by its prejudicial effect.

7. **Evidence or Argument Regarding the Alleged Withholding of the Polaroid Photograph and Inventory List As Well As the Federal Claims Against Defendant Schalk Already Dismissed on Summary Judgment Should Be Barred.**

This court granted summary judgment on Plaintiff's claim regarding the alleged withholding of the Polaroid photograph of Plaintiff and full inventory list contained within the Area File for the investigation of the murder of Eric Morro, filed under RD No. X-051839, as well as on Plaintiff's federal claims against Defendant Schalk. Therefore, evidence or argument regarding the alleged withholding of the photograph and inventory list, as well as any federal claims against Defendant Schalk, should be barred, including, but not limited to, Plaintiff's exhibit comparing two inventory lists Bates-stamped JIM 30 and TRJ 254.

**8. Phil Torres's Deposition Testimony Should Be Stricken.**

Phil Torres's deposition testimony should be stricken because he was incompetent to testify due to intoxication. At the beginning of Mr. Torres's deposition, he was asked directly whether he was of sound mind. Mr. Torres responded "No, I'm not." He then explained that he was not of sound mind "Because I get high." Later in the deposition, when asked whether he actually remembered the events of 1993, he reiterated "I told you I was high man." Therefore, because Mr. Torres specifically affirmed that he was not of sound mind due to his intoxication, his deposition testimony should be stricken.

**9. General Allegations the Police Officers Lie, Conspire, Cover-up, or Promote a Code of Silence to Protect Other Officers Should be Barred.**

Defendants are not seeking to tie plaintiff's hands at trial. In fact, defendants concede that questioning officers on bias and even arguing that the officers in this case are lying is clearly fair game. This motion is brought to seek exclusion of such general evidence, terms, and argument because it is not relevant to any jury determination, including credibility of the police officers. Therefore, such evidence would also be extremely prejudicial to the defendants.

Generalized statements are merely opinions and are not supported by the evidence. Evidence will be admissible at trial only if it makes the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed. R. Evid. 401 (West 2007).  At trial, the only relevant inquiry is whether the Defendants committed the specified misconduct against the Plaintiffs. Given this narrow question of fact, it is evident that general allegations of a police "code of silence" or similar assertion has no bearing on the jury's assessment of the defendants' conduct in this case. Moreover, even when evidence is relevant, it should be excluded if its prejudicial effect substantially outweighs its probative value. *See* Fed R. Evid. 403 (West 2007).  By allowing such prejudicial evidence, the jury might improperly infer that the Defendant Officers act in conformance with a general, prejudicial stereotype about the entire Department.

Even if general evidence of a police code of silence did have minimal probative value, this Court should exclude such evidence because its prejudicial effect substantially outweighs its probative value. *See* Fed. R. Evid. 403 (West 2007). *Shaw*, 1997 WL 187352, at *7; *and see Townsend v. Benya*, 287 F.Supp.2d 868, 876-7 (N.D. Ill. 2003) (barring phrases "code of silence", "cover-up" and "conspiracy" as unduly prejudicial).

Accordingly, this Court should bar Plaintiffs from presenting at trial any testimony, evidence or argument that police officers in general lie, conspire, cover-up or otherwise maintain a "code of silence" to protect their fellow officers.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court grant their motions in *limine* and enter an order precluding the plaintiff, his attorneys, witnesses or others from introducing evidence and mentioning in the presence of the jury the matters encompassed by these motions.

Respectfully Submitted,

13

DEFENDANTS

BY:

/s/ Joan E. Ahn
One of the Attorneys for Defendants

Andrew M. Hale
Avi T. Kamionski
Joan E. Ahn
Andrew M. Hale & Associates, LLC
53 W. Jackson, Suite 1800
Chicago, IL 60604
312-341-9646

## <u>CERTIFICATE OF SERVICE</u>

I, Joan E. Ahn, an attorney, hereby certify that on November 15, 2011, I caused DEFENDANTS' MOTIONS *IN LIMINE* to be served upon all counsel of record by filing the same before the Court via the ECF system.

<u>/s/ Joan E. Ahn</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-8081 |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | The Hon. Matthew F. Kennelly |
| Defendants. | ) | |

**PLAINTIFF'S MOTION *IN LIMINE* NO. 2 TO
BAR DR. MARK LEVY'S EXPERT OPINIONS**

Plaintiff Thaddeus, by his undersigned attorneys, respectfully moves this Court for entry

of an order *in limine* pursuant to FED.R.EVID. 702 barring Defendants from introducing the

expert opinions of Dr. Mark Levy.  In support, Plaintiff states:

1.      The defendant police officers have designated Mark Levy, M.D., a forensic

psychiatrist, as an expert witness on their behalf.  Levy's report, a copy of which is attached as

Ex. A, makes clear that Levy's purpose at trial will be to provide commentary on the credibility

of testimony that will be offered by Larry Tueffel.  Levy's proposed testimony fails the *Daubert*

test, would usurp the role of the jury and should be barred.

**Larry Tueffel's Anticipated Testimony**

2.      Larry Tueffel, the Court will recall, was present with Eric Morro when Morro was

fatally shot on the afternoon of February 3, 1993 in the 3000 block of West Belmont.  Tueffel

will testify at trial that Plaintiff was not the person who shot Morro and that the shooter instead

was an individual Tueffel accurately described at the scene as a 13-14 year old male Hispanic,

5'4 to 5'5, with curly black hair, wearing a "Purple Jacket with Yellow Lettering and/or #'s" and

baggy blue jeans.  Tueffel was 14 years old at the time of the Morro shooting.

3.     Tueffel will explain that, the morning following the murder, he was rudely awakened at his home between 2:00 and 3:00 a.m. by police officers who insisted that he accompany them to police headquarters without his parents.  Once there, Tueffel was hostilely and aggressively questioned by defendants, who told him they had evidence Plaintiff committed the shooting, called Tueffel a liar and accused him of covering up for Plaintiff.  When Tueffel continued to insist that Plaintiff was not involved in Morro's shooting, the defendants threatened to arrest Tueffel and send him to jail.  The defendants would not leave Tueffel alone and would not allow him to go home.  Tueffel caved to the pressure and, at the defendants' insistence, reluctantly named Plaintiff as Morro's killer.

4.     Tueffel felt considerable guilt and remorse for having testified falsely against Plaintiff.  In two 2006 interviews, Tueffel recanted to members of Plaintiff's legal team, telling the full story of his mistreatment by the defendant police officers and acknowledging that Plaintiff did not shoot Eric Morro.  Tueffel gave a video deposition under the Court's direct supervision, in which he related all of these circumstances.

### Dr. Levy's Opinions

5.     Larry Tueffel had a series of psychiatric hospitalizations, starting in his late teens—some three years following the events in issue.  Medical records reflect that he has been variously diagnosed as a paranoid schizophrenic and as suffering from schizoaffective disorder.  He has abused drugs and alcohol at various points in his life starting at the age of 14, the same age he was when he witnessed Morro's murder and lied about the real identity of the shooter.  He has also received a psychiatric diagnosis of polysubstance dependence.

6.     Prior to preparing the 67 page report that is attached as Ex. A, Dr. Levy had never met or spoken with Tueffel and, thus, was in no position to offer his own diagnosis of Tueffel's

2

psychiatric condition, if any.[1]  *See* 11/2/11 Mark Levy Dep. Tr. at 51-52 (portions attached as Ex. B).  Dr. Levy had not performed or requested a neuropsychological assessment of Tueffel (the battery of tests designed to evaluate various aspects of a person's cognitive functioning, including memory).  *Id.* at 48.  Nor had Dr. Levy reviewed any records of neuropsychological assessments performed by others at any time in the course of Tueffel's psychiatric treatment.  *Id.* at 48-49.

7.     Dr. Levy opines, generically, that persons with the diagnoses of paranoid schizophrenia and/or schizoaffective disorder "usually exhibit significant cognitive impairment including impaired memory."  Ex. A at 4.  He opines that this cognitive impairment increases over time.  *Id.*  He asserts that a history of heavy substance abuse over many years may also lead to impaired cognition (and memory).  *Id.*  And he claims that people with paranoid schizophrenia and/or schizoaffective disorder may be particularly naïve and trusting and capable of being "pied-pipered."  *Id.*

8.     As to Tueffel in particular, Dr. Levy devotes 41 pages of his opinion to deconstructing 27 excerpts of Tueffel's video deposition in which Dr. Levy claims to see evidence that Tueffel: (a) was compliant and susceptible to leading questions that may have altered his recounting of events; (b) was confused and may have confused reality and fantasy in his recounting of events; or (c) may have confabulated (that is, offered a made-up version of events as the truth).  *See* Ex. A at 9-50.  Dr. Levy opines that the possible susceptibility to leading questions, confusion of fantasy and reality and confabulation are consistent with the

---

[1]     Two days before his deposition and months after the submission of his report with his opinions in this case, Levy conducted a last-minute psychological assessment of Larry Tueffel.  As of the filing of this motion, Plaintiff's counsel have not been provided with a report regarding this assessment (although we have received Dr. Levy's notes thereof).  Not surprisingly, the psychological assessment failed to produce any material changes to Levy's previously fixed opinions with regard to Tueffel.

3

mental illnesses with which Teuffel has been diagnosed.  *See id.* at 6-8.

9.      It is apparent from the report what the defendant police officers plan for Dr. Levy's testimony at the trial:  He will offer generic opinions about the cognitive deterioration often associated with schizophrenia and other psychoses.  He will offer the opinion that paranoid delusions could have intruded on Tueffel's testimony, affecting his recollection of events.  *See id.* at 54.  He puts that proposition forward in his report even though, at his own deposition, Dr. Levy was forced to admit that he did not know whether that had occurred with respect to any aspect of Tueffel's testimony.  *See* Ex. B at 110-112.

10.      Without having taken any steps to evaluate Tueffel's own cognitive functioning, Dr. Levy will then go on to provide an elaborate discourse on Tueffel's credibility, dissecting every inconsistency and nuance in Tueffel's prior deposition testimony in order to cast aspersions upon the reliability of Tueffel's story.  In other words, Dr. Levy's role is to advise the jury that Tueffel is not a believable witness.   As he does in his report, Dr. Levy can be expected to testify, that specific answers Tueffel has given are, for example:

    a.      "possible confabulation" (*see id.* at 11);

    b.      reflective of  "compliance with leading questions" (*id.* at 13);

    c.      indicative of a "strong desire to affiliate with the 'team' from Northwestern" and/or to "avoid conflict" (*id.* at 17, 24);

    d.      a sign of "memory impairment" (*id.* at 21);

    e.      "really quite confused" (*id.* at 22); or,

    f.      fabricated, because Tueffel "doesn't actually remember" the matter in issue (*id.* at 25).

### Dr. Levy's Opinions Are Not Admissible under *Daubert*

11.      Expert testimony is admissible under FED. R. EVID. 702 only if "'the expert is

proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand

or determine a fact in issue.'"  *United States v. Hall*, 93 F.3d 1337, 1341 (7th Cir. 1996) ("*Hall*

*I*") (quoting *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993)); *see also*

*United States v. Parra*, 402 F. 3d 752, 758 (7th Cir. 2005) ("Expert testimony is admissible if

offered by a witness qualified as an expert by knowledge, skill, experience, training, or

education, and if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the

product of reliable principles and methods, and (3) the witness has applied the principles and

methods reliably to the facts of the case.") (quoting FED. R. EVID. 702).

12.      *Daubert* requires that an expert's testimony bear upon his field of expertise.  *Hall*

*I*, 93 F.3d at 1343.   Thus, the district court, in analyzing expert testimony for admissibility, must

"rule out 'subjective belief or unsupported speculation.'" *Porter v. Whitehall Laboratories, Inc.*,

9 F.3d 607, 613 (7th Cir. 1993) (quoting *Daubert*, 509 U.S. at 590).   In other words, the expert

must be able to aid the jury in understanding a disputed fact at issue in the case.  *Hall I*, 93 F.3d

at 1342, 1343 ("Unless the expertise adds something, the expert at best is offering a gratuitous

opinion, and at worst is exerting undue influence on the jury that would be subject to control

under Rule 403."); *see also United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("An

expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge,

or experience to formulate that opinion; the opinion must be an expert opinion (that is, an

opinion informed by the witness's expertise) rather than simply an opinion broached by a

purported expert.") (emphasis in original).  Dr. Levy's opinions fail this test.

13.      At his own deposition, Dr. Levy admitted that, in his extensive experience as an

expert witness, he has never before conducted an analysis like the one he did in this case, where

he scrutinized a deposition transcript for evidence that particular portions of a witness's

testimony might not be reliable.  *See* Ex. B at 84, 105-107.  Nor can Dr. Levy point to any

research studies or other scientific literature that explains how to go about performing an analysis

like the analysis Levy did of the Tueffel deposition.  *Id.* at 87-89.  With no body of scientific

research or scientific procedure that could be used to validate Dr. Levy's approach or the specific

findings he makes, it cannot be said that Levy's analysis of Tueffel's deposition answers and

Levy's impressions of the reliability of those answers is the "product of reliable principles and

methods."

14.     There are, of course, no experimental error rates associated with Dr. Levy's

analysis of Tueffel's testimony.  The truth is that the "analysis" is pure speculation that is not

grounded in science.  Dr. Levy's expertise as a forensic psychiatrist does not afford him any

special ability to analyze sworn testimony for "reliability" or to guess at the cognitive processes

that lie behind any witness's answers.  Such opinions are inadmissible under FED.R.EVID. 702

and should be barred from trial.

15.     Dr. Levy's planned attack on Tueffel's credibility, in other words, extends well

beyond the scope of his education, training and experience in forensic psychiatry and clearly "is

divorced from the scientific, medical, or other expert basis that qualifie[s] the witness in the first

place."  *Hall I*, 93 F.3d at 1344; *see also Mid-State Fertilizer v. Exchange Nat'l Bank*, 877 F.2d

1333, 1340 (7th Cir.1989) (rejecting an economist's "expert" opinion that drew on inferences

from the record rather than any economic expertise); *United States v. Lundy*, 809 F.2d 392, 935

(7th Cir. 1987) ("Courts agree that it is improper to permit an expert to testify regarding facts

that people of common understanding can easily comprehend.").

16.     Finally, Dr. Levy's proposed testimony in this case also runs afoul of the principle

that the *jury* is the sole judge of the credibility of witnesses.  It is hornbook law that the

credibility of a witness is not a proper subject for expert testimony and should be barred.  *Hall I*, 93 F.3d at 1343; *Klein v. Vanek*, 86 F. Supp. 2d 812, 817 (N.D. Ill. 2000) ("[C]redibility is not a proper subject for expert testimony.") (quotation omitted).  Whether a witness appears uncertain, whether his memory is vague, whether he wavers or is inconsistent are matters that our system trusts the jurors to evaluate, based on their life experience.  Dr. Levy's proposed testimony, therefore, would usurp the jury's role as fact-finder.  *See U.S. ex rel. Garrett v. Acevado*, 608 F. Supp. 2d 1005, 1017 (N.D. Ill. 2009) ("The credibility of witnesses and conflicts in testimony are to be resolved by the trier of fact.") (citing *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007)).

17.     The defendants, in sum, should not be permitted to call an expert witness whose only purpose at trial will be to hector Larry Tueffel and encourage the jury to disregard his testimony.  Training in psychiatry does not afford Dr. Levy or anyone else special insight into whether or not a witness is testifying truthfully (or "reliably," to use Dr. Levy's word).  The defendants should be barred from calling Dr. Levy to pretend to such powers of divination.

WHEREFORE, Plaintiff Thaddeus Jimenez respectfully requests that this Court enter an order *in limine* barring the proposed expert testimony of Dr. Mark Levy in its entirety.

Respectfully submitted,

**THADDEUS JIMENEZ**

By:   /s/   Stuart J. Chanen
One of his Attorneys

| | | |
|---|---|---|
| Arthur Loevy | Stuart J. Chanen | Locke E. Bowman |
| Jon Loevy | Lisa Castle | RODERICK MACARTHUR |
| Russell Ainsworth | VALOREM LAW GROUP | JUSTICE CENTER |
| LOEVY & LOEVY | 35 East Wacker Dr. | Northwestern University |
| 312 North May Street | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | | Chicago, IL 60611 |

<u>**CERTIFICATE OF SERVICE**</u>

I, Stuart J. Chanen, an attorney, certify that on November 15, 2011, I delivered a copy of this MOTION *IN LIMINE* NO. 6 TO BAR DR. MARK LEVY'S EXPERT OPINIONS via the Court's Electronic Court Filing ("ECF") system to all counsel of record.

_/s/ Stuart J. Chanen_____

Dated: November 15, 2011

SERVICE LIST

*Attorneys for Defendant City of Chicago*
Mr. Terrence M. Burns
Mr. Daniel Noland
Mr. Harry Arger
DYKEMA
10 S. Wacker Drive
Chicago, IL 60606

*Attorneys for Individual Defendants*
Mr. Andrew M. Hale
Mr. Avi T. Kamionski
Christina M. Liu
Joan E. Ahn
ANDREW M. HALE & ASSOCIATES
53 W. Jackson Blvd.,
Suite 1800
Chicago, IL 60604

# EXHIBIT A



Forensic Psychiatric Associates
Medical Corporation
655 Redwood Hwy., Suite 271
Mill Valley, CA 94941
415.388.8040

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

THADDEUS JIMENEZ,

Plaintiff,

vs.

CITY OF CHICAGO, ET AL.

Defendants.

Case No. 09-CV-8081

FEDERAL RULES OF CIVIL PROCEDURE RULE 26

FORENSIC PSYCHIATRIC EXPERT DISCLOSURE REPORT

BY MARK I. LEVY, M.D., D.L.F.A.P.A

**REGARDING LAWRENCE TUEFFEL,**

**HIS PARANOID SCHIZOPHRENIA &**

**HIS RECANTATION OF TESTIMONY**

May 8, 2011

Avi Kamionski, Esq.
Andrew M. Hale & Associates
53 W. Jackson Blvd.
Suite 1800
Chicago IL 60604

RE: *Thaddeus Jimenez vs. City of Chicago*
United States District Court, Northern District of Illinois, Eastern Division

Dear Mr. Kamionski:

**Mark I. Levy, MD DLFAPA**
Medical Director
Forensic Psychiatrist
Distinguished Life Fellow,
American Psychiatric Association
Diplomate American Board of Psychiatry
& Neurology - Psychiatry & Forensic
Psychiatry
(415) 388-8040
mlevy@fpamed.com

**Sarah A. Hall, PhD**
Forensic Adult, Child & Adolescent
Neuropsychologist
(415) 927-1310
shall@fpamed.com

**David Y. Kan, MD**
Forensic Psychiatrist
Diplomate American Board of Psychiatry
& Neurology - Psychiatry & Forensic
Psychiatry
Addiction Medicine & Substance Abuse
Specialist
(415) 812-1092
dkan@fpamed.com

**Anlee Kuo, MD, JD**
Forensic Child Psychiatrist
Diplomate American Board of Psychiatry
& Neurology, Adult, Child  Adolescent
Psychiatry & Forensic Psychiatry)
(415) 516-3621
akuo@fpamed.com

**Susan M. Meffert, MD, MPH**
Forensic Psychiatrist
Diplomate American Board of Psychiatry
& Neurology – Psychiatry
Individual & Group Emotional Trauma
(415) 513-7556
smeffert@fpamed.com

**Ronald H. Roberts, PhD**
A Professional Corporation, Forensic
Neuropsychologist
Diplomate American Board of
Professional Psychology (Forensic
Psychology)
Diplomate American College of Law &
Psychology
(415) 776-2000
rroberts@fpamed.com

**Charles Saldanha, MD**
Forensic Psychiatrist
Diplomate American Board of Psychiatry
& Neurology - Psychiatry & Forensic
Psychiatry
Administrative, Acute Care &
Emergency Psychiatry

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 2.

The following is my FRCP Rule 26 Report pertaining to the case
*Thaddeus Jimenez v. City of Chicago et al. 09 C 8081.*   Specifically, I
was asked to determine whether mental disorder or disorders are
revealed in the records of Lawrence Tueffel. Furthermore, I was asked
whether any mental disorders suffered by Mr. Tueffel may have affected
the reliability of his 2006 recantation of his testimony in two prior
criminal trials where he consistently identified Thaddeus Jimenez as the
shooter who killed Eric Morro in 1993. The sources of information
reviewed are listed below (see "Sources of Information"). In addition, I
was asked to discuss the significance of Mr. Tueffel's diagnosed
Schizophrenia, particularly with regard to his recantation of his prior
identification of Thaddeus Jimenez as the murderer of Eric Morro. In so
doing I have relied upon the psychiatric diagnoses given to Mr. Tueffel
by other psychiatrists and psychologists, as reflected in the medical
records.

My forensic psychiatric colleague, Charles Saldanha, MD, assisted with
both reviewing Mr. Tueffel's medical records and preparing this report.

## QUALIFICATIONS:

I am a graduate of Columbia College (A.B. 1967) and the Columbia
University College of Physicians and Surgeons (M.D. 1971). Since 1972
I have been licensed to practice medicine by the State of California and
since 2004 by the State of Hawaii.  I am a Diplomate of the American
Board of Psychiatry and Neurology in Psychiatry (1981) and Forensic
Psychiatry (1999, 2009). I have previously served as a Qualified
Medical Examiner ("QME") for the State of California (inactive since
1996).

I am also a graduate of the San Francisco Psychoanalytic Institute. I am
an Assistant Clinical Professor, Department of Psychiatry, School of
Medicine, University of California, San Francisco (where I currently
teach graduate psychiatrist Fellows within the Forensic Psychiatry
Fellowship) and am on the Faculty of the San Francisco Psychoanalytic
Institute. I am the founder and former Chairman and President of the
San Francisco Foundation for Psychoanalysis, a community outreach
public service organization.

In addition, I am a Distinguished Life Fellow of the American and
California Psychiatric Associations as well as the Northern California
Psychiatric Society. I am a member of numerous local, national and
international medical organizations including the American Academy of
Psychiatry and the Law and the International Society for the Study of

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 3.


Traumatic Stress. Since the early 1990's I have participated as visiting faculty in various Continuing Legal Education programs for attorneys including those sponsored by the Bar Associations for San Francisco and the State of California as well as by other non-profit legal organizations and private firms..

I have authored and co-authored approximately thirteen original articles on clinical and forensic psychiatric topics, including a chapter on "Deposing Psychiatric and Psychological Experts in Posttraumatic Stress Disorder Litigation," published in Chapter 716, *Lawyers' Guide to Medical Proof*, Volume 4 edited by Marshall Houts, J.D., LexisNexis Mathew Bender, 2002. I have also written on "Eggshell" Plaintiffs, Psychiatric Disabilities in Personal Injury Claims and Employment lawsuits, Causation of Mental Injuries and on Forensic Psychiatry in general. I am a frequent media expert and commentator on forensic, psychiatric and public mental health issues.

I have been in the full time private practice of psychiatry and psychoanalysis since 1975. In addition, I have practiced the subspecialty of forensic psychiatry since the early to mid-1980s. I currently devote the majority of my professional time to practicing forensic psychiatry. I have been retained as a psychiatric medical expert in more than 350 cases, have been deposed in excess of 200 times and have been qualified to testify as an expert in State and Federal Court on 38 occasions.

In approximately 36 years of private practice of psychiatry and forensic psychiatry. I have examined and treated many people with diagnoses of schizophrenia and related psychotic conditions. Cognitive impairments exhibited by Mr. Tueffel, particularly within the transcripts of his deposition, are similar to the cognitive impairments found in most people suffering from Schizophrenia and is similar to the cognitive impairment that I have personally observed in numerous other psychotic individuals.


See Appendix A, "Curriculum Vitae of Mark I. Levy, M.D." attachment.

## ASSIGNMENT:

I have been retained by defense counsel Andrew M. Hale and Associates as a forensic psychiatric expert in the matter of *Thaddeus Jimenez vs. City of Chicago et al*. I have been asked to address in general, what influence, if any, a chronic psychotic mental illness such as Paranoid Schizophrenia is likely to have upon the reliability of testimony offered by a person with this condition.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 4.


I have also been asked to review medical and legal documents pertaining to Lawrence Tueffel, a man with a history of the psychotic diagnoses of Paranoid Schizophrenia and Schizo-Affective Disorder, in order to determine whether Mr. Tueffel's testimony shows evidence of the kind of cognitive impairment usually found in people suffering from Chronic Schizophrenia.

## BRIEF SUMMARY OF OPINIONS

**GENERAL OPINIONS:**

1. **PEOPLE WITH DIAGNOSES OF CHRONIC PSYCHOTIC CONDITIONS SUCH AS SCHIZOPHRENIA, PARANOID TYPE, OR SCHIZO-AFFECTIVE DISORDER USUALLY EXHIBIT SIGNIFICANT COGNITIVE IMPAIRMENT INCLUDING IMPAIRED MEMORY. THIS COGNITIVE IMPAIRMENT OFTEN PROGRESSES OVER TIME REGARDLESS OF WHETHER THE PERSON IS ACUTELY PSYCHOTIC OR IN REMISSION.**

2. **PEOPLE WITH PARANOID SCHIZOPHRENIA AND CHRONIC PSYCHOTIC MENTAL ILLNESS MAY BE PARTICULARLY NAÏVE AND TRUSTING UNDER CERTAIN CIRCUMSTANCES. AS SUCH THEY ARE SUSCEPTIBLE TO BEING "PIED PIPERED," OR EASILY INFLUENCED AND COMPLIANT WHEN BEING QUESTIONED. FOR THESE AND OTHER REASONS  DETAILED BELOW, THEIR LEGAL TESTIMONY MAY BE UNRELIABLE.**

3. **PEOPLE WITH A HISTORY OF HEAVY SUBSTANCE ABUSE OVER A NUMBER OF YEARS, PARTICULARLY BUT NOT LIMITED TO CANNIBIS ABUSE AND/OR ALCOHOL ABUSE, OFTEN SUFFER OVER TIME CUMULATIVE AND CHRONIC COGNITIVE IMPAIRMENT THAT MAY EVENTUALLY AFFECT THE RELIABILITY OF THEIR MEMORY.**

**OPINIONS SPECIFIC TO LAWRENCE TUEFFEL:**

1. **11 OR 12 YEARS AGO AT AGE 19 OR 20 MR. TUEFFEL WAS ORIGINALLY DIAGNOSED WITH A CHRONIC PSYCHOTIC MAJOR MENTAL ILLNESS, EITHER PARANOID SCHIZOPHRENIA OR SCHIZO-AFFECTIVE DISORDER.**

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 5.

2. **IN THE DOCUMENTS REVIEWED, MR. TUEFFEL EXHIBITS MANY OF THE USUAL COGNITIVE IMPAIRMENTS ASSOCIATED WITH SCHIZOPHRENIA. IN A REMARKABLE VIDEO AND WRITTEN TRANSCRIPTION OF MR. TUEFFEL'S 2 DAY DEPOSITION TESTIMONY ON MARCH 3 AND MARCH 7, 2011, HE APPEARS TO BE SUSCEPTIBLE TO *BEING INFLUENCED BY LEADING QUESTIONS* AND TO *CONFUSE SPECULATION AND FANTASY WITH ACTUAL RECOLLECTION. AT TIMES HE ALSO APPEARS TO CONFABULATE.* THESE ARE TYPICAL SYMPTOMS OF THE COGNITIVE IMPAIRMENT ASSOCIATED WITH SCHIZOPHRENIA.**

3. **FOR SEVERAL YEARS APPARENTLY ENDING IN HIS MID-TWENTIES, MR. TUEFFEL HEAVILY ABUSED A VARIETY OF MIND ALTERING SUBSTANCES INCLUDING, BUT NOT LIMITED TO, ALCOHOL, MARIJUANA AND COCAINE. IT IS PROBABLE THAT HIS CUMULATIVE HEAVY EXPOSURE TO THESE PSYCHOACTIVE SUBSTANCES EVENTUALLY INTERFERED WITH HIS COGNITIVE FUNCTIONING AND WORSENED THOSE SYMPTOMS OF HIS SCHIZOPHRENIA.**

Mr. Tueffel's medical records consistently reflect a diagnosis of a chronic psychotic illness, either paranoid schizophrenia or schizoaffective disorder, with its onset in 1999 or 2000. There is also consistent evidence of a substance related disorder, most likely polysubstance dependence involving alcohol, marijuana, and cocaine, which became heavy during his late teens through his twenties. During the last few years he appears to be no longer abusing substances.

There is also evidence suggesting that Mr. Tueffel may have a learning disability or other cognitive impairment.

Within the documents reviewed, there are several indications of problems of reliability in Mr. Tueffel's statements, including inconsistencies between statements made at different times and even within a single deposition. It is significant that at the time of his original identification of Thaddeus Jimenez and his testimony supporting that identification in two separate criminal trials in 1994 and 1997, Mr. Tueffel was not yet psychotic. Nor, at the time of the two trials, had he yet accumulated years of heavy substance abuse eventually causing chronic cognitive impairment. However, in 2006 at the time that he recanted his testimony identifying Thaddeus Jimenez as the murderer

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 6.

of Eric Morro, he had already had multiple psychotic breaks, had been diagnosed with Schizophrenia, paranoid type, had been treated with antipsychotic medication for 7 years and had a twelve-year cumulative, history of substance abuse.

Furthermore, throughout the records we've reviewed, **he appears to be susceptible to being influenced by leading questions and to confuse speculation and fantasy with actual recollection. There are also instances of probable confabulation.** This observation is remarkably demonstrated throughout his two days of deposition testimony on March 3 and March 7, 2011. Consequently, I have quoted extensively from his deposition and annotated particular examples of these phenomena below. Furthermore, this observation is consistent with the well-researched psychiatric understanding of the cognitive impairments that are known to be associated with psychotic conditions.[1],[2],[3],[4]

**Factors Pertaining to Mr. Tueffel's Schizophrenia That May Affect His Reliability as a Witness:**

- In Schizophrenia, although so-called "positive symptoms" (hallucinations, delusions) usually respond to treatment with antipsychotic medication such as those prescribed for Mr. Tueffel, the cognitive symptoms often persist and contribute to chronic disability, including impaired executive functioning (problem solving), learning, memory and processing speed that are a core feature of the illness.[5],[6],[7] These significant cognitive disabilities may impair the accuracy and reliability of testimony from such individuals

---

[1] Prefrontal cortical circuits in schizophrenia.Volk DW, Lewis DA. Department of Psychiatry, University of Pittsburgh, *Curr Top Behav Neurosci*. 2010;4:485-508.

[2] True and false autobiographical memories in schizophrenia: preliminary results of a diary study, Pernot-Marino E, Schuster C, Hedelin G, Berna F, Zimmermann MA, Danion JM. *Psychiatry Res*. 2010 Aug 30;179(1):1-5. Epub 2010 May 15.

[3] Reduced levels of specific autobiographical memories in schizophrenia,  Riutort M, Cuervo C, Danion JM, Peretti CS, Salamé P,. *Psychiatry Res*. 2003 Jan 25;117(1):35-45.

[4] Types and characteristics of remote memory impairment in schizophrenia, . Feinstein A, Goldberg TE, Nowlin B, Weinberger DR, *Schizophr Res*. 1998 Mar 10;30(2):155-63

[5] Glutamate: New Hope for Schizophrenia Treatment, Kantrowitz,J.T, Javitt, D.C., *Current Psychiatry*, 10:4, Apr 2011

[6] Antecedents, symptom progression, and long-term outcome of the deficit syndrome in schizophrenia, Fenton WS, McGlashan, TH, *Am J Psychiatry*,1994;151(3):351-356.

[7] Premorbid IQ in schizophrenia: a meta-analytic review, Woodberry, KA, *Am J Psychiatry*,2008;165(5):579-587.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 7.

- Persons suffering from schizophrenia commonly exhibit particular problems with *autobiographical* memory. Autobiographical memory is a memory system consisting of episodes recollected from an individual's life, based on a combination of episodic (personal experiences and specific objects, people and events experienced at a particular time and place) and semantic (general knowledge and facts about the world) memory.[8] These memory problems, specifically associated with diagnoses of chronic psychotic conditions, often causes inaccurate recollection of events.[1,2,3,4] Thus, people with chronic Schizophrenia who suffer from impaired autobiographical memory are likely to be unreliable witnesses.

- Suggestibility stemming from problems with *reality testing*. Reality testing is the objective evaluation of situations, a process which is defective in Schizophrenia, enabling one to distinguish between the external objective world and one's internal world of subjective reality including fantasy and dreams. Impaired reality testing is a hallmark symptom of all psychoses. Mr. Tueffel's impaired reality testing make his "recollections" easily influenced and changeable by questioners urging him to "recall" specific facts. This core defect renders Mr. Tueffel an unreliable witness.

- Mr. Tueffel's impaired reality testing also causes him difficulty in trying to make sense out of disparate and confusing information. Among people with cognitive impairment from Schizophrenia, one solution to this dilemma is for them to confabulate false answers to questions, or to confuse false information with actual memories and be unable to clearly differentiate one from the other. Confabulation is one of the symptoms of the disabling cognitive impairment associated with schizophrenia that may render Mr. Tueffel an unreliable witness.

- Definition of Confabulation:
  In psychology, **confabulation** is the spontaneous narrative report of events that never happened. It consists of the creation of false memories, perceptions, or beliefs about the self or the environment—usually as a result of neurological or psychological

---

[8] Williams, H. L., Conway, M. A., & Cohen, G. (2008). Autobiographical memory. In G. Cohen & M. A. Conway (Eds.), *Memory in the Real World* (3rd ed., pp. 21-90). Hove, UK: Psychology Press.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 8.

dysfunction. When it is a matter of memory, confabulation is the confusion of imagination with memory, or the confused application of true memories.

- In his videotaped statements and deposition testimony, Mr. Tueffel exhibits a strong desire for the approval of others and for affiliation with them, i.e., to "cooperate" in order to be accepted as "part of the team." These wishes probably cause him, either intentionally or unintentionally, to adapt his narrative of events to suit what he believes are the wishes of those who are questioning him, such as deposing attorneys and investigators. This strong tendency makes him an unreliable witness

- Acquired problems with cognition related to Mr. Tueffel's cumulative history of heavy substance abuse from his late teens and twenties, especially with cannabis, alcohol and cocaine, is likely to have impaired his cognitive processes[9].independent from his Schizophrenia. Therefore a history of cumulative substance abuse alone may render him to be an unreliable witness.

- Mr. Tueffel who has been diagnosed with Paranoid Schizophrenia, realistically or unrealistically may have feared retribution from Thaddeus Jimenez or others, compelling him to recant. If this were so, it would make him an unreliable witness.

- Due to his chronic Schizophrenia, Mr. Tueffel is vulnerable to the intrusion of delusional thinking regarding the events relevant to the case. This vulnerability too would make him an unreliable witness.

**EXCERPTS FROM LAWRENCE TUEFFEL'S DEPOSITION TRANSCRIPT ILLUSTRATING HIS BEING INFLUENCED BY LEADING QUESTIONS & SUGGESTION, CONFUSING SPECULATION AND FANTASY WITH RECOLLECTION, AND APPEARING TO CONFABULATE:**

---

[9] Changes in neuropsychological functioning over 10 years following adolescent substance abuse treatment, Hanson KL, Cummins K, Tapert SF, Brown SA,.*Psychol Addict Behav*. 2011 Mar;25(1):127-42.

.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 9.


**Deposition of Mr. Tueffel dated March 3 & March 7, 2011**

This is a very important document which, when combined with the video recording, illustrates repeatedly how easily influenced Mr. Tueffel's responses to questions can be, due to his schizophrenic mental disorder. I have witnessed this phenomenon repeatedly in my 35 years of clinical practice. This is due to various factors including their progressive cognitive impairment, their profound emotional immaturity and naiveté, their desire to avoid conflict and, under certain conditions, their loneliness and desire to affiliate. Due to these factors, people with severe mental illness may be unreliable witnesses. The cognitive impairment present in people suffering from chronic paranoid schizophrenia persists regardless of whether they are mentally "compensated" during periods when they are taking appropriate antipsychotic medication. These drugs markedly reduce the psychotic levels of anxiety that can cause dramatic breaks in perceptions of reality such as delusions or hallucinations. However, these medications do not reduce the other factors listed above which impair the accuracy of their memory and may render their testimony unreliable.

Mr. Tueffel was deposed for several hours spanning two days. He was deposed in the jury room of Judge Kennelly with the judge available to supervise. The record indicates that he met with the judge in advance of the deposition and assured Judge Kennelly that he had taken his medications, had adequate sleep, and was ready to go. The judge described his role as being there to protect him.

Mr. Tueffel was examined first by Stuart Chanen, an attorney representing Thaddeus Jimenez in this lawsuit. Mr. Tueffel confirmed that he took medication, but only at night time.

In describing the events of the shooting, Mr. Tueffel described that he had been hanging around with Mr. Morro and that Mr. Morro was homeless as his family had moved away. Mr. Tueffel described having fed him and giving him a jacket to wear. He described Mr. Morro asking him if he wanted to go to Shawn Cosmen's house because Mr. Morro was staying over there.

Mr. Tueffel said that the two of them were heading down Belmont when he noticed two guys coming around the corner. He stated that one of the two guys said that Mr. Morro owed Leo money. He said that he did

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 10.

not recognize this person but recognized the second person from
school.

Mr. Tueffel recalled that he saw one guy pull a gun from his pocket. Mr.
Tueffel confirmed that he and Mr. Morro kept walking and that soon
thereafter Mr. Morro and the guy with the gun got into a scuffle. He
recalled that Mr. Morro was overpowered and the gun was stuck to his
chest and Mr. Morro was shot. He said that the person who originally
showed the gun shot Mr. Morro. He then recalled running away through
an open lot to an alley. He then ran back to Mr. Morro. Mr. Tueffel said
that no one had been on the street at the time of the shooting and that
after he came back he saw multiple people on the street. He recalled
that the ambulance and police came.

He recalled being in a police car and that Phil Torres was also in the
police car. He did not recall how he was identified as a witness. He
recalled that before police officers questioned him Phil Torres
questioned him asking him if it was TJ. He described himself as saying,
"no, no, no, it wasn't." He recalled that Phil Torres got out of the car and
that he stayed in the car and that was how he got to the station. He did
not recall being asked questions on the street and in the squad car. On
the way to the police station, he recalled hearing over the radio that Mr.
Morro had died. He described the events as traumatic and beyond
anything he had seen. When asked whether he was crying, he initially
said yes. He then said, "I probably was." Then, "I'm pretty sure I was."

<span style="color:red">Excerpt 1 page 25</span>

Q. And I assume that was very traumatic for you?
A. Yes, it was. I was just in shock. I couldn't
even believe that somebody could pull a trigger like
that, you know. I was like -- It was beyond anything
I've ever seen. I mean, I never -- I never thought that was going
to happen. I thought maybe a little argument
and we were going to be on our way to the Cosmens' house
and everything was going to be fine for that night. You
know, I never -- I didn't know what happened. I was
just in shock, I mean.
Q. Were you crying in the backseat of the squad
car --
A. Yes.
Q. -- when you heard that Eric had died?
A. I probably was. I'm pretty sure I was.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 11.

When shown a photo of a police officer, Mr. Tueffel initially said he did not have any memory of speaking to him that night. He then said that he looked familiar. He then speculated that he was probably one of the police that were around the neighborhood. He then said that this was a police officer that took him away on another occasion.

**Excerpt 2 page 25**
**Suggestibility - Confusing speculation with recollection:**

Q. (Mr. Chanen) All right. I'm going to show you a picture that **we're going to** mark as Tueffel 3 and **ask you if you recognize this picture?**
A. This **looks like a police officer** to me.
Q. Okay. (suggestion) **Do you have any memory of speaking to this police officer that night**?
A. **No, I don't have any memory** as far as I remember. (complying with suggestion) I can't -- **He looks familiar.** I mean, (speculation) **he's probably one of the police that was around the neighborhood and I seen him before for other things because a lot went on in that neighborhood**, you know, and the police were always around.
Q. (Laying the foundation for suggesting the identity of police officer and a connection with the Royals gang   ) **And did the policeman -- Were you involved in a gang at that point?**
**A. Yes, I was.**
**Q. And was that the Simon City Royals?**
**A. Yes, it was.**
**Q. And were you -- As a 14-year-old, were you considered a peewee Royal?**
**A. Yes, I was.**
Q. Okay. (leading) **And did the police --**
A. (compliance)**You know what? Now that I remember** -- I'm sorry to cut you off.
Q. That's okay.
A. (possible confabulation in effort to comply with expected answer) I went to jail one time because my parents were drinking on the front porch and they wouldn't stop. So they put me in the squad car for them and they just said go ahead, take him, and I went to -- I've been locked up and **I think he was the one that was in the front seat that were warning my parents** because it was a

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 12.

real big party over there. I mean, people were out there drinking.
It was summertime.
Q. And did they take you -- Did this police
officer take you under the guise of juvenile
protection?
A. They never did that -- Yeah. You know, he
just arrested me and took me to the station, and my
parents had to get me out earlier -- I mean later on,
later on. <span style="color:red">(total compliance with suggestion)</span> **But he does look
familiar. That was the cop that was always around there
looking at the Royals all the time and stuff.**
Q. All right. <span style="color:red">(final suggested conclusion)</span> **You think this is one
of the beat cops that was in the same area where the Royals
had their activities?**
<span style="color:red">**A. (mission accomplished)**</span> **Yes.**

Mr. Tueffel recalled giving a description of the shooter as white
complexioned with curly hair and wearing a jacket that was maroon and
yellow. He recalled being very specific. He recalled knowing that the
gun was a 22 or 25 automatic and that he was aware of this because of
his gang affiliation.

He reported having spoken to a couple of police officers and "some
other guys" in a small room at the station. He recalled that when he
came home his mother and stepfather were there with his half-brother.
He did not remember what, if anything, he told his family when he came
back.

Mr. Tueffel reported that the police came back and were screaming that
he needed to come back to the station. He described them as having
been banging on the door. When asked whether his parents were
advised of why he was being taken to the station, he initially said that
he did not remember, but then said that he didn't think that they were.

He recalled trying to tell the police that Mr. Jimenez was not the
shooter. He recalled the police told him he was lying and that they had
other witnesses and threatening him that he would go to jail too. He
indicated that the police thought he was trying to cover for Mr. Jimenez.
He described himself as having been scared and in shock. He recalled
that he became exhausted. He did not remember how he returned
home. He did not recall whether they held him for a while after he told
them that the shooter was Mr. Jimenez.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 13.

Mr. Tueffel denied having any contact with the police between when he was taken home from the lineup and when he was needed for testimony. He recalled that he didn't want to go to court because he knew it was wrong and the wrong guy was getting blamed. He recalled being arrested and put in the Audy Home. He insisted that he was always trying to warn someone that Mr. Jimenez was not the shooter. He recalled a time when a police officer came to pick him up from home to go testify and he told the officer that he did not want to go and that they had the wrong guy. He recalled his mother telling him to tell the truth.

Mr. Tueffel explained that he had been threatened a great deal after the shooting. He recalled that the real shooter wanted to shoot him to keep him quiet. He recalled that one of his friends, Joey, stuck up for him and told one of the shooter's friends to tell him to back off.

Mr. Tueffel described that he had both the Royals and Triangles street gangs after him. He said that unidentified adults beat him up when he was 16 or 17. He recalled how he felt guilt about Mr. Jimenez being in jail and that he never wanted to send him to prison.

At one point, Mr. Tueffel stated he had "no clue why" he testified against the wrong person. He said that he just did it and was scared and that he lied. When asked about talking in a low voice and then asked whether it was hard to say the wrong name, he answered in the affirmative. When asked whether he was ashamed, he answered in the affirmative.

**Excerpt 3 page 62**
**Complete compliance with leading questions:**

**Q. And was it hard for you on the witness stand**
**to say the name of the wrong person?**
**A. Yes, it was.**
**Q. Were you -- Did you feel somewhat ashamed?**
**A. Yes, I did.**
**Q. And was that one of the reasons why you**
**couldn't state clearly in a clear voice that he was the**
**shooter?**
**A. Yes.**

He recalled telling his mother, while in the elevator at the 1994 trial, that they had the wrong guy. He conceded, "I was so paranoid and stuff that I was going to get in trouble, you know, that I just didn't say anything."

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 14.

He claimed at this point in the deposition that he went to a church and told a priest on one occasion. He recalled that he went to the church and wanted to give a confession. Later in the deposition he admitted that he never actually talked to the priest. He described having gone because he was feeling guilty and having always wanted to correct it. He explained that he was afraid of vengeance being taken if he tried to set it right. He recalled there was a time they had the right guy but that he couldn't point him out because he was so scared about what might happen.

Excerpt 4 page 64

Q. Tell me about telling your mother. When was
the first time that you recall --
A. Oh, it didn't come out until later on, you
know.
Q. Approximately how old were you?
A. Probably at the '94 trial, like I said, when
we were downstairs in the elevator I told her, you know,
they got the wrong guy; and she -- I was so paranoid and
stuff that I was going to get in trouble, you know, that
I just didn't say anything. I just lied, you know.
Q. Okay. So, so far you've mentioned the
policeman and your mother?
A. Uh-huh.
Q. And when you were a few years older, did you
tell anyone else?
A. I just bottled it in after that because so
much stuff happened. I just kept it inside and didn't
say anything. I didn't tell nobody else, you know.
Q. Okay.
A. I mean, I -- one time I went to a church and I
told the priest, you know. They tried to track down the
priest and everything.
Q. Before -- I'm sorry to interrupt, but before
we get to tracking him down, let's go back to that.
Approximately when did you go to a church?
A. I don't -- I think when I was living in that
neighborhood. This was back in maybe '97, '98.
Q. Okay. And when you say that neighborhood,
what neighborhood was that?
A. By Fullerton and Cicero, the St. Genevieve's

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 15.


Church.
Q. Okay. So you went to St. Genevieve's
Church --
A. Yes.
Q. -- to talk to a priest? Is that --
A. I was -- That was -- Yes.
Q. And it was during --
A. I wanted to have a confession, you know, make
a confession like you do because I was raised Catholic
and all that stuff, you know. I wanted to tell
somebody. I just didn't know who to turn to, and I went
to the church.
Q. All right. Stop there for a second because
of -- I want to make sure we go in a logical order.
This was a period of time when you were living near
Fullerton and Cicero?
A. Yes. And the Royals were looking for me
around there, too.
Q. Okay. And you went to a church at -- called
St. Genevieve?
A. Yes.
Q. And that's located at Fullerton and Cicero?
A. Yes.
Q. All right. And then my question is: When you
went into the church to talk to the priest, was this in
a formal confessional setting or an informal setting?
A. <span style="color:red">(Recantation of claim that he spoke to a priest)</span> You know
what? I didn't get a chance to talk
to a priest in the confession booth like you do.
Q. Okay.
A. My intentions were to go in there and tell
somebody, you know.
Q. Okay. Did you talk to a priest outside of the
confession room?
A. No, I didn't.
Q. Did you ever talk to any priest at
St. Genevieve about --
A. No, I never went through with it.
Q. Okay. Why didn't you go through talking to
the priest?
A. I -- I -- There was nobody around and I didn't
know what to do, and I just took -- I just walked out of
the church and left.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 16.

Q. So you went into the church with the purpose
of talking to a priest?
A. Yeah, yeah, (the claim that he confessed to a priest was false)
but I never went through with it.
So the only one that really knew that -- besides me, I
mean, I told my mom and stuff, but she -- you know, she
told me what to do when we were in court and I didn't,
you know, and that was on my conscience for a long time,
you know. And I never went -- My intentions were never
for this to get this far like that, you know, and it's
just terrible.
I mean, it was a terrible thing, that the
wrong -- the other guy was scot-free too, and that was
on me too. And just all the pressure and then I had
problems at home and stuff, and I never said nothing again. I just
kept my mouth shut, you know, and didn't
say anything.

(A short break)

Q. Mr. Tueffel, when we last broke you had
just -- were telling us that you had gone into
St. Genevieve's Church at Fullerton and Cicero with the
intent of talking to a priest?
A. Yes.
Q. But you never actually --
A. No, I didn't.
Q. -- spoke to a priest?
A. I didn't go through with the confession.
Q. Okay. What was it that you intended to tell
the priest when you entered the church?
A. I just thought I could -- You know, I figured
I could trust the priest, you know, and just to let
somebody else -- I can get it off my chest, you know,
just tell somebody, an adult.
Q. Were you feeling guilt about the fact that you
had --
A. Yes.
Q. -- testified against TJ?
A. Yes.
Q. And were you trying to find some way to
correct what had happened?
A. Yeah. I always wanted to correct it. I just

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 17.

didn't know how -- about going -- about how to do it.
Q. Okay. And did you have fear -- If you made
attempts to try to correct it, did you have fear that
the person who had seen you next to Eric might take some
action against you?
A. Yes.
Q. Okay. And so you were going to -- the initial
intention was to talk to the priest to confess that you
had testified falsely in court?
A. Yes.

Mr. Tueffel stated that he did not warn anyone because they had in their
minds that it was Mr. Jimenez. He recalled that one time the real
shooter was brought to the courthouse area. He confirmed that he did
not say anything at that time and they let him go.

Mr. Tueffel was asked about telling someone that he falsely testified
when he was at Somerset Place. He recalled that people from
Northwestern University came to see him. He recalled that Luke Netzel
came to see him. He said that he remembered this clearly and that he
was asked about Mr. Jimenez and that "right off the bat" he told him that
"the guy's innocent."

Excerpt 5 page 73 talking about meeting Luke Netzel
Strong desire to affiliate with the "team" from Northwestern

Q. All right. And what did Mr. Netzel say to
you?
A. I was coming down from the stairs because I
was on the fourth floor and it was time for lunch. This
is like 12:00 o'clock. I'm sorry. This is like 12:00
o'clock and it's lunchtime because we get our meals
three times a day. And I was coming down and Luke
Netzel was in the hallway and he introduced himself. He
said I'm a private investigator in dealing with the --
do you know Thaddeus Jimenez, and he started asking me
questions about him; and I said yes, I do. And right
off the bat, I told him the guy's innocent, you know.
Right there I just let it out and I said he's innocent.
Q. All right. Other than telling the police
officer in your mother's kitchen and telling your mother
near one of the trials, was this the first person who
you had --

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 18.

A. I figured maybe I can get -- fix this thing I
thought in my mind. I just let it out. I said yes,
he's innocent.
Q. And do you remember when this occurred
approximately?
A. Approximately it was in the summertime, I
think.
Q. Was --
A. Or early spring it might have been. And he
came in and he introduced himself, like I said, and I
told him plain off the bat; and he goes all right and he
gave me his card, and then he said we might come back.
And that's how I started knowing the people from
Northwestern.
Q. All right. We're going to get to that in a
second. We're going to move right to your next
conversation with some Northwestern people. But before
we get to that, I just want to make sure we've covered
everything regarding Mr. Netzel.
A. <span style="color:red">(He's eager to affiliate, to belong to the team)</span> I shook his
hand. I said if you have any
questions feel free to come back here, there's pay
phones, you can get ahold of me, you can get ahold of my
nurses that live on the floor, you can get ahold of me;
you know, there's always a way to get ahold of me here,
this is my residence I told him.
Q. All right. Did Mr. Netzel do anything at all
to try to coerce you to change your story about TJ?
A. No, no, he didn't. He didn't force nothing on me. He didn't say
anything, try to get me -- to force me to say anything. I just came
out and said it on my own. He never took any action or
threatened me or anything.
Q. All right. Has anyone else other than
Mr. Netzel in any way threatened you or tried to offer
you any inducement to change your story against TJ?
A. No.
Q. Okay. This is something you did voluntary
when Mr. Netzel --
A. I voluntarily said because I found out he was
a -- he told me he was a private investigator regarding
the situation. I said yes, I know about it and, yes,
this guy is innocent and, yes, I gave him – <span style="color:red">(strong desire to
affiliate, be part of the team)</span> you can catch me here anytime, you

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 19.

know, there's a curfew. I told him how to get ahold of me, there's
pay phones, you know, there's the phones upstairs, you can get
ahold of me here. And then that's when it took off from there
after that.

Mr. Tueffel maintained that Mr. Netzel had not tried to coerce him and
that he was not threatened or induced by anyone else to change his
story. He said that he felt great telling Mr. Netzel about what happened.
When asked whether the Northwestern people told him what to say or
tried to put words in his mouth, he said no. When asked whether they
requested permission to make a video statement, he answered, "yes,
they did, and I went along with it and said yes, they can. Anything they
need, just get ahold of my -- I agreed to that. I did agree to that." Mr.
Tueffel confirmed, regarding the Northwestern people, that "I know I
was trying to do everything to cooperate with them the best that I could.
To my knowledge, that's what I was doing, cooperating."

<span style="color:red">Excerpt 6 page 80</span>

A. And I agreed to everything they were doing. I
signed some stuff. I think I signed some stuff. I
don't remember too good. But I know I was trying to do
everything to cooperate <span style="color:red">(he's eager to comply, cooperate, be
accepted)</span> with them the best that I could.
To my knowledge, that's what I was doing, cooperating.
I told them -- They kept me posted and everything. She
would call me and let me know how the stuff is going,
you know, and -- Because there were pay phones and she
would call me and ask for me because that was the only
way to get ahold of me really because if you go through
the staff phone it was really hard to get ahold of
somebody over there.
So she used to call me on the pay phone. I
gave her the pay phone number where she could get ahold
of me and my room number and everything, and that's how
we -- this went on like that.

Mr. Tueffel said that the video statement was voluntary, not coached,
and truthful. He said that he recanted everything he said during the
trials. He described himself as having developed a "friendship" with
Alison Flaum over this.

<span style="color:red">Excerpt 7 page 91 re feeling of belonging, affiliation</span>

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 20.

> Q. And previously you talked about staying in
> touch with Ms. Flaum and that she contacted you at
> Somerset?
> A. She kept me posted on everything while this
> went on. The whole time she would call me every other
> day and let me know -- not every other day, but --
> Q. From time to time?
> A. Time to time she would call me. I knew right
> away when I got a phone call over there it was -- you
> know, it was her.
> Q. Okay. During that period --
> A. <span style="color:red">(a friendship with Ms. Flaum)</span>
> We developed like a friendship over all this
> when this happened, you know.

Mr. Tueffel recalled that when he met with the Morro family they were angry. He indicated that he told them that he said that Mr. Jimenez was the shooter because nobody believed him. He also recalled having been truthful with State's Attorney's Office investigator Brian Killacky.

Mr. Tueffel explained that he knew Victor Romo but did not know his name at the time of the shooting. He confirmed that he would have been able to identify him. He recalled that he told the police that he knew the second person from school. He recalled telling Celeste Stack and Brian Killacky that one of the reasons he had not implicated Juan Carlos Torres was fear that he would kill him.

Mr. Tueffel acknowledged that he had psychological problems prior to seeing Mr. Morro shot. He agreed that his 2009 suicide attempt was caused or made worse by guilt. He agreed that it made it hard for him to function.

Mr. Tueffel explained that when he was at Somerset Place he was on two different medications. He also explained that he believed his suicide attempt was related to being on the wrong meds. Later in the deposition, he was unable to recall the name "clozapine," the antipsychotic he took for most of his stay there. He did correctly recall the name Zonegran (an anticonvulsant used to treat mood disorders) as one of his medicines.

<span style="color:red">Excerpt 8 page 363 re meds</span>

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 21.

Note he believes Zonegran to be for schizophrenia - memory
impairment - he only took 2 drugs for years at Somerset but cannot
recall the name of the common schizophrenia drug Clozaril (aka
clozapine). Zonegran is a much less common anticonvulsant
occasionally used with mood disorders. One of my points is that the
cognitive impairment associated with chronic schizophrenia is
progressive over time, REGARDLESS of whether or not one is
intermittently compensated (i.e. not acutely psychotic) at various times.

> Q. Okay. You had mentioned I think at your last
> session of the deposition that when you were at Somerset
> in 2006 when Luke came to see you that you were on two
> different medications?
> A. Yes.
> Q. And I don't think you were asked what two
> medication were those?
> A. I think one of them was Zonegran. I know one
> of them for sure was Zonegran, and I don't remember what
> the other medicine was. It might have been Depakote or
> a mood stabilizer.
> Q. Do you remember why you were taking the
> Zonegran?
> A. It was for my mental illness.
> Q. Which was what at the time?
> A. For my schizophrenia. (Not true, Clozaril was his drug for
> Schizophrenia that he took for years)

Mr. Tueffel repeated that the police were screaming at him and that
they "interrogated me real bad." Mr. Tueffel denied that the police said
that they wanted him to say Mr. Jimenez was the shooter. He said that
he didn't think it was fair of them to come get him at night and
interrogate him without parents or adults.

Mr. Tueffel recalled that Mr. Chanen had told him that he was going to
"prep me or something" for being deposed.

Mr. Tueffel recalled that Roger Sandoval began coming to his
residence. He recalled Mr. Sandoval showing him pictures of guys that
he didn't know. He did not recall Mr. Sandoval being clear about what
side of the dispute he was on. He recalled telling Mr. Sandoval that he
did not blame the police. He stated that he did not say nor was given an
opportunity to say to Mr. Sandoval anything about the police yelling at
him. He recalled that Mr. Sandoval came to see him with Mr. Hale.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 22.

Excerpt 9 page 151 re Sandoval coming by to speak with him. Note he claims to be bothered but yet is compliant. He is really quite confused about who Sandoval was and unable to clearly comprehend, he chooses to comply – his default position to avoid aggression, almost at all costs. Typical behavior by people with chronic Schizophrenia.

Q. All right. Did Mr.- -- You started to say
before, I believe I heard you say, that Mr. Sandoval was
not completely clear on which side of the dispute he was
on?
A. Yeah. I don't even know why he was coming by
bothering me, you know. I just -- That's how -- that's
how it became -- When I told Steve that's how he got
involved and said this is enough already, it's going too
far, you've got all these people coming to your house.
Q. Did Mr. Sandoval at any time identify which
side of the dispute he was on?
A. He never identified any of that with me. He
just kept on coming by like a couple days looking for
me. I don't know why. I just don't know --
Q. And what kinds of questions would he ask you?
Questions about the murder? (suggested answer)
A. He was asking me, yeah, stuff like that. (compliant response)
Q. All right.
A. But I didn't give him the whole story and told
him everything. I was just -- He'd come by for a couple
minutes and then just leave and --
Q. And did they --
A. They were trying to keep in contact with me,
but they weren't letting me know what for. I didn't
know -- Because every time I'd relocate somewhere, some
guy pops out of nowhere and doesn't explain or anything.
They just ask me stuff and then, you know...
Q. Well, when you had been interviewed --
A. I didn't understand why he was coming by -- Is
it to give me another paper, to tell me to be here, or
-- He didn't explain much. He just kept on coming by
asking me these questions. (The problem here is that Sandoval,
as contrasted to Flaum, is not seducing him into the affiliated
relationship that Tueffel wants. He wants to be part of the team.
Which side he's on is less important. Sandoval didn't welcome

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 23.

him onto the team.)
Q. All right. Let's stop there a second. Did
there come --
A. It was about -- He asked me a question about
the police, though, I think it's the police's fault, and
I said I don't blame the police, you know. I said I'm
not blaming anybody, (wants to avoid even the *appearance* of
conflict. Typical behavior of compensated schizophrenics) I just
wanted to get this fixed or
whatever --
Q. Okay.
A. -- you know.
Q. Did you say -- Did you describe to him or did
he give you an opportunity to describe to him the
details that you provided in your deposition today about
the police yelling at you and --
A. No, he didn't say anything like that. He just
said do I blame the police, and I said no, I don't blame
the police, I don't hate cops, I don't hold that against
them, whatever happened. I told him that. I said, you
know, I told -- That's exactly what I told him. (again, wants to
avoid even the *appearance* of conflict when speaking with
Sandoval.)
Q. Okay. Did you tell him, though, that you
believed that the questioning of you at 4:00 and 5:00
and 6:00 in the morning when you were a 14-year-old
boy -- did you describe that to Officer Sandoval as
coercive?
A. I don't -- I don't -- He didn't -- I really
didn't explain to him about that situation. He just was
coming by. He asked me that question and I told him I
don't blame anybody for what happened, I don't blame the
police or anything. That's all I can remember, and
then --
Q. All right. And then at a different time,
Mr. Sandoval came with other people, correct?
A. Yeah. He came with some other guy.
Q. All right. And one of them was Mr. Hale who
stood --
A. Yes, yeah.
Q. All right.
MR. HALE: Object to the leading, but go ahead.
BY THE WITNESS:

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 24.

A. 6540 North Seeley. I didn't recognize him. I
only seen him like once.
Q. Okay. Did the people who were with
Mr. Sandoval identify themselves to you?
A. Yes.
Q. Did they say whether or not they were lawyers?
A. They didn't say if they were lawyers or police
or any -- I don't remember because, you know, I had
things going on in my apartment. All I know is people
kept on coming by asking me stuff. Roger -- Roger was
trying to keep contact and I told him to come back any
time if you need to ask anything and... (again, avoiding conflict,
complying, cooperating are very important to Tueffel. He wants
very much to affiliate.)
Q. All right. But on this particular day, Roger
came by your apartment with two other people?
A. Yes.
Q. Okay.
A. I think I've explained it -- I explained some
of the story to them, you know.

Mr. Tueffel recalled having signed a couple papers, but did not know
what they were. He said "I probably signed some stuff." He explained
that he did not know why he signed but speculated that he was trying to
cooperate. He stated that concerns about him being taken advantage of
potentially had to do with his Aunt Yolanda's significant other Steve
cutting off access to him.

Mr. Tueffel acknowledged being confused because of all the different
people showing up. He acknowledged having difficulty remembering
who had given him what. In looking at a document he signed, he was
able to identify his own signature but did not remember who gave it to
him. When asked whether he had a memory of reading 15 statements
before signing it, Mr. Tueffel replied that he had to have read them
before signing it. (in order to make sense out of what he cannot
remember, he must speculate and assume his speculation to be true)

Excerpt 10 page 159 regarding signing the statement

A. I have no -- I don't know where this came
from. Oh. Okay. Here it goes. I must have seen this
before, (speculating) but I don't know who gave it to me.
Q. Okay. And as you sit here today, Larry, you

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 25.

have no memory of ever having seen this before; is that
correct?
A. I had to see it before because it's recent. (He cannot
remember whether or not he saw the document. This is a
cognitive dilemma for him. He wants to comply with what he may
perceive to be Chanen's suggestion. He must use circular
reasoning to "prove" to himself that he saw the document
previously. This is an example of unreliable testimony typical of
people with the cognitive impairments associated with chronic
psychosis like Schizophrenia)
Q. I understand.
A. 8-20-2010. Somebody gave this to me, (he doesn't actually
remember this. But he cannot say that. So he speculates, he
"invents" a reasonable explanation. That is confabulation, a
symptom of people with cognitive impairment) but I
don't remember who, if it was Roger or if it was a cop
or -- See, I'm confused because all these different
people keep showing up and I can't remember who gave me
what.
Q. All right. So stop one second. Did you tell
the boyfriend of your Aunt Yolonda, Steve Tomeres, that
people kept showing up at your house and that they were
getting you confused about statements related to the
Thaddeus Jimenez case? (1st suggestion of "people kept
showing up at your house and they were getting you confused."
In other words, "I'm on your side. I understand what the other
side has been putting you though.)
A. This is in August. This is before I moved
with Yoli and Steve.
Q. I understand. You're still living at Seeley
in August of 2010, correct?
A. Yes.
Q. So here's my question. As you sit here today,
you don't -- you agree that's your signature, correct?
A. Yes, that is my signature. I just don't
remember who gave it to me.
Q. You don't remember who gave it to you and you
don't remember signing it, correct?
A. I don't remember signing it.
And is it also fair to say you don't remember
reading the statements in this report, in this
statement? (suggested answer)
A. It's fair to say that. (compliance)

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 26.

Q. Okay. And did you at one point say to Steve
while you were still living at Seeley but before you had
moved in with Steve and Yolonda -- did you say to Steve
that you were starting to get -- that people kept
showing up at your house to get you to sign statements
regarding the TJ case and that they were making you
confused? <span style="color:red">(2nd suggestion of "people kept showing up at your
house" to get you to do something that you didn't want to do)</span>
A. Yes. <span style="color:red">(compliance)</span>
Q. All right. And when did you say that to Steve
Tomeres? Sometime in the summer --
A. Yeah. I used to keep contact with them and
this was in the summer. So I told them -- I was just
telling them what was going on with this and that the
lawyers showed up to my house again and they wanted me
to sign some papers and stuff, and he was informed about
it because I told him and then he just took control
after that -- after I moved in and then I couldn't talk
to anybody.
Q. Okay. When you say Steve took control, did
Steve take control because he was concerned about the
various people who were showing up? <span style="color:red">(Suggestion that Steve,
his aunt's significant other, was "concerned" about Tueffel and
was protecting him. Chanen attempts to get Tueffel to see
Chanen as an extension of that "protection" previously provided
by Steve.)</span>
A. Yes. <span style="color:red">(compliance)</span>
Q. And concerned that you were being asked to
sign statements that you were confused about? <span style="color:red">(suggestion,
similar to above)</span>
A. Yes. <span style="color:red">(compliance)</span>
MR. HALE: Objection, lack of foundation, calls for
speculation.
BY MR. CHANEN:
Q. And as you sit here today, Larry, you have no
memory of reading these 15 statements before you signed
this document; is that correct?
A. Well, <span style="color:red">I had to read them before I signed them.
I'm pretty sure I read</span> all this stuff before I signed
it, yeah. <span style="color:red">I know I had to.</span> I know I <span style="color:red">had to sign</span> -- I
mean <span style="color:red">read all this stuff before and I signed it. That
is my signature. So I had to.
(This is a perfect illustration of the tautological reasoning of</span>

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 27.

> schizophrenic thinking that makes such a person an unreliable witness: he cannot remember something that he thinks the other person regards as important so he makes up a rationale to produce a definitive answer   however, the rationale may or may not be true. Here is the sequence: A) I cannot remember. B) I want to remember because if I cannot remember something that they think is important, I'll be viewed as defective and non-cooperative. C) People should read things before they sign them. D) This is my signature so I must have signed it. E) Therefore, since I signed it and people are supposed to read things before signing, I MUST have read it.)
> Q. Okay.
> A. I had to.
> Q. Did you understand everything in here before you signed it?
> A. Yes. Yes, I did. I understand all this. (At this point there is no longer any doubt in his mind; he understood everything before he signed, he "had to.")

Looking at the statement again, Mr. Tueffel maintained that it was not true that the police never threatened him or coerced him to say that Mr. Jimenez was the shooter. He said that he was just asked to sign it and did. He indicated that he shouldn't have and maybe it should have been gone over first to make sure everything was right but instead he just signed. (Yet he testified previously that he "understood everything in here before [he] signed it." Both cannot be true. Probably he is confused and does not know which alternative is true. It is all contextual – his answer depends upon who is asking him the question and when.) He affirmed that he just signed a statement so that Mr. Sandoval would stop bothering him and go on his way.

He then indicated that, "this statement is okay, I guess. I just read it. So everything to my knowledge on here I guess is fine." (Once again, he reverses his position about what is true. This is another typical example of why people with the cognitive impairment associated with schizophrenia make unreliable witnesses: their story must keep changing because A) they no longer remember or can differentiate what is true vs. what is false, and B) they need to avoid interpersonal conflict.)

Mr. Tueffel, when asked by Mr. Chanen whether he believed what the police did was wrong, agreed. He speculated that Mr. Sandoval was trying to take advantage of him and get information. He speculated that

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 28.

Steve (Aunt Yolanda's significant other) was concerned about this issue.

Mr. Tueffel affirmed that he is able to remember and answer questions when on medication.

Mr. Hale then examined Mr. Tueffel. When asked about different treatment facilities at which he has resided, Mr. Tueffel had a difficult time giving an accurate and clear history. <span style="color:red">(These are more "neutral" issues – i.e., not directly related to the case he is being deposed about – so he does not have to speculate or to confabulate answers: he can say he doesn't remember.)</span> Mr. Tueffel acknowledged that he was homeless and staying at Trilogy at the time of the deposition. Mr. Tueffel stated that he was not currently experiencing mental health problems and was fine and on his medicine. He felt that he would be able to testify if needed. He attributed his suicide attempt in 2009 to being on the wrong medication. <span style="color:red">(Mr. Hale, unlike Mr. Chanen, is not prompting Tueffel for specific factual answers, so his need for certainty about his recollection softens.)</span>

Mr. Tueffel recalled his diagnosis of schizophrenia first being made in 2001 or 2002. He described having a family history of mental illness, specifically manic depression in his mother and mental illness in his maternal grandfather as well. He recalled that there were a lot of family issues including drinking and drug abuse. When asked whether his mother was a drug user, Mr. Tueffel replied that she was. Regarding her use of cocaine in particular, he maintained that she was "just an alcoholic." <span style="color:red">(One medical record says she died cocaine related death. He seems to minimize or frankly deny his family history as reflected in his own medical records which most probably based upon information that he originally provided.)</span>

<span style="color:red">Excerpt 11 page 192 (Mr. Tueffel will deny absolute facts – such as that his mother was a cocaine abuser, not just an alcoholic - if they make him feel uncomfortable. This makes him an unreliable witness. He isn't even astute enough to discern that this is a transparent lie because the lawyers have read his medical records and it was most probably he who informed his caregivers of the circumstances of his mother's death.)</span>
Q. Again, I don't mean any disrespect by this. Your mom was a drug user?
A. Yes, she was.
Q. <span style="color:red">Was she a cocaine user?</span>

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 29.

    A. Just an alcoholic. I mean, she would party.
It wasn't -- It didn't agree with her, but she did it.
    Q. Did she not die from a cocaine related
incident?
    A. No, no. Nothing like that.

Mr. Tueffel described that mental health issues did not cause him to
drop out of high school. He explained that he was hanging out with the
wrong people and that he had an incident after which he could not go
back to school because he was going to get jumped.

Mr. Tueffel was unable to identify any of the names of people he was
hanging out with.

    Excerpt 12 page 195

    Q. Can you give me some names?
    A. I don't really remember all the names.
Just -- I was just younger.
    Q. Can you remember anybody's name?
    A. No.
    Q. Anybody from the old neighborhood? Anybody
that you hung out with at the time that Eric was shot?
    A. Anybody from the old neighborhood?
    Q. Yeah. In high school were you still hanging
around with any of the people from --
    A. Not from this neighborhood, Belmont and
Sacramento, no.

He recalled getting kicked out of the house when he was 18 because he
beat up his stepfather because his stepfather was giving his mother
drugs and he did not like that. He recalled having served two weeks for
domestic violence at the Cook County Jail.

Mr. Tueffel described suicidal behavior in his grandfather and that his
grandfather had lived in a hospital for an extended period. He described
having used drugs and alcohol himself in the past. He stated that his
mother having nervous breakdowns when he was a child was very
difficult for him.

Mr. Tueffel recalled that, on the day of the shooting, he saw Mr.
Jimenez at the Cosmens' house and Mr. Morro and the Cosmens
kicked him out of the hallway because he was bragging about a gun

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 30.

and flashing it around. He stated that the gun he saw Mr. Jimenez with at that time was a revolver, not an automatic.

Mr. Tueffel recalled that he did not see Mr. Jimenez after he was asked to leave the Cosmens' house. He reported having stayed with Mr. Morro at that time. <span style="color:red">He stated he was absolutely 100% sure that Mr. Jimenez was not the shooter. He recalled that he and Mr. Morro had probably spent the day getting high on marijuana or drinking alcohol.</span>

<span style="color:red">Excerpt 13 page 204 (How can someone be 100% sure of their memory when they probably spent the day prior to the event "getting high on something?")</span>
Q. -- that -- let me finish my question -- that <span style="color:red">TJ was not the shooter?</span>
A. <span style="color:red">Yes.</span>
Q. Is it possible TJ was present but wasn't the shooter?
A. He wasn't present.
Q. At all?
A. When it happened, no.
Q. <span style="color:red">There's no doubt in your mind about that?</span>
A. <span style="color:red">There's no doubt in my mind. I seen it with my own two eyes and I know that it was -- it definitely wasn't him.</span>
Q. Okay. Is there anybody else that was around -- hanging around with you and TJ and Eric the day of the shooting other than the people you've told me about already?
A. No. I was with Eric most of the day. Me and him just hung out, you know. We were probably getting high or something too, you know, smoking weed or drinking beer or whatever, you know, and that's how -- That's what we would do mostly, you know, just hang out, smoke a little pot and drink.

Mr. Tueffel recalled that he first learned that Juan Carlos Torres was affiliated with the Triangles after he was threatened. Mr. Tueffel described threats coming at him from all quarters. He recalled seeing Juan Carlos Torres once or twice. He stated he was reluctant to get close to Juan Carlos Torres because he was terrified to be around him. Mr. Tueffel stated he thought he was going to do something to him.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 31.

Excerpt 14 p207 (Confusing statements about when Tueffel knew  the various names of Juan Carlos Torres, most likely reflecting Tueffel's own confusion: first Tueffel says he "knew Juan Carlos Torres" and later he says he only learned the name later. However he also said that he first learned his nickname, "Crazy," during the 90s after he was threatened and called upon Joey and Louis saved him. Yet, at another point in the deposition he says that although he knew Juan Carlos Torres by the name "Crazy," he didn't give that name to the police at the time he learned it because he thought that they would not be able to do anything with only a nickname. Finally, he states that he only learned the name Juan Carlos Torres' from Mr. Netzel after Tueffel identified a single photograph that he was shown to him by Netzel when he was approached by the Northwestern University group who were seeking Tueffel's recantation.)

As is common with the cognitive impairment associated with chronic Schizophrenia, memories of "facts," and therefore "truthfulness," are recalled in a highly contextual manner, i.e., making memories fluid or plastic, not fixed or absolute. Most importantly, the nature of what is "recalled" is significantly influenced by upon who is questioning him.)

Q. Who else -- Who else did you believe was part of this Triangles group?
A. I believe that the Triangles group was --
There was a guy named Louis. There was a guy named Leo, and there was Juan Carlos Torres. He was the one affiliated with the Triangles too.
Q. Did you know him?
A. Juan Carlos Torres?
Q. Yeah.
A. Not until later on after this stuff happened.
Q. But how did you -- When did you first learn that Juan Carlos Torres was affiliated with the Triangles?
A. After I was threatened -- he threatened me and stuff. He told me, you know -- I found out by the conversation with Joey Beedron and Louis -- Louis was like the leader, and he sat down and saved me from getting shot because he wanted to come after me because he knew I seen what happened and he threatened me.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 32.

In this part of his testimony, Mr. Tueffel recalled learning in the 1990s, after the shooting, that Juan Carlos Torres was nicknamed "Crazy".

Mr. Tueffel agreed with Mr. Hale that he and his colleagues had treated him professionally and were nice. He denied that they were trying to put words in his mouth. In this part of the testimony, he agreed that he told Mr. Hale and his colleagues that he recognized the shooter and the other person he was with. He said that he told them that he did not know their names but knew that one was Victor and went to the same school with him and the other was "Crazy."

Mr. Tueffel agreed that Mr. Netzel showed him a picture and asked him if this person was the one that shot Eric Morro and that he agreed it was. He recalled that the picture that Mr. Netzel showed was of an individual older than the shooter was at the time of the shooting. He stated that he did not know the name Juan Carlos Torres at the time of his meeting with Mr. Netzel and that "all I had to go by . . . was Crazy." He said that he did not tell anyone that information because he did not think that they could do much with a nickname.

**Excerpt 15 page 218 Photo ID of Juan Carlos Torres**

Q. Paragraph 14, "I never told anybody that
Carlos Juan Torres was the shooter. I first learned of the name Juan Carlos Torres from Luke (Netzel) who worked for the Northwestern clinic. Luke showed a photograph and asked me if this person was the one who shot Eric, and I said it was. Luke then told me the picture identified was a picture of Juan Carlos Torres." That's what you told us on August 19, 2010, right?
A. Yes. That's -- I never knew his name. That's
why I couldn't tell the police who it was because I didn't know his name. All I could give was a description. That's all I had to go by.
Q. Okay. And Luke showed you a picture of a guy
and that's who he said was the shooter?
A. Yes. He showed me, but he was older then in the picture. He wasn't --
Q. But you recognized him?
A. Yes, I recognized him.
Q. From the picture Luke showed you?
A. Yes.
Q. And he only showed you one picture?
A. That's all it took was one picture. As soon

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 33.

as I seen, I go that's him right there.
Q. It was that quick?
A. Yeah, that quick.
Q. Okay. He didn't show you any other pictures
after that, right?
A. No.
Q. He just told you that that was Juan Carlos
Torres?
A. I got to know the name. Somebody -- I'm
pretty sure, yes, he did because I didn't know his name.

(He is trying to defend his earlier statement that he first learned
who Juan Carlos Torres was, albeit by the name "Crazy," when
he was threatened and went to Joey and Louis of the Triangles
for help. Once again, the "facts" for people with chronic
Schizophrenia are contextual and dependent upon who asks him
what and when.)

And all I had to go by when they were calling him around
the neighborhood was Crazy. That's where that name came
from. I didn't know his name back then. They just
had -- His nickname was Crazy around the neighborhood.

Mr. Tueffel confirmed that he did not feel that Roger Sandoval put
words in his mouth and agreed that he was polite with him. He said that
he never told Mr. Sandoval that he did not want him to come back. Mr.
Tueffel also confirmed that Mr. Sandoval had asked questions in a
fashion similar to how Mr. Netzel had asked questions. He recalled that
he did not get into the issue of whether the police yelled at him with Mr.
Sandoval.

Excerpt 16 page 222

Q. How many times would you estimate Roger met with you?
A. About maybe three times.
Q. Did you ever feel that Roger was trying to put words in your
mouth?
A.  No.

(Contradicts his earlier testimony where he suggested that he felt
manipulated by Roger. Once again, for a person like Mr. Tueffel
who is suffering from Chronic Schizophrenia, his recall and
therefore his testimony on the issue of whether or not he freely

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 34.

signed a statement for Roger, is strongly influenced by who is asking the questions and under what circumstances.)

Q. Did Roger treat you politely when he met with you?

A. Yes. (He contradicts his own testimony again.)

Q. Did you ever tell Roger that you didn't want him to contact you anymore?

A. No.

Q. And did we only meet the one time on August 19, 2010, you and I?

A. Yes. I think that's why I didn't recognize you because I think I've only seen you once.

Q. Okay. And do you remember on one occasion --
I think it was after August 20, 2010 -- Roger came by with some photographs?

A. Yes. He came by with some photographs and I looked at them, and I didn't recognize none of the people in the pictures. I don't any know any of those guys that were in the picture.

Q. Right. Okay. When you signed Exhibit 7, this one here, did anybody tell you what they were going to do with this exhibit, how it was going to be used?

A. All I knew it was going to be used to help -- to help TJ get out of jail. I knew that much. (i.e. he knew the context when Luke Netzel asked him to identify the picture. He also knew which side was asking him and the importance and the purpose of a positive identification of Juan Carlos Torres. This is significant in light of the fact that frequently for Tueffel, who is the questioner and what is the context determines his response over and over again even within this single deposition.) That's all I knew. I didn't know when it was going to be used or where or anything like that.

Q. Okay. I'm now -- I'm looking at my notes and I'm working backwards when I wrote questions. I'm just going to go through the notes in reverse order. Okay?

A. Uh-huh.

Q. When Roger first came to talk to you, did he ask you questions similar to the way -- to the way Luke asked you questioned when Luke came to talk to you?

A. Yes.

Q. Okay. Did Roger tell you that he worked for attorneys who were -- attorneys representing Chicago police officers who had been sued by Thaddeus Jimenez?

A. Yes. (This is a complete contradiction of Tueffel's earlier

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 35.

<span style="color:red">testimony of Roger not fully identifying himself and confusing Tueffel. Why is his testimony different? Because much more important than the accuracy of statements is the context. He is now being questioned by Mr. Hale and not by Mr. Chanen. Like most compensated chronic schizophrenics, he wants to comply in order to avoid even the possibility of any interpersonal conflict, real or imagined.)</span>
Q. And he left you my business card too, didn't he?
A. Yes.
Q. Okay. Am I correct you never told Roger in any of your conversations that the police were yelling at you for a couple hours on the night Eric was shot, correct?
A. We didn't get too much into that.

Mr. Tueffel denied that Mr. Jimenez had ever contacted him or threatened him after the shooting.

Mr. Tueffel was unable to remember how he got to the police station the day following the shooting. He stated that he did not remember Sandra Elder driving him to the police station.

Mr. Hale asked Mr. Tueffel about having identified "Frankie" as the shooter. Mr. Tueffel explained that he thought that the shooter's name was Frankie at the time and that it was not something he made up. When confronted with his previous testimony that he had made the name up, he stated that he did not know why he would do that and then speculated that he was mistaken, thinking the guy that he had seen was named Frankie.

<span style="color:red">Excerpt 17 page 248 Tueffel initially says he does not recall saying "Frankie," then he manufactures an answer to explain why he might have said that, i.e. Tueffel is confabulating in order to make sense out of memory fragments with missing connection pieces</span>

<span style="color:red">Q. Okay. You told the police at some point that the shooter was named Frankie, right?
A. Frankie? I don't remember that. I don't know anybody named Frankie</span> besides my Uncle Frank.
Q. Well, let's look at -- see if I can refresh your recollection -- your first criminal trial testimony, page 150, let me know when you're there.
A. Okay.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 36.

Q. And just read line 16 through 20.
A. Uh-huh.
Q. Particularly 19 and 20. Do you see that?
A. Yes.
Q. Does that refresh your recollection that you
told the police that one of the guys was named Frankie?
A. Yeah, I probably did because I thought -- I
said male, Hispanic, right, and I said yes, and his name
was Frankie, right. I said that.
Q. But Frankie was just a name you made up, right?
A. It's not that I made it up. I thought that
was the person at that time.
Q. Well, let's look at -- I want to look at your testimony from the
Victor Romo juvenile hearing.
A. Okay.
Q. And page 28 -- I'm going to give you a copy of this. Let's mark
this as --
MR. CHANEN: 16.
MR. HALE: 16.
BY MR. HALE:
Q. I'm handing you what's been marked as 16 and
I'm going to look at page 28, line 19:
"QUESTION: Who is this Frankie that you were
trying to tell the police that pulled the
trigger?
"ANSWER: I just made it up.
"QUESTION: You just made it up?
"ANSWER: Yeah.
"QUESTION: Invented it" --
I'm on page 28.
A. Oh.
Q. I just read from lines 19 through 24. Do you
see that?
A. Yes.
Q. Now I'm turning the page, 29 --
A. Made it up.
Q. -- page 29, answer, yes. Did you give -- Were
you asked those questions and did you give those answers
at Victor Romo's juvenile hearing?
A. I don't remember, but I don't know why I would
make it up about Frankie. Maybe I got mistaken thinking
the guy that I seen was named Frankie. (Beginning with "Maybe,"
he is likely confabulating.)

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 37.

Q. Were you making it up because you were
covering for TJ?
MR. CHANEN: I'm going to object to the form of
that question as vague as to time frame specifically.
BY THE WITNESS:
A. I don't know. I wasn't trying to cover up for
anybody. All I wanted to do was tell the truth, but I
lied on a lot of this thing. I made mistakes and I lied
in the courtroom, and I tried to fix it
(He probably no longer really knows what is true and what is
merely his fantasy. His emotional problems interfere with his
memory and confuse him – then he has the logical problem of
trying to make sense of contradictory statements, fragmented
memories and his own emotional distress. This is an example of
how the anxiety associated with serious mental illness such as
Schizophrenia interferes with cognitive functioning and makes
testimony by this person unreliable) and a lot of
this stuff is wrong or right. It had to be right
because they typed down everything, so...

At this point, the first day of the deposition was concluded. He was
described as feeling tired at this point and his mind not being at "full
speed."

On the second day of the deposition, March 7, 2011, Mr. Tueffel stated
that he had frequently hung out with Mr. Jimenez at the corner of
Belmont and Sacramento. He initially answered that he'd seen Juan
Carlos Torres before the shooting but then said that he had not seen
him before the shooting. He recalled having seen Juan Carlos Torres in
court. He confirmed that he never again saw Juan Carlos Torres face-
to-face.

Excerpt 18 page 269 (confusion over when he first saw Juan
Carlos Torres. He initially seems confused by the question, then
seems to confabulate about when he saw him after the
shooting.)

Q. Okay. Prior to Eric Morro getting shot, when
you would be hanging out around the corner of Belmont
and Sacramento, did you ever see the person who you now
know to be Juan Carlos Torres?
A. Yes, I have.
Q. Where had you seen him?

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 38.

A. Just after -- a while after I seen him like
once or twice, and I didn't know him personally, like I
didn't know Victor Romo personally. But he has to be
from this side of the neighborhood because I've never
seen him on -- where I used to hang out or anything.
Q. Let me -- let me -- let me just make sure -- I
want to clarify something. My question was prior.
Prior to Eric Morro getting shot, did you ever -- when
you would be hanging out around Belmont and
Sacramento --
A. Oh.
Q. -- did you ever see the person you now know to
be Juan Carlos Torres in that area?
A. No, no, no. (reversal of testimony just prior to this)
Q. All right.
A. Sorry about that. (apologizes, because he needs to cooperate
to avoid interpersonal conflict at all costs, even the truth –
characteristic of communication statements from people with
chronic Schizophrenia.)
Q. So now let's move to after Eric got shot.
After Eric got shot -- Let me strike that.
Is the first time that you ever saw the person
that you now know to be Juan Carlos Torres the night
when he shot Eric Morro?
A. That's the first time. (This is a reversal of his earlier testimony
that he saw Juan Carlos Torres around the neighborhood. Why
the reversal? Because he probably doesn't know when he first
saw Torres or when he first learned his name but he wants to
cooperate and answer the question being asked by Mr. Hale in a
way that he thinks Mr. Hale expects, thus avoiding real or
imagined interpersonal conflict.)
Q. All right. And after Eric was shot, you said
you ran into him a couple times in the neighborhood?
Was that what you were saying?
A. After?
Q. Right.
A. I -- I -- Yes. I probably seen him like much
after this happened, like once or twice because, see, I
had gotten threatened by him so I had to see him
sometime after that.
Q. Let's just walk through it in order. When is
the first time you saw Juan Carlos Torres after Eric was
shot?

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 39.

A. I'm trying to remember. I don't know if he
disappeared for a while after that happened. I can't
remember when the last time I seen him. I think they
bring him in one time, and this was when the trial was
going on. But I don't remember much about seeing him
after that.
Q. You did say you ran into Juan Carlos Torres at
court at one of TJ's criminal trials?
A. Yes, I think so.
Q. Do you know if -- TJ had a trial in 1994 and
he had a trial in 1997. Do you know which trial it was
where you ran into Juan Carlos Torres at court?
A. I'm trying to think.
Q. And if you don't remember, that's fine too,
Mr. Tueffel.
A. I don't remember. (Given "permission" to say "I don't know,"
he does. That permission reassures him that it will not risk
interpersonal conflict if he answers truthfully, i.e., saying "I don't
know.") I'm sorry. I know -- I
don't know -- I know -- I don't think it was the first
one. It had to be the second one. (Tueffel cannot leave his
answer ambiguous. He needs to impose logic and order upon
what is his imperfect memory, so he speculates. There is no
explanation of why "it had to be the second" trial where he saw
Torres)
Q. All right. Prior to seeing Juan Carlos Torres
in court, had you ever seen Juan Carlos Torres any time
after Eric was shot?
A. No.
Q. Okay.
A. No.
Q. So court was the first time you ran into him?
A. Yes.
Q. All right. And when you saw Juan Carlos
Torres in court, where were you and where was he?
A. I was in another room with the witness -- with
the other witnesses and I had seen him in the hallway.
I don't know if they bring him in, and I think the
police picked him up. I don't – (most likely he is speculating in
order to sound more certain about his statements than he
actually is.)
Q. Did -- did -- did you make eye contact with
Juan Carlos Torres at that time?

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 40.

<span style="color:red">A. I -- I think I did, yeah. (It does not sound like he is at all certain but he wants to cooperate with the questioner.)</span>
Q. Did you speak to him?
A. No, I didn't speak to him.

When asked about the arrival of the officers at his home in the early hours of the morning following the shooting, he recalled that they were banging at the door and stating that he needed to come to the station. He recalled ending up there by himself. He said that the police might have become aggravated and swore at him but denied that they physically touched him.

<span style="color:red">Excerpt 19 page 321 a good example of him being led.</span>

Q. Did those officers swear at you at all?
A. They might have sworn at me. They might have got aggravated and swore at me. They just kept on drilling me and saying, you know, you're lying, we got other witnesses, tell the truth.

Mr. Tueffel testified at this point in the deposition that he remembered that "Frankie was probably the one I thought Victor Romo was." He denied ever having spoken with his mother or stepfather about the lineup.

<span style="color:red">Excerpt 20 page 322</span>

<span style="color:red">He now says he thought Victor Romo's name was Frankie - this is most likely pure confabulation in the service of attempting to make sense of missing memory and of his resulting confusion and anxiety about not knowing.</span>

Q. And at that time, were you also telling the police officers that -- that one of the offenders was a guy named Frankie?
A. I think Frankie -- I remember -- Frankie was probably the one I thought Victor Romo was. That's how the Frankie name came up. I said it was Frankie because I thought that's what Victor Romo's name was, Frankie.

Mr. Tueffel testified that the first time he spoke to the Morro family about the shooting was in conjunction with the Northwestern attorneys. <span style="color:red">(Meetings with the Morros in Chicago and Iowa were very important in</span>

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 41.

cementing the bond between him and the Northwestern group – as were Ms. Flaum's telephone calls to him. He desperately wants to be part of the "team." To be taken to Iowa with them as their star witness is very exciting.)

Mr. Tueffel denied thinking that identifying Juan Carlos Torres as the real shooter would make the threats go away. When asked why he did not tell police that Juan Carlos Torres was the real shooter, he answered that he did not know why and referenced him having been threatened and Joey Biedron stopping it.

Mr. Tueffel described that he did not leave the house for 2 to 3 months after the shooting. He recalled that the Royals were in front of his house and hanging out on his porch. When asked why he did not tell them that Mr. Jimenez wasn't the shooter, he answered that he did not know and referenced feeling very scared.

Mr. Tueffel stated that, despite his having told his mother that Mr. Jimenez was not the shooter before testifying at Mr. Jimenez's first trial, his mother did not tell him to tell the truth after he testified at Mr. Jimenez's first and second trials. (During his videotaped statement on July 31, 2006, he maintained that he didn't tell his mother that Mr. Jimenez was not the shooter until he was around 20 years old. Again, his cognitive difficulties coping with incomplete or absent memories typical of chronic Schizophrenia produce shifting statements over time.)

Mr. Tueffel denied that he was aware when he testified at either trial that Victor Romo was testifying that Juan Carlos Torres was the shooter.

When asked about the visits of the Northwestern University people to Somerset, he answered that Luke Netzel came first and that he then came back with Alison Flaum and another man. He recalled that the video statement happened on a separate day, not on July 31, 2006.

Excerpt 21 page 340 (indicates that he was not shown pictures by Luke Netzel on his first visit with Tueffel at Somerset.

Q. Is Luke the first person that told you the name?
A. Yes, I think so -- I don't know -- I'm not sure. I'm not saying yes because I don't know -- All I know is they said Juan Carlos Torres. (He is visibly shaken here.) I don't remember

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 42.

if it was back then when he was in court that one time
and I found out his name or with the Northwestern people
his name came up because I think they had a picture of
him and that's when I said yeah, that's him.
Q. That's when Luke showed you a picture?
A. Yeah. Somebody showed me -- Yes, there was a
picture of him and he was much older and I said yeah,
that's him.
Q. All right. We're going to get to that --
Maybe we should just talk about that now.
A. Okay.
Q. That -- that first time Luke came to see you
at Somerset --
A. That's not the first time he showed me
pictures. This came -- was later on.
Q. When -- when Luke first came to talk to you, did
he showed you a picture of Juan Carlos Torres?
A. I didn't see any pictures. The first thing he
said was I'm a private investigator working on the
Thaddeus Jimenez case, and I said -- he asked me do you
know anything about it and I said yeah, the guy's
innocent, he's in jail. I told him right off the bat.
Q. Immediately?
A. Immediately.

Excerpt  22 page 364 Tueffel's statements re the incorrect
sequence of events (tape made on a different day from 7/31).
This is rather impressive because the fact that the statement was
taped on 7/31 has just been implicitly covered in the deposition.

Q. Did you talk to anybody from Northwestern between the time
Luke first spoke to you and July 31, 2006?
A. Did I talk to anybody besides him at that time?
Q. You know, like in between. Did you see Luke
again, for instance?
A. Yes.
Q. Before July 31, 2006, the day the video
statement?
A. I seen him -- first time I ever met him was
when he came to Somerset and he told me he was a private
investigator.
Q. Right.
A. Then they came back and it was him and two

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 43.

other people, Alison Flaum and another man.
Q. A man?
A. The picture -- they had pictures of him.
Q. Is that the same day that you did the video
statement that we've talked about?
A. I don't know if they did the video statement
-- I think they talked to me first and had everything
written down. Then they said they were going to -- I
know later on in -- somewhere in the 2000 they came --
in 2006 they came back with the -- and videotaped me.

When asked whether the Northwestern University people asked him
why he was at Somerset Place, Mr. Tueffel answered that he did not
remember them asking. He then stated that it probably came up and
that he probably told them why he was there. He said that he "told them
everything - that my mom passed away and I ended up here because I
went into the hospital and then they sent me there and my family
thought it was better for me to try this place." When asked whether he
told them he had paranoid schizophrenia, he answered that he did not
know whether they asked. He stated he did not recall them asking him
much about the history of his illness and that they were just more
concerned with his testimony. He stated he did not think he discussed
his medications with them.

Excerpt 23 page 366 re what Larry Tueffel told the Northwestern
people about his mental health history. Appears to confabulate in
order to fill in.

Q. All right. Did any of the Northwestern
attorneys ask you why you were at Somerset?
A. I don't remember them asking -- I don't know
if I had a con- -- We probably -- It probably came up
and I probably told them why I was there and stuff,
(once again he goes from a denial to speculating because he
wants to accommodate the questioner)
but I told them everything, that my mom passed away and I
ended up here because I went into the hospital and then
they sent me there and my family thought it was better
for me to try this place out and I ended up living
there. I probably did have a conversation with them why
I was there. (he clearly has no distinct memory of telling them but
feels that he needs to confirm that he did indeed tell them)
Q. Okay. Did you tell the Northwestern attorneys

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 44.

that you had been diagnosed as a paranoid schizophrenic?
A. I don't know if they asked me about my
illness.
Q. Did the Northwestern attorneys ask you about
your mental health history?
A. I don't remember them asking me much about the
history of my illness. They were just more concerned
with my testimony to -- what I said to Luke, prior to
what I said to Luke.
Q. Did you discuss with the Northwestern
attorneys at all in that July 31, 2006 meeting the
medications you were taking?
A. I never said -- discussed that -- I don't
think I've ever discussed my medications with them. I'm
sure they asked me why I was here and stuff, but --
Q. Okay.
A. -- we didn't talk much about my medication.

Mr. Tueffel then testified that the offenders were two people he
recognized from the neighborhood. He testified that he had seen Juan
Carlos Torres in the neighborhood and recognized him but did not know
his name.

Excerpt 24 page 369. Tueffel recalls that he had earlier in the
deposition said he had never seen Juan Carlos Torres before the
day of the shooting, now when confronted with his statement he
says indeed he recognized Mr. Torres from the neighborhood.

Q. Was that a true statement when you told that
to the Northwestern people, that you recognized both
people from the neighborhood?
A. Yes.
Q. So you also recognized who you now know to be
Juan Carlos Torres?
A. Yes.
Q. And how did you -- how did you -- You had seen
him in the neighborhood before?
A. This statement that I gave here is right.
Q. I thought what you previously said was that
you hadn't seen Juan Carlos Torres before?
A. I just recognized him like I said here, but I
didn't know their names.
Q. So you actually -- you actually recognized

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 45.

<span style="color:red">both offenders is what you're telling the Northwestern
people?
A. Yes.</span>
Q. Okay. Is that true?
A. Yes.

When asked about the recantation statement in which he said that he
knew that one of them was named Victor, he said that he did not know
that the name was Victor until later.

When asked about his use of the name Carlos in the transcript of his
July 31, 2006 video statement and when he learned that the shooter's
name was Carlos, Mr. Tueffel indicated that he did not know when he
knew that name. When asked whether he was shown a picture and
identified the person as the shooter prior to the date of the video
statement, he speculated that it was possible that that happened and
"that's why I learned the whole full name."

Mr. Tueffel recalled being shown single pictures and identifying only
one of them. He recalled that the person in the picture that he identified
was a lot older than when the incident happened. When asked whether
the person had facial hair, Mr. Tueffel responded that there was not
much and then speculated that he might have had facial hair because
he was older.

<span style="color:red">Excerpt 25 page 377 re what the photo that he was shown
looked like, and how he came to know JCT's name, seems like
speculation or confabulation. Notably, Tueffel describes his
relationship with the Northwestern attorneys as being "in contact
pretty much every other day."</span>

Q. And do you remember the picture you
identified, the person, what did that person look like
in the photo?
A. All I remember is I could recognize his face.
I don't know if he was -- head was shaved or still had
the curly hair, but I knew the face real good. And he
was older. This was -- He was a lot older than when
this happened.
Q. How old did the person in the photo that you
identified look like?
A. Maybe late 20s, early 30s at the most.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 46.

> Q. Okay. And in that photo did that person have
> any facial hair?
> A. Not much. If there was any, there wasn't
> much.
> Q. And how -- In that photo where you identified
> the person --
> A. He might have had facial hair because he was
> older. All I know that was the person.
> Q. And you told the Northwestern people that was
> the person who shot Eric Morro?
> A. Yes.
> Q. At that point did anybody -- did the
> Northwestern people say anything to you?
> A. I don't remember exactly what they said, but I
> just told them that's him right there and then they took
> the picture away from me and I don't exactly what hap-
> -- how it went on from there.
> Q. And I guess let me ask you a more specific
> question. Did anybody from Northwestern ever tell you
> the name of the person who you identified in the photos?
> A. They had to because that's how I learned the
> whole name. Somebody had to tell me because I don't
> know how Carlos and Victor Romo -- Somebody told me
> their names, so...
> Q. Okay. How many -- how many meetings would you
> estimate you attended with the Northwestern attorneys?
> A. We were keeping in contact pretty much every
> other day.
> Q. Okay.
> A. Alison Flaum I talked to a lot. She would
> call me from time to time on the pay phone. Maybe like
> three -- maybe four or five meetings.

When asked whether the Northwestern people told him the name of the person he identified as the shooter, he answered that "they had to because that's how I learned the whole name."

When asked how many meetings he had with the Northwestern people, Mr. Tueffel said that they were keeping in contact "pretty much every other day." Mr. Tueffel recalls a much closer relationship with Ms. Flaum that she does in her testimony. This probably reflects how much value he placed on affiliating with her and being part of the "wrongful conviction" team. His strong need for acceptance and affiliation is a

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 47.

potential threat to the accuracy of his recollection. He reported that he spoke a lot with Alison Flaum and that she would call him on the payphone. He recalled between three and five actual meetings.

Mr. Tueffel was asked about Alison Flaum asking him about "Louis" or "Hitman." He answered that he did not remember being asked about that.

Mr. Arger then examined Mr. Tueffel.

Mr. Arger asked him about the contents of the jacket Mr. Morro was wearing on the night of the shooting. Mr. Tueffel responded that a card from the Income Assurance Agency was not familiar to him. He stated that the cigarettes had to belong to Mr. Morro because he was not old enough to buy cigarettes at the time. Earlier in the deposition, he had testified that he did not know whether they were his or not and that he was a smoker at that time. <span style="color:red">(additional contradictory testimony based upon impaired memory functioning secondary to the cognitive deficits usually associated with chronic Schizophrenia)</span>

<span style="color:red">Excerpt 26 page 390 re cigarettes. On the same deposition day Tueffel said that the cigarettes found in Morro's jacket on the day of the shooting "had to be" Morro's because he was too young to buy cigarettes at the time (i.e. he was 14 years old). But earlier he asserted that he was a smoker in 1993. At the end of the earlier excerpt he is confused stating, probably quite accurately, "I don't know if I gave him those or if he already had them."</span>

<span style="color:red">Q. As you sit here today looking at the picture of the Newport cigarette pack, do you think that was yours on the day of the incident?
A. No, I don't think so. These had to be his.</span>

<span style="color:red">Contrast with testimony on page 303</span>

<span style="color:red">Q. Mr. Tueffel, one of the items in Exhibit 21 that we can see is a pack of Newport cigarettes. Did you smoke at the time in '93?
A. Yes. I was -- Yes, I did.
Q. Were these your cigarettes, the Newport pack of cigarettes?
A. I don't remember if they were mine. All I know is I smoked -- I smoked -- That's when I just</span>

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 48.

started getting into cigarettes and --
Q. You know, I'll represent to you that you can't see it on this --
clearly on Exhibit 21 --
A. I don't know if I gave him those or if he already had them.

Mr. Tueffel testified that, on the day of the shooting, "I'm sure I went home to eat dinner and Eric was there. He was in the hallway and I fed him." He then testified that "as soon as he came to the door, I finished up my food and then he knocked on the door and I knew it was him. So I asked him if he wanted to have some dinner."

Mr. Tueffel testified that Dr. McKenna was his current psychiatrist since Alden Lakeland and was prescribing him Risperdal. He reported that he had started seeing Dr. McKenna in 2009 after a suicide attempt. He recalled that he had been at Somerset Place from 2003 to 2009 or 2010.

Mr. Tueffel reported having worked at Kmart as a cashier after he came out of the Cook County Jail. He reported that he had work as a janitor with an agency that served Chicago public schools. He recalled working as a caretaker for his friend John's mother for about a year. He reported having worked at a plastics factory.

Mr. Tueffel then testified that the recantation statement he signed was discussed before it was written out. He confirmed that before giving the recantation statement no one had told him Juan Carlos Torres's name.

Mr. Chanen then re-examined Mr. Tueffel. Mr. Tueffel agreed with Mr. Chanen that Mr. Sandoval and Mr. Hale were "controlling the questions, that they were deciding what topics you were and were not discussing."

Mr. Tueffel then agreed that the statement that the police never threatened or coerced him was not accurate. He testified that he did not know the name "Crazy" on February 3, 1993.

Mr. Tueffel was then questioned about conflicting statements he had made about when he had told his mother that Mr. Jimenez was not the shooter. Mr. Tueffel indicated that the first time he told her was when they were at the first trial downstairs in the elevator. He said that he did not know how old he was when he went to a church to talk to a priest. He again stated that he did not go through with it. He then testified that

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 49.

the only people he had told were his mother at the time of the first trial
and the police officer or State's Attorney's Office investigator who
picked him up for the 1997 trial. He said that he did not tell anyone else
that Mr. Jimenez was not the shooter between 1997 and July 2006.

Excerpt 27 page 433

Q. Okay. So in this transcript that you had with
Ms. Flaum, you said that the first time you told your
mother you were about 20 years old?
MR. HALE: I would object, Judge. The question is
a compound question when --
THE COURT: Break it down.
MR. HALE: Can I show the --
THE COURT: The question in the transcript is --
MR. HALE: Yeah. Right. The question was "And
when was it that you told your mom and told the priest,"
then there was an answer given to that question.
THE COURT: Okay. That's what he's got to deal
with, so...
MR. CHANEN: All right. So let's clarify.
BY MR. CHANEN:
Q. During some questioning from Mr. Hale, I
believe your testimony was that you told your mom that
you hadn't testified truthfully against TJ at one of the
trials; is that correct?
A. Yes.
Q. All right. And during your questioning by
Mr. Hale, I believe that you said it was near one of the
trials that you said that to your mom; is that correct?
A. Yes.
Q. All right. In the transcript, it appears --
and you can -- you just read it so correct me if I'm
wrong -- that you didn't tell your mom about the false
testimony until you were closer to 20 years old; is
that -- is that correct?
MR. HALE: Objection, mischaracterizes --
THE COURT: Overruled. It's a question. He's not
mischaracterizing his testimony.
MR. HALE: Okay.
BY THE WITNESS:
A. Yes.
Q. So either way, Mr. Tueffel, as you sit here

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 50.

right now, what's the best memory you have of when you
told your mother that you had testified falsely against
Mr. Jimenez?
MR. HALE: Objection, asked and answered.
THE COURT: Overruled.
BY THE WITNESS:
A. The first time I ever told her was the first
trial when we were downstairs in the elevator.
Q. Down -- In the elevator at the courthouse?
A. At the courthouse.
Q. Okay. And you think it was at the first
trial?
A. Yes.
Q. All right. And when you went to St. Genevieve
to speak to a priest --
A. Yes. I --
Q. -- how old were you at that time to the best
of your memory?
A. This was like -- I was on Montana. Probably
-- I don't know if I -- I went into church to talk to a
priest, but I never went through with it.
Q. Okay.
A. I don't remember how old I was. I don't know
if it was later on when I was in my 20s or when I -- It
wasn't right away, I know that, when I lived through the
neighborhood. I might have went back to that
neighborhood.

(Tueffel is completely confused about times and dates. Like most
people with chronic Schizophrenia, he does not have reliable memory
upon which he can rely – only memory fragments which due to his
cognitive impairment may be accurate, imagined or significantly
modified memories as a result of  his inner emotional turmoil, confusion
and desire to please.)

Mr. Tueffel denied that Mr. Jimenez spoke to him when he saw him
during the first trial.

Mr. Tueffel stated that he had been aware that signing medical releases
would allow the lawyers to get his medical records from psychiatrists
and hospitals.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 51.

Mr. Tueffel agreed that with medication he is able to function properly. He also agreed that he has never had a suicide attempt, delusions or a schizophrenic reaction other than when he was off his medication.

## OPINIONS WITH DISCUSSION AND CONCLUSIONS

The opinions expressed below are offered to a reasonable degree of medical certainty, that is, as more probable than not. They are based on the materials made available for me to review and are subject to amendment, should additional information become available.

### Psychiatric Diagnosis of Mr. Tueffel

1. Mr. Tueffel's medical records and the other documents reviewed consistently reflect a diagnosis of a chronic psychotic illness, Schizophrenia, Paranoid type, or Schizoaffective Disorder, with its onset in 1999 or 2000. There is also consistent evidence of a substance abuse disorder, most likely polysubstance abuse and dependence involving alcohol, marijuana, and cocaine which became heavy during his late teens and twenties. Furthermore, Mr. Tueffel appears to have had either a learning disability or some other developmental disorder such as a congenital intellectual impairment. A chronic psychotic disorder, a substance related disorder, and a learning disorder or developmental intellectual deficit can produce overlapping behavioral and cognitive symptoms. Although I did not personally examine Mr. Tueffel, I have relied upon the diagnostic opinions of the many other mental health professionals who examined and or treated Mr. Tueffel, as reflected in the extensive medical and psychiatric records that I reviewed.

2. The medical records and documents I reviewed support the *DSM-IV(TR)* Axis I[10] diagnosis of a chronic psychotic illness for Mr. Tueffel, either Schizophrenia, Paranoid Type, Chronic or Schizoaffective Disorder (a diagnosis of psychosis that combines symptoms of Schizophrenia with those of a Mood Disorder).

3. Mr. Tueffel appears to have become symptomatic of his psychotic illness in approximately early 1999, when he was hospitalized with florid psychotic symptomatology including

---

[10] *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, (Text Revised),* American Psychiatric Association, 2000, Washington D.C.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 52.

delusions and hallucinations. The course described by his medical records is one of intermittent exacerbations, often triggered by medication noncompliance and/or concomitant substance abuse.

4. Schizophrenia and Schizoaffective Disorder are severe chronic mental conditions that cause marked functional impairment, particularly in social and cognitive functioning. This impairment is present throughout the life course of the individual, even during periods of relative symptom stability, when hallucinations and delusions may be less prominent.

5. Schizophrenia is a severe, life-long, mental disorder that usually causes problems in distinguishing reality from fantasy, i.e., inner experiences not based in reality. It also is characterized by illogical thinking, abnormal and impaired social relatedness and at times bizarre and/or idiosyncratic emotional responses. Problems with memory, attention, concentration and organizing one's thoughts are also characteristic of the severe functional impairment associated with Schizophrenia.  It most often has its onset in late adolescence or at the latest early adulthood. Though the etiology remains unknown, chronic psychotic illnesses are thought to result from a combination of genetic and environmental factors. Treatment usually includes antipsychotic medication and psychosocial interventions. With treatment, symptoms may be reduced to manageable levels so that a fortunate minority of patients is able to function in work settings and live independently, although their functional skill set usually declines after the first psychotic break and continues to decline over years and decades. When Schizophrenia was first described by Bleuler it was labeled *Dementia Praecox*, or "premature dementia," due to the recognized cognitive deterioration that occurs in individuals afflicted with this disabling condition. The majority of individuals who are diagnosed with schizophrenia experience more limited recovery even with appropriate treatment and psychosocial interventions. They may continue to demonstrate severe functional impairment. They often require supervised housing and some supervision of their activities of daily living.

6. The paranoid subtype of schizophrenia is characterized by prominent delusions and hallucinations including beliefs that the

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 53.

person is being persecuted, threatened, followed or is the object of a conspiracy to cause harm.

7. Schizoaffective Disorder involves persistent psychotic symptomatology, as in schizophrenia, but with recurrent episodes of mood disturbance, such as depression or mania. The age of onset and persistence of symptoms are similar to those of Schizophrenia.

8. An important feature of psychotic illnesses is that persons experiencing them are often unaware of their areas of even significant functional impairment. For example, persons who are delusional generally do not acknowledge that their delusional beliefs are in fact false. Nor is the illogical and idiosyncratic thinking typical of Schizophrenia usually recognized as disordered functioning by the person so afflicted. Persons with psychotic disorders also often minimize or deny their condition or impairment due to feelings of shame and stigma.

9. There are recurrent reports in Mr. Tueffel's medical records of substance abuse, particularly heavy use of alcohol and cannabis during his late teens and 20's. Cocaine abuse is also described in his records. Although Mr. Tueffel appears to have discontinued his heavy polysubstance abuse  by the time he recanted his trial testimony, heavy use of alcohol, cannabis and other drugs can over a number of years cause permanent neurologic damage, including to brain centers that are critical to memory and other aspects of cognition. There can be a range of impairment from this type of neuropsychiatric damage.

10. The new generation of powerful antipsychotic drugs, such as the clozapine and risperidone that Mr. Tueffel was prescribed, reduce psychotic levels of anxiety thus usually eliminating the most dramatically disabling symptoms such as delusions and hallucinations. These drugs can, nevertheless, cause side effect symptoms that interfere with higher function cognitive processes. For example, clozapine commonly causes drowsiness and confusion. Risperidone causes sleepiness, fatigue and confusion. Zonegran commonly causes somnolence, fatigue, impaired concentration, impaired memory and confusion.[11]

---

[11] Epocrates Essentials Version 3.16, updated May 1, 2011.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 54.

11. There are reports in Mr. Tueffel's medical records and documents I reviewed that suggest a learning disorder or intellectual handicap. These include references to him being in special education class while in school and to being intellectually "slow." In the thousands of pages of medical records reviewed, there is no evidence of a distinct cognitive disorder (as opposed to the known cognitive impairment associated with chronic psychosis) being diagnosed. In my opinion, his chronic psychotic condition first appearing around age 19 and his pattern of heavy substance abuse from his late teens through his twenties, are the likely cause of his cognitive impairment noted in recent years.

**Relationship of Mental Disorders to Reliability of Mr. Tueffel's Statements**

Below, I describe features of Mr. Tueffel's diagnosed mental disorders and how they may have affected the reliability of his recantation and conflicting statements and testimony over time.

1. *Persons with psychotic disorders like Paranoid Schizophrenia or Schizoaffective Disorder have problems with reality testing (distinguishing reality from unreality).* Delusions, false beliefs that are held even in the face of evidence to the contrary, are common in Schizophrenia. Delusions often persist even during periods of stability. *Aspects of Mr. Tueffel's testimony may have been influenced by the intrusion of delusional beliefs on his recollection of events.*

2. Paranoia refers to the inaccurate perception of threat or hostility from others and is a common feature of chronic psychotic illnesses. There is evidence in the medical records that Mr. Tueffel was susceptible to and experienced frank paranoia. When he experienced acute exacerbations of his illness, he was described as having accused staff of watching him and believing that there was a plot to kill him. Mr. Tueffel also cited fears of retribution as among his motivations for testifying that Mr. Jimenez was the shooter. Though Mr. Tueffel may have had realistic bases for concern about his safety in the aftermath of the shooting, such concerns often become exaggerated or frankly delusional in the context of a chronic psychotic illness. *Paranoia or paranoid delusions could have motivated Mr. Tueffel to amend his testimony*.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 55.

3. Persons with psychotic illnesses have problems with both logical thinking and reality testing. These difficulties can interfere with their capacity to make sense of their experience. As a result, direct recollection of autobiographical memories may be combined with or replaced by inferences they have drawn, or frank fantasy, in an illogical manner. They may not be able to differentiate real from imagined recollection. They are thus susceptible to confusing beliefs they have about an event, or fantasies, with memories of actual experience. *There are several instances in Mr. Tueffel's deposition transcript in which he appears to be unsure of an answer to a question, but nevertheless offers an answer after apparently struggling to make sense of the question and ideas that he may mistake as memory.*

4. *Mr. Tueffel appears to be susceptible to leading questions and to answering questions in a compliant manner according to what he presumes may be the mindset of the questioner.* This quality may underlie some of the inconsistencies in how he has described his treatment by the police in the hours after the murder. *This susceptibility to leading questions and tendency to be compliant may also explain his having described events dissimilarly, even within the single entity of his own deposition.*

5. *Several impaired cognitive aspects of Mr. Tueffel's psychiatric diagnoses could contribute to his tendency to comply with what he presumes to be the response expectations of others, particularly following leading questions.* Schizophrenia and Schizoaffective Disorder are associated with difficulties with attention and logical reasoning. Questions or statements may therefore not be fully understood by a person with Mr. Tueffel's mental illness. *Thus an individual with a psychotic diagnosis may attempt to supply the questioner with what he perceives to be the "correct" or desired response. Mr. Tueffel's deposition testimony indicates that he at times did not fully understand the identity, role or advocacy bias of various individuals from both sides of this litigation who visited and questioned him.*

6. *Mr. Tueffel's relative isolation, loneliness and paucity of involvement with his family or significant others may have caused a sense of longing for affiliation, friendship and acceptance.* Notably, he describes in his deposition "working with" various individuals and groups involved in the case. He

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 56.

even describes having formed "friendship" with a member of the Northwestern group. *There are several instances in his deposition testimony when he describes himself as having been trying to be "cooperative" and to comply with the demands of those who were questioning him.*

7. *The significant inconsistencies in Mr. Tueffel's statements may also be attributable to diminished intellectual capacity affecting memory formation and retrieval.* During Mr. Tueffel's school years he was placed in special education classes, suggesting that he may have had a learning disorder or cognitive impairment since early childhood. One of Alison Flaum's notes describes him as "kind of slow mentally."

8. Finally, chronic psychotic mental disorders such as Schizophrenia are often characterized by the progressive decline of cognitive and intellectual functioning over the life course of the affected individual.

## SOURCES OF INFORMATION RELEVANT TO MY OPINION

1. Affidavit of Mr. Tueffel dated May 1, 2008
2. Medical records of Mr. Tueffel from Alden Lakeland
3. Cook County State's Attorney's Office investigative report dated February 3, 2009
4. Chicago-Read Mental Health Center records
5. Letter by Danielle Zdeb dated September 6, 2005
6. Deposition of Steven Drizin dated November 3, 2010
7. Deposition of Alison Flaum dated January 25 and 28, 2011
8. Deposition of Mr. Tueffel dated March 3 and 7, 2011
9. Statement of ER dated February 28, 2007
10. Handwritten statement of Mr. Tueffel dated July 31, 2006
11. JIM06317-JIM06319
12. Medical records of Mr. Tueffel from Thorek Memorial Hospital
13. Medical records of Mr. Tueffel from St. Joseph Hospital
14. Medical records of Mr. Tueffel from Riveredge Hospital
15. Medical records of Mr. Tueffel from Resurrection Medical Center
16. Medical records of Mr. Tueffel from Louis A. Weiss Memorial Hospital
17. Medical records of Mr. Tueffel from R. Craig McKenna, M.D.
18. Trial transcripts from *The People of the State of Illinois vs. Thaddeus Jimenez*

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 57.

19. NU000001- NU000121
20. Medical records of Mr. Tueffel from Somerset Place
21. Medical records of Mr. Tueffel from Swedish Covenant Hospital
22. Video of Mr. Tueffel statement dated July 31, 2006
23. Video of Mr. Tueffel addressed to Mrs. Morro
24. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, (Text Revised,)* American Psychiatric Association, 2000, Washington, D.C.


## SELECTED SUMMARIES OF SOURCES OF INFORMATION

### Affidavit of Mr. Tueffel dated May 1, 2008

In this affidavit, Mr. Tueffel indicates that the transcript of his July 31, 2006 videotaped statement is entirely true.

### Chicago–Read Mental Health Center Records

Mr. Tueffel was hospitalized at this facility multiple times early in the course of his chronic psychotic illness during 1999 and 2000.

Mr. Tueffel was admitted in February 1999 after a suicide attempt in which he tried to cut his wrists. He exhibited psychotic symptoms at that time, including auditory hallucinations, disorganized thought processes, and delusions of thought control. At one point in this episode, he attempted to break a window and jump out.  Reports varied as to whether he was attempting to kill himself or was attempting to flee due to persecutory delusions. Records indicate that he had been drinking heavily. They also indicate a conflictual relationship with his mother and stepfather and that he had spent two weeks in jail after an altercation with his stepfather in November 1998.

Mr. Tueffel was admitted from September 14, 1999 to November 16, 1999 after he tried to kill himself on the elevated train tracks. He was described as paranoid and responding to internal stimuli and reported hearing voices.  He described "lights" directing him to kill himself on the train tracks. He was given a provisional diagnosis of schizophrenia, paranoid type and polysubstance dependence. Marijuana use since age 12 or 13 was reported. He was described as likely using more substances then he reported. A history of gang involvement was noted.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 58.

Mr. Tueffel was again admitted in March of 2000 after making threats to harm his family and himself. He was described as having a family history of mental illness in his mother and grandfather and as not having followed up with the outpatient plan of care. He was described as having been in an altercation with his uncle. On this admission, he had concerns that he contracted HIV. He believed a man named Pedro tried to take his life away by giving him HIV. He was experiencing command hallucinations to kill himself. Heavy alcohol use is described.

Mr. Tueffel was hospitalized again in October of 2000. At this time, he was making statements about vampires sucking his blood according to records. He is described as behaving in a threatening manner. He talked about beating somebody in the head with an aluminum bat. He described having used marijuana a lot prior to admission and described experiencing voices laughing at him. During this hospitalization he had an episode of agitation in which he kicked a solarium door. He was also noted during that admission to be paranoid, bizarre, and laughing inappropriately. *During this admission, he was noted on a social services assessment to have a memory problem.* Discharge diagnoses were psychotic disorder not otherwise specified, marijuana dependence, alcohol dependence, and  personality disorder not otherwise specified.

In November of 2000, Mr. Tueffel was again admitted to the hospital. This admission followed him presenting to an emergency department requesting medication. Once there, he behaved in a verbally aggressive manner and was noted to be delusional.  The discharge summary indicates that Mr. Tueffel threatened another patient in the emergency department, "I'll choke your ass; I'll kill you."  This discharge summary also notes that the patient was in special education for being a "slow learner." He was unable to pay for his medication at that time and was staying with a friend of the family because he could not return to his mother's home. This was described as due to his problematic relationship with his stepfather.  The social assessment describes him as socially isolated with minimal family support.  At the time of discharge on December 14th 2000, he was prescribed Risperidone 2 mg twice daily and Cogentin 1 mg twice daily.


**Alden Lakeland Medical Records**

Mr. Tueffel was admitted to Alden Lakeland in late 2008.  It is a skilled nursing facility. His diagnoses included schizophrenia, hypertension,

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 59.

and reflux. His admission to Alden Lakeland followed an acute
hospitalization stemming from a suicide attempt by overdose. His
psychiatric treatment at Alden Lakeland included group and individual
therapy as well as treatment with the antipsychotic medication
risperidone.

Mr. Tueffel briefly left the facility in 2009, but was readmitted in
September 2009 after his brother kicked him out of where he was living.
Records described him as depressed over the failed attempt to live in
the community. The records indicate that he eventually was discharged
from Alden Lakeland in early 2010.

In these records, Mr. Tueffel is described as having a mother who
suffered from manic depression. He is described as having had his first
hospitalization at the age of 23.


**Cook County State's Attorney's Office Investigative Report dated
February 3, 2009**

This report was authored by Brian Killacky and describes an interview
with Mr. Tueffel. In describing the events of the day of the shooting, Mr.
Tueffel reported meeting Mr. Morro right after school. He recalled
seeing Mr. Jimenez with a gun in the hall at the Cosmen residence. He
reported that Mr. Jimenez was not the person who shot Mr. Morro.

Mr. Tueffel recalled that after walking home with him, Mr. Morro waited
in the lobby or outside because Mr. Tueffel was not allowed to have
visitors at dinner.

According to the report, Mr. Tueffel recalled that the two individuals who
approached them were Victor Romo and another person not known to
him. He said that the person not known to him said that Mr. Morro owed
Leo money. In describing the physical altercation that followed, the
report indicates that Mr. Tueffel ran through a vacant lot and heard a
gunshot.

According to the report, Mr. Tueffel did not recall providing the name
Frankie when he testified. The report describes Mr. Tueffel as nervous
and uncertain when he was asked why he identified Mr. Jimenez as the
shooter. The report indicates that Mr. Tueffel said that prosecutors or
police never threatened him into identifying Mr. Jimenez or providing
testimony that Mr. Jimenez was the shooter.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 60.

The report indicates that Mr. Tueffel described an incident in which Luis Hernandez approached him in the presence of a friend named Joey. He reported that Luis Hernandez told him that Juan Carlos Torres wanted to kill him because he was a witness to the killing of Mr. Morro. Mr. Tueffel described fearing that he would be killed if he identified the real shooter.

The report details Mr. Tueffel being taken to several places in the vicinity of the shooting.

**Deposition of Steven Drizin Dated November 3, 2010**

Mr. Drizin is employed at the Northwestern University School of Law in Chicago and works with the Center on Wrongful Convictions. In the deposition, he said that he believed Somerset Place to be a halfway house or Section 8 housing and understood that some of the people there had mental health issues. Mr. Drizin stated that he considered whether Mr. Tueffel might have mental health issues and that he or Ms. Flaum asked Mr. Tueffel himself about his mental health status. He recalled this information being transmitted to the State's Attorney's Office. He indicated that his concerns were alleviated by speaking with and observing Mr. Tueffel. He did not recall whether Mr. Tueffel ever told him that he was a paranoid schizophrenic. He recalled Mr. Tueffel telling him that he had attempted suicide. Mr. Drizin stated that he understood that some of Mr. Tueffel's mental health problems stemmed from having put an innocent person in prison.

Mr. Drizin indicated that Luke Netzel was the first member of the Center on Wrongful Convictions team to contact Mr. Tueffel. He explained that it had taken significant effort for them to locate Mr. Tueffel. He recalled that Mr. Tueffel had told Mr. Netzel that Thaddeus Jimenez was not the shooter on Mr. Netzel's original meeting with him and that Mr. Netzel had conveyed this information to Mr. Drizin.

In the deposition, Mr. Drizin indicated that he, Ms. Flaum, and Mr. Netzel met with Mr. Tueffel for approximately an hour on July 31, 2006 before taking the statement. He recalled that the handwritten statement was prepared in the presence of Mr. Tueffel. He did not think that Mr. Tueffel was shown any documents or videotapes at the time of the initial interview. He also did not think that Mr. Tueffel was told that Thaddeus Jimenez was thought to be innocent or that Juan Carlos Torres was thought to be the shooter before his statement was taken.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 61.

Mr. Drizin indicated that he recalled that Mr. Tueffel had spoken to a priest and confessed. He recalled that his team had tried to locate the priest.

Mr. Drizin recalled that the Center had a picture of Juan Carlos Torres as an adult but not as a juvenile.

**Deposition of Alison Flaum dated January 25 and 28, 2011**

Ms. Flaum is an attorney who worked for the Northwestern University School of Law's Center on Wrongful Convictions. She had several contacts both by telephone and in person with Mr. Tueffel.

Ms. Flaum did not recall any efforts to determine, in advance of interviewing him on July 31, 2006, the reason Mr. Tueffel was staying at a nursing home. She said that any concerns she had were allayed after meeting with him that day. She indicated that she was satisfied that he could give a statement based on speaking with him before taking the statement.

On the subject of Mr. Tueffel's mental health at the time, Ms. Flaum stated that her concerns were his ability to make a free choice to speak and to understand who they were and what they were asking. She stated that she saw no signs that these abilities were compromised. She did not believe that Mr. Tueffel mentioned that he had schizophrenia. She did not recall him mentioning a history of delusions. She did not recall what questions they may have asked along those lines or what answers Mr. Tueffel may have given. She did not recall him mentioning previous suicide attempts. She denied having concerns due to Mr. Tueffel's residence at Somerset that he had memory problems. She acknowledged that she did not speak with Mr. Tueffel's doctors at any time and that she was unaware of anyone else doing so. She recalled that Mr. Tueffel said he suffered from anxiety. She recalled that Mr. Tueffel felt guilty about what he had done in Thaddeus Jimenez's case.

She believed that Mr. Tueffel mentioned Carlos on July 31, 2006. She estimated that she and her colleagues were at Somerset for a couple of hours.

Notes from the Thaddeus Jimenez case were reviewed during the deposition. The notes detail several telephone calls with Mr. Tueffel as

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 62.

well as multiple in person meetings. The notes indicate that Mr. Tueffel participated in a January 2007 meeting with the Morro family and personnel from the Center on Wrongful Convictions. The notes also indicate that Mr. Tueffel accompanied her team when they visited the Morro family in Iowa. A note dated March 3, 2009 reads "What LT like? Kind of slow mentally." The notes describe telephone calls in which she is discussing with Mr. Tueffel meeting with the State's Attorney's Office. The notes indicate that Mr. Tueffel was provided the names of priests who had worked at Saint Genevieve's to see if the priest he said he told that Mr. Jimenez was not the shooter could be located. The notes indicate that he did not recognize the names.

**Handwritten statement of Mr. Tueffel dated July 31, 2006**

In this handwritten statement, Mr. Tueffel stated that he knew Thaddeus Jimenez pretty well and would have recognized him if he had been at the scene of the shooting. He reported having given a correct description of the shooter to the police right after the shooting. He remarked that police came and brought him back to the police station at approximately 2 AM. He said that they were screaming at him and telling him that he was lying. He admitted that he was scared, upset, nervous and crying. He explained that he did not know what would happen to him if he did not tell them it was Mr. Jimenez. The statement indicates that Mr. Tueffel tried to tell the police that it was not Mr. Jimenez but that after an hour or two hours of being screamed at he was so confused and scared that he just said what they wanted.

He stated that they asked him to pick Mr. Jimenez out of a lineup and that he did so. He stated that the shooter did not resemble Mr. Jimenez.

He indicated he did not want to testify at trial because he knew it was wrong. He recalled telling an officer that he did not want to testify because Mr. Jimenez was innocent. He remembered thinking that no one would believe him if he told the truth. He reported that he had told the truth only to the officer that came to pick him up for trial, his mother, and a priest at St. Genevieve's.

**JIM06317– JIM06319**

These pages are a copy of an e-mail from Patrick Harrigan that appears to describe the interview of Celeste Stack with Larry Tueffel. The e-mail indicates that the interview went well and that Mr. Harrigan had lunch with Mr. Tueffel after the interview. It describes that a great weight had

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 63.

been lifted from Mr. Tueffel's shoulders and that he had shown a willingness to take a lie detector test. He reported that he had been interrogated quite hard in the middle of the night and was in shock from Mr. Morro's death at that time. The e-mail indicates that he had explained his mental health situation and asked that it not be shared with Mr. Jimenez or anyone else.

**Mr. Tueffel statement dated August 20, 2010**

This statement signed by Mr. Tueffel on August 20, 2010 indicates that he was with Mr. Morro when he was shot. The statement indicates that he recognized the shooter and the person with the shooter, that one of them was named "Victor," and that the other was nicknamed "Crazy." The statement indicates that he now knows that the real shooter was Juan Carlos Torres. The statement indicates that when Mr. Tueffel sat in a police car with Phil Torres, Phil Torres said that he thought TJ was the shooter and Mr. Tueffel told Phil Torres at that time that TJ was not the shooter.

The statement indicates that when Mr. Tueffel first talked to police he gave a description of who shot Mr. Morro but did not give the names Victor or Crazy. The statement indicates that, at 2 AM, he was taken down to the station for more questions and told police that Mr. Jimenez was the shooter. The statement indicates that the police never threatened or coerced Mr. Tueffel to say that Mr. Jimenez was the shooter and that he said Mr. Jimenez was the shooter because other witnesses were saying it and because he did not think that people would believe him otherwise.

The statement indicates that Mr. Tueffel does not think that the police did anything wrong. It indicates that Mr. Tueffel simply went along with what the other witnesses were saying and that he knows he should not have done that and regrets it.

The statement indicates that, on the day of the shooting, Mr. Tueffel went to Shawn Cosmen's house after school and saw Mr. Jimenez with a handgun. The statement indicates that Mr. Morro kicked Mr. Jimenez out of the house and that Mr. Jimenez was mad about it. The statement indicates that Mr. Tueffel had seen Mr. Jimenez with guns on other occasions.

The statement indicates that Mr. Tueffel testified two times that Mr. Jimenez was the shooter and that he was not coerced to do so. It

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 64.

indicates that Mr. Tueffel never told anyone that Juan Carlos Torres
was the shooter. The statement indicates that he first learned the name
Juan Carlos Torres from Luke from the Northwestern Clinic. The
statement indicates that Luke showed him a photo and asked if this was
the person who shot Mr. Morro and that, when he said it was (the
person), Luke said that the picture was of Juan Carlos Torres.

## Trial Transcripts from *The People of the State of Illinois vs. Thaddeus Jimenez*

At the trials, Mr. Tueffel identified Mr. Jimenez as having been in a gang
with him. He said that he knew Victor from school.

Mr. Tueffel described Victor pushing Mr. Morro up against a wall, Mr.
Morro trying to take a swing and missing, Mr. Jimenez putting a gun to
Mr. Morro's chest, and the gun going off. He testified that Mr. Jimenez
fled on foot with Victor. He testified that the police arrived and that he
was put in a police car. He testified that he was in the car with Phil
Torres, that Phil Torres asked if it was T.J., and that he said it wasn't.
He testified that he was taken to the police station around 9:30 in the
evening and around 3:30 in the morning. He testified that, the second
time he was taken to the station, the police told him that he was lying
and that there were other witnesses. He said that after hearing that, he
told the truth and identified Mr. Jimenez. He said that he did not indicate
it was Mr. Jimenez before then because he didn't want anything to
happen to his family or house, because you are not supposed to testify
against members of the same gang, and because he was scared and
nervous. He agreed that he did not want to come and testify against Mr.
Jimenez at the first trial.

## Medical Records of Mr. Tueffel from R. Craig McKenna, M.D.

Dr. McKenna is a psychiatrist who treated Mr. Tueffel. The records
reflect outpatient treatment from February 2010 through November
2010. The records describe him as generally stable taking risperidone
at a dose of 2 mg in the evening.

## Medical Records from Somerset Place

Somerset Place is a skilled nursing facility where Mr. Tueffel lived from
November 2003 to October 2008.  He was admitted there from
Riveredge Hospital. The principal diagnosis noted at Somerset Place

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 65.

was schizoaffective disorder. Mr. Tueffel's course at Somerset Place was notable for two hospitalizations early in his stay there.

The first hospitalization while at Somerset Place occurred in December 2003. At that time he was experiencing auditory and tactile hallucinations, including voices commanding him to kill someone. He had a plan to kill with his hands and stated that he would attempt to follow through.  He believed that there was a plot to kill him. He was placed on one to one nursing supervision due to having become agitated and aggressive. He apparently smoked "crack" cocaine on December 13, 2003. He was noted to have been swinging his fists at a peer. With a lighter, he was attempting to set aflame a sales paper. He was refusing medication.  He had been sexually inappropriate and described that the hospitalization was punishment because he was not paying enough sexual attention to the nurse.

Mr. Tueffel was admitted to St. Elizabeth's Hospital on December 29, 2003. At that time he had been increasingly agitated, hostile, and was inappropriate towards a female.  He is described as having been paranoid, grandiose and exhibiting poor insight. There is a report of psychological testing completed on January 4, 2004. It describes Mr. Tueffel as the son of a mentally ill mother. Both his mother and his maternal grandfather had abused alcohol and drugs. He is described as being at increased risk for violence and in need of more supervision based on his risk. He is described as grieving for his mother who died a cocaine related death in May of 2003. The report characterizes him as anxious and impulsive and prone to "losing" (?) instructions and quick to feel bad about himself.

He returned from the hospital to Somerset Place in early January of 2004. His medication had been transitioned from quetiapine and trileptal, an antipsychotic and mood stabilizer respectively, to clozapine, an antipsychotic used for refractory psychosis and that requires close monitoring to prevent potentially lethal side effects. Along with clozapine, Mr. Tueffel was taking Zonegran, an antiepileptic sometimes used to help curtail weight gain.

Mr. Tueffel's course at Somerset Place was relatively stable after that point while he was taking appropriate mediations, i.e., he did not suffer periods of acute psychotic decompensation. However, the progressive cognitive impairment associated with schizophrenia continues over time, whether or not a person is adequately medicated. He continued on clozapine, and had the dose decreased over the upcoming months.

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 66.

He appeared to be having some side effects including weight gain and sedation.  Clozapine was reduced to 50 mg at that time in June 2007. It was reduced further to 25 mg at bedtime in August of 2007.

The records reflect that Mr. Tueffel made several visits with family over the course of his stay at Somerset Place, at times to visit his Aunt Colette and at other times he would visit Yolanda Aguilar. During his stay at Somerset Place, Mr. Tueffel had a romantic relationship with another resident. Mr. Tueffel appears to have ceased the use of drugs and alcohol during his stay there. He also appears to have stopped smoking.

With the end of Mr. Tueffel's stay at Somerset Place, he appears to develop some depressive symptomatology in September 2008. He is described as isolating to his room and not eating well. He had an episode of abdominal pain in September 2008 for which he visited the hospital. He requested discharge from the facility in October 2008 and was discharged on October 7, 2008.

**Mr. Tueffel's video for Ms. Morro**

This is a brief videotaped message by Mr. Tueffel addressed to Ms. Morro. Mr. Tueffel appears to be rocking a bit as he speaks to the camera. He indicates that he wants her to know what happened with her son and that he wants to do the right thing and straighten it out. He expresses the hope that she looks at this tape.


Thank you for asking me to consult with you on this forensic psychiatric matter.

After you have had an opportunity to review this report, if you have any additional questions please do not hesitate to contact me.

Sincerely,
.

Mark I. Levy, M.D., D.L.F.A.P.A.
Distinguished Life Fellow, American Psychiatric Association
Diplomate, American Board of Psychiatry and Neurology In Psychiatry
& Forensic Psychiatry

FRCP Rule 26 Expert Opinion
Re: Recantation by Larry Tueffel
Mark I. Levy MD
May 8, 2011
Page 67.

Assistant Clinical Professor, Psychiatry
School of Medicine, University of California,
San Francisco

# EXHIBIT B

Case 1:09-cv-08081  Document 156-2  Filed 11/15/11  Page 2 of 16  PageID 2256

Jimenez vs. City of Chicago
Mark I. Levy, M.D. - 11/02/2011                                    Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION


 3
    THADDEUS JIMENEZ,                    )
 4                                       )
                    Plaintiff,           )
 5                                       )
            vs.                          )  No. 09 CV 08081
 6                                       )
    CITY OF CHICAGO, Chicago Police      )
 7  Detectives JEROME BOGUCKI,           )
    MARK SANDERS, RAYMOND                )
 8  SCHALK, and F. MONTILLA,             )
    Chicago Police Officers LAWRENCE     )
 9  RYAN and ROBERT WHITEMAN, and        )
    as-yet unknown City of Chicago       )
10  Employees,                           )
                                         )
11                  Defendants.          )

12

13            The videoconference deposition of

14  MARK I. LEVY, M.D., called by the Plaintiff for

15  examination, taken pursuant to notice and pursuant to

16  the Federal Rules of Civil Procedure for the United

17  States District Courts pertaining to the taking of

18  depositions, taken before Cheryl A. Goetsch, Certified

19  Shorthand Reporter and Registered Professional Reporter,

20  at 205 West Randolph Street, 5th Floor, Chicago,

21  Illinois, commencing at 10:03 a.m. on the 2nd day of

22  November, A.D., 2011.

23

24
```

 1   discussed the issues with Dr. Roberts.  I'm not sure.

 2   Nothing formal.

 3        Q.   Have you personally ever participated in any

 4   scientific research on any subject in the area of

 5   neuropsychology?

 6        A.   No.  I'm a practicing clinician.  I'm not a

 7   researcher.

 8        Q.   Are you personally qualified to do a

 9   neuropsychological assessment?

10        A.   No.  A neuropsychologist is qualified to do a

11   neuropsychological assessment.  I'm qualified to rely on

12   that data and understand a fair amount of it.

13        Q.   In this case, did you rely on any

14   neuropsychological assessment?

15        A.   Well, I relied on a mental status exam, which

16   is part of a, you know, psychiatric exam, but I did not

17   have Mr. Tueffel tested by a neuropsychologist.

18        Q.   Did you have any neuropsychological assessment

19   done on Mr. Tueffel?

20        A.   I thought I just answered that.

21        Q.   I think that the answer is -- is no, but I

22   wanted to confirm that.

23        A.   The answer is no.

24        Q.   Did you review any records of any

Jimenez vs. City of Chicago
Mark I. Levy, M.D. - 11/02/2011

Page 49

```
 1  neuropsychological assessment?

 2       A.   I have to -- I reviewed a lot of medical

 3  records.  I don't recall any neuropsych testing.

 4       Q.   Tell me what you did in preparing your opinion

 5  in this case.

 6       A.   Well, prior to this past Monday when I

 7  examined Mr. Tueffel, I reviewed the records listed in

 8  my report on page 56 and 57, including looking -- both

 9  reading and reviewing the video of Mr. Tueffel's two

10  volumes of deposition and the video of his July 31st,

11  2006 statement and his video message to Mrs. Morro.  And

12  I reviewed a number of articles in the literature, which

13  I've -- I believe I footnoted, that are concerned with

14  cognitive impairment that's well-known to be a part of

15  the presentation of chronic schizophrenia.

16       Q.   Okay.  Prior to the -- Prior to the psycho- --

17  the face-to-face psych assessment, which we're going to

18  talk about at another date, your -- your work in this

19  case consisted of document review and literature review.

20  Do I have that right?

21       A.   That's correct.

22       MR. KAMIONSKI:  And he said the video.

23       THE WITNESS:  The stuff --

24       MR. BOWMAN:  Yeah.  When I --
```

Jimenez vs. City of Chicago
Mark I. Levy, M.D. - 11/02/2011

Page 51

1      Q.   I'm sorry.  "Is There Evidence of" -- "Is

2   There Evidence For" -- what?

3      A.   Okay.  "Is There Evidence" -- This is the

4   title.  "Is There Evidence For Late Cognitive Decline in

5   Chronic Schizophrenia?"  The lead author is Shah,

6   S H A H.  And the journal is Psychiatric Quarterly.  And

7   it was published -- At least the online version was

8   published by Springer, the publisher, on August 24th,

9   2011.

10      Q.   Thank you.  So other -- Sorry.  Go ahead.

11      A.   That's -- That's all.  I -- I had nothing else

12   to say.

13      Q.   All right.  Other than that -- that article

14   and the -- the articles that are noted in footnotes 1

15   through 9 of your report, that's -- that's it in terms

16   of the literature review?

17      A.   Yes.

18      Q.   Now, I want to make sure I understood an

19   answer that you gave earlier in our conversation.  You

20   said that without the face-to-face assessment -- And

21   correct me if I have this wrong.  You said that without

22   the face-to-face assessment, you were not in a position

23   to diagnose Tueffel yourself; is that right?

24      A.   Yeah.  My understanding of medical ethics is

1   that it is unethical to make a diagnosis of a patient

2   without an examination unless they are deceased or

3   total- -- You know, you have to make, really, a best

4   effort to examine him.  And I -- I try to refrain from

5   making those -- from making diagnoses without

6   examination.

7        Q.   Okay.  Well, that was how I read your report,

8   and I wanted to make sure I had that right.  As far as

9   your May 8 report is concerned, you are not putting

10  forth any diagnosis of Tueffel, you are simply

11  reflecting the diagnoses that are in the medical records

12  that you had the opportunity to look at?

13       A.   That's right.

14       Q.   And your opinion is that the diagnosis has

15  been consistent since onset, schizophrenia or

16  schizoaffective disorder?

17       A.   My opinion today is that it's schizophrenia

18  and not schizoaffective disorder, but when I wrote the

19  report, that's what I relied upon because both diagnoses

20  were in the note -- were in the medical charts.

21       Q.   Okay.  Well, I -- I -- I was -- I wasn't going

22  to be able to restrain myself from asking how you ended

23  up diagnosing him after your assessment, but I'm not

24  going to pursue right now the reasons for your

1      A.    That's correct.

2      Q.    -- with respect to those -- Is that right?

3      A.    Yes.

4      Q.    And then with respect to those portions of the

5    transcript that drew your interest, you also looked at

6    the -- at the video?

7      A.    Correct.

8      Q.    All right.  Now, have you ever done an

9    analysis like this one in any other case, where you have

10   reviewed a transcript and then commented on whether in a

11   particular instance the witness was exhibiting

12   compliance, confabulation, or confusion?

13     A.    In -- In a report, you're asking me?

14     Q.    In any other --

15     A.    In a written --

16     Q.    In any other forensic assignment, have -- that

17   you have undertaken in your career, have you ever

18   performed a study similar to the study that you did in

19   this case?

20     A.    Not that I can recall.

21     Q.    All right.  And is it fair to call this a

22   study, a -- a psy- -- a psychiatric study of the Tueffel

23   transcript?  Is that how you characterize what you did

24   here?

1  dilemmas that Mr. Tueffel struggles with in the

2  deposition, as I see it.  I think any well-trained

3  forensic psychiatrist, experienced person, would come --

4  would find similar observations.

5        Q.  All right.  Well, can you specify a rate of

6  error as between the particular observations that you

7  made and the observations that another trained

8  psychiatrist might make?

9        A.  No, I cannot.

10        Q.  All right.  Have you ever -- Are you familiar

11  with any literature anywhere in which there has been any

12  study undertaken to validate a study or a review similar

13  to the study that you did in this case?

14        A.  Off -- I'm not aware offhand of any study

15  of -- A study of what?  Maybe I should ask you to define

16  that.

17        Q.  Well --

18        A.  A study of -- of what?

19        Q.  Well, I -- What you did is -- I -- I -- I

20  thought we agreed that -- that -- I guess you didn't

21  want to call it a study because it's not really a study,

22  is it?

23        A.  No.  It's a review of documentary evidence.

24        Q.  All right.  Are you aware of any -- any

 1  scientific literature in your field in which anyone has

 2  attempted to validate a review of documentary evidence

 3  similar to the review of documentary evidence that you

 4  did in this case?

 5      A.   The operative word there is "similar."

 6  There's all kinds of research, say, psychotherapy

 7  research, where independent observers looked at and

 8  recorded a series of sessions and there's generally a

 9  high level of consensus.  What's the error rate?  I

10  don't know.  But there's generally a high level of

11  consensus about what's going on dynamically in the

12  situation that's being recorded and studied.

13      Q.   And when you say --

14      A.   I don't know --

15      Q.   -- sessions -- excuse me for interrupting --

16  you're talking about psychoanalytic sessions?

17      A.   Or psychotherapeutic sessions, yes.

18      Q.   Or psychotherapeutic sessions, right.

19           Okay.  But that's not what we have here, is

20  it?  The deposition is not a psychoanalytic or a

21  psychotherapeutic session, right?

22      A.   That -- Absolutely, yes.

23      Q.   Okay.  All right.  So what I'm asking about is

24  a documentary review, a transcript or, if you like, some

Jimenez vs. City of Chicago
Mark I. Levy, M.D. - 11/02/2011

Page 89

1   other type of similar document.  Are you aware of any

2   scientific literature anywhere in which anyone has

3   attempted to validate scientifically this type of

4   documentary review?

5       A.   By "validate," do you mean validate the

6   conclusions of the observer such as myself?

7       Q.   Correct.

8       A.   I'm not a- -- The an- -- The short answer is

9   I'm not aware of any study where that's been attempted.

10      Q.   Okay.  Let me ask you this.  Would your

11  opinion in this case change if another psychiatric

12  expert were to review the same Tueffel transcripts and

13  come to different conclusions about the prevalence of

14  compliance, confabulation, and confusion in -- in

15  evidence in that transcript?

16      A.   As in any forensic psychiatric opinion, it

17  depends on the evidence proffered to support the

18  conclusions.

19      Q.   Okay.  So you'd -- you'd wait and see, and

20  you'd keep an open mind?

21      A.   Yes.

22      Q.   All right.  Now, you identify a number of

23  instances in the -- in the transcript in which Tueffel

24  appears to be compliant with questioning, right?

Jimenez vs. City of Chicago
Mark I. Levy, M.D. - 11/02/2011

Page 105

1        A.   Certainly --

2        Q.   Go ahead.

3        MR. KAMIONSKI:   Let him just finish his answer.

4   BY MR. BOWMAN:

5        Q.   Go -- Go ahead --

6        A.   Certainly --

7        Q.   Go ahead and continue.   Then I'll ask my next

8   question.

9        A.   Okay.   What you just said as far as looking at

10  depositions for evidence of mental illness, that's

11  something I do frequently if there's any question of

12  mental illness.

13       Q.   All right.   Have you -- Have you in any other

14  case prepared a report like this one, in which you have

15  dissected a deposition transcript for evidence of

16  symptoms of mental illness and -- and prepared a report

17  like this one that identifies those -- those areas of

18  the transcript in which you would -- you would caution

19  anyone from relying on the testimony?

20       A.   No, not in this manner.   The answer is no, I

21  have not in this written manner.

22       Q.   Now, you obviously want me to ask you, so I'll

23  go ahead and ask you.   In what other manner have you

24  done this if not in a written report?

Jimenez vs. City of Chicago
Mark I. Levy, M.D. - 11/02/2011

Page 106

1      A.   This is a somewhat unusual situation because I

2   was being asked to offer an opinion about the effects of

3   a mental illness upon the reliability of testimony.

4   That's not a typical situation.  Typically I am asked to

5   make a diagnosis and then answer questions about

6   causation, sometimes damages, et cetera.

7      Q.   Can you speci- --

8      A.   In all of --

9      Q.   Sorry.  Go ahead.  Sorry.

10     A.   So in all of those cases, deposition

11  transcripts are important documents for me to review.

12  And I may quote from the deposition transcripts or -- or

13  point out the contradictions or point out how certain

14  statements in the depositions support a particular

15  psychiatric diagnosis, but it's not in the manner that I

16  did it in this case.

17     Q.   Right.  And I may have asked you this before

18  already as well.  And if I did, I apologize.  Is there

19  any other case that you can identify in which you have

20  been asked to give an opinion as to the reliability of

21  testimony as you were here?

22     A.   Not that I can recall offhand.  Now, let me

23  just -- I must add to that.  Often there are issues of

24  malingering and reliability of claims, you know --

Jimenez vs. City of Chicago
Mark I. Levy, M.D. - 11/02/2011

Page 107

1        Q.    That's not what I'm asking.   I'm asking --

2        A.    Okay.

3        Q.    I'm asking -- You've got an individual who is

4    going to testify at a trial about some events that he

5    experienced in the world, not having to do with his

6    mental illness but having to do with events external to

7    him.   And -- And so that's my question.   In that

8    circumstance, other than this case, is there any other

9    case in which you have been asked to offer an opinion

10   like this one about the witness's reliability?

11       A.    Not that I can recall.

12       Q.    And does that include the -- the woman with

13   senility that we asked you about before?

14       A.    Well, it doesn't include that because -- but

15   that's also a little different.   If I'm understanding

16   your question, you're asking me -- Let me rephrase your

17   question as I understand it, and you tell me if I'm

18   missing it.

19            I think you're asking me:   Have I ever been

20   asked before to look at the effects of a person's mental

21   illness upon the reliability of their testimony?   And

22   the only case I can think of where that is -- was true

23   is this woman with a testimonial competency issue.   And

24   then I believe there are one or two other cases, and I

1   schizophrenia.

2       Q.   Well, let me -- let me ask you this.  Can you

3   say more probably than not that this desire for approval

4   and to cooperate in order to be accepted as part of the

5   team and so forth, that that is attributable to his

6   chronic mental illness?  Can you say it within --

7       A.   Yes.

8       Q.   -- a reasonable degree of scientific

9   certainty?

10      A.   Yes.

11      Q.   Okay.  You will agree, though, that -- that

12  there are all kinds of healthy people in the world who

13  have this set of personality characteristics, right?

14      A.   Yes.

15      Q.   And you'll agree that juries evaluate this all

16  of the time, right?

17      A.   Yes.

18      Q.   Let me look at -- with you at the last bullet

19  point.  Due to his chronic -- And I'm on the same page.

20  Due to his chronic schizophrenia, Mr. Tueffel is

21  vulnerable to the intrusion of delusional thinking

22  regarding the events relevant to the case, and this

23  vulnerability would make him an unreliable witness.  Did

24  delusional thinking intrude in the course of the

1   transcript that you reviewed?

2          A.    I can't know that.

3          Q.    Okay.

4          A.    I don't know.

5          Q.    You don't have any idea?

6          A.    I just don't know.

7          Q.    Right.  So you can't say to a reasonable

8    degree of -- of medical certainty whether there were any

9    delusional thoughts that intruded in the deposition

10   process in March of this year, right?

11         A.    Well, I -- as I think about it, there was

12   certain -- there were -- there were statements of

13   questionable validity.  It's not clear -- You know, a

14   delusion is a -- is a false belief, not necessarily a

15   bizarre one.  And the whole matter of whether he

16   confessed to a priest at St. Genevieve Church or not --

17   he swings back and forth on this.  And so I don't know

18   whether he has a false belief that he made a confession

19   or whether he made a confession and it's an accurate

20   belief.  But if it were a false belief, it could be seen

21   as falling under the umbrella of a delusional thought.

22         Q.    Right.  I'm going to ask Cheryl if she could

23   read my question back.  And if you could answer it yes

24   or no, I'd appreciate it.  And if you just can't manage

Jimenez vs. City of Chicago
Mark I. Levy, M.D. - 11/02/2011

Page 112

1   that, then I'll move on.

2                        (From the record above, the court

3                         reporter read the following:

4                         ("Q.  So you can't say to a

5                          reasonable degree of medical

6                          certainty whether there were any

7                          delusional thoughts that intruded in

8                          the deposition process in March of

9                          this year, right?")

10  BY THE WITNESS:

11      A.   The answer is I do not know.

12      Q.   All right.  Now, let's look at this bullet

13  point just above the one we've been discussing.

14  Tueffel, who's been diagnosed with paranoid

15  schizophrenia, including now by you, realistically or

16  unrealistically may have feared retribution from

17  Thaddeus Jimenez or others, compelling him to recant.

18  If this were so, it would make him an unreliable

19  witness.  Now, is that a psychiatric opinion, Doctor?

20      A.   No.

21      Q.   And -- And -- You know, again, whether --

22  whether some witness may be in fear of retribution for

23  his testimony, this is the kind of thing that juries

24  evaluate all of the time, right?