APPEAL,TERMED,VALDEZ

# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 5.0.3 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:09–cv–08081
# *Internal Use Only*

Jimenez v. City Of Chicago et al
Assigned to: Honorable Matthew F. Kennelly
Demand: $9,999,000
Case in other court:  12–02779
Cause: 42:1983 Civil Rights Act

Date Filed: 12/31/2009
Date Terminated: 01/24/2012
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/01/2011 | 186 | 2 | PROPOSED Pretrial Order (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Chanen, Stuart) (Entered: 12/01/2011) |
| 12/01/2011 | 187 | 108 | RESPONSE by Jerome Bogucki, Mark Sanders, Raymond Schalk to MOTION by Plaintiff Thaddeus Jimenez in limine 183 (Attachments: # 1 Exhibit Ex. 3, # 2 Exhibit Ex. 4, # 3 Exhibit Ex. 5, # 4 Exhibit Ex. 7, # 5 Exhibit Ex. 9, # 6 Exhibit Ex. 11, # 7 Exhibit Ex. 12, # 8 Exhibit Ex. 13, # 9 Exhibit Ex. 14, # 10 Exhibit Ex. 15, # 11 Exhibit Ex. 16, # 12 Exhibit Ex. 17, # 13 Exhibit Ex. 18, # 14 Exhibit Ex. 19)(Ahn, Joan) (Entered: 12/01/2011) |
| 12/05/2011 | 188 | 203 | MOTION by Plaintiff Thaddeus Jimenez in limine *to bar certain opinions of Alexander Obolsky* (Attachments: # 1 Exhibit A (Expert Report of Alexander Obolsky))(Bowman, Locke) (Entered: 12/05/2011) |
| 12/05/2011 | 190 | 253 | MINUTE entry before Honorable Matthew F. Kennelly:Final pretrial conference held on 12/5/2011, and continued to 12/7/2011 at 02:30 PM.Judicial staff mailed notice (gl, ) (Entered: 12/05/2011) |
| 12/07/2011 | 191 | 254 | MINUTE entry before Honorable Matthew F. Kennelly:Continued pretrial conference held on 12/7/2011, and continued to 12/12/2011 at 03:00 PM.Judicial staff mailed notice (gl, ) (Entered: 12/08/2011) |
| 12/13/2011 | 192 | 255 | Plaintiff's motion in limine to bar certain opinions of Alexander Obolsky is terminated in part as moot due to defendants' withdrawal of Dr. Obolsky as a witness and entered and continued in part, pending further discussions between the parties, with regard to the exhibits identified in the motion. All remaining motions in limine are terminated based on the oral rulings made by the Court at the pretrial conferences held on 12/5/11, 12/7/11, and 12/12/11. (mk) (mb, ). (Entered: 12/13/2011) |
| 12/13/2011 | 193 | 256 | MINUTE entry before Honorable Matthew F. Kennelly: Continued final pretrial conference held on 12/12/2011. (mk) (mb, ). (Entered: 12/13/2011) |

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

THADDEUS JIMENEZ,                    )
                     Plaintiff,        )        No. 09 C 8081
     v.                              )
                                      )        Judge Matthew F. Kennelly
CITY OF CHICAGO, et al.,              )
                   Defendants.       )

**FINAL PRETRIAL ORDER**

Plaintiff Thaddeus Jimenez and Defendants Jerome Bogucki, Mark Sanders, and Raymond Schalk,[1] hereby submit this Final Pretrial Order to the Honorable Judge Matthew F. Kennelly. This Order will control the course of the trial and may not be amended except by consent of the parties, or by order of the Court to prevent manifest injustice.

**1.      JURISDICTION.**
This Court has federal subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331.   This Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

**2.      CLAIMS.**
Plaintiff Thaddeus Jimenez spent 16 years in prison for a murder before his conviction was overturned and he was granted a certificate of innocence.  Mr. Jimenez has now brought this lawsuit alleging that the three defendants, Chicago police officers Jerome Bogucki, Mark Sanders, and Raymond Schalk violated his civil rights and maliciously caused him to be prosecuted in 1993 for the murder of a boy named Eric Morro.  The Defendant Officers, Bogucki, Sanders, and Schalk, deny that they did anything to violate plaintiff's civil rights or to maliciously cause him to be prosecuted. Defendants further deny that they caused plaintiff to suffer any damages.

**3.      RELIEF SOUGHT.**

---

[1]      Defendant, City of Chicago ("City"), hereby joins in this Final Pretrial Order and states that it is attempting to finalize an agreement with plaintiff whereby no mention, reference, or instruction will be made to the jury regarding the City.  In the event said agreement is not reached, the City hereby incorporates its previously filed defenses, and adopts all witnesses, exhibits and instructions identified by the Defendant Officers herein as if fully set forth herein on behalf of the City.  The last issue to be resolved in order to finalize the agreement is that Plaintiff reserves the right to seek recovery against all of the former Defendants.  The City opposes that reservation.  If the parties cannot come to an agreement, they will file a motion with the Court to adjudicate the issue.

Mr. Jimenez seeks compensatory damages to compensate him for the 16 years, 2 months, and 28 days that he spent in prison for a murder he did not commit, and everything that entails, as well as the damages caused to Mr. Jimenez's current and future life based on his wrongful incarceration, including but not limited to the fact that:

- the last years of his childhood and all of this adolescence were taken from him;
- upon release at 30 years old, he does not have the life skills or work history that one develops through progressive socialization in society from ages 13-30;
- upon release at 30 years old, Mr. Jimenez suffered and continues to suffer from depression and post-traumatic stress disorder.

While it is impossible to precisely liquidate the damages that would compensate a person for these sorts of injuries, Plaintiff intends to ask the jury for an amount commensurate with his loss, which should exceed $1 million per year of wrongful incarceration.

**4.      WITNESSES.**
Plaintiff's witnesses, including experts, are attached as **Exhibit 1** to this Final Pre-Trial Order.  **Exhibit 1** includes (a) who will be called; (b) who may be called; and (c) whose deposition may be used, and also includes any of Defendants' objections to those lists.

Defendants' witnesses, including experts, are attached as **Exhibit 2** to this Final Pre-Trial Order.  **Exhibit 2** includes (a) who will be called; (b) who may be called; and (c) whose deposition may be used, and also includes any of Plaintiff's objections to those lists.

**5.      EXHIBITS.**
Plaintiff's Exhibit List (including Defendants' agreement as to Admissibility and Authenticity, and Defendants' Objections) is attached as **Exhibit 3**.

Defendant's Exhibit List by trial exhibit number (including Plaintiff's Agreement as to Admissibility and Authenticity and Plaintiff's Objections) is attached as **Exhibit 4**.

**A.      COPIES OF EXHIBITS FOR COURT.**
Plaintiff and Defendants will provide a bench book of their respective proposed exhibits at or before the start of trial.

**B.      EXHIBITS TO BE DISPLAYED TO JURY.**
The parties acknowledge that if an exhibit is to be displayed to the jury, the party intending to display the exhibit must use an enlargement or projection of the exhibit.

**6.      TYPE AND LENGTH OF TRIAL.**
The trial of this case will be to a jury and will take approximately 10-15 trial days.

**7.      PROPOSED FINDINGS AND CONCLUSIONS.**
Because this is a jury trial, the parties have not submitted findings and conclusions.

**8.      PROPOSED VOIR DIRE QUESTIONS.**
The parties' proposed *voir dire* questions and their respective objections are attached as **Exhibit 5**.

**9.      PROPOSED JURY INSTRUCTIONS.**

**A.      AGREED INSTRUCTIONS.**
The parties' proposed jury instructions to which both sides agree are numbered consecutively and attached as **Exhibit 6**.

**B.      DISPUTED INSTRUCTIONS.**
Plaintiff's proposed jury instructions to which Defendants object are attached as **Exhibit 7**.  Both Plaintiff's authority and Defendants' objections and authority are included at the bottom of each proposed instruction.

Defendants' proposed jury instructions to which Plaintiff objects are attached as **Exhibit 8**.  Both Defendants' authority and Plaintiff's objections and authority are noted at the bottom of each proposed instruction.

**10.     EXHIBITS TO FINAL PRETRIAL ORDER**

**Exhibit 1**     Plaintiff's witnesses, including experts, with Defendants' agreements and objections.

**Exhibit 2**     Defendants' witnesses, including experts, with Plaintiff's agreements and objections.

**Exhibit 3**     Plaintiff's Exhibit List, with Defendants' agreements and objections.

**Exhibit 4**     Defendants' Exhibit List, with Plaintiff's agreements and objections.

**Exhibit 5**     Each parties' proposed *voir dire* questions.

**Exhibit 6**     The parties' agreed instructions numbered consecutively.

**Exhibit 7**     Plaintiff's proposed jury instructions to which Defendants object.

**Exhibit 8**     Defendants' proposed jury instructions to which Plaintiff objects.

Dated: December 1, 2011

Respectfully submitted,

THADDEUS JIMENEZ

By:     /s/ Stuart J. Chanen_____
        One of his attorneys

Mr. Jon Loevy            Mr. Stuart J. Chanen       Mr. Locke E. Bowman
Mr. Russell Ainsworth    Ms. Lisa R. Carter         RODERICK MACARTHUR JUSTICE CENTER
Mr. Joel Feldman         VALOREM LAW GROUP          Northwestern University School of Law
LOEVY& LOEVY             35 E. Wacker Dr.           357 E. Chicago Ave.
312 North May St.        30th Floor                 Suite 800
Chicago, IL 60607        Chicago, IL 60601          Chicago, IL 60611
(312) 243-5900           (312) 676-5480             (312) 503-0844

Respectfully submitted,

DETECTIVES JEROME BOGUCKI, MARK SANDERS,
AND RAYMOND SCHALK

By:     /s/ Avi T. Kamionski_____
        One of their attorneys

Mr. Andrew M. Hale
Mr. Avi T. Kamionski
Ms. Joan Ahn
Andrew M. Hale & Assoc.
53 W. Jackson Blvd.,
Suite 1800
Chicago, IL 60604
(312) 341-9646

Respectfully submitted,

CITY OF CHICAGO

By:     /s Harry N. Arger_____
        One of their attorneys

Mr. Terrence M. Burns
Mr. Harry N. Arger
Mr. Paul A. Michalik
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700

**SO ORDERED.**

ENTERED THIS 5TH OF DECEMBER 2011.

_____

THE HONORABLE MATTHEW F. KENNELLY

## <u>CERTIFICATE OF SERVICE</u>

I, Stuart J. Chanen, an attorney, certify that on December 1, 2011, I caused to be served

by ECF a copy of the attached Final Pretrial Order and Exhibits 1-8 to counsel of record at:

Mr. Andrew M. Hale
Mr. Avi T. Kamionski
Ms. Joan Ahn
Andrew M. Hale & Assoc.
53 W. Jackson Blvd.,
Suite 1800
Chicago, IL 60604
(312) 341-9646

Mr. Terrence M. Burns
Mr. Harry N. Arger
Mr. Paul A. Michalik
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700

Mr. Locke E. Bowman
Roderick MacArthur
Justice Center
Northwestern U. School of Law
357 E. Chicago Avenue
Chicago, IL 60611

Mr. Jon Loevy
Mr. Russell Ainsworth
Mr. Joel Feldman
312 N. May Street Suite 100
Chicago, IL 60607

/s/ Stuart Chanen

One of the Attorneys for Thaddeus Jimenez

Mr. Stuart J. Chanen
Ms. Lisa R. Carter
Valorem Law Group LLC
35 E. Wacker Drive
30th Floor
Chicago, IL 60601
(312) 676-5480

EXHIBIT 1

### FINAL PRETRIAL ORDER EXHIBIT 1:    PLAINTIFF'S WITNESSES

### PLAINTIFF -- WILL BE CALLED
1.  Jerome Bogucki
2.  Thaddeus Jimenez
3.  Victoria Jimenez
4.  Larry Tueffel
5.  Mary Morro. Defendants Object. F.R.E. 401, 402, 403, 801, 802.

### PLAINTIFF -- MAY BE CALLED
6.  Steve Drizin
7.  Sandra Elder
8.  Tina Elder
9.  Kendall Hill
10. Angela Jimenez
11. Susie Jimenez
12. Chester Makowski
13. Edward Mendrys
14. Lorraine Mendrys
15. Fernando Montilla
16. Charles Murphy
17. Leopold Robles
18. Victor Romo
19. Ezequiel Romo
20. Lawrence Ryan
21. Mark Sanders
22. Raymond Schalk
23. Jayson Spriggle
24. Juan Carlos Torres
25. Phil Torres
26. Robert Whiteman
27. Rosa Wiszo-Waty

### PLAINTIFF – MAY BE CALLED (EXPERTS)
28. Steve Dinwiddie, Rebuttal Expert
29. Kent Gibson, Expert
30. Peggy Hough, Expert
31. Antoinette Kavanaugh, Expert
32. Greg McCrary, Expert

### PLAINTIFF -- MAY CALL BY DEPOSITION TRANSCRIPT
Tina Elder


We reserve the right to call any witness that appears on Defendants' Witness Lists, any witness for impeachment, and any other witness called for "good cause" and approved by the Court.

# EXHIBIT 2

## FINAL PRETRIAL ORDER EXHIBIT 2: DEFENDANTS' WITNESSES

**DEFENDANTS -- WILL BE CALLED**

| No. | Witness | Plaintiff's Objections |
|-----|---------|------------------------|
| 1. | Bogucki, Jerome | |
| 2. | Cortez, Carmelo | See motion in limine |
| 3. | Cosmen, Donna (by deposition) | See motion in limine regarding threat testimony. Plaintiff also reserves his right to require a showing of unavailability and to object to any specific designated testimony that the defendants may hereafter provide. |
| 4. | Elder, Sandra (by deposition) | See motion in limine regarding threat testimony. Plaintiff also reserves his right to require a showing of unavailability and to object to any specific designated testimony that the defendants may hereafter provide. |
| 5. | Elder, Tina (by deposition) | See motion in limine regarding threat testimony. Plaintiff also reserves his right to require a showing of unavailability and to object to any specific designated testimony that the defendants may hereafter provide. |
| 6. | Gutekanst, Elizabeth | See motion in limine. |
| 7. | Hill, Kendall | |
| 8. | Jimenez, Susie | See motion in limine regarding irrelevant and prejudicial testimony. |
| 9. | Makowski, Chester | Objection as to relevance. |
| 10. | Murphy, Charles | |
| 11. | Murphy, John | Objection as to relevance. See motion in limine regarding irrelevant and prejudicial testimony. |
| 12. | Netzel, Luke | |
| 13. | O'Brien, Darren | See motion in limine. |
| 14. | Sanders, Mark | |
| 15. | Sandoval, Roger | Objection hearsay. |
| 16. | Savini, Gina | Objection relevance. |

| No. | Witness | Plaintiff's Objections |
|-----|---------|------------------------|
| 17. | Schalk, Raymond | |
| 18. | Stack, Celeste | See motion in limine. |
| 19. | Torres, Phil | See motion in limine. |

## DEFENDANTS -- MAY BE CALLED

| No. | Witness | Plaintiff's Objections |
|-----|---------|------------------------|
| 20. | Alvarez, Anita | See motion in limine.  Objection relevance. |
| 21. | Betbabo, Albertin | Relevance, Potential Spousal or Quasi-Spousal Privilege |
| 22. | Brady, Dennis | Objection relevance. |
| 23. | Cornett, Danny | Objection relevance. |
| 24. | Cosmen, Shawn | Objection relevance.  See motion in limine regarding threat testimony. |
| 25. | Drizin, Steve | |
| 26. | Flaum, Alison | |
| 27. | Gaughn, David | Objection relevance.  See motion in limine regarding irrelevant and prejudicial testimony. |
| 28. | Gillin, Margot | See motion in limine. |
| 29. | Harris, Whitney | Objection relevance and non-disclosure. |
| 30. | Hernandez, Luis | |
| 31. | Montilla, Fernando | |
| 32. | Morro, Herb | Objection relevance and non-disclosure. |
| 33. | Pomeroy, Anthony | Objection relevance and non-disclosure. |
| 34. | Romo, Catalina | See motion in limine. |
| 35. | Ryan, Lawrence | |
| 36. | Scroggins, Jerry | See motion in limine. |
| 37. | Snyder, Charles | Objection relevance and non-disclosure. |

| No. | Witness | Plaintiff's Objections |
|---|---|---|
| 38. | Spaw, John | Objection relevance. |
| 39. | Spellman, John | Objection relevance and non-disclosure. |
| 40. | Sullivan, Terry | Objection relevance. |
| 41. | Torres, Juan Carlos, Sr. | Objection relevance and non-disclosure to the extent this witness will offer any opinion. |
| 42. | Viale-Val, Graciela | Objection relevance. |
| 43. | Vorbeck, Rachel | See motion in limine. |
| 44. | Weiner, David | See motion in limine. |
| 45. | Whiteman, Robert | |
| 46. | Zdeb, Danielle (by deposition) | Objection relevance.  Plaintiff also reserves his right to require a showing of unavailability and to object to any specific designated testimony that the defendants may hereafter provide. |

## DEFENDANTS -- MAY BE CALLED (EXPERTS)

| No. | Witness | Plaintiff's Objections |
|---|---|---|
| 47. | Bumcrot, Mike | Plaintiff reserves the right to object to this witness upon receipt of his expert report. |
| 48. | Levy, Mark | See motion in limine. |
| 49. | Obolsky, Alexander | Plaintiff reserves the right to object to this witness following review and analysis of his expert report, which Plaintiff did not receive until the same date that motions in limine were due. |
| 50. | Rebuttal Voice Comparison Expert | Plaintiff reserves the right to object to this witness upon receipt of his expert report. |
| 51. | Ward, Lilliana | See motion in limine. |
| 52. | West, Arlo | Plaintiff reserves the right to object to this witness following review and analysis of all of his materials. |

Defendants reserve the right to call any witness listed by Plaintiff, any witness for impeachment purposes, and any witness for "good cause" who is approved by the Court.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | No. 09-CV-8081 |
| | ) | |
| CITY OF CHICAGO, ET. AL. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## INDEX OF PLAINTIFF'S TRIAL EXHIBITS

## Exhibits Marked For Admission Into Evidence

| EXH. | DESCRIPTION | OTHER ID | USED | OFFERED | ADMITTED | AUTHENTIC | ADMISSIBLE | DEFENDANTS' OBJECTION |
|---|---|---|---|---|---|---|---|---|
| PX 01 | CPD Supplementary Report re: Field Investigation | JIM 00013 – 00020 TRJ 00039 – 00046; **SJ PX 15** | | | | | | |
| PX 02 | CPD General Progress Report re: Notes of Tueffel Interview | TRJ 00255 – 00256 **SJ PX 16** | | | | | | |
| PX 03 | CPD General Offense Case Report re: RD No. X-051839 | JIM 00004 – 00007 **SJ PX 17** | | | | | | |
| PX 04 | CPD Polaroid Photograph re: Thaddeus Jimenez | TRJ 00259; T. Elder Dep. 2 **SJ PX 18** | | | | | | |

| Exh. | Description | Other ID | Used | Offered | Admitted | Authentic | Admissible | Defendants' Objection |
|------|-------------|----------|------|---------|----------|-----------|------------|------------------------|
| PX 05 | CPD General Progress Report re: Notes of Torres Interview | JIM 00033, JIM 0036; TRJ 00257 – 00258 **SJ PX 19** | | | | | | |
| PX 06 | CPD Arrest Report | JIM 00046 TRJ 00052 **SJ PX 20** | | | | | | |
| PX 13 | CPD Supplementary Report re: Field Investigation Lineup Report | TRJ 00049 – 00051 **SJ PX 28** | | | | | | |
| PX 14 | CPD Supplementary Report re: Victor & Ezequiel Rome dated 02/10/93 | JIM 00021 – 00024 **SJ PX 29** | | | | | | |
| PX 15 | Hand drawn map | JIM 00039 **SJ PX 30** | | | | | | |
| PX 16 | General Progress Report re: Ezequiel Romo | JIM 00040 **SJ PX 31** | | | | | | |
| PX 18 | Translation of Taped Confession | JIM 00253 – 00262 **SJ PX 33** | | | | | | |
| PX 19 | CPD Supplementary Report re: Re-Interview of Juan Torres | JIM 00025 – 00026 **SJ PX 34** | | | | | | |
| PX 20 | CPD Investigative File Inventory | JIM 00030 **SJ PX 35** | | | | | | Defs' MIL No. 7. |
| PX 22 | CPD Investigative File Inventory | TRJ 00254 **SJ PX 37** | | | | | | |
| PX 23 | Comparison of JIM 00030 and TRJ 00254 | **SJ PX 38** | | | | | | Defs' MIL No. 7. |
| PX 24 | Inventory Item No. 1058724: Note found in the victim's pocket and photo of same | | | | | | | |
| PX 31 | Letter written by Thaddeus | JIM 0589 – | | | | | | |

| Exh. | Description | Other ID | Used | Offered | Admitted | Authentic | Admissible | Defendants' Objection |
|---|---|---|---|---|---|---|---|---|
| | Jimenez requesting legal assistance | 05864 **SJ PX 47** | | | | | | |
| PX 38 | Press Release dated 05/05/09 re: State's Attorney Alvarez Vacates Conviction in 1993. | JIM 06057 **SJ PX 54** | | | | | | Defs' MIL No. 6 and F.R.E. 401, 402, 403., 801, 802 |
| PX 39 | Order re: People v. Jimenez entered by Hon. J. Claps on 05/01/09 | JIM 05245 **SJ PX 55** | | | | | | |
| PX 40 | Certificate of Innocence re: People v. Jimenez entered by Hon. P. Biebel on 06/03/09 | JIM 04351 **SJ PX 56** | | | | | | |
| PX 41 | Arrest Report re: Juan Carlos Torres | [SAO] 0088 – 0092 **SJ PX 57** | | | | | | Defs' MIL No. 6 and F.R.E. 401, 402, 403., 801, 802 |
| PX 42 | Indictment re: Juan Carlos Torres filed on 05/19/09 | **SJ PX 58** | | | | | | Defs' MIL No. 6 and F.R.E. 401, 402, 403., 801, 802 |
| PX 44 | General Progress Report re: Eric Morro and Tina Elder | JIM 00032 TRJ 00061 **SJ PX 67** | | | | | | |
| PX 50 | Petition for Relief from Judgment and Motion for New Trial | JIM 05867 - 05869 | | | | | | |
| PX 53 | Expungement Order | JIM 04340 | | | | | | FRE 401, 402, 403. |
| PX 57 | Medical Examiner's Report | TRJ 00088 | | | | | | |
| PX 58 | Crime Laboratory Report – Firearms Evidence | TRJ 00028 | | | | | | |
| PX 59 | Inventory Intake Sheet regarding the clothing of Juan Carlos Torres | | | | | | | Defs' MIL No. 6. |
| PX 77 | TJ's Letter to Temple Professor Steinberg | | | | | | | F.R.E. 801, 802, 901 |
| PX 78 | Demonstrative re: Aerial Map of Neighborhood | | | | | | | |

| Exh. | Description | Other ID | Used | Offered | Admitted | Authentic | Admissible | Defendants' Objection |
|------|-------------|----------|------|---------|----------|-----------|------------|------------------------|
| PX 79 | Demonstrative re: Satellite Map of Neighborhood | | | | | | | |
| PX 80 | Photo re: View of Honey Baked Ham Building from across Belmont | | | | | | | |
| PX 81 | Photo re: View of Honey Baked Ham Building and adjacent lot from across Belmont | | | | | | | |
| PX 82 | Photo re: View of empty lot | | | | | | | |
| PX 83 | Photo re: View of Honey Baked Ham Building and adjacent lot from across Belmont | | | | | | | |
| PX 84 | Photo re: View of Honey Baked Ham Building and adjacent lot from across Belmont | | | | | | | |
| PX 85 | Photo re: View of Buildings across from Honey Baked Ham Building on Belmont | | | | | | | |

## Exhibits Marked for Identification Only

| Exh. | Description | Other ID | Used | Offered | Admitted | Authentic | Admissible | Defendants' Objection |
|------|-------------|----------|------|---------|----------|-----------|------------|------------------------|
| PX 08 | Handwritten Statement re: Larry Tueffel dated 07/31/06 | [SAO] 0004 – 0019 **SJ PX 23** | | | | | | |
| PX 09 | Affidavit of Larry Tueffel dated 08/20/10 | **SJ PX 24** | | | | | | |
| PX 10 | Defendants' Responses to Third Set of Interrogatories | **SJ PX 25** | | | | | | |
| PX 12 | Affidavit of Tina Elder dated 05/15/07 | [SAO] 0020 – 0021 **SJ PX 27** | | | | | | F.R.E. 801, 802, 901 |
| PX 17 | Affidavit of Ezequiel Romo dated 02/28/07 | [SAO] 0001 – | | | | | | F.R.E. 801, 802, 901 |

| Exh. | Description | Other ID | Used | Offered | Admitted | Authentic | Admissible | Defendants' Objection |
|---|---|---|---|---|---|---|---|---|
| | | 0003 **SJ PX 32** | | | | | | |
| PX 27 | Stipulation and Waiver of Requirement of Proof re: *Jimenez v. City*, et.al. | **SJ PX 42** | | | | | | Plaintiff and the City have not yet finalized the stipulation. F.R.E. 401, 402, 403. |
| PX 32 | Investigative Report re: Interview of Rosa Wiszo-Waty (sister of Victor Romo); and Ms. Medina (Juan Carlos Torres neighbor) | [SAO] 0042 – 0043 **SJ PX 48** | | | | | | F.R.E. 801, 802, 901 |
| PX 33 | Investigative Report re: Interview of Leo Robles and Attempts to locate Phil Torres. | [SAO] 0055 – 0057 **SJ PX 49** | | | | | | F.R.E. 801, 802, 901 |
| PX 34 | Investigative Report re: Interview of Juan Carlos Torres at ESPN Zone. | [SAO] 0038 – 0039 **SJ PX 50** | | | | | | Defs' MIL No. 6 and F.R.E. 401, 402, 403., 801, 802 |
| PX 35 | Investigative Report re: Attempts to locate Juan Carlos Torres at ESPN Zone and Palmer Street address. | [SAO] 0036 – 0037 **SJ PX 51** | | | | | | Defs' MIL No. 6 and F.R.E. 401, 402, 403., 801, 802 |
| PX 36 | Investigative Report re: Interview of Ernie Ritchie (Facility Manager of ESPN Zone.) | [SAO] 0045 – 0046 **SJ PX 52** | | | | | | Defs' MIL No. 6 and F.R.E. 401, 402, 403., 801, 802 |
| PX 37 | Investigative Report re: Interview of Mark Nhoddenbach (Landlord at Palmer Street address). | [SAO] 0093 – 0095 **SJ PX 53** | | | | | | |
| PX 43 | Affidavit of Lisa Carter dated 9/2/2011 | **SJ PX 66** | | | | | | We would simply rather replace this with a stipulation regarding the distance. |
| PX 60 | SAO Request to Test Victim's Clothing for Gun Powder | TRJ 0272 | | | | | | |
| PX 61 | CPD Inventory List of Items Recovered with Victim's Clothing | TRJ 0274 - 00276 | | | | | | |

| Exh. | Description | Other ID | Used | Offered | Admitted | Authentic | Admissible | Defendants' Objection |
|------|-------------|----------|------|---------|----------|-----------|------------|----------------------|
| PX 62 | Chicago Police Officers' Attorney's Motion to Apprise Court of Evidence Exonerating Juan Carlos Torres | | | | | | | FRE 401, 402, 403. 801, 802 |
| PX 64 | Resume re: Gregg McCrary | | | | | | | F.R.E. 401, 402, 403., 801, 802 |
| PX 66 | Resume re: Kent Gibson | | | | | | | F.R.E. 401, 402, 403., 801, 802 |
| PX 68 | Resume re: Antoiniette Kavanaugh | | | | | | | F.R.E. 401, 402, 403., 801, 802 |
| PX 70 | Resume re: Steven Dinwiddie | | | | | | | F.R.E. 401, 402, 403., 801, 802 |
| PX 71 | Warfield v. City of Chicago Fourth Amended Complaint 10/6/2008 | | | | | | | Defs' MIL No. 3. |
| PX 72 | Warfield v. City of Chicago Judgment 7/23/2009 | | | | | | | Defs' MIL No. 3. |
| PX 73 | "Edited" Version of Taped Confession Recorded by Ezequiel Romo | | | | | | | |
| PX 74 | "Unedited" Version of Taped Confession Recorded by Ezequiel Romo | | | | | | | |
| PX 75 | CPD Supplementary Report re: Interview of E. Romo and V. Romo | TRJ00081-00084 | | | | | | |
| PX 76 | CPD Supplementary Report re: Tape Given to ASA Savini | TRJ00085-00086 | | | | | | |
| PX 86 | Photo re: Jerome Bogucki | TRJ00252 | | | | | | |
| PX 87 | Photo re: Lawrence Ryan | TRJ00251 | | | | | | |
| PX 88 | Photo re: Mark Sanders | TRJ00250 | | | | | | |
| PX 89 | Photo re: Raymond Schalk | TRJ00249 | | | | | | |
| PX 90.01 | Photo re: Duke Starter Jacket (Front View) | | | | | | | |
| PX 90.02 | Photo re: Duke Starter Jacket (Rear View) | | | | | | | |
| PX 91.01 | Photo re: Georgetown Starter Jacket (Front View) | Ryan 2 | | | | | | |
| PX 91.02 | Photo re: Georgetown Starter Jacket (Rear View) | | | | | | | |

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THADDEUS JIMENEZ | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| V. | )   No. 09-CV-8081 |
| | ) |
| CITY OF CHICAGO, ET. AL. | ) |
| | ) |
| DEFENDANTS. | ) |

**INDEX OF DEFENDANT'S TRIAL EXHIBITS**

| EXH. | DESCRIPTION | OTHER ID | USED | OFFERED | ADMITTED | AUTHENTIC | ADMISSIBLE | PLAINTIFF'S OBJECTION |
|---|---|---|---|---|---|---|---|---|
| DX 01 | Case Report | JIM 4-7 | | | | | | NO OBJECTION |
| DX 02 | GPR Re: Tina Elder | JIM 31 | | | | | | NO OBJECTION |
| DX 03 | GPR Re: Tina Elder | JIM 32 | | | | | | NO OBJECTION |
| DX 04 | GPR Re: Phil Torres | JIM 33 | | | | | | NO OBJECTION |
| DX 05 | GPR Re: Sandra Elder | JIM 34 | | | | | | NO OBJECTION |
| DX 06 | GPR Re: Larry Tueffel | TRJ 255-56 | | | | | | NO OBJECTION |
| DX 07 | GPR Re: Cindy Hunter | TRJ 257-58 | | | | | | NO OBJECTION |
| DX 08 | GPR Re: Canvass | JIM 37 | | | | | | NO OBJECTION |
| DX 09 | GPR Re: Victor Romo | JIM 38 | | | | | | NO OBJECTION |
| DX 10 | GPR Re: Juan Carlos Torres | JIM 39 | | | | | | NO OBJECTION |
| DX 11 | GPR Re: Ezequiel Romo | JIM 40 | | | | | | NO OBJECTION |
| DX 12 | GPR Re: Elizabeth Heatley | JIM 41 | | | | | | NO OBJECTION |

Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

| DX 13 | Supplementary Report, 2/4/93 | JIM 13-20 | | | | | | NO OBJECTION |
|---|---|---|---|---|---|---|---|---|
| DX 14 | Supplementary Report Re: Lineup, 2/4/93 | JIM 10-12 | | | | | | NO OBJECTION |
| DX 15 | Supplementary Report, 2/10/93 | JIM 21-24 | | | | | | NO OBJECTION |
| DX 16 | Supplementary Report, 3/8/93 | JIM 25-26 | | | | | | NO OBJECTION |
| DX 17 | Supplementary Report, 6/15/93 | JIM 27-29 | | | | | | NO OBJECTION |
| DX 18 | Thaddeus Jimenez Arrest Report, 2/4/93 | JIM 46 | | | | | | NO OBJECTION |
| DX 19 | Thaddeus Jimenez Arrest Report, 6/15/93 | JIM 47 | | | | | | NO OBJECTION |
| DX 20 | Victor Romo Arrest Report, 2/10/93 | JIM 48 | | | | | | NO OBJECTION |
| DX 21 | Property Inventory No. 1058724 (multicolor shirt, red coat) | JIM 52, TRJ 261-62 | | | | | | NO OBJECTION |
| DX 22 | Chain of Custody for Property Inventory No. 1058724 | TRJ 263-64 | | | | | | HEARSAY RELEVANCE |
| DX 23 | Property Inventory No. 1173048 (Heatley letters) | JIM 55 | | | | | | SUBJECT TO MIL |
| DX 24 | Crime Scene Processing Report Re: Scene Photos | JIM 43 | | | | | | NO OBJECTION |
| DX 25 | Crime Scene Processing Report Re: Scene/Victim Photos | JIM 42 | | | | | | NO OBJECTION |
| DX 26 | Crime Scene Processing Report Re: Inventory No. 1058723-25 | JIM 44 | | | | | | NO OBJECTION |

Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

| DX 27 | Crime Scene Processing Report Re: Lineup Photos | JIM 45 | | | | | NO OBJECTION |
|-------|---|---|---|---|---|---|---|
| DX 28 | Declaration of Sergeant John Spellman | Ex. 14 to Defs' SJ Reply | | | | | HEARSAY |
| DX 29 | Crime Scene Photograph No. 1 | Impounded Evidence | | | | | NO OBJECTION |
| DX 30 | Crime Scene Photograph No. 2 | Impounded Evidence | | | | | NO OBJECTION |
| DX 31 | Crime Scene Photograph No. 3 | Impounded Evidence | | | | | NO OBJECTION |
| DX 32 | Crime Scene Photograph No. 4 | Impounded Evidence | | | | | NO OBJECTION |
| DX 33 | Crime Scene Photograph No. 5 | Impounded Evidence | | | | | NO OBJECTION |
| DX 34 | Photographs of 3012 W. Belmont | | | | | | NO OBJECTION |
| DX 35 | Diagram of Area of 3018 W. Belmont | Impounded Evidence | | | | | HEARSAY |
| DX 36 | Photographs of Lineup | Impounded Evidence | | | | | NO OBJECTION |
| DX 37 | Individual Photograph of Plaintiff | Impounded Evidence | | | | | NO OBJECTION |
| DX 38 | Individual Photograph of Plaintiff in Duke Jacket | Impounded Evidence | | | | | NO OBJECTION |
| DX 39 | Close-Up Photographs of Plaintiff | Impounded Evidence | | | | | NO OBJECTION |
| DX 40 | Photograph of Victor Romo | Impounded Evidence | | | | | NO OBJECTION |
| DX 41 | Photograph of Eric Morro | Impounded Evidence | | | | | UNDUE PREJUDICE |
| DX 42 | Photographs of Eric Morro's Jacket | Inventory Inspection | | | | | *RESERVE OBJECTION* |

| DX 43 | Photographs of Eric Morro's Shirt | Inventory Inspection | | | | | | | *RESERVE OBJECTION* |
|---|---|---|---|---|---|---|---|---|---|
| DX 44 | Photographs of Box, Envelope, Open Envelope, and Items Inside Envelope | Inventory Inspection | | | | | | | *RESERVE OBJECTION* |
| DX 45 | People's Answer to Discovery, 10/26/93 | JIM 188-92 | | | | | | | NO OBJECTION |
| DX 46 | People's Answer to Discovery, 8/1/97 | JIM 5523-27 | | | | | | | NO OBJECTION |
| DX 47 | Answer to State's Attorney's Motion for Discovery, 5/18/93 | JIM 5577-78 | | | | | | | RELEVANCE |
| DX 48 | Answer to People's Motion for Discovery, 4/21/94 | JIM 89-90 | | | | | | | RELEVANCE |
| DX 49 | Amended Answer to People's Motion for Discovery, 6/23/94 | JIM 91-92 | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 50 | Amended Answer to People's Motion for Pre-Trial Discovery | PD-HALE 10 | | | | | | | RELEVANCE |
| DX 51 | Case Report, RD No. X-035320 | PD-HALE 17-18 | | | | | | | RELEVANCE HEARSAY |
| DX 52 | Subpoena to Joe PaoPao | PD-HALE 15 | | | | | | | RELEVANCE |
| DX 53 | Subpoena to Juan Carlos Torres | JIM 5576 | | | | | | | RELEVANCE |
| DX 54 | Motion in Limine to Use Out of Court Admission Against Penal Interest by a Third Party, Non-Defendant, 9/17/97 | JIM 251-62 | | | | | | | RELEVANCE |
| DX 55 | Transcript of hearing on offer of proof, 10/3/94 | JIM 1632-37 | | | | | | | RELEVANCE |

4

Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

| DX 56 | Transcript of hearing on motion in limine, 11/3/97 | JIM 2643-2719 | | | | | | RELEVANCE |
|---|---|---|---|---|---|---|---|---|
| DX 57 | Opinion Granting First Appeal, 11/1/96 | JIM 444-54 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 58 | Opinion Denying Second Appeal, 1/18/00 | JIM 907-23 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 59 | Official Statement of Facts by ASA John Murphy | JIM 933-35 | | | | | | HEARSAY, RELEVANCE, UNDUE PREJUDICE |
| DX 60 | Letter from IDOC to Judge Porter, 9/27/96 | JIM 365-69 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 61 | Letter from IDOC to Judge Berkos, 11/15/96 | JIM 340-41 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 62 | Social Investigation by Dennis Brady | JIM 5631-48 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 63 | Addendum to Social Investigation by Dennis Brady | JIM 5663-64 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 64 | Supplemental to Social Investigation by Dennis Brady | JIM 5666-73 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 65 | School Report by Margot Gillin, 5/26/93 | JIM 5697 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 66 | School Report by Margot Gillin, 6/5/93 | JIM 5696 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 67 | Investigative Report by Jerry Scroggins | JIM 378-84 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |

Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

| DX 68 | Report by Dr. Anthony Marchlewski | JIM 5674-78 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
|-------|-----------------------------------|-------------|--|--|--|--|--|------------------------------------|
| DX 69 | Forensic Psychological Evaluation Report by Dr. Graciela Viale-Val | JIM 5679-90 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 70 | Psychological Assessment by Dr. Heather Francek | JIM 5691-95 | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 71 | Letter from Plaintiff to Elizabeth Heatley Postmark 2/25/93 | NWU 871-77 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 72 | Letter from Plaintiff to Elizabeth Heatley Postmark 2/26/93 | NWU 823-25 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 73 | Letter from Plaintiff to Elizabeth Heatley Dated 3/22/93 | NWU 826-29 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 74 | Letter from Plaintiff to Elizabeth Heatley Dated 3/22/93 | NWU 830-33 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 75 | Letter from Plaintiff to Elizabeth Heatley Postmark 4/19/93 | NWU 840-45 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 76 | Letter from Plaintiff to Elizabeth Heatley Postmark 4/21/93 | JIM 3770-75 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 77 | Letter from Plaintiff to Elizabeth Heatley Postmark 4/28(?)/93 | NWU 865-68 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 78 | Letter from Plaintiff to Elizabeth Heatley Dated 5/1/93 | NWU 846-50 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |

Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

| DX 79 | Letter from Plaintiff to Elizabeth Heatley Postmark 6/9/93 | NWU 878-79 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
|---|---|---|---|---|---|---|---|---|
| DX 80 | Letter from Plaintiff to Elizabeth Heatley Dated 9/11/93 | NWU 851-54 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 81 | Letter from Plaintiff to Elizabeth Heatley Dated 10/23/93 | NWU 855-64 | | | | | | RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 82 | Poem: "Freedom" | JIM 3825 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 83 | Poem: "Devilish" | JIM 3899 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 84 | Poem: "The Courts Are Playing with My Mind" | JIM 3902-03 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 85 | Poem: "Real Friends - The Second Half!" | JIM 3906, 3911 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 86 | Letter from Plaintiff to Charles Murphy, 7/7/97 | JIM 3852-56 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 87 | Letter from Plaintiff to Charles Murphy, 9/25/97 | JIM 3845-3845.001, 3846 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 88 | Letter from Plaintiff to Victoria Jimenez, 12/25/93 | VIC 43-46 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 89 | Letter from Plaintiff to Victoria Jimenez, 1/22/98 | VIC 83-84 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 90 | Letter from Plaintiff to Victoria Jimenez, 2/4/98 | VIC 87-91 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 91 | Letter from Plaintiff to Victoria Jimenez, 3/15/01 | VIC 168-79 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 92 | Letter from Plaintiff to Victoria Jimenez, 7/18/02 | VIC 204-07 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 93 | Letter from Plaintiff to Victoria Jimenez, 4/28/05 | VIC 239-42 | | | | | | RELEVANCE UNDUE PREJUDICE |

Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DX 94 | Letter from Plaintiff to Victoria Jimenez, 5/1/05 | VIC 243 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 95 | Letter from Plaintiff to Victoria Jimenez, 6/5/05 | VIC 244-46 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 96 | Letter from Plaintiff to Victoria Jimenez, 7/20/05 | VIC 247-49 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 97 | Letter from Plaintiff to Victoria Jimenez, 9/25/05 | VIC 250-53 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 98 | Letter from Plaintiff to Victoria Jimenez, 12/26/05 | VIC 254-56 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 99 | Letter from Plaintiff to Angela Jimenez, 4/15/01 | ANG 8-15 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 100 | Letter from Plaintiff to Laurence Steinberg, 6/3/05 | NWU 310-13 | | | | | | NO OBJECTION |
| DX 101 | Letter from Plaintiff to Mary Morro, 2/10/07 | JIM 3879-93 | | | | | | UNDUE PREJUDICE |
| DX 102 | Letter from Chester Makowski to Plaintiff | VIC 510-11 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 103 | Letter from Victoria Jimenez to Charles Murphy, 8/18/97 | JIM 3858 | | | | | | RELEVANCE |
| DX 104 | Letter from Victoria Jimenez to Plaintiff, 10/14/97 | VIC 630-31 | | | | | | RELEVANCE |
| DX 105 | Letter from Victoria Jimenez to Plaintiff, 5/4/05 | JIM 6216-19 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 106 | Letter from Victoria Jimenez to Mary Morro, 1/10/07 | JIM 3782-84 | | | | | | *Description does not match production Numbers* |
| DX 107 | Letter from Susie Jimenez to Plaintiff 5/28/98 | JIM 6105-10 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 108 | Letter from Susie Jimenez to Plaintiff, 10/3/98 | JIM 6111-15 | | | | | | RELEVANCE UNDUE PREJUDICE |

| DX 109 | Letter from Susie Jimenez to Plaintiff, 10/13/98 | JIM 6116-18 | | | | | RELEVANCE UNDUE PREJUDICE |
|---|---|---|---|---|---|---|---|
| DX 110 | Letter from Susie Jimenez to Plaintiff, 2/11/99 | JIM 6119-20 | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 111 | Letter from Susie Jimenez to Plaintiff, 4/1/00 | JIM 6154-56 | | | | | RELEVANCE NDUE PREJUDICE |
| DX 112 | Letter from Susie Jimenez to Plaintiff, 6/24/00 | JIM 6169 | | | | | HEARSAY, RELEVANCE UNDUE PREJUDICE |
| DX 113 | Letter from Susie Jimenez to Plaintiff, 7/25/00 | JIM 6170-77 | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 114 | Letter from Susie Jimenez to Plaintiff, 3/29/05 | JIM 6209-12 | | | | | NO OBJECTION |
| DX 115 | Letter from Susie Jimenez to Plaintiff, 8/7/06 | JIM 6234-37 | | | | | NO OBJECTION |
| DX 116 | Letter from Robert Jimenez to Plaintiff | JIM 6294-96 | | | | | HEARSAY |
| DX 117 | Letter from Chrystal Lynn to Plaintiff, 10/9/97 | VIC 533-35 | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 118 | Letter from Danielle Zdeb to Plaintiff, 4/14/00 | JIM 6157-62 | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 119 | Letter from Danielle Zdeb to Plaintiff, 4/21/05 | JIM 6214 | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 120 | Letter from Danielle Zdeb to Plaintiff, 9/6/05 | JIM 6220-23 | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 121 | Letter from GRR to Plaintiff, 10/15/01 | VIC 554 | | | | | RELEVANCE |
| DX 122 | Letter to Plaintiff, 3/19/07 | JIM 6241-42 | | | | | RELEVANCE |
| DX 123A | Letter from Ashley to Plaintiff | JIM 6292-93 | | | | | RELEVANCE |

| DX 123B | Letter from Carolyn Nielsen to Victoria Jimenez | JIM 3851 | | | | | | RELEVANCE |
|---|---|---|---|---|---|---|---|---|
| DX 124 | Larry Tueffel Handwritten Statement, 7/31/06 | NWU 590-605 | | | | | | HEARSAY |
| DX 125 | Larry Tueffel Transcribed Statement, 7/31/06 | KMR 1437-59 | | | | | | HEARSAY |
| DX 126 | Authorization for Release of Information, 7/31/06 | NWU 723 | | | | | | RELEVANCE |
| DX 127 | Larry Tueffel Medical Records | | | | | | | *Defendants still determining the scope; Reserve Objection until Defendants Produce* |
| DX 128 | Email from Patrick Harrigan, 3/20/08 | JIM 6317-19 | | | | | | HEARSAY |
| DX 129 | Larry Tueffel SAO Interview, 2/3/09 | 219-22 | | | | | | HEARSAY |
| DX 130 | Larry Tueffel Affidavit, 8/20/10 | | | | | | | HEARSAY |
| DX 131 | Photograph of Juan Carlos Torres produced by Northwestern | | | | | | | *Possibly NWU 00342, but need to confirm with defendants (NO OBJECTION assuming it's just a photo of JCT)* |
| DX 132 | Photographs Shown to Larry Tueffel | Ex. 5 to Roger Sandoval's deposition | | | | | | RELEVANCE |
| DX 133 | Ezequiel Romo Draft Affidavit | KMR 1411-14 | | | | | | RELEVANCE HEARSAY |
| DX 134 | Ezequiel Romo Affidavit | KMR 227-29 | | | | | | HEARSAY |
| DX 135 | Ezequiel Romo Video Statement | VTS_03_1.VOB | | | | | | HEARSAY |

| DX 136 | NU Power-Point Presentation | JIM 5612 | | | | | | HEARSAY, RELEVANCE |
|---|---|---|---|---|---|---|---|---|
| DX 137 | Alison Flaum Notes | NU 1-121 | | | | | | HEARSAY, RELEVANCE |
| DX 138 | Alison Flaum Notes, 2/15/06 | NWU 1097-99 | | | | | | HEARSAY |
| DX 139 | Alison Flaum Notes, Undated | NWU 1100 | | | | | | HEARSAY, RELEVANCE |
| DX 140 | Alison Flaum Notes, 9/10/07 | NWU 1101 | | | | | | HEARSAY, RELEVANCE |
| DX 141 | Alison Flaum Notes, 3/3/09 | NWU 1102-09 | | | | | | HEARSAY, RELEVANCE |
| DX 142 | IRC File | IRC 1-15, NWU 1117 | | | | | | HEARSAY |
| DX 143 | IRC File – Not Yet Produced | | | | | | | *RESERVE OBJECTION* |
| DX 144 | Email from Stuart Chanen to Celeste Stack, 2/10/08 | KMR 1587-89 | | | | | | RELEVANCE |
| DX 145 | SAO Investigative Report Re: Jose Mendez [1] | 26 | | | | | | HEARSAY |
| DX 146 | SAO Investigative Report Re: Emanuel Leyva | 33-35 | | | | | | HEARSAY |
| DX 147 | SAO Investigative Report Re: Juan Carlos Torres | 38-39 | | | | | | HEARSAY |
| DX 148 | SAO Investigative Report Re: Plaintiff | 69-71 | | | | | | HEARSAY |
| DX 150 | SAO Investigative Report Re: Sandra Elder | 98-99 | | | | | | HEARSAY |
| DX 151 | SAO Investigative Report Re: Beth Johnsen | 100-01 | | | | | | HEARSAY |

---

[1]     DX 145-47, 154 are offered in the event the Court denies Defendants' Motion in Limine No. 6.

Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

| DX 152 | SAO Investigative Report Re: Rosa Wiszo-Waty | 129-30 | | | | | | HEARSAY |
|---|---|---|---|---|---|---|---|---|
| DX 153 | SAO Investigative Report Re: Sandra Elder | 159 | | | | | | HEARSAY |
| DX 154 | SAO Investigative Report Re: Joey Santiago | 207-12 | | | | | | HEARSAY |
| DX 155 | SAO Investigative Report Re: Victor Romo | 217-18 | | | | | | HEARSAY |
| DX 156 | Affidavit of Thomas McGreal and Joanne Ryan | 160-65 | | | | | | HEARSAY, R |
| DX 157 | Verified Petition for Post-Conviction Relief, 4/4/08 | JIM 4392-4418 | | | | | | UNDUE PREJUDICE |
| DX 158 | Order on Post-Conviction Petition, 6/26/08 | JIM 4151-73 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 159 | Petition for Relief from Judgment and Motion for New Trial, 5/1/09 | JIM 4070-72 | | | | | | NO OBJECTION |
| DX 160 | Transcript of hearing on petition for relief from judgment, 5/1/09 | JIM 4582-87 | | | | | | NO OBJECTION |
| DX 161 | Petition for a Certificate of Innocence, 5/27/09 | JIM 4374-82 | | | | | | UNDUE PREJUDICE |
| DX 162 | CBS Article, 5/4/09 | JIM 3935-37 | | | | | | NO OBJECTION *subject to the defendants' agreement to redact the prosecutor's opinion regarding police misconduct* |
| DX 163 | Completed Application to St. Leonard's | DEF 79-85 | | | | | | HEARSAY, RELEVANCE |
| DX 164 | Letter from St. Leonard's Re: Thaddeus Jimenez | DEF 3842 | | | | | | *RESERVE OBJECTION* |

Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

| DX 165 | CCJ Reports Re: Rachel Vorbeck | DEF 3943-44, 3949 | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
|---|---|---|---|---|---|---|---|---|
| DX 166 | Letter from Rachel Vorbeck to Andy Hale re: Katten Privilege Logs | | | | | | | RELEVANCE |
| DX 167 | Katten Muchin Rosenman LLP's Privilege Log for Hard Copies | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 168 | Katten Muchin Rosenman LLP's Privilege Log for Email | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 169 | Katten Muchin Rosenman LLP's Privilege Log for Electronic Documents Other Than Email | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 170 | Letter from Northwestern to Andy Hale, 3/31/10 | NWU 1-4 | | | | | | RELEVANCE |
| DX 171 | Northwestern's Privilege Log | | | | | | | RELEVANCE |
| DX 172 | Plaintiff's Resp. to Bogucki's First Set of Interrogatories | | | | | | | RELEVANCE |
| DX 173 | Plaintiff's Resp. to Whiteman's Second Set of Interrogatories | | | | | | | HEARSAY, RELEVANCE |
| DX 174 | Plaintiff's Resp. to Whiteman's Third Set of Interrogatories | | | | | | | HEARSAY, RELEVANCE |
| DX 175 | Plaintiff's Resp. to Sanders' Fourth Set of Interrogatories | | | | | | | RELEVANCE UNDUE PREJUDICE |

13

| DX 176 | Plaintiff's Resp. to Defs' First Set of Requests for Admission | | | | | | | NO OBJECTION to ones admitted; RELEVANCE UNDUE PREJUDICE to remainder |
|---|---|---|---|---|---|---|---|---|
| DX 177 | Plaintiff's Resp. to Defs' Second Set of Requests for Admission | | | | | | | NO OBJECTION to ones admitted; RELEVANCE UNDUE PREJUDICE to remainder |
| DX 178 | Dr. Mark Levy Report | | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE, SUBJECT TO MIL |
| DX 179 | Arlo West Report | | | | | | | HEARSAY |
| DX 180 | Ezequiel Romo Audio No. 1 | KMR 309, "SideB" | | | | | | *RESERVE OBJECTION* |
| DX 181 | Ezequiel Romo Audio No. 2 | State's Attorney File (Enhanced audio).wma | | | | | | *RESERVE OBJECTION* |
| DX 182 | Ezequiel Romo Audio No. 3 | Romo Tape.mp3 (produced 3/30/11) | | | | | | *RESERVE OBJECTION* |
| DX 183 | Ezequiel Romo Tape Translation No. 1 | JIM 253-62 | | | | | | NO OBJECTION |
| DX 184 | Ezequiel Romo Tape Translation No. 2 | JIM 4456-65 | | | | | | NO OBJECTION |
| DX 185 | Ezequiel Romo Tape Translation No. 3 | PD-HALE 1-7 | | | | | | NO OBJECTION |

| DX 186 | Lilliana Ward Report | | | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE SUBJECT TO MIL |
|---|---|---|---|---|---|---|---|---|---|
| DX 187 | Dr. Alexander Obolsky Report | | | | | | | | HEARSAY , RELEVANCE UNDUE PREJUDICE |
| DX 188 | Plaintiff's Juvenile Police Reports | JIM 5717-25, 5728-92 | | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 189 | Plaintiff's Audy Home Rule Violation/Incident Reports | JIM 5698-5709 | | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 190 | Plaintiff's Juvenile IDOC Disciplinary Records | NWU 445-533 | | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 191 | Plaintiff's Adult IDOC Disciplinary History | KMR 292-95 | | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 192 | Plaintiff's Criminal History Report | | | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 193 | Certified Statements of Disposition, YP 581 483-84 | | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 194 | Certified Statements of Disposition, Y T135236-37 | | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 195 | Certified Statement of Conviction/Disposition, 09128524901 | | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 196 | Certified Statement of Conviction/Disposition, 10 CR 8031 | | | | | | | | RELEVANCE UNDUE PREJUDICE |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DX 197 | Police Reports, RD No. HS 245981 | DEF 3863-70, 3881-85 | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 198 | Complaint for Search Warrant | | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 199 | Transcript of hearing in 10 CR 8031, 6/10/10 | | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 200 | Certified Statement of Conviction/Disposition, 1030221401 | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 201 | Rosemont PD Offense/Incident Report | DEF 3855-56 | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 202 | Certified Statement of Conviction/Disposition, 10200202001 | | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 203 | Des Plaines PD Criminal Offense Report | DEF 402-03 | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 204 | Cook County Sheriff's Office Inmate Classification | DEF 3890-91 | | | | | | HEARSAY RELEVANCE UNDUE PREJUDICE |
| DX 205 | Dr. Pica Interview Summary, 6/18/10 | DEF 60-61 | | | | | | RELEVANCE UNDUE PREJUDICE |
| DX 206 | Mike Bumcrot Report | | | | | | | *RESERVE OBJECTION* |
| DX 207 | Rebuttal Voice Comparison Expert Report | | | | | | | *RESERVE OBJECTION* |
| DX 208 | Demonstrative Map (Victor Romo House) | | | | | | | HEARSAY |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DX 209 | Demonstrative Map (Juan Carlos Torres House) | | | | | | HEARSAY |
| DX 210 | Demonstrative Map (Victoria Jimenez House) | | | | | | HEARSAY |
| DX 211 | Demonstrative Map (Gloria Makowski House) | | | | | | HEARSAY |
| DX 212 | Demonstrative Map (CPS Schools) | | | | | | NO OBJECTION |
| DX 213 | Demonstrative Chart of Letters Produced | | | | | | RELEVANCE |
| DX 214 | Demonstrative Chart of NU-Larry Tueffel Contacts | | | | | | RELEVANCE |
| DX 215 | Police Reports, RD No. HT-435346 | DEF 3956-66 | | | | | FOUNDATION, HEARSAY RELEVANCE UNDUE PREJUDICE |

# EXHIBIT 5

## EXHIBIT 5: PLAINTIFF'S PROPOSED VOIR DIRE

1.   If you concluded after hearing this case and the Court's instructions that the evidence justified a finding of compensatory damages, would there by an upper limit to the damages that you would award?

2.   Have you ever worked in law enforcement?  Do you have any family members or close friends who have worked in law enforcement?

3.   Have you or any family or friends had positive or negative experiences with law enforcement?

4.   Do you have any negative or positive feelings about the Chicago Police Department in general?

5.   Have you ever had military or law enforcement training?

6.   Do you or someone in your family own a gun?  How many?

7.   Is it ever acceptable for a law enforcement officer to violate the law in order to punish an individual he believes to be guilty of a crime?

8.   Do you believe that law enforcement officers should never be allowed to use deadly force regardless of the circumstances?

9.   Do you believe that the police department should decide whether its own officers' actions are justified or is that a job for a jury?

10.  Do you think that citizens who have been treated illegally or unfairly have less of a right to bring a lawsuit against a law enforcement officer than other instances where people commonly file a lawsuit?

11.  Would you be more inclined to believe a law enforcement officer over somebody who was not one?

12.  Do you belong to any social, political, or religious organizations?  If so, please describe the organization and your participation in it.

13.  Do you belong to a union?

14.  How do you get to work?

15.  Do you have any psychological or psychiatric training?  If you hear evidence in the case that conflicts with your training, will you be able to accept the evidence?

16.  How long have you lived where you live now?

17.   Where did you grow up?

18.   Have you ever been to the near west side of Chicago?

19.   Do you have extended family in the City of Chicago?

20.   Where do you get information about current events?  (What newspapers, magazines, T.V. shows, radio shows do you listen to?)

21.   Show of hands, which sources would you be more likely to watch?  MSNBC?  CNN?  Or Fox News?

22.   Do you regularly listen to talk radio?  What stations/shows?

23.   Have you or any members of your family or close friends ever been involved in a lawsuit?
            If yes, who filed a lawsuit?
            What was the suit about?

24.   Have you ever served as a juror?
            If yes, what are the details?
            Were you ever a foreperson of a jury?

25.   Have you ever been the victim of a crime?

26.   Do you have teenaged kids?

27.   Do you consume alcohol?
            If so, how often?
            If not, are you morally opposed to consuming alcohol?

28.   Have you ever been in a traffic stop with the police?

29.   Do you like to do crosswords or other logical puzzles?

30.   What hobbies do you have?

31.   Do you support the death penalty?

32.   Have you ever had to call 9-1-1?

33.   Is there anything I haven't asked you that might affect your ability to be fair and impartial in this case?

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| Plaintiff, | ) | No. 09 C 8081 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| CITY OF CHICAGO, et al., | ) | |
| Defendants. | ) | |

### Defendants' Proposed Voir Dire

In addition to the questioned proposed by the Court on its Section 1983

questionnaire, Defendants request the Court inquire into the following areas:

1.  Have you, any family member or close friend had any experience with a Jail or the Prison system? If so, explain

2.  Do you know anyone that has been diagnosed as a schizophrenic? If so, explain.

3.  Do you know anyone who has had Post Traumatic Stress Disorder? If so, explain.

4.  Do you, any family member or close friend have any medical training of any kind? If so, what?

5.  Do you, any family member or close friend have any training or have knowledge of audio-visual equipment?

6.  Do you believe if a Judge vacates someone's conviction that he necessarily did not commit the actual crime?

7.  Plaintiff received a certificate of innocence after he was released from prison, would you be able to keep an open mind to evidence and arguments that he is actually guilty?

8.  If Plaintiff fails to prove his claims by a preponderance of the evidence, are you comfortable awarding no money damages?

9.  Do you believe people that a person who spent 16 years in prison for a crime he did not commit is automatically entitled to some compensation regardless of whether he can prove that defendants are at fault?

10. If after hearing all the evidence and the instructions in this case and you found that the plaintiff failed to prove his case, would you be able to reject his request for money damages despite the fact that he spent 16 years in prison?

# EXHIBIT 6: Proposed Jury Instructions

## FUNCTIONS OF THE COURT AND THE JURY

Members of the jury, you have seen and heard all the evidence and arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts. You must follow these instructions, even if you disagree with them. Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear, or public opinion to influence you.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

Plaintiff's Jury Instruction No. 1

Source: Seventh Circuit Pattern Civil Jury Instruction 1.01

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

**EVIDENCE**

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations.  A stipulation is an agreement between both sides that certain facts are true or that a person would have given certain testimony.

Plaintiff's Jury Instruction No. 2

Source: Seventh Circuit Pattern Civil Jury Instruction 1.04

_____  Given

_____  Rejected

_____  Withdrawn

_____  Objected to

## WHAT IS NOT EVIDENCE

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, or television reports you may have seen or heard. Such reports are not evidence and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence. The purpose of these is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

Plaintiff's Jury Instruction No. 3

Source: Seventh Circuit Pattern Civil Jury Instruction 1.06

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## NOTE-TAKING

Any notes you have taken during this trial are only aids to your memory. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

Plaintiff's Jury Instruction No. 4

Source: Seventh Circuit Pattern Civil Jury Instruction 1.07

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

**CONSIDERATION OF ALL EVIDENCE REGARDLESS OF WHO PRODUCED**

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

Plaintiff's Jury Instruction No. 5

Source: Seventh Circuit Pattern Civil Jury Instruction 1.08

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

**LIMITED PURPOSE OF EVIDENCE**

You will recall that during the course of this trial I instructed you that I admitted certain evidence for a limited purpose. You must consider this evidence only for the limited purpose for which it was admitted.

Plaintiff's Jury Instruction No. 6

Source: Seventh Circuit Pattern Civil Jury Instruction 1.09

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## WEIGHING THE EVIDENCE

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this "inference." A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

Plaintiff's Jury Instruction No. 7

Source: Seventh Circuit Pattern Civil Jury Instruction 1.11

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## DEFINITION OF "DIRECT" AND "CIRCUMSTANTIAL" EVIDENCE

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

As an example, direct evidence that it is raining is testimony from a the witness who says, "I was outside a minute ago and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

Plaintiff's Jury Instruction No. 8

Source: Seventh Circuit Pattern Civil Jury Instruction 1.12

\_\_\_\_\_ Given

\_\_\_\_\_ Rejected

\_\_\_\_\_ Withdrawn

\_\_\_\_\_ Objected to

## TESTIMONY OF WITNESSES
## (DECIDING WHAT TO BELIEVE)

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

— the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

— the witness's memory;

— any interest, bias, or prejudice the witness may have;

— the witness's intelligence;

— the manner of the witness while testifying;

— and the reasonableness of the witness's testimony in light of all the evidence in the case.

Plaintiff's Jury Instruction No. 9

Source: Seventh Circuit Pattern Civil Jury Instruction 1.13

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## PRIOR INCONSISTENT STATEMENTS

You may consider statements given by a Party or by a Witness under oath before trial as evidence of the truth of what he said in the earlier statements, as well as in deciding what weight to give his testimony.

With respect to other witnesses, the law is different. If you decide that, before the trial, one of these witnesses made a statement not under oath or acted in a manner that is inconsistent with his testimony here in court, you may consider the earlier statement or conduct only in deciding whether his testimony here in court was true and what weight to give to his testimony here in court.

In considering a prior inconsistent statements or conduct, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

Plaintiff's Jury Instruction No. 10

Source: Seventh Circuit Pattern Civil Jury Instruction 1.14

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## IMPEACHMENT OF WITNESS — CONVICTIONS

You have heard evidence that [certain witnesses] have been convicted of a crime. You may consider this evidence only in deciding whether their testimony is truthful in whole, in part, or not at all. You may not consider this evidence for any other purpose.

Plaintiff's Jury Instruction No. 11

Source: Seventh Circuit Pattern Civil Jury Instruction 1.15

\_\_\_\_\_   Given

\_\_\_\_\_   Rejected

\_\_\_\_\_   Withdrawn

\_\_\_\_\_   Objected to

**LAWYER INTERVIEWING WITNESS**

It is proper for a lawyer to meet with any witness in preparation for trial.

Plaintiff's Jury Instruction No. 12

Source: Seventh Circuit Pattern Civil Jury Instruction 1.16

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## NUMBER OF WITNESSES

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

Plaintiff's Jury Instruction No. 13

Source: Seventh Circuit Pattern Civil Jury Instruction 1.17

\_\_\_\_\_   Given

\_\_\_\_\_   Rejected

\_\_\_\_\_   Withdrawn

\_\_\_\_\_   Objected to

**ABSENCE OF EVIDENCE**

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

Plaintiff's Jury Instruction No. 14

Source: Seventh Circuit Pattern Civil Jury Instruction 1.18

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## EXPERT WITNESSES

You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witnesses' qualifications, and all of the other evidence in the case.

Plaintiff's Jury Instruction No. 15

Source: Seventh Circuit Pattern Civil Jury Instruction 1.21

\_\_\_\_\_  Given

\_\_\_\_\_  Rejected

\_\_\_\_\_  Withdrawn

\_\_\_\_\_  Objected to

## MULTIPLE CLAIMS;
## MULTIPLE PLAINTIFFS/DEFENDANTS

You must give separate consideration to each claim and each party in this case.

Although there are three defendants, it does not follow that if one is liable, any of the others is

also liable. In considering a claim against a defendant, you must not consider evidence admitted

only against other defendants.

Plaintiff's Jury Instruction No. 16

Source: Seventh Circuit Pattern Civil Jury Instruction 1.25

\_\_\_\_\_ Given

\_\_\_\_\_ Rejected

\_\_\_\_\_ Withdrawn

\_\_\_\_\_ Objected to

## BURDEN OF PROOF

When I say a particular party must prove something by "a preponderance of the evidence," or when I use the expression "if you find," or "if you decide," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

Plaintiff's Jury Instruction No. 17

Source: Seventh Circuit Pattern Civil Jury Instruction 1.27

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## SELECTION OF PRESIDING JUROR; GENERAL VERDICT

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.  Forms of verdict have been prepared for you.

-- Forms of verdict read --

Take these forms to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the appropriate form, and all of you will sign it.

Plaintiff's Jury Instruction No. 18

Source: Seventh Circuit Pattern Civil Jury Instruction 1.32

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## COMMUNICATION WITH COURT

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The writing must be signed by the presiding juror, or, if he or she is unwilling to do so, by some other juror. The writing should be given to the marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

Plaintiff's Instruction No. 19
Source: Seventh Circuit Pattern Civil Jury Instruction 1.33
_____ Given
_____ Rejected
_____ Withdrawn
_____ Objected to

## IN-TRIAL INSTRUCTION ON NEWS COVERAGE

I understand that reports about this trial [or about this incident] are appearing in the newspapers and [or] on radio and television [and the internet]. The reporters may not have heard all the testimony as you have, may be getting information from people whom you will not see here under oath and subject to cross examination, may emphasize an unimportant point, or may simply be wrong.

You must not read anything or listen to anything or watch anything with regard to this trial. It would be a violation of your oath as jurors to decide this case on anything other than the evidence presented at trial and your common sense. You must decide the case solely and exclusively on the evidence that will be received here in court.

Plaintiff's Jury Instruction No. 20

Source: Seventh Circuit Pattern Jury Instruction 2.02

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected To

## LIMITING INSTRUCTION CONCERNING
## EVIDENCE OF REGULATIONS AND POLICIES

You have heard evidence about whether Defendants' conduct violated a departmental

procedure or regulation. You may consider this evidence in your deliberations. But remember

that the issue is whether Defendant vioalted Plaintiff's right to a fair trial, not whether a

departmental rule might have been violated.

Plaintiff's Instruction No. 21

Source: Seventh Circuit Pattern Jury Instruction 7.04 (modified)

_____        Given

_____        Rejected

_____        Withdrawn

_____        Objected To

## DAMAGES: COMPENSATORY

If you find in favor of either Plaintiff, then you must determine the amount of money that will fairly compensate that Plaintiff for any injury that you find he sustained as a direct result of the Defendants' unlawful conduct.  These are called "compensatory damages".

Plaintiff must prove his damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both the physical and mental aspects of injury, even if they are not easy to measure.

You should consider the following types of compensatory damages, and no others:

1. The mental/emotional or physical pain and suffering that Plaintiff has experienced and is reasonably certain to experience in the future;

2. The loss of normal life that Plaintiff has suffered and is reasonably certain to experience in the future;

3. The legal fees Plaintiff has expended; and

4. The wages that Plaintiff has lost.

No evidence of the dollar value of physical or mental/emotional pain and suffering has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of pain and suffering. You are to determine an amount that will fairly compensate the Plaintiff for the injury he has sustained.

Plaintiff's Jury Instruction No. 23
Source: Seventh Circuit Pattern Civil Jury Instruction 7.23 (modified)
_____ Given
_____ Rejected
_____ Withdrawn
_____ Objected to

## ISSUES

Plaintiff Thaddeus Jimenez claims that one or more of the Defendants violated his right to due process, resulting in an unfair criminal trial, resulting in injuries in terms of wrongful imprisonment.

Plaintiff Thaddeus Jimenez further claims that one or more of the Defendants caused him to be maliciously prosecuted, and intentionally inflicted emotional distress on Plaintiff, also resulting in injuries.

The Defendants deny each of Plaintiffs' claims.

Plaintiff's Jury Instruction No. 25

\_\_\_\_\_ Given

\_\_\_\_\_ Rejected

\_\_\_\_\_ Withdrawn

\_\_\_\_\_ Objected to

## FAILURE TO INTERVENE

To succeed on his failure to intervene claim, Plaintiff must prove each of the following things by a preponderance of the evidence:

1.    Plaintiff's right to due process was violated;

2.    A Defendant who did not actively participate in the due process violation knew that Plaintiff was about to have his due process rights violated;

3.    That Defendant had a realistic opportunity to do something to prevent harm from occurring;

4.    That Defendant failed to take reasonable steps to prevent harm from occurring;

5.    That Defendant's failure to act caused Plaintiff to suffer harm;

If you find that Plaintiff has proved each of these things by a preponderance of the evidence against one or more of the Defendants, then you should find for Plaintiff against that Defendant, and go on to consider the question of damages.

If, on the other hand, you find that Plaintiff has failed to prove any one of these things by a preponderance of the evidence, then you should find for the Defendants, and you will not consider the question of damages.

Plaintiff's Jury Instruction No. 27

Source: Seventh Circuit Pattern Civil Jury Instruction 7.16 (modified)

_____    Given

_____    Rejected

_____    Withdrawn

_____    Objected to

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To succeed on their claims of intentional infliction of emotional distress, one or both Plaintiffs must prove the following elements by a preponderance of the evidence:

First, that the conduct of one or more of the Defendants was extreme and outrageous; and

Second, that one or more of the Defendants intended that his conduct would inflict severe emotional distress, or knew that there was at least a high probability that his conduct would cause severe emotional distress; and

Third, the conduct must in fact cause severe emotional distress.

Extreme and outrageous conduct is defined as conduct that exceeds all bounds of human decency and that is regarded as intolerable in a civilized community.

If you find from your consideration of all the evidence that each of these propositions has been proven as to any Defendant, then your verdict should be for that Plaintiff and against that Defendant, and you should go on to consider the question of damages on this claim.

If, on the other hand, you find from your consideration of all the evidence that Plaintiff has failed to prove these three propositions, then you should find in favor of Defendants and against that Plaintiff on this claim, and you will have no occasion to consider the question of damages as to that Plaintiff for this claim.

Plaintiff's Jury Instruction No. 31

Source: *Adams v. Sussman & Hertzberg,* 292 Ill.App.3d 30, 684 N.E.2d 935 (1st Dist. 1997)

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## VERDICT FORM

1.      As to Plaintiff Thaddeus Jimenez's claim for violation of his constitutional right to a fair trial, we find (as to each Defendant, put a check on one and only one line, either for Plaintiff, or for that Defendant):

For Plaintiff Jimenez                    For Defendant Bogucki

_____            _____


For Plaintiff Jimenez                    For Defendant Schalk

_____            _____


For Plaintiff Jimenez                    For Defendant Sanders

_____            _____


2.      As to Plaintiff Thaddeus Jimenez's claim for failure to intervene, we find (as to each Defendant, put a check on one and only one line, either for Plaintiff, or for that Defendant):

For Plaintiff Jimenez                    For Defendant Bogucki

_____            _____


For Plaintiff Jimenez                    For Defendant Schalk

_____            _____


For Plaintiff Jimenez                    For Defendant Sanders

_____            _____

3.     As to Plaintiff Thaddeus Jimenez's claim for conspiracy, we find (as to each Defendant, put a check on one and only one line, either for Plaintiff, or for that Defendant):

For Plaintiff Jimenez                     For Defendant Bogucki

_____                   _____

For Plaintiff Jimenez                     For Defendant Schalk

_____                   _____

For Plaintiff Jimenez                     For Defendant Sanders

_____                   _____

4.     As to Plaintiff Thaddeus Jimenez's claim for malicious prosecution, we find (as to each Defendant, put a check on one and only one line, either for Plaintiff, or for that Defendant):

For Plaintiff Jimenez                     For Defendant Bogucki

_____                   _____

For Plaintiff Jimenez                     For Defendant Schalk

_____                   _____

For Plaintiff Jimenez                     For Defendant Sanders

_____                   _____

5.      As to Plaintiff Thaddeus Jimenez's claim for intentional infliction of emotional distress, we find (as to each Defendant, put a check on one and only one line, either for Plaintiff, or for that Defendant):


For Plaintiff Jimenez                    For Defendant Bogucki

    _____                          _____


For Plaintiff Jimenez                    For Defendant Schalk

    _____                          _____


For Plaintiff Jimenez                    For Defendant Sanders

    _____                          _____


Damages are to be awarded, only if you find against at least one Defendant on at least one claim/

    We find the amount of **compensatory** damages suffered by Plaintiff Thaddeus Jimenez to be as follows: $ _____

    We find punitive damages in the following amounts (If you do not find punitive damages against any Defendant, enter zero ("0")):


    Against Defendant Bogucki:  $ _____

    Against Defendant Schalk:    $ _____

    Against Defendant Sanders:  $ _____

# EXHIBIT 7: Plaintiff's Proposed Jury Instructions to which Defendants Object

## PROXIMATE CAUSE

When I use the expression "proximate cause," I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury.  It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury.

Plaintiff's Jury Instruction No. 22

Source: Illinois Pattern Jury Instruction No. 15.01

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

## Plaintiff's Jury Instruction No. 22

**Defendants' Objection**:  This is instruction is unnecessary as it defines a term not used

anywhere in plaintiff's proposed instruction

## DAMAGES: PUNITIVE

If you find for Plaintiff, you may, but are not required to, assess punitive damages against any or all of the Defendants. The purposes of punitive damages are to punish a Defendant for his conduct and to serve as an example or warning to Defendant and others not to engage in similar conduct in the future.

Plaintiff must prove by a preponderance of the evidence that punitive damages should be assessed against a given Defendant. You may assess punitive damages only if you find that his conduct was malicious or in reckless disregard of one or both Plaintiffs' rights. Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring Plaintiff(s). Conduct is in reckless disregard of one or both Plaintiffs' rights if, under the circumstances, it reflects complete indifference to one or both Plaintiffs' safety or rights.

If you find that punitive damages are appropriate, then you must use sound reason in setting the amount of those damages. Punitive damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward either/any party. In determining the amount of any punitive damages, you should consider the following factors:

— 	the reprehensibility of the Defendant's conduct;

— 	the impact of the Defendant's conduct on Plaintiff;

— 	the relationship between Plaintiff and the Defendant;

— 	the likelihood that the Defendant would repeat the conduct if an award of punitive damages is not made; and

— 	the relationship of any award of punitive damages to the amount of actual harm the Plaintiff(s) suffered.


Plaintiff's Jury Instruction No. 24

Source: Seventh Circuit Pattern Civil Jury Instruction 7.24

**Plaintiff's Jury Instruction No. 24**

**Defendants Objection:** This pattern instruction is missing the element of "defendants' financial condition"

## DUE PROCESS

To succeed on his claim for the violation of his constitutional right to due process of law, Plaintiff Thaddeus Jimenez must prove by a preponderance of the evidence that one or more of the Defendants caused a situation in which no fair trial of Plaintiff Jimenez could take place by doing any of the following things:

1. Withholding material evidence from the prosecutors, judge, or defense counsel that would have undermined the credibility of the State's witnesses against Jimenez, or would have otherwise tended to show that Jimenez was innocent of the charges against him; or

2. Employing or facilitating unnecessarily suggestive identification procedures that resulted in an unreliable identification of Jimenez; or

3. Creating false evidence or statements pointing to Plaintiff's alleged guilt or tending to implicate Plaintiff in a crime by means of improper coercion, manipulation, and/or outright fabrication, all without the knowledge of the prosecutors, judge, or defense counsel; or

4. Testifying falsely at Planitiff's criminal trial in a manner that was reasonably likely to have affected the judgment of the jury.

If you find from your consideration of all the evidence that any of these four propositions has been proven by Plaintiff against any of the Defendants, then your verdict should be for Plaintiff on this claim against that Defendant, and you should go on to consider the question of damages on this claim.

If, on the other hand, you find from your consideration of all the evidence that none of these propositions have been proven by Plantiff, then you should find in favor of the Defendants on this claim, and you will have no occasion to consider the question of damages on this claim.

Plaintiff's Jury Instruction No. 26

Sources: *Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008), *cert denied*, 129 S. Ct. 2381 (2009), *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *United States v. Agurs,* 427 U.S. 97, 103 (1976); *Braun v. Powell,* 227 F.3d 908, 920 & n.11 (7th Cir. 2000).

_____     Given

_____     Rejected

_____     Withdrawn

_____     Objected to

**Plaintiff's Jury Instruction No. 26**

**Defendants Objection:** Plaintiff's four elements are vague and over broad. The Court has already ruled at Summary Judgment on the scope of plaintiff's due process claim. As this Court instructed in *Manning v. Miller*, particulars of the claim are necessary and defendants have proposed them – in line with the Court's ruling.

In addition, plaintiff's proposed instruction also do not follow the long line of Seventh Circuit precedent that in order to have a due process claim the police officers must withhold material exculpatory evidence. *See Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008). There is no due process claim for fabricating evidence or lying under oath. The key is the failure to disclose. Plaintiff's cases do not support his elements. Plaintiff's elements at paragraphs at 2, 3 and 4 do not factor that into the analysis and suggest that plaintiff could recover on a claim based on fabrication of evidence alone which is akin to a malicious prosecution claim and not a *Brady* "due process" claim.

Defendants have proposed due process instructions in line with the ones on the Court's website that were used in *Manning v. Miller.*

## CONSPIRACY

Plaintiff Thaddeus Jimenez claims that one or more of the Defendants and/or other employees of the City of Chicago conspired to deprive him of his rights under the United States Constitution.  To succeed on this claim, Plaintiff must prove each of the following things by a preponderance of the evidence:

(1)     One or more of Defendants, and/or the City of Chicago through any of its employees, entered into an agreement amongst themselves or with others to deprive Plaintiffs of constitutional rights; and

(2)     An actual deprivation of one or more constitutional rights resulting from an overt act taken in furtherance of the agreement.

If you find that Plaintiff has proved each of these things by a preponderance of the evidence against one or more of the Defendants, then you should find for Plaintiff against that Defendant, and go on to consider the question of damages.

If, on the other hand, you find that Plaintiff has failed to prove any one of these things by a preponderance of the evidence, then you should find for the Defendants, and you will not consider the question of damages.

Plaintiff's Jury Instruction No. 28

Source:  Vukadinovich v. Zentz, 995 F.2d 750 (7th Cir. 1993); Mnyofu v. Board of Educ. of Rich Tp. H.S. Dist. 227, 2007 WL 1308523, *11 (N.D.Ill. 2007).

_____  Given

_____  Rejected

_____  Withdrawn

_____  Objected to

**Plaintiff's Jury Instruction No. 28**

**Defendants Objection:**  Plaintiff seeks to impose respondeat liability on the City on federal claims through actions of unknown individuals.  There is also no evidence anyone else other than the named defendants were involved in the allegations plaintiff complains about. In addition, the conspiracy must be tied to the underlying constitutional violation (due process) – so by definition must be dealing with the individually named officers.

## MALICIOUS PROSECUTION

For a Plaintiff to succeed on his claim of malicious prosecution, the Plaintiff must prove each of the following things by a preponderance of the evidence as to the particular Defendant that you are considering:

1. The commencement or continueance of a criminal proceeding by the Defendant;

2. The termination of the criminal proceedings in favor of the Plaintiff in a manner indicative of innocence;

3. The absence of probable cause for such proceedings;

4. The presence of malice; and

5. Damages resulting to the Plaintiff.

If you find that Plaintiff has proved each of these things by a preponderance of the evidence against a particular Defendant, then you should find for the Plaintiff and against the Defendant, and go on to consider the question of damages.   If on the other hand, you find that Plaintiff has failed to prove any one of these things against a particular Defendant by a preponderance of the evidence, then you should find for that Defendant.

Probable cause in a malicious prosecution claim means a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charge. It is the state of mind of the one commencing the prosecution, and not the actual facts of the case or guilt or innocence of the accused, that is at issue. The fact that the charges against a particular Plaintiff were later dismissed does not by itself mean that there was no probably cause at the time the criminal proceeding was commenced.

Malice, as an element of malicious prosecution, does not necessarily mean personal ill-will, spite, or hatred toward the person prosecuted, but instead means the commencement of a

prosecution for and improper motive. An improper motive for a prosecution is any reason other than to bring the party to justice. Malice may be inferred from the absence of probable cause when the circumstances are inconsistent with good faith by the prosecutor and where the want of probable cause has been clearly proved.

Plaintiff's Jury Instruction No. 29

Source: Approved by Judge Holderman, *Edwards v. Haritos,* 09 C 1726, *citing Turner v. City of Chicago,* 415 N.E.2d 481, 487 (Ill. App. 1980) ("Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith by the prosecutor and where the want of probable cause has been clearly proved"); *Swick v. Liautaud*, 169 Ill.2d 504, 512, 662 N.E.2d 1238, 1242 (1996);

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

**Plaintiff's Jury Instruction No. 29**

**Defendants Objection**: Defendants have proposed alternative instructions

## DEFINITION OF MALICE

Malice, as an element of malicious prosecution, does not necessarily mean personal ill-will, spite, or hatred toward the person prosecuted, but instead means the commencement of a prosecution for and improper motive. An improper motive for a prosecution is any reason other than to bring the party to justice. Malice may be inferred from the absence of probable cause when the circumstances are inconsistent with good faith by the prosecutor and where the want of probable cause has been clearly proved.

Plaintiff's Jury Instruction No. 30

Source: *Aleman v. Village of Hanover Park*, -- F.3d --, 2011 WL 5865654, *8 (7th Cir. Nov. 21, 2011) ("On a malicious prosecution claim under Illinois law, an inference of malice may be drawn from an absence of probable cause); *Gauger v. Hendle,* 954 N.E.2d 307, 333 (Ill.App. 2 Dist. 2011)  (The term malice is not limited to personal ill-will, spite, or hatred toward plaintiff. Instead, malice may be inferredfrom the absence of probable cause, if the circumstances surrounding the commencement of the criminal proceeding are inconsistent with good faith and if the absence of probable cause has been clearly proved."); *Turner v. City of Chicago,* 415 N.E.2d 481, 487 (Ill. App. 1980) ("Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith by the prosecutor and where the want of probable cause has been clearly proved")

_____        Given

_____        Rejected

_____        Withdrawn

_____        Objected To

**Plaintiff's Jury Instruction No. 30**

**Defendants Objection**:  Defendants have proposed alternative instruction.  This is instruction is confusing and incorporate a variety of legal sentences but is ultimately confusing when read all together.

# EXHIBIT 8: Defendants' Proposed Jury Instructions to which Plaintiff Objects

**Due Process Claim**

To prevail on his first claim, Mr. Jimenez must prove each of the following propositions:

First, that the defendant you are considering intentionally concealed material exculpatory and/or impeachment evidence from the prosecutors.

Second, that Mr. Jimenez would not have been convicted of murder if this evidence had been disclosed.

I will define several of these terms for you shortly.

If you find from your consideration of all the evidence that Mr. Jimenez has proven each of these propositions as to a particular defendant, then you should find in favor of Mr. Jimenez and against that defendant on this claim, and go on to consider the question of damages on this claim.

If you find from your consideration of all the evidence that Mr. Jimenez has failed to prove any one of these propositions as to a particular defendant, then you should find in favor of that defendant and against Mr. Jimenez on this claim, and you will have no occasion to consider the question of damages as to that defendant on this claim.

Defendants' Proposed Jury Instruction No. 1

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

Court's Instructions Given in *Manning v. Miller*, 02 C 372, *See* http://www.ilnd.uscourts.gov/JUDGE/KENNELLY/mfk_02c00372.pdf

<div align="center">

**Plaintiff's Objection to
Defendants' Instruction No. 1**

</div>

As drafted, the first element requires an "intentional" act.
There is no intent element for a <u>Brady</u> violation.  <u>Strickler v.</u>
<u>Greene</u>, 527 U.S. 263, 281-82 (1999); <u>United States v. Salem</u>, 578
F.3d 682, 685 (7th Cir. 2009) (failure to disclose evidence
"whether intentional or inadvertent" violates <u>Brady v. Maryland</u>).
This principle has been applied in Section 1983 cases.  <u>Parish v.</u>
<u>City of Chicago</u>, 594 F.3d 551, 554 (7th Cir. 2009); <u>Carvajal v.</u>
<u>Dominquez</u>, 542 F.3d 561, 566-67 (7th Cir. 2008).

The second element states that Plaintiff must prove that he
"would not have been convicted" had the evidence been disclosed.
The law establishes a lower hurdle.  To establish materiality,
Plaintiff need only demonstrate "that had the evidence been
disclosed to the jury at trial, there is a reasonable probability
that the result would have been different.  <u>Goudy v. Basinger</u>,
604 F.3d 394, 399-401 (7th Cir. 2010), citing <u>Strickler v.</u>
<u>Greene</u>, 527 U.S. 263, 280 (1999); <u>United States v. Bagley</u>, 473
U.S. 667, 682 (1985).  As the Seventh Circuit explained:

> The reasonable probability standard for materiality of
> suppressed evidence is less rigorous than a preponderance of
> the evidence standard in that a petitioner need only show
> that the new evidence undermines confidence in the verdict.
> <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995). When the
> cumulative effect of all the suppressed information is to
> undermine confidence in the verdict, such a reasonable
> probability exists.  <u>See</u> <u>id.</u>
>
> The Supreme Court has clearly established that the
> standard for determining whether suppressed evidence is
> material is whether the cumulative effect of the new

evidence creates a reasonable probability of a different result at trial. _Kyles_, 514 U.S. at 434. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." _Id._ While the state court initially identified this as the correct legal principle for determining whether suppressed evidence was material, its statements repeatedly dismissing the materiality of evidence on the basis that it "does not mean that Goudy was not the other shooter," miss the point. [citation omitted]. At least three times, the court rejected the materiality of individual pieces of evidence on the basis that the evidence did not conclusively establish Goudy's innocence. ....

So while the Indiana court identified the correct legal principle -- that Goudy had to demonstrate a reasonable probability that the new evidence would lead to a different result -- the statements quoted above would require that Goudy prove the new evidence necessarily "would have" established his innocence. Placing this burden on Goudy was "diametrically different," _Taylor_, 529 U.S. at 406, than the clearly established principle laid out in _Kyles_, 514 U.S. at 434, _Bagley_, 473 U.S. at 682, and _Agurs_, 427 U.S. at 112-14.

_Goudy v. Basinger_, 604 F.3d 394, 399-401 (7th Cir. 2010) (granting _habeas_ relief because the state court erroneously required the petitioner to prove that he would not have been convicted but for the _Brady_ violation).

Plaintiff's proposed due process instruction cures both problems. It was drafted by Judge Shadur and affirmed in _Dominguez v. Hendley_, 545 F.3d 585, 590 (7th Cir. 2008), _cert. denied_, 129 S.Ct. 2381 (2009).

## Particulars Of The Claim

Mr. Jimenez contends that the following exculpatory and/or impeachment evidence was concealed from the prosecutors prior to his trial:

- that Defendants knowingly and intentionally induced Larry Tueffel to identify Mr. Jimenez as the shooter; and/or

- that Defendants knowingly and intentionally placed Tina Elder in front of a photo of Mr. Jimenez to create an unduly suggestive lineup and/or

- that Defendants took Phil Torres to the police station in the morning of February 4 against his will and induced Phil Torres to identify Mr. Jimenez as the shooter and/or

- that Defendants induced witnesses to give statements that the shooter was wearing a Duke Jacket by first telling the witness that the shooter was wearing a Duke Jacket.

Defendants' Proposed Jury Instruction No. 2

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

Court's Instructions Given in *Manning v. Miller*, 02 C 372, *See* http://www.ilnd.uscourts.gov/JUDGE/KENNELLY/mfk_02c00372.pdf

**Plaintiff's Objection to
Defendants' Instruction No. 2**

Plaintiff should be the master of his statement of the claims, and Plaintiff's instruction (No. 25) should be used.

## Definitions

Exculpatory evidence is evidence that would tend to show that the accused person is not guilty of the crime charged. Impeachment evidence is evidence that would undermine the credibility of a prosecution witness who testifies at the trial.

Exculpatory and impeachment evidence may include evidence that the claims of a prosecution witness have been fabricated by law enforcement; evidence that law enforcement has knowingly induced a prosecution witness to make a false statement; evidence of benefits or other inducements promised or provided to prosecution witnesses; and evidence of prior statements by a prosecution witness that are inconsistent with the witness' testimony or that otherwise might undermine the credibility of that witness.

Exculpatory and impeachment evidence is "material" if it has a reasonable likelihood of affecting the outcome of the particular criminal case.

A law enforcement officer has the obligation to turn over material exculpatory and impeachment evidence to the prosecutors handling the case that is not otherwise available through the exercises of reasonable diligence. If the officer satisfies this obligation, he is not responsible if the prosecutor does not provide the information to the accused person. An officer does not have a duty to turn over evidence if he reasonably believes that the prosecutor already has the evidence. An officer does not have a duty to seek out exculpatory or impeachment evidence of which he is not aware.

Defendants' Proposed Jury Instruction No. 3

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

Court's Instructions Given in *Manning v. Miller*, 02 C 372, *See* http://www.ilnd.uscourts.gov/JUDGE/KENNELLY/mfk_02c00372.pdf (modified to include "that is not otherwise available through the exercises of reasonable diligence" *See Holland v. City of Chicago*, No. 09-3905, 2011 WL 2473473, at *1 (7th Cir. June 23, 2011).

**Plaintiff's Objection to
Defendants' Instruction No. 3**

Plaintiff does not object, except to the extent that the definition of "material" in the third paragraph should reflect the case law set forth in Plaintiff's objection to Defendants' Instruction No. 1.  Specifically, the following Supreme Court case law should be added: "The reasonable probability standard for materiality of suppressed evidence is less rigorous than a preponderance of the evidence standard in that a petitioner need only show that the new evidence undermines confidence in the verdict.  When the cumulative effect of all the suppressed information is to undermine confidence in the verdict, such a reasonable probability exists."  Goudy v. Basinger, 604 F.3d 394, 399-401 (7th Cir. 2010).

**Malice**

A police officer commences or continues a criminal proceeding with malice if the officer commences or continues the criminal proceeding with an improper motive, or a reason other than to bring the person against whom the criminal proceeding is commenced to justice.

Defendants' Proposed Jury Instruction No. 4

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to

Source: *Denton v. Allstate Insurance Co.,* 152 Ill. App. 3d 578, 587 (1st Dist. 1986); *Turner v. City of Chicago,* 91 Ill. App. 3d 931, 937 (1st Dist. 1980); *Magnus v. Cock Robin Ice Cream, Inc.,* 52 Ill. App.3d 110, 117 (1st Dist. 1977).

## Plaintiff's Objection to
## Defendants' Instruction No. 4

This instruction is incomplete.  There is no pattern instruction for malice, but the complete version of the law must include the language in Plaintiff's Instruction Nos. 29 & 30. Specifically, as the Seventh Circuit reaffirmed just last week: "On a malicious prosecution claim under Illinois law, an inference of malice may be drawn from an absence of probable cause." <u>Aleman v. Village of Hanover Park</u>, -- F.3d --, 2011 WL 5865654, *8 (7th Cir. Nov. 21, 2011); <u>Gauger v. Hendle</u>, 954 N.E.2d 307, 333 (Ill.App. 2 Dist. 2011)  ("The term malice is not limited to personal ill-will, spite, or hatred toward plaintiff. Instead, malice may be inferred from the absence of probable cause, if the circumstances surrounding the commencement of the criminal proceeding are inconsistent with good faith and if the absence of probable cause has been clearly proved."); <u>Turner v. City of Chicago</u>, 415 N.E.2d 481, 487 (Ill. App. 1980) ("Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith by the prosecutor and where the want of probable cause has been clearly proved").

Plaintiff's proposed instruction for malicious prosecution (incorporating a definition of probable cause consistent with the foregoing case law) was approved by Judge Holderman this week in <u>Edwards v. Haritos</u>, No. 09 C 1726.  A copy of that proposed instruction is approved and minute order is attached hereto. Malice is defined both in that malicious prosecution instruction No. 29) and the stand-alone malice instruction (No. 30) if the Court decides to break it up.

flight from a clearly identifiable police officer. A person may not resist arrest even if the arrest is unlawful.

**2.    Claim of Use of Excessive Force Against Defendants Haritos, Park, and Khan**

For a Plaintiff to succeed on his claim of the use of excessive force, that Plaintiff must prove each of the following things by a preponderance of the evidence with respect to the particular Defendant that you are considering:

1. The Defendant used unreasonable force against the Plaintiff;

2. Because of the Defendant's unreasonable force, the Plaintiff was harmed.

If you find that the Plaintiff you are considering has proved each of these things by a preponderance of the evidence as to a particular Defendant, then you should find for that Plaintiff and against the particular Defendant, and go on to consider the question of damages. If, on the other hand, you find that the Plaintiff you are considering did not prove any one of these things by a preponderance of the evidence as to a particular Defendant, then you should find for that Defendant, and you will not consider the question of damages as to that Defendant on this claim.

When deciding if a Defendant police officer's use of force, if any, was unreasonable, you must consider the Defendant's conduct from the perspective of a reasonable officer facing the same circumstances that the Defendant faced. You must make this decision based on what the officer knew at the time of the arrest, not based on what you know now. In deciding whether a Defendant's use of force was unreasonable, you must not consider whether that Defendant's intentions were good or bad.

In performing his job, an officer can use force that is reasonably necessary under the circumstances. In deciding whether a Defendant's use of force was reasonable you are to consider all circumstances, including among other things:

- the need for the use of force;

- the relationship between the need for the use of force and the amount of force used;

- the extent of the plaintiff's injury;

- any efforts made by the defendant to temper or limit the amount of force;

- the severity of the crime at issue;

- the threat reasonably perceived by the defendant; and

- whether the plaintiff was actively resisting arrest or was attempting to evade arrest.

**3.    Claim of Malicious Prosecution Against Defendants Haritos and Park**

For a Plaintiff to succeed on his claim of malicious prosecution, that Plaintiff must prove each of the following things by a preponderance of the evidence as to the particular Defendant that you are considering:

1. The commencement or continuance of a criminal proceeding by the Defendant;

2. The termination of the criminal proceedings in favor of the Plaintiff in a manner indicative of innocence;

3. The absence of probable cause for such proceedings;

4. The presence of malice; and



5. Damages resulting to the Plaintiff.

If you find that the Plaintiff you are considering has proved each of these things by a preponderance of the evidence against a particular Defendant, then you should find for that Plaintiff and against that Defendant, and go on to consider the question of damages. If on the other hand, you find that the Plaintiff has failed to prove any one of these things against a particular Defendant by a preponderance of the evidence, then you should find for that Defendant and will not consider the question of damages.

Probable cause in a malicious prosecution claim means a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged. It is the state of mind of the one commencing the prosecution, and not the actual facts of the case or the guilt or innocence of the accused, that is at issue. The fact that the charges against a particular Plaintiff were later dismissed does not by itself mean that there was no probable cause at the time the criminal proceeding was commenced.

Malice, as an element of malicious prosecution, does not necessarily mean personal ill-will, spite, or hatred toward the person prosecuted, but instead means the commencement of a prosecution for an improper motive. An improper motive for a prosecution is any reason other than to bring the party to justice. Malice may be inferred from the absence of probable cause when the circumstances are inconsistent with good faith by the prosecutor and where the want of probable cause has been clearly proved.

4. **Claim of Failure to Provide Medical Attention Against Defendants Haritos and Park**

For a Plaintiff to succeed on his claim of failure to provide medical attention, that Plaintiff must prove by a preponderance of the evidence that the conduct of the Defendant you are considering was objectively unreasonable under the circumstances, and that the Defendant's conduct caused harm to that Plaintiff. In determining whether the Defendant's conduct was objectively unreasonable, you should consider the following factors:

– whether the Defendant had notice of the Plaintiff's medical needs, either because of the Plaintiff's words or through the Defendant's observation of Plaintiff's physical symptoms;

– the seriousness of Plaintiff's medical need;

– the scope of the requested treatment;

– the other legitimate interests of the Defendant as a police officer, including administrative, penological, or investigatory concerns.

If you find that the Plaintiff you are considering has proved each of these things with respect to a particular Defendant by a preponderance of the evidence, then you should find for that Plaintiff, and go on to consider the question of damages. If, on the other hand, you find that the Plaintiff you are considering has failed to prove any one of these things with respect to a particular Defendant by a preponderance of the evidence, then you should find for that Defendant, and you will not consider the question of damages.

09C1726 Orlando Edwards and Lee Edwards vs. Chicago Police Officer J. Haritos et al.

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 1726 | **DATE** | 11/29/2011 |
| **CASE TITLE** | Orlando Edwards and Lee Edwards vs. Chicago Police Officer J. Haritos et al. | | |

**DOCKET ENTRY TEXT**

The court has considered the defendants' objections to the proposed final jury instructions, preliminary jury instructions, and verdict form [109]. The defendants' objections are resolved as described in the Statement section of this order. The Plaintiffs have not filed any objections to the proposed jury instructions and verdict form.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

1. The phrase "in a manner indicative of innocence" will be added to the jury instruction on the second element of the malicious prosecution claim. *See Lopez v. City of Chicago*, No. 09-3349, 2011 WL 1557757, at *3-4 (N.D. Ill. Apr. 25, 2011); *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996).

2. The court declines to remove the following sentence from the instruction on malice: "Malice may be inferred from the absence of probable cause when the circumstances are inconsistent with good faith by the prosecutor and where the want of probable cause has been clearly proved." The defendants have waived their objection to the sentence because the plaintiffs requested a substantially similar instruction, and the defendants failed to object to it (Dkt. No. 69, at 29). Moreover, the instruction is consistent with Illinois law, so there is no reason to remove it. *See Turner v. City of Chicago*, 415 N.E.2d 481, 487 (Ill. App. 1980) ("Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith by the prosecutor and where the want of probable cause has been clearly proved.").

3. The defendants' request to include an instruction to the jury to check either "For Plaintiff" or "For Defendant" on each claim is granted. The defendants request to use the language "as to" instead of "against" to designate each claim is granted.

4. The defendants are correct that "[w]here a plaintiff has suffered a single, indivisible injury," the verdict form should not invite the jury to assess a separate damage award for each claim. *Duran v. Town of Cicero*, 653 F.3d 632, 640 (7th Cir. 2011). Here, the plaintiffs' claims, if true, indicate that they have suffered two discrete injuries: First, the physical and emotional injuries sustained during the defendant's false arrest; and second, the expense incurred when defending against the prosecution the defendants' initiated. The court has thus eliminated the verdict form's line for damages from each claim, and has instead included one line for physical and emotional injury incurred from the arrest, and another line for the expenses incurred defending against the prosecution. *See*

09C1726 Orlando Edwards and Lee Edwards vs. Chicago Police Officer J. Haritos et al.

Page 1 of 29

## STATEMENT

*Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 315 (7th Cir. 2010) (en banc) (Sykes, J., dissenting) ("Damages *may* be measured *by category*–that is, the verdict form may have separate line-item inquiries for economic damages (medical expenses, lost wages, and other pecuniary losses) and noneconomic damages (pain and suffering, loss of consortium, etc.).").

5.  The defendants object because the court did not include an instruction regarding impartiality with respect to race, color, religion, national ancestry, or sex.  The defendants did not request that instruction in their proposed jury instructions (Dkt. No. 69).  Moreover, the committee comments to the Seventh Circuit Civil Cases Pattern Jury Instruction 1.01 states that the instruction "should not be given unless a party has a legitimate concern about the possibility of influence by one or more of these factors."  The defendants have articulated no such concern, so the court will not add the instruction.

6.  The defendants object to the inclusion of an instruction allowing the jury to consider the defendants' financial condition when awarding punitive damages, because they do not intend to present evidence of their financial condition.  The plaintiffs could present such evidence, however, so the instruction will remain at this time.

*James F. Holderman*

IN THE UNITED STATES DISTRICT COURT

09C1726 Orlando Edwards and Lee Edwards vs. Chicago Police Officer J. Haritos et al.

## Conspiracy

Plaintiff Thaddeus Jimenez claims that Jerome Bugocki and Mark Sanders conspired to concealed material exculpatory and/or impeachment evidence from the prosecutors.   To succeed on this claim, Plaintiff must prove each of the following things by a preponderance of the evidence:

    (1)    Defendants Bogucki and Sanders entered into an agreement amongst themselves to conceal material exculpatory and/or impeachment evidence from the prosecutors, and

    (2)    Defendants Bogucki and Sanders concealed material exculpatory and/or impeachment evidence from the prosecutors as a result of an overt act taken in furtherance of the agreement.

If you find that Plaintiff has proved each of these things by a preponderance of the evidence against one or more of the Defendants, then you should find for Plaintiff against that Defendant, and go on to consider the question of damages.

If, on the other hand, you find that Plaintiff has failed to prove any one of these things by a preponderance of the evidence, then you should find for the Defendants, and you will not consider the question of damages.


Defendants' Proposed Jury Instruction No.  5


_____ Given


_____ Rejected


_____ Withdrawn


_____ Objected to

**Plaintiff's Objection to**
**Defendants' Instruction No. 5**

Defendants' definition of conspiracy is unduly narrow.

A conspiracy need not be limited to the named Defendants, but may include other unnamed co-conspirators.  Plaintiff's Instruction No. 28 fixes that shortcoming.

**Personal Involvement**

Plaintiff must prove by a preponderance of the evidence that Jerome Bogucki, Raymond Schalk, and Mark Sanders *were* personally involved in the conduct that Plaintiff complains about. You may not hold Jerome Bogucki, Raymond Schalk, and Mark Sanders liable for what other employees did or did not do.

Defendants' Proposed Jury Instruction No. 6

_____ Given

_____ Rejected

_____ Withdrawn

_____ Objected to


Seventh Circuit Pattern Instruction 7.02

**Plaintiff's Objection to**
**<u>Defendants' Instruction No. 6</u>**

Plaintiff's objects on the basis of the Stipulation reached with the City of Chicago. As the Court has been advised, the parties remain hopeful they can negotiate a resolution.

## Probable Cause To Charge Definition

Let me explain what probable cause means. There is probable cause to charge someone with a crime if a prudent person would have believed that Plaintiff had committed or was committing a crime. In making this decision, you should consider what Defendants knew and what reasonably trustworthy information Defendants had received.

Probable cause requires more than just a suspicion. But it does not need to be based on evidence that would be sufficient to support a conviction, or even a showing that Defendant's belief was probably right. If there was probable cause, Defendants did not need to do more investigation to uncover evidence that Plaintiff was innocent.

The fact that plaintiff's conviction was subsequently vacated and that he received a certificate of innocence does not, by itself, mean that the officers lacked probable cause to charge plaintiff with murder.

There is probable cause to charge someone with murder if an eyewitness reports to the police that he observed a certain person kill someone.

Defendants' Proposed Jury Instruction No. 7

7th Cir. Pattern Instruction 7.06 and 7.07 (modified)
*Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006); *Mustafa,* 442 F.3d at 548;
*Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000);
*Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999);
*Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 439 (7th Cir.1986),
*Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir. 1991);
*Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988).

GIVEN: _____

REFUSED: _____

WITHDRAWN: _____

OBJECTION: _____

## Plaintiff's Objection to
## Defendants' Instruction No. 7

Plaintiff's proposed Instruction No. 29, approved by Judge Holderman, contains a superior definition of probable cause for purposes of malicious prosecution.

Alternatively, if the Defendants are to be permitted to include argumentative snippets from the case law that shade the probable cause in one direction, the instruction should be more balanced, and should include the following additions:

The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate. Beauchamp v. City of Noblesville, 320 F.3d 733, 743 (7th Cir. 2003). The defense of probable cause is inapplicable where probable cause is based on fabricated evidence. Finwall v. City of Chicago, 490 F. Supp. 2d 918, 923 (N.D. Ill. 2007) (citing Smith v. City of Chicago, 913 F.2d 469, 473 (7th Cir. 1990); Kingsland v. City of Miami, 382 F.3d 1220, 1226-28 (11th Cir. 2004)); Manning v. United States, 2006 WL 3240112, at *33 (N.D. Ill. Dec. 26, 2006). Sufficient reliability must support any statement used to help establish probable cause. If a criminal suspect is offered leniency if he provides information against others, that information is clearly suspect because of the obvious motivation to shift blame to someone else. Kincaid v. Ames Dept. Stores, Inc., 283 Ill. App. 3d 555 (1st Dist. 1996).

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE***

Defendants Jerome Bogucki, Raymond Schalk, and Mark Sanders ("Defendants"), by

their undersigned attorneys, hereby respond to Plaintiff's motions *in limine* as follows:

1. **Response to Plaintiff's Motion *in Limine* No. 1**

Defendants are withdrawing their expert Ms. Lilliana Ward. Therefore, this motion is

moot.

2. **Response to Plaintiff's Motion *in Limine* No. 2**

Larry Tueffel is arguably the most important witness in this case. Tueffel was standing

within a few feet of the person who murdered Eric Morro. In 1993, Tueffel identified Plaintiff as

the shooter and testified in three trials (Victor Romo's juvenile trial and both of Plaintiff's trials)

that Plaintiff murdered Eric Morro. For the next sixteen years Tueffel never told anyone[1] that he

lied under oath when he identified Plaintiff as the murderer. That all changed in 2006, when an

investigator working on Plaintiff's behalf confronted Tueffel in a mental health nursing home –

---

[1] Tueffel does claim he told his mother and a priest, although the priest story has been re-told by Tueffel
several different ways. In some versions he did tell a priest while in other versions he went to the church
but never spoke to a priest. None of these stories have been checked out and, as Dr. Levy explains, the
story changes depending on who is questioning Tueffel.

Somerset Place – about his identification of Plaintiff. After speaking with Plaintiff's investigator,

Tueffel, for the first time in over sixteen years, recanted his identification of Plaintiff.

Sometime in 2000, Tueffel was diagnosed as a paranoid schizophrenic. Tueffel was also

diagnosed with a polysubstance dependence, including a cocaine disorder. None of this is in

dispute. What is in dispute is how Tueffel's psychiatric condition affects his recantation. Both

sides have retained experts to opine on the relationship between Tueffel's psychiatric condition

and his testimony. Both experts agree that his schizophrenia has to be taken into consideration

when Tueffel testifies. Dr. Steve Dinwiddie Report at p. 9, submitted under separate cover as

Exhibit 1; Dr. Mark Levy Report at pp. 4-5, submitted under separate cover as Exhibit 2. This is

in line with the way the Court will instruct the jury.

The Court will instruct the jury that, when deciding what witnesses to believe, it may

consider factors like bias, prejudice, witness intelligence, and the witnesses' memory. Just like

the jury must consider these factors, it must also consider the effect of a psychiatric condition on

the testimony of a witness. Courts across the country have recognized this – especially with

schizophrenic individuals. *See United States v. Butt,* 955 F.2d 77, 82-83 (1st Cir. 1992); *United*

*States v. Hargrove,* 382 Fed. App'x 765, 776 (10th Cir. 2010); *United States v. Lindstorm*, 698

F.2d 1154, 1160 (11th Cir. 1983) (finding it reversible error to limit cross examination on

psychiatric condition). "Simply put, knowledge relies on cognition, and cognition can be affected

by schizophrenia." *Clark v. Arizona*, 548 U.S. 735, 783 (2006) (Justice Kennedy, in dicta and

dissent, discussing the knowledge of a criminal defendant and citing the American Psychiatric

Association, Diagnostic and Statistical Manual of Mental Disorders 299 (4th ed. text rev. 2000)

("The characteristic symptoms of Schizophrenia involve a range of cognitive and emotional

dysfunctions that include perception")); *ibid.* (Symptoms include delusions, which are "erroneous beliefs that usually involve a misinterpretation of perceptions or experiences").

Dr. Mark Levy, an experienced clinical and forensic psychiatrist who has been practicing in this field of medicine for more than 36 years, explains that there is extensive, peer-reviewed, scientific literature on the cognitive impairment found in people suffering from chronic schizophrenia and chronic substance abuse and addiction. In schizophrenia, the cognitive symptoms often persist and contribute to chronic cognitive disability, including impaired executive functioning (problem solving), learning, memory and processing speed that are a core feature of the illness.[2] These significant cognitive disabilities may impair the accuracy and reliability of testimony from such individuals. This explains why courts across the country admit evidence of a witness's schizophrenia.

## I.    Motion to Bar Limited To Deposition Analysis

Although Plaintiff's motion is styled as motion to "bar Dr. Mark Levy's expert opinions," Plaintiff only seeks to bar Dr. Levy from discussing his analysis of Tueffel's testimony.[3] Dr.

---

[2] **Autobiographical memory.** In G. Cohen & M. A. Conway (Eds.), *Memory in the Real World* (3rd ed., pp. 21-90). Hove, UK: Psychology Press
**True and false autobiographical memories in schizophrenia**: preliminary results of a diary study, Pernot-Marino E, Schuster C, Hedelin G, Berna F, Zimmermann MA, Danion JM. *Psychiatry Res.* 2010 Aug 30;179(1):1-5. Epub 2010 May 15.
**Reduced levels of specific autobiographical memories in schizophrenia,** Riutort M, Cuervo C, Danion JM, Peretti CS, Salamé P,. *Psychiatry Res.* 2003 Jan 25;117(1):35-45.
**Types and characteristics of remote memory impairment in schizophrenia,** . Feinstein A, Goldberg TE, Nowlin B, Weinberger DR, *Schizophr Res.* 1998 Mar 10;30(2):155-63; Glutamate: New Hope for Schizophrenia Treatment, Kantrowitz,J.T, Javitt, D.C., *Current Psychiatry,* 10:4, Apr 2011;
**Antecedents, symptom progression, and long-term outcome of the deficit syndrome in schizophrenia,** Fenton WS, McGlashan, TH, *Am J Psychiatry,*1994;151(3):351-356;
**Premorbid IQ in schizophrenia: a meta-analytic review**, Woodberry, KA, *Am J Psychiatry,*2008; 165(5):579-587. Williams, H. L., Conway, M. A., & Cohen, G. (2008).
**Prefrontal cortical circuits in schizophrenia.**Volk DW  Lewis DA. Department of Psychiatry, University of Pittsburgh, *Curr Top Behav Neurosci.* 2010;4:485-508.

[3] Plaintiff is critical that Dr. Levy did not interview Tueffel until months after issuing his opinion. The criticism is misplaced. First, under court order (requested by Plaintiff), no one was allowed to talk to

Levy does go through several points in Tueffel's deposition to explain how certain responses are consistent with schizophrenics. These responses include several inconsistencies. Although it is true that you do not need to be schizophrenic to testify inconsistently at a deposition, this is not the point of Dr. Levy's analysis.

First, Dr. Levy has still been unable to explain what he has done. Plaintiff is still in the middle of Dr. Levy's deposition. The deposition was suspended so that Plaintiff could complete questioning on another date. Defense counsel attempted to ask follow-up questions based on the questions Plaintiff's counsel posed until that point – but Plaintiff objected and would not allow defense counsel to ask any questions. Deposition of Mark Levy at 124:24-125:13, attached hereto as Exhibit 3. As such, at this point it is unfair for Plaintiff's counsel to rely on a deposition that is not complete in seeking to bar Dr. Levy. Second, Plaintiff's motion suggests that it is an aberration for experts to analyze deposition transcripts. All experts review depositions and extract points from the depositions in forming their opinions. Here, the very nature of Dr. Levy's opinion is explaining the effects of schizophrenia on someone's testimony. Prior to having the opportunity to actually examine Tueffel, Dr. Levy merely used the transcripts of Tueffel's deposition testimony as a template or data set to examine for evidence of cognitive difficulty. Dr. Levy's analysis identified the kinds of verbal behavior that might result from the deficits in autobiographical memory commonly demonstrated by people suffering from chronic schizophrenia and chronic substance abuse and dependence.

For instance, the central issue in this case will be whether the police coerced Tueffel into identifying Plaintiff. What does Tueffel have to say? Well, it depends. When speaking to

---

Tueffel. Second, Tueffel's diagnosis is well documented in three thousand pages of mental health records. Dr. Levy's opinions address the general problems of cognitive and memory dysfunction found in people who have been diagnosed with chronic schizophrenia and chronic substance abuse, both of which are examples of severe mental disorders possessed by Tueffel. Dr. Levy's subsequent interview confirmed this diagnosis.

Plaintiff's team, Tueffel reports that the police yelled and screamed at him until he would identify Plaintiff. However, when speaking to the State's Attorney's Office in 2009 or defense counsel in 2010, Tueffel stated that the police treated him well. SAO Investigative Report Re: Larry Tueffel at pp. 2-3, attached hereto as Exhibit 4; Larry Tueffel Affidavit, attached hereto as Exhibit 5. Why the change? Schizophrenics have impairment in "*reality testing*." Dr. Levy will explain:

> Reality testing is the objective evaluation of situations, a process which is defective in Schizophrenia, enabling one to distinguish between the external objective world and one's internal world of subjective reality including fantasy and dreams. Impaired reality testing is a hallmark symptom of all psychoses. Mr. Tueffel's impaired reality testing make his "recollections" easily influenced and changeable by questioners urging him to "recall" specific facts. []

> Mr. Tueffel's impaired reality testing also causes him difficulty in trying to make sense out of disparate and confusing information. Among people with cognitive impairment from Schizophrenia, one solution to this dilemma is to confabulate false answers to questions, or to confuse false information with actual memories and be unable to clearly differentiate one from the other. []

Ex. 2 at p. 7.

To explain his points further, Dr. Levy uses Tueffel's deposition to highlight these points. It is true that you do not need an expert to point out inconsistencies or find leading questions in a deposition – but that is not Dr. Levy's point or the purpose of his analysis. As Dr. Levy stressed several times in his deposition, it is up to the trier of fact to determine if Tueffel is telling the truth. Ex. 3 at 115:9-13, 116:7-10. Dr. Levy used the transcripts to demonstrate the phenomena he explained is prevalent among schizophrenics to explain to the trier of fact the evidence that Tueffel is compliant in his testimony. There is no need for an error rate in evaluating compliance. Dr. Levy uses the deposition to show "here is an example of compliance." Showing evidence of compliance and inconsistencies is not expert work. The expert work is explaining how these examples differ from normal adult reporting and how it relates to cognitive vulnerabilities.

## II.     Dr. Levy's Remaining Opinions Are Admissible.

If the Court is not inclined to allow Dr. Levy to comment on Tueffel's specific testimony,

in addition to his comments on Tueffel's deposition, Dr. Levy's remaining opinions are still

relevant and admissible. As explained in his report, Dr. Levy will opine:

1. *People with diagnoses of chronic psychotic conditions such as schizophrenia, paranoid type, or schizo-affective disorder usually exhibit significant cognitive impairment including impaired memory. This cognitive impairment often progresses over time regardless of whether the person is acutely psychotic or in remission.*
2. *People with paranoid schizophrenia and chronic psychotic mental illness may be particularly naïve and trusting under certain circumstances. As such they are susceptible to being "Pied Pipered," or easily influenced and compliant when being questioned. For these and other reasons detailed below, their legal testimony may be unreliable.*
3. *People with a history of heavy substance abuse over a number of years, particularly but not limited to cannabis abuse and/or alcohol abuse, often suffer over time cumulative and chronic cognitive impairment that may eventually affect the reliability of their memory.*

*Opinions Specific to Lawrence Tueffel:*

1. *11 or 12 years ago at age 19 or 20 Mr. Tueffel was originally diagnosed with a chronic psychotic major mental illness, either paranoid schizophrenia or schizo-affective disorder.*
2. *In the documents reviewed, Mr. Tueffel exhibits many of the usual cognitive impairments associated with schizophrenia. In a remarkable video and written transcription of Mr. Tueffel's 2 day deposition testimony on March 3 and March 7, 2011, he appears to be susceptible to <u>being influenced by leading questions</u> and to <u>confuse speculation and fantasy with actual recollection. At times he also appears to confabulate. These are typical symptoms of the cognitive impairment associated with schizophrenia.</u>*
3. *For several years apparently ending in his mid-twenties, Mr. Tueffel heavily abused a variety of mind altering substances including, but not limited to, alcohol, marijuana and cocaine. It is probable that his cumulative heavy exposure to these psychoactive substances eventually interfered with his cognitive functioning and worsened those symptoms of his schizophrenia.*

Ex. 2 at pp. 4-5.

Tueffel was not diagnosed as a paranoid schizophrenic at the time he witnessed the

murder and when he testified against Plaintiff in three trials. Tueffel was, however, a diagnosed

paranoid schizophrenic in 2006, at the time of the recant. Tueffel was actually living in a mental

health nursing home facility when Plaintiff solicited Tueffel's recantation. Therefore, Dr. Levy

should be able to explain the characteristics of schizophrenics and their effects to the jury. This is

in line with case law explaining the relevance and considering the effects of a witness's mental

health on issues of credibility.

Courts in Illinois have held "that in determining credibility of a witness or the weight to

be accorded his testimony, regard is generally given to his mental condition. Almost any

emotional or mental defect may materially affect the accuracy of the testimony." *People v.

Hogan*, 904 N.E.2d 1036, 1047 (1st Dist. 2009) (Schizophrenia was one of the witness's

diagnoses) (citations omitted). "The mental-health history of a witness is relevant as it relates to

her credibility and it is a permissible area on impeachment." *Id.* (citing *People v. Plummer,* 743

N.E.2d 170, 179 (1st Dist. 2000).

As to schizophrenics, Courts across the country have explained why such evidence is

admissible. In *United States v. Lindstorm,* 698 F.2d 1154, 1160 (11th Cir. 1983), the Eleventh

Circuit explained:

> Certain forms of mental disorder have high probative value on the issue of
> credibility.... Mental illness may tend to produce bias in a witness' testimony. A
> psychotic's veracity may be impaired by lack of capacity to observe, correlate or
> recollect actual events. A paranoid person may interpret a reality skewed by
> suspicions, antipathies or fantasies. A **schizophrenic** may have difficulty
> distinguishing fact from fantasy and may have his memory distorted by delusions,
> hallucinations and paranoid thinking. A **paranoid schizophrenic,** though he may
> appear normal and his judgment on matters outside his delusional system may
> remain intact, may harbor delusions of grandeur or persecution that grossly distort
> his reactions to events.

In *United States v. Jimenez*, 256 F.3d 330, 343 (5th Cir. 2001), the Fifth Circuit noted the
following:

> [A] defendant has "the right to attempt to challenge [a witness's] credibility with
> competent or relevant evidence of any mental defect or treatment at a time

probatively related to the time period about which he was attempting to testify." *United States v. Partin*, 493 F.2d 750, 763 (5th Cir.1974). To be relevant, the mental health records must evince an "impairment" of the witness's "ability to comprehend, know, and correctly relate the truth." Id. at 762 . . . the decisions of this and other circuits stand for the general principle that a diagnosis of **schizophrenia** or a psychosis will be relevant, unless the diagnosis is too remote in time from the events alleged in the indictment.

In *United States v. Butt,* 955 F.2d 77, 82-83 (1st Cir. 1992), the First Circuit explained:

> For over forty years, federal courts have permitted the impeachment of government witnesses based on their mental condition at the time of the events testified to. *See United States v. Hiss*, 88 F. Supp. 559, 559-60 (S.D.N.Y.1950). Evidence about a prior condition of mental instability that "provide[s] some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately" is relevant. *United States v. Moore*, 923 F.2d 910, 913 (1st Cir.1991) . . . federal courts appear to have found mental instability relevant to credibility only where, during the time- frame of the events testified to, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as **schizophrenia**, that dramatically impaired her ability to perceive and tell the truth.

To be clear, Dr. Levy will not be testifying about whether or not Larry Tueffel is actually telling the truth. That is not his role. In line with the issues recognized in the case law, Dr. Levy will be explaining the signs and symptoms of cognitive deficit commonly found in the two major psychiatric illnesses from which Tueffel suffers, chronic paranoid schizophrenia and chronic substance abuse and dependence. This clearly falls within the purview of *Daubert* and is recognized by the case law discussed above. Therefore, Plaintiff's motion should be denied.

### 3.  Response to Plaintiff's Motions *in Limine* Nos. 3, 11-14

Defendants recognize that, as a general rule, arrests not resulting in a conviction are inadmissible, absent Plaintiff opening the door.  The door in this case is wide open.  Plaintiff's expert, Dr. Antoinette Kavanaugh, will testify that Plaintiff suffers from Post-Traumatic Stress Disorder ("PTSD") and Depression on a "debilitating level" as a result of his arrest and sixteen-year incarceration. Dr. Kavanaugh Report at p. 28, submitted under separate cover as Exhibit 6.

Plaintiff is seeing Ms. Peggy Hough, a mental health specialist, who has also diagnosed him with PTSD and Depression. Like any competent psychologist making a severe mental diagnosis, Dr. Kavanaugh and Ms. Hough evaluated Plaintiff's entire life in reaching their conclusion.  They both discuss his arrests, drug use and gang activity and how these events affected Plaintiff's life. Therefore, Plaintiff cannot cherry-pick his life apart and decide what did and did not factor into his expert's opinions.

Second, even without his PTSD claim, Plaintiff's pre and post arrest conduct would be relevant as Plaintiff will still be arguing he suffered severe emotional distress from this case. The extent of his conduct is relevant to rebut those emotional distress claims and at the very least attribute them to other causes.

Third, Plaintiff's pre-arrest history is relevant to explain why Plaintiff was tried as an adult. Likewise, Plaintiff's pre-arrest history is also relevant as it was used in aggravation at his sentencing hearings and caused his sentences to be longer than usual. Finally, Plaintiff's pre-arrest history supported the probable cause for his charging, because Defendants knew of his extensive juvenile record prior to the lineup.

### A.  Prior Juvenile Arrests – Plaintiff's Motion *in Limine* No. 11

### i.      Plaintiff's Prior Juvenile Arrests Are Relevant to Emotional Damages

Plaintiff was charged with murder at the age of 13 and had already been arrested **over 20 times** between the ages of 10 and 13. This is relevant to understanding Plaintiff's mental condition prior to his arrest in this case and Dr. Kavanaugh agrees. Dr. Kavanaugh relies upon Dennis Brady's juvenile probation reports, which detail Plaintiff's extensive prior criminal history. Ex. 6 at pp. 2-3.

Much of Plaintiff's pre-arrest conduct involved violence. At Dr. Kavanaugh's deposition,

she explained that violent behavior pre-arrest was relevant to her analysis:

> Q:           Okay. And do you know if TJ committed any crimes before he
>              was arrested in this case.
> MR. BOWMAN: Objection to the form of the question.
> A:           Well, I'm going to ask you to tell me what you mean by "violent
>              crime."
> Q:           If he fought with -- If he was fighting with anybody.
> A:           Well, I know that he fought from his own report.
> Q:           Is that relevant to your -- to your opinion?
> A:           Yes. And it's something that I considered.
> Q:           And why is that important to consider?
> A:           Because it let's me know how he was, it let's me know where he
>              was at the time -- where he was psychologically at the time that
>              all of this started, what kind of coping skills he might rely upon in
>              a time of stress and -- Yes, that's my answer.

Deposition of Dr. Kavanaugh at 110:5-22, attached hereto as Exhibit 7.

> Q:           Did you ask him how many times he engaged in fights?
> A:           I don't know if I exact -- asked him that exact question, but he talked that
>              he engaged in fights.
> Q:           Do you know how often?
> A:           I do not know. I don't have an exact number.
> Q:           Is that important to know one way or the other?
> A:           My impression based upon what I read and the interviews is that it was
>              something that he engaged in and was not an infrequent occurrence.

Ex. 7 at 113:10-20.

To rebut Dr. Kavanaugh's PTSD diagnosis, defense expert Dr. Alex Obolsky opines that

Plaintiff's pre-arrest conduct is actually consistent with someone who has a conduct disorder and

not PTSD. Dr. Obolsky explains that a review of Plaintiff's criminal history demonstrated the

following:

> [Plaintiff] recklessly disregarded others' safety for personal entertainment…He
> showed extreme indifference to the feelings and welfare of other people. He
> exhibited no remorse or fear upon apprehension.

Dr. Obolsky Report at pp. 3-4, submitted under separate cover as Exhibit 8.

Plaintiff's pre-arrest criminal history includes:

1.        03/10/90 - criminal damage to property (i.e., broken plate glass)

2.      05/28/90 - attempted strong armed robbery (i.e., confronted a victim  in attempt to take away a bike)
3.      06/06/90  - simple battery (i.e., bit victim's hand and attempted to tear  her shirt while truant from school)
4.      07/20/90 - theft (i.e., bicycle; then attempted to sell k to another  person)
5.      12/07/90 - simple battery (i.e., verbal and physical battery including  taunting and taking victims' property)
6.      01/10/91 - vehicle theft (i.e., allegedly drove grandmother's car without  permission)
7.      02/05/9l - battery (i.e., threw a rock at a another student)
8.      11/15/91 - criminal damage to public property (i.e., etched gang  symbols on his classroom desk; Mr. Jimenez was suspended for similar offences before)
9.      01/16/92 -) vehicle theft (i.e., stole a car)
10.     02/18/92 - aggravated battery (i.e., shot two victims in the back with pellets from attic window)
11.     02/20/92 - aggravated battery (i.e., shot victim in the back, other passers-by, car window, and a bus with a BB gun)
12.     02/29/92 - weapons violation (i.e., apprehended with an air rifle used in previous attacks)
13.     03/15/92 - vehicle theft (i.e., driving a stolen car)
14.     04/30/92 - theft (i.e., stole tools out of a car)
15.     05/08/92 - weapons violation (i.e., mother calls police to report her son who is wanted on warrants; during arrest, found to possess 22 caliber starter pistol)
16.     06/07/92 - criminal damage to vehicle (i.e., broken rear car window)
17.     06/26/92 – attempted theft (i.e., attempt to steal a car)
18.     07/18/92 - aggravated assault (i.e., threw bricks and bottles at victims)
19.     08/08/92 - vehicle theft (i.e., driving stolen car)
20.     10/18/92 - burglary (attempted stealing and destruction of school property)
21.     10/25/92 - delinquent of criminal trespass to vehicle
22.     01/05/93 – burglary

Dr. Marchlewski, a child adolescent psychiatrist, evaluated Plaintiff in April of 1993. His findings are the most hands-on observation of Plaintiff's emotional condition at the time he was first incarcerated for the murder which is relevant to evaluating whether or not Plaintiff has PTSD today. Dr. Obolsky summarized his findings:

According to Dr. Marchlewski, Mr. Jimenez exhibited various negative behavioral and prognostic aspects, such as a history of multiple court referrals, evidence of manipulative behaviors in evading consequences for his delinquent acts, and, despite probation officer's great investment into Mr. Jimenez, lack of positive response to various interventions. Despite voicing the desire to leave the gang, Mr. Jimenez does not do so. He has a significant alcohol and drug misuse history. The positive aspect to Mr. Jimenez's functioning was his ability to do

well academically. Dr. Marchlewski's diagnosis was conduct disorder and poly-substance abuse.

Both side's experts discuss and address Plaintiff's prior arrests as a part of their analysis. Therefore, it cannot be excluded as evidence in this case. In fact, courts have recognized that arrests are admissible in rebutting emotional distress claims – even in cases where no experts were retained – let alone cases where the experts on both sides address the effect of Plaintiff's arrests on his current mental condition. *See Gribben v. City of Summit,* 2010 WL 2928094 at * 3 (N.D. Ill. July 20, 2010) ("Court also agrees that evidence concerning Mr. Gribben's prior convictions and arrests is relevant for the limited purpose of undermining his claim of intentional infliction of emotional distress"). *See also Redmond v. City of Chicago,* No. 06 C 3611, 2008 WL 539164, at *2 (N.D. Ill. Feb. 26, 2008) (evidence concerning prior arrests is relevant, not for purpose of showing bad character, but to allow jury to assess claim of emotional distress stemming from arrest).

### ii.   Plaintiff's Prior Juvenile Arrests Are Relevant to the Amount of Time He Spent In Prison and the Probable Cause for His Charging

Plaintiff seeks damages for sixteen years of incarceration. But not all juveniles charged with murder are tried as adults or given such lengthy sentences. Defendants should be permitted to argue that Plaintiff received unique treatment because of his particularly extensive juvenile criminal record. First, Plaintiff's prior juvenile arrests caused him to be tried as an adult. At Dennis Brady's deposition, he testified:

> Q.   Let me ask a new question. T.J.'s 10 station adjustments -- Strike that. Thaddeus Jimenez's 10 station adjustments and his 13 court referrals -- The ones we just talked about, correct?
> A.   Correct.
> Q.   (Continuing) -- all of these were considered by you in your recommendation that T.J.'s court be transferred -- T.J.'s murder trial be transferred to the adult court versus being in the juvenile court; is that correct?
> A.   Correct.
> Q.   And they formed one of the major bases for why you asked for the case to be

                transferred to the adult court versus the juvenile court; is that correct?

MR. CHANEN: Object to the form.

BY THE WITNESS:

A.      I think there were seven criteria for where you make that recommendation. So that would be one of the criteria. And it was definitely a reason, yes.

Deposition of Dennis Brady at 26:24-27:19, attached hereto as Exhibit 9. Second, Plaintiff's prior juvenile arrests caused him to receive lengthy sentences. Twenty witnesses, including Dennis Brady, testified at Plaintiff's first sentencing about his juvenile arrests. After hearing this testimony, Judge Berkos sentenced Plaintiff to fifty years' imprisonment, observing:

> Thaddeus, you have an extensive juvenile record. It starts at age nine or ten years old. A variety of crimes, attempt robbery, batteries, criminal damage to property, thefts, trespass to motor vehicles, possession of weapons, I think there were two or three possession of stolen motor vehicles, a couple of burglaries, attempt burglaries, several disorderly conducts, battery, looks like 22, 23 crimes that you've been involved in . . . Most of these crimes although they're juvenile crimes would except for your age have been felonies.

Finally, Defendants knew of Plaintiff's juvenile record of over twenty arrests prior to his lineup. His extensive prior juvenile arrests also supported the probable cause for his charging following the lineup. Therefore, because Plaintiff's prior juvenile arrests are relevant to his claim of emotional damages, the amount of time he spent in prison, and the probable cause for his charging, those arrests should be admissible.

### B.  Conduct In Prison

Dr. Kavanaugh discussed why Plaintiff's conduct in prison is relevant as well.

Q:      Why did you ask for records related to his tickets? Why was that important to you?

A:      So that I can have an understanding of what tickets he obtained.

Q:      Why is that important?

A:      So I can have an understanding of his behavior while he was in.

Q:      Why is that important?

A:      Because it's a relevant factor and it helps to have a -- as complete picture as possible knowing that there are inherent limits of how complete you can get.

Ex. 7 at 57:4-14.

Q:      Do you think you don't have a complete picture of Mr. Jimenez?
MR. BOWMAN: Objection, argumentative.
BY THE WITNESS:
A:      I feel that given what data I have, I have as complete a picture as I have.
Q:      Okay. Now, back to the tickets, the tickets were so that they can assist you in getting as complete of a picture as possible; that would be fair?
A:      The tickets were so that I can understand how others -- meaning the system -- documented his behavior while he was there.
Q:      Why is his behavior in prison relevant?
A:      Because -- His behavior in prison is relevant to the degree in which they noted it, which isn't always complete, because it helps me understand how he was behaving during that time and that's part of my assessment.
Q:      My question is: Why is that important? Why is it important how he was behaving in prison?
A:      To allow me to assess how he was during that time.

Ex. 7 at p. 58:10-59:13.

Q:      How about while he was incarcerated, do you know how many fights he engaged in while he was incarcerated?
A:      I don't have a tally of the number of fights.
Q:      Do you know if he engaged in fights --
A:      Yes.
Q:      -- while he was incarcerated? Do you know if it was just as infrequent as it was before he got incarcerated?
A:      Well, I know that he -- Well, I guess – Wow Okay. So it's really hard to assess that because he, before incarceration, was 13 and he had a 16-year period, so even with the same -- So there's a -- So – I know that he, by his report, engaged in a lot of fights while he was incarcerated and also records from the detention center describe him in a similar manner.

Ex. 7 at pp. 113:21-114:12.

Accordingly, even Dr. Kavanaugh agrees that one must look at the complete picture, including Plaintiff's conduct in prison, when evaluating his mental condition.

**C.  Post-Release Conduct – Plaintiff's Motion *in Limine* No. 12**

As with his prior arrests, Plaintiff's post-release arrests are relevant to assessing his emotional damages and PTSD claim. After serving sixteen years for a crime he claims he did not commit, Plaintiff was released from prison in May of 2009. Since that time, Plaintiff has been arrested at least five times. These arrests include driving on a suspended license, guns and drugs

recovered in a search of his home, resisting arrest, and aggravated assault on a police officer.

For one case, Plaintiff was incarcerated without bail in Cook County Jail for over six months in 2010. As a part of facilitating his release on bail (which he currently is on), Plaintiff submitted a report to the Circuit Court of Cook County Criminal Court judge by Ms. Peggy Hough, who evaluated Plaintiff and diagnosed him with PTSD. Peggy Hough Report at p. 9, submitted under separate cover as Exhibit 10. In fact, Plaintiff's first PTSD diagnosis came from Ms. Hough, who evaluated Plaintiff while he was incarcerated for his post-release arrests. Dr. Kavanaugh summarized Ms. Hough's opinions:

> [Plaintiff] suffers from symptoms of PTSD including hypervigilance, flashbacks, intrusive thoughts or images related to his incarceration as well as "nightmares and traumatic responses, [and] feeling as if it is really happening." She reported that as a result of being convicted of a crime that he did not commit and serving more than sixteen years in prison "he experiences a fair amount of detachment and problems with trusting people for fear that the relationship will not last or will be interrupted without any control on his part." Moreover, she opined that he experiences paranoia, which she conceptualizes as "extension of what I consider the hyper vigilance." She opined that aspects of his depression "**manifest with rage,** but I think he is depressed. At times he demonstrates hopelessness and helplessness. It is going to be a long time before he can navigate through this and see life through a different lens."

Ex. 6 at p. 23.

Dr. Kavanaugh had no idea that Plaintiff was even incarcerated in Cook County Jail when she evaluated him and diagnosed him with PTSD. For all we know, Plaintiff's emotional distress may come from the six months he spent in Cook County Jail. Moreover, Plaintiff seeks compensatory damages for "the loss of a normal life that [he] has suffered and is reasonably certain to experience in the future." Pl's Jury Instruction No. 23. His multiple arrests and six-month incarceration in Cook County Jail rebut the notion that Defendants deprived him of a normal life. Therefore, Defendants should not be precluded from introducing evidence related to his post-release arrests and recent 2010 incarceration.

Dr. Obolsky explains in his report that on March 19, 2010:

Mr. Jimenez refused to comply with directions of the fire department to move his vehicle as to allow an emergency vehicle pass though a toll booth in order to respond to an emergency of another driver having a heart attack Indeed, Mr. Jimenez reportedly yelled: "Fuck you. I don't have to move. I ain't listening to you."

Eventually Mr. Jimenez moved his vehicle, parked his car, and exited the car. He walked up to Sergeant McDonald with his arms raised and he was yelling, "Fuck you. I'll fuck you up." Mr. Jimenez walked closer to Sergeant McDonald swinging his arms. Officer McDonald identified himself as peace officer and toll Mr. Jimenez he was under arrest and to lay on the ground with his hands behind his back Mr. Jimenez refused and continued to approach Sergeant McDonald. At that time, Officer McDonald and first deputy superintendent apprehended Mr. Jimenez and arrested him.

At the police station, the search of Mr. Jimenez resulted in finding marijuana in his sock At the time of this hearing on 06/10/10, the case was pending at Rolling Meadows with the next court date on 07/29/10.

Upon further hearing the arguments made by defense attorney, the judge stated that he saw a "theme here and I see a theme that he has very little self-control. He is impulsive and responds instinctually. He yells and screams and he acts out. He has an order of protection, he is a danger." The bond was increased to $50,000 and Mr. Jimenez was released to Cook County Sheriff's Day Reporting in addition to wearing a bracelet. The judge ordered mental health counseling and alcohol and drag treatment. In the judge's opinion, Mr. Jimenez was "a time bomb."

Dr. Pica, a psychologist, and Chief Judge Rodriguez interviewed Mr. Jimenez on 06/18/10 in order to ascertain his fitness to participate in the Cook County Sheriff's Day Reporting program. According to the report, Mr. Jimenez did not exhibit florid signs of mood or thought disorders.

During this interview, Mr. Jimenez was found to contradict himself on occasion. Mr. Jimenez denied current gang involvement and downplayed his past involvement as a "pee-wee;" yet he boasted about running a prison house (i.e., he was in charge of the entire division) while incarcerated. He initially reported he can identify a gang member anywhere only to contradict himself when he stated that he did not know of any gang members in jail.

Ex. 8 at pp. 21-22.

In summary, the review of contemporaneous records documenting Mr. Jimenez's involvement with the criminal justice system since May 2009 indicates a pattern of various acts that brought him to the attention of law enforcement. Although

many charges were dropped, the facts are that Mr. Jimenez was involved in drug related behaviors, driving offenses, weapon offenses, and overall he exhibited aggressive, impulsive, and hostile behaviors. Indeed his mandated mental health treatment focused on his poor self-control, irritability, impulsivity, not taking responsibility for his own actions and blaming others, and lastly domestic violence treatment.

Ex. 8 at p. 24.

Even Dr. Kavanaugh admits that Plaintiff's post-release "conduct was consistent with what one would expect given what he has undergone." Ex. 7 at p. 81:12-13. Accordingly, all of his post-release conduct is relevant in evaluating his emotional damages in this case.

### D. Drug Use – Plaintiff's Motion *in Limine* No. 14

Plaintiff seeks to keep out his drug use. Once again, drug use is relevant to damages. Both Dr. Kavanaugh and Dr. Obolsky address Plaintiff's use of drugs. As recently as last year, Plaintiff was forced to undergo drug counseling. According to a November 29, 2010 court order, Plaintiff was required to attend a weekly AA/NA meeting. Dr. Obolsky, in rebuttal to Dr. Kavanaugh's PTSD assessment, also diagnosis Plaintiff with substance abuse disorders based on the DSM-IV guidelines. Dr. Obolsky will explain how Plaintiff's prior and current drug use is relevant to understanding his mental disorder. Even Dr. Kavanaugh considered Plaintiff's drug use as a part of her overall analysis of his mental condition.

> Q:    There's some brief mention in your report about his drug use, and I want to talk to about some of that right now. Okay?
> A.    Yes.
> Q.    He told you he did cocaine, correct?
> A.    When are we talking about?
> Q.    Prior to his incarceration he told you that he did cocaine?
> A.    I just need to check the time period which is -- Hold on. Correct.
> Q.    How much did he do?
> A.    I don't -- It's not included in my report. I don't know.
> Q.    Did you ask him?
> A.    I don't have -- I don't know.
> Q.    Would it have been important to ask him?
> A:    I think what was important for me is understanding what his -- what substance he was using and get some idea of the pattern of his use and when it started. What I

know -- So I think that that's -- That's what I felt that I needed to do.

Ex. 7 at pp. 115:6-116:3.

Therefore, this Court should not bar evidence of Plaintiff's drug use as it is relevant to his claim of emotional damages. *E.E.O.C. v. Kim and Ted, Inc.,* 1996 WL 26871, at *3 (N.D. Ill Jan. 22, 1996)(evidence of prior drug use is relevant to claim of emotional damages); *Egebergh v. Village of Mount Prospect,* 2004 WL 856437, at *1 (N.D. Ill. April 20, 2004)(drug use relevant to damages.)

### E.  Gang Evidence – Plaintiff's Motion *in Limine* No. 3

#### i.      Gang Evidence Is Relevant to Plaintiff's Motive to Shoot Eric Morro

Just a few hours before the shooting, Eric Morro saw Plaintiff throwing Royals signs and yelling Royals at a school bus around Belmont and Sacramento. When Mr. Morro told Plaintiff to take his gangbanging elsewhere, Plaintiff responded by threatening him, saying "you'll get yours, you'll get yours." Donna and Shawn Cosmen witnessed this altercation, and told Detective Bogucki about it prior to Plaintiff's arrest and charging for the murder of Eric Morro. The motive supplied by this gang-related altercation thus supported the probable cause for Plaintiff's charging, and is directly relevant to Plaintiff's claims. The State argued at Plaintiff's first trial:

> [T]he Thaddeus Jimenezes of the world believe that if somebody crosses their path and he disagrees with them or they try to stop him from doing his gangbanging crap in front of little kids, that he has the right to take their life.

Plaintiff's gang affiliation cannot be disentangled from his motive for shooting Eric Morro. Therefore, because gang evidence was an element of the probable cause for Plaintiff's charging and the evidence supporting his allegedly wrongful convictions, it should not be barred.

#### ii.      Gang Evidence Is Relevant To Explain Why Larry Initially Refused To Identify Plaintiff

18

Plaintiff's gang affiliation is also relevant to establish the relationship and actions people took in this case. The Seventh Circuit has long recognized that gang membership has probative values under appropriate circumstances, "particularly 'in cases where the interrelationship between people is a central issue.'" *United States v. Morales*, 03-CR-90, 2009 WL 1456567, at *16 (N.D. Ill. May 22, 2009). *See also United States v. Westbrook,* 125 F.3d 996, 1007 (7th Cir.1997) ("Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue.").

For example, Plaintiff and Larry Tueffel were both members of the Simon City Royals. Tueffel was interviewed on three occasions by the police. Tueffel only told the police Plaintiff committed the murder after he was told that another witness had identified Plaintiff. During cross-examination at trial, Tueffel explained that at first he was scared to identify Plaintiff because "if you trick on another gang member . . . You end up dead." Larry Tueffel Testimony at Plaintiff's First Criminal Trial at B134:6-136:5, attached hereto as Exhibit 11.

Additionally, Jerry Scroggins was a probation officer who documented that Plaintiff and Victor Romo were in the same gang. Both Plaintiff and Mr. Romo deny this gang affiliation – but this is probative of their motive to lie for each other. *United States v. Thomas,* 86 F.3d 647, 652 (7th Cir. 1996) (affirming district court's ruling allowing gang evidence because that evidence "helped demonstrate the existence of the conspiracy and the connections between members of the conspiracy").

### iii.    Gang Evidence Is Relevant to Emotional Damages

Plaintiff seeks to exclude evidence that he was a member of the Simon City Royals. Better yet – he would like to tell the jury that the Royals was some "party crew" that he was a part of. This could not be farther from the truth and is a distortion of how Plaintiff was leading

19

his life prior to his arrest, which, as discussed above, is relevant to understanding the "complete

picture" of Plaintiff and its relation to his incarceration.

During his forensic interview with Dr. Obolsky, Plaintiff explained that his uncle Mark

taught him how to protect himself, how to fight, and how to maintain respect from others.

According to Plaintiff, these skills came in handy when he was incarcerated because he was able

to keep himself safe. Uncle Mark – as well as other family members – were gang members who

acted as role models for him. Plaintiff explained that he joined the gang because:

> Because I always wanted to. I seen my uncles, they were, I joined the same gang
> that my uncles were and my cousins were in. I wanted, I knew that's what they
> were part of, that was the gang that they were a member of and I wanted to follow
> in their footsteps. I wanted to do it too... I wanted to be in that same gang. I
> wanted to do the things they did. I wanted to walk their footsteps and that's what I
> did.

In his interview with Dr. Obolsky, Plaintiff explained:

> I quickly developed a reputation as a bad ass in the neighborhood quickly,
> quickly. I was, this is what I was told, not, I was told to do this, I was told to do
> that, whatever I was told to do I did it immediately and without question and
> without hesitation whatsoever, I did it and that gained my reputation for me.
> People would call this guy is serious about it, you know, don't mess with him,
> he's a gangbanger, you know, and...

Plaintiff experienced satisfaction from his reputation and the respect gang membership gathered

for him. He explained:

> It, in, in some ways it made me feel good, it did, I cannot lie. In some ways, you
> know, this was a sense of power, a sense of authority for me because I could walk
> around the neighborhood and none of the other kids would mess with me, none of
> the other kids would be scared of or would, all the other kids were scared of me.
> Even neighbors, you know, even adults in the neighborhood they knew who I was
> and, you know, they didn't give me no problems. All the girls in the
> neighborhood they liked me, not because they knew me because I was a good
> guy, but because they knew who I was and they knew of me and, you know, in
> that, in that aspect, you know, I liked it because I was, I was force, I was
> somebody...

Again, even Dr. Kavanaugh considered Plaintiff's gang affiliation in her analysis.

> Q.     Do you know how old TJ was when he joined the gang?

A.      I don't know off the top of my head.
Q.      Is that important to this case? Strike that. Is that relevant in anything to consider in your opinion in this case?
A.      What's more relevant is me being aware that he was in -- was gang involved.
Q.      Why is that relevant?
A.      Because it helps me to understand him and what kind of potential issues might have been involved when was incarcerated -- that he would face when incarcerated.
Q.      And we're talking about the gangs prior to incarceration?
A.      Correct, we are.
Q.      Okay. So why is his gang prior to him being incarcerated relevant?
A.      Because it could put him in more danger or perhaps afford some level of -- I don't know -- for lack of a better word -- protection at a cost while incarcerated.

Ex. 7 at pp. 117:14-118:11.

Therefore, this Court should not bar any discussion of Plaintiff's gang activity and affiliation because it is relevant to damages.

**F.  Margot Gillin's Testimony Is Relevant – Plaintiff's Motion *in Limine* No. 9**

Margot Gillin was Plaintiff's teacher while he was incarcerated at the Audy Home. Ms. Gillin will testify to her observations of Plaintiff, observations she clearly remembers to this day. These observations are relevant to the assessment of his conduct while incarcerated on this case. As Dr. Kavanaugh explained, it is important to have as complete a picture as possible. Ex. 7 at 57:4-58:9. Here, we have direct observations of Plaintiff when he was incarcerated in the Audy Home. Ms. Gillin testified:

The reason I recall Thaddeus is I remember he shook my belief in humankind, made me question my religious beliefs very deeply, and I have never seen a child that I was as scared of. Nor had I seen a child that I took their threats as seriously as this child. That's why this child stands out in my mind.

Deposition of Margot Gillin at 11:2-8, attached hereto as Exhibit 12.

Ms. Gillin will also testify about the threats Plaintiff made against Victor Romo's father.

According to Ms. Gillin's report dated 5-26-93:

21

On 5-25-93 Thaddeus announced that he would kill the father of the young man
he is on the case with if the young man said he pulled the trigger. Thaddeus
has been fighting, attempting to steal things, and being uncooperative, sneaky.

It is Defendants' position that Ezequiel Romo fabricated the Juan Carlos Torres
confession tape because he was scared of Plaintiff. Ms. Gillin's recollection and memorialization
of the threat is circumstantial evidence the threat was made and supports Defendants' assertion
that Mr. Romo was indeed afraid of Plaintiff. Mr. Romo in fact confirmed he knew about the
threat. Deposition of Ezequiel Romo at 74:23-75:6, attached hereto as Exhibit 13. Plaintiff tries
to massage the threat because Mr. Romo does not admit hearing the threat directly from Plaintiff.
This is really beside the point. First, Mr. Romo could very well be lying about the circumstances
of the threat. Truth be told, he might still be scared of Plaintiff. Second, whether he heard the
threat directly or not, he learned about it. Ms. Gillin's testimony about the threat supports that
Plaintiff actually did make a threat to Victor Romo's father.

Ms. Gillin also testified that Plaintiff bragged that he arranged for the apartment of one of
the witnesses in the case to be firebombed. Ex. 12 at 14:6-13, 24:8-20. Phil Torres testified to a
fire at his apartment after he agreed to be a witness against Plaintiff. Plaintiff denies participating
in the fire at Mr. Torres's apartment. Ms. Gillin's testimony is therefore also relevant to rebut
Plaintiff's denial of any involvement in the fire at Mr. Torres's house.

Therefore, Ms. Gillin's testimony is relevant to both damages and to establish that
Plaintiff did in fact threaten Ezequiel Romo and brag about the fire at Phil Torres's house.

According to Dr. Kavanaugh, just looking at Plaintiff and observing his mannerisms
show that he is extremely depressed. Ex. 7 at 137:3-22. Therefore, even if Plaintiff seeks to
withdraw Dr. Kavanaugh, Plaintiff's conduct, arrests, drug use and gang activity are relevant to
explain Plaintiff's emotional distress.

### 4.  Response to Plaintiff's Motion *in Limine* No. 4

Plaintiff's motion to bar Carmelo Cortez from testifying at trial should be denied. First, Plaintiff is not prejudiced by the timing of Mr. Cortez's disclosure. Second, Rule 26(a)'s disclosure requirements do not apply to impeachment witnesses. Fed. R. Civ. P. 26(a)(1)(A)(i).

Under Rule 37, this Court should consider whether Plaintiff is prejudiced by the timing of Mr. Cortez's disclosure and Plaintiff's ability to cure any prejudice that may exist. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857-58 (7th Cir. 2003). Defendants disclosed Mr. Cortez's name, address, and expected testimony on October 26, 2011, promptly after locating and interviewing him. Plaintiff's motion *in limine* poses some questions regarding Mr. Cortez's contacts with defense counsel and his conversation with Larry Tueffel which Plaintiff claims cannot be answered before trial. In response, Defendants state the following:

- In September of 2010, Plaintiff testified that he, Danny, and Eric Morro once delivered drugs to "Carmello."
- In February of 2011, Defendants first learned the full name Carmelo Cortez in the course of their investigation, and began trying to locate Mr. Cortez.
- In March of 2011, Larry Tueffel testified that "Carmello" came by his house after the shooting and asked him who shot Eric Morro, and that he did not tell "Carmello" that Plaintiff shot Eric Morro.
- In October of 2011, Defendants finally located Mr. Cortez.
- On October 16, 2011, Defendants' investigator made contact with Mr. Cortez.
- On October 25, 2011, Andrew Hale interviewed Mr. Cortez.
- On October 26, 2011, Defendants disclosed Mr. Cortez.

The remainder of Plaintiff's questions – such as why Mr. Cortez did not "come forward earlier" – can be answered through the standard process of taking Mr. Cortez's deposition. Defendants previously advised Plaintiff that they have no objection to Plaintiff deposing Mr. Cortez should they desire. If Plaintiff chooses to depose Mr. Cortez, he will also have the opportunity to verify that defense counsel did not engage in any misconduct. A deposition of Mr. Cortez would be consistent with the parties' practice of continuing to conduct discovery past the official discovery cut-off date in this case. For example, Plaintiff recently issued a subpoena for a video of Juan

Carlos Torres. This video was referenced in a State's Attorney's Office Investigative Report produced by Defendants in April or May of 2010. Plaintiff could have sought the video in 2010, yet waited until the eve of trial to do so, then strenuously argued to this Court that three weeks was ample time for Defendants to find, retain, and obtain a response report from a voice comparison expert – a decidedly more time-consuming task than deposing a single witness. Other recent examples include Plaintiff's seeking to obtain more of Mr. Tueffel's medical records in November, and the production of Rosa Wiszo-Waty's grand jury testimony in October on Plaintiff's motion in Cook County Criminal Court. By January 9, 2011, Plaintiff will have had more than two months from the time Mr. Cortez was disclosed during which to depose Mr. Cortez and learn the answers to his questions. Thus, the timing of Mr. Cortez's disclosure has not prejudiced Plaintiff.

Moreover, the plain language of Rule 26(a) exempts impeachment witnesses from the general requirement that witnesses be disclosed in advance of trial. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005). Mr. Cortez is a textbook impeachment witness. Mr. Tueffel testified that Mr. Cortez came by his house after the shooting and asked him who shot Eric Morro, and that he did not tell Mr. Cortez that Plaintiff shot Eric Morro. Mr. Cortez is expected to testify to exactly the opposite, that is, that Mr. Tueffel did, in fact, tell him that Plaintiff shot Eric Morro. As such, Mr. Cortez directly impeaches Mr. Tueffel. Therefore, both because of the absence of prejudice and because Mr. Cortez is an impeachment witness, Plaintiff's motion to bar Mr. Cortez from testifying at trial should be denied.

5. **Response to Plaintiff's Motion *in Limine* No. 5**

Plaintiff's motion to bar evidence of the Elizabeth Heatley letters should be denied. First, the letters were important evidence supporting Plaintiff's allegedly wrongful convictions.

Second, the letters corroborate Larry Tueffel's original testimony that he did not immediately

identify Plaintiff as the shooter because he was afraid of implicating a fellow member of the

Simon City Royals. Third, the letters are relevant to Plaintiff's emotional damages.

First, the State prominently featured the letters in its case against Plaintiff at both trials.

For example, the State began its closing argument at Plaintiff's first trial as follows:

> There are 13-year-old children, and there are Thaddeus Jimenez. Thaddeus
> Jimenez is the type of person that writes letters and says, "Oh, this Saturday on
> the 8th I am going to call John Spaw . . . I am going to tell him to stop Larry from
> going to court in any way he has to, even if he has to kill him."

Likewise, the State ended its closing argument as follows:

> Ladies and Gentlemen, don't stop at just his actions. Listen to his words. Listen to
> the letter he wrote on April 19, 1993. "Even if he has to kill him, it won't mean
> anything to me, and it only takes the pull of a trigger."

Plaintiff claims that he was wrongfully convicted due to Defendants' misconduct, and seeks

substantial damages for injuries stemming from those convictions. Defendants are entitled to

argue that Plaintiff was not convicted because of any police misconduct, but because the State

successfully utilized the letters as powerful evidence of consciousness of guilt. The letters also

mitigate Plaintiff's *Brady* allegations. To prove his *Brady* claim Plaintiff must show that the

failure to disclose certain evidence was "material" i.e. the jury would have reached a different

result if the material suppressed were disclosed. Here, the jury could easily find that the even if

Defendants withheld certain *Brady* evidence, it was not material because the threatening letters

written by Plaintiff were strong indicators of guilt. Indeed, Plaintiff appealed his second

conviction based on the trial court's admission of his letters. The appellate court rejected this

argument, finding that the letters were properly admitted as probative of consciousness of guilt.

Appellate Opinion at p. 17, attached hereto as Exhibit 14. While Plaintiff is free to disagree and

call the letters "childish expressions of love and longing," he should not be permitted to pretend

that they do not exist. Such a sanitized version of what occurred at Plaintiff's trials would be a gross rewriting of history and deprive Defendants of a significant line of defense. Moreover, Plaintiff intends to argue that, following his arrest, Defendants failed to investigate the "real shooter." Defendants should be permitted to argue that they did not investigate Juan Carlos Torres as much as Plaintiff wishes because, even after Plaintiff's arrest, they continued to receive evidence that Plaintiff was the shooter.

Second, the letters corroborate Larry Tueffel's criminal trial testimony that he did not initially identify Plaintiff as the shooter because he was afraid of implicating a fellow member of the Simon City Royals. The letters demonstrate that those fears were justified. Therefore, for all of the aforementioned reasons, Plaintiff's motion to bar evidence of the Elizabeth Heatley letters should be denied.

Third, the letters are relevant to Plaintiff's mental condition shortly after the shooting. Dr. Obolsky relied on the letters in diagnosing Plaintiff with a juvenile conduct disorder. Ex. 8 at p. 10. The letters are thus relevant to Plaintiff's claim of emotional damages. *See* Response to Plaintiff's Motions *in Limine* Nos. 3, 11-14.

6. **Response to Plaintiff's Motion *in Limine* No. 6**

Plaintiff's motion to bar references to Victoria Jimenez's communications with Elizabeth Heatley should be denied. First, Defendants anticipate that Ms. Jimenez will testify that she always believed in Plaintiff's innocence. Defendants should be permitted to counter this testimony with evidence that Ms. Jimenez attempted to manipulate the case against Plaintiff. Such testimony also goes to bias i.e. to what extent Ms. Jimenez will act on behalf of her son. Second, like the letters themselves, Ms. Jimenez's communications with Ms. Heatley regarding the letters were a part of the criminal trials and likely affected the juries' determinations of Ms.

Jimenez's credibility. Just as the letters affected the outcome of Plaintiff's trial so did his mother's actions. Therefore, Plaintiff's motion to bar references to Ms. Jimenez's communications with Ms. Heatley should be denied.

### 7.  Response to Plaintiff's Motion *in Limine* No. 7

Plaintiff's motion to bar "amorphous" threats should be denied. The threats are admissible to explain the witnesses' testimony at Plaintiff's criminal trials and during the current lawsuit as well. Virtually every civilian witness who testified against Plaintiff at his criminal trials was threatened in connection with the case. To briefly summarize:[4]

- Larry Tueffel was threatened by Plaintiff in the Elizabeth Heatley letters, and originally testified that he was afraid to identify Plaintiff because of gang retaliation. Charles Snyder testified that Tueffel's home was burned down a few days after the shooting. Deposition of Charles Snyder at 36:15-37:3, attached hereto as Exhibit 15.
- Tina Elder was told to "mind her own business" and "keep her mouth shut." She "[took] that to mean [her] family shouldn't get involved in Mr. Jimenez's criminal trial." Deposition of Tina Elder at 67:16-69:12, attached hereto as Exhibit 16.
- Sandra Elder was told that "we'd be sorry if we testified against TJ." She was "concerned about testifying against TJ at the criminal trials." At her deposition, she testified that the threats "scared me. Still scares me." Deposition of Sandra Elder at 75:3-76:1, attached hereto as Exhibit 17.
- Phil Torres's apartment was burned down after he identified Plaintiff as the shooter. Tina Elder, Sandra Elder, Donna Cosmen, Shawn Cosmen, and Charles Snyder have all corroborated that the fire occurred. Margot Gillin recalled Plaintiff bragging about having a witness's home firebombed.
- Shawn Cosmen's life was threatened by members of Plaintiff's family. At the time of his deposition, he was still afraid of gang retaliation. Deposition of Shawn Cosmen at 36:3-40:14, 64:8-22, attached hereto as Exhibit 18.
- Elizabeth Heatley was threatened by Plaintiff's mother after Plaintiff's letters were turned over to the police.
- Margot Gillin also recalled Victor and/or Ezequiel Romo being threatened by Plaintiff on multiple occasions. Ezequiel and Catalina Romo recall threats against the Romo family.

Taken together, the threats show a striking pattern of witness intimidation. The fact that some witnesses did not identify their aggressors is beside the point. First, they may still be too afraid to

---

[4] Plaintiff has only moved to bar some of these threats. The complete list is included for illustrative purposes.

name names, especially knowing that Plaintiff has been released and will learn everything they say. (Plaintiff attended Tina and Sandra Elders' depositions in Fulton, Illinois.) Second, regardless of whether they can identify their aggressors, the threats are admissible to explain why they testified the way they did at Plaintiff's criminal trials. *See People v. Williams*, 635 N.E.2d 781, 788 (1st Dist. 1994) (evidence of threats admissible to explain witnesses' inconsistent statements). Even today, these witnesses are still very reluctant to testify because of everything they endured at the time of the criminal proceedings and because of fear of what might happen if they continue to testify against Plaintiff. As such, the threats are also admissible to explain the witnesses' testimony in this lawsuit. Therefore, Plaintiff's motion to bar "amorphous" threats should be denied.

### 8.  Response to Plaintiff's Motion *in Limine* No. 8

This Court should reserve ruling on Plaintiff's motion to bar references to an incident at Cook County Jail between Plaintiff and Rachel Vorbeck, one of his former post-conviction attorneys. On June 11, 2010, Ms. Vorbeck visited Plaintiff at Cook County Jail for over nine hours. She was no longer his attorney at the time. At the conclusion of the visit, Cook County Jail personnel witnessed Plaintiff and Ms. Vorbeck kissing on the lips which prompted them to complete both an Incident Report and a Memorandum. At this point, Defendants do not intend to reference the incident at trial. If, however, Plaintiff opens the door by testifying that he is in a healthy, committed relationship with the mother of his child, Abby Betbabo, then Defendants should be permitted to question him regarding the incident. If Ms. Vorbeck is called at trial, the incident is also potentially relevant to bias. Therefore, this Court should reserve ruling on Plaintiff's motion to bar references to the Cook County Jail incident.

### 9.  Response to Plaintiff's Motion *in Limine* No. 9

Plaintiff's motion to bar "irrelevant witnesses" from testifying at trial should be denied. As a threshold matter, the motion should be denied because it is overbroad and supported solely by conclusory allegations of irrelevance. Nevertheless, Defendants will briefly describe each witness's expected testimony.[5] Jerry Scroggins is expected to testify about a probation report which he authored stating that Plaintiff and Victor Romo were members of the same gang, contradicting both of their claims that they did not know each other prior to the shooting. Terry Sullivan, Executive Director of the Illinois Council on Long Term Care, is expected to testify about the requirements for admission to Somerset Place, where Larry Tueffel was residing at the time that he recanted in July of 2006. Graciela Viale-Val is expected to testify about a psychological evaluation of Plaintiff which she completed in May of 1993, which is relevant to Plaintiff's claim of emotional damages. Catalina Romo, Victor Romo's mother, is expected to testify about the Romos moving due to threats. Deposition of Catalina Romo at 14:15-15:18, attached hereto as Exhibit 19. David Weiner, Victor Romo's defense attorney, is expected to testify about the Ezequiel Romo audiotape which he handed to ASA Gina Savini in Defendants' presence on March 8, 1993. Therefore, Plaintiff's motion to bar "irrelevant witnesses" from testifying at trial should be denied.

### 10. Response to Plaintiff's Motion *in Limine* No. 10

Plaintiff's motion to bar Anita Alvarez, Celeste Stack and Darren O'Brien from testifying about whether, based on their investigation, they believe Defendants engaged in any misconduct should be denied. The motion should be denied for two reasons. First, depending on which version Tueffel goes with at trial, Stack and/or O'Brien may be called as impeachment witnesses. Despite Plaintiff claiming that Tueffel told them that the police screamed and yelled at him,

---

[5] Defendants reserve the right to question the witnesses regarding matters beyond those included in these necessarily brief descriptions.

Tueffel told Stack and O'Brien that the police treated him well and did not engage in any misconduct. Stack and O'Brien are expected to testify that they met with Tueffel on several occasions and he never said anything about the police coercing him to identify Plaintiff as the shooter. Second, Stack, O'Brien and Alvarez's opinion that Defendants did not engage in any misconduct is relevant for that very reason. Plaintiff's police practices expert Gregg McCrary has opined that, if Plaintiff's allegations are true, then Defendants are "guilty of willful, deliberate misconduct." Thus, Defendants should be permitted to examine Stack, O'Brien or Alvarez, who conducted a re-investigation of the criminal case, about their conclusion of whether police misconduct was the cause of their decision to join the motion to vacate Plaintiff's conviction. If, as McCrary claims, Defendants engaged in this horrible conduct, then representatives from the State's Attorney's Office should be permitted to explain why Defendants were not charged with a crime. Plaintiff should not be allowed to dissect what parts of the re-investigation are admissible.

WHEREFORE, Defendants respectfully request that this Court deny Plaintiff's motions *in limine* nos. 1-7 and 9-14, and reserve ruling on Plaintiff's motion *in limine* no. 8.

Respectfully Submitted,

DEFENDANTS

BY:

/s/ Joan E. Ahn
One of the Attorneys for Defendants

Andrew M. Hale
Avi T. Kamionski
Joan E. Ahn
Andrew M. Hale & Associates, LLC
53 W. Jackson, Suite 1800
Chicago, IL 60604
312-341-9646

## <u>CERTIFICATE OF SERVICE</u>

    I, Joan E. Ahn, an attorney, hereby certify that on December 1, 2011, I caused DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE* to be served upon all counsel of record by filing the same before the Court via the ECF system.

<u>/s/ Joan E. Ahn</u>

EXHIBIT 3

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3

THADDEUS JIMENEZ,                    )
4                                    )
                   Plaintiff,        )
5                                    )
          vs.                        )   No. 09 CV 08081
6                                    )
CITY OF CHICAGO, Chicago Police      )
7    Detectives JEROME BOGUCKI,      )
     MARK SANDERS, RAYMOND           )
8    SCHALK, and F. MONTILLA,        )
     Chicago Police Officers LAWRENCE)
9    RYAN and ROBERT WHITEMAN, and   )
     as-yet unknown City of Chicago  )
10   Employees,                      )
                                     )
11                 Defendants.       )

12

13          The videoconference deposition of

14   MARK I. LEVY, M.D., called by the Plaintiff for

15   examination, taken pursuant to notice and pursuant to

16   the Federal Rules of Civil Procedure for the United

17   States District Courts pertaining to the taking of

18   depositions, taken before Cheryl A. Goetsch, Certified

19   Shorthand Reporter and Registered Professional Reporter,

20   at 205 West Randolph Street, 5th Floor, Chicago,

21   Illinois, commencing at 10:03 a.m. on the 2nd day of

22   November, A.D., 2011.

23

24

Page 114

1      Q.   All right.  Let's look at paragraph 3 on
2   page 55.  I'm interested, again, in the italicized
3   sentences.  The next one reads:  There are several
4   instances in Mr. Tueffel's deposition transcript in
5   which he appears to be unsure of an answer to a question
6   but, nevertheless, offers an answer after apparently
7   struggling to make sense of the question and ideas that
8   he may mistake as memory.  Is that a psychological
9   opinion, Doctor?
10      A.   Yes.
11      Q.   Okay.  How so?
12      A.   If -- With the caveat we're taking this
13   statement in isolation.  But to the extent that his
14   autobiographical memory skills are impaired, he may -- I
15   actually think he probably does believe some statements
16   that he presents as autobiographical fact which are not
17   accurate.
18      Q.   Okay.  Tell me -- Tell me what statement he
19   presents as autobiographical fact that's not accurate.
20   Can you identify one?
21      A.   The confession to the priest.
22      Q.   And you've concluded that -- that that's not
23   accurate?
24      A.   Well, he says opposite things, so I don't know

Page 115

1   which is accurate.
2      Q.   Right.  Well, you said -- So one or the other
3   is -- is incorrect, and your point is that -- that the
4   one that's incorrect is cause that he -- that he's given
5   that answer because of -- of his belief at the time that
6   it's correct and -- and the struggle that you identify
7   in -- in this particular sentence?  Is that your
8   testimony?
9      A.   Yeah.  You know, to the extent that I'm -- I
10   don't want to make the value judgment that the fact
11   finder has to make, that is, deciding on the truth or
12   falsehood of a witness's statements.  That's not my role
13   as an expert.  But to the extent that everything that
14   I've said about his mental illness is accurate or even
15   reasonably accurate, it is more probable than not that
16   his -- that some of his statements are made out of a
17   belief that they're true even though they are not true.
18   Is that responsive to your question?
19      Q.   Well, let me -- let me ask you this one.  Are
20   you -- Are you not intending to testify in front of this
21   jury that they should -- that they should -- they --
22   they should be skeptical of Tueffel's testimony?  Is
23   that not your role here, sir?
24      A.   No.  My role is a little different.  It will

Page 116

1   be used for that purpose, I'm sure, by the attorneys who
2   have retained me, but my role is to explain how this
3   chronic mental illness affects the cognitive functioning
4   of an individual afflicted with it.
5      Q.   Well, so -- so your role here is not to talk
6   about Tueffel?
7      A.   My -- To the extent that Tueffel has this
8   diagnosis, my role is to talk about this diagnosis and
9   it applies to Tueffel.  My role is not to determine
10   whether he's a truth teller or a falsehood teller.
11      Q.   Well, that's not -- that's not my -- my
12   suggestion that that -- that is your role.  But my
13   question is, Is it not your role to inform the jury that
14   they should be skeptical of this individual's testimony
15   because of his mental illness, in other words, he is an
16   unreliable autobiogra- -- autobiographer because he has
17   mental illness?  That's your position, right?
18      A.   Anyone with this mental illness is less
19   reliable than a person who doesn't have it.  That's
20   right.
21      Q.   Right.  And -- And you're here to tell the
22   jury that -- that Tueffel is an unreliable -- is an
23   unreliable witness, right, an unreliable witness to
24   these autobiographical facts about which he will

Page 117

1   testify?
2      A.   Well, you're putting words in my mouth.
3      Q.   I'm not trying to put words in your mouth.
4   I'm asking you a question, and I'd appreciate a yes or
5   no answer to it if you can do it.
6      A.   My role is to explain to the jury how chronic
7   paranoid schizophrenia affects the cognitive functioning
8   of a person like Tueffel, who has it.  It's their
9   judgment whether he's an unreliable witness or not.
10   They may throw out everything I say, for example.
11      Q.   Well, they -- they -- they -- they may well,
12   and -- and I'm here in the hope that they do.  But --
13   But that's not my question.  My question is -- is what
14   your position is and what your opinions are and what you
15   intend to testify in front of the jury.  That's my
16   question, okay, not whether the jury is going to believe
17   you or not but whether it is not your opinion that
18   Tueffel is an unreliable witness who should be
19   disbelieved.
20      A.   It is my opinion that Tueffel's mental illness
21   makes his testimony unreliable.
22      Q.   And unbelievable?
23      A.   Well, unreliable.  It depends on what you want
24   to do with unreliable testimony.

Page 122

| | |
|---|---|
| 1 | you've read a lot of answers? |
| 2 | A.   Yes. |
| 3 | Q.   As a general matter, have you noticed that -- |
| 4 | that many witnesses are susceptible to leading questions |
| 5 | and tend to be compliant in response to leading |
| 6 | questions?  Have you noticed that that's a phenomenon? |
| 7 | A.   Other people are susceptible to leading |
| 8 | questions and are compliant to answers when they are |
| 9 | led. |
| 10 | Q.   Right.  And this may -- |
| 11 | A.   That's an objection. |
| 12 | Q.   Pardon me? |
| 13 | A.   My understanding is that's one of the reasons |
| 14 | it is an objection, it's a valid objection at trial. |
| 15 | Q.   Right.  Except during cross-examination, |
| 16 | right? |
| 17 | A.   I didn't know that, but I accept what you're |
| 18 | telling me. |
| 19 | Q.   Let's look on page 56, No. 7.  You say:  The |
| 20 | significant inconsistencies in Mr. Tueffel's statements |
| 21 | may also be attributable to diminished intellectual |
| 22 | capacity affecting memory formation and retrieval. |
| 23 | Right? |
| 24 | A.   Yes. |

Page 123

| | |
|---|---|
| 1 | Q.   And this is a problem that afflicts witnesses |
| 2 | day in and day out in our court system, right? |
| 3 | A.   That there are mentally slow witnesses?  I'm |
| 4 | sure there are, yes. |
| 5 | Q.   Every day, right? |
| 6 | A.   I'm sure that there are. |
| 7 | Q.   Yes.  And juries have to evaluate that, right? |
| 8 | A.   Right. |
| 9 | Q.   Oh, I -- This is something I may have asked |
| 10 | you, Dr. Levy, and forgive me for going back over it, |
| 11 | page 4 of your report, paragraph No. 2.  I think it |
| 12 | was -- |
| 13 | A.   Okay. |
| 14 | Q.   I think it was your testimony, Doctor, that -- |
| 15 | that -- that -- that this opinion about people with |
| 16 | schizophrenia and other psychosis being naive and |
| 17 | trusting under circumstances, that this was just based |
| 18 | on your -- your experience treating such people over the |
| 19 | years?  Do I have that right? |
| 20 | A.   Well, not -- You say "just."  It's not just, |
| 21 | but that's certainly a significant component of that. |
| 22 | Q.   Part of it, yeah. |
| 23 | I don't know if I asked you about literature |
| 24 | review.  Is there any literature that you can cite to |

Page 124

| | |
|---|---|
| 1 | support this proposition in this paragraph? |
| 2 | A.   Not that I can cite offhand.  I would have to |
| 3 | look for the literature.  This is not something that I |
| 4 | derive from a literature review.  This was my general |
| 5 | knowledge and -- I'm sure there is literature, but I -- |
| 6 | I have to look for it. |
| 7 | Q.   All right.  So this is general knowledge in |
| 8 | terms of your -- your -- your practice and your |
| 9 | training? |
| 10 | A.   Yes. |
| 11 | MR. BOWMAN:  Okay.  Well, we're going to see each |
| 12 | other again before trial, unfortunately, Doctor.  And so |
| 13 | for today, I'm done, but we're not going to -- we're not |
| 14 | going to close this off because of -- because of our |
| 15 | need to come back for Round 2, which Mr. Kamionski and I |
| 16 | will work out.  All right? |
| 17 | THE WITNESS:  Okay. |
| 18 | MR. KAMIONSKI:  Sounds good. |
| 19 | MR. BOWMAN:  Okay. |
| 20 | MR. KAMIONSKI:  I guess (inaudible). |
| 21 | THE COURT REPORTER:  Are you off the record or ... |
| 22 | MR. BOWMAN:  Yeah.  Let's -- Avi, does this need to |
| 23 | be on the record or off? |
| 24 | MR. KAMIONSKI:  You know, I was just going to |

Page 125

| | |
|---|---|
| 1 | add one -- I was going to ask a -- a follow-up question. |
| 2 | MR. BOWMAN:  Well, I don't think we're quite there |
| 3 | yet.  I haven't finished my questioning. |
| 4 | MR. KAMIONSKI:  Okay. |
| 5 | MR. BOWMAN:  Right? |
| 6 | MR. KAMIONSKI:  As long as -- I guess with -- with |
| 7 | that understanding, okay. |
| 8 | MR. BOWMAN:  Yeah.  I mean, you get your -- you get |
| 9 | your chance when I'm done, and I can't be done because |
| 10 | of the circumstances that we experienced this morning, |
| 11 | so. |
| 12 | MR. KAMIONSKI:  Okay.  So I guess we'll reserve in |
| 13 | the meantime. |
| 14 | Have a good day. |
| 15 | MR. BOWMAN:  Thank you.  You too. |
| 16 | THE WITNESS:  Thank you. |
| 17 | MR. BOWMAN:  Yeah.  Nice meeting you. |
| 18 | (The deposition was continued |
| 19 | sine die.) |

EXHIBIT 4

# Cook County State's Attorney's Office
# Investigations Bureau



# INVESTIGATIVE REPORT

| FILE/CONTROL#: | DOCKET#:<br>93CR14710 | REPORT#:<br>9 |
|---|---|---|
| | One | |

| SUBJECT:<br>Investigative Report | TYPE OF CASE:<br>Homicide/ PC Investigation | DATE DRAFTED:<br>3 February 09 |

| SYNOPSIS OF REPORT:<br>See Narrative | PERIOD COVERED:<br>See Narrative | INVESTIGATOR (S):<br>Brian Killacky |

This is an Investigative Report filed by Brian Killacky Star# 361, assigned to the Special Prosecution/ Cold Murder Unit:

**PC Case:**            Jimenez, Thaddius 93CR 14710

**Victim:**             Eric Morrow
                        ME Case # 046 Feb 1993
                        GSW Chest Dr. Lifchultze ME

**Chicago PD**          X 051839 Homicide
                        8 Feb 1993 3018 West Belmont

**Cold Murder Unit
Assigned:**
                        INV Brian Killacky
                        ASA Linas Kelecius

**Post Conviction
Unit**
                        ASA Celeste Stack
                        ASA Darren O Brien

**Chicago Police Department**   Commander Joseph Salemne Area Five
                                Lt. Mark Hawkins Area Five Homicide
                                Det. Kevin McDonald Area Five Homicide

**Person Interviewed:**         Larry Tueffel M/2 21 Sept 1978
                                820 West Lawrence 2nd floor
                                (773) 769- 2570
                                Eye and circumstantial witness
                                To this homicide.
                                Previous interviews and testimony.

Date Time @ Location
Of Interviews

* 3 Feb 2009 26th and California 13C10 1045
• 3 Feb 2009 vicinity of 3018 W Belmont 1300

Investigation
re interview of Larry. This took place in the 13c10 conference room at 26th and California. Shortly after the beginning of this interview, ASA O Brien and Investigator Killacky conducted a after the beginning of this interview, ASA Stack arrived and participated.

Larry told the group that on the day of the murder he had met with the victim Eric right after school. Larry, it should be noted was fourteen years of age at the time and attending Linne school.

It should also be noted that Larry is describing facts and circumstances, sixteen years to the day of this homicide. Larry seemed nervous but wished to be interviewed.

Larry indicated that at the time of the murder he was a member of the Royals street gang. He stated that Eric was not a gang member. Larry stated that he also knew the victims brother Nathan.

Larry also stated that he knew Thaddeus Jimenez. To his recollection, he thought he remembered seeing " TJ" in the hallway of the Cosmans on the day of Eric's murder with a gun. He contends at this time that " TJ" was not the person who shot Eric.

Larry remembers walking home with Eric to his residence on north Whipple to eat dinner. Eric came with him but stayed in the lobby or outside as Larry was not allowed to have visitors at dinner.

Larry stated that is was cold so he gave Eric a Bulls jacket and the proceeded to walk back to the Cosmans. While walking along Belmont Ave., they saw two individuals approaching them. One of them he knew as Victor Romo, the other one was unknown to him.

Larry stated the one unknown to him stated to Eric, that" you know you owe Leo money". Eric replied that it was none of his business. This individual displayed a gun and Eric told him to put it away. This person did and then Eric was pushed and he took a swing at the person with the firearm. This person then took out the gun. Larry stated that he ran through a vacant lot and heard a gun shot. Larry stated he saw the individuals running away and found Eric had been shot.

Larry told us the police responded and he gave them a description of the shooter. He told us that the shooter was not Thaddeus Jimenez, " TJ". Larry now informs us that the shooter is Juan Carlos Torres and that he had a nickname "Crazy ". He stated that he in fact knew Victor Romo previously.

Larry did not recall when asked by ASA O Brien that he originally provided the name of "Frankie " when he testified. He also was initially vague when asked how it became known to him that the shooter was "Juan Carlos Torres'. Larry looked at photos where he indicated he recognized Luis Hernandez, Leo Robles, Thaddeus Jimenez and Juan Carlos Torres. Larry commented that he thought Luis was a member of the " Triangle Group " which was some type of group or gang around the area.

The R/Is continued to ask Larry why he identified Jimenez as the shooter and he seemed to be nervous and uncertain. He indicated that he was never threatened by

prosecutors or the police into identifying or providing testimony into what he is now contending to be a false identification of the person who shot Eric.

He then told the members of the CCSAO the following story. Larry indicated that several days after the murder of his friend Eric he was at a friend named Dave's residence on Belmont. This may have been prior to the funeral of the victim.

Larry informed the group that he was approached by Luis Hernandez in the presence of another friend "Joey Bedran " at the residence. Larry is unsure if Dave was present or close enough in the residence to hear the conversation.

Larry stated that he has never told anyone this story. He indicated Luis told him that "Carlos " (meaning Juan Carlos Torres ) wanted to kill him because he was a witness when he killed Eric. According to Larry, his friend " Joey " interceded and told Luis that Larry would not change his story about " TJ " and not to worry about Larry telling the authorities that " Carlos " was the actual killer. Larry felt that Luis was informing him that the real shooter, Juan Carlos Torres, wanted to come after him. Larry told the CCSAO that he feared for his life. He stated that he once saw "Carlos" some time later in the area of Fullerton and Cicero and that Carlos just starred directly at him. Again according to Larry, he felt that he would be killed if he mentioned the discrepancy in individuals who actually shot Eric.

The CCSAO terminated the interview and Investigator Killacky drove Larry to the vicinity of the homicide. Larry first directed Investigator Killacky to the residence in which he stated " Joey Bedran" lived. The R/I noted that this address was 3044 North California, on the second floor. Larry stated that this individual was several years older than him and that his mothers name was Debby. He indicated that he last say this individual around 1996 and Joey informed him that he was in the process of moving to Michigan (parts unknown). The R/I attempted to speak to the building residents with negative results. Larry told the R/I that his aunt may know where "Debby " was currently living.

Larry then directed the R/I to 3018 West Belmont. This is where Larry indicated that Eric was shot. Larry indicated that the business (Honey Baked Ham) had a steel door down in front of the windows at the time of the shooting.

Larry then showed the R/I the vacant lot that he ran when "Carlos " pulled out the weapon. The R/I noted that he ran north through this lot to an alley that runs east and west. Larry informed the R/I that it appeared they ran towards the rail road tracks west of Francisco.

Larry then directed the R/I to his residence in Feb of 1993. The R/I then noted this to be 3214 North Whipple. Larry pointed out the second floor apartment. Larry indicated that this is where he went home to dinner and where he gave Eric the Bulls jacket that he was wearing when he was shot and killed. Larry indicated that he and Eric walked south on Whipple, crossing to the east side of Whipple and then proceeded east along the north side of Belmont to the location of the confrontation and subsequent murder of Eric.

Larry then directed Investigator Killacky to the northwest corner of Belmont and Sacramento. Larry indicated that on the second floor is where the Cosmen family lived. Both he and Eric were there prior to the murder. It is also at this location that Larry recalls seeing " TJ " in the hallway or kitchen area with a gun. Larry could not exactly recall if this was the day of the homicide or not, but recalls one of the Cosmans telling TJ to leave because of his weapon possession.

Larry then directed the R/I to 3116 West Belmont 1st and 2nd floor. He indicated that this is the residence of his friend Dave. This is also where Larry told the CCSAIO that Luis had spoke to him about Carlos wanting to kill him because he was a witness.

Larry believes that this conversation happened on the 1st floor of this property which was a vacant office at the time. Larry stated that the residence where Dave lived with his parents was on the second floor. Larry also indicated that "Joey and Dave" both in 1993 worked at the business to the west of this location. The R/I stopped in this business and left a card for the owner/ manager to call the R/I.

Larry informed the R/I he would reach out to his aunt to identify "Joey". Larry indicated that he would be available to assist at any further time. Larry further stated that he has talked about this with other attorneys. He stated that Eric's brother Nathan, Victor Romos father and others were present when the lawyers played a tape which was in Spanish and the words on a screen in English. Larry told the R/I that he was shown numerous photographs and provided a taped interview. He stated that he was told that the voice on the tape was Victor's father and that he was speaking to Juan Carlos Torres. Larry stated that he was informed that this conversation was taped at the Burger King on Belmont and Elston.

Things to Do:
* Identify locate "Joey "and "Dave ".
- Re interview Luis Hernandez
- Re interview Leo Robles
- Interview Phil Torres
- Re interview Shawn and Kevin Cosmen

Notifications:
ASA Celeste Stack
ASA Darren O Brien
ASA Linas Kelecius
ASA Tom Biesty
Sr. Sup Maurice Macklin
SUP. Larry Tuider
Inv Tom McGreal

Brian Killacky

Brian Killacky

Investigator 361
Cold Murder Unit
Cook County States Attorney Office

Supervisor

00222

EXHIBIT 5

## STATEMENT OF LARRY TUEFFEL

1. My name is Larry Tueffel. My date of birth is September 21, 1978 and I currently live at 6540 N. Seeley in Chicago, Illinois.
2. On February 3, 1993, I was with Eric Morro when he was shot.
3. I recognized the shooter and the other person he was with from the neighborhood. I did not know their full names, but I did know that one of them was named "Victor" and that he went to the same school that I did. The other person had the nick-name "Crazy."
4. I was friends with TJ Jimenez at the time and TJ did not shoot Eric Morro.
5. I now know that the real shooter was Juan Carlos Torres.
6. After the shooting, I sat in a police car with Phil Torres. Phil Torres told me he thought TJ was the shooter. I told him TJ was not the shooter.
7. When I first talked to the police right after the shooting happened, I gave them a description of who shot Eric. I did not mention the names "Victor" or "Crazy."
8. Later that night, around 2:00 a.m., the police came back to my house and took me down to the police station to ask me more questions.
9. At the police station, I told the police TJ was the shooter. The police never threatened or coerced me to say TJ was the shooter. I said TJ was the shooter because other witnesses were saying TJ was the shooter and I didn't think anyone would believe me otherwise.
10. I don't blame the police for believing me and charging TJ with the murder. The police were doing their job and did nothing wrong.
11. I simply went along with what the other witnesses were saying. I know I should not have done that and I regret doing that.
12. On the day that Eric Morro was shot, Eric and I went to Shawn Cosmen's house after school. I saw TJ with a small handgun. Eric got mad at TJ for having the gun and kicked him out of the house. TJ was mad about that. I had seen TJ with guns on other occasions too.
13. I testified at two trials that TJ was the shooter. No Chicago police officer or anyone else ever coerced me or threatened me to testify against TJ. I know I should not have done that – but I did.
14. I never told anyone that Juan Carlos Torres was the shooter. I first learned of the name "Juan Carlos Torres" from Luke, who worked for the Northwestern Clinic. Luke showed a photograph and asked me if this person was the one who shot Eric and I said it was. Luke then told me the picture I identified was a picture of Juan Carlos Torres.
15. I have read this statement and it is true. I am giving this statement voluntarily. No one has made me any promises to me in return for giving this statement. I am making this statement because I want people to know that TJ did not shoot Eric Morro and that I don't think the police did anything wrong.

*I've had Read and Reviewed*                *Lawrence Tueffel 8/20/2010*
*the statement for any errors,*
*and have found none. This statement*
*is true. L.T.*

EXHIBIT 7

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION


 3


 4    THADDEUS JIMENEZ,                )
                                       )
 5            Plaintiff,               )
                                       )
 6      vs.                            ) No. 09 CV 8081
                                       )
 7    CITY OF CHICAGO, Chicago Police  )
      Detective JEROME BOGUCKI, MARK   )
 8    SANDERS, RAYMOND SCHALK, F.      )
      MONTILLA, Chicago Police         )
 9    Officers LAWRENCE RYAN and       )
      ROBERT WHITEMAN, and as-yet      )
10    Unknown City of Chicago          )
      Employees,                       )
11                                     )
              Defendants.              )
12

13          The deposition of ANTOINETTE KAVANAUGH,

14    PH.D., called by the Defendants for examination, taken

15    pursuant to notice and pursuant to the Federal Rules of

16    Civil Procedure for the United States District Courts

17    pertaining to the taking of depositions, taken before

18    Michelle M. Scalise, Certified Shorthand Reporter, at 53

19    West Jackson Boulevard, Suite 1800, Chicago, Illinois,

20    commencing at 10:09 a.m. on October 26, 2011.

21

22

23

24
```

1  was finally able to open it this morning that should
2  have been on the list.
3      Q.   That should have been?
4      A.   Uh-huh.
5      Q.   Do you know what those documents are?
6      A.   It's the IDOC mental health records.
7      Q.   When you say you couldn't open them, you just
8  reviewed them today?
9      A.   I skimmed them today.
10     Q.   And it's the first time you've ever looked at
11 them?
12     A.   I don't know that for certain, so -- I don't
13 know that for certain because I think that his -- I'm
14 not sure in my quick review whether or not these medical
15 progress Acne notes are part of it or not, so I don't
16 know.  So I can't say for certain.
17     Q.   Why do you think those notes should be
18 included on this appendix?
19     A.   What notes?
20     Q.   The documents you just looked at yesterday or
21 today, why should those be included on the appendix?
22     A.   Because they -- The ones that I was able to
23 review this morning at home talk about -- at my home
24 office talk about him being in segregation.

1      Q.   Okay.  And so that you would include as -- as
2  one of the relevant documents for your opinion?
3      A.   Correct.
4      Q.   Okay.  And I take it everything that's on this
5  list, on the appendix, which is the last two pages of
6  Exhibit 2, plus what you just mentioned this morning
7  just now about these other records, these would be the
8  only documents you would deem were relevant to your
9  opinion; would that be fair?
10     A.   I don't know if I'd say -- I don't know if I
11 could answer yes to the way that you asked it.
12     Q.   What's wrong with the way that I asked it?
13     THE WITNESS:  Could you repeat his question again
14 for me, please.
15          (Record read as requested.)
16 BY THE WITNESS:
17     A.   I think that it's -- it's unlikely that I
18 reviewed other records that were relevant and not
19 including them, but it could have happened but it's
20 unlikely.
21     Q.   Can you think of any other records that you
22 could have reviewed that would have been relevant other
23 than the ones that are on this list?
24     MR. BOWMAN:  Objection to the form of the question.

1          She said that there were some records that are
2  not on the list that she's identified generically for
3  you.  So, you know, you can't switch it up that way.
4      MR. KAMIONSKI:  Well, just to be clear, let me go
5  back to the question.
6          (Record read as requested.)
7  BY MR. KAMIONSKI:
8      Q.   Do you understand the question?
9      A.   No.
10     Q.   Okay.  Are there any other records that you
11 can think about as you're sitting here today that were
12 relevant that you did not include on this list?
13     A.   I've already told you about the mental health
14 records.
15     Q.   Besides those.
16     A.   None that I can think of at this moment.
17     Q.   Okay.
18     A.   If you feel like there's something else that
19 should be on the list, I'd be glad to review it.
20     Q.   Do you recall asking for any
21 documents -- specific documents while you were reviewing
22 the case from the lawyers?
23     A.   I think I asked for his tickets while he was
24 in IDOC, I -- I think that's how we got to this Acne

1  thing, that I asked for those, and I think I asked for
2  records related to segregation and I just wasn't able to
3  open them.
4      Q.   Why did you ask for records related to his
5  tickets?  Why was that important to you?
6      A.   So that I can have an understanding of what
7  tickets he obtained.
8      Q.   Why is that important?
9      A.   So I can have an understanding of his behavior
10 while he was in.
11     Q.   Why is that important?
12     A.   Because it's a relevant factor and it helps to
13 have a -- as complete picture as possible knowing that
14 there are inherent limits of how complete you can get.
15     Q.   And what specifically about getting tickets is
16 relevant for his behavior?  And maybe question is:  What
17 about his behavior could affect your opinion one way or
18 the other?
19     MR. BOWMAN:  Object to the form of the question.
20 Vague.
21 BY THE WITNESS:
22     A.   I don't know what you're asking.
23     Q.   Tickets were important for you to get a
24 complete picture, correct?

Page 58

1    A.   You never get a fully complete picture, so you
2  try to get more to help you; but you're never able to
3  get the total complete picture.
4         So I want to be clear when we say "complete."
5  I don't feel like my picture was incomplete.  There are
6  limits that are just inherent in doing this kind of
7  work, but you try to get as complete as possible knowing
8  that because you can't go back in time, there will
9  always be some things that are left.
10    Q.   Do you think you don't have a complete picture
11  of Mr. Jimenez?
12    MR. BOWMAN:   Objection, argumentative.
13  BY THE WITNESS:
14    A.   I feel that given what data I have, I have as
15  complete a picture as I have.
16    Q.   Okay.  Now, back to the tickets, the tickets
17  were so that you can assist you in getting as complete
18  of a picture as possible; that would be fair?
19    A.   The tickets were so that I can understand how
20  others -- meaning the system -- documented his behavior
21  while he was there.
22    Q.   And why did you want to see how his behavior
23  was documented in prison?
24    A.   So that I can see -- I think that it -- it --

Page 59

1  It's just another way to assess how his behavior was as
2  someone else documented it.  It's not an accuracy
3  factor, it's just to see what was documented.
4    Q.   Why is his behavior in prison relevant?
5    A.   Because -- His behavior in prison is relevant
6  to the degree in which they noted it, which isn't always
7  complete, because it helps me understand how he was
8  behaving during that time and that's part of my
9  assessment.
10    Q.   My question is:  Why is that important?  Why
11  is it important how he was behaving in prison?
12    A.   To allow me to assess how he was during that
13  time.
14         I feel like I'm answering your question and
15  you keep asking the same question.
16    Q.   What I'm trying to figure out is, why is his
17  behavior -- What is important about his behavior in
18  prison, to your opinion?
19    MR. BOWMAN:   Objection.  That's -- That's very
20  vague.  I mean, perhaps if you can specify behavior it
21  would help Dr. Kavanaugh.  You know, it's a vague
22  question.
23         Object to the form.
24    THE WITNESS:  Can you say it again?

Page 60

1              (Record read as requested.)
2  BY THE WITNESS:
3    A.   One of the things is for me to assess how he
4  was during this time period.  It would be yet another
5  indicia of that.
6    Q.   Why -- Why is -- What did you glean from the
7  tickets?
8    A.   What did what?
9    Q.   What did you get from the tickets?
10    A.   I didn't get anything.  I didn't get them.  I
11  requested them, I was told that the IDOC had served a
12  discovery and that they weren't included so we didn't
13  know if they still existed.
14    Q.   Do you know how much you billed to date in the
15  case -- in this case?
16    A.   I think approximately $11,000.
17    Q.   What's your hourly rate?
18    A.   In this case, I'm doing my discounted public
19  sector rate of 350 an hour.
20    Q.   Why?
21    A.   Because I believe that the legal clinic is
22  sort of on call with public sector.
23    Q.   What's your regular rate if it's not the
24  public sector?

Page 61

1    A.   I'm $500.
2    Q.   What percentage of your work is dedicated to
3  legal consultation?
4    A.   What do you mean?
5    Q.   Do you interview -- What percentage of your
6  work is -- are you retained by lawyers?
7    A.   In my private practice now, I would say that's
8  probably 80 percent.
9    Q.   What's the other 20 percent?
10    A.   I lecture to attorneys and judges and I also
11  do things like -- I was on a commission, three local
12  psychologists and three national, to evaluate the mental
13  health services of IDJJ.  I do some other things related
14  to juvenile issues and juvenile justice.
15    Q.   The 80 percent when you were retained by
16  lawyers and -- Are you retained either by criminal
17  defense lawyers or plaintiffs in lawsuits?
18    A.   Are you asking in my private practice
19  currently?
20    Q.   Correct.
21    A.   Yes.
22    Q.   Have you ever been retained by a defense
23  lawyer in a civil case?
24    A.   Wait a minute.

Page 78

1  hypothetically --
2      Q.   Hypothetically, if there were letters --
3      A.   It's certainly consistent -- It would not be
4  surprising and it's consistent with the way that he
5  recalled this period in his life, and it's also
6  consistent with what's documented in the detention
7  center reports.
8      Q.   And you're not aware one way or the other if
9  there are letters like that or not?
10     A.   I can't remember at the moment.
11     Q.   Are you aware how many letters or to the
12 extent of how many letters TJ wrote from jail?
13     A.   I don't -- I don't remember exactly how many.
14 I don't remember.
15     Q.   Do you know if it's a lot or a little?
16     A.   I don't know what those terms mean.  My answer
17 is, I don't remember.
18     Q.   What terms, a lot or a little?
19     A.   Yes.  They're relative so I don't know what
20 you're talking -- I don't know what you mean, but my
21 answer to you is, I don't remember.
22     Q.   Do you know if he wrote more than ten letters?
23     A.   I don't -- I can't say with certainty how many
24 letters he wrote.

Page 79

1      Q.   Can you say with any certainty if it's more or
2  less than ten?
3      A.   I don't remember.  I don't know with certainty
4  how many letters he wrote.  That's my answer.
5      Q.   And am I correct you don't know with certainty
6  if he wrote more or less than ten?
7      A.   I don't know with certainty how many letters
8  he wrote.  That's my answer.
9      Q.   So that would be yes to my question?
10     MR. BOWMAN:  Don't -- Don't -- No.  I mean, you've
11 asked it now three or four times.  You've got your
12 answer.  That's -- That's the question; that's the
13 answer.
14          You don't need to answer that again.
15 BY MR. KAMIONSKI:
16     Q.   Did you ever -- Were you ever provided with an
17 opinion by Judge Sachs about this case?
18     A.   I do not recall that.
19     Q.   Were you provided with arrest reports for
20 arrests that occurred after TJ was released from jail?
21     A.   Not the arrest reports, no.
22     Q.   Would it have been important for you to review
23 the details of those arrest reports?
24     A.   Would it have been important for me --

Page 80

1      THE WITNESS:  When I mumble do you type?
2      THE COURT REPORTER:  Yes.
3      THE WITNESS:  Oh, sorry.
4  BY THE WITNESS:
5      A.   It -- It may have been helpful.
6      Q.   Do you have any knowledge of the details of
7  what occurred on those arrests?
8      A.   Yes.
9      Q.   And what is your understanding of what
10 happened in those arrests?  First off -- Let me ask a
11 different question.
12          How many times was he arrested after he was
13 released from prison in 2009?
14     A.   Twice.
15     Q.   That's what -- That's what your understanding
16 is?
17     A.   Correct.
18     Q.   And what are the two times that you're
19 understanding he was arrested?
20     A.   One time the police came in his home and
21 arrested him.  I think that they were -- if my memory
22 serves me correctly not having memorized my report -- I
23 think that they came in and -- with a warrant and that
24 matter is still before the Court.  The other time

Page 81

1  involved an altercation that he got into, someone --
2  having to do with a safety issue.  Like, didn't move
3  over quickly or something of that nature.
4      Q.   Did -- How did the first incident factor into
5  your opinion in this case?
6      A.   It factored because it let -- I factored it in
7  because that indicated that he did have interactions
8  with police.  I talked to him about what that was like
9  for him.
10     Q.   How did his conduct affect your opinion in
11 this case?
12     A.   His conduct was consistent with what one would
13 expect given what he has undergone.
14     Q.   Okay.  Do you know what he did in the first
15 case?
16     A.   It's my understanding that he did not follow
17 the instructions.  That he didn't do what he was
18 instructed with the speed that he needed to.
19     Q.   In the case of the -- the search warrant in
20 this house, that case I'm talking about.
21     A.   I'm sorry.  I thought you said first.  When
22 you said first case --
23     MR. BOWMAN:  Are you asking what he's accused of
24 are you asking what -- what he, in fact, did?

1    them, right?
2         A.   Without having the social in front of me,
3    which would allow me to be accurate, I don't want to
4    guess.
5         Q.   Okay.   And do you know if TJ committed any
6    violent crimes before he was arrested in this case?
7         MR. BOWMAN:   Objection to the form of the question.
8    BY THE WITNESS:
9         A.   Well, I'm going to ask you to tell me what you
10   mean by "violent crime."
11        Q.   If he fought with -- If he was fighting with
12   anybody.
13        A.   Well, I know that he fought from his own
14   report.
15        Q.   Is that relevant to your -- to your opinion?
16        A.   Yes.   And it's something that I considered.
17        Q.   And why is that important to consider?
18        A.   Because it let's me know how he was, it let's
19   me know where he was at the time -- where he was
20   psychologically at the time that all of this started,
21   what kind of coping skills he might rely upon in a time
22   of stress and -- Yes, that's my answer.
23        Q.   And how would you assess his psychological
24   abilities at the time based on what you were told?

1         A.   Well, my assessment of them was based upon his
2    report and, fortunately, there was a psychological
3    evaluation done for his transferring hearing.
4              Oh, you looked at him.
5         MR. BOWMAN:   Everything -- You don't need to worry
6    about the -- Maybe you need the question read back
7    to ...
8         MR. KAMIONSKI:   We can go on.   There's more.
9         THE WITNESS:   Can you read the question back?
10             (Record read as requested.)
11   BY THE WITNESS:
12        A.   You mean at the time of his arrest, correct?
13        Q.   Prior to his arrest.   During the time that he
14   was -- During the time that he had these arrests.
15        A.   Oh, I'm sorry.   Because the psychological
16   evaluation I was referring to was -- was the only
17   external document that -- and the social that I had to
18   do so, and I assessed it by his self-report, by the
19   report of his mother as well.   But I had to rely on the
20   documents that were most contemporaneous, and those were
21   the social and psychological.   Those were things that I
22   considered.
23        Q.   There's a comment in your report where you say
24   that his behavior was improving prior to his arrest.   Do

1    you remember that at all?
2         A.   Yes.
3         Q.   And do you know what was improving?
4         A.   His school attendance.   If my memory serves me
5    correctly, there was a decrease in fighting.   If memory
6    serves me correctly as well, he -- he was also going to
7    the services and following the Court's -- the terms of
8    his probation.
9         Q.   Are you done?
10        A.   I'm -- No.   I'm pausing.   Sorry.   Thank you
11   for asking.   I appreciate that.
12             Okay.   So you mentioned school already.   So
13   that's what I remember.
14        Q.   If he -- You're done?
15        A.   Yes.
16        Q.   Okay.
17        A.   Sorry.
18        Q.   If his behavior did not improve prior to his
19   arrest, would that be important for you to know?
20        A.   If his behavior did not -- I would want to
21   know what aspect of the behavior and I'd want to know
22   what was going around in his life so I can make sure --
23   I could assess whether or not it was a response to
24   something that was happening then, so I'd want to know

1    more about the circumstances.
2         Q.   Why?
3         A.   Because that would be important for me
4    clinically to put it in context.
5         Q.   And you mentioned that you are aware that he
6    had a fighting history prior to his arrest in this case?
7         A.   Yes.
8         MR. BOWMAN:   Objection to the form of the question.
9    BY MR. KAMIONSKI:
10        Q.   Did you ask him how many times he engaged in
11   fights?
12        A.   I don't know if I exact -- asked him that
13   exact question, but he talked that he engaged in fights.
14        Q.   Do you know how often?
15        A.   I do not know.   I don't have an exact number.
16        Q.   Is that important to know one way or the
17   other?
18        A.   My impression based upon what I read and the
19   interviews is that it was something that he engaged in
20   and was not an infrequent occurrence.
21        Q.   How about while he was incarcerated, do you
22   know how many fights he engaged in while he was
23   incarcerated?
24        A.   I don't have a tally of the number of fights.

Page 114

```
1      Q.   Do you know if he engaged in fights --
2      A.   Yes.
3      Q.   -- while he was incarcerated?
4           Do you know if it was just as infrequent as it
5  was before he got incarcerated?
6      A.   Well, I know that he -- Well, I guess -- Wow.
7  Okay.  So it's really hard to assess that because he,
8  before incarceration, was 13 and he had a 16-year
9  period, so even with the same -- So there's a -- So -- I
10 know that he, by his report, engaged in a lot of fights
11 while he was incarcerated and also records from the
12 detention center describe him in a similar manner.
13     Q.   If someone has a fighting history or a violent
14 history when they're a child, would that be consistent
15 with them having a conduct disorder?
16     A.   It could be.
17     Q.   Do you think TJ had a conduct disorder before
18 he was incarcerated?
19     A.   I wasn't asked to assess whether or not he
20 had.
21     Q.   I'm asking you.
22     A.   Well, I can't -- I'm not prepared to give that
23 opinion.
24     Q.   Why aren't you prepared to give --
```

Page 115

```
1      A.   Because I'd have to review everything with
2  that in mind whether or not he -- I'd have to review
3  everything again to assess -- to determine that.  I was
4  not asked to give him an opinion -- to render a
5  diagnosis about how he was during his childhood years.
6      Q.   There's some brief mention in your report
7  about his drug use, and I want to talk to about some of
8  that right now.  Okay?
9      A.   Yes.
10     Q.   He told you he did cocaine, correct?
11     A.   When are we talking about?
12     Q.   Prior to his incarceration he told you that he
13 did cocaine?
14     A.   I just need to check the time period which
15 is -- Hold on.
16          Correct.
17     Q.   How much did he do?
18     A.   I don't -- It's not included in my report.  I
19 don't know.
20     Q.   Did you ask him?
21     A.   I don't have -- I don't know.
22     Q.   Would it have been important to ask him?
23     A.   I think what was important for me is
24 understanding what his -- what substance he was using
```

Page 116

```
1  and get some idea of the pattern of his use and when it
2  started.  What I know -- So I think that that's --
3  That's what I felt that I needed to do.
4      Q.   And what did you learn about the pattern, how
5  many times did he use it?
6      A.   I don't remember.
7      Q.   Did he tell you?
8      A.   I don't remember.
9      Q.   Did you ask him?
10     A.   I don't remember.
11     Q.   Would it have been important to know for
12 purposes of your diagnosis in this case if he used
13 cocaine on a regular basis?
14     A.   When he was 13 or prior?
15     Q.   Correct.
16     A.   Given the -- It would have very little
17 relevance.
18     Q.   That's your opinion?
19     A.   Yes, that's my opinion.
20     Q.   Okay.  Now, he also told you he was using LSD?
21     A.   He told me that he --
22     MR. BOWMAN:  Objection to the form of the question.
23 BY THE WITNESS:
24     A.   He told me that he had tried a variety of
```

Page 117

```
1  drugs.  "Using" makes it seem like it's a continual
2  thing, but ...
3      Q.   Well, how many times did he tell you he used
4  LDS?
5      A.   I don't remember but I know that the way that
6  I have it referenced it was "tried," which is different
7  than -- has a different characterization than "using."
8      Q.   Do you know one way or the other how many
9  times he used it?
10     A.   I do not know how many times he tried it, no,
11 or how many times he reported that he tried it, no.
12     Q.   How about marijuana?
13     A.   I -- I don't know off the top of my head.
14     Q.   Do you know how old TJ was when he joined the
15 gang?
16     A.   I don't know off the top of my head.
17     Q.   Is that important to this case?  Strike that.
18          Is that relevant in anything to consider in
19 your opinion in this case?
20     A.   What's more relevant is me being aware that he
21 was in -- was gang involved.
22     Q.   Why is that relevant?
23     A.   Because it helps me to understand him and what
24 kind of potential issues might have been involved when
```

Page 118

1   he was incarcerated -- that he would face when
2   incarcerated.
3       Q.   And we're talking about the gangs prior to
4   incarceration?
5       A.   Correct, we are.
6       Q.   Okay.  So why is his gang prior to him being
7   incarcerated relevant?
8       A.   Because it could put him in more danger or
9   perhaps afford some level of -- I don't know -- for lack
10  of a better word -- protection at a cost while
11  incarcerated.
12      Q.   And -- Do you know what he did in the gang --
13      A.   No.
14      Q.   -- before he was incarcerated?
15      A.   I do not know.
16      Q.   Did you ask him?
17      A.   I'm not sure.
18      Q.   Would it have been important to ask him?
19      A.   Not really.  It's not relevant for this.
20      Q.   Do you know what his rank was in the gang?
21      A.   I do not.
22      Q.   Do you know if he ever had a gun in the gang?
23      A.   I do not.
24      Q.   Is that important?

Page 119

1       A.   No.
2       Q.   Why not?
3       A.   Because how is that relevant to the impact of
4   his arrest and the psychological impact of spending
5   16 years in prison.
6       Q.   Do you know how being in a gang made TJ feel
7   prior to him being incarcerated?
8       A.   I'm not sure that I asked him that.
9       Q.   Is that important -- Would that be an
10  important thing to know?
11      A.   I'm not sure how that would relate to the
12  psychological consequences, if there are any, which is
13  what I was asked to assess of his spending 16 years in
14  prison except to the degree -- which is I think what
15  you're implying -- that the need that the -- I'm not
16  sure how it's relevant to what I was asked to assess.
17      Q.   Why not?
18      A.   Go back to the question that we sort of
19  started.  Remind me of -- Why not what?
20      Q.   Well, if he was happy in the gang, would that
21  be relevant?  If he enjoyed gang life, would that be
22  relevant to you?
23      A.   So that's a hypothetical, if he enjoyed?
24      Q.   Well, you didn't ask him, so we don't know.

Page 120

1   Everything is a hypothetical.
2       A.   Well, no, I didn't say I didn't ask him.  I
3   said, I don't remember if I asked him.  There's a
4   difference.
5       Q.   Okay.  Hypothetically, if he was happy in the
6   gang, would that be -- would that be relevant?
7       A.   It could be, it may not be.  It depends if it
8   needs to be pursued.
9       Q.   Why didn't you pursue it?
10      A.   I didn't say that I didn't pursue it.  First
11  of all, you asked why didn't I pursue your hypothetical;
12  because it's a hypothetical.  Let's not forget that.
13      I feel, like, you're shifting hypothetical
14  into reality things so that's very difficult to pursue a
15  hypothetical thing.
16      Q.   Okay.
17      MR. BOWMAN:  Why don't we take another short pause.
18      MR. KAMIONSKI:  Got it.
19            (A short break was had.)
20  BY MR. KAMIONSKI:
21      Q.   Do you know if TJ was a leader in his gang
22  prior to being incarcerated?
23      A.   I do not.
24      Q.   Would that be important to understanding him

Page 121

1   pre-arrest?
2       A.   My focus was not to understand him pre-arrest
3   or to obtain a complete assessment of him pre-arrest.
4       Q.   Do you know if he was in a gang in prison?
5       A.   I do.
6       Q.   What gang was he in?
7       A.   I don't know the name of it.
8       Q.   Do you know if he's in a gang now?  Well -- I
9   mean, when I say "now" -- I apologize.  As of the time
10  that you interviewed him, do you know if he was in a
11  gang?
12      A.   By my recollection, he was not actively
13  involved in a gang after his release.
14      Q.   Do you recall -- And I assume that means you
15  recall the conversation you had with him about
16  that -- that topic?
17      A.   That's my recollection and I -- That's my
18  answer to you.
19      Q.   Do you know what way TJ used his gang
20  affiliation to get through prison?
21      A.   What did you just say?  I didn't hear the
22  first part.  Say it again, please.
23      Q.   In what way did TJ use his gang affiliation to
24  get through prison?

Page 134

1  grouping them. That's my answer.
2      Q.   Not all traumatic events lead somebody to have
3  post traumatic stress disorder?
4      A.   It is true.
5      Q.   And can you identify which specific traumatic
6  event that happened to TJ causes him to have, according
7  to what you're saying, post traumatic stress disorder?
8      A.   He had nightmares about -- which is a symptom
9  of PTSD, and is contributed to it, about going to jail,
10 reliving the arrest, and reliving some of the
11 experiences that he had during that time, that time
12 being the imprisonment. Most globally, he has things
13 associated with prison. He relives different aspects of
14 being in prison.
15     Q.   What did he tell you about that?
16     A.   Things -- I can't give you a complete list,
17 but things, for example, smells and sounds. He relives
18 that he lives with this over raunching feeling and fear
19 that he is going to be just taken away again and have no
20 control of his -- and be put in prison; that it's going
21 to happen again.
22     Q.   In -- Do you know what -- Can you -- Is there
23 a specific point in the prison experience that gave him
24 the traumatic event or are we just saying the entire

Page 135

1  prison event?
2      A.   It's -- The way that he describes it and my
3  clinical perception of it is it's sort of this --
4  there's no one specific time. It really starts with the
5  arrest because he has -- still reexperiences that event
6  and fears that it's going to occur again, so it really
7  starts from there and -- So that's your answer.
8      Q.   When does the event end?
9      A.   It -- That's a fear -- Well, I think -- I
10 imposed a finding at the ending of his release. He
11 lives with the symptoms and the mental distress related
12 to the entire arrest and imprisonment.
13     Q.   And he had those symptoms of distress before
14 the event concluded as well, right?
15     A.   He had the symptoms of distress before the
16 event -- Sorry. Yes.
17     Q.   Okay. And would you say the event -- You
18 know, TJ has been back in jail since he's been out. Are
19 you aware of that?
20     A.   I'm not sure if I'm aware of that.
21     Q.   Are you aware that he spent months in Cook
22 County Jail? Are you aware of that at all, like, in the
23 year 2010 that he spent months in Cook County Jail?
24     A.   I'm not sure if I'm aware of that.

Page 136

1      Q.   Did he tell you about that?
2      A.   I don't remember.
3      Q.   Do you think that's important to your analysis
4  of his mental state?
5      A.   I certainly -- If it were true that he spent
6  months, which is what you're telling me that I'm not
7  taking as fact, if it were true I would -- that would be
8  something that I would explore with him so that I can
9  understand if and how it played part, a role.
10     Q.   So -- And it's possible that his -- his time
11 in Cook County Jail after he was let out could also be a
12 cause of some of his distress that he's feeling today?
13 Do you agree with me, if that's true what I'm saying?
14     A.   If what you're saying -- It is possible. It
15 is clear, however, that he had traumatic events and was
16 experiencing them in a way that was consistent with PTSD
17 while he was in -- in jail related to the current -- to
18 the offense that we're here for today. To the case that
19 we're here for today. Pardon me.
20     Q.   Right. Well, he's -- I don't think Locke is
21 going to disagree with me that he was in Cook County
22 Jail for months before you saw him.
23     A.   Is that a question to me or to Locke?
24     Q.   No. I mean, it's a statement and my point is

Page 137

1  that, is it possible that the affects that you -- when
2  you observed him -- Strike that.
3           When you -- When you talked to him -- When you
4  talked to TJ, did you observe him -- Is part of your
5  assessment when you do your psychological review
6  observing him?
7      A.   Yes.
8      Q.   That's important, you can't just do it over
9  the telephone, right?
10     A.   I did not do it over the telephone.
11     Q.   I mean, it's important to do a face-to-face
12 psychological interview to make an analysis if somebody
13 is having depression, if he's had post traumatic stress
14 disorder, if he has a problem, correct?
15     A.   Seeing him is an important part of it, yes.
16     Q.   Why is that?
17     A.   So that you can assess the way that -- their
18 mannerisms and the way they're presenting material.
19     Q.   And how did his mannerisms present to you when
20 you talked to him?
21     A.   He presents as an extremely depressed beaten
22 down young man. Young compared to my age.
23     Q.   Now, if he was in prison hypothetically -- I
24 mean, it's a fact, but we'll just say hypothetically

# EXHIBIT 9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

THADDEUS JIMENEZ,                          )
                                           )
            Plaintiff,                     )
                                           )
     vs.                                   ) No. 09-cv-8081
                                           )
CITY OF CHICAGO, Chicago Police            )
Detectives JEROME BOGUCKI, MARK            )
SANDERS, RAYMOND SCHALK,                   )
F. MONTILLA, Chicago Police                )
Officers LAWRENCE RYAN and ROBERT          )
WHITEMAN, and as-yet unknown City          )
of Chicago Employees,                      )
                                           )
            Defendants.                    )

STATE OF ILLINOIS     )
                      )  SS.
COUNTY OF COOK        )


            The deposition of DENNIS BRADY taken before

Liana Rivera, Certified Shorthand Reporter and Notary

Public, at 53 West Jackson Boulevard, Suite 1800,

Chicago, Illinois, commencing at 10:25 a.m. on the

21st day of October, A.D., 2010.

**JENSEN REPORTING**
205 West Randolph Street
5ᵗʰ Floor
Chicago, Illinois 60606
Phone:(312) 236-6936
Fax:(312) 236-6968
www.jensenreporting.com



JENSEN REPORTING
*Whenever you need it. Whatever it takes.*

 1    BY THE WITNESS:

 2        **A.**    Repeat the question because I'm a little

 3    confused.

 4        **Q.**    At some point T.J., on the murder charge, is

 5    going to be transferred to adult court to be tried,

 6    right?

 7        **A.**    Correct.

 8        **Q.**    Now, that's based on the recommendation that

 9    you made?

10        **A.**    Right.

11        **Q.**    Now, when you make the recommendation to

12    transfer him to adult court as opposed to him being

13    tried in juvenile court, all these arrests that T.J.

14    previously had, including his station adjustments, those

15    are all part of your decision-making in order to

16    transfer him to adult court versus juvenile court?

17        MR. CHANEN:  I'm sorry.  I'm going to object.

18        MR. KAMIONSKI:  Let me finish my question.  I'm in

19    the middle of a question.

20        MR. CHANEN:  I thought you were done.

21        MR. KAMIONSKI:  Can you read back the question?

22                       (Record read as requested.)

23    BY MR. KAMIONSKI:

24        **Q.**    Let me ask a new question.  T.J.'s 10 station

JENSEN REPORTING  (312) 236-6936

1     adjustments -- Strike that.

2              Thaddeus Jimenez's 10 station adjustments and

3     his 13 court referrals -- The ones we just talked about,

4     correct?

5         A.   Correct.

6         Q.   (Continuing) -- all of these were considered

7     by you in your recommendation that T.J.'s court be

8     transferred -- T.J.'s murder trial be transferred to the

9     adult court versus being in the juvenile court; is that

10    correct?

11        A.   Correct.

12        Q.   And they formed one of the major bases for why

13    you asked for the case to be transferred to the adult

14    court versus the juvenile court; is that correct?

15             MR. CHANEN:  Object to the form.

16    BY THE WITNESS:

17        A.   I think there were seven criteria for where

18    you make that recommendation.  So that would be one of

19    the criteria.  And it was definitely a reason, yes.

20        Q.   And T.J. admitted to you that he was a Simon

21    City Royals gang member, correct?

22        A.   Yes.

23        Q.   He wasn't bashful about it?

24        A.   No.

# EXHIBIT 11

```
STATE OF ILLINOIS    )
                     )    SS:
COUNTY OF C O O K    )
```

IN THE CIRCUIT COURT OF COOK COUTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

```
THE PEOPLE OF THE    )
STATE OF ILLINOIS    )
                     )
        VS           )    Indictment No. 93-CR-14710
                     )
THADDEUS JIMINEZ     )    Before JUDGE CHRISTY BERKOS
                          and a Jury

                          Friday, September 30, 1994
```

Court convened pursuant to adjournment.

APPEARANCES:

        HON. JACK O'MALLEY,
            State's Attorney of Cook County, by
        MR. JOHN MURPHY and
        MR. DAVID GAUGHAN,
            Assistant State's Attorneys,
            appeared for the People;

        MS. RITA FRY,
            Public Defender of Cook County, by
        MR. KENDALL HILL and
        MS. CYNTHIA BURKE,
            Assistant Public Defenders,
            appeared for the defendant.

Jeanne Rathbun, CSR
Official Shorthand Reporter
Circuit Court of Cook County
Criminal Division
License No. 084-001014

FILED

MAR 22 1995

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

JIM01768

1        A   He asked me was it T.J.

2        THE COURT:   He asked you what?

3        THE WITNESS:   He asked me if it was T.J.

4        MR. GAUGHAN:   Q   What did you tell him?

5        A   I told him no, it wasn't.

6        Q   Larry, why did you tell Phil that it wasn't

7   T.J?

8        A   Because I was scared.

9        Q   Why were you scared?

10       A   Because I lived right in the neighborhood and I

11   didn't want nothing to happen to my family or my

12   house.

13       Q   Why did you think something would happen to

14   your family or your house?

15       A   Because when you're in the gang, you're not

16   supposed to testify against somebody that's in the

17   gang with you.

18       Q   What do they call that?

19       A   Tricking on you.

20       Q   What happens if you trick on another gang

21   member, another guy in the Royals?

22       A   End up dead.

23       Q   I'm sorry?

24       A   You end up dead.

JIM01889

B-134

1       Q   As a matter of fact, Larry, you were subpoenaed

2    to testify in here for Wednesday of this week, is that

3    correct?

4       A   Yes, sir.

5       Q   And you didn't honor that subpoena, is that

6    correct?

7       A   Yes, sir.

8       Q   And on Thursday morning the state's attorney

9    investigator went out and personally picked you up and

10   brought you into this courtroom, correct?

11      A   Yes, sir.

12      Q   And when they brought you into the courtroom,

13   the judge put you in custody, is that correct?

14      A   Yes, sir.

15      Q   And he held you in custody until you testified,

16   is that correct?

17      A   Yes, sir.

18      Q   And you didn't want to come in here and testify

19   against T.J., did you?

20      A   No, sir.

21      Q   Larry, that evening after you were put in the

22   car, you were taken to the police station, right?

23      A   Yes, sir.

24      Q   And you gave the police a description, right?

JIM01890

B-135

1      A  Yes, sir.

2      Q  Did you give a description of T.J?

3      A  No.

4      Q  Why didn't you give a description of T.J?

5      A  Because I was scared, nervous.

6      Q  Did you give them a description that didn't

7   match T.J?

8      A  Yes, sir.

9      Q  Later on that night, after you were let go from

10  the police station, did you again talk to the police?

11     A  Yes, sir.

12     Q  Where was that at?

13     A  They came back to my house around 3:00, 3:30 in

14  the morning.

15     Q  Was it two detectives that came back to your

16  house?

17     A  Yes, sir, the same ones I talked to earlier.

18     Q  What happened when the detectives came back to

19  your house?

20     A  They picked me up and brang me back to the

21  station.

22     Q  Did they show you -- did you have a

23  conversation with them?

24     A  Yes, sir.

JIM01891

EXHIBIT 12

Case 1:09-cv-08081   Document 187-7   Filed 12/01/11   Page 2 of 5   PageID 2992
Case: 12-2779      Document: 11-19        Filed: 08/27/2012   Pages: 256

*1*

```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
 2


 3   THADDEUS JIMENEZ,                    )
                                          )
 4                  Plaintiff,            )
                                          )
 5         vs.                            )    No. 09-CV-8081
                                          )
 6   CITY OF CHICAGO, Chicago Police      )
     Detectives JEROME BOGUCKI, MARK      )
 7   SANDERS, RAYMOND SCHALK, F.          )
     MONTILLA, Chicago Police Officers    )
 8   LAWRENCE RYAN and ROBERT WHITEMAN,   )
     and as-yet unknown City of Chicago   )
 9   Employees,                           )
                                          )
10                  Defendants.           )


11

12   STATE OF ILLINOIS    )
                          )  SS.
12   COUNTY OF COOK       )

13

14        The subpoenaed deposition of MARGOT GILLIN

15   taken before Kimberly A. Crescente, Certified Shorthand

16   Reporter and Notary Public, taken pursuant to the

17   provisions of the Illinois Code of Civil Procedure and

18   the Rules of the Supreme Court thereof pertaining to

19   the taking of depositions for the purpose of discovery

20   at 7 South Fairview, Unit 201, Park Ridge, Illinois,

21   commencing at 5:38 p.m. on the 4th day of November,

22   A.D., 2010.

23

24
```

Case 1:09-cv-08081   Document 187-7   Filed 12/01/11   Page 3 of 5   PageID 2993
Case: 12-2779      Document: 11-19         Filed: 08/27/2012   Pages: 256

*11*

1   threat to?

2       A.   No.   I just remember -- the reason I recall

3   Thaddeus is I remember he shook my beliefs in

4   humankind, made me question my religious beliefs very

5   deeply, and I had never seen a child that I was as

6   scared of.   Nor had I seen a child that I took their

7   threats as seriously as this child.   That's why this

8   child stands out in my mind.

9       Q.   Do you remember any other threats that he

10  made?

11      A.   There were -- There was another day, I had

12  somebody -- the kids switched up, but he did it on

13  multiple times.   And I think this report is not my

14  complete report.   There should have been a second side

15  to this report.

16      Q.   Let me show you another document that's

17  marked as Gillin Deposition Exhibit No. 2.   I want you

18  to take a look at it and tell me if it refreshes your

19  recollection about any of the other threats that he

20  made.

21                  (Document tendered.)

22  BY THE WITNESS:

23      A.   Here's the day he was threatening me.   I know

24  he threatened -- he threatened everybody; the probation

Case 1:09-cv-08081   Document 187-7   Filed 12/01/11   Page 4 of 5   PageID 2994
Case: 12-2779    Document: 11-19     Filed: 08/27/2012    Pages: 256

*14*

1    that T.J. made about -- I'm sorry -- that Thaddeus made

2    about he would kill the father of the young man.

3         A.   Yes.

4         Q.   Do you recall if he ever made that specific

5    threat on any other day?

6         A.   Not offhand.  One of the threats included

7    that he would have the -- that he would have somebody

8    killed like he had an old man killed who was watching.

9    An old man whose house he had bombed out.  And I

10   remember speaking with the probation officer about

11   that, that this man that was a witness that his house

12   had been set afire or bombed, so I took these very

13   seriously.

14        Q.   Do you remember any other threats that he

15   made?

16        A.   Not specifically.  He was a kid I kept a

17   close eye on and was very scared of.  I mean, the

18   judge, myself, the probation, this kid ...

19        Q.   Do you remember him ever making any personal

20   threats to you?

21        A.   Yes.

22        Q.   Okay.  And what type of threats did he make

23   to you?

24        A.   If I would send these reports down.  Because

Case 1:09-cv-08081   Document 187-7   Filed 12/01/11   Page 5 of 5   PageID 2995
Case: 12-2779      Document: 11-19         Filed: 08/27/2012   Pages: 256

24

1      A.    The appropriate polite thing would always be

2  to -- when you switched a kid out of your classroom, if

3  there were two kids having trouble, you were to keep

4  the more aggressive kid and never dump on your

5  colleague.  So if two kids were brawling, the one who

6  started it stayed.  Am I clear?

7      Q.    That makes sense.  Thank you.

8            And I just want to go back and just make sure

9  I understand it.  Around the same time in May of '93

10 when Thaddeus was threatening to kill the father of the

11 young man he was on the case with, at that same time or

12 around that time, Thaddeus also boasted that he had

13 bombed another witness's home?

14     A.    Not that he had personally done it.  My

15 understanding of it was that he had had it bombed.  I

16 don't know that he was -- it wasn't clear to me whether

17 Thaddeus had done the bombing or had arranged to have

18 the bombing done, but that a witness had been bombed

19 and killed.  An old man in a corner house that had seen

20 something that he had done.

21     Q.    Okay.  And you recall Thaddeus saying that in

22 the classroom?

23     A.    Yes.

24     MR. ARGER:  That's all I have.  Thanks for your

# EXHIBIT 13

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THADDEUS JIMENEZ,          )
                           )
        Plaintiff,    )
                           )
vs.            )   No. 09 CV 08081
                           )
CITY OF CHICAGO, et al.,    )
                           )
        Defendants.    )

        The deposition of EZEQUIEK ROMO, pursuant to
notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Carmella T. Fagan, C.S.R., R.P.R., Notary Public
within and for the County of Cook and State of
Illinois, at 357 East Chicago Avenue, in the City of
Chicago, Cook County, Illinois, commencing at 10:56
a.m. on the 16th day of May, 2011.

Page 2

1          There were present during the taking
2  of this deposition the following counsel:
3
4          RODERICK MacARTHUR JUSTICE CENTER,
           BY:  MR. LOCKE E. BOWMAN
5          (Legal Director, Clinical Associate
           Professor
6          750 North Lake Shore Drive
           Suite 800
7          Chicago, Illinois  60611)
           (312) 503-8576
8
           Appeared on behalf of
9          Thaddeus Jimenez;
10         VALOREM LAW GROUP,
11         BY:  MR. STUART J. CHANEN
           (35 East Wacker Drive
12         Suite 2900
           Chicago, Illinois  60601)
13         (312) 676-5480
14         Appeared on behalf of
           Thaddeus Jimenez;
15
16         ANDREW M. HALE & ASSOCIATES, LLC,
           BY:  MR. AVI T. KAMIONSKI
17         (53 West Jackson Boulevard
           Suite 1800
18         Chicago, Illinois  60604)
           (312) 341-9646
19
           Appeared on behalf of
20         The Individually Named Police
           Officers;
21
22
23
24

Page 3

1          There were present during the taking
2  of this deposition the following counsel:
3
4          ANDREW M. HALE & ASSOCIATES, LLC,
           BY:  MS. JOAN E. AHN
5          (53 West Jackson Boulevard
           Suite 1800
6          Chicago, Illinois  60604)
           (312) 341-9646
7
           Appeared on behalf of
8          The Individually Named Police
           Officers;
9
10  ALSO PRESENT:
11         MR. RICK KOSBERG, Videographer.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              I N D E X
2
3  WITNESS:                      PAGE
4  EZEQUIEL ROMO
5
6  Examination by Mr. Bowman:        6
   Examination by Mr. Kamionski:    52
   Further Examination by Mr. Bowman:   114
7
8
9
10            E X H I B I T S
11  E. Romo No. 1              16
    E. Romo No. 2              17
12
    E. Romo No. 3              33
13  (E.Romo No. 3, a cassette tape, was retained
     by Counsel)
14
    E. Romo No. 4              44
15
    E. Romo No. 5              47
16  E. Romo No. 6              47
    (E. Romo Nos. 5 and 6, photographs of
17   detectives, were retained by Counsel.)
18  E. Romo No. 7              52
    E. Romo No. 8              93
19
20
21
22
23
24

1  (Pages 1 to 4)

Page 73

1      Q      Somewhere between one and five?
2      A      It could be.  I don't remember.
3      Q      Then at some point you moved from
4  Sacramento and Nelson, correct?
5      A      Yeah.
6      Q      Where did you move to?
7      A      To Sacramento and Fletcher.
8      Q      When did you move from -- to --
9      A      I don't remember.
10      Q      Did you move anywhere else after
11  Sacramento and Fletcher?
12      A      Yeah.  I have moved to many places.
13      Q      All right.  Where did you move after
14  Sacramento and Fletcher?
15      A      To -- to -- I don't remember the name
16  of the street.
17              (WHEREUPON, Mr. Stuart Chanen
18              exited the deposition.)
19              Somewhere by Irving Park, but I don't
20  remember the other street.
21      Q      Can you remember what year that was
22  in?
23      A      No.
24      Q      Do you remember how long after you

Page 74

1  moved to Sacramento and Fletcher that you moved to
2  Irving Park?
3      A      No.  Like I'm telling you, I -- I
4  don't remember.  I don't -- I don't keep track of
5  dates.
6      Q      Where did you move after Irving Park?
7      A      To South Elgin.
8      Q      I'm sorry?
9      A      South Elgin.
10      Q      South Elgin.  And you currently live
11  in Elgin now, sir?
12      A      Where?
13      Q      You currently live in Elgin?
14      A      Yeah.
15      Q      Okay.  Do you remember --
16      A      At times.
17      Q      At times.  Did you -- did you move to
18  Elgin in the '90s or in 2000?
19      A      I don't remember.  I don't remember.
20  I think it was in that 2000.
21      Q      Okay.
22      A      I don't remember.
23      Q      At some point, do you recall receiving
24  threats?

Page 75

1      A      No.  I never -- the only one I hear
2  about threats was when we were in T.J.'s trial or
3  in -- in -- when he was in jail.
4      Q      Right.  That's what I'm asking about.
5  And you heard about threats to you, correct, sir?
6      A      Yeah.
7      Q      And did you -- you moved as a result
8  of the threats?
9      A      No, I didn't.
10      Q      How long after the threats did you
11  move?
12      A      I don't remember.
13      Q      Do you remember anything specific
14  about the threats?
15      A      I -- I don't remember where -- where I
16  hear them, and I even talked to his mother about it.
17      Q      Were -- were you nervous at all?
18      A      No.  No, because I didn't know
19  anything about it.  I had no reason to -- for him to
20  make threats to me.
21      Q      Do you remem -- did you ever visit
22  Victor in the Audy Home?
23      A      Yes.  Many times.
24      Q      And can you tell me a little bit about

Page 76

1  how that process was that you would see Victor in the
2  Audy Home?
3      A      I don't know what you mean.
4      Q      Sure.  I'll explain.  When you went
5  there, were you able to talk to him as close as we
6  are right now?
7      A      Yes.
8      Q      You were able to touch his hand and --
9      A      Yes.
10      Q      Okay.  Were you able to walk outside
11  and take a walk around the block with him?
12      A      No, not around the block.
13      Q      Were you able to step outside with
14  him?
15      A      Outside of where?
16      Q      The Audy Home.
17      A      No.
18      Q      Were you able to be in private with
19  him?
20      A      I guess.  I guess that was private
21  when we were together, both of us.
22      Q      And you were able to be -- and after
23  Victor was arrested, did he ever come home before he
24  went to the Audy Home?

19  (Pages 73 to 76)

EXHIBIT 14

FILED

2000 MAY 23  PM 3: 54

AURELIA PUCINSKI

SECOND DIVISION
January 18, 2000

<u>NOTICE</u>
The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

No. 1-98-0247

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) | |
| v. | ) | 93 CR 14710 |
| THADDEUS JIMENEZ, | ) | Honorable Stanley Sacks, Judge Presiding |
| Defendant-Appellant. | ) | |

FILED
MAY 2 6 2000
AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

<u>ORDER</u>

This case comes before us for a second time.  Again, Thaddeus Jimenez appeals from his conviction and sentence on the charge of first degree murder.

Around 6:30 p.m. on February 3, 1993, Larry Tueffel and Eric Morro encountered Victor Romo and another boy in front of the Honey Baked Ham store. Several witnesses on the street saw the boy with Romo kill Morro by shooting him point-blank in the chest.  One of the witnesses called police about six hours later and named defendant as the shooter.  Based on the telephone call police arrested defendant before dawn on February 4, 1993. Tueffel and two other witnesses viewed a lineup at the police station.  Tueffel and another witness identified defendant as the shooter; the third witness said both defendant and another person

JIM00907

1-98-0247

discretion by excluding the statements from evidence.  See <u>People</u>
<u>v. Davis</u>, 254 Ill. App. 3d 651, 665, 626 N.E.2d 1187 (1993).

The trial court did not abuse its discretion by admitting
defendant's letters into evidence to show his consciousness of
guilt.  The testimony at trial could not support a finding that
defendant committed second degree murder, so the court correctly
refused the proposed instruction on that charge.  And the court
did not abuse its discretion by excluding from evidence Torres'
tape recorded statements.  Any improprieties in the prosecutor's
closing argument did not amount to plain error.  Accordingly, the
judgment of the trial court is affirmed.

Affirmed.

McNULTY, J., with GORDON and McBRIDE, JJ., concurring.

JIM00923

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THADDEUS JIMENEZ,                )
                                 )
            Plaintiff,           )
                                 )
    vs.                          )    No. 09 C 8081
                                 )
CITY OF CHICAGO, et al.,         )
                                 )
            Defendants.          )

        The deposition of CHARLES SNYDER, called by

the Plaintiffs for examination, taken pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Kelly A. Siska, Certified Shorthand Reporter,

Certified LiveNote Reporter, and Notary Public, at

53 West Jackson Boulevard, Chicago, Illinois,

commencing at 11:00 a.m. on January 13, 2011.

JENSEN REPORTING
205 West Randolph Street
5th Floor
Chicago, Illinois 60606
Phone (312) 236 6936
Fax (312) 236-6968
www.jensenreporting.com



```
 1   little group of friends.
 2       Q.     So did you ever see Larry after the
 3   shooting?
 4       A.     No.
 5       Q.     Just kind of disappeared?
 6       A.     Yes.
 7       Q.     Did you hear anything about, like, why he
 8   was not around?
 9       A.     No.  All I heard from -- Danny had
10   mentioned that Larry was testifying against T.J.  That
11   Larry actually seen T.J. or something -- from what
12   I've heard from Danny that Larry actually seen T.J.
13   shoot Eric.  That's what I found out later on down the
14   week.  But, again, it was like Larry -- Larry was
15   gone.  Right after all this had happened Larry was
16   gone.  His house got burned.  Like, two days later his
17   house caught fire or got burned.  So it was like all
18   of sudden he just disappeared.
19       Q.     Was the word on the street that his house
20   was torched because of his involvement?
21       A.     No specifics were ever said what happened.
22   But it just -- you know, just looking at it, okay,
23   some guy testifies against another guy, his house
24   burns.  I mean, it was -- but no one ever said
```

```
 1    specific.  I don't know if it was ever ruled out of
 2    it.  I just know a couple days later I was driving by
 3    and his house was burnt.
 4         Q.    And you said you heard from Danny that
 5    Larry saw T.J. shoot Eric?
 6         A.    Yeah.  That was the talk between the
 7    Royals.  That's what they were saying.  Between the
 8    Royals and all that, and that's what Danny had
 9    mentioned that that's how it came out as far as --
10         Q.    And so was it your understanding that they
11    had kind of discussed it and their conclusion was that
12    Larry saw T.J. do it?
13         A.    From what my understanding from looking in
14    as an outsider looking in, that's how it kind of
15    seemed to me, yes.
16         Q.    Did Danny ever mention talking with Larry
17    about the shooting?
18         A.    No.  I don't know where Danny was on the
19    day of the shooting.  I just know Danny was hanging
20    out with Eric the night prior to the shooting.  I know
21    they were all hanging out and drinking and just
22    hanging out at Sean Cosman's house.  I know that the
23    night before the shooting had happened because I was
24    supposed to meet up with them that night.  I'm like,
```

EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

THADDEUS JIMENEZ,            )
                             )
              Plaintiff,     )  Case No. 2009 C 8081
                             )
      vs.                    )
                             )  DEPOSITION OF
CITY OF CHICAGO, et al,      )  TINA ELDER
                             )
              Defendants.    )
------------------------)

        THE DEPOSITION OF TINA ELDER, taken
before Erin M. Weitl, Certified Shorthand
Reporter of the States of Iowa and Illinois and
Notary Public of the State of Iowa, commencing
at 9:00 a.m., on Monday, January 3, 2011, at
1301-17th Street, Fulton, Illinois.

            A P P E A R A N C E S

Plaintiff by:
                STUART J. CHANEN
                Attorney at Law
                VALOREM LAW GROUP
                35 East Wacker Drive, Suite 2900
                Chicago, IL 60601
                (312)676-5480

Defendant police officers by:
                ANDREW M. HALE
                Attorney at Law
                ANDREW M. HALE & ASSOCIATES
                53 West Jackson Boulevard
                Chicago, IL 60604
                (312)341-9646

Also present:   Thaddeus Jimenez

Reported by:    Erin M. Weitl, RPR, CSR

Case 1:09-cv-08081   Document 187-11   Filed 12/01/11   Page 3 of 5   PageID 3008
Case: 12-2779   Document: 11-19   Filed: 08/27/2012   Pages: 256

67

1      A.    Sports.   Georgetown, Bulls jackets.

2      Q.    When you saw Eric Morro get shot, was the

3  shooter wearing a Starter jacket?

4      A.    Yes.

5      Q.    Was the shooter wearing a Duke Starter jacket?

6      A.    It was gray.

7      Q.    One of the colors was gray?

8      A.    Yes.

9      Q.    Back at the time of the 1994 criminal trial,

10  were you nervous testifying in a criminal proceeding?

11      A.    Of course.

12      Q.    And at the criminal trial, did it make you

13  nervous identifying Mr. Jimenez as the shooter of

14  Eric Morro?

15      A.    Yes.

16      Q.    Had your family received any kind of threats

17  prior to you testifying at Mr. Jimenez's first criminal

18  trial?

19      A.    Yes.

20      Q.    Can you describe what those were?

21      A.    Just to mind my own business.  Keep my mouth

22  shut.  They burned down my mom's garage.  I had a brick

23  thrown through the window and hit me in the head.

24      Q.    Who was making those threats?

Case 1:09-cv-08081   Document 187-11   Filed 12/01/11   Page 4 of 5   PageID 3009
Case: 12-2779      Document: 11-19      Filed: 08/27/2012   Pages: 256

68

```
1        A.    Just the neighborhood punks.

2        Q.    At the time of the criminal trial before you

3    testified, did you become aware of whether Mr. Jimenez

4    was a member of a gang?

5        A.    No.

6        Q.    Were there gangs that operated in your

7    neighborhood?

8        A.    Yes.

9        Q.    What gangs were those?

10       A.    Royals, Disciples.

11       Q.    Were any of the threats your family was

12   receiving coming from members of the Royals gang?

13              MR. CHANEN:   Objection, foundation.

14       A.    I don't know what gang.

15       Q.    Do you recall anybody who personally made

16   threats to you?

17       A.    No.

18       Q.    But you said your mom's garage was burned

19   down?

20       A.    Yes.

21       Q.    Who were you aware of in your family receiving

22   threats?

23       A.    They beat up my dad.

24       Q.    Do you know who?
```

Case 1:09-cv-08081   Document 187-11   Filed 12/01/11   Page 5 of 5   PageID 3010
Case: 12-2779       Document: 11-19       Filed: 08/27/2012       Pages: 256

*69*

```
 1        A.   No.

 2        Q.   Did they talk about Mr. Jimenez's criminal

 3    trial?  I mean, was it because your family was going to

 4    testify against Mr. Jimenez?

 5              MR. CHANEN:  Objection to the form.

 6        A.   Basically, it was to mind our own business.

 7        Q.   That your family should mind its own business?

 8        A.   Yes.

 9        Q.   Did you take that to mean your family

10    shouldn't get involved in Mr. Jimenez's criminal trial?

11              MR. CHANEN:  Form and foundation.

12        A.   Yes.

13        Q.   Did you have any kind of police protection?

14        A.   No.

15        Q.   Did you know any members of the Royals?

16        A.   Yes.

17        Q.   Did they ever talk about Mr. Jimenez's

18    involvement in the shooting of Eric Morro?

19        A.   No.

20        Q.   Did you ever talk to Larry Tueffel about the

21    shooting of Eric Morro?

22        A.   I'm sure I did.

23        Q.   Did he ever give you any indication that the

24    shooter was not Thaddeus Jimenez?
```

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

THADDEUS JIMENEZ,              )
                              )
            Plaintiff,        ) Case No. 2009 C 8081
                              )
      vs.                     )
                              ) DEPOSITION OF
CITY OF CHICAGO, et al,       ) SANDRA ELDER
                              )
            Defendants.       )
-----------------------)

      THE DEPOSITION OF SANDRA ELDER, taken
before Erin M. Weitl, Certified Shorthand
Reporter of the States of Iowa and Illinois and
Notary Public of the State of Iowa, commencing
at 1:00 p.m., on Monday, January 3, 2011, at
1301-17th Street, Fulton, Illinois.

            A P P E A R A N C E S

Plaintiff by:
            STUART J. CHANEN
            Attorney at Law
            VALOREM LAW GROUP
            35 East Wacker Drive, Suite 2900
            Chicago, IL 60601
            (312)676-5480

Defendant police officers by:
            ANDREW M. HALE
            Attorney at Law
            ANDREW M. HALE & ASSOCIATES
            53 West Jackson Boulevard
            Chicago, IL 60604
            (312)341-9646

Also present:   Thaddeus Jimenez

Reported by:    Erin M. Weitl, RPR, CSR

Case 1:09-cv-08081   Document 187-12   Filed 12/01/11   Page 3 of 4   PageID 3013
Case: 12-2779     Document: 11-19      Filed: 08/27/2012     Pages: 256

75

1     Q.   And you could tell it was TJ?

2     A.   Yes.

3     Q.   At any point after the shooting, was your

4   family getting any kind of threats from anybody in the

5   neighborhood?

6     A.   We had a few threats.

7     Q.   Describe that for me.

8     A.   Just that we'd be sorry if we testified

9   against TJ.   They threatened -- well, my garage was

10  burned down.

11    Q.   Were you able to identify specifically who was

12  making those threats?

13    A.   No.

14    Q.   Did that scare you?

15    A.   Yeah, it scared me.   Still scares me.

16    Q.   Did you wind up moving out of the

17  neighborhood?

18    A.   Yes.

19    Q.   When was that?

20    A.   We moved here in 2000.

21    Q.   Okay.   Why did you move here?

22    A.   Because of gang retaliation.

23    Q.   Were you concerned about testifying against TJ

24  at the criminal trials?

Case 1:09-cv-08081   Document 187-12   Filed 12/01/11   Page 4 of 4   PageID 3014
Case: 12-2779      Document: 11-19      Filed: 08/27/2012      Pages: 256

*76*

1       A.     Yes.

2       Q.     You mentioned that you thought you may have

3   driven Larry to the police station for the lineup.

4       A.     Yes.

5       Q.     Do you recall talking to Larry's mother on her

6   porch?

7       A.     Larry's mother just told me make sure I bring

8   him straight home and drop him off in front of the

9   house.

10      Q.     Would that lead you to believe you would have

11  taken him --

12      A.     That I picked him up.

13      Q.     -- to the police station?

14      A.     I don't know if he walked -- she was at the

15  police station and she left or what, but I remember her

16  saying to bring him straight home.

17      Q.     Where had Larry lived in relation to your

18  family at the time?

19      A.     A block away.  He lived on Whipple.

20      Q.     Did Albany run north/south?

21      A.     Albany was north and south.

22      Q.     Was Albany just a little bit to the east of

23  Whipple?

24      A.     Albany was east of Whipple, yeah.  I mean --

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THADDEUS JIMENEZ,                          )
                                           )
              Plaintiff,                   )
                                           )
        vs.                                )   No. 09 C 8081
                                           )
CITY OF CHICAGO, et al.,                   )
                                           )
              Defendants.                  )

        The deposition of SHAWN COSMEN, called by the
Defendants for examination, taken pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for the
United States District Courts pertaining to the taking
of depositions, taken before Terry M. Barfield,
Certified Shorthand Reporter and Notary Public, at
121 North Campbell, Chicago, Illinois, commencing at
10:34 a.m., on the 7th day of March, A.D., 2011.

JENSEN REPORTING
205 West Randolph Street
5ᵗʰ Floor
Chicago, Illinois 60606
Phone:(312) 236-6936
Fax:(312) 236-6968
www.jensenreporting.com



Case 1:09-cv-08081   Document 187-13   Filed 12/01/11   Page 3 of 8   PageID 3017
Case: 12-2779     Document: 11-19      Filed: 08/27/2012     Pages: 256

36

1          A.    That Duke coat, yeah, the black and blue one.

2          Q.    Okay.  Just a second.

3                Have you ever been threatened in connection

4     with your testimony --

5          A.    Yes.

6          Q.    -- at TJ's trial?

7          A.    Yes.

8          Q.    How many times?

9          A.    That's why I quit when they came out, what, a

10    year ago, a year and a half.  They kept trying to get me

11    to court and I wouldn't go.  And we got threatened a

12    lot.  We had to move.  I had to move away for a while.

13    I had to go by my sister in Cleveland because so-called

14    attorneys or whatever said, Oh, you get threatened,

15    we'll move you.  We'll help you.  They didn't do

16    nothing.  So I said why should I help them.

17         Q.    Do you remember who the attorneys were that

18    approached you or who they were representing?

19         A.    They were on 26th and Cal.  I don't know

20    their -- I forget their names and everything.  And I

21    didn't want to be bothered no more because I got

22    threatened by the Royals.  They burnt my brother's house

23    down.

24         Q.    You mean Phil Torres?

Case 1:09-cv-08081   Document 187-13   Filed 12/01/11   Page 4 of 8   PageID 3018
Case: 12-2779     Document: 11-19       Filed: 08/27/2012     Pages: 256

37

1        A.    Yes.

2        Q.    Who else were you threatened by?

3        A.    All the Royals, their family.  When we left

4    court we had -- they were following us home.  We had to

5    break loose from that.

6        Q.    Their family, you mean TJ's family?

7        A.    Yes.  And when he left court they followed --

8    we had to have police escort escort us to the garage

9    because they were all waiting for us out front.

10        Q.    Do you remember which members of TJ's family?

11        A.    No.  There was a bunch of them.

12        Q.    How many?

13        A.    There was about 10, 15 of them.  And all I

14    remember is one that always threatened me, he was a

15    Harrison Gent.  I don't know his name but I know he's

16    related to TJ and he was a Harrison Gent.

17        THE COURT REPORTER:  I'm sorry.  What is it,

18    Harrison Gent?

19        THE WITNESS:  Gent.  Gent.  Yeah, Harrison Gent.

20        MS. AHN:  I think that's G E N T.

21        THE WITNESS:  I guess.  I don't know.  I just know

22    he was a Harrison Gent.

23    BY MS. AHN:

24        Q.    Would that have been Chester Makowski --

Case 1:09-cv-08081   Document 187-13   Filed 12/01/11   Page 5 of 8   PageID 3019
Case: 12-2779      Document: 11-19      Filed: 08/27/2012      Pages: 256

38

1        A.    I don't know his name.

2        Q.    -- nickname is Cheech?

3        A.    Never knew his name.

4        Q.    Okay.  And approximately when was that that

5    you were leaving the courthouse and they were standing

6    outside?

7        A.    It was right after the second trial, I

8    believe.

9        Q.    So right after the second trial you were

10    leaving the courthouse and there were 10 to 15 of TJ's

11    family members --

12        A.    Yeah, family members.

13        Q.    -- standing outside --

14        A.    Yes.

15        Q.    -- threatening you?

16        A.    Yes.  They were actually threatening us at the

17    court.

18        Q.    They threatened you in the courtroom?

19        A.    Yeah.  They were sitting there pointing and

20    talking and when we were all on bench when we were doing

21    the trial.

22        Q.    I'm sorry.  Was this when you were

23    testifying --

24        A.    Yes.

1      Q.    -- or when you were --

2      A.    Testifying against them in court.

3      Q.    So while you were actually testifying, they

4   were --

5      A.    In the court they were over there talking,

6   pointing.  And then right after that when we come out

7   when we got to the front doors of that day, they were

8   all standing outside.  We had to go back in and tell the

9   sheriffs and they had to escort us to our car.

10     Q.    Okay.  Other than the time at the courthouse,

11  do you remember any other specific times that TJ's

12  family threatened you?

13     A.    There was a lot.  There's a lot.  Every time I

14  turned around, someone is chasing me in the car or ...

15  It was just crazy so I didn't want to help no more.

16  Because I have my kids of my own now and I had to get

17  away.

18     Q.    Mm-hmm.  I understand.

19           Did they ever threaten your life?

20     A.    Oh, yeah, they always threatened to kill me.

21     Q.    And --

22     A.    Even the Royals.  So I said -- I thank God I

23  made it through Stateville without them knowing.

24     Q.    Mm-hmm.

Case 1:09-cv-08081   Document 187-13   Filed 12/01/11   Page 7 of 8   PageID 3021
Case: 12-2779     Document: 11-19       Filed: 08/27/2012     Pages: 256

40

1        A.    Because my understanding Little Man is in

2    Stateville now for two murders.

3        Q.    Right.   Right.

4              So they threatened you at the courthouse

5    after -- during your testimony?

6        A.    Yes.

7        Q.    And also right after you got out?

8        A.    Yes.

9        Q.    And then they've also threatened to kill you?

10       A.    On the street and everything.  I ran into them

11   a lot, their family, but I never knew them.  All I know

12   they used to jump out and say you tricked on my cousin.

13   You tricked on my brother.  This and that.  And I start

14   -- I used to run a lot.  I even had the Royals chasing

15   me at times.  But then Shorty Brian talked them into not

16   messing with me.  I don't know how but I don't believe

17   none of them, you know.  Because when you're a

18   gangbanger, you stick with the gang.

19       Q.    And were these threats around the times of

20   both trials?

21       A.    Yes.

22       Q.    So the first and second trial?

23       A.    Yes.  And then the third one or whatever, they

24   had the last one, I didn't go.  I refused it.  Then they

Case 1:09-cv-08081  Document 187-13  Filed 12/01/11  Page 8 of 8  PageID 3022
Case: 12-2779    Document: 11-19    Filed: 08/27/2012    Pages: 256

64

1      A.    Yes.

2      Q.    Was -- That happened today?

3      A.    No.  It happened when I was in Stateville.

4      Q.    How long ago was that?

5      A.    Three -- When did I get here?  I got here

6    January or February 10th, I got here, so it's like two

7    weeks before I got to here.  January something.

8      Q.    Was this only Ms. Ahn or was she with other

9    people?

10      A.    It was on the phone.

11      Q.    Okay.  Do you know how long you talked for

12    approximately?

13      A.    About ten minutes.

14      Q.    And what did you talk about?

15      A.    Just ask -- telling me about the case coming

16    up about being sued and that if I wanted to do a

17    deposition, and I told her not really.  And then I said

18    if I got to move out of Stateville because I didn't know

19    because there's lot of Royals locked up there.  I didn't

20    want it to kind of come back on me.  So I said if I got

21    out of Stateville and got to my work release center, I

22    would be more than happy to talk to her.

23      Q.    Were you -- At that time did you know that you

24    were about to be moved?

# EXHIBIT 19

# In The Matter Of:

*Thaddeus Jimenez v.*
*City of Chicago, et al.*

---

*CATALINA ROMO*
*September 14, 2010*

---

*DMK REPORTING, INC.*

Case 1:09-cv-08081 Document 187-14 Filed 12/01/11 Page 3 of 3 PageID 3025

Thaddeus Jimenez v.
City of Chicago, et al.

Document: 11-19

CATALINA ROMO
September 14, 2010

Filed: 08/27/2012 Pages: 256

---

**Page 13**

1  in maybe seventh grade or so -- well, let me ask a
2  different question.
3        When you lived at 2970 West Nelson,
4  were there any gangs in your neighborhood?
5     A.  As far as I know, no, as far as I
6  know, no.
7     Q.  Do you know if Victor was ever in a
8  gang?
9     A.  As far as I know, no.
10    Q.  Do you know if any of Victor's friends
11 were in a gang?
12    A.  No, because I don't remember about his
13 friends. I don't know.
14    Q.  Do you know if Leo was ever in a gang?
15    A.  I don't know, I don't know.
16    Q.  Do you remember Victor ever getting
17 arrested by the police when he was a boy?
18    A.  No. I don't think so, no.
19    Q.  Did you ever hear that your husband
20 had made a tape recording after he met with one of
21 Victor's friends?
22    A.  They mentioned something. I don't
23 know what it was. But apparently they mentioned
24 that something had been taped. I don't know what

---

**Page 14**

1  the thing taped was.
2     Q.  Who mentioned something?
3     A.  I don't know. I heard something at a
4  court proceeding that we had.
5     Q.  Did you know that your husband was
6  going to be taping a conversation with one of
7  Victor's friends?
8     A.  No, no.
9     Q.  Did you ever listen to any tape that
10 your husband made?
11    A.  No, never, never.
12    Q.  Did you ever hear whose voices, well,
13 were you ever told whose voices were on the tape?
14    A.  No, nothing.
15    Q.  Did anybody back in, around 1993, did
16 anybody ever threaten your family?
17    A.  That apparently did know something
18 about that but not directly. It was in other
19 words a conversation.
20    Q.  What conversation did she hear?
21    A.  I'm not sure if it was something I
22 heard my ex-husband talking about with another
23 person or overheard them, but I don't know.
24    Q.  Did that conversation have to do with

---

**Page 15**

1  a threat?
2     A.  Apparently so.
3     Q.  Do you recall who the threat was made
4  to?
5     A.  No. I only knew that somebody
6  threatened us or with us at the family.
7     Q.  And you were learning about the threat
8  from your husband?
9     A.  Yes.
10    Q.  Did you ever find out who was making
11 the threat?
12    A.  I never knew. I don't know, no.
13    Q.  Did you ever have to move out of the
14 2970 West Nelson address because you were scared?
15    A.  Yes.
16    Q.  Where did you move to?
17    A.  What's it called, to Cuyler, but I'm
18 not remembering the address number.
19    MR. BOWMAN: I'm sorry. To what
20 street?
21    THE INTERPRETER: Cuyler.
22 BY MR. HALE:
23    Q.  Do you know how to spell Cuyler?
24    A.  I need to write it to spell it.

---

**Page 16**

1     Q.  Sure.
2     A.  I don't know if this is right, but I
3  think it is. (Indicating.)
4     Q.  And just for the record the witness
5  spelled it West C-U-Y-L-E-R.
6        Did you ever testify at any trial
7  involving Victor?
8     A.  No. The one who was speaking was my
9  ex-husband.
10    MR. HALE: Let me do this, I want to
11 take a break and go over my notes. I don't have
12 too much more.
13    THE WITNESS: Can I take some pills,
14 diabetic pills?
15    MR. HALE: Sure. Let's take a
16 five-minute break.
17    (A recess was taken.)
18 BY MR. HALE:
19    Q.  Prior to today, have you ever spoken
20 with any of T.J.'s attorneys?
21    A.  No. I don't know anybody, no.
22    Q.  Do you know if Victor has spoken with
23 any of T.J.'s attorneys?
24    A.  I don't know.

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-8081 |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | The Hon. Matthew F. Kennelly |
| Defendants. | ) | |

**PLAINTIFF'S MOTION *IN LIMINE* TO BAR
CERTAIN OPINIONS OF ALEXANDER OBOLSKY**

**INTRODUCTION**

The Defendants are operating under the mistaken assumption that Plaintiff's claim for emotional distress damages automatically throws open the door to any and all prior bad acts ever allegedly committed by Plaintiff, including juvenile arrests, "pee wee" gang membership, cannabis use, and so forth.  Defendants have retained an expert, Dr. Alexander Obolosky, to try to make these otherwise-inadmissible and inflammatory subjects relevant to the issues at trial.[1]

The majority of Dr. Obolsky's opinions fail to withstand scrutiny.  Not only are these opinions of dubious merit, but they are irrelevant even if they were valid.  Because the subject-matter is so prejudicial, and because the potential to unfairly affect the trial outcome is so substantial, Plaintiff moves in limine to bar those opinions, as well as references to certain underlying information upon which Dr. Obolsky purports to rely.[2]

---

[1]  Plaintiff did not receive Dr. Obolsky's report and materials until the due date for submitting motions in limine, which is why the present motion is being submitted at this time.

[2]  To simplify the trial and streamline the evidence, Plaintiff has elected not to call his own psychologist, Dr. Antoinette Kavanaugh, during his case in chief.  There will thus be no psychological testimony elicited by the Plaintiff for which Dr. Obolsky's testimony could be considered fair rebuttal.

Dr. Obolsky offers four opinions.  *See* 11/15/2011 Report of Alexander Obolsky, Ex. A hereto.  First, Dr. Obolsky opines that as a boy prior to his arrest for the Morro murder, Plaintiff "was exhibiting behaviors" of a "severe and profound conduct disorder," a disorder that disposed Plaintiff to criminality and presaged a life of crime and imprisonment.  *Id.* at 2-7, 33 ("Mr. Jimenez was reasonably expected to grow up to be an adult with antisocial personality disorder, and an adult involved in criminal acts with a reasonable probability of adult incarceration, whether or not he was incarcerated on the first degree murder charge at age 13.").  Second, he opines that Plaintiff was "exhibiting substance abuse symptoms" prior to his incarceration (*id.* at 33), and presently warrants a DSM diagnosis of "Cannabis abuse" and "history of polysubstance abuse."  *Id.* at 2.  Third, Dr. Obolsky opines that Plaintiff presently "exhibits ... antisocial personality features."  *Id.* at 27-33.  Fourth, he opines that Plaintiff did not develop any depression, post-traumatic stress disorder, or other "condition of mental ill-being because of his 16 year incarceration.  *Id.* at 2, 30-33.

Of these four opinions, only the last is valid and admissible.  Though Plaintiff obviously disagrees with the fourth opinion, there are no grounds to move to exclude it.  The first three opinions, on the other hand, are objectionable and should be barred.

## I.      DR. OBOLSKY'S OPINION THAT PLAINTIFF "EXHIBITED BEHAVIORS" OF A "SEVERE AND PROFOUND CONDUCT DISORDER" THAT FORETOLD A LIFE OF CRIMINALITY SHOULD BE BARRED.

Defendants' objective is no secret: they are looking for a hook to introduce a number of alleged prior bad acts that would otherwise be barred by the Rules of Evidence.  To be sure, this is not an inherently impermissible or objectionable tactic.  If the "dirty laundry" evidence upon which an expert relies is genuinely sufficient to form an opinion, and if that particular valid opinion is relevant to the issues at trial, then, assuming Rule 403 does not provide an independent ground for

exclusion, the introduction of the dirty-laundry can be justified.  In this case, however, Defendants' attempt fails on both levels.

*First,* and most important, the opinion itself has no relevance to anything legitimately at issue here.  While never defined by Dr. Obolsky (a conspicuous absence in his 35-page report), a childhood conduct disorder is simply "[a] repetitive and persistent pattern of behavior [in childhood] in which the basic rights of others or major age-appropriate societal norms or rules are violated."  *See* DSM IV-TR, Diagnostic and Statistical Manual of Mental Disorders, 312.81, Conduct Disorder, Childhood Onset Type.  It is not clear whether Defendants are expressly offering this opinion to help create doubt about whether Plaintiff committed the Morro murder.  *See, e.g.,* Ex. A at 6, quoting speculation by probation officer after Plaintiff's murder arrest that Plaintiff was "capable of murder."  That justification is obviously improper under Rule 404, which bars the introduction of evidence to show propensity.  Moreover, there is certainly no logical support for an argument that an alleged pattern of childhood behavior would genuinely rebut Plaintiff's claim to have been damaged by 16 years of wrongful incarceration.  While Defendants and Dr. Obolsky obviously considered various ways to try to make the evidence relevant at trial, their proposed "conduct disorder" solution misses the mark.  That opinion is simply irrelevant.

*Second*, despite having spent years searching for every scrap of unflattering information about Plaintiff's pre-arrest life, and having deposed numerous witnesses and scoured every available juvenile record, the Defendants came up short.  Examined carefully, the pile of alleged bad acts that defense counsel provided to Dr. Obolsky—particularly once the unsupported allegations are separated out from the verified conduct—is plainly insufficient to support the diagnosis.

A.    **Dr. Obolsky's Diagnosis of "Conduct Disorder" Is Not Relevant To Anything Legitimately At Issue.**

Dr. Obolsky is supposedly a witness to rebut Plaintiff's claim to have been damaged by his 16 years of wrongful incarceration.  Dr. Obolsky's opinion that Plaintiff suffered from a conduct disorder in childhood is completely beside the point.  Accurate or fallacious, the diagnosis doesn't bear on damages or any other issue in this case.  It should therefore be barred.

The opinion is particularly insidious because Dr. Obolsky's diagnosis of conduct order is supported by a list of bad childhood behavior that would obviously be inadmissible under Federal Rules of Evidence 401, 404, or at a minimum, 403.  There is a manifest danger that Dr. Obolsky's conduct disorder opinion (and the information Dr. Obolsky cites to support it) could be misconstrued as evidence that Plaintiff might be guilty of the Morro murder.  There is a grave risk that the otherwise-inadmissible prior bad acts would unfairly prejudice Plaintiff generally.  Therefore, Rule 403 requires a showing of probative value sufficient to justify admission.

The probative value of the conduct disorder diagnosis, however, is strikingly absent.  For starters, Defendants presumably are not relying on a propensity theory.  The Rules of Evidence expressly forbid such arguments.  Turning to damages, there is nothing in Dr. Obolsky's report suggesting that Plaintiff suffered less during the sixteen years he spent in prison because he (supposedly) has a "conduct disorder."  The conclusion simply does not follow from the premise, and Dr. Obolsky cites no literature or studies or even conjecture suggesting otherwise.[3]

---

[3] For the sake of argument (although it is waived here because it is nowhere part of Dr. Obolsky's report), if Dr. Obolsky could support a scientifically-valid opinion that the "conduct disorder" alleged here truly rises to the level of psychopathology, one could at least imagine the link to damages because psychopaths are devoid of emotion.  Dr. Obolsky's problem is that there is insufficient evidence to opine that Plaintiff is or was lacking in emotion.  The evidence simply does not support that characterization of

4

**B.       There Is Insufficient Evidence To Diagnose a Childhood "Conduct Disorder."**

Even if the conduct disorder diagnosis were relevant, there is not sufficient evidence in this case to support the diagnosis.  Clearing away the smoke (*i.e.,* the arrests for unproven allegations, the rumors, and the conclusory characterizations) there is insufficient evidence to support Dr. Obolsky's conclusion that there is anything pathological about Plaintiff's behavior, much less Dr. Obolsky's characterization of Plaintiff's "early age psychology."  *Id.* at 3.  *See also id.* at 13 ("psychopathic personality features"); *id.* at 8 ("presence of psychopathy").

First, Dr. Obolsky lists Plaintiff's juvenile arrests (ages 10-13).  These accusations can be grouped into two categories: relatively benign allegations, and more serious ones.  The more benign arrests include: breaking a plate glass; trying to take another child's bicycle; biting a girl and trying to tear her shirt; stealing a bike and trying to re-sell it; a "simple battery" involving taunting and taking property; driving his grandmother's car without permission; throwing a rock at someone; etching a gang sign in a school desk; stealing tools from a car; breaking a car window; and throwing a brick and bottle at someone;

The more serious arrests include: five allegations involving trespassing in or driving (stolen) cars that did not belong to him (an offense also referred to as "joyriding"); another allegation of attempting the same; shooting two people in the back with a pellet gun from a window; shooting a BB gun at a person's back, a car window, and a bus; being apprehended with the air-rifle used in the prior attack; caught in possession of a .22 caliber "starter pistol"; "attempted stealing" and destruction of undefined school property; and an undefined "burglary."

Leaving aside any debate about how to characterize this list, the problem with Dr. Obolsky's jump from the arrests to his diagnosis (*id.* at 2-3) is that all of these arrests are just that—arrests.

---

Plaintiff.                                                        5

They are accusations of misconduct.  With one known exception, there are no convictions, and none of this other alleged conduct has ever been proven.[4]  Our legal system affords a presumption of innocence.  For purposes of the present analysis, there is no admissible evidence to corroborate that Plaintiff committed any of these acts.

Dr. Obolsky and the Defendants skip right over this problem.  The specific use Defendants seek to make of the arrests assumes the truth of the underlying allegations, and thus rests on an improper foundation.  Our legal system does not permit the inference that if someone is accused of many wrongs, we can safely assume he must have committed some or all of them.  Defendants would surely object, for example, if Plaintiff provided a long list of CR allegations to a psychologist to opine from those allegations that a Defendant officer had a "conduct disorder" disposing him to criminality and misconduct.  This is no different.[5]

In fairness, Dr. Obolsky relies on other information, including the fact that Plaintiff was in a gang, "cooperating and collaborating in a team effort" of criminality.  *Id.* at 4.  Regardless of what being a gang member—even a "committed" one—really means in the case of a 10 to 13 year-old child (especially one who has never even been adjudicated guilty of any drug or gun offense), mere identification and status as a gang member does not differentiate Plaintiff from thousands of other boys in the neighborhood where Plaintiff lived and went to school and in other neighborhoods across the City of Chicago.

Dr. Obolsky next relies on the report by a single boy (Shawn Cosmen) who claims to have

---

[4] There appears to be only one finding of delinquency in Plaintiff's juvenile records: for criminal trespass to a vehicle.

[5] Having gone the conduct disorder route, Dr. Obolsky does not opine that a history of juvenile arrests could somehow reduce the amount of pain and suffering from 16 years of wrongful incarceration. Nor is there any scientific support for such an opinion.

seen Plaintiff in the possession of a gun "4-6 times" (and who apparently also claims to believe that Plaintiff "always" carried one). *Id.* at 4. The danger of unfair prejudice cannot be understated (Defendants accuse Plaintiff of shooting someone) and the relevance is virtually nil.

Dr. Obolsky also relies upon probation reports that describe Plaintiff as declining to express remorse. *Id.* at 4-5. Without a baseline for knowing whether Plaintiff actually committed the crime for which he allegedly declined to express remorse, the information is useless.[6]

In sum, once the Court isolates the conduct that can be legitimately attributed to Plaintiff, it adds up to a boy who was a "pee wee" gang member who undoubtedly got into trouble. This is hardly sufficient to support Obolsky's opinion that Plaintiff had traits of a "psychopath" and a diagnosable "severe and profound" conduct disorder such that he "was reasonably expected to grow up to be an adult with antisocial personality disorder, and an adult involved in criminal acts with a reasonable probability of adult incarceration, whether or not he was incarcerated on the first degree murder charge at age 13." *Id.* at 33.

This is truly an extraordinary and unprecedented opinion. Dr. Obolsky identifies no scientific support for his claim to be able to review the juvenile record of a 13-year-old boy and say to a "reasonable degree of scientific certainty" that Plaintiff was going to end up in prison even if the Defendants had not framed him. Dr. Obolsky's professed ability to predict that outcome based upon Plaintiff's gang membership, arrest history, and cat-kicking is unsupported by any empirical studies, literature, or anything else. It is precisely the sort of junk science that is inadmissible after

---

[6] Dr. Obolsky relies on other facts to support his "conduct disorder" diagnosis, including the fact that he supposedly admitted to making fires in garbage cans and cruelty to animals. Id. at 4. His evidence is that Plaintiff supposedly admitted that he "does not like cats and tends to kick them and throw them out of windows." Id. at 7. He is also not shy about relying on rumors. Id. at 5 ("Reportedly minor was carrying weapon to school, a rumor never substantiated").

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  It should be barred.

Dr. Obolsky should be barred from offering the opinion that Plaintiff exhibited a "conduct disorder" or that Plaintiff had a propensity for a life of crime.  Pursuant to Plaintiff's previously-filed motions *in limine,* Dr. Obolsky (and the Defendants) should also be barred from referencing the information he claims to have supported that opinion, including references to Plaintiff's gang membership; juvenile arrest record; and the other subjects listed above.

## II.    DR. OBOLSKY'S OPINION THAT PLAINTIFF WAS EXHIBITING SUBSTANCE ABUSE SYMPTOMS PRIOR TO HIS INCARCERATION, AND PRESENTLY WARRANTS A DSM DIAGNOSIS OF "CANNABIS ABUSE" SHOULD BE BARRED.

Plaintiff has previously filed a motion citing the abundance of case law that references to a civil rights plaintiff's drug use is an irrelevant and inadmissible prior bad act.  That law governs the issue.  *See United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007) (discussing the possibility that witness testimony will be unduly discounted once jury hears about illegal drugs), citing *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992) and *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987).  Indeed, the Seventh Circuit has been consistently clear (reaffirmed at least twice in the past two years) about the "considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony."  *Kunz v. City of Chicago*, 538 F.3d 667, 677 (7th Cir. 2008); *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007), citing *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992) and *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987).  *See also Buffone v. Rosebud Restaurants, Inc.,* 2006 WL 2425327 (N.D. Ill. Aug. 21, 2006) ("Even if relevant, any arguable probative value of evidence about their drug use is substantially outweighed by the danger of unfair prejudice"), citing *Mankey v. Bennett*, 38 F.3d

353, 360 (7th Cir. 1994).

Here, Defendants seek to wedge the issue back into the trial by having Dr. Obolsky attach a DSM diagnosis to Plaintiff's use of marijuana and other drugs, including LSD.  The fact that Dr. Obolsky can talk about drug use in scientific terms does not make the underlying subject matter any more relevant or admissible.  Any minimal probative value is greatly outweighed by the possibility that the jury would unfairly punish Plaintiff.  The danger for unfair prejudice is simply too great.[7]

## III.   DR.   OBOLSKY'S   OPINION   THAT   PLAINTIFF   HAS   "ANTISOCIAL PERSONALITY FEATURES" SHOULD BE BARRED.

Dr. Obolsky opines that Plaintiff presently has "features" of an antisocial personality.  Dr. Obolsky does not explicitly define what that means, but he explains that "children who exhibit severe conduct disorder often grow up to be adults with antisocial personality disorder."  *Id.* at 33. This purported phenomenon apparently does not apply to Plaintiff, who did not grow up to have an antisocial personality, but rather, according to Dr. Obolsky, merely "exhibits antisocial personality features."  *Id.* at 33.

There are numerous problems with this opinion.  First, as with the conduct disorder opinion, it is largely reliant on Plaintiff's post-exoneration arrest record.  Plaintiff stands convicted of none of those allegations, and disputes them.[8]  Second, as is also true of the conduct disorder, there is no apparent reason why features of an antisocial personality disorder are in any manner relevant to this trial.

Third, and most dispositive, Plaintiff has decided to voluntarily withdraw any claim for

---

[7]  Additionally, as discussed immediately below, Plaintiff has decided to voluntarily dismiss any claim for damages from six months after his exoneration forward.  That concession removes any doubt that the issue is irrelevant.

[8]  Since filing this lawsuit, Plaintiff has attracted an undue amount of attention from the police.

present and future damages.  Because he has elected to cut off his claim for damages at the period

of time six months after his exoneration, evidence of more recent arrests are irrelevant.

**IV.   DR. OBOLSKY'S OPINION THAT PLAINTIFF DID NOT DEVELOP ANY DEPRESSION, POST-TRAUMATIC STRESS DISORDER, OR OTHER "CONDITION OF MENTAL ILL-BEING" BECAUSE OF HIS 16 YEAR INCARCERATION IS ADMISSIBLE, BUT SOME OF THE EVIDENCE "RELIED UPON" BY DR. OBOLSKY IN SUPPORT IS NOT.**

Finally, Dr. Obolsky also opines that the 16 years that Plaintiff spent incarcerated (from

ages 13 to 30) did not cause him any emotional injury or "condition of mental ill-being" qualifying

for a psychological diagnosis.   *Id.* at 7-33.   In support, Dr. Obolsky relies upon what he

characterizes as contemporaneous and recent denials by Plaintiff of symptoms associated with Post

Traumatic Stress Disorder (*id.* at 7, 9, 11, 14, 15, 22); the absence of any clinical disorders or

psychiatric diagnoses noted by various prison treaters (*id.* at 8, 9, 10, 11, 12, 14, 15, 23); Dr.

Obolsky's interview (*id.* at 12); and the psychological testing administered at Dr. Obolsky's behest

(*id.* at 24-25, 31-32).

Though he disagrees with it, Plaintiff has no basis to try to prevent Dr. Obolsky from

offering this opinion.  Unlike the others, it is both relevant and supported by admissible evidence.

However, Dr. Obolsky is not entitled to parlay the opinion that Plaintiff's incarceration did not

cause psychic injury into bootstrapping testimony regarding a number of Plaintiff's other alleged

prior bad acts—references that do not support much less directly relate to the opinion.  Specifically,

the following facts are contained in the "discussion" of Dr. Obolsky's opinion as things he claimed

to have taken into consideration.  Closer examination reveals that none of them is sufficiently

related to the substance of the opinion in question to outweigh the tremendous danger of unfair

prejudice:

1.      "Stealing and fighting" starting in the first or second grade, including "punching the other kid in the face," and a serious attack by a rival gang member. *Id.* at 8, 16.

2.      Plaintiff's use of inhalant sprays. *Id.* at 8.

3.      A "family component to Mr. Jimenez's delinquent behaviors." *Id.* at 9 ("Mr. Jimenez's older sister was violent toward others").

4.      Plaintiff's claim to be "vice-prez over the pee wees for the Simon City Royals."

5.      Plaintiff's experimentation with alcohol, marijuana, uppers, "wickie sticks," and acid, the last between 10 and15 times. *Id.* at 10.

6.      "Various incidents and rule violations" in prison. *Id.* at 10.

7.      An alleged threat against Margot Gillen, Plaintiff's teacher. *Id.* at 11.

8.      An extremely unflattering opinion of Plaintiff by Ms. Gillen, who claimed that Plaintiff was so angry and scary to her that he made her question her religious beliefs and "shook [her] belief in humankind." *Id.* at 11.[9]

9.      Detention records indicating "oppositional, defiant, threatening, manipulative, and aggressive behaviors. *Id.* at 11.

10.     Letters written by Plaintiff that Dr. Obolsky claims exhibit, *inter alia,* evidence of entitlement, grandiosity, poor behavioral control, multiple rule violations, and sadism. *Id.* at 11.

11.     Plaintiff's need to "be more aggressive" to survive at the Audy Home. *Id.* at

---

[9]  In his defense, Plaintiff was at the time convicted of a crime he did not commit, and looking at a long sentence.  He was very angry and bitter.

12 ("I had to be tougher, I had to badder.").

12.     Plaintiff's intention after his conviction to "make a scene" at his sentencing because he was so angry about his conviction. *Id.* at 12-13 ("When you're fifteen years old and you've got, uh, all these different people ... trying you for a crime you didn't commit, you know, you tend to take a disliking to them.   ...   I charged them.  I was attempting to, you know, hit them, strike them, something ... kick the table, do anything, just do something to them. And, uh, before I got close to them, though, the guards ... tackled me and restrained me").   According to Dr. Obolsky, this demonstrates not only premeditated use of violence, but "the ability to use violence as an instrument to achieve a premeditated goal." *Id.* at 13 ("This incident exemplifies Mr. Jimenez's psychopathic personality features").

13.     Alleged rule violations in prison, including gang activity, contraband, intimidation, and fighting. *Id.* at 14.

14.     Plaintiff's description, in response to Dr. Obolsky's questioning, of his uncles' involvement in the gang, and how Plaintiff looked up to them. *Id.* at 16.

15.     Plaintiff's description, in response to Dr. Obolsky's questioning about how he learned that gangs had access to weapons and drugs. *Id.* at 16.

16.     Plaintiff's description in response to Dr. Obolsky's questioning, about how he experienced satisfaction from the respect that he felt gang membership "gathered for him." *Id.* at 17.

12

17.   Plaintiff's description, in response to Dr. Obolsky's questioning, about the "cat and mouse game between the police and us on the streets" where he and others would sometimes lie and be smartasses.  *Id.* at 17.

18.   Plaintiff's description, in response to Dr. Obolsky's questioning, of Plaintiff's belief that the older guys in the gang "wouldn't like even consider[] ever violating me."  *Id.* at 17.

19.   Plaintiff's description, in response to Dr. Obolsky's questioning, of how he would turn on gang members if they said something he didn't like and ... start beating on them."  *Id.* at 18.

20.   Plaintiff's description, in response to Dr. Obolsky's questioning, of his "rise through the ranks" in the gang as a 10 to13 year old boy, including his claim to have been "in charge" of six to twenty-five gang members.  *Id.* at 18.

21.   Plaintiff's description, in response to Dr. Obolsky's questioning, of how he would "lie" to other gang members about his location.  *Id.* at 18.

22.   Dr. Obolsky's claim that Plaintiff told him during the interview that (brackets in original): "It was [fun committing a crime], it depends on what it was."  *Id.* at 19 ("If I got away from the cops, I would feel, you know, some sense of accomplishment.").

23.   Plaintiff's description, in response to Dr. Obolsky's questioning, of how he "would use anything as a potential weapon if outnumbered or fighting an adult."  *Id.* at 20.

24.   Plaintiff's post-exoneration arrests, and the particulars of the disputed

incidents that underlie them.  *Id.* at 20-22.

25.     An order of protection his cousin placed against Plaintiff.  *Id.* at 22.

26.     A suggestion, without any further discussion or explanation, that "secondary elevations" on some of the written tests "are associated with longstanding characterological problems featuring diagnosis of ... borderline personality disorders."  *Id.* at 24.

27.     An incident with Plaintiff's girlfriend in August 2011 where a police report was filed concerning verbal, but not physical abuse, wherein Plaintiff "reportedly" said terrible and outrageous things about his girlfriend.

For each of these subjects, the question has to be, "why exactly should the jury hear this inflammatory evidence?"  As stated, each and every one of these topics has no relevance to Dr. Obolsky's sole admissible opinion, namely, that Plaintiff did not suffer from depression, PTSD, or any other disorder as a result of his wrongful incarceration.  Though woven into the discussion of this opinion in the Rule 26 report, all of these references are purely gratuitous.  They are designed to invoke prior bad acts, an alleged propensity for violence, and a perception that Plaintiff might really have been guilty of the Morro murder.  But none are connected in any way to Dr. Obolsky's sole admissible opinion: the absence of any emotional distress meriting a clinical diagnosis.  Plaintiff thus asks the Court to require the Defendants to go through these references, one by one, outside the presence of the jury, and justify why any of these references has anything to do with any of the issues in the case.

## CONCLUSION

For the foregoing reasons, this Court should enter an order barring all of Dr. Alexander

Obolsky's proposed opinions except for the opinion that Plaintiff's incarceration did not cause him

emotional injury and, as to that one admissible opinion, barring certain evidence on which the

opinion purports to be based.

<div style="text-align: right;">

Respectfully submitted,

**THADDEUS JIMENEZ**

By: /s/ Locke E. Bowman
One of his Attorneys

</div>

| | | |
|---|---|---|
| Arthur Loevy | Stuart J. Chanen | Locke E. Bowman |
| Jon Loevy | Lisa Castle | RODERICK MACARTHUR |
| Russell Ainsworth | VALOREM LAW GROUP | JUSTICE CENTER |
| LOEVY & LOEVY | 35 East Wacker Dr. | Northwestern University |
| 312 North May Street | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | | Chicago, IL 60611 |
| (312) 243-5900 | | |



**Health&Law Resource**

**Alexander E. Obolsky, MD, DFAPA**
*Medical Director*

Health & Law Resource, Inc.
100 West Monroe, Suite 1107
Chicago, Illinois 60603-1917

Phone (312) 456-4343
Fax (312) 456-8304

November 15, 2011

# Independent Forensic Psychiatric Examination of Mr. Thaddeus Jimenez

### Case Synopsis

Mr. Jimenez is a 32 year-old man who alleges that a 16-year incarceration based on wrongful conviction and beginning on 02/04/93 caused him to develop a condition of mental ill-being. In order to assess Mr. Jimenez's reported mental health consequences of this incarceration this examiner performed this forensic psychiatric evaluation.

Attorney Avi Kamionski from Andrew M. Hale & Associates requested the performance of this forensic psychiatric evaluation of Mr. Jimenez. This forensic psychiatric evaluation comprised of over 87 hours of record review, forensic psychiatric interview, forensic psychological and cognitive testing, and data analysis.

Based on the evidence and reasoning documented in Section 2 of this report, this examiner reached opinions to a reasonable degree of medical psychiatric certainty that Mr. Jimenez was exhibiting severe conduct disorder and substance misuse symptoms since age 10. Now as an adult, he exhibits antisocial personality features and cannabis abuse. There is no evidence that Mr. Jimenez's 16-year incarceration caused him to develop an independent condition of mental, emotional, or cognitive ill-being, such as posttraumatic stress disorder, major depression, or another condition of mental ill-being.

# Summary of Contents

Section 1.  Statement of Non-Confidentiality .........................................1

Section 2.  Conclusions ...................................................................1

Section 3.  Qualifications of the Examiner ...........................................33

Section 4.  Signature .....................................................................33

Appendix A .... Summary of Interview with Mr. Jimenez on 10/17/11

Appendix B...............................................Review of Selected Records

Appendix C  ............................................ Selective Summary of Letters

Appendix D   Transcript of Interview with Mr. Jimenez on 10/17/11

Appendix E ......................................... Sources of Information

Appendix F................................. Dr. A. E. Obolsky's Curriculum Vitae

Appendix G .................Expert Witness Deposition and Testimony List

Appendix H.......................Health & Law Resource, Inc. Fee Schedule

# Identifying Information

Name of Petitioner..........................................**Mr. Thaddeus Jimenez**

Plaintiff's Date of Birth ...................................................03/05/79

Plaintiff's Illinois Driver's License # ....................................J552-8167-9067

Defendant..........................................................City of Chicago

Case Number ......................................................09 CV 8081

Plaintiff's Counsel................................................ Stuart Chanen, JD

Defense's Counsel .............................................Avi Kamionski, JD

Referring Counsel................................................Avi Kamionski, JD

Evaluating Physician .......................................... A. E. Obolsky, MD

Dates of the Evaluation.................................08/02/11, 10/17/11

Date of Completion of Record Gathering......................11/02/11

Date of the Report .......................................................**11/15/11**

*i*

## Section 1.  Statement of Non-Confidentiality

On 08/02/11, at the initiation of the evaluation, Anna Kultys, MA, LPC informed Mr. Jimenez both verbally and in writing of the non-confidential nature of this forensic psychiatric evaluation (i.e., the non-confidentiality of the results of forensic psychological testing, the content of the forensic psychiatric interview, behavioral observations, evidence obtained from the review of records, and the opinions reached by Dr. A. E. Obolsky).

**Nota Bene:**  Various legal and professional regulations govern the disclosure of the psychological raw data.  Psychological raw data may only be disclosed in accordance with such regulations.

Mr. Jimenez, verbally and by his signature, acknowledged his understanding of the warnings provided and proceeded with the evaluation after having contacted and spoken with his counsel.  Mr. Jimenez further certified by his signature that all statements he will make throughout the duration of the evaluation at Health & Law Resource, Inc. (HLR) would be true and accurate to the best of his knowledge.

On 10/17/11, Dr. A. E. Obolsky warned Mr. Jimenez of the non-confidential nature of this forensic psychiatric evaluation and the fact that HLR and Dr. A. E. Obolsky will be providing both verbal and written reports to Andrew M. Hale & Associates.  Dr. A. E. Obolsky further informed Mr. Jimenez that HLR and Dr. A. E. Obolsky will not provide any opinions to Mr. Jimenez directly.  Additionally, Dr. A. E. Obolsky informed Mr. Jimenez of the non-confidential nature of the audiotaped forensic psychiatric interview before the beginning of the interview.  Mr. Jimenez verbalized his understanding of the warnings provided.  Mr. Jimenez proceeded with the forensic psychiatric interview after the above warnings were administered.

## Section 2.  Conclusions

**Opinions**

It is my opinion held with a reasonable degree of medical and psychiatric certainty that Mr. Jimenez exhibits the following condition of mental ill-being:

- DSM IV TR[1] Axis I Code 312.81 History of Severe Childhood-Onset Conduct Disorder Starting at Age 10
- DSM IV TR Axis I Code 305.90 History of Poly-Substance Abuse
- DSM IV TR Axis I Code 305.20 Cannabis Abuse
- DSM IV TR Axis II Antisocial Personality Features

It is my opinion held with a reasonable degree of medical psychiatric certainty that Mr. Jimenez did not develop a new condition of mental ill-being, such as posttraumatic stress disorder, major depression, or another condition of mental ill-being because of his 16-year incarceration.

**Reasoning**

The review of the contemporaneously produced records that document Mr. Jimenez's behavior before his arrest on 02/04/93 indicate the following.

Police reports indicate criminal activity since age 10.  Mr. Jimenez was involved in the following criminal acts (this list may include duplicate charges):

1. 03/10/90 → criminal damage to property (i.e., broken plate glass)
2. 05/28/90 → attempted strong armed robbery (i.e., confronted a victim in attempt to take away a bike)
3. 06/06/90 → simple battery (i.e., bit victim's hand and attempted to tear her shirt while truant from school)
4. 07/20/90 → theft (i.e., bicycle; then attempted to sell it to another person)
5. 12/07/90 → simple battery (i.e., verbal and physical battery including taunting and taking victims' property)
6. 01/10/91 → vehicle theft (i.e., allegedly drove grandmother's car without permission)
7. 02/05/91 → battery (i.e., threw a rock at a another student)
8. 11/15/91 → criminal damage to public property (i.e., etched gang symbols on his classroom desk; Mr. Jimenez was suspended for similar offences before)
9. 01/16/92 → vehicle theft (i.e., stole a car)

---

[1] American Psychiatric Association.  *Diagnostic and Statistical Manual of Mental Disorders*. Fourth Edition, Text Revision.  American Psychiatric Association, 2000.  Washington, DC.

10. 02/18/92 → aggravated battery (i.e., shot two victims in the back with pellets from attic window; Mr. Jimenez's family totally uncooperative with investigation)
11. 02/20/92 → aggravated battery (i.e., shot victim in the back, other passers-by, car window, and a bus with a BB gun)
12. 02/29/92 → weapons violation (i.e., apprehended with an air rifle used in previous attacks)
13. 03/15/92 → vehicle theft (i.e., driving a stolen car)
14. 04/30/92 → theft (i.e., stole tools out of a car)
15. 05/08/92 → weapons violation (i.e., mother calls police to report her son who is wanted on warrants; during arrest, found to possess 22 caliber starter pistol)
16. 06/07/92 → criminal damage to vehicle (i.e., broken rear car window)
17. 06/26/92 → attempted theft (i.e., attempt to steal a car)
18. 07/18/92 → aggravated assault (i.e., threw bricks and bottles at victims)
19. 08/08/92 → vehicle theft (i.e., driving stolen car)
20. 10/18/92 → burglary (attempted stealing and destruction of school property)
21. 10/25/92 → delinquent of criminal trespass to vehicle
22. 01/05/93 → burglary

The criminal acts noted above involved aggression toward others that included weapons. On at least two occasions, Mr. Jimenez caused physical harm to another. Mr. Jimenez damaged or destroyed other's property. Some of the crimes involved theft. Many of the above crimes were committed in cooperation with other youths.

The frequency of the known criminal acts has remained steady since Mr. Jimenez reached age 11; Mr. Jimenez was arrested between five and seven times a year. Violent acts that involved physical attacks on other persons started early, at age 11.

The above frequency, nature, and severity of criminal acts indicate that Mr. Jimenez exhibited a repetitive and persistent pattern of behavior in which the basic rights of others and major age-appropriate societal rules were violated frequently and severely. Mr. Jimenez verbalized his intent when he shot two victims (i.e., 02/18/92) in the back with a pellet rifle, stating:

> I shot both of them in their backs. I did it on purpose. I did it just because it was fun to do it. I didn't know them.

The next day, Mr. Jimenez once again shot a person in the back as well as shot at a CTA bus and the street. When apprehended, Mr. Jimenez reportedly told police the following:

> ... I know I was just arrested for the same thing yesterday. So what?...

The above two quotes indicate that Mr. Jimenez, at the early age of 12, exhibited pre-meditated brutality toward complete strangers. He recklessly disregarded others' safety for personal entertainment. These two episodes of interpersonal violence were not a product of aroused emotions (i.e., "crime of passion"), but calculated behaviors in order to "have fun." He showed extreme indifference to the feelings and welfare of other people. He exhibited no remorse or fear upon apprehension. These two episodes are examples of early age psychopathy, a very troubling and poor prognostic sign for living a law-abiding life. As records reviewed below will show, Mr. Jimenez exhibited behaviors of fire setting and cruelty to animals – a reliable diagnostic signs for psychopathy.

At the same time, Mr. Jimenez was a member of a gang (i.e., Simon City Royals) and committed some of the criminal acts noted above while cooperating and collaborating in a team effort with others. The ability to work together cooperatively in pursuit of illegal ends indicates that Mr. Jimenez is capable of cooperative behavior when it suits his goals; he exhibits instrumental aggression and disregard of social norms. His crimes since his early years are not driven by emotional dyscontrol. His criminal acts are means to desired ends.

Mr. Shawn Cosmen was a childhood friend of Mr. Jimenez. He testified on 03/07/11 that Mr. Jimenez "always carried a gun" and a "knife on him." He testified that he saw a gun in Mr. Jimenez's possession four to six times. Reportedly, Mr. Jimenez had different guns and he tended to show off his guns. He also testified that Mr. Jimenez threatened to shoot him and others.

Mr. Dennis Brady, Mr. Jimenez's probation officer, conducted a social investigation and then authored a report for the Juvenile Court of Cook County on 11/23/92. In this report, Mr. Brady documents that Mr. Jimenez expressed regret for his actions because he was caught; there was no evidence of remorse for "any crimes that he has committed."

The list of previous police and court contacts includes 10 station adjustments and 13 court referrals. Mr. Brady expressed his opinion that Mr. Jimenez is:

> ... much more of a ring leader and a leader than he is a follower. The minor has been involved with too many different crimes with too many different people, to believe that this is all just a matter of him being in the wrong place at the wrong time with the wrong people.

Mr. Jimenez admitted to Mr. Brady that he has been involved in crimes where he avoided detection by law enforcement. He has been a member of the Simon Royals Street Gang since 1990. Apparently, other family members were members of the same gang. Mr. Jimenez admitted to probation officer Brady that he has been drinking alcohol with members of the gang.

The school report to Mr. Brady indicated that Mr. Jimenez was a good and bright student who exhibited no disciplinary troubles at school. Mr. Brady concluded

his report by stating that in his opinion, this is a "borderline" case, where Mr. Jimenez may become permanently involved with the criminal justice system.

Mr. Brady authored a supplemental report on 02/17/93. According to Mr. Brady Mr. Jimenez is "showing very little emotion in relation to the crime that he has been charged with. Minor continues to deny his involvement in this crime to the P.O., however he does not seem very upset about the fact that he is pending such a serious matter."

According to the report of the school principal to the probation officer, Mr. Jimenez lead other youths at the school to get into trouble, while often managing to keep himself in the background, even though it was his idea to do the behaviors. Reportedly minor was carrying weapon to school, a rumor never substantiated.

At the time of this supplemental report, Mr. Jimenez was heavily involved with the gang despite a serious beating he received in December 1992 and his probation officer's previous thoughts that the minor started to separate himself from the gang. Thus, there is no evidence to substantiate a current claim that Mr. Jimenez was doing "better" before his arrest in February 1993.

The probation officer recommended transferring this case to the adult court due to the extensive history of delinquency prior to the current charge of murder. In his judgment, a 30-month "stint" in the penitentiary was insufficient.

Mr. Brady testified on 10/21/10. He testified in part as to the following:
- "When you first meet Mr. Jimenez he comes across cooperative and then you become aware of numerous problems"
  - *This is indicative of Mr. Jimenez's craftiness and superficial charm in interpersonal conduct* (italicized statements are by this examiner in this paragraph)
- Mr. Jimenez was suspected of killing some of the classroom pets
  - *This is a sign of psychopathy.*
- Mr. Jimenez was suspected in burglary at Reilly school
- Mr. Jimenez was not genuine in expressing regret for committing his crimes
  - Mr. Jimenez expressed regret over the fact that he was apprehended
    - *This is indicative of lack of remorse and guilt*
    - *This is indicative of failure to accept responsibility for one's own actions*
- Mr. Jimenez shared that he avoids getting sentenced by continuing court dates and then witnesses eventually don't appear
  - *This is a troubling example of Mr. Jimenez's ability to analyze a situation and then execute highly calculating behaviors to achieve desired ends*
- Mr. Jimenez exhibited pride in his gang membership
  - *This is indicative of identification with gang culture*

- Mr. Jimenez did not show more concern about murder charge compared to his previous charges; his response to murder charge was similar to previous charges
  - *This is indicative of shallow emotionality*
  - *This is indicative of callousness and lack of empathy*
- Mr. Jimenez threatened his co-defendant's father (Mr. Ezequiel Romo)
  - *This is indicative of ruthless aggression*
- Mr. Jimenez was confrontational with Mr. Brady during their last meeting
- Mr. Jimenez was beaten severely in a gang fight around Christmas 1992
- Mr. Jimenez developed good relationship with Mr. Sutton, UDIS case worker
  - They reportedly made progress
  - *The review of Mr. Sutton's notes indicates most superficial contact between Mr. Sutton and the minor*
- Mr. Jimenez responded with improved behaviors to increased supervision by Jahn school
- Thought Mr. Jimenez was capable of murder
- Two reports from detention teachers:
  - First unsigned report stating that Mr. Jimenez threatened the father of co-defendant
    - Testified at hearing that a teacher, Ms. Gillen, authored this report
  - Second report by Ms. Gillen that Mr. Jimenez threatened a non-identified teacher and Mr. Brady (see below for Ms. Gillen's testimony)
- Mr. Jimenez was "very close with his extended family; his grandmother, his cousins, his aunts, his uncles."
  - *This is consistent with commitment to the gang, as at least two of the uncles were members of the same gang*
- There was extremely low chance of turning Mr. Jimenez around
  - Mr. Jimenez was a very high risk
  - We were going to continue on this path
  - Eventually something serious was going to happen
  - Eventually Mr. Jimenez would end up in DOC

The evidence supplied by probation officer Brady documents several relevant and important facts. Mr. Jimenez was an active and committed gang member, who exhibited no remorse for his crimes, who felt sorry that he was apprehended, but who took no note of court involvement or his mother's reported distress at his delinquent behaviors. Officer Brady judged Mr. Jimenez to be a very high risk for further future criminal behavior and incarceration in the Illinois Department of Corrections (IDOC). He was a bright student that was able to get school officials to want to help him; he was acting as a leader and instigator of trouble while being able to maintain distance and providing no evidence of his involvement. As the italicized statements above indicate, Mr. Jimenez exhibited various symptoms of psychopathy.

Mr. Thaddeus Jimenez                    6 of 33                    11/15/11
DL # J552-8167-9067

It is of particular note that Mr. Jimenez exhibited no evident distress over his first-degree murder charge. This is evidence of significant emotional self-control for a 13-year old.

In December 1992, Mr. Sutton was a UDIS counselor for Mr. Jimenez. The contact form indicates that Mr. Jimenez told Mr. Sutton that he had no problems with a rival gang over the Christmas break. At no point did Mr. Jimenez inform his counselor that he had suffered a severe beating at the hands of a rival gang over the Christmas holiday. Furthermore, the records indicate that the counselor relied solely on Mr. Jimenez's self-report of pledging cooperation, staying home, and staying out of trouble.

The above-reviewed data document that before the alleged crime on 02/03/93 and his conviction, Mr. Jimenez was exhibiting behaviors of severe and profound conduct disorder.

The review of the contemporaneous records from the time Mr. Jimenez has spent incarcerated between 1993 and 2009 indicate the following.

Dr. Marchlewski, a child and adolescent forensic psychiatrist, evaluated Mr. Jimenez in April 1993. This psychiatrist interviewed Mr. Jimenez's mother. She reported that her son was not depressed in detention. She denied psychotic symptoms, neurovegetative symptoms (i.e., problems with sleep, appetite, or concentration), she denied her son having nightmares, flashbacks, hypervigilance, de-personalization, or de-realization.

Dr. Marchlewski interviewed Mr. Jimenez. Mr. Jimenez denied being "crazy," disturbed, or troubled. He identified gang membership as his only problem. He described himself as feeling bored but also happy most of the time; he denied hallucinations when not on drugs, or any history of suicidal ideations or acts. He denied neurovegetative symptoms. He denied symptoms of posttraumatic stress disorder, such as nightmares, flashbacks, hypervigilance, de-personalization, or de-realization.

Mr. Jimenez did not provide an explanation for the numerous petitions he has accumulated. When asked about juvenile arrest warrants (JAW), he ventured that the court must have had a wrong address and thus he was unaware of his court dates. When asked about his relationship with his mother, Mr. Jimenez answered: "I do what I want," a statement echoed by his mother.

He reported misuse of marijuana three times a week since the previous summer, beer daily, and about six hits of acid every weekend. Mr. Jimenez reported that he has a history of fire setting to garbage cans. He does not like cats and tends to kick them and throw them out of the window. The fire setting and cruelty to animals are symptoms of psychopathy.

When asked as to the reason why so many of his detentions were stricken with leave to reinstate (S.O.L.), Mr. Jimenez replied: "I play it slick. I don't go to

court and then the others with me get found delinquent they get their sentences and then when they catch me the witnesses don't want to come because they figure somebody already paid for the crimes so they let me go." This is an example of highly developed manipulative behavior and planning. It is also makes a lie of his prior statement as to why he got many JAWs.

According to Dr. Marchlewski, Mr. Jimenez exhibited various negative behavioral and prognostic aspects, such as a history of multiple court referrals, evidence of manipulative behaviors in evading consequences for his delinquent acts, and, despite probation officer's great investment into Mr. Jimenez, lack of positive response to various interventions. Despite voicing the desire to leave the gang, Mr. Jimenez does not do so. He has a significant alcohol and drug misuse history. The positive aspect to Mr. Jimenez's functioning was his ability to do well academically. Dr. Marchlewski's diagnosis was conduct disorder and poly-substance abuse.

Dr. Marchlewski's evaluation and report further establishes presence of psychopathy. Mr. Jimenez's fire setting and cruelty to animals is pathognomonic. His manipulative behavior within legal system is remarkable for someone so young and is consistent with a precocious leadership role within the Simon City Royals as well as observed delinquent leadership at the school. In addition, a direct evaluation was performed for psychotic, mood, and anxiety disorders, including symptoms of posttraumatic stress disorder. No clinical disorders were identified other than conduct disorder and poly-substance abuse.

Dr. Viale-Val, a psychologist, performed a forensic psychological evaluation of Mr. Jimenez and authored a report dated 05/06/93.

She reported that Mr. Jimenez showed "only mild fluctuations in affect and behavior during the clinical interview and examination," and he complained only that his lawyer was "not doing enough to get him out."

She noted his self-report of use of inhalant sprays, drinking until drunk on weekends, and often going to school "high." He also reported the use of marijuana and other drugs.

Mr. Jimenez admitted to frequently occurring fights, and he reported that he was seriously injured in an attack by rival gang members in December 1992. He noted that he had failed seventh grade, and he was failing most classes during eighth grade at the time of his arrest. Dr. Viale-Val noted that Mr. Jimenez's mother regarded her son as out of control at age 10 when she sent him to his biological father. His mother reported that her son stayed away from home for several days at a time on several occasions. She also reported that he has been truant from school on several occasions.

On interview, Mr. Jimenez denied psychiatric symptoms. He admitted to being "paranoid." He stated "I always watch my back" and he does not trust anyone outside his family since he joined the gang. He is afraid of walking into the

wrong neighborhood and very worried about his future. He denied traumatic
experiences despite serious injures sustained when attacked by a rival gang during
Christmas 1992.

He described an active social life, but he has no close friendships and often
prefers to be alone; according to his mother, he assumed the role of the man of
the house; he can be moody and oppositional.

According to the school reports, Mr. Jimenez was failing seventh grade before
his current charge. This was due to poor attendance.

Mr. Jimenez obtained a verbal IQ score within the low average range, a
performance IQ score within the average range, and a full-scale IQ score within
the average range. The performance IQ was 19 points above verbal IQ. Dr.
Viale-Val reported that Mr. Jimenez displayed "aggressive tendencies or
impulses, difficulties in controls, and entrenched antisocial tendencies... the
history of parental discord and primarily the unavailability of a strong parental
figure have contributed to his difficulties... Gang affiliation, instead, appears to
have provided the grounds for his upward strivings and the needed structure
lacking in his home environment." Dr. Viale-Val diagnosed Mr. Jimenez with
group type conduct disorder and substance abuse disorder.

Several important points are documented in Dr. Viale-Val's report. First, there is
no evidence of mood or anxiety disorders, such as major depressive disorder,
acute stress disorder, or posttraumatic stress disorder. Second, behavioral and
academic difficulties are traced back to conduct disorder, substance abuse, and
various environmental factors – all pre-dating his incarceration on the first
degree murder charge. Mr. Jimenez reported a suspicious style of relating to
others that pre-dates the date of the crime and his arrest on 02/04/93.

Ms. Francek, a psychologist, evaluated Mr. Jimenez and authored a report of
psychological assessment dated 05/10/93. The psychologist reviewed Mr.
Jimenez's history, which is consistent with the above noted facts.

Ms. Francek highlighted a family component to Mr. Jimenez's delinquent
behaviors. His father exhibited a pattern of irresponsible behavior in his role as
a husband and father. He lacked steady employment, misused substances, and
reportedly had a criminal history. Mr. Jimenez's older sister was violent toward
others.

Mr. Jimenez reported to this psychologist that he is a "vice-prez over the pee
wees" for the Simon City Royals. He reported that he holds "money for dues
and for guns." At the same time, Mr. Jimenez blamed his gang involvement for
his delinquent behaviors. His school history is noted for failing grades and
behavior problems. The minor's behavior adversely affected his school
functioning.

Mr. Thaddeus Jimenez                    9 of 33                    11/15/11
DL # J552-8167-9067

Mr. Jimenez was curious about his court date and asked legal questions. He wanted to do well on tests and asked how he compared to others.

According to this report, Mr. Jimenez experimented with beer, wine, hard liquor, marijuana, uppers, and wikki sticks. He used acid between 10 and 15 times.

On testing, Mr. Jimenez exhibited over a 10-point difference between his verbal and performance IQ scores. His Bender-Gestalt drawings indicated the potential for impulsivity and acting out behaviors.

The examination found no evidence of mental disorder such as psychosis, mood, or anxiety. His problems were seen as behavioral in nature. Ms. Francek wrote: "he is quite streetwise, adept at trying to avoid legal consequences, and tends to project blame onto others, such as police and peers for his many court involvements." His diagnosis was group type conduct disorder.

The review of the Cook County temporary detention center records dated from 03/13/93 to 09/07/94 indicates that Mr. Jimenez was involved in various incidents and rule violations. The described behaviors indicate oppositional, defiant, and manipulative attitudes toward authority figures and hostile aggressive conduct with peers.

Mr. Jimenez wrote letters from the Audy Home to Ms. Elizabeth Heatley. Mr. Jimenez wrote on several occasions about his friend Larry, who he thought was a snitch. In these letters, Mr. Jimenez wrote that he will kill Larry and expressed his pleasure at the rumors that Larry was shot. Most distressingly, Mr. Jimenez planned to stop Larry from testifying by getting another gang member to "kill him."

A school report by Ms. Gillen, a teacher, dated 05/27/93 documents that Mr. Jimenez made threat to kill the co-defendant's father if the co-defendant said that Mr. Jimenez "pulled the trigger." According to the report dated 06/05/93, Mr. Jimenez "continues with threat making. Now he threatens his teacher and probation officer."

Ms. Gillen testified on 11/04/10 that on 05/25/93, Mr. Jimenez threatened to kill a fellow student's father if that student were to testify against him. Mr. Jimenez reportedly threatened this student on multiple occasions (i.e., between three and five times). Ms. Gillen testified that Mr. Jimenez did not threaten the student with violence in case the student lied on him, but in case he told the truth. Ms. Gillen testified that the other student (i.e., the one Mr. Jimenez threatened) was transferred out of her classroom.

On 05/25/93, Mr. Jimenez stated that he already took care of another witness (i.e., set fire to residence of an older man). He bragged that his uncle paid the judge off. He threatened Ms. Gillen. Ms. Gillen described that when making threats, Mr. Jimenez was loud and pacing. Ms. Gillen testified that Mr. Jimenez

exhibited fighting, attempts to steal things, being uncooperative, and was "sneaky."

Ms. Gillen testified that Mr. Jimenez threatened her and his probation officer on 06/05/92.

Ms. Gillen testified that "the reason I recall Thaddeus is I remember he shook my belief in humankind, made me question my religious beliefs very deeply, and I have never seen a child that I was as scared of. Nor had I seen a child that I took their threats as seriously as this child. That's why this child stands out in my mind." She testified further: "This was a kid I was afraid of."

During the forensic psychiatric interview, Mr. Jimenez recalled the above events quite differently. He reported:

> I think I got into one and -- and I could be wrong -- but I, I only remember one incident, it's because it became a big issue in court, where a teacher, one of the teachers wrote me a disciplinary report, wrote a disciplinary report on me for, she said I was threatening the, uh, the codef...  the codefendant, the guy on the case with me, said I was threatening his father. She said I, I was making remarks about threatening his father.

> I don't remember ever that happening. And I don't even know if she got the story right. I just know one day I went to court and I seen the paper where I didn't even know she had written the report.

> I just know one day I got it and I don't, you know, I was, at first, I, I, you know, I thought she was somebody else doing it. And then the, uh, a couple days later, I confronted her about it, I said, man, you know, you wrote this and then she had me moved to another class.

The review of the detention records indicates presence of oppositional, defiant, threatening, manipulative, and aggressive behaviors. These reports do not indicate presence of psychosis, mood, or anxiety symptoms or signs.

The review of letters written by Mr. Jimenez between 1993 and 2005 indicate continued involvement with the gang, leadership role among other inmates, planning and executing legal steps to achieve release or reduction in sentence, as well as evidence of manipulation, entitlement, grandiosity, blaming others, poor behavioral control, sadism, and multiple instances of rules violations. None of the reviewed letters indicated any complaints of or evidence for mental health difficulties such as depressive, anxiety, or other symptoms.

During the forensic psychiatric interview, Mr. Jimenez provided history of his initial almost two year incarceration at the Audy Home until he was convicted of first degree murder. At no time before the verdict did Mr. Jimenez think he would be convicted. He was focused on winning his case, worked with

attorneys, and never lost hope. His attorneys did not suspect he was not fit to
stand trial. The above reviewed mental health evaluations further disprove any
and all contentions that the arrest event or time he spent incarcerated before the
final verdict was traumatic as defined by the DSM-IV-TR.

Indeed, Mr. Jimenez quickly sized up the situation and came up with a plan on
how to establish his place within the hierarchy at Audy Home. He reported:

> I had to, uh, be more aggressive. I had to be tougher, I had to be badder.
> Because on the streets in my neighborhood, I was at the top of the food
> chain.

> But here I am in, in a whole new world at the bottom of the food chain.
> I had to work my way up to the middle, at least, as quick as possible. So
> I was fighting, uh, I was engaged in gang activity. I, I immediately, uh,
> found some, some guys with some of the guys who were in a similar gang
> as me, in the same gang as me, and I...

Mr. Jimenez further reported to this examiner that after observing the situation
at Audy Home for a few days he figured out what he needed to do to place
himself within a gang hierarchy to keep himself safe. Within a short time, he
achieved his goals. He denied any sexual and serious physical injuries or
untoward events. He further reported that because he steadfastly maintained his
innocence and because his family was friendly with staff during their visits, staff
concluded that he was innocent, protected him, and provided more supportive
treatment.

Mr. Jimenez finished grade school while in Audy Home. He reported he was
one of the brightest kids there. He enjoyed school, looked forward to visits with
family, and never became hopeless for the almost two years he spent in the Audy
Home.

Thus, Mr. Jimenez's current recollections of his initial arrest and subsequent
almost two year stay at the Audy Home substantiate the above reviewed
contemporaneously produced records that he did not experience any condition
of mental ill-being, such as major depressive or posttraumatic stress disorders.

A telling episode occurred once Mr. Jimenez was sentenced. He was mentally
prepared for a long sentence and made up his mind to "make a scene." He
reported:

> I go, a month later, I go back to court. I get sentenced. During my
> sentencing, I had made up my mind, uh, to make, to make a scene in the
> courtroom. I had made up my mind ahead of time to make a scene in the
> courtroom. Uh, I didn't know what I was going to do, I just knew
> that these people, I looked at them like, I looked at the court, I looked at
> the system, I looked at the State's Attorney's Office, I looked at the
> Chicago Police Department as my enemy.

I just seen them as that. When you're fifteen years old and you've got, uh, all these different people processing you, charging you, uh, trying you for a crime you didn't commit, you know, you tend to take a disliking to them. Uh, and that's what I did. I, I looked at them as my enemy. I looked at the judge as working against me, I looked that the police as my enemy for putting me in here, I looked at the State's Attorney's office as being my enemy for trying to prosecute this case and convict me of doing a crime that I knew I didn't do.

Uh, so, uh, I looked at them, uh, the only one who was in the courtroom at the time who I could, uh, uh, release some of my anger out on were the State's Attorney's Office. Uhm, so after I got sentenced, I was walking back towards the, uh, the back room to go back to the waiting bullpens. And I seen the State's Attorney's Office, uh, both, uh, State Assistant State Attorneys were sitting at the desk and, uh, and I charged them. I was attempting to, you know, hit them, strike them, something...

...kick the table, do anything, just do something to them. And, uh, before I even got close to them, though, the, the guards, the sheriffs, County sheriffs, they tackled me and restrained me and put me in the back. But that was after I was sentenced to fifty years. Now, when I went to the courtroom that day, my mind frame was completely different because I had already accepted the fact that I got convicted. You know, I had a whole month to let it soak in, let it absorb, and my lawyers prepared me for the worst on, as far as the sentencing goes. They told me about my, you know, because of my background and because of the seriousness of the case that I was probably going to receive a hefty sentence, and not the twenty years I was hoping for.

You know, he [my attorney] prepared me [for a lengthy prison term] and then when the judge said fifty years, I kind of laughed it off, you know. You know, I, in my mind, I wasn't going to do the fifty years. In my mind, there was gonna be some way somebody was going to fix this case.

So they sentenced me to fifty years and it was like, it was a joke to me. Uh, so on my way out the courtroom, I wanted to, you know, lash out at somebody because I didn't care no more.

This episode encapsulates the premeditated use of violence, the ability to hold his temper in check, the ability to use violence as an instrument to achieve a predetermined goal. In this case, the goal was revenge. This incident exemplifies Mr. Jimenez's psychopathic personality features.

The review of the records from various correctional facilities between 1994 and 2009 indicates the following.

Mr. Jimenez reported on the suicide probability scale no symptoms consistent with depression, poor future orientation, or hopelessness about his future. This form was filled out on 11/29/94 shortly after he was sentenced (i.e., 11/22/94) and transferred to department of corrections. This indicates that during the most stressful time (e.g., found guilty, sentenced, etc.) Mr. Jimenez did not lose hope, felt depressed, or feel anxious.

Mr. Jimenez was medically evaluated the next day on 11/30/94 at IYC-Juliet. This evaluation did not note any mental health difficulties. Review of medical transfer forms between Juliet and Stateville facilities between 1994 and 1998 indicates that no mental health difficulties were identified or reported.

The review of IYC-Joliet medical records indicates that no mental health difficulties were identified or reported between 12/01/94 and 10/16/96. On one occasion in November 1995, Mr. Jimenez "played with staff" pretending to have various physical symptoms. He exhibited none of the symptoms next day and was upset he was placed on crisis status. In June 1996, Mr. Jimenez ended up in four way leather restraints after he started a fire; he was angry. No mental health difficulties were observed or identified.

A judicial review by IYC-Juliet staff dated 09/27/96 and addendum dated 11/15/96 documented 39 disciplinary tickets over a period of 22 months at IYC-Juliet. Several infractions occurred in between the hearing regarding transfer to the adult division. Thus, even when faced with such a transfer, Mr. Jimenez continued his negative behaviors. His misconduct involved gang activity, assaults, fighting, trafficking, intimidation, contraband, and disobedience among other infractions. According to the correctional staff, Mr. Jimenez's gang involvement was "serious."

Mr. Jimenez underwent a mental health evaluation on 11/20/96. The evaluation identified no mental health difficulties that required mental health treatment.

Mr. Jimenez arrived to Stateville in early 1997. The reception medical evaluation noted no mental health difficulties. The mental health evaluation on 03/12/98 diagnosed Mr. Jimenez with no clinical psychiatric condition. He was diagnosed with antisocial traits (a rule out diagnosis). No follow up was scheduled.

During 03/04/99 mental health review, Mr. Jimenez reported "visions" since 1994; he presented with anxious affect. On 03/12/99, a mental health evaluation was conducted due to Mr. Jimenez's report of anxiety, depression, and visions. He also reported problems with a female outside the institution. Mr. Jimenez reported prophetic dreams to the psychologist. He did not report any problems with women inside or outside of the institution. The psychologist found no evidence of acute anxiety or depression. Apparently, Mr. Jimenez was in segregation for infractions that included smoking marijuana.

In a 06/03/99 mental health evaluation, Mr. Jimenez denied the presence of any mental health difficulties.

Mr. Thaddeus Jimenez                    14 of 33                    11/15/11
DL # J552-8167-9067

Mr. Jimenez was at Pontiac correctional facility between 1999 and 2002. Mr. Jimenez was screened on 06/08/99. He reported no mental health difficulties. The review of the available records indicates that while at this facility, Mr. Jimenez neither reported nor exhibited mental health difficulties. Mr. Jimenez underwent a regular mental health screenings and each time he was found to be without mental health difficulties or in need of mental health treatment.

Mr. Jimenez was at Menard correctional facility from 2002 to 2003. Mental health reviews were performed regularly. Each found that Mr. Jimenez neither reported nor exhibited mental health difficulties. No psychiatric diagnoses were assigned.

Mr. Jimenez was at Western Illinois Correctional Center in 2005. While in this facility, Mr. Jimenez reported poor attention. He also reported a history of special education classes and that Ritalin was recommended but never tried. He reported depressed mood, despite normal affect and observed euthymia, and terrible sleep with difficulty falling asleep and staying asleep. No psychomotor symptoms were observed. Referral was made to a physician.

During a 03/17/07 mental health evaluation, Mr. Jimenez denied any psychiatric difficulties. He was not diagnosed with any condition of mental ill-being.

The review of Danville Area Community College revealed that in spring 2007, Mr. Jimenez took an introduction to sociology class and received an A. In summer 2007, he took an art history class and received a grade of C; in the fall 2007, he took political science and logic classes, and achieved a grade of A in both courses. He took a psychology class in 2009 and received a great of an A.

The contemporaneous evidence from between 1993 and 2009 indicates that Mr. Jimenez did not exhibit or report any pathological symptoms of anxiety or depression indicative of a diagnosable condition of mental ill-being. Indeed, Mr. Jimenez exhibited and reported behaviors that indicate that he was not experiencing a condition of mental ill-being other than his pre-existing conduct disorder and adult antisocial behaviors. There is no clinical evidence for posttraumatic stress disorder or any other anxiety condition. Furthermore, there is no evidence for any mood disorder (e.g., major depression) during the time of his incarceration. None of the multiple mental health professionals that evaluated and examined Mr. Jimenez between 1993 and 2009 ever diagnosed any clinical condition of mental ill-being currently alleged by Mr. Jimenez.

During the forensic psychiatric interview, Mr. Jimenez reported that his maternal uncle, Mark, taught him how to be manly, e.g., how to protect himself, how to fight, and how to maintain respect from others. These skills, according to Mr. Jimenez, came handy when he was incarcerated because he was able to keep himself safe and respected.

Mr. Jimenez reported that he started out stealing and fighting in the first or second grade. In one of the earliest fights he recalls, he punched the other kid in the face.

His two maternal uncles and cousin, all ten years or so older than he, were members of the same gang Mr. Jimenez joined. By the time he started to get into trouble, Mr. Jimenez reported uncle Mark "cracking down" on him, because he left the gang and had a family and who ran his own construction business.

Mr. Jimenez explained that he joined the gang because:

> Because I always wanted to. I seen my uncles, they were, I joined the same gang that my uncles were and my cousins were in. I wanted, I knew that's what they were part of, that was the gang that they were a member of and I wanted to follow in their footsteps. I wanted to do it too… I wanted to be in that same gang. I wanted to do the things they did. I wanted to walk their footsteps and that's what I did.

He liked what membership in the gang did for him, he explained:

> I did like it at first because it was, I was cool, I was one of the guys. I was in the neighborhood, I could walk around the neighborhood, I could do what I want in the neighborhood. Everybody knew who I was and they respected me… yeah I liked that feeling at first. I liked being okay this is, I'm somebody, I'm a part of something that's recognized in the neighborhood…

Eventually, Mr. Jimenez discovered other aspects of gang membership, he relayed:

> But when I got, when I finally started to understand the ins and outs of it I knew I had got myself into some serious shit. I didn't know about dues or, or, or, or treasuries or, or patrolling the neighborhood with guns and lookouts and drug dealing…

> For example drug dealing, you know, I had no idea that gangs, it was so organized like they were, gangs had an organized system for distributing, for getting, packaging and distributing drugs, I had no idea that was part of that thing, you know. I had no idea it was a business of a gang to sell drugs.

> Another thing is with, with the weapons, I had no idea that they, you know, that there was an armory if you will, that there was a stash of weapons for the gang…

> I didn't know there was guns involved like that, but when I started seeing how serious it was like that I was like 'whoa' now I know what my uncles were talking about and then there was all this, it was, I was, it was a

complete like, like shock to learn the structure of the organ... the organization behind the whole thing...

I quickly developed a reputation as a bad ass in the neighborhood quickly, quickly. I was, this is what I was told, not, I was told to do this, I was told to do that, whatever I was told to do I did it immediately and without question and without hesitation whatsoever, I did it and that gained my reputation for me. People would call this guy is serious about it, you know, don't mess with him, he's a gangbanger, you know, and...

Mr. Jimenez experienced satisfaction from his reputation and the respect gang membership gathered for him. He explained:

It, in, in some ways it made me feel good, it did, I cannot lie. In some ways, you know, this was a sense of power, a sense of authority for me because I could walk around the neighborhood and none of the other kids would mess with me, none of the other kids would be scared of or would, all the other kids were scared of me. Even neighbors, you know, even adults in the neighborhood they knew who I was and, you know, they didn't give me no problems. All the girls in the neighborhood they liked me, not because they knew me because I was a good guy, but because they knew who I was and they knew of me and, you know, in that, in that aspect, you know, I liked it because I was, I was force, I was somebody...

Mr. Jimenez described his relationship with the police at the time, he stated:

It was a cat and mouse game between police and between us on the streets. They want this and we, you know, we didn't want it. So when they would say show me where stolen cars are, all your stolen cars are at, not mine but the gangs they mean, I would tell them, "We don't have any stolen cars." But I was lying because they were the police, you know, I'm not gonna incriminate myself or my so called brothers at the time...

Because I was smartass to the police, I was, I'm not gonna lie... They'd [policemen] get out of the car and if they get out of the car and they were older, you know, officers, I'd just take off on them because I know they couldn't catch me...

Mr. Jimenez worked on establishing his place within the gang hierarchy, he explained:

... I played my part to the fullest, my role. I lived, I played it to the fullest so that [getting violated] wouldn't even be a possibility in my book. The older guys they wouldn't even, after it got, it got to a point where they wouldn't even like considering ever violating me. I was unpredictable to them, you know, they're like...

They don't know if I would turn on them. It got to the point where like this kid is out of control, this kid is, you know, we let him loose and he's, he's uncontrollable now...

... I purposefully developed my reputation so because this is what I was told to do, I was told to go, if I was told to go do this I went and did it and... . I started doing stuff to the extreme, not to the extreme, but I just started doing, I just I was constantly in trouble, I was constantly jumping on guys, you know, beating on my, you know, some of the old gang members, the young ones my age I'll turn on them if they say something I didn't like I'd turn on them and start beating on them...

Because I, I just felt like I was empowered. The more and more stuff I did successfully for the gang the more and more I felt empowered.

Mr. Jimenez rose quickly through the ranks, as he explained:

... it got to the point where the older guys were letting me do what I wanted to do, like let him do what he wants to do, leave him alone because I think, I honestly think they were scared of me. I honestly think that they were like this kid we done created a demon, you know what I mean, this kid he's, you know, intimidating.

Absolutely, absolutely [I got more responsibilities]. As the leader of the younger guys. Yeah they put me at that quick and I was the newest one. As far as that group goes I came in Johnny come lately as far as cause most of them other kids they had been in the gang for a year or two before I did. They were already established in the gang. And I came along and, and joined and then within a year I was already, you know, at the top.

Depending on the season, Mr. Jimenez was in charge of between six to twenty five gang members. According to Mr. Jimenez other kids like him, he stated:

the younger guys were getting on me because they liked me, the young the kids that were my age they liked having me around because I was exciting, I was always like, I was the leader, so, you know, they was always, there was always something to do when I was there. We're gonna go do this, we're gonna go do that, we're gonna go do this.

Whenever Mr. Jimenez decided not to fulfill his gang duties, he would "fade away." When he reappeared, he would lie that he was at Audy home. He established himself as the most reliable member and used that reputation to his advantage. Lying to his fellow gang members was not an issue for this young man.

Mr. Jimenez described his behaviors in school:

I was having gang problems there. I was having, I was, I was, I don't know to say it, like I said a troublemaker, but it was, it was, it wasn't just that it was, there were a lot of kids that were troublemakers, but they had me like in the behavior disorder class, so there were some periods I'd go down there and just hang out there and stuff like that.

[I caused other problems such as] fighting, like I wouldn't listen to the teacher, the teacher, I would get bored of class and the teacher could be on the chalkboard doing her lesson and I'd just leave the class and walk out.

And it got to the point where they didn't even, they didn't even care no more. They were like 'man let him leave' because they didn't want to go through the whole, you know, the whole trouble of calling the principal and having the principal call my parents, them coming down to the school and sitting there and talking to me again, you know, like why are you just leaving the class, you can't just leave the class and walk home.

... The kids in the school loved me... The kids in the school loved me because I was fun, I was, they loved having me around, I was a good guy. It's just that the teachers and the administration didn't want me because I would never listen to them and I would just like, I was a clown. They would tell me to sit down and I'd move from my desk and go to someone else's desk. They'll tell me don't sit there and I'd sit there anyway. They'd call the principal in, they'd call principal and I'd run out the other door. It was, I was just being, you know, a hassle for them.

During the forensic psychiatric interview, Mr. Jimenez described his various difficulties with the law while he was a juvenile. In his description of his crimes, Mr. Jimenez typically found a way to minimize or excuse his behavior. He also minimized the sense of enjoyment he experienced at the performance of the illegal acts. Yet, he did admit the following:

It was [fun committing a crime], it depends on what it was. Sometimes it was exhilarating; I don't want to say fun, but exhilarating like the adrenaline... Yeah, yeah like a high. Sometimes, it depends on what it was I was doing. Like if I'm running from, if I was running from the cops and, you know, I knew I was getting away or I did get away from him yeah it was, I got a high from that, the adrenaline was pumping through my veins and, you know, I felt like I, I beat him, you know. If... Because I got away from him. I said, I said if I got away from the cops I would feel, you know, some sense of accomplishment.

I would be, yeah and I would be excited about that like I just, I just got, I just got away from the cops. Or like if I get in a fight and I win the fight obviously I'm gonna be feeling good about that even though I just I probably hurt the kid, you know, I'm going to feeling good about that because, you know, I'm a boy.

Mr. Thaddeus Jimenez                    19 of 33                    11/15/11
DL # J552-8167-9067

Mr. Jimenez reported that when fighting, he would use anything as a potential weapon if outnumbered or fighting an adult:

> If it was just, if it was me and another kid then I would most definitely, that's another thing my uncle taught me, you know, don't ever, you know, use a weapon on a person like that. He said that's a coward. So, you know, if I was fighting one person yeah if I had to take my ass whipping, I would take my ass whipping if it was just a one on one fight and if I won I won, but there was times when there was two or three kids trying to jump on me or, you know, and I did pick up a stick or something. There was times where it was, it was a grown man, you know, trying to beat me and I would pick up a stick or a brick or something and defend myself.

In this description, Mr. Jimenez once again places himself in a good light; he would only use weapons to defend himself or his family.

Mr. Jimenez spoke at length at how he was raised never to use violence against women. His uncles taught him this rule and the fact that his father was physically abusive toward his mother as well as the fact that his sister killed her boyfriend during a physical fight (she was convicted of manslaughter and served eight years) further reinforced the idea he is not to be physically abusive to women. He denied being physically abusive toward women.

The review of the available evidence since the time Mr. Jimenez was released from prison in May 2009 indicates the following.

Police arrested Mr. Jimenez after his release from prison nine times. He also served six months in Cook County jail. The following is a list of police arrests based on the review of available records.

Mr. Jimenez was arrested for drinking in public on 11/06/09. The charge was stricken with leave to reinstate.

Mr. Jimenez was arrested for speeding and driving on a suspended license on 02/13/10. On 04/09/10, Mr. Jimenez stipulated to speeding, with the remaining charge stricken with leave to reinstate.

On 04/16/10, Mr. Jimenez is next arrested on a charge of resisting a peace officer, aggravated assault, and possession of less than 2.5 grams of cannabis (per Rosemont Police Department Arrest Report dated 04/16/10). On 12/20/10, Mr. Jimenez was convicted of resisting a peace officer. Other charges were stricken with leave to reinstate.

On 05/15/10, Mr. Jimenez was arrested by Des Plaines Police for possession of cannabis and encouraging the delinquency of a minor. The charges were stricken with leave to reinstate.

On 01/24/11, Mr. Jimenez was arrested for disregarding a traffic light and driving on a suspended license. On 04/11/11, he was found guilty of disregarding a traffic light with the remaining charge stricken with leave to reinstate.

The detailed review of select arrests and charges indicates the following.

The review of the complaint for search warrant dated 04/06/10 indicates that Ms. Jane Doe, a police informant, related to Chicago Police Officer Pentimone that Mr. Jimenez showed her various guns, ammunition, and holsters on the previous Easter Sunday. He reportedly told her "this is the shit, I like my protection, these missiles are from a cop's crib." A police officer who resided within three miles of Mr. Jimenez's residence reported similar items to have been stolen. On the strength of this information, a search warrant was issued.

On 04/07/10 Mr. Jimenez was arrested and charged with the following offences:

- Possession of 5-15 grams (i.e., 11 grams) of psilocybin (mushrooms with effects similar to LSD) with intent to deliver
- Possession of ammunition without a valid FOID card
- Possession of firearms without a valid FOID card (i.e., shotgun, 40 caliber semi-automatic pistol, and 45 caliber semi-automatic pistol)
    - The possessed FOID card was revoked
        - To note Mr. Jimenez's FOID card was revoked due to order of protection
- Theft of lost or mislaid property (e.g., six GPS devices)

Mr. Jimenez and various members of his family wrote affidavits contradicting the informant's report and Mr. Jimenez affirmed that he did not know his FOID card was revoked.

During the proceedings, Mr. Jimenez was allowed to go to Las Vegas between 04/29/10 and 05/02/10. This indicates, at the minimum, that despite a potentially adverse legal outcome, Mr. Jimenez felt sufficiently emotionally stable to go on vacation.

On 06/10/10, court proceeding took place in front of Judge Higgins. The State filed a violation of bail bond, because Mr. Jimenez committed the offenses of aggravated assault, resisting peace officer, and possession of cannabis on 04/16/10.

The facts, as reported during this hearing (and documented in Rosemont Police Department Incident Report dated 04/19/10), were that Mr. Jimenez refused to comply with directions of the fire department to move his vehicle as to allow an emergency vehicle pass through a toll booth in order to respond to an emergency of another driver having a heart attack. Indeed, Mr. Jimenez reportedly yelled: "Fuck you. I don't have to move. I ain't listening to you."

Eventually Mr. Jimenez moved his vehicle, parked his car, and exited the car. He walked up to Sergeant McDonald with his arms raised and he was yelling, "Fuck you. I'll fuck you up." Mr. Jimenez walked closer to Sergeant McDonald swinging his arms. Officer McDonald identified himself as peace officer and told Mr. Jimenez he was under arrest and to lay on the ground with his hands behind his back. Mr. Jimenez refused and continued to approach Sergeant McDonald. At that time, Officer McDonald and first deputy superintendent apprehended Mr. Jimenez and arrested him.

At the police station, the search of Mr. Jimenez resulted in finding marijuana in his sock. At the time of this hearing on 06/10/10, the case was pending at Rolling Meadows with the next court date on 07/29/10.

Upon further hearing the arguments made by defense attorney, the judge stated that he saw a "theme here and I see a theme that he has very little self-control. He is impulsive and responds instinctually. He yells and screams and he acts out. He has an order of protection, he is a danger." The bond was increased to $50,000 and Mr. Jimenez was released to Cook County Sheriff's Day Reporting in addition to wearing a bracelet. The judge ordered mental health counseling and alcohol and drug treatment. In the judge's opinion, Mr. Jimenez was "a time bomb."

Dr. Pica, a psychologist, and Chief Judge Rodriguez interviewed Mr. Jimenez on 06/18/10 in order to ascertain his fitness to participate in the Cook County Sheriff's Day Reporting program. According to the report, Mr. Jimenez did not exhibit florid signs of mood or thought disorders.

During this interview, Mr. Jimenez was found to contradict himself on occasion. Mr. Jimenez denied current gang involvement and downplayed his past involvement as a "pee-wee;" yet he boasted about running a prison house (i.e., he was in charge of the entire division) while incarcerated. He initially reported he can identify a gang member anywhere only to contradict himself when he stated that he did not know of any gang members in jail.

Mr. Jimenez exhibited agitation when describing his behaviors after release from prison. He was upset regarding an episode of resisting arrest; he focused on police alleged wrongdoing instead of his own behavior leading to the arrest. He vaguely explained the order of protection placed by his cousin against him.

Reportedly, Mr. Jimenez was arrested numerous times since May 2009. His charges included possession of handguns, resisting arrest, public intoxication, possession, and an order of protection placed against him. He reported current regular use of marijuana.

Mr. Jimenez was not judged to be an appropriate candidate for the Cook County Sheriff's Day Report Program; he was recommended to a treatment-oriented structured program.

On 06/22/10, Mr. Jimenez was remanded to the Cook County Jail Gateway drug treatment program. Further evaluation found Mr. Jimenez ineligible for Cook County Division XIV Gateway drug rehabilitation program. On 07/20/10, Mr. Jimenez was ordered to Cook County Jail Division VI WestCare drug treatment program.

The review of WestCare progress reports dated from 05/06/10 to 11/23/10 indicates the following. Mr. Jimenez initially exhibited an attitude that "wasn't the best." As time progressed, his attitude improved. He participated in addiction treatment. He also participated in aggression groups. Mr. Jimenez reported a pattern of self-defeating behaviors which he wanted to change. He identified how feeling rejected leads to anger and violence. He identified taking time out as a technique he could use to manage his anger and preventing violence. He also identified his unrealistic expectations and how these expectations lead to anger and inappropriate behaviors. He was learning how to express anger without resorting to violence.

Mr. Jimenez remained incarcerated in Cook County Jail until December 2010.

Ms. Peggy Hough examined Mr. Jimenez in Cook County Jail on 09/09/10. In the report dated 10/04/10, Ms. Hough stated that she interviewed Mr. Jimenez for six hours and administered the Addiction Severity Index. Based upon this process, Ms. Hough stated that Mr. Jimenez "meets the diagnostic criteria for posttraumatic stress disorder." Ms. Hough offered no clinical evidence for the diagnosis of posttraumatic stress disorder.

Ms. Hough relied exclusively on Mr. Jimenez's self-report in her evaluation. She reviewed none of the voluminous contemporaneously produced records to establish Mr. Jimenez's behavioral history before and during his incarceration. Mr. Jimenez was not candid in reporting to Ms. Hough his history of delinquent behaviors and substance misuse (e.g., see Dr. Marchlewski and other reports above) before his incarceration on murder charge in 1993. For example, he misrepresented his relationship with his probation officer Brady. According to the contemporaneous report of his mother, Mr. Jimenez did not do well with Mr. Brady. Furthermore, Mr. Jimenez painted an inauthentic picture of his behaviors in the months preceding his arrest on the murder charge. He created an image that before he was arrested on the murder charge, significant positive changes occurred in his behavior; he stated "good things happening to me and for me." This is not borne out by the contemporaneously produced evidence.

The review of documents relating to Mr. Jimenez's treatment at the St. Leonard's House indicates that Mr. Jimenez filled out an application for admission on 10/01/10. In this application, Mr. Jimenez reported that he harbors "serious anger issues that need to be addressed and treated." He stated further that he is "willing to accept whatever treatment necessary to deal with my anger and put me on the road to living a productive life. My goals are to get treatment, find meaningful employment, continue my education, take care of my family, which at

this point consists of my fiancé and first child, and become a productive citizen."
He further stated that it "is my understanding that St. Leonard's House is my
best chance at receiving the help I need to achieve the above goals." In the letter
dated 06/24/11, reverend Gonzalez from St. Leonard's House wrote that Mr.
Jimenez has never been a resident in the St. Leonard's House Program.

According to the court order issued on 11/29/10, Mr. Jimenez was to participate
in WestCare program, participate in therapy with Ms. Hough weekly, participate
in an anger management program, drug program, attend one AA/NA meeting a
week, and address domestic violence in treatment.

In summary, the review of contemporaneous records documenting Mr. Jimenez's
involvement with the criminal justice system since May 2009 indicates a pattern
of various acts that brought him to the attention of law enforcement. Although
many charges were dropped, the facts are that Mr. Jimenez was involved in drug
related behaviors, driving offenses, weapon offenses, and overall he exhibited
aggressive, impulsive, and hostile behaviors. Indeed his mandated mental health
treatment focused on his poor self-control, irritability, impulsivity, not taking
responsibility for his own actions and blaming others, and lastly domestic
violence treatment.

The results of forensic psychological testing indicate the following.

Mr. Jimenez's current responses to items on the clinical scales of the Personality
Assessment Inventory (PAI) were consistent with the presence of hostility,
suspiciousness, hypersensitivity, and resentfulness. He presents with a
longstanding history of stormy, embittered, and distrustful relationships
characterized by a longstanding deep core of anger and bitterness, resulting in
chronic maladjustment in social relationships. His scores indicated that he is
apathetically indifferent toward others, and he is unlikely to adhere to authority
or to social conventions. Further, his pattern of scores suggested the substance
use that is potentially used to modulate his affect may be simultaneously
contributing to his distrust. The secondary elevations of multiple scales within
this inventory are associated with longstanding characterological problems
featuring diagnoses of antisocial or borderline personality disorders.

Further, Mr. Jimenez's current results on his PAI indicated the explosive
presence of anger, hostile control in relationships, history of antisocial behavior,
limited capacity for empathy, hostile suspiciousness, social alienation, and drug
use as a potential disinhibition condition.

Mr. Jimenez's scores on the validity scales of the Millon Clinical Multiaxial
Inventory (MCMI-III) were within normal limits; his profile of scores indicated
that if his self-report was authentic, then he required in-patient psychiatric care.
The forensic psychiatric interview indicated that Mr. Jimenez was not mentally
disturbed and he did not require inpatient hospitalization, indeed, he did not
require any mental health treatment.

Thus, the MCMI-III test results indicate that Mr. Jimenez presents with a moderately severe level of character pathology that features ineffective emotional regulation, impoverished coping strategies, as well as a deficient and incompetent foundation for socially acceptable behavior. His scores indicate the presence of strained and alienated relationships, and he is likely disengaged from normal pathways to personal and social fulfillment. This disconnection features an indifference and apathetic attitude toward the feelings and thoughts of others, and he has been unable to participate in the normal give and take in relationships. He is resentful and mistrustful of others, and since he projects his feelings and thoughts onto others, he misinterprets positive approaches to him, rendering him more confused. Under such conditions, and in the presence of longstanding self-esteem deficits, he tends to respond in an aggressive manner to exploit others in any fashion that meets his dependency and ego needs.

Mr. Jimenez's current clinical scale scores on the (Minnesota Multiphasic Personality Inventory-2-Restructure Form) MMPI-2-RF indicate that he has problems with social conformity and adhering to societal expectations, and he displays significant problems with those in authority He can become both impulsive and he is likely to take physical risks, particularly under conditions of boredom. However, he showed no elevations on scales associated with either specific or generalized fears. Further, his responses to items on the personality factors were not consistent with the scoring patterns associated with the presence of post-traumatic stress disorder or major depressive disorder.

The above documented results of forensic psychological testing dovetail the contemporaneously documented behaviors on the part of Mr. Jimenez since he was ten years old. The results of forensic psychological testing further support the conclusion that Mr. Jimenez's mental difficulties are part of his personality difficulties, such as antisocial personality features. The forensic psychological testing did not indicate the presence of a mood or anxiety disorder.

During the forensic psychiatric interview, this examiner inquired as to the most traumatic events that occurred while Mr. Jimenez was incarcerated; he reported:

> I think it was my mother; she had gotten in a serious car accident right after I got locked up. I don't know what month; I don't even know what year it was. I just know I was in the Audy Home, so it could've been '93, it could've been '94. I want to say it was in '94. But she almost died in a car accident. And me and my ma, we always been really close.

> Uhm, they got, she got in to a car accident. She was with some friends and she got into a serious car accident and almost died. The turning signal had penetrated her chest plate and, and went through her chest and it hit her heart and she had to have heart surgery. I didn't, when this happened, I had no idea about none of it.

> I was in Audy Home. They were scared to tell me about it. So, uh, my aunt just started, my mom used to come see me. Like I said, she would

come see me every visiting day. And one day it just stopped and my aunt was coming in her place; one of my aunts and my sister, you know, they were coming to see me. And I would ask them, what's, you know, what's going on with my mom? Well, why isn't she making it? And they're like, oh, she had to go to work. They made up excuse and the next week it was, well, where's my ma? Oh, she couldn't make it today and she's the one, that she, she wrote you a letter, though, and she said that... you know, so it was excuse after excuse. And, uh, it got to the point where there was no more excuses. Like after, you know, four or five visits missed, this is unlike my mom who never missed a single visit. Something's up, you know. What's going on? And then my aunt finally told me. She said, okay, I'm going to tell you. It's like your mom's in the hospital -- and she was still in the hospital at the time -- she was like, yeah, she's in the hospital. She's, she's in critical condition. She might die. And then she told me what happened and it, man, it broke me down because this...

... this, without my mother, at that point in my life, without my mother, man, I had nothing. I had no base, no ground, no, no nothing. She was my station.

Man, I know I was scared to death. I wanted to get out more than ever now. Not even for my own freedom no more because I knew she couldn't come to me. I wanted to come to her because we, we had that bond. Me and my mom, we have that special bond, man. It's like I love her to death. I'll do anything for her and I know she'll do anything for me. And she was always there for me. No matter what her life was, whatever was going on in her life, I mean, whatever problems she was experiencing or whatever events took, were taking place in her life that were not good for her or whatever in the family, her, her routines or whatever. She made time to come see me and to be here for me.

Oh, as soon as she was able to recuperate [she visited me]. I don't remember. I, see, by the time I found out, she had already been in the hospital for a while. So you know, I didn't know about it 'till after. And, uh, uhm, she was still in the hospital for a long time after that. And she finally got out and she was still recuperating. She had, you know, she was walking real slow and it took her a long time to be able to come back up there and see me. People had to help her, she was coming with people.

And, uh, but I was talking to her on the phone immediately after that. Like when I knew I couldn't go see here or nothing like that, I, I told the guards, I have to talk to my mom. I have to, then I explained to the supervisor and everybody, you know, they talked to me. I said, man, I need to talk to my mom. That's one thing you guys gotta do for me, man. Let me have... I told them, I was like, she might die.

Yeah. Every day they let me call my mom. They were like every day.

Mr. Jimenez stated that he did not seek out mental health services at that time.

Mr. Jimenez reported that because he suffered [being in prison for over 16 years], he thinks "I should be shown special consideration... I think I, I do think I should be given a little bit more help, a little bit of a more of a push."

When asked whether he feels bitter, he responded:

> Uh, bitter as in resentful? If that's what you mean, then, uh, not at all, man. I'm glad to be out of jail. I'm not, and no, I don't have... You know, obviously, there's some, there's some, you know, uh, there's some, uh, not so good feelings between me and the people that made me suffer like this. But you know, at the end of the day, man, I'm just glad to be out of jail, man. I'm, to this day I'm glad.
>
> I was telling somebody, one of my coworkers the other day, like you know, everybody says they would be doing this, they'd be, they'd be pissed at the police, they'd be pissed at the government, they'd do this, they'd do... Man, you don't know. I was this close to doing that time. I was this close to doing that time, all that time.
>
> So for me to be out here right now talking to you, who's working for an opponent party, man, I'm glad I'm here with you. I'm glad I can do this with you. This is like something that I, I'd appreciate it, you know. I'd appreciate this time sitting with you. Uh, true, the reason you're here is because of some fucked up shit. The whole reason you're sitting here today is because of fucked up shit that happened to me. But am I bitter because you're here? No. You know, I appreciate, I'm glad that I'm out of jail, that I can...
>
> I mean, uh, obviously, I wish I wouldn't have had that happen to me. I, I, I regret losing those years. I wish I could have those, those years back. You know, who wants to send you up for sixteen years for something they didn't do?
>
> So in that respect, then, you know, I guess you could say I am, if that's what you mean. But if you're saying do I have any, uh, hatred or anger or, or, or ill feelings pent up in me, uh, you know, that's targeted or, you know, anger in particular, then no, I'm not.

Mr. Jimenez is not sure he needs counseling; he stated that talking to people makes him feel better. When he talks to his therapist he feels better "as [long as] I remember everything she told me." He stated further:

> It [talking] is helpful. It is, when I leave her office, it's a big relief. She, she opens my eyes up to a lot of things. I'm a, I'm a very emotional person...

Mr. Thaddeus Jimenez
DL # J552-8167-9067

27 of 33

11/15/11

We talk about everything from what I've experienced in jail to, uh, how
do I feel about working or how do I feel about my relationship, uh, with,
uh, my fiancée and, uh, how my, uh, how am I developing my social skills
in, in society, you know, stuff, just general stuff.

Mr. Jimenez reported the following emotional difficulties that for which he seeks
compensation:

- The fact of being incarcerated with a bunch of murderers, rapists, and
  other violent offenders
- Having to be subject to that kind of living for sixteen years of his life
  since the age of thirteen up until thirty
- Experience of beatings and being "snaked on"
- Separation from family
- Death of various family members while he was incarcerated
- Having to "catch up to society:"
  o Use cell phone
  o Learn how to drive
  o Learn to deal with women
  o Learn about sex
  o Learn how to deal with people professionally
  o Learn how to dress like a man

He reported the following distressful experiences since his release from prison:

- Experiences variety of emotions with preponderance of "sadness"
- Feels guilty over many things (not related to incarceration)
- Startle reflex
- "I'm terrified of the Chicago Police Department."
- Recurrent sounds of two way radios and other prison sounds when he
  thinks about it
- Reported feeling helpless because he lacks various life skills

Mr. Jimenez described his current functioning:

- Has a fiancée
- Has a child
- Has his own place
  o Lives in apartment with fiancée and baby boy
- Life is stabilizing now
- Lacks idle time
  o Extended family is always around
  o No time to plan, research, read, etc.
  o Wants time to read, think, etc.
- Loves his mother

- Loves his son
  - Would sacrifice himself to make sure his child gets quality time
  - Spends quality time with his son
  - Child loves him
- Relationship with fiancée is "rocky"
  - Mr. Jimenez is unfaithful to his fiancée
  - Has strong sexual drive toward other women
  - Not sure if his behavior selfish
  - Is physically attracted to his fiancée
  - Wanted to have a family with fiancée
  - Reports he loves his fiancée
  - Reported occasionally losing temper with his fiancée

The review of the police reports from August 2011 indicates that Mr. Jimenez's fiancée was reported missing when she did not come to work. Her friends were concerned for her and her son's safety. One friend filed a missing person report. Apparently Mr. Jimenez was "physically beating her [his girlfriend and now missing person] and she was afraid to leave him. Reportedly, Mr. Jimenez sent text messages to his fiancée's friends that "she will not be working any more, she will not be allowed to see or talk to her friends. She will be on a leash like a dog and if she doesn't comply she will get fucked up."

When the fiancée was located, she reported that Mr. Jimenez was not physically abusive but only verbally. She reported frequent verbal fights between them.

- Mr. Jimenez is now working at a restaurant
  - Has potential future plans to become a regional manager
  - Feels he can get the necessary education to advance occupationally
- Mr. Jimenez reported that he did not continue his education after release from prison due to lack of time and money
- Mr. Jimenez described his activities of daily living
  - Takes care of his son
    - Feeding
    - Changing diapers
    - Bathes baby
    - Plays with baby
  - Takes care of house chores
  - Exercises on occasion

He answered questions regarding various potential mental difficulties as follows:

- Enjoys eating
- Enjoys sexual activities
- Denied experiencing de-realization or de-personalization
- Denied feeling worthless
- Never experienced suicidal ideations

- o Denied homicidal ideations
- o Does not experience nightmares
- o Denied irritability
- o Reported multiple visits of incarcerated friends
- Denied losing temper with the child
- Denied current gang activities or membership

When asked about legal involvements since release from prison, Mr. Jimenez was not forthcoming. He did not report any events where charges against him were dismissed. He did not report that he was incarcerated for six months at Cook County Jail in 2010.

When asked about order of protection filed against him, Mr. Jimenez reported that one of his female cousins crashed and totaled his car and that he used her car, only to have her call the police and report that he stole her car.

Mr. Jimenez reported that he plead guilty to driving without a license plate and a drug possession charge are still pending.

Mr. Jimenez denied any violent behavior on his part after he was released from prison.

When asked if he read memoirs of others who were incarcerated for a prolonged period of time, Mr. Jimenez responded:

> ... every man's different. And I don't think there's a man in prison or out of prison that can relate to what I've been through. Like just as easily as I can't relate to what he's been through. Because he, we might've been in the same places, might've been locked up for the same extended times. But his life's not my life. Maybe he wasn't as close to his mom or his grandma as I was. Maybe I'm not as close to my sister as he may have been his, you know. It's a different life.

> And I don't think, because nobody's going to fit my profile. And if you tell me yes, you know, if some guy tells me yes, I've been through that, I've been through, I know what it's like what you're talking about, then, then I'm going to look at him as a liar. Because you don't know what I've been through for you to say that you've been the same thing I've been through. Does that make sense?

The above reported mental health functioning since his release from Illinois Department of Corrections indicates that Mr. Jimenez did not develop posttraumatic stress disorder, major depression, or any other condition of mental ill-being. Mr. Jimenez continues to display behavioral symptoms of conduct disorder that, at his age, are best conceptualized as features of antisocial personality.

This forensic psychiatric evaluation addressed issues of symptom exaggeration, malingering, minimization, and misattribution.

Mr. Jimenez's scores on the validity scales of the MCMI-III were within normal limits as reported above.

Mr. Jimenez also showed a variable response pattern to items on the validity scales of the PAI. He scored within normal limits on scales associated with positive impression, negative impression, and infrequent responses. However, he obtained a moderately elevated score on a scale associated within inconsistent responding, a score that is associated with impression management. This score indicates that he is inconsistently reporting emotional symptoms. Nevertheless, this inventory was valid and eligible for interpretation.

Mr. Jimenez showed a variable response pattern to the validity scales of the MMPI-2-RF. He scored within normal limits on two scales associated with internal consistency, indicating that he was able to accurately regard the item content. He obtained a significantly elevated scale score on a scale associated with over-reporting, indicating that he endorsed a much larger than average number of infrequent responses that, in the absence of a corroborating history, is indicative of over-reporting. He scored within normal limits on three other scales associated with over-reporting of mental symptoms. He scored within normal limits on two scales associated with defensive reporting. This inventory was valid and eligible for interpretation.

Mr. Jimenez scored within normal limits on a general inventory associated with symptoms validity (Structured Inventory of Malingered Symptomatology (SIMS)). He obtained scores within normal limits on each of the five validity scales as well as total raw score.

Mr. Jimenez scored within normal limits on two validity scales associated with a valid presentation of cognitive symptoms.

The review of Dr. Kavanaugh's report and deposition indicates that she diagnosed Mr. Jimenez with posttraumatic stress disorder and depression as well as development difficulties due to incarceration. The available evidence as documented above does not support these diagnoses. She also opined that Mr. Jimenez's development was disrupted by his incarceration. This opinion is also unsupported by the available data. Furthermore, the review of the psychological test and interview data generated by her evaluation does not support her diagnoses.

Dr. Kavanaugh bases her opinions about Mr. Jimenez's depression and posttraumatic stress disorder, in part, upon three brief self-report measures — the Beck Hopelessness Scale (BHS), the Beck Depression Inventory –II (BDI-II), and the Posttraumatic Stress Diagnostic Scale (PTSDS), all of which make misrepresentation of symptoms easy and undetectable. That is, since the item

content can be easily gauged for symptom identification, it is easy to present oneself as someone who suffers from symptoms of depression and posttraumatic stress disorder. Dr. Kavanaugh did not properly evaluate for symptom exaggeration or malingering.

Further, Mr. Jimenez denied the presence of symptoms that are associated with the presence of posttraumatic stress disorder, such as restlessness, decision-making, sleep disruptions, or feelings of worthlessness on the BDI-II. Yet he contradicted himself when he endorsed items in the contrary direction on the screening measure of posttraumatic stress disorder (PTSDS) such as almost always having difficulty falling or staying asleep or almost always being overly alert; at the same time, he stated that he was startled or jumpy less than once weekly.

According to Dr. Kavanaugh, Mr. Jimenez is experiencing agitation and depression, yet his responses on the PTSDS indicated that he feels angry or irritable less than once a week. The frequency of symptoms is inconsistent with presence of depression or posttraumatic stress disorder.

Mr. Jimenez noted on the PTSDS that he relived the traumatic event "less than once weekly," he was experiencing upsetting thoughts and images and reliving the event "only once in a while," yet he was upset "2-4 times weekly/half the time" when thinking about the traumatic event.

Thus, when item responses are reviewed, Mr. Jimenez showed inconsistent reporting on both the PTSDS as well as between responses on the BDI-II and the PTSDS. Yet, Dr. Kavanaugh relies upon the scores on these inventories as indicative for the presence of posttraumatic stress disorder for Mr. Jimenez.

Dr. Kavanaugh noted the presence of a "moderate degree of hopelessness" as indicated by Mr. Jimenez's score on the Beck Hopelessness Scale (BHS), and Dr. Kavanaugh expressly noted Mr. Jimenez's endorsement of items reflecting pessimistic feelings such as "my future is dark to me." Yet, Mr. Jimenez only endorsed an item indicating he feels only mildly discouraged about his future, again indicating inconsistent responding.

A high VRIN-scale score and a high F-scale on the MMPI-2 are typically indicative of random responding. Mr. Jimenez showed this scoring pattern in his results on the MMPI-2 with Dr. Kavanaugh. Further, the printout accompanying these test results indicated that his responses may have been inconsistent, reflected "a pattern that suggests some carelessness or inattention to content," and may reflect some exaggeration of symptoms. Also the results of this MMPI-2 do not support clinical diagnoses of posttraumatic stress disorder or major depression.

There is also no evidence that Mr. Jimenez's incarceration negatively influenced his development.

Overall, the evidence Dr. Kavanaugh relies on to reach her conclusions in this case do not support the conclusions she has reached.

Thus, the review of the evidence indicative of Mr. Jimenez's behavior and emotions since his release from prison indicates the presence of antisocial personality features and continued substance misuse. There is no evidence for posttraumatic stress disorder or any other anxiety disorder. Furthermore, there is no evidence for any mood disorder (e.g., major depression) following the release from 16-year incarceration.

In conclusion, Mr. Jimenez was exhibiting severe conduct disorder and substance misuse symptoms since age 10. Now, as an adult, he exhibits antisocial personality features. The current scientific and clinical knowledge indicates that young children who exhibit severe conduct disorder often grow up to be adults with antisocial personality disorder. There is no evidence that Mr. Jimenez's incarceration caused a development of an independent condition of ill-being, such as posttraumatic stress disorder, major depression, or another condition of mental ill-being. Mr. Jimenez was reasonably expected to grow up to be an adult with antisocial personality disorder, and an adult involved in criminal acts with a reasonable probability of adult incarceration, whether or not he was incarcerated on the first degree murder charge at age 13.

## Section 3.  Qualifications of the Examiner

This examiner's curriculum vitae is enclosed as Appendix F.

## Section 4.  Signature

The opinions expressed in this report are based on the currently available data and the examining physician's education, experience, and research. This examiner reserves the right to modify his opinions if further data becomes available for review and assessment.

Unless otherwise specified, this examiner holds the opinions expressed in this reports with a reasonable degree of medical psychiatric certainty.

Respectfully submitted,
Health and Law Resource, Inc.

A. E. Obolsky, M.D.

Mr. Thaddeus Jimenez                    33 of 33                    11/15/11
DL # J552-8167-9067

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2**
**Eastern Division**

Thaddeus Jimenez

                         Plaintiff,

v.                                      Case No.: 1:09−cv−08081
                                      Honorable Matthew F. Kennelly

City Of Chicago, et al.

                         Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, December 5, 2011:

      MINUTE entry before Honorable Matthew F. Kennelly:Final pretrial conference held on 12/5/2011, and continued to 12/7/2011 at 02:30 PM.Judicial staff mailed notice(gl, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.2**
**Eastern Division**

Thaddeus Jimenez

                                   Plaintiff,

v.                                                       Case No.: 1:09−cv−08081
                                                         Honorable Matthew F. Kennelly

City Of Chicago, et al.

                                   Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, December 7, 2011:

        MINUTE entry before Honorable Matthew F. Kennelly:Continued pretrial
conference held on 12/7/2011, and continued to 12/12/2011 at 03:00 PM.Judicial staff
mailed notice(gl, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

Case 1:09-cv-08081   Document 192   Filed 12/13/11   Page 1 of 1   PageID 9551
Case: 12-2779    Document: 11-19    Filed: 08/27/2012    Pages: 256

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 8081 | **DATE** | 12/13/2011 |
| **CASE TITLE** | Jimenez vs. City of Chicago | | |

**DOCKET ENTRY TEXT**

**Plaintiff's motion in limine to bar certain opinions of Alexander Obolsky is terminated in part as moot due to defendants' withdrawal of Dr. Obolsky as a witness and entered and continued in part, pending further discussions between the parties, with regard to the exhibits identified in the motion. All remaining motions in limine are terminated based on the oral rulings made by the Court at the pretrial conferences held on 12/5/11, 12/7/11, and 12/12/11.**

Docketing to mail notices.

| Courtroom Deputy Initials: | OR |
|---|---|

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 8081 | **DATE** | 12/3/2011 |
| **CASE TITLE** | Jimenez vs. City of Chicago | | |

**DOCKET ENTRY TEXT**

Continued final pretrial conference held on 12/12/2011.

Docketing to mail notices.

| | |
|---|---|
| Courtroom Deputy Initials: | OR |