No. 12-2779

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

THADDEUS JIMENEZ,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 09-cv-08081
The Honorable Matthew F. Kennelly, District Judge, Presiding

## SUPPLEMENTAL APPENDIX
## VOLUME 2 OF 5

STEPHEN R. PATTON
Corporation Counsel
  of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, Illinois 60602
(312) 744-0746

BENNA RUTH SOLOMON
  Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
  Chief Assistant Corporation Counsel
JONATHON D. BYRER
  Assistant Corporation Counsel
Of Counsel

# TABLE OF CONTENTS OF SUPPLEMENTAL APPENDIX

**Volume 1**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
      Report of Proceedings ........................................ SA 1

**Volume 2**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
      Report of Proceedings (continued) ........................... SA 288

**Volume 3**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings ...................................... SA 575

**Volume 4**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings (continued) ........................... SA 841

**Volume 5**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings (continued) ........................... SA 1106

1      Q    The original letters you have had a chance to

2    look at them not only here in court but up in the

3    States Attorney's Office; is that correct?

4      A    Yes.

5      Q    Are those original letters in the same or

6    substantially the same condition they were in and the

7    envelopes when you received them from the defendant on

8    the various dates?

9      A    Yes.

10     Q    Now, what I would like you to do is start out

11   with People's Exhibit Number 15A.  What I will do is

12   show you a copy -- the copy of a letter which is a B.

13   What I would ask you to do is to read the section that

14   I marked in yellow, that's marked in yellow, and the

15   first page.  Would you read that out loud and very

16   slowly for the Ladies and Gentlemen of the jury?

17     A    Okay.

18              "So, I hear the Royals are looking for

19              Larry."

20   MR. HILL:    Judge, I would object to this.

21   THE COURT:  Overruled.

22   THE WTINESS:    "So I hear the Royals

23              are looking for Larry.  You

24              see, I got connections in

JIM01609

C65

SA288

1           and out of jail."

2      Q    And also in that letter did he indicate --

3  you testified he indicated in that first letter that

4  you received or one of the first letters what his real

5  name was to you; is that correct?

6      A    Yes.

7      Q    I will ask you read the section marked in

8  yellow.

9      A    "Don't tell Charlie, Daniel, Lorie, my real

10  name. I'm still a little -- --

11     THE COURT:   Why don't you read it?  She has a

12  copy. We will hear it better. A little difficult to

13  understand.

14     MR. MURPHY:   Would you like me?

15     THE COURT:  If you can read it she can follow you.

16  Start with fifteen.

17     MR. MURPHY:  I'm sorry.

18     THE COURT:  This is in People's Exhibit -- reading

19  from the copies which is 15B.

20     THE COURT:  Read it.

21     MR. MURPHY:   I will read from a section of the

22  letter and ask you to stop me at any point if I read

23  anything inaccurate.  Will you read along with me?

24  Defense you have a copy of the letters also.  Okay.

JIM01610

C66

```
 1              "Don't tell Charlie, Danny, or Larry

 2              My real name.

 3         THE WITNESS:  A    Lorie.

 4         MR. MURPHY:     "Lorie my real name.  I am

 5                   still a just little mad you have it

 6                   because I'm not ashamed.  But

 7                   no one knows it, not even my

 8                   best friends.  I just feel safer

 9                   with TJ even if it is my nickname.

10                   Bottom P.S. Here's my real name

11                   just in case you need to write it

12                   here.  Thaddeus Jimenez."  Is that what

13    it says on the letter?

14         MR. HILL:     Objection.

15         MR. MURPHY:     Fifteen B?

16         THE WITNESS:  Yes.

17         MR. HILL:     That's not relevant.

18         THE COURT:  Humm?

19         MR. HILL:     Objection to relevance.

20         THE COURT:  Only place it would be relevant in

21    identifying who wrote it.

22         MR. MURPHY:  It is to show who the author of the

23    letter is.

24         THE COURT:  For that reason only.  Fine.
```

JIM01611

C67

1    MR. MURPHY: Q    You have identified People's

2    Exhibit Number 16A.  I will show you People's Exhibit

3    16B, a copy of that letter; is that correct?

4    THE WITNESS: A    Yes.

5    Q    And, there's a section marked off in that

6    letter as well; is that correct?

7    A    Yes.

8    MR. MURPHY:    Judge, if I may.  If the witness is

9    able to read slowly would the Court allow the witness

10    to read this section of it?

11    THE COURT:  If she had reads nice and loud.

12    MR. MURPHY: Q    Would you, please, read the

13    section marked in yellow and speak very loudly and

14    slowly so all the people can hear?

15    THE WTINESS: A    Okay.

16        "I don't want anyone to know I'm in

17        here still.  When I get out I will

18        take care of Larry, that pussy-ass

19        mark."

20    Q    Thank you.  That's from the letter that was

21    dated March 22nd, one of the two letters dated March

22    22nd, '93; is that right?

23    A    Yes.

24    Q    You received another letter dated March 22nd,

JIM01612

C68

1   1993, which is People's Exhibit Number 17A; is that

2   correct?

3        A    Yes.

4        Q    And 17B you have already identified as a copy

5   of that letter; is that correct?

6        A    Yes.

7        Q    What I want you to do now, Elizabeth, please,

8   read the section marked in yellow, Page One and two.

9   I will ask you to even read it slower than the last

10  letter that you read, okay?

11       A    Okay.

12            "So Danny tried to hook you up

13             with Larry, humm?  I got something

14             special for him.  And for Larry,

15             you better see him while you can

16             because he won't be living very long.

17             On second thought stay away from him.

18             He's bad news.  The Royals are supposed

19             to be looking for him.  It looks like

20             I'll have to kill him myself since

21             the Royals won't.  He's lucky he is

22             living now, but I told my cousin not

23             to kill him because he's my problem.

24             As soon as I get out Danny's pussy ass

JIM01613

C69

1              will be going to Larry's wake.  You

2              know the rules:  If you shoot, you

3              shoot to kill but watch for mice or

4              you will pay the price but don't

5              worry.  I won't get caught. "

6    Q    Now, I'm showing you People's Exhibit Number

7 18A.  That is a letter that you have already

8 identified as a letter dated April 15, 1993; is that

9 right?

10    A    Yes.

11    Q    18B is a copy of that letter; is that right?

12    A    Yes.

13    Q    What I would like you to do is read the

14 section that's marked in yellow on Page Two.

15    A    "Danny now says that Larry didn't

16              get shot, humm?  I think that Danny

17              is lying because this time my mom

18              told me that she heard something

19              like Larry getting shot.  If he did,

20              good for him.  But if he didn't I

21              will be out soon."

22    Q    Now, you have already identified People's

23 Exhibit Number 19A as a letter that was postmarked

24 April 19th, 1993; is that right?

JIM01614

C70

1        A    Yes.

2        Q    What I would like you to do is read from the

3    copy, which is 19B, the section marked in yellow on

4    Page One of that letter?

5        A    "Oh, yeah.  I didn't tell my mom to

6             lie to you.  I told her to say I

7             was out of jail to everyone just

8             to see if anyone comes looking for

9             me and to see if anyone tries to

10            light me up like they did Larry.

11            He deserved it."

12        Q    And, finally the last letter, Elizabeth,

13    that's People's Exhibit Number 20A; is that right?

14        A    Yes.

15        Q    And, 20B, last copy of that letter; is that

16    right?

17        A    Yes.

18        Q    What I would like you to do is read, first of

19    all, the section marked in yellow on Pages One and Two

20    again.  If I may remind you, please, speak very

21    slowly.

22        A    Okay.

23             "Three more Royals came on

24             my section today so now there's

JIM01615

C71

1            probably going to be a lot of

2            shit going on.  Oh, yeah.  They

3            told me that Larry did not get

4            shot and he's still testifying

5            against me.  So on the 20th I

6            want you to call my grandmother's

7            house to see what happened.

8            Here's the number, 583-2279.

9            The reason why I gave you

10           that grandmas' number is

11           because my mom broke her phone.

12           and she ain't got a new one yet."

13   Q    Elizabeth, now I would like you to read from

14 Page 3 of the same letter.

15   A       "Oh, this Saturday on the 8th I'm

16           going to call John Spaugh.  I don't

17           -- if you remember, but he is the one

18           Royal who drives the motorcycle and

19           lives on Kedzie.  I'm going to tell

20           him to stop Larry from going to

21           court in any way he has to even

22           if he has to kill him.  It won't

23           mean anything to me, and it only

24           takes the pull of a trigger."

JIM01616

C72

1      MR. MURPHY:  I have no further questions, Judge.

2      THE COURT:  Cross-examination?

3      MR. MURPHY:  Can I have a sidebar?

4      THE COURT:    Sure.

5

6                    (Whereupon, there was a sidebar
                     discussion had outside the
7                    hearing of the jury.)

8

9

10     MR. MURPHY:  First of all, defense counsel is

11     asking questions about not giving him letters in front

12     of the jury.  Secondly -- he said he didn't give him

13     three letters in front of the jury.

14             Secondly, Judge I did give him all the

15     letters.  I will be happy if he wants a few moments to

16     give him the letters.  I just ask for a brief recess

17     because I gave the -- I have the letters put away.  I

18     only picked up letters I was going to use.  Now he is

19     asking for letters in front of the jury as if I didn't

20     before.

21     MR. HILL:    John, I asked you.  I'm sorry you

22     think the jury heard.  I wasn't asking you --

23     MR. MURPHY:  No problem.  I will give them to you.

24     I thought I gave them all to you.

                                        JIM01617

C73

SA296

1      MR. HILL:    Could we have a brief recess so I can

2   receive all the other letters?

3      MR. MURPHY:  There's a to total of 11 letters.  We

4   used six.  We did not use the remaining letters.  I

5   will give him the originals, all the originals.

6      THE COURT:  Short recess?

7      MR. HILL:    Yes.

8      MR. MURPHY:  Keep going.

9      THE COURT:  I don't know.

10      MR. MURPHY:  I will check on the three, which ones

11   he doesn't have.

12      THE COURT:  You may proceed.

13

14                      (Whereupon, the following
                        proceedings were conducted within
15                      the presence and hearing of the
                        jury.)
16

17      MR. HILL:  If me may have a recess.  If we may

18   break at the point.

19      THE COURT:  Short recess and continue?

20      MR. HILL:    Yeah.  All right.

21      THE COURT:  There will be a short recess.

22

23                      (Whereupon, there was a short

24                      recess.)

                                        JIM01618

1    MR. MURPHY:  Could we make a motion before the

2    jury comes out?

3        THE COURT:  Hold the jury for a second.

4        MR. MURPHY:  Can I have a moment, Judge.

5        THE COURT:  Sure.

6        MR. MURPHY:  Judge, we would make a motion in

7    limine to preclude defense from introducing any

8    evidence of denials.  I don't know whether they intend

9    to.

10       MR. HILL:  Yes, a letter they didn't tender that

11   was sent to that girl.  This is another letter that he

12   sent to her.

13       THE COURT:  What does it say?

14       MR. HILL:  Here.  I will go get it.  Here's where

15   it starts, your Honor.  You can start with this.

16       THE COURT:  I can't very well let this in.  If he

17   wants to take the stand he can.  I cannot let you get

18   this in through a letter from him.

19       MR. HILL:  This is part of the completion --

20       MR. MURPHY:  This is not in any of the

21   letters -- it's a different letter like a different

22   statement.

23       MR. HILL:  He sent her a collection of letters,

24   and this is one and it should -- if they are allowed

JIM01619

C75

SA298

1    to bring out part of the letters I should have the

2    right as part of the completion to bring out the

3    others.

4    THE COURT:  If the defendant wants to testify

5    that's his own business.  He can testify to all this,

6    but I cannot permit you to have the defendant not

7    testify and bring in this denial, which is a prior

8    consistent statement.

9    MR. HILL:  Your Honor, this goes to the completion

10    doctrine.

11    THE COURT:  Well -- not when the subject matter is

12    I didn't do it.

13    MR. HILL:    Yes, it is.  They know that.

14    MR. MURPHY:    This is not any of the letters the

15    witness has identified.  Each letter is like a

16    different statement.  Each time he sends her a letter

17    a different day it's like a different statement.

18    THE COURT:  No.

19    MR. MURPHY:  For the defense to come in and say

20    this is one of the letters, she didn't identify this

21    letter on direct examination.

22    THE COURT:  I'm sure she identified it, but I

23    still couldn't let it in.  Sorry.  Completeness is one

24    thing.

JIM01620

C76

1     MR. HILL:  Your Honor, if I may as it relates to

2  completion when you open the door and bring part --

3     THE COURT:  I'm well aware.

4     MR. HILL:  You open it for all witnesses, and they

5  did that when they brought the letters in.

6     THE COURT:  I will not permit it for that purpose,

7  prior consistent statement, I didn't do it, and

8  prevents him from taking the stand and establishes his

9  testimony.  Doesn't give the State an opportunity to

10  cross-examination.  That would be my ruling.

11     MS. BURKE:  It's our understanding the reason

12  these letters were being offered is consciousness of

13  guilt.  The statements made regarding consciousness of

14  guilt regarding guilt would weigh that.  It will be

15  completing -- we would have a right to certainly in

16  proper cross-examination.  That's the theory the State

17  has originally offered the letters unless they have

18  changed the theory, prior consistent statement.

19     MR. HILL:  When they opened the door --

20     THE COURT:  It's a different subject.

21     MR. GAUGHAN:  If he takes the stand then I'm sure

22  you can bring her back as a witness.

23     MR. HILL:   Would you keep her here, Donna -- I

24  mean Elizabeth?

JIM01621

C77

1      MR. MURPHY:  Keep her?  How long?

2      MR. HILL:    Until our case is finished.

3      MR. MURPHY:  We can discuss this after the break,

4  can't we?

5      THE COURT:  Yeah, at the break.  Keep her here for

6  now.  You may proceed.  Call the witness back out on

7  cross-examination.

8

9                    (Whereupon, the following
                      proceedings were conducted within
10                   the presence and hearing of the
                      jury.)

11

12     THE COURT:  You may proceed.

13

14                    CROSS-EXAMINATION

15                    BY

16                    MR. HILL:

17

18     Q    You said you and TJ had been dating since

19  '92?

20     A    Yes.

21     Q    August?

22     A    August.

23     Q    And, those letters that you identified they

24  were sent to you?

JIM01622

C78

SA301

1      A    Yes.

2      Q    For your purpose?

3      A    Yes.

4      Q    And, in fact after you got so many of them

5   you turned them over to the police officer?

6      A    My mother did after she found out he was

7   threatening to kill people.

8      Q    Your mother did?

9      A    Yes.

10      Q    You did not give those letters to Larry

11   Tueffel, did you?

12      A    (No response)

13      Q    You never gave those letters to Larry

14   Tueffel, did you?

15      A    No.

16      Q    You never gave those letters to Phillip

17   Torres, did you?

18      A    No.

19      Q    You never gave those letters to anybody, did

20   you?

21      A    No.

22      Q    And, your understanding was that this was

23   simply letters from him to you, right?

24      A    Yes.

JIM01623

C79

SA302

1    Q    Now, you say he wrote you how many letters?

2    A    Eleven.

3    Q    Eleven.

4         How many letters did you identify in

5    court today; do you recall?

6    A    I think there was about five.

7    THE COURT:  For the record I think there were six.

8    MR. HILL:    Six.  Okay.

9    Q    There are five more letters that he

10   wrote that you turned over to police officers?

11   THE WITNESS:  A    There was two I had brought

12   when I came in last week.

13   Q    So you gave them to the police?

14   A    Yes.

15   Q    And then you gave the State two more?

16   A    Yes.  That he sent after I had turned those

17   letters in.

18   Q    You identified six here in court today?

19   A    Yes.

20   Q    If I can have just a second.

21        And in those letters some of those

22   letters you identified in court today, Thaddeus in

23   fact denied or said that he was no longer a member of

24   the Royals?

JIM01624

C80

1        MR. GAUGHAN:  Judge, objection.

2        THE COURT:  Sustained.

3        MR. HILL:    If I can have the letters they used

4  today.

5        Q  I refer to the letter.  Show you what's

6  marked as State's Exhibit Number 18.  Take a look at

7  that.

8        MR. MURPHY:  I think it's 18A.

9        MR. HILL:   Q 18A.  Could you read the line

10  where I had my finger pointed at?

11        THE WITNESS:  A   "I ain't in that gang.

12              shit anymore, but you got some

13              of it right.  I'll never tell."

14        THE COURT:  Is that it?

15        MR. HILL:  Um-humm.

16        THE COURT:  That's -- is there any objection to

17  that?  I will permit that.

18        MR. MURPHY:   We have no objection.

19        THE COURT:  Long as you are referring to the

20  letter and the line rather just quote it.  I didn't

21  want you to summarize it.

22        MR. HILL:  Q   So, in that letter he denied gang

23  membership?

24        MR. GAUGHAN:  Objection to the form of the

JIM01625

1    question.

2    THE COURT: Sustained.  He said I ain't no longer

3    in that gang.  Ask the question properly.  Go ahead.

4    Ask it again.

5    MR. HILL:  Q    You understood that letter --

6    THE COURT:  Sustained as to what she understood.

7    You ask the question.  You can ask the question.

8    MR. HILL:  Q    There's six more letters, right?

9    THE WITNESS:  A    Beside the six, yes.

10   MR. HILL:  No further questions.

11   THE COURT:  Thank you, Ma'am.  You will be

12   excused. - - -

13   MR. MURPHY:  I have one question.

14   THE COURT:  Sorry.  Yeah.

15

16              REDIRECT EXAMINATION

17              BY

18              MR. MURPHY:

19

20   Q    Elizabeth, every letter that he sent to you

21   did Thaddeus Jimenez threaten Larry?

22   A    Not every one.  Almost every one.

23   MR. MURPHY:  No further questions.

24   MR. HILL:    Judge,

JIM01626

1      THE COURT:  Go ahead.

2

3                    RECROSS-EXAMINATION

4                    BY

5                    MR. HILL:

6

7      Q    In fact in some of those letters --

8      MR. GAUGHAN:  Objection.

9      MR. HILL:    He opened.  He said every letter,

10   your Honor.

11     THE COURT:  I don't know what you are going to

12   ask.  I don't need the court reporter right now.

13     MR. HILL:    I would like a court reporter.

14     THE COURT:  All right.

15

16                    (Whereupon, there was a sidebar
                       discussion had outside the
17                    hearing of the jury.)

18

19     THE COURT:  What are you going to ask?

20     MR. HILL:  He opened the door to ask.  He asked.

21   If he would have only asked about the six I wouldn't,

22   but when he got up his question was in every letter.

23     THE COURT:  And she said no.

24     MR. HILL:    That opened the door.

                                    JIM01627

                        C83

                      SA306

1      THE COURT:  Why?

2      MR. HILL:   To all the letters, your Honor.

3      MR. GAUGHAN:  That's ridiculous.

4      THE COURT:  About what?

5      MR. HILL:  What he said to her in those letters.

6      THE COURT:  Come on.  Come on.  You know better

7  than that.

8      MR. HILL:   No, I don't.  He opened the door.

9      MR. MURPHY:  That was one particular point he

10  addressed on cross.

11      THE COURT:  Overruled.  Can't do that.

12

13                    (Whereupon, the following
                       proceedings were conducted within
14                    the presence and hearing of the
                       jury.)
15

16      THE COURT:  You may proceed.

17      MR. HILL:  Q   The State asked you in almost all

18  those letters he made threats to Larry Tueffel?

19      THE WITNESS:  A   Yes.

20      Q   In some of those he didn't in fact, isn't

21  that correct?

22      A   Yes?

23      MR. HILL:   If I could have just a second.

24                 No further questions.

                                          JIM01628

1    MR. MURPHY:  Nothing further, Judge.

2    THE COURT:  You may be excused.  Good time to

3    break for lunch.  Come back here at two-ish.  Okay.

4        See you then.

5    MR. HILL:    I will ask Elizabeth Heatley be kept

6    available for the defense.

7    THE COURT:  I would suggest you issue a subpoena

8    for her.  I have no authority to tell her to stay

9    here.

10   MR. HILL:    She is under State subpoena, and she

11   is here right now.

12   THE COURT:  I will ask her.  You are playing it

13   kind of rough.  I would like to hold her until this

14   afternoon and subpoena her in for today or tomorrow.

15   MR. HILL:  I will if you keep her here until this

16   afternoon.

17   THE COURT:  Bring her out.  I will tell her to be

18   here this afternoon.  But would you get that subpoena

19   out?  This is still before lunch.

20   MR. MURPHY:  I would like to address another

21   issue.

22   THE COURT:  Let's get rid of this issue.

23   MR. MURPHY:  Fine, Judge.

24   THE COURT:  Elizabeth, I will have you stay around

JIM01629

1    this afternoon until about 2:30 or so.  Don't leave

2    the building.  You can leave the building for lunch.

3    Make sure you are here some time after two o'clock,

4    2:15, 2:30.

5        THE WITNESS:  Okay.

6        MR. MURPHY:  Judge, there was a question raised by

7    defense, and it just may have been inadvertent.  He

8    indicated on the record he did not receive certain

9    letters.

10        I would indicate we have been keeping

11   track of discovery.  These are my notes, both dates.

12   October 28, 1993, when we tendered the large volume of

13   our discovery we tendered to defense letters and

14   envelopes of the defendant to Elizabeth Heatley; one

15   dated March 22, another one dated March 22, '93,

16   another one April 15, 1993, one May 1st, 1993, and a

17   fifth one with no date.

18        Then the following date on November 3rd,

19   1993, we tendered four additional letters, a total of

20   nine.  The witness testified she received two letters

21   since she gave those letters to police, and she gave

22   them to the state's attorney, which is me.

23        When I received the letters on the eve

24   of this trial I tendered those letters to counsel for

JIM01630

C86

1   defense which is a total of 11, so the record is

2   clear, Judge, all eleven letters were tendered to

3   defendant prior to this trial.

4       THE COURT:  Is that correct, counselor?

5       MR. HILL:  Judge, I differ on that, but I did not

6   argue that as a discovery violation.  I differ on the

7   number of letters were tendered to me back in October

8   of November.

9       MR. MURPHY:  He didn't argue discovery violation.

10  He did indicate certain letters weren't received.

11  These are my notes.  I was in the courtroom at the

12  time, and I'm the person that tendered those

13  materials.

14      THE COURT:  You have them now.  That's for sure.

15      MR. HILL:  Yes.

16      THE COURT:  See you at two-ish, 2:05, 2:10.

17                  (Whereupon, the hearing in the
                    above-entitled cause was
18                  adjourned and scheduled to
                    reconvene at 2:15 on the same
19                  day.)

20

21

22

23

24

JIM01631

C87

1   STATE OF ILLINOIS )
                   )
2   COUNTY OF C O O K )

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT - CRIMINAL DIVISION

4

5   THE PEOPLE OF THE    )
    STATE OF ILLINOIS,   )
                   )
6                )   Indictment No. 93-14710
                )   CHARGE: MURDER
        vs.      )   October 3, 1994
7                )   2:15 p.m.
    THADDEUS JIMENEZ     )   JUDGE CHRISTY S. BERKOS
8

9                REPORT OF PROCEEDINGS

10        Court reconvened pursuant to luncheon
   recess.
11

12   APPEARANCES:
                 Same as heretofore noted.
13

14

15

16

17

18

19

20

21

22

23

24

JIM01632

C88

1        THE COURT:  Thaddeus Jimenez.

2        MR. HILL:    Before the jury comes out I wanted to

3    ask you a question.  I know you have ruled regarding

4    the tape recording and the father testifying, Mr.

5    Romo, who was the father who was supposed to have tape

6    recorded a conversation between himself and a witness.

7                     I just want to make for the record you

8    made a ruling he could not testify; is that correct?

9        THE COURT:  He was going to bring in a tape, play

10   it.  He was going to testify.  I am assuming he was

11   going to testify that he had a tape of somebody else

12   admitting the crime and he wanted to play the tape to

13   the jury.

14       MR. HILL:    He was going to talk about a

15   conversation he had with that person and that person

16   admitted to him that he committed the crime, yes, sir.

17   He did attempt to tape it.  We weren't offering him to

18   bring in the tape.  We were offering him to talk about

19   the conversation that he had under Chambers versus

20   Mississipppi.

21       THE COURT:  That would be totally hearsay.  We

22   agreed to that or don't you agree with that?

23       MR. HILL:  I don't agree with you.  That's why I

24   am bringing this up again so I will have clarification

JIM01633

C89

SA312

1    in the record.  You are barring us from calling Mr.

2    Romo?

3         THE COURT:  I'm not barring you from calling your

4    mother if you want to bring your mother.  What is he

5    going to testify to?  Anybody can be called as a

6    witness in the case if it's relevant and admissible.

7               He didn't testify.  I don't know.  If

8    you are telling me he would testimony to a

9    conversation he had with somebody else as to that

10   person doing the killing, I would say that's hearsay.

11        MR. HILL:   With all due respect my mother is

12   deceased.  I was trying to get a clarification, so I

13   wouldn't have to call the person in.  I wanted the

14   record to clearly show we could not call Mr. Romo

15   regarding the conversation that he had with a Juan

16   Carlos Torres because in your interpretation it was

17   hearsay and --

18        THE COURT:  I don't know.  I don't know what you

19   are exactly trying to do to me, sir.  You are trying

20   to get me to commit to something that you are saying.

21   I entered an order, and that's it, and don't tell me

22   what I did say and I didn't say.  I'm telling you what

23   I said.

24               That was my order.  Don't tell me what

JIM01634

C90

1      you are saying.  You are telling me what I am saying.

2      I am saying -- I am saying exactly this person you are

3      trying to bring in to testify about a conversation he

4      had with someone else who says he killed the victim in

5      this case is not admissible as hearsay.

6              Beyond that I am not saying anything.

7      You might be adding a few things.

8          MR. HILL:  I'm not trying to add.  I was trying to

9      make at this point if I could, your Honor, make an

10     offer of proof.

11         THE COURT:  You want to make an offer of proof?

12     That I would be more than happy to let you do.  Okay.

13     No problem there.  You can always make an offer of

14     proof.  Okay.

15              Are we ready?

16         MR. HILL:   I would like to make the offer of

17     proof so if I forget it will be this is the offer of

18     proof if Mr. -- I will spell the first name

19     E-z-e-q-u-i-e-l Romo, of 2970 West Nelson were allowed

20     to testify he would testify that on a date after

21     February 10th, 1993, he had a conversation with a Juan

22     Carlos Torres, and in that conversation he asked

23     Mr. -- among other questions he asked Mr. Torres did

24     he have any information regarding the murder of Eric

JIM01635

C91

SA314

1    Morro.

2            He did inform Mr. Romo that he in fact

3    had shot and killed Eric Morro on February 3rd, 1993.

4        THE COURT:  My ruling on it I will not allow it,

5    number one, absolutely no reliability and, number two,

6    it's hearsay.

7        MR. MURPHY:  If I may inquire I know the defense

8    is making an offer of proof.  Is Mr. Romo prepared to

9    testify, too, that we spoke to Mr. Romo yesterday and

10   I'm not sure if Mr. Romo was even going to testify in

11   this case, willing to testify?  I'm asking the

12   defense. -

13       MR. HILL:    Yes.  He was under subpoena.

14       MR. MURPHY:  Is he indicating he would testify?

15       MR. HILL:    His yes.

16       MR. MURPHY:  We received indications from him

17   yesterday he indicated hesitancy in getting involved.

18       MR. HILL:  There was no question.  I had a

19   conversation with him.  I got a prover if I need to

20   bring him that would say we talked to him at his job,

21   had lunch with him, and he informed us that --

22       THE COURT:  I assume he will not testify?

23       MR. HILL:    That would be the only thing that he

24   would testify to, your Honor.

JIM01636

1    THE COURT: All right. I have ruled it out.

2    MR. GAUGHAN: Also at this time, the original gang

3    officer we had intended on calling injured himself

4    over the weekend. We are amending our answer.

5         The testimony will be basically to

6    change from Dan Noone to Galligan, Star Number 2430,

7    of the Gang Investigation Unit of the Chicago Police

8    Department.

9    THE COURT: Any objection? I know you object to

10   the testimony of the gang officer. Are you objecting

11   to the fact it's one instead of the other?

12   MR. HILL: We have asked a long time ago for a

13   curriculum vitae. I never received it on any officer

14   as it relates the gang expert.

15   MR. MURPHY: They did and I told defense I would

16   provide one for Dan Noone. It's my understanding he

17   does have one; however, this officer testifying does

18   not have a resume' or curriculum vitae, so none

19   exists.

20   THE COURT: I assume he will testify to his

21   expertise?

22   MR. MURPHY: That's correct.

23   THE COURT: I will let it in on this basis.

24   MR. MURPHY: One additional witness who is not

JIM01637

1    here today.  He's a ballistic expert.  He would be

2    called merely for the purpose of establishing the

3    caliber of bullet recovered from the victim's body.

4         We spoke to defense in this case, Judge,

5    and we understand that defense will not stipulate to

6    that testimony.  I spoke to the ballistics expert this

7    morning, and we had thought that he would be able to

8    come in today if we couldn't reach a stipulation.

9         We learned when we called the lab that

10    he had to leave today for a therapy session due to

11    some injury he has.  He is gone for the day.  Your

12    Honor, we anticipate resting after the next witness

13    except for the ballistics expert.

14         What I am asking the Court and defense

15    counsel and both to consider calling that witness out

16    of order tomorrow.  I understand the defense will put

17    witnesses on today.

18    THE COURT:  Do you have an objection to that, him

19    being called out of order?

20    MR. HILL:  No.

21    THE COURT:  You don't want to stipulate?

22    MR. HILL:   No.

23    THE COURT:  Okay.

24    MR. HILL:  I want the record to indicate he died

JIM01638

C94

SA317

1    of a 22 bullet shell.

2        THE COURT:  You don't want to stipulate?

3        MR. HILL:    No, sir.  I don't.

4        THE COURT:  Okay.

5            There's no objection by the State.

6    Proceed.

7        MR. MURPHY:  We will rest after this witness.

8    Will you take the jury back out?

9        THE COURT:  Yeah.  Then I'm sure the defense may

10   want to have a short recess.  I'm not sure.

11       MR. MURPHY:  We're ready to go.

12       THE COURT: State call their next witness.

13       MR. GAUGHAN:  People would call Officer Galligan.

14       THE CLERK:  Please, raise your right hand.

15            (witness sworn.)

16       THE COURT:  Please, proceed.

17

18

19

20

21

22

23

24

JIM01639

1    O F F I C E R    J.    G A L L I G A N,

2    the witness herein, called as a witness on behalf of

3    the People of the State of Illinois, having been first

4    duly sworn, was examined and testified as follows:

5

6              DIRECT EXAMINATION

7              BY

8              MR. GAUGHAN:

9

10        Q    Officer, could you, please, state your name,

11    star number, current assignment?

12        A    My name is John Galligan, G-a-double

13    l-i-g-a-n, Star Number 2430.  I'm a gang specialist

14    currently assigned to the Gang Investigations Section

15    Chicago police.

16        Q    How long have you been assigned to the Gang

17    Investigation Section of the Chicago Police

18    Department?

19        A    I have been in gangs since 1982.  I have been

20    a specialist since 1985.

21        Q    How long have you been a Chicago police

22    officer?

23        A    16 years.

24        Q    Have you had specialized training in the

JIM01640

C96

1    field of gangs?

2        A    Other than going through the department's

3    gang specialist school and working the streets for

4    over ten years with gangs, no.

5        Q    Okay.

6             Officer, specifically, what kind of

7    duties are you engaged in working the streets as a

8    gang crimes specialist?

9        A    Gang specialists are charged with any gang

10   related homicides, serious aggravated batteries, gang

11   related narcotics trafficking, gang recruitment,

12   anything criminal activity that would be on the gang

13   end of it.

14       Q    Officer, as part of your duties have you been

15   assigned to monitor any particular gangs?

16       A    Yes.

17       Q    What gangs are those?

18       A    I have been charged with monitoring Simon

19   City Royals, Latin Kings and Harrison Gents.

20       Q    Specifically, with respect to Simon City

21   Royals what have you done in gathering information or

22   monitoring that gang?

23       A    Every year you are required from the

24   department to fill out what we call a gang synoptic

JIM01641

C97

1   report; membership, leadership, what do they, you

2   know, how do they obtain their money, what criminal

3   activities are they engaging in, where they are

4   located, where do they hang out, where do they conduct

5   your criminal activity.

6        Q    Specifically with respect to Simon City

7   Royals how long have you been monitoring them first of

8   all?

9        A    That was my first gang that I was given back

10  in '85.

11       Q    Specifically with respect to Simon City

12  Royals what information have you gathered since 1985?

13       A    That they were -- they are the oldest white

14  street gang in the city.  They were formed in the

15  1960's at a place called Simon Park in the 14th

16  District.  They are currently located -- strong point

17  are School and Albany, Avondale Park and Koscuiszko

18  Park.

19       Q    Okay.

20            Where are School and Albany in relation

21  to Belmont and Sacramento?

22       A    Very close, very close.

23       Q    Over the years in gathering information on

24  the Simon City Royals, what particular activities is

                                      JIM01642

1    that gang involved in?

2        A    Traditionally the Royals have been --

3        MR. HILL:  I would object to relevancy.

4        THE COURT:  Overruled at least at this point to

5    the last question.  It's overruled.  Not that I am

6    closing you on other objections.  As to activity he

7    may testify.

8        THE WITNESS:    Thank you, your Honor.

9             They're historically a home

10   invasion-burglary crew.  Within the last 3 to 5 years

11   they are more into the narcotics end of criminal

12   activity.

13       Q    Okay.

14            You testified that you do a synoptic

15   report at the end of each year?

16       A    Yes.

17       Q    Does the include synoptic report on Simon

18   City Royals?

19       A    Yes.

20       Q    How many members are there in the Simon City

21   Royals?

22       A    There are currently over five hundred names

23   on record being in this gang.

24       Q    What about back in February, 1993?

JIM01643

C99

SA322

1        A    Approximately the same number.

2        Q    Officer, are you familiar with the leadership

3   structure of Simon City Royals?

4        A    Yes.

5        Q    What is the structure?

6        A    Would you likes names or structure?

7        Q    Both?

8        A    There are currently two what they call first

9   presidents.  Fender and Akim Hatsa.  That would be the

10  two leaders.

11            Next would be the street coordinators

12  under him would be their section leaders, and each

13  different area of the city that they are strong in

14  would be a separate section.  Under the section

15  leaders would be soldiers.

16       Q    Okay.

17            Officer, are you familiar with a branch

18  of Simon City Royals called the Pee Wee Royals?

19  THE COURT:  What?

20  MR. MURPHY:    Pee Wee Simon City Royals?

21  THE WITNESS:  A    Yes.

22       Q    What are the Pee Wee Simon City Royals?

23       A    Pee Wee's would pertain to any street gang in

24  this city are younger kids who are from ages --

JIM01644

C100

SA323

1    youngest I have found to be ten, and they would be

2    recruited by the older gang members to work as

3    lookout, carry the weapons, transport narcotics

4    throughout the area because they are less likely to be

5    stopped by the police.

6        Q    There is a structure to the Pee Wee Royals

7    also?

8        A    Yes.

9        Q    What is the structure of the Pee Wee Royals?

10       A    There will be a leader.  That leader would be

11   in charge of the younger kids.  He would answer to the

12   leader of the older group.

13       Q    Officer, what are the gang colors of Simon

14   City Royals?

15       A    Black and blue.  Royal blue and black.

16       Q    Do they have any particular signs or signals?

17       A    Their hand sign is something like this.

18   Always left hand.

19       Q    Indicating the officer holding up his left

20   hand across his first two fingers, other two fingers

21   down and thumb over it.

22            What about the symbol of Simon City

23   Royals?

24       A    Their symbols range from SCR, standing for

JIM01645

C101

SA324

1    Simon City Royals, a top hat with cross shotguns or

2    cross swords, a bunny's head with a bent left ear.

3    They have many, many symbols.

4         Q    Are you familiar with the term tricking?

5         A    Sure.

6         Q    In gang terminology what does the term

7    tricking stand for?

8         A    As far as a gang member, tricking would be

9    that if you have two members of the same gang and one

10   talks to the police and implicates the other in a

11   crime, that is what is termed tricking.

12        Q    Is there any consequences?

13        A    Yes, there is.

14        Q    For tricking on a fellow gang member?

15        A    Yes.

16        Q    What are the consequences?

17        A    The consequence for talking to the police is

18   what they call a violation.  The severity of the crime

19   that this individual would be tricking on has a direct

20   relationship to the severity of the punishment

21   received.

22        Q    Are you familiar with what the violations for

23   tricking on a fellow gang member in a murder case?

24        A    Yes, I am.

JIM01646

C102

1    Q    Specifically are you familiar with respect to

2  the Simon City Royals?

3    A    Yes.

4    Q    Officer, what is the consequence of one Simon

5  City Royal tricking on another one?

6    A    In a murder investigation?

7    Q    Yes.

8    A    That's a death violation.

9    Q    What do you mean by death violation?

10    A    That member who tricked to the police that

11  cooperated with the police would either be shot,

12  stabbed or beaten to death.  He would be dead.

13    Q    Officer, is there any consequences for

14  civilians testifying against a Simon City Royal?

15    A    Sure.

16    Q    What is the consequence for a civilian?

17    MR. HILL:  Judge, I would object to this line of

18  questioning.

19    THE COURT:  I didn't get the last question.

20    MR. GAUGHAN:  I'm asking the consequences of a

21  civilian witness testifying against a Simon City

22  Royal, a nongang member testifying against a Simon

23  City Royal.

24    THE COURT:  A nongang member testifying against --

JIM01647

C103

1    is that a violation?

2        THE WITNESS:    Your Honor, they consider us

3    neutrons.  We're not in the gang.  They would only

4    violate other members.  What they would do to a

5    civilian would be intimidation, violence.

6        THE COURT:  I will sustain the objection, what

7    they would to do.

8        MR. GAUGHAN:    Q  Is there any particular types of

9    letters that the Simon City Royals use to display

10   their gang?

11       THE WITNESS:  A    They like to write in what I

12   call Gothic script.  It's real ornate lettering.  It's

13   just not printing.  It's pretty fancy.

14       Q    Officer, are you familiar with a Simon City

15   Royals by the name of John Spaugh?

16       A    Yes, John Spaugh.

17       Q    What is your familiarity with John Spaugh?

18       THE COURT:  Who?

19       MR. GAUGHAN:    Spaugh?

20       THE WITNESS:    Johnny Spaugh is a -- what I would

21   consider an old gang member.  He's been around down in

22   that particular area.

23       Q    When you say that particular area?

24       A    Albany and School.

JIM01648

1      MR. HILL:     Judge, I would have an objection.

2    There's no evidence in this case about a Johnny

3    Spaugh.

4      THE COURT:  I don't know of any either.

5      MR. GAUGHAN: Judge, there is.

6      MR. MURPHY:  Last paragraph, last witness.  Last

7    witness who testified testified about that witness,

8    that person.  I can read it if you like.

9      THE COURT:  Let me see it.

10          All right.

11      MR. GAUGHAN:  Q  How are you familiar with Johnny

12    Spaugh?

13      THE WITNESS:  A    Johnny Spaugh has been a Simon

14    City Royal many years.

15      Q    What area of the city is he a Simon City

16    Royal?

17      A.  He belongs in that Albany-School section.

18      Q    Officer, I want to show you -- could I have

19    one moment, your Honor?

20      THE COURT:  Yeah.

21      MR. GAUGHAN:    I'm showing counsel what's

22    previously been marked as People's Exhibit Number 23.

23          Q    Showing you what has be marked as

24    People's Exhibit Number 23, for purposes of

JIM01649

C105

SA328

1    identification.  The coat the gentleman his wearing in

2    that picture what's the significance of that coat?

3        THE WITNESS:  A    To a gang member the

4    significance is that it's royal blue with black,

5    standard colors for Simon City Royals.

6        THE COURT:  Coloring?

7        THE WITNESS:    Yes, your Honor.

8        MR. GAUGHAN:    I have no further questions.

9        THE COURT:  Cross-examination?

10

11            CROSS-EXAMINATION

12            BY

13            MR. HILL:

14

15        Q    Officer, if I can have just a second, your

16    Honor.

17        THE COURT:  Sure.

18        MR. HILL:  Q  Officer, do you know a gentleman by

19    the name of Taeksu?

20        THE WITNESS:  A  Do I know him personally?

21        Q    No.  Is he a member of Simon City Royals.

22        A    There's five hundred members.

23        Q    His last name is Chi, C-h-i.

24        A    I don't know contend to know every one.

JIM01650

C106

SA329

1    Q    What gang has purple and gold as its colors?

2    A    Purple and gold?

3    Q    Yeah.

4    A    It could be the Harrison Gents.

5    Q    Um-humm.  Anybody else?

6    A    I can't think of any.

7    Q    Who would have Georgetown jackets?  Which

8    gang would have that?

9    A    That could be AO's.  Georgetown his blue and

10   white.

11   Q    You said who?

12   A    AO's.  Albany and Orchestra.

13   Q    Okay.

14        If a gang member, a lower gang member or

15   somebody in his family does something to a higher gang

16   member, couldn't they go after their own?

17   A    Yes.

18   Q    And in fact a person wouldn't get violated if

19   he assisted higher gang members in going after that

20   one; isn't that right?

21   A    If I am following you correctly, they would

22   actually gain respect.

23   Q    Now, if you got out of the gang you said you

24   are violated, right?

JIM01651

C107

1        A    Yes.

2        Q    Now, if somebody got out of the gang and

3   wasn't violated, wouldn't that raise some suspicion in

4   your mind as a gang expert?

5        THE COURT:  As to what terms?

6        MR. MURPHY:    Objection.

7        THE COURT:  As to what?

8        MR. HILL:    As it relates to whether he is out of

9   the gang.

10       THE COURT:  Overruled.  He may answer if he

11  understands the question.

12       THE WITNESS:    I think I do, your Honor.

13              There are ways of getting out of the

14  gang without being violated; one, being an older

15  ranking member who has served his time in the gang.

16  They are not going to give this gentleman a five man

17  head to toe violation.  He has rank with these people.

18  He is honored, gained their respect.  If he announced

19  his retirement he would not be violated.

20       Q    How about a fourteen year old?

21       A    That would not fit that criteria.

22       Q    Unless he earned a benefit or did something

23  for a higher gang member, right?

24       A    Yes.  That could be a possibility.

JIM01652

C108

SA331

1    MR. HILL: No further questions.  Thank you very

2    much.

3    MR. GAUGHAN:  Nothing further, your Honor.

4    THE WITNESS:    Thank you, your Honor.

5    MR. MURPHY:  At this time we are prepared to rest

6    our case in chief.

7    THE COURT:  Exhibits?

8    MR. MURPHY:  We would like to offer exhibits.

9    There's one witness who we discussed previously.

10    THE COURT:  Exhibits one through what?

11    MR. MURPHY:  Judge, it would be one through 22 I

12    believe.

13    THE COURT:  23 is the last picture.

14    MR. MURPHY:  I'm sorry.  One through twenty-three.

15    Actually, Judge, I believe there was not an exhibit

16    marked 21.  It would be one through 20, 21, 22 and 23.

17    THE COURT:  And then what?

18    MR. MURPHY:  21.  22 and 23.

19    THE COURT:  What.

20    MR. MURPHY:   21 through 23.

21    THE COURT:  Okay.

22              Any objection?  These are for the

23    purposes of admission at this point.  They will be

24    admitted.  Identification marks will be stricken.

                                        JIM01653

```
 1    State rests.

 2         MR. MURPHY:  People rest.

 3         THE COURT:  Defense ready to proceed?

 4         MR. HILL:    If we could have five minutes.

 5         THE COURT:  Okay.

 6              Short recess and hear the defendant's

 7    case.

 8                   (Whereupon, there was a
                     discussion had outside the
 9                   presence and hearing of the jury.)

10

11

12    MR. MURPHY:    The witness we asked to stay until

13    2:30 is here.  She received a subpoena for tomorrow.

14         THE COURT:  Until tomorrow?

15         MR. HILL:    Yes.

16         THE COURT:  We will excuse her as of day?

17         MR. HILL:  Um-humm.  This is first.

18         THE COURT:  Call her out.  Tomorrow at 1:30?

19         MR. HILL:    Yes.

20                   (Whereupon, there was a short

21                   recess.)

22

23         THE CLERK:  Thaddeus Jimenez, Sheet 6.

24         MR. MURPHY:  There's a witness who is out in the
```

JIM01654

C110

1    hall.  We actually spoke to him yesterday.  His name

2    is Joe P-a-u-p-a-u.  I believe pronunciation is

3    pow-pow.

4              We spoke with him yesterday.  Based on

5    what he told us, Judge, I believe his testimony is

6    completely irrelevant to any issue that is involved in

7    this particular trial.

8              I'm asking defense make an offer of

9    proof what that witness will testify to because I

10   believe it's completely and totally irrelevant to this

11   trial.

12              THE COURT:  What is the witness going to testify

13   to?  Maybe defense can tell me.

14              MR. HILL:  Sure, your Honor.  He would testify --

15   he would testify that on -- you have to think of this

16   in light of their expert's testimony, but he would

17   testify on January 24th, 1993, that he was at a party

18   in the building TJ lived in.

19              MR. MURPHY:  Are you reading from a report?

20              MR. HILL:  No.  I'm looking at a report.  He was

21   at a party where TJ lived on January 24, 1993.  On

22   that date he said he had an altercation with a Taeksu,

23   T-a-e-k-s-u and Chi, C-h-i, is the last name.

24              On that day he had an opportunity -- he

JIM01655

C111

SA334

1    knew Taeksu was a member of the Simon City Royals.

2    He's 23 years old, Asian man.  He had an altercation.

3    He knocked three of Taeksu's teeth out.

4              If you recall what the expert said he

5    said when something happens regarding a family member

6    or somebody related then you are not tricking on them

7    when you get them in trouble.  That's basically what

8    he testified to.

9              Our theory of the case is Taeksu,

10   because Joe Paopao knocked out Taeksu's teeth at his

11   house, that's why they gave him this case.  That's

12   why --

13        THE COURT:  Paopao knocked out Taeksu's teeth?

14        MR. HILL:    Is a leading gang member of the Simon

15   City Royals.

16        THE COURT:  Therefore, they accused this defendant

17   of murder?

18        MR. HILL:    Larry Tueffel, who is a member of the

19   Simon City Royals, who said now he's out of the gang

20   and didn't get violated, nor did he get in trouble,

21   and this officer said, expert said, when you trick on

22   somebody the violation is death.  He said it's pretty

23   strange in that when you do a favor for an older gang

24   member you can get out.

JIM01656

C112

SA335

1          I asked him, and so we feel that he

2   should be allowed to testify. He does add something.

3      THE COURT: As to knocking out Taeksu's teeth?

4      MR. HILL:    Um-humm.

5      THE COURT: Therefore, they placed the blame on to

6   hang the murder on this defendant?

7      MR. HILL: To get back at him.

8      THE COURT: That is about as far-fetched a theory

9   based on nothing, based on nothing at all.

10     MR. HILL:   Yes, it is, your Honor.   Maybe you

11  don't see it, but that's a factual issue and one for

12  which --

13     THE COURT: There's no evidence that any of that

14  occurred or that that was the result -- that's just

15  some supposition or dream in somebody's mind.  I will

16  permit that testimony for a minute.

17     MR. HILL:   Judge, it's not a supposition or a

18  dream.  It's a factual basis, and they put on an

19  expert who doesn't have any connection and gave some

20  theories, and his theories corroborate our evidence.

21     THE COURT: He will not testify in this case.

22  Absolutely not.  No semblance of any connection with

23  this case whatsoever.  He thinks somebody --

24     MR. HILL:    No.  He will not say he thinks.  He

JIM01657

C113

1    doesn't know.

2         MR. GAUGHAN:   Judge --

3         MR. HILL:    If I can finish.

4         THE COURT:  Sure.

5         MR. HILL:    I didn't say he was going to say he

6    thinks.

7         THE COURT:  Does he know?

8         MR. HILL:    If I can finish, your Honor.

9         THE COURT:  Well --

10        MR. HILL: I said what he would testify to is that

11   he knows Taeksu as a member of the Simon City Royals,

12   has a high rank.  He would testify a week before he

13   was at a party at Thaddeus' house; that the party was

14   for Thaddeus' nephew; and at this point Taeksu was

15   there.

16             They got in an altercation and he struck

17   Taeksu and knocked out three of his teeth out.  That's

18   what I said.  How do I tie this up?  It's a reasonable

19   inference and allowable to argue the fact the expert

20   testified, your Honor; and I asked him that; and I

21   asked him very clearly that if you are a member of the

22   gang and somebody in your family or somebody you know

23   does something to a high ranking it is not tricking or

24   sometimes if you get them in trouble and he said you

JIM01658

C114

SA337

1    are right.

2              I think I am allowed to argue that and

3    draw on the inference because I can put Joe on to

4    testify to that, your Honor.

5              Now you may not see that as having any

6    rhyme or reason, but that is a factual issue and

7    factual issues are for the jury to decide, not your

8    Honor.  That is not a legal issue.

9        THE COURT:  All right.

10       MR. GAUGHAN:  I would like to make sure the record

11   is clear.  When we talked to Mr. Paopao he also

12   indicated to us he had no direct knowledge there was

13   any connection between them punching out Taeksu.  He

14   indicated Taeksu said he didn't indicate -- think

15   there was a connection between them punching out

16   Taeksu.

17             This is total, total speculation.  It's

18   like let's go down two blocks and find out where there

19   was a fight or two months ago and say it has something

20   to do with this case.  It's ridiculous.

21       THE COURT:  I will not hear any more of this.  I

22   will not allow him to testify.  You made your

23   argument.  Maybe the appellate court will agree with

24   you on the issue.

JIM01659

C115

SA338

1      MR. HILL:  Thank you, your Honor.

2      THE COURT:  Paopao?

3      MR. HILL:   Joe Paopao.

4      MR. MURPHY:  P-a-u-p-a-u.

5      MR. HILL:  It's P-a-o-p-a-o.

6      THE COURT:  Okay.  P-a-o-p-a-o.  Okay.

7      MR. MURPHY:  There's two defense witnesses who

8  will testify I believe as alibi witnesses.  Defense

9  did give us the name -- there were six witnesses they

10 indicated they may call, gave dates of birth before

11 trial started on four of the witnesses.  The others

12 were Donna Whitley and Avery Patterson, who are here

13 that we just got the dates of birth from the witnesses

14 directly a couple minutes ago.

15          We are in the process of doing checks we

16 do when witnesses testify, so I would just ask defense

17 wait and give us an opportunity to obtain the records

18 we need to obtain.

19     THE COURT:  How long will that take?

20     MR. MURPHY:  Five to ten minutes.

21     THE COURT:  Is that one of your first witnesses?

22     MS. BURKE:  Lorraine.

23     MR. MURPHY:  Lorraine we have.  We don't have

24 Donna and Avery.

JIM01660

c116

SA339

1      MS. BURKE:  Avery is not here.

2      MR. MURPHY:  Donna, Avery.

3      MS. BURKE:  Our second one.

4      THE COURT:  First one?

5      MS. BURKE:  No, second one.  Go have the first

6  one.  By that time she might be here.

7      THE COURT:  Do you have the information on the

8  witnesses?

9      MS. MC CARTHY:  Yes.

10     THE COURT:  Is it moot now?

11     MR. MURPHY:  Yes.  I will proceed.

12     THE COURT:  Let's go.

13          Defense ready to proceed?

14     MR. BURKE:  Thank you.  We would call our first

15  witness.

16          (witness sworn.)

17     THE COURT:  Make sure you keep your voice nice and

18  loud.

19     THE COURT:  Defense ready to proceed?

20     MS. BURKE:  Thank you.  We would call as our first

21  witness.

22          (witness sworn.)

23     THE COURT:  Make sure you keep our voice nice and

24  loud.

JIM01661

1          L O R R A I N E   D O O L E Y,

2     the witness herein, called as a witness on behalf of

3     the Defendant, having been first duly sworn, was

4     examined and testified as follows:

5

6              DIRECT EXAMINATION

7              BY

8              MS. BURKE:

9

10        Q    Tell us first name and spell your last name

11    for us.

12        A    Lorraine Dooley, D-o-o-l-e-y.

13        Q    Okay.

14              And, Lorraine, how old are you?

15        A    I'm 19?

16        Q    And, Lorraine, where do you live at this

17    time?

18        A    Bloomington, Illinois.  Well, in Normal.

19    It's the twin cities.

20        Q    Okay.

21              Where were you living back on February

22    23, '93?

23        A    On Belmont.

24        Q    The address?

                                         JIM01662

1    A    3618 West Belmont.

2    Q    Who resides at this household?

3    A    Gloria Makowski, TJ's grandmother.

4    Q    Are you related in any way to Thaddeus

5 Jimenez or any of his family members?

6    A    No.

7    Q    Taking you back to that date February 3rd,

8 1993, I want to ask you questions about events that

9 occurred some time after 4:30, okay?

10    A    Um-humm.

11    Q    Going back to that date until that time did

12 you have occasion to see Thaddeus Jimenez?

13    A    Yes.  He came home around 4:30.

14    Q    Do you know where he came home from?

15    A    No.

16    Q    Who was present at the time Thaddeus came up?

17    A    All the grandchildren, quite a few of the

18 adults.

19    Q    Grandchildren?

20    A    And, quite a few of the adults.

21    Q    What was Thaddeus doing after he came home?

22    A    Playing Nintendo.

23    Q    Where -- I assume that's on a TV?

24    A    Yes.

JIM01663

1    Q    Where was he playing that at?

2    A    Front room.

3    Q    Where were you located when Thaddeus was

4    playing Nintendo?

5    A    In the front room.

6    Q    Was there anyone else in the front room at

7    that time?

8    A    All the grand kids.

9    Q    Approximately what time as best as you can

10   recall?  I know it's been over a year now.

11   Approximately what time did Thaddeus first start to

12   play Nintendo?

13   A    About ten minutes after he got home.

14   Q    Did anyone else arrive at that place at this

15   location, anyone else arrive after Thaddeus?

16   A    My brother at about six.

17   Q    Okay.

18        What's your brother's name?

19   A    Edward.

20   Q    Okay.

21        And, did anyone else arrive either

22   before or after Edward?

23   A    Donna.

24   Q    Do you know what Donna's full name is?

JIM01664

C120

SA343

1    A    No, I don't.

2    Q    Do you recall what time Donna arrived?

3    A    About five.

4    Q    Okay.

5         And, so, did you -- where were you at

6    after 4:30 until approximately seven o'clock?  Do you

7    recall where you were?

8    A    In the house.

9    Q    Do you remember what part of the house that

10    you were in?

11    A    Front room or living room.

12    Q    Okay.

13         And, you said Thaddeus was playing

14    Nintendo with the TV set?

15    A    Yes.

16    Q    That is located in the living room?

17    A    In the front room.

18    Q    I would ask you questions about the way this

19    particular household his laid out.  First of all that

20    is an apartment or a house?

21    A    It's an apartment.

22    Q    Can you describe what is in the living room

23    besides the TV?

24    A    Couch, some chairs, couple of tables.

JIM01665

C121

SA344

1      Q     Is that living room completely closed off or

2    is that living room open?

3      A     It's open.

4      Q     If you were to -- can you mentally walk us

5    through the living room to the back, the other part of

6    apartment?  If you were to walk through the living

7    room what would be the next room you would walk into?

8      A     From the front room?

9      Q     From the living room.

10     A     You go straight to the kitchen.

11     Q     What, if anything, do you pass through from

12   the living room?  I'm calling it a living room.  That

13   is the same thing as front room?

14     A     It's -- there's no door.  It's just

15   connected.

16     Q     From the room -- to clarify the room that has

17   the TV where Thaddeus was playing Nintendo is the

18   living room?

19     A     Front room.

20     Q     Starting from the front room where Thaddeus

21   was what's located?  Walk us back towards where the

22   kitchen is.  What do you walk to to get to the

23   kitchen?  What's the first room?

24     A     Living room.

JIM01666

c122

1   Q What's in the living room?

2   A A table, dresser and a couch that's like a

3 bed couch.

4   Q Okay.

5     His that a closed room the -- what you

6 call the living room, that is a closed room or open

7 room?

8   A It's open.

9   Q Okay.

10     Can you walk us from the front room to

11 the living room from the living room to another room?

12   A Yeah.

13   Q Okay.

14     Are there any walls then that close you

15 off from --

16   A No.

17   Q From them to the living room?

18   A No.

19   Q Okay.

20     Now, let's go from the front room to

21 living room.  In the living room where you described

22 there are chairs and other things, what do you walk

23 through when you -- if you were to walk through,

24 proceed to continue to go in the same direction to go

JIM01667

1  through the living room, what room would be the next

2  room you would walk into?

3      A      Kitchen.

4      Q    Can you say what is in the kitchen?

5      A      Tables, refrigerator, microwave, stove,

6  phone.

7      Q    Can you see from -- if you were to be located

8  and stand in the kitchen could you see straight

9  through to where the front room his?

10     A    Yes.

11     Q    So is the apartment laid out kind of one long

12 rectangular shape?

13     A    Yes.

14     Q    On the other hand if you were standing at the

15 very end, furthest most end of the front room where

16 the TV his, can you look all the way through and then

17 see -- go all the way to the end where the kitchen

18 his?

19     A    Yes.  You can see the back door.

20     Q    Let's talk about the doors.  There's a back

21 door located where?

22     A    In the kitchen.

23     Q    Okay.

24                Now, his there a front door anywhere in

JIM01668

C124

SA347

1    the apartment?

2    A    Yes.

3    Q    Where would that be located?

4    A    Front room.

5    Q    Okay.

6         Now, when you said TJ was playing

7    Nintendo, where is the TV located in the front room?

8    A    Right by the wall where the door his.

9    Q    Okay.

10        Where was TJ sitting or standing or

11   whatever however it was he had himself positioned to

12   play Nintendo?

13   A    In front of the chair and TV.  In front of

14   the chair?

15   Q    If you were to stand in the kitchen area

16   looking down toward where the front room his again

17   could you see Thaddeus from the kitchen?

18   A    Yes.

19   Q    Okay.

20        If you were to stand where Thaddeus was

21   sitting with the Nintendo set could you then look down

22   in the kitchen, the opposite end to where the kitchen

23   his?

24   A    Yes.

JIM01669

```
 1        Q    Is it fair to say there's a clear shot?

 2        MR. MURPHY:    Objection to leading.  Counsel his

 3   leading the witness through the entire  --

 4        THE COURT:  Overruled.  She is explaining.

 5        MS. BURKE:  Q   There's a clear shot from one end

 6   of the apartment to the other end of the apartment?

 7        THE WITNESS:  A    Yes.

 8        Q    Now, was there ever a time between the hours

 9   of 4:30 and 7 that you ever saw Thaddeus leave that

10   apartment?

11        A    Yes.

12        Q    Where did he go?

13        A    Hallway to do his homework.

14        Q    Where is that located?

15        A    On the inside of the building.

16        Q    Inside of the building?

17        A    No, of the building.

18        Q    Okay.

19                   Was that actually located, the hallway,

20   located outside of the apartment?

21        A    No.

22        Q    Was it still inside the apartment building?

23        A    Yes.

24        Q    Okay.
```

JIM01670

1          And the hallway was there anyone in the

2    hallway besides Thaddeus?

3        A    Yes.

4        Q    Okay.

5             Who was that?

6        A    Edward.

7        Q    And who is Edward?

8        A    My brother.

9        Q    Okay.

10            And what time approximately did you see

11   Thaddeus enter that hallway?

12       A    About some time after 6:30.

13       Q    Okay.

14            It was after 6:30?

15       A    Yeah.

16       Q    Did you see him enter that hallway with

17   anyone?

18       A    My brother.

19       Q    Your brother?

20            Did you know how long -- if you know how

21   long Thaddeus was with your brother, Edward, in the

22   hallway after 6:30?

23       A    About forty minutes.

24       Q    Do you know what Thaddeus was doing in the

JIM01671

C127

SA350

```
 1   hallway with your brother?

 2        A    Yes.

 3        Q    What was he doing?

 4        A    His homework.

 5        Q    Did you see Thaddeus go anywhere beside the

 6   hallway between the hours of 4:30 and 7?

 7        A    No.

 8        Q    Do you know what Thaddeus was doing between

 9   the hours of 4:30 and 7?

10        A    Playing Nintendo.

11        Q    Did you remain after seven o'clock at

12   Thaddeus'?

13        A    Yes.

14        Q    How long were you there for?

15        A    I lived there.

16        Q    How long had you been living there before

17   this?

18        A    Oh, I would say about nine months.

19        Q    Okay.

20                  Lorraine, were you -- are you under

21   subpoena today?

22        A    Yes.

23        Q    And, do you care about what happens to

24   Thaddeus?
```

JIM01672

C128

SA351

1     A   Yes.

2     Q   Would you lie for Thaddeus?

3     A   No.

4     MS. BURKE:   May I have one moment, Judge?

5          Q   You have already told us that you were

6  at Thaddeus' house all night; is that right?

7     THE WITNESS: A   Yes.

8     Q   Did Thaddeus ever leave at any time that

9  night?

10     A   Yeah -- oh, at night?  Just to do his

11  homework.

12     Q   Beside going into the hallway?

13     A   No.

14     Q   Did he leave any time after going into the

15  hallway?

16     A   No.

17     Q   Did he leave the apartment building at any

18  time?

19     A   No.

20     MS. BURKE:  I have nothing further of this

21  witness.

22

23

24

JIM01673

```
 1                CROSS-EXAMINATION

 2                BY

 3                MR. MURPHY:

 4

 5      Q    Lorraine, how many people were in that

 6  apartment when you were there that night?

 7      A    Adults or children?

 8      Q    Adults?

 9      A    About 6.

10      Q    And, would you give me the names of the

11  adults who were in there?

12      A    Donna.

13      Q    What's her last name?

14      A    I don't know.  The Donna I'm talking about is

15  I believe Jimenez.  That's part of the family.

16      Q    Who else?

17      A    Vickie, Glorie.

18      Q    I'm sorry?

19      A    Vickie.

20      Q    Who is Vickie?

21      A    TJ's mom.

22  THE COURT:  She is who?

23  THE WITNESS:    TJ's mom.

24  MR. MURPHY:  Q    What is Donna's relation to TJ?
```

JIM01674

C130

1        THE WITNESS: A    The one I just named?

2        Q    Yes.

3        A    His aunt.

4        Q    Who are the other parties?

5        A    Glorie.

6        Q    Gloria?

7        A    Yes.

8        Q    And, what is Gloria's last name?

9        A    I don't know which one she goes by.  I

10   believe Makowski.

11       Q    Makowski?

12       A    Yes.  It's his aunt.

13       Q    Does she go by another name besides Makowski?

14       A    They have like two names.

15       Q    What's the other name?

16       A    Jimenez.

17       Q    Jimenez and Makowski?

18       A    I believe she goes by Makowski.

19       THE COURT:  That is Gloria?

20       THE WITNESS: A  Yes.

21       THE COURT:  Gloria Jimenez?

22       THE WITNESS:  No, Makowski.  I believe she goes

23   by,  It's his aunt.

24       MR. MURPHY:  Q    That's TJ's aunt?

JIM01675

C131

SA354

```
 1          THE WITNESS:  A  Yes, another aunt.

 2      Q   Who else?

 3      A   Donna.

 4      Q   Same Donna?

 5      A   Another Donna.

 6      Q   What's this Donna's last name?

 7      A   I don't know her last name.  This is Vickie's

 8  friend.

 9      Q   That's Vickie, TJ's mother's, friend?

10      A   Yes.

11      Q   That's four adults.  How many other adults?

12      A   Monroe.  That's another friend of his mom's.

13      Q   What's his last name?

14      A   I have no idea.

15      Q   Was that like a boyfriend?

16      A   No.

17      Q   Just a friend?

18      A   Yeah.

19      Q   Who else?

20      A   Well, that's about all.  My brother.  He is

21  20.

22      Q   Your brother's name is?

23      A   Edward.

24      Q   What's his last name?
```

JIM01676

C132

1       A       Mendryz.

2       Q       Mendryz?

3       A       Yes.

4       Q       Dooley is your married name?

5       A       Yes.

6       Q       You are married?

7       A       Yes.

8       Q       What is your relationship with TJ?

9       A       There is none.

10      Q       There's none at all?

11      A       Nope.

12      Q       You have testified that you were living,

13      though, with his mother?

14      A       His grandmother.

15      Q       That was at 3618 West Belmont?

16      A       Yes.

17      Q       How long have you been living with TJ's

18      grandmother at 3618 West Belmont before February 3rd

19      23rd, 1993?

20      A       About nine months.

21      Q       Who else was living in that apartment beside

22      yourself and TJ's grandmother?

23      A       Joe, Kermit.  That's about all I know.

24      Q       Who?

JIM01677

C133

1  A  Joe and Kermit.

2  Q  Joe?  What's Joe's last name?

3  A  I don't know what he goes by.

4  Q  And who is the other person?

5  A  Kermit.

6  Q  Kermit?

7  A  Yes.  That's his real name.

8  Q  Okay.

9     That is his first or last name?

10  A  First name.

11  Q  What's his last name?

12  A  I believe he goes by Makowski.  Those are

13 both his uncles.

14  Q  TJ's uncles?

15  A  Yes.

16  Q  What caused you to move in with TJ's

17 grandmother?  How did you meet her so that you moved

18 in with her?

19  A  I lived in the apartment upstairs on the

20 third floor.

21  Q  You moved downstairs and lived with her; is

22 that right?

23  A  Yeah.

24  Q  Why did you move out of your apartment?

JIM01678

C134

1       A    Because I ran away.

2       Q    Okay.

3    THE COURT:  You what?

4    THE WITNESS:    Ran away.

5    MR. MURPHY:  Q    You ran away from your parents?

6    THE WITNESS:  A    My aunt.

7       Q    Your aunt?

8       A    Yeah.

9       Q    Okay.

10           Then you moved into the apartment

11   underneath your aunt with TJ's grandmother?

12      A    No.  My aunt moved.  Then I went down.  She

13   knew I was there, though.

14      Q    Right.  TJ's grandmother took you in when you

15   ran away?

16      A    Yes.

17      Q    Did you tell TJ's grandmother you were going

18   to run away and you wanted to move in with her?

19      A    She knew I did.

20      Q    What's TJ's grandmother's name?

21      A    Gloria.

22      Q    What's her last name?

23      A    I believe she goes by Makowski.

24      Q    She is different than the Gloria Makowski or

JIM01679

C135

```
 1   Jimenez?

 2        A    Yes.  That's her first daughter.

 3        Q    Now, Lorraine, you lived -- how long did you

 4   know TJ before February 23rd, 1993?

 5        A    About 3 years.

 6        Q    Before you moved in with his grandmother then

 7   you knew him a little less than two and a half years;

 8   is that correct?

 9        A    About a year.

10        Q    Under what circumstances did you know TJ?

11        A    I went out with his cousin.

12        Q    Who?

13        A    Cheech.

14        Q    What's his name?

15        A    Cheech, Chester.

16        Q    What's his last name?

17        A    Makowski.

18        Q    How long did you go out with TJ's cousin,

19   Chester Makowski?

20        A    About two years.

21        Q    You ultimately didn't marry him, is that

22   accurate to say?

23        A    No.

24        Q    You broke up with him?
```

JIM01680

C136

1      A    Yes.

2      Q    Would it be fair to say you are pretty close

3  to the Makowski family?  That's pretty accurate?

4      A    I haven't seen them in like a year.

5      Q    At that time you were?

6      A    Yes.

7      Q    Now, Lorraine, what time did you get to the

8  apartment and what time did you leave?

9      A    I got there between 1:30 and two and I didn't

10  leave at all.

11      Q    You stayed all night?

12      A    Yes.

13      Q    What adults were in the apartment when you

14  got there?

15      A    When I got there?

16      Q    Yeah.

17      A    Joe, Kermit, and all the kids, Mark, but he

18  didn't live there.

19      Q    Kermit was there?

20      A    Yeah.

21      Q    Joe was there?

22      A    Yeah.

23      Q    Who is Joe?

24      A    His uncle.

JIM01681

C137

1      Q    He was not there later that night?  He was

2   there earlier?

3      A .  He's there all the time.  He never goes

4   anywhere.

5      Q   What's Joe's last name?

6      A   I don't know what he goes by.

7      Q    So you are saying Joe was there the whole

8   time?

9      A .  Yes.

10     Q    In the afternoon when you got there at one

11  o'clock and in the evening?

12     A   Yes.

13     Q .  He was one of the adults?

14     A   Yes.

15     Q    So Joe and Kermit are in the apartment when

16  you get there at one o'clock?

17     A   Yes.

18     Q   When you were there did other adults arrive?

19     A   There was more there.  I don't recall.  There

20  was a lot there.  All the grandchildren were there.

21     Q .  This is where you lived at that time, is that

22  right?

23     A   Yes.

24     Q    Would it be fair to say a lot of Makowskis

JIM01682

C138

1    were in and around the apartment a lot of times during

2    the day?

3         A    They were in the apartment.

4         Q    Is that true?

5         A    Yes.

6         Q    A lot of kids?

7         A    Yes.

8         Q    And Jimenez' -- Makowski and Jimenez are one

9    family in a sense?

10        A    Yes.

11        Q    They were all there, too?

12        A    Yes.

13        Q    So you were present at this time close to

14   them.  You would spend a lot of time with those

15   families; is that right?

16        A    Yes.

17        Q    Can you remember the names of the other

18   adults besides Joe and Kermit who were there?

19        A    Gloria, Mouse.

20        Q    Grandmother?

21        A    No, aunt.

22        Q    Who else?

23        A    I mean Donna.

24        Q    Which Donna is this?

JIM01683

C139

1    A    His aunt.

2    Q    Any other adults?

3    A    My brother around 6.

4    Q    Your brother got there at 6?

5    A    Around 6, yeah.

6    Q    Anybody else?

7    A    Donna arrived around five.

8    Q    Which Donna is that?

9    A    Vickie's friend.

10    Q    Up until five -- excuse me -- up until six

11    o'clock when your brother came were there any other

12    adults there?

13    A    Just ones I named.

14    Q    Okay.

15         Gloria showed up.  Donna, his aunt,

16    showed up.  Your brother showed up, and that's it?

17    Those are the only other people that came into the

18    apartment when you were there?

19    A    Gloria lived there at the time.

20    Q    What time did Gloria arrive?

21    A    I just told you Gloria lived there at the

22    time.

23    Q    She was gone when you came at one o'clock and

24    at some point she came to the apartment; is that

JIM01684

C140

SA363

1   right?

2        A   No.  She was there.

3        THE COURT:  Joe and Kermit with there also?

4        THE WITNESS:    Excuse me?

5        THE COURT:  Joe and Kermit were there?

6        THE WITNESS:    Yes.

7        MR. MURPHY:  Q    You didn't just say a little

8   while ago Gloria came in after you came in at one

9   o'clock, did you?

10       THE WITNESS:  A    I don't recall.  I'm sorry.  It

11  was a long time ago.

12       Q   So you are not sure about Donna?

13       A   She was there.

14       Q   His aunt, what time did she get there?

15       A   She was already there.

16       Q   Didn't you say a little while ago that Donna

17  got there after you got there?

18       A   Which Donna are you talking?  About Vickie's

19  friend?

20       Q   His aunt?

21       A   She lived there.  She was there.

22       Q   So she is there at one o'clock when you got

23  there?

24       A   Yes.  I didn't get there at one o'clock.  I

JIM01685

C141

1    said I got there between 1:30 and two.

2        Q    Did any of the adults leave when you were
3    there?

4        A    No.

5        Q    What time did you leave?

6        A    I didn't leave.

7        Q    You left the next morning?

8        A    To school.

9        Q    What time was that?

10       A    About 7.

11       Q    Who were the adults that were in the
12   apartment then?

13       A    Granny, Joe, Kermit and Gloria.

14       Q    Granny is his grandmother?

15       A    Yes.

16       Q    Joe.  Who is the other?

17       A    Kermit and Glorie.

18       Q    Kermit Makowski?

19       A    Yes.

20       Q    And which Gloria is this?

21       A    His aunt.

22       Q    Those were the only four adults there?

23       A    I believe Vickie.  She was sleeping.

24       Q    Who is Vickie?

JIM01686

C142

1      A      His mom.

2      Q      What about the other adults who were there

3  earlier, did you see them leave?

4      A -    Yeah, at night.

5      Q      When did they leave?  That's what I was

6  asking.  What adults left when you were there?

7      A      Oh.  Mark.  He comes in and out because he

8  lives down the street.

9      Q      Who is Mark?

10     A      His uncle.

11     Q      What's his last name?

12     A      I believe he goes by Makowski.

13     Q      What time did he arrive?  What time did he

14  leave?

15     A      He walks in and out constantly.

16     Q      On that particular day what time did he

17  arrive and leave as best as you can remember?

18     A      I don't know.  I don't pay attention to them.

19     Q      You remember him coming in and leaving?

20     A      Comes in all the time and leaves all the

21  time.

22     Q      Other than the fact you remember the time

23  your brother came in, the time you came in, and the

24  time that Donna came in, are there any other times

JIM01687

C143

1    that you remember?

2         MR. HILL:  Judge, I will object to this.

3         THE WITNESS:    Monroe arrived around six o'clock.

4         MR. HILL:    Compound question.

5         THE COURT:  I don't think it's compound.

6    Overruled.  She can answer that question.  If she

7    can't answer it she can ask it be repeated.

8         MR. MURPHY:    Do you understand the question?

9         THE WITNESS:  No.

10        Q    I will rephrase.

11        A    I started listening to him.

12        Q    Other than the time that you remember when

13   your brother came in, when Donna came in, and when you

14   came in do you remember any other times when anybody

15   came in or left?

16        A    Monroe came in around six o'clock.

17        Q    What time did he leave?

18        A    They left around 7.

19        Q    They?  Did he leave with somebody?

20        A    Yes.

21        Q    Who did he leave with?

22        A    Vickie and Donna.

23        Q    Which Vickie did he leave with?

24        A    His mom.

                                        JIM01688

1      Q    TJ's mom?

2      A    Yes.

3      Q    Anybody else?

4      A    Donna.

5      Q    I'm sorry.  Do you remember times anybody

6  else arrived and left?

7      A    Oh, no.

8      Q    You do remember TJ was there from 4:30 until

9  7; is that right?

10     A    Yes.

11     Q    In fact you remember so well what he did that

12  night that you remember him walking out of the

13  apartment at 6:30 to do homework, which you said he

14  did for forty minutes; is that right?

15     A    I said a little after 6:30, and yes.

16     Q    He did it for about forty minutes?

17     A    Yes.

18     Q    You remember the approximate time he did his

19  homework in the hall?

20     A    I didn't say approximate.

21     Q    You said a little more than forty minutes?

22     A    No.  I said about 40 minutes.

23     Q    That's what you testified to on direct,

24  right?

JIM01689

1    A    Um-humm.

2    Q    Do you remember when you were in the
3 apartment where Donna, his aunt, was at when she was
4 in the apartment?  What room was she in?

5    A    Kitchen.

6    Q    What about Vickie, his mom?

7    A    Walking around.

8    Q    She was all over the apartment?

9    A    Yes.

10    Q    What about Gloria Makowski?

11    A    Kitchen.

12    Q    What about Donna, TJ's mother's friend?

13    A    In the kitchen and walking around sometimes
14 in the front room.

15    Q    What about Monroe?

16    A    Sitting in the front room.

17    Q    And Edward Mendryz, your brother?

18    A    Sitting in the front room.

19    Q    And they spent most of their time in those
20 rooms?  Is that what you are saying, the people you
21 each described?

22    A    Yes.

23    Q    What about Joe, where was he?

24    A    In his own room.

JIM01690

C146

SA369

```
 1      Q    How about Kermit?

 2      A    Walking around.

 3      Q    Walking around where?

 4      A    The house.

 5      Q    The whole apartment?

 6      A    Mostly the kitchen.

 7      Q    What about Mark?

 8      A    He comes in and out.  He don't stay very

 9  long.

10      Q    When he was staying where was he in the

11  apartment?

12      A    Kitchen.

13      Q    The anybody have dinner or anything or eat,

14  any meals, during that time you were there?

15      A    Not really because we were all into Nintendo.

16      Q    From the time you were there from 4:30 on you

17  or no one else in your presence ate, correct?

18      A    I don't recall.

19      Q    You don't remember that.  You don't remember

20  anybody eating?

21      A    No, because they eat when they want to eat.

22      Q    Do you remember eating?

23      A    I ate.

24      Q    You do remember eating?
```

JIM01691

C147

SA370

```
 1      A    Yeah.  I always eat.

 2      Q    What time do you eat?

 3      A    I don't remember the time.

 4      Q    Approximately?

 5      A    I don't know.

 6      Q    Do you remember what you ate?

 7      A    No.

 8      Q    Lorraine, do you remember what you did the

 9   day before?

10      A    Went to school.

11      Q    Do you remember that day?

12      A    Why not?

13      Q    I'm sorry?

14      A    Yeah.

15      Q    Do you remember that you went to school

16   because you went to school every week day or do you

17   remember anything about that day?

18      A    No.

19      Q    You don't remember anything about that day?

20      A    No.

21      Q    Do you remember anything about the day after,

22   February 4, 1993?

23      A    Yes.

24      Q    What do you remember about that day?
```

JIM01692

C148

SA371

1    A    Because we were all upset TJ got arrested for

2    nuttin'.

3    Q    Okay.

4         When did you first learn TJ was

5    arrested?

6    A    When the cops came and took him.

7    Q    What time did the cops take him?

8    A    About 4:30 in the morning.

9    Q    Were you there when the cops came?

10   A    Yes.

11   Q    Did you talk to the police?

12   A    No.

13   Q    Now, Lorraine, like you said they took him

14   for no reason?

15   A    Yes.

16   Q    You knew according to what you are saying TJ

17   couldn't have been involved in this crime because you

18   were with him, right?

19   A    Yes.

20   Q    In fact when the police took him they said

21   the reason they were taking him is because he was --

22   they thought he was involved in a murder that occurred

23   at around 6:25 or 6:30 at night; isn't that true?

24   A    Yes.

JIM01693

C149

SA372

1    Q    You knew that that night when they took him,

2  didn't you?

3    A    In the morning, yes.

4    Q    Then they took TJ away in your presence; is

5  that true?

6    A    Yes.

7    Q  I'm sorry?

8    A    Yes.

9    Q    Did you tell the police at that time did you

10  say, "Hey, police officer, he was with me"?

11    A    Everybody there was saying that.

12    Q    Who did you tell that to?

13    A    The police.

14    Q    Could you describe the police officer you

15  said that to?

16    A    No.

17    Q    Can you tell us anything about what he looks

18  like?

19    A    No.

20    Q    Was he wearing a uniform or not wearing a

21  uniform?

22    A    Uniform.

23    Q    How many police officers came into your house

24  and arrested TJ?

JIM01694

C150

| | | |
|---|---|---|
| 1 | A | Two. |
| 2 | Q | Were both of them in or out of uniform? |
| 3 | A | I really don't recall that. |
| 4 | Q | Do you remember at least one in uniform? |
| 5 | A | Um-humm. |
| 6 | Q | The other one you don't remember? |
| 7 | A | Um-humm. |
| 8 | Q | How many times did you tell the police when |

9  they were there TJ was with you?

| | | |
|---|---|---|
| 10 | A | I don't recall how many times. |
| 11 | Q | You told them? |
| 12 | A | Yes. |
| 13 | Q | And who else told the police besides you? |
| 14 | A | Whoever woke up when they came in. |
| 15 | Q | Do you remember who else was there that was |

16 saying that?

| | | |
|---|---|---|
| 17 | A | Yes.  His mom, his grandmother. |
| 18 | Q | Anybody else? |
| 19 | A | His Uncle Joe. |
| 20 | Q | Lorraine, you know that TJ was charged |

21 sometime after that, within the next day; isn't that

22 correct?

| | | |
|---|---|---|
| 23 | A | Charged with what? |
| 24 | Q | Charged with murder. |

JIM01695

C151

1     A    Um-humm.

2     Q    You found that out, didn't you?

3     A.   Yes.

4     Q    Let me ask you this, Lorraine.  After TJ was

5 charged did you ever come into the state's attorney's

6 office and try to talk to any of the assistants like

7 myself and say, "Hey, TJ was with me.  He couldn't

8 have committed this crime"?  Did you ever do that?

9     A    Yes.  I talked to those -- Cynthia.

10    Q    Did you come into the State's Attorney's

11 Office and tell the states attorney's that they

12 charged the wrong guy because TJ was with you?

13    A    (No response)

14    Q    Did you ever do that?

15    A    I don't understand how you are saying it.

16    Q    Did you ever come -- do you know what the

17 State's Attorney's Office his?

18    A    No.

19    Q    Do you know who the prosecutors are?  Do you

20 know what the prosecutors are in a courtroom like

21 myself?

22    A    Um-humm.

23    Q    Did you ever go to any prosecutors in the

24 case, either go to the court or go to the prosecutor's

JIM01696

C152

```
 1    office, and tell them, "Hey, you charged the wrong

 2    guy.  I was with him.  You made a mistake"?  Did you

 3    ever do that?

 4         A    No.

 5         Q    Lorraine, how did you get here today?

 6         A    Car.

 7         Q    Who did you come with?

 8         A    His mother.

 9         Q    Who else?

10         A    My brother, his sister, Donna, and me.

11         Q    How many times have you come to court besides

12    today?

13         A    To the courtroom?

14         Q    To this building.

15         A    A couple.

16         Q    Two other times beside today?

17         A    About three times.

18         Q    The other times you came here who did you

19    come with then?

20         A    His mother, his sister, my brother.  Same

21    people.

22         Q    Where are you staying with while you are in

23    Chicago?

24         A    Now?
```

JIM01697

C153

```
 1        Q     Right now.  Where did you spend the night?

 2        A     At his grandmother's.

 3        Q     Who stayed there with you?

 4        A     My brother, Vickie, his sisters.  Do you want

 5   everybody in the house?

 6        Q     No.  That's okay.  That's enough.

 7              How many times did you talk to his

 8   family about what your testimony would be here today,

 9   anybody in his family?

10        A     Hardly because I have not even been in

11   Chicago for the past year.

12        Q     I understand that.  How many times before

13   today did you talk to anybody in his family about what

14   your testimony would be?

15        A     Once.

16        Q     One time.  That's it?

17        A     Yeah.

18        Q     Who was -- when was that you talked, had that

19   one conversation?

20        A     Yesterday.

21        Q     And, where did that conversation occur?

22        A     In the house.

23        Q     That was on Belmont, right?

24        A     Yeah.
```

JIM01698

C154

SA377

1      Q      Who was present when you spoke about what

2   your testimony would be at that time?

3      A      Same people.

4      Q      Lorraine, the people who are present for this

5   conversation I would like you to please name all the

6   adults who were part of that.

7      A      Me, my brother, Angela, Vickie, Donna.

8      Q      And each of you spoke about what your

9   testimony would be today?

10     A      No.

11     Q      Who spoke?

12     A      Well, we were just talking about what was

13  going to happen.

14     Q      Did you tell the other people who were there

15  what your testimony would be today?

16     A      No.

17     Q      Did they tell you what their testimony would

18  be?

19     A      No.  Parts.  We didn't lay nuttin' out.

20     Q      Who spoke about their testimony?

21     A      Everybody.

22     Q      You did, too, right?

23     A      Yeah.

24     Q      You said you talked to Cynthia?

JIM01699

1      A    Yes.

2      Q    Is that this attorney right here?

3      A    Yes.

4      Q    But when are you saying -- when is the first

5  time you talked to her?

6      A    Since when?

7      Q    When is the first time you told her what you

8  are saying here in court?

9      A    First time?

10      Q    Very first time.

11      A    When she was appointed to TJ.

12      Q    When was that?

13      A    I don't remember the date.  It was long.

14  When he first started.

15      Q    You are telling us that you spoke to her the

16  first day after this occurred?

17      A    I didn't say the first day.

18      Q    How long after?

19      A    I don't remember.

20      Q    Was it a week later?

21      A    I don't remember.

22      Q    Can you give us an approximate time period?

23      A    No.

24      Q    It could have been a week or could have been

JIM01700

C156

1  two weeks?  It could have been a month, could have

2  been two months?  You don't know?

3      A    Yeah.

4      MR. MURPHY:    Judge, I have no other questions.

5      THE COURT:  Redirect?

6

7              REDIRECT EXAMINATION

8              BY

9              MS. BURKE:

10

11     Q    Lorraine, when you spoke to me some time

12  before today some time in the past did you tell me the

13  same thing then that you have told the Court today?

14     A    Yes.

15     MS. BURKE:  Nothing further, Judge.

16     MR. MURPHY:  Nothing.  No further questions.

17     THE COURT:  Thank you.  You will be excused.  Next

18  witness?

19

20

21                    (witness sworn.)

22

23

24

JIM01701

C157

1               <u>D O N N A   W H I T L E Y</u>,

2    the witness herein, called as a witness on behalf of

3    the Defendant, having been first duly sworn, was

4    examined and testified as follows:

5

6                   DIRECT EXAMINATION

7                   BY

8                   MS. BURKE:

9

10        Q    Tell us your full name and spell last name

11   for the record.

12        A    Donna Whitley, W-h-i-t-l-e-y.

13        Q    Okay.

14                  How old are you?

15        A    38.

16        Q    And where do you reside at this time?

17        A    2526 Rose Street, Franklin Park.

18        Q    Are you employed at this time?

19        A    I'm a self-employed carpenter.

20        Q    Okay.

21                  I want to take you back to where you

22   were at February 3rd, 1993, around five clock in the

23   evening on that day. Do you recall?

24        A    Okay.

JIM01702

C158

SA381

1           Yeah.  I went to meet Vickie and some

2    friends by -- on Belmont, 3618 Belmont.

3        Q    Let me stop you.  You said Vickie.  Who is

4    Vickie?

5        A    Victoria Makowski, the mother.

6        Q    Is that Thaddeus Jimenez' mother?

7        A    Yes.

8        Q    What time did you arrive at that location?

9        A    4:55.

10       Q    How do you know you arrived at that time?

11       A    I asked the bus driver.  I just recently

12   moved, and I wanted to see the time for the

13   travelling; so, I asked him.  I didn't have a watch,

14   so he told me 4:55 when I got off the bus on the

15   corner.

16       Q    You actually arrived inside the apartment on

17   Belmont at what time?

18       A    Three minutes later once I stepped off the

19   bus, so five o'clock.

20       Q    Was Thaddeus there at that time?

21       A    Yes, he was on the video games.

22       Q    Okay.

23            And, what time did you leave that

24   location?

JIM01703

C159

SA382

1      A    It was very close to 7, maybe ten to, maybe

2  quarter to, very close to 7.

3      Q    Did anyone leave with you?

4      A    Yes.  Well, I left because I got in a cab to

5  hold the cab because Vickie was still getting ready.

6  It was me, Vickie, a friend named Monroe, so we left

7  together.

8      Q    Okay.

9                 Now, prior to the time that you left

10  around 7, did Thaddeus Jimenez ever leave the

11  apartment at any time that you were there?

12      A    No.

13      Q    Now, are you related in any way to either

14  Thaddeus or Thaddeus' mother?

15      A    No.

16      Q    And, are you here today under subpoena?

17      A    Yes.

18      Q    And, are you friends with Thaddeus?

19      A    (No response)

20      Q    Are you a friend of his?

21      A    I know him through his mother.  I would say

22  I'm more friends with his mother.

23      Q    Do you care about what happens to Thaddeus?

24      A    I care about -- you mean his well-being?

JIM01704

C160

1    Q    Would you lie for him?

2    A    No, no.

3    MS. BURKE:  I have nothing further of this

4    witness.

5    THE COURT:  Cross-examination?

6

7              CROSS-EXAMINATION

8              BY

9              MR. GAUGHAN

10

11    Q    Miss Whitley, how long have you known the

12    defendant's mother?

13    A    Almost a year prior to his arrest.

14    Q    How do you know her?

15    A    We lived in the same building.

16    Q    That would be at 3618?

17    A    No.  That was on Clarendon.

18    Q    What was the address?

19    A    48 -- gee.  I don't remember to tell you the

20    truth.

21    Q    How long did you live in the same building?

22    A    Close to a year, about nine months, ten

23    months.

24    Q    Was the defendant living in that building at

JIM01705

C161

```
 1    the time?

 2         A    He was there, yeah.

 3         Q    So did you get to know him fairly well?

 4         A    Not like his mother, no.

 5         Q    Did you ever talk to his mother about him?

 6         A    Not really.

 7         Q    Never talked about her son?

 8         A    I mean not really.

 9         Q    Did you know he was a Simon City Royal?

10         A    Pardon me?

11         Q    Did you know he was a Simon City Royal?

12         A    No.  I don't even know what that is.

13         Q    You said you got there at 4:55, right?

14         A    Yes.

15         Q    You were taking the bus?

16         A    Yes.

17         Q    Were you working as a carpenter back in

18    February, '93?

19         A    Yes.

20         Q    Were you working on that day?

21         A    No, I wasn't.

22         Q    Where were you coming from?

23         A    I was coming from Cicero and Armitage.

24         Q    You said you lived at Franklin Park?
```

JIM01708

C162

1     A    Now I do.

2     Q    When did you move to Franklin Park?

3     A    About two, three days ago.

4     Q    You testified you arrived in the apartment

5    about five clock?

6     A    Um-humm.

7     Q    Who else was in the apartment when you

8    arrived?

9     A    When I walked in Thaddeus was there and

10   Bobby.  They were playing the game in the living room.

11   I went straight to the bathroom because I really had

12   to go, but I could hear people in the kitchen.

13             I was in the bathroom maybe ten minutes.

14   I came out, went into the kitchen.  There was Gloria,

15   Donna, there was Ker -- Joey, one of the sons.  Vickie

16   came in after I came in.

17    Q    Who was playing the game?

18    A    Thaddeus and Bobby were playing.

19    Q    Bobby who?

20    A    I don't know even know his last name.

21    Q    What did he look like?

22    A    He's here.  What does he look like?  He's in

23   the room here.

24    Q    Do you know what his last name was?

JIM01707

```
1        A    Jimenez I think.

2        Q    And you testified you were there until seven

3   o'clock, right?

4        A    Close to seven.

5        Q    Was the defendant playing the video game from

6   the time you were there until you left?

7        A    When I walked out to get in the cab he was

8   still on the game.

9        Q    When you went out to get in the cab?

10       A    To hold the cab.

11       Q    What were you getting a cab for?

12       A    Holding the cab.  Victoria was not ready.  I

13  was pushing her.  We were trying to meet people, and

14  the cabs will leave if you don't hold them.  I went

15  out to tell them they will --

16       Q    Where were you going to meet people?

17       A    To Carol's Pub.

18       Q    What time were you supposed to meet people?

19       A    We were going to try to get there by seven.

20  We didn't make it.  We got there closer to 7:30.

21       Q    What did you do -- you were going over to

22  meet Vickie and who is it, Monroe?

23       A    Monroe.

24       Q    Who else?
```

JIM01708

C164

SA387

1      A    These are the people who went out.

2      Q    Right.

3      A    Monroe used to also live in the building we

4    lived in, and then every other Wednesday we just

5    started to get together to go out.

6      Q    And you went over there at five o'clock to

7    meet them to go out and stayed there until seven

8    o'clock?

9      A    Um-humm.  People got there later, you know.

10     Q    Who got there later?

11     A    Monroe.

12     Q    What time did Monroe get there?

13     A    Would have to be after -- around 6, close to

14   6 maybe.

15     Q    Did anybody else get there at 6?

16     A    Edward.  He got there about 6, maybe five,

17   ten after.

18     Q    So you kept in touch at that time back in

19   February, 1993, with the defendant's mother quite a

20   bit, correct?

21     A    Well, yeah.  We used to try to get together

22   every other week.

23     Q    When did you first learn the defendant was

24   arrested for murder?

JIM01709

C165

SA388

1    A    The following day.

2    Q    The following day.  You knew at that time

3  when you learned the following day on February 4th

4  according to what you are testifying to here today

5  that the defendant was being arrested for a murder he

6  didn't commit, correct?

7    A    I he was shocked, yeah.

8    Q    Did you ever go to the police station and

9  tell the police, "No, this man didn't commit it.  He

10  was with me"?

11    A    I have come here.

12    Q    Excuse me, Ma'am.

13    MR. HILL:    Judge, I would object.  Let her

14  answer.

15    THE COURT:  Wait, wait, wait.  Let her answer the

16  question.

17    THE WITNESS:    Did I go to the police station?

18  No, I did not go to the police station.  I knew he was

19  going to be appearing in court, so why would I go to a

20  police station?

21    MR. GAUGHAN:  Q  The answer his you never went to

22  the police, correct?

23    THE WITNESS: A    I did not.

24    Q    You knew he was arrested?

JIM01710

C166

```
 1        A     I found out the next day.

 2        Q     Did you ever tell anybody else that there was

 3   a wrong -- a wrongly accused man or boy accused of

 4   murder?

 5        A     My roommate.

 6        Q     Any authorities?

 7        A     No.

 8        Q     When did you move to Cicero and Armitage?

 9        A     Exact date?

10        Q     Yes.

11        A     It was September, '91, I think.

12        Q     September of '91?

13        A     I believe, yeah.

14        Q     How long did you live at Cicero and Armitage?

15        A     Two years, a little over two years.

16        Q     That's where you testified you were coming

17   from taking the bus, correct?

18        A     Um-humm.

19        Q     And you also testified that you got off the

20   bus and asked the bus driver what time it was because

21   up had to know how long it took you to take the bus

22   from the house you lived at for two years; correct?

23        A     No.  That's incorrect.  That's not what I

24   said.
```

                                    JIM01711

1    Q    Didn't you testify, Ma'am, you got off the

2    bus; you asked the bus driver what time it was because

3    you wanted to know how long it took to take the bus?

4    A    Yes, sir.

5    Q    Yes or no?

6    A    That was -- I had a car prior to that, sir.

7    My car broke down.  I just started bussing it.

8    Q    Did your car break down February 2nd?

9    A    My car was not -- it was beyond repair.

10   Q    Ma'am, during the time you were there from

11   five o'clock to seven o'clock what other adults were

12   in the apartment?

13   A    Okay.

14              There was Joey.

15   Q    Sorry?

16   A    Joey.

17   Q    What is the gentleman's last name?

18   A    Makowski I guess.  I'm not sure about the

19   last names.

20   Q    Who else?

21   A    Gloria.

22   Q    What was Gloria's last name?

23   A    Makowski I think.

24   Q    What is her relationship to defendant?

JIM01712

C168

SA391

1     A    She is a -- Vickie's sister.

2     Q    Who else?

3     A    Donna.

4     Q    Do you know what Donna's last name was?

5     A    I think it's Jimenez.

6     Q    Was there anybody else?

7     A    Denise.  Denise was there.

8     Q    Denise?

9     A    Denise.

10    Q    What was Denise's last name?

11    A    Makowski I think.

12    Q    How old was Denise?

13    A    She is forty something.  I don't know.

14    Q    What time did she arrive?

15    A    She was there when I got there at five

16  o'clock.

17    Q    Was she there when you left at seven o'clock?

18    A    Still there.

19    Q    Anybody else there?

20    A    Edward -- when I first arrived or after I got

21  there he came after.

22    Q    What time?  You said Edward got there around

23  6?

24    A    Yes.

JIM01713

C169

SA392

1.    Q    Was he there when you left?

2.    A    He was there when I left.  He was going to

3.  help Thaddeus with his homework.

4.    Q    He was going to?

5.    A    Yeah.  They were getting ready to do it.

6.    Q    When you left at seven o'clock?

7.    A    Um-humm.

8.    Q    He was going to tutor him?

9.    A    Yeah.

10.    Q    His there anybody else there?

11.    A    A lot of grand kids, the smaller kids.

12.    Q    Any other adults?

13.    A    Let's see.  Well, Monroe got there after I

14.  got there and, of course, Vickie.

15.    Q    One moment, your Honor.

16.         How many grandchildren were there?

17.    A    There was Debbie, Susie, the little ones,

18.  Michael, Manuel,

19.    Q    That is it?

20.    A    Duck.  I don't know her name.  It's a

21.  nickname.

22.    Q    Any more adults?

23.    A    No.  Well, Lorraine was there.

24.    Q    Lorraine Mendryz?

JIM01714

C170

1      A    I don't know her last name.

2      Q    Was she there when you left?

3      A    Yes.

4      Q    Was she there when you arrived?

5      A    Yes.

6      Q    You left with Vickie and Monroe?

7      A    We took the cab to Carol's.

8      Q    Were all the adults you just named there when

9   you left with Vickie and Monroe other than Vickie and

10  Monroe obviously?

11     A    Yes.  When we left they were there.

12     Q    How many times, Ma'am, did you talk to Vickie

13  about your testimony here today?

14     A    How many times?  Maybe once.

15     Q    Maybe once.  Are you still keeping in touch

16  with Vickie?

17     A    We talk maybe every other week.

18     Q    How many times have you discussed your

19  testimony for her son in this case?

20     A    Once or twice.

21     Q    Once or twice since February, 1993?

22     A    Yeah.

23     Q    Have you ever discussed your testimony with

24  any of the other family members?

JIM01715

1      A    No.

2      Q    How about with Lorraine?

3      A    No.

4      Q    How about Edward?

5      A    No.

6      Q    How did you get down to court today?

7      A    I got a ride.

8      Q    With who?

9      A    A friend.

10     Q    Was it any of the people that you named as

11   being with you?

12     A    No.

13     Q    Did you talk to them outside court today?

14     A    Not about this.

15     MR. GAUGHAN:  I have nothing further, Judge.

16

17                REDIRECT EXAMINATION

18                BY

19                MS. BURKE:

20

21

22     Q    When did your car break down?

23     A    Well, it broke down like December, but it was

24   a beater.  It wasn't really worth repairing, so, I had

                                        JIM01716

                    C172

                   SA395

1    to start doing the bus thing until I got another one.

2        MS. BURKE:    I have nothing further, Judge.    Thank

3    you, Donna.

4

5            RECROSS-EXAMINATION

6            BY

7            MR. GAUGHAN:

8

9        Q    You said your car broke down in December?

10        A    Like the end of December after Christmas.

11        Q    Just after Christmas?

12        A    Yeah.

13        Q    Did you go out with Vickie during January?

14        A    We went out in January but I had a ride at

15    that time.

16        Q    You got a ride during the other times in

17    January?

18        A    We went out a couple times in January.

19        Q    You got a ride that time?

20        A    My roommate gave me a ride.

21        MR. GAUGHAN:  Nothing further, Judge.

22        THE COURT:  Short recess.

23                (Whereupon, the jury left the

24                courtroom.)

JIM01717

C173

1    MR. MURPHY:    I would ask if you would tell

2    defense counsel's witnesses they should not talk to

3    each other.

4    THE COURT:  Yeah.  Do that.

5

6                        (WHEREUPON, there was a recess

7                         in the above-entitled cause.)

8

9    THE COURT:  Ready to proceed?

10    MS. BURKE:  Thank you, Judge.

11         (witness sworn.)

12

13              A N G E L A   J I M E N E Z,

14    the witness herein, called as a witness on behalf of

15    the Defendant, having been first duly sworn, was

16    examined and testified as follows:

17

18              DIRECT EXAMINATION

19              BY

20              MS. BURKE:

21

22    Q    Keep your voice nice and loud.

23    A    Okay.

24    Q    Thank you, Judge.  Angela, could you tell us

                                    JIM01718

                        C174

1    your first name and spell your last name for us?

2        A    Angela Jimenez, J-i-m-e-n-e-z.

3        Q    Okay.

4             Angela, are you related to Thaddeus

5    Jimenez?

6        A    Yes, I am.

7        Q    How is it that you are related?

8        A    He's my brother.

9        Q    Angela, how old are you?

10       A    19.

11       Q    Angela, where do you live at this time?

12       A    3618 West Belmont.

13       Q    Okay.

14             Now, I want to take you back to February

15    3rd, 1993.

16       A    Okay.

17       Q    In the hours approximately around say

18   from about six o'clock to about seven, a little after

19   seven, do you recall where you were at that time?

20       A    Yes.

21       Q    Where were you at?

22       A    At my grandmother's house.

23       Q    What's the address?

24       A    3618 West Belmont.

JIM01719

C175

SA398

1      Q    At that time was Thaddeus, your brother,

2    there that night?

3      A    Yes.

4      Q    Was he there during that time period of

5    approximately six to some time after seven?

6      A    Well, he was there from 6 to about quarter

7    the seven, seven o'clock, and then he was -- he went

8    in the hallway with my friend.

9      Q    Let's go back a little bit to when you first

10   saw Thaddeus.  When would that have been that day?

11     A    4:30.

12     Q    Okay.

13          And, did you see -- when was -- did you

14   see him the whole night?

15     A    To about eleven o'clock.

16     Q    What happened at eleven o'clock?

17     A    I left.

18     Q    Okay.

19          Now, you mentioned a moment ago that it

20   was a point where he went outside -- your brother went

21   into the hallway?

22     A    Um-humm.

23     Q    That was at what time approximately?

24     A    About 6:45 to seven o'clock.

JIM01720

C176

SA399

1    Q    Did he go by himself or was he with someone

2  else?

3    A    He was with Edward.

4    Q    And do you recall how long he was in the

5  hallway?

6    A    Until about 7:30.

7    Q    Do you know what he was doing when he was in

8  the hallway?

9    A    His homework.

10   Q    Was there ever a time that Thaddeus left the

11  apartment -- actually left the apartment?

12   A    No, not the apartment building.

13   Q    And that was while the entire time that you

14  were there until eleven o'clock did you ever see

15  Thaddeus leave the apartment?

16   A    No.

17   Q    What was Thaddeus doing while you were there

18  before you left?

19   A    Playing Nintendo.  Right before I left he was

20  laying down going to sleep.

21   Q    How is it that -- this is some time ago.  How

22  is it that you recall what your brother was doing that

23  night?

24   A    Because that was the date that they charged

JIM01721

C177

1    him for murder.

2        Q    Okay.

3            And, are you under subpoena to be here

4    today?

5        A    Yes, I am.

6        Q    Okay.

7            Would you lie for your own brother?

8        A    No.

9    MS. BURKE:    Nothing further, Judge.

10   THE COURT:    Cross-examination?

11

12            CROSS-EXAMINATION

13            BY

14            MR. MURPHY:

15

16       Q    Angela, what time did you get to the

17   apartment and what time did you leave?

18       A    Well, I stayed the night there.  I didn't

19   live there at that time.  I stayed the night there the

20   night before and I left eleven o'clock February 3rd.

21       Q    The next morning?

22       A    That night.

23       Q    What time did you get there?  I'm sorry.  I

24   think you said.

JIM01722

C178

SA401

1      A    The night before.

2      Q    That would have been on February 2nd?

3      A    Second.

4      Q    Okay.

5           Where did you live?

6      A    In Cicero.

7      Q    Now, Angela, from -- between the hours of

8   five and eleven o'clock that evening when you left who

9   were the adults that were in the apartment?

10     A    Well, my mother.

11     Q    I'm sorry.  Let me ask you that question

12  again.  During the time you were in the apartment on

13  February 3rd, 1993, who were the adults that were in

14  the apartment?

15     A    During the whole time?

16     Q    Yes.

17     A    Everybody there?

18     Q    Just the adults.

19     A    Okay.

20          My aunts, Aunt Donna, my Aunt Glore, my

21  mother.

22     Q    I will ask you to take them a little slower.

23  Aunt who?

24     A    Donna.

JIM01723

C179

| | | |
|---|---|---|
| 1 | Q | Who else? |
| 2 | A | My Aunt Glore. |
| 3 | Q | What time did your Aunt Donna arrive and what |
| 4 | | time did she leave? |
| 5 | A | My Aunt Donna lived there. |
| 6 | Q | Did you see her get in the apartment? |
| 7 | A | Who? |
| 8 | Q | Aunt Donna. |
| 9 | A | She lives there. |
| 10 | Q | I understand. |
| 11 | A | She was there. |
| 12 | Q | The whole time you were there and when you |
| 13 | | left? |
| 14 | A | Yes. |
| 15 | Q | Who else? |
| 16 | A | My Aunt Glorie. |
| 17 | Q | And your Aunt Gloria, what time did she get |
| 18 | | there? |
| 19 | A | She lived there, too. |
| 20 | Q | She was there when you got there and left? |
| 21 | A | Yes. |
| 22 | Q | Who else? |
| 23 | A | My mother. |
| 24 | Q | And was your mother there when you got there? |

JIM01724

C180

SA403

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Was she there when you left? |
| 3 | A | No, she wasn't. |
| 4 | Q | What time did she leave? |
| 5 | A | About ten to seven, seven o'clock. |
| 6 | Q | And who else was there? |
| 7 | A | My Uncle Joe. |
| 8 | Q | And was he there when you got there? |
| 9 | A | Yes. |
| 10 | Q | Was he there when you left? |
| 11 | A | Yes. |
| 12 | Q | Was he there the whole time? |
| 13 | A | Yes. |
| 14 | Q | Who else? |
| 15 | A | My Uncle Kermit. |
| 16 | Q | Was he there when you got there? |
| 17 | A | Yes. |
| 18 | Q | Was he there when you left? |
| 19 | A | Yes. |
| 20 | Q | And he was there the whole time? |
| 21 | A | Um-humm. |
| 22 | Q | Who else? |
| 23 | A | And then Lorraine was there. |
| 24 | Q | And when did she get there? |

JIM01725

C181

SA404

1    A    I don't know.  About two o'clock.

2    Q    What time did she leave?

3    A    She didn't.  She lives there.

4    Q    So she spent the night?

5    A    Yes.

6    Q    Anybody else?

7    A    Monroe.

8    Q    And, what time -- was he there when you got

9    there?

10    A    No.

11    Q    When did he get there?

12    A    I don't know.

13    Q    Was he there when you left?

14    A    No.  He left with my mother.

15    Q    He came and left when you were there?

16    A    Pardon?

17    Q    He came and left when you were there?

18    A    Yes.

19    Q    You don't know what time he came in and left?

20    A    He left the same time my mother did.

21    Q    Anybody else?

22    A    Donna.

23    Q    And that's Donna who just testified here?

24    A    Whitley, yes.

JIM01726

C182

1    Q    What time did she get there and what time did

2    she leave?

3    A    I don't know what time she got there.  She

4    left the same time as they did.

5    Q    Angela, how many times have you talked to the

6    other witnesses in this case about the testimony here

7    today?

8    A    Well, I went over my testimony yesterday with

9    my mother.

10    Q    All right.

11           And, other than going over your

12    testimony with your mother yesterday did you talk to

13    any of the other people who were supposed to be in the

14    apartment with you during this time?

15    A    I talked to them.

16    Q    Did you talk to them about your testimony?

17    A    No.

18    Q    Did you talk to -- did any of them talk to

19    you about what their testimony would be?

20    A    No.

21    Q    So, the only time you ever talked to anybody

22    about what your testimony would be was your mother one

23    time yesterday; is that correct?

24    A    Yes.

JIM01727

C183

SA406

1    Q    Who did you get come to court here with
2    today?
3    A    Pardon me?
4    Q    Who did you come to court here with today?
5    A    My aunt.
6    Q    Who is that?
7    A    Denise.
8    Q    Anybody else?
9    A    My mother.
10    Q    Anyone else?
11    A    Lorraine.
12    Q    Yes.  Who else?
13    A    Edward, and that's it.
14    Q    And, Lorraine is Lorraine Dooley?
15    A    Yes.
16    Q    Edward is her brother?
17    A    Um-humm.
18    Q    Angela, were you there when the police took
19    your brother into custody?
20    A    No.
21    Q    You were gone?
22    A    Yes.
23    Q    When did you learn your brother was taken
24    into custody?

JIM01728

C184

SA407

1       A     Seven o'clock next morning when my mother

2   came and told me.

3       Q     Did your mother tell you they took your --

4   strike that -- had arrested him about a murder that

5   occurred at 6:30 in the evening on February 3rd, 1993?

6       A     Yes.

7       Q     Did you -- when you learned that from your

8   mother did you go ever go to the police station and

9   tell the police that you were with your brother at the

10  time this murder occurred?

11      A     No, but I called them, and they told me that

12  there's nothing they could do it about it, and my

13  mother went the next day to the police station at

14  noon, and they said that my brother had already gone.

15      Q     When did you call the police?

16      A     All morning from seven until about ten.

17      Q     Do you know the names any of police officers

18  you spoke to?

19      A     My mother does.  I don't.

20      Q     You didn't ask names of police officers you

21  had spoke to?

22      A     No.

23      Q     Do you have any phone records showing you

24  made any calls to the police?

JIM01729

C185

1       A    We tried to get the records from the phone

2    company, but they don't go back that far.   They only

3    keep records for six months.

4       Q    Answer is no; is that correct?

5       A    Yes.

6       Q    Did you ever come into the state's attorney's

7    office and try to talk to any of the assistant state's

8    attorneys who were handling the case and tell them

9    that you were with your brother at the time that the

10   murder occurred and he couldn't have committed it?

11      A    No.

12      Q    And it's your testimony you would never lie

13   for your brother, that is what you are saying here?

14      A    That's true.

15      Q    Under any circumstances?

16      A    Under any circumstances I will not lie.

17      MR. MURPHY:    I have no further questions.

18      THE COURT:  Anything further?

19      MS. BURKE:  Nothing further, Judge.   Thank you.

20      THE CLERK:  Please, stand raise your right hand.

21                  (witness sworn.)

22

23

24

JIM01730

C186

SA409

1          E D W A R D   M E N D R Y Z,

2     the witness herein, called as a witness on behalf of

3     the Defendant, having been first duly sworn, was

4     examined and testified as follows:

5

6               DIRECT EXAMINATION

7               BY

8               MS. BURKE:

9

10        Q    Edward, could you tell us your first name and

11    spell your last name for us?

12        A    Edward Mendryz, M-e-n-d-r-y-z.

13        Q    Where do you live?

14        A    At the present time?

15        Q    Right.

16        A    3114 North Monticello.

17        Q    How old are you, Edward?

18        A    20.

19        Q    Are you employed at this time?

20        A    Yes, I am.

21        Q    Okay.

22               Where are you employed at?

23        A    Williams Electronics.

24        Q    Edward, I want to ask you questions and take

JIM01731

C187

1    you back to February 3rd, 1993.  Okay.

2                     At around the hours of six o'clock in

3    the evening that night do you recall where you were on

4    that date?

5        A    Yes, I do.

6        Q    Okay.

7                     Where were you at at that time?

8        A    I was at Thaddeus' grandmother's house.

9        Q    Do you know what the address is?

10       A    3618 West Monticello -- West Belmont.  My

11   fault.

12       Q    That's Okay.

13                    Edward, what time did you first arrive

14   at that location?

15       A    6:05.

16       Q    I'm sorry?

17       A    It was 6:05.

18       Q    Incidentally, are you related in any way to

19   Thaddeus Jimenez or anyone in his family?

20       A    No.

21       Q    When you arrived at that time did you see

22   Thaddeus there?

23       A    Yes, I did.

24       Q    Okay.

JIM01732

C188

SA411

1          Where did you see him?

2      A    He was in front of the TV playing a football

3   game on Nintendo with his cousin.

4      Q    This was in the living room or front room

5   rather?

6      A    Yes.

7      Q    Okay.

8               How long did you stay there that night?

9      A    Until midnight.

10     Q    Okay.

11              Now, during that time was there ever a

12  time that Thaddeus left that location, left that

13  apartment?

14     A    No, Ma'am.

15     Q    At around 6:30 or 6:45 did you have occasion

16  to work with Thaddeus on his homework?

17     A    Yes.

18     Q    Where did that happen at?

19     A    On the stairs in the hallway.

20     Q    Do you recall what kind of homework you were

21  helping him with?

22     A    I believe it was some math and history and

23  some writing of some kind.

24     Q    How long did that last approximately if you

JIM01733

1    can remember?

2        A    Half hour, forty-five minutes.

3        Q    Then after that at the end of your assisting

4    Thaddeus with his homework where did you and Thaddeus

5    go at that time?

6        A    Back into the living room.

7        Q    Did Thaddeus ever leave the house any time

8    after this point?

9        A    No, he didn't.

10       Q    And you yourself were there until

11   approximately midnight?

12      A    Yes.

13      Q    Where did you go at that time?

14      A    After midnight I went home.

15      Q    Okay.

16           Are you under subpoena today?

17      A    Yes, I am.

18      Q    Okay.

19           And, Thaddeus was a friend of yours?

20      A    No.  I used to live upstairs from his

21   grandmother.

22      Q    So you were a neighbor then?

23      A    Yes.

24      Q    Would you lie for Thaddeus?

JIM01734

C190

1      A    No, I wouldn't.

2      MS. BURKE:    I have nothing further, Judge.

3

4                    CROSS-EXAMINATION

5                    BY

6                    MR. GAUGHAN:

7

8      Q    You testified you used to live upstairs from

9   the defendant's grandmother?

10     A    Yes.

11     Q    What was that address?

12     A    3618 West Belmont, third floor.

13     Q    How long did you live at 3618 West Belmont?

14     A    About a year.

15     Q    And the entire time was the defendant living

16   there?

17     A    No.

18     Q    Was his grandmother living there?

19     A    Yes.

20     Q    Did he stay there quite a bit?

21     A    Couple times a week.

22     Q    He stayed there couple times a week?

23     A    Sort of.

24     Q    Was Vickie living there, his mother?

                                        JIM01735

```
 1      A    No, she wasn't.

 2      Q    What year did you live over there?

 3      A    Excuse me?

 4      Q    What year was it that you lived over there?

 5      A    I believe it was -- I moved out like winter

 6    of '90.

 7      Q    Sorry?

 8      A    In the winter of '90 I moved out.

 9      Q    You became pretty good friends with the

10    Jimenez; is that correct?

11      A    You can say that, yes.

12      Q    You like their family?

13      A    Yeah.  They are very decent.

14      Q    Do you like the defendant?

15      A    Excuse me?

16      Q    Do you like the defendant?

17      A    Yes.

18      Q    You wouldn't want to see anything bad happen

19    to him?

20      A    No, I wouldn't.

21      Q    When did you first learn that the defendant

22    had been arrested for murder?

23      A    The evening of the next day when I came over.

24      Q    So on February 4th, 1993; correct?
```

JIM01736

C192

1      A    Yes.

2      Q    And after you learned that the defendant had

3  been arrested did you ever tell the police that you

4  were with him when this murder took place?

5      A    No, I didn't.

6      Q    Did you ever attempt to contact any

7  authorities whatsoever and tell them that the guy they

8  had for murder was with you when the murder happened?

9      A    No, I didn't.

10     Q    Lorraine is your sister, correct?

11     A    Yes.

12     Q    Lorraine was living with the Jimenez' back in

13  February, 1993, correct?

14     A    Yes.

15     Q    As a matter of fact, Mr. Mendryz, not only

16  did you not attempt to contact any authorities, isn't

17  it a fact that just outside when we attempted to talk

18  to you about your testimony you refused to talk to us?

19     A    Yes, I did.

20     Q    What adults were in the apartment when you

21  arrived?

22     A    His mother was there.

23     Q    Where was Vickie?

24     A    Vickie was in the kitchen.

JIM01737

C193

1      Q    Who else?

2      A    Everly, Donna, his Aunt Donna, Glorie, his

3  Uncle Joe.  I believe his Aunt Denise was there.

4      Q    Was there anybody else, any other adults?

5      A    I don't recall.

6      Q    You were in the hallway from 6:30 until

7  quarter to seven until what time was it?

8      A    7:30.

9      Q    That would be the hallway somebody going in

10  and out of the apartment would have to go through,

11  correct?

12      A    Yes.

13      Q    How well did you know the defendant back in

14  February, 1993?

15      A    I used to hang out with him once in awhile.

16      Q    Were you aware he was a Simon City Royal?

17      A    Yes, I was.

18      Q    Show you what I will mark -- what's been

19  marked as People's Exhibit Number 23, for purposes of

20  identification.  Do you recognize the coat the

21  defendant is wearing in that picture?

22      A    Yes, I do.

23      Q    Is that his coat?

24      A    Yes, it is.

JIM01738

1      Q    How long had he been a Simon City Royal?

2      A    I have no idea.

3      Q    Now you said that Vickie was in the kitchen?

4      A    Yes.

5      Q    Where was Donna, not the aunt, the other

6  Donna?

7      A    The other Donna?  She was sitting in the

8  kitchen.

9      Q    How about Joe?

10     A    Who.

11     Q    Joe?

12     A    Uncle Joe, he stays in his room all the time.

13     Q    He lives there?

14     A    Yes.

15     Q    How about Gloria?

16     A    Gloria, she was in the kitchen.

17     Q    Were they in the kitchen the entire time you

18  were there?

19     A    People would go back and forth through the

20  house all the time.

21    MR. GAUGHAN:    One moment.  Nothing further, your

22  Honor.

23

24

JIM01739

C195

```
 1                    REDIRECT EXAMINATION

 2                    BY

 3                    MS. BURKE:

 4

 5         Q    Edward, do you remember speaking to me,

 6    contacting me, speaking to me around some time

 7    approximately last March of 1993?

 8         A    Yes.

 9         MR. MURPHY:  Objection to leading, Judge.

10         THE COURT:  Sustained.  That's very leading.

11         MS. BURKE:  Q  Do you recall the first time that

12    you ever spoke to me about this case?

13         THE WITNESS:  It was the first time I went to

14    court for the trial.

15         Q    Do you recall when approximately that was?

16         A    I don't remember the date exactly.

17         Q    Do you remember the month?

18         A    No.

19         Q    Was it in 1993?

20         A    Yes, when the case first started.

21         Q    So that would have been -- would that have

22    been some time after February of 1993?

23         A    Yes.

24         Q    Okay.
```

JIM01740

C196

1          Do you recall talking to me telling me

2   what you knew about this case?

3        A    Yes, I do.

4        Q    And did you tell me what you told the Court

5   today?  Was that about the same that you told me at

6   that time?

7        A    Yes, it was.

8        Q    Back in March of '93.

9          Could I have one moment, Judge?  I have

10  nothing further at this time.

11       THE COURT:  Thank you.

12       MR. GAUGHAN:  No questions.

13       THE COURT:  You are excused.

14       THE CLERK:  Please, stand and raise your right

15  hand.

16          (witness sworn.)

17

18

19

20

21

22

23

24

JIM01741

C197

1         V I C T O R I A     J I M E N E Z,

2    the witness herein, called as a witness on behalf of

3    the Defendant, having been first duly sworn, was

4    examined and testified as follows:

5

6                   DIRECT EXAMINATION

7                   BY

8                   MS. BURKE:

9

10        Q   Vickie, could you tell us first name and

11   spell your last name for us?

12        A   Victoria Jimenez, J-i-m-e-n-e-z.

13        Q   Okay.

14            Could you tell us where you reside at

15   this time?

16        A   3618 West Belmont.

17        Q   Okay.

18            Are you related in any way to Thaddeus

19   Jimenez?

20        A   I'm his mother.

21        Q   Okay.

22            Now, I'm going to take you back to

23   February 3rd, 1993, around the time of approximately

24   six o'clock. Do you recall where you were at at that

                                          JIM01742

                        C198

                      SA421

1    time?

2        A    Yes.

3        Q    Okay.

4            Where was that?

5        A    Same address.

6        Q    Okay.

7        A    It's my mother's house.

8        Q    That's your mother's house.  Did you see

9    Thaddeus there at that location?

10       A    Yes.

11       MS. BURKE:  Could I have one moment?

12       THE COURT:  All right.

13       MS. BURKE:  Q  When was it that you first saw

14   Thaddeus that day on February 3rd?

15       THE WITNESS: A    About 4:30 because he didn't

16   come straight from school.

17       Q    Okay.

18            And, how long were you there that night?

19   Was there a point where you left?

20       A    Yes.

21       Q    What time would that have been?

22       A    About a quarter to seven.

23       Q    Who did you leave with?

24       A    Donna and Monroe.

JIM01743

C199

1     Q    And, where was -- what was your designation

2  at that time?

3     A    We were going to meet a couple other friends

4  at this one lounge.

5     Q    Okay.

6          Now, before you left did you ever see

7  Thaddeus, your son?  Did you ever see your son ever

8  leave the apartment at that time?

9     A    No.

10     Q    Did he in fact have permission to leave that

11  apartment?

12     A    No.

13     Q    At any time that night?

14     A    No.

15     Q    Do you recall what Thaddeus was doing before

16  he left?

17     A    Playing Nintendo.

18     Q    Do you recall where the last place was that

19  you saw him before you left?

20     A    As I was leaving?

21     Q    As you were leaving?

22     A    He was in the hallway with Edward doing the

23  homework.

24     Q    Now, what school does -- was Thaddeus

JIM01744

C200

SA423

1    attending at that time?

2        A    John's.

3        Q    Tell us a little bit about your son.  What

4    kind of child was Thaddeus?

5        A    He is a good boy, very good boy, has a lot of

6    morals, a lot of respect.

7        MR. MURPHY:    Objection, Judge, character

8    evidence.

9        THE COURT:  Overruled if you don't go much

10   further.  It's a question that's admissible at this

11   point.

12       MS. BURKE: Q    Let me ask his Thaddeus right

13   handed or left handed?

14       THE WITNESS:  A    Right handed.

15       Q    Now, Vickie, did you ever attempt to contact

16   the police about your son and about this case?

17       A    Yes.

18       Q    When was the first time that you recall

19   contacting the police?

20       A    As soon as I walked in the door and found

21   out.

22       Q    Okay.

23            When was that?

24       A    About 6:30 in the morning.

JIM01745

C201

SA424

1       Q      Do you remember what date that was?

2       A      February 4th.  It was a Thursday because I

3   got off of work at 6.

4       Q      Was that the day Thaddeus was arrested?

5       A      Yep.

6       Q      Did you make personal contact or telephone

7   contact?

8       A      When I entered the house everybody woke up,

9   told me what was going on.  They gave me a card that

10   the detective had left, Bogucki.

11      Q      All right.

12      A      I called him repeatedly over and over, and I

13   says there's no way he could have killed nobody.  It's

14   not in him.  If I told the officer -- detective I said

15   if he if my son killed anybody may God take him from

16   me right now.

17             He says he did not do it.  I kept

18   calling.  He would not answer none of my questions.  I

19   finally got a hold of him again.  I said please tell

20   me what time this was supposed to happen and who he

21   was supposed to have killed.  They would not tell me

22   who he killed, but they told me around 6:20, and

23   that's when I knew it was impossible.

24      Q      Why did you know that?

JIM01746

C202

SA425

1    A.    Because I knew TJ was in the house playing

2    the game because I was getting mad at him because he

3    was delaying the homework.

4    Q    Did you make a further attempt at any time to

5    contact the police?

6    A    Then I took -- after they kept saying they

7    were taking him to juvenile I said could you, please,

8    hold them so I could see him.  They couldn't, kept

9    telling me not to come down.  Finally they said okay.

10    I took a cab from 3618 Belmont to Grand

11    and Central police station; and when I got there they

12    told me I just missed him.  He just left, and it

13    couldn't have took me more than twenty-five minutes.

14    The cab came real quick.

15    Q    Did you make a further attempt?

16    A    Yes.

17    Q    To talk to police?

18    A    I kept telling them, especially this

19    Detective Bogucki.  I told him look me in the eyes and

20    tell me why he isn't out there getting the real one,

21    the real killer.

22    Q    Did you tell Detective Bogucki any of the

23    names of any of the people that were there, any of

24    people there were there at your mother's house at that

JIM01747

C203

1    time this incident --

2        MR. GAUGHAN:  I will object to this whole line of

3    questioning.

4        THE COURT:  What's your objection?

5        MR. GAUGHAN:  Prior consistent statements.

6        THE COURT:  Overruled.

7        THE WITNESS:    I'm sorry.

8        MS. BURKE: Q    You can answer.

9        THE WITNESS: A    I told them there's a whole

10   bunch of people that were here when he was playing the

11   game.  I said -- he kept saying well, he goes, you are

12   the mother.  That's all he kept saying.  I kept

13   repeating to myself if I even had the slightest doubt

14   in my mind my son was capable of murder may God take

15   him from me right now, and I do believe in God.

16       Q    You love your son?

17       A    Yes, I do.

18       Q    But would you cover up for your son if your

19   son had done something wrong?

20       A    No, I would not.

21       MS. BURKE:  One more moment, Judge, if I may.

22       Q    Did you have occasion, Vickie, to see

23   Detective Bogucki as recently as yesterday?

24       THE WITNESS: A    Yes.

JIM01748

C204

SA427

1      Q    Did you talk to him about the case at all

2   yesterday?

3      A    I said based on -- I said if justice prevails

4   then my son will be home after all this is over.

5      Q    Did you say anything else about the people

6   that were there at the house, the witnesses, the

7   people that knew that your son was there?

8      A    Yes.

9      Q    And he couldn't have been any place else at

10  that time?

11     A    Yes.

12     Q    Did Detective Bogucki ever tell you why he

13  had never followed up on Juan Carlos Torres or anyone

14  else?

15     MR. MURPHY:  Objection.

16     THE COURT:  Sustained.

17     MS. BURKE:  Q    Did Detective Bogucki ever tell

18  you why he never followed up, did any further

19  investigation?

20     MR. GAUGHAN:  Objection.

21     THE COURT:  Is that anything different than this

22  one I just sustained?  Same question twice.

23  Sustained.

24     MS. BURKE:  I have nothing further, Judge.

                                    JIM01749

1      THE COURT:  Cross-examination?

2

3               CROSS-EXAMINATION

4               BY

5               MR. MURPHY:

6

7      Q    Ma'am, that night February 3rd, 1993, what

8 lounge were you going to?

9      A    Carol's.

10     Q    Who did you go there with?

11     A    With Donna and Monroe.

12     Q    Now, prior to that night -- strike that.

13 After that night, after your son was arrested did you

14 know a girl by the name of Elizabeth Heatley?

15     A    Yes.

16     Q    In fact you knew her before then as well

17 before February 3rd, 1993?

18     A    No.

19     Q    You didn't know her then?

20     A    Yes.

21     Q    You met her after February 3rd, 1993; is that

22 correct?

23     A    Correct.

24     Q    In fact, on a couple of occasions you brought

JIM01750

C206

1    letters from your son to her; isn't that correct?

2        A    Yes.

3        Q    And you also brought letters that she sent to

4    your son to him; isn't that correct?

5        A    Yes.  Her mother bring them to me and I took

6    them to my son.

7        Q    Ma'am, you testified that a number of times

8    you told Detective Bogucki that your son was with you

9    during the time that this murder occurred; is that

10   correct?

11       A    Yes.

12       Q    Other than Detective Bogucki can you tell us

13   the name of any other police officers that you told

14   your son was with you during the time the murder

15   occurred?

16       A    That was the only police officer's name I had

17   because he left the card with my mother.

18       Q    And, are you saying that you didn't tell any

19   other police officers or you told other police

20   officers and you couldn't tell us their names?

21       A    I wouldn't know there names if I did talk to

22   other ones.

23       Q    How many other police officers?

24       A    Whoever answered the phone when I was calling

JIM01751

C207

1    Bogucki.

2        Q.    How many other police officers did you tell

3    your son was with you during the murder other than

4    Detective Bogucki?

5        A    Every police officer I run into to this day.

6        Q    Approximately how many police officers did

7    you tell, Ma'am?

8        A    A hundred.

9        Q    A hundred?

10       A    At least.  I work in a restaurant.  I see a

11   lot of police officers.

12       Q    Can you tell us other than Detective Bogucki

13   tell us names of any, any other of those hundred

14   police officers that you told that your son was with

15   you?

16       A    Not by name, no.

17       Q    Ma'am, do you remember having a conversation

18   with Elizabeth Heatley on the telephone shortly after

19   the letters were given to the police?

20       A    Yes, I do.

21       Q    And, in fact, you called her and you told her

22   that she shouldn't go to court?

23       A    No.  That's not what I said, sir.

24       Q    That's not true?

JIM01752

C208

SA431

1      A    That's not true.

2      Q    Did you tell Elizabeth Heatley she must be

3   associated with another gang?

4      A    No, I did not.

5      Q    Did you have any conversation with Elizabeth

6   Heatley about gangs?

7      A    No, I did not.

8      Q    Ma'am, obviously you love your son?

9      A    True.

10     Q    And it's your testimony here today that you

11  would not lie even to protect your son from being

12  convicted of first degree murder; is that what you are

13  saying?

14     A    That is correct.

15  MR. MURPHY:    I have no further questions, your

16  Honor.

17  MS. BURKE:  Nothing further, Judge.

18  THE COURT:  Thank you.  You may be excused.

19  THE WITNESS:  Thank you, sir.

20  THE COURT:  Okay.

21      Is that it for today?

22                      (Whereupon, the hearing in the
                        above-entitled cause was
23                      adjourned and scheduled to
                        reconvene on 10-04-94).

24

JIM01753

C209

SA432

1

2          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

3              COUNTY DEPARTMENT - CRIMINAL DIVISION

4

5

6                    I, HELEN M. HACKNEY,

7    Official Court Reporter of the Circuit Court of Cook

8    County, County Department - Criminal Division, do

9    hereby certify that I reported in shorthand the

10   proceedings had in the hearing in the above-entitled

11   cause, that I thereafter caused to be transcribed into

12   typewriting the above Excerpt of Report of

13   Proceedings, which I hereby certify is a true and

14   correct transcript of all the evidence heard on said

15   date before the Honorable CHRISTY S. BERKOS.

16

17   _____

18                   HELEN M. HACKNEY, CSR

19                   084-001452

20                   Official Court Reporter

21

22

23

24

                                              JIM01754

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS }
COUNTY OF COOK } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of VOLUME (FOUR) OF (SIX) VOLUMES CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 94-4358

in a certain cause LATELY pending in said Court, between The People of the State of Illinois WERE, Plaintiffs and THADDEUS JIMENEZ WAS, Defendant.



Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago In said County, MARCH 23, 19 95.

Aurelia Pucinski
Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JIM01755

SA434

94-435

FILED

CLERK

Crim. Div. No. 94-B

JIM01756

CCCR-310

# Transcript of Record
## Appeal
to

~~Appellate First~~ Court of Illinois District

Circuit Court No. _____ 93 CR 14710

Trial Judge _____ CHRISTY S. BERKOS

Reviewing Court No. _____ 94-4358

THE PEOPLE OF THE STATE OF ILLINOIS

### vs.

THADDEUS JIMENEZ

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

VOLUME THREE OF SIX VOLUMES

REPORT OF PROCEEDINGS, ONLY

**AURELIA PUCINSKI**

Clerk of Court

AP/GL

**Deputy**

JIM01406

STATE OF ILLINOIS     )
                      )   SS:
COUNTY OF COOK        )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT–CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,     )
                                     )
                    Plaintiff,       )
                                     )
            vs.                      )     No. 93 CR 14710
                                     )
THADDEUS JIMENEZ,                    )
                                     )
                    Defendant.       )

JURY TRIAL

         REPORT OF PROCEEDINGS had at the hearing

of the above-entitled cause, before the Honorable CHRISTY S.

BERKOS, one of the judges of said court, on Tuesday, the

4th day of October, A.D. 1994.

                PRESENT:     HON. JACK O'MALLEY, State's
                             Attorney of Cook County, by
                             MR. JOHN MURPHY and
                             MR. DAVID GAUGHAN,
                             Assistant State's Attorneys,
                             on behalf of the People;

                             HON. RITA A. FRY, Public
                             Defender of Cook County, by
                             MR. KENDALL HILL and
                             MS. CYNTHIA BURKE,
                             Assistant Public Defenders,
                             on behalf of the Defendant.

Pamela M. Terry, CSR
Official Court Reporter
Circuit Court of Cook County
Criminal Division

D1

FILED
MAR 2 2 1995
AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

JIM01407

SA437

1

2   VICTOR ROMO

3   Direct -- 10

4   Cross  -- 15

5   Redirect -- 23

6   DEFENSE RESTS -- 24

7   OFFICER JAMES TREACY

8   Direct -- 25

9   Cross  -- 31

10   Redirect -- 32

11   OFFICER ZAJAC

12   Direct -- 35

13   Cross  -- 39

14   ELIZABETH HEATLEY

15   Direct -- 43

16   DETECTIVE JEROME BOGUCKI

17   Direct -- 53

18   Cross  -- 58

19   Redirect -- 60

20   Recross -- 61

21   PEOPLE REST IN REBUTTAL  -- 62

1

2

3

INDEX

CLOSING ARGUMENTS

By the State (Mr. Gaughan) -- 63

By the Defense (Mr. Hill) -- 76

By the State (Mr. Murphy) -- 93

INSTRUCTIONS TO JURY  -- 115

VERDICT -- 134

$D$2

JIM01408

1       THE CLERK:  People versus Thaddeus Jimenez.

2                       (Whereupon the following proceedings

3                       were had outside the presence and

4                       hearing of the Jury:)

5       MR. HILL:  Judge, I just learned that our next witness

6  that we intend to call says he is going to take the 5th, and

7  this has taken us by surprise, Judge, Victor Romo.

8       THE COURT:  What did you want me to do with that

9  situation?

10      MR. HILL:  Judge, I just put in a call.  I had

11 previously talked to his lawyer, and his lawyer told me there

12 was no problem.  I just put in a call -- I didn't think it

13 was a problem until this morning.  I had put in a call to his

14 lawyer, and I am waiting on a return from that call, Judge.

15 If he is going to take the 5th -- I mean, he has already been

16 tried in this matter.  I think this Court has one or two

17 possible alternatives.  One is that you could bring him out

18 here -- I think he needs to be represented -- but bring him

19 out here, and that you have the right to hold him in contempt

20 for not testifying.  He cannot incriminate himself if he has

21 already testified in this matter.

22      MR. GAUGHAN:  Our information is that Victor Romo has an

23 appeal pending.

24      THE COURT:  If he has an appeal pending, he is entitled

$\mathcal{D}$ 3

JIM01409

1   to the same 5th Amendment.

2        MR. HILL:  If that is the case, he becomes unavailable,

3   and we should then be allowed to get in his prior testimony

4   in this matter.  The State had an opportunity to cross-

5   examine him on this, and they went through everything, so we

6   should have the right since -- if you are considering that he

7   has an appeal pending and that appeal makes him, because he

8   has taken the 5th, unavailable, we should have the option or

9   right to get in the transcript.

10       MR. MURPHY:  Contrary to what counsel is saying -- and I

11   am sure he can't provide any case law to support that

12   position.  That is not the law.  When a witness takes the

13   5th, he is not unavailable, and I believe there is no case

14   law to support that position.

15       MR. HILL:  Judge, this has taken me by surprise.  I have

16   talked to this young man as well as his lawyer.  If I had an

17   opportunity, I would get some case law to support my

18   position.  I didn't know until this morning.

19       THE COURT:  You have the opportunity, and now let's get

20   it done.  How many other witnesses do you have?

21       MR. HILL:  I may call the Defendant, but I would like to

22   get this matter resolved first, your Honor.

23       THE COURT:  How long will it take you?

24       MR. HILL:  If I could have a half hour, your Honor.

D4

JIM01410

1   THE COURT:  Okay.

2   MR. HILL:  Thank you.

3   THE COURT:  I would like the State to get some law also.

4 Both of you get some law to support your positions.    All

5 right.

6         (Whereupon the Court took a short

7         recess, after which reconvening,

8         the following proceedings were

9         had outside the presence and

10        hearing of the Jury:)

11   MR. HILL:  Your Honor, we would call Victor Romo to the

12 stand out of the presence of the Jury.

13   THE COURT:  All right.  How old are you, son?

14   THE WITNESS:  Fourteen (14).

15   MR. MURPHY:  Judge, I would ask that before any

16 questions are asked of this witness that he be advised of his

17 constitutional rights.  It is my understanding that this

18 witness told us and his father told us on Sunday that he has

19 an appeal pending from a finding of delinquency on the charge

20 of first degree murder in Juvenile Court.

21   THE COURT:  You want to advise him of his constitutional

22 rights, Mr. Hill?

23   MR. HILL:  Well, Judge, the only constitutional right he

24 has at this point because he doesn't have a constitutional

$$\mathcal{D}\,5$$

JIM01411

SA441

 1  right -- he doesn't have --

 2      THE COURT:  State, you want to give him his

 3  constitutional rights?

 4      MR. HILL:  He doesn't have Miranda rights.

 5      MR. MURPHY:  First of all, we object to this argument

 6  being made in front of this witness.

 7      THE COURT:  Will the State give him his Miranda rights?

 8

 9                          VICTOR ROMO,

10  called as a witness, was examined and testified as follows:

11

12                          EXAMINATION

13                          BY

14                          MR. GAUGHAN:

15      Q    Do you understand that you have the right to remain

16  silent?

17      A    Yes.

18      Q    Do you understand that anything you say here can be

19  used against you in a court of law?

20      A    Yes.

21      Q    Do you understand that you have the right to an

22  attorney before any questions are put to you?

23      A    Yes.

24      Q    Understanding those rights, do you wish to have a

                          $\mathcal{D}$6

JIM01412

1    lawyer present with you before you answer any questions?

2         A    No.   That's okay.

3         MR. GAUGHAN:  All right, Judge.

4

5                              EXAMINATION

6                              BY

7                              MR. HILL:

8         Q    State your name.

9         A    Victor Romo.

10        Q    And, Victor, on February 3, 1993, where were you

11   at?

12        A    Walking down Belmont Street.

13        Q    And who were you with?

14        A    Carlos Torres.

15        MR. MURPHY:  Judge, --

16        MR. GAUGHAN:  Judge, if he is not exercising his 5th

17   Amendment right --

18        THE COURT:  Are you willing to testify in this case,

19   sir?

20        THE WITNESS:  Yes.

21        THE COURT:  So, you are not declaring your 5th Amendment

22   rights?

23        THE WITNESS:  No.

24        THE COURT:  Then we don't have a problem.

                          ‎⤵ 7

JIM01413

SA443

1      MR. HILL:  No, we don't have a problem now.

2      THE COURT:  Fine.  All right.  Bring out the Jury.

3      MR. GAUGHAN:  Judge, we would be asking after the cross

4   examination of Mr. Romo before there is any redirect done

5   that we have a sidebar.  We have no intention of challenging

6   this testimony as a recent fabrication.  We would like a

7   sidebar after the cross examination and a ruling on whether

8   or not Mr. Hill can ask any questions concerning any prior

9   statements made by this witness.  We don't want it to be done

10  in front of the Jury, have the question out, and so after the

11  cross, we would be asking for a sidebar and a ruling.

12      THE COURT:  Right after the cross?

13      MR. MURPHY:  Yes.

14      MR. GAUGHAN:  To determine whether or not we opened up

15  the door to the prior consistent statements.

16      THE COURT:  I don't know exactly what you have in mind,

17  but we will go on that basis.

18      MR. MURPHY:  Judge, also there is an indication in the

19  testimony this witness gave in Juvenile Court that he had a

20  conversation with what the Defense claimed is the alleged

21  offender, Juan Carlos Torres, on the telephone where certain

22  statements were made to him by Juan Carlos Torres.  We have a

23  standing motion in limine to preclude any evidence regarding

24  statements made by Juan Carlos Torres, and this would be a

$\mathcal{D}$ 8

JIM01414

1   situation where under Chambers versus Mississippi, the

2   declarant is not in court, and we would ask that there be no

3   testimony regarding any statements of Juan Carlos Torres.

4       THE COURT: We have ruled on that prior, conversations,

5   tape recordings, by Juan Carlos Torres and this Defendant's

6   father.

7       MR. HILL: Yes.

8       MR. MURPHY: It is also this witness.

9       THE COURT: Also applies to this witness.

10      MR. MURPHY: He was part of another conversation, Judge.

11      THE COURT: All right. Okay. You understand then -- is

12  your case on appeal?

13      THE WITNESS: Yes.

14      THE COURT: And you have a right to take the 5th

15  Amendment and refuse to testify. You understand that?

16      THE WITNESS: Yes.

17      THE COURT: But you are not asking for that privilege;

18  is that correct?

19      THE WITNESS: Yes, that's correct.

20      THE COURT: Okay. Bring out the Jury.

21

22

23

24

$D$ 9

JIM01415

```
 1                        (Whereupon the following proceedings
 2                        were had back in the presence and
 3                        hearing of the Jury:)
 4        THE COURT:  Good morning.  I apologize for the long
 5   delay.  We didn't plan it this morning, but certain things
 6   did occur that required us to delay this case for a period of
 7   two hours.  We couldn't avoid it.
 8                        You may continue with this witness.
 9
10                        (Witness duly sworn.)
11                        VICTOR ROMO,
12   called as a witness, having been first duly sworn, was
13   examined and testified as follows:
14
15                        DIRECT EXAMINATION
16                        BY
17                        MR. HILL:
18   Q    Would you state your name?
19   A    Victor Romo.
20   Q    And, Victor, how old are you?
21   A    Fourteen (14).
22   Q    And on February 3, 1993, where did you live at?
23   A    2970 West Nelson.
24   Q    Now, at about six o'clock or 6 P.M. that evening,
```

🌙 10

JIM01416

SA446

1    who were you with?

2        A    A boy named Carlos Torres.

3        Q    And where did you go?

4        A    First we went to a Burger King, and then we went by

5    my old school, and then we were walking home.

6        Q    When you talk about Juan Carlos, you are not

7    talking about Thaddeus Jimenez, are you?

8        A    No.

9        Q    Where is your old school at?

10        A    It's on School Street and Ridgeway, I think.

11        Q    I can't hear you.

12        A    I'm not too sure.  I think it is on School and

13    Ridgeway.

14        Q    Now, when you got there, where did you go from

15    there?

16        A    To a park next to it.

17        Q    What was the park's name?

18        A    I am not sure.

19        Q    Okay.  Now, when you left the park, Juan Carlos was

20    still with you?

21        A    Yes.

22        Q    Now, where did you go with Juan Carlos after that?

23        A    We were walking home.

24        Q    Which way were you walking?

⟩ 11

JIM01417

SA447

```
 1      A    Walking east going down Belmont Street.

 2      Q    And did you get to Whipple?

 3      A    Yes, I think so.

 4      Q    At Belmont and Whipple, what, if anything,

 5  happened?

 6      A    We got into an argument --

 7      Q    You got into an argument?

 8      A    Yes.

 9      Q    Who did you get into an argument with?

10      A    It was Carlos.  He got into an argument with Eric.

11      Q    Carlos got into an argument with Eric?

12      A    Yes.

13      Q    You were there?

14      A    Yes.

15      Q    Now, when you say "Carlos," you are not talking

16  about Thaddeus?

17      A    No.

18      Q    Was Thaddeus there?

19      A    No.

20      Q    What, if anything, happened when Carlos got into an

21  argument with Eric?

22      A    The kid, Eric, was about to punch on Carlos, and

23  that is when I ran, and when I was ready to turn the corner,

24  I heard a gunshot.
```

$D$ 12

JIM01418

1      Q    So, Eric swung --

2      THE COURT:  Wait.  Let him testify, counsel.  This is

3   very important that he tells us what occurred.

4      MR. HILL:  Q  Who swung at who?

5      A    Eric swung on Carlos Torres.

6      Q    And after Eric swung at Carlos, what -- after Eric

7   swung at Carlos, did you see Thaddeus Jimenez around?

8      A    No, I did not see him.

9      Q    Let me ask you this.  On February 3, 1993, did you

10   know Thaddeus?

11     A    No, I didn't.

12     Q    Now, you say you ran?

13     A    Yes.

14     Q    And then what happened after you ran?  What did you

15   see or hear?

16     A    I just heard a gunshot, and then I just ran

17   straight home.

18     Q    Okay.  Now, where do you live at right now?

19     A    2959 West Richmond.

20     Q    Okay.  Is that where your father lives now?

21     A    Yes.

22     Q    Now, let me ask you.  What color jacket did Juan

23   Carlos have on that evening?

24        A    That evening, black.

𝄐 13

JIM01419

SA449

1    Q   Black?

2    A   Yes.

3    Q   And what color did you have on?

4    A   Blue.

5    Q   Was it purple --

6    THE COURT:  Wait.  Let him testify, counsel.

7    MR. HILL:  Q  Did you have any lettering on your jacket?

8    A   Yes.

9    Q   What color lettering?

10   A   White.

11   Q   And what color lettering was in Juan Carlos'

12   jacket?

13   A   White.

14   Q   Okay.  Now, where are you presently being housed

15   at, you?

16   A   1100 South Hamilton.

17   Q   And what is that?

18   A   The Audy Home.

19   Q   And why are you in the Audy Home?

20   A   To see what the Court is going to do with me.

21   Q   Have you had a trial?

22   A   Yes.

23   Q   And you were found delinquent.  You were found

24   delinquent in the murder of Eric Morro?

$\mathcal{D}$14

JIM01420

1      A      Yes.

2      Q      And at no time that evening was Thaddeus Jimenez

3  with you?

4      A      No.

5      Q      And when the shot was fired, it was just you and

6  Juan Carlos?

7      A      Together, yes.

8      Q      Now, when you ran, did you run down towards

9  Whipple?

10     A      I ran back and then turned the corner.

11     Q      When was the first time that you ever met Thaddeus?

12     A      After they sent me to the Audy Home, about two

13 months afterwards, a month.

14     Q      March or April of 1993?

15     A      Around there.

16     MR. HILL:  No further questions.

17     THE COURT:  Cross examination.

18

19                     CROSS EXAMINATION

20                          BY

21                     MR. MURPHY:

22     Q      Victor, how old are you now?

23     A      Fourteen (14).

24     Q      How old were you back on February 3, 1993?

                     $\mathcal{D}$15

JIM01421

1      A      Twelve (12).

2      Q      And, Victor, you said you lived at 2970 West

3 Nelson?

4      A      Yes.

5      Q      That was where you lived on February 3, 1993; is

6 that right?

7      A      Yes.

8      Q      Now, I am going to show you for the record what is

9 marked as People's Exhibit No. 10.  Can you see this?

10      A      Yes.

11      Q      And you recognize that this is Belmont Avenue?

12      A      Yes.

13      Q      And do you recognize that this is Sacramento Avenue

14 right here; is that correct?

15      A      Yes.

16      Q      Now, your house where you were living at that time

17 was right around the corner and down Sacramento about a half

18 a block?

19      A      Yes.

20      Q      So, you lived more or less right in here; is that

21 right?

22      A      Yes.

23      Q      And, Victor, the area that you lived in was an area

24 that was controlled by the Simon City Royal street gang; is

D 16

JIM01422

SA452

1   that correct?

2       A    Yes.   There is a couple of more, but yes.

3       Q    On February 3, 1993, did you belong to any street

4   gang?

5       A    No.

6       Q    Now, you are saying that you were walking down the

7   street with this person named Juan Carlos Torres, and he and

8   Eric got into an argument; is that correct?

9       A    Yes.

10      Q    Who started the argument?

11      A    It was really both of them, but Carlos Torres said

12  the first words.

13      Q    Who?

14      A    Carlos Torres.

15      Q    And what did he say?

16      A    I am not too sure what he said.

17      Q    You don't know what he said?

18      A    No.

19      Q    Do you remember anything he said?

20      A    Something about money.

21      Q    He said something about money?

22      A    Yes.   That is the only word I can really remember

23  now.

24      Q    And what do you remember Eric saying?

D17

JIM01423

1    A    He was like mumbling.  It wasn't clear.

2    Q    It wasn't clear?

3    A    No.

4    Q    And, according to you, just with Juan Carlos Torres

5    saying something about money and Eric saying something you

6    didn't hear, the next thing that happened is there was an

7    argument and then it got physical; is that right?

8    A    Yes.

9    Q    And, at that point, it is your testimony that you

10   ran down the street?

11   A    Yes.

12   Q    You ran away?

13   A    Yes.

14   Q    And you ran across Belmont?

15   A    Across the street, went around, went back, and then

16   there is a street that goes down.

17   Q    Did you go west on Belmont?

18   A    Yes.

19   Q    Did you go down to the corner down here

20   (Indicating)?

21   A    No; I crossed the street.

22   Q    Where were you when you heard the gunshot?

23   A    Across the street ready to turn the corner.

24   Q    You were on the other side of Belmont?

D18

```
1     A    Yes.

2     Q    Were you over in this area here (Indicating)?

3     A    A little bit more that way though (Indicating).

4     Q    More this way (Indicating)?

5     A    Yes.

6     Q    So, you were a good distance away from where Eric

7  and Juan Carlos Torres was when you hear the first shot; is

8  that right?

9     A    Yes.

10     Q    In fact, Victor, did you ever see Juan Carlos

11  Torres with a gun that night?

12     A    No.

13     Q    Did you know Juan Carlos Torres, whether or not he

14  even had a gun?

15     A    No.

16     Q    And when the shot rang out, what did you believe

17  happened?

18     A    I believed that Carlos got shot.

19     Q    You thought your friend got shot or the person you

20  were with; is that right?

21     A    Yes.

22     Q    Did you see what happened?

23     A    No.

24     Q    You just heard the shot?
```

D19

1     A    Yes.

2     Q    So, Victor, according to you then, you had nothing

3   to do with this shooting.  Is that what you are saying?

4     A    Yes.

5     Q    And, according to you, these two boys, Eric Morro

6   and Juan Carlos Torres, were fighting with each other before

7   any shots were even fired.  Is that what you are saying?

8     A    They weren't really fighting that I saw.

9     Q    What did you see?

10    A    I seen one punch thrown, and I ran.

11    Q    Who threw the punch?

12    A    Eric Morro.

13    Q    Now, you believe that this person you were with had

14  just been shot when you heard that shot ring out; is that

15  right?

16    A    Yes.

17    Q    Victor, did you go back to help the person you were

18  with?

19    A    No.  I told my sister to find out what happened.

20    Q    Did you go to a public phone and call for an

21  ambulance for the guy you were with?

22    A    No.

23    Q    Did you go to a phone and call the police and tell

24  the police what happened?

꒭20

1      A    No.

2      Q    In fact, Victor, you never called the police; isn't

3  that correct?

4      A    Yes, that's correct.

5      Q    And you never called for any help for your friend;

6  is that correct?

7      A    That's correct.

8      Q    And it wasn't until six days later that in fact the

9  police found you and arrested you; is that correct?

10     A    That's correct.

11     Q    This other person that you say you were with, Juan

12  Carlos Torres, was he in a gang?

13     A    Not that I know of.

14     Q    He was not a Simon City Royal?

15     A    Not that I know of.

16     THE COURT:  He would like to correct the address.

17     THE WITNESS:  It is 2959 West Fletcher, not Richmond.  I

18  got the two streets mixed up.

19     MR. MURPHY:  Q  Whatever you said the street name was,

20  the house is right around the corner?

21     A    That is how it was then.  Now, we moved.

22     Q    Where has your family moved to since?

23     A    The next corner from that old house.

24     Q    How far from the house that you were at on February

$\mathcal{D}$ 21

JIM01427

1  3, 1993?

2      A      Around four or five houses down.

3      MR. MURPHY:   Judge, the Defense is asking for a sidebar.

4                         (Whereupon the following proceedings

5                          were had outside the hearing of

6                          the Jury:)

7      MR. HILL:   Judge, it is my opinion that the State opened

8  the door by asking him -- as it relates to his conversation

9  with the police -- by asking him did he call the police and

10  did he tell them and when he was arrested, and I think that

11  opened the door about his conversations to the police when he

12  was arrested.

13      THE COURT:   They didn't go into any conversations with

14  the police at all.

15      MR. HILL:   They said what he didn't do.

16      MR. GAUGHAN:   All it was intended to do was challenge

17  the believability of his story that he left a friend dying on

18  the street with a gunshot because he thought he was dead and

19  never called for help.

20      THE COURT:   Okay.  Overruled.

21

22

23

24

$\mathcal{D}$ 22

JIM01428

SA458

```
 1                          (Whereupon the following proceedings
 2                           were had back in the presence and
 3                           hearing of the Jury:)
 4          THE COURT:  All right.  Proceed.
 5
 6                          REDIRECT EXAMINATION
 7                          BY
 8                          MR. HILL:
 9      Q    Victor, after you took off running down Belmont,
10 you heard a shot within seconds?
11      A    A couple of seconds.
12      THE COURT:  Let him testify, counsel.  Again, I will ask
13 you not to lead him.  You ask him when, how long, so forth.
14 Don't tell him.
15      MR. HILL:  Q  How long after you started running did you
16 hear shots?
17      A    Couple of seconds.
18      Q    Now, after you heard those shots, did you look
19 back?
20      A    No.
21      MR. HILL:  Nothing further, your Honor.
22      THE COURT:  Anything further?
23      MR. MURPHY:  No, Judge.  We have nothing further.
24      THE COURT:  Thank you.  You are excused.
```

$\mathcal{D}$ 23

JIM01429

1        MR. HILL:  At this point, your Honor, the Defense rests.

2        THE COURT:  Okay.  State ready to proceed with rebuttal?

3   You have one witness who is going to be called out of order

4   that we all agreed upon.  All right.  You may call that

5   witness.

6        MR. MURPHY:  Judge, can we approach the bench?

7        THE COURT:  Sure.  All right.  There will be a five-

8   minute recess.

9                                (Whereupon the Court took a short

10                                recess, after which reconvening,

11                                the following proceedings were

12                                had back in the presence and

13                                hearing of the Jury:)

14        THE COURT:  All right.  Let's proceed.

15        MR. MURPHY:  Your Honor, People would call James Treacy.

16        THE COURT:  This is the witness being called out of

17   order that was not available yesterday, still in the State's

18   case.

19        MR. MURPHY:  Yes, Judge.

20

21

22

23

24

D 24

JIM01430

1                        (Witness duly sworn.)

2                        JAMES TREACY,

3  called as a witness, having been first duly sworn, was

4  examined and testified as follows:

5

6                        DIRECT EXAMINATION

7                        BY

8                        MR. MURPHY:

9      Q    Sir, would you please state your name?

10     A    James Treacy, T-r-e-a-c-y, 5181.

11     Q    You are employed by the Chicago Police Department?

12     A    Yes, I am.

13     Q    How long have you been a Chicago police officer,

14  sir?

15     A    I have been a police officer for approximately

16  twenty-five (25) years.

17     Q    And what is your occupation?  What is your position

18  there?

19     A    I am presently a Firearms Technician in the Crime

20  Lab.

21     Q    Could you tell the Ladies and Gentlemen of the Jury

22  what your duties are as a Firearms Technician?

23     A    Some of my duties at the Laboratory include

24  receiving firearms evidence; I sign a control number to the

                        D25

JIM01431

1  evidence; I examine the evidence, and I make a written report

2  as to my findings.

3      Q      And have you studied under any recognized experts

4  in the field of Ballistics or Firearms Identification?

5      A      Sergeant James Gainer, who is presently in charge

6  of the Firearms Identification Section and who has over

7  twenty-five (25) years in the field.

8      Q      What is your experience in this field?

9      A      Since being assigned to the Firearms Identification

10 Section, I received three years extensive on-the-job

11 training.  I have attended classes at Colt, Smith and Wesson,

12 Rugar, Beretta, and Remington Arms.

13     Q      What are those?

14     A      Firearms manufacturers.

15     Q      Do you belong to any professional organizations?

16     A      Yes.  I belong to the Association of Firearms and

17 Toolmark Examiners.

18     Q      Have you written or published any articles?

19     A .   I co-produced a training film on the conversion of

20 semi-automatic weapons to full automatic fire.  This training

21 film is being used in crime labs throughout the country and

22 also as a training film with the FBI Academy.

23     Q      Officer Treacy, what is the basis of an

24 identification?

$D$26

1      A    The basis for an identification is the reproduction

2  of class and individual characteristics from test to test and

3  from test to evidence.

4      Q    What are the class characteristics?

5      A    Well, class characteristics are characteristics

6  common to any number of guns.  An example of class

7  characteristics would be the caliber, number of lands and

8  grooves, and the direction of twists.

9      Q    When you say "lands and grooves," what are they?

10      A    Well, during the manufacture of a weapon, there are

11  spiral grooves which are cut into the barrel.  These grooves

12  are cut in the barrel to give the bullets stability in

13  flight.  It is based on the same principle as a quarterback

14  in a football game.

15      Q    You also talked about direction of twists.  What

16  does that mean?

17      A    That is the direction that the lands and grooves

18  are cut in the barrel, either to the left or to the right,

19  and that is basically up to the discretion of the

20  manufacturer.

21      Q    In addition to the number of lands and grooves and

22  the direction of twists, is the caliber of the bullet or the

23  weapon also a class characteristic?

24      A    Caliber would be a class characteristic, yes.

$D$ 27

JIM01433

1    Q    What does the caliber determine?

2    A    Diameter of the bullet or barrel.

3    Q    How are class characteristics different than
4    individual characteristics?

5    A    Individual characteristics are unique to one gun
6    and only one gun.  During the manufacturing process, this
7    tool used to cut the spiral grooves leaves microscopic marks
8    inside the barrel, and when a bullet of a softer lead or
9    metal passes through the barrel, it picks up the microscopic
10   marks and imparts them on the surface of the bullet.

11   Q    How do you make the comparisons?

12   A    With a comparison microscope.

13   Q    What is a "comparison microscope?"

14   A    Two microscopes set side by side brought together
15   by a bridge.  This allows you to view two objects
16   simultaneously.

17   Q    Officer Treacy, during your career, approximately
18   how many weapons and/or bullets have you examined?

19   A    Approximately twenty-five thousand weapons and an
20   equal number of fired evidence.

21   Q    And how many times have you been qualified as an
22   expert in the field of firearms identification prior to
23   today?

24   A    Approximately 15 or 20 times.

$\mathcal{D}$28

JIM01434

1      MR. MURPHY:  Your Honor, at this time, I would tender

2   the witness as an expert in the field.

3      THE COURT:  The Court would find the witness qualified

4   as an expert in his field.

5      MR. MURPHY:  Q  I am going to show you People's Exhibit

6   No. 13.  First, I am going to show you the envelope it is

7   contained in.  Do you recognize that?

8      A   Yes.

9      Q   What is that?

10     A   It is an evidence envelope.

11     Q   In fact, does that have any marking that you placed

12  on there?

13     A   My name, the date, the laboratory control number,

14  and a letter designation.

15     Q   I will ask you to look inside the envelope at this

16  time.  Do you recognize what that is?

17     A   Yes, sir, I do.

18     Q   What do you recognize that to be?

19     A   It is a .22 long rifle caliber fired bullet.

20     Q   Now, you received that bullet on May 2, 1993; is

21  that correct?

22     A   That's correct.

23     Q   And you conducted various examinations and tests on

24  that bullet; is that correct?

D 29

JIM01435

SA465

1      A    Yes, I did.

2      Q    And, in this particular case, a weapon was never

3    submitted to you.  The only evidence you received under this

4    case was the bullet; is that correct?

5      A    That's correct.

6      Q    And when you examined the bullet, could you

7    describe to the Ladies and Gentlemen of the Jury what class

8    characteristics you found?

9      A    Well, this was a .22 long rifle caliber bullet with

10    sixteen (16) lands and grooves with a right-hand twist.

11      Q    So, this particular weapon -- it was a .22 caliber,

12    this particular bullet; is that correct?

13      A    Yes.

14      Q    You also said "long rifle?"

15      A    Yes.  That is a caliber designation.

16      Q    It doesn't refer to the type of weapon that fired

17    it necessarily?

18      A    No, it doesn't.

19      Q    And if a weapon had been recovered, would that

20    bullet have been suitable for comparison to the weapon?

21      A    Yes, it would.

22      Q    Would that bullet that you are looking at there,

23    People's Exhibit No. 13, would that bullet be consistent with

24    being fired from a .22 caliber handgun?

                            ⅅ30

1      A    It would have to be a .22 caliber handgun with the

2    sixteen (16) grooves with a right-hand twist.

3         MR. MURPHY:  No further questions, Judge.

4         THE COURT:  Cross examination.

5

6                        CROSS EXAMINATION

7                        BY

8                        MS. BURKE:

9      Q    Officer, there are thousands of different types of

10   .22's; is that correct?

11     A    Correct.

12     Q    Now, Officer, you are an expert in firearms?

13     A    Correct.

14     Q    And you are employed by the Police Department here

15   in Chicago?

16     A    Yes, I am.

17     Q    There is a test that is commonly performed by the

18   Chicago Police Department in another unit other than your

19   unit called the gunshot residue test; is that correct?

20     A    Yes.

21     Q    That test is a test that looks for the presence or

22   absence of powder burns on someone suspected of having

23   discharged or shot a handgun or a firearm?

24     A    They look for residue, yes.

                        𝄐 31

                                                          JIM01437

                        SA467

1    Q    That is from the gun itself after the gun has been

2    fired?

3    A    That's correct.

4    Q    Now, Officer, you testified that you examined a

5    bullet?

6    A    That's correct.

7    Q    But you never examined a gun in this case?

8    A    No, I never received a gun.

9    MS. BURKE:  I have nothing further.  Thank you, Officer.

10   THE COURT:  Redirect.

11

12                    REDIRECT EXAMINATION

13                    BY

14                    MR. MURPHY:

15   Q    And isn't it also true, Officer Treacy, that

16   gunshot residue that might be left on the hand of a shooter

17   would not be on that individual's hands nine and a half hours

18   after the shooting occurred?

19   A    That is another unit that does that procedure

20   itself, and it is not my field of expertise, and I am not

21   sure how long it would be.

22   Q    Would it be fair to say or do you know that there

23   is only a certain period of time that that residue would

24   remain on the hand of the individual who fired the weapon?

                    𝒟 32

JIM01438

1      A    Yes, that's correct.

2      Q    After that period of time, a test like that would

3  be inconclusive?

4      A    Correct.

5      Q    Would it also be fair to say that any number of

6  things that individual does with his hand such as washing his

7  hand or any contact he would have would affect that test?

8      A    Yes, that's correct.

9      MR. MURPHY:  Nothing further, Judge.

10     MS. BURKE:  Nothing further, Judge.

11     THE COURT:  Thank you, Officer.  You are excused.

12                    Does the State have any witnesses in

13  rebuttal?

14     MR. MURPHY:  Yes, your Honor.  Call Officer Zajac.

15     MR. HILL:  Your Honor, may we have a sidebar?

16                    (Whereupon the following proceedings

17                    were had outside the hearing of

18                    the Jury:)

19     MR. HILL:  Your Honor, we would object to this Officer

20  testifying.  It is my understanding that this Officer would

21  testify that he went to the house and he didn't tell them

22  that he was taking him in on a murder.  That is not material.

23  Rebuttal witnesses have to be material, and that is not a

24  material issue in this case.

D33

JIM01439

1      THE COURT:  What is the issue?

2      MR. MURPHY:  Judge, one of the witnesses who testified

3   for the Defense, Lorraine Dooley I think is her name, said

4   that when the Defendant was arrested that night, that she and

5   other members of the family were telling the police officers

6   that he couldn't have committed the crime because he was with

7   them, and this police officer is going to testify that when

8   he placed the Defendant under arrest, he and the other

9   officers, they told the family that he was under arrest for

10  murder, and that was the extent of the conversation.  There

11  was no conversation about the time, location, and none of the

12  family members complained or said they were with the

13  Defendant at that time as she testified, so it is absolutely

14  relevant because it goes to her credibility, the credibility

15  of her testimony.

16     MR. HILL:  Judge, there is another rebuttal witness,

17  which would be Elizabeth Heatley.  It is my understanding

18  that she is a rebuttal witness, too, and we would object to

19  her, too.

20     THE COURT:  What is your objection?  I don't know why

21  she is a witness.

22     MR. MURPHY:  Judge, she will contradict the mother's

23  testimony.  The mother said -- I asked her did she have a

24  phone conversation with Elizabeth Heatley and whether she

D 34

JIM01440

SA470

1  said to Elizabeth that she must be associated with or part of

2  another gang.

3      THE COURT:  The mother testified.

4      MR. MURPHY:  I asked the mother that question, did she

5  tell that to Elizabeth, and she said no, and Elizabeth is

6  here to testify that the mother did say that to her.

7      THE COURT:  He has a right to rebut that as part of the

8  case.  Okay.

9                      (Whereupon the following proceedings

10                      were had back in the presence and

11                      hearing of the Jury:)

12      THE COURT:  All right.  Proceed.

13

14                      OFFICER ZAJAC,

15  called as a witness, having been first duly sworn, was

16  examined and testified as follows:

17

18                      DIRECT EXAMINATION

19                      BY

20                      MR. MURPHY:

21      Q    Officer, would you state your name and spell your

22  last name?

23      A    Officer Zajac, Z-a-j-a-c, star number 8142.

24      Q    By whom are you employed, sir?

                      Ɗ 35

JIM01441

SA471

1      A     City of Chicago, Chicago Police Department.

2      Q     And how long have you been a Chicago police

3  officer?

4      A     Almost twenty-two (22) years.

5      Q     Officer, where are you presently assigned?

6      A     17th District.

7      Q     Now, Officer, I would like to direct your attention

8  back to the date of February 4, 1993.  Where were you

9  assigned on that date?

10      A     17th District.

11      Q     During the early morning hours at approximately

12  four o'clock in the morning on February 4, 1993, were you,

13  along with other officers, at the location of 3618 West

14  Belmont?

15      A     Yes, sir.

16      Q     And the other officers who were with you, there

17  were three other uniformed police officers; is that correct?

18      A     One other uniformed police officer and one tactical

19  unit, which was plain clothes.

20      Q     Would that be your partner, Officer Casey?

21      A     Yes.

22      Q     And there were two Detectives?

23      A     Yes.

24      Q     Would that be Detectives Bogucki and Sanders?

$\mathcal{D}$ 36

JIM01442

1    A    Yes.

2    Q    Could you tell the Ladies and Gentlemen of the Jury

3    why you were at that location at that time?

4    A    We were assigned to meet the Detective unit to

5    assist them in making an arrest at that location.

6    Q    And did you place an individual under arrest at

7    that location that you see here in court today?

8    A    Yes, sir.

9    Q    Could you point to that individual and indicate an

10    article of clothing he is wearing?

11    A    The gentleman with the dark suit, blue tie

12    (Indicating).

13    MR. MURPHY:  May the record reflect the in-court

14    identification of the Defendant, Thaddeus Jimenez.

15    THE COURT:  Yes.

16    MR. MURPHY:  Q  Were there other people there besides

17    the Defendant?

18    A    Yes.

19    Q    Who was there?

20    A    I believe it was his grandmother who opened the

21    door.

22    Q    And do you remember any other persons there?

23    A    There may have been other people there, but I don't

24    recall.

D 37

JIM01443

1        Q    And, Officer, at the time that you placed the

2    Defendant under arrest, did you tell anybody there from the

3    family why he was being placed under arrest?

4        A    Yes, they were informed.

5        Q    What did you indicate or the other officers

6    indicate?

7        A    It was indicated that he was being placed under

8    arrest for murder.

9        Q    And did anyone indicate to the family at that time

10   the date and time or location of the murder?

11       A    Not that I recall, sir.

12       Q    And, in fact, was there any discussion about the

13   date and time or the location of the murder with the family

14   at that time?

15       A    No, sir.

16       Q    Do you remember, or did anybody approach you or any

17   police officers in your presence and tell you that the

18   Defendant couldn't have committed the murder because he was

19   with them at the time?

20       A    No, sir.

21       MR. MURPHY:  I have no further questions, Judge.

22       THE COURT:  Cross examination.

23

24

$\mathcal{D}$ 38

JIM01444

SA474

```
 1                           CROSS EXAMINATION

 2                                  BY

 3                              MR. HILL:

 4      Q    Officer, you said that your partner was Casey?

 5      A    Officer Casey, yes.

 6      Q    And then there was Detective Bogucki?

 7      A    Right.

 8      Q    And then there was Detective Sanders?

 9      A    Yes, sir.

10      Q    Were there any other officers?

11      A    There were two officers in the back of the

12   building, plainclothes officers, their Tact Unit from the

13   17th District.

14      Q    So, there were a total of six officers, right?

15      A    That I recall, yes.

16      Q    Now, that was about a year and some months ago; is

17   that correct?

18      A    Yes, sir.

19      Q    And year and about six months?

20      A    Yes.

21      Q    About a year and a half?

22      A    Yes.

23      Q    Did you do any paperwork on this case?

24      A    No, sir.
```

$\mathcal{D}$ 39

JIM01445

1    Q    Any reports?

2    A    No, sir.

3    Q    Do you recall how many people were there besides

4    his grandmother?

5    A    No, sir, I don't.

6    Q    Do you recall the state of the room or the house at

7    that time when you went in there?

8    A    No, I don't.

9    Q    What time was it when you got there?

10    A    Around four in the morning I do believe.

11    Q    And when you got there, your concentration was to

12    assist the Detectives in making an arrest; is that correct?

13    A    Yes, sir.

14    Q    And, before you went, did you find out how old the

15    person was you were going to arrest?

16    A    Yes.  The Detectives told us what to expect when we

17    walked in.

18    Q    Thirteen years old?

19    A    Yes, sir.

20    Q    And you mean to say that you went there to arrest a

21    13-year-old at 4 A.M. in the morning and didn't tell his

22    mother or his grandmother what you were arresting him for and

23    when and how?  Is that what you are saying?

24    A    No.

D40

JIM01446

SA476

1        MR. GAUGHAN:  Objection, Judge.

2        THE COURT:  Didn't tell them?

3        MR. HILL:  Q  You told them you were arresting him for

4    murder?

5        A    Yes; they were informed of what he was being

6    arrested for, sure.

7        Q    But you didn't tell them when it happened.  Is that

8    your testimony?

9        A    There was no discussion as far as I know about the

10   case at all.

11       Q    To your knowledge, there was no discussion?

12       A    Right.

13       Q    To your knowledge, there was no discussion of the

14   date that the murder occurred; is that right?

15       A    No, sir, there was not.

16       Q    You were not in the presence of all of the officers

17   all the time you were there, were you?

18       MR. MURPHY:  Objection to the form of that question.

19       THE COURT:  Sustained.  Be more precise.

20       MR. HILL:  Q  Were you in the presence of the two

21   officers who were in the rear all the time you were there?

22       A    No, sir.

23       THE COURT:  The two officers in the rear?

24       MR. HILL:  Who initially went to the rear of the

                    D41

1   building.

2        THE COURT:  Wait a minute.  Were these two officers in

3   the rear of the building outside the building?

4        THE WITNESS:  Outside the building.

5        THE COURT:  Where outside the building are these two

6   officers?

7        THE WITNESS:  There is a gangway that runs alongside of

8   the building.

9        THE COURT:  On the ground level?

10       THE WITNESS:  Ground level, right.

11       THE COURT:  They are not in the apartment?

12       THE WITNESS:  No, sir.

13       MR. HILL:  Q  Now, were you in the presence of Detective

14   Sanders the entire time you were there in the apartment?

15       A   I don't recall.

16       Q   Were you in the presence of your partner, Officer

17   Casey, the entire time you were there?

18       A   Yes.

19       Q   Were you in the presence of Detective Bogucki the

20   entire time you were there?

21       A   I don't recall.

22       MR. HILL:  Thank you very much.  If I can have just a

23   second.  Thank you.

24       THE COURT:  Redirect.

                         𝒟 42

JIM01448

1        MR. MURPHY:  No further questions.

2        THE COURT:  Thank you, sir.  You are excused.

3

4                          (Witness duly sworn.)

5                          ELIZABETH HEATLEY,

6    called as a witness, having been first duly sworn, was

7    examined and testified as follows:

8

9                          DIRECT EXAMINATION

10                         BY

11                         MR. MURPHY:

12   Q    Your name is Elizabeth Heatley; is that correct?

13   A    Yes.

14   Q    Elizabeth, you testified here in this courtroom

15   yesterday; is that correct?

16   A    Yes.

17   Q    Elizabeth, I would like to ask you about one other

18   matter.  You testified that at some point after you had

19   gotten the eleven letters -- the nine initial letters you got

20   from the Defendant, that your mother saw them and then

21   brought those letters to the police; is that correct?

22   A    Yes.

23   Q    And after your mother gave those letters to the

24   police, did you ever have a telephone conversation with the

                            ⌡43

1    Defendant's mother?

2        A    Yes.

3        Q    And do you remember approximately when that

4    telephone conversation occurred?

5        A    In late October, early November.

6        Q    And do you remember what day of the week it was?

7        A    No, I don't.

8        Q    Do you remember what time of the day it was?

9        A    It was either between six and eight o'clock in the

10   evening.

11       Q    All right.  And do you remember whether you called

12   her or whether she called you?

13       A    She called me.

14       Q    And could you tell the Ladies and Gentlemen of the

15   Jury what happened during that telephone conversation?

16       A    She had asked me if I turned the letters in, and I

17   said, "I didn't turn them in; my mother turned them in," and

18   she said how did my mother get her hands on the letters --

19       THE COURT:  Please slow down.

20       THE WITNESS:  I told her I didn't turn the letters in,

21   that my mother turned the letters in because my sisters

22   opened my mail before I did, and then she told me she was

23   going to send an officer to my house --

24       MR. HILL:  Objection, your Honor.  It is not clear who

                            D44

1  she is talking about.

2      THE COURT:  Ask another question.  Sustained.

3      MR. MURPHY:  Q  You said that somebody said she was

4  going to send an officer to your house?

5      A    Because my sisters and my mother shouldn't be

6  reading my mail.

7      Q    Who told you she was going to send an officer to

8  your house?

9      A    His mother.

10     Q    The Defendant's mother?

11     A    Yes.

12     Q    And she said the reason she was going to send an

13  officer to your house --

14     MR. HILL:  Objection to the leading nature.

15     THE COURT:  Ask another question.

16     MR. MURPHY:  Q  What was the reason she said she was

17  going to send an officer to your house?

18     A    Because my sisters had opened my mail before I got

19  it and they let my mother read it, too.

20     Q    While you were talking to her, was there any

21  discussion of gangs?

22     MR. HILL:  Objection, your Honor, to the leading.

23     THE COURT:  It is rebuttal; overruled.

24     THE WITNESS:  A  Yes, there was.

D45

JIM01451

SA481

1      MR. MURPHY:  Q  What, if anything, did she say to you or

2  did you say to her about gangs?

3      A   She told me that because I turned the letters in I

4  must be in a gang or my boyfriend must be in a gang.

5      Q    And did she say what gang?

6      A    No, she didn't.

7      Q    Did she say anything about whether it was the same

8  gang as the Royals or a different gang from the Royals?

9      A    No, she didn't.

10      Q    And did she say anything else?

11      A    No, but there was a guy in the background that

12  said --

13      MR. HILL:  Objection, your Honor.

14      THE COURT:  Sustained.

15      MR. MURPHY:  Q  The Defendant's mother never told you

16  not to come to court; is that correct?

17      A    No, she didn't.

18      MR. MURPHY:  I have nothing else, Judge.

19      THE COURT:  Cross.

20      MR. HILL:  No questions, your Honor.

21      THE COURT:  Thank you.  You are excused.

22                        Any other rebuttal witnesses?

23      MR. MURPHY:  Judge, there is one other brief witness,

24  and we expected him to be here in the courtroom, and he is

D 46

JIM01452

SA482

1  not here.

2      THE COURT:  Well, we can break for lunch at this point.

3  We have some work to do.

4      MR. MURPHY:  After that, we are prepared to rest our

5  case in rebuttal.

6      THE COURT:  All right.  Members of the Jury, let's break

7  for lunch, get one of those great lunches again.  See you

8  back here about a quarter to two.  Thank you very much.

9                          (Whereupon the following proceedings

10                          were had outside the presence and

11                          hearing of the Jury:)

12      THE COURT:  All right.  Thaddeus, you understand and I

13  am sure your attorney explained to you that you have a right

14  to testify, and you have a right not to testify if you so

15  choose.  You understand that?

16      THE DEFENDANT:  Yes.

17      THE COURT:  Now, I notice that you did not testify.  Was

18  that your decision?

19      THE DEFENDANT:  Yes.

20      THE COURT:  Do you wish to testify in this case at all?

21      THE DEFENDANT:  No.

22      THE COURT:  And that is your decision, not necessarily

23  your attorney's decision?

24      THE DEFENDANT:  That is my decision.

                          D47

JIM01453

SA483

1          MR. HILL:  It says that he thought he was acting

2    reasonably, but that belief was unreasonable.

3          THE COURT:  I have the instructions here.  Don't move.

4    Are you objecting to it?

5          MR. GAUGHAN:  No, Judge.

6          THE COURT:  All right.  We can discuss this after lunch.

7                              (Whereupon the Court took a recess

8                               for the lunch break, after which

9                               reconvening, the following

10                              proceedings were had outside the

11                              presence and hearing of the Jury:)

12         THE COURT:  All right.  1.01, People's 1.

13         MR. HILL:  No problem.

14         THE COURT:  Has everybody checked it for errors?

15         MR. HILL:  No.

16         THE COURT:  1.02, People's 2.

17         MR. HILL:  No problem.

18         THE COURT:  All right.  1.03, People's 3.

19         MR. HILL:  No problem.

20         THE COURT:  1.05, People's 4.

21         MR. HILL:  No problem.

22         THE COURT:  2.01, People's 5.

23         MR. MURPHY:  2.01A.

24         MR. HILL:  No problem.

D49

JIM01454

SA484

```
 1        THE COURT:  People's 6, 2.02.

 2        MR. HILL:  No problem.

 3        THE COURT:  People's 7, 2.03A.

 4        MR. MURPHY:  Judge, there is two 2.03A's.  We have one

 5   with three paragraphs and one with four.

 6        THE COURT:  Okay.  No objection to 2.03A?  That is the

 7   one you want in?

 8        MR. HILL:  The four paragraphs.

 9        MR. MURPHY:  That is fine, Judge.

10        THE COURT:  All right.  2.04, People's 5.  Any

11   objection?

12        MR. HILL:  No.

13        THE COURT:  3.02, People's 6.

14        MR. MURPHY:  Judge, 2.04 is People's 8, I believe.

15   Isn't it?  2.03A was 7.

16        THE COURT:  Wait.  2.03A was 7.  2.04 was 8.

17        MR. MURPHY:  Right.

18        THE COURT:  Is that it now?

19        MR. MURPHY:  Right, Judge.  That is where we left off.

20        THE COURT:  3.02, People's 9.

21        MR. HILL:  No problem.

22        THE COURT:  10 is 3.10.  Any objection?

23        MR. HILL:  No problem.

24        THE COURT:  3.11 is People's 11.  Any objection?
```

D50

JIM01455

1      MR. HILL:  No.

2      THE COURT:  3.12 is People's 12.  Any objection?

3      MR. HILL:  No.

4      THE COURT:  13 is People's 7.01A.

5      MR. HILL:  No problem; definition of murder.

6      THE COURT:  14 is 7.05A.

7      MR. HILL:  No problem.

8      THE COURT:  Any objection?

9      MR. HILL:  No objection.

10     THE COURT:  15 is the long one, 7.06A.  Let's read it

11  for errors.

12     MR. MURPHY:  Judge, perhaps I can indicate this now

13  since we are on the record.  All the instructions -- we

14  prepared the instructions.  All the instructions with respect

15  to the issue of second degree are the Defendant's requested

16  instructions, although they are marked People's because we

17  prepared the instructions.  Judge, I don't have any problem

18  either way, but I would like the record to reflect that they

19  are asking for the second degree in this case.

20     THE COURT:  You are asking for second degree?

21     MR. HILL:  Yes.

22     THE COURT:  Then, they will be marked People's 15 to be

23  kept in order, but they will be Defendant's instructions, 14

24  and 15.

$\mathcal{D}$ 51

JIM01456

SA486

1       MR. MURPHY:  Thank you, Judge.

2       THE COURT:  Any objection to 7.06A, which is People's

3  15, actually Defendant's 2.  That is the long one.

4       MR. HILL:  Okay.

5       THE COURT:  26.01A will be 16.  Any objection?

6       MR. HILL:  No objection, your Honor.

7       THE COURT:  17 and 18 are 26.05 and -- let's take them

8  separately.  26.05, People's 17, guilty of first degree

9  murder.  Any objection?

10      MR. HILL:  No objection.

11      THE COURT:  Next number, which would be 18, guilty of

12 second degree murder.  Any objection?

13      MR. HILL:  No, your Honor.

14      THE COURT:  And 19, which is 26.02, which is not guilty,

15 period.

16      MR. HILL:  No objection.

17      THE COURT:  Any other instructions?

18      MR. HILL:  3.15, your Honor.  The State tendered it to

19 me earlier in their initial packet, and this one, it was not

20 in there, 3.15, and I will hand it to you, the issue on

21 identification.  This is the one the State tendered to me

22 earlier.

23      THE COURT:  Okay.

24      MR. MURPHY:  Judge, in the set that was redone, I think

D52

JIM01457

SA487

1   the secretary inadvertently did not do that.  I can run over

2   right now and make a copy.  So, we will make that 12A.  3.15

3   will be People's 12A.

4        MR. HILL:  Yes.  No objection, your Honor.

5        THE COURT:  Okay.  All right.  You may bring out the

6   Defendant.  Bring out the Jury, please.

7                          (Whereupon the following proceedings

8                           were had back in the presence and

9                           hearing of the Jury:)

10       THE COURT:  You may proceed.

11       MR. MURPHY:  Judge, we have one final witness, Detective

12  Jerome Bogucki.

13

14                    (Witness duly sworn.)

15                    JEROME BOGUCKI,

16  called as a witness, having been first duly sworn, was

17  examined and testified as follows:

18

19                    DIRECT EXAMINATION

20                    BY

21                    MR. MURPHY:

22       Q    Your name is Detective Jerome Bogucki; is that

23  correct?

24       A    Yes.

                          ⫭ 53

1      Q     Spell your name for the court reporter.

2      A     B-o-g-u-c-k-i.

3      Q     Detective Bogucki, you testified in this matter on

4   another date; is that correct?

5      A     Yes.

6      Q     Detective Bogucki, you testified previously that

7   you arrested the Defendant, Thaddeus Jimenez, on the date of

8   February 4, 1993; is that correct?

9      A     Yes.

10      Q     And that is the person who you previously

11   identified as this individual seated here in court; is that

12   correct?

13      A     That's correct.

14      Q     And where did you arrest the Defendant at?

15      A     3618 West Belmont on the 1st floor.

16      Q     That would have been at approximately four o'clock

17   in the morning?

18      A     Yes.

19      Q     What other officers were with you when you arrested

20   him?

21      A     Two 17th District uniformed officers, Zajac and

22   Casey, and there were two more tactical officers on the

23   outside of the building.

24      Q     What Detective was with you?

$)$54

1     A     Detective Mark Sanders.

2     Q     When you arrested the Defendant at that time, were

3  there any family members or any other persons in the

4  apartment?

5     A     Yes.

6     Q     Who was there, if you remember?

7     A     The only one I know specifically was the

8  Defendant's grandmother, Gloria Makowski (phonetic).  There

9  were other people around.

10     Q     You don't know who they are?

11     A     No.

12     Q     Detective, when you were present at the apartment,

13  who spoke on behalf of the police at that time?

14     A     I did.

15     Q     And what did you tell the family about the arrest

16  of the Defendant at that time?

17     A     I told the grandmother that he was under arrest for

18  murder.  I gave her my card and told her that she would have

19  to contact his mother and have her come into our station.

20     Q     Now, you say you gave her your card.  Would that

21  card have your name and phone number on it?

22     A     Name, phone number, address.

23     Q     Now, at the time that you were at the home, did

24  anybody come up to you or any other police officers in your

$\mathcal{D}$ 55

JIM01460

1  presence and say to you that they were with Thaddeus Jimenez

2  at the time that the shooting occurred?

3      A    No.

4      Q    In fact, did you or any of the other police

5  officers in your presence advise the family at that time of

6  the location or the time that the murder occurred?

7      A    No, I did not.

8      Q    When did you first speak to the Defendant's mother?

9      A    It was -- there was a conversation in person in

10  Area 5, Violent Crimes.

11     Q    Before that conversation in person, was a telephone

12  call received at Area 5, Violent Crimes?

13     A    There was a telephone call.

14     Q    And that was by his mother?

15     A    Yes.

16     Q    And was she advised that if she wanted to speak to

17  you to come down to Area 5?

18     A    Yes.

19     Q    What time did she arrive at Area 5, Violent Crimes,

20  the following morning?

21     A    To the best of my recollection, it was about noon.

22     Q    This was still on February 4, 1993 but during the

23  daytime; is that correct?

24     A    That's correct.

$\mathcal{D}$ 56

JIM01461

SA491

1    Q    Did you speak to her at that time?

2    A    Yes.

3    Q    Where did you speak to her at?

4    A    It would be in the Area 5 office.

5    Q    And what did you tell her about the murder at that

6    time?

7    A    I gave her the location, time it happened.  I told

8    her that three witnesses had positively identified --

9        MR. HILL:  Objection, your Honor.

10       THE COURT:  I will allow it only for the purpose of

11    explaining what he did in fact say and not necessarily for

12    the truth of the matter.

13       THE WITNESS:  I told her that three witnesses had

14    positively identified her son as being the shooter in this

15    murder and that -- and she replied that this must be a

16    conspiracy, "My son couldn't kill anybody."

17       MR. MURPHY:  Q  When you gave the information about the

18    date and the time that this occurred, did she ever tell you

19    that she was with the Defendant at the time that the murder

20    occurred?

21    A    No.

22    Q    Did she ever tell you that anybody else from the

23    family or any friends of hers were with the Defendant at the

24    time that the murder occurred?

                    𝒟 57

                                        JIM01462

                    SA492

1      A    No.

2      Q    And you did prepare an arrest report, a report

3 documenting your actions on that day; is that correct?

4      A    Yes.

5      MR. MURPHY:  No further questions, Judge.

6      THE COURT:  Cross examination.

7

8                          CROSS EXAMINATION

9                              BY

10                          MR. HILL:

11     Q    Does that document that you prepared on that day

12 have anything in it regarding your conversation with Victoria

13 Jimenez?

14     A    No.

15     Q    Now, you said you did talk to her on that day?

16     A    Yes.

17     Q    Now, was that the only time that you talked to her

18 from today's date until back then, February 4, 1993?

19     A    No.

20     Q    And, in fact, on other occasions, she did tell you

21 in fact that he was at home at the time of this incident?

22     MR. MURPHY:  Objection, Judge.  I would ask for a

23 foundation.

24     THE COURT:  Lay a foundation, counsel.

                        )58

JIM01463

1      MR. HILL:  Q  When else after that date did you have

2  conversations with Ms. Jimenez?

3      A      There was one conversation in Juvenile Court, which

4  was shortly after the arrest.  The next conversation was on

5  the phone about three weeks later, and there have been

6  several other phone calls since that time.

7      Q      Juvenile, a short time later; on the phone a short

8  time later?

9      A      Three weeks later.

10     Q      And then there were numerous ones after that?

11     A      Two to three after that.

12     Q      At the time at Juvenile, isn't it a fact that she

13  told you he was at home on the date of this incident?

14     A      That is not what she told me there.

15     Q      You talked to her on that day?

16     A      Yes, short conversation.

17     Q      What was that short conversation?

18     A      Well, she started off by calling me a prick and

19  that why don't I go out and find the real person that did

20  this, and I responded that I did.

21     Q      Okay.  Now, in fact, the conversation three weeks

22  later, she told you that he was at home at this time?

23     A      She told me that she had witnesses and they would

24  come to court to say that he was at home at the time of the

⟩ 59

1    murder.

2        Q    Now, did you then go out those three weeks later

3    and talk to those witnesses?

4        A    No, I did not.

5        Q    In fact, after you arrested Victor Romo -- Victor

6    Romo was arrested February 10th; is that right?

7        A    That's correct.

8        Q    After you arrested Victor Romo, the case was

9    closed; is that correct?

10       A    For paperwork purposes, yes.

11       Q    So, you never went out and talked to these

12   witnesses three weeks later, did you?

13       A    No, I did not.

14   MR. HILL:  Thank you very much, Officer.

15   THE COURT:  Redirect.

16

17                       REDIRECT EXAMINATION

18                       BY

19                       MR. MURPHY:

20       Q    Detective, you spoke to the Defendant's mother the

21   morning that you arrested him on February 4, 1993; is that

22   correct?

23       A    Yes.

24       Q    And you spoke to his mother in Juvenile Court at

                         60

JIM01465

SA495

1    some point shortly after he was arrested; is that correct?

2        A    That's correct.

3        Q    And in neither of those conversations did she tell

4    you that the Defendant was with her or anybody else during

5    the time the shooting occurred; is that correct?

6        A    That's correct.

7        Q    And you had told her the date and time the murder

8    occurred on the morning of February 4, 1993; is that correct?

9        A    Yes.

10       Q    And the very first time that she told you that she

11   had witnesses to say where he was was approximately three

12   weeks after he was arrested?

13       A    That's correct.

14       MR. MURPHY:  I have no further questions, Judge.

15       THE COURT:  Recross.

16

17                    RECROSS EXAMINATION

18                           BY

19                      MR. HILL:

20       Q    Officer, excuse me.  You said that Juvenile was

21   like February 5th, or was it the 6th or something like that?

22       A    It was very soon after.  I believe there were two

23   short court dates, and I am not certain at which one it was.

24       Q    Please forgive me.  You said she called you a

                       $\mathcal{D}$ 61

JIM01466

SA496

1  prick?

2      A    That's correct.

3      Q    I take it that at the time she called you that, she

4  was quite upset?

5      A    I don't know her demeanor before that.  I was

6  standing in the hall when she walked by and said this.

7      Q    But she did tell you why don't you go out and find

8  the person who did this?

9      MR. MURPHY:  Objection; asked and answered, Judge.

10     THE COURT:  You are asking is that what she said?

11     MR. HILL:  Q  Is that what she said to you after she

12  said that?

13     A    Basically, yes.

14     MR. HILL:  Thank you, Officer.

15     THE COURT:  Anything further?

16     MR. MURPHY:  No, Judge.

17     THE COURT:  Thank you.  You may be excused.

18     MR. MURPHY:  Your Honor, we rest our case in rebuttal.

19     THE COURT:  Does the Defense have any additional

20  witnesses?

21     MR. HILL:  No, your Honor.

22     THE COURT:  Defense rests.

23               Members of the Jury, you have now heard

24  all of the testimony in this case, and we will proceed if

                        $\mathcal{D}$ 62

JIM01467

1    everyone is ready with closing arguments.

2        MR. GAUGHAN:  Yes, your Honor.

3        THE COURT:  You may proceed.

4

5        MR. GAUGHAN:  May it please the Court, John, counsel,

6    Ladies and Gentlemen of the Jury.

7                    There are 13-year-old children, and there

8    are Thaddeus Jimenezes.  Thaddeus Jimenez is the type of

9    person that writes letters and says, "Oh, this Saturday on

10   the 8th I am going to call John Spaw.  I don't know if you

11   remember him, but he is the one Royal who drives a motorcycle

12   and lives on Kedzie.  I am going to tell him to stop Larry

13   from going to court in any way he has to, even if he has to

14   kill him.  It won't mean anything to me, and it only takes

15   the pull of a trigger."  Ladies and Gentlemen, on February

16   3rd of 1993, this man's life, this photograph of how old he

17   was when he encountered Thaddeus Jimenez on the street, his

18   life ended because all it took for that person right there

19   was the pull of a trigger, and this is the result.  Ladies

20   and Gentlemen of the Jury, the Thaddeus Jimenezes of the

21   world believe that if somebody crosses their path and he

22   disagrees with them or they try to stop him from doing his

23   gangbanging crap in front of little kids, that he has the

24   right to take their life.  He believes that he can do

                        𝄞 63

JIM01468

1   whatever he wants, that he is not accountable for anything.
2   Ladies and Gentlemen of the Jury, Abraham Lincoln had a quote
3   he liked to use during the Civil War.  He said, "Let us have
4   faith that right makes might, and in that faith, let us dare
5   to do our duty to the end as we understand it.".  Thaddeus
6   Jimenez believes that might makes right.  Thaddeus Jimenez
7   believes that if he has a gun and he encounters somebody and
8   they disagree with him, he can take that life.  Now, in these
9   courtrooms today, it is time to correct that.  It is time to
10  tell Thaddeus Jimenez that no, that is not the way it works,
11  that no, society doesn't operate on the law of him doing
12  whatever he wants and taking guns and killing people.
13              Ladies and Gentlemen of the Jury, Judge
14  Berkos is going to instruct you as to that law.  Judge Berkos
15  will instruct you that to sustain the charge of first degree
16  murder or the charge of second degree murder, the State must
17  prove the following propositions:  First, that the Defendant
18  performed the acts which caused the death of Eric Morro;
19  Second, that when the Defendant did so, he intended to kill
20  or do great bodily harm to Eric Morro, or he knew that such
21  acts would cause death to Eric Morro, or he knew that such
22  acts created a strong probability of death or great bodily
23  harm to Eric Morro, and that the Defendant was not justified
24  in using the force which he used.  Well, according to the

$D$ 64

JIM01469

1  Defendant, he wasn't there.  Ladies and Gentlemen of the

2  Jury, the person who acted that day, that man right there,

3  took a gun, took a gun, and he placed it up to the chest of

4  Eric Morro.  He pulled the trigger.  There is no question,

5  Ladies and Gentlemen, that when you take a gun and you put it

6  to the chest of somebody and you pull that trigger, you,

7  number one, intend to kill them or you, number two, at least

8  know that by taking a gun and placing it to the chest of a

9  human being, you know that you can cause death or great

10  bodily harm.

11          This case, Ladies and Gentlemen, is about

12  choices.  It is about the choices that Thaddeus Jimenez made

13  on February 3, 1993.  It is about the choices he made when he

14  encountered for the first time that day Eric on the street

15  when Eric was with Donna Cosmen and Shawn Cosmen.  It is

16  about the choices he made at that time when he was armed with

17  that gun to show that gun to Donna Cosmen.  You heard the

18  testimony.  He had the gun earlier in the day.  It is about

19  the choices that Donna and Shawn told you about of following

20  Eric Morro and getting mad at Eric Morro because he told him

21  to take his gangbanging stuff somewhere else because there

22  were kids around.  It is about the choices he made.  It is

23  about the choices he made when he came back, Ladies and

24  Gentlemen, when he came back later that day with Victor and

$\mathcal{D}$ 65

JIM01470

SA500

1  when he saw Eric again, and it is about the choices he made

2  to walk up to Eric Morro and to take that gun and to put it

3  to Eric Morro's chest and to pull that trigger.

4              Ladies and Gentlemen of the Jury, Judge

5  Berkos will also instruct you that you are the judges of the

6  credibility of the witnesses.  Ladies and Gentlemen, Judge

7  Berkos will instruct you that only you are the judges of the

8  believability of the witnesses and the weight to be given to

9  the testimony of each of them.  When considering the

10  testimony of any witness, you may take into account his

11  ability and opportunity to observe, his memory, his manner

12  while testifying, any interest, bias, or prejudice he may

13  have, and the reasonableness of his testimony considered in

14  the light of the evidence in the case.  Ladies and Gentlemen

15  of the Jury, what interest and bias does Tina Elder or did

16  Mrs. Elder have to come in here, to take that witness stand,

17  and to testify that the Defendant pulled the trigger that

18  day?  They had one.  They were motivated by the duty to Eric

19  Morro, their friend.  They were motivated by the fact that

20  they were out on the street that day, that they saw the

21  Defendant shoot Eric Morro.  The motivation, Ladies and

22  Gentlemen, to convict the killer of a friend does not extend

23  to a motivation to put the wrong person in jail.  They came

24  in here, and they took the stand, and they testified against

           D 66

JIM01471

1    a gang member.  They testified against the person -- and you

2    heard the letters -- they testified against a person who

3    threatened to kill people, that threatened to kill Larry how

4    many times.  They came in here -- that's a horrible

5    experience.  It's not something that they chose to do -- it's

6    something they chose to do out of duty.  It is not something

7    they chose to do because they wanted to be here.  They chose

8    to do it because he chose on February 3rd of 1993 to kill

9    Eric Morro.

10                     Ladies and Gentlemen of the Jury, Tina

11    Elder told you that she had never seen the Defendant before.

12    Tina Elder went to the police station and picked Thaddeus

13    Jimenez out of a lineup.  Mrs. Elder went to the police

14    station and picked out the two people who she could narrow it

15    down to saying it was one of the two.  Take a look at those

16    two people.  They could be brothers.  Phillip Torres picked

17    Thaddeus Jimenez out of the lineup.  Phillip Torres who,

18    Ladies and Gentlemen of the Jury, was looking out this window

19    right here at the Defendant killing Eric Morro down here,

20    Phillip Torres who was talking to Tina Elder down on the

21    street; Phillip Torres, Ladies and Gentlemen of the Jury, who

22    knew the Defendant.  No, he didn't name the Defendant that

23    night right away to the police.  Phillip Torres was sitting

24    in the back of a police car with a person he knew to be this

$D$ 67

JIM01472

1    guy's gangbanging friend.  We are not here to decide, Ladies

2    and Gentlemen, the morality of whether or not it is ever

3    right to lie to the police, but, Ladies and Gentlemen of the

4    Jury, Phillip Torres had just witnessed a murder.  He was

5    sitting in the back of the police car when he first

6    encountered the police with this guy's gangbanging friend.

7    Phillip Torres lives in the neighborhood.  He knows the

8    neighborhood.  Phillip Torres is perfectly justified at that

9    time, Ladies and Gentlemen, in not telling the police that he

10   knew who it was.  You heard what Larry testified to.  Larry

11   gave the wrong description.  Of course, Larry gave the wrong

12   description.  Larry gave the wrong description to the police

13   for the same reason Victor Romo came in here and lied to you

14   today, because when you testify against another gangbanger in

15   your gang, you get a death violation.  Later on that night,

16   Ladies and Gentlemen, Phillip Torres, whether it was guilt,

17   duty to do the right thing, decided to do the right thing.

18   He called the police, and he told them T.J. did it.  The

19   police then go to Larry's house.  Well, Larry at that age

20   isn't quite as cold-hearted as this guy right here.  The

21   police confront him.  Larry decides to tell the truth.  Larry

22   says, "Yeah, it was T.J."  Larry, who came in here, Ladies

23   and Gentlemen, and testified to you that it was T.J., his

24   fellow Simon City Royal.

D 68

JIM01473

1           You heard Officer Galligan testify that
2  in his expertise in dealing with gangs what the consequences
3  are for testifying against a fellow gangbanger.  You heard
4  Officer Galligan tell you that the consequences of testifying
5  against a fellow gangbanger in a murder trial is a death
6  violation.  You heard Larry tell you that he was subpoenaed
7  to be down to court last Wednesday and that he didn't show
8  up.  You heard him tell you that it was the officers that
9  went out and took him in and that Judge Berkos had to hold
10  him in custody overnight so he could come in here and
11  testify.  Do you really believe that Larry wanted to come in
12  here and testify against T.J.?  Do you believe that?  Do you
13  believe, Ladies and Gentlemen of the Jury, that he wanted to
14  testify against the guy who wrote this letter?  "So, Danny
15  tried to hook you up with Larry.  I got something special for
16  him and for Larry.  You better see him while you can because
17  he won't be living very long.  Second thought, stay away from
18  him.  He is bad news.  The Royals are suppose to be looking
19  for him.  It looks like I will have to kill him myself since
20  the Royals won't."  This, Ladies and Gentlemen, from the guy
21  that was home studying on February 3rd of 1993.  "He is lucky
22  he is living now, but I told my cousin not to kill him
23  because he is my problem, and as soon as I get out, Danny's
24  pussy ass will be going to Larry's wake."  This, Ladies and

                     D 69

JIM01474

1    Gentlemen, from the guy who, on February 3rd of 1993, is
2    getting tutored in Math and English.  If those witnesses,
3    Ladies and Gentlemen, Tina, Mrs. Elder, if they came in here,
4    Phillip Torres, Larry Tueffel, if they lied, why is he
5    writing those letters?  Ladies and Gentlemen of the Jury, his
6    letters tell you that Tina Elder, that Mrs. Elder, that
7    Phillip Torres, and that Larry Tueffel came in here and told
8    you the truth.  They came in here, and they told you exactly
9    what happened on February 3, 1993 the way they saw it.  They
10   have absolutely zero motivation to lie to you about that.
11                    On the other side of it, Ladies and
12   Gentlemen, you have Victor Romo.  What did Victor Romo tell
13   you?  Victor Romo told you that he was adjudged delinquent,
14   the equivalent of guilty, at Juvenile Court of this murder.
15   Victor Romo told you that on that day he was with somebody
16   else, and he told you that a fight started, that he never saw
17   a gun, that he didn't know the other guy had a gun, turned
18   around, he is halfway down the block, hears a gunshot, thinks
19   it is his friend.  First of all, Ladies and Gentlemen of the
20   Jury, based on what Victor Romo told you, Victor Romo
21   committed no crime that day.  He is lying through his teeth.
22   Running halfway down the block because a fight started and
23   then hearing a gunshot doesn't make you delinquent of murder.
24   What he did in here, Ladies and Gentlemen of the Jury, was he

$D$70

1 took himself out of it. He lied to you, and you know he lied

2 from the testimony of Tina and Mrs. Elder and Phillip and

3 Larry because he was the guy that was pushing Eric up against

4 the wall. He came in here, and he lied. How did he lie? He

5 lied by taking himself out of it, and he lied by taking the

6 Defendant out of it. That's exactly what he did.

7                               Interest and bias. You heard the

8 testimony, Ladies and Gentlemen, of the Defendant's mother,

9 of his sister, of all kinds of friends and family. Interest

10 and bias. Bias to lie. None of those people wants to see

11 the Defendant held accountable for what he did on February

12 3rd of 1993. Look at what a few of those witnesses said.

13 The first witness who testified, Lorraine. She was asked

14 what adults were in the apartment that night. She went

15 through that list of adults for you. She was asked on cross,

16 and she went through each and every person. Donna Whitley

17 comes up. All of a sudden, another name comes out of

18 nowhere, Antonice (phonetic). You know where Antonice came

19 from. Angela told you that Antonice drove Angela down to

20 court. Remember how consistent they all were? Okay, this

21 person was in this room, and this person was in that room.

22 Donna Whitley assumed that Antonice was suppose to be there,

23 too, because Antonice was out with them and Antonice came

24 down to court with Angela Jimenez. Every one of those

                              D71

JIM01476

1  witnesses, Ladies and Gentlemen, got up here and lied to

2  protect him, to protect him.

3              Ladies and Gentlemen of the Jury, you

4  also have the coat that the Defendant wore when he was

5  arrested and took out of his house, the Royals coat, the coat

6  that Tina, Mrs. Elder, Phillip, and Larry all said he was

7  wearing, and, Ladies and Gentlemen, you have the Defendant.

8  You ask yourself, Ladies and Gentlemen of the Jury, if these

9  letters are letters of somebody who was home studying on

10  February 3, 1993 or if these letters tell you that what Tina,

11  who had absolutely no -- if anything, those witnesses had a

12  motive not to come in here, not to come forward, because they

13  were afraid of him, if anything. These letters tell you that

14  what they told you is true. "I don't want anyone to know I

15  am in here still. When I get out, I will take care of Larry,

16  that pussy ass mark." What do you think "mark" means? Do

17  you think maybe that means it is already a mark on him?

18              Do you remember the other letter that was

19  read earlier, Johnny Spaw. What did Officer Galligan tell

20  you about Johnny Spaw from his work in gang crimes, as an

21  expert? Officer Galligan told you that Johnny Spaw is a

22  longtime member of the Simon City Royals, of the older group,

23  the group that the Pee-Wees answer to, the group that

24  Elizabeth Heatley told you he holds rank in. Do you think he

                        𝐷 72

1  has mentioned Johnny Spaw in his letters because he doesn't

2  hold a rank and because he doesn't believe he can carry this

3  out?  Is that, Ladies and Gentlemen, the kind of letter from

4  a young boy who is home studying on February 3rd of 1993, or

5  is that the letter from the man just like Tina and Mrs. Elder

6  and Phillip and Larry told you was out on February 3rd of

7  1993 taking a gun and putting it to the chest of Eric and

8  firing that gun?

9            Ladies and Gentlemen, what else was in

10  the letter?  "Yeah, I didn't tell my ma to lie to you -- the

11  mom who would never submit a lie for her son -- I told her to

12  say I was out of jail just so everyone -- to see if anyone

13  comes looking for me and see if anyone tries to light me up

14  like they did Larry.  He deserved it."  What does that tell

15  you?  It tells you that the Defendant's mother told Elizabeth

16  that he was out of jail.  Listen again.  "Yeah, I didn't tell

17  my ma to lie to you.  I told her to say I was out of jail

18  just to see if anyone comes looking for me and to see if

19  anyone tries to light me up like they did Larry.  He deserved

20  it."  It also tells you, Ladies and Gentlemen of the Jury,

21  that he is telling his mom to tell Elizabeth and to tell

22  people that he is out of jail because he wants to see if

23  anybody is going to light him up.  Does that tell you that

24  his mom knows?  She came in, Ladies and Gentlemen, and she

D 73

JIM01478

1   lied for her son, and nobody is here to judge whether that is

2   right or wrong, but you are here to judge the truth of what

3   happened.  The bottom line is she came in here and so did

4   those other witnesses, and they lied to save him.  That is

5   the bottom line.

6               How about, Ladies and Gentlemen of the

7   Jury, the letter of March 22nd of 1993?  "He is lucky he is

8   living now, but I told my cousin not to kill him because he

9   is my problem, and as soon as I get out, Danny's pussy ass

10  will be going to Larry's wake."  He goes on to say, "You know

11  the rules.  If you shoot, you shoot to kill, but watch for

12  myself or you will pay the price, but don't worry, I won't

13  get caught."  He goes on to say, "You know the rules."

14  Ladies and Gentlemen of the Jury, the Defendant doesn't know

15  the rules.  This is when it gets corrected.  Tina,

16  Mrs. Elder, Phillip, and Larry, and Elizabeth -- what kind of

17  courage do you think it took for Elizabeth to come in to turn

18  those letters over, to come in here and sit on that stand and

19  testify to those letters knowing full well what he is made

20  of?  What kind of courage do you think that took?  Ladies and

21  Gentlemen of the Jury, Tina, Mrs. Elder, Phillip, Larry, and

22  Elizabeth, they did what was right.  They did their duty.

23  They saw wrong, and they did their part to try to correct it,

24  and anyone who thinks that it is an easy thing to come in and

                    D 74

JIM01479

1    testify against a stone-cold killer is mistaken.  That took

2    great courage.  Ladies and Gentlemen of the Jury, now the

3    duty gets passed on to you.  Their part has been done.  They

4    acted courageously, and they told you what happened.  Now, it

5    is time, after the rest of the arguments, for you to go back

6    and deliberate, and the duty becomes yours.

7              Ladies and Gentlemen of the Jury, the

8    evidence in this case is proof beyond a reasonable doubt that

9    the Defendant, on February 3rd of 1993, took a gun, put it to

10   the chest of this man, pulled the trigger, and killed him.

11   Now, we ask you to go back and deliberate, to look at the

12   evidence, and find the Defendant guilty of the first degree

13   murder of Eric Morro.  You will be given three verdict forms,

14   Ladies and Gentlemen, guilty of first degree murder, guilty

15   of second degree murder, and not guilty.  We are asking you

16   to find that Tina, Mrs. Elder, Phillip, Larry, and Elizabeth

17   told you the truth, to do your duty, and to find him guilty

18   of first degree murder and to sign only one verdict form, a

19   verdict form of guilty of first degree murder.

20              Thank you.

21   THE COURT:  Thank you, counsel.

22              Counsel, Mr. Hill, you may proceed.

23

24

$D$75

JIM01480

1    MR. HILL:  As I told you in opening statements, I told

2    you that Thaddeus did not do it.  Thaddeus was not there.  By

3    all means, this was a tragedy, and as much as the State asks

4    you to sympathize with the family of Eric Morro, when you sat

5    down, you took an oath to judge this case by the evidence

6    that came before you and to be fair and impartial and that if

7    the State did not meet their burden of proving him guilty

8    beyond a reasonable doubt, none of you would hesitate in

9    signing a verdict of not guilty.  You took an oath not to be

10   bulldozed, but, more importantly, you took a personal oath

11   not to create a second tragedy.  The second tragedy is to

12   take an innocent man and find him guilty of something he

13   didn't do.

14              The State waved letters at you showing

15   threats, but those letters went to Elizabeth.  They didn't go

16   to Larry.  She said she gave the police eleven letters.  They

17   only brought five.  Where are the other six letters, and what

18   do they say?  Don't be threatened or bulldozed.

19              Let's get to what happened that day

20   because we know, we know without a shadow of a doubt because

21   we heard today from somebody who has been found guilty of

22   this, and what did he tell you?  He said he was walking down

23   the street.  He was walking with who?  Was it Thaddeus?  No.

24   It was Juan Carlos Torres.  That is what he told you.  He was

$$\mathcal{D}\,76$$

1    walking down the street, and what did he say?  They got into

2    an argument, Juan and Eric, about some money.  That is

3    interesting because he said the same thing Larry Tueffel

4    said, that the argument was about money.  How would he know

5    unless he was there?  What did he say?  He said the same

6    thing that Larry said, that Eric swung at him, the exact same

7    thing.  Larry and Victor haven't talked.  Then, what did he

8    say?  He ran and, within two seconds, he heard a shot, and

9    he thought Juan got killed.  Now, tell me that within two

10   seconds Thaddeus got up and said, "Move out of the way, Juan.

11   I am here."  No, he wasn't there.  It is clear.  It is quite

12   obvious.  What they want you to believe is because this young

13   man was a member of the Simon City Royals that you should

14   find him guilty of murder.  Mere association is not a crime.

15   Some of you may have some associates or some friends who may

16   not be looked at in the best of lights, but does that make it

17   a crime for you to hang with them?  He was 13 years old.  He

18   was in school, and now they want to make him the president of

19   the Simon City Royals.  No.

20                   Now, it is interesting what happens three

21   hours earlier.  The evidence is clear that three hours

22   earlier him and Eric got into an argument about that, but

23   what happens three hours earlier does not magically put him

24   there three hours later, but that is what they want you to

                          $\mathbf{)}$ 77

JIM01482

1  believe.  They want you to believe that.  He was a student,
2  but it is clear that Victor Romo and Juan Carlos Torres did
3  this.  Do you remember when I asked the Detective when he
4  stopped his investigation?  He said after Victor.  Why not
5  Juan?  Why didn't he even talk to the alibis?  He said they
6  tried to make it look like they are lying.  This is a murder
7  case.  This is somebody's life, and he is going to stop three
8  weeks later?  You should require more, and the standard is
9  proof beyond a reasonable doubt, not just proof and
10  reasonable, but it says "beyond," and that means not a maybe,
11  not a speculation, not a guess.

12      THE COURT:  Counsel, there is an objection, and I will
13  ask you not to define in your mind what reasonable doubt is.
14  That is for the mind of each of the jurors, and you know
15  better.  Do not define reasonable doubt.  The Jury will be
16  instructed to disregard counsel's comments.

17      MR. HILL:  The words are proof beyond a reasonable
18  doubt.

19              Let's look at those eyewitnesses.  They
20  want you to believe that those eyewitnesses are the crux of
21  their case and that they came in here and told the truth.
22  Well, let's first take Tina.  What was Tina doing?  Tina was
23  talking on the third floor to Phillip.  The incident happened
24  over here.  She looked.  She said it happened real quick.

$\mathcal{D}$ 78

JIM01483

1  What time was it? 6:30, February 3, 1993.  You know what it

2  is like at 6:30 in February.  It is dark, and she is not even

3  looking that way, and then she looked, and it happened that

4  quick, and somebody on the other side of her -- she is not

5  looking clearly at his face.  He is not looking that way.  He

6  is looking at the person he has up against the wall, and then

7  remember I asked her about the lineup, did she look at

8  everybody, or did she pick him out right away.  He is number

9  two.  I said, "Did you say that's him, I am sure, or did you

10  look at all of them?"  She said, "I looked at all of them

11  first."  Why?  If you knew who it was, you would have pointed

12  at him right away.  They called her on the phone and said,

13  "We think we have got the person."  Now, if Eric was such a

14  good friend of hers, why didn't she talk to the police before

15  then?  She had information that would help resolve a crime in

16  which she knew the victim.  Why wasn't she there banging the

17  police's doors down?  She didn't see him.  She didn't.

18              Let's go to the next one.  Who is next on

19  the list?  Phillip.  You saw him on the stand.  First of all,

20  he is on the third floor talking and looking over, and then

21  he says he knew him, had been to his mother's house before.

22  Why didn't he tell somebody then?  What did he wait until?

23  He waited until three o'clock or two o'clock in the morning.

24  Why?  Who was he home with?  Donna and Shawn Cosmen.  Who is

D 79

1   Donna and Shawn Cosmen?  They were the ones who were there at
2   three o'clock in the afternoon.  They probably told him about
3   the incident at three o'clock, and that is how he came up
4   with T.J. because before then they never had a blue duck
5   jacket.  Before then, they had a purple jacket with gold
6   lettering and a Georgetown jacket, and all of a sudden, three
7   o'clock in the morning, they all of a sudden come up with
8   T.J. in a blue Georgetown jacket.  Because Phillip talked to
9   his half brother and sister, who had saw the incident
10  earlier, and that is how they came up with it, but he
11  couldn't have -- everybody said it happened so quick, and he
12  was up there, and he was talking, and this is the same man
13  who has a conviction of theft, a conviction of selling drugs,
14  a conviction of burglary, and a burglary pending, and he
15  couldn't even tell you that the 1993 burglary conviction --
16  when it was.  He couldn't tell you the month.  Now, he is
17  suppose to be able to see at dark in a split second on an
18  angle, and he said that he told Larry Tueffel this then.  He
19  didn't tell the police that, and he said that this man had
20  been to his house before, and he knew him from the
21  neighborhood.  No.  When you say about the way that area
22  looked, this is at night when the police got there, and
23  everybody was suppose to see real good in a split second.
24  Also, look at where Phillip was at.  There is a space there,

)80

1  and then the Honey Bake is down further.  He is way up here,

2  and he is talking.

3           Let's go to Sandra.  Sandra comes across

4  the street.  She is in the middle of the street, so she is

5  back here, and then she is looking over and can see the

6  person.  The person didn't turn around and say, "Hi, Sandra,"

7  and she had just left the tavern.  Oh, yeah, she only had one

8  beer, but she can't see through there, and she admits it.

9  She came in this court and said that Thaddeus is the one.

10 Everybody knew who the Defendant was here in court.  Was that

11 a mystery?  But when she went to the lineup, at least she was

12 halfway honest.  She picked two out of five.  She said she

13 thought it was him and him, and they want to tell you they

14 look like brothers.  Look at it closely.  Please look at it

15 closely.  Look at it when you go back there.  She didn't see

16 who it was, and there is no different description except --

17 nothing about a blue duck jacket in the police report or that

18 officer who said he had talked to three witnesses that night.

19 He said he talked to Larry, Phillip, and he talked to Sandra.

20 Nothing in there about a blue duck jacket, but at 3 A.M. or

21 2 A.M. in the morning, all of a sudden everybody saw T.J. in

22 a blue duck jacket.  No.

23           Larry Tueffel speaks for himself.  There

24 was a stipulation, and the stipulation was that the State

$\mathcal{D}$ 81

JIM01486

SA516

1  agreed with me that on cross examination he said he told the

2  police three different times it was Victor Romo, and then on

3  redirect, they stipulated -- when I got back up, they

4  stipulated that no, he didn't.  They stipulated that he lied

5  in court because he told two different things.

6      MR. GAUGHAN:  Objection.

7      THE COURT:  Sustained.  They didn't stipulate to that.

8      MR. HILL:  They stipulated that he said one thing on

9  cross examination and another thing on direct.  You tell me

10  what that is.  Larry Tueffel, gang member, who tells the

11  police, who knows Thaddeus.  He knows him.  He didn't tell

12  them anything about him at 6:30 or 9:30, nor at three

13  o'clock, until they said -- and this is really interesting.

14  I asked him, "Did the police tell you what Phillip Torres

15  said?"  No.  But when I asked the Detective up here, I said,

16  "Did you tell Larry Tueffel what Phillip Torres told you at

17  three o'clock," and he said, "Yes, I told him that Phillip

18  Torres told me it was Thaddeus," and then all of a sudden,

19  Larry said, "Yeah, it was Thaddeus."  Those are the

20  eyewitnesses they want you to believe to convict this man of

21  first degree murder.  No.  The law requires more.

22              We talked about the lineup.  I asked

23  Larry and I asked Phillip, "Anybody else in there you knew?"

24  No.  And they knew Thaddeus, and they had already started

                    ⟩ 82

JIM01487

1  this, Phillip because he accepted what his sister and brother

2  had said, and then Larry because Larry had agreed once the

3  police confronted him.

4              Now, something is strange about that

5  description about the jackets.  Even if you didn't want to

6  give the person up, you would make a mistake and tell them

7  what color clothes they had, but that initial description had

8  nothing to do with a duck jacket with either person.  When

9  you are covering up, you make small mistakes.  There were no

10  small mistakes here, and then they want to say -- who is the

11  only one in the photograph in a blue duck jacket?  Only one

12  they got is Thaddeus, and they expect somebody not to be able

13  to pick him out?

14      MR. GAUGHAN:  Objection, Judge.  There was no evidence

15  that he was wearing the coat in the lineup, and the picture

16  shows he is not.

17      THE COURT:  Sustained.

18      MR. HILL:  I have a picture of him in a blue duck

19  jacket, and there is a measurement.  You make a determination

20  of how and when and where the photograph was taken.

21      MR. GAUGHAN:  Objection.

22      THE COURT:  The Jury heard the evidence.  They will make

23  a decision based on the evidence.

24      MR. HILL:  That is what I ask.

                        D 83

JIM01488

1          Who called Victor?  Did the State call

2  him?  Why do you think they didn't?  Do you think it was a

3  surprise to them?  No.  The interesting thing is not only did

4  Victor say that Thaddeus was not there, but he didn't know

5  Thaddeus.  He met Thaddeus in custody two months after, and

6  he admits to being there.  They said, "Well, you could tell

7  he is lying because he ran away."  You draw the conclusion.

8  Maybe another innocent man was convicted of something that

9  Juan Carlos did.

10      MR. MURPHY:  Objection, Judge.

11      THE COURT:  The Jury will base their decision on the

12  evidence they heard in this courtroom and not anything else.

13      MR. HILL:  You heard witnesses come in, five of them.

14  They clearly told you where Thaddeus was.  They want to say

15  those are his family members and they are lying.  No, they

16  aren't.  He was at home.  And, in fact, I guess you should

17  find it really strange that the police officer, even if he

18  only knew about this three weeks later, did not bother about

19  talking to him about it, inquiring, and they want to say

20  well, it is a discrepancy of who was there and who wasn't.

21  You should think they were very consistent.  There was some

22  people that said different things, but basically all of them

23  agreed where he was at 4:30 until that morning when he was

24  arrested.  They want to say they didn't tell the police.

D 84

JIM01489

SA519

1    They told them three weeks later.  Why didn't they go out and

2    talk to them then?  That's about eighteen months.  He said,

3    "Well, I closed the case on February 10th."  They want to

4    scare you into thinking that being a member of the Simon City

5    Royals is a crime.  It's not.  That is not enough to find

6    somebody guilty of first degree murder.

7                    Now, you are going to receive some

8    instructions.  One of them says that the believability of

9    witnesses may be challenged by evidence that on some former

10   occasion he made a statement that was not consistent with

11   his testimony in this case.  Who does that fit?  Well,

12   Phillip, Larry, fits them clearly.

13                    You will get an instruction that says

14   that evidence that the witness has been convicted of an

15   offense may be considered by you only as it may affect the

16   believability of that witness.  You remember what Ryan said

17   about Larry Tueffel, about he wouldn't trust him?  And they

18   ask you to trust him and Phillip in his convictions.   No.

19                    You are going to get another instruction

20   that I think is even more important.  It talks about the

21   identification, and it lists five criteria, and if you look

22   at those five criteria, none of these four witnesses fall

23   favorably into any of them.  The first criteria is the

24   opportunity the witness had to view the offender at the time

$D$85

JIM01490

SA520

1  of the offense.

2       MR. GAUGHAN:  Judge, objection.  The instruction says

3  among others, not five criteria only.

4       THE COURT:  Counsel, always read the instruction in the

5  whole.

6       MR. HILL:  When you weigh the evidence, testimony of a

7  witness, you should consider all the facts and circumstances

8  in the evidence, included but not limited to the following,

9  and they list these five criteria, which doesn't fit any of

10 these people.  It says the opportunity a witness had to view

11 the offender at the time of the offense.  Did any of them

12 have a good opportunity that you could trust?  Probably the

13 best one is Larry, and where was Larry at the time?  You

14 remember what Tina said?  He was gone.  She didn't see him,

15 and he ran.  We will get back to that.

16            Then, the degree of attention at the

17 time.  Sandra, Phillip, and Tina were all doing something

18 else.

19            The witnesses' earlier description.  You

20 heard the earlier description.  None of them pointed to

21 Thaddeus.

22            And then the level of certainty shown by

23 the witness when confronting the Defendant.  We will give

24 them that.  They knew him at that point.  I didn't mention

                        $D$86

JIM01491

1    this, but who all went to the lineup together?  Tina, Sandra,
2    and Phillip all went to the lineup together.
3                     And then the length of time between the
4    offense and the identification.  It is over 17 hours or,
5    better yet, there was at least ten hours when -- there was
6    actually 15 hours before they confronted, but once they
7    realized and got their story together at 3 A.M. that they
8    were going to put this on Thaddeus -- none of them were
9    certain.  Read the instruction real carefully.  You will find
10   that none of them could have an adequate identification, but
11   there is even physical evidence to support that Thaddeus
12   didn't do it.  Unrefuted, uncontradicted evidence.
13                     The first is what hand -- only one person
14   mentioned the hand of the shooter, and that was Tina, and she
15   said once -- he was left-handed.  What did Thaddeus' mother
16   say about him?  She said he was right-handed.
17                     Second piece.  Where is the murder
18   weapon?  They went in his house at 4 A.M., two officers in
19   the back and four in the house.  There is no murder weapon.
20   Where is the gun?  Then, today, the gun expert, James Treacy,
21   said that there is a test called a gun residue test that
22   could test the powder burns if you fired a gun.  Is there any
23   evidence that they tested his hands?  That would have been
24   unrefuted, uncontradicted.  There is no evidence here.  Why?

$D$ 87

JIM01492

1  Because he didn't do it.

2               Most important is the initial

3  description.   It goes from somebody in a purple and yellow

4  jacket and a Georgetown jacket to somebody in a duck jacket.

5  Why?  Also, the State made a big deal in their opening

6  statement about the letters.  Ask the State about the other

7  letters they didn't bring in.

8       MR. MURPHY:  Objection, Judge.

9       THE COURT:  Read that back to me, please.  I'm sorry.

10               (Whereupon the statement was read back

11                by the court reporter as requested.)

12               Are you suggesting you didn't have the

13  other letters, counsel?

14       MR. HILL:  No.  I suggested there were other letters --

15  I am not making any suggestion.  There was evidence that

16  there were eleven letters given to the State, and here I

17  don't have eleven.  Here, there is not eleven letters that

18  were presented to this Court today.

19       MR. MURPHY:  Objection, Judge.

20       MR. GAUGHAN:  Judge, --

21       THE COURT:  Counsel, as I recall during this trial, you

22  were given those letters.  You had nine, and then you were

23  given two, then you were given the others.  The Jury heard

24  the evidence.

                    D 88

JIM01493

1    MR. HILL:  Judge, --

2    THE COURT:  Well, -- I am not sure what you are telling

3    them, counsel.

4    MR. MURPHY:  Also, we are objecting that he indicated to

5    the Jury that we represented something to the Jury in opening

6    statements about the letters, and in opening statements, we

7    never addressed that letter.  That is a mischaracterization

8    of the argument.

9    THE COURT:  The Jury heard the evidence.

10   MR. HILL:  Maybe I was somewhere else when he was

11   reading from these, but I thought he was reading from these

12   letters.  These letters are from a 13-year-old to a

13   girlfriend, and if they were as threatening and damaging as

14   the State wants to make it -- Larry not once said he was

15   threatened by anybody.  Larry not once said he was

16   intimidated by anybody, and, in fact, Larry never saw --

17   there is no evidence that Larry ever saw these letters.

18   These letters went from Thaddeus to Elizabeth and from her

19   mother to the police, but now they want to make these enough

20   to find somebody guilty.

21                   And then there was the gang expert.  He

22   said that if somebody tricked on another person in a murder

23   case --

24   MR. GAUGHAN:  Judge, --

ⅅ89

1    MR. HILL:  Here is the question asked by the State, and

2    here is the answer:  "Officer, what is the consequences of

3    one Simon City Royal tricking on another one?"  "In a murder

4    investigation?"  "Yes."  "That is a death violation."  "What

5    do you mean by a death violation?"  "What do I mean by a

6    death violation?  That member who tricked to the police, who

7    cooperated with the police would either be shot, stabbed, or

8    beaten to death.  He would be dead."  Any evidence here that

9    Larry was shot, beaten or stabbed?  No.  In fact, if you

10   remember, I asked the Officer on cross examination, I asked

11   him --

12   MR. GAUGHAN:  Judge, I will object.

13   MR. HILL:  This is evidence.

14   MR. GAUGHAN:  He is reading from the transcript.  It is

15   for the Jury to decide what the evidence is.

16   THE COURT:  The Jury will rely on their collective

17   memory.

18   MR. HILL:  This is evidence.  "If a gang member, a lower

19   member, does something to someone that is a higher member,

20   could they have gone after their own?  Isn't it a fact that

21   the person wouldn't get violated if he assisted the higher

22   member in going after that one?  Is that correct?"  "If I am

23   following you correctly, that would gain respect."  So, Larry

24   could gain respect by going after Thaddeus.  Then, I asked

D 90

JIM01495

SA525

1  him -- I asked him finally about getting out of the gang, and

2  I asked him about whether you are violated if you get out of

3  the gang, and he said that an older member can retire.  I

4  asked him then what about a 14-year-old like Larry, and the

5  next question was, "Unless he earned the benefit or did

6  something for a higher gang member," and the answer from

7  their expert, the gang expert, was, "Yes, that could be

8  possible."  The gang expert corroborates.

9            Now, they brought some witnesses in here,

10  Dr. Lifschultz.  We don't dispute that the victim got shot

11  and killed.  Donna Cosmen and Shawn.  We don't dispute that

12  there was a prior conflict with Eric and Thaddeus.  They

13  brought officers in that said they talked to Thaddeus who

14  said he was a member of the Simon City Royals.  That doesn't

15  reach the level of finding you guilty because they said in

16  1992 he told them that, and they want to say that from 1992,

17  because he told them that he was a member of the Simon City

18  Royals, that he should now be found guilty.

19            Then they brought in Elizabeth, and

20  Elizabeth told you she received the letters, that she had the

21  letters, and she gave them to her mother.

22            It is interesting that Larry Tueffel is

23  right there walking, and Larry gave a description of the

24  offenders to the police later, but what did he do right away?

$\mathcal{D}$91

JIM01496

1    He said he ran through the vacant lot.  What did Sandra say?

2    She said that when she heard the shot, she didn't see Larry.

3    Maybe Larry had more to do with this than he wanted any of us

4    to know.

5              Now, the State is going to get up, and we

6    don't get another chance, but the State will get up and talk

7    about the alibis and that they had a reason to lie.  You make

8    that judgment.  They will get up and talk about gangs and the

9    Simon City Royals, but this incident is not about gangs.

10   Somebody was with Victor Romo, and we know who it was, Juan

11   Carlos Torres, and he walked up to Eric and asked him about

12   some money, and that is when it happened.  It is not about

13   Simon City Royals and what happened at three o'clock earlier

14   in the day.

15             Ladies and Gentlemen, in a short while,

16   you will go back there, and you will be presented with some

17   verdict forms, and you will be presented with a decision, but

18   I will tell you in closing that somewhere out there is a

19   killer.  Somewhere out there, outside of this courtroom,

20   outside of this building, is Eric's killer.  I ask you to

21   tell the police to go out there and look.  I would ask you to

22   tell them to bring truth and justice back into this

23   courtroom.  I would ask you to see all of the evidence quite

24   clearly, and I would ask you to find Thaddeus not guilty

                    $D$ 92

JIM01497

1   because Thaddeus was not there.  Thaddeus didn't do it, but I

2   would ask you in finding him not guilty to send the police

3   out there to continue to investigate because you heard in

4   this courtroom information of who was there and to send them

5   out there to bring justice.

6                     Thank you very much.

7        THE COURT:  Thank you, counsel.  I think we will give

8   the Jury about a five-minute break at this time.  Let's give

9   them a five-minute break right now.

10                    (Whereupon the Court took a short recess,

11                     after which reconvening, the following

12                     proceedings were had back in the

13   presence and hearing of the Jury:)

14        THE COURT:  All right.  Mr. Murphy, you may proceed.

15        MR. MURPHY:  Thank you, Judge.

16                    Your Honor, counsel, Dave, Ladies and

17   Gentlemen of the Jury.  Proof beyond a reasonable doubt.

18   That is the same standard that was applied in the case of

19   Victor Romo, the "innocent man" that he talked about.  Proof

20   beyond a reasonable doubt, Ladies and Gentlemen, is the same

21   burden of proof that is applied and met in every courtroom in

22   the city, in the state, and in this country.  Proof beyond a

23   reasonable doubt, a reasonable doubt, Ladies and Gentlemen,

24   is a burden in this case that we welcome, and pardon me,

                          D 93

JIM01498

1    Ladies and Gentlemen, if when I argue to you here today if I

2    don't walk up like the Defense counsel did and put my hands

3    on the Defendant's shoulders because the last time somebody

4    did that before this trial, he wound up dead.

5         MR. HILL:  Objection, objection.  I am not on trial.

6         THE COURT:  Objection overruled.  He is not saying

7    anything about you being on trial.  Overruled.

8         MR. MURPHY:  Ladies and Gentlemen, the Defendant, in the

9    letters he sent to his girlfriend -- and I don't have to go

10   through all of quotes, but I would like to talk about a

11   couple -- gave you a clue as to the kind of person he is and

12   the fact that he is the person who did this crime, and I just

13   want to read one to you now.  "You know the rules.  If you

14   shoot, shoot to kill, but watch for myself, or you will pay

15   the price, but don't worry, I won't get caught."  Thaddeus

16   Jimenez, March 22, 1993.  On February 3, 1993, this guy right

17   here, shot, and he shot to kill, but for a guy who supposedly

18   is so careful and who is so measured in what he does, he

19   overlooked the fact that there were witnesses out on the

20   street, and he did it right out on a major thoroughfare where

21   there were street lights in view of other people.

22                  Let's talk about those four witnesses who

23   testified here in this case, Ladies and Gentlemen, and keep

24   in mind what the Defense said, proof beyond a reasonable

𝄐 94

JIM01499

SA529

1    doubt.  Four eyewitnesses.  This didn't occur in a dark alley

2    where there was nobody around.  This occurred in the middle

3    of a street where four eyewitnesses were all in almost the

4    immediate proximity of the crime when they saw it occurring.

5                         Tina Elder.  Tina Elder is the best

6    example of a recognition witness that you will see because

7    Tina Elder, she doesn't even know him.  She never even met

8    him before February 3, 1993.  She has got no ax to grind.

9    She has no interest in identifying anybody.  When she views

10   that lineup, Ladies and Gentlemen, she could just as easily

11   pick out anybody.  What does she do?  She picks out the

12   Defendant.  She never met him before February 3, 1993, and

13   she had no difficulty picking him out.  What they are talking

14   about with see this and that, that is ridiculous.  She picked

15   him out, proof positive, positive I.D., and she had a

16   tremendous opportunity to view this crime relative to where

17   she was and the shooters were, the shooter and the other

18   offenders.  The Defendant says to you, "Well, you can't

19   believe her identification testimony.  She was talking to her

20   mom.  She was talking to her mom at the time."

21        MR. HILL:  Objection.  I didn't say that.

22        THE COURT:  The Jury heard the evidence.  Overruled.

23        MR. HILL:  That is not the evidence.

24        THE COURT:  The Jury heard your comments also.

$$\mathcal{D}\ 95$$

1      MR. MURPHY:  Or she was talking to Phil Torres.  Who

2    cares.  She is not believable because of that?  We can't

3    believe her even though she accounts for details up and down

4    in this crime?  She was not sure whether the gun was in the

5    right or left hand, so she is not believable?  That is

6    ridiculous, absolutely absurd.

7                    Phillip Torres.  Ladies and Gentlemen,

8    you saw Phillip Torres up there on the witness stand, and you

9    had a chance to judge him.  He is not perhaps -- perhaps he

10    is not the brightest guy in the world, and perhaps he has had

11    his troubles in life, but you know what, Ladies and

12    Gentlemen, he is a person who lived in that community, and he

13    is a person who was out there or at least viewing the crime

14    when it occurred, and he is aware as a person who lives in

15    the community of the potential consequences and what he faces

16    coming in here to court, and he felt the fear, which you all

17    saw up there on the witness stand.  You all saw him up there

18    as he testified crying like a baby because, Ladies and

19    Gentlemen, when he goes back to his home and he is back with

20    his children and he walks to the store, the police and the

21    State's Attorney's office can't be walking with him.  He goes

22    back to that community, and but for Phil Torres, Ladies and

23    Gentlemen, the police would not even have been directed to

24    the Defendant.  He is the guy who got the police directed to

𝒟 96

JIM01501

1  the right guy.  They say to you don't believe Phil Torres

2  because he is bad with dates or bad with numbers.  That is

3  not what his testimony is about.  He knew the Defendant.

4  Sure, he didn't say who he was right off the bat, and you

5  heard what happened there.  He is afraid.  He is sitting with

6  a gangbanger in the back seat of the car, and the gangbanger

7  is telling them that is not the guy.  What is he suppose to

8  do?

9          Larry Tueffel.  He is the person who had

10  the best opportunity to observe all the witnesses.  He is

11  right there, and he is a gangbanger, but that is what makes

12  him credible.  That actually makes him credible because he is

13  in the same gang.  He is in the same gang that this guy

14  belongs to, and for him the consequences are even more

15  severe, the consequences of identifying not only another

16  gang member but a gang member of some rank, and they say we

17  put this in the game that he is a gangbanger of some rank.

18  That is what he told his girlfriend in August of 1992, that

19  he had rank with the pee-wees.  Larry Tueffel acted like a

20  person who belonged to the Royals because his first reaction

21  when the police talked to him was he didn't want to get

22  involved.  He refused to cooperate.  Then, the next thing he

23  does is come up with some nonsense about two guys.  Total

24  descriptions were off so he could mislead the police and

$D$97

JIM01502

1    direct them away from him, and it was only when he was

2    confronted by the police with the Defendant's name that he

3    then said, "Okay.  He was the guy."  He did the things you

4    would expect a gang member, a guy in his gang, to do.

5              Now, the Defendant's approach to Larry

6    Tueffel is kind of interesting.  It is ridiculous actually

7    because they say to you, "Well, Larry Tueffel isn't

8    believable because he is not dead."  He should be dead.  The

9    only way Larry Tueffel could be credible to you is if he is

10    dead.  That is ridiculous.  He manages to dodge the gang up

11    to this point, and the Defendant says to you he should be

12    dead and, therefore, he is not credible.  Does the gang

13    always get every guy they want to get?  Absolutely not.

14    Absolutely not.  And, Ladies and Gentlemen, there is a couple

15    of questions you have got to ask yourself about this crazy

16    theory -- and it was addressed in closing argument here --

17    that the Royals are using Larry Tueffel to convict him of

18    first degree murder.  That is what the Defense attorney

19    argued about reading from the transcript, that he can move up

20    in gang favors with the leaders and the Royals if he does

21    something for them.  Ladies and Gentlemen, let me ask you a

22    couple of questions that perhaps you should ask yourselves if

23    that is really the case here.  First of all, why would the

24    Royals use civilian witnesses, not gang members, to set up a

$\mathcal{D}$98

JIM01503

1  Royal?  They are going to go to Sandra and Tina and Phil

2  Torres, who are not gang members, and they are going to get

3  them involved in this conspiracy to set up another Royal.

4  Does that make sense?  Let me ask you another question.  Does

5  it make sense that if some member of the Royals or the Royals

6  gang wants to get the Defendant, Thaddeus Jimenez, does it

7  make sense that they would want to use the criminal justice

8  system to get him?  They would want to cause a court

9  proceeding or have him implicated in a case, or do you think

10  that a gang like this who resorts to illegal activity could

11  take care of their own business?  Does it make sense that

12  they are going to go through a trial or set up a trial of a

13  fellow gang member?  No, it doesn't.  It doesn't make sense.

14  Let me ask you this question, another question along the same

15  lines.  Why, if the Royals are trying to set up Thaddeus

16  Jimenez, fellow gang member, why is it that when he is

17  writing these letters he wants the Royals to go out and kill

18  this witness, Larry Tueffel, who supposedly is in line with

19  them trying to set him up?  He expects the Royals to do his

20  bidding for him, and yet he comes in here to court, and he

21  says to you, "Oh, the Royals are setting me up."  Because it

22  is all nonsense.  It is all nonsense.  He doesn't know what

23  to do with Larry Tueffel.  That is the problem the Defendant

24  has.  He can't explain to you why Larry Tueffel would come

$D$99

JIM01504

1   in, a fellow gang member, and identify him in court, so he

2   makes up all this stuff that makes no sense whatsoever.  It

3   really doesn't.  It is all made up for your benefit, "The

4   Royals are setting me up."  Does it make a difference whether

5   Roméo's name came from Larry Tueffel at one part of the

6   investigation or not?  Absolutely not because there is no

7   question in this case that Victor Romo was the other person

8   out there that night.  Big issue about that.  What is the

9   difference?  He was out there.

10                  Sandra Elder is the fourth witness.  You

11  know, Ladies and Gentlemen, it is not a positive

12  identification.  She gets down to two people, and my partner

13  talked about that.  Look at the two individuals, positions

14  number two and four.  Look at him, and look at the other guy.

15  Look at how similar they look to each other.  What frankly

16  winds up being a bonus in this case is Sandra Elder because

17  Sandra Elder can't make an identification.  She only gets

18  down to two people, and that actually shows the integrity of

19  her and these other witnesses, and it shows the integrity of

20  the police department, too, because if this is a set-up, if

21  they are going to have -- well, they implied to you in

22  closing that he was wearing the jacket like the reason he was

23  identified is because he was in this jacket in the police

24  station.  Well, how come Sandra can't identify him with the

                        𝔇 100

JIM01505

SA535

1  jacket if that happened?  It is ridiculous.  Sandra Elder

2  shows the integrity of the witnesses in this case.  She

3  never met the Defendant before this day just like her

4  daughter.  She did not know who he was.  Like any witness,

5  she came in, and she did the best she could.  She couldn't

6  pick him out.  She said, "That looks like him, and that looks

7  like him."  If this is a set-up, she would have identified

8  him.  Each of these witnesses, each of these four witnesses,

9  are independent witnesses.  Each one of them viewed this

10  crime alone.  Each one of these people viewed the lineup

11  separately and were separated after the identification was

12  made in the lineup and before the others went in, and each of

13  these witnesses got up on his or her own and got up on that

14  witness stand and testified individually.  Each one is an

15  independent witness.  Ladies and Gentlemen, you could be

16  faced with a situation where you have only one of these

17  witnesses.  You could have just Tina.  What if you just had

18  Tina alone?  What if she was the only person out there on the

19  street?  What if you just had Larry Tueffel, alone?  What if

20  you just had Phil Torres, alone, just one witness?  You have

21  got three, three witnesses who identify him, three of them,

22  and a fourth one says it was him or the other guy in the

23  lineup, and we know now that she picked out two people, and

24  one was him.  Any one of those three witnesses, those three

                        ) 101

JIM01506

1    witnesses, are enough to convict by themselves.  They are

2    enough to convict.  You have got three who paint a picture,

3    unmistakable picture, that he is the person who pulled the

4    trigger.

5            Ladies and Gentlemen, the Defendant spent

6    a lot of time in cross examination and talked about, "Well,

7    you can't believe these witnesses because everything doesn't

8    fit.  There is little inconsistencies, and it doesn't fit."

9    Well, Ladies and Gentlemen, that is what makes them

10   believable because they did the best they could to remember

11   what they saw.  Maybe one person saw this or one person saw

12   that, one person focused on this, one person saw the

13   struggle, one person saw the one guy push - - Victor - - saw

14   him push the victim, and Victor went to swing, and the gun

15   comes out, and there is a shot, and another person sees

16   another aspect, but together they painted a picture for you.

17   They didn't do what the Defense witnesses did, which was

18   basically read through a script, a script of what supposedly

19   this guy was doing instead of being at the murder scene.

20   They did their best to describe the details.  Ladies and

21   Gentlemen, that is what human beings do.  That is what human

22   beings do.  Take a key moment in this trial if you want to go

23   back and talk about it.  Take a key moment, if one exists,

24   and individually go one by one by one and ask yourselves

$\mathcal{D}$ 102

JIM01507

SA537

1  where was this witness, where was this Larry, where was this

2  guy, what was said, and everybody will have a varying account

3  because we are all human beings and we all focus on different

4  things, but together we can paint a picture that is pretty

5  accurate.  Let me ask you this question, Ladies and

6  Gentlemen.  Take that key moment and come back here one year

7  and seven months from that moment because that is what they

8  did.  They all got up there and testified about an event that

9  occurred one year and seven months ago.  People forget.  They

10  remember certain things.  That is just the way human beings

11  are, and that is what these witnesses did when they testified

12  here in court.

13               Ladies and Gentlemen, if you are going to

14  believe the Defendant's argument and the Defendant's theory

15  in this case, you have to believe one of two things.  You

16  either have to believe that all or some of these witnesses

17  are mistaken, and, in order to do that, you have to believe

18  that even though Tina Elder picked him out of the lineup,

19  even though her mom said it was either him or the other guy,

20  and even though Phil Torres and Larry named him, you have got

21  to believe that somehow, coincidentally, this guy is the

22  unluckiest guy in the world.  That is one possibility if it

23  is a mistake.  Okay.  The other possibility is all four of

24  these witnesses conspired together.  They got together, and

⟩ 103

JIM01508

1  they decided let's name this guy, or three of them have

2  decided to name him, and the other one said, "I will name

3  two."  You know what?  If they are going to go out and try

4  and pick out this guy and name him as the shooter, there is

5  something that doesn't make sense because three of these

6  people, three of these people, as you heard from the witness

7  stand, had a close relationship with the victim in this case,

8  with Eric Morro.  He was somebody they cared about.  So, if

9  you are going to believe that this was some kind of a

10  conspiracy, conspiracy to convict and frame the wrong guy,

11  then what you have got to believe is that these people would

12  willingly let the real guy, the guy that killed their friend,

13  killed somebody they cared about, let him walk away from

14  this.  So, they frame him?  For what?  And incur potentially

15  the wrath of the Royals in naming the wrong guy, in naming a

16  member of their gang when he was not involved?  Ridiculous.

17  It is ridiculous.

18                    Ladies and Gentlemen, the bottom line is

19  simply this.  This was a cold-blooded murder.  There were

20  witnesses out there on the street who saw this happen.  Two

21  of them knew the offender, but they also knew the offender

22  was a gang member, and they would do what you would expect

23  witnesses who live in that neighborhood and who are looking

24  out for themselves to do.  They protected themselves first.

                        $D$ 104

1    Ladies and Gentlemen, let me put it to you this way.  What if
2    we had, what if we had, instead of these four people, what if
3    we had a Rabbi, Bishop, minister, and a nun.  Let's say we
4    had those four people and they get up here and they testify.
5    Same facts.  He was the shooter.  Everything was the same,
6    but those are the four people who described the crime.  The
7    Defendant has gotten up here in closing, and he has attacked
8    these four witnesses who testified for the State up and down.
9    Don't believe them; don't believe them.  He wasn't out there.
10   But you know what?  You know what the one variable in this
11   case is.  The one variable is our witnesses.  Those things
12   changed, and you know who decided who the witnesses are?  He
13   does.  He does.  When he walks up to Eric Morro and puts that
14   gun in his chest on February 3, 1993 and when he pulls the
15   trigger right out on the street and he kills him, at that
16   moment, whether he intended to or not, he picked the
17   witnesses.  He selected the witnesses in this case.  Then he
18   comes in here to court and he attacks them and he says don't
19   believe them.  Four eyewitnesses, Ladies and Gentlemen, four.
20                       So, he attacks these witnesses, and then
21   he moves on in his defense to Plan B.  Well, let's attack the
22   police, too.  Let's take a couple of shots at the police.
23   One was the implication about the coat.  The police are in
24   the conspiracy.  Another one is this gunshot residue.  That

D105

JIM01510

SA540

1  is something he throws in the game today at the last minute.

2  He doesn't even ask an expert about gunshot residue.  He asks

3  a guy in Ballistics who really doesn't know anything about

4  it.  Let's attempt to attack the police.  Why didn't they do

5  a gunshot residue even though they had a guy who was arrested

6  nine and a half hours after the shooting?  Why doesn't he

7  call a gunshot residue tester to tell you why that test

8  wasn't performed?

9      MR. HILL:  Judge, objection.

10     THE COURT:  Overruled.  I haven't heard anything

11  objectionable yet, counsel.

12     MR. MURPHY:  He asked the Ballistics guy who he knows

13  can't answer the question just to throw something up and see

14  what sticks.  It is ridiculous.

15              Speaking of ridiculous, let's look at the

16  defense in this case, the defense.  This guy has been waiting

17  for this trial for one and a half years.  He has been

18  waiting.  This is his day in the sun.  The alibi, the alibi.

19  Anybody, anybody, could run a bunch of witnesses up there on

20  that witness stand, and they could say whatever they want to

21  say.  That is his right, but the person, one of the people we

22  start out with, and the closing witness is mom, mom.  Mom is

23  the one who says that she wouldn't lie for her son.  Mom is

24  the one who calls the Detective who is just doing his job a

D106

JIM01511

SA541

1  prick in Juvenile Court.  That is mom.  Mom says she wouldn't
2  lie for her son.  "He was with me."  Mom doesn't tell the
3  police within 12 hours of -- 16 or 18 hours -- when she was
4  suppose to be with her son when she just learned about it,
5  "Hey, he was with me; he was with me."  She doesn't tell
6  them.  She doesn't tell them because this is something that
7  is made up for your benefit now.  Look at these witnesses,
8  Ladies and Gentlemen.  Is there one single, independent
9  witness who testified as to the alibi?  One?  No.  Every
10  single one of them has an interest or bias.  They really do,
11  and the Judge will instruct you that you should consider the
12  interest and bias of the witnesses when they testify.  Just
13  one.  Is there one?  There is none.  They don't exist.
14               Did you get the feeling, Ladies and
15  Gentlemen, when you were sitting there, did you get the
16  feeling that it was like a script that they were reading
17  from?  It was like a script.  There may have been a couple of
18  screw-ups here and there.  Another one that was kind of
19  interesting is that mom says she goes out drinking with her
20  friend, and then she said she came home from work at six
21  o'clock the next morning and went to the police station
22  later, but there was a script.  There was a script, and they
23  couldn't remember other things, but they remembered certain
24  events.  Everybody remembered.  Everybody remembered that

                        D107

JIM01512

1   Thaddeus was playing a video game.  When Thaddeus got

2   finished playing the video game, they went out and did

3   homework in the hallway, and then he came back and played a

4   video game, and they all knew the times of when those events

5   occurred.  Those were the anchors, part of the script.  That

6   is what makes it unbelievable, incredible, because these

7   witnesses told you for the most part, they said, "I just

8   talked to a couple of these witnesses a little bit

9   yesterday."  And they remember those kinds of details?  It is

10  ridiculous.  It is ridiculous.  They don't do the things you

11  would expect an alibi witness to do because this is not

12  just -- this is a murder.  This is a murder, and if you are a

13  person who is charged with murder and you know darn well that

14  they didn't commit the crime, you do what you can.  You go to

15  the police, State's attorney, and say, "Listen.  This is a

16  gigantic mistake."  You try, you try, but they didn't do it.

17  They didn't do that.  Mom does it.  Mom does it three weeks

18  later after she has gotten her people together, but she

19  doesn't do it when you would expect her to do it, and the

20  others don't do it at all.

21                         Victor Romo.  Victor Romo.  He is the

22  innocent man.  You know, the Defendant puts a lot of stock in

23  his testimony, and it is difficult to understand why.

24  Because let's see -- Dave touched on Victor Romo a little

*D*108

JIM01513

1    bit -- Victor Romo, he is in an interesting position.  First
2    of all, Victor Romo, this is a person who has been adjudged
3    guilty.  He has been adjudged delinquent in this case.
4    Perhaps what would make him somewhat believable is if he came
5    in here and told you that he was the offender, that he was
6    the person involved in this crime.  He doesn't do that
7    because he doesn't want to implicate himself.  He can't do
8    that.  That is strike one because he doesn't want to say to
9    you, "I was involved in this crime."  He doesn't want to say,
10   "I shoved Eric."  He has got to take himself out, and that is
11   what makes him so unbelievable off the bat.  He tries so hard
12   to take himself out that he says, "I didn't even know that
13   this other guy had a gun."  He says, "I didn't even see the
14   shooting.  I crossed the street.  I was over here when the
15   shooting occurred."  Taking himself out.  "I never saw a gun;
16   I never saw a gun."  That is Victor Romo, the innocent man.
17   Victor Romo.
18                    You know what is interesting, too, Ladies
19   and Gentlemen, is he doesn't want to implicate him.  Now,
20   Ladies and Gentlemen, whether Victor Romo is a member of a
21   gang or not -- and perhaps he is not -- what is his situation
22   with respect to him?  First of all, if he gets in here in
23   court and he is trying to protect himself, he doesn't want to
24   connect himself to him because that is also like implicating

D109

1   himself.  Ladies and Gentlemen, this is a point that has been
2   made time and time again.  You think Victor Romo is going to
3   come in here -- this is a person who is in custody right now
4   whose family is still out in the neighborhood.  Do you think
5   he is going to come in here and implicate the gang member?
6   He knows what the Defendant is.  Do you think he is going to
7   come in here and implicate a ranking gang member among the
8   Pee-Wees?  No, he is not going to do that.  He wants to take
9   him out, and it makes sense that he would do that.  He is
10  between a rock and a hard place because he doesn't want to
11  nail this guy, too, because he is worried about the
12  consequences for him.
13                          What does he do?  He makes up this guy,
14  Juan Carlos Torres.  Juan Carlos Torres is interesting, too,
15  because Victor Romo apparently has some morals because he
16  doesn't want to say that Juan Carlos Torres committed the
17  murder.  Maybe he doesn't want to say it because he thinks it
18  implicates him, too.  The other possibility is that Victor
19  Romo knows Juan Carlos Torres didn't do this because he tries
20  to give him a little bit of a defense, so he talks about,
21  "Well, the one guy hit him."  He tries to give Juan Carlos
22  Torres a little defense because he doesn't want to implicate
23  a guy in a murder to take Jimenez off the hook.  That is
24  Victor Romo.  That is strike two.

ꝺ110

JIM01515

1        Strike three, Ladies and Gentlemen, is

2    Victor Romo's actions.  If you believe that Victor Romo was

3    telling you the truth about his actions on February 3rd, what

4    he saw on February 3, 1993, why doesn't he do the things you

5    would expect anybody in that situation to do?  Why doesn't he

6    call the police?  Why doesn't he call an ambulance for his

7    friend or the guy he is with that he thinks is shot?  He goes

8    home, sits at home, and waits for six days, and then waits

9    for the police to come and arrest him.  Because that is a

10   story for your benefit.

11       The Defendant said to you in opening,

12   "Well, the State's attorneys probably won't be surprised that

13   Victor Romo came in here and testified."  Absolutely right,

14   we weren't.  Victor Romo was convicted and adjudged

15   delinquent as a juvenile.  He is in another court.  He is not

16   being tried as an adult.  What has he got to lose really to

17   come in here and take him off the hook?

18       MR. HILL:  Objection.

19       THE COURT:  The Jury heard the evidence.

20       MR. MURPHY:  We are not surprised at all, Ladies and

21   Gentlemen, and he shouldn't be either.

22       Ladies and Gentlemen, you are going to

23   get instructions about second degree murder, and, Ladies and

24   Gentlemen, you will learn as you read the instruction that if

D111

JIM01516

1   you find the Defendant guilty of first degree murder, then

2   you can't consider what is called second degree murder. Let

3   me just make this clear. We are not asking you to convict

4   the Defendant of second degree murder. We do not want you to

5   convict the Defendant of second degree murder. This is not a

6   second degree murder case. It is not. This is an

7   out-and-out cold-blooded, execution-style killing. That is

8   all it is. We say, Ladies and Gentlemen, and the evidence

9   shows that the Defendant is guilty of first degree murder,

10  and he says that he wasn't there. He says he had nothing to

11  do with it. Please do not convict the Defendant of second

12  degree murder. It does not apply.

13        MR. HILL: Objection, your Honor. It does apply.

14        THE COURT: The Jury will receive the instruction, and

15  they will make that decision. You have your opinion, and he

16  has his opinion, and the Jury will have their opinion.

17        MR. MURPHY: He may think it applies. We don't. We

18  don't.

19                Ladies and Gentlemen, on February 3,

20  1993, the paths of Eric Morro and the Defendant, Thaddeus

21  Jimenez, crossed. Eric Morro was a 19-year-old young man who

22  had managed, as I said in opening, to stay out of gangs for

23  all 19 years of his life. On that day, February 3, 1993, he

24  stood up for something. He told a gangbanger, this guy right

                        D112

1  here, told a gangbanger who was representing in front of kids

2  in his neighborhood, to take it somewhere else, and the

3  response he got was anger and threats, "You are going to get

4  yours.  I am going to get you," something to that effect, and

5  that just occurred approximately three to three and a half or

6  four hours before he walked up and killed him in cold blood.

7                         We are not trying to bulldoze you, Ladies

8  and Gentlemen.  We are not trying to bulldoze you with gang

9  evidence.  That is the motive for this crime.  That is the

10  evidence that he played a part in bringing to you, and you

11  heard it from the witnesses.  That is the reason that Eric

12  Morro is dead, and I am sure, Ladies and Gentlemen, that this

13  innocent young guy never thought that when he told this punk

14  to take it somewhere else that he thought he was going to

15  lose his life.

16      MR. HILL:  Objection to the characterization of "this

17  young man."

18      THE COURT:  Overruled.

19      MR. MURPHY:  Look at him sitting there.  Look at him

20  sitting there, 15 years old, 15 years old, 13 at the time.

21  He is not like any 13-year-old that you or I know.  You can't

22  judge a book by its cover.  When you look at the Defendant,

23  don't judge him by his appearance.  Don't judge him by his

24  age.  Don't judge him by his size.  Judge him by his actions.

                    $\mathcal{D}$ 113

1  His size and his age and his appearance are what make him
2  more dangerous because people like Eric Morro don't suspect
3  or expect that he will do what he did.  It is used as a means
4  to deceive because who could ever think, how could Eric Morro
5  ever think that when he walked up to him that this
6  13-year-old would pull a gun and stick it to his chest and
7  kill him, but that is what he did with the help of Victor
8  Romo, accomplice, who distracts Morro about a debt.  Maybe
9  that was a pretext to distract Morro, but in a flash, in a
10 flash, when that comment is made, Eric Morro was shoved
11 against the wall.  Perhaps he saw the gun coming out.  This
12 guy is right next to him, and out comes the gun; bang, right
13 in the chest, and he is dead.  Look at his actions.  He
14 casually executed a man like you or I would open a door.  No
15 emotion; no hesitation.  The heart of a stone-cold killer
16 with ice running through his veins.  So, don't judge him by
17 the way he looks.  Judge him by his actions.
18              Human life, Ladies and Gentlemen, is
19 something we treasure, we love, we hang on to.  This man,
20 this guy right here, has no respect for human life because
21 human life can be taken by him when the gang is insulted.
22 That is all it takes.  That is all it takes to kill another
23 human being, but, Ladies and Gentlemen, don't stop at just
24 his actions.  Listen to his words.  Listen to the letter he

D114

JIM01519

1  wrote on April 19, 1993.  "Even if he has to kill him, it

2  won't mean anything to me, and it only takes the pull of a

3  trigger."

4              Thank you, Ladies and Gentlemen.

5      THE COURT:  Thank you, counsel.

6              Members of the Jury, the evidence and

7  arguments in this case have been completed, and I now will

8  instruct you as to the law.

9              The law that applies to the case is

10  stated in these instructions, and it is your duty to follow

11  all of them.  You must not single out certain instructions

12  and disregard others.  When I use the word "he" in these

13  instructions, I mean a male or a female.

14              It is your duty to determine the facts

15  and to determine them only from the evidence in this case.

16  You are to apply the law to the facts and in this way decide

17  the case.

18              You are not to concern yourself with

19  possible punishment or sentence for the offense charged

20  during your deliberation.  It is the function of the trial

21  judge to determine the sentence should there be a verdict of

22  guilty.

23              Neither sympathy nor prejudice should

24  influence you.  You should not be influenced by any person's

                        D115

                                        JIM01520

                    SA550

1  race, color, religion, or national ancestry.

2                    From time to time, it has been the duty

3  of the Court to rule on the admissibility of evidence.  You

4  should not concern yourselves with the reasons for these

5  rulings.  You should disregard questions and exhibits which

6  were withdrawn or to which objections were sustained.

7                    Any evidence that was received for a

8  limited purpose should not be considered by you for any other

9  purpose.

10                    You should disregard testimony and

11  exhibits which the Court has refused or stricken.

12                    The evidence which you should consider

13  consists only of the testimony of the witnesses and the

14  exhibits and stipulations which the Court has received.

15                    You should consider all the evidence in

16  the light of your own observations and experience in life.

17                    Neither by these instructions nor by any

18  ruling or remark which I have made do I mean to indicate any

19  opinion as to the facts or as to what your verdict should be.

20                    Faithful performance by you of your

21  duties as jurors is vital to the administration of justice.

22                    Only you are the judges of the

23  believability of the witnesses and of the weight to be given

24  to the testimony of each of them.  In considering the

D 116

JIM01521

1  testimony of any witness, you may take into account his

2  ability and opportunity to observe, his memory, his manner

3  while testifying, any interest, bias, or prejudice he may

4  have, and the reasonableness of his testimony considered in

5  the light of all the evidence in the case.

6            Opening statements are made by the

7  attorneys to acquaint you with the facts they expect to

8  prove.  Closing arguments are made by the attorneys to

9  discuss the facts and circumstances in the case and should be

10  confined to the evidence and to reasonable inferences to be

11  drawn from the evidence.  Neither opening statements nor

12  closing arguments are evidence, and any statement or argument

13  made by the attorneys which is not based on the evidence

14  should be disregarded.

15            Those of you who took notes during the

16  trial may use your notes to refresh your memory during jury

17  deliberations.

18            Each juror should rely on his or her

19  recollection of the evidence.  Just because a juror has taken

20  notes does not necessarily mean that his or her recollection

21  of the evidence is any better or more accurate than the

22  recollection of a juror who did not take notes.

23            When you are discharged from further

24  service in this case, your notes will be collected by the

D117

JIM01522

1   deputy and destroyed.  Throughout that process, your notes

2   will remain confidential, and no one will be allowed to see

3   them.

4                    The Defendant is charged with the offense

5   of first degree murder.  The Defendant has pleaded not

6   guilty.  Under the law, a person charged with first degree

7   murder may be found (1) not guilty, or (2) guilty of first

8   degree murder, or (3) guilty of second degree murder.

9                    The Indictment in this case is the formal

10  method of accusing the Defendant of an offense and placing

11  him on trial.  It is not any evidence against the Defendant

12  and does not create any inference of guilt.

13                   The Defendant is presumed to be innocent

14  of the charge against him of first degree murder.  This

15  presumption remains with him throughout every stage of the

16  trial and during your deliberations on the verdict and is not

17  overcome unless from all the evidence in this case you are

18  convinced beyond a reasonable doubt that the Defendant is

19  guilty.

20                   The State has the burden of proving that

21  the Defendant is guilty of first degree murder, and this

22  burden remains on the State throughout the case.  The

23  Defendant is not required to prove his innocence.

24                   If the State proves beyond a reasonable

                          D 118

JIM01523

1  doubt that the Defendant is guilty of first degree murder,

2  the Defendant then has the burden of proving by a

3  preponderance of the evidence that a mitigating factor is

4  present so that he is guilty of the lesser offense of second

5  degree murder and not guilty of first degree murder.  In

6  deciding whether a mitigating factor is present, you should

7  consider all of the evidence bearing on this question.

8            The Defendant is not required to present

9  any evidence in order to establish the existence of a

10  mitigating factor.

11            The fact that the Defendant did not

12  testify must not be considered by you in any way in arriving

13  at your verdict.

14            Circumstantial evidence is the proof of

15  facts or circumstances which give rise to a reasonable

16  inference of other facts which tend to show the guilt or

17  innocence of the Defendant.  Circumstantial evidence should

18  be considered by you together with all the other evidence in

19  the case in arriving at your verdict.

20            It is proper for an attorney or

21  attorney's investigator to interview or attempt to interview

22  a witness for the purpose of learning the testimony the

23  witness will give.  However, the law does not require a

24  witness to speak to an attorney or attorney's investigator

D119

JIM01524

SA554

1  before testifying.

2            The believability of a witness may be

3  challenged by evidence that on some former occasion he made a

4  statement and/or acted in a manner that was not consistent

5  with his testimony in this case.  Evidence of this kind may

6  be considered by you only for the limited purpose of deciding

7  the weight to be given the testimony you heard from the

8  witness in this courtroom.

9            Evidence that a witness has been

10  convicted of an offense may be considered by you only as it

11  may affect the believability of the witness.

12            When you weigh the identification

13  testimony of a witness, you should consider all the facts and

14  circumstances in evidence, including but not limited to the

15  following:  The opportunity the witness had to view the

16  offender at the time of the offense; or the witness' degree

17  of attention at the time of the offense; or the witness'

18  earlier description of the offender; or the level of

19  certainty shown by the witness when confronting the

20  Defendant; or the length of the time between the offense and

21  the identification confrontation.

22            A person commits the offense of first

23  degree murder when he kills an individual if, in performing

24  the acts which cause the death, he intends to kill or do

𝐷 120

JIM01525

1  great bodily harm to that individual; or he knows that such

2  acts will cause death to that individual; or he knew that

3  such acts create a strong probability of death or great

4  bodily harm to that individual.

5        A mitigating factor exists so as to

6  reduce the offense of first degree murder to the lesser

7  offense of second degree murder if at the time of the killing

8  the Defendant believes that circumstances exist which would

9  justify the deadly force he uses, but his belief that such

10 circumstances exist is unreasonable.

11       To sustain either the charge of first

12 degree murder or the charge of second degree murder, the

13 State must prove the following propositions:

14       First:  That the Defendant performed the

15 acts which caused the death of Eric Morro; and, Second, that

16 when the Defendant did so, he intended to kill or do great

17 bodily harm to Eric Morro; or he knew that such acts would

18 cause death to Eric Morro; or he knew that such acts created

19 a strong probability of death or great bodily harm to Eric

20 Morro; and, Third, that the Defendant was not justified in

21 using the force which he used.

22       If you find from your consideration of

23 all the evidence that any one of these propositions has not

24 been proved beyond a reasonable doubt, your deliberations

$\mathcal{D}$121

JIM01526

SA556

1  should end, and you should return a verdict of not guilty.

2              If you find from your consideration of

3  all the evidence that each one of these propositions has been

4  proved beyond a reasonable doubt, then you should go on with

5  your deliberations to decide whether a mitigating factor has

6  been proved so that the Defendant is guilty of the lesser

7  offense of second degree murder instead of first degree

8  murder.

9              You may not consider whether the

10 Defendant is guilty of the lesser offense of second degree

11 murder until and unless you have first determined that the

12 State has proved beyond a reasonable doubt each of the

13 previously stated propositions.

14             The Defendant has the burden of proving

15 by a preponderance of the evidence that a mitigating factor

16 is present so that he is guilty of the lesser offense of

17 second degree murder instead of first degree murder.  By

18 this, I mean that you must be persuaded, considering all the

19 evidence in this case, that it is probably more true than not

20 true that the following mitigating factor is present:  That

21 the Defendant, at the time he performed the acts which caused

22 the death of Eric Morro, believed the circumstances to be

23 such that they justified the deadly force he used, but his

24 belief that such circumstances existed was unreasonable.

                        D122

1           If you find from your consideration of

2  all the evidence that the Defendant has proved by a

3  preponderance of the evidence that a mitigating factor is

4  present so that he is guilty of the lesser offense of second

5  degree murder instead of first degree murder, you should find

6  the Defendant guilty of second degree murder.

7           If you find from your consideration of

8  all the evidence that the Defendant has not proved by a

9  preponderance of the evidence that a mitigating factor is

10  present so that he is guilty of the lesser offense of second

11  degree murder instead of first degree murder, you should find

12  the Defendant guilty of first degree murder.  You will have

13  to read that one kind of closely.

14           When you retire to the jury room, you

15  first will elect one of your members as your foreperson.  He

16  or she will preside during your deliberations on your

17  verdict.

18           Your agreement on a verdict must be

19  unanimous.  Your verdict must be in writing and signed by all

20  of you, including your foreperson.

21           The Defendant is charged with the offense

22  of first degree murder.  Under the law, a person charged with

23  first degree murder may be found (1) not guilty, or

24  (2) guilty of first degree murder, or (3) guilty of second

D 123

JIM01528

1  degree murder.

2             Accordingly, you will be provided with

3  three verdict forms:  Not Guilty, Guilty of First Degree

4  Murder, and Guilty of Second Degree Murder.  From these three

5  verdict forms, you should select the one verdict form that

6  reflects your verdict and sign it as I have stated.  Do not

7  write on the other two verdict forms.  Sign only one verdict

8  form.

9             I have three forms.  Out of these three

10  forms, you will sign only one.  The forms are as follows:

11  We, the Jury, Find the Defendant, Thaddeus Jimenez, Guilty of

12  First Degree Murder, and there is a place for the Foreperson

13  to sign and all the jurors to sign.  Or We, the Jury, find

14  the Defendant, Thaddeus Jimenez, Guilty of Second Degree

15  Murder and a place for the Foreperson to sign and all the

16  jurors to sign.  Or We, the Jury, find the Defendant,

17  Thaddeus Jimenez, Not Guilty, and there is a place for the

18  Foreperson and all the jurors to sign.  You will sign only

19  one of those verdict forms.

20             Now, I think there was some evidence

21  concerning police reports and so forth and so on.  So often

22  jurors say, "Can we see the police reports?"  Well, police

23  reports themselves in their entirety are not admissible, but

24  evidence you might have heard as to what is in that police

D 124

JIM01529

1  report, that should be considered as part of the evidence,

2  but we never, for several reasons, give the Jury the entire

3  police report because it contains other information which is

4  not admissible under the code of law.

5          The exhibits, please.  The alternate

6  jurors, if you have some belongings back in the jury room,

7  pick those up, and I will meet you in my chambers in a few

8  moments.  Would the clerk swear in the deputies, please?

9          (Whereupon the deputy sheriffs were

10          sworn in.)

11          Members of the Jury, this matter is now

12  in your hands.

13          (Whereupon the Jury exits the

14          courtroom to begin their deliberations,

15          after which the following proceedings

16          were had outside the presence and

17          hearing of the Jury:)

18  THE COURT:  Any objection to any of the exhibits?

19  MR. HILL:  Yes, Judge.  Group Exhibit No. 22, which is a

20  photo array, which doesn't include Thaddeus but has Victor in

21  it and four other people.

22  MR. GAUGHAN:  Judge, it goes to the testimony of Larry

23  Tueffel.  He picked out the person who came into court and

24  said he was there and just how he picked out the Defendant.

                    𝒟 125

1   This is the photo array of Victor Romo that Larry Tueffel

2   looked at and picked out Victor.  I think it goes to his

3   credibility.

4       THE COURT:  Yes, I do recall that.  This is the array he

5   looked at and picked out.  I don't know if the Jury will

6   understand that.  I guess they will.  They heard the

7   evidence.  I will admit that over the objection of the

8   Defense.

9       MR. HILL:  The only other exhibit I object to, your

10  Honor, --

11      THE COURT:  Group Exhibit No. 22.  There was evidence

12  that this is the picture.  I don't know what good it will do

13  anybody.  What else?

14      MR. MURPHY:  Judge, did the Defense indicate what the

15  basis was for objecting to the Polaroid photos?

16      THE COURT:  I don't know.  I didn't hear any reason.

17      MR. HILL:  Judge, they are not relevant to Thaddeus'

18  case.  The photo array that was shown to Larry Tueffel six

19  days later is not relevant.

20      THE COURT:  It does have some relevance.  Let's start at

21  one.

22      MR. MURPHY:  One is the live photo of the victim.

23      THE COURT:  Any objection?

24      MR. HILL:  Yes, Judge.  There is no question or issue as

*D* 126

1  it relates to life and death.  This victim was alive at one

2  point and then he was dead.  This photo only invokes

3  sympathy, Judge.

4      THE COURT:  It will be admitted.  They have a right to

5  know what he looked like.

6                  Two.

7   MR. MURPHY:  Two is the morgue I.D. photo.

8      THE COURT:  As I recall, that was his eighth grade

9  graduation picture.

10     MR. HILL:  Yes.  He was 19 at the time.

11     THE COURT:  When he graduated grade school?

12     MR. HILL:  No, when the incident occurred, so actually

13  it is not even a likeness of him at the time of death.  The

14  only purpose is to invoke sympathy.

15     THE COURT:  Admitted over Defense's objection.

16                  Three.

17     MR. MURPHY:  Three is a photograph of the crime scene,

18  in front of the Honey Baked Ham store.

19     MR. HILL:  No objection.

20     THE COURT:  You are not objecting to this?

21     MR. HILL:  No.

22     MR. MURPHY:  Four is another shot from that other angle.

23     THE COURT:  Okay.

24     MR. MURPHY:  Five is a shot from directly in front of

                     ⅅ 127

JIM01532

1    the Honey Baked Ham store showing the large door and the

2    smaller door.

3                    Six is a photograph of Phillip Torres'

4    home.

5        THE COURT:  Okay.

6        MR. MURPHY:  Seven is another shot of the same.

7    Basically it shows more of the Honey Baked Ham store.

8                    Eight is a photograph of a lineup, five

9    individuals, including the Defendant.

10       MR. HILL:  Judge, I would object to that going back.  It

11   invokes undue attention to the Defendant.  The Defendant is

12   marked on.

13       THE COURT:  It is also very pertinent that she picked

14   out two, so the jurors will have to make a decision why she

15   picked out two if they looked that much alike that she had a

16   right to pick out two, so that will be over Defense's

17   objection.  That is number eight?

18       MR. MURPHY:  The full lineup is eight.  The close-up is

19   nine.

20       THE COURT:  Eight is admitted over Defendant's

21   objection.

22                    Nine.

23       MR. MURPHY:  Nine is the photograph of the Defendant

24   after the lineup or photograph of the Defendant at the police

                              $\mathcal{D}$128

1  station.

2      THE COURT:  Any objection?

3      MR. HILL:  No.

4      THE COURT:  All right.

5      MR. MURPHY:  Ten is the diagram of the crime scene.

6      THE COURT:  Any objection?

7      MR. HILL:  No.

8      THE COURT:  Eleven.

9      MR. MURPHY:  Eleven is a morgue photograph of the

10  victim, Judge, showing the area of the gunshot entry wound.

11      THE COURT:  Any objection?

12      MR. HILL:  Yes.

13      THE COURT:  What is your objection?

14      MR. HILL:  Judge, that adds nothing to the case except

15  that it shows the stitching and everything and blood.  It is

16  highly inflammatory.

17      THE COURT:  It is certainly not a gory picture.

18      MS. BURKE:  The Jury is not going to understand why the

19  stitches are there.

20      THE COURT:  It shows the wound.

21      MS. BURKE:  But the stitching makes it much worse,

22  Judge.  The first time I looked at those types of pictures I

23  was confused by what was caused by what until I became

24  familiar with those photos.

D 129

JIM01534

1    MR. MURPHY: Judge, we had multiple morgue photos. We

2  picked out one that we thought was not very graphic.

3    THE COURT: It is not gory at all. Over the

4  Defendant's objection, I will admit it. That is Number 11.

5    MR. MURPHY: Judge, twelve is a photograph of the

6  bullet.

7    THE COURT: Any objection?

8    MR. HILL: No.

9    THE COURT: Okay. Thirteen.

10    MR. MURPHY: Thirteen is the actual bullet.

11    THE COURT: All right. Any objection?

12    MR. HILL: No.

13    THE COURT: Fourteen.

14    MR. MURPHY: Fourteen is a photograph -- fourteen is a

15  photograph of Wally's Tavern, which is the location that

16  Sandra Elder and Tina Elder came out of from across the

17  street. That's across the street from the Honey Baked Ham

18  Company.

19    THE COURT: That isn't Torres' house?

20    MR. MURPHY: No. Two witnesses testified that they were

21  in a tavern just before the shooting, and that is the tavern

22  they came out of, and they were crossing the street and the

23  shooting occurred.

24    THE COURT: Any objection?

*D*130

JIM01535

SA565

1      MR. HILL:  No, your Honor.

2      THE COURT:  Fifteen.

3      MR. MURPHY:  Judge, 15, 16, 17, 18, 19, and 20 are the

4  original letters and copies of the letters that were

5  identified by the witness, Elizabeth Heatley.  Actually, I

6  misstated.  It is 15A and B through 20A and B.

7      THE COURT:  Are you asking that they go back?

8      MR. MURPHY:  Judge, we have excerpted the portions of

9  the letters which the witness read.

10     THE COURT:  The letters will not go back.  Where are the

11  excerpts?

12     MR. MURPHY:  Judge, I have them here.

13     THE COURT:  The Defense is objecting?

14     MR. HILL:  I haven't even seen these.

15     MR. MURPHY:  Judge, I think I misstated.  I think I

16  referred to the exhibits as going up to 19, and I believe I

17  indicated that I thought there was no 20 and then there was a

18  21, 22, and 23.  It was up to 20, and there was no 21, and

19  then there was a 22 and 23, Judge.

20     MR. HILL:  Judge, I would object to any of this going

21  back.  I would object to the excerpted letters going back,

22  and I would object to the letters going back, your Honor.

23     MR. MURPHY:  Judge, we are not asking that the original

24  letters go back.  We know the Court is concerned about the

$\mathcal{D}$ 131

JIM01536

SA566

1  contents of all of those letters.  We took the copies and

2  made excerpts from the copies of the letters, and we didn't

3  want to cut the original letters and destroy those, and that

4  is why we are offering them in this form.

5       THE COURT:  Review those with the letters.

6       MR. MURPHY:  Judge, there is a couple of other exhibits.

7       THE COURT:  Okay.

8       MR. MURPHY:  Judge, we already discussed the photo array

9  of Victor Romo, which is People's Exhibit No. 22, and there

10 is a photo of the Defendant with the duck jacket, which is

11 People's Exhibit No. 23.

12      THE COURT:  Any objection?

13      MR. HILL:  None, your Honor.

14      THE COURT: Okay.

15      MR. MURPHY:  Judge, if the Court is going to allow the

16 excerpts to go back, when we copied the excerpts from the

17 letters, we don't have the dates of those letters.  Would the

18 Defense have any objection to us placing the date on here?

19      THE COURT:  As long as you go over it with the

20 Defendant --

21      MR. HILL:  The excerpts, you are letting those go back?

22      THE COURT:  I will let the excerpts because they have

23 been read to the Jury.  Every one has been read to the Jury.

24 I think there are several of them that are missing.  I don't

$\mathcal{D}$132

JIM01537

1  really know.  You make that determination.

2                      Anything further?  That's it, gentlemen?

3  Those may go back.

4      MR. MURPHY:  Judge, it is my understanding -- I know

5  they are objecting to the excerpts, but they have no

6  objection to the dates being placed on the excerpts?

7      MR. HILL:  No problem.

8      THE COURT:  No problem with that.  Okay.

9      MR. HILL:  Judge, for the record, I do want at some

10  point -- if this comes back a guilty -- I want the original

11  letters impounded as well as the original one that I wanted

12  that I was refused to have it impounded.

13      THE COURT:  Counsel, --

14      MR. HILL:  The letter earlier that we had the discussion

15  about.

16      THE COURT:  Okay.  We shall do that.

17      MR. HILL:  Okay.

18                      (Whereupon the case was passed, after

19                       which having been recalled, the

20                       following proceedings were had:)

21      THE COURT:  It is my understanding that this Jury has

22  reached a verdict?

23      THE DEPUTY SHERIFF:  Yes, your Honor.

24      THE COURT:  All right.  Bring out the Jury.

                        D133

JIM01538

1  your verdict?

2         THE JUROR:  Yes, it is.

3         THE CLERK:  Laurie Newman, was this then and is this now

4  your verdict?

5         THE JUROR:  Yes, it is.

6         THE CLERK:  Victor Panozzo, was this then and is this

7  now your verdict?

8         THE JUROR:  Yes, it is.

9         THE CLERK:  William Schwartz, was this then and is this

10 now your verdict?

11        THE JUROR:  Yes, it is.

12        THE CLERK:  Verneda Scott, was this then and is this now

13 your verdict?

14        THE JUROR:  Yes, it is.

15        THE CLERK:  Thomas Dvorak, was this then and is this now

16 your verdict?

17        THE JUROR:  Yes.

18        THE CLERK:  Alonzo Echols, was this then and is this now

19 your verdict?

20        THE JUROR:  Yes, it is.

21        THE CLERK:  Randal Hofstra, was this then and is this

22 now your verdict?

23        THE JUROR:  Yes, it is.

24        THE COURT:  The Jury having been polled, there will be a

$\mathcal{D}$ 135

JIM01539

1    judgment on the finding of the Jury.  This matter shall be

2    continued to November 3, 1994 for a pre-sentence

3    investigation, post-trial motions, and for sentencing.

4                        All bonds will be revoked.  The Defendant

5    shall be taken into the custody of the Sheriff of Cook

6    County.

7                        (Whereupon the Defendant leaves the

8                        courtroom.)

9                        Members of the Jury, I told you about

10   four or five days ago when we started this case that this

11   would be an extremely interesting and challenging event in

12   your life.  I never said it would be enjoyable because it is

13   not enjoyable when you are deciding the fate of another human

14   being, but I have had the opportunity to observe you, so

15   there is no question that you gave us your full and your

16   complete attention.  I am sure you listened to all the

17   evidence, and I am sure that when you went back there you

18   gave every bit of it all the consideration it was entitled to

19   and your decision was what it was.

20                       I want to thank you for being a part of

21   our justice system on behalf of the County and the State of

22   Illinois and on behalf of myself and all the attorneys -- I

23   see the Defense attorneys have left -- no, they are here --

24   but the attorneys did a fine job.  They are very

$\mathcal{D}$136

JIM01540

SA570

1  professional, and they behaved themselves very well, and they

2  did as much as they could for their particular clients, which

3  makes my job a lot easier.  They are good lawyers, and they

4  are very professional, and I thank you, gentlemen, for the

5  fine job.

6                    You will be officially discharged.   I

7  will stop back there and talk to you for a few moments if you

8  don't mind.  You are officially discharged.  Thank you very,

9  very much.

10

11                    (Which were all the proceedings had

12                     in the above-entitled cause.)

13  — — — — — — — — — — — — — — — — — — — — — — — — — — — —

14

15

16

17

18

19

20

21

22

23

24

D137

JIM01541

SA571

1  STATE OF ILLINOIS

2  COUNTY OF COOK

3

4              I, PAMELA M. TERRY, Official Shorthand

5  Reporter of the Circuit Court of Cook County, County

6  Department-Criminal Division, do hereby certify that I

7  reported in shorthand the evidence had in the above-entitled

8  cause and that the foregoing is a true and correct transcript

9  of all the evidence heard.

10

11

12              *Pamela L. Terry*  3/20/95

13              Official Shorthand Reporter

14              Circuit Court of Cook County

15              Criminal Division

16              CSR #084-001170

17

18

19

20

21

22

23

D138

JIM01542

SA572

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS } ss
COUNTY OF COOK }

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of .. VOLUME (FIVE) OF (SIX) VOLUMES .. CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 94-4358

in a certain cause .............. LATELY ............... pending in said Court, between
The People of the State of Illinois............ WERE ............, Plaintiffs and
THADDEUS JIMENEZ ............ WAS ............, Defendant....



Witness: AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, ......... MARCH 23 ........., 19. 95

*Aurelia Pucinski*
Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JIM01543

SA573

94-4358

FILED

Crim. Div. No. 94-B

JIM01544

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2013, I electronically filed the attached with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


   s/ Jonathon D. Byrer

JONATHON D. BYRER, Attorney