No. 12-2779

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

THADDEUS JIMENEZ,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 09-cv-08081
The Honorable Matthew F. Kennelly, District Judge, Presiding

**SUPPLEMENTAL APPENDIX**
**VOLUME 3 OF 5**

STEPHEN R. PATTON
Corporation Counsel
  of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, Illinois 60602
(312) 744-0746

BENNA RUTH SOLOMON
  Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
  Chief Assistant Corporation Counsel
JONATHON D. BYRER
  Assistant Corporation Counsel
Of Counsel

# TABLE OF CONTENTS OF SUPPLEMENTAL APPENDIX

**Volume 1**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
      Report of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 1

**Volume 2**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
      Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 288

**Volume 3**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 575

**Volume 4**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 841

**Volume 5**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 1106

CCCR-310

# Transcript of Record
## Appeal
## to

APPELLATE _____ **Court of Illinois**

FIRST _____ **District**

**Circuit Court No.** _____ 93 CR 14710

**Trial Judge** _____ STANLEY SACKS

**Reviewing Court No.** _____ 98–0247

THE PEOPLE OF THE STATE OF ILLINOIS

## vs.

THADDEUS JIMENEZ

# from
# CIRCUIT COURT
## of
# COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CRIMINAL DIVISION

VOLUME THREE OF SIX VOLUMES

REPORT OF PROCEEDINGS, ONLY

**AURELIA PUCINSKI**

**Clerk of Court**

Per _____ AP/GL

**Deputy**

JIM02937

1   STATE OF ILLINOIS  )
                        )  SS:
2   COUNTY OF COOK      )

3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
4

    THE PEOPLE OF THE   )
5   STATE OF ILLINOIS   )
                        )
6                       )   Indictment No. 93 14710
            VS          )
7                       )   Charge:  Murder
                        )
8   THADDEUS JIMENEZ    )

9              REPORT OF PROCEEDINGS

10       BE IT REMEMBERED that on the 5th day of

11   November A.D., 1997, this cause came on for trial

12   before the Honorable STANLEY SACKS, Judge of said

13   court, and a jury, upon the indictment herein, the

14   defendant having entered a plea of not guilty.

15       APPEARANCES:

16       HON. RICHARD DEVINE,
         State's Attorney of Cook County, by
17       MESSRS. JOHN MURPHY and DAVID GAUGHAN,
         Assistant State's Attorneys,
18           appeared for the People;

19       MR. CHARLES MURPHY,
             appeared for the Defendant.
20

21

22

23   Brenda D. Hayes, CSR
     Official Court Reporter
     2650 S. California
24   Chicago, Illinois  60608

                          FILED

                          JUN 3 0 1998

                          AURELIA PUCINSKI
                          CLERK OF CIRCUIT COURT

                                  JIM02938

1                          I N D E X

2

3      Date of Hearing:  11-5-97

4      Page Numbers:  R-1 - R-191

5                          PROCEEDINGS

6                          Page    DX      CX      RDX     RCX

7      Opening Statements
       State              R-14
8      Defense            R-21

9      Mary Morro                 R-33
       Lawrence Ryan             R-36    R-52    R-57    R-58
10     Barry Lifshultz           R-62
       Tina Elder                R-78    R-94    R-105   R-107
11     Phillip Torres            R-110   R-134   R-146   R-150
       Larry Tueffel             R-153   R-175
12

13

14

15

16

17

18

19

20

21

22

23

24

                                                    JIM02939

                          R-2

                          SA577

1          THE CLERK:  Thaddeus Jimenez.

2          THE COURT:  The defendant, Thaddeus Jimenez,

3     is here, his attorney, Charles Murphy, is here and

4     John Murphy is here for the State.  While we're

5     waiting for Mr. Gaughan from the State we can deal

6     with any motions in limine, if necessary, at this

7     point.

8               Mr. Charles Murphy, anything you want to

9     bring to my attention regarding the motion in limine

10    of any sort?

11         MR. CHARLES MURPHY:  There is, judge.  Judge,

12    opening statements are about to take place and I

13    believe, judge, during the course of the trial the

14    prosecution may seek to introduce into evidence

15    letters my client would have sent to his then

16    girlfriend when he was being detained at the Audy Home

17    back in I guess 1993.

18               In any event, in none of the letters

19    that the prosecution will be seeking to introduce, and

20    I've read them, does my client make any admission as

21    to his involvement or his guilt in the case before the

22    court, however, in several of the letters, and there's

23    a number of them, my client, I guess I will be the

24    master of the understatement, voices his displeasure

JIM02940

R-3

1    with one of the State's witnesses, Mr. Larry Tueffel,

2    and indicates at some future unspecified date when he

3    got out that he was going to kill Tueffel, someone

4    that he knows, for being a witness.

5                In any event, your Honor, it's my

6    understanding that no threat was ever communicated to

7    Mr. Tueffel and that no one ever attempted to harm

8    Mr. Tueffel.  Obviously, it is prejudicial as to my

9    client but I do not think that it's probative of the

10    single issue that the jurors are going to have to be

11    determining in this case as to whether or not my

12    client was the person who killed Mr. Morro.

13          THE COURT:  Okay.  Let me ask the State,

14    Mr. John Murphy, do you propose to offer letters

15    during the course of the trial written allegedly by

16    Mr. Thaddeus Jimenez to someone referred to as his

17    girlfriend?

18          MR. JOHN MURPHY:  Yes, we are, judge.

19          THE COURT:  All right.  Were you planning to

20    refer to those in any fashion in your opening

21    statement or can you leave those out until the court

22    has had a chance to read them?

23          MR. JOHN MURPHY:  Judge, in view of the fact

24    we are on the eve of opening statements --

JIM02941

R-4

1        THE COURT:  Please, Mr. Murphy, keep your

2   voice up would you.

3        MR. JOHN MURPHY:  I'm sorry, judge.

4             In view of the fact we're on the eve of

5   opening statements and this is an issue that may take

6   some time to address we will not address that issue in

7   opening.

8        THE COURT:  The State will leave it out of

9   the opening, the court will then look at the letters

10  in the presence of the attorneys and the defendant, of

11  course, before the issue comes up during the course of

12  the trial; I will then determine if the letters, any

13  of them, parts of them or none of them should be heard

14  by the jury.  So we'll take it up at a later time.

15  The State will leave it out of the opening statement,

16  however.

17             Anything else, Mr. Charles Murphy?

18        MR. CHARLES MURPHY:  No, judge.

19        THE COURT:  Anything from the State as far as

20  an opening -- motion in limine I should say?

21        MR. JOHN MURPHY:  Yes, judge.  We have two

22  motions in limine.  First we will call a witness by

23  the name of Phillip Torres and we are making a motion

24  in limine with respect to one conviction.  Mr. Torres

JIM02942

R-5

1    was convicted on the date of August 10, 1987 of

2    possession of cannabis with intent to deliver for

3    which he received a sentence of one year probation,

4    four weekends, Cook County Jail and seventy dollars

5    costs, Judge Bentivenga.

6        THE COURT:  Is he going to be testifying

7    today?

8        MR. JOHN MURPHY:  Judge, he will be

9    testifying today in all likelihood.

10        THE COURT:  You wouldn't be bringing it up in

11    your opening statement, anything about Torres' prior

12    conviction for possession of cannabis.  Let me mull it

13    over during the lunch break and I'll let you know

14    before we get to the point during the trial where it

15    might come in and we'll see.

16            Mr. Charles Murphy, what's your position

17    about that?

18        MR. CHARLES MURPHY:  Judge, it's my

19    understanding that the conviction was for possession

20    with the intent to deliver or delivery.  Once he's

21    sentenced it's straight possession though.

22        THE COURT:  So you would be attempting to

23    offer it against Torres for Cross-Examination

24    purposes?

JIM02943

R-6

1    MR. CHARLES MURPHY:  Yes.

2    THE COURT:  I'll mull it over.  Possession

3    with intent to deliver cannabis in August of 1987.

4    All right.  I'll let you know before we get to

5    Mr. Torres' testimony.

6    MR. JOHN MURPHY:  Thank you, judge.

7    THE COURT:  What else?

8    MR. JOHN MURPHY:  Also, judge, we would have

9    a motion in limine with respect to a witness we

10   anticipate the defense calling, Victor Romo.  Victor

11   Romo testified in the trial previously, he also gave a

12   statement to the police at the time that he was

13   arrested on February 10, 1993.

14   We believe that both the prior testimony

15   and the prior statement that was given by Victor Romo

16   is consistent with the testimony that will be elicited

17   from him here in court in this trial, therefore, we'd

18   make a motion in limine to preclude any reference to

19   the prior testimony or the contents of the prior

20   testimony or the prior statement or the content of the

21   prior statement.

22   THE COURT:  All right.  Mr. Charles Murphy is

23   an excellent lawyer, I don't believe he was planning

24   to bring out prior consistent statements, were you?

JIM02944

R-7

1     MR. CHARLES MURPHY: Depending -- Not in my

2   opening statement for sure but depending upon how

3   events unfold.

4         THE COURT: It depends on what Romo

5   testifies. He may get up there and tell Mr. Charles

6   Murphy different things than he said before. In that

7   case, I'm not sure but I think it applies to both

8   sides, that 115.10 statements are admissible as prior

9   inconsistent statements as substantive evidence I

10  think for either side. So it depends on what Romo

11  says but ordinarily a prior consistent statement is

12  not admissible and we'll take up that issue if we get

13  to it.

14        Anything else?

15        MR. JOHN MURPHY: Not at this point, judge.

16        THE COURT: It's 12:00 o'clock. The most

17  recent word is we don't know when Mr. Gaughan will be

18  coming up so can we, Mr. John Murphy, can we start

19  without Mr. Gaughan?

20        MR. JOHN MURPHY: Judge, I've just been told

21  that they anticipate that Mr. Gaughan will be done

22  testifying within five minutes, that being the case

23  I'd ask the court to wait five minutes, if he's not

24  here I'd begin.

JIM02945

R-8

1        THE COURT:  All right.  Fair enough.  We'll

2   recess until ten after 12:00, that's five minutes, if

3   he's not here we'll start without him.  Since you're

4   making the opening statement any way, Mr. John Murphy,

5   Mr. Gaughan has already been involved in this case

6   once before, he knows what the opening statement will

7   be any way so I don't think the State is prejudiced in

8   any fashion if he's not sitting here for the opening

9   statement, but we'll wait until ten after and we'll go

10  from there.

11       MR. JOHN MURPHY:  Judge, if I may?  If

12  Mr. Gaughan is not here I would ask that the court --

13       MR. CHARLES MURPHY:  Here he is.

14       THE COURT:  All right.  It's academic.  All

15  right.

16       Okay.  On the case of Thaddeus Jimenez

17  everybody is here.  So what are we waiting for,

18  anything?  The State is ready.  The defendant is

19  ready.  Let's get it on.

20       Bring out the jury, please.

21                    (The following proceedings

22                    were had in the presence and

23                    hearing of the jury:)

24       THE COURT:  Please be seated, ladies and

JIM02946

R-9

1    gentlemen.  Sorry for the delay.  Things will run much

2    more smoothly now.  For various reasons that need not

3    concern you we were not able to get everybody together

4    to start when I said but from now on things will run

5    much more smoothly.

6            I want to reintroduce the various

7    participants in this particular case before we

8    actually start.  The defendant, as I told you

9    yesterday, that's the young man in the blue suit

10   Thaddeus Jimenez.  His attorney is the gentleman next

11   to him with the gray suit it appears from here,

12   Charles Murphy.  And the state's attorneys are the two

13   gentlemen closest to the jury box, Mr. John Murphy and

14   Mr. David Gaughan.

15           As I told you yesterday the defendant is

16   charged with the February 3, 1993 murder of someone

17   named Eric Morro in the general vicinity of 3018 West

18   Belmont in the City of Chicago.

19           If I can ask you for a moment just to

20   stand so we can swear you in all together at this

21   point and raise your right hands, please.

22                   (Jurors sworn.)

23           THE COURT:  You've now been sworn as a jury

24   to try this case.  By your verdict in the case you

JIM02947

R-10

SA585

1   will decide the disputed issues of fact.  The court

2   will decide the questions of law that arise during the

3   course of the trial and before you retire to

4   deliberate at the close of the case the court will

5   instruct you on the law that you are to follow and

6   apply in reaching your verdict.

7           You should give careful attention to the

8   testimony and evidence as it is received and presented

9   for your consideration but you should not form or

10  express any opinion about the case until you've

11  retired to the jury room to consider your verdict

12  after having heard all the evidence, the closing

13  arguments of the attorneys and the instructions by me.

14          During the trial you must not discuss

15  the case among yourselves or with anyone else or

16  permit anyone to discuss the case in your presence.

17  You must avoid reading newspaper articles if any

18  should happen to appear about the case during the

19  course of the trial.  You must also avoid seeing or

20  hearing television commentary, radio commentary or

21  accounts of the trial while the case is in progress if

22  any should happen to appear.

23          You must not visit the scene of the

24  occurrence, which I told you before is 3018 West

JIM02948

R-11

1    Belmont Avenue in the City of Chicago unless the court

2    directs the jurors to view the scene in which case

3    we'll all go there together.

4              From time to time during the course of

5    the trial I'll be called upon to make rulings of law

6    on objections or motions made by the attorneys.  You

7    should not infer from any such ruling that I have any

8    opinion on the merits of the case favoring one side or

9    the other.  If I sustain an objection to a question

10   asked of a witness, did not permit the witness to

11   answer the question, you cannot speculate on what

12   answer the witness might have given nor can you draw

13   any inference from the question itself.

14             The trial will proceed in the following

15   fashion:  The state's attorney will make an opening

16   statement outlining his case, then the defendant may

17   also make an opening statement outlining his case.

18   Neither party is required to make any opening

19   statements.

20             Opening statements are not evidence,

21   they are merely to assist you in understanding the

22   significance of the evidence when it is introduced.

23   After the opening statements, if any are made, the

24   State will introduce evidence.  At the conclusion of

JIM02949

R-12

1    the State's evidence the defendant may introduce

2    evidence, rebuttal evidence may then be introduced by

3    the State.

4            At the conclusion of all the evidence

5    the attorneys may make their closing arguments to you.

6    At the conclusion of the closing arguments you will be

7    given further instructions, you will then deliberate

8    and arrive at your verdict.  The law applicable to

9    this case is contained in the instructions I give you

10   during the course of the trial and it is your duty to

11   follow all of those instructions.

12           As you can tell you have the right to

13   take notes during the course of this trial.  Notepads

14   have been provided for your convenience.  Please place

15   your name on the cover of the notepad.  No one else

16   will be allowed to look at your notes at any time.

17   You do not have to take notes, that is entirely up to

18   you.  I have no preference one way or the other.  If

19   you do take notes do not let that stop you from

20   hearing all of the evidence.

21           You may use your notes to refresh your

22   memory at the appropriate time.  Your notes are for

23   your own use only, not for any other juror's.  Do not

24   show them to anyone at any time, that includes other

JIM02950

R-13

SA588

1    jurors and includes the time when you are deliberating

2    on your verdict.

3              You should rely on your own memory of

4    the evidence.  If your notes conflict with your memory

5    or someone else's notes conflict with your memory you

6    are free to use your own memory of the evidence.  Just

7    because a juror has taken notes does not mean that his

8    or her memory of the evidence is any better than the

9    memory of a juror who has not taken notes.

10             Your notes will not leave the courtroom,

11   they'll be collected by the deputy sheriff when you

12   leave for lunch and at the close of the court day.  At

13   the end of the case the notes will be collected by the

14   deputy sheriff, they will then be destroyed.  No one

15   will be allowed to look at your notes before they are

16   destroyed.  Your notes, if you choose to take them,

17   are entirely your own.

18             At this point the lawyers for each side

19   have the opportunity of making an opening statement to

20   you if they wish.  An opening statement is not

21   evidence, should not be considered by you as evidence.

22   It is merely a statement by the lawyer as to what he

23   expects the evidence in the case will show.  With that

24   the State will make their opening statement.  Mr. John

JIM02951

R-14

SA589

1   Murphy.

2            MR. JOHN MURPHY:  Thank you, your Honor.

3                  OPENING STATEMENT

4            BY MR. JOHN MURPHY:

5            Good afternoon, ladies and gentlemen.  On

6   February 3, 1993 the defendant, Thaddeus Jimenez, was

7   a member of a gang.  On February 3, 1993 the defendant

8   was a member of a gang who called themselves the Simon

9   City Royals.  And on February 3, 1993 the defendant

10  was proud to call himself a member of the gang Simon

11  City Royals, so proud that he wanted others to know,

12  so proud that he told his friends and the people that

13  he saw on the street, so proud that he even told

14  police officers that he was a Simon City Royal, so

15  proud that on February 3, 1993 the defendant was out

16  on the street, on the northwest side of Chicago, in

17  the area of Sacramento and Belmont and in the

18  vernacular he was flashing his gang signs, flashing

19  his gang signs where a passing bus, school bus, was

20  going by and where young children were nearby as well.

21            The victim, Eric Romo, was also nearby

22  when the defendant proudly flashed his gang signs and

23  yelled Royal, Royal, representing his gang, the Simon

24  City Royals.  Eric Morro, the victim in this case, was

JIM02952
R-15

SA590

1    not a Simon City Royal.  Eric Morro was not a gang

2    member.

3            Eric Morro said to the defendant take

4    his gang stuff somewhere else because there were kids

5    out there.  And that's when Thaddeus Jimenez went off.

6    He screamed at Eric, he swore at Eric and he

7    threatened Eric but then they parted company and

8    apparently, apparently, it was over.  But it wasn't

9    over, ladies and gentlemen.  It wasn't over.  That

10   pride being a Simon City Royal was now bruised, that

11   pride turned into rage and that pride became the fuel

12   for a vengeful retaliation killing which takes us to

13   the events leading to the death of Eric Morro.

14           Later the same day, on February 3, 1993,

15   just after 6:30 in the evening and ironically just

16   down from the same corner, Sacramento and Belmont,

17   where the defendant had been flashing the gang signs

18   earlier that afternoon Eric Morro was walking east on

19   Belmont Avenue and he was walking down the street with

20   somebody by the name of Larry Tueffel, walking towards

21   Sacramento.  And as they were walking together down

22   the street they were approached by two people.  One of

23   those people was the defendant, Thaddeus Jimenez.  The

24   other was a person whose name is Victor Romo.

JIM02953

R-16

SA591

1          They were approached in front of a

2     business on Belmont which is called, Honey Baked Ham

3     at 3018 West Belmont, and Romo, Romo the distracter,

4     said something, said something to Eric about Eric

5     owing money to somebody named Leo and Eric responded

6     what business is it of yours or something to that

7     effect.

8          Around the same time the defendant,

9     Thaddeus Jimenez, who was with Romo pulled a gun, he

10    put the gun away and he pulled the gun back out again

11    and at this time Victor Romo had shoved Eric into the

12    wall, the front of the building at Honey Baked Ham and

13    in the same instant Eric tried to take a swing but he

14    missed and around about the same time the defendant,

15    Thaddeus Jimenez, pointed that gun at Victor -- at

16    Eric's chest and fired one shot. He didn't miss.

17         Eric staggered away from the front of

18    Honey Baked Ham and he died there on the street while

19    the defendant and Victor Romo fled into the night.

20         When the defendant killed Eric there

21    were people who were out on Belmont Avenue and the

22    police investigation began. One of those witnesses,

23    who I've talked about already, was Larry Tueffel,

24    Larry Tueffel who had been walking with Eric just

JIM02954

R-17

1    before the shooting occurred and however ironically as

2    fate would have it Larry Tueffel was also at that time

3    a member of the Simon City Royals Street Gang and

4    although he knew the defendant, Thaddeus Jimenez, and

5    although he knew that the name of the other person

6    with Thaddeus Jimenez was a person named Victor he

7    misled the police and deliberately gave them false

8    information.

9            Another witness, Phil Torres, was

10   looking out the window of his apartment which faced

11   Belmont Avenue, the third floor apartment that he

12   lived in, and although he thought that the person he

13   saw raise his hand to the victim's chest was the

14   person he knew as T. J., the defendant, he sat in a

15   police car with Larry Tueffel during the initial

16   stages of this investigation, he sat with Larry

17   Tueffel, the person who is down there on the street

18   next to these people, he sat with Larry Tueffel, a

19   person who was a member of the Simon City Royals

20   Street Gang and said to him that was T. J. and Larry

21   Tueffel said no.

22           So Phil did not give the police the name

23   of T. J. at that time in the early stages of this

24   investigation but the evidence in this case will show,

JIM02955

R-18

SA593

1    ladies and gentlemen, that Phil went back home and he

2    talked with his family that evening and after talking

3    to his family at 1:00 o'clock in the morning,

4    approximately six and a half hours after Eric was

5    shot, he called the police back up and said T. J. is

6    the person you're looking for and within hours the

7    defendant, Thaddeus Jimenez, was arrested.

8            And later that morning, on February 4,

9    1993, a lineup was conducted in the police station and

10   there were four witnesses who viewed that lineup.

11   Each viewed the lineup separately, the lineup in which

12   the defendant, Thaddeus Jimenez, stood in.  One of

13   those witnesses was Larry Tueffel.  He identified him

14   because now the gig was up and he was telling the

15   truth.

16           Phillip Torres, that other witness, also

17   identified him but there were two other witnesses,

18   ladies and gentlemen, a mother and her daughter,

19   Sandra Elder and Tina Elder.  Both of these witnesses

20   were out on the street on February 3, 1993.  Both of

21   these witnesses are people who knew Phil Torres.  Both

22   of these witnesses are witnesses who were very close

23   to Eric Morro and knew Eric well, but they were two

24   witnesses who did not know, who did not know the

JIM02956

R-19

SA594

1  defendant, Thaddeus Jimenez.  They also viewed the

2  lineup.

3          Tina Elder, when she viewed that lineup

4  identified the defendant as the gunman in this case

5  and Sandra Elder, ladies and gentlemen, got it down to

6  two people, the defendant and another person in that

7  five person lineup.  The defendant was charged with

8  first degree murder.  Seven days later Victor Romo was

9  arrested and he was also charged with first degree

10  murder.

11          Ladies and gentlemen, up front some of

12  the witnesses in this case who are going to testify

13  are not angels.  Phillip Torres was a drug user at the

14  time that this occurred, the drug of choice marijuana.

15  Larry Tueffel was a gang member, a member of the Simon

16  City Royals at the time that this occurred.  But these

17  were the witnesses, the people who saw this crime,

18  these were the people who were out on Belmont when the

19  defendant chose to point that gun at Eric Morro and

20  shoot him.

21          On February 3, 1993 Eric Morro took a

22  stand, he took a stand against gang activity in the

23  streets where children are present and for that he

24  paid the ultimate price.  We're going to ask, ladies

JIM02957

R-20

1   and gentlemen, at the conclusion of this trial, after

2   you've heard all the evidence in this case, that you

3   sign a guilty verdict of first degree murder.  Thank

4   you.

5          THE COURT:  Thank you, Mr. John Murphy.

6   Mr. Charles Murphy.

7                OPENING STATEMENT

8              BY MR. CHARLES MURPHY:

9          Mr. Gaughan.  Mr. Murphy.  T. J., judge

10  Sacks.  Good afternoon.  Ladies and gentlemen.

11            Very briefly.  All of the attorneys as

12  well as Judge Sacks certainly extend to you our thanks

13  for your willingness to participate as jurors.

14  Yesterday when you folks were being selected you saw

15  some people who did their level best to get out of

16  here and shirk their duty.  You folks chose not to go

17  that route.  You can pat yourselves on the back so

18  much you hurt your arm.  Again thank you.

19            We believe Judge Sacks told you

20  yesterday and the lawyers concur that this case will

21  get to you for your consideration Friday of this week,

22  that's not a promise that that will happen, it is a

23  promise though that we will give you our best effort

24  to see to it that you get this matter for your

JIM02958

R-21

SA596

1    consideration on Friday.  The significance I guess of

2    getting the case by Friday is it's not going to take

3    that long, a few days.

4              You have notepads in front of you, as

5    the judge just told you you can, if you choose to,

6    take notes, that's up to you.  I urge you, please, pay

7    careful and close attention to the testimony you're

8    going to hear.

9              Much of what Mr. Murphy told you as he

10   was standing here addressing you sounded more like his

11   closing argument rather than his opening statement and

12   a lot of conclusions by the prosecution were given to

13   you.  Well, you've been told what he said and what I'm

14   saying to you now is not evidence.  The evidence will

15   come to you from the witness stand.

16             There's no question that what happened

17   to Eric Morro is a tragedy.  The young man, I believe

18   he was nineteen years of age, he should not have been

19   shot, he should not have died at Belmont and

20   Sacramento.  That is not an issue though for your

21   consideration.  As I suggested I believe in some

22   questioning that I did to some of you folks yesterday

23   collectively as I indicated this case is really about

24   who done it, that's what this case is about, not

JIM02959

R-22

1    whether or not you're aggravated by the circumstances

2    but who did it, that is the point.

3              At the time that Mr. Morro was killed my

4    client was thirteen years of age.  At the time that

5    Mr. Morro died he died at 6:25 or thereabouts -- Let

6    me rephrase that.  I believe he was shot at about 6:25

7    p.m. on February 3rd, the significance being you will

8    hear it was dark out.  The lighting that was available

9    would have been, of course, artificial lighting.

10             Mr. Murphy just told you that a fella by

11   the name of Larry Tueffel was an occurrence witness.

12   Mr. Murphy told you that Mr. Tueffel was a member of a

13   street gang, Simon City Royals.  That's not a crime,

14   of course, being a member of a street gang.

15             Mr. Tueffel will tell you that the man

16   that he was with, the man who was shot, the man who

17   died was a close friend of his, Eric Morro.  And you

18   heard Mr. Murphy tell you that when the police arrived

19   on the scene and his close friend had been shot and he

20   died right there on the street, even though he was

21   pronounced dead at the hospital, he doesn't tell the

22   police the truth, that's how Mr. Murphy characterized

23   it.  He says that he lied to the police about who shot

24   his good friend.

JIM02960

R-23

1          In addition to Mr. Tueffel being an

2     occurrence witness who spoke to the police at the

3     time -- right after the shooting took place, Phillip

4     Torres falls in that same category again. He too was

5     an occurrence witness who spoke to the police right

6     away. He's a person who knew the deceased. He's a

7     person that knew my client. The deceased is not only

8     someone that he knew, the deceased was a friend of

9     his. You would think he would tell the truth to the

10    police. I know who did it. I saw it, it was T. J.,

11    it was Thaddeus Jiminez. That didn't happen.

12          What you're going to hear in terms of an

13    explanation as to how that could take place is going

14    to be this, you're going to hear that -- I'm talking

15    about from the witness stand out of the mouth of

16    Phillip Torres. He's sitting in a police car and he's

17    sitting in the police car with Larry Tueffel, the

18    other occurrence witness, and Tueffel tells him what

19    he didn't see. Tueffel tells him it wasn't T. J. and

20    because Tueffel tells him that he goes I guess it

21    wasn't T. J., someone who he knows, that is the

22    explanation that you're going to hear out of the mouth

23    of Mr. Torres as to why he didn't tell the truth.

24          Mr. Murphy just told you, and I concur,

JIM02961

R-24

SA599

1    that hours later, after conferring with God knows

2    whom, he picks up the phone and he calls the police,

3    he's now had a revelation.  He now remembers who did

4    it.  He implicates my client.

5              Ladies and gentlemen, you're going to

6    hear, even though you understand and you know and

7    you've all accepted the premise that my client need

8    not prove his innocence you are nonetheless going to

9    hear alibi testimony.  You're going to hear from not

10   only members of my client's family, friends of the

11   family who were at his house at the time that the

12   shooting took place, not just that moment but had been

13   at the house before the shooting took place as well as

14   after and he was there.  He was home.  But you're

15   going to hear something else that's very important in

16   this case.

17             You're going to hear the testimony of a

18   young man who is only going to appear here because he

19   is under subpoena and has to be here, Victor Romo.

20   Victor Romo Mr. Murphy characterized for you a moment

21   ago was the co-offender.  You will find out when he

22   comes here and testifies that he was convicted of

23   murder.  You will understand, of course, when he

24   testifies that there is a person that he is concerned

JIM02962

R-25

1    about and has been and will be for the rest of his

2    life, that's himself, but you're going to know or hear

3    something else.  He's going to tell you who the

4    shooter was.  He's going to tell you that the young

5    man's name that he was with is Juan Carlos Torres, the

6    same surname as Mr. Phillip Torres.

7            He's going to tell you that in February

8    of 1993 he didn't know who he was.  He didn't know my

9    client at all.

10           Ladies and gentlemen, at the conclusion

11   of the case I submit to you right now there's going to

12   be not just a doubt, there will be a substantial

13   doubt, a large doubt, as to who did it but

14   nonetheless, ladies and gentlemen, you're going to

15   hear substantial testimony and I trust it will be

16   persuasive testimony that the person who had the gun,

17   the person who did the shooting his name is Torres.

18           THE COURT:  Thank you, Mr. Charles Murphy.

19           Abraham Lincoln said at one point in his

20   term of office many, many years ago, obviously the

21   highest act of citizenship is service on a jury.

22   You're going to get to do that for the next two or

23   three days and not only that you're going to get to do

24   that by having the case presented to you from both

JIM02963

R-26

SA601

1    sides by three exceptionally fine lawyers.

2            And when this case is over with Friday,

3    hopefully, if not Monday at the latest, you will have

4    to answer the same question I told you yesterday, the

5    one question, the only question in this case is

6    whether the State can convince you beyond a reasonable

7    doubt that Thaddeus Jimenez is guilty of the crime

8    he's charged with.

9            What you've heard now are the opening

10   statements by the attorneys.  Opening statements are

11   what they believe the evidence in the case will be.

12   What they told you is not evidence.  You'll hear the

13   evidence from the witness stand after you have lunch.

14   What you heard now is basically food for thought.

15   What you'll get now is actual food for lunch, if you

16   want to call it that, since you're getting your food

17   on the County.  You have my best wishes and my prayers

18   are with you.

19           We'll see you back here one hour from

20   now, which is 1:35.  Do not discuss this case during

21   the recess among yourselves or with anybody.  Do not

22   let anybody attempt to talk to you about the case or

23   talk about the case in your presence.  Do not form or

24   express any opinions about the case.  I'll tell you

JIM02964

R-27

SA602

1    the proper time to do that.

2    You can leave your notepads and pens on

3    the chairs, we'll give them back to you at 1:30.  I'm

4    just kidding about the food, it's not as bad as I

5    might suggest.  And we'll see you then.

6    At the end of the trial there should be

7    fourteen pens, if there's not fourteen pens Captain

8    Queeg goes on the search for the missing pens as well

9    as the missing strawberries.  We'll see you back here

10   at 1:35.

11   (Jury excused.)

12   THE COURT:  Mr. John Murphy, if you have

13   those letters I can look at them during lunch.

14   MR. JOHN MURPHY:  Yes, I do.

15   THE COURT:  I'll rule on the Torres motion in

16   limine before we start on evidence.

17   (A luncheon recess was taken.)

18   THE COURT:  Bring out Jimenez.

19   The defendant, Thaddeus Jimenez, is

20   here.  His attorney, Charles Murphy, is present and

21   John Murphy and David Gaughan are here for the State.

22   I'll rule on the motion in limine about

23   the prior conviction about Phillip Torres.  I want to

24   ask the State regarding when it is you plan to call,

JIM02965

R-28

1  if you do plan to call Elizabeth Heatley, the former

2  apparently girlfriend of Jimenez back in '93?

3       MR. JOHN MURPHY:  At the earliest tomorrow,

4  judge.

5       THE COURT:  Okay.  So it won't be this

6  afternoon?

7       MR. JOHN MURPHY:  It definitely won't be

8  today.

9       THE COURT:  During the recess, I'll give you

10  back all these letters that you gave me to look at, I

11  read them during the recess.  I counted eleven

12  altogether; is that correct?

13       MR. JOHN MURPHY:  Yes, judge.

14       THE COURT:  I read all eleven letters.  I'd

15  like to hear some argument on both sides concerning at

16  least the ones the State plans to offer.  There was

17  some information in some of them which seems to me

18  would be admissible evidence of consciousness of

19  guilt, statements by the Defendant Jimenez in the

20  letters regarding someone referred to as Larry.  So

21  we'll discuss those before the jury gets to hear about

22  them, if they get to hear about them at all, but since

23  we have a jury waiting I can hear those arguments

24  after we finish today about what letters the State

JIM02966

R-29

1    wants to offer through Elizabeth Heatley and then I'll

2    hear the defense argument about their position about

3    those letters.

4              As far as the motion in limine

5    concerning the -- the State's motion to prevent the

6    defense from introducing a prior felony conviction for

7    possession with intent to deliver cannabis of Phillip

8    Torres, the court has read the case of People versus

9    Montgomery, 1971 Illinois Supreme Court case, 47 Il.

10   2d. 510 and also People versus Yost 70 Il. 2d. 292,

11   Illinois Supreme Court, 1980 and also the portions of

12   a book which I just recently got called Illinois

13   Evidence Manual by Justice Steigmann, the chapter

14   dealing with credibility and impeachment, there's a

15   chapter basically -- Chapter Twenty-three and the

16   sections I refer to in there start at basically

17   Section Twenty-three -- Just a moment.  Twenty-three,

18   Section Twenty-five and there's a computer in the

19   chambers, I read some cases also during the break that

20   are referred to in this evidence manual which I looked

21   at during the break.

22             I'm going to deny the State's request.

23   We're talking about a witness here as apposed to a

24   defendant.  I think the rules should be slightly

JIM02967

R-30

1   more -- I think the rule is more liberal, not just my

2   opinion but the case law suggests that you be more

3   liberal in the viewpoint of a witness as apposed to a

4   defendant.

5            In this case the conviction of Torres

6   was in August of '87, we're now in November of '97, so

7   it's just slightly approximately three months after

8   the ten year period of time which is referred to in

9   Montgomery, but other cases which are referred to in

10  this evidence manual if you read them closely it

11  indicates it appears to me that the court has some

12  discretion even if it is slightly past the ten years

13  particularly in regard to a particular witness.

14           I would also point out that in the

15  opening statement by the State the State referred to

16  Torres as either an occasional or a user of marijuana

17  and that he was convicted of possession with intent,

18  that might be a misleading comment or suggestion on

19  their part.  He was just a user or occasional user or

20  user.  The weight of that conviction going back to '87

21  when he's testifying in '97 is just slightly more than

22  ten years past the initial setting out of that ten

23  year parameter in Montgomery.  Certainly the jurors

24  can determine what weight, if any, they want to give

JIM02968

R-31

SA606

1    to a conviction of somebody that occurred ten years

2    and a couple or three months prior to the time he

3    testified, but if the defense chooses to bring out the

4    prior conviction of Phillip Torres on

5    Cross-Examination, which they can do, then the defense

6    will be allowed to do that. Okay. Anything else?

7        MR. JOHN MURPHY: No, judge.

8        THE COURT: All right. Let's bring out the

9    jurors, please.

10                    (The following proceedings

11                    were had in the presence and

12                    hearing of the jury:)

13        THE COURT: Please be seated. We're just a

14    little bit later than I thought but not too much. The

15    State can proceed.

16        MR. GAUGHAN: Your Honor, at this time the

17    People would call Mary Morro.

18        THE COURT: Okay.

19                    (Witness sworn.)

20        THE COURT: Please be seated. Keep your

21    voice up nice and loud. Wait until the attorneys

22    finish the entire question before you start to answer.

23    If you start answering the question before the

24    question is finished you'll both be talking at the

JIM02969

R-32

1    same time, so wait until they're finished with the

2    question then answer.  Keep your voice up and talk to

3    those fourteen people to your right.  Go ahead,

4    please.

5                        MARY MORRO,

6    called as a witness on behalf of the People of the

7    State of Illinois, having been first duly sworn, was

8    examined and testified as follows:

9                    DIRECT EXAMINATION

10                    BY MR. GAUGHAN:

11    Q    Ma'am, could you please introduce yourself to

12    the ladies and gentlemen of the jury?

13    A    My name is Mary Morro.  I'm Eric's mother.

14    Q    How do you spell your last name?

15    A    M-o-r-r-o.

16    Q    Ma'am, how many children do you have?

17    A    Herbie and Nathan and I had Eric.

18    Q    And before February 3rd of 1993 when was the

19    last time you had spoken to your son, Eric?

20    A    It was about two weeks before he died.

21    Q    When you spoke to him was he okay at that

22    time?

23    A    Yes, he was.

24    Q    How old was your son, Eric, back in February

JIM02970

R-33

SA608

1      of 1993?

2          A      He was eighteen.

3          Q      Eighteen years old?

4          A      Yes.

5          Q      After February 3rd of 1993 when was the next

6      time you saw Eric?

7          A      When I seen him at the morgue.

8          Q      I'm going to show you what I'm marking as

9      People's Exhibit No. 1 for purposes of identification.

10     Do you recognize what that photograph is?

11         A      Yes.

12         Q      Miss Morro, could you please tell the ladies

13     and gentlemen of the jury what that photograph is?

14         A      When he graduated from eighth grade.

15         Q      How old was he in that photograph?

16         A      He was fifteen.

17         Q      Other than being three years younger does

18     this photograph accurately show the way your son,

19     Eric, looked before February 3rd of 1993?

20         A      Yes, it does.

21             MR. GAUGHAN:  Your Honor, at this time the

22     parties would proceed by way of stipulation.

23             THE COURT:  All right.  A stipulation, ladies

24     and gentlemen, is an agreement by the lawyers as to

JIM02971

R-34

SA609

1    what a particular witness would testify to, it avoids

2    the necessity of asking the particular witness or

3    having the witness testify in open court because the

4    parties agree as to what the witness would say.  Go

5    ahead, Mr. Gaughan.

6         MR. GAUGHAN:  Ladies and gentlemen of the

7    jury, it will be stipulated by and between the

8    parties, the State's Attorney, Richard Devine, through

9    his assistants, John Murphy and David Gaughan, and

10    through the defense, Thaddeus Jimenez, and his lawyer,

11    Charles Murphy, that if Miss Mary Morro were shown

12    People's Exhibit No. 2 for purposes of identification

13    she would identify that photograph as a photograph

14    that accurately depicts the way her son, Eric, looked

15    when she viewed him at the Cook County Morgue on

16    February 4, 1993.  So stipulated?

17         MR. CHARLES MURPHY:  Yes.

18         MR. GAUGHAN:  I have nothing further, your

19    Honor.

20         THE COURT:  Any questions, Mr. Murphy?

21         MR. CHARLES MURPHY:  No.

22         THE COURT:  Mrs. Morro, you can step down.

23              (Witness excused.)

24         MR. JOHN MURPHY:  Your Honor, the People

JIM02972

R-35

1    would call Officer Lawrence Ryan.

2              THE COURT:  Okay.

3                      (Witness sworn.)

4              THE COURT:  Keep your voice up.  Wait until

5    the questions are finished before you start answering

6    them.

7              THE WITNESS:  Yes, sir.

8                  LAWRENCE RYAN,

9    called as a witness on behalf of the People of the

10   State of Illinois, having been first duly sworn, was

11   examined and testified as follows:

12                 DIRECT EXAMINATION

13             BY MR. JOHN MURPHY:

14       Q    Sir, would you please state your name and

15   spell your name for the court reporter.

16       A    Officer Lawrence Ryan, R-y-a-n.

17       Q    And you're employed as a Chicago police

18   officer; is that right?

19       A    Yes, sir.  That's correct.

20       Q    How long have you worked as a Chicago police

21   officer?

22       A    Twenty-five years.

23       Q    And where are you presently assigned?

24       A    The Seventeenth Albany Park District.

JIM02973

R-36

SA611

1      Q      What is your position in the Seventeenth

2  District?

3      A      Patrol officer.

4      Q      How long have you been a patrol officer in

5  the Seventeenth District?

6      A      Almost eighteen years, sir.

7      Q      And during that eighteen year period would it

8  be fair to say that you learned the neighborhood in

9  and around the Seventeenth District?

10     A      Yes, sir.

11     Q      First of all, could you tell the ladies and

12 gentlemen of the jury what the borders are of the

13 Seventeenth District?

14     A      The Seventeenth District runs from Belmont,

15 3200 North, to Devon, 6400 North, and the Chicago

16 River roughly, California Avenue to Cicero Avenue.

17     Q      And in the years that you have worked in the

18 Seventeenth District have you in fact learned whether

19 certain gangs operate in that area?

20     A      Yes, sir.

21     Q      Now, specifically I'd like to ask you about

22 the area of Sacramento and Belmont and I'd like to ask

23 you about the time period of February, 1993, do you

24 know what gangs were active in that particular area

JIM02974

R-37

1   during that time period?

2       A    During that time period the Simon City Royals

3   were very active, the Maniac Latin Disciples were very

4   active and I believe the Spanish Cobras were starting

5   to be active.

6       Q    Officer Ryan, I'd like to direct you to the

7   date of February 3, 1993 at approximately 6:30 in the

8   evening, were you working on that day?

9       A    Yes, sir, I was.

10      Q    Were you working alone or were you work

11  working with a partner?

12      A    No, sir.  I was assigned to beat 1733 with

13  Officer Robert Whiteman.

14      Q    And were you in uniform?

15      A    Yes, sir.

16      Q.   And were you in a marked car?

17      A    Yes, sir.

18      Q    Now, while you were working did you respond

19  to a call?

20      A    Yes, sir, I did.

21      Q    What was the nature of that call?

22      A    The call was broadcast as a man shot at

23  Belmont and Sacramento.

24      Q    And where did you and your partner go?

JIM02975

R-38

1        A    We went to the area of Belmont Avenue,

2    proceeded eastbound on Belmont Avenue to approximately

3    3018 West Belmont Avenue.

4        Q    Now, before I ask you what you saw there

5    would you please describe that area to the ladies and

6    gentlemen of the jury?

7        A    That area is mostly residential, it does have

8    some small shops, it has a gas station, it has a

9    restaurant on the corner of Sacramento, flower shop,

10   what have you, small businesses basically.

11       Q    When you arrived there could you tell us what

12   you saw?

13       A    Yes, sir.  We arrived on the scene and as we

14   approached the scene we could see a fairly large crowd

15   on the street and noticed a man lying on the sidewalk.

16       Q    Now, did you have an opportunity to go to

17   that man?

18       A    Yes, sir.

19       Q    What did you see?

20       A    I saw, as I said, he was lying on the street,

21   face up.  He was limp and ashen looking.

22       Q    Did you check to see if there were any signs

23   of life?

24       A    Yes, sir.

JIM02976

R-39

1     Q   What did you find?

2     A   As far as I could tell there were not.

3     Q   Now, what did you do nonetheless?

4     A   I immediately radioed for a fire department

5  ambulance and called for assistance and stated that

6  the shooting was bonafide, to let other responding

7  units know that.

8     Q   Did other units or police officers arrive at

9  the scene?

10    A   Yes, sir, they did.

11    Q   At some point while you were at the scene was

12  a search conducted?

13    A   As far as what, sir?

14    Q   For any bullets.

15    A   Not by me.  No, sir.

16    Q   Do you know if a search was conducted?

17    A   I do not.  I would suspect that the crime

18  laboratory did make a search later on, yes, sir.

19    Q   To your knowledge were any bullets, shell

20  casings or weapons recovered at the scene?

21    A   To my knowledge, no, sir.

22    Q   Now, Officer Ryan, could you describe what

23  the lighting was like in the area where the body was?

24    A   Artificial streetlighting.

JIM02977

R-40

1      Q     And in particular what kind of thoroughfare

2   or street is Belmont?

3      A     It's a main thoroughfare, Belmont Avenue.

4      Q     Is the lighting different on a main

5   thoroughfare than it would be on other streets in the

6   City of Chicago?

7      A     Usually it's brighter than it would be on a

8   side street, yes, sir.

9      Q     While you were at that location, Officer

10  Ryan, did you learn of any witnesses?

11     A     Yes, sir, I did.

12     Q     What names did you learn?

13     A     Larry Tueffel, Phillip Torres and I believe

14  it's a Sandra Elder.

15     Q     Did you speak to Sandra Elder?

16     A     Briefly, yes, sir.

17     Q     Why did you only speak to her briefly?

18     A     Basically hysterical.  She knew the party.

19     Q     And the body that you saw, was that body

20  taken anywhere at some point when you were there?

21     A     Yes, sir, it was.

22     Q     Where was it taken?

23     A     I believe it was taken to Illinois Masonic,

24  Trauma Unit.

JIM02978

R-41

1       Q    Do you know what happened to Sandra Elder

2  when the body was taken?

3       A    She went in the fire department ambulance to

4  the hospital.

5       Q    In addition to Sandra Elder you testified you

6  learned of Larry Tueffel and Phillip Torres; is that

7  correct?

8       A    Yes, sir.  That's correct.

9       Q    Did you have a conversation with either of

10  those individuals?

11      A    Yes, sir, I did.

12      Q    Who did you speak to?

13      A    I spoke to Larry Tueffel mainly.

14      Q    When you spoke to Larry Tueffel did you have

15  an opportunity to observe his demeanor?

16      A    Yes, sir, I did.

17      Q    How would you characterize his demeanor?

18      A    Well, scared, extremely frightened, hyper,

19  evasive.

20      Q    Could you describe --

21           MR. CHARLES MURPHY:  Objection, your Honor.

22           THE COURT:  The jurors will disregard the use

23  of the term evasive.  The jurors determine the

24  credibility of the witnesses, not the police officers.

JIM02979

R-42

1    Next question.

2    BY MR. JOHN MURPHY:

3        Q    Officer, when you initially attempted to

4    speak to Larry Tueffel could you describe what he did?

5        A    Tried to walk away from me.

6        Q    And after -- Did he in fact speak to you

7    then?

8        A    Yes, sir.

9        Q    When you spoke to him could you describe what

10   occurred?

11       A    Again he was hyper, he was --

12            MR. CHARLES MURPHY:  Objection:  Asked and

13   answered.

14            MR. JOHN MURPHY:  Your Honor, I'm going to

15   withdraw the question.

16            THE COURT:  There's no question pending at

17   this point.

18   BY MR. JOHN MURPHY:

19       Q    Did you also speak to Phillip Torres?

20       A    Yes, sir.

21       Q    Can you describe his demeanor?

22       A    He was again frightened I believe, threw up

23   his arms, his hands and basically didn't want anything

24   to do with this.

JIM02980

R-43

SA618

1       Q   When you say he didn't want anything to do

2  with it, did he do anything of a physical nature?

3       A   He attempted to walk away also.

4       Q   Did he attempt to walk away once or more than

5  once?

6       A   Several times.

7       Q   Officer Ryan, at some point did your

8  responsibilities in this investigation end?

9       A   Yes, sir.

10      Q   Who takes the lead role after the original

11  officers on the scene after their responsibilities are

12  complete?

13      A   The Violent Crimes detective.

14      Q   And in this particular case did Violent

15  Crimes detectives work on this case after you arrived?

16      A   Yes, sir.

17      MR. JOHN MURPHY:  May I have a moment, your

18  Honor?

19      THE COURT:  Sure.

20      MR. JOHN MURPHY:  Your Honor, for the record

21  I'm showing to counsel People's Exhibits No. 3, 4, and

22  6.

23      THE COURT:  Okay.

24      MR. JOHN MURPHY:  May I approach?

JIM02981

R-44

1          THE COURT:  Sure.

2          MR. JOHN MURPHY:  Thank you.

3    BY MR. JOHN MURPHY:

4          Q    Officer, I'm going to show you -- Initially

5    I'd ask you to look at all four of these exhibits, if

6    you would, People's No. 3, 4, 5 and 6.  Could you

7    describe what these exhibits are?

8          A    These are pictures of the crime scene.

9          Q    And do these photographs truly and accurately

10   show the area in and around 318 West Belmont as it

11   appeared on February 3, 1993?

12         A    3018, counsel?

13         Q    I'm sorry.  3018.

14         A    Yes, it does.

15         MR. JOHN MURPHY:  Your Honor, at this time I

16   would move that these exhibits be admitted into

17   evidence.

18         THE COURT:  Mr. Charles Murphy, any

19   objection?

20         MR. CHARLES MURPHY:  No.

21         THE COURT:  All right.  They'll be admitted

22   in evidence.  Do you want to publish them to the jury

23   at this time?

24         MR. JOHN MURPHY:  Judge, I was going to ask,

JIM02982

R-45

1    if I could, the witness step down from the witness

2    stand, identify each photograph and show them to the

3    jurors as he's doing it.

4              THE COURT:  Sure.  That's fine.

5              MR. JOHN MURPHY:  Thank you.

6    BY MR. JOHN MURPHY:

7         Q    Officer, if you would you can stand in a

8    position where you can hold this photograph and hold

9    it so everyone in the jury can see it, I'm going to

10   show you what's been marked as People's Exhibit No. 3,

11   would you please describe what's in that photograph as

12   you show it to the ladies and gentlemen of the jury?

13             THE COURT:  Officer, turn back your left

14   shoulder.  You're standing in front of some of the

15   jurors.

16             THE WITNESS:  This is a photograph -- Can

17   everybody see this?  Okay.  This is a photograph from

18   the east to the west of the scene.  This is a

19   building, 3018 west on Belmont Avenue, which is Honey

20   Baked Ham Corporation.

21

22

23

24

JIM02983

R-46

1    BY MR. JOHN MURPHY:

2        Q    I'm also going to show you what's been marked

3    as People's Exhibit No. 4.  Will you please do the

4    same.

5        A    This is also a photo, probably taken from the

6    street, looking westbound on Belmont Avenue.

7        Q    And again that also shows the same business,

8    Honey Baked Ham; is that correct?

9        A    Yes.  That's correct.

10        Q    Officer, I'm going to ask you to take that

11    photograph and show it again.  Directly to the right

12    in the photograph of Honey Baked Ham, which would be

13    the east; is that correct?

14        A    Let's see.  You're referring to what,

15    counsel?

16        Q    The right of the Honey Baked Ham building?

17        A    In the photo?

18        Q    Yes.  Would that be an easterly direction?

19        A    That would be easterly, yes, sir.

20        Q    What is located there?

21        A    That is a vacant lot.

22        Q    Thank you.

23            Now showing you what has been marked as

24    People's Exhibit No. 5, what's depicted in that

JIM02984

R-47

1   photograph?

2       A    This is a picture just east of the building

3   again looking westbound down the sidewalk.

4       Q    Now, Officer Ryan, does that photograph show

5   the area where you saw the body?

6       A    Yes, sir, it does.

7       Q    Could you please point on the photograph

8   where the body was?

9       A    There's a post for a sign that was previously

10  probably a no parking sign, the body was just adjacent

11  to that post, half on the curb and half on the

12  sidewalk.

13      Q    Where was the body in relation to the Honey

14  Baked Ham business?

15      A    Almost directly in front of it.

16      Q    The photographer in this picture would be

17  facing?

18      A    Westbound.

19      Q    Westerly; is that right?

20      A    Yes.

21      Q    Now, I'm showing you what's been marked as

22  People's Exhibit No. 6, what's shown in that photo?

23      A    This is again the scene looking eastbound

24  from the west on Belmont Avenue, again there's some

JIM02985

R-48

SA623

1    shuttered doors Honey Baked Ham uses to close up their

2    business at night.

3        Q    Now, officer, I'd ask you to remain standing

4    if you would.  Officer, I'm showing you what has been

5    previously marked as People's Exhibit No. 7, could you

6    describe to the ladies and gentlemen of the jury what

7    that is?

8        A    This is --

9             THE COURT:  Can you all see that from where

10   you're at?  Go ahead.

11            THE WITNESS:  This is a diagram of Belmont

12   Avenue, the area around Belmont, Sacramento and

13   Whipple Avenue.  This is eastbound, westbound Belmont

14   Avenue, northbound and southbound, Sacramento.  I

15   wouldn't call it a main thoroughfare up there.  What

16   word am I searching for?  A small thoroughfare.

17   Whipple is a northbound side street.

18   BY MR. JOHN MURPHY:

19       Q    Now, officer, you testified that you

20   responded to the address of 3018 West Belmont; is that

21   correct?

22       A    Yes, sir.

23       Q    Is that address and location shown in the

24   diagram?

JIM02986

R-49

1       A       Yes, sir, it is.

2       Q       Where is it at?

3       A       It's right here.  It's designated as Honey

4    Baked Ham, 3018 West Belmont.

5       Q       In addition to that is there an area which

6    shows a vacant lot in the diagram as well?

7       A       Yes, sir.

8       Q       Where is that in relation to Honey Baked Ham?

9       A       Directly east of the building, Honey Baked

10   Ham.

11      Q       And also, officer, are you familiar with the

12   address of 3012 West Belmont?

13      A       Yes, sir.

14      Q       Where is that in relation to the Honey Baked

15   Ham in the vacant lot?

16      A       That would be several doors down, maybe less

17   than a quarter of a block right here, just east of the

18   vacant lot.

19      Q       Officer, in addition do you remember -- At

20   that particular time of the evening at 6:30 in the

21   evening was it light or dark?

22      A       It was dark.

23      Q       You already testified regarding the lighting

24   conditions, were there any lights on the street?

JIM02987

R-50

1      A    Yes, sir.

2      Q    Where were the lights?

3      A    Streetlights, artificial lights, lights from

4  the businesses.

5      Q    Do you see any lights in the diagram which

6  reflect where the lights were on the street?

7      A    Yes, sir.

8      Q    Would you please point them out to the ladies

9  and gentlemen of the jury?

10      A    There's a streetlight right at 3012 West

11  Belmont, a streetlight across the street which shines

12  on the street and also reflects on the opposite side

13  of the street at approximately 3023 on Belmont and

14  then there's another streetlight by a gas station

15  which is also fairly bright and does light up Belmont

16  Avenue.

17      Q    Officer Ryan, the area of 3018 West Belmont

18  that is in the County of Cook in the City of Chicago;

19  is that correct?

20      A    Yes, sir, it is.

21      Q    Does this -- To the best of your knowledge

22  does this diagram truly and accurately show that area

23  and the buildings as they relate -- the streets as

24  they relate to one another?

JIM02988

R-51

1      A    Yes, sir, it does.

2      Q    Thank you, sir.

3           And, officer, to the best of your

4  knowledge does that diagram appear to be to scale, to

5  the best of your knowledge?

6      A    I'm not an architect but I would suspect,

7  counsel.  That's pretty good.

8           MR. JOHN MURPHY:  Your Honor, no further

9  questions.

10          THE COURT:  All right.  Can I just see the

11  lawyers for a second before Mr. Charles Murphy starts

12  briefly.  I don't need the reporter.

13                    (A discussion was had between

14                     the court and counsel off

15                     the record out of the hearing

16                     of the jurors and the court

17                     reporter.)

18          THE COURT:  I'm sorry.  Go ahead, Mr. Murphy.

19               CROSS-EXAMINATION

20               BY MR. CHARLES MURPHY:

21      Q    Officer Ryan, when you got to the vicinity of

22  3018 West Belmont you arrived with your partner that

23  night, an Officer Whiteman; is that correct?

24      A    Yes.  That's correct.

JIM02989

R-52

SA627

1    Q    When you got there am I correct that you and

2    your partner were the first two police officers on the

3    scene?

4    A    Yes, sir, that is correct.

5    Q    As a result of your being the first two there

6    was it your responsibility to secure the scene in

7    addition to other matters like tend to the man that

8    was laying on the street?

9    A    Of course. Yes, sir.

10   Q    But securing the scene that was also one of

11   your responsibilities?

12   A    Yes.

13   Q    Additionally at least at the time that you

14   arrived there were no suspects at the scene; is that

15   correct?

16   A    As far as we knew, no, sir.

17   Q    Is it also part of your responsibility as the

18   first officers on the scene to attempt to obtain

19   information that would permit you to broadcast a

20   description of a possible offender or offenders?

21   A    Yes, sir.

22   Q    You undertook that responsibility, did you

23   not?

24   A    Yes, sir.

JIM02990

R-53

1       Q    You said that you spoke to three people who

2    identified themselves to you, there was a Larry

3    Tueffel, that was one of them; is that correct?

4       A    Yes, sir.

5       Q    And Mr. Phil or Phillip Torres was another

6    one; isn't that correct?

7       A    Yes, sir.

8       Q    You said here today that at some point either

9    or both of them started to walk away; is that right?

10       A    Yes, sir.

11       Q    But in fact neither one of them did walk away

12    from you, did they?

13       A    Well, they did.  They turned to walk away and

14    I went after them.

15       Q    Did you have to tackle anyone?

16       A    No, sir.

17       Q    When you spoke to these two people, now I'm

18    looking for a yes or no answer, when you spoke to

19    these two men did they tell you that they were

20    occurrence witnesses and had seen what had happened?

21       A    Yes, sir.  I believe they did.

22       Q    They didn't deny that they had seen the

23    shooter or the shooting, did they?

24       A    No, sir.

JIM02991

R-54

1      Q     You said that they both appeared frightened,

2   did I hear you correctly?

3      A     Yes, sir.

4      Q     Would I be correct, sir, it is not unusual

5   for individuals to have just seen a murder committed

6   to be frightened by it?

7      A     Not at all.

8      Q     Again I'm looking for a yes or no answer.

9   After speaking to these two men did you in fact have a

10  description broadcast over the police network of a

11  possible offender or offenders, yes or no?

12     A     Yes, sir.

13     Q     Did you speak to any person at the scene when

14  you arrived who was identified to you as being Tina

15  Elder?

16     A     No, sir.

17     Q     How long were you there at the scene?

18     A     This is just a guess, I'm saying

19  approximately ten minutes, possibly fifteen minutes.

20     Q     As a result of your involvement, and I

21  understand that you do turn this investigation over to

22  homicide detectives, but as a result of your

23  involvement in the investigation did you have an

24  occasion to prepare a case report?

JIM02992

R-55

1      A    Yes, sir, I did.

2      Q    That's referred to as a general offense case

3    report?

4      A    Yes, sir.

5           MR. CHARLES MURPHY:  May I approach the

6    witness?

7           THE COURT:  Sure.

8    BY MR. CHARLES MURPHY:

9      Q    Officer, I've got a number of pieces of paper

10    stapled here together, I want to direct your attention

11    to the top four pieces, okay?

12      A    Yes, sir.

13      Q    Am I correct that those top four pieces of

14    paper, which have been marked as Defense Exhibit No. 1

15    for identification, constitute a photocopy of the

16    general case report that you prepared in conjunction

17    with your participation in this investigation?

18      A    That is correct.

19      Q    There's a narrative that you wrote, is there

20    not, sir, concerning information which you obtained?

21      A    Yes, sir.

22      Q    In the narrative that you prepared and as you

23    look at the exhibit did you include any information in

24    the narrative about either Mr. Tueffel or Mr. Torres

JIM02993

R-56

SA631

1     attempting to walk away?

2         A    No, sir.

3         Q    You just testified the men appeared

4     frightened to you.  They provided you with their

5     names, did they not?

6         A    Yes, sir.

7         Q    Their addresses, did they not?

8         A    Yes, sir.

9         Q    Telephone numbers, did they not?

10        A    I believe so.

11        Q    And all of the information that they gave you

12    concerning their personal information to the best of

13    your knowledge and belief was accurate, wasn't it?

14        A    I believe so, yes, sir, at the time.

15            MR. CHARLES MURPHY:  I have nothing else of

16    the officer.

17            THE COURT:  Okay.  Mr. John Murphy, any

18    Redirect?

19            MR. JOHN MURPHY:  Yes, just briefly.

20                REDIRECT EXAMINATION

21                BY MR. JOHN MURPHY:

22        Q    Officer Ryan, you were asked on Cross and you

23    testified I believe that you did broadcast information

24    regarding two offenders; is that correct?

JIM02994

R-57

SA632

1      A    Yes, sir, that's correct.

2      Q    And the information that you used in that

3  broadcast was received from where?

4      A    Larry Tueffel.

5      Q    And in addition to broadcasting the

6  information of the offenders, which you received from

7  Larry Tueffel, did you do anything else with that

8  information?

9      A    Placed it in my case report, yes, sir.

10         MR. JOHN MURPHY:  No further questions,

11  judge.

12         THE COURT:  Mr. Charles Murphy, anything

13  else.

14                 RECROSS-EXAMINATION

15             BY MR. CHARLES MURPHY:

16     Q    Officer, did you or did you not speak to

17  Phillip Torres and Sandra Elder in addition to

18  Mr. Tueffel?

19     A    Yes, sir, briefly.  That's correct.

20     Q    Did you ask either Mr. Torres or Miss Elder

21  for any descriptive information as to a possible

22  offender or offenders?

23     A    Briefly of Mr. Torres -- not of Mr. -- I'm

24  sorry.  -- Mrs. Elder.

JIM02995

R-58

1    Q    Regarding what Mr. Torres said to you did he

2    concur or agree with the descriptive information that

3    was given to you by Tueffel?

4    A    He was rather vague at the time.  Mr. Tueffel

5    was doing most of the talking.

6    Q    Did he contradict him, did Torres contradict

7    Tueffel?

8    A    There was some back and forth bantering but

9    nothing -- not a direct contradiction, nothing like

10   that.

11   Q    Think back, if you can, to what the banter

12   was where apparently you were alluding to the fact

13   that Torres was disputing Tueffel's information, what

14   was it?

15   A    It was basically one of the jackets of one of

16   the described offenders if it was purple or if it was

17   a dark blue, a navy blue, that type of thing.  It

18   wasn't anything major.

19   Q    There was no dispute for example as to, I'm

20   looking for a yes or no right now, height, was there,

21   of the offenders?

22   A    No, sir.

23   Q    Weight of the offenders; is that correct?

24   A    It's all an approximation.  No, sir.

JIM02996

R-59

1      Q    Hairstyle of offenders; is that correct?

2           MR. JOHN MURPHY:  Judge, I'm going to object

3      to the form of the question, no dispute, that's a

4      conclusion.

5           THE COURT:  He can tell us whether Tueffel or

6      Torres agreed or disagreed about the height, weight,

7      et cetera.  Overruled.

8      BY MR. CHARLES MURPHY:

9      Q    The last question I asked you was about

10     hairstyle?

11     A    No, sir.

12     Q    You're agreeing there was no dispute?

13     A    As far as I can remember, no, sir.

14     Q    Other than the possible dispute between the

15     two men as to whether or not a jacket was blue or

16     purple, was there any other dispute about clothing

17     now?

18     A    I'm sorry.

19     Q    About clothing?

20     A    About clothing?

21     Q    Yes.

22     A    No.  That's the only thing I can remember as

23     far as the jacket concerned.

24     Q    Again showing Defense Exhibit No. 1 for

JIM02997

R-60

1    identification, directing your attention to page two.

2    My exhibit is coming apart.  Am I correct that in the

3    narrative on the top half of the page, and again I'm

4    looking for a yes or no answer, is that the

5    descriptive information that was provided to you by

6    Tueffel as well as Torres at the scene?

7        A    Yes, sir.

8            MR. CHARLES MURPHY:  I have nothing else.

9            THE COURT:  Okay.  We go back to Mr. John

10   Murphy now.

11           MR. JOHN MURPHY:  Your Honor, we have no

12   additional questions.

13           THE COURT:  All right.  You can step down.

14   You'll make yourself available if necessary, officer?

15           THE WITNESS:  Yes, sir, I will.

16                   (Witness excused.)

17                   (Witness sworn.)

18           THE COURT:  Please be seated.  Keep your

19   voice up.  Wait until the questions are finished

20   before you start answering them.  Thank you.

21

22

23

24

JIM02998

R-61

1                    BARRY LIFSCHULTZ,

2    called as a witness on behalf of the People of the

3    State of Illinois, having been first duly sworn, was

4    examined and testified as follows:

5                    DIRECT EXAMINATION

6                 BY MR. JOHN MURPHY:

7        Q     Sir, would you please state your name and

8    spell your last name for the court reporter, please.

9        A     Yes.  My name is Dr. Barry Lifschultz.  My

10   last name is spelled L-i-f-s-c-h-u-l-t-z.

11       Q     By whom are you employed?

12       A     I'm employed by the Cook County Medical

13   Examiner's Office in Chicago.

14       Q     How long have you been employed there?

15       A     Since 1981.

16       Q     What is your position there?

17       A     I'm a staff forensic pathologist.

18       Q     And are you licensed to practice medicine in

19   the State of Illinois?

20       A     Yes, I am.

21       Q     When were you licensed?

22       A     In 1978.

23       Q     Could you describe what your duties are as a

24   staff pathologist at the Cook County Medical

JIM02999

R-62

1    Examiner's Office?

2        A    Yes.  Basically it's my duty to help in the

3    investigation of sudden and unexpected deaths and I do

4    that in three ways.  I can first of all consider

5    information about the circumstances of the death,

6    which is provided to me.  Secondly, I consider

7    whatever available medical history there might be

8    about the person who has died.  And then thirdly, and

9    probably most importantly, I perform examinations on

10   the bodies of people who have died in order to help

11   determine exactly why they died.

12       Q    And what education have you had in order to

13   become licensed to practice medicine in the State of

14   Illinois and to become a pathologist in the State of

15   Illinois?

16       A    In 1972 I graduated with a bachelor's degree

17   with honors from Harvard University, which is in

18   Cambridge, Massachusetts.  Then in 1977 I received my

19   MD or doctor of medicine degree from Loyola University

20   Medical school, which is in Maywood, Illinois.

21              In 1981 I finished a four year residency

22   in general anatomic pathology at Northwestern Medical

23   School in Chicago and then in 1982 I finished a one

24   year residency in a subspecialty of general anatomic

JIM03000

R-63

SA638

1    pathology, which is called forensic pathology, and I

2    finished that residency at the Cook County Medical

3    Examiner's office.

4                Since 1982 then I've been employed at

5    that office as a staff forensic pathologist.

6    Q    Doctor, do you specialize in any fields then?

7    A    Well, yes.  Actually my specialty field is

8    general anatomic pathology.  My subspecialty field is

9    forensic pathology.

10    Q    What is anatomic pathology, what is forensic

11    pathology and what is the difference between the two?

12    A    General anatomic pathology basically deals

13    with the study of diseases and injuries as those

14    injuries and diseases appear in the tissues of the

15    human body, whether we look at the tissues with our

16    naked eye or with the aid of a microscope.

17                In forensic pathology we use the

18    principles of general anatomic pathology but we use

19    them to focus in specifically on investigating sudden,

20    unexpected or possibly violent deaths.

21    Q    And are you board certified in any particular

22    area?

23    A    Yes, I am.

24    Q    What are you board certified in?

JIM03001

R-64

1    A    In 1982 I was board certified in general

2    anatomic pathology and then in 1983 I was board

3    certified in forensic pathology.

4    Q    Can you explain to us what it means to be

5    board certified?

6    A    Yes.   To be board certified in an area you

7    have to do two things, first of all you have to finish

8    an accredited residency program in that field of

9    medicine and then the second thing you have to do is

10   pass a comprehensive examination in the field.

11   Q    Doctor, as best you can estimate could you

12   tell us approximately how many autopsies have you

13   performed in your career?

14   A    Yes.   I perform about three hundred autopsies

15   each year and I've been employed at our office for

16   over sixteen years, so I've performed well over four

17   thousand autopsies.

18   Q    And approximately how many times have you

19   been qualified as an expert in a courtroom like this,

20   either as an expert in the field of anatomic pathology

21   or forensic pathology?

22   A    I testify about once a month, so I've

23   testified and been qualified over a hundred and fifty

24   times.

JIM03002

R-65

1          MR. JOHN MURPHY:  Your Honor, at this time I

2    would offer the doctor as an expert in his field.

3          THE COURT:  Mr. Charles Murphy, any

4    objection?

5          MR. CHARLES MURPHY:  None at all.

6          THE COURT:  The doctor is an expert in the

7    field of forensic pathology.  Go ahead, please.

8          MR. JOHN MURPHY:  Thank you.

9    BY MR. JOHN MURPHY:

10         Q    Doctor, could you describe to the ladies and

11   gentlemen of the jury what an autopsy consists of?

12         A    Yes.  An autopsy as we perform this

13   examination at our office first of all consists of an

14   examination of the clothing that the person is wearing

15   then the body is carefully undressed and all the

16   external surfaces of the body are examined for any

17   evidence of disease or any evidence of injury that we

18   can see.

19              At the time we're doing the external

20   examination of the body in addition to taking notes I

21   also may direct our photographers to take pictures of

22   the body to show pertinent findings like injuries.

23              After the external examination of the

24   body is finished we open the body, both the lower part

JIM03003

R-66

SA641

1    of the body and the head, and then we carefully

2    examine the organs inside the body, again looking for

3    any evidence of injury or disease that we can see.

4              When we are doing this examination also

5    in addition to looking for diseases and injuries we

6    may take samples of the body fluids for later studies

7    for drugs and poisons and then when that examination

8    is all finished the body is carefully sewed up and I

9    take the notes that I've made from this examination

10   and dictate a typewritten autopsy report and then I

11   also will sign the death certificate, if I can, with a

12   cause and the manner of the person's death.

13        Q    Doctor, were you working as an assistant

14   medical examiner on the date of February 4, 1993?

15        A    Yes.

16        Q    And on that date did you perform an autopsy

17   on the body of a person who was identified to you as

18   Eric S. Morro?

19        A    Yes.

20        Q    And, doctor, could you describe -- Initially

21   did you determine Eric Morro's height and weight?

22        A    Yes.

23        Q    Or was that determined?

24        A    It was determined.  I myself did not weigh or

JIM03004

R-67

1   measure the body but the body was weighed to be one

2   hundred and seventy-six pounds and the height was

3   measured to be five feet four inches.

4        Q    Thank you.  And, doctor, did you perform an

5   autopsy on that body as you described here today?

6        A    Yes.

7        Q    And could you describe what you found during

8   your external examination?

9        A    Yes.  When we did the external examination of

10  the body of Mr. Morro there were really only two

11  things that I noted.  First of all there was a gunshot

12  wound and second of all there was some evidence of

13  hospital therapy in the form of several intravenous

14  lines in place.

15       Q    Could you describe to us, if you would, where

16  you found the gunshot wound?

17       A    Yes.  May I stand up to demonstrate?

18       Q    Certainly.

19       A    When I examined Mr. Morro's body I found in

20  the area that I'm pointing to here --  (Indicating.)

21            MR. JOHN MURPHY:  For the record, judge, the

22  upper left-hand chest.

23            THE COURT:  Okay.

24            THE WITNESS:  -- a gunshot wound of entrance.

JIM03005

R-68

SA643

1    The course of this gunshot wound of entrance

2    perforated the skin of the upper left chest and then

3    it went through inside the body a high pressure blood

4    vessel, which is called the aorta, and the aorta is

5    what carries blood that's been pumped from the heart

6    to the rest of the body, so it's a very high pressure

7    pipe like structure.  The bullet went through that and

8    then from beneath the skin of the right back in the

9    area I'm pointing to here we recovered a small caliber

10   lead bullet.  (Indicating.)

11   BY MR. JOHN MURPHY:

12        Q    Doctor, I'm sorry to interrupt you.  Could

13   you show the area where you recovered the bullet from?

14        A    Yes.  Under the skin of the right back.

15   (Indicating.)

16        MR. JOHN MURPHY:  For the record, judge, the

17   upper area, mid to upper area of the right-hand side

18   of the back.

19        THE COURT:  All right.  The record will so

20   reflect.

21        MR. JOHN MURPHY:  Thank you, doctor.  I'm

22   sorry, doctor, I interrupted you.  Would you finished

23   with what you were saying?

24        THE WITNESS:  Yes.  The bullet was recovered

JIM03006

R-69

SA644

1    from beneath the skin and it was just slightly to the

2    right of the spine.  So the course of the wound was

3    from front to back and also from left to right.

4    BY MR. JOHN MURPHY:

5        Q    Now, doctor, you've also described not only

6    what was fond externally but what was found internally

7    in the internal examination as well; is that correct?

8        A    Yes, I have.

9        Q    Doctor, was an examination performed on the

10   bodily fluids of Eric Morro?

11       A    Yes.

12       Q    What was the finding?

13       A    We examined the body fluids, especially the

14   blood, looking for any evidence of drugs and poisons

15   and we found that first of all the test for

16   benzoylecgonine, which is a breakdown product of the

17   drug cocaine, was negative, so he hadn't been taking

18   cocaine.

19            The second test was a test for alcohol

20   or drinking alcohol and that also was negative, so

21   there was no evidence that he had drinking alcoholic

22   beverages.  And then finally we tested for a group of

23   drugs which are called opiates.  The most common

24   opiates are drugs like heroin or morphine and that

JIM03007

R-70

1    test also was negative.

2    Q    Are those three particular tests which are

3    performed on bodily fluids routinely performed on

4    cases where autopsies are done in the medical

5    examiner's office?

6    A    We don't do as many tests in all of our cases

7    but these are the routine tests that we do in a case

8    of a homicide.

9        MR. JOHN MURPHY:  Thank you.  For the record,

10   judge, I'm showing to counsel People's Exhibits No. 8

11   and 9 and also No. 10.  May I approach, judge?

12       THE COURT:  Sure.

13       MR. JOHN MURPHY:  Thank you.

14   BY MR. JOHN MURPHY:

15   Q    Doctor, first I'm going to show you what has

16   been marked as People's Exhibit No. 2.  Could you

17   please describe to the ladies and gentlemen of the

18   jury what that is?

19   A    Yes.  This is a picture that I had taken of

20   our medical examiner's case number 046 February 93 and

21   this is the person who was identified to me as Eric S.

22   Morro.

23   Q    Thank you.  And would that be for purposes

24   of -- that photograph will be taken for purposes of

JIM03008

R-71

1    identification; is that correct?

2         A    That's correct.

3         Q    Showing you also what's been marked as

4    People's Exhibit No. 8.  Do you recognize what's

5    depicted in that photograph?

6         A    Yes, I do.

7         Q    What is that?

8         A    This is a picture that I had taken of

9    Mr. Morro's upper left chest and this shows the

10   gunshot wound of entrance of the upper left chest.

11   The autopsy tag, a pictorial tattoo, and then above

12   the gunshot wound of entrance there is an area of

13   small pinpoint hemorrhages and abrasions and these are

14   consistent with what we call powder tattooing or

15   stippling.

16        Q    What I'm going to ask you to do, if you

17   would, before we go into that further is with the use

18   of that marker please circle the area where you see

19   the tattooing?

20        A    What I'm doing is I'm circling the area where

21   I see injury consistent with powder tattooing, there

22   is also an actual regular tattoo in the lower part of

23   the picture.  (Indicating.)

24        Q    Where is the area of tattooing where you

JIM03009

R-72

1    circled?

2    A    The area of tattooing is above the gunshot

3    wound of the upper left chest, it's actually in the

4    area I'm pointing to here on the upper left neck.

5    (Indicating.)

6    Q    Thank you.  And, doctor, could you explain to

7    the ladies and gentlemen of the jury what tattooing

8    is?

9    A    Yes.  When a typical gun or handgun is fired

10    in addition to the bullet coming out of the tip of the

11    gun also pieces of burning and unburnt gunpowder come

12    out too.  They don't go as far as the bullet but if

13    the tip of the gun is less than about a foot and a

14    half from the target and if the target is skin then

15    those pieces of burning and unburned gunpowder can

16    actually get embedded in the skin and when that

17    happens that's what we call powder tattooing or

18    stippling.

19    Q    So for purposes of determining approximate

20    distances what is -- between the weapon and the body

21    what is the significance of that tattooing?

22    A    We don't see powder tattooing on the skin at

23    distances of greater than about a foot and a half with

24    a typical handgun.

JIM03010

R-73

1          Q     Thank you.  Now I'm showing you what's been

2     marked as People's Exhibit No. 9, what is shown in

3     that photo?

4          A     This is a picture that I had taken of the

5     small caliber lead bullet that we recovered from case

6     46 February 93, the person who was identified to me as

7     Mr. Morro.

8          Q     And I'm going to show you again now People's

9     Exhibits No. 2, 8 and 9, do these three photographs

10    truly and accurately show the body of Eric Morro as it

11    appeared or the bullet that was recovered from his

12    body?

13         A     Yes.

14         Q     Thank you.  And I'm going to leave out

15    People's Exhibit No. 9 and what I'm going to ask you

16    to do, if you would, is please examine People's Group

17    Exhibit No. 10 and as you examine it could you please

18    describe what it is?

19         A     Yes.  What I'm holding now is an outer light

20    blue bullet envelope that we used to store the bullet

21    that we recovered from Mr. Morro's body.  I can see on

22    this his name, the case number, 46 February 93, my

23    signature and a description of what's in the envelope,

24    which is one small caliber lead bullet.

JIM03011

R-74

1          This envelope has been cut open and

2     inside of the envelope is a tan inner bullet envelope

3     which has also been cut open and it has the case

4     number again, 46 February 93 and it shows the name and

5     it says on the label a bullet and it also has my

6     initials.  This envelope also has been cut open and

7     inside this envelope is a small caliber lead bullet

8     and comparing this bullet with the picture that I had

9     taken of the bullet that I removed from Mr. Morro it

10    appears to be exactly the same bullet.

11         Q    And so, doctor, based on your comparison of

12    the bullet to the photograph and based on the autopsy

13    you performed on February 3, 1993 to the best of your

14    knowledge does that bullet appear to be in the same or

15    substantially the same condition as it was when you

16    recovered it from the body of Eric Morro?

17         A    Yes, it does.

18         Q    Thank you.  And one final question.  Doctor,

19    based on your education, based on your experience,

20    based on the autopsy which you performed on February

21    4, 1993, I believe I misstated earlier when I said

22    February 3rd, on February 4, 1993, did you reach a

23    determination to a medical degree of certainty what

24    the cause of death was to Eric Morro?

JIM03012

R-75

1          A    Yes, I did.

2          Q    What is that?

3          A    Eric Morro died as a result of the gunshot

4    wound of the chest that I described.

5               MR. JOHN MURPHY:  Thank you.  Your Honor, I

6    have no further questions.

7               THE COURT:  All right.  Good.  Mr. Charles

8    Murphy?

9               MR. CHARLES MURPHY:  No.

10              THE COURT:  You can step down, doctor.  Thank

11   you very much.

12                          (Witness excused.)

13              THE COURT:  Do you ever yearn to examine a

14   live body, doctor?

15              THE WITNESS:  I have.

16              THE COURT:  Okay.  Thank you.  We'll take

17   another witness then we'll take a short break.  Do you

18   have a witness available?

19              MR. JOHN MURPHY:  Yes, judge.  Judge, I

20   apologize.  Can we have a brief recess?

21              THE COURT:  All right.  3:00 o'clock we'll

22   have some more witnesses.  Do not discuss the case

23   during that short pause.  We'll call you back at 3:00.

24   Leave your notepads and pens on the chairs if you

JIM03013

R-76

SA651

```
 1   like.
 2                        (A brief recess was taken.)
 3        THE COURT:  The defendant is here with his
 4   attorney, both states attorneys are here as well.
 5   Bring out the jury, please.
 6                        (The following proceedings
 7                        were had in the presence and
 8                        hearing of the jury:)
 9        THE COURT:  Please be seated.  Thank you very
10   much.  The State can call its witness, please.
11        MR. GAUGHAN:  Your Honor, the People would
12   Tina Elder.
13        THE COURT:  Okay.
14                        (Witness sworn.)
15        THE COURT:  Please be seated.  Keep your
16   voice up nice and loud.  Wait until the attorneys
17   finish the questions before you start to answer them.
18   Thank you very much.  Go ahead.
19
20
21
22
23
24
```

JIM03014

R-77

1      TINA ELDER,

2  called as a witness on behalf of the People of the

3  State of Illinois, having been first duly sworn, was

4  examined and testified as follows:

5                  DIRECT EXAMINATION

6                  BY MR. GAUGHAN:

7      Q     Tina, in a nice loud voice could you

8  introduce yourself to the ladies and gentlemen of the

9  jury?

10     A     My name is Tina Elder.

11     Q     How do you spell your last name?

12     A     E-l-d-e-r.

13     Q     Tina, how old are you?

14     A     Twenty-five.

15     Q     Do you have any children?

16     A     Two.

17     Q     How old are you children?

18     A     Ten and four -- Nine and four.

19     Q     I want to direct your attention back to

20  February of 1993, how many children did you have at

21  that time?

22     A     One.

23     Q     Were you also pregnant at that time?

24     A     Yes.

JIM03015

R-78

SA653

1      Q      How old was the child that you had at that
2  time back in February of '93?

3      A      Four.

4      Q      What was her name?

5      A      Jackie.

6      Q      Tina, did you know a person by the name of
7  Eric Morro?

8      A      Yes.

9      Q      How did you know Eric Morro?

10     A      He was a friend.  I grew up with him.

11     Q      I want to direct your attention specifically
12 back to February 3rd of 1993, a little after 6:00 in
13 the evening, did you have occasion to be at a bar,
14 Wally's Bar over on Belmont Avenue, 3017?

15     A      Yes.

16     Q      Why did you go to Wally's Bar?

17     A      To get money from my mother.

18     Q      Did your mother work there?

19     A      No.

20     Q      Was she in there at that time?

21     A      Yes.

22     Q      When you went into the bar did you get the
23 money from your mother?

24     A      Yes.

JIM03016

R-79

1      Q      How long were you in the bar?

2      A      For about five minutes.

3      Q      Did you have anything to drink while you were

4   in the bar?

5      A      No.

6      Q      After you left Wally's Bar what did you do?

7      A      Went across the street and was talking to

8   Phil.

9      Q      When you say you were talking to Phil, would

10  that be Phillip Torres?

11     A      Yes.

12     Q      Where was Phil?

13     A      Up in his third floor window.

14     Q      Does he live right across the street from

15  Wally's?

16     A      Almost.

17     Q      Who were you with at that time?

18     A      My daughter.

19     Q      That would be your four-year-old daughter,

20  Jackie?

21     A      Uh-huh.

22     Q      You said you were talking to Phil?

23     A      Yes.

24     Q      You said Phil was out of his window?

JIM03017

R-80

```
1      A    Yeah.  He was hanging out his window.

2      Q    What story or what floor window was that?

3      A    Third floor.

4      Q    Where were you at when you were talking to

5    Phil?

6      A    Right in front of his house.

7      Q    As you were talking to Phil what happened?

8      A    My mom called my name.

9      Q    When your mother called your name where was

10   she?

11     A    In the middle of Belmont.

12     Q    Why did she call your name?

13     A    Because I forgot my radio in the bar.

14     Q    Now, as your mother called your name what

15   happened next?

16     A    I saw Eric taking a swing at somebody.

17     Q    You say you saw him taking a swing at

18   somebody, do you see that someone in court today?

19     A    Uh-huh.

20     Q    Please look around the courtroom and identify

21   him?

22     A    He's right over there in the blue jacket.

23   (Indicating.)

24          THE COURT:  Indicating for the record
```

JIM03018

R-81

1    Thaddeus Jimenez.

2    BY MR. GAUGHAN:

3        Q    Now, when you say you saw Eric taking a

4    swing, was there anybody else out there with Eric and

5    the defendant?

6        A    Yes.

7        Q    Who else was out there?

8        A    Larry Tueffel and another kid.

9        Q    Did you know who the other kid was?

10       A    No.

11       Q    Had you ever seen the defendant before that

12   day?

13       A    No.

14       Q    Now, when --

15       THE COURT:  Just a moment.  Go ahead.

16   BY MR. GAUGHAN:

17       Q    Where exactly was Eric, the defendant and the

18   other guy at?

19       A    In front of Honey Baked Ham.

20       Q    Was there anybody else with them?

21       A    I don't know.

22       Q    Well, how many people were out there?  Think

23   back then.

24       A    Four.

JIM03019

R-82

1       Q      Okay.  So there was four people.  So there

2   was Eric --

3       A      Larry, him and another kid.

4       Q      Who is Larry?

5       A      Eric's friend.

6       Q      All right.  Now, all four of them were near

7   the Honey Baked Ham?

8       A      Uh-huh.

9       Q      When you say that you saw --

10      A      I think.

11      Q      I'm sorry?

12      A      Yeah.

13      Q      When you say you saw Eric take the swing what

14  exactly did you observe?

15      A      Eric taking the swing and the one kid grabbed

16  Eric's arm.

17      Q      When you say the one kid, who are you

18  referring to?

19      A      Victor Romo.

20      Q      The person whose name you know now to be

21  Victor Romo?

22      A      Yes.

23      Q      It wasn't Larry?

24      A      No.

JIM03020

R-83

```
1       Q     It wasn't the defendant?

2       A     No.

3       Q     It was the other kid that was out there?

4       A     Uh-huh.

5       Q     The person you now know to be Victor Romo

6    took Eric, what happened next?

7       A     He pulled out a gun --

8       Q     You have to speak up.

9       A     He pulled out a gun and put it to Eric's

10   chest and shot him.

11      Q     When you say he pulled out a gun, who are you

12   referring to?

13      A     T. J.

14      Q     When he pulled out the gun where did he put

15   it?

16      A     To Eric's chest.

17      Q     After he pulled out the gun and put it to

18   Eric's chest and shot him what happened?

19      A     Eric came stumbling towards us.

20      Q     When you say towards us, who are you

21   referring to?

22      A     My daughter and my mother.

23      Q     And yourself?

24      A     Uh-huh.
```

JIM03021

R-84

1      Q     And when Eric came stumbling towards you what

2   did you do?

3      A     He said he'd been shot.  I told my daughter

4   to go upstairs to Phil's house so she got off the

5   street so nothing happened to her, Eric fell to the

6   ground and called an ambulance.

7      Q     Did the ambulance eventually arrive?

8      A     Yes.

9      Q     Did the ambulance take Eric to Illinois

10  Masonic Hospital?

11     A     Yes.

12     Q     Did you eventually go to Illinois Masonic

13  Hospital?

14     A     Yes.

15     Q     Did you ever talk to any police that night at

16  the hospital?

17     A     No.

18     Q     Do you know whether or not the police had

19  your name as a witness in this?

20     A     Yes.

21        MR. CHARLES MURPHY:  Objection.

22        THE COURT:  All right.  Overruled.  She can

23  answer that yes or no.  The answer is yes.  Next

24  question.

JIM03022

R-85

BY MR. GAUGHAN:

Q     Were you aware if your mother had talked to the police?

A     Yes.

Q     Why didn't you talk to the police while you were at the hospital?

A     Because I wasn't feeling well.

Q     What exactly were you doing?

A     I was in the bathroom throwing up.

Q     Why were you throwing up?

A     Because I was pregnant and upset.

Q     Upset because you had just witnessed your friend gunned down on the street?

A     Yes.

Q     Now, later on that morning -- Are you okay?

A     Uh-huh.

Q     Later that morning did you receive a phone call from the police?

A     Yes, I did.

Q     Was that at your home?

A     Yes.

Q     Incidentally where did you live at that time?

A     I don't remember the address.  It was on Neenah.

JIM03023

R-86

```
1        Q    Who did you live with?

2        A    My boyfriend and my daughter.

3        Q    So you weren't living with your mother at

4   that time?

5        A    No.

6        Q    Did the police call and specifically ask for

7   you?

8        A    Yes.

9        Q    Why did they call you?

10       A    To go to the station and look at a lineup.

11       Q    Were arrangements at that time made for you

12   to view a lineup that following morning on

13   February 4th at 10:00 o'clock?

14       A    Yes.

15       Q    And at 10:00 o'clock that morning,

16   February 4th did you go to Area Five, Violent Crimes

17   at Grand and Central?

18       A    Yes.

19       Q    When you went to Area Five, Violent Crimes

20   how did you get there?

21       A    My mom drove me.

22       Q    When you arrived at the area did you in fact

23   view a lineup?

24       A    Yes, I did.
```

JIM03024

R-87

1          Q     When you viewed that lineup did you pick

2     anybody out in the lineup as the person who shot your

3     friend, Eric Morro?

4          A     Yes.

5              MR. GAUGHAN:  May I approach the witness,

6     your Honor?

7              THE COURT:  Sure.

8     BY MR. GAUGHAN:

9          Q     Tina, I'm going to show you what I've marked

10    as People's Exhibit No. 11 for purposes of

11    identification.  Do you recognize what that photograph

12    shows?

13         A     The lineup.

14         Q     Does that photograph accurately show the way

15    the lineup looked when you viewed it back on

16    February 4th of 1993?

17         A     Yes.

18         Q     I'm going to ask you to take this red marker

19    and put an X above the head of the person you picked

20    out as the person who shot your friend Eric Morro?

21         A     (Indicating.)

22              MR. GAUGHAN:  Judge, indicating for the

23    record the witness has placed an X over Thaddeus

24    Jimenez, the second person from the left over.

JIM03025

R-88

```
 1              THE COURT:  All right.

 2    BY MR. GAUGHAN:

 3         Q    I'm also going to show you what I've marked

 4    as People's Exhibit No. 12 for identification.   What

 5    does that photograph show?

 6         A    The person who shot Eric.

 7         Q    That's an individual photo?

 8         A    Uh-huh.

 9         Q    And does that photograph accurately show the

10    way the defendant looked back on February 4th when you

11    viewed him in a lineup?

12         A    Uh-huh.

13         Q    Now, Tina, when you were viewing the lineup

14    there was five people in the lineup; is that correct?

15         A    Yes.

16         Q    Did the police ask each one of the five

17    people to do anything?

18         A    To put a jacket on.

19         Q    When they -- How did they ask each one in the

20    lineup to do that?

21         A    They just passed the jacket down.

22              THE COURT:  Please, Miss Elder, keep your

23    voice up.

24              THE WITNESS:  One put it on then they took it
```

JIM03026

R-89

1    off, they stepped up, I looked at them, then took it

2    off, passed it down the line.

3    BY MR. GAUGHAN:

4        Q    So each of the five put the jacket on?

5        A    Uh-huh.

6        Q    I'm going to show you what I have marked as

7    People's Exhibit No. 13 for identification.   What does

8    that photograph show?

9        A    Him with the jacket on.

10       Q    When you say him, are you referring to the

11   defendant?

12       A    Yes.

13       Q    Does that photograph accurately show the way

14   the defendant looked when he put on that jacket?

15       A    Yes.

16       Q    Is that the same jacket that each of the

17   other people in the lineup also put on when you viewed

18   it?

19       A    Yes.

20       MR. GAUGHAN:   Judge, I'd ask that the

21   identification marks be stricken, that the photographs

22   be admitted into evidence.

23       THE COURT:   Mr. Charles Murphy, any objection

24   at this time?

JIM03027

R-90

1      MR. CHARLES MURPHY:  No.

2          THE COURT:  All right.  The exhibits are

3  admitted into evidence.

4  BY MR. GAUGHAN:

5      Q    Tina, would a diagram assist you in

6  explaining to the ladies and gentlemen of the jury

7  what you've just testified in terms of what happened

8  out on the street that day?

9      A    Yeah.

10     Q    I'm going to ask you to step down in the well

11 of the courtroom here.

12         THE COURT:  Miss Elder, please stand to the

13 side so the jurors can see it.  Thank you.

14 BY MR. GAUGHAN:

15     Q    I'm showing you what's previously been marked

16 as People's Exhibit No. 7.  Is that a diagram of the

17 area of 3018 West Belmont?

18     A    Yes.

19     Q    Okay.  Now I'm going to ask you first to

20 point out where on the diagram Wally's is at where you

21 went in to see your mother and get money?

22     A    Right here.  (Indicating.)

23     Q    It says Wally's 3017.  I'm going to ask you

24 to take this red marker and draw a line from Wally's

JIM03028

R-91

1    to where you were standing when you first saw the

2    defendant struggling with your friend, Eric Morro?

3         A    (Indicating.)

4         Q    Okay.  Now right -- You drew that line across

5    the street -- Indicating for the record she drew the

6    line across the street to 3012 West Belmont?

7              THE COURT:  The record will so reflect.

8    BY MR. GAUGHAN:

9         Q    3012 West Belmont, is that Phil Torres'

10   house?

11        A    Yes.

12        Q    It would be the third story that you

13   testified to earlier that he was leaning out talking

14   to you?

15        A    Yes.

16        Q    I want you to take a circle and just mark in

17   a circle the area where the four individuals, the

18   defendant, Eric Morro, Larry Tueffel and the person

19   with the defendant were when you looked over and saw

20   the defendant shoot Eric Morro?

21        A    (Indicating.)

22        Q    And then I'm going to ask you to take an X

23   and mark where your mother was when she called you?

24        A    (Indicating.)

JIM03029

R-92

1          MR. GAUGHAN:  You can be seated.

2     BY MR. GAUGHAN:

3          Q     Tina, before February 3rd of 1993 had you

4     ever seen the defendant before?

5          A     No.

6          Q     Had you ever seen the person who you now know

7     to be Victor Romo before February 3rd of 1993?

8          A     No.

9          MR. GAUGHAN:  Judge, I have no further

10    questions.  I ask that the photographs be published to

11    the jury.

12          THE COURT:  Any objection, Mr. Murphy, at

13    this time?

14          MR. CHARLES MURPHY:  No.

15          THE COURT:  Publishing is just a fancy word

16    it just means you can look at the photographs now.  I

17    would point out in regard to the exhibits referred to

18    during the course of the trial so far most likely

19    you'll get to see the vast majority of them during

20    deliberations also.

21               Mr. Gaughan, I think the jurors are done

22    with the photos.

23          MR. GAUGHAN:  I have no further questions,

24    your Honor.

                                        JIM03030

                              R-93

1    THE COURT:  All right.  Mr. Murphy.

2     CROSS-EXAMINATION

3    BY MR. CHARLES MURPHY:

4   Q Miss Elder, at the time that the shooting

5 took place, if I understand your testimony correctly,

6 you were talking with Phil Torres first of all; is

7 that correct?

8   A Yes.

9   Q And you were standing there on the sidewalk

10 in front of 3018 West Belmont?

11   A Yes.

12   Q So you were directly below him looking up

13 what about twenty-five feet or so?

14   A Yes.

15   Q Something attracted your attention to an

16 event that was taking place to your left, in other

17 words to your west; is that correct?

18   A Yes.

19   Q When you turned your head and saw the four

20 people that you testified to is the first thing that

21 you saw Eric taking a swing?

22   A Yes.

23   Q Do you recall what it was that prompted you

24 to turn to your head to the left?

                 JIM03031

             R-94

1       A    My mother called me.

2       Q    So it wasn't anything that you heard coming

3   from where the men were, it was rather the sound that

4   your mother made when she called your name?

5       A    Right.

6       Q    When you turned your head to the left you

7   would then be looking at what four people, three of

8   whom you did not know?

9       A    I knew two of them.

10      Q    You knew Larry Tueffel?

11      A    Correct.

12      Q    And you knew Eric Morro?

13      A    Correct.

14      Q    The other two men when you turned your head

15  to the left were perfect strangers to you?

16      A    Right.

17      Q    At the time you turned your head to the left

18  and saw Eric swing, did Eric swing with his right

19  hand, his right fist?

20      A    I don't know.

21      Q    Did he swing at a man who wound up shooting

22  him or did he swing at the man who was with him?

23      A    Who shot him.

24      Q    Did he hit the man who shot him?

JIM03032

R-95

1        A    No.

2        Q    How far away from each other were the two men

3   at that point.

4        A    A little more than arm's reach.

5        Q    In regard to how far away you were, you were

6   further away from the four men than I am from you

7   right now, aren't you?

8        A    A little bit.  Not too much.

9        Q    Would you estimate -- Close to the inner or

10  the outer door?

11       A    The outer door.

12            THE COURT:  You mean the wooden door?

13            THE WITNESS:  Yeah.

14  BY MR. CHARLES MURPHY:

15       Q    The outer door to the courtroom, correct?

16       A    Correct.

17            MR. CHARLES MURPHY:  Give me one second,

18  judge.

19  BY MR. CHARLES MURPHY:

20       Q    That's fourteen paces I took.  You were

21  approximately forty-five feet away from where the four

22  men were?

23       A    Yes.

24       Q    When Eric took the swing the next thing that

JIM03033

R-96

1     happened is that a gun came from somewhere?

2       A    The one boy pushed Eric back and then Eric

3   was shot.

4       Q    Am I correct that when Eric took the swing at

5   the first boy that boy did not have anything in his

6   hand, did he?

7       A    Not that I know of.

8       Q    You could see his hands from where you were,

9   couldn't you?

10      A    Uh-huh.

11      Q    So it was the second boy who then pushed Eric

12   up against the wall?

13      A    He grabbed his arm and pulled him back.

14      Q    And then a shot was fired?

15      A    Correct.

16      Q    Within a second?

17      A    A second.

18      Q    And then the two men who you had never seen

19   before turned and ran away from you, didn't they?

20      A    Ran west.

21      Q    Ran away from you?

22      A    Uh-huh.

23      Q    Would I be correct then that you looked in

24   the direction of the two men who you did not know

JIM03034

R-97

1    before they turned and ran for two or three seconds?

2        A    Yes.

3        Q    It happened very fast, didn't it?

4        A    Yes.

5        Q    Once the two men who you did not know turned

6    and ran did you ever see them again that night?

7        A    No.

8        Q    And when they turned and ran of course their

9    backs were now facing in your direction; is that

10   correct?

11       A    Correct.

12       Q    Did you see where they ran to?

13       A    To Whipple Street.

14       Q    That's the next block west?

15       A    Correct.

16       Q    When they got to Whipple could you see what

17   they did?

18       A    No.

19       Q    Did you see both of the two men who you did

20   not know struggling with Eric?

21       A    Just Eric taking the swing.

22       Q    Is the only contact, physical contact I'm

23   talking about between the men, the contact that took

24   place by fellow number two when he grabbed Eric's arm,

JIM03035

R-98

1    is that the only physical contact that you saw?

2        A    That and when he put the gun to his chest.

3        Q    I understand but there was no kicking, no

4    second punch, nothing of that nature?

5        A    No.

6        Q    When you went to the lineup on February 4th

7    at the police station and when you got to the lineup

8    at the police station did you meet a detective who was

9    running or in charge of that lineup?

10       A    Yes.

11       Q    Do you remember his name?

12       A    No.

13       Q    Was it Bogucki?

14       A    Yeah.  I think so.

15       Q    Did he lead you to believe that one of the

16   offenders was going to be in the lineup that you were

17   about to view?

18       A    No.

19       Q    Did anyone, I'm speaking of police officers,

20   lead you to believe that one of the suspects was going

21   to be in the lineup that you were going to view?

22       A    No.  They just told me to look at a lineup.

23       Q    You testified in prior court proceeding on

24   September 30, 1994, did you not?

JIM03036

R-99

1    A    Yes.

2    Q    It was right here at 26th Street; is that

3    correct?

4            MR. GAUGHAN:  Page?

5            MR. CHARLES MURPHY:  Forty-one.

6    BY MR. CHARLES MURPHY:

7    Q    And were you asked this question and did you

8    give these answers:  When they contacted you and asked

9    you to view a lineup you knew it was in regards -- And

10   you said I knew it was in regards to, yes.  And then

11   you were asked and then they gave you the indication

12   that they might have the person; is that right?  And

13   you said I guess.  Do you remember that?

14   A    No.

15   Q    Is it your testimony here today that the

16   second person who you saw that you did not recognize

17   grabbed Eric before Eric was shot?

18   A    Yes.

19   Q    Do you remember testifying again at a prior

20   court proceedings on May 7th of 1993, page

21   sixty-seven, at Juvenile Court?

22   A    Yes.

23   Q    And again you were under oath and you were

24   asked questions about this incident; is that correct?

**JIM03037**

R-100

```
 1          A    Yes.

 2          Q    Do you recall these questions and these

 3     answers?

 4          A    Not really.  I don't remember.

 5          Q    I'll read it to you.

 6               THE COURT:  Wait until he asks you the

 7     questions, Miss Elder.  Thank you.

 8     BY MR. CHARLES MURPHY:

 9               "Q    Did Mr. Morro throw the punch with his

10                     right arm or his left arm?"

11                     You said "his right."

12               "Q    That was the same hand that the second

13                     individual grabbed, wasn't it?

14                     And you responded "but he didn't grab

15                     him until like after the shot went off."

16                     Do you remember that answer given

17     by you?

18          A    No.  It was all at the same time.

19          Q    And then the question was asked of you right

20     after that:  "He didn't grab him until after the shot

21                     went off."

22                     And you said "right."

23                     Do you remember that?

24          A    No.
```

JIM03038

R-101

1    Q    Miss Elder, do you know what Jeri Curls are?

2    A    No.

3    Q    Miss Elder, again you testified here in this

4    building in prior court proceedings on September 30,

5    1994; is that right?

6    A    Yes.

7    Q    When you testified then you testified about

8    the very same lineup that you observed that you just

9    testified to here today; is that correct?

10    A    Uh-huh.

11    Q    And here today you testified that when you

12    viewed the lineup the police detectives had each of

13    the people in the lineup put on a jacket and then move

14    the jacket down one at a time; is that correct?

15    A    Correct.

16    Q    When you testified during a prior court

17    proceeding did you ever mention anything about the

18    detectives putting a jacket, one jacket, on each

19    person in the lineup?

20    MR. JOHN MURPHY:  Objection.

21    THE COURT:  Form of the question.  Sustained.

22

23

24

JIM03039

R-102

BY MR. CHARLES MURPHY:

Q   Did you testify on September 30th I believe
it was of 1994 when you testified about the lineup
that you observed that a jacket was placed on each of
the individual suspects?

MR. JOHN MURPHY:  Objection.

THE COURT:  If you have a specific question
to ask her you can ask her that but sustained.

BY MR. CHARLES MURPHY:

Q   When you testified on that date you were
shown a photograph of the lineup, were you not?

A   Yes.

Q   The same photograph, was it not, that was
just handed to you a moment ago; is that correct?

A   Yes.

Q   Meaning People's Exhibit No. 11, correct?

A   Yes.

Q   When you were shown a photograph of the
lineup, page thirty-six, you were asked first of all
to place an X over the head of someone in this
photograph, were you not?

A   Uh-huh.

MR. GAUGHAN:  Objection, judge.  I'd ask for
a side bar.

JIM03040

R-103

SA678

1                THE COURT:  No.  Overruled.  The answer was

2       uh-huh.  Please answer yes or no, Miss Elder.

3                THE WITNESS:  Sorry.

4                THE COURT:  Go ahead.

5       BY MR. CHARLES MURPHY:

6            Q    Then you were asked what's that a photograph

7                 of.

8                 And you said the shooter.

9            "Q    When you say the shooter are you

10                 referring to the shooter, the person who

11                 shot Eric Morro on February 3rd?

12                 Yes."

13                 Then the question was asked:  "Do

14                 these pictures accurately depict the way

15                 the shooter looked when you viewed him

16                 on February 4th of 1993?

17                 And you said "Besides he had the jacket

18                 on."

19                 Do you remember that?

20           A    No.

21           Q    My client is not depicted in this photograph

22       with the jacket on, is he?

23           A    No, he doesn't.

24           Q    When you were testifying here on

JIM03041

R-104

SA679

1    September 30, 1993 and you were shown this photograph

2    and you said "besides he had the jacket on," you're

3    talking about the same lineup, aren't you?

4              MR. GAUGHAN:  Objection.

5              THE COURT:  Do you understand the question?

6              THE WITNESS:  Not really.

7              THE COURT:  Okay.

8    BY MR. CHARLES MURPHY:

9        Q    How many lineups did you see?

10       A    One.

11       Q    You're talking about -- You were talking

12   about the same lineup then that you're talking about

13   here today?

14       A    Right.

15       Q    Correct?

16             MR. GAUGHAN:  Objection, judge.

17             THE COURT:  Overruled.  Her answer is

18   correct.  Next question.

19             MR. CHARLES MURPHY:  I have nothing else of

20   the witness.

21             THE COURT:  Anything else, Mr. Gaughan?

22             MR. GAUGHAN:  Very briefly, judge.

23             THE COURT:  Sure.

24

JIM03042

R-105

1        REDIRECT EXAMINATION

2        BY MR. GAUGHAN:

3        Q    Miss Elder, when you went down on February --

4    the day after this, February 4th, you knew you were

5    going to view a lineup, right?

6        A    Yes.

7        Q    And you knew it was in relation to this

8    murder, right?

9        A    Yes.

10       Q    When you were testifying -- You knew why you

11   were going down but nobody -- did anybody indicate to

12   you one way or another who the person was in the

13   lineup that did the shooting?

14       A    No.

15       Q    And as a matter of fact the other person that

16   was with the defendant you never identified him,

17   right?

18       A    No.

19       Q    And in fact you told the police you couldn't

20   identify him, right?

21       A    Correct.

22       Q    The reason you did that was because the only

23   person you saw well enough to identify was the

24   defendant; is that correct?

JIM03043

R-106

1    A    Correct.

2    Q    So you never identified the codefendant in

3 this case?

4    A    No.

5    Q    And you told the police that you couldn't,

6 correct?

7    A    Correct.

8    MR. GAUGHAN:  Nothing further judge.

9    THE COURT:  Mr. Murphy.

10                RECROSS-EXAMINATION

11            BY MR. CHARLES MURPHY:

12    Q    Miss Elder, you just said no one assisted you

13 or told you who to pick out of the lineup; is that

14 correct?

15    A    Correct.

16    Q    You know Phil Torres very well, do you not?

17    A    He's a friend.

18    Q    He's the same Phil Torres who you were

19 talking to when he was looking out the third floor

20 window at the time this incident took place; is that

21 correct?

22    A    Right.

23    Q    How long has he been a friend of yours?

24    A    Twenty years.

JIM03044

R-107

1      Q    Is he still a friend of yours?

2      A    Yes.

3      Q    The incident happened at 6:30 p.m. on

4 February 3rd; is that correct?

5      A    Correct.

6      Q    You did not talk to the police at the scene

7 of the shooting; is that correct?

8      A    Correct.

9      MR. GAUGHAN:  Objection.  Beyond the scope.

10      THE COURT:  It may be slightly but overruled.

11 Go ahead.

12 BY MR. CHARLES MURPHY:

13      Q    Is that correct?

14      A    Correct.

15      Q    Phil Torres was at the scene of the shooting;

16 is that correct?

17      A    Correct.

18      Q    You say you were at the hospital later that

19 evening but you didn't talk to the police then; is

20 that correct?

21      A    Correct.

22      Q    Did you talk to Phil Torres the night of

23 February 3rd of 1993?

24      A    No.  I didn't see Phil until the next day.

JIM03045

R-108

1      Q    Do you know -- Did you know his telephone

2  number?

3      A    He didn't have a phone.

4      Q    Did he know your telephone number?

5      A    I don't know.

6      Q    He's been a friend of yours for twenty years,

7  had he ever called you at home?

8      A    I just moved the day before --

9           MR. GAUGHAN:  Objection.

10          THE COURT:  Overruled.  Finish your answer.

11  Please keep your voice up, Miss Elder.  What did you

12  say?

13          THE WITNESS:  I just moved.  I don't know if

14  he had my phone number.

15  BY MR. CHARLES MURPHY:

16     Q    Did your mother know your phone number?

17     A    Yes.

18     Q    Is your mother a friend of Phillip's?

19     A    Yeah.

20          MR. CHARLES MURPHY:  I have nothing else.

21          MR. GAUGHAN:  No questions.

22          THE COURT:  You can step down, Miss Elder.

23  Thank you very much.

24               (Witness excused.)

                                        JIM03046
                     R-109

```
 1                    (Witness sworn.)

 2            THE COURT:  Have a seat.  Keep your voice up.

 3    Wait until the lawyers finish the questions before you

 4    start to answer.  Thank you.

 5                    PHILLIP TORRES,

 6    called as a witness on behalf of the People of the

 7    State of Illinois, having been first duly sworn, was

 8    examined and testified as follows:

 9                    DIRECT EXAMINATION

10                 BY MR. JOHN MURPHY:

11        Q    Phillip, if I could ask you to really try and

12    keep your voice up?

13        A    Yes, sir.

14        Q    Would you please state your name, spell your

15    first and last name for the court reporter.

16        A    Phillip Torres.  First name P-h-i-l-l-i-p,

17    last name Torres, T-o-r-r-e-s.

18        Q    And what area do you live in at this time,

19    Phil?

20        A    Chicagoland.

21        Q    And who do you live with?

22        A    My wife and three kids.

23        Q    Now, Phil, before I ask you about February 3,

24    1993, I want you to tell a little bit about your
```

JIM03047

R-110

1    background.  Phil, back in February of '93, during

2    that time period did you use drugs?

3        A    Yes.

4        Q    What drugs did you use?

5        A    Marijuana.

6        Q    And could you describe how often did you use

7    marijuana?

8        A    Couple times a week.

9        Q    And in the recent past have you used drugs?

10       A    Yes.

11       Q    What have you used in the recent past?

12       A    Marijuana.

13       Q    And how often?

14       A    Twice a week.

15       Q    Now, Phil, have you been convicted of any

16   felony offenses?

17       A    Yes.

18       Q    Would that be possession of cannabis with

19   intent to deliver?

20       A    Yes.

21       Q    And approximately when were you convicted?

22       A    (No response.)

23       Q    Do you remember the exact date?

24       A    No, I don't.

JIM03048

R-111

1    Q    Would that be August 10th of 1987?

2    A    That sounds correct.

3    Q    Was it in August of '87?

4    A    Yes.

5    Q    Now, Phil, I'd like to take you back to the

6    date of February 3, 1993, where were you living at

7    that time?

8    A    3012 West Belmont.

9    Q    Who did you live there with?

10   A    My wife and two kids.

11   Q    Which side of Belmont did you live on?

12   A    The north side.

13   Q    And were you familiar at that time with a

14   business that is called Honey Baked Ham on Belmont

15   Avenue?

16   A    Yes, sir.

17   Q    How far were you from Honey Baked Ham?

18   A    There's an empty lot and then my apartment.

19   My apartment, the empty lot and Honey Baked Ham.

20   Q    On February 3, 1993 you testified that you

21   lived in an apartment; is that right?

22   A    Correct.

23   Q    What floor did you live on?

24   A    Third floor, attic.

JIM03049

R-112

1        Q       Just before 6:30 in the evening on that date

2    do you remember where you were at?

3        A       Yes.  Looking out my front room window.

4        Q       Who were you with?  Who else was in your

5    apartment?

6        A       My wife, my kids and Johnny Elder, a friend.

7        Q       And what is the relationship between Johnny

8    Elder and Tina Elder?

9        A       Brother and sister.

10       Q       And you know somebody by the name of Sandra

11   Elder?

12       A       That's their mother.

13       Q       Now, you said you were at a window; is that

14   correct?

15       A       Correct.

16       Q       What window were you at?

17       A       My front room window.

18       Q       And what street does that face?

19       A       Belmont, facing south.

20       Q       How many windows did you have at the front of

21   your apartment on February 3, 1993?

22       A       Three.

23       Q       And which window were you looking out?

24       A       The closest one to Honey Baked Ham.

JIM03050

R-113

1          Q     That would be the one on the far west part of

2     the building?

3          A     Correct.

4          Q     Could you describe the way you were looking

5     out the window just before 6:30?

6          A     Just like this.  (Indicating.)

7               MR. JOHN MURPHY:  For the record, judge, the

8     witness has leaned forward on the witness stand.

9               THE COURT:  Your elbows were on the window

10     sill and you were leaning out?

11              THE WITNESS:  Correct.

12              THE COURT:  Okay.

13     BY MR. JOHN MURPHY:

14          Q     How far was your body out the window?

15          A     To right here.  (Indicating.)

16              THE COURT:  To about your waist?

17              THE WITNESS:  Yes.  It's a low window sill

18     because it's an attic.

19              THE COURT:  Keep your voice up, Mr. Torres,

20     and speak to the jurors.  Go ahead.

21     BY MR. JOHN MURPHY:

22          Q     As you were looking out the window did you

23     see anybody initially that you knew?

24          A     Yes, I did.

JIM03051

R-114

1    Q    Who was that?

2    A    Tina, her mother.

3    Q    Where did you see Tina?

4    A    Coming from the bar across the street.

5    Q    And when you saw Tina what did you do with

6    respect to Tina?

7    A    I was talking to her.

8    Q    Where was Tina at in relation to where you

9    were at?

10   A    Coming towards my house from across the

11   street.

12   Q    Now, while you were talking to Tina did you

13   see anybody else out in the area of Belmont besides

14   Tina and her mother?

15   A    Yes, I did.

16   Q    Who else?

17   A    Larry Tueffel and Eric Morro.

18   Q    Did you -- Where did you see Eric Morro and

19   Larry Tueffel?

20   A    Walking eastbound on Belmont coming towards

21   my apartment building.

22   Q    Were they on the north side of the street or

23   the south side of Belmont?

24   A    North side.

JIM03052

R-115

1    Q    How long had you known Eric Morro before

2  February 3, 1993?

3    A    About eight years.

4    Q    And what was your relationship to him?

5    A    Friend.

6    Q    How long had you known Larry Tueffel before

7  February of 1993?

8    A    About three years.

9    Q    And what was your relationship to him?

10    A    Friends.

11    Q    As -- You testified you saw them walking

12  together, is that right?

13    A    Correct.

14    Q    Did you see anybody else?

15    A    Yes, I did.

16    Q    Who else did you see?

17    A.    I seen two kids coming behind them going

18  eastbound too.

19    Q    And the two kids that you saw, were they on

20  the north side of the street when you saw them or were

21  they on the south side of the street?

22    A    The north side.

23    Q    And did you know any of these two kids?

24    A    Yes, I did.

JIM03053

R-116

```
 1         Q     Who did you know?

 2         A     T. J.

 3         Q     And do you see T. J. in court today?

 4         A     Yes, I do.

 5         Q     Could you please point to him and indicate

 6    what he's wearing?

 7         A     A blue suit and glasses.  (Indicating.)

 8               THE COURT:  Indicating for the record

 9    Thaddeus Jimenez.

10    BY MR. JOHN MURPHY:

11         Q     In February of 1993 how did you know the

12    defendant, by what name?

13         A     T. J.

14         Q     And do you remember what, if anything, he was

15    wearing when you saw him?

16         A     A Duke jacket.

17               THE COURT:  Say that again, please.

18               THE WITNESS:  A Duke jacket.

19    BY MR. JOHN MURPHY:

20         Q     What color was that Duke jacket?

21         A     Blue and white.

22         Q     Now you say you saw another kid; is that

23    right?

24         A     Yes, I did.
```

JIM03054

R-117

SA692

1     Q    Was that other kid walking separately from

2   the defendant or were they walking together?

3     A    Together.

4     Q    Did you know that other kid?

5     A    No.  No, sir.

6     Q.   Now, could you describe what you saw as you

7   leaned out the window of your apartment on February 3,

8   1993?

9     A    I seen the two kids coming from behind Larry

10  and Eric, the Hispanic kid grabbed Eric by his arm and

11  spun him around and threw him up against Honey Baked

12  Ham.

13    Q    Okay.  I'm going to stop you there for a

14  minute.  The kid who you described as a Hispanic kid

15  who grabbed him and threw him around, was that the

16  defendant or was that the other kid?

17    A    The other kid.

18    Q    And you said he threw him against Honey Baked

19  Ham; is that correct?

20    A    Correct.

21    Q    What happened after he threw him against

22  Honey Baked Ham?

23    A    Then I seen the other kid put his hand up to

24  Eric's chest and I heard a shot.

JIM03055

R-118

SA693

1      Q      Now, when you say the other kid, who you are
2  you talking about?
3      A      T. J.
4      Q      And where was his hand when you heard the
5  shot?
6      A      Right on his chest.
7      Q      Were you able to tell -- see whether or not
8  he actually had a gun in his hand at that time?
9      A      I can't really say I did.
10     Q      Okay.  But you saw his hand up near his
11  chest; is that right?
12     A      Correct.
13     Q      After you heard the shot did you see what the
14  defendant did?
15     A      Turned around and started running westbound
16  towards Whipple.
17     Q      Did he run on Belmont Avenue?
18     A      Correct.
19     Q      Did you see what the other kid who was with
20  him did?
21     A      He ran also the same direction.
22     Q      And did one run and then the other run or did
23  they run together?
24     A      Together.

JIM03056

R-119

1    Q    Did you see where they went when they got to

2    Whipple?

3    A    Northbound on Whipple.

4    Q    Now, Larry -- I'm sorry.  Phil, did you see

5    what happened to Eric after you heard the shot?

6    A    Yes.

7    Q    What did he do?

8    A    Started walking towards my apartment building

9    and he fell right there in Sandy's arms, Sandy Elder.

10    Q    Did the police arrive sometime after this?

11    A    Yes.

12    Q    And how would you describe your desire to

13    cooperate initially in this case?

14    A    I didn't want to.

15    Q    Why was that?

16    A    Fear.

17    Q    Now, Phil, did you in fact talk to the police

18    that night?

19    A    Yes, I did.

20    Q    Did you tell the police that the shooter was

21    T. J.?

22    A    Yes, I did.

23    Q    Okay.  Did you tell them that night when you

24    talked to them at the -- in the area where Eric was

JIM03057

R-120

1    shot?

2        A    No, I didn't.

3        Q    Why didn't you tell the police that T. J. was

4    the shooter or was the person who put his hand up to

5    Eric's chest?

6        A    I said to Larry when we were in the police

7    car that was T. J. and he told me, no, it wasn't but

8    that's because Larry was a Royal too.

9        Q    And what impact did that have on you?

10        A    I was nervous, scared.

11        Q    Now, when you say Larry was a Royal too, did

12    you know Larry Tueffel to be a member of the Simon

13    City Royals on that day?

14        A    Yes.

15        Q    You also said too -- Did you nobody else who

16    was out on the street on Belmont area to be a member

17    of the Simon City Royals on February 3, 1993?

18        A    Yes.

19        Q    Who was that?

20        A    T. J.

21        Q    Now, after you talked to the police in the

22    area of Belmont Avenue, in the area where Eric was

23    shot, did you also talk to the police later?

24        A    Yes.

JIM03058

R-121

```
 1        Q    In fact did you go to the police station?

 2        A    Yes, sir.

 3        Q    And even at the police station you did not

 4   give the police the name T. J.; is that correct?

 5        A    Correct.

 6        Q    Did you leave the police station at some

 7   point?

 8        A    Yes.

 9        Q    Where did you go?

10        A    To my mother's house.

11        Q    And did you -- What happened at your mother's

12   house?

13        A    I was talking with my brother and sister.

14        Q    Did you speak to a number of different people

15   in your family?

16        A    Yes.

17        Q    And after you spoke to the people in your

18   family could you describe what you did?

19        A    I went and called the police, the detective.

20        Q    Approximately what time did you call the

21   police?

22        A    About 1:00 in the morning.

23        Q    So this would have been on February 4, 1993;

24   is that right.
```

JIM03059

R-122

1      A      Correct.

2      Q      When you called the police did you talk to a

3  police officer?

4      A      Yes.

5      Q      What did you tell the police officer?

6      A      I told them I knew it was T. J.

7      Q      And what happened after you told the police

8  that?

9      A      They came to my mother's house.

10      Q      Did you give the police some information at

11  that time?

12      A      Yes.

13      Q      Now, Phil, I'd like to talk about a little

14  bit later on the same date, February 4th, the next

15  morning, did you go back to a police station again?

16      A      Yes, I did.

17      Q      Approximately what time did you go?

18      A      10:00 o'clock in the morning.

19      Q      Do you remember -- Where was that police

20  station at?

21      A      Grand and Central.

22      Q      Do you remember whether you saw anybody else

23  in the police station or you went with anybody else to

24  the police station that you knew?

1    A    Yes.

2    Q    Who was that?

3    A    Sandy Elder, Tina Elder, Larry Tueffel.

4    Q    Did you go with any of those people?  Do you

5    remember how you got there?

6    A    I believe I went with Sandy and Tina.

7    Q    And you saw Larry Tueffel there?

8    A    Yes.

9    Q    When you were at the police station at about

10    10:00 in the morning could you tell the ladies and

11    gentlemen of the jury what happened?

12    A    I viewed a lineup.

13    Q    Could you describe that lineup?

14    A    There was four males -- Five males.  I'm

15    sorry.

16    Q    When you viewed that lineup did you recognize

17    anybody?

18    A    Yes, I did.

19    Q    Who did you recognize?

20    A    T. J.

21    Q    When you recognized him what did you do?

22    A    I said that's him.

23    Q    When you viewed that lineup did you view the

24    lineup at the same time that Tina, Sandra and Larry

JIM03061

R-124

SA699

1    viewed the lineup or did you view it at different

2    times?

3         A    Separately.

4         Q    So when you were in looking at the lineup

5    were Tina, Sandra or Larry in the room with you?

6         A    No.

7         Q    And vice versa to your knowledge while you

8    were not in the room, you're not present when either

9    Tina, Sandra or Larry viewed the lineup as far as you

10   know; is that correct?

11        A    Correct.

12             MR. JOHN MURPHY:  May I approach, judge?

13             THE COURT:  Sure.

14             MR. JOHN MURPHY:  Counsel these are Exhibits

15   11, 12 and 13.

16   BY MR. JOHN MURPHY:

17        Q    I'm showing you what's been marked as

18   People's Exhibit No. 11, do you recognize what that

19   is?

20        A    Yes.

21        Q    What is that?

22        A    That's the lineup.

23        Q    Does that show the way the lineup appeared?

24        A    Yes.

JIM03062

R-125

1    Q    Do you see the person in the lineup that you

2    identified who you described as T. J.?

3    A    Yes.

4    Q    Where is he at?

5    A    The second from the left.

6    Q    Thank you.  Now showing you what's been

7    marked as People's Exhibit No. 12, what is that?

8    A    A single picture of T. J.

9    Q.    And finally People's Exhibit No. 13, can you

10    tell us what's shown in that photograph?

11    A    T. J. with the Duke jacket.

12    Q    How does the jacket that you see him wearing

13    there compare with the jacket that you saw the person

14    wearing who put his hand up to Eric Morro's chest when

15    you heard the shot?

16    A    The same jacket.

17    Q    When you viewed the lineup was there anything

18    of significance about that jacket that you remember?

19    A    It was brand new.

20    Q    Okay.  Let me rephrase the question.  When

21    the people who were in the lineup -- When you were

22    viewing the people in the lineup did the police have

23    them do something with that jacket?

24    A    Take it off and put it on.

JIM03063

R-126

1      Q     How many people -- Did everyone in that

2   lineup take that jacket and put it on at some point?

3      A     Yes.

4      Q     So you had an opportunity to view each of

5   these five individuals with the Duke jacket on; is

6   that correct?

7      A     Correct.

8      Q     Was there just one Duke jacket to your

9   knowledge that was at the police station?

10     A     Yes.

11     Q     There weren't five Duke jackets?

12     A     No.

13            MR. JOHN MURPHY:  Your Honor, may the witness

14   step down from the witness stand?

15            THE COURT:  Sure.  You can step down,

16   Mr. Torres.

17   BY MR. JOHN MURPHY:

18     Q     Phil, do you recognize, for the record this

19   is People's Exhibit No. 7, what this is a diagram of?

20     A     Yes.

21     Q     What is it?

22     A     Belmont Avenue, Honey Baked Ham, my

23   apartment.  Wally's is right there.  (Indicating.)

24     Q     Does that show -- Specifically does that show

JIM03064

R-127

SA702

1    the area where you were when you were in your

2    apartment?

3        A    Yes.

4        Q    I'm going to ask you if you would -- Could

5    you write your initials, Phil.  Would you like me to

6    do it?

7        A    I can do it.

8        Q    I'm going to give you this marker and if you

9    would place on the diagram your initials in the area

10    where you were when you heard the shot?

11        A    (Indicating.)

12        Q    And if you would, you testified that you were

13    talking to Tina just before you saw these guys; is

14    that right?

15        A    Yes.

16        Q    Where was Tina at and would you place the

17    initials T. E. where Tina was at when the shot went

18    off?

19        A    (Indicating.)

20        Q    Now, you testified that after you heard the

21    shot that the defendant and the other guy, the other

22    fella who was with him, went toward Whipple; is that

23    right?

24        A    Right.

JIM03065

R-128

1     Q    Could you show the ladies and gentlemen of

2  the jury the path they took on that diagram?

3     A    Turned around this way and ran around the

4  corner.

5     Q    Now, the area between the Honey Baked Ham

6  store and your apartment is there a structure there?

7     A    No.

8     Q    In February of 1993 was there a structure

9  there?

10     A    No.

11     Q    What was located there?

12     A    An empty lot.

13     Q    Was there anything obstructing your view of

14  the defendant and the other individuals, Eric Morro,

15  Larry Tueffel and the person who was with the

16  defendant when you heard the shot go off?

17     A    No.

18         MR. JOHN MURPHY:  Would you have a seat.

19  Thank you.  For the record, judge, I'm showing counsel

20  what has been marked as People's Exhibit No. 14.

21         THE COURT:  Okay.

22

23

24

JIM03066

R-129

1    BY MR. JOHN MURPHY:

2        Q    Phil, I'm showing you one last photograph,

3    People's Exhibit No. 14, do you recognize what's shown

4    in that photograph?

5        A    Yes, I do.

6        Q    Could you please describe to the ladies and

7    gentlemen of the jury what's in that photo?

8        A    My apartment building, the empty lot, Honey

9    Baked Ham, Belmont Avenue.

10       Q    Now, that particular photograph was taken

11   during daytime hours, is that right, not nighttime?

12       A    Correct.

13       Q    And that picture was not taken on or near the

14   date of February 3, 1993; isn't that correct?

15       A    Correct.

16       Q    Is there any difference in the way the

17   structures appear that are shown in that photograph

18   than the way they appeared on February 3, 1993?

19       A    Yes.

20       Q    And what is that?

21       A    My apartment building is remodeled.

22       Q    Other than that and other than the fact this

23   is a picture taken during daytime hours does this

24   picture truly and accurately show the area around

JIM03067

R-130

1    Belmont and Sacramento?

2        A    Yes.

3            MR. JOHN MURPHY:  Your Honor, I would ask

4    that this exhibit be admitted into evidence at this

5    time.

6            THE COURT:  Any objection Mr. Murphy?

7            MR. CHARLES MURPHY:  No.

8            MR. JOHN MURPHY:  I would ask that the

9    witness again be allowed to step down from the witness

10   stand.

11           THE COURT:  All right.  You can step down

12   again, Mr. Torres.

13           MR. JOHN MURPHY:  I ask that I be allowed to

14   publish this picture to the jury, your Honor.

15           THE COURT:  Sure.

16   BY MR. JOHN MURPHY:

17       Q    Phil, I'm going to hold the photo for you.

18   What I'd ask you to do is show the ladies and

19   gentlemen of the jury, if you could step back just a

20   little bit so everybody can see but give yourself a

21   chance to see it there, which apartment did you live

22   in at the time the shooting occurred?

23       A    Right here.  (Indicating.)

24       Q    This would be the top area; is that right?

JIM03068

R-131

1    A    Right.

2    Q    Does this area show where the shooting

3    occurred?

4    A    Yes.

5    Q    Where is the shooting shown in this

6    photograph?

7    A    Right here.  (Indicating.)

8    Q    It would be behind the area where the van is?

9    A    Right.

10    Q    You said your apartment was remodeled before

11    this picture was taken; is that right?

12    A    Right.

13    Q    How is this picture of your apartment

14    different, particularly with respect to the windows in

15    the front, than the way your apartment looked on

16    February 3, 1993?

17    A    It had three older windows but now they

18    remodeled it and made it newer, there's only two

19    windows and they slide.

20    Q    Despite the fact it's been remodeled you were

21    looking out of a window from the third floor from that

22    area of the apartment building; is that correct?

23    A    Correct.

24    Q    And by the way in this particular photograph

JIM03069

R-132

1    are there any streetlights depicted?

2        A    Excuse me?

3        Q    Are there any streetlights shown in this

4    photograph?

5        A    Yes, sir.

6        Q    Where is the streetlight in relation to your

7    Apartment?

8        A    Right in front.

9        Q    Was that street light there on the date of

10    February 3, 1993?

11        A    Yes, it was.

12        Q    It was nighttime, it was dark when the

13    shooting occurred; is that right?

14        A    Correct.

15        Q    How were the lighting conditions on Belmont

16    Avenue in the area where, Eric Morro, the defendant,

17    Larry Tueffel and this other person were when the

18    shooting occurred?

19        A    It was light.

20        MR. JOHN MURPHY:  Your Honor, I have no

21    further questions.

22        THE COURT:  Okay.  Mr. Charles Murphy.

23

24

JIM03070

R-133

SA708

1                    CROSS-EXAMINATION

2              BY MR. CHARLES MURPHY:

3         Q     Mr. Torres, when you viewed that lineup on

4    February 4th at the police station would I be correct

5    that you had absolutely positively no difficulty in

6    picking out my client's face out of a lineup because

7    you knew him, right?

8         A     Yes.

9         Q     How long had you known him?

10        A     A few years.

11        Q     As in three?

12        A     Maybe two.

13        Q     My client wasn't a friend of yours though,

14   was he? He was just someone that you knew?

15        A     Right.

16        Q     But you knew him well enough to know his

17   name?

18        A     Yes.

19        Q     On February 3rd?

20        A     Yes.

21        Q     Even though you had no difficulty picking him

22   out of the lineup apparently you did have difficulty

23   giving his name to police investigators who came to

24   the scene of the shooting; isn't that correct?

JIM03071

R-134

1    A.    Correct.

2    Q    The man who shot and killed Eric Morro you

3    said had been a friend of yours for eight years?

4    A    Right.

5    Q    You talked to a uniformed Chicago police

6    officer at the scene of the shooting the night of the

7    shooting, didn't you?

8    A    I believe I did.

9    Q    Do you remember if his name was Officer Ryan?

10    A    Yes.

11    Q    And Officer Ryan asked you, did he not, if

12    you could provide him with any information with regard

13    to the identity of the offenders who had done this to

14    your friend, he asked you, didn't he?

15    A    Yes, he did.

16    Q    And that's when you didn't say my good friend

17    was shot by someone who I know, T. J., you didn't say

18    that, did you?

19    A    No.

20    Q    You sat here today on the witness stand you

21    said that the reason or a reason that you didn't tell

22    the police investigators on the scene when it happened

23    that you knew it was T. J. is because you were afraid,

24    I heard you say that, didn't you?

JIM03072

R-135

SA710

1    A    Right.

2    Q    You also said on the witness stand that you

3    talked to police investigators sometime after 1:00

4    a.m. on November 4th about what you really did know,

5    right?

6    A    Right.

7    Q    You talked to Detective Bogucki about what

8    you really did know, didn't you, on February 4th?

9    A    Yes.

10    Q    You didn't tell Detective Bogucki when you

11    spoke to him about what you really knew, that the

12    reason you had been reluctant to disclose my client's

13    name was because you were afraid, you didn't mention

14    that, did you?

15    A    Yes.

16    Q    What you told Detective Bogucki, Mr. Torres,

17    was that the reason you didn't name my client was

18    because Larry Tueffel told you it wasn't T. J., that's

19    what you said; isn't it?

20    A    Right.

21    Q    So Larry Tueffel talked you out of

22    remembering what you saw?

23    A    No.

24    Q    When did Larry Tueffel tell you that it

JIM03073

R-136

1    wasn't T. J., at the scene of the shooting?

2        A    Correct.

3        Q    Where were you and Larry Tueffel when he told

4    you that it wasn't T. J.?

5        A    In the police car.

6        Q    When he told you that did you tell him you're

7    nuts, I know exactly who it was, it was T. J., did you

8    tell him that?

9        A    No, I did not say that.

10        Q    When you were talking to the officer did

11    Larry Tueffel at the scene tell the officer that it

12    was T. J., someone that he knew, did he do that?

13        A    I don't believe so.

14        Q    The officer asked him that question though,

15    didn't he?

16        A    I don't know.

17        Q    Weren't you angry that your friend had been

18    shot and killed just a short distance away from where

19    you live?

20        A    No.

21        Q    You weren't?

22        A    No.

23        Q    How long had you been living at 3012 West

24    Belmont as of February 3, '93?

JIM03074

R-137

SA712

1        A    Five years.

2        Q    And a friend of yours at that time was Tina

3    Elder; is that correct?

4        A    Correct.

5        Q    She's been a friend of yours virtually all of

6    her life, hasn't she?

7        A    Pretty much.

8        Q    In fact when the shooting took place her

9    brother was in your home, wasn't he?

10       A    Correct.

11       Q    When the shooting took place you were

12   actually talking to her, she's down below; isn't that

13   correct?

14       A    Correct.

15       Q    She was over at your place at 3012 West

16   Belmont frequently, she was a close friend; is that

17   correct?

18       A    Not like her brother was.  Her brother was

19   there more often.

20       Q    She had been at your home frequently

21   nonetheless, had she not, during the period of time

22   that you lived there?

23       A    A couple times, maybe.

24       Q    Two times.  Mr. Torres, am I correct that my

JIM03075

R-138

SA713

1    client, T. J., used to hang right there at that

2    corner, Belmont and Sacramento, didn't he?

3        A    Yes.

4        Q    Tina knew him, didn't she?

5        MR. JOHN MURPHY:  Objection to what another

6    witness knows or doesn't know.

7        THE COURT:  You can ask if he saw them

8    together or something.  So sustained.

9        THE WITNESS:  I can't say I do or I did.

10   BY MR. CHARLES MURPHY:

11       Q    Did you ever see my client on that corner a

12   short distance away from your house while Tina was

13   there?

14       A    The same day?

15       Q    Yeah -- Not that day, any day?

16       A    I can't say I have.

17       Q    You can't say you haven't, is that what

18   you're saying.

19       MR. JOHN MURPHY:  Objection.

20       THE COURT:  Overruled.  You can answer the

21   question if you understand what he just asked you.

22       THE WITNESS:  I'm sorry.  I did not

23   understand the question.

24       THE COURT:  Okay.  He didn't understand the

JIM03076

R-139

SA714

1    question.

2    BY MR. CHARLES MURPHY:

3        Q    You've said here today that you were finally

4    able to remember what you really saw after you spoke

5    with family members; is that correct?

6        A    Correct.

7        Q    What family members did you talk to that

8    helped you remember what you really saw?

9        A    My brother and my sister.

10       Q    Do you know someone by the name of Juan

11   Carlos Torres, T-o-r-r-e-s?

12       A    No, sir, I don't.

13       Q    Never heard the name?

14       A    No, sir, I have not.

15       Q    Well, your brother wasn't at the scene of the

16   shooting, was he?

17       A    No, he wasn't.

18       Q    No family member of yours was at the scene of

19   the shooting, were they, other than you?

20       A    Correct.

21       Q    After you talked to family members then you

22   remembered what you saw?

23       A    Correct.

24       Q    When you spoke to the beat officer, that's

JIM03077

R~140

1    the uniform officer at the scene of the shooting, did

2    you tell the beat officer that even though you didn't

3    know the name of the shooter you knew his face, did

4    you do that?

5         A    I'm sorry.  I do not remember.

6         Q    Did you testify in this building at a prior

7    court proceeding on September 30, 1994?

8         A    Yes.

9         Q    And you were asked questions about the same

10   incident, were you not?

11        A    Yes.

12        Q    Were you asked these questions and did you

13   give these answers:

14                  You say you knew T. J.?

15                  You said yes.

16                  He had been to your mother's house?

17                  You said yes.

18                  But when you talked to the police did

19                  you tell them the offender was T. J.

20                  when you first talk to them?

21                  You said no.

22                  Did you tell them that the offender had

23                  been to your mother's house?

24                  Yes, you said.

JIM03078

R-141

1          You were then asked you did when you

2          first talked to them?

3          And you said I believe so.

4     "Q   Well, when you first talked to them you

5          told them the defendant had been in your

6          mother's house?

7          You said he was there.

8     "Q   Now, you also told them the offender

9          knew your brother; isn't that right?

10         You said yes.

11         But you didn't tell them it was T. J.?

12         And you said not at that time, no.

13         MR. JOHN MURPHY:  Objection -- I'll withdraw

14    it.

15    BY MR. CHARLES MURPHY:

16       Q    Did that conversation, did those questions

17    and answers takes place when you testified here on

18    September 30, 1994?

19         MR. JOHN MURPHY:  Objection.

20         THE COURT:  I'll overrule.  The jurors

21    determine the impeaching effect of any witness's

22    testimony.  Overruled.

23         Do you recall being asked those

24    questions, Mr. Torres, and giving those answers?

JIM03079

R-142

1          THE WITNESS:  Yes.

2     BY MR. CHARLES MURPHY:

3          Q    So you do recall telling the finders of fact

4     in a prior court proceeding that you told police

5     investigators that the man who was the shooter you

6     knew him, he had been to your mother's house but you

7     didn't know his name, that's what you said, isn't it?

8          A    I don't remember.

9          Q    You said here today that you smoked marijuana

10    a couple times a week, right?

11         A    Correct.

12         Q    That was the same habit that you had back in

13    1993; is that correct?

14         A    Correct.

15         Q    But that felony conviction that you have

16    that's not for possession of marijuana, that's for

17    possession with the intent to sell it or deliver it;

18    is that correct?

19         A    Correct.

20         Q    The night of the shooting while you're still

21    at the scene of the shooting the police brought a

22    suspect back to Belmont and Sacramento and showed the

23    suspect to you, do you remember that?

24         A    Yes.

JIM03080

R-143

1        MR. GAUGHAN:  Objection.

2        THE COURT:  Overruled.

3  BY MR. CHARLES MURPHY:

4     Q   Do you remember that?

5     A   Yes.  They bring a few people.

6     Q   And one of the people they brought back for

7  you to view was your stepbrother?

8     A   No.

9     Q   Who is Shawn Cosmen?

10    A   That's my stepbrother.

11    Q   They didn't bring him back and show him to

12  you?

13    A   No, sir.

14    Q   You were right there with Larry Tueffel in a

15  police car after the shooting, correct?

16    A   Correct.

17    Q   Mr. Torres, if I understand what you're

18  saying correctly Larry Tueffel talked you out of

19  telling the police what you knew to be a fact, is that

20  what you're saying?

21        MR. GAUGHAN:  Objection.  Asked and answered.

22        THE COURT:  I'll let him answer again.

23  Overruled.

24        THE WITNESS:  He tried to throw me off, yes.

JIM03081

R-144

BY MR. CHARLES MURPHY:

1

2    Q    When the officer asked you for information
3    concerning identification aspects of the shooter you
4    did your level best, even though you didn't give a
5    name, to describe the person, didn't you?

6    A    Yes.

7    Q    You didn't say anything about the shooter
8    wearing a dark jacket, did you?

9    A    I believe I did.

10    Q    You told him, meaning the police investigator
11    at the scene, that the offender had on a purple jacket
12    with yellow lettering, didn't you?

13    A    No, sir, I did not.

14    Q    You didn't say that?

15    A    I did not.

16    Q    The jacket my client had on in the lineup was
17    a blue and white jacket; is that correct?

18    A    Correct.

19    Q    And you told the police investigator who
20    asked you for descriptive information at the scene of
21    the shooting that the offender had curly black hair,
22    didn't you?

23    A    No, sir, I did not.

24    Q    Then please correct me.  What did you tell

JIM03082

R-145

1   him about the shooter's identification aspects, his

2   height, weight, clothing, what did you say?

3        A    I remember saying he had spiked hair.

4        Q    We're talking about the shooter now, right,

5   the person you're saying is T. J.?

6        A    Correct.

7        Q    The police officer you were talking to, he

8   was writing the stuff down, wasn't he?

9        A    I can't really say he was.

10       MR. CHARLES MURPHY:  Nothing else.

11       THE COURT:  Mr. Murphy.

12       MR. JOHN MURPHY:  Thank you, judge.  Could I

13   have a moment?

14       THE COURT:  Sure.

15            REDIRECT EXAMINATION

16       BY MR. JOHN MURPHY:

17       Q    Now, Phil, let's talk about first of all the

18   questions -- do you remember the questions you were

19   asked about seeing the defendant at your mother's

20   house?

21       A    Yes.

22       Q    Now you had testified at another proceeding

23   in this building; is that correct?

24       A    Correct.

JIM03083

R-146

SA721

1     Q     Now, when you were testifying were you asked

2     questions about how you knew the Defendant T. J.?

3     A     Yes.

4     Q     And was one of the reasons that you knew the

5     name T. J. and knew who he was because he was at your

6     mother's house; is that right?

7     A     Correct.

8     Q     Now, when you said he was at your mother's

9     house did you testify that he was inside -- Let me

10    rephrase the question.

11         On that day was he inside your mother's

12    house or was he outside your mother's house?

13         MR. CHARLES MURPHY:  Objection, your Honor.

14    We have a transcript and it's leading as well.

15         MR. JOHN MURPHY:  Well, judge, I'm trying to

16    rehabilitate him.

17         THE COURT:  You can ask him where it was he

18    saw the defendant at his mother's house, inside or

19    out.  Overruled.

20         THE WITNESS:  Inside her house.

21    BY MR. JOHN MURPHY:

22    Q     Could you describe to the ladies and

23    gentlemen of the jury the circumstances under which

24    you saw T. J. in that instance?

JIM03084

R-147

SA722

1      A    He was there at my mother's house with

2    another group of kids.

3      Q    Okay.  And what happened when he was there?

4      A    My mother had me chase him out.

5      Q    Okay.  And from that instance as well as

6    others that is how you knew him, this person here

7    seated with the blue suit by the name of T. J.; is

8    that correct?

9      A    Correct.

10      Q    And when you testified before was that who

11    you were describing when you were testifying?

12      A    Yes.

13          MR. CHARLES MURPHY:  Objection.  We have the

14    transcript.

15          THE COURT:  That portion will be sustained.

16    The jurors heard the testimony about the previous

17    testimony, they'll determine what he's referring to.

18    Go ahead.

19    BY MR. JOHN MURPHY:

20      Q    Now, you testified that that evening just

21    after the shooting occurred that the police brought a

22    number of individuals, a number of people, back to

23    where you were at; is that right?

24      A    Correct.

JIM03085

R-148

SA723

1    Q    Was Larry Tueffel also there with you?

2    A    Yes.

3    Q    And did you identify any of those people?

4    A    No, sir.

5    Q    Did Larry Tueffel identify any of these

6    people?

7    A    No, sir.

8    Q    Did -- Do you remember all the people that

9    the police brought back at that time?

10   A    I can't say I do.

11   Q    In addition to yourself did anybody else --

12   Rephrase that question.

13        Do you know if Larry Tueffel talked to

14   the police?

15   A    I can't say I do.

16   Q    Okay.  You testified later that evening you

17   talked to people in your family; is that right?

18   A    Correct.

19   Q    Who did you talk to?

20   A    My brother and sister.

21        MR. CHARLES MURPHY:  Objection.  Asked and

22   answered by the State.

23        THE COURT:  Overruled.  Next question.

24

JIM03086

R-149

SA724

1    BY MR. JOHN MURPHY:

2        Q    What are their names?

3        A    Donna Cosmen and Shawn Cosmen, Kevin Cosmen.

4        Q    And finally, Phil, do you know who this

5    person by the name of Juan Carlos Torres is?

6        A    No, sir, I do not.

7        Q    Is he any relation to you at all?

8        A    No, sir, he is not.

9             MR. JOHN MURPHY:  No further questions.

10            THE COURT:  Mr. Charles Murphy.

11                   RECROSS-EXAMINATION

12                BY MR. CHARLES MURPHY:

13       Q    Mr. Torres, you just said to Mr. John Murphy

14   you don't know whether or not Larry Tueffel talked to

15   the police, you just said that, didn't you?

16       A    Right.  Correct.

17       Q    He talked to the police right next to you at

18   the scene of the shooting, didn't he?

19       A    No.  We were in separate cars.

20       Q    When I was asking you questions just a few

21   minutes ago I asked you if --

22       A    At one time --

23       Q    I asked -- Let me finish my question.

24            THE COURT:  Let him finish his question,

JIM03087

R-150

SA725

1    please.

2            THE WITNESS:  Sorry.

3    BY MR. CHARLES MURPHY:

4        Q    I asked you if you and Mr. Tueffel talked to

5    the police at the scene of the shooting together and

6    you said yes, do you remember that?

7        A    I'm sorry.  I did not understand it.

8            MR. MURPHY:  I have nothing else.

9            THE COURT:  Okay.  Mr. John Murphy, any

10   Redirect?

11           MR. JOHN MURPHY:  Your Honor, we have no

12   further questions.  You can step down, Mr. Torres.

13   Thank you very much.

14                    (Witness excused.)

15           THE COURT:  We'll take a short pause for a

16   good cause.  We'll take about ten minutes.  Don't

17   discuss the case during that short break.  We have

18   some additional witnesses, perhaps a few more this

19   afternoon.  See you in about ten minutes.

20                    (A brief recess was taken.)

21           THE CLERK:  Thaddeus Jimenez.

22           THE COURT:  What we'll do, gentlemen, is take

23   one more witness then we'll call it a day for today.

24           MR. JOHN MURPHY:  All right, judge.

                                        JIM03088
                        R-151

SA726

```
 1          THE COURT:  Bring out the defendant and then
 2    bring out the jury.
 3              The defendant, Thaddeus Jimenez, is here
 4    with his lawyer.  The state's attorneys are both here.
 5    We're all set.
 6                          (The following proceedings
 7                           were had in the presence and
 8                           hearing of the jury:)
 9          THE COURT:  You can all be seated.  Thank you
10    very much.  The game plan, so you'll know, there's
11    other witnesses here, we're not going to make you stay
12    all night, we're going to hear one more witness today
13    then we'll recess until tomorrow.
14              The State can call their next witness.
15          MR. GAUGHAN:  Your Honor, the People will
16    call Larry Tueffel.
17                          (Witness sworn.)
18          THE COURT:  Please be seated.  Keep your
19    voice up nice and loud, Mr. Tueffel.  Wait until the
20    lawyers finish the questions before you start
21    answering them.  Thank you very much.  Go ahead,
22    please.
23
24
```

JIM03089

R-152

SA727

1                        LARRY TUEFFEL,

2      called as a witness on behalf of the People of the

3      State of Illinois, having been first duly sworn, was

4      examined and testified as follows:

5                        DIRECT EXAMINATION

6                    BY MR. DAIVD GAUGHAN:

7          Q    Larry, in a nice loud voice could you

8      introduce yourself to the ladies and gentlemen of the

9      jury?

10         A    My name is Lawrence Tueffel.

11              THE COURT:  That's not going to work a bit.

12     Keep your voice up real loud.  Talk like you're

13     talking to somebody out in the hall.

14              THE WITNESS:  Hi.  My name a Lawrence

15     Tueffel.

16     BY MR. GAUGHAN:

17         Q    How do you spell your last name, Larry?

18         A    T-u-e-f-f-e-l.

19         Q    Larry, how old are you?

20         A    I'm nineteen.

21         Q    You have to speak up.

22         A    Nineteen.

23         Q    I want to direct your attention back to

24     February of 1993, at that time were you a member of

                                              JIM03090
                            R-153

1    the Simon City Royals Street Gang?

2        A    Yes.

3        Q    Did you know another member of that street

4    gang by the name of T. J.?

5        A    Yes.

6        Q    Do you see T. J. here in court today?

7        A    Yes.

8        Q    Could you please identify him for the ladies

9    and gentlemen of the jury?

10        A    Right there.  (Indicating.)

11        Q    Point out something he's wearing?

12        A    Huh?

13        Q    Would you describe something he's wearing?

14        A    A tie and glasses.

15            THE COURT:  What color suit?

16            THE WITNESS:  Blue.

17            THE COURT:  Indicating for the record

18    Thaddeus Jimenez.

19            THE WITNESS:  Thaddeus Jimenez.

20    BY MR. GAUGHAN:

21        Q    Larry, how long had you known Thaddeus

22    Jimenez back in February of 1993?

23        A    Not for a long time.  I seen him around the

24    neighborhood before.

JIM03091

R-154

1      Q    Did you also know a person by the name of

2  Eric Morro?

3      A    Yes.

4      Q    How did you know Eric Morro?

5      A    He was a good friend of mine.

6      Q    Was Eric Morro in any gangs?

7      A    No.  No, sir.

8      Q    Okay.  I want to direct your attention

9  specifically to about 6:00 o'clock in the evening on

10 February 3rd of 1993, were you with Eric Morro at that

11 time?

12     A    Yes, sir.

13     Q    Where were you first with Eric that evening

14 at around 6:00?

15     A    He came by my house and asked me if I wanted

16 to take a walk with him to visit a friend.

17     Q    Since February of '93 you moved; is that

18 correct?

19     A    Yes.

20     Q    At that time where was your house?

21     A    On Belmont and Whipple.

22     Q    And when he came by your house he asked you

23 if you wanted to do what?

24     A    To take a walk with him to visit a friend.

JIM03092

R-155

1      Q      Did you take a walk with him?

2      A      Yes, sir.

3      Q      Where did you and Eric go?

4      A      We went down Belmont to Albany to visit

5  because he lived there and the friend wasn't home.

6      Q      And do you remember what the friend's name

7  was?

8      A      His first name was Mack.

9      Q      After you went by Mack's house and he wasn't

10  home where did you go?

11     A      We turned around and headed back by Shawn

12  Cosmen's house, he lives on Belmont and Sacramento.

13     Q      Which way did you go from Albany and Whipple?

14     A      We turned around and walked eastbound towards

15  the lake, that's where he lives, Shawn's house.

16     Q      You're back in the area of Albany and

17  Whipple?

18     A      Right.

19     Q      Did you get onto Whipple?

20     A      No.  We kept on walking on Belmont.

21     Q      You walked up to Belmont?

22     A      Right.

23     Q      Which way did you walk on Belmont?

24     A      To Sacramento, towards Sacramento Street.

JIM03093

R-156

SA731

1    Q    As you were walking on Belmont towards

2    Sacramento did anything happen with the defendant?

3    A    Yes.  We seen two guys.  I turned around and

4    I seen two people in back of us.

5    Q    Okay.  And what two people did you see?

6    A    Victor Romo and T. J.

7    Q    And when you say T. J., this is the gentleman

8    you referred to earlier?

9    A    Yes, sir.

10    Q    Now, let me stop you for one minute.  How did

11    you know Victor Romo?

12    A    I seen him from around school.  He just

13    transferred in, he was a new kid at Linne School.

14    Q    Is Linne School a grammar school?

15    A    Yes.

16    Q    What grade were you in back in February of

17    1993?

18    A    Eighth.

19    Q    You were fourteen years old?

20    A    Yes.

21    Q    As you were walking with Eric east on Belmont

22    what happened with the defendant and Victor Romo?

23    A    I looked back and we looked back as Victor

24    Romo asked Eric if he owed some money to this guy

JIM03094

R-157

1    named Leo.

2        Q    Where were you and Eric at when Victor asked

3    Eric if he owed money to Leo?

4        A    We were by -- before the Honey Baked Ham

5    place.

6        Q    Okay.  And when Victor asked Eric if he owed

7    Leo money and you turned around what happened then?

8        A    Eric said that's none of your business and he

9    kept on walking.

10        Q    Okay.  Did you walk with Eric at that time?

11        A    Yes.

12        Q    And as you were walking with Eric what

13    happened next?

14        A    I seen a gun come out.

15        Q    When you say you seen a gun come out, who

16    pulled a gun out?

17        A    T. J.

18        Q    After T. J. pulled a gun out what happened?

19        A    He told Eric -- Eric told him to put it back

20    in his pocket and we just kept on walking.

21        Q    You and Eric kept walking?

22        A    Yes.

23        Q    After you kept walking what was the next

24    thing that happened after Eric told him to put the gun

JIM03095

R-158

SA733

1  away?

2      A    We were walking and when we got by Honey

3  Baked Ham and Eric turned around and Victor pushed

4  Eric up against the wall and Eric took a swing at him,

5  he missed and then I seen the defendant pull out the

6  gun.

7      Q    When you say the defendant, you're referring

8  to T. J.?

9      A    Yes, sir.

10      Q    When the defendant pulled out the gun what

11  happened?

12      A    He pulled it up to Eric's chest and he shot

13  him.

14      Q    Where was Eric when the defendant put the gun

15  up to his chest?

16      A    Up against the wall on the Honey Baked Ham.

17      Q    When you say he put it up to his chest, would

18  you please describe for the ladies and gentlemen of

19  the jury exactly what he.

20      A    Eric took a swing at Victor and he missed and

21  then the gun came out and he put it directly on his

22  chest.

23          MR. GAUGHAN:  Indicating for the record, your

24  Honor, that the witness is touching his hand against

JIM03096

R-159

SA734

1    his chest.

2         THE COURT:  The record will so reflect.

3    BY MR. GAUGHAN:

4         Q    When the defendant, T. J., put the gun

5    against Eric's chest what was the next thing you saw

6    or heard?

7         A    I heard a loud pop and then I ran through a

8    lot next to the Honey Baked Ham place.

9         Q    Where did you run to?

10        A    I ran toward the alley, I got to the end of

11   the lot and I looked, I looked to my left, and I seen

12   them running down the alley.

13        Q    Let me stop you for a minute.  When you say

14   you got to the end of the lot and you looked to your

15   left you say you saw them running, who is them?

16        A    Victor Romo and T. J.

17        Q    Where did you see them running?

18        A    Down the alley by where -- right by the side

19   of my house.

20        Q    After you saw them running what did you do?

21        A    I ran back to see if Eric was okay and he was

22   screaming I got shot, I got shot, and then the

23   ambulance came.

24        Q    Was there anybody else on the street?

JIM03097

R-160

SA735

```
 1        A    A bunch of other people.

 2        Q    Who was Eric with at that time when you ran

 3   back up to Belmont?

 4        A    I seen Sandy, Phil, Donna, Shawn was out

 5   there and that's it.

 6        Q    What about Tina?

 7        A    Excuse me?

 8        Q    What about Tina?

 9        A    Tina too.

10        Q    Now, I'm going to stop for a minute.  I'm

11   going to ask you to step down, Larry.

12             THE COURT:  Step to the side of the diagram,

13   sir, towards me.  That's good.

14             MR. GAUGHAN:  Step off a little bit more to

15   the side, Larry, so they can all see you.

16   BY MR. GAUGHAN:

17        Q    Larry, does this diagram accurately show the

18   way Belmont looked --

19        A    Yes.

20        Q    -- back in February of 1993 with the

21   buildings and everything?

22        A    Yes.

23             THE COURT:  That's Exhibit 1 again,

24   Mr. Gaughan?
```

JIM03098

R-161

1          MR. GAUGHAN:  Excuse me.  This is People's

2     Exhibit No. 7, judge.

3          THE COURT:  All right.

4     BY MR. GAUGHAN:

5          Q    Larry, I'm going to ask you to take this

6     marker and put your initials in the general area that

7     you were when Eric got shot?

8          A    Right about here.  (Indicating.)

9          Q    Okay.  Now -- That's fine.  Now, after he got

10    shot take the marker and go with a line in the lot you

11    said you ran down?

12         A    (Indicating.)

13         Q    Okay.  Now at the end of that lot what's in

14    back there?

15         A    There's a garden and there's a house across

16    from it.

17         Q    Does an alley run back there?

18         A    Yeah.  An alley runs this way.  (Indicating.)

19         Q    Is that the alley you were talking about that

20    you ran to?

21         A    Yes.

22         Q    Okay.  You said when you reached the back of

23    the lot you looked and you saw again the defendant and

24    Victor Romo running?

JIM03099

R-162

```
 1        A     Right.

 2        Q     Can you tell me where you saw them running?

 3        A     This way, straight down like this.

 4   (Indicating.)

 5              THE COURT:  Sir, please keep your voice up.

 6              THE WITNESS:  This way.  They got into the

 7   alley, the alley leads straight.  (Indicating.)

 8   BY MR. GAUGHAN:

 9        Q     Put an X where you saw them.

10        A     (Indicating.)

11        Q     That's where they were running?

12        A     Yes.

13        Q     Put an arrow pointing in the direction they

14   were running?

15        A     (Indicating.)

16              MR. GAUGHAN:  Then it's at that point where

17   you saw them -- Indicating for the record, judge, the

18   witness has put an X at the mouth of the alley on

19   Whipple Street and the alley that was running

20   east-west one block north of Belmont.

21              THE COURT:  All right.  Very good.

22

23

24
```

JIM03100

R-163

BY MR. GAUGHAN:

Q    Now, you testified that after you saw the defendant and Victor Romo running you went back onto Belmont?

A    Yes.

Q    Did you run through the same lot?

A    I ran through the same lot.  I just turned around and ran back to where he was at.

Q    Okay you can sit down again, Larry.  After you ran back to where everybody was at did the police arrive?

A    Yes, sir.  They were the first ones that arrived.

Q    The police were the first ones that arrived?

A    Yes.

Q    Did an ambulance arrive?

A    Right after that.

Q    And did the ambulance take Eric away?

A    Yes.

Q    Now, when the police arrived did you talk to the police at that time?

A    No, not until we got to the station.

Q    Were you put in a car with Phil Torres?

A    Yes.

JIM03101

R-164.

1      Q    At the time you were put in the car with Phil

2 Torres did Phil Torres say anything to you?

3      A    He asked if T. J. did it and I told him no.

4      Q    Why did you tell him no?

5      A    Because I was scared.

6      Q    Why were you scared?

7      A    Because I just seen a murder.

8      Q    Eventually -- Did the police take you down to

9 the police station that night?

10     A    Yes, sir.

11     Q    And when the police took you down to the

12 police station at that time did you indicate to them

13 that it was T. J.?

14     A    No, sir.

15     Q    Why didn't you tell them that it was T. J.?

16     A    I don't know.

17     THE COURT:  Keep your voice up.

18     THE WITNESS:  I was scared.

19 BY MR. GAUGHAN:

20     Q    Again why were you scared, Larry?

21     A    Because I was thinking about what would

22 happen to my family and stuff because I lived right in

23 the neighborhood where it happened.

24     Q    Why were you worried about what would happen

JIM03102

R-165

SA740

```
 1    to your family?
 2              MR. CHARLES MURPHY:  Objection, your Honor.
 3              THE COURT:  Overruled.  He can answer the
 4    question.
 5              THE WITNESS:  Because it's a gang and --
 6    BY MR. GAUGHAN:
 7         Q    You're going to have to speak up.
 8         A    I'm afraid they might hurt my family next.
 9         Q    When you say they, who are you referring to?
10         A    The gang that was in the neighborhood.
11         Q    Was that the Simon City Royals?
12         A    Yes.
13         Q    Was there any ramifications -- Let me
14    rephrase that.
15              How would the gang look upon you in
16    pointing out a fellow Simon City Royal on a murder?
17              MR. CHARLES MURPHY:  Objection, your Honor.
18              THE COURT:  How someone else would perceive
19    something.  Sustained.
20    BY MR. GAUGHAN:
21         Q    You said you were afraid of the gang, right?
22         A    Yes.
23         Q    What was your perception at that time, being
24    in the same gang, the Simon City Royals, as Thaddeus
```

JIM03103

R-166

SA741

1    Jimenez, in your head what did you believe the gang

2    would do if you pointed out a fellow gang member as a

3    shooter in a murder case?

4         MR. CHARLES MURPHY:  Objection, your Honor.

5    It's been asked and answered.  I'll let him answer

6    again.  Overruled.

7         THE WITNESS:  I'll probably end up like my

8    friend did.

9    BY MR. GAUGHAN:

10        Q    Your friend being?

11        A    Eric Morro.

12        Q    Incidentally you said you were fourteen at

13   that time, right?

14        A    Yes, sir.

15        Q    Now, as a matter of fact, Larry, back in

16   September of 1994 you were subpoenaed to appear to

17   testify in a matter concerning this case, weren't you?

18        A    Yes.

19        Q    And at that time back in September of 1994

20   did you come to court on that subpoena?

21        A    Can you repeat it, please.

22        Q    Did you initially come to court the day you

23   were subpoenaed to be in court?

24        A    No, sir.

JIM03104

R-167

SA742

1    Q    And were you in fact back at that time picked

2    up and placed in custody because you didn't show up on

3    your subpoena?

4    A    Yes, sir.

5    Q    And did a judge at that time, Judge Berkos,

6    hold you in custody until you did testify back in

7    September of '94?

8    A    Yes, sir.

9    Q    Now, since that time, Larry -- You are under

10    subpoena today too; is that correct?

11    A    Yes, sir.

12    Q    Are you as scared today as you sit here as

13    you were back in September of 1994?

14    A    No.

15        MR. CHARLES MURPHY:  Objection.

16        THE COURT:  He answered the question already.

17    The objection is overruled.  The answer is no, is that

18    what you said?

19        THE WITNESS:  No, sir.

20    BY MR. GAUGHAN:

21    Q    Do you go near that area anymore?

22    A    No, sir.

23    Q    Did you move from the home you were living in

24    on Whipple?

JIM03105

R-168

SA743

1      A    Yes.

2      Q    Now, Larry, I want to -- after you talked to

3   the police at the station that night eventually you

4   went home, right?

5      A    Yes, sir.

6      Q    Later on that evening did the police come to

7   your house about 3:00 or 3:30 in the morning.

8      A    Yes, sir.

9      Q    At that time what happened when the police

10  came to your house?

11     A    They picked me back up and they said they had

12  to ask me some more questions.

13     Q    Did you go back down to Area Five?

14     A    Yes.

15     Q    When you went back down to Area Five what

16  happened?

17     A    They said that I was lying and they had other

18  witnesses.

19     Q    When they told you they had other witnesses

20  and you were lying what did you tell them at that

21  time?

22     A    I told them the truth.

23     Q    And what was the truth?

24     A    That it was Victor Romo and T. J.

JIM03106

R-169

SA744

```
 1          Q     Did the police ever tell you the name T. J.

 2     at that time?

 3          A     No.

 4          Q     That following morning at about 10:00 o'clock

 5     in the morning did you view a lineup?

 6          A     Yes.

 7          Q     Just so we're clear, this would be like about

 8     10:00 o'clock in the morning going from the day this

 9     happened until the --

10          A     Yes.

11          Q     Did you view a lineup down at Area Five,

12     Grand and Central?

13          A     Yes.

14          Q     At that time did you pick anybody out in that

15     lineup?

16          A     Yes.

17          Q     You have to do better than that.

18          A     Yes.

19          Q     Who was the person you picked out in the

20     lineup?

21          A     T. J.

22          Q     What did you pick out T. J. as doing when you

23     picked him out in that lineup?

24          A     Can you repeat it.  I don't understand.
```

JIM03107

R-170

SA745

```
 1        Q    When you identified T. J. in the lineup what
 2   were you identifying him for doing?
 3        A    Shooting somebody.
 4        Q    Shooting who?
 5        A    Eric Morro.
 6             MR. GAUGHAN:  May I approach, judge?
 7             THE COURT:  Sure.
 8   BY MR. GAUGHAN:
 9        Q    Larry, I'm going to show you what's
10   previously been marked as People's Exhibit No. 11 for
11   purposes of identification.  Do you recognize what
12   that photograph is?
13        A    Yes.
14        Q    What is that?
15             THE COURT:  Mr. Tueffel, please keep your
16   voice up.
17             THE WITNESS:  Yes.  Yes, sir.
18   BY MR. GAUGHAN:
19        Q    What is that a photograph of?
20        A    Thaddeus Jimenez.
21             THE COURT:  I didn't hear a word you said.
22   Would you keep your voice up.
23             THE WITNESS:  Thaddeus Jimenez.
24
```

JIM03108

R-171

BY MR. GAUGHAN:

1

2      Q      Is Thaddeus Jimenez alone in that photo?

3      A      Yes.

4      Q      Are there other people in the photo?

5      A      Yes.

6      Q      Who else is in the photo?

7      A      I don't know the other people.

8      Q      Were those the same people that were in the

9   lineup with Thaddeus Jimenez back in February of

10  1993 -- '94. Excuse me.

11     A      I'm not sure.

12     Q      You're not sure if it's the same people?

13     A      No.  The only one I know in this photograph

14  is him, but I don't remember the other people.

15     Q      Do you know if that is a photograph of the

16  lineup you viewed?

17     A      Yes.

18     Q      Does that -- I understand -- You're saying

19  that you don't know anybody else in the photograph,

20  correct?

21     A      Right.

22     Q      My question is is that a photograph of the

23  lineup you viewed at Area Five that day on February

24  4th?

JIM03109

R-172

```
 1        A    Yes.

 2        Q    Does that photograph accurately show the way

 3   the lineup looked when you viewed it back then?

 4        A    Yes.

 5        Q    Is the person you picked out of the lineup in

 6   that photograph?

 7        A    Yes, sir.

 8        Q    Which person is that?

 9        A    Thaddeus Jimenez.

10        Q    You've got to speak up.

11        A    Thaddeus Jimenez.

12        Q    Which person is he from left to right in that

13   photograph?

14        A    (Indicating.)

15             MR. GAUGHAN:  Indicating the witness has

16   pointed to the second person from left to right,

17   Thaddeus Jimenez.

18             THE COURT:  All right.

19   BY MR. GAUGHAN:

20        Q    I'm going to show you what's been marked as

21   People's Exhibit No. 12 for purposes of

22   identification, what is that a photograph of?

23        A    Thaddeus Jimenez.

24        Q    You've got to speak up, Larry.
```

JIM03110

R-173

1          A    Thaddeus Jimenez.

2          Q    Does that photograph accurately show the way

3     Thaddeus Jimenez looked when he stood in the lineup?

4          A    Yes.  Yes, sir.

5          Q    Larry, just one or two more questions.  Go

6     back to the first time you talked to the police at the

7     scene and then at the police station --

8          A    Yes.

9          Q    -- when you didn't tell them that it was

10    T. J., as a matter of fact at that time you gave false

11    information to the police; is that correct?

12         A    Yes.  That's right.

13         Q    Why did you do that?

14              MR. CHARLES MURPHY:  Objection, your Honor.

15              THE COURT:  You can cross-examine.  He can

16    answer as to why.  Overruled.  Do you understand the

17    question?

18              THE WITNESS:  Yes.

19              THE COURT:  You can answer then if you

20    understand it.

21              THE WITNESS:  The same reason why I told you,

22    I said before.

23              MR. GAUGHAN:  I have nothing further, judge.

24              MR. CHARLES MURPHY:  Judge, can I have a side

                                      JIM03111

                          R-174

1    bar, please?

2              THE COURT:  Sure.  Mr. Murphy, do you need

3    the reporter?

4              MR. CHARLES MURPHY:  No.

5              THE COURT:  Okay.

6                        (A discussion was had between

7                         the court and counsel off

8                         the record out of the hearing

9                         of the jury and the court

10                        reporter.)

11                   CROSS-EXAMINATION

12                   BY MR. CHARLES MURPHY:

13    Q    Mr. Tueffel, you said on Direct Examination

14    that you saw Eric take a swing at Victor Romo; is that

15    correct?

16    A    Yes.

17    Q    Did the swing miss Victor Romo?

18    A    Yes.

19    Q    Was that the only swing that Eric took at

20    anyone that you saw?

21    A    Yes.

22    Q    Am I correct that you testified previously on

23    May 7th of 1993 at Juvenile Court regarding the same

24    incident?

JIM03112

R-175

1    A    Yes, sir.

2    Q    Do you remember these questions and these

3    answers:

4         "Q    And you say he took a swing at T. J.; is

5               that right?"

6               You said "yes."

7               Do you remember that question and that

8    answer when you testified previously?

9    A    No, sir.

10   Q    You said here today though that when Eric

11   swung at Victor then T. J. pulled a pistol and fired a

12   single shot; is that correct?

13   A    Yes.

14   Q    So at the time that Eric swung at Victor my

15   client didn't have a gun in his hand; is that correct?

16   A    I didn't say that.

17   Q    I'm asking you?

18   A    Yes, he did.

19        MR. CHARLES MURPHY:  Page thirty-five.

20   BY MR. CHARLES MURPHY:

21   Q    At that same proceeding when you testified

22   back in May of 1993 at Juvenile Court do you remember

23   this question and this answer by you:

24        "Q    What happened then?

JIM03113

R-176

```
 1                    And you said "Eric took a swing, tried
 2                    to knock the gun out of T. J.'s hand."
 3                    Do you remember that?
 4          A    No, sir, I don't.
 5          Q    Did that happen?
 6          A    No, it didn't.
 7          Q    You had known Eric Morro for how long as of
 8     February 3rd of 1993?
 9          A    For about since I moved over there.
10          Q    Was he a good friend of yours?
11          A    Yes, he was.
12          Q    As of February 3, 1993 was Phil Torres a good
13     friend of yours?
14          A    Yes, he was.
15          Q    How long had you known him?
16          A    About two or three years.
17          Q    After the shooting took place and you
18     returned to the location where your friend was laying
19     the police came up very shortly thereafter, did they
20     not?
21          A    Yes, they did.
22          Q    Did you talk to the police in the presence of
23     Phil Torres?
24          A    No, I didn't.
```

JIM03114

R-177

1      Q    When you talked to the police you didn't

2  mention my client, did you?

3      A    No, I didn't.

4      Q    Did you talk to Phil Torres at the scene of

5  the shooting?

6      A    No.

7      Q    So you didn't get in a squad car with him and

8  tell him at the scene of the shooting that T. J.

9  wasn't involved?

10     A    After it happened, yes.

11     Q    Well, that's what I'm asking you.  Did you do

12  that?

13     A    Yes.

14          MR. CHARLES MURPHY:  Page forty-three.

15  BY MR. CHARLES MURPHY:

16     Q    When you testified on May 7th of 1993 at

17  Juvenile Court do you remember these questions and

18  these answers:

19          "Q    Did you have occasion to talk to Phillip

20                Torres about what happened out there in

21                the street?"

22          "A    You said "no."

23          "Q    You've never talked to him?"

24                You said, "oh, yeah."

JIM03115

R-178

SA753

1    "Q    When did you talk to him?

2    "A    About when we were in the station

3          together?

4    "Q    That was the same day that things

5          happened?"

6          "Yeah," you said.

7          "Was that before you gave your statement

8          to the police?

9          No.   I think it was after."

10         Do you remember testifying in Juvenile

11   Court that you talked to Phil Torres about the

12   incident for the first time at the police station

13   after you gave your statement, do you remember that?

14       A    The only time I talked to him was in the car

15   after it happened.  He asked me if he did it and I

16   told him no and that was the last I seen of him

17   because when we got to the station they split us up

18   and put us in two separate rooms and I didn't see him

19   again after that.

20       Q    Mr. Tueffel, I just read to you a

21   transcription of questions and answers that were asked

22   of you when you testified on May 7th of '93.  Did I

23   read to you accurately the questions and the answers

24   that you gave or not?

JIM03116

R-179

SA754

```
 1        A    Yes.

 2        Q    You agree?

 3        A    Yes.

 4        Q    You did not tell the officer who arrived at

 5   the scene of the shooting -- He was wearing a uniform,

 6   wasn't he, right?

 7        A    The officers that came to the scene?

 8        Q    Yeah?

 9        A    After it happened, yeah, they were in the

10   blue suits.

11        Q    They were in uniform?

12        A    Yeah, uniform.

13        Q    And they asked you what happened, right?

14        A    Not until I got to the station.

15        Q    Did you tell uniformed police officers the

16   night that the shooting took place that the shooter

17   had curly black hair did you say that?

18        A    No, I don't remember saying that.

19        Q    Did you tell the officers in uniform the

20   night of the shooting that the guy who did the

21   shooting was wearing a purple jacket with yellow

22   lettering, do you remember that?

23        A    Yes, I remember that.

24        Q    You said here today that after you decided to
```

JIM03117

R-180

1   tell the truth you told the police officers sometime

2   about 3:30, 4:00 o'clock in the morning that T. J. and

3   Victor were involved; is that correct?

4        A    Right.

5        Q    When you got to the police station on

6   February 4th at about 3:30 or 4:00 o'clock in the

7   morning you spoke to a Detective Bogucki, didn't you?

8        A    I think that's who -- It was a detective but

9   I'm not sure what his last name was.

10        Q    Whoever the detectives were am I correct that

11   when you decided to tell the truth you described the

12   second guy not by name but by male white; is that

13   correct?

14        A    The second guy?

15        Q    Yeah.  The guy who you now say was Victor

16   Romo you described him to the detectives when you say

17   you were going to tell the truth as being a male

18   white, didn't you?

19        A    Yes.

20        Q    You didn't say Victor Romo, did you?  The

21   name, you didn't say the name Victor Romo, did you?

22        A    I said his first name.  I didn't know his

23   last name at the time.

24        Q    Well, then in addition to saying his name did

**JIM03118**

R-181

1    you then tell the officers the reason I know his guy

2    is I go to school with him, did you do that?

3        A    I seen him at school before.  I didn't go to

4    school with him.

5        Q    Did you tell the officers that the reason you

6    knew his name is you had seen him at school?

7        A    Yes.

8        Q    And you gave the name Victor?

9        A    Yes.

10        Q    Not just male white, right?

11        A    Right.

12        Q    You've said here today that the reason you

13    decided to tell the truth is they told you that there

14    were other witnesses who said you were lying; is that

15    correct?

16        A    Yes.

17        Q    They told you exactly what Phil Torres had

18    told them before you recollected the truth, didn't

19    they?

20        MR. JOHN MURPHY:  Objection.

21        THE COURT:  If he understands the question he

22    can attempt to answer it.  Overruled.

23        THE WITNESS:  No.

24

JIM03119

R-182

1    BY MR. CHARLES MURPHY:

2        Q    No?

3        A    No.

4        Q    You had no reason to believe that Victor Romo

5    was a gang member, did you?

6        A    I didn't know much about him.  All I did was

7    see him at school.  I didn't know him personally.

8            MR. CHARLES MURPHY:  Page one sixty.

9    BY MR. CHARLES MURPHY:

10       Q    You also testified on September 30, 1994 in

11   this building during prior court proceedings, did you

12   not?

13       A    Yes.

14       Q    And do you remember this question asked of

15   you and this answer by you:

16               "Was Victor Romo a Royal?

17                Your answer, "no, sir."

18            Do you remember that question asked of

19   you and that answer by you?

20       A    No, I don't remember.

21       Q    You said here today that when you first

22   noticed T. J. and Victor the night of the shooting at

23   least they were behind you; is that correct?

24       A    Yes.

JIM03120

R-183

1     Q    They never passed you heading in the opposite

2    direction on the sidewalk, did they?

3     A    No.  No, sir.

4     Q    When you were at the police station talking

5    to the detectives did you tell the detectives at the

6    police station that you and Eric were walking

7    eastbound and the other two men were walking westbound

8    and they passed by you and then turned around and then

9    came behind you, did you tell that to the detectives?

10     A    No.

11     Q    You said that the reason that you were

12    reluctant to tell the truth about who shot and killed

13    your friend was your concern about what would happen

14    to you; is that correct?

15     A    Not only that it's because Eric was my

16    friend.  I couldn't just keep on going and not say

17    anything.  I had to turn around.

18     Q    You said that the reason that you didn't tell

19    the truth initially was because of your concern for

20    yourself and your family; isn't that correct?

21     A    Yes, sir.

22     Q    And you testified you have testified on two

23    prior occasions that we just talked about; is that

24    correct?

JIM03121

R-184

1        A    Yes, sir.

2        Q    No one has ever hurt you, have they,

3    concerning this; isn't that correct?

4        A    Well, I've got threatened a lot.

5        Q    By my client?

6        A    No, not by him.

7        Q    By Victor Romo?

8        A    No.

9        Q    Has anyone laid a hand on you?

10       A    No.

11       Q    You were talking to police investigators not

12    only at the scene of the shooting but then you were

13    taken directly from the scene to the police station,

14    that was Area Five; is that correct?

15       A    Yes.

16       Q    When you got to Area Five at about -- You

17    tell me what time did you get there?

18       A    I'm not sure what time it was.

19       Q    The shooting took place at 6:30, give us an

20    estimate?

21       A    It was later on in the afternoon around --

22       Q    Around 9:00 or 9:30 you were there?

23       A    Yes, probably.  I told them I seen what

24    happened as soon as the squad car came on the scene.

JIM03122

R-185

1        Q    You were still lying to the police, if I

2    understand your testimony correctly, when they took

3    you down to the police station and spoke to you for

4    the first time, right?

5        A    Yes.  I gave them false information.

6        Q    You didn't give them your version of the

7    truth until 3:30 or 4:00 a.m. of the next day, right?

8            MR. JOHN MURPHY:  Objection to the form of

9    that question.

10           THE COURT:  Overruled.  If he understands the

11   question he can answer it.

12           THE WITNESS:  Right.  That's right.

13   BY MR. CHARLES MURPHY:

14       Q    When you testified on September 30th of

15   1994 here in this building again you were asked

16   questions concerning this incident.  I'm going to ask

17   you if you remember these questions and these answers:

18               "Now, you also knew Victor, right?"

19                You said "yes."

20               "Did you tell the officer that you knew

21                one of the offenders from school that

22                day named Victor?

23                "Yes.

24           "Q    You did?

                                              JIM03123

                         R-186

1           "A    Yes.

2                  "Now this is at 6:30?

3                  You said "yes."

4                  Do you remember those questions and

5       those answers?

6           A    Yes, sir.

7           Q    You've said here today though that you

8       didn't -- you were still lying at 6:30, right?

9           A    Yes, about one person.  I told them one

10      person that did it but the other one --

11          Q    At 6:30 you told the police that Victor was

12      involved in this?

13          A    Yes, but I didn't mention --

14          Q    Who did you tell?

15          THE COURT:  Read back the last part of his

16      answer because the next question started and he wasn't

17      finished with the answer.

18          THE WITNESS:  I only told --

19          THE COURT:  Please.  Just a moment, sir.

20                  (The record was read by the

21                   court reporter.)

22          THE COURT:  Try to avoid speaking at the same

23      time somebody else is speaking, that applies to both

24      of you.

                                        JIM03124
                              R-187

SA762

1    BY MR. CHARLES MURPHY:

2         Q    At 6:30, that's when the shooting took place,

3    who did you tell that you knew one of the offenders to

4    be, who did you say that to?

5         A    Victor.

6         Q    Who did you tell, what policemen did you

7    tell?

8         A    I don't know.

9         Q    Was he wearing a uniform?

10        A    No.  It was a detective.

11        Q    Did you tell the detective at the police

12   station right after 6:30 that you knew who one of the

13   offenders was?

14        A    Yes.

15        Q    And you told him it was Victor, is that your

16   testimony?

17        A    Yes.

18        Q    Was that Detective Bogucki?

19        A    I don't know his name.

20        Q    Sometime after the 3rd of February or the 4th

21   of February did police officers take you to the school

22   that you went to in an effort to find Victor?

23        A    No.

24             MR. CHARLES MURPHY:  I have nothing else.

JIM03125

R-188

SA763

1          THE COURT:  Any Redirect by the State?

2          MR. GAUGHAN:  Judge, I have no questions.

3          THE COURT:  You can step down, sir.  Thank

4     you very much.

5                         (Witness excused.)

6          THE COURT:  All right.  We're going to

7     recess, it's 5:15.  I think it's been a long day.

8     Tomorrow may be a long day also but it's not going to

9     be as chopped up as it was today as far as the time

10    frame.  We're going to try and start at 10:45 tomorrow

11    so try and be here by 10:30.  We'll hopefully start at

12    10:45.  We should be able to do that.

13          And do not discuss the case amongst

14    yourselves, with anybody else, allow anybody to

15    attempt to talk to you about the case, do not form or

16    express any opinions until I tell you it's a proper

17    time to do that.  You can leave your notebooks and

18    pens, I'll take care of them for the night.  We'll see

19    you tomorrow morning.  Have a safe trip home.

20                         (Jury excused.)

21          THE COURT:  Before you take the defendant

22    back just let me ask the State how many witnesses do

23    you have left?  We heard six today.

24          MR. GAUGHAN:  One moment, judge.  Give or

1    take a half dozen, judge.  They shouldn't be real

2    long.

3         MR. GAUGHAN:  I think the longest witnesses

4    have testified, which is comparable to what we just

5    heard, there's one more comparable.

6         THE COURT:  Okay.  We'll take up the issue

7    about those letters tomorrow morning.  I want to read

8    a few cases.  I generally recall what the letters in

9    essence say.  The State can tell me first thing in the

10   morning when they get here which ones of those letters

11   you intend to offer through the witness Elizabeth

12   Heatley and then we'll hear Mr. Charles Murphy's

13   response to the offer about those particular letters.

14        If anybody has anything you want me to

15   look at, as far as cases, I'll be certainly willing to

16   do that.  If you have them in the morning I'll look at

17   them.

18        Okay.  We'll see you -- We'll try and

19   start at 10:45, if possible.  I've got other stuff out

20   of the way so try and be here by 10:30.  We'll try and

21   go at 10:45.

22             (The above entitled matter

23             was continued to

24             November 7, 1997.)

JIM03127

R-190

```
 1   STATE OF ILLINOIS)
                     )        SS:
 2   COUNTY OF C O O K)

 3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
 4

 5            I, BRENDA D. HAYES, Official Court

 6   Reporter for the Circuit Court of Cook County, Cook

 7   Judicial Circuit of Illinois, do hereby certify that

 8   I reported stenographically the proceedings had on

 9   the trial in the above entitled cause; that I

10   thereafter transcribed said trial into

11   typewriting, which I hereby certify to be a

12   true and accurate transcript of the proceedings

13   had before the Honorable STANLEY SACKS, Judge of

14   said court.

15

16

17

18

19

20            OFFICIAL COURT REPORTER

21

22

23

24
```

JIM03128

R-191

SA766

(Rev. 2/18/93)  CCCR-56

**STATE OF ILLINOIS** } ss
**COUNTY OF COOK**

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of ... VOLUME ( THREE) OF (SIX) VOLUMES ... CONSISTING OF THE REPORT OF PROCEEDIGNS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 98-0247 .....

.............................................................................

.............................................................................

.............................................................................

in a certain cause .............. LATELY ................................ pending in said Court, between
                                  WERE
The People of the State of Illinois ....................................., Plaintiffs and
THADDEUS JIMENEZ                          WAS
.........................................................., Defendant ...



Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, ............ JULY 8 ........, 19 . 98 ..

*Aurelia Pucinski / ps*
Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JIM03129

CCCR-310

93-CR 14710

Transcript of Proceedings to

APPELLATE Court of Illinois
FIRST District

98-0247

Circuit Court No. ___ 93 CR 14710 ___

Trial Judge ___ STANLEY SACKS ___

Reviewing Court No. ___ 98–0247 ___

THE PEOPLE OF THE STATE OF ILLINOIS

vs.

THADDEUS JIMENEZ

**FILED**
APPELLATE COURT

JUL 01 1999

GILBERT S. MARCHMAN
CLERK

from
# CIRCUIT COURT
of
# COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

ONE VOLUME

SUPPLEMENTAL RECORD

AURELIA PUCINSKI

Clerk of Court

Per ___ AP/NJD ___

**Deputy**

9

JIM02324

(Rev. 4/8 /92) CCCR 0051

# UNITED STATES OF AMERICA

State of Illinois )
Cook County ) ss.

Pleas, before a branch of the Circuit Court of Cook County, in said County and

State, begun and held at the Circuit Court, in said County,     COOK

one thousand nine hundred and _____ NINETY–EIGHT _____ AND OF THE INDEPENDENCE
OF THE UNITED STATES OF AMERICA, TWO HUNDRED AND TWENTY–SECOND YEAR.

Present: Honorable

THOMAS R. FITZGERALD.... Judge of the Circuit Court of Cook County

RICHARD A. DEVINE............................State's Attorney

MICHAEL F. SHEAHAN......................Sheriff of Cook County

AURELIA PUCINSKI.......................................Clerk

Attest:

And afterwards, to-wit: on

NOVEMBER 9, 19 98    , there was RECEIVED and FILED

in the Office of the Clerk of the Clerk of the Circuit Court of Cook County, Illinois.    COUNTY DEPARTMENT,
CRIMINAL DIVISION.    AN INFORMATION GENERAL NUMBER '93 CR 14710. FOLLOWING TO WIT:

JIM02325

01

FILED

OCT 2 8 1998

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF C O O K    )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE      )
STATE OF ILLINOIS,     )
        Plaintiff,  )   No. 93-14710
                   )
    vs.          )   Charge:  Murder
                   )
THADDEUS JIMENEZ,      )
        Defendant.  )

REPORT OF PROCEEDINGS of the hearing before

the Honorable STANLEY SACKS, on the 6th day of

November, 1997.

           APPEARANCES:

           MR. JOHN MURPHY & MR. DAVID GAUGHAN,
              Assistant State's Attorneys,
              for the People of the State of Illinois.

           MR. CHARLES MURPHY,
              for the Defendant.

Christina F. Basis, CSR 084-001769
Official Court Reporter
2650 South California Avenue, Room 4C02
Chicago, Illinois  60608
773-869-6065

A. _ _ _

02

JIM02326

```
 1   Date:      11-6-97

 2   Pages:     A1-A66

 3                         INDEX

 4                  DIRECT    CROSS    REDIRECT    RECROSS

 5   Sandra Elder        4       24

 6   Jerome Bogucki     40       55

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

A--2

03

JIM02327

1   Date:      11-6-97

2   Pages:     C1-C91

3                        INDEX

4                 DIRECT    CROSS    REDIRECT    RECROSS

5   Shawn Cosmen        7        14

6   Officer Dwyer      19

7   Victor Romo        23       34       44,47        46

8   Officer Haldczuk   49

9   Elizabeth Heatley  54       81       88           90

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

C - 2
0 4                          JIM02328

SA772

1                          I N D E X

2

        Date:  November 6, 1997
3       Pages:  D-1 to D-23 (Supplemental)

4

5  WITNESS                    DX   CX  RDX   RCX  FD  FC
   DONNA WHITLEY               4    10   16    17
6

7

8

9

10

11

12          State Rests                         3
            Motion for Directed Verdict        22
13

14

15

16

17

18

19

20

21

22

23

24

                    D-2    (Supp.)


                 _ _ _
              _     0 5              JIM02329
                   . . .

```
 1                    (The following proceedings were had

 2                     out of the presence of the jury:)

 3              THE CLERK:  Thaddeus Jimenez.

 4              THE COURT:  The defendant, Thaddeus Jimenez,

 5     is here.

 6              State ready to resume?

 7              MR. JOHN MURPHY:  Yes, judge.

 8              THE COURT:  Mr. Charles Murphy, are you ready

 9     to resume?

10              MR. CHARLES MURPHY:  I am.

11              THE COURT:  Bring out the jurors, and let's

12     go.

13                    (The following proceedings occurred

14                     in the presence of the jury:)

15              THE COURT:  You can all be seated, folks.

16     Thank you very much.  We are getting closer to starting

17     on time.  It is only ten minutes late this time.

18              Everybody is here that is supposed to be here

19     so the State can call their next witness.

20              MR. JOHN MURPHY:  Your Honor, the People call

21     Sandra Elder.

22              THE COURT:  Sandra Elder.

23                    (Witness sworn.)

24              THE COURT:  Keep your voice nice and loud.
```

A  3    06

JIM02330

1   Wait until the attorneys finish the whole question

2   before you start to answer it.  If you start talking

3   while they are still talking, both talking at the same

4   time, the people won't be able to hear what you're

5   saying.

6          Also don't talk like you're just talking to

7   me or the lawyers.  Talk like you're talking to those 14

8   people over there.

9          THE WITNESS:  All right.

10          THE COURT:  Go ahead.

11                  SANDRA ELDER,

12   called as a witness on behalf of the People of the State

13   of Illinois, having been first duly sworn, was examined

14   and testified as follows:

15                  DIRECT EXAMINATION

16          BY MR. JOHN MURPHY:

17   Q     Would you please state your name and spell

18   your first name and last name for the court reporter?

19   A     My name is Sandra Elder, S-a-n-d-r-a,

20   E-l-d-e-r.

21   Q     Ma'am, what area do you live in?

22   A     I live on the northwest side.

23   Q     Who do you live with?

24   A     I live with my husband and my son.

A. - 4
— 07

JIM02331

```
 1      Q      What is your occupation?

 2      A      I am a bartender.

 3      Q      Now I would like to refer you back to the

 4  date of February 3rd, 1993.  Do you remember that day?

 5      A      Yes.  I do.

 6      Q      Do you remember what you did during the day

 7  on that day?

 8      A      Yes.  I do.  I was at work.

 9      Q      Working as a bartender?

10      A      Yes.  As a bartender.

11      Q      By the way, how long have you worked as a

12  bartender, ma'am?

13      A      I have worked as a bartender for about seven

14  years.

15      Q      What time did you get off of work on

16  February 3rd, 1993?

17      A      5:00 o'clock.

18      Q      When you got off of work, where did you go?

19      A      I went home.

20      Q      After you went home, what did you do?

21      A      I went home, I changed clothes, then I went

22  to meet my husband at another lounge.

23      Q      Where did you go?

24      A      3017 West Belmont, to Wally's Lounge.
```

A - 5

0 8

JIM02332

1    Q      Approximately what time did you get there?

2    A      6:00 o'clock.

3    Q      When you arrived at Wally's Lounge, did you

4  see your husband there?

5    A      Yes.  I did.

6    Q      What did you do after you saw your husband

7  there?

8    A      I went in.  He ordered a beer, sat down and

9  had a beer with him.

10    Q      Approximately -- While you were there, did

11  you see anybody else that you knew?

12    A      Yes.  My daughter, Tina, came in.

13    Q      How long after you arrived at Wally's Lounge

14  did Tina come in?

15    A      It was around 15 minutes.

16    Q      At that particular time when Tina came in,

17  did she say anything to you?

18    A      We talked for a few moments.

19    Q      How long did Tina remain in the bar?

20    A      Probably around ten minutes.

21    Q      What happened after you talked to her for ten

22  minutes?

23    A      Tina left the bar.

24    Q      When she left the bar, did you notice

A   6

—   09

JIM02333

1   anything?

2        A      Yes.  She left her car radio.  She had one of

3   those pull-out type radios.  She left it on the bar, and

4   I picked it up to take it outside to her.

5        Q      When you -- By the way, at this particular

6   point, how much had you had to drink?

7        A      I only had about half a beer.

8        Q      That would be -- Would that be a twelve-ounce

9   beer or a glass of beer?

10       A      Yes, twelve ounce.

11       Q      And you picked up Tina's radio to give it to

12   her, is that right?

13       A      Yes.

14       Q      She had already walked out the door?

15       A      Yes.

16       Q      Could you describe what you did?

17       A      I picked up the radio, ran out the doors,

18   proceeded to cross Belmont Avenue.  Tina was already

19   across Belmont and we met and that is when I handed her

20   the radio.

21       Q      Let me ask you this.  When you were

22   outside -- After you got outside, did you see Tina?

23       A      Yes.  I did.

24       Q      Where was Tina at?

A.-7                                  JIM02334

        10

SA778

1    A    Tina was standing in front of 3012 Belmont.

2    Q    Did you see anybody else outside besides

3 Tina?

4    A    Yes.  I did.

5    Q    Who else?

6    A    I saw two young men.

7    Q    Let me go back to the area where Tina was.

8 Did you see what Tina was doing?

9    A    She was talking with Phil Torres.

10    Q    Did you see Phil?

11    A    Yes.  He was looking out his window.

12    Q    What window was he looking out of?

13    A    He lived on the third floor.

14    Q    Where was his building in relation to

15 Wally's Lounge?

16    A    Directly across the street.

17    Q    Now you also said you saw two young men, is

18 that right?

19    A    Yes, sir.

20    Q    Who else did you see out on the street

21 besides Tina and Phil?

22    A    Eric and Larry Tueffel.

23    Q    Where did you see Eric and Larry Tueffel?

24    A    They were walking down Belmont by Honeybaked

JIM02335

A _ _8

11

1    Ham.

2        Q    Which way were they going?

3        A    They were going eastbound towards Sacramento.

4        Q    Did you know Eric?

5        A    Yes.  I knew Eric.

6        Q    What was Eric's last name?

7        A    Morro.

8        Q    How long had you known Eric?

9        A    I have known Eric since he was two years old.

10       Q    How would you describe your relationship with

11   Eric?

12       A    Eric was like a stepson to me.  He lived with

13   my family and me for a couple years.  Him and my son

14   knew each other.  They were best friends.

15       Q    Ma'am, the other person that you said was

16   Larry Tueffel, is that right?

17       A    Yes.

18       Q    Did you know Larry Tueffel?

19       A    Just from the neighborhood.

20       Q    You knew him well enough to know that his

21   name was Larry Tueffel, is that correct?

22       A    Yes.

23       Q    Now did you see anybody else besides Eric and

24   Larry Tueffel?

1    A    Yes.  I did.

2    Q    Who else did you see?

3    A    I saw two other men across the street on

4    Belmont.

5    Q    Now when you say across the street, which

6    side of the street -- which side of Belmont were they

7    on?

8    A    On the north side.

9    Q    What were they doing?

10    A    They were walking down the street.

11    Q    Which direction were they walking?

12    A    Eastbound.

13    Q    Do you see any of those men in court today?

14    A    Yes.  I do.

15    Q    Could you please point to that person and

16    indicate what he is wearing?

17    A    The gentleman with the blue jacket with the

18    hanky and the glasses.

19         THE COURT:  Indicating Thaddeus Jimenez.

20         MR. JOHN MURPHY:  Thank you, your Honor.

21    Q    Did you know Thaddeus Jimenez?

22    A    No.  I did not.

23    Q    The person who was with him, did you know

24    him?

1      A      No.

2      Q      Could you describe him?

3      A      He was about 13 years old, dark hair.  It's
4   all I can remember.

5      Q      What did you see -- Well let me go back.

6             Now you have identified the defendant here in
7   open court, is that right?

8      A      Yes.

9      Q      You now believe that the person you saw was
10  the defendant, is that right?

11     A      Yes.

12     Q      Let's go back.  You saw these two men walk in
13  the same direction that Eric and Larry Tueffel were
14  walking, is that right?

15     A      Yes.

16     Q      Could you describe what you saw happen next?

17     A      Okay.  Not this gentleman, but another
18  gentleman had grabbed a hold of Eric Morro and swung him
19  around, pushed him up against the wall of Honeybaked
20  Ham, and that is when this gentleman came up and put his
21  hand up against his chest.

22     Q      When you say this gentleman, are you
23  referring to the defendant?

24     A      Yes.

JIM02338

A 11
14

SA782

1    Q    When you saw the defendant put his hand

2  against his chest, whose chest are you referring to?

3    A    Eric Morro.

4    Q    What happened then?

5    A    The gun went off, and he shot Eric.

6    Q    When the gun went off, what happened?

7    A    Eric staggered over to me and says, mom, I've

8  been shot, and he fell into my arms.  I yelled for

9  someone to call for an ambulance and the police, and I

10 proceeded to tend to Eric.

11   Q    As you were tending to Eric, what happened

12 then?

13   A    I don't understand.

14   Q    Let me rephrase that question.  Did Eric

15 remain conscious?

16   A    He was conscious for a moment.  I ripped his

17 jacket open.  I saw the bullet hole, and we just waited

18 there.  I tried reviving him until the ambulance got

19 there but with no luck.

20   Q    After the ambulance arrived, what happened?

21   A    I went in the ambulance with Eric, and we

22 went to Illinois Masonic Hospital.

23   Q    Before you left did you give your name to the

24 police?

A .12_

15

JIM02339

1    A    Yes. I did.

2    Q    There were police officers there as well?

3    A    Yes. There were.

4    Q    After you got to the hospital, Mrs. Elder,
5. could you tell us what happened?

6    A    Okay. I called Eric's mother, Mary Morro.
7    She lived out of town, and I just sat in the waiting
8    room waiting to hear word on if they revived Eric or
9    not.

10    Q    Did you learn what happened with respect to
11    Eric at the hospital when -- from the attempts there to
12    revive him?

13    A    Yes.

14    Q    What did you learn?

15    A    They told me that Eric had passed away.

16    Q    While you were at the hospital, did you talk
17    to any police officers?

18    A    Yes. I spoke with two.

19    Q    Who did you speak to?

20    A    Ryan and Whitemore.

21    Q    Did you also speak to some detectives as well
22    later?

23    A    Later, yes.

24    Q    Mrs. Elder, you testified earlier that Tina

1   was talking to Phil when you were out on the street, is

2   that right?

3       A    Yes, correct.

4       Q    What happened to Tina after the shooting

5   occurred?

6       A    Tina had my granddaughter with her and she

7   went back to my house to take my granddaughter there and

8   then Tina went home to pick up her boy friend to come

9   back to the hospital by me.

10      Q    Did she come to the hospital?

11      A    Yes.  She did.

12      Q    What happened after Tina arrived at the

13  hospital?

14      A    Tina was very upset.  She was sick.  She

15  spent most of her time in the bathroom because she was

16  eight months' pregnant.

17      Q    When you spoke to the police, did you give

18  the police an account of what you saw?

19      A    Yes.  I did.

20      Q    At the hospital?

21      A    Yes.

22      Q    Did you give them any information about Tina?

23      A    I gave them Tina's name and told them they

24  could reach her at my house because Tina had just moved.

1      Q      Did you tell the police anything about Tina's

2  condition at the hospital?

3      A      Yes.  I told them she was eight months'

4  pregnant.

5      Q      Did you say anything else about the fact that

6  she had been sick?

7      A      Just that she was upset and sick.

8      Q      Sandra, did you have any more contact with

9  the police after you left the hospital?

10     A      No.  Not until the next morning.

11     Q      Approximately when did the police contact

12  you?

13     A      I believe it was somewhere between 5:00 and

14  7:00.

15     Q      A.M.?

16     A      Yes.

17     Q      When they contacted you, what did you learn?

18     A      They asked us to come to Grand and Central.

19  They had picked up some gentleman and that we should go

20  view a lineup.

21     Q      Did you do that?

22     A      Yes, sir.

23     Q      Who did you go to the police station with?

24     A      I went with my daughter.

JIM02342

```
1      Q      Did you also go with Phil?

2      A      With Phil.

3      Q      When you arrived at the police station, could

4  you describe to the ladies and gentlemen of the jury

5  what happened?

6      A      Okay.  We were all put in separate rooms to

7  view the lineup.  After we all went to view the lineup,

8  we just met back outside.

9      Q      Did you view the lineup?

10     A      Yes.  I did.

11     Q      When you viewed the lineup, how many people

12 were standing in the lineup?

13     A      There were five.

14     Q      Could you describe what happened -- First of

15 all, could you describe the procedure in the lineup?

16     A      Okay.  I had picked out two gentlemen in the

17 lineup.  There were five.

18     Q      When you picked out two gentlemen, what did

19 you indicate to the police about the two gentlemen you

20 picked out?

21     A      That they looked very much alike.

22     Q      Now so you got it down to two people, is that

23 correct?

24     A      Yes, sir.
```

JIM02343

A _ 16

19

1    Q    Do you see any of those two people in court
2    today that you picked out?

3    A    Yes.  I do.

4    Q    Could you please point to that person
5    again -- point to that person again?

6    A    With the glasses and the blue jacket.

7    THE COURT:  Thaddeus Jimenez.

8    MR. JOHN MURPHY:  Thank you, judge.

9    Q    Sandra, prior to February 3rd or on
10   February 3rd, 1993, did you know the defendant?

11   A    No.

12   Q    What area did you live in at that particular
13   time?

14   A    I lived near Belmont and Kedzie.

15   Q    How far did you live from the area of
16   Sacramento and Belmont?

17   A    A block and a half.

18   Q    How far did you live from 3618 West Belmont?

19   A    It was about maybe 12, 15 blocks.

20   Q    On February 3rd, 1993, where did your
21   daughter, Tina, live?

22   A    Tina lived up towards the Brickyard.

23   Q    Now had she just moved --

24   A    She had just moved.

A-17
20

JIM02344

SA788

1        Q      -- before that.  Could you tell the ladies

2   and gentlemen of the jury -- She moved just a few days

3   before February 3rd?

4        A      Yes.  She moved somewhere on Neenah.

5        Q      The area that you're describing now is the

6   area where she had lived before that?

7        A      Yes.

8        Q      How far was that from the area of Belmont and

9   Western --

10       A      Oh, that's --

11       Q      Excuse me.  Belmont and Sacramento.

12       A      That is quite a way.  It is 6500 west.

13       Q      Approximately how far would you say?

14       A      Maybe four, five miles.

15       Q      How far did she live from the area -- from

16   the address of 3618 West Belmont?

17       A      I'd say probably five miles.

18       Q      Sandra, when you observed this shooting

19   occur, where were you at?

20       A      I was standing in the middle of Belmont

21   Avenue.

22       Q      Where were you in relation to Wally's?

23       A      I was directly in front of Wally's in the

24   middle of the street.

JIM02345

1      Q      Now you testified that you went out to give

2  your daughter a radio, is that right?

3      A      Correct.

4      Q      Had you given her the radio before or after

5  you saw the shooting?

6      A      After.

7      Q      I am going to show you --

8             For the record, I am showing to counsel

9  People's Exhibits Number 11, 12, 13, and also what has

10  been marked -- what we will mark as People's Exhibit

11  Number 15, your Honor.

12             THE COURT:  Okay.

13             MR. JOHN MURPHY:  May I approach?

14             THE COURT:  Sure.

15             MR. JOHN MURPHY:    Q.  Showing you first what

16  has been marked as People's Exhibit Number 11.  Do you

17  recognize what that is?

18      A      Yes.  This is a picture of the lineup.

19      Q      You testified that you got it down to two

20  people, is that right?

21      A      Yes, sir.

22      Q      Those two people shown in that lineup?

23      A      Yes, sir.

24      Q      What I would ask you to do, if you would, is

1    on the cardboard frame around the lineup or the matting

2    place your initials above the two individuals who you

3    got it down to.

4              For the record, judge, the witness has placed

5    the initials SE above the person in the second position

6    from the left and also the fourth position from the

7    left.

8              THE COURT:  Okay.

9              MR. JOHN MURPHY:  Q.  Now I am going to show

10   you what has been marked as People's Exhibit Number 13.

11             Do you recognize what that is?

12    A    Yes.

13    Q    What is that?

14    A    That is a picture of this gentleman in the

15   Dukes jacket.

16    Q    That is one of the two individuals that you

17   picked out in the lineup, is that right?

18    A    Yes.  It is.

19             THE COURT:  By this gentleman, do you mean

20   the person you referred to before as Thaddeus Jimenez?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Okay.

23             MR. JOHN MURPHY:  Thank you, judge.

24    Q    I am also showing you what's been marked as

JIM02347

A-20
23

SA791

1   People's Exhibit Number 15.

2              Do you recognize what that is?

3       A     Yes.

4       Q     What is that?

5       A     It is a picture of Wally's Lounge and Belmont

6   Avenue.

7       Q     The photographer in that picture would be

8   facing southbound?

9       A     He would be facing southbound.

10      Q     Is that correct?  Standing on north side of

11  Belmont?

12      A     Yes, sir.

13      Q     Does that photograph show the area where you

14  were standing when you observed the shooting?

15      A     Yes.  It does.

16      Q     In fact, in a previous proceeding, did you,

17  in fact, mark your initials, SE, on that photograph

18  where you were standing?

19      A     Yes.  I did.

20      Q     Did you see them there on the photograph?

21      A     Yes.  I do.

22      Q     Thank you.

23             Does that photograph truly and accurately

24  show the scene -- Other than the fact that it's light,

A  21

JIM02348

1   does it truly and accurately show the buildings as they

2   appeared?

3       A      At that night, yes.

4               MR. JOHN MURPHY:  May the witness be allowed

5   to step down from the witness stand?

6               THE COURT:  Sure.

7               (Witness stepped down.)

8               MR. JOHN MURPHY:   Q.  Sandra, I am showing

9   you what has been previously marked as People's Exhibit

10  Number 7 for identification.

11              Do you recognize what this is?

12      A      Yes.  I do.

13      Q      What is it?

14      A      It is a picture of Belmont Avenue.

15      Q      That is, in fact, a diagram of the area, is

16  that correct?

17      A      Yes.

18      Q      Would this assist you in explaining your

19  testimony to the ladies and gentlemen of the jury?

20      A      Pardon?

21      Q      Would this assist you in explaining your

22  testimony to the ladies and gentlemen of the jury?

23      A      Yes.

24      Q      I am going to give you a marker, and what I

A-22
25

1    would ask you to do, if you would, is place on that

2    diagram your initials and the area where you were

3    standing when you saw the shooting?

4            For the record, judge, the witness has marked

5    the exhibit.

6            THE COURT:  Okay.

7            MR. JOHN MURPHY:    Q.  In the diagram, can

8    you see the area where you observed the shooting occur?

9        A    Yes.

10       Q    Specifically the area where two individuals

11   were that you didn't know?

12       A    Yes.

13       Q    Where Eric was at --

14       A    Yes.

15       Q    -- when he was shot.  Could you please point

16   to that for the ladies and gentlemen of the jury?

17       A    Eric was standing right here.

18       Q    That would be in front of the Honeybaked Ham

19   store, is that correct?

20       A    Yes.

21           MR. JOHN MURPHY:  Thank you very much.

22               (The witness resumed the stand.)

23           MR. JOHN MURPHY:  No further questions.

24           THE COURT:  Mr. Charles Murphy.


A  23

2 6

JIM02350

<pre>
1                    CROSS EXAMINATION

2               BY MR. CHARLES MURPHY:

3        Q     Mrs. Elder, at the time you came out of

4    Wally's Lounge, it was dark out, was it not?

5        A     It was dusk.

6        Q     It was about 6:25 P.M. on February 3rd, is

7    that correct?

8        A     Yes.

9        Q     Are you suggesting that there was still some

10   artificial or excuse me some natural daylight?

11       A     No.  It was from the streetlights and the

12   businesses.

13       Q     At the time that you left Wally's, what you

14   intended to do is catch your daughter and give her her

15   car radio back?

16       A     Correct.

17       Q     When you came out of Wally's, did you, in

18   fact, see your daughter right away across the street

19   speaking with Phil Torres?

20       A     Yes.  I did.

21       Q     If you know, was another member of your

22   family inside Mr. Torres' apartment at that time?

23       A     Yes.

24       Q     Who would that have been?
</pre>

1    A    My son.

2    Q    Once you saw your daughter, did you call out

3    to her right away?

4    A    I said, Tina.

5    Q    When you called out to her, were you still on

6    the south side of Belmont Avenue?

7    A    I was in the middle of the street.

8    Q    Was it about that time that you happened to

9    notice that Eric Morro and Larry Tueffel?

10    A    Tueffel.

11    Q    Excuse me.  Larry Tueffel.  Were walking

12    eastbound?

13    A    Yes.

14    Q    When you saw Eric, did you acknowledge him,

15    wave to him, or speak to him?

16    A    No.

17    Q    In any event, did you also note at that

18    precise time that it was Larry who was with him?

19    A    Yes.  I did.

20    Q    You said here today that there were two other

21    people that were behind Eric and Larry, is that correct?

22    A    Yes.

23    Q    At least at that particular moment were they

24    doing anything dramatic, exciting, unusual, or unique?

A  25

28

JIM02352

1      A       Nothing.

2      Q       Did you continue at that particular time,

3   from the moment that you're in the middle of the street,

4   to walk or did the traffic prevent you from going any

5   further?

6      A       The traffic prevented me from crossing.

7      Q       You have said here today that you noted that

8   one of the men that was behind Eric spun him and pushed

9   him up against the wall of the Honeybaked Ham?

10     A       Yes.

11     Q       Did you notice whether or not either before

12  or after he was pushed up against the wall anyone threw

13  a punch or anybody take a swing?

14     A       I did not see anyone throw a punch.

15     Q       At the time that you saw this one man push

16  Eric up against the wall, would I be correct in assuming

17  that your attention was directed to the man who pushed

18  him up against the wall?

19     A       Yes.

20     Q       You have said and -- You have identified my

21  client --

22     A       Yes.

23     Q       -- as approaching Eric as he was up against

24  the wall and he fired a single shot, is that correct?

A -26

— 29

JIM02353

SA797

1      A      Yes.

2      Q      The man who fired that shot, would I be

3   correct that when the shot was fired his back was to

4   you?

5      A      At the time of the shot, yes.

6      Q      Immediately after the shot was fired, did

7   these two young men take off running westbound on --

8      A      I have no idea which way they ran because I

9   was tending to Eric.

10      Q      Your attention was directed -- directed at

11   Eric?

12      A      Yes, directly at Eric.

13      Q      When you were looking at the photograph that

14   the prosecutor showed you, you identified the photograph

15   of my client wearing a Duke jacket?

16      A      Yes.

17      Q      You knew what a Duke jacket is?

18      A      Yes.

19      Q      You had seen them before on February 3rd,

20   1993, had you not?

21      A      Yes.

22      Q      In the photograph that you identified that

23   portrays my client as he's wearing a Duke jacket, did

24   you notice whether or not he has any gericurls in his

A  27

JIM02354

SA798

1    hairstyle?  Did you notice?

2        A     No.

3        Q     I'll get to it.  What are gericurls?

4        A     Gericurls are little tiny curls that they

5    wear in their hair.

6        Q     Mrs. Elder, when you initially spoke with

7    police on February 3rd, am I correct that you spoke to

8    the police at the hospital, this is February 3rd, now?

9        A     Yes.

10       Q     You did not go to the police station until

11   the following day, the 4th?

12       A     Correct.

13       Q     When you spoke to the police detectives at

14   the hospital, do you remember if you spoke with a

15   Detective Bogucki?

16       A     I spoke with him the next day.

17       Q     Who did you speak to at the hospital?

18       A     Ryan and Whitemore, two police officers from

19   the 17th District.

20       Q     When you spoke to detectives and you're

21   saying that it was the next day, am I correct that you

22   described the shooter in this incident as having

23   gericurls?

24       A     I don't recall.

JIM02355

1           MR. JOHN MURPHY:  Objection.

2           THE COURT:  Basis being what?

3           MR. JOHN MURPHY:  That is not what the report

4    indicates.

5           THE COURT:  He is asking her if that is what

6    she said, and her answer is no.  Overruled.

7           MR. GAUGHAN:  He has no good faith basis.

8           THE COURT:  Overruled.  Next question,

9    Mr. Charles Murphy.

10           MR. CHARLES MURPHY:  I would ask for a

11    sidebar.

12           THE COURT:  No need to.  Go ahead.

13           MR. CHARLES MURPHY:  Q.  Did you tell the

14    detectives that an offender who was 13 to 14 years of

15    age had gericurls?

16    A    I don't recall saying that.

17    Q    Did you tell detectives in this particular

18    investigation that a person who had gericurls was

19    wearing a blue nylon waist-length jacket?

20    A    I said a nylon jacket, but I don't recall

21    anything about saying gericurls.

22    Q    Did you ever tell any police detective before

23    you went to a lineup that either of the two young men

24    that you saw that came up behind Eric and Larry had on a

A _29
3 2

1    blue nylon waist-length jacket?

2        A    I said there was a Dukes jacket.

3        Q    Who did you say that to?

4        A    That was the next day.

5        Q    Who did you say that to?

6        A    To Bogucki.

7        Q    Did you say that to Bogucki before you viewed

8    the lineup or after?

9        A    It was after.

10        Q    You gave a description of the second person

11    that you saw as being five-five and 120 pounds?

12        A    Correct.

13        Q    The person that you described as being

14    five-five and 120 pounds, would that have been a

15    description of the person that pushed Eric up against

16    the wall?

17        A    It is the one that spun him around.

18            MR. CHARLES MURPHY:  May I approach the

19    witness?

20            THE COURT:  Sure.

21            MR. CHARLES MURPHY:   Q.   Mrs. Elder, I am

22    going to show you something that you've already seen.

23    This is People's Exhibit Number 13, and this is a

24    photograph of my client wearing the Dukes jacket that

A. 30

33

JIM02357

SA801

1   you mentioned, is that correct?

2       A    Yes.

3       Q    Am I also correct that he is not shown -- By

4   the way, that photograph was taken on February 4th, is

5   that right?

6       A    Yes, or I don't know when the photo was

7   taken.

8       Q    Is that the way my client looked on

9   February 4th when you saw him at the police station?

10      A    Yes.  He did not have the jacket on in the

11  lineup.

12      Q    Am I correct that that photograph does not

13  show my client with any short gericurls in his

14  hairstyle?

15      A    Correct.  As I stated, I have never seen

16  gericurls.

17      Q    On my client?

18      A    I didn't testify to anyone having gericurls.

19      Q    You said that you knew Larry from around the

20  neighborhood, is that right?

21      A    Yes, sir.

22      Q    What neighborhood were you referring to?

23      A    The area of Belmont and Kedzie.

24      Q    Belmont and Kedzie is two blocks away from

1    Belmont and Sacramento, is that right?

2        A    It's four blocks.  Yes.  Two-and-a-half

3    blocks.

4        Q    How long had you been familiar with or known

5    Larry before February 3rd, 1993?

6        A    I just seen Larry around the neighborhood.

7        Q    I know but for about -- How long had it been

8    since you had first seen him?  Can you estimate?

9        A    Probably around eight months.

10       Q    The night that this incident took place, you

11   were at Wally's which is just off the corner of Belmont

12   and Sacramento, is that right?

13       A    Yes.

14       Q    That is not the first time that you had been

15   to Wally's?

16       A    No.  It is not.

17       Q    Had you been there frequently prior to that

18   evening?

19       A    I used to tend bar there.

20       Q    How long had you tended bar at Wally's?

21       A    I tended bar for Wally for about a year and a

22   half.

23       Q    Did that lead up to just before February 3rd?

24       A    No.  I had been away from Wally's for quite

A .32 -

35

JIM02359

SA803

1  awhile.

2      Q      Nonetheless after you left their employ, you

3  continued -- after you left their employ, you became a

4  customer?

5      A      Yes.

6      Q      Is it your testimony that during that period

7  of time that you were a customer at Wally's after you

8  had left their employ, you had never seen my client

9  hanging around the corner of Belmont and Sacramento?

10     A      I have seen him in the neighborhood every

11 once in a while.

12     Q      When you went to the lineup, you knew who he

13 was by face, didn't you?

14     A      By face.

15     Q      You never told any police investigators

16 either at the hospital or for that matter at the police

17 station before you viewed the lineup that you recognized

18 the shooter from the neighborhood, did you?

19     A      I just said he was from the neighborhood -- a

20 boy that I'd seen in the neighborhood.

21     Q      Who did you tell that to?

22     A      Ryan and Whiteman.

23     Q      How many times have you, to the best

24 recollection that you have, how many times had you seen

A  33

3 6

JIM02360

SA804

1   my client in the neighborhood before February 3rd, 1993?

2       A      Oh, I have no idea.  I couldn't even

3   estimate.

4       Q      Was it more than five times?

5       A      It could have been more, could have been

6   less.  I was working, and I see a number of kids go down

7   the street.

8       Q      I am talking about my client though.

9       A      Well say five times.

10      Q      The street that you would usually see him

11  walking down, would that be Belmont?

12      A      Yes.

13      Q      When you went to the lineup the next day on

14  February 4th, you went to the lineup with your daughter

15  and Phil Torres, is that correct?

16      A      Correct.

17      Q      How long have you known Phil Torres?

18      A      I have known Phil for about 18 years.

19      Q      Would I be correct that Mr. Torres is a close

20  personal friend to both yourself as well as your

21  daughter?

22      A      He is a friend.  I wouldn't say a personal

23  friend.

24      Q      You have known him nonetheless for 18 years?

A  34 --
—      37

JIM02361

1    A    Yes.

2            MR. CHARLES MURPHY:  I have nothing else of

3  the witness.

4            THE COURT:  Mr. John Murphy.

5            MR. JOHN MURPHY:  I have no questions.

6            THE COURT:  You may step down, Mrs. Elder.

7  No further questions.

8            THE WITNESS:  Thank you.

9                (Witness excused.)

10           THE COURT:  People call --

11           MR. CHARLES MURPHY:  May I request a sidebar?

12           THE COURT:  With or without the reporter?

13           MR. CHARLES MURPHY:  With.

14                (The following proceedings occurred

15                 out of the hearing of the jury:)

16           THE COURT:  Yes, Mr. Murphy, Charles Murphy.

17           MR. CHARLES MURPHY:  Judge, when I was cross

18  examining this witness, I was referring to the General

19  Progress Report that has Sandra Elder's name on it, has

20  other information on it as well.

21           THE COURT:  Lower your voice.

22           MR. CHARLES MURPHY:  It also includes some

23  descriptive information of the two individuals that she

24  saw.

1          I was questioning her about the gericurls

2  that were being described as well as the fact -- as well

3  as a blue nylon waist-length jacket.

4          The prosecutors yell out in the presence of

5  the jurors that I have no good faith basis in asking

6  those questions of the witness.

7          THE COURT:  I overruled the objection -- that

8  she can answer it I should say.

9          MR. CHARLES MURPHY:  I understand, judge.  A

10 bell was rung, and it is hard to unhear it.

11         I am requesting the opportunity at this time

12 for you to permit -- to tell the jurors right now that I

13 was quoting from a General Progress Report.

14         THE COURT:  First of all, police reports are

15 not evidence.  Do you want to call whoever wrote up

16 that report, Bogucki?

17         MR. CHARLES MURPHY:  I assume it is.

18         THE COURT:  I will instruct the jury and I

19 will tell the lawyers there will be no more speaking

20 objections.  Either object and if there is a problem

21 tell me on the side.  I do not want any commentary along

22 with it.

23         If you are going to call in whoever you are

24 going to call in, so there is no song and dance about

JIM02363

A . 36.

39

1  who prepared this report, I did not do it, I do not know

2  where the information was from, are those descriptions

3  from Bogucki or whoever wrote that report?  The State

4  found out who wrote it.

5            This is a murder case, not a high school

6  debate.  If it is in the report, this is what was said.

7  There is not going to be song and dance about I do not

8  know who told me that.  I do not know who wrote the

9  report.

10           MR. JOHN MURPHY:  The question that we

11  objected to, and frankly in retrospect we agree with the

12  Court's ruling 100 percent, it should have been

13  overruled, but the question that was posed initially we

14  were misled by because the question was, did you tell

15  the police that the shooter was -- had gericurls.

16           I had a General Progress Report in front of

17  me at the time, and the General Progress Report did not

18  indicate two offenders, it did not indicate who the

19  shooter was.  We believed in good faith that he was not

20  asking her about who the shooter was.  It has become

21  clear in light of what he said that it's correct.

22           We are not trying to mislead the jury.  I

23  think it became clear after additional questions that

24  that is what he was doing.  We have no problem with

JIM02364

A. 32

— 40

1    that.  I think it's clear to the jury because of the

2    fact that he talked about the fact that she said he had

3    a blue nylon jacket.

4         THE COURT:  It was not necessary to add in

5    the commentary about Mr. Murphy not asking the questions

6    in good faith.  That is certainly not appropriate for

7    the jurors to be given a suggestion that the lawyer is

8    trying to do something that he is not entitled to do.

9    In the future just object, and if there is a problem, we

10   will talk about it on the side.

11        MR. JOHN MURPHY:  We will do that.  We

12   apologize for that.

13        THE COURT:  Also in the future only the

14   lawyer who questioned the witness can object, not both

15   state's attorneys, only the lawyer who questioned the

16   witness.

17        I am trying to think of something appropriate

18   to say about the lawyers ask questions, and they'll

19   present whatever evidence they wish in regard to that.

20        MR. JOHN MURPHY:  We apologize, judge.

21        THE COURT:  Thank.  Okay.

22             (The following proceedings occurred

23              in the hearing of the jury:)

24        THE COURT:  Before we hear the next witness,

1    during the questioning of the last witness by

2    Mr. Charles Murphy, attorney for Jimenez, there was an

3    objection made, and during the course of the objection,

4    one of the state's attorneys said that question was not

5    asked in good faith.

6            When lawyers ask questions in a particular

7    case, it is up to the Court to determine whether the

8    question is a proper question or not.  The Court ruled

9    that the question was a proper question.  You will

10   disregard the State's comment that the question was not

11   asked in good faith.

12           Call the next witness.

13           MR. JOHN MURPHY:  Your Honor, the People call

14   Detective Jerome Bogucki.

15           (Witness sworn.)

16           THE COURT:  Please be seated and keep your

17   voice up nice and loud.

18

19

20

21

22

23

24

A   39

42

JIM02366

SA810

```
 1                      JEROME BOGUCKI,

 2  called as a witness on behalf of the People of the State

 3  of Illinois, having been first duly sworn, was examined

 4  and testified as follows:

 5                  DIRECT EXAMINATION

 6                  BY MR. MURPHY:

 7      Q      Would you please state your name and spell

 8  your last name for the court reporter?

 9      A      Detective Jerome Bogucki.  That's

10  B-o-g-u-c-k-i.

11      Q      You are employed as a Chicago police officer,

12  is that right?

13      A      Yes.

14      Q      How long have you been a Chicago police

15  officer?

16      A      Approximately 21 years.

17      Q      You testified that you are a detective at

18  this time, is that right?

19      A      Yes.

20      Q      How long have you worked as a detective?

21      A      About 17 years.

22      Q      Where are you presently assigned?

23      A      Area 5 Detective Division.

24      Q      How long have you worked in Area 5?
```

A  40__

__  43

JIM02367

1    A    All of the 17 years I was a detective.

2    Q    Could you describe what your duties are as a

3    detective in Area 5?

4    A    My present duty is to work homicide

5    investigations.  We get involved obviously after the

6    crime is committed.  We're basically responsible for

7    follow-up investigation.

8    Q    Detective, were you working as a Chicago

9    police officer on the date of February 3rd, 1993?

10    A    Yes.

11    Q    On that particular day, were you working

12    alone or were you with a partner?

13    A    On that day I was basically alone.

14    Q    What shift did you work?

15    A    That would be what we would call the third

16    shift which is -- starts at 4:30 in the afternoon and

17    ends at 1:00 in the morning.

18    Q    While you were on duty on that day, were you

19    assigned to the investigation of a shooting which had

20    occurred on the same day during the evening hours in the

21    area of Sacramento and Belmont?

22    A    Yes.

23    Q    Where did you go initially?

24    A    Initially I passed by what I was told was the

A  41

44

1    scene which was at 3018 West Belmont.  I saw that there

2    were no more police personnel out there any more or no

3    one for that matter.  I continued on to Illinois Masonic

4    Hospital where I had learned the victim had been taken.

5        Q    When you went to Illinois Masonic Hospital,

6    did you speak to anyone there?

7        A    Yes.

8        Q    Who did you speak to?

9        A    17th District officers Ryan and Whiteman.

10       Q    In addition to Officers Ryan and Whiteman,

11   did you speak to any witnesses in the hospital?

12       A    Yes.

13       Q    Who did you speak to?

14       A    Sandra Elder.

15       Q    At some point at the hospital did

16   Sandra Elder give you an account of what she saw?

17       A    Yes.  She did.

18       Q    While you were at the hospital, did you learn

19   from Sandra Elder about the existence of any other

20   eyewitnesses?

21       A    Yes.

22       Q    Who was that?

23       A    Her daughter, Tina.

24       Q    Did you speak to Tina Elder at the hospital?

A. 42

4 5

JIM02369

1    A    No.

2    Q    Why not?

3    A    She was not there.

4    Q    Did you learn anything about her condition

5    from Sandra Elder?

6    A    Sandra told me that --

7         MR. CHARLES MURPHY:  Objection.

8         THE COURT:  Sustained.

9         MR. JOHN MURPHY:    Q.  Did you talk to any --

10   Strike that.

11        After you completed your investigation at the

12   hospital, where did you go?

13   A    I went back to the -- Well actually I went

14   back to the scene.  I was met by a Detective Montilla

15   who was going to conduct a canvass of the area to try to

16   find any additional witnesses, and then I went back to

17   the Area 5 office.

18   Q    Now when you arrived back at the Area 5

19   office, did you learn of the existence or did you, in

20   fact, meet any other additional witnesses?

21   A    Yes.  There were two witnesses that had been

22   transported into Area 5 by my request.

23   Q    Who were those witnesses?

24   A    They were Larry Tueffel and Phillip Torres.

A   43- -
46

JIM02370

SA814

1    Q    Did you speak with each of those witnesses?

2    A    Yes.  I did.

3    Q    Did you learn accounts from each of those

4  witnesses as well what they saw?

5    A    Yes.

6    Q    Did you also receive descriptions of the

7  offenders from each of those witnesses?

8    A    Yes.

9    Q    Were the descriptions that you received

10  regarding each of the offenders from Phil Torres and

11  Larry Tueffel the same?

12    A    No.

13    Q    Now, officer, at some point did Phillip

14  Torres and Larry Tueffel leave the area?

15    A    Yes.

16    Q    After they left the area, was there any

17  additional developments in this investigation?

18    A    Yes.  There was.

19    Q    Can you describe what happened?

20    A    At approximately 1:00 o'clock in the morning

21  would now be the 4th of February, I received a phone

22  call at the Area 5 office from Phillip Torres.

23    Q    When you received that phone call, did you

24  speak to him on the telephone?

JIM02371

A  44

47

1        A    Yes.

2        Q    Can you describe what, if anything, he said

3    to you and what you said to him?

4             MR. CHARLES MURPHY:  Objection.

5             THE COURT:  Sustained.

6             MR. JOHN MURPHY:   Q.  Did you receive some

7    information from Phillip Torres at that time?

8        A    Yes.  I did.

9        Q    When you received that information, what did

10   you do?

11       A    I proceeded to his mother's house at

12   3000 West Belmont in order to talk to Phillip Torres.

13       Q    Did you, in fact, go to that location and see

14   him there?

15       A    Yes.  I did.

16       Q    What happened when you arrived there?

17       A    I did, indeed, have a conversation with

18   Phillip Torres.

19       Q    After you completed -- you finished your

20   conversation with Phillip Torres, were you looking in

21   particular for anyone as a suspect in this case?

22       A    Yes.

23       Q    Who were you looking for?

24       A    A subject, a 13 or 14 year old subject by the

A. 45.

— 48

SA816

JIM02372

1    name of TJ.

2         Q    Prior to your conversation with Mr. Torres,

3    were you looking for a person by the name of TJ?

4         A    No.

5         Q    What did you do after you left

6    Phillip Torres' house or mother's house?

7         A    I went back to the Area 5 office, and I

8    actually solicited the help of Detective Mark Sanders

9    who was working the midnight watch.

10        Q    What happened?

11        A    At that point I went to the home of Larry

12   Tueffel.

13        Q    Did you have a conversation with him?

14        A    Yes.

15        Q    After you completed your conversation --

16   After you finished your conversation with Larry Tueffel,

17   what happened?

18        A    At that point I went to the address of

19   3618 West Belmont and place Thaddeus Jimenez under

20   arrest.

21        Q    Do you see him in court today?

22        A    Yes.

23        Q    Would you please point to him and indicate an

24   article of clothing?

A. 46

4 0

JIM02373

SA817

1      A      He is wearing a blue suit.

2            THE COURT:  Indicating, for the record,

3    Thaddeus Jimenez.

4            MR. JOHN MURPHY:    Q.  Detective, could you

5    describe what occurred at 3618 West Belmont?

6      A      Yes.

7            Myself and Detective Sanders knocked on the

8    door.  A woman answered the door.  She said her name was

9    Gloria Makowski.  We asked, is there a TJ that lives

10   here.  She said, yes, that is my grandson.  She allowed

11   us entry into the apartment and she showed us the couch

12   where someone was lying there and she said, this is TJ.

13     Q      Is that the person that you previously

14   identified in court?

15     A      Yes.

16     Q      After placing the defendant under arrest,

17   what did you do?

18     A      We brought the defendant into the Area 5

19   office.

20     Q      Can you describe what happened with respect

21   to the investigation after the defendant was placed

22   under arrest?

23     A      Well he had been advised of his rights, and

24   we asked him if he knew anything about the case.

1        Q        Detective, what I am asking you is was there

2    a lineup procedure conducted?

3        A        Yes.  There was.

4        Q        Where was the lineup procedure?

5        A        In the Area 5 office.

6        Q        Now, detective, can you tell us what time was

7    that lineup -- approximately what time was that lineup

8    procedure conducted?

9        A        Approximately 10:00 A.M.

10       Q        Were any witnesses contacted in order to view

11   that lineup?

12       A        Yes.

13       Q        Who was contacted?

14       A        Tina and Sandra Elder, Phillip Torres, and

15   Larry Tueffel.

16       Q        Could you describe how you conducted that

17   lineup?

18       A        Yes.  There were -- Thaddeus Jimenez was the

19   subject of our lineup.  With the subject of a lineup, we

20   would always -- before we did a lineup, we would get a

21   number of shills or what we call fillers.  These would

22   be people that would look similar as to the size and

23   appearance and age of the subject of the lineup, the

24   person that we want to show.

JIM02375

1    Q    How many fillers did you use in this lineup?

2    A    There were four fillers.

3    Q    Can you describe what you did once you

4    used -- found the four fillers you would use in the

5    lineup?

6    A    The fillers and the subject of the lineup,

7    which was Mr. Jimenez were placed -- Actually I

8    described the room that we use.  It is a two-part room.

9    It is actually two rooms, and in between the two rooms

10    is glass.  We call it a one-way mirror.

11           The participant side, they could only see a

12    mirror, and on the viewing side you can see through into

13    the participant side.

14           Mr. Jimenez was offered to choose his own

15    position in the lineup.  In other words, there are five

16    people.  He could choose anywhere from standing in the

17    Number 1 through 5 position.  He chose the Number 2

18    position.  When the lineup was shown, there was one

19    witness brought into the lineup room at a time.  They

20    would view alone.  Each of the participants of the

21    lineup were required to wear a Duke starter coat, which

22    was the property of Mr. Jimenez.

23    Q    Let's talk about that, that Duke starter

24    coat.  You said it was his property.  When did you first

A  -49 -

—  52

JIM02376

1    see that Duke starter coat?

2        A        He put that on when he got dressed to come

3    into the Area 5 office when he was placed under arrest.

4        Q        So that came from his house?

5        A        Yes.  It did.

6        Q        He wore that coat when he went into the area?

7        A        Yes.  He did.

8        Q        Now you said you had each of the people in

9    the lineup wear the Duke coat, is that right?

10       A        Yes.

11       Q        So they wore it one at a time?

12       A        Yes.  They did.  There was --

13       Q        There was only one coat?

14       A        There was only one coat.  We would call each

15    of the participants in the lineup up close to what they

16    were looking at was a mirror.  They would be required to

17    make several turning motions in front of the mirror.

18    Before they did that, each of them put on this coat.

19       Q        Did each of the five people who stood in the

20    lineup wear that Duke coat before identification was

21    made?

22       A        Yes.

23       Q        Regarding that Duke coat, in the previous

24    descriptions that you had received of the offenders, had

A   50   -
—      53

JIM02377

SA821

1  any of the eyewitnesses described any of the offenders

2  as wearing a Duke coat or a blue-and-white coat?

3      MR. CHARLES MURPHY:  Objection.

4      THE COURT:  Sustained at this point.

5      MR. JOHN MURPHY:    Q.  Detective, when

6  Phillip Torres viewed the lineup, what did he do?

7      A   He positively identified Mr. Jimenez as being

8  the offender.

9      Q   When Larry Tueffel viewed the lineup, what

10 did he do?

11     A   He positively identified Mr. Jimenez as the

12 person he knows as TJ and the person who shot the

13 victim.

14     Q   You were aware even before you conducted the

15 lineup that both Phillip Torres and Larry Tueffel

16 already knew the defendant, is that correct?

17     A   Yes.

18     Q   Would it be fair to say that nonetheless you

19 wanted to obtain a formal identification?

20     A   Yes.  And to make sure that this, indeed, was

21 the TJ that they knew.

22     Q   Tina Elder you testified viewed that lineup

23 as well, is that right?

24     A   That's correct.

1   Q       When she viewed the lineup, what did she do?

2   A       She positively identified Mr. Jimenez as the

3   person who shot the victim, Eric Morro.

4   Q       And Sandra Elder, what happened when she

5   viewed the lineup?

6   A       She picked out two people as looking too

7   close alike, one of which was Mr. Jimenez.  She said

8   both of them to her looked like the person that shot

9   Eric Morro.

10  Q       After the -- You may have stated this,

11  detective, but I apologize for going over this again.

12          Did each of the witnesses view the lineup

13  separately?

14  A       Yes.  They did.

15  Q       After the lineup procedure was completed, was

16  the defendant charged?

17  A       Yes.  He was.

18  Q       What was he charged with?

19  A       First-degree murder.

20  Q       This investigation though did not end with

21  the arrest and charging of the defendant, Thaddeus

22  Jimenez, is that correct?

23  A       That's correct.

24  Q       Sometime later was another individual

A  52

55

JIM02379

SA823

1    arrested?

2        A    Yes.

3        Q    Who was that?

4        A    Victor Romo.

5        Q    When was Victor Romo arrested?

6        A    I believe it was the 10th of February.

7        Q    Why was Victor Romo arrested?

8        A    He assisted Thaddeus Jimenez in this --

9             MR. CHARLES MURPHY:  Objection to the

10    officer's opinion.

11            THE COURT:  Sustained as to the conclusion.

12    Sustained.

13            MR. JOHN MURPHY:    Q.  Detective, prior to

14    Victor Romo's arrest, was there any kind of

15    identification procedure -- Strike that.

16            Had you received any information with respect

17    to Victor Romo?

18        A    Yes.

19        Q    What information had you received?

20            MR. CHARLES MURPHY:  Objection.

21            THE COURT:  Sustained.  Romo was eventually

22    arrested and charged?

23            THE WITNESS:  That's correct.

24            THE COURT:  Next question.

JIM02380

1           MR. JOHN MURPHY:  Your Honor, for the record,

2    I am showing People's Exhibits 11 and 13 to counsel for

3    the defense.

4           May I approach?

5           THE COURT:  Sure.

6           MR. JOHN MURPHY:   Q.   Showing you first

7    what's been marked as People's Exhibit Number 11.  Do

8    you recognize what that is?

9       A    Yes.  This is the -- a picture of the lineup

10   that was conducted on the 4th of February which included

11   Mr. Jimenez.

12      Q    And does that picture truly and accurately

13   show the way the five individuals that stood in the

14   lineup appeared?

15      A    Yes.

16      Q    The two individuals that Sandra Elder picked

17   out -- The two individuals that Sandra Elder picked out,

18   what positions are they in in the lineup?

19      A    Second from the left and fourth from the

20   left.

21      Q    Thank you.  Also showing you what's been

22   marked as People's Exhibit Number 13, what is that?

23      A    This is a singular photo of Thaddeus Jimenez.

24      Q    That picture -- How is that different from

A  54    57

JIM02381

SA825

1  the picture of Thaddeus Jimenez as he appears in the

2  lineup?

3      A    He's wearing his Duke starter jacket.

4      Q    Is that the same jacket that you recovered

5  from his house and that he wore to the police station

6  after he was arrested on February 4th, 1993?

7      A    This is the jacket that he put on when he got

8  dressed.  Yes, sir.

9            MR. JOHN MURPHY:  I have no further

10.  questions.

11            THE COURT:  Mr. Charles Murphy.

12                CROSS EXAMINATION

13            BY MR. CHARLES MURPHY:

14      Q    Detective, I have just marked this exhibit as

15  Defendant's Exhibit Number 2 for identification.  Do you

16  recognize what that is?

17      A    Yes.  These are notes that I had wrote.

18      Q    You anticipated my question.  That is your

19  handwriting on the exhibit?

20      A    Yes.  It is.

21      Q    That is a General Progress Report, is that

22  correct?

23      A    That is what is listed on there.  It is paper

24  that the police department provides for notes for us.


A  55

_  5 8

JIM02382


SA826

1    Q    Number 3 for -- Number 2 for identification,

2    the exhibit that I just showed you, were those the notes

3    that you took when you spoke with Sandra Elder?

4    A    Yes.

5    Q    Defendant's Exhibit Number 3 for

6    identification, am I correct that those are also general

7    progress reports or notes?

8    A    These are notes, yes.

9    Q    Is that your handwriting again?

10    A    Yes.  It is.

11    Q    Number 3 that you have in front of you, are

12    those the notes that you took when you spoke with Larry

13    Tueffel?

14    A    This is the original interview with

15    Larry Tueffel.

16    Q    Defendant's Exhibit Number 4 for

17    identification, those are also General Progress Reports

18    or notes, is that correct?

19    A    Yes.

20    Q    There is handwriting on that as well?

21    A    Yes.  There is.

22    Q    Is that your handwriting?

23    A    Yes.  It is.

24    Q    Are those the notes that you took when you

1  spoke with Phillip Torres?

2      A      This is actually a combination of two

3  different interviews with Phillip Torres.

4      Q      Nonetheless that is your handwriting?

5      A      Yes.  It is.

6      Q      Sir, when you went and arrested my client in

7  the early morning hours of February 4th, while you were

8  there did you and other officers conduct a search of the

9  residence looking for a gun?

10     A      No.

11     Q      Was the gun ever recovered anywhere during

12 the course of this investigation that was tied to the

13 slaying of Eric Morro?

14     A      No.

15     Q      You gave us testimony today concerning the

16 lineup procedure that took place February 4th at Area 5,

17 and you said that the individual witnesses viewed the

18 lineup separately, is that correct?

19     A      Yes.  They did.

20     Q      Do you remember the sequence of individuals

21 taking a look at the lineup, who was first, second,

22 third, and fourth?

23     A      I believe so.

24     Q      What was it?

A .57

—  6 0

JIM02384

1       A      I believe Tina Elder was first,

2   Phillip Torres was second, Sandra Elder was third, and

3   Larry Tueffel was fourth.

4       Q      You were conducting a running lineup, were

5   you not?

6       A      Myself and Detective Sanders.

7       Q      At the time that the lineup was actually

8   being conducted in whatever room it was being conducted

9   in, where was your partner?

10      A      With me.

11      Q      Would --

12      A      I believe he was with me.

13      Q      Would the following procedure take place --

14  Would I be correct that the lineup itself, you had a

15  police officer in the lineup for security purposes,

16  didn't you, to make sure no one ran out the door?

17      A      The reason I say I believe he was with me is

18  my regular partner, who was off at the time, we do the

19  procedure in a certain way.  Some people have --

20      Q      My question to you though is this day, this

21  time, was there --

22      MR. JOHN MURPHY:  Objection.

23      THE COURT:  Overruled.

24      The question is this particular day.  If you

A  58
—  61

JIM02385

SA829

1    do not recall that particular day, then you can say you

2    don't recall and go from there.

3         THE WITNESS:  I don't recall if anyone was

4    actually in the participant's side of the lineup.

5         MR. CHARLES MURPHY:    Q.    The room that the

6    four witnesses were placed in, how far away from --

7         By the way, were they looking through a

8    one-way mirror when they viewed the lineup?

9    A    Yes.  They were.

10   Q    How far away from the room where they viewed

11   the lineup from were they stored, if you will, before

12   they were brought to the room where they could view the

13   lineup?

14   A    It would have been the entire length of the

15   Area 5 office.

16   Q    So you, probably yourself, would go down and

17   get a witness and bring them the entire length of the

18   hallway at Area 5, that person, whoever was first, would

19   view the lineup, and then you would march them back to

20   that room?

21   A    No.

22   Q    Where did you put them?

23   A    They would go into a separate room on that

24   end, on the lineup end of the office.

A - 59
62                                    JIM02386

1      Q      You said here today that you knew when you

2   conducted the lineup that two of the people who viewed

3   the lineup knew my client, and those people were

4   Larry Tueffel and Phillip Torres, is that correct?

5      A      They knew a subject named TJ.

6      Q      And they told you so, right?

7      A      They told me they knew a subject named TJ.

8      Q      Did either Sandra or Tina Elder, either one

9   of them, tell you that they had seen the individual who

10  did the shooting previously in the neighborhood prior to

11  the shooting?

12     A      I do not recall that.

13     Q      That is important information, would you

14  agree, sir?

15     A      Yes.  I do not recall hearing that.

16     Q      You spoke with Sandra Elder at least the

17  first time at the hospital?

18     A      Correct.

19     Q      Is that when she provided you with

20  information concerning her knowledge and her

21  recollections of the shooting that she had seen, isn't

22  that right?

23     A      Yes.

24     Q      When you spoke to her at the hospital, is

1    that when you were taking the general progress notes

2    that you identified just a short time ago?  I believe it

3    was Defendant's Number 2 for identification.

4        A      Yes.  I believe that is when those notes were

5    taken.

6        Q      Those notes do not reflect that Sandra Elder

7    had ever told you that she had known or seen I should

8    say the shooter in the neighborhood before the shooting

9    do that?

10              MR. JOHN MURPHY:  Objection.

11              THE COURT:  Overruled.

12              MR. CHARLES MURPHY:   Q.  Do that?

13       A      They don't say that.  No.

14       Q      When you spoke with Sandra Elder at the

15    hospital, you didn't have any suspect's name or any

16    suspect's identity or any suspect's address or hangouts

17    he might have in mind, did you?

18       A      No.  I did not.

19       Q      You have said here today that after you spoke

20    with Phil Torres in the early morning hours of

21    February 4th, that is when you went to go look for my

22    client and arrest him, is that correct?

23       A      Not immediately after.

24       Q      Shortly thereafter?

```
 1        A      Yes.

 2        Q      Right?

 3        A      Yes.

 4        Q      You said here today as well that on

 5   February 10th, 1993, you placed Victor Romo under arrest

 6   for his alleged participation in the same shooting, is

 7   that correct?

 8        A      That is correct.

 9        Q      And you spoke with Victor Romo when you

10   placed him under arrest, didn't you?

11        A      Yes.  I did.

12        Q      After you spoke to Victor Romo, you went out

13   looking for Juan Carlos Torres, didn't you?

14               MR. JOHN MURPHY:  Objection.

15               THE COURT:  No.  Overruled.

16               THE WITNESS:  No.  I did not.

17               MR. CHARLES MURPHY:   Q.  Who went out to

18   look for Juan Carlos Torres from the Chicago Police

19   Department after you spoke with Victor Romo?

20               MR. GAUGHAN:  Objection.

21               MR. CHARLES MURPHY:   Q.   Who was it?

22               THE COURT:  Well that assumes somebody did.

23   You can ask him that first.

24               Sustained.
```

A  62

65

JIM02389

1                THE WITNESS:  The word looked would not be

2    proper in this.  I did -- I did interview a person by

3    the name --

4                MR. CHARLES MURPHY:   Q.  You found him?

5        A    Yes.

6        Q    That was after you spoke with

7    Mr. Victor Romo, is that correct?

8                MR. GAUGHAN:  Objection.

9                THE COURT:  Overruled.

10               THE WITNESS:  Yes.

11               MR. CHARLES MURPHY:   Q.  Was it the same

12   day?

13       A    I can't say that for sure.

14       Q    Did you take a picture of this Mr. Torres

15   when you spoke to him after you had found him?

16       A    Not that I recall, no.

17       Q    Where did you find him at?

18       A    I found him where they told me he lived.

19       Q    Where was that?

20       A    I believe -- You know, I can't recall the

21   address.

22       Q    You got the address from Victor's father,

23   didn't you?

24       A    Yes.  I believe he drew us a map of where

1    this boy lived.

2                MR. CHARLES MURPHY:  Judge, I have nothing

3    else.

4                If your Honor could please ask the witness to

5    make himself available later?

6                THE COURT:  Sure.

7                State have any redirect?

8                MR. JOHN MURPHY:  Your Honor, I have no

9    further questions.

10                THE COURT:  You will make yourself available

11    to come back and testify.  Thank you.  You can step down

12    for now.

13                THE WITNESS:  Okay.

14                (Witness excused.)

15                MR. CHARLES MURPHY:  I am suggesting

16    tomorrow, detective.

17                THE COURT:  Be back tomorrow morning, sir.

18                Let me see the lawyers for just a second.  I

19    do not need the reporter.

20                (Proceedings occurred out of the

21                 hearing of the jury and the court

22                 reporter.)

23                (The following proceedings occurred

24                 in the hearing of the jury:)

A 64

67

JIM02391

```
 1              THE COURT:  Ladies and gentlemen of the jury,
 2    rather than starting a witness which may take us until a
 3    quarter to 1:00 or so and then breaking in the middle of
 4    a witness, we will just break now for lunch and we will
 5    start back at 1:30.
 6              The State has a few more witnesses this
 7    afternoon.  Hopefully they will be able to finish their
 8    case, and we will get into the balance of the case.
 9              We will see you back here at 1:30.  Do not
10    discuss the case amongst yourselves or with anybody else
11    during the lunch recess.
12                   (A recess was taken.)
13                   (Further proceedings were reported by
14                    Official Court Reporter Tanya Whiters.)
15
16
17
18
19
20
21
22
23
24
```

A. -65

68

JIM02392

1          IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION

2

3          I, Christina F. Basis, Official Court

4  Reporter for the Circuit Court of Cook County, County

5  Department-Criminal Division, do hereby certify that I

6  reported in shorthand the proceedings had on the hearing

7  in the above-entitled cause; that I thereafter

8  transcribed the foregoing into typewriting, which I

9  hereby certify to be a true and accurate transcript

10  of the proceedings had before the Honorable

11  STANLEY SACKS, judge of said court.

12

13                 *Christina F Basis*
                 --------------------------------

14                 Christina F. Basis

15

16

17

18

19

20

21

22

23

24

A 66-

6 9

JIM02393

SA837

STATE OF ILLINOIS    )
                     )    SS.
COUNTY OF C O O K    )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT—CRIMINAL DIVISION

THE PEOPLE OF THE          )
STATE OF ILLINOIS,         )
            Plaintiff,     )    No. 93-14710
                           )
      vs.                  )    Charge:  Murder
                           )
THADDEUS JIMENEZ,          )
            Defendant.     )

REPORT OF PROCEEDINGS of the hearing before

the Honorable STANLEY SACKS, on the 6th day of

November, 1997.

APPEARANCES:

MR. JOHN MURPHY & MR. DAVID GAUGHAN,
    Assistant State's Attorneys,
    for the People of the State of Illinois.

MR. CHARLES MURPHY,
    for the Defendant.

Christina F. Basis, CSR 084-001769
Official Court Reporter
2650 South California Avenue, Room 4C02
Chicago, Illinois   60608
773-869-6065

C            7 0                    JIM02394

1              (The following proceedings were had

2              out of the presence of the jury:)

3         THE CLERK:  Thaddeus Jimenez.

4         THE COURT:  Before I bring out the jury,

5    Mr. Charles Murphy, anything about -- regarding this

6    witness, Miss Heatley, if she is going to be testifying

7    next, that you want me to instruct the jurors about, and

8    the case I referred to, People v. Woods, they refer to

9    I.P.I. 3.14, and if you want an instruction before the

10   jurors hear the evidence of Miss Heatley and also at the

11   conclusion of the trial the substance of which could be

12   along these lines:

13        Evidence has been received that the defendant

14   has been involved in conduct other than that charged in

15   the indictment.  This evidence has been received on the

16   issue of the defendant's consciousness of guilt of the

17   instant offense.  It is for you to determine whether the

18   defendant was involved in that conduct, and, if so, what

19   weight should be given to this evidence on the issue

20   of consciousness of guilt.

21        Do you want a prior instruction to the jury

22   along those lines or some other lines if that is not

23   acceptable to you?

24        MR. CHARLES MURPHY:  That would be acceptable

1   to me.

2             THE COURT:  Anything else?

3             MR. CHARLES MURPHY:  Just one other thing.

4             Judge, I have Mr. Victor Romo under subpoena,

5   and I informed you of that Tuesday morning.  We agreed

6   that I could call him out of order this afternoon.

7             THE COURT:  Is he here?

8             MR. CHARLES MURPHY:  He's here.

9             THE COURT:  Let's take this witness, and I

10  will let you call him after that.

11            If the State objects, I will let you call

12  Romo out of order because he is a hard person to get to.

13  I do not think it would interfere with the State's case.

14  They are going to hear from Romo anyway.  Whether it is

15  today or some other time, they can hear from him today.

16            MR. JOHN MURPHY:  Judge, I was mistaken when

17  I indicated before the bench that we were going to call

18  Miss Heatley next.  Shawn Cosmen is going to be our

19  witness.

20            THE COURT:  That's fine.  We will hear from

21  Shawn Cosmen, and then maybe we can let Romo testify at

22  that point and then leave Heatley for afterwards.

23            I do not ordinarily do this, but under the

24  circumstances where Romo is a reluctant witness to be

c   4   72                          JIM02396

SA840

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on January 18, 2013, I electronically filed the attached with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


                        s/ Jonathon D. Byrer
                   JONATHON D. BYRER, Attorney