No. 12-2779

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

THADDEUS JIMENEZ,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 09-cv-08081
The Honorable Matthew F. Kennelly, District Judge, Presiding

**BRIEF AND SHORT APPENDIX OF DEFENDANTS-APPELLANTS**

STEPHEN R. PATTON
Corporation Counsel
  of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, Illinois 60602
(312) 742-4961

BENNA RUTH SOLOMON
  Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
  Chief Assistant Corporation Counsel
JONATHON D. BYRER
  Assistant Corporation Counsel
  Of Counsel

# TABLE OF CONTENTS

——

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     The Evidence At Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.     The Murder of Eric Morro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     B.     The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     C.     Criminal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     D.     Expert Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II.    Other Trial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     A.     Voir Dire And Batson Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     B.     The Verdict And Post-Verdict Settlement . . . . . . . . . . . . . . . . 31

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

I.     THE DISTRICT COURT'S BATSON RULING AND FORFEITURE
     REQUIRE REVERSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     A.     The District Court's Batson Ruling Was Clearly Erroneous . . 34

     B.     The District Court Abused Its Discretion In Imposing A
          Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C.      Whether Considered Separately Or Together, These Rulings
        Require Reversal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

II.     THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING
        MCCRARY TO OFFER LEGAL CONCLUSIONS ABOUT HOW A
        "REASONABLE" OFFICER WOULD CONDUCT A MURDER
        INVESTIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

III.    THE DISTRICT COURT ERRED BY ALLOWING THE JURY TO
        CONSIDER <u>BRADY</u> THEORIES JIMENEZ FAILED TO TIMELY
        DISCLOSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

IV.     JUDGMENT SHOULD BE ENTERED FOR THE DEFENDANTS AS A
        MATTER OF LAW ON JIMENEZ'S <u>BRADY</u> CLAIMS. . . . . . . . . . . . . . 79

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

SHORT APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7). . . . . . xvi

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30. . . . . . . . . . . xvi

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvi

# TABLE OF AUTHORITIES

_____

Page

## CASES

A.E. ex rel. Evans v. Independent School District No. 25,
       936 F.2d 472 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

Arizona v. Youngblood,
       488 U.S. 51 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   78

Ashcroft v. Iqbal,
       556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

Batson v. Kentucky,
       476 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28, 34, 41, 44

Beauchamp v. City of Noblesville,
       320 F.3d 733 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

Bell Atlantic Corp. v. Twombly,
       550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

Bennett v. United States,
       133 S. Ct. 71 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

Bodzin v. City of Dallas,
       768 F.2d 722 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61

Boss v. Pierce,
       263 F.3d 734 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67, 81

Brady v. Maryland,
       373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

Brandon v. Village of Maywood,
       179 F. Supp. 2d 847 (N.D. Ill. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

Brinegar v. United States,
       338 U.S. 160 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

Brooks v. Armco, Inc.,
       194 S.W.3d 661 (Tex. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

Brown v. Sternes,
    304 F.3d 677 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Bruton v. United States,
    391 U.S. 123 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Burdett v. Miller,
    957 F.2d 1375 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 81

Burkhart v. Washington Metropolitan Area Transit Authority,
    112 F.3d 1207 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Cameron v. City of New York,
    598 F.3d 50 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Cefalu v. Village of Elk Grove,
    211 F.3d 416 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Cheney v. U.S. District Court,
    542 U.S. 367 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

Cooley v. United States,
    501 F.2d 1249 (9th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Cruz v. Kagan,
    2011 WL 2516711 (D. Mass. June 22, 2011). . . . . . . . . . . . . . . . . . . . . . . 57

Darbin v. Nourse,
    664 F.2d 1109 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 41

Dawson v. New York Life Insurance Co.,
    135 F.3d 1158 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Douglas v. Owens,
    50 F.3d 1226 (3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Dunham v. Frank's Nursery & Crafts, Inc.,
    967 F.2d 1121 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

English v. Cromwell,
    10 F.3d 434 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Estes v. Moore,
       993 F.2d 161 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

FAA v. Landy,
       705 F.2d 624 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

Freeman v. Continental Gin Co.,
       381 F.2d 459 (5th Cir. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  76

Fuesting v. Zimmer,
       448 F.3d 936 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62

Gauger v. Hendle,
       349 F.3d 354 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

Goldschmidt v. Patchett,
       686 F.2d 582 (7th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79

Gong v. Jones,
       2008 WL 4183937 (N.D. Cal. Sept. 9, 2008). . . . . . . . . . . . . . . . . . . . . . . . .  59

Good Shepherd Manor Foundation v. City of Momence,
       323 F.3d 557 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

Goodwin v. MTD Products, Inc.,
       232 F.3d 600 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

Gorlikowski v. Tolbert,
       52 F.3d 1439 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

Goudy v. Basinger,
       604 F.3d 394 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79

Gramenos v. Jewel Cos.,
       797 F.2d 432 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

Green v. Warden,
       699 F.2d 364 (7th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

Green County Food Market, Inc. v. Bottling Group, LLC,
       371 F.3d 1275 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

Hardison v. State,
       94 So.3d 1092 (Miss. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

Hartford Accident & Indemnity Co. v. Gulf Insurance Co.,
    837 F.2d 767 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Hernandez v. New York,
    500 U.S. 352 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Holland v. City of Chicago,
    643 F.3d 248 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Holmes v. Village of Hoffman Estates,
    511 F.3d 673 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

In re Air Crash Disaster,
    795 F.2d 1230 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

In re American Reserve Corp.,
    841 F.2d 159 (7th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

In re Ford Motor Co.,
    344 F.3d 648 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Jenkins v. Chrysler Motors Corp.,
    316 F.3d 663 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Jenkins v. Keating,
    147 F.3d 577 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Jimenez v. Tuna Vessel Granada,
    652 F.2d 415 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Johnson v. California,
    545 U.S. 162 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Jones v. Basinger,
    635 F.3d 1030 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63

Jordan v. City of Chicago,
    No. 08 C 6902, 2012 WL 88158 (N.D. Ill. Jan 11, 2012). . . . . . . . . . . . . . . 61

Kelley v. Myler,
    149 F.3d 641 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Kentucky v. King,
    131 S. Ct. 1849 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Koo v. McBride,
      124 F.3d 869 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48

Koon v. United States,
      518 U.S. 81 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Kotteakos v. United States,
      328 U.S. 750 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Kovacich v. Benjamin,
      951 F.2d 114 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Knox v. Smith,
      342 F.3d 651 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Kyles v. Whitley,
      514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Logsdon v. Hains,
      492 F.3d 334 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Mahaffey v. Ramos,
      588 F.3d 1142 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Maloney v. Plunkett,
      854 F.2d 152 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 49

Maryland v. Pringle,
      540 U.S. 366 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Marx & Co. v. Diner's Club, Inc.,
      550 F.2d 505 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

McCrory v. Henderson,
      82 F.3d 1243 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Messner v. Northshore University Healthsystem,
      669 F.3d 802 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Mathews v. Eldridge,
      424 U.S. 319 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Miller-El v. Cockrell,
      537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Miller-El v. Dretke,
    545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37-38

Moriarty v. Glueckert Funeral Home, Ltd.,
    155 F.3d 859 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Morrison v. United States,
    491 F.2d 344 (8th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Nelson v. Adams USA, Inc.,
    529 U.S. 460 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 76

Okland Oil Co. v. Conoco Inc.,
    144 F.3d 1308 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Olympia Hotels Corp. v. Johnson Wax Development Corp.,
    908 F.2d 1363 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-54

Opaka v. INS,
    94 F.3d 392 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Patterson v. United States,
    531 U.S. 1033 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

People v. Hecker,
    942 N.E.2d 248 (N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

People v. Luciano,
    890 N.E.2d 214 (N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 46, 47, 48, 53

People v. Nelson,
    85 So. 3d 21 (La. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

Peetz v. State,
    180 S.W.3d 755 (Tex. App. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

Peterson v. City of Plymouth,
    60 F.3d 469 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Reed v. City of Chicago,
    77 F.3d 1049 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66

Rice v. Collins,
    546 U.S. 333 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Rice v. White,
    660 F.3d 242 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Rivera v. Illinois,
    556 U.S. 148 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 53

RLJCS Enterprises, Inc. v. Professional Benefit Trust,
    487 F.3d 494 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Rochez Brothers, Inc. v. Rhoades,
    527 F.2d 891 (3d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Rodriguez v. Doral Mortgage Corp.,
    57 F.3d 1168 (1st Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Ross v. Oklahoma,
    487 U.S. 81 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Roundy's Inc. v. NLRB,
    674 F.3d 638 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-58

Ruiz v. Cady,
    635 F.2d 584 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

Schmidt v. City of Bella Vita,
    557 F.3d 564 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Scott v. Harris,
    550 U.S. 372 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Shertz v. Waupaca County,
    875 F.2d 578 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Smith v. Bray,
    681 F.3d 888 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Smith v. Lamz,
    321 F.3d 680 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Specht v. Jensen,
    853 F.2d 805 (10th Cir. 1988) (en banc). . . . . . . . . . . . . . . . . . . . . . . 56, 57

State v. Mootz,
    808 N.W.2d 207 (Iowa 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Strickland v. Washington*,
    466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Stuart v. United States*,
    23 F.3d 1483 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Thomas v. Moore*,
    866 F.2d 803 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Thompson v. Altheimer & Gray*,
    248 F.3d 621 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Thompson v. City of Chicago*,
    472 F.3d 444 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 58

*Tinner v. United Insurance Co.*,
    308 F.3d 697 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Torres v. County of Oakland*,
    758 F.2d 147 (6th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 59, 61

*United States v. Agurs*,
    427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Aleman*,
    246 Fed. Appx. 731 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Bell*,
    585 F.3d 1045 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Bennett*,
    664 F.3d 997 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Botero-Ospina*,
    71 F.3d 783 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Briscoe*,
    896 F.2d 1476 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Broomfield*,
    417 F.3d 654 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Carlisle,
    614 F.3d 750 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Collins,
    604 F.3d 481 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Diekhoff,
    535 F.3d 611 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Ervin,
    540 F.3d 623 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

United States v. Esposito,
    523 F.2d 242 (7th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

United State v. Garcia-Garcia,
    633 F.3d 608 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Gray,
    648 F.3d 562 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

United States v. Greer,
    285 F.3d 158 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Harbin,
    250 F.3d 532 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52, 53

United States v. Hendrix,
    509 F.3d 362 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States ex rel. Jones v. DeRobertis,
    766 F.2d 270 (7th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

 United States v. Kimbrel,
    532 F.3d 461 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. LaMacchio,
    362 F.2d 383 (3d Cir. 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58-59

United States v. Lee,
    399 F.3d 864 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .66-67

United States v. Lopez,
    484 F.3d 1185 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

United States v. Martinez-Salazar,
    528 U.S. 304 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50, 51

United States ex rel. Marzeno v. Gengler,
    574 F.2d 730 (3d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

United States v. McMath,
    559 F.3d 657 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-35

United States v. Navarro,
    737 F.2d 625 (7th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77

United States v. Noel,
    581 F.3d 490 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57, 58

United States v. Odum,
    72 F.3d 1279 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

United States v. O'Hara,
    301 F.3d 563 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67-68

United States v. Patterson,
    215 F.3d 776 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51, 52

United States v. Perkins,
    470 F.3d 150 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

United States v. Ramirez-Martinez,
    273 F.3d 903 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44, 46, 48

United States v. Reyes,
    270 F.3d 1158 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77

United States v. Roberts,
    534 F.3d 560 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77

United States v. Sinclair,
    74 F.3d 753 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

United States v. Stephens,
    514 F.3d 703 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43, 45, 49

United States v. Stewart,
    388 F.3d 1079 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

United States v. Tavarez,
    626 F.3d 902 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

United States v. Taylor,
    509 F.3d 839 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Taylor,
    636 F.3d 901 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Trigg,
    925 F.2d 1064 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

United States v. United States Currency,
    863 F.2d 555 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

United States v. Walker,
    490 F.3d 1282 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

United States v. Watts,
    29 F.3d 287 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Wiggins,
    104 F.3d 174 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Williams,
    343 F.3d 423 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Yarrington,
    640 F.3d 772 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Usery v. Marquette Cement Manufacturing Co.,
    568 F.2d 902 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Wallace v. City of Chicago,
    440 F.3d 421 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Walton v. United Consumers Club, Inc.,
    786 F.2d 303 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

West ex rel. Norris v. Waymire,
    114 F.3d 646 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Whren v. United States,
    517 U.S. 806 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Will v. United States,
      389 U.S. 90 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

Williamson v. United States,
      512 U.S. 594 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

Wilk v. American Medical Association,
      719 F.2d 207 (7th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

Wipf v. Kowalski,
      519 F.3d 380 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

Woolley v. Rednour,
      No. 10-3550 (7th Cir. Dec. 14, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

**STATUTES AND OTHER AUTHORITIES**

28 U.S.C. § 1291 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

28 U.S.C. § 1331 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 1343 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 1870 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

42 U.S.C. § 1983 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Fed. R. Civ. P. 15.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74, 75

Fed. R. Civ. P. 47(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

Fed. R. Evid. 103.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55, 62

Fed. R. Evid. 403.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54, 58

Fed. R. Evid. 702.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

Fed. R. Evid. 704, 1972 Advisory Committee Notes. . . . . . . . . . . . . . . . . . . . .  56

Fed. R. Evid. 804(b)(3)(A).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

Hon. David Hittner & Eric J.R. Nichols, Jury Selection In Federal Civil Litigation:
General Procedures, New Rules, And The Arrival Of Batson,
      23 Tex. Tech. L. Rev. 407 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Scott J. Krischke, Note, <u>Absent Accountability: How Prosecutorial Impunity Hinders The Fair Administration of Justice In America</u>,
    19 J.L. & Policy 395 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Mary C. Townsend, <u>Essentials Of Psychiatric Mental Health Nursing</u>
    (4th ed. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

## JURISDICTIONAL STATEMENT

———————

Thaddeus Jimenez filed an eight-count complaint against the City of Chicago; Detectives Jerome Bogucki, Mark Sanders, Raymond Schalk, and F. Montilla; Police Officers Lawrence Ryan and Robert Whiteman; and "as-yet unknown City of Chicago Employees." R. 1.[1] Three counts alleged federal claims under 42 U.S.C. § 1983 – count I, due process; count II, failure to intervene; and count III, conspiracy to deprive constitutional rights. Five counts alleged state-law claims – count IV, malicious prosecution; count V, intentional infliction of emotional distress; count VI, civil conspiracy; count VII, respondeat superior; and count VIII, indemnification. The district court had jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343 (2006), and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 (2006).

Jimenez dismissed Montilla, Ryan, and Whiteman. R. 151 at 1 n.1. He also dismissed Schalk and Sanders, although no formal order was entered. 7th Cir. R. 9 ¶6. Jimenez abandoned his claims against unknown employees, and his claims for failure to intervene, intentional infliction of emotional distress, and state-law conspiracy. Id. ¶¶ 3, 7. On January 25, 2012, the district court entered judgment on the remaining claims under Fed. R. Civ. P. 58 on the jury's verdict against Bogucki, R. 289, 290, and, on February 1, 2012, entered a corrected judgment nunc

———————

[1] We designate references to the district court record with"R. ___"; the transcript with "Tr. ___"; the short appendix with "A___"; and our supplemental appendix with "SA___".

pro tunc to reflect disposition of Jimenez's claims against the City pursuant to stipulation, R. 199-1, 294, 296, A1.  The corrected judgment was final, terminating all claims.  Defendants timely moved for a new trial and judgment as a matter of law under Fed. Rs. Civ. P. 50 and 59 on February 21, 2012.  R. 301, 302.  The court denied those motions on July 11, 2012.  R. 337, A5-A47.  Defendants filed their notice of appeal on July 31, 2012.  R. 342.  This court has jurisdiction under 28 U.S.C. § 1291 (2006).

## ISSUES PRESENTED

———————

1.     Whether the district court clearly erred in sustaining a <u>Batson</u> objection to Bogucki's final peremptory challenge, where the court erroneously required evidence of actual bias, misrepresented the factual record, and relied on new grounds Bogucki had no opportunity to address.

2.     Whether the court abused its discretion by forfeiting Bogucki's last peremptory challenge as a penalty for a <u>Batson</u> violation, where the court's <u>Batson</u> ruling was clearly erroneous; precedent forecloses that penalty; and the forfeiture was imposed arbitrarily.

3.     Whether the court abused its discretion in permitting extensive expert testimony regarding the reasonableness of Bogucki's investigation, where such testimony constituted a legal conclusion inadmissible under Fed. Rs. Evid. 702 and 403.

4.     Whether the court abused its discretion in failing to instruct the jury that it could not consider claims regarding supposed <u>Brady</u> material that

Jimenez never made until closing argument, where Jimenez never moved under

Fed. R. Civ. P. 15(b) to amend his complaint, and where the jury's consideration of

those claims therefore denied Bogucki's right to notice of the claims against him.

## STATEMENT OF THE CASE

———————

Jimenez alleged that Bogucki and the City denied him due process and

maliciously prosecuted him.  A jury found for Jimenez; the district court entered

judgment on that verdict and denied defendants' post-judgment motions.  Bogucki

and the City appeal.

## STATEMENT OF FACTS

———————

On October 4, 1994, an Illinois jury found Jimenez guilty of first-degree

murder for the fatal shooting of Eric Morro.  SA1-574.[2]  On November 1, 1996, the

Illinois Appellate Court reversed and remanded for a retrial.  R. 118-48.  A jury

again found Jimenez guilty of first-degree murder, and he was sentenced to 45

years.  SA575-SA1370.  The appellate court affirmed that conviction on January 18,

2000.  R. 187-9.

On May 1, 2009, an Illinois court vacated Jimenez's conviction.  R. 118-57.

On December 31, 2009, Jimenez filed this case, alleging, in relevant part, federal

due process claims and a state-law malicious prosecution claim relating to his

———————

[2]  Jimenez's state-court proceedings are not in the record, but this court may
"take notice of proceedings in other courts, both within and outside of the federal
judicial system" when, as here, they "have a direct relation to matters at issue."
Green v. Warden, 699 F.2d 364, 369 (7th Cir. 1983); see Opaka v. INS, 94 F.3d 392,
394 (7th Cir. 1996).

conviction.  R. 1.

## I.    The Evidence At Trial.

### A.    The Murder of Eric Morro.

Morro was murdered on February 3, 1993.  R. 349-1.  At that time, Jimenez

was a member of the Simon City Royals gang, Tr. 439-40, and had a gun to "chas[e]

other rival gang members out of the neighborhood," Tr. 766.  Around 3:00 p.m. that

day, Jimenez and another person flashed gang signs at a passing school bus.  Tr.

2419, 2562-63.  Morro, who was with his friend Shawn Cosmen ("Shawn"), Shawn's

sister Donna Cosmen ("Donna"), Larry Tueffel, and others, was upset by this; Morro

was not in a gang and did not like gangs.  Tr. 928-29, 932, 2563-64.  Jimenez and

Morro argued, Tr. 927, 2419, 2563, and Morro asked Jimenez to leave; this angered

Jimenez, who threatened Morro, Tr. 2419, 2563.  Morro was killed later that

evening.  R. 349-1.  Four eyewitnesses – Sandra Elder ("Sandra"), Tina Elder

("Tina"), Phillip Torres ("Phillip"), and Tueffel – testified at trial.

The night of the shooting, Sandra was at a bar, when her daughter Tina

came in with Tina's daughter, asked for money, and left, Tr. 2434, 2462-63.  Tina

crossed the street toward her car parked in front of Phillip's apartment building.

Tr. 2434-35, 2437.  As Tina walked, she talked with Phillip, who was leaning out

his third-floor window.  Tr. 2437, 2684-85.  She saw Morro and Tueffel, a 14-year-

old member of the Royals, nearby.  Tr. 842, 2435, 2438.  Tina also saw two other

people, one wearing a Duke University jacket and the other wearing dark clothing.

Tr. 2445-46.  Tina asked Morro to come with her, then heard arguing and a

gunshot.  Tr. 2435, 2437.  Tina also saw Morro swing at the person wearing the

Duke jacket.  Tr. 2446.  Tina took her daughter up Phillip's staircase, then went

back outside, where Morro told her he had been shot.  Tr. 2438-39.

Meanwhile, Sandra left the bar, Tr. 2437, 2463, and saw Morro, Tueffel,

another individual, and Jimenez, Tr. 2463-64, 2481.  Sandra had seen Jimenez in

the neighborhood before, but knew him only as "TJ," Tr. 2461, 2474.  Sandra saw

Jimenez push Morro against a wall and shoot him.  Tr. 2463.  Jimenez and the

other individual then fled westbound.  Tr. 2465.

From his apartment window, Tr. 2684, 2691, Phillip saw Jimenez and

another individual come from behind Morro and turn him around, and saw Jimenez

put a gun to Morro's chest, Tr. 2663, 2685-86, 2695.  The shooter was wearing a

Duke University jacket, Tr. 2686-87, and "looked like" Jimenez, Tr. 2672.  Phillip

knew Jimenez from around the neighborhood and because Jimenez was friends with

Phillip's brother Shawn.  Tr. 2683.  Jimenez was also at Phillip's mother's house

earlier that day with a gun.  Tr. 2663, 2672, 2702.

At the civil trial, Jimenez admitted flashing gang signs at cars and a bus, but

denied having been in an argument with Morro, and said Morro had no problem

with his gang activities.  Tr. 459, 461, 497-99, 716-17.  Jimenez, his mother Victoria

Jimenez ("Victoria"), and his cousin testified that Jimenez was at his grandmother's

house playing video games and doing homework when Morro was shot.  Tr. 462,

1493-94, 1508, 1517-18.

Victor Romo ("Victor") testified that Juan Carlos Torres ("Juan Carlos"),

killed Morro.  Tr. 352-55.  The day of Morro's murder, Victor shot a chrome .22- or

.25-caliber handgun after school, then met Juan Carlos, a classmate and fellow

member of an informal gang or "party crew" known as the "Triangles," to hang out

and so Victor could get back his Georgetown University jacket, Tr. 345-46, 347-52.

Victor said the gun was not his, but was only "in [his] possession" and "move[d]

around . . . between a group of friends," and that he probably handed the gun to

Juan Carlos before they saw Morro and Tueffel, Tr. 395-96, 423-24.  Victor could not

remember if Juan Carlos asked for the gun – it was like an "iPod, you know,

sometimes you ask for it."  Tr. 424.  Victor also said that it may actually have been

Juan Carlos who had been shooting the gun in the alley.  Tr. 396.  Upon seeing

Morro, Victor asked about some money Morro owed Leo Robles, Tr. 353-54, who was

dating Victor's sister, Tr. 347.  They argued a short time, and the argument was

ending when Morro punched Juan Carlos, who then pulled a gun and shot Morro.

Tr. 355.  At the civil trial, Juan Carlos asserted the Fifth Amendment in response to

all questions regarding Morro's death.  Tr. 324-29.[3]

Robles testified that he and Victor were members of the Triangles, and that

Juan Carlos was a member of the Triangles and "good friends" with Victor.  Tr.

1470.  Robles testified that a phone number in Morro's jacket pocket when he was

shot, R. 349-13, was to the apartment where Robles was staying at the time, Tr.

---

[3]  On January 17, 2013, following a bench trial in the Circuit Court of Cook County, Juan Carlos was acquitted of all charges in relation to Morro's death. These proceedings, too, can be judicially noticed.  E.g., Green, 699 F.3d at 369.  We will provide a copy of the circuit court's decision when it is available.

1475-77.  Robles was involved in drug sales, and said it was possible Morro owed

him $40 when he died, Tr. 1474-76, but Robles never instructed Juan Carlos to

collect any debt for him, Tr. 1487.

Tueffel, diagnosed in 2001 or 2002 as a paranoid schizophrenic, Tr. 973-74,

testified that Juan Carlos killed Morro, Tr. 856-57.  In 2006, Tueffel was residing in

a facility for the mentally ill and taking Risperdal for schizophrenia when a private

investigator approached him regarding Jimenez's case.  Tr. 974.  When the

investigator told Tueffel that he believed Jimenez was innocent, Tueffel agreed

"right away."  Tr. 975.

### B.      The Investigation.

Chicago police officers Robert Whiteman and Lawrence Ryan were on patrol

when they received a report of a shooting.  Tr. 822-23, 1663-64.  Arriving, they saw

Morro lying on the ground.  Tr. 823, 1666, 1682.  Ryan asked Sandra if she had

seen anything, and she motioned toward Phillip and Tueffel.  Tr. 1668-69, 1683,

1691-92.  Whiteman remained with Sandra for awhile, but she "was hysterical.

There was no way to talk to her."  Tr. 823.

Initially, neither Phillip nor Tueffel would speak with Ryan.  Tr. 1685.

Phillip was "scared to death," said he "[d]idn't want any part of it," and tried to

walk away, Tr. 1669, 2674, 2688, but Ryan grabbed his arm and told him to stay,

Tr. 1671.  Tueffel also acted as if he wanted to leave.  Tr. 1690-91.  Tueffel

eventually told Ryan the shooter was a male Hispanic with curly black hair and a

purple jacket with yellow lettering, and the other individual had partially shaved

black hair and was wearing a Georgetown University jacket. Tr. 862-63, 1673. Tueffel did not provide the suspects' ages or heights because he "wasn't paying attention." Tr. 864-65. Tueffel also said Morro owed someone money, and that somebody shouted "Triangle killers" before a gun was fired. Tr. 1673. At police request, Phillip and Tueffel also viewed Shawn at the scene, Tr. 2565, 2574-75; they said Shawn was not the shooter, and he was released. Tr. 2565, 2574-75. At some point, when Phillip and Tueffel were alone in the back of a squad car, Phillip asked Tueffel if Jimenez was the shooter; Tueffel said he was not. Tr. 866, 2671-72, 2687-88, 2693; R. 349-66 ¶6.

Whiteman and Ryan prepared a "general offense case report," describing two suspects – the shooter and an accomplice. Tr. 830-32; R. 349-1. One was described as a white, male Hispanic, approximately 5'4"-5'5", with curly black hair, and wearing a purple jacket with yellow lettering. Tr. 832-34; R. 349-1. The other was described as a white, male Hispanic, 13-14 years old, approximately 5'6"-5'7", with partially shaved black hair, wearing a blue Georgetown University jacket. Tr. 834-35; R. 349-1. The report listed Tueffel, Phillip, and Sandra as witnesses. Tr. 835-36, 1686; R. 349-1.

At the hospital where Morro had been taken, Tr. 1006; R. 349-4, Bogucki interviewed Sandra, Tr. 1027, 1273; R. 349-4, who said that when Morro was shot, she was "in the middle of the street," and Tina was in front of Phillip's residence five to ten feet from Morro, Tr. 1019, 1023-24, 1234-35; R. 349-4. Sandra said the suspects were white Hispanic males and approximately 13 years old, Tr. 1235; R.

349-29, with the shooter wearing a blue-and-white nylon jacket, approximately 5'5"
tall, and "Jheri curls," Tr. 1234-35, 1273-74, 2478-79; R. 349-29, which she
described as a "tight, twisted curl," Tr. 2478-79. Sandra could not identify the
second suspect or describe his clothing, but informed Bogucki that he was slightly
shorter than the first suspect. Tr. 1193, 1274-76. Bogucki did not interview Tina at
the hospital because she was too sick. Tr. 2435-36.

Bogucki interviewed Tueffel at Area 5 at approximately 9:30 p.m. that night.
Tr. 869-70, 1028. Tueffel told Bogucki that he and Morro were walking eastbound
when two individuals approached and asked them about money. Tr. 1030; R. 349-2.
Tueffel said Morro had swung at the shooter and missed, and someone yelled out
"Triangle killers" before one of the individuals pushed Morro against a wall and
shot him. Tr. 1030, 1226; R. 349-2. Tueffel identified one of the suspects as
"Frankie," with spiked hair and wearing a blue Georgetown jacket, but did not
provide his last name. Tr. 1033, 1266-67; R. 349-2. Tueffel said the other suspect
was wearing a turquoise jacket with yellow lettering and had curly hair with
shaved sides. Tr. 1036, 1270; R. 349-2. The interview took approximately 20
minutes, Tr. 1037, and Tueffel was free to go at any point, Tr. 1103. At the time,
Bogucki did not believe Tueffel was concealing information. Tr. 1032. Tueffel
appeared nervous, Tr. 1028, but not upset, agitated, or flustered during
questioning, Tr. 1000. Tueffel spoke to Bogucki voluntarily, and Bogucki did not
intimidate him or force him to speak. Tr. 1028-29.

Bogucki also interviewed Phillip at the station that night. Tr. 1037-38, 1286-

9

87.  Phillip informed Bogucki that he witnessed the shooting from his third-floor apartment, Tr. 1075, 1192, 1285; R. 349-3; R. 349-4, but that he did not know who shot Morro, Tr. 2666.  Phillip saw Tina cross the street, followed by Sandra.  Tr. 1285, 2690; R. 349-3.  Phillip saw Tueffel and Morro walking eastbound, and two white Hispanics came from behind them.  Tr. 1285-86, 2690; R. 349-3.  Phillip saw someone push Morro and heard a shot.  Tr. 1286; R. 349-3.  Phillip did not see the gun, only a hand go up against Morro's chest.  Tr. 1287.  Phillip said the shooter had short, light brown hair shaved at the sides, was about the same height as Tueffel, and wore a blue-and-white Duke University jacket. Tr. 1042, 1231-32, 1287-88, 2678-79, 2687, 2693; R. 349-3.  This was the first Bogucki learned about a Duke University jacket.  Tr. 1233-34.  Phillip could not identify the second suspect, Tr. 1192, and provided no description of that suspect's clothing, Tr. 1288.

When he spoke to Bogucki, Phillip suspected Jimenez was the shooter, and became convinced after speaking with his sister and brother, who told him Jimenez had argued with Morro and threatened to kill him, and that Jimenez wore the kind of jacket Phillip said the shooter wore.  Tr. 2425-26, 2578-79, 2676, 2693-94, 2709-10; R. 349-4.  Later that night, Phillip called Bogucki to say that he knew who the shooter was.  Tr. 1051, 1062-63, 1229, 2580-81, 2706, 2709-10.  Around 1:00 a.m., Bogucki went to Shawn's residence, where he met with Phillip, Shawn, Donna, and Cindy Hunter.  Tr. 1064, 1229, 2561, 2582, 2680-81, 2706.  Phillip immediately said that Jimenez had shot Morro.  Tr. 1065, 1229, 2568, 2707.  Phillip also said that Jimenez and Morro had argued about Jimenez's gang activities earlier that day.

10

Tr. 1067, 1229, 1280; R. 349-3; R. 349-4.  Shawn and Phillip told Bogucki they saw Jimenez at their home with a gun around Christmas.  Tr. 1069, 1281, 2568; R. 349-3; 349-4.  Bogucki did not pressure Phillip to name Jimenez.  Tr. 2709.  Bogucki took notes of his interviews with Phillip on a "general progress report" form, and combined his notes of both interviews, although this is not apparent from those notes.  Tr. 1040-43, 1044; R. 349-3.

When Phillip identified Jimenez, Bogucki believed Tueffel had lied to him, so he spoke to Tueffel again.  Tr. 1096-98.  Bogucki and Detective Sanders went to Tueffel's residence at 3:00 a.m.  Tr. 935, 1236-37, 2314-15.  Tueffel started telling the same story as before, Tr. 1107, 1238, 2315; R. 349-4; Bogucki stopped him, told him Phillip had said Jimenez shot Morro, and asked if that was true, Tr. 1108, 1238, 2315; R. 349-4.  Tueffel said Jimenez was the shooter, Tr. 1110, 1238, 2316, and that Jimenez and Morro had been in an argument, Tr. 939, 1317; R. 349-4.  Tueffel also said that Jimenez had .22 and .25 caliber handguns, Tr. 1240, 1318; R. 349-4; Morro was killed with a .22, Tr. 1240.  Tueffel said he lied previously because he was a Royal and feared retaliation.  Tr. 935, 1098, 1113, 1239; R. 349-4.  This interview took at most 20 minutes.  Tr. 2315.  Bogucki did not take Tueffel to the station that night, yell at or intimidate Tueffel, or coerce him to implicate Jimenez.  Tr. 1106, 1117, 1122-23, 1238-39, 1241, 1345-46, 2315.

Tueffel testified that this second interview was not at home, but at the station, where the police told him other witnesses had implicated Jimenez, swore loudly at him, and told him he was in trouble for lying to them.  Tr. 873-77, 880,

11

934, 981-82.  Tueffel said that this lasted around "an hour, hour and a half," Tr. 877, or "two or three hours," Tr. 983, during which he "kept telling" the officers Jimenez was innocent, but finally told them Jimenez was the shooter because he was "exhausted," Tr. 881-82, 983.

After leaving Tueffel's, Bogucki and Sanders proceeded to Jimenez's grandmother's house to arrest Jimenez.  Tr. 1290, 2317; R. 349-4.  Bogucki woke Jimenez and told him to get dressed because he was under arrest for a murder that occurred earlier that day.  Tr. 1292, 2318.  Jimenez was 5'4", 115 pounds, with brown, spiked hair shaved at the sides "close" to what Phillip described, Tr. 1268-69, 1288; R. 349-38, 349-46, but not the Jheri curls Sandra mentioned, Tr. 1021.  Jimenez put on a Duke University jacket.  Tr. 1130, 1269, 2318-19; R. 349-45.  As Bogucki escorted Jimenez out, Jimenez said that he had been home since 7:00 p.m. the previous night.  Tr. 1137-38, 1294; R. 349-4.  Jimenez was placed in the police car, read his rights, and driven to the station.  Tr. 1295, 2319.  There, Bogucki and Sanders interviewed Jimenez, Tr. 452, 454, 1141-42, 1299, 2319, who denied any involvement in Morro's murder, Tr. 1142, 1299.  When told the time Morro was shot, Jimenez said he had been home since 5:30 p.m.  Tr. 1297-98, 2320; R. 349-4.

Jimenez testified that he believed that he had told the officers who arrested him that he was at home when Morro was killed, Tr. 456, but denied saying he had been home since 7:00 p.m. the previous night, Tr. 684.  He also testified that, while being questioned at the station, he heard officers yelling at Tueffel and telling Tueffel he was lying, as well as Tueffel's responses that he was telling the truth.

12

Tr. 735-36.  Jimenez also testified that, during his first criminal trial, Tueffel told

him that he was testifying against him because the police "were making him – he

had to do it."  Tr. 737-40.

The next morning, February 4, 1993, Bogucki asked Sandra, Tina, Phillip,

and Tueffel to view a lineup.  Tr. 1144-45, 1303-04, 2473; R. 349-6.  All four drove

together to the station, Tr. 1146, 2429-30, 2473-74, and were not prevented from

talking with one another, Tr. 1148-49, but were separated before the lineup, Tr.

2433, 2467-68.  The lineup, held at 10:00 a.m., included four volunteers and

Jimenez in the second position.  Tr. 1304-05, 1308, 2320-21; R. 349-6.  Each

participant put on Jimenez's Duke jacket, stepped forward, then handed the jacket

to the next person.  Tr. 1308, 2321; R. 349-6.

All four witnesses identified Jimenez.  Tr. 1308-10; R. 349-4; R. 349-6.  Tina

said the jacket was the same as the shooter's, Tr. 1308-09, and Phillip said "that's

the TJ I was talking about, number two," Tr. 1309.  Both identified Jimenez

because they believed he was the shooter.  Tr. 2453, 2696.  Sandra said two people –

Jimenez and another person – looked like the shooter, and said she thought the

jacket was the one she had seen earlier.  Tr. 1154, 1157,1309-10, 2468-69; R. 349-4,

349-6.  Tueffel said "this is the TJ I was talking about, and he's number two."  Tr.

883-84, 1310; R. 349-4, 349-6.  Tueffel never said that he did not want to participate

in the lineup or that Jimenez was innocent.  Tr. 1311.

Tina testified that, before the lineup, she was placed at a desk with a "bunch

of papers and two photos," including one of Jimenez.  Tr. 2433, 2440, 2456.  No

13

officer said anything to her about the photo or pointed it out to her, Tr. 2441, 2453, and she did not know it was related to Morro's murder, Tr. 2452-53. During the lineup, Tina recognized one participant as the person in the photo, Tr. 2441, but the photo had no influence on whom she picked, Tr. 2453. Sandra testified that she also saw an upside-down photo of Jimenez on a desk near the lineup room, Tr. 2475, which she glanced at as she walked by, but it did not make her think it more likely that Jimenez was the shooter; she "had no idea why that picture was there," and did not know it was of Jimenez until she saw him in court, Tr. 2469-71. Bogucki did not know Sandra or Tina saw a photo of Jimenez before the lineup, never saw a photo on a desk, and did not place a photo there. Tr. 1149, 1311, 1346. Bogucki admitted the photo was his, but "was working with another detective" and did not "know who had what at the time" of the lineup. Tr. 1150-51. Sanders assisted with the lineup, but also never saw a photo on a desk, and did not place any photos there. Tr. 2320, 2324.

Following the lineup, Bogucki separately interviewed Sandra and Tina. Tr. 1282, 2441-43, 2468-69. Sandra stated she had picked out two people in the lineup and believed she had picked out "TJ" but was not sure because the two she picked looked similar and "could have been twins." Tr. 2474. Bogucki's interview with Tina lasted only ten minutes, and his notes reflect that Tina said she was standing in front of "3012," Tr. 1282; R. 349-26, which was Phillip's address and close to where the shooting occurred, Tr. 1283. Tina was unable to identify the second offender. Tr. 1194-95. Bogucki stopped taking notes while interviewing Tina, Tr.

1429; R. 349-27, because her statement matched the other witnesses', Tr. 1431. Based on the evidence he had gathered, Bogucki charged Jimenez with murder and contacted a youth officer to take his statement. Tr. 1165; R. 349-4. Bogucki and the youth officer spoke with Jimenez and advised him of his rights. Tr. 462-63, 1312-13; R. 349-4.

Bogucki testified that he spoke with Victoria, Jimenez's mother, around noon after the lineup; she never told Bogucki that Jimenez was home the night of the murder, but asked him not to take Jimenez's jacket from him, Tr. 1314-15. Bogucki did not believe he needed the jacket anymore because he had photographed it, so he allowed Jimenez to keep the jacket. Tr. 1314. Victoria testified that she told Bogucki that Jimenez was home at the time of the shooting and that she asked him to test Jimenez's jacket for gunshot residue, but he refused to do so. Tr. 1521-22, 1529-30. Bogucki did not believe that blood would have spattered on Jimenez's jacket, and believed that testing it for gunshot residue would be impossible, and did not send it for testing. Tr. 1133, 1136.

On February 8, Bogucki received a phone call relaying an anonymous tip implicating Victor in Morro's shooting. Tr. 1170-73, 1319, 1696; R. 349-7. This was the first information Bogucki had received about Victor, and the caller did not say Jimenez was not the shooter. Tr. 1228-29. Victor was a 12-year-old member of the Triangles. Tr. 343-46. Bogucki also spoke with Tueffel, who indicated that the second offender "could be Victor." Tr. 1167. On February 9, Bogucki and his partner, Detective Schalk, went to Victor's house, where Victor's parents informed

15

Bogucki that Victor was sick. Tr. 359-60, 1177-78, 1320, 1739, 1743-44; R. 349-7.

Because Victor "was twelve years old and . . . sick," Bogucki and Schalk told Victor's

family they could come to the station the next day. Tr. 359-60, 1178, 1320, 1744-45;

R. 349-7.

Victor testified that he spoke to his parents about the shooting "right after it

happened," but tried "very much" to "minimize [his] involvement in what happened"

to Morro. Tr. 412. Around the time the police came to his home, Victor testified, he

went to a pancake house with his father Ezequiel Romo ("Ezequiel") and Juan

Carlos because Ezequiel wanted to talk to Juan Carlos about Morro's murder. Tr.

357-58, 372-73. Victor said that he waited outside in the car while Ezequiel and

Juan Carlos went inside the restaurant to talk, and that Ezequiel recorded that

conversation, which Victor did not overhear, Tr. 358-59, 373-74. Afterward, Victor

testified, he believed that they "probably sat down, ate, and had a normal

conversation." Tr. 373.

Ezequiel testified that, after Victor told him that he was with Juan Carlos

when Morro was shot, he decided to protect Victor by making a secret recording of

Juan Carlos. Tr. 2048. Two days after the shooting, Ezequiel said, he and Victor

went to a pancake house together; Ezequiel brought a voice-activated tape recorder,

which he turned on as he and Victor entered the restaurant. Tr. 2020-21, 2024-25.

Ezequiel said that Victor pointed out Juan Carlos, Tr. 2020, and Ezequiel sat down

with Juan Carlos and started talking to him, Tr. 2022-23. Ezequiel testified that

Juan Carlos told him he had shot another boy in self-defense. Tr. 2049. Ezequiel

16

said the recorder was in his jacket pocket during the conversation, Tr. 2022, and was on the entire time they were in the restaurant, Tr. 2025. Ezequiel said it was a quiet restaurant; not many people were nearby, and only the two of them were at the table, Tr. 2024, 2049-50, because he did not want Victor to hear their conversation, Tr. 2021. After they finished speaking, Ezequiel said, they ate and he drove Juan Carlos "somewhere closer to his house. I never knew where he was living." Tr. 2024-25, 2050.

When Victor and Ezequiel came to the station, Bogucki and Schalk spoke first with Ezequiel, who said Victor's friend "Carlos" had shot Morro while Victor ran away, Tr. 1179-80, 1321, 1745-46, 2051-52; R. 349-7. Ezequiel stated that Morro had struck Carlos, leaving a bruise on Carlos' face, Tr. 1180, 1321, 1225-26, 1745-47, 1843; R. 349-7, and that Carlos had admitted shooting Morro in self-defense, Tr. 1180-81, 1321, 1746-47; R. 349-7. Ezequiel also drew Bogucki a map to Carlos' home. Tr. 1181, 1321, 1758; R. 349-7. Ezequiel was "very evasive," Tr. 1206, and "didn't really want to say very much. He just gave us a few details, and it was, go talk to Carlos," Tr. 1756. Ezequiel testified that he had not told the police everything he knew. Tr. 2050-51. Ezequiel did not mention Jimenez, Tr. 1185-86, or a secret recording of Carlos' confession to Morro's murder, Tr. 1224, 1343, 1843, 1858-59, 2028, and did not give Bogucki and Schalk the recording of his alleged conversation with Carlos, Tr. 2028.

Bogucki, Schalk, and a youth officer interviewed Victor, Tr. 1758-59, who denied knowing Jimenez, Tr. 1185-86, 1762-63; R. 349-7, but stated he had been

walking with someone named "Juan Carlos," who argued with Morro, and that the argument developed into a struggle, Tr. 1026, 1322-23, 1759-60; R. 349-7. Victor said he ran off and heard a gunshot, but did not look back. Tr. 377, 379, 1322-23, 1760; R. 349-7. Victor denied pushing Morro or being by him when the shooting occurred, and said he did not know Juan Carlos had a gun, Tr. 1190, 1323, 1760; R. 349-7. Victor said that he did not know Juan Carlos' last name or where he lived, that Juan Carlos had moved away, and that Juan Carlos was wearing a gold jacket. Tr. 1323, 1760, 1842-43, R. 349-7. Victor admitted at the civil trial that he lied to the police when he told them that he was running away when he heard the gunshot, that he did not know Juan Carlos had a gun, and that he was not near Morro when he was shot. Tr. 377, 379. Based on the contradictory witness statements, Bogucki did not trust Victor and Ezequiel, and believed their statements against Juan Carlos were an attempt to distance Victor from the shooting, Tr. 1025-26, 1105, 1182, 1190-91, 1224-25, 1323-24. Bogucki concluded that Victor's statement sufficient to charge him with murder, Tr. 1105, 1182, 1189, 1698. After Bogucki arrested Victor, Tueffel identified Victor's picture from a photo array. Tr. 941, 1189, 1782; R. 349-7.

Although Bogucki and Schalk did not consider Juan Carlos a suspect because they had "two positive identifications" of Jimenez, Tr. 1196-97, 1811, they used the map Ezequiel provided to go to Juan Carlos' house, where they interviewed him in his family's presence, Tr. 1195-96, 1325; R. 349-7. They told Juan Carlos he had been accused of Morro's murder and asked if he was involved. Tr. 1808. Juan

Carlos responded he had not spoken with Victor or Ezequiel for months, and believed he was at a friend's home when Morro was killed, Tr. 1199-1200, 1202, 1326, 1810; R. 349-7. Although the detectives believed this was a "very weak" and "vague" alibi, Tr. 1202, 1810, Juan Carlos had wavy hair, Tr. 1022, not Jheri curls, Tr. 1235, no bruise on his face, Tr. 1226, 1322, 1326; R. 349-7, and did not resemble Jimenez, so the witnesses could not have confused them, Tr. 1204-05, 1326; R. 349-7. When asked about his jacket, Juan Carlos stated that he owned only a White Sox jacket, which his family confirmed. Tr. 1205, 1326, 1812; R. 349-7. The detectives did not ask to see the jacket, Tr. 1205, 1812, and did not photograph Juan Carlos, Tr. 1022. The interview took approximately 15 minutes. Tr. 1812-13.

In March 1993, Victor's attorney David Weiner provided a tape to Gina Savini, a prosecutor with the State's Attorney's Office. Tr. 1343, 2308-09, 2311; R. 349-11. On the tape, Ezequiel and an unnamed individual discuss Morro's shooting. R. 349-70. The unnamed speaker states that Victor asked Morro about money owed to "Leo," and that Morro appeared to be on drugs and hit the speaker in the face. Id. The speaker said he was carrying a gun he had bought, but that he did not know if Victor knew he had a gun; he said he pulled the gun when Morro started to hit him, and that he shot Morro when Morro "hit [him] close to the nose." Id. The speaker stated that Victor was nearby, but was "running when [the speaker] was hit," and that Morro "took off running" when he was shot. Id. The speaker also said that "they pinned the blame on . . . the other gang boy that he . . . wanted to kill." Id.

Savini gave the tape to another prosecutor, but never gave it to the police or asked them to follow up. Tr. 1344, 2309. Later, the prosecutors in Jimenez's criminal case asked Bogucki and Schalk to speak with Juan Carlos about a tape recording of his alleged confession, Tr. 1207-08, 1343, 1818, but did not give them the tape or ask them to review it, Tr. 1344, 1823, 1848-50. Bogucki did not review the tape or a transcript of the tape, Tr. 1208, 1213, 1344, but spoke with Weiner, who said the tape was of a telephone conversation, Tr. 1343, 1821; R. 349-11. That evening, the detectives interviewed Juan Carlos at home, where they asked him about the tape. Tr. 1209-11, 1826-27; R. 349-11. Juan Carlos denied having any telephone conversation with Ezequiel and said he had not seen Victor in several months. Tr. 1209-11, 1827-28; R. 349-11. The detectives ended the interview, Tr. 1211, without taking Juan Carlos in for further questioning, Tr. 1828.

### C.    Criminal Proceedings.

Victor was tried as a juvenile for his involvement in Morro's death. Tr. 364. At that proceeding, Victor testified that he had been running away when he heard a gunshot, that he thought Juan Carlos had been shot, that he never saw a gun the day of the shooting, and that he was not close to Morro at the time he was shot. Tr. 382-85. Victor admitted at the civil trial that this testimony was false. Id. Tueffel testified that Morro had attempted to strike Jimenez and that Jimenez and Victor had shot Morro, Tr. 884-86, 943-48. Tueffel admitted he lied when he said "Frankie" shot Morro, Tr. 950, and said he had not initially told the police who shot Morro because he feared retaliation if he incriminated Jimenez, Tr. 949. At the

civil trial, Tueffel recanted this testimony, and said he implicated Jimenez only because he was threatened by gangs.  Tr. 886-87.  Tina also testified that Jimenez shot Morro.  Tr. 2449.  Victor was found delinquent.  Tr. 364-65.

At Jimenez's criminal trials, Phillip testified that he saw the shooting while leaning out his apartment window, Tr. 2214; that Morro fell into Sandra's arms after he was shot, Tr. 2240; and that he knew Jimenez, Tr. 2276-77, who was wearing a blue-and-white Duke University jacket when he shot Morro, Tr. 2688-89. Phillip further testified that, while in the police car with Tueffel at the scene, he asked Tueffel if Jimenez shot Morro, and Tueffel said no.  Tr. 2278, 2307, 2688. Phillip testified that he had picked Jimenez from a lineup.  Tr. 2696-97.  Phillip admitted he had not initially told the police Jimenez was the shooter, but had called the police later that night to tell them, and was cross-examined on this.  Tr. 2218, 2277, 2671.  Evidence was also introduced regarding Phillip's marijuana use, criminal history, fear of testifying, and traveling to the lineup with Sandra and Tina.  Tr. 2214-15, 2285.

At the criminal trials, Bogucki testified about speaking with Phillip at approximately 1:00 a.m. the night of Morro's shooting, Tr. 1338-39, and that, after that conversation, he was looking for a 13-to-14-year-old suspect named "TJ," Tr. 1340.  Sandra and Tina also testified that Jimenez shot Morro.  Tr. 2216, 2217, 2448-49, 2479-80.  Shawn testified at both trials that Morro and Jimenez argued the afternoon of the shooting, after which Jimenez threatened Morro, Tr. 2282-83, 2565-66.  Shawn also testified that the police had picked him up that night, Tr.

2566, and brought him back to the scene of the shooting so witnesses could see if he was the shooter, Tr. 2284-85. Donna testified that Jimenez showed her a .22- or .25-caliber handgun on the day of the shooting, and she described an incident between Morro and Jimenez, during which Jimenez told Morro "you got yours coming." Tr. 2283-84, 2424.

Victor testified at Jimenez's first criminal trial that Morro and Juan Carlos had been in an argument, and that he was running away when he heard a gunshot. Tr. 388-89. Victor also testified that he thought that Juan Carlos had been shot. Tr. 389. At the civil trial, Victor admitted that he had lied at Jimenez's criminal trial because he "did not care" about his oath to tell the truth and "had no respect for the justice system or authority figures." Tr. 388-89.

Tueffel testified at both of Jimenez's criminal trials and was cross-examined by the defense. Tr. 2213-14. David Gaughan, a prosecutor at both trials, Tr. 2145-46, interviewed Tueffel before the first trial, and Tueffel told him Jimenez had shot Morro. Tr. 951, 2147. Tueffel never indicated to Gaughan that his identification of Jimenez was involuntary or false, or that the police had yelled at him. Tr. 892, 2147. Tueffel refused to speak to Jimenez's attorney. Tr. 952, 990. Tueffel had to be arrested to testify at Jimenez's first trial, and said he feared Jimenez and the Royals because he was accusing a fellow gang member of murder. Tr. 2149-50, 2159, 2183.

At Jimenez's first criminal trial, Tueffel testified that Jimenez and Victor killed Morro. Tr. 892. Tueffel saw Jimenez with Victor the night of the shooting

and "saw a gun come out of TJ's pocket"; he also demonstrated the gang sign Jimenez had made before shooting Morro, Tr. 954-59. Tueffel testified that Victor pushed Morro against a wall, that Morro attempted to strike Jimenez, and that Jimenez put a gun to Morro's chest and shot him. Tr. 956-57. Tueffel also testified that, when Phillip asked him if Jimenez shot Morro, he said no because he was scared he could "end up dead" for testifying against a fellow gang member. Tr. 959-61. Tueffel said he did not initially identify Jimenez to the police because he was scared, but later picked Jimenez from a lineup because "that was the person that did it," not because anyone told him to. Tr. 962-64.

Before Jimenez's second trial, Gaughan again interviewed Tueffel, who said Jimenez shot Morro, but nothing about being yelled at by police. Tr. 2148. Although Tueffel did not want to testify at the second trial, Tr. 2162, he was not as scared of retaliation because he had moved away, Tr. 2183. At that trial, Tueffel again testified that Jimenez and Victor had killed Morro. Tr. 894, 967-69. Tueffel also testified that "Sandy, Phil, Donna," as well as "Shawn" and "Tina" were with Morro after he was shot, Tr. 969; that, when Phillip asked him if Jimenez was the shooter, he answered no because he was scared, Tr. 970; that he did not initially identify Jimenez to the police because he feared retaliation from the Royals, Tr. 970-73; and that he identified Jimenez in a lineup for "shooting . . . Morro," Tr. 973.

At the civil trial, Tueffel testified that he lied at Jimenez's criminal trials because he "was so scared of the real guy that did it." Tr. 894-95. Tueffel also said that he told a blonde detective around the time of Jimenez's second criminal trial

23

that "you got the wrong guy." Tr. 894. Tueffel was impeached by a State's Attorney's Office employee who met with Tueffel in 2009, to whom Tueffel said no police officer had threatened him to identify Jimenez; Tueffel did not say that the police yelled at him, or that this was why he identified Jimenez. Tr. 2349-50, 2353. Tueffel was also impeached by his August 20, 2010, signed statement that the police had never coerced him into identifying Jimenez as the shooter or into testifying against Jimenez at his criminal trials. Tr. 915-16; R. 349-66 ¶¶9-10.

A number of letters Jimenez wrote were admitted at his criminal trials; in them, Jimenez said that "the Royals are looking for Larry [Tueffel]," and that he would "take care of Larry, that pussy-ass mark," when he got out of jail. Tr. 666-69; R. 349-52, 349-53. Jimenez also wrote:

> I got something special . . . for Larry, you better see him [while] you can because he won't be living very long. . . . The Royals are supposed to be looking for him. It looks like I will have to kill him myself since the Royals won't. He's lucky he's living now but I told my cousin not to kill [him] because he's my problem, and as soon as I get out, Danny's pussy ass will be going to Larry's wake. You know the rules. If you shoot, you shoot to kill . . . . But don't worry. I won't get caught.

Tr. 670-71; R. 349-54. In another letter, Jimenez wrote, "Three more Royals . . . told me that Larry did not get shot and he's still testifying against me. . . . I'm going to tell [another Royal] to stop Larry from goin[g] to court. In any way he has to, even if he has to kill him. It won't mean anything to me. And it only takes the pull of the trigger." Tr. 673-74; R. 349-57.

Jimenez put on a number of alibi witnesses, Tr. 2256, and cross-examined Sandra, Tina, and Phillip regarding their inability to identify the second suspect,

Tr. 2279-80, but did not explore whether Tueffel was coerced to testify against him, Tr. 2169-70, or whether Phillip could have seen the shooting from his window, Tr. 2275. The tape of Juan Carlos' alleged confession was not admitted. Tr. 2252. Charles Murphy, Jimenez's attorney at his second trial, Tr. 2109-10, had received that tape, Tr. 2117, but did not send an investigator, or go himself, to talk to Juan Carlos, Tr. 2124-25, because Ezequiel could not arrange an interview, Tr. 2118-20. Murphy did not speak with Sandra, Tina, or Tueffel because Jimenez's attorney at his first trial already had. Tr. 2111-12.

### D.    Expert Witnesses.

Defense expert Arlo West reviewed the recording Victor's attorney provided to the prosecutors, Tr. 2060-64, and concluded that it was not made with a voice-activated recorder, Tr. 2064, and that the recorder was "absolutely" not in someone's pocket when the recording was made – had it been, it would have contained the sounds of the recorder being placed into and removed from his pocket, but it contained neither, Tr. 2073-75. By enhancing the recording, West also determined that a third person was present when the recording was made – a young male whispering "gonna tape now." Tr. 2071. West also concluded the recording was not made in a restaurant because it had none of the background noises associated with a restaurant, Tr. 2075-76, 2084, but was actually made in a car, as indicated by the sounds of a car door opening and shutting, Tr. 2079-80.

Former FBI agent Gregg McCrary offered extensive expert testimony for Jimenez about how he believed a reasonable investigator would have conducted the

Morro murder investigation.  Tr. 1573-1661.  According to McCrary, a reasonable investigator would have considered Phillip's identification of Jimenez problematic because it was offered during a group interview.  Tr. 1609.  McCrary also opined that Tina's account of the shooting "can't be true" and that a reasonable investigator would have followed up on discrepancies in her statement.  Tr. 1619-20.  McCrary further opined that a reasonable investigator would have realized that academic research has demonstrated "eyewitness testimony is notoriously fallible."  Tr. 1621-22.

McCrary testified that a reasonable officer would have considered Victor's statement against Juan Carlos "stunning" and "very strong" because it was an "admission against interests," Tr. 1628, and would have treated Ezequiel's statement as a "very important piece of potential evidence," Tr. 1632.  McCrary continued that, because Victor's statement was "credible" and "pretty strong," a reasonable officer would "[s]urely" need evidence to support any doubt in that statement, Tr. 1630-31.  McCrary stated that Victor was "pretty credible as being at the scene," so an investigator would need to "either confirm or disconfirm" his statement.  Tr. 1637.  McCrary further opined that Victor was Juan Carlos' "coconspirator," that Victor's statement against Juan Carlos established probable cause to search Juan Carlos, and that Bogucki's investigation of Juan Carlos was not "conducted in the way a reasonable police officer legitimately trying to get to the truth would conduct it."  Tr. 1638, 1644.

McCrary also declared that police "absolutely" have a duty to continue

26

investigating even after a case is being prosecuted and cannot "advocate [sic] their responsibility to investigate to prosecutors." Tr. 1649. McCrary further testified that an investigator must continue investigating even if "four really good eyewitnesses" identify a suspect, Tr. 1635-36, and that it is reasonable to continue investigating even after an arrest, Tr. 1630.

## II.    Other Trial Proceedings.

### A.    Voir Dire And Batson Ruling.

Voir dire commenced on January 9, 2012. Tr. 1.[4] Prospective juror S.M. stated that her great-nephew had been convicted of murder and had recently been released after 14 years in prison, Tr. 77-78. S.M. had attended his trial, and said her nephew had been treated fairly during those proceedings. Tr. 78. Another of S.M.'s nephews had been murdered seven years earlier, and no one had been charged or arrested for that crime. Tr. 78-79. S.M. stated she could put these matters aside. Tr. 78-79.

Prospective juror E.C.'s late uncle was a police officer, and they had talked "much" about his work. Tr. 81. E.C. had been convicted of possession of marijuana 40 years earlier, but felt he had been treated fairly because "[he] was guilty." Tr. 81-82. E.C. was convicted in Iowa and served 2½ years of a five-year sentence. Tr. 154. E.C. did not feel he had been treated unfairly by the police, prosecutors, or courts, but expressed frustration that his attorney was "a tax lawyer." Tr. 154-55.

---

[4] Consistent with Judicial Conference policy against making jurors' names available electronically, we refer to them only by their initials.

E.C. said that "the only person [he] was mad at was [himself] for getting caught."
Tr. 155.  E.C. also had been a member of a motorcycle club until approximately
seven years prior, and during that time had "many" encounters with police, whom
he said were just "doing their job."  Tr. 153.  None of those encounters involved
Chicago police, and he would not hold those incidents against anyone in this case
because "the police [were] doing their job."  Tr. 153-54.  When asked whether the
police had treated him unfairly, E.C. responded that he was stopped for wearing a
motorcycle club patch, but "still, you know, it's just part of that culture.  They're
doing their job."  Tr. 154.  E.C. said his past encounters with police would
"[a]bsolutely not" leave him with "any bad feelings against the police officers in this
case."  Tr. 154.

    Bogucki peremptorily challenged S.M., as well as S.T. and M.  Tr. 205-08.
Jimenez objected under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), stating that S.M.
and S.T. were the only African-Americans on the venire, Tr. 208, and the court
asked Bogucki to explain those challenges, Tr. 208.  Concerning S.T., Bogucki's
counsel stated – as he had in attempting to strike S.T. for cause, Tr. 185-86 – that
S.T. had failed to disclose two prior arrests, which were "important in a case . . .
dealing with police officers."  Tr. 208-09.  After Jimenez's counsel's response, Tr.
209-10, the district court allowed Bogucki's challenge to S.T., Tr. 213.  As for S.M.,
Bogucki's counsel noted that she has "a nephew who spent 14 years in prison and
just got out for murder," making her "not the kind of person [he] would like on [his]
jury for damages because . . . she would be very sympathetic to Mr. Jimenez who

spent 16 years in prison for murder." Tr. 209. Jimenez's counsel responded that

S.M. "said that her nephew was guilty and, you know, everybody brings life

experiences to the courtroom. She said she could be fair. She struck us as

objectively fair." Tr. 209. Counsel repeated that S.M. and S.T. were "the only two

blacks on the venire." Tr. 210.

The court asked Bogucki's counsel to elaborate further on S.M. Tr. 210.

Counsel explained that she

> had a nephew who . . . spent 14 years in prison for murder and just
> got out. She is going to . . . relate to what it's like to have a family
> member in prison. Mr. Jimenez was in prison for 16 years, and I think
> with her having a nephew in prison for 14 years and . . . I didn't
> remember her saying he didn't do it. I doubt she knows anything
> about the circumstances of whether he did it or not. And it wouldn't
> surprise me if she thought he didn't do it but –

Tr. 210. The court interrupted that S.M. "didn't think that [her nephew] was

treated unfairly," and counsel responded that S.M. "was not present when the

murder took place" and "obviously does not know what happened." Tr. 210-11.

Counsel continued:

> My point is the damages issue. She is somebody I think that is going
> to be very sympathetic to somebody like Mr. Jimenez who is claiming
> 16 years in prison. You know, we're going to say that he wasn't
> damaged in prison because . . . he was properly charged. She's a
> difficult juror for us in light of her experience with her nephew.

Tr. 211.

The court asked Bogucki's counsel to explain "why [he] didn't strike [E.C.]

who himself spent two and a half years in the joint." Tr. 211. Bogucki responded,

"Two and a half years is much different. It's a much smaller time compared to 14.

29

[E.C.'s time] I think was in the 1970s. . . . [H]is was the marijuana charge.  That was . . . a much smaller charge and I think it doesn't even compare to spending . . . . Two and a half years and 14 I think is a significant difference." Tr. 211-12.  When the court noted that E.C. "actually did [the crime] as opposed to her [sic] being the grandnephew," Bogucki's counsel explained that "the difference is [that E.C.] didn't contest that" he was guilty, while S.M. "doesn't know the circumstances of the murder" and "could believe [her great-nephew] was innocent." Tr. 212.  Counsel believed S.M. "could sympathize with Mr. Jimenez and view him as being like her nephew," but that E.C., "who was in prison for two years in 1975, [is] not going to associate himself with Jimenez" the same way.  Tr. 212.

The court then stated, "each and every case in which <u>Batson</u> has been violated in my courtroom has been a City of Chicago case, each and every one, and it has been by lawyers for the City of Chicago, every time.  It's not a massive amount of time, maybe four or five." A2.  The court disallowed Bogucki's peremptory challenge to S.M., stating that counsel was "grasping at straws," given what it deemed counsel's "differential treatment" of her and E.C.:

> [Y]ou can always come up with some sort of a this person isn't exactly the same as that person, but you've got a person here who spent two and a half years in prison himself.  He expressed some concerns about fairness, about the fairness of the proceeding.  She didn't.  You struck her, you didn't strike him.  The only conclusion I can reach is it's racially based, and I so find, and it's deliberate.
>
> And some day, the City is going to have to come to grips with this because it's – and it's the experience of judges in this building that this happens in the City of Chicago cases and the City of Chicago cases only.  She is seated.  I'm not giving you another [challenge] because you forfeited it.

30

A3-A4.

## B.     The Verdict And Post-Verdict Settlement.

The jury returned a verdict for Jimenez on his claims, and awarded

compensatory damages of $25 million.  Tr. 2973-74.  Immediately after that verdict,

the district court advised the jury that there would be "a five-minute break" before

an "extremely short part of the trial" on punitive damages.  Tr. 2974.  During the

break, Jimenez's counsel proposed to waive punitive damages if Bogucki "accepted

responsibility, like a criminal sentencing context."  Tr. 2974.  After a moment's

discussion about how to proceed, Tr. 2976-77, the court told the parties "[y]ou have

one minute," Tr. 2977.  Counsel for Bogucki pointed out that "[m]y other client is

not here.  Would I – ," to which the court responded, "What other client?"  Tr. 2977.

The court interrupted counsel's answer after the word "The – ,"  Tr. 2977, stating,

"Folks, we have a jury here.  I told you we were going to go right into this.

Everything can be anticipated.  No, that's the answer.  We're starting in a minute.

Okay, unless somebody tells me we're not, we're starting in one minute."  Tr. 2977.

Jimenez's counsel then explained that Jimenez had offered a settlement

agreement in which Jimenez would "seek no punitive damages.  In exchange Mr.

Bogucki is going to give sworn testimony at sidebar in secret that he acknowledges

that he violated [Jimenez's] constitutional rights, he's sorry, and that the verdict

was correct in every way."  Tr. 2978.  Jimenez's counsel added, "We're never going

to use this again unless there's an appeal and a successful retrial, in which case we

would be able to use this.  That's the only conceivable way this testimony would be

31

under seal." Tr. 2978. In response to Bogucki's counsel's statement that he was "not conceding" that this "could affect an issue we may raise" on appeal, Tr. 2979. Jimenez's counsel stated, "Let's make sure we understand. Let's say they win a Batson challenge and the Court says do this again. We intend to use this at the retrial," Tr. 2979. Bogucki's counsel concluded "this was done for purposes of avoiding punitive damages, too. That's the procedure, and we're not waiving any arguments we may make on appeal about the effect of it." Tr. 2981.

## SUMMARY OF ARGUMENT

In sustaining Jimenez's Batson objection and disallowing Bogucki's challenge to juror S.M., the district court critically erred. Nothing Jimenez offered at trial supported that objection, and the ruling sustaining it misstated substantial portions of the record, conflated challenges for cause and peremptory challenges, relied on Fourth Amendment doctrine irreconcilable with controlling law regarding peremptories, applied an unconstitutional presumption that white jurors must always be stricken before ostensibly-similar minorities, and rested on meritless arguments to which Bogucki had no opportunity to respond. Compounding this serious error, the court punished Bogucki with the forfeiture of his last peremptory challenge, despite clear precedent from this court and others that forfeiture is inappropriate for a Batson violation standing alone, and may be imposed only for egregious misconduct or manifest necessity. This error denied Bogucki his statutory right to exercise three peremptory challenges, necessitating reversal.

Additionally, the district court abused its discretion by permitting Jimenez to

offer extensive expert testimony how a "reasonable" police investigation should be conducted. That testimony consisted entirely of legal conclusions inadmissible under Fed. Rs. Evid. 702 and 403, which forbid expert testimony that simply tells the jury how to decide a case. It also seriously misstated the controlling law, contained impermissible opinions on the credibility of key witnesses, and attempted to bolster almost every aspect of Jimenez's case. This was not harmless error, but requires reversal.

The district court further abused its discretion by refusing to instruct the jury that it could consider only those due process theories Jimenez timely disclosed to Bogucki before trial. Absent that instruction, the jury was able to consider several theories of relief Jimenez first offered in closing argument and of which Bogucki was not aware in time to prepare an adequate defense, in violation of basic due process principles and Fed. R. Civ. P. 15's corresponding requirements regarding mid-trial amendments of a complaint. This lack of disclosure requires reversal of the judgment on Jimenez's due process claims and, indeed, entry of judgment for defendants on the theories he failed to timely disclose. And on all the due process claims, because Jimenez failed to adduce more than a thousand pages of transcripts from his criminal trials, the jury was unable to properly assess materiality. This was an intentional choice by Jimenez, who was warned this evidence was necessary. He should therefore not be allowed to offer this evidence for the first time on retrial; judgment should be entered against him on his due process claims.

**ARGUMENT**

———

**I.    THE DISTRICT COURT'S <u>BATSON</u> RULING AND FORFEITURE REQUIRE REVERSAL.**

### A.    The District Court's <u>Batson</u> Ruling Was Clearly Erroneous.

<u>Batson</u> prohibits the use of peremptory challenges "to challenge potential jurors solely on account of their race," 476 U.S. at 89.  When evaluating a <u>Batson</u> claim, a court follows a three-step inquiry.  <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006).  First, the court determines whether the opponent of a strike made a prima facie showing that it was racially-based.  <u>Id.</u>  If so, the burden shifts to the strike's proponent to provide a race-neutral explanation.  <u>Id.</u>  "[T]he court must then determine whether the [opponent] has carried his burden of proving purposeful discrimination."  <u>Id.</u>

We do not dispute that Jimenez made the minimal prima-facie showing, <u>see United States v. Hendrix</u>, 509 F.3d 362, 370 (7th Cir. 2007) (removal of two African-American jurors sufficient); <u>see also Johnson v. California</u>, 545 U.S. 162, 173 (2005) (three African-American jurors sufficient), and Jimenez has never disputed that Bogucki's stated reason for challenging S.M. – the lengthy prison sentenced served by a family member convicted of the same crime – is race-neutral on its face.  Only the third step of the <u>Batson</u> analysis is at issue.  While that step is normally reviewed for clear error, it is reviewed de novo when the district court misapprehends or misapplies <u>Batson</u>, <u>United States v. Yarrington</u>, 640 F.3d 772, 778 (7th Cir. 2011) (citing <u>United States v. McMath</u>, 559 F.3d 657, 663 & n.2 (7th

Cir. 2009)), because a factual finding made under an erroneous legal standard is itself necessarily clearly erroneous, e.g., Moriarty v. Glueckert Funeral Home, Ltd., 155 F.3d 859, 864 (7th Cir. 1998); United States v. Kimbrel, 532 F.3d 461, 465-66 (6th Cir. 2008).

None of the reasons provided by Jimenez or the district court established pretext. Jimenez's initial reason – that Bogucki had challenged the only two African-Americans on the venire, Tr. 208, 210 – was insufficient as a matter of law. "[D]isparate impact on a particular group is not sufficient to establish discriminatory intent" under Batson. Tinner v. United Insurance Co., 308 F.3d 697, 705 (7th Cir. 2002). Jimenez's additional reasons – that S.M. said her great-nephew was guilty, and that he believed S.M. when she said she could be fair, Tr. 209 – also do not support a finding of pretext. S.M. never said her grandnephew was guilty, nor was she even asked about his guilt. Rather, S.M. said that he had been treated fairly, Tr. 78, but fair treatment hardly implies guilt; indeed, juror E.C. admitted his guilt, Tr. 81-82, but nevertheless felt he had been treated unfairly by his inept defense attorney, Tr. 154-55. Nor does it matter that S.M. claimed she could be fair despite her personal experiences, let alone whether Jimenez found that statement credible. While such statements undermine a challenge for cause "generally based on actual bias, implied bias, or inferable bias," e.g., United States v. Greer, 285 F.3d 158, 171 (2d Cir. 2002), demonstrated "[b]ias is only one factor in deciding whether to challenge a juror" peremptorily, Thompson v. Altheimer & Gray, 248 F.3d 621, 623 (7th Cir. 2001). The "peremptory challenge is considerably

more extensive in scope," and "serves to remove jurors who, in the opinion of counsel, have unacknowledged or unconscious bias." <u>Darbin v. Nourse</u>, 664 F.2d 1109, 1113 (9th Cir. 1981). In short, each of Jimenez's arguments faltered as a matter of law, contradicted the factual record, or both; a finding of pretext based on them would have been clear error.

The district court's own reasons fared no better. Elaborating on its ruling post-verdict, the district court concluded that Bogucki's stated concern about S.M. – her possible empathy for Jimenez's time in prison – was pretextual because it applied "more strongly" to E.C., a white juror convicted 40 years prior for a minor drug offense. A14. The court relied primarily on the inference recognized in <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241 (2005), that, "[i]f a . . . proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered." A13. That inference is inapplicable here, both because S.M. and E.C. were not similar in the first place, and because Bogucki could not strike both of them after striking S.T. and M.

First, it was crucial in <u>Miller-El</u> that, despite having peremptories available, the prosecutors failed to challenge a number of non-minorities whose opinions about the application of the death penalty were as problematic as those held by minorities they challenged. <u>See</u> 545 U.S. at 241-52. Thus, the circumstances in which the decision to "permit[ ]" a non-minority juror to serve indicates pretext must necessarily involve both the meaningful opportunity to challenge that juror and the

failure to do so nonetheless.  When there is no such opportunity, as when a party does not have enough peremptories to challenge every juror possessing a particular characteristic, the inference of pretext is weakened and, when only one challenge is at issue, falls away entirely.

Here, Bogucki could not challenge both S.M. and E.C. without giving up a legitimate challenge to another juror.  Bogucki had only three peremptory challenges to begin with, and used two for S.T. and M.  That left Bogucki with only one peremptory and, as the district court saw things, two potentially-biased jurors of different races.  To find racial discrimination merely because a litigant uses his last peremptory to strike a minority instead of a comparable non-minority effectively creates a presumption that, when faced with such a choice, litigants must always challenge the non-minority, or be found to have engaged in racial discrimination.  Such a presumption is almost certainly unconstitutional.  Cf. United States v. Bennett, 664 F.3d 997, 1010 (5th Cir. 2011) (equal protection prohibits use of peremptory challenge "to strike a white prospective juror because of that juror's race"), vacated on other grounds, Bennett v. United States, 133 S. Ct. 71 (2012).

Compounding this problem, the district court considered S.M. and E.C. similar, not because they shared a particular background trait or opinion, but because it believed their individual circumstances could make each sympathetic to Jimenez.  Similarities at such a high level of abstraction are not comparable to a specific trait as in Miller-El, namely, a stated belief about the propriety of the death

penalty when rehabilitation is possible.  545 U.S. at 242-45; see United States v. Taylor, 509 F.3d 839, 844-45 (7th Cir. 2007) (propriety of death penalty for defendant who did not kill victim himself).  It is a matter of objective fact whether a juror possesses a particular characteristic or belief, which should be equally desirable or undesirable regardless of the juror's race.  The same cannot be said of whether that juror, considered in his entirety, might be more empathetic than another.  Jurors "are not products of a set of cookie cutters," Miller-El, 545 U.S. at 247 n.6, and comparisons among them in the context of peremptory challenges are highly subjective, see Thomas v. Moore, 866 F.2d 803, 805 (5th Cir. 1989), often turning on counsel's assessment of his case.  As a result, the inference recognized in Miller-El is strongest when based on purely objective, factual similarities, and weakest when based on a subjective evaluation of which of two factually-dissimilar jurors might be "better" for a litigant's case.  For this reason as well, the district court erred by relying on Miller-El.

Second, the district court's underlying conclusion that S.M. was actually "a less desirable juror from a plaintiff's standpoint" than E.C., A14, was unfounded.  The court tried to justify this conclusion by insisting that E.C. "never" said that he could set his experiences aside, id., but the record demonstrates that E.C. said exactly that – the police were "just doing their job" and his experiences left him with "absolutely" no "bad feelings" against law enforcement.  Tr. 153-54.  This inexplicable factual error aside, that a court deems one juror "less desirable" than another does not a Batson violation make.  As the Court has made clear in

assessing ineffective assistance of counsel, "advocacy is an art and not a science," Strickland v. Washington, 466 U.S. 668, 681 (1984), and strategic decisions are notoriously difficult to analyze "from counsel's perspective at the time," id. at 689. This is particularly true of jury selection, which is so imprecise that attorneys often turn to social science, consultants, and mock juries for guidance. See, e.g., Hon. David Hittner & Eric J.R. Nichols, Jury Selection In Federal Civil Litigation: General Procedures, New Rules, And The Arrival Of Batson, 23 Tex. Tech. L. Rev. 407, 437-39 (1992). Batson requires proof of actual "discriminatory intent or purpose." Hernandez v. New York, 500 U.S. 352, 360 (1991). That high standard is not satisfied by merely second-guessing the strategic decisions of counsel; "the adversary system requires deference" to such decisions, Strickland, 466 U.S. at 681; see Brown v. Sternes, 304 F.3d 677, 691 (7th Cir. 2002), so long as they "have some basis in accepted trial strategy," Miller-El v. Cockrell, 537 U.S. 322, 339 (2003).

The decision to challenge S.M. had ample strategic basis: S.M.'s great-nephew was convicted of the exact same offense as Jimenez, and he spent nearly the same amount of time in prison. Tr. 78. As Bogucki's counsel explained, he was concerned that S.M.'s experiences with her great-nephew would make her unusually sympathetic to Jimenez on damages. Tr. 209. A juror's familial relationship with an incarcerated person is, for obvious reasons, always a legitimate concern for a litigant affiliated with law enforcement. See, e.g., United States v. Wiggins, 104 F.3d 174, 176 (8th Cir. 1997). That concern was particularly acute here, seeing that S.M. had a close enough relationship with her great-nephew that

39

she attended his murder trial, Tr. 78; she was hardly a "relatively distant relative," as the district court tried to characterize her, A14. And certainly, that concern did not dissipate, as the district court speculated, A17, merely because a proceeding is civil rather than criminal, especially where Jimenez requested compensatory and punitive damages for 16 years spent in prison.

The district court's apparent response, that E.C. would be unfavorable to Bogucki because E.C. felt that his conviction was unfair, A14, simply ignores *why* E.C. felt this way: the incompetence of the tax lawyer who served as his defense counsel, Tr. 154-55. If anything, that fact helped Bogucki, whose counsel suggested in opening that an obvious explanation for Jimenez's conviction was his lawyer's incompetence. Tr. 287, 290. This suggestion was supported by the testimony of Jimenez's second defense attorney, who saw no need to interview the witnesses because prior counsel had already done so, Tr. 2111-12, and did not even try to investigate or interview Juan Carlos because Ezequiel supposedly could not schedule a meeting, Tr. 2118-20, 2124-25. Having had incompetent defense counsel himself, E.C. was likely receptive to the possibility that this was why Jimenez was convicted even if innocent.

While the district court's error in weighing the facts under the wrong legal standard itself constitutes clear error, other legal errors tainted its factual conclusions. The court deemed it "significant" that Bogucki's counsel justified striking S.M. for what it called a "made-up" and "hypothesized reason having no support whatsoever in the record." A15-A16. The court further criticized Bogucki's

counsel for relying on his intuition, declaring that "intuition . . . cannot provide any support" for a peremptory challenge because "'subjective . . . appeals to an ineffable intuition should not be credited.'"  A16 (quoting United States v. Broomfield, 417 F.3d 654, 655 (7th Cir. 2005)).  These criticisms reflect a fundamental misunderstanding of peremptory challenges.

First, to the extent the district court demanded direct evidence of S.M.'s bias, A15-A16, it conflated peremptory challenges with challenges for cause, contrary to Batson itself, which "emphasiz[ed]" that an acceptable explanation for a peremptory challenge "need not rise to the level justifying exercise of a challenge for cause." 476 U.S. at 97.  It is well established that peremptories may be based on a party's fear of a juror's "unacknowledged or unconscious bias." Darbin, 664 F.2d at 1113. It was precisely such potential for unconscious or unacknowledged bias to which Bogucki's counsel referred when he expressed his concern that S.M. would be "difficult" on the issue of damages, Tr. 211, because she might "view [Jimenez] as being like her nephew," Tr. 212.  By demanding concrete proof of such bias, the district court not only held Bogucki to a burden rejected in Batson itself, but demanded the impossible – proof of a bias of which S.M. herself might not even be aware until the evidence was presented.

 Furthermore, the district court's reliance on Broomfield, A16, was wholly misplaced.  Broomfield's discussion of intuition was in the context of the Fourth Amendment, 417 F.3d at 655, and has no application whatsoever to peremptory challenges.  Indeed, this court has "rejected" any contention that "a subjective

determination based only on [an attorney's] own intuition . . . is insufficient to justify [a] peremptory challenge." United States v. Briscoe, 896 F.2d 1476, 1489 (7th Cir. 1990) (collecting authority); see, e.g., Mahaffey v. Ramos, 588 F.3d 1142, 1147 (7th Cir. 2009); Dunham v. Frank's Nursery & Crafts, Inc., 967 F.2d 1121, 1125 (7th Cir. 1992).

The district court also erred by relying, in ruling on the post-judgment motions, on an argument about S.M. to which Bogucki had no opportunity to respond. Post-verdict, Jimenez's only argument regarding S.M. was that he thought she "would be impartial and that her great-nephew was not wrongfully convicted or treated unfairly." R. 323 at 3. Again, neither of these beliefs establishes a Batson violation. So, in ruling on those motions, the district court offered an entirely new theory – that S.M. would be "less sympathetic to Jimenez" because another "nephew had been the victim in an as-yet-unsolved homicide." A14-A15. This was error. By basing its ruling on an argument Jimenez never made, the district court denied Bogucki opportunity to respond. "[O]pportunity to respond is deeply embedded in our concept of fair play and substantial justice." English v. Cromwell, 10 F.3d 434, 437 (7th Cir. 1993); see Smith v. Bray, 681 F.3d 888, 903 (7th Cir. 2012). That is particularly true when the party denied a response had "something substantial to say in opposition." English, 10 F.3d at 438. Here, Bogucki had an obvious response to this argument; indeed, S.M.'s slain nephew was only further reason to strike her – individuals often have "little or no faith in the police," in part *because* of law enforcement's perceived "failure to solve

crimes." <u>E.g.</u>, Scott J. Krischke, Note, <u>Absent Accountability: How Prosecutorial Impunity Hinders The Fair Administration of Justice In America</u>, 19 J.L. & Policy 395, 412 & n.117 (2010) (quotation omitted).

More troubling, at the same time the court made a new argument for Jimenez, it denied Bogucki any elaboration on the arguments he made during colloquy.  A15.  Post-verdict, Bogucki argued that it was significant that S.M.'s nephew had been arrested for the same crime as Jimenez, while E.C. was convicted of a minor marijuana offense.  R. 332 at 2.  The district court refused to even consider this argument, claiming that Bogucki "did not suggest" during colloquy that a reason he "distinguished between [E.C.] and [S.M.] was that . . . Jimenez and [S.M.'s] great-nephew were convicted of the same crime."  A15 (citing <u>United States v. Taylor</u>, 636 F.3d 901 (7th Cir. 2011)).  In fact, Bogucki specifically stated that the fact that S.M.'s great-nephew "spent 14 years in prison and just got out for murder" made her undesirable because "she would be very sympathetic to Mr. Jimenez who spent 16 years in prison for murder."  Tr. 209.  As this court has held in reversing another <u>Batson</u> ruling by the same district judge, it is "unable to defer" when that ruling "incorrectly recounts" the record.  <u>United States v. Stephens</u>, 514 F.3d 703, 713 (7th Cir. 2008).  That is particularly true when, as here, the court's misrepresentation of the record is used as a justification for an outright refusal to consider a litigant's argument.

## B.  The District Court Abused Its Discretion In Imposing A Forfeiture.

Because its <u>Batson</u> ruling was clearly erroneous, the court necessarily erred when, as punishment for Bogucki's supposed <u>Batson</u> violation, it prevented him from using that challenge on another member of the venire.  But even apart from that error, imposing a forfeiture was an abuse of discretion.

<u>Batson</u> suggested two possible remedies for a discriminatory peremptory challenge: (1) "discharge the venire and select a new jury from a panel not previously associated with the case"; or (2) "disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire."  <u>Batson</u>, 476 U.S. at 99 n.24.  While these are "[t]he two primary remedies," <u>Rice v. White</u>, 660 F.3d 242, 259 (6th Cir. 2011), violations are remediable in "a number of ways," such as by calling additional jurors to the venire and granting additional challenges to the objector, <u>McCrory v. Henderson</u>, 82 F.3d 1243, 1247 (2d Cir. 1996).  Given "the variety of jury selection practices followed in our state and federal trial courts," <u>Batson</u>, 476 U.S. at 99 n.24, the choice of a specific remedy is generally "a matter upon which [trial] courts are to be accorded significant latitude," <u>Koo v. McBride</u>, 124 F.3d 869, 873 (7th Cir. 1997).  Accordingly, the choice of remedy is reviewed for abuse of discretion.  <u>United States v. Ramirez-Martinez</u>, 273 F.3d 903, 910 (9th Cir. 2001), <u>overruled on other grounds</u>, <u>United States v. Lopez</u>, 484 F.3d 1185 (9th Cir. 2007).  "An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered or when the court fails to analyze the applicable factors."  <u>United States v. United</u>

States Currency, 863 F.2d 555, 561 (7th Cir. 1988) (citation omitted); see Stephens,

514 F.3d at 712.

The latitude to determine a proper remedy is circumscribed by "the basic

proposition that the nature of the remedy must be determined by the nature and

the scope of the constitutional violation" and "the practicalities of the situation,"

Koo, 124 F.3d at 873, as well as by statute.  In Maloney v. Plunkett, 854 F.2d 152

(7th Cir. 1988), the district court, concluding that the parties "had used their

peremptory challenges to alter the racial composition of the jury," id. at 154,

discharged the jury, ordered the selection of a new jury, and disallowed any

peremptory challenges, id. at 153.  The parties petitioned for mandamus, which this

court granted because the district court had "deliberately refused to enforce a

peremptory . . . statutory command.  [28 U.S.C. § 1870] provides, in words that

could not be clearer, that, 'In civil cases, each party shall be entitled to three

peremptory challenges.'"  Id. at 154.  "[D]eprivation of the statutory right to exercise

peremptory challenges as a sanction for misconduct is, so far as we are able to

determine, utterly without precedent."  Id.

The grant of mandamus in Maloney shows that forfeiture as a sanction for a

Batson violation, without more, is outside "the sphere of [the district court's]

discretionary power."  Will v. United States, 389 U.S. 90, 104 (1967).  Mandamus is

a "drastic and extraordinary remedy reserved for really extraordinary cases," such

as rulings "amounting to a judicial usurpation of power" or so severely erroneous as

to constitute a "clear abuse of discretion."  Cheney v. U.S. District Court, 542 U.S.

367, 380 (2004) (citation omitted).  If the district court had absolute discretion to impose forfeiture, its decision would have been "ill-suited" to mandamus because the existence of such discretion, by its very nature, means that a "a litigant's right to a particular result will rarely be clear and indisputable."  In re Ford Motor Co., 344 F.3d 648, 651 (7th Cir. 2003) (quotation marks omitted).

Subsequent decisions further indicate that forfeiture may not be imposed in just any case in which a Batson violation has been found, but only when "the nature and the scope of the constitutional violation" and "the practicalities of the situation," Koo, 124 F.3d at 873, specifically warrant that sanction.  Applying Koo, the Ninth Circuit has found "little reason to 'punish'" a Batson violation with forfeiture absent "evidence of egregious bad faith or maliciousness," particularly if the Batson ruling was "close;" the improperly-challenged jurors were restored to the panel; and the district court was able to "to ensure that [the challenges] were exercised in a constitutionally acceptable fashion."  Ramirez-Martinez, 273 F.3d at 910.  Similarly, other courts have rejected automatic forfeiture as a Batson remedy, explaining that "the free exercise of peremptory challenges is a venerable tool that should be denied only in rare circumstances," after considering "whether the challenged juror is available to be reseated, whether the litigant appears to be engaging in a pattern of discrimination, and the number of peremptory challenges that remain to be exercised."  People v. Luciano, 890 N.E.2d 214, 219 (N.Y. 2008).  Under this standard, "even a single instance of discriminatory conduct may warrant forfeiture," but "where the finding of discrimination is close, forfeiture may not be

46

an appropriate remedy." Id. (citing Ramirez-Martinez). Recently, the Louisiana Supreme Court endorsed Luciano, concluding that forfeiture is "an acceptable remedy in some cases," such as when "necessary to punish sufficiently egregious conduct." People v. Nelson, 85 So. 3d 21, 36 (La. 2012); accord Brooks v. Armco, Inc., 194 S.W.3d 661, 666-67 (Tex. App. 2006) (noting that "compelling reason" is necessary to impose a forfeiture; mere "error of judgment" insufficient).

The few reported cases imposing forfeiture are consistent with this approach. In Nelson, the court upheld a forfeiture where defense counsel collaborated to use seventeen of their eighteen challenges to remove white jurors from the panel, nine of whom were removed with discriminatory intent. 85 So. 3d at 25-26. In United States v. Walker, 490 F.3d 1282 (11th Cir. 2007), the venire "was drawn from a geographically diverse pool, and some of the jurors had driven several hours to attend"; the "Batson challenges were decided late in the evening"; and the rest of the venire "had already been dismissed" with the defendants' consent, id. at 1295. As a result, allowing the defendants to exercise four challenges "would have required that the court start anew the next day, at considerable time and expense." Id. Although "the better practice in certain circumstances is to begin afresh with a new venire," the court concluded that forfeiture in the extreme circumstances presented there was within the district court's discretion. Id. In Peetz v. State, 180 S.W.3d 755 (Tex. App. 2005), the court found a forfeiture appropriate where the defendant "used every peremptory challenge he had to remove every African-American person available to be on the jury," Brooks, 194 S.W.3d at 666, one of

whom counsel challenged on the ground that the juror's "face resembled one part of the anatomy of a chicken" before "act[ing] out precisely what she meant," Peetz, 180 S.W.3d at 757 & n.1. And in United States v. Aleman, 246 Fed. Appx. 731 (2d Cir. 2007), the court upheld a forfeiture where the defendant had engaged in a "suspicious pattern of peremptory strikes," id. at 733.

In this case, the district court did not doubt that forfeiture should be governed by the Koo factors. A21-A23. Nonetheless, "the nature and the scope of the constitutional violation" and "the practicalities of the situation," Koo, 124 F.3d at 873, do not justify such a sanction. Jimenez has never contended, the court did not find, and nothing in the record shows, that Bogucki acted in "egregious bad faith or maliciousness," Ramirez-Martinez, 273 F.3d at 910, or committed any "egregious conduct," Nelson, 85 So. 3d at 36. Plainly, there is no "pattern of discrimination," Luciano, 890 N.E.2d at 219, in a single peremptory challenge. Moreover, S.M. was seated, weighing against forfeiture. See Ramirez-Martinez, 273 F.3d at 910; Luciano, 890 N.E.2d at 219. Thereafter, it was easy to ensure that Bogucki's last peremptory challenge was "exercised in a constitutionally acceptable fashion." Ramirez-Martinez, 273 F.3d at 910. And because the venire had not been dismissed, Bogucki could have exercised his last challenge without any meaningful delay or expense, as in Walker, 490 F.3d at 1295.

Even in its post-judgment ruling, the court still could not identify a single egregious circumstance warranting a forfeiture. Although the court said its Batson ruling was not "close," A24, as we have already explained, that ruling was wholly

48

unsupportable as a matter of law and fact.  The only other consideration the court could muster in support of a forfeiture – the supposed necessity of deterrence, A22-A24 – was not sufficient.  If the misuse of a single peremptory, absent any aggravating circumstances, justifies forfeiture as a deterrent, then every violation of <u>Batson</u> could support forfeiture as a matter of course.  That is not the law; <u>Maloney</u> and the other decisions we discuss above all squarely reject forfeiture for <u>Batson</u> violations standing alone.  Moreover, mere "boilerplate" considerations – such as "deterrence" – cannot sustain an exercise of judicial discretion, which must be based on "well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors," <u>TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 434 (1968); <u>see</u> <u>Stephens</u>, 514 F.3d at 713 (requiring "greater immersion in the case"), and is abused when a district court district court fails to "actually exercise" any discretion, <u>In re American Reserve Corp.</u>, 841 F.2d 159, 162 (7th Cir. 1987); <u>see</u> <u>Stephens</u>, 514 F.3d at 712.

The court's other explanations for imposing a forfeiture also fall short.  The court incorrectly distinguished <u>Maloney</u> as forbidding only "anticipator[y]" forfeitures of strikes "in an entirely new trial."  A19.  Although a previous trial in <u>Maloney</u> ended in mistrial, it was during jury selection on retrial that the court found a <u>Batson</u> violation, discharged the venire, and forfeited the parties' peremptory challenges against a new venire.  854 F.2d at 155.  Finally, the district court's fallback claim that Bogucki did not actually forfeit anything because he "used all three" of his peremptory challenges, A19-A20, is simply inexplicable.

49

Aside from being inconsistent with the court's own declaration that Bogucki's challenge was "forfeited," A4, this approach implies that merely allowing a litigant to identify – but not actually remove – three undesirable jurors satisfies section 1870. While peremptory challenges are not themselves of "constitutional dimension," they are "part of our common-law heritage" and "reinforc[e] a defendant's right to trial by an impartial jury," United States v. Martinez-Salazar, 528 U.S. 304, 311 (2000); section 1870 does not envision a mere request, granted only as a matter of judicial grace, but contemplates the ability to actually remove jurors from the panel. Indeed, the Federal Rules make this clear, requiring the district court to "*allow* the number of peremptory challenges provided by" section 1870. Fed. R. Civ. P. 47(b) (emphasis added).

### C. Whether Considered Separately Or Together, These Rulings Require Reversal.

Whether because of the district court's erroneous Batson ruling, its erroneous forfeiture of Bogucki's remaining peremptory challenge, or both, reversal is required. Although it is settled that the Constitution requires reversal for the loss of a peremptory challenge only if it resulted in the seating of a juror challengeable for cause, Rivera v. Illinois, 556 U.S. 148, 157 (2009); Ross v. Oklahoma, 487 U.S. 81, 88 (1988), neither the Supreme Court nor this court has ever considered when an erroneous Batson ruling, or an erroneous forfeiture of a peremptory challenge as a penalty for a Batson violation, requires reversal under the federal statutes and

50

rules providing peremptory challenges.[5]  Indeed, "[t]he caselaw is still evolving . . . in determining the extent to which errors regarding peremptory challenges" require reversal, United States v. Harbin, 250 F.3d 532, 542 (7th Cir. 2001), and only two of this court's decisions shed any light on this issue.

In United States v. Patterson, 215 F.3d 776 (7th Cir. 2000), vacated in part on other grounds, Patterson v. United States, 531 U.S. 1033 (2000), this court held that an erroneous reduction of the number of peremptories afforded for alternate jurors was not reversible because the struck-jury procedure used there had resulted in "a higher ratio of challenges to alternates than of challenges to principal jurors," obviating any "need for a second allotment of challenges," id. at 780.  Moreover, these peremptories were in addition to the 20 peremptories – twice the number afforded under Fed. R. Crim P. 24(b)(2) – already received, and the possibility of any harm resulting from allowing 22 peremptories instead of 24 against such a "well-screened panel" was "too remote to be worth investigating."  Id. at 782.  While Patterson made clear that mere "technical" errors in affording a party its peremptory challenges are not reversible error, Harbin, 250 F.3d at 548, it left open whether other errors, such as "[a]n exceptionally-confused jury selection process," might justify reversal, Patterson, 215 F.3d at 782.

Subsequently, in Harbin, this court held that permitting the use of a single

---

[5]  The Court had no occasion to reach this issue in Martinez-Salazar because it held that a party is not denied a peremptory challenge merely because he had to use that challenge to remedy an erroneous ruling on a challenge for cause, but has "used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury."  528 U.S. at 315-16.

peremptory in the midst of trial required reversal because it had "cripple[d] the device designed to ensure an impartial jury by giving each party an opportunity to weed out the extremes of partiality." 250 F.3d at 548. Such error was "precisely the type of error that 'defies harmless error analysis'" – as "many errors relating to peremptory challenges" are – because "challenges for cause presumably remove[ ] anyone with obvious bias or potential for bias, and [a court] cannot assess how the makeup of the jury may have impacted the decisionmaking process," id. at 545. Stopping short of holding "that automatic reversal is appropriate for all errors involving peremptory challenges," id., this court asked whether that error was "severe enough to call into question the proper functioning of the jury selection process" or "adversely impacted the ability of the peremptory challenge device to fulfill its purpose of ensuring an impartial jury," id. at 548; see id. at 541 (asking whether error "impacted the ability of the peremptory challenge process to fulfill its function as a means of ensuring an impartial jury and a fair trial"). If so, "reversal is necessary without engaging in a harmless error inquiry" because "[a]ny other holding would effectively eliminate the ability of defendants to appeal any restrictions on peremptory challenges, thus frustrating the peremptory challenge device as a means of ensuring an impartial jury." Id. at 548-49. Ultimately, this court concluded that, unlike the "insignificant . . . technical error" at issue in Patterson, id. at 548, the use of a peremptory mid-trial – even a single peremptory – undermined the very purpose of the peremptory device itself and mandated reversal because it "threaten[ed] [the] goal of an impartial jury by skewing the jury towards

the favored party," id. at 549.

The Harbin-Patterson framework makes clear that the district court's Batson errors here were not "insignificant" or "technical," but undermined the very purpose of the peremptory device. The district court did not simply miscount or misallocate Bogucki's peremptories (and certainly did not provide him additional peremptories, as in Patterson) but affirmatively denied him one-third of the peremptories section 1870 provides. As a result, both S.M., a juror Bogucki rightfully believed would be biased against him, *and* E.C., who the court thought was even more biased against him, sat on the jury, significantly skewing the jury towards Jimenez. Reversal for that erroneous Batson ruling is necessary, as several courts have recognized. See, e.g., Harbin, 250 F.3d at 549;  State v. Mootz, 808 N.W.2d 207, 225-26 (Iowa 2012) (court will "presume [an erroneous Batson ruling] is prejudicial"); Hardison v. State, 94 So. 3d 1092, 1101-02 (Miss. 2012) (when Batson is misapplied, "prejudice is automatically presumed, and we will find reversible error"); People v. Hecker, 942 N.E.2d 248, 272 (N.Y. 2010) ("unjustified denial of a peremptory challenge . . . requires reversal without regard to harmless error"); Luciano, 890 N.E.2d at 219 (erroneous forfeiture of peremptory is "reversible error").  Indeed, a contrary ruling would unjustifiably tilt trial courts toward resolving close Batson objections by finding a violation, because an error in overruling a Batson objection requires reversal, Rivera, 556 U.S. at 161, while an error in sustaining such an objection would be harmless.  It would also "effectively eliminate" this court's ability to review such Batson errors on appeal, Harbin, 250 F.3d at 549, "the normal route for

correcting trial errors and assuring minimal uniformity of legal obligation,"

Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1370 (7th

Cir. 1990).  In sum, the district court's erroneous Batson rulings were not harmless,

and require a new trial.

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING MCCRARY TO OFFER LEGAL CONCLUSIONS ABOUT HOW A "REASONABLE" OFFICER WOULD CONDUCT A MURDER INVESTIGATION.

Before trial, Bogucki moved to exclude the testimony of Jimenez's police

practices expert McCrary as inadmissible under Fed. R. Evid. 702 because it was

not helpful to the jury, inconsistent with the law, evinced McCrary's inadmissible

credibility determinations, and asked the jurors to substitute McCrary's conclusions

regarding a "reasonable and prudent investigation" for their own.  R. 206 at 3-6.

Bogucki also argued for exclusion under Rule 403 because the "minimal probative

value" of McCrary's opinions was "overwhelmingly outweighed by [their] prejudicial

effect."  Id. at 6.  Responding, Jimenez argued that, although "parties should not be

permitted to call experts to testify as to ultimate issues," R. 231 at 10 n.2, "McCrary

is perfectly positioned to opine what a reasonable officer *should and would have

done*," id. at 10.  The district court excluded McCrary's testimony that Bogucki's

actions were influenced by "[c]ognitive biases," but allowed McCrary "to testify

regarding the steps a reasonable police investigation would have involved," to help

the jury understand whether Bogucki "maliciously caused [Jimenez] to be

prosecuted," and as "relevant regarding (among other things) the issue of malice."

A49.  At trial, in response to a defense objection, the court reiterated that McCrary

could testify to "how a reasonable police investigator . . . should have conducted this particular investigation."  A52.

These rulings definitively resolved that McCrary could testify to the reasonableness of Bogucki's actions; the court not only denied the motion in limine, A49, but reiterated that ruling during McCrary's testimony, A52.  Accordingly, under Fed. R. Evid. 103(b), that error was preserved for appeal without further objection at trial.  See, e.g., Wipf v. Kowalski, 519 F.3d 380, 385 (7th Cir. 2008).  This court reviews evidentiary rulings for abuse of discretion, and will reverse if no reasonable person could agree with the district court.  Jenkins v. Chrysler Motors Corp., 316 F.3d 663, 664 (7th Cir. 2002).  "If, however, the district court bases its discretionary decision on an erroneous view of the law . . . then it has necessarily abused its discretion."  Messner v. Northshore University Healthsystem, 669 F.3d 802, 811 (7th Cir. 2012); accord Koon v. United States, 518 U.S. 81, 100 (1996).

Here, the district court committed legal error by misapplying Rule 702, which allows for expert opinion testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue."  Interpreting this rule, courts have consistently recognized that "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect."  Burkhart v. Washington Metropolitan Area Transit Authority, 112 F.3d 1207, 1212 (D.C. Cir. 1997).  For starters, "testimony containing a legal conclusion" will often "convey[ ] the witness' unexpressed, and perhaps erroneous, legal standards to the jury."  Torres v. County of Oakland, 758 F.2d 147, 150 (6th Cir. 1985).  Aside from the obvious prejudice

caused when an expert misstates the law, such testimony "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law," FAA v. Landy, 705 F.2d 624, 632 (2d Cir. 1983), and confuses jurors by putting before them inconsistent or contradictory statements of the controlling law, Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988) (en banc); see Cooley v. United States, 501 F.2d 1249, 1254 (9th Cir. 1974). Furthermore, an expert's legal conclusions "amount[ ] to no more than an expression of . . . general belief as to how the case should be decided," Marx & Co. v. Diner's Club, Inc., 550 F.2d 505, 510 (2d Cir. 1977) (quotation marks omitted); see Thompson v. City of Chicago, 472 F.3d 444, 458 (7th Cir. 2006); Specht, 853 F.2d at 808, and "bring to the jury [no] more than the lawyers can offer in argument," In re Air Crash Disaster, 795 F.2d 1230, 1233 (5th Cir. 1986). Put simply, expert opinions on matters of law are precisely the sort of opinions Rule 702 excludes as unhelpful: those that "merely tell the jury what result to reach." Fed. R. Evid. 704, 1972 Advisory Committee Notes.

Indeed, expert testimony on legal matters is worse than unhelpful – it is "detrimental to the trial process" itself. Specht, 853 F.2d at 809. "Legal arguments are costly enough without being the subjects of 'experts' depositions and extensive debates in discovery, in addition to presentations made directly to the judge. If specialized knowledge . . . would assist the judge, the holders of that knowledge can help counsel write the briefs and present oral argument." RLJCS Enterprises, Inc. v. Professional Benefit Trust, 487 F.3d 494, 498 (7th Cir. 2007). Unlike attorneys, whose arguments regarding application of law to fact jurors are instructed to

disregard whenever they conflict with the evidence, an expert is imbued "with the imprimatur of the trial judge's decision that he is an 'expert.'" Air Crash Disaster, 795 F.2d at 1234. This "give[s] the appearance that the court [is] shifting to witnesses the [jury's] responsibility to decide the case," Marx, 550 F.2d at 510, and may lead the jury to "think that [an] 'expert' in [a] particular branch of the law knows more than the judge – surely an [impermissible] inference," id. at 512. Furthermore, cross-examination to "repair the damage" caused by an expert's inadmissible legal opinions "is to invite disaster, for much will turn on the obstinancy of the expert, and repetition before a jury, especially on cross-examination, is likely to impress the jury." Id. at 511. Given these difficulties in cross-examination,"[i]f one side is allowed the right to call [an expert] to define and apply the law, one can reasonably expect the other side to do the same." Specht, 853 F.2d at 809. This would only compound the confusion and "allow trials before juries to become battles of paid advocates posing as experts." Marx, 550 F.3d at 511; accord Cruz v. Kagan, 2011 WL 2516711 at *2 (D. Mass. June 22, 2011) (explaining that such testimony is "perhaps better characterized as 'expert argument'").

Recognizing these problems, this court has "repeatedly held" that "testimony offering a legal conclusion is inadmissible because it is not helpful to the jury," under Fed. R. Evid. 701, United States v. Noel, 581 F.3d 490, 496 (7th Cir. 2009), and that experts are "'prohibit[ed] . . . from offering opinions about legal issues that will determine the outcome of the case'" under Rule 702, Roundy's Inc. v. NLRB,

674 F.3d 638, 648 (7th Cir. 2012) (quoting <u>United States v. Sinclair</u>, 74 F.3d 753,

757 n.1 (7th Cir. 1996)); <u>see</u> <u>Good Shepherd Manor Foundation v. City of Momence</u>,

323 F.3d 557, 564 (7th Cir. 2003). Accordingly, "an expert may not state his or her

opinion as to legal standards nor may he or she state legal conclusions drawn by

applying the law to the facts." <u>Okland Oil Co. v. Conoco Inc.</u>, 144 F.3d 1308, 1328

(10th Cir. 1998); <u>see</u> <u>United States v. Diekhoff</u>, 535 F.3d 611, 619 (7th Cir. 2008)

(noting that "experts cannot make" testimony that "would involve a legal

conclusion" or "a fact-law conclusion"); <u>A.E. ex rel. Evans v. Independent School</u>

<u>District No. 25</u>, 936 F.2d 472, 476 (10th Cir. 1991). While expert legal opinions are

inadmissible under Rule 702, <u>e.g.</u>, <u>Roundy's</u>, 674 F.3d at 648; <u>Noel</u>, 581 F.3d at 497,

they are also inadmissible under Rule 403 because they are so lacking in probative

value relative to their prejudicial impact, <u>see</u>, <u>e.g.</u>, <u>Thompson</u>, 472 F.3d at 457-58.

The reasonableness of a police officer's actions constitutes a legal conclusion

inadmissible under both rules. As this court has explained, "when 'what happened'

questions are not at issue, the ultimate resolution of whether probable cause

existed is a question of law." <u>Smith v. Lamz</u>, 321 F.3d 680, 684 (7th Cir. 2003); <u>see</u>

<u>United States v. Carlisle</u>, 614 F.3d 750, 754 (7th Cir. 2010); <u>Knox v. Smith</u>, 342

F.3d 651, 657 (7th Cir. 2003). "'The substance of all the definitions of probable

cause is a reasonable ground for belief of guilt.'" <u>Maryland v. Pringle</u>, 540 U.S. 366,

371 (2003) (quoting <u>Brinegar v. United States</u>, 338 U.S. 160, 175 (1949)); <u>see</u>, <u>e.g.</u>,

<u>Kelley v. Myler</u>, 149 F.3d 641, 646 (7th Cir. 1998); <u>United States v. LaMacchio</u>, 362

F.2d 383, 384 (3d Cir. 1966) ("reasonable ground" for arrest is "equivalent to the

'probable cause' requirement of the Fourth Amendment"); Tr. 2778 (instructing that probable cause exists when "a reasonably prudent person would have believed that the plaintiff had committed the crime that was charged").  Thus, the reasonableness of a police officer's actions in making an arrest is necessarily a "pure question of law" as well.  Scott v. Harris, 550 U.S. 372, 381 & n.8 (2007); see Gong v. Jones, 2008 WL 4183937 at *5 (N.D. Cal. Sept. 9, 2008) (testimony about reasonableness "indistinguishable from opinion testimony about . . . probable cause").[6]

Legal conclusions regarding reasonableness and probable cause are particularly unhelpful to the jury, as well as confusing and unduly prejudicial. First, such testimony inevitably touches on credibility, a subject on which experts "cannot testify."  Goodwin v. MTD Products, Inc., 232 F.3d 600, 609 (7th Cir. 2000). Witness credibility, whether an eyewitness or a police officer, is often central to probable cause.  E.g., United States v. Collins, 604 F.3d 481, 486 (7th Cir. 2010); United States v. Bell, 585 F.3d 1045, 1049 (7th Cir. 2009).  Accordingly, an expert's opinion on reasonableness/probable cause will often communicate to the jury his personal assessment of the evidence – what he credited, what he ignored.  And even

---

[6]  Some courts, when determining whether a witness's testimony consists of legal conclusions, also ask "whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.  If they do, exclusion is appropriate."  Torres, 758 F.2d at 151.  Clearly, "reasonableness" of an arrest has a "distinct and specialized" meaning – it is defined without reference to matters the average person might take into account in other contexts, such as the arresting officer's subjective beliefs or intent, e.g., United States v. Garcia-Garcia, 633 F.3d 608, 612-13 (7th Cir. 2011), as well as any information learned after the fact, e.g., United States v. Odum, 72 F.3d 1279, 1284 (7th Cir. 1995).

if the expert's conclusions are based solely on his understanding of good or usual police practices, reliance on such practices in evaluating probable cause has been repeatedly rejected as "unworkable," United States v. Botero-Ospina, 71 F.3d 783, 786-87 (10th Cir. 1995) (en banc) (collecting authority); accord United States v. Trigg, 925 F.2d 1064, 1065 (7th Cir. 1991), because it turns on "trivialities" that "vary from place to place and from time to time," Whren v. United States, 517 U.S. 806, 815 (1996), and thus "fails to provide clear guidance for law enforcement," Kentucky v. King, 131 S. Ct. 1849, 1861 (2011); cf. Gramenos v. Jewel Cos., 797 F.2d 432, 440 (7th Cir. 1986) ("the fourth amendment does not define as probable cause whatever good police practice requires").

Unsurprisingly, courts have consistently held expert testimony on both probable cause and reasonableness inadmissible. In Cameron v. City of New York, 598 F.3d 50 (2d Cir. 2010), for example, on claims for false arrest and malicious prosecution, witnesses testified that they believed the defendants had probable cause for an arrest, id. at 58. Applying "well-settled rules of evidence," the Second Circuit held this testimony "quite obviously . . . inadmissible," explaining that witnesses may not "present testimony in the form of legal conclusions" because "[s]uch testimony undertakes to tell the jury what result to reach, and thus attempts to substitute the [witness's] judgment for the jury's." Id. at 62-63 (citation omitted). Specifically, "the issue of whether or not probable cause to arrest exists is a legal determination that is not properly the subject of expert opinion testimony." Id. at 62 (citation omitted). The Eighth Circuit reached the same conclusion in

Estes v. Moore, 993 F.2d 161 (8th Cir. 1993) (per curiam), holding testimony

"whether probable cause for [an] arrest existed" inadmissible because such

testimony "was a statement of a legal conclusion," id. at 163; accord Stuart v.

United States, 23 F.3d 1483, 1487 (9th Cir. 1994).

That court subsequently held that "testimony . . . concerning the

reasonableness of [police] officers' conduct" is similarly inadmissible as "a

statement of legal conclusion" solely "for the court to make." Peterson v. City of

Plymouth, 60 F.3d 469, 475 (8th Cir. 1995) (citing Estes, 993 F.2d at 163); see

Schmidt v. City of Bella Vita, 557 F.3d 564, 570 (8th Cir. 2009) (expert's testimony

regarding "overall reasonableness of the procedures used" was "impermissible legal

conclusion[ ]").  In the Fourth Circuit, expert testimony on police practices is

admissible only if "phrased in such a manner so as to avoid the baseline legal

conclusion of reasonableness," United States v. Perkins, 470 F.3d 150, 159 (4th Cir.

2006).  And the Fifth Circuit has – on plain error review, no less – held expert

testimony concerning reasonableness under the Fourth Amendment "a legal

conclusion" inadmissible under the Federal Rules.  United States v. Williams, 343

F.3d 423, 435 (5th Cir. 2003); see Bodzin v. City of Dallas, 768 F.2d 722, 725 (5th

Cir. 1985) (noting that testimony about "reasonable officer" was not "competent

proof" if treated as expressing a legal opinion on the existence of probable cause).[7]

Applying these principles, the district court could have permitted McCrary to,

---

[7]  The district court itself has recognized that expert opinions on
reasonableness are inadmissible.  Jordan v. City of Chicago, 2012 WL 88158 at *6-
*7 (N.D. Ill. Jan 11, 2012).

at the very most, "'describ[e] sound professional standards and identify[ ]

departures from them.'" Brandon v. Village of Maywood, 179 F. Supp. 2d 847, 852

(N.D. Ill. 2001) (quoting West ex rel. Norris v. Waymire, 114 F.3d 646, 652 (7th Cir.

1997)).  Plainly, the ruling allowing McCrary to testify "how a reasonable police

investigator . . . should have conducted this particular investigation," A52,

constituted an abuse of discretion.

      Under Fed. R. Evid. 103(a), this court may reverse only if the introduction of

McCrary's testimony "affect[ed] a substantial right" – *i.e.*, if "there is a significant

chance that it . . . affected the result of the trial."  Walton v. United Consumers

Club, Inc., 786 F.2d 303, 313 (7th Cir. 1986).  In making this determination, a court

asks "what effect the error had or reasonably may be taken to have had upon the

jury's decision.  The crucial thing is the impact of the thing done wrong on the

minds of other men, not on one's own, in the total setting."  Kotteakos v. United

States, 328 U.S. 750, 764 (1946).  Although the court cannot make this

determination "without considering the force of the other evidence presented to the

jury," Fuesting v. Zimmer, 448 F.3d 936, 940 (7th Cir. 2006), "[t]he inquiry cannot

be merely whether there was enough [evidence] to support the result, apart from

the phase affected by the error.  It is rather, even so, whether the error itself had

substantial influence," Kotteakos, 328 U.S. at 765; accord Jones v. Basinger, 635

F.3d 1030, 1053 (7th Cir. 2011) (contrary approach would give little incentive to

follow evidentiary rules).  Here, given the nature and extent of inadmissible

testimony McCrary put before the jury and the weakness of Jimenez's claims, this

testimony undoubtedly had a significant effect on the jury's verdict.

As for the sheer amount of inadmissible testimony that went before the jury, courts differentiate between "one or two inconsequential pieces of [testimony], perhaps inadvertently elicited," and inadmissible testimony "deliberately elicited" and "extensive." Jones, 635 F.3d at 1053 (citation omitted). Here, nearly the entirety of McCrary's lengthy and purposeful testimony consisted of conclusions regarding both the supposed unreasonableness of Bogucki's actions and what a reasonable police officer in his position should have done. In fact, Jimenez's counsel phrased virtually every question to McCrary in terms of "reasonableness." Moreover, McCrary touched on every aspect of Jimenez's malicious prosecution and due process claims, from the initial moments of Bogucki's investigation through his conduct during the criminal trials. And in closing, Jimenez's counsel repeatedly returned to McCrary's testimony to support his due process and malicious prosecution claims, Tr. 2790, 2798-99, 2812-13, 2818, 2933-35, specifically emphasizing McCrary's statements on eyewitness credibility, Tr. 2798-99, that probable cause turns on reasonableness, Tr. 2831, and that McCrary's testimony was essentially that, if the jury believed Jimenez's account of events, "we should win," Tr. 2933-34. Jimenez also argued that Bogucki's limited cross-examination of McCrary only proved the strength of McCrary's conclusions, id., and that Bogucki's decision not to present his own expert showed that there "was [not] a defense expert . . . that would have contradicted" McCrary's testimony, Tr. 2813. Thus, in addition to relying on his own improperly-admitted expert testimony, Jimenez also exploited

both the inherent difficulty of cross-examining an expert's legal conclusions and Bogucki's decision not to present inadmissible legal conclusions in response.

Imposing further prejudice, McCrary's legal conclusions exhibited many specific infirmities that courts have recognized warrant their exclusion. To start, that testimony directly touched upon a matter firmly beyond any expert's competence: the credibility of several key trial witnesses. McCrary testified that Tina's testimony "can't be true," Tr. 1619-20, and that Bogucki should not have relied on *any* of the eyewitnesses (apparently other than Tueffel and Victor, whom Jimenez offered) because it has "been known for decades . . . that eyewitness testimony is notoriously fallible" and this fallibility has been the subject of "a lot of academic work with psychologists, a lot of work in law enforcement," Tr. 1621-22. McCrary went on to say that Bogucki acted unreasonably because Victor's identification of Juan Carlos as the killer was credible, Tr. 1627-29, consistent with the other evidence, Tr. 1635, "stunning," Tr. 1628, and "strong," Tr. 1630. And McCrary's characterization of Bogucki's entire investigation as not just unreasonable, but "a recipe for disaster," Tr. 1625, must have affected the jury's assessment of Bogucki's credibility, by calling his very competence as a police officer into question. With witness credibility of the utmost importance in a case concerning events occurring nearly 20 years ago, testimony telling the jury how to assess the credibility of practically every major witness in the case was particularly harmful.

McCrary's opinions also blatantly misrepresented the law. McCrary's

64

criticism of Bogucki's investigation was based in significant part on his belief that a reasonable police officer "absolutely" has a "duty" to continue investigating even after establishing probable cause for an arrest. Tr. 1630, 1633, 1643-44, 1649. But it is settled that law enforcement officers have no such duty. E.g., Shertz v. Waupaca County, 875 F.2d 578, 583 (7th Cir. 1989) (collecting authority); Logsdon v. Hains, 492 F.3d 334, 341 (6th Cir. 2007); Morrison v. United States, 491 F.2d 344, 346 (8th Cir. 1974). McCrary further claimed that this nonexistent duty persists even after the commencement of prosecution. Tr. 1632-33, 1649. This, too, is wrong. For purposes of a malicious prosecution claim, only police misconduct, not mere failure to sufficiently investigate, forges the necessary "chain of causation" between a police investigation and a subsequent prosecution. Reed v. City of Chicago, 77 F.3d 1049, 1053 (7th Cir. 1996). More troubling, a chief reason for McCrary's belief that Victor was "stunning" and credible was itself an erroneous legal conclusion: that Victor's statement implicating Juan Carlos was an inherently-reliable "admission against self interests." Tr. 1627-29. While Victor's statement that he was with the shooter may have been such a statement, see Fed. R. Evid. 804(b)(3)(A), the portion of his statement shifting the blame to Juan Carlos plainly was not, see Williamson v. United States, 512 U.S. 594, 602-03 (1994); id. at 604 (plurality opinion); id. at 607 (Scalia, J., concurring); id. at 607-10 (Ginsburg, J., concurring in part). Indeed, such statements are "inevitably suspect," Bruton v. United States, 391 U.S. 123, 136 (1968), as Bogucki himself understood, Tr. 1218.

    Against all of this must be weighed the serious problems with Jimenez's

claims. Jimenez's malicious prosecution claim against police instead of prosecutors was already "anomalous," because "the chain of causation is broken by an indictment" absent affirmative misconduct. <u>Reed</u>, 77 F.3d at 1053. Moreover, Jimenez's claim faltered at the outset because there was ample probable cause to prosecute him, regardless of whether he was guilty. Probable cause is an absolute defense to malicious prosecution, <u>Holmes v. Village of Hoffman Estates</u>, 511 F.3d 673, 682 (7th Cir. 2007), and even a single eyewitness is sufficient to establish probable cause, <u>Beauchamp v. City of Noblesville</u>, 320 F.3d 733, 743 (7th Cir. 2003). Here, three witnesses – Sandra, Tina, and Phillip – identified Jimenez in a lineup, testified against him at both criminal trials, and reaffirmed at the civil trial that they identified Jimenez as Morro's shooter. At the scene that night, before Bogucki was even involved in the investigation, Phillip told Tueffel that he suspected that Jimenez was the shooter, as Tueffel himself confirmed. R. 349-66 ¶6; Tr. 866, 2671-72, 2687-88, 2693. Phillip and Tueffel also confirmed Jimenez's motive to kill Morro: an argument about Jimenez's gang activities earlier the same day, during which Jimenez threatened to kill Morro. Tr. 939, 1067, 1229, 1280, 1317; R. 349-3; R. 349-4.

Jimenez's due process claims under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), fared no better. Jimenez claimed that he overheard the police yelling at Tueffel at the police station, and that Tueffel had told him that he had been forced to testify against him. Tr. 736-40. This information, always in Jimenez's possession, cannot have been "suppressed" under <u>Brady</u>, which "deals with the concealment of . . .

evidence unknown to the defendant." United States v. Lee, 399 F.3d 864, 865 (7th Cir. 2005); accord Gauger v. Hendle, 349 F.3d 354, 360 (7th Cir. 2003), overruled on other grounds, Wallace v. City of Chicago, 440 F.3d 421 (7th Cir. 2006). As for the fact that Sandra and Tina supposedly saw a photo of Jimenez on a desk before the lineup, Tr. 2433, 2440, 2456, 2475, the failure to disclose exculpatory or impeachment evidence denies due process only if the evidence was "material," meaning there is a reasonable probability that disclosure would have changed the prosecution's outcome. Boss v. Pierce, 263 F.3d 734, 744 (7th Cir. 2001). But both Tina and Sandra testified the photo had no effect on their identification of Jimenez. Tr. 2453, 2469-71. Jimenez's claim that Bogucki failed to disclose that Phillip never actually saw Jimenez or a Duke jacket simply ran headlong into Phillip's testimony directly to the contrary. Tr. 2661-63, 2672, 2686-87, 2693, 2694, 2709-10. Nor did Jimenez identify any evidence Bogucki suppressed indicating Juan Carlos' guilt, and his claim that Bogucki failed to adequately investigate Juan Carlos, Tr. 2818; R. 323 at 25, wrongly presupposes that due process required Bogucki to investigate him in the first place. The Brady obligation to disclose information and evidence in police possession, United States v. Gray, 648 F.3d 562, 564 (7th Cir. 2011), is not a "duty to go further and conduct the defense's investigation for it," id. at 567. And even if Juan Carlos matched the description of the shooter, Tr. 2807-08, that fact could not be considered suppressed because it was easily discoverable by Jimenez or his counsel. Information available upon "reasonable diligence" cannot be considered suppressed under Brady. United States v. O'Hara, 301 F.3d 563, 569

67

(7th Cir. 2002); accord Holland v. City of Chicago, 643 F.3d 248, 256 (7th Cir. 2011).

Jimenez was able to look at Juan Carlos himself and put him on the stand for the

criminal juries to do the same, but opted not to because his attorney thought it was

too inconvenient.  Tr. 2118-20, 2124-25.[8]

Moreover,  Jimenez's star witnesses, Tueffel and Victor, were markedly

untrustworthy.  Tueffel is a diagnosed paranoid schizophrenic who was

institutionalized at the time he recanted his criminal trial testimony against

Jimenez.  Tr. 974.  "Paranoid schizophrenia is characterized mainly by the presence

of delusions of persecution or grandeur . . . related to a single theme."  Mary C.

Townsend, Essentials Of Psychiatric Mental Health Nursing 311 (4th ed. 2008).

That Tueffel would believe that he was forced to falsely identify Jimenez, and that

he could help Jimenez by coming forward, is consistent with his diagnosis.  The

courts "treat recantations . . . with great skepticism even under the best of

circumstances," United States ex rel. Jones v. DeRobertis, 766 F.2d 270, 272 (7th

Cir. 1985), so a paranoid schizophrenic's recantation after nearly two decades is

entitled to little, if any, weight.  In fact, it was clear at the civil trial that Tueffel

was no longer able to discern truth from fiction, as was demonstrated by his

willingness to sign, with full understanding, a sworn statement that Bogucki "never

threatened or coerced" him into identifying Jimenez and "did nothing wrong," R.

349-66 ¶¶9-10; Tr. 915-16, only to say the exact opposite on the witness stand.

---

[8]  These problems are in addition to the fundamental flaws in Jimenez's due
process claims we note in greater detail below.  See, infra, Sections III-IV.

Victor was hardly more credible.  Victor admitted that he repeatedly lied about his involvement in Morro's shooting, Tr. 377, 379, 382-83, 385, 389, because he "did not care" and "had no respect for the justice system or authority figures," Tr. 388, and Bogucki recognized that Victor was lying to him, Tr. 1025.  Obviously, the statement of an admitted liar, recognized as such at the time, is not the sort of "reasonably credible" statement necessary for probable cause against Juan Carlos, Jenkins v. Keating, 147 F.3d 577, 585 (7th Cir. 1998), let alone sufficient evidence to cast doubt on the mounting evidence against Jimenez.  Moreover, Victor exhibited the same disregard for the truth at this trial.  According to Victor, he was shooting the gun used to kill Morro shortly before he met with Juan Carlos.  Tr. 352.  But to explain how Juan Carlos came to have the gun at the time of the shooting, Victor offered a feeble explanation that it was not his gun, Tr. 395-96, and that, in his neighborhood, people just gave guns to each other, Tr. 424, and even changed his story entirely to say that it might actually have been Juan Carlos who shot the gun earlier that day, Tr. 396.  And Victor never explained why Juan Carlos would have cared about a small debt Morro supposedly owed to Victor's sister's boyfriend, Robles, let alone care enough to shoot someone over that debt; Robles himself was not even sure there was any debt and never asked Juan Carlos to collect any debt for him.  Tr. 1474, 1487.

Worse, Victor's and Ezequiel's testimony about taping Juan Carlos' purported confession was obviously false – the tape itself bore no indication that it was made with a voice-activated recorder inside a jacket pocket, or inside a restaurant, as

they testified. Tr. 2064, 2073-76, 2084. In fact, the recording bore the indicia of being made inside a car. Tr. 2079-80. Unsurprisingly, Victor and Ezequiel could not get their stories straight, disagreeing about such basic details as where Victor was when the tape was made. Tr. 358 (in the car); 2021 (in the restaurant). Ezequiel also failed to explain the presence of an adolescent's voice on the tape saying "gonna tape now," Tr. 2071, why he did not give the tape to the police (or even mention it) when he spoke to them the day after they visited his home, Tr. 2028, or how he could have drawn a map to Juan Carlos' home, Tr. 1181, 1325, 1758, if he "never knew" where Juan Carlos lived, Tr. 2050. The contents of the tape itself were even more problematic for Jimenez – the unnamed individual on the tape claimed that he had purchased the gun Victor testified he gave to the shooter, compare R. 349-70 with Tr. 423-24, and that Morro somehow "took off running" with a fatal bullet lodged in his chest, R. 349-70. Indeed, the best Jimenez could do with Victor's and Ezequiel's detailed testimony about meeting Juan Carlos in a quiet restaurant, Tr. 358, 2020-25, 2049-50, was to argue that both simultaneously forgot that they made the tape inside a car, Tr. 2826, but that did more to illustrate their fraud than to rehabilitate their testimony.

We recognize that, despite the obvious weaknesses of Jimenez's entire case, the jury returned a verdict in his favor. But that only illustrates the significant impact McCrary's extensive testimony must have had on the jury's analysis of all the evidence presented in this case. McCrary's testimony was improperly admitted, clearly prejudicial, and reversal is required.

### III.   THE DISTRICT COURT ERRED BY ALLOWING THE JURY TO CONSIDER BRADY THEORIES JIMENEZ FAILED TO TIMELY DISCLOSE.

Jimenez's complaint described his Brady claim broadly, claiming that Bogucki "withheld exculpatory evidence," R. 1 at 9, specifically, evidence that Bogucki had "coerced" Tueffel to implicate Jimenez, id. at 5, and showed Tina a photo of Jimenez immediately before the line-up in which she identified Jimenez, id. at 5-6.  Responding to Bogucki's interrogatories, Jimenez said that Bogucki withheld evidence that he coerced Tueffel into identifying Jimenez; that Tina saw a photo of Jimenez before the line-up; that Bogucki withheld information relating to that line-up; that he manipulated evidence to make it appear that witnesses saw the shooter wearing a blue-and-white Duke University jacket; and that he withheld evidence regarding Juan Carlos' guilt.  R. 105 Ex. 57.

At summary judgment, Jimenez argued five Brady theories, claiming that Bogucki did not disclose to him that he coerced Tueffel to identify Jimenez, that Phillip "never told police he saw Jimenez shoot [Morro]," that Tina saw a photo of Jimenez before the lineup, that police induced the witnesses to give false testimony that they saw the shooter wear a Duke jacket, and that the police had in their possession certain physical evidence: a handwritten note, a Polaroid photo of Jimenez, and an evidence inventory list.  R. 128 at 17.  This was the first Bogucki learned of any claim that this physical evidence had been suppressed, and he objected that he had not been provided notice in time to respond.  R. 133 at 12.  The court granted Bogucki summary judgment regarding the Polaroid and the

inventory, on the ground that they had been timely disclosed to Jimenez, R. 151 at
33-34, but denied summary judgment on the remainder, id.

The proposed Final Pretrial Order described Jimenez's claims as being that
Bogucki had "violated his civil rights and maliciously caused him to be prosecuted
in 1993 for the murder of . . . Morro," and contained the parties' proposed jury
instructions. R. 186 at 1; 186-6, 186-7, 186-8.[9]  Before trial, Bogucki objected to
Jimenez's Brady instruction, R. 186-7 at 6-8, and requested a limiting instruction
that the jury consider only the theories that were presented at and survived
summary judgment, R. 186-8 at 5.  Jimenez objected that he "should be the master
of his statement of the claims."  Id. at 6.  During trial, Bogucki explained his
concern that Jimenez would argue theories not raised previously, to which he had
not had an adequate opportunity to respond.  A54.  The district court rejected
Bogucki's proposed instruction, saying that "there is no rule" a party must "try the
case in the same way that they argue it on summary judgment" and that "it's open
to the plaintiff to argue all of the evidence in the record and not be limited to the
particular theories they argued on summary judgment."  A54-A55.  In closing
argument, Jimenez set out ten theories why he should prevail on his Brady claim,
arguing that Bogucki had failed to disclose (1) his supposed coercion of Tueffel; (2)
"that Phil didn't want to be a witness, and that the police put the words in his
mouth"; (3) that Tina and Sandra saw a photograph prior to the lineup; (4) "the

---

[9]  The record contains only the proposed Final Pretrial Order, not the final
signed order.

Juan Carlos Torres story"; (5) Shawn's involvement in the investigation; (6) that Bogucki did not record the "contemporaneous version" of events when he stopped taking notes of his interview with Tina; (7) that Bogucki's notes of his interviews with Phillip were of two separate interviews; (8) the anonymous phone call that identified Victor; (9) the omission of times and dates in Bogucki's general progress reports; and (10) that Jimenez's Duke jacket was not tested and then "disappeared." Tr. 2814-19. The latter six were raised for the first time in closing. Compare Tr. 2814-19 with R. 105 Ex. 57 and R. 128 at 17.

This court reviews de novo the district court's rejection of an instruction as "inappropriate as a matter of law." E.g., United States v. Tavarez, 626 F.3d 902, 904 (7th Cir. 2010). "[A] tendered instruction which is essential to the jury's understanding of the case and not adequately covered by other instructions should not be omitted." Kovacich v. Benjamin, 951 F.2d 114, 116 (7th Cir. 1991). If a requested instruction should have been given, reversal is necessary if the error seriously affected the jury's understanding of the issues. Wilk v. American Medical Association, 719 F.2d 207, 218-19 (7th Cir. 1983). When a jury might have reached a verdict on an improper theory, this court "will not assume the jury decided one way or the other," but will set aside the verdict. Dawson v. New York Life Insurance Co., 135 F.3d 1158, 1165 (7th Cir. 1998).

Bogucki's requested instruction was plainly not "adequately covered" by other instructions – none instructed the jury that it could impose Brady liability only on the basis of the theories Jimenez had timely disclosed. The question, then,

73

is whether that omission seriously affected the jury's understanding of the case. On review, the district court's instructions "must be evaluated in context of the procedural framework created by the Federal Rules of Civil Procedure," <u>Gorlikowski v. Tolbert</u>, 52 F.3d 1439, 1443 (7th Cir. 1995), which "are designed to further the due process of law that the Constitution guarantees," <u>Nelson v. Adams USA, Inc.</u>, 529 U.S. 460, 465 (2000).

"The essence of due process is the requirement that a person in jeopardy of a serious loss be given notice of the case against him and opportunity to meet it." <u>Mathews v. Eldridge</u>, 424 U.S. 319, 348 (1976) (quotation marks and brackets omitted). To provide defendants "'fair notice of what . . . the claim is and the grounds upon which it rests,'" <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (citation omitted), a complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face,'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).

A complaint may be freely amended before trial to add new factual allegations, <u>see</u> Fed. R. Civ. P. 15(a), but that is not the standard for amendments during or after trial, <u>see</u> Fed. R. Civ. P. 15(b). Unless an issue is tried by consent, Fed. R. Civ. P. 15(b)(2), the court "may permit" amendment only "when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's . . . defense on the merits," Fed. R. Civ. P. 15(b)(1). If the amendment is permitted, the court "may grant a continuance to enable the objecting party to meet the evidence." <u>Id.</u> Absent an amendment under

74

Rule 15(b), the defendant is entitled to judgment as a matter of law on any new theories presented at trial, even if the evidence was sufficient to support a verdict on those theories because the lack of adequate notice necessarily impacts a defendant's ability to "present contrary evidence." <u>Burdett v. Miller</u>, 957 F.2d 1375, 1379-81 (7th Cir. 1992).

Rule 15(b) "contemplates exactly [the] situation" in which "a plaintiff attempts to have a claim presented to the jury . . . even though that claim was not presented in the pleadings." <u>Douglas v. Owens</u>, 50 F.3d 1226, 1235 (3d Cir. 1995). Here, Bogucki objected to any <u>Brady</u> theories not disclosed prior to trial. Such an objection precludes automatic amendment under Rule 15(b)(2). <u>See</u> <u>Usery v. Marquette Cement Manufacturing Co.</u>, 568 F.2d 902, 907 (2d Cir. 1977) (finding no consent where party objected to opponent's "change in legal theory"). Instead, "upon objection by the opposing party, the party wishing to amend the pleadings must . . . expressly move . . . for such an amendment." <u>Green County Food Market, Inc. v. Bottling Group, LLC</u>, 371 F.3d 1275, 1280-81 (10th Cir. 2004). Despite Bogucki's objection, Jimenez never moved to amend his complaint. Instead, Jimenez announced that he "should be the master of his statement of the claims." R. 186-8 at 6.

"[W]hen proper objections have been made but no Rule 15(b) motion has been filed, the lack of prejudice to a party does not provide a basis for amendment." <u>Green County</u>, 371 F.3d at 1281. And because Jimenez never moved to amend his complaint under Rule 15(b), the district court did not consider whether such

75

amendment would prejudice Bogucki, or whether a continuance was appropriate. Obviously, the prejudice to Bogucki that resulted from allowing the jury to consider several theories of the case he was not aware of until closing was extraordinarily severe, and undermined the integrity of this litigation, from discovery to verdict. The "opportunity to respond" to a claim is "fundamental to due process." Nelson, 529 U.S. at 466; accord Jimenez v. Tuna Vessel "Granada", 652 F.2d 415, 420 (5th Cir. 1981) ("Notice remains a first-reader element of procedural due process . . . ."). Indeed,

> plaintiffs may [not] leave defendants to forage in forests of facts, searching at their peril for every legal theory . . . lurking in the penumbra of the record. Under the Civil Rules, notice of a claim is a defendant's entitlement, not a defendant's burden. The truth-seeking function of our adversarial system of justice is disserved when the boundaries of a suit remain ill-defined and litigants are exposed to the vicissitudes of trial by ambush. At a bare minimum . . . a defendant must be afforded both adequate notice of any claims asserted against him and a meaningful opportunity to mount a defense.

Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1172 (1st Cir. 1995). Here, Bogucki's lack of notice of several new theories of the case severely impeded his ability to muster the necessary facts and law in his defense at trial.

This lack of notice also prevented Bogucki from using summary judgment for its "principal purpose[ ] . . . to isolate and dispose of factually unsupported claims or defenses," Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); see Freeman v. Continental Gin Co., 381 F.2d 459, 469-70 (5th Cir. 1967). Indeed, had Jimenez timely disclosed his theories of the case, Bogucki would have been entitled to summary judgment on a number of them. For example, that Bogucki's notes of his

interviews with Phillip were compiled from two separate interviews, Tr. 2816-17, was volunteered by Bogucki himself at Jimenez's second criminal trial, SA827-28. A Brady claim necessarily fails if it was based on information "reflected in the record at trial." United States v. Reyes, 270 F.3d 1158, 1167 (7th Cir. 2001). Jimenez also claimed that he was not aware that Shawn provided information implicating him in the shooting, Tr. 2815, but this fact is neither impeaching nor exculpatory, and therefore not Brady material. Post-verdict, Jimenez claimed it was actually Shawn's arrest that was suppressed, R. 323 at 16, but that arrest was discussed at both criminal trials, SA213-15, SA848-49, SA851 and thus could not support a Brady claim either.

Jimenez could only speculate that the dates and times omitted from Bogucki's reports, Tr. 2818, the information disclosed by Tina during her interview, Tr. 2816, and any additional information that would have been provided by the anonymous source who implicated Victor, Tr. 2817, would have been exculpatory or impeaching. Indeed, Jimenez admitted that "we don't know if [the anonymous source] also said Juan Carlos Torres," id., that the source had only "potentially exculpatory material," R. 323 at 24, and that the jury had "to assume that whatever Tina told Bogucki during [their] interview" was exculpatory or impeaching, R. 323 at 22. Such speculation is insufficient to sustain a Brady claim. E.g., United States v. Roberts, 534 F.3d 560, 572 (7th Cir. 2008); United States v. Navarro, 737 F.2d 625, 631 (7th Cir. 1984). Besides, the absence of the dates and times, contemporaneous notes of Tina's interview, and of the informant's name appear on

77

the face of the relevant documents themselves, so Jimenez had ample opportunity to use any holes in those documents for impeachment at his criminal trials. And these are only the most obvious of the arguments for summary judgment had Bogucki been on notice of Jimenez's late-disclosed claims; others may well have been identified during discovery.

These problems persisted into trial. Just as the lack of notice denied Bogucki the chance to use summary judgment to narrow the issues presented to the jury, it also denied him the opportunity to timely move for a directed verdict "to simplify the trial by resolving some issues, or even all issues, without submission to the jury." Fed. R. Civ. P. 50, 2006 Advisory Committee Notes. Post-trial, when Bogucki was finally aware of Jimenez's belatedly-disclosed theories, the court deemed any argument under Rule 50 waived despite the lack of prior notice. A46-A47. Worse still, belated notice of Jimenez's claim regarding the failure to test his Duke jacket, Tr. 2818-19, resulted in incomplete, and therefore erroneous, jury instructions on this issue. Such a claim "is not governed by [Brady], but, rather, by the more rigorous standard established in Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988)," United States v. Stewart, 388 F.3d 1079, 1085 (7th Cir. 2004), requiring proof of bad faith, that the exculpatory value of the evidence was apparent before it was lost, and of an inability to obtain comparable evidence by other reasonably available means, United States v. Watts, 29 F.3d 287, 289-90 (7th Cir. 1994).

The error here affected not only the claims Jimenez belatedly disclosed, but rather all of his Brady theories. Materiality is determined based on the

78

"cumulative effect" of all suppressed evidence.  E.g., Goudy v. Basinger, 604 F.3d 394, 400 (7th Cir. 2010) (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).  As a result, the jury's acceptance of any of Jimenez's late-disclosed theories would have affected its evaluation of the timely-disclosed theories as well.  This error also requires reversal of Jimenez's section 1983 conspiracy claim.  Such a conspiracy claim requires proof of an underlying constitutional violation, e.g., Cefalu v. Village of Elk Grove, 211 F.3d 416, 423 (7th Cir. 2000); Goldschmidt v. Patchett, 686 F.2d 582, 585 (7th Cir. 1982), so if the verdict on the underlying violation cannot stand, neither can the verdict on the conspiracy claim.

Because Jimenez failed to move to amend his complaint to include several of the theories on which his Brady claim was based, and disclosed those theories to Bogucki for the first time in closing, judgment for Bogucki on each of those theories was necessary under Rule 15(b).  Absent Bogucki's requested instruction, the jury was permitted, as Jimenez argued in closing, to find for Jimenez on his Brady claim if it accepted even one of those theories, including those untimely disclosed.  Tr. 2937.  This error implicates a fundamental right – to present a meaningful defense – and demands a new trial on the theories timely disclosed.

## IV.  JUDGMENT SHOULD BE ENTERED FOR THE DEFENDANTS AS A MATTER OF LAW ON JIMENEZ'S BRADY CLAIMS.

Because serious errors occurred during trial in this matter, retrial is necessary.  As we explain above, on remand, judgment should be entered for the defendants on the Brady and Youngblood theories Jimenez did not raise until closing argument.  In addition, judgment is required as a matter of law on *all* of

Jimenez's Brady theories because he failed to put into evidence the transcripts of his criminal trials, totaling 1,370 pages.  See SA1-SA1370.  In fact, Jimenez opposed their admission, and successfully had significant portions of them excluded on procedural grounds.  Tr. 1909-17, 2207.  As a result, only a small fraction of this evidence was introduced through the witnesses, whose recollections may have differed from their trial testimony and otherwise been affected by the passage of time.  Without those transcripts, Jimenez's Brady claim fails as a matter of law.

Materiality of suppressed evidence under Brady "must be evaluated in the context of the entire record."  United States v. Agurs, 427 U.S. 97, 112 (1976).  The stronger the evidence of guilt, the more significant the suppressed evidence must be.  See id. at 112-13 & n.21; a court "cannot view even a serious error in isolation," Woolley v. Rednour, No. 10-3550, at 29 (7th Cir. Dec. 14, 2012) (citing Agurs); accord United States v. Esposito, 523 F.2d 242, 248 (7th Cir. 1975); United States ex rel. Marzeno v. Gengler, 574 F.2d 730, 736 (3d Cir. 1978).  Rather, "an examination of the entire record is required."  Ruiz v. Cady, 635 F.2d 584, 587 (7th Cir. 1980).  This is particularly true of impeachment evidence, because Brady does not extend to material used for "cumulative impeachment."  United States v. Ervin, 540 F.3d 623, 632 (7th Cir. 2008).  Moreover, impeachment value is particularly dependent on the criminal trial record – if, for example, a witness's testimony was consistent with the withheld evidence, that evidence would have no impeachment value.  See Ruiz, 635 F.2d at 588.  Indeed, the district court explicitly warned Jimenez that the criminal transcripts were "essential" to materiality.  Tr. 1911.

By failing to put transcripts before the jury, Jimenez made a verdict in his favor impossible as a matter of law – the jury could not find any of the allegedly-suppressed evidence material to the outcome of trials of which it knew little about. See Boss, 263 F.3d at 745-56 (granting writ of habeas corpus under Brady where state court failed to "exhaustively examine[ ]" the evidence presented at trial); Ruiz, 635 F.2d at 588-89 (vacating and remanding because of district court's failure to consider "entire record").  Moreover, "'[f]ailure to put into evidence all the proof necessary for sustaining a judgment is generally fatal.  Further, on review, a case is ordinarily not remanded to give a party the opportunity to supply the missing evidence.'" Hartford Accident & Indemnity Co. v. Gulf Insurance Co., 837 F.2d 767, 774 (7th Cir. 1988) (quoting Rochez Brothers, Inc. v. Rhoades, 527 F.2d 891, 894 (3d Cir. 1975)); see Burdett, 957 F.2d at 1380-81.  Accordingly, judgment should be entered against Jimenez on his Brady claims.

## CONCLUSION

This court should reverse the judgment and order entry of judgment for the defendants on Jimenez's due process claims.  In the alternative, this court should order entry of judgment for the defendants on the Brady/Youngblood theories Jimenez first disclosed in closing and remand the remainder of this matter for further proceedings.

Respectfully submitted,

STEPHEN R. PATTON
Corporation Counsel

81

<u>s/ Jonathon D. Byrer</u>

BY:    JONATHON D. BYRER
        Assistant Corporation Counsel
        30 N. LaSalle Street, Suite 800
        Chicago, Illinois 60602
        (312) 742-4961

No. 12-2779

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

THADDEUS JIMENEZ,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 09-cv-08081
The Honorable Matthew F. Kennelly, District Judge, Presiding

## SHORT APPENDIX

STEPHEN R. PATTON
Corporation Counsel
  of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, Illinois 60602
(312) 744-0746

BENNA RUTH SOLOMON
  Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
  Chief Assistant Corporation Counsel
JONATHON D. BYRER
  Assistant Corporation Counsel
Of Counsel

## TABLE OF CONTENTS OF SHORT APPENDIX

Amended Judgment Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 1

Oral Ruling On Jimenez's <u>Batson</u> Objection . . . . . . . . . . . . . . . . . . . . . . . . . A 2

Memorandum Opinion And Order Denying
Defendants' Post-Judgment Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 5

Order Denying In Part Defendant's Motion To
Exclude Gregg McCrary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 48

Oral Ruling Regarding Testimony Of Gregg McCrary . . . . . . . . . . . . . . . . . . A 51

Oral Ruling Regarding Proposed Jury Instructions . . . . . . . . . . . . . . . . . . . A 54

Case: 12-2730    Document: 51    Filed: 01/18/2013    Pages: 156
Case: 1:09-cv-08081 Document #: 297 Filed: 01/24/12 Page 1 of 1 PageID #:4170
AO 450(Rev. 5/85)Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Eastern Division

Jimenez

v.

City of Chicago, et al

**JUDGMENT IN A CIVIL CASE**

Case Number: 09 C 8081

■  Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☐  Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Thaddeus Jimenez and against defendants Jerome Bogucki and the City of Chicago in the amount of $25 million.

Thomas G. Bruton, Clerk of Court

Date: 1/24/2012

_____
/s/ Olga Rouse, Deputy Clerk

A 1

1    spending --

2         THE COURT:  It was a marijuana charge in Iowa that he

3    did two and a half years on a five-year sentence.

4         MR. HALE:  Right.

5         Two and a half years and 14 I think is a significant

6    difference.

7         THE COURT:  He actually did it as opposed to her

8    being the grandnephew.

9         MR. HALE:  And I think the difference is what he said

10   was he didn't contest that, you know, he probably was charged.

11   With this woman, who is 62, she doesn't --

12        Like I said, I'm sure she doesn't know the

13   circumstances of the murder, and I think in her heart she

14   probably believes her -- she could believe he was innocent.  I

15   think she could sympathize with Mr. Jimenez and view her as

16   being like her nephew, and that's my concern.

17        Mr. Casey, who was in prison for two years in 1975,

18   he's not going to associate himself with Mr. Jimenez, but I

19   think Ms. McKee could.

20        THE COURT:  You know, I have been a judge for 12 and

21   a half years, and each and every case in which Batson has been

22   violated in my courtroom has been a City of Chicago case, each

23   and every one, and it has been by lawyers for the City of

24   Chicago, every time.  It's not a massive amount of time, just

25   maybe four or five.

1    I guess I had another one that was a criminal case

2    where I got overturned on it, so that's an exception.  But the

3    Court of Appeals said it wasn't violated.  So I think there's

4    an appropriate basis to -- a sufficient basis to make a

5    finding that Ms. --

6         The lady in the front row.

7         MS. AUERBACH:  Tillman.

8         THE COURT:  -- Ms. Tillman, that that's a legitimate

9    nonracially based challenge.  I didn't think it was enough for

10   a cause challenge, but the photograph, which is quite clearly

11   her, shows she has encounters with the police.  And I think

12   that's -- and the fact that, you know, those arguably were not

13   disclosed I think is sufficient and it's an intent issue.  So

14   I'm not sustaining the Batson challenge on that one.  I am on

15   the other one.  I just think you're grasping at straws.  And

16   it's largely the difference between her -- or the differential

17   treatment of her and the other person I mentioned.

18        You know, you can make -- you can always come up with

19   some sort of a this person isn't exactly the same as that

20   person, but you've got a person here who spent two and a half

21   years in prison himself.  He expressed some concerns about

22   fairness, about the fairness of the proceeding.  She didn't.

23   You struck her, you didn't strike him.  The only conclusion I

24   can reach is it's racially based, and I so find, and it's

25   deliberate.

A 3

1          And some day, the City is going to have to come to

2    grips with this because it's -- and it's the experience of

3    judges in this building is that this happens in the City of

4    Chicago cases and the City of Chicago cases only.  She is

5    seated.  I'm not giving you another one because you forfeited

6    it.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THADDEUS JIMENEZ,                  )
                                   )
              Plaintiff,           )
                                   )
     vs.                           )        Case No. 09 C 8081
                                   )
CITY OF CHICAGO and                )
JEROME BOGUCKI,                    )
                                   )
              Defendants.          )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Thaddeus Jimenez has sued City of Chicago and Jerome Bogucki, a former Chicago police detective, for claims arising from his wrongful conviction of the murder of Eric Morro. Jimenez served approximately sixteen years in prison before his conviction was vacated and he was released. In January 2012, a jury returned a verdict in favor of Jimenez and awarded him $25 million. Defendants have moved for a new trial and for judgment as a matter of law on Jimenez's claims. For the reasons stated below, the Court denies defendants' motions.

### Background

The present decision assumes familiarity with the Court's November 10, 2011 decision on defendants' summary judgment motion [docket no. 151].

In February 1993, Victor Romo and another boy, who Romo has always identified as Juan Carlos Torres, shot and killed Eric Morro on the street in Chicago. Morro's friend Larry Tueffel was present at the scene of the crime, and Tina Elder and

A 5

Phil Torres were nearby.

Detective Bogucki was assigned to investigate the murder. Jimenez claimed that Bogucki used middle-of-the-night interviews and other coercive tactics to coerce Tueffel and Phil Torres to falsely identify Jimenez as Morro's shooter. Jimenez also claimed that Bogucki tainted a lineup identification that Elder made of Jimenez, by arranging for her to see a picture of her friend Morro's corpse next to a picture of Jimenez before she was shown the lineup. Bogucki also allegedly planted with the witnesses the idea that the shooter was wearing a blue and white Duke jacket, because that was the type of jacket that Jimenez owned.

In October 1994, Jimenez, who was fifteen years old at the time, was tried as an adult in the Circuit Court of Cook County for the murder of Morro. Romo testified that Juan Carlos Torres had committed the murder, while Tueffel, Elder, and Phil Torres testified that Jimenez was the shooter. A jury convicted Jimenez, and the trial judge sentenced him to a fifty year prison term. After the conviction was overturned for reasons unrelated to this case, Jimenez was tried again in 1997. The same witnesses testified and gave essentially the same testimony. A jury again convicted Jimenez, and the trial judge sentenced him to a forty-five year prison term.

In 2006, an investigator working for the Northwestern University Center on Wrongful Convictions contacted Tueffel, who was institutionalized in a mental health facility because he had been diagnosed as a paranoid schizophrenic. Tueffel volunteered that Jimenez was innocent. The investigator and attorneys obtained recorded statements to that effect. Using those statements, investigators confronted Elder about her identification of Jimenez. For the first time, she revealed that she had

2

A 6

seen a picture of Jimenez just before she identified him in the lineup.  Investigators

were also able to cast doubt on other parts of the prosecution's case against Jimenez.

In 2008, they convinced the Cook County State's Attorney to reopen the case, and

state investigators discovered more evidence tying Juan Carlos Torres to the killing.

In May 2009, the State's Attorney and Jimenez's lawyers asked to vacate his

conviction, and a judge of the Circuit Court of Cook County did so.  The court later

granted Jimenez a certificate of innocence.  *See* 735 ILCS 5/2-702.  Juan Carlos Torres

was arrested for Morro's murder the same day that Jimenez was released.  Torres is

currently awaiting trial.

## Discussion

Defendants contend that they are entitled to a new trial for several reasons.

They claim that the Court erroneously disallowed one of their peremptory challenges

under *Batson v. Kentucky*, 476 U.S. 79 (1986); the Court erred in refusing to instruct

the jury on specifically what actions by Bogucki were alleged to violate Jimenez's right

to a fair trial; and the Court made several erroneous evidentiary rulings.  Defendants

also argue that they are entitled to judgment as a matter of law on Jimenez's due

process, conspiracy, and malicious prosecution claims.

## A.    *Batson* challenge

Defendants contend that the Court incorrectly sustained Jimenez's *Batson*

objection to a peremptory challenge that defense counsel used against an African-

American juror.  Defendants also contend that the Court erred in not granting

defendants another strike to use in place of the disallowed peremptory challenge.

3

A 7

1.      **Relevant facts**

During the jury selection process, two potential jurors indicated that they had

personal experience with the prison system.   One, Ms. McKee, who is African-

American, stated that she has a great-nephew who served fourteen years in prison for

murder and was released in 2011.  Def. Ex. 1 at 77–78.   She stated that she attended

court during his criminal case, indicating that she went to court along with other family

members.  *Id.* at 78.  Ms. McKee did not think that her great-nephew had been treated

unfairly by anyone in the process, including the courts, police, prosecutors, or his own

lawyers.  *Id.*  She stated that she could put her great-nephew's situation aside and

decide Jimenez's case based solely on the evidence before her.  *Id.*

Ms. McKee also disclosed that a nephew of hers had been killed on the street

seven years prior to the trial.   When asked if anyone had been arrested or charged for

the homicide, she answered "[n]ot yet."  *Id.* at 79.   She stated that she could also set

that experience aside if chosen for the jury.  *Id.*

Another potential juror stated that he himself had actually served a prison term.

Mr. Casey, who is white, disclosed that he had spent time in prison for possession of

marijuana.  *Id.* at 81–82.  He stated that he was convicted in Iowa in the 1970s, was

sentenced to a five year prison term, and he served two and one-half years.  *Id.* at 154.

He did not think that the police, courts, or prosecutors had treated him unfairly, but he

stated that he felt he had been treated unfairly by his defense lawyer.  *Id.* at 154–55.

Mr. Casey also stated, however, that he had been guilty and "the only person I was

mad at was me[,] for getting caught."  *Id.* at 155; *accord id.* at 82.  Unlike Ms. McKee,

4

Mr. Casey never stated that he could put those experiences aside and not use them when deciding Jimenez's case. (In fact, the Court neglected to ask him this question. Counsel—including defense counsel—did not ask the Court to follow up in this regard.)

Mr. Casey also had been a member of a motorcycle club for twelve years, up until six or seven years prior to trial. When asked if "you or anybody else that you know ever had an encounter with a police officer that leaves you with bad feelings," he answered "of course." *Id.* at 153. He also claimed that at times he had been stopped by police solely because he was wearing the motorcycle club's patch on his clothes. *Id.* at 153. Mr. Casey stated that none of the encounters had been with Chicago police. *Id.* He indicated that he would not start the trial with any negative feelings about the police officers involved in the case because of previous experiences. *Id.* at 154.

Defendants did not challenge either Ms. McKee or Mr. Casey for cause. *Id.* at 183. Defense counsel used a peremptory challenge to attempt to remove Ms. McKee from the jury. They did not use a peremptory challenge with regard to Mr. Casey. Jimenez's attorneys objected to the defense challenge of Ms. McKee, arguing that the challenge violated was racially discriminatory in violation of *Batson*. They noted that defendants had exercised two of their three peremptory challenges to remove the only two African-Americans from the jury and that if defendants' strikes were allowed, the jury would be entirely white. Tr. 208–10.

The Court asked defense counsel to justify the strikes of the two African-American jurors. Defendants justified their peremptory challenge of the other potential African-American juror, whom they had also challenged for cause, on the ground that

5

A 9

she had been arrested twice and had failed to disclose either arrest. *Id.* at 208–09.

With regard to Ms. McKee, defendants' attorney stated:

> For number 17, Ms. McKee, she had a nephew who spent 14 years in prison and just got out for murder. That's not the kind of person I would like on my jury for damages because I think she would be very sympathetic to Mr. Jimenez who spent 16 years in prison for murder.

Def. Ex. 1 at 209. The attorney also said "I think she's going to relate to what it's like to have a family member in prison. Mr. Jimenez was in prison for 16 years, and I think with her having a nephew in prison for 14 years . . . ." *Id.* at 210. When the Court noted that Ms. McKee had stated that her great-nephew was treated fairly, defendants' attorney responded, "My point is the damages issue. She is somebody I think that is going to be very sympathetic to somebody like Mr. Jimenez who is claiming 16 years in prison. You know, we're going to say he wasn't damaged in prison because . . . basically he was properly charged." *Id.* at 211.

The Court then asked why defendants had not struck Mr. Casey, who (the Court noted) had spent time in prison himself. Defendants' attorney justified the differential treatment by noting that Mr. Casey had been in prison for two and one-half years, whereas Ms. McKee's great-nephew had been in prison for fourteen years. *Id.* at 211–12. The attorney also stated that Mr. Casey had been imprisoned in the 1970s and that his marijuana charge "was a much smaller charge." *Id.* The attorney concluded by noting that "Mr. Casey, who was in prison for two years . . . , he's not going to associate himself with Mr. Jimenez, but I think Ms. McKee could." *Id.* at 212.

Twice during the exchange, defense counsel also sought to justify the challenge by hypothesizing that Ms. McKee might believe that her great-nephew was wrongfully

6

A 10

convicted.  Counsel stated, "I didn't remember her saying he didn't do it.  I doubt she

knows anything about the circumstances of whether he [d]id it or not.  And it wouldn't

surprise me if she thought he didn't do it."  *Id.* at 210.  A bit later, counsel reemphasized

this hypothesis, even more strongly:  "Like I said, I'm sure she doesn't know the

circumstances of the murder, and *I think in her heart she probably believes her—she

could believe he was innocent.*  I think she could sympathize with Mr. Jimenez and view

her [sic] as being like her nephew, and that's my concern."  *Id.* at 212 (emphasis

added).

This rationale for the strike had no basis in the record.  To the contrary, Ms.

McKee had expressly affirmed, in response to a direct question, that her nephew had

*not* been treated unfairly in any respect:

> THE COURT:  . . . Was there any question—and just a yes or no on this.
> Was there any question or issue about whether he had been treated fairly
> either by the courts, the police, the prosecutors, lawyers, anybody at all?
>
> [MS. McKEE]:  No, there was no question about it.

*Id.* at 78.  Defense counsel do not suggest, nor could they, that anything in Ms.

McKee's demeanor suggested that she was hedging or somehow suggested a belief

that her great-nephew might have been innocent.  The Court observed Ms. McKee

carefully during questioning.  She responded to the questions about her nephew's case

unflinchingly and without any hint that she felt the criminal justice process had gone

awry in any way, shape, or form.

The Court overruled plaintiff's objection to defendants' strike of the other African-

American juror, finding that it was "a legitimate nonracially based challenge."  *Id.* at 213.

With regard to Ms. McKee, however, the Court concluded that defendants' challenge was racially motivated. The Court suggested that counsel was "grasping at straws" in attempting to explain the strike. *Id.* The Court noted "the differential treatment of her and [Mr. Casey]." *Id.* Though noting that one can almost always identify some differences between two allegedly comparable jurors, the Court stated:

> [Y]ou've got a person here who spent two and a half years in prison himself. He expressed some concerns about fairness, about the fairness of the proceeding. She didn't. You struck her, you didn't strike him. The only conclusion I can reach is it's racially based, and I so find, and it's deliberate.

*Id.* The Court disallowed the challenge of Ms. McKee and also ruled that defendants were not entitled to another strike because they had forfeited it. *Id.* at 214.

### 2. Propriety of the peremptory challenge

Allowing a party in a civil case to exclude a juror on the basis of the juror's race violates the juror's equal protection rights, and an opposing party can make a *Batson* objection to a racially discriminatory peremptory challenge. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628–30 (1991). A *Batson* objection is analyzed in three steps.

> First, the [opponent of the strike] must establish a *prima facie* case that the strike was racially motivated. The burden then shifts to the [maker of the peremptory challenge] to articulate race-neutral reasons for the strike. Finally, the trial judge must assess the credibility of the prosecution's explanation and determine if the [opponent] has established purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with the opponent of the strike.

*United States v. Hendrix*, 509 F.3d 362, 370 (7th Cir. 2007) (emphasis in original; citations omitted).

Defendants do not contest that Jimenez established a *prima facie* case, so the Court moves on to the second step in the analysis. Defendants justified their strike of Ms. McKee by stating that she might be sympathetic to Jimenez because her great-nephew had undergone a similar experience and spent a similar amount of time in prison. This was a facially race-neutral explanation. "Unless a discriminatory intent is inherent in the [challenger]'s explanation, the reason offered will be deemed race-neutral." *Id.*

Accordingly, the Court moves to the third step of the *Batson* analysis. At this stage, a court must determine whether the opponent of the strike has proved purposeful discrimination.

> The critical question in determining whether [the opponent] has proved purposeful discrimination at the last stage is the persuasiveness of the [challenger]'s justification for his strike. The issue is whether the trial court finds the [challenger]'s race-neutral explanations to be credible. When approaching the issue of credibility, the court assesses how reasonable, or how improbable the [challenger's] explanations are; and by whether the proffered rationale has some basis in accepted trial strategy. *Batson* and its progeny direct trial judges to assess the honesty—not the accuracy—of a proffered race-neutral explanation.

*Id.* at 371 (citations and internal quotation marks omitted).

The Court found at the time, and now reaffirms, that defendants' proposed justification for striking Ms. McKee was not credible. "If a [party]'s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). Defendants expressed concern that Ms. McKee might be a bad juror for them on damages, because she would know what it

9

A 13

was like to have a relative in prison. The same rationale, however, applied even more strongly to Mr. Casey. Ms. McKee might have a second or third-hand sense of what prison life is like through the experiences of her sibling's child's son. By comparison, Mr. Casey had direct and visceral personal experience with prison life because he himself spent two and one-half years in prison.

Defendants argued at the time that there was a substantial difference between Mr. Casey's time in prison, which he had served in the 1970s, and Ms. McKee's great-nephew's fourteen years, which he served recently. The Court finds it improbable that defendants actually relied on these distinctions when choosing whom to strike. The length of time and remoteness of the imprisonment pale in comparison to the fact that Mr. Casey personally experienced prison, whereas Ms. McKee only had a relatively distant relative who was imprisoned. The passage of time may have affected how Mr. Casey viewed his time in prison, but he still possesses direct experience of prison, whereas Ms. McKee had no such direct experience.

Furthermore, Mr. Casey stated that he felt he was treated unfairly in the criminal justice process—by his defense lawyer—although he added that he was only angry with himself for committing a crime. Ms. McKee, in contrast, stated that she did not know of any time when *anyone* involved in the criminal process treated her great-nephew unfairly. In addition, Ms. McKee stated unequivocally that she could put her experience aside when deciding Jimenez's case, whereas Mr. Casey never did so.

Finally, there were other factors that made Ms. McKee a less desirable juror from a plaintiff's standpoint than Mr. Casey and that add to the improbability that the reason defendants cited was their actual rationale for striking her. Specifically, Ms. McKee

10

A 14

stated that her family had suffered from street violence; her nephew had been the victim in an as-yet-unsolved homicide. This experience would tend to make her less sympathetic to Jimenez, who was accused of—and, the defendants contended, guilty of—a murder on the streets of Chicago. Mr. Casey, by contrast, stated he had many negative experiences with police from his time in a motorcycle club and felt that police had sometimes detained him unfairly, solely because his clothing identified him as a member of the club. Although Mr. Casey said he could put those experiences aside as a juror, they would tend to make him more sympathetic to Jimenez, who claimed the police treated him unfairly and wrongly accused him of an even more serious crime.

Defendants contend that a key difference between Mr. Casey and Ms. McKee is that Ms. McKee's great-nephew was convicted of murder, the same crime of which Jimenez was convicted, whereas Mr. Casey was convicted of a marijuana offense. In determining the propriety of a peremptory challenge, however, "the trial court should consider only the reasons initially given to support the challenged strike, not additional reasons offered after the fact." *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011). During voir dire, the defendants did not suggest that the reason, or a reason, that they distinguished between Mr. Casey and Ms. McKee was that his offense was different from, or less serious that, Jimenez's or because Jimenez and Ms. McKee's great-nephew were convicted of the same crime. Rather, they focused on the fact that Ms. McKee's great-nephew spent much longer in prison and that Mr. Casey's prison time was more than thirty years ago. It would be clear error for the Court to consider this new justification for the peremptory challenge. *Id.* at 905–06.

The Court also considers it significant that in his contemporaneous attempt to

11

A 15

justify the challenge, defense counsel cited, twice, a hypothesized reason that had no support whatsoever in the record—the suggestion that Ms. McKee might have believed her great-nephew was wrongfully accused.  This contention was directly contradicted by Ms. McKee's unhesitating and unequivocal statement that she did not believe her great-nephew had been treated unfairly by anyone.  There was no other basis for this in the record.  And any claim of intuition on the part of defense counsel cannot provide any support for this hypothesized rationale.  As Judge Posner has aptly stated in a different context, "[s]uch subjective . . . appeals to an ineffable intuition should not be credited." *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005).  Counsel's resort to what the Court considered to be a made-up reason to justify the strike of Ms. McKee was further evidence of discriminatory intent.

Defendants cite two criminal cases in which the Seventh Circuit upheld a district court's determination that strikes of jurors who had personal experience with similar crimes were not racially motivated.  In *United States v. Lampkins*, 37 F.3d 175 (7th Cir. 1995), a crack cocaine drug conspiracy case, the prosecution struck a woman because she had an uncle and a former boyfriend who had been convicted of dealing cocaine, and was the only juror who had ever seen crack.  *Id.* at 177.  Defendants claimed that striking the potential juror constituted gender discrimination.  Reviewing for plain error, the Seventh Circuit upheld the district court's determination that the strike was nondiscriminatory.  *Id.* at 178.  The court stated that "a prosecutor may permissibly strike a prospective juror on the grounds that close relatives or friends have been convicted of the very crime at issue."  *Id.*  In *United States v. Brown*, 289 F.3d 989 (7th Cir. 2002), the Seventh Circuit upheld a district court's determination that a strike of an

12

A 16

African-American potential juror was nondiscriminatory. *Id.* at 993. The juror's husband had been convicted of a firearm offense in the 1970s, and she had failed to disclose the conviction on a written questionnaire. *Id.* at 992–93.

Setting aside the fact that defendants cite criminal cases, where a juror's personal experience with the crime charged may matter more than in a civil case arising from an exoneration, each of these cases is distinguishable. In both of them, the potential juror's romantic partner, not a distant relative, had a conviction similar to the charged offense. Furthermore, in *Brown*, the potential juror had initially not disclosed the conviction. In *Lampkins*, the juror knew two people with the same type of conviction as the charge against the defendants, and the Seventh Circuit was reviewing only for plain error a determination already made by the district court. In this case, by contrast, the Court made a finding of fact in the first instance. *See Hendrix*, 509 F.3d at 369.

In addition, in neither *Brown* nor *Lampkins* was there another member of the venire to whom the prosecutors' expressed rationale applied even more strongly. Here, by contrast, defendants' justification for their strike was that Ms. McKee might be sympathetic to Jimenez concerning damages due to the fact that her relative had been in prison. As the Court has noted, this justification applied even more strongly to another member of the venire, Mr. Casey, who had been imprisoned himself. *Compare Miller-El*, 545 U.S. at 241–53 (issuing writ of habeas corpus when state prosecutor struck African-American jurors who expressed doubt about death penalty but not white jurors who expressed similar doubts) *with Hendrix*, 509 F.3d at 371 (no *Batson* violation when African-American and white potential jurors struck for the same reason).

13

Defendants finally contend that they are entitled to a new trial because they

"could and should have [challenged Ms. McKee for cause] on the basis of implied bias."

Def. Rule 59 Mot. at 8.  As defendants' statement makes clear, they did not challenge

Ms. McKee for cause.  Even if Ms. McKee were challengeable for cause, such a

challenge can be forfeited, and that is what occurred here.  *See United States v.*

*Brazelton*, 557 F.3d 750, 753–55 (7th Cir. 2009) (defendant waived implied-bias

challenge to a juror, who was the second cousin of a potential witness who had

allegedly been shot by defendant, when district court asked if defense lawyer would like

to challenge the juror for cause and defense lawyer declined).  The Court notes that in

response to this argument in defendants' post-trial motion, Jimenez contended the point

was forfeited, and defendants did not reply to the forfeiture argument in their reply brief.

In sum, the Court again finds that defendants' proffered explanations for their

peremptory challenge of Ms. McKee are not credible.  The Court appropriately

disallowed the strike of Ms. McKee because defense counsel exercised the strike in a

racially discriminatory manner.

### 3.    Propriety of the remedy

Defendants contend that even if their peremptory challenge of Ms. McKee

violated her equal protection rights, the Court erred in concluding that their strike was

forfeited and that were not entitled to another.

There is no controlling authority discussing the proper remedy for a *Batson*

violation in these circumstances.  In *Batson*, the Supreme Court reserved the question

of what remedy was appropriate, though it stated that two possible options were

14

A 18

ordering a mistrial and starting again with a new venire, or seating the improperly challenged jurors. *Batson*, 476 U.S. at 99 n.24. The Court did not discuss whether a party who made an improper peremptory challenge should be allowed to reuse the improperly exercised challenge.

In *Maloney v. Plunkett*, 854 F.2d 152 (7th Cir. 1988), the court held that a district court could not, as a remedy for *Batson* violations by both sides, order a mistrial and bar either party from using any peremptory challenges at all in the retrial. The Seventh Circuit granted the plaintiffs' petition for a writ of mandamus. The court called the district court's sanction "utterly without precedent" and held that it conflicted with the statutory grant of three peremptory challenges to each party. *Id.* at 154. As the Seventh Circuit noted, a federal statute provides that, "[i]n civil cases, each party shall be entitled to three peremptory challenges." 28 U.S.C. § 1870; *see* Fed. R. Civ. P. 47(b).

Defendants argue that the Court's determination that they had forfeited their strike by using it in a racially discriminatory manner is contrary to *Maloney*. That case, however, involved a very different situation in which the district court precluded both sides from using any strikes at all in an entirely new trial. In the present case, the Court did not anticipatorily bar the defendants from using peremptory challenges. Nor did the Court limit defendants' use of their other strikes based on their single racially discriminatory strike.

Indeed, the Court did not deprive defendants of the peremptory challenges provided by section 1870. They used all three of them. The Court found they had used

15

A 19

one in a racially discriminatory manner and declined to give them a do-over, finding they had forfeited that particular challenge. This is not the same as refusing to permit a litigant to use all three of his peremptory challenges. Defendants offers no reason why this particular statutory entitlement, like other entitlements, cannot be forfeited.

Defendants contend that "[t]he proper sanction for discriminating against a juror is having the juror seated." Def. Rule 59 Mot. at 4. Defendants do not, however, cite to any authority to support the contention that this is the only proper remedy for a *Batson* violation. Indeed, this argument is contrary to the Supreme Court's reservation of the question of the proper remedy for a *Batson* violation. *Batson*, 476 U.S. 99 n.24.

Defendants also argue that the Court's sanction left Jimenez with more strikes than them and thus "skew[ed] the jury towards the favored party." *United States v. Harbin*, 250 F.3d 532, 549 (7th Cir. 2001). In *Harbin*, the Seventh Circuit reversed a decision by the district court allowing the government to use, in the middle of trial, a peremptory challenge it had foregone during voir dire, when new information about a juror came to light. *Id.* at 538–39. The defendants had exhausted their strikes during voir dire but were unaware that they might be able to save them and use them during the trial. *Id.* at 538, 541. The Seventh Circuit held that the district court's decision was erroneous because "[t]he prosecution was unilaterally granted control over the composition of the jury during the trial stage . . . [and the] jury selection process . . . failed to minimally inform [defendants] of the procedures that ultimately were followed." *Id.* at 541–42.

The current case is nothing like the situation in *Harbin*. Here, each side

16

A 20

received, and used, three peremptory challenges.  Both sides also knew full well that

they were prohibited from using any of their challenges in a racially discriminatory

manner.  All parties to the case were subject to the same requirements, and the jury

selection process was not weighted in Jimenez's favor.  Only defendants violated the

Constitution, and accordingly only they were found to have forfeited the right to re-use

the disallowed challenge.

   The Court has found no cases discussing forfeiture of a discriminatory

peremptory challenge in a civil case in which a party is entitled to three peremptory

strikes under section 1870 and Rule 47.  Several courts of appeal have, however,

discussed the issue in the context of a federal criminal case, in which the parties are

entitled to a particular number of peremptory challenges under Federal Rule of Criminal

Procedure 24.

   In *United States v. Walker*, 490 F.3d 1282 (11th Cir. 2007), the defendants used

all of their peremptory challenges to remove white male jurors.  *Id.* at 1289.  After

hearing the defendants' race-neutral explanations for the strikes, the district court

disallowed four of them and did not allow defendants to reuse the disallowed strikes.

*Id.* at 1290.  The district court reasoned that replacing the impermissible strikes would

simple restore the status quo, and "improperly reward [defendants] for violating *Batson*."

*Id.* at 1295.  In reviewing the decision, the Eleventh Circuit noted that the Supreme

Court had never stated whether a party should be allowed replacement strikes.  *Id.*  The

court held that lower courts have wide latitude to apply *Batson* and should consider the

"practicalities of the situation" as well as "'the nature and scope of the constitutional

17

violation.'" *Id.* at 1294 (quoting *Young Soo Koo v. McBride*, 124 F.3d 869, 873 (7th Cir.
1997)). The court upheld the district court's remedy, based on the district court's
reasoning and the fact that the remaining members of the venire had already been
discharged, so that allowing defendants additional strikes would have required another
day of jury selection. *Id.* at 1295.

In *United States v. Aleman*, 246 F. App'x 731 (2d Cir. 2007) (unpublished), the
district court had determined that defendant used three strikes against African-
American jurors in a discriminatory manner and ruled that the challenges had been
forfeited. *Id.* at 734. The Second Circuit upheld the forfeiture ruling. It reasoned that
allowing the defendant replacement strikes would mean that there were no
consequences, and thus no deterrent, to using strikes in an improper discriminatory
manner. *Id.* at 734–35; *see Peetz v. State*, 180 S.W.3d 755, 761 (Tex. Ct. App. 2005)
("In short, appellant exercised his three strikes, the court invalidated two of them, and
appellant must cope with losing his race-based gamble."). The court also noted that
"trial courts retain broad discretion to fashion an appropriate remedy for a violation" of
*Batson*. *Aleman*, 246 F. App'x at 735.

In *United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001), *overruled in
part on other grounds by United States v. Lopez*, 484 F.3d 1186, 1200 n.17 (9th Cir.
2007) (en banc), the district court had barred two government peremptory challenges
as discriminatory, but granted the government two replacement strikes. *Id.* at 910. The
Ninth Circuit upheld this decision, noting that trial courts have discretion in fashioning
*Batson* remedies. *Id.* at 910. The court recognized that there would be scant

punishment for the prosecution because its strikes had been returned, but stated that

"'the nature of the remedy must be determined by the nature and the scope of the

constitutional violation.'" *Id.* (quoting *Young Soo Koo*, 124 F.3d at 873).  The Ninth

Circuit noted that the district court had thought the strikes by the prosecution a very

close case and had admitted that it could be wrong in ruling that they were barred by

*Batson*. *Id.*  The court also noted that there was nothing in the record to indicate bad

faith on the part of the prosecutor, so there was little need for punishment.  *Id.*

The Court is further persuaded by the reasoning of these analogous criminal

cases that it had the discretion to determine an appropriate remedy for defendants'

race-based discrimination and was not obliged to allow defendants to have a do-over.

Defendants' justification of their decision to challenge an African-American juror was

not at all credible, because the justification applied much more strongly to a white juror

whom defendants did not strike.  When confronted with the discrepancy, defendants

could not give a satisfactory explanation, thus further confirming that any nonracial

justification they offered was pretextual.  And as the Court has noted, defense counsel

attempted to rely on a hypothesized rationale that was contrary to the record, which is

significant evidence that counsel's attempted justification was a mere pretext for

invidious discrimination. The Court is persuaded by the reasoning of *Walker* and

*Aleman* that allowing defendants to try again would have merely restored the status quo

and would provide an insufficient sanction for and deterrence of racially discriminatory

conduct.

Defendants contend that because the finding that they exercised their

peremptory challenge in a discriminatory manner was "close," forfeiture of the strike

19

A 23

was not appropriate. *People v. Luciano*, 890 N.E.2d 214, 219 (N.Y. 2008); *see Ramirez-Martinez*, 273 F.3d at 910. The Court does not agree that the matter was close, for the reasons already discussed. Defendants also contend that because they only used one peremptory challenge in a discriminatory manner, forfeiture of their strike was inappropriate. *See Walker*, 490 F.3d at 1290 (defendants forfeited four strikes by using them in racially discriminatory manner); *Gabe v. United States*, No. CV408-156, 2009 WL 50161, at *3 (S.D. Ga. Jan. 6, 2009) (six strikes forfeited when defendant used them in a racially discriminatory manner). None of defendants' cited authority, however, suggests that forfeiture is appropriate only if a party commits multiple constitutional violations. *See Luciano*, 890 N.E.2d at 219 ("even a single instance of discriminatory conduct may warrant forfeiture"). The Court declines to adopt a course that would, in effect, invite litigants to attempt one discriminatory strike, knowing that if caught they would get a second bite at the apple.

For these reasons, the Court concludes that its determination of the *Batson* matter was appropriate and does not warrant a new trial.

**B.    Jury instruction**

Defendants argue that the Court erred in refusing to give a proposed jury instruction that set out their view of the evidence that Jimenez could use to prove his claim that Bogucki violated his due process right to a fair trial by withholding exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In their proposed instruction, they sought to limit the jury to consideration of the concealment of coercion of Tueffel and Phil Torres to identify Jimenez as the shooter; showing Elder a photo of Jimenez

20

A 24

before she was asked to identify the shooter in a lineup; and inducing witnesses to say that the shooter was wearing a Duke jacket.

"[The Court] construe[s] jury instructions in their entirety in order to determine whether as a whole the instructions were sufficient to inform the jury correctly of the applicable law." *Lasley v. Moss*, 500 F.3d 586, 589 (7th Cir. 2007). "[T]he issued instructions must be correct legal statements and must convey the relevant legal principles in full." *Id.* A new trial is appropriate only if the instructions had a legal error and that error was "likely [to] confuse or mislead the jury and prejudice the objecting litigant." *Javier v. City of Milwaukee*, 760 F.3d 823, 828 (7th Cir. 2012).

The Court's instruction told the jurors the elements of a *Brady* due process claim—concealment of material exculpatory or impeachment information—and it defined the terms concealment, exculpatory, impeachment, and material. Def. Ex. 3; *see Carvajal v. Dominguez*, 542 F.3d 561, 567–68 (7th Cir. 2008). Defendants do not contend that there were any errors in this instruction, and in particular they do not contend that the Court defined any of the key terms incompletely or incorrectly. Indeed, the wording of that instruction is virtually the same as the one defendants proposed. Def. Ex. 3; Pl. Ex. B. Rather, defendants' contention is that in addition to telling the jury what the law required Jimenez to prove, the Court should also have instructed the jury on specifically what facts they could consider when deciding whether Bogucki had withheld material exculpatory evidence. Defendants have not, however, offered any authority indicating that a jury that has been properly instructed on the elements of a *Brady* due process claim must also be instructed on specifically what evidence it can

consider.

Defendants contend that because the jury instructions did not contain a list of the evidence the jury should consider for the due process claim, the jury may have improperly considered other evidence, including evidence that defendants believe Jimenez's attorney mentioned for the first time in closing argument. In closing arguments, Jimenez's attorney referenced a number of matters that he claimed were concealed. He stated:

> [The jury instruction] says you have to conceal exculpatory information. We only have to show one thing was concealed that might have changed the outcome in this very close case and we win. Well, I'm going to show you ten things, ladies and gentlemen, ten things that were concealed. And so we win the case ten times over, and certainly in any combination they would have changed the outcome.

Def. Ex. 1 at 2814. Defendants, however, did not object to Jimenez's closing argument at the time, and they make clear now that they are not asserting that they are entitled to a new trial because the closing argument was improper. They claim only that the failure to give their proposed jury instruction requires a new trial because the juror may have considered some of the items of suppressed evidence Jimenez's attorney mentioned in his closing argument. The Court has a hard time seeing how defendants can, on the one hand, let counsel's argument go without objection and then, on the other hand, claim that the jury might have inappropriately considered some of the points that counsel referenced in that selfsame argument.

That aside, defendants' arguments regarding the items of evidence listed in the closing argument of Jimenez's counsel amount to either a contention that the evidence was disclosed to Jimenez or was available to him with the exercise of reasonable

22

A 26

diligence and thus was not suppressed, or a contention that the evidence was not material. *E.g.*, Def. Rule 59 Mot. at 14 (claiming that Tueffel coercion was disclosed to Jimenez because he heard police yelling at Tueffel); *id.* at 15 (claiming that Tina Elder's exposure to picture of Jimenez next to picture of her friend Morro's corpse was inconsequential because Tina recognized Jimenez from the neighborhood); *see Carvajal*, 542 F.3d at 567–68. The jury instructions, however, made clear to the jurors that Jimenez's claim would succeed only if the evidence was concealed by police and was material, and the instructions defined those terms with clarity. Def. Ex. 3. As even defendants concede, the jury instructions given contained no errors. That being the case, defendants were not prejudiced by the absence of a particularized-evidence instruction. The instructions that the jury had gave it all the tools it needed to evaluate whether the evidence cited by Jimenez's attorney was sufficient to sustain Jimenez's *Brady* claim.

Defendants cite cases that they argue indicate that due process rights should be narrowly construed. *See Albright v. Oliver*, 510 U.S. 266, 273 (1995) (plurality) (indicating that claims should be analyzed under specific provisions of Bill of Rights instead of more general notion of substantive due process); *id.* at 284 (Kennedy, J., concurring in the judgment) (not every wrong committed by government official is a violation of Fourteenth Amendment); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028–29 (7th Cir. 2006) (no *Brady* violation when defendant complained that the circumstances of her own confession had been concealed by police); *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003) (procedural due process claim regarding

23

manufacturing evidence failed when state malicious prosecution action provided a remedy). Again, however, none of these cases indicates that a jury instruction telling the jury that it can consider only certain evidence is required in a case involving a claim for violation of a person's due process right to a fair trial.

Defendants also note that "[a]n incorrect instruction calls for a new trial even if the jury could have based its verdict on a different, properly instructed theory. In that situation, [courts] cannot speculate about which theory the jury chose." *Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998). Defendants essentially argue that each item of *Brady* evidence amounted to its own separate theory of liability and that if any particular item of evidence mentioned by plaintiff's counsel was not a proper basis for a *Brady* claim, they are entitled to a new trial because there is a chance that the jury based its verdict on an incorrect theory. *See id.* (if jury could have based verdict on incorrect instruction, new trial is required even if there were properly instructed theories that could have supported claim). Defendants, however, misunderstand the nature of a *Brady* claim. There is not a separate claim for each piece of evidence that Bogucki concealed. Instead, the claim is that Jimenez was denied his due process right to a fair trial because Bogucki concealed exculpatory evidence. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (question for a *Brady* claim is whether in the absence of suppressed evidence, criminal defendant received a fair trial). All items of evidence that were concealed or suppressed are considered as part of a single, unitary claim. *See Kyles*, 514 U.S. at 440–41; *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (all evidence is considered cumulatively to evaluate *Brady*

24

A 28

claim).

Defendants note that in a previous case tried some seven years ago, the Court gave a jury instruction providing a detailed description of the evidence that defendants allegedly concealed in a previous case. *See Manning v. Miller*, Case No. 02 C 372, docket no. 206 at 26 (N.D. Ill. Jan. 5, 2005) (Jury Instructions). The fact that the Court has given instructions similar to the ones defendants requested here in a previous case does not mean that the Court committed a legal error requiring a new trial by not doing so in the present case.

Furthermore, the *Manning* case was significantly more complicated than the claims brought by Jimenez. Manning claimed that federal agents had sought to frame him for two different crimes, a kidnaping in Missouri and a murder in Illinois. *Id.*, docket no. 75 ¶¶ 19–22, 38, 40 (N.D. Ill. Apr. 29, 2004) (Second Amended Complaint). Each of these crimes gave rise to separate claims that the agents had violated Manning's due process rights to a fair trial by withholding exculpatory evidence. Jury Instructions at 23–25. Each *Brady* claim, however, involved different evidence. Manning also claimed that the agents had violated the Racketeer Influenced and Corrupt Organizations Act (RICO) and conspired to do the same. Second Amended Complaint ¶¶ 93–109. The evidence supporting the RICO claims overlapped with the evidence supporting the *Brady* claims. Jury Instructions at 36–37. Jimenez's single *Brady* claim did not require that the jury be so specifically instructed.

## C.    Evidentiary issues

Defendants contend that four evidentiary issues require the Court to order a new

25

A 29

trial. An erroneous evidentiary ruling requires a new trial only if the losing party was prejudiced by the error. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 868 (7th Cir. 2005).

### 1.    Carmelo Cortez

Defendants sought to have Carmelo Cortez testify as an impeachment witness. They contend he would have testified that he was best friends with Morro and on the night of the shooting asked Tueffel what had happened. Pl. Ex. D. Defendants contend that Cortez would have testified that Tueffel told him Jimenez shot Morro. *Id.* Defendants argue that Cortez was an important witness because he would have shown that Tueffel identified Jimenez as the shooter before the police pressured and coerced Tueffel to finger Jimenez.

Defendants did not disclose Cortez as a potential witness until October 26, 2011, long after fact discovery had closed. At the time, trial was scheduled for December 5, 2011, only about five weeks after disclosure of Cortez, although the trial was later postponed to January 9, 2012. And during that period, the parties were engaged in expert discovery and were preparing intensively for trial. The Court barred Cortez as a witness, citing Federal Rule of Civil Procedure 26(a)(1), local rule 16.1, and "lateness and unfair prejudice." Dec. 7, 2011 Pretrial Conf. Tr. at 19–20.

Defendants contend that barring Cortez was error. The Court assumes for purposes of this discussion that Rule 26(a)(1) did not apply to Cortez because he was an impeachment witness (though this is not so clear as defendants argue). *See Hammel*, 407 F.3d at 869. Cortez was also listed as a defense witness in the pretrial

26

order, so Local Rule 16.1 did not bar him from testifying. The Court did not err, however, in barring Cortez because defendants disclosed him so late.

At the time of disclosure, fact discovery was long since closed, as the Court has noted. Had the Court permitted defendants to call Cortez, it would have been required to reopen fact discovery. In that event, plaintiff would have had little more than a month to conduct investigation and discovery related to Cortez, and even after the brief continuance he would have postponement of the trial Jimenez had only two months. And as Jimenez argued at the time, this discovery and the associated investigation would not have been limited to simply taking Cortez's deposition, as defendants suggest. Rather, Cortez was first appearing as a witness almost nineteen years after the day in 1993 that Tueffel spoke to him. Jimenez would have had to investigate and conduct discovery to determine if Cortez had spoken to others in those nineteen years about his alleged conversation with Tueffel. Further, Jimenez would have had to investigate the circumstances under which defendants located Cortez and learned what he had to say—significant factors in a case involving claims that the police influenced witnesses to the Morro murder. And last but not least, as the Court has noted, the parties were still conducting intensive expert discovery at the time of the disclosure. Allowing defendants to call Cortez would have required counsel to divert their attention from this and from trial preparation. These are among the reasons why the Court did not err in sustaining Jimenez's objection to the calling of Cortez as a witness.

Finally, defendants were not substantially prejudiced by their inability to present Cortez as a witness. They offered copious evidence at trial to attempt to impeach Tueffel. The jury learned that in both of Jimenez's criminal trials, Tueffel testified that

27

Jimenez had shot Morro, and he did not recant until an investigator talked to him while

he was institutionalized due to a diagnosis of paranoid schizophrenia.  The jury also

heard the deposition testimony of Elizabeth Gutekanst, Jimenez's girlfriend at the time

of the shooting, who testified that Tueffel told her a few days after the shooting that

Jimenez had done it.  Tr. 2641.  (Tueffel confirmed that they had met but said that he

told her Jimenez did not do it.  Tr. 979–80.)  Defendants note that, unlike Cortez,

Tueffel talked to Gutekanst after he had allegedly been pressured by Bogucki.  The

jurors also heard, however, deposition testimony from Phil Torres, who stated that he

talked to Tueffel at the scene of the crime.  Tr. 2671.  Torres stated that Tueffel told him

that Jimenez had shot Morro.  Tr. 2672.  Torres's deposition testimony was often

confused and he admitted that he had testified differently at the criminal trials, but at the

deposition, he stuck to his story that immediately after the shooting, Tueffel told him

that Jimenez was the shooter.  Tr. 2687–88.  Given this and the other evidence

defendants offered to contradict Tueffel, the exclusion of Cortez was not substantially

prejudicial even if it can be claimed to have been erroneous.

### 2.    Evidence that Jimenez threatened Romo

Defendants sought to offer the testimony of Margot Gillin, a worker at the juvenile

home where both Jimenez and Romo were incarcerated before trial.  Gillin would have

testified that she heard Jimenez threaten to kill Romo's father if Romo testified against

him.  On the third day of trial, after Romo had testified and defendants had not asked

him about the threat, the Court barred any mention of the threat.  Tr. 756–57.  The

Court determined that the threat was relevant only to show Jimenez's consciousness of

guilt, an issue that the Court concluded related primarily to damages. Tr. 756. The Court held that the threat was barred by Federal Rule of Evidence 403, because it was of little probative value, other threats made by Jimenez had been admitted, and there was a potential for jury confusion if this evidence were admitted. Tr. 756–57.

Defendants argue that, in addition to showing consciousness of guilt, evidence of the threat was also relevant to the malice element of Jimenez's malicious prosecution claim. "Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice." *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 349, 733 N.E.2d 835, 842 (2000). It is undisputed that, however, Bogucki never knew about the threat to Romo, making it rather difficult to see how the threat could have any bearing on whether Bogucki had malice. *See Porter v. City of Chicago*, 393 Ill. App. 3d 855, 867, 912 N.E.2d 1262, 1272 (2009) (generally only information the police know about at the time is relevant to malice or probable cause elements of malicious prosecution).

Defendants argue that in *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 887 N.E.2d 656 (2008), three men wrongly accused of murder were allowed to present the testimony of the actual murderer to support their malicious prosecution claim even though it was not known to police at the time the three men were prosecuted. *Id.* at 96–98; 887 N.E.2d at 662–64. Defendants contend that this establishes that the Romo threat was admissible evidence of malice. In *Aguirre*, however, plaintiffs had a clear theory illustrating the relevance of the murderer's testimony on the issue of malice. Each plaintiff had been coerced to give a confession, and all of the confessions had

29

similar details even though the evidence established that the plaintiffs had not spoken while police interrogated them. *Id.* at 97–99; 887 N.E.2d at 663–64. The jury could infer from this either that plaintiffs actually committed the crime or that the police told them what to say, which if true would tend to establish malice. The testimony of the actual killer was relevant to show that plaintiffs' confessions were inaccurate and thus had to have been based on police suggestion rather than actual memories of the murder. *Id.* The same analysis does not apply here.

Defendants have offered no argument to show why, as in *Aguirre*, evidence of which Bogucki was not aware could tend to rebut the claim that he acted with malice. *Aguirre* is limited to situations where there is some link between evidence of guilt that was not known to police at the time and a party's theory of the case. *Porter*, 393 Ill. App. 3d at 867; 912 N.E.2d at 1272. It may even be limited to situations involving a coerced confession, which was not an issue in this case. *Gauger v. Hendle*, _ Ill. App. 3d _, 954 N.E.2d 307, 335 (2011).

Furthermore, Jimenez's alleged threat against Romo was not strongly probative even of consciousness of guilt. It is undisputed that when Jimenez purportedly threatened Romo, Romo had already told the police that Juan Carlos Torres was the actual shooter. At that point, Jimenez would have less reason to fear Romo's testimony. Defendants contend that the purported threat caused Romo's father to fabricate the tape of Torres confessing that he obtained. Although Romo's father testified in a deposition that he had heard about threats, he also testified that he was not nervous about the threats and could not remember any specific details. Def. Resp.

30

A 34

to Pl. Mot. in Limine, Ex. 13 at 75. In any event, the taped statement that Romo's father

obtained from Juan Carlos Torres is consistent with the story Romo had given before

he was allegedly threatened. This tends to further minimize the probative value of the

threat. An additional indication of the relatively low probative value of the threat

evidence is that defendants failed to ask Romo about the threat when he was on the

witness stand, even though the Court had not yet excluded the evidence at that time.

Tr. 749–51.

    In sum, the Court did not err in barring evidence of the threat against Romo. It

was not particularly probative, and it posed a considerable risk of unfair prejudice or jury

confusion. The jury could have been given a limiting instruction, but there would still

have been a risk of confusion or misuse of the evidence. "[E]vidence of threats on

witnesses can be highly prejudicial . . . [such evidence] appeals to the jury's

sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise

may cause a jury to base its decision on something other than the established

propositions in the case." *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996)

(internal quotation marks omitted).

    The evidence of the threat was also cumulative in a way that far outweighed its

probative value. *See* Fed. R. Evid. 403. Defendants were able to introduce and cross-

examine Jimenez about several letters that he wrote to his girlfriend at the time of the

murder that included threats against Tueffel for testifying against him. Tr. 666–75.

Jimenez claimed that the threats were taken out of context, but he did not deny that he

had made them. By contrast, the existence of a threat against Romo was disputed. At

his deposition, Jimenez denied making any threat to Romo (although he wrote while he

was in the home that he had gotten in trouble for saying he was going to kill someone).

Def. Ex. 9; Pl. Ex. C.  And Romo stated only that he heard of a threat from Jimenez

secondhand.  Pl. Ex. C.  These factors render the evidence less probative and minimize

any prejudice to defendants.  *Cf. Cobige v. City of Chicago*, 651 F.3d 780, 784–85 (7th

Cir. 2011) (defendants entitled to new trial when district court excluded evidence that

plaintiff decedent had a criminal record and was addicted to drugs, when that evidence

called into question how much enjoyment plaintiff got out of life and could have

significantly reduced damages).

      To support their argument, defendants cite a criminal case that notes that threats

made by a criminal defendant are routinely admitted to show consciousness of guilt.

*United States v. Blake*, 286 F. App'x 337, 340 (7th Cir. 2008) (unpublished).  That,

however, does not suggest that such evidence is always admissible irrespective of the

circumstances.  Cases in which a court says a trial judge did not abuse his discretion in

admitting evidence of a particular type do not amount to authority that a trial judge does

abuse his discretion in excluding such evidence.

      **3.**    **Jimenez's juvenile arrests**

      Defendants also sought to introduce evidence that Jimenez had been arrested

numerous times as a juvenile before he was arrested for Morro's murder.  Before trial,

the Court barred this evidence because it was irrelevant and pursuant to Rule 403, but

it specifically authorized defendants to offer evidence of the juvenile arrests to the

extent that they explained specific investigative decisions by Bogucki or other police.

Dec. 12, 2011 Pretrial Conf. Tr. 31–32. Defendants, however, made no attempt to

introduce any of the arrests for that purpose.  But because Jimenez's attorney opened

32

A 36

the door, the Court permitted defendants to elicit that Jimenez had previously been arrested, before his arrest for the Morro murder.

Defendants argue that they are entitled to a new trial because Jimenez's juvenile arrests resulted in him being charged as an adult. They state that his claimed damages are higher because he was charged as an adult, because if his case had been litigated in Illinois's juvenile system, he would have been released when he turned twenty-one. *People v. L.J.*, 274 Ill. App. 3d 977, 982, 654 N.E.2d 671, 674 (1995). Instead, Jimenez was incarcerated from the time he was thirteen until he was released at age twenty-nine. Defendants contend that because Bogucki did not cause Jimenez to be charged as an adult, he should have been able to argue to the jury that he was not responsible for all of the damages Jimenez suffered. *See Duncan v. Nelson*, 466 F.2d 939, 943 (7th Cir. 1972) (police who obtained illegal confession did not proximately cause the years plaintiff spent in prison when sentence was at the discretion of trial judge and thus were not liable for damages based on time of imprisonment).

The Court doubts the continued vitality of the holding in *Duncan*, because it calls into question the availability of any damages in a wrongful conviction case and is in serious tension with the principle that a tortfeasor takes the victim as he finds him. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision"). But even if *Duncan* still represents good law, the Court did not err by barring evidence of Jimenez's earlier

33

A 37

juvenile charges.  The decision to prosecute Jimenez as an adult was made by a state court judge.  The judge issued a two-page order, listing eight factors that justified treating Jimenez as an adult.  Def. Ex. 14.  One of those eight factors was that "Jimenez has had previous Juvenile Court involvement."  *Id.* at 1.  The order contains no analysis indicating the relative importance of the factors.  Three of the other factors listed were that Jimenez was charged with murder, the crime was aggressive and premeditated, and Jimenez possessed a deadly weapon at the time.  *Id.* at 1–2.  Given these factors, there is scarcely any basis to believe that Jimenez's prior arrests played a determinative role in whether he was charged as an adult.

The probation officer who recommended charging Jimenez as an adult stated that Jimenez's juvenile arrests were a factor in that recommendation.  Def. Ex. 13 at 27.  When asked at his deposition whether the arrests were "one of the major bases" for trying Jimenez as an adult, the probation officer replied only that "I think there were seven criteria for where you make that recommendation.  So that would be one of the criteria.  And it was definitely a reason, yes."  *Id.*  In sum, Jimenez's arrests appear to be no more than a single factor in what likely was nearly a foregone conclusion, specifically that a juvenile charged with committing a premeditated murder by firearm would be prosecuted as an adult.  *See L.J.*, 274 Ill. App. at 980–82, 654 N.E.2d at 673–75 (considering factors and ordering that fifteen-year-old accused of premeditated murder by firearm be tried as an adult).

Against the relatively small probative value of the arrests, the Court concluded, and continues to believe, that admission of the evidence would have posed a significant risk of unfair prejudice, confusing the issues, misleading the jury, and waste of time.

34

The jury could have been tempted to use Jimenez's history of arrests improperly as a factor affecting defendants' liability. *See Gregory v. Oliver*, No. 00 C 5984, 2003 WL 1860270, at *1–2 (N.D. Ill. Apr. 9, 2003). Additionally, one of defendants' contentions at trial was that Jimenez was guilty of the murder and that accordingly Bogucki was not liable. Tr. 269; *see* Dec. 7, 2011 Pretrial Conf. Tr. 57. The presence of this contention enhanced the likelihood that jurors might have improperly used Jimenez's previous arrests on the issue of liability, specifically as evidence that he was guilty of killing Morro. Finally, admission of evidence of the arrests would have required substantial additional trial time, to establish what the charges and the final disposition were. The Court concludes that it did not err in excluding this evidence.

### 4.    Prosecution of Juan Carlos Torres

Defendants contend that Jimenez should have been barred from introducing the fact that Juan Carlos Torres is being prosecuted for the Morro murder and from calling Torres to testify at trial.

Torres was charged for the murder on the same date that Jimenez's conviction was vacated at the behest of Cook County prosecutors. Given these circumstances, the fact that Torres has been charged was relevant and highly probative to establish that the charges against Jimenez had been dropped under circumstances indicative of innocence, an element of Jimenez's malicious prosecution claim. *See Swick v. Liautaud*, 169 Ill. 2d 504, 512–13, 662 N.E.2d 1238, 1242–43 (1996). Though defendants offered at the pretrial conference to concede that element, *see* Dec. 7, 2011 Pretrial Conf. Tr. 53, Jimenez was not required to accept the concession. And given

35

A 39

defendants' clear indication that they intended to argue that Jimenez had, in fact, committed the Morro murder, the evidence regarding Torres would have been relevant and admissible even if the "indicative of innocence" requirement had been eliminated.

In any event, the Court did not rule at the pretrial conference that Jimenez would be allowed to put into evidence the fact that Torres was under indictment. Rather, the Court specifically reserved ruling. *See id.* at 61.[1] At trial, Jimenez's counsel did not bring up the point in his opening statement. Defense counsel did so, however, stating:

> The State's Attorney got duped. Juan Carlos Torres got arrested. He hasn't had a trial. He's presumed innocent. He's going to get acquitted, and he's probably going to have his own trial, and somebody might be on his jury.

Trial Tr. 291-92. Having first brought the issue before the jury, defendants cannot now insist on a new trial on that basis. *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011).

In any event, defendants' contention that Jimenez had actually committed the Morro murder – a contention they previewed at the pretrial conference and repeated in their opening statement – made Torres's prosecution relevant. To put it another way, defendants opened the door to admission of this evidence and thus cannot now complain that it was admitted. (The Court again notes that at that point, it still had

---

[1] Defendants note that in an order the Court stated "Defendants' Motion No. 6 to bar references to the prosecution of Juan Carlos Torres is denied." Def. Reply at 26 n.13. This order was a summary drafted by the parties, purportedly based on the Court's oral rulings at the pretrial conference. To the extent it varied from the Court's specific oral rulings, the oral rulings control; indeed, the order specifically incorporated the Court's comments at the pretrial conference. At the conference, the Court clearly stated that it was reserving the question of the admissibility of the indictment of Torres. *See* Dec. 7, 2011 Pretrial Conf. Tr. 61.

36

A 40

under advisement whether it would admit evidence that Torres had been charged.)

Aside from any door-opening, the fact that Torres was charged with the murder was, together with the vacating of Jimenez's conviction, probative in rebutting defendants' contention that Jimenez was guilty after all. The Court acknowledges that the charge does not prove that Torres committed the murder. But that does not make it irrelevant. The Court offered at the pretrial conference to entertain a request for an instruction that the charge did not mean that Torres was guilty. *See* Dec. 7, 2011 Pretrial Conf. Tr. 52. But despite this invitation, defendants never proposed such an instruction. That aside, in a case in which the plaintiff claimed to have been wrongfully convicted not once but twice, there is no reason to believe that the jury would inappropriately believe that the fact Torres was charged proved his guilt.

Defendants claim that it was unfair for the Court to allow evidence related to Torres's prosecution as relevant to Jimenez's guilt and then later bar discussion of the threat against Romo which was also relevant to guilt. But as the Court has discussed, the Torres evidence was significantly more probative, and it did not pose the same risk of unfair prejudice.

Defendants also argue that Jimenez should not have been allowed to call Torres to testify at trial. In this regard, they do not argue that testimony by Torres regarding whether he committed the murder was irrelevant – nor could they, given their freely-chosen strategy of injecting into the case the contention that Jimenez was guilty after all. Instead, defendants take issue with the manner in which Torres was presented. Before trial, Torres's criminal counsel made it clear that if called to testify, he would claim his privilege against self-incrimination. Defendants contend that for this reason,

37

A 41

Jimenez should have been required to stipulate to what Torres would say if called to testify and should not have been permitted to present his self-incrimination claim live at trial.

Defendants have offered two cases to support their argument. *See United States v. Mabrook*, 301 F.3d 503, 507 (7th Cir. 2002) (witness should not be forced to take the stand, because the jury cannot draw any inference from exercise of Fifth Amendment privilege); *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980) (witness can be called even if he will assert Fifth Amendment privilege, but the potential for prejudice is very high). Both of these cases, however, are criminal cases in which it is impermissible to draw an inference from a witness's invocation of his Fifth Amendment privilege. *Mabrook*, 301 F.3d at 507. In a civil case, by contrast, the jury can draw a negative inference from a party's invocation of his Fifth Amendment privilege, and defendants do not suggest that the rule for witnesses in civil cases is any different.[2] *See Baxter v. Palmigiano*, 425 U.S. 308, 318–19 (1976) (recognizing general rule that parties in civil actions are subject to a negative inference if they refuse to testify). Thus the criminal cases that defendants cite are not controlling.

Defendants also cite *Old Chief v. United States*, 519 U.S. 172 (1997), another criminal case. In *Old Chief*, the Court held that a prosecutor could be forced to prove a defendant's prior conviction by stipulation, because testimony about the conviction conveyed no more information than a stipulation and bore a large risk of prejudice.

---

[2] Defendants do not challenge the Court's instruction to the jury that "[y]ou may, but are not required to, draw an inference from Mr. Torres's invocation of his Fifth Amendment privilege that truthful answers to the questions he was asked would have incriminated him." Jury Instructions (docket no. 287) at 10.

*Id.* at 190–92. The Supreme Court also recognized, however, that the situation was an unusual one and that even in criminal cases a prosecutor generally should not be forced to accept defense stipulations. *Id.* at 188–89. Defendants cite no authority suggesting that the Court's holding in *Old Chief* governs civil cases in which a witness plans to invoke his Fifth Amendment privilege, and they offer no authority to support the proposition that a party in a civil case is required to accept a stipulation in lieu of proving a point at trial. The Court also notes that defendants have not described any stipulation they proposed that would have conveyed the information that was conveyed by Torres's invocation of the Fifth Amendment.

For these reasons, the Court concludes that it did not abuse its discretion in allowing Jimenez to call Torres at trial or in permitting him to introduce evidence that Torres had been charged with the murder.

**D. Motion for judgment as a matter of law**

Defendants move for judgment as a matter of law on all of Jimenez's claims. Fed. R. Civ. P. 50(b). After trial, however, a party can move for judgment as a matter of law only on issues he raised before submission of the case to the jury. *Id.* A Rule 50(b) motion for judgment as a matter of law "is only a renewal of the preverdict motion, [and] can be granted only on grounds advanced in the preverdict motion." *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010) (internal quotation marks omitted).

> The earlier [preverdict] motion informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available. The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury.

Case: 1:09-cv-08081 Document #: 338 Filed: 07/11/12 Page 40 of 43 PageID #:5423

Fed. R. Civ. P. 50, advisory committee note, 2006 amendment.

It is undisputed that before the verdict, defendants moved for judgment as a matter of law only on Jimenez's conspiracy claim, arguing that there was no evidence that Bogucki had conspired with others. Tr. 2722. Defendants have thus forfeited any opportunity to argue for judgment as a matter of law on Jimenez's due process and malicious prosecution claims. *See Witherspoon v. City of Waukegan*, No. 06 C 7089, 2011 WL 1230986, at *4 (N.D. Ill. Mar. 30, 2011).

Defendants make several arguments that the contentions in their Rule 50(b) motion have not been forfeited. First, they argue that the issues presented in the motion are purely legal and thus are not forfeited as arguments based on the sufficiency of the evidence presented at trial. Although defendants are correct that one purpose of the forfeiture rule in Rule 50 is to allow the other party to provide additional evidence when the evidence already presented may not be sufficient, the requirement that a motion for judgment as a matter of law be made before submission of the case to the jury also serves to "alert[ ] the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury." Fed. R. Civ. P. 50, advisory committee note, 2006 amendment.

More importantly, defendants do not cite any authority recognizing that purely legal issues may be argued in a Rule 50(b) motion when they were not advanced in a Rule 50(a) motion. The cases they cite involve appellate court review of legal issues, not district court consideration of legal issues on a Rule 50(b) motion. *See Carlson v. Bukovic*, 621 F.3d 610, 617 n.13 (7th Cir. 2010) (appellate court could consider purely legal issues on appeal even though plaintiff had not filed any sort of Rule 50 motion);

40

*Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718–20 (7th Cir. 2003) (appellate court could review purely legal issues involved in denial of summary judgment even though plaintiff had not filed any Rule 50 motion at trial). Even if the Court were to agree that defendants' Rule 50(b) arguments are purely legal, the arguments are still forfeited in the Rule 50(b) context, based on the plain language of Rule 50. Fed. R. Civ. P. 50(b) & advisory committee note, 2006 amendment; *Wallace*, 606 F.3d at 418.

Defendants also argue that their position on Jimenez's due process claim has always been clear throughout this litigation and that similar arguments were raised at summary judgment and the preliminary jury instruction conference held off the record.[3] Again, however, defendants provide no authority to disregard the plain language of Rule 50. They cite *Laborers' Pension Fund v. A&C Envtl., Inc.*, 301 F.3d 768 (7th Cir. 2002), but in that case the moving party had made a Rule 50(a) motion. The nonmoving party's contention was simply that the motion was not sufficiently specific. *Id.* at 777–78. Unlike in *Laborers' Pension Fund*, defendants did not make a Rule 50(a) motion in this case that simply failed to give enough detail regarding the grounds for the motion. To the contrary, it is undisputed that defendants never made any Rule 50(a) motion for judgment as a matter of law on Jimenez's due process and malicious prosecution claims.

Defendants also cite *Petit v. City of Chicago*, 239 F. Supp. 2d 761, 767 (N.D. Ill. 2002). There, the court stated:

---

[3] The Court made it clear to all parties that the preliminary instruction conference would be held off the record but that the parties would have the opportunity to put any point they wished on the record.

41

A 45

> The Seventh Circuit has held that a failure to expressly state all grounds or expressly state a sufficient argument when the motion is presented at the close of evidence will not result in waiver if previously presented arguments (in an earlier Rule 50(a) motion, in trial briefs, in motions in limine, or summary judgment, or otherwise) have made the moving party's position clear for the court and opposing party.

*Id.* at 767. This, however, is not a situation in which defendants requested judgment on Jimenez's due process and malicious prosecution claim but simply failed to express all of the grounds they now advance or made only cursory arguments. Rather, they failed entirely to ask for judgment on these claims, on any ground at all. Neither the court's decision in *Petit* nor the Seventh Circuit cases it cites as support allow a district court to consider a Rule 50(b) motion requesting judgment on claims that were entirely ignored in the Rule 50(a) motion. *See Rankin v. Evans*, 133 F.3d 1425, 1431–32 (7th Cir. 1998) (Rule 50(b) motion not forfeited when defendant made Rule 50(a) motion and court and plaintiffs understood the grounds on which it was made); *Urso v. United States*, 72 F.3d 59, 61 (7th Cir. 1995) (Rule 50(b) argument not forfeited when party made Rule 50(a) motion but did not support it with argument, because position was clear and district court addressed Rule 50(b) on the merits).

Finally, defendants contend that because Jimenez raised new due process claims in his closing argument, the most appropriate time to ask for judgment as a matter of law on those claims is now. The premise of this argument is incorrect; Jimenez did not advance new *Brady* claims in closing argument. In any event, Defendants' only authority to support this contention is an inapposite case addressing when an issue must be raised in summary judgment briefing. *See Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (defendants had not waived

42

issue that was addressed in cursory fashion in opening brief, when response and reply briefs both contained full discussions of the issue).

In sum, defendants have forfeited the opportunity to contend via Rule 50(b) that they are entitled to judgment as a matter of law on Jimenez's due process and malicious prosecution claims. Accordingly, the Court declines to grant judgment as a matter of law in favor of defendants on those claims. To the extent defendants seek any judgment in their favor on the conspiracy claim, their only contention is that this claim is dependent on the due process claim. Because the Court has declined to enter judgment as a matter of law on the due process claim, this argument fails.

### Conclusion

For the reasons stated above, the Court denies defendants' motion for a new trial [docket no. 301] and their motion for judgment as a matter of law [docket no. 302].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 11, 2012

43

Order Form (01/2005) Case: 1:09-cv-08081 Document #: 266 Filed: 01/13/12 Page 1 of 4 PageID #:3761

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 8081 | **DATE** | 1/13/2012 |
| **CASE TITLE** | | Jimenez vs. Bogucki | |

**DOCKET ENTRY TEXT**

The Court grants in part and denies in part defendant's motion to preclude plaintiff's expert Gregg McCrary and plaintiff's motion to bar certain opinions of defendant's expert Michael Bumcrot as described below.

■[ For further details see text below.]                    Docketing to mail notices.

## STATEMENT

Defendant has moved to preclude plaintiff's police practices expert Gregg McCrary, and plaintiff has moved to bar certain opinions to be offered by defendant's police practices expert Michael Bumcrot. The Court grants each motion in part and denies each in part as stated below.

*Bumcrot.* Plaintiff seek to bar Bumcrot from testifying that the police had probable cause to arrest and prosecute plaintiff for murder. Defendant says that "Bumcrot will not opine that the officers had probable cause," Def. Resp. (dkt. no. 209) at 5, and the Court agrees that this opinion should be excluded. It is not inappropriate, however, for Bumcrot to testify that *if* one concludes that the police had probable cause to charge plaintiff, then proper police practice did not require them to further investigate others – in particular, Juan Carlos Torres – unless prosecutors directed them to do so. This is essentially the flip side of an opinion that plaintiff intends to offer via McCrary, and the Court sees nothing improper about it, because it involves a matter outside the ordinary ken of jurors on which an expert can contribute something meaningful that will assist the jury.

Plaintiff also seeks to preclude Bumcrot from testifying that the lineup in which plaintiff appeared was fair and not unduly suggestive. Defendant says that Bumcrot will testify only that because Tina Elder says the photograph she saw before viewing the lineup did not affect her, the lineup was fair. This goes a bit too far, because it amounts to a judgment of Elder's credibility, which is inappropriate. Bumcrot may, however, testify that *if* Elder is correct that the photograph did not affect her – a judgment that is appropriately reserved to the jury – then the lineup was fair. This, again, is essentially the flip side of an opinion that plaintiff intends to offer via McCrary.

*McCrary.* Defendant seeks to bar McCrary from testifying altogether, on two grounds. First, he contends that McCrary has insufficient expertise to opine regarding murder investigations because he "has no police

09C8081 Jimenez vs. Bogucki                                                          Page 1 of 3

A 48

Case: 1:09-cv-08081 Document #: 266 Filed: 01/15/12 Page 2 of 4 PageID #:3782

# STATEMENT

background." Def.'s Mot. to Bar (dkt. no. 206) at 2 (heading). That is incorrect. McCrary worked as an agent of the Federal Bureau of Investigation for twenty-five years. Though some Chicago police officers perhaps might not view FBI agents as "police," both are law enforcement officers. In addition, plaintiff notes, without dispute by defendant, that McCrary, regularly investigated violent crimes both as a law enforcement officer and as a consultant to police departments for fifteen years. For this and the other reasons noted in plaintiff's response to the motion, McCrary unquestionably has sufficient expertise and background to testify regarding proper police practice in investigating a violent crime.

Defendant's second general objection is that McCrary's opinion is improper, and will not assist the jury, because it merely reiterates plaintiff's theory of the case that defendant and others coerced witnesses and influenced witnesses to identify plaintiff as the perpetrator. The Court disagrees. Plaintiff says that McCrary will not opine that witnesses were coerced, tricked, or influenced, Pl.'s Resp. to Def.'s Mot. to Bar (dkt. no. 231) at 5, and the Court agrees that such testimony would be inappropriate. There is nothing inappropriate, however, in McCrary testifying – as plaintiff proposes – that if one believes certain witnesses and disbelieves others, then the defendant did not engage in proper police practices. It is likewise not inappropriate for McCrary to testify that *if* Tina Elder was permitted to see a photograph of plaintiff before seeing a lineup that included him, this was inappropriate police practice because it risked tainting the reliability of any resulting identification.

The Court also rejects defendant's argument that it is inappropriate for McCrary to testify regarding the steps a reasonable police investigation would have involved given certain facts and assumptions. By way of example, one of the hotly disputed matters in this case involves whether, following receipt of information that implicated another person (Juan Carlos Torres), defendant ignored that information and instead maliciously caused plaintiff to be prosecuted. McCrary has sufficient background and expertise to opine on these points, as plaintiff argues. In addition, the Court finds that his opinion will assist the jury in understanding these issues, which are relevant regarding (among other things) the issue of malice, and that the opinion does not simply involve, as defendant contends, application of common sense.

Defendant argues that McCrary should not be permitted to opine regarding what led Cook County prosecutors to agree to vacate plaintiff's conviction and what led Cook County judges to grant that motion and issue him a certificate of innocence. Plaintiff does not dispute this, and the Court agrees that these matters are outside McCrary's expertise.

Defendant also objects to McCrary rendering an opinion that defendant, in pursuing charges against plaintiff and failing to investigate Juan Carlos Torres, may have been influenced by "[c]ognitive biases such as tunnel vision, confirmation bias, anchor traps, organization momentum and groupthink." McCrary Report at 10. First of all, the Court is persuaded, based on McCrary's background and expertise, that he has the expertise and a sufficient foundation to testify that these sorts of biases may exist or sometimes influence how police investigations are conducted. Second, the Court finds that McCrary can appropriately testify regarding what these concepts mean, how they can influence police investigations, and how a reasonable police investigator not influenced by these factors should have conducted the investigation at issue in this case. The Court agrees with defendant, however, that it is inappropriate for McCrary to testify that defendant or other police investigators actually were motivated by these or other factors. That would amount to an improper opinion regarding the state of mind of the defendant. *See generally Dahlin v. Evangelical Child and Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002).

Finally, the Court disagrees with defendant's contention that he should be able to elicit from McCrary on cross examination an opinion that, as they put it, "a juvenile with plaintiff's background is likely to engage in

## STATEMENT

violent behavior." "  Def.'s Mot. to Bar (dkt. no. 206) at 8 (heading).  This is outside the subject on which plaintiff identified McCrary as an expert, and it is outside the scope of his report.  In addition, permitting testimony on this subject would, as plaintiff argues, run headlong into the prohibition of Federal Rule of Evidence 404(b) regarding "propensity" evidence, not to mention the fact that it would violate an *in limine* ruling that the Court made after extensive briefing and argument.

09C8081 Jimenez vs. Bogucki                                    Page 3 of 3

A 50

1    And then I think what we can see happening is as this

2    went along, is disconfirming evidence was sort of marginalized

3    or dismissed.  And what happens in this, there's a series of

4    things.  Tunnel vision sets in, and then there's a series of

5    these biases.  One is confirmation bias where you just look --

6  Q    Slow down.  What is confirmation bias?

7            THE COURT:  Hang on a second.

8            MR. HALE:  Could I have a sidebar?

9            THE COURT:  Sure.

10   (The following proceedings were had at sidebar in the

11   presence but out of the hearing of the jury:)

12            THE COURT:  Go ahead, Mr. Hale.

13            MR. HALE:  My understanding of your ruling was that

14   McCrary could talk about concepts like tunnel vision and

15   hypotheses, but what he could not do is he could not -- it

16   would be inappropriate for him to testify that the police

17   investigation in this case was motivated by these factors.

18            When Mr. Loevy asked him, did you see evidence of

19   that in this case, I think --

20            THE COURT:  Mr. Loevy.

21            MR. LOEVY:  Well, he doesn't -- he saw --

22            What I asked him was:  Do you see evidence of this?

23   And he's not -- the jury will decide whether they believe

24   there was tunnel vision or not.  I'm asking him:  What

25   evidence supports your hypothesis?

A 51

McCrary - direct

1    THE COURT:  I suppose you could look at this really

2  and say that it didn't really draw a clear line, but what

3  you're doing here is on the other side of it.

4    What I said is that he can appropriately testify

5  regarding what these various concepts mean, how they can

6  influence police investigations and how a reasonable police

7  investigator not influenced by these factors should have

8  conducted this particular investigation, but that he couldn't

9  testify that the police were actually motivated by these

10  factors.

11    And I think when he says that he saw -- he's really

12  doing the latter, so I'm going to strike the last answer.

13    MR. LOEVY:  Then when I do walk him through the

14  investigation, I don't want to screw it up.  I'm going to

15  say --

16    I can't say, does this prove it, but can I say, you

17  know, is this --

18    THE COURT:  Well, I mean, I think the opening that

19  you're left with here is that how reasonable police officers

20  not influenced by these factors should have conducted this

21  investigation.

22    MR. LOEVY:  Okay.

23    THE COURT:  But he can't testify about his view that

24  the tunnel vision, et cetera, did influence this.

25    MR. HALE:  Thank you.

1    MR. LOEVY:  Thank you.

2    MR. KAMIONSKI:  Thank you, Judge.

3    (The following proceedings were had in the presence and

4    hearing of the jury:)

5    THE COURT:  The last answer that was given right

6    before the sidebar is stricken, and the jury is directed to

7    disregard it.

8    Mr. Loevy, you can proceed.

9    MR. LOEVY:  Thank you, your Honor.

10   BY MR. LOEVY:

11   Q   Sir, you were explaining the next bias, the confirmation

12   bias.  Tell the jury what that is.

13   A   Yes.  Confirmation bias is a type of selective thinking in

14   which an individual is more likely to notice or search for

15   evidence that confirms a belief, then while either ignoring or

16   failing to search for information that disconfirms that

17   belief.

18   So it's closely related to tunnel vision where you

19   have a belief, and then confirmation bias sort of sets in

20   where you begin to search for or notice the evidence that

21   supports that belief and where the people then also either

22   disregard or marginalize information that disconfirms that

23   belief or they fail to search for any disconfirming evidence

24   at all.

25   Q   Now, you worked with police officers a lot as you've

1    one back in '93 and one more recently.  It would have been

2    very easy for him to just repeat those if it was true.  And

3    the fact that he didn't, you know, that's one of the reasons

4    why you can infer that his Fifth Amendment privilege or that

5    his truthful answers would have incriminated him.

6        On the defense side, I mean, I think it's open to the

7    defendant to argue that, A, you saw the lawyer sitting there.

8    The lawyer is the one who advised him to do that.  Don't read

9    anything into it.  But I think the instruction fairly states

10   the law, and the other part isn't necessary.

11       Next point.

12       MR. LOEVY:  That's it from the plaintiff, your Honor.

13       THE COURT:  Okay, defense.

14       MR. KAMIONSKI:  From the defense, we submitted a

15   particulars claim for the due process instruction.  That was

16   defendant's number 2.  And we expressed that when we left

17   summary judgment, there was certain things that we believed

18   were what was called material exculpatory evidence, and we

19   feel that certain things that the plaintiff's counsel may have

20   implied in closing arguments are -- in addition, we didn't

21   have much opportunity to respond to on summary judgment, and

22   we would have at the time.  And so we object to the not

23   including the particulars instruction number 2.

24       THE COURT:  All right.  And the reason I rejected

25   that is that although it's relatively common for a plaintiff

1   to try the case in the same way that they argue it on summary

2   judgment, there is no rule that says they have to.  And, you

3   know, a plaintiff only basically needs one genuine issue of

4   fact to defeat summary judgment, and so I think it's open to

5   the plaintiff to argue all of the evidence in the record and

6   not be limited to the particular theories they argued on

7   summary judgment.

8           Next point.

9           MR. KAMIONSKI:  The other instruction that we asked

10  to submit was the personal involvement instruction, the

11  Seventh Circuit pattern.  And we think it is important in this

12  case given the allegations surrounding a lot of other people

13  involved in the case, and even though the instruction says the

14  word "defendant," it's important that, you know, that is why

15  the Seventh Circuit has that personal involvement instruction,

16  and that's why we asked for it to be given in this case.

17          THE COURT:  So the reason that I didn't -- or that I

18  overruled that objection and not giving that instruction is

19  two reasons.

20          Number one, on each one of the claims, the

21  instructions as worded clearly require the jury to find that

22  the defendant, which is defined on page 10 as Mr. Bogucki, did

23  something.

24          And, secondly, the personal responsibility

25  instruction I think would be confusing in a case in which

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)
————————————————

In accordance with Fed. R. App. P. 32(a)(7)(C)(i), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(I), as enlarged by this court's order of January 7, 2013, granting leave to file a brief of no more than 23,000 words, because it contains 22,631 words, beginning with the words "JURISDICTIONAL STATEMENT" on page 1 and ending with the words "Respectfully submitted" on page 81. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was WordPerfect X3.

s/ Jonathon D. Byrer
JONATHON D. BYRER, Attorney

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30
————————————————

In accordance with Circuit Rule 30(d), I certify that the short appendix to this brief contains all of the materials required by Circuit Rule 30(a) & (b).

s/ Jonathon D. Byrer
JONATHON D. BYRER, Attorney

## CERTIFICATE OF SERVICE
————————————————

I certify that on January 18, 2013, I electronically filed the attached Brief and Short Appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jonathon D. Byrer
JONATHON D. BYRER, Attorney