No. 12-2779

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

THADDEUS JIMENEZ,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 09-cv-08081
The Honorable Matthew F. Kennelly, District Judge, Presiding

## SUPPLEMENTAL APPENDIX
## VOLUME 1 OF 5

STEPHEN R. PATTON
Corporation Counsel
  of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, Illinois 60602
(312) 744-0746

BENNA RUTH SOLOMON
  Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
  Chief Assistant Corporation Counsel
JONATHON D. BYRER
  Assistant Corporation Counsel
Of Counsel

# TABLE OF CONTENTS OF SUPPLEMENTAL APPENDIX

## Volume 1

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
      Report of Proceedings .......................................... SA 1

## Volume 2

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
      Report of Proceedings (continued) ............................ SA 288

## Volume 3

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings .......................................... SA 575

## Volume 4

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings (continued) ............................ SA 841

## Volume 5

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings (continued) ............................ SA 1106

CCCR-310

# Transcript of Record
## Appeal
### to
APPELLATE    Court of Illinois
FIRST    District

*94-4358*

Circuit Court No. _____ 93 CR 14710
Trial Judge _____ CHRISTY S. BERKOS
Reviewing Court No. _____ 94-4358

THE PEOPLE OF THE STATE OF ILLINOIS

## vs.

THADDEUS JIMENEZ

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

VOLUME FIVE OF SIX VOLUMES

REPORT OF PROCEEDINGS, ONLY

AURELIA PUCINSKI

Clerk of Co—

Per _____ AP/GL

JIM01757

SA1

STATE OF ILLINOIS )
)  SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS )
)
VS )  Indictment No. 93-CR-14710
)
THADDEUS JIMINEZ )  Before JUDGE CHRISTY BERKOS
and a Jury

Friday, September 30, 1994

Court convened pursuant to adjournment.

APPEARANCES:

HON. JACK O'MALLEY,
State's Attorney of Cook County, by
MR. JOHN MURPHY and
MR. DAVID GAUGHAN,
Assistant State's Attorneys,
appeared for the People;

MS. RITA FRY,
Public Defender of Cook County, by
MR. KENDALL HILL and
MS. CYNTHIA BURKE,
Assistant Public Defenders,
appeared for the defendant.

Jeanne Rathbun, CSR
Official Shorthand Reporter
Circuit Court of Cook County
Criminal Division
License No. 084-001014

FILED

MAR 2 2 1995

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

JIM01758

SA2

<u>I N D E X</u>

Date of Hearing:  <u>September 30, 1994</u>

Page Numbers:  <u>B-1</u> to <u>B-222</u>

<u>PROCEEDINGS</u>

Opening Statement

  By Mr. Murphy ....................... Page B-12

  By Mr. Hill ........................ Page B-18

| LIST OF WITNESSES | DX | CX | RDX | RCX |
|---|---|---|---|---|
| Mary Morro | B-20 | | | |
| Tina Elder | B-24 | B-41 | B-51 | B-54 |
| Phillip Torres | B-57 | B-83 | B-106 | |
| Dr. Barry Lifschultz | B-111 | B-122 | | |
| Larry Tueffel | B-124 | B-140 | B-159 | B-162 |
| Sandra Elder | B-163 | B-180 | B-183 | |
| Lawrence Ryan | B-185 | B-192 | B-199 | |
| Donna Cosmen | B-200 | B-207 | | |
| Shawan Cosmen | B-208 | B-213 | | |

JIM01759

B-2

SA3

1     THE CLERK:  The People of the State of Illinois

2  versus Thaddeus Jiminez.

3              (The following proceedings were

4             outside the presence and hearing

5             of the jury:)

6     THE COURT:  Good morning, Thaddeus.

7     MR. JIMINEZ:  Good morning.

8     THE COURT:  Do you plan to go into the questioning

9  of those letters in the opening statement?  I can rule

10  now or later.

11     MR. MURPHY:  Judge, actually that's fine.  We

12  don't have to go into it at this time, and we would

13  not intend on calling that witness today anyway, so

14  it's not a problem.

15     THE COURT:  Very good.

16     MR. HILL:  Judge, you don't want to argue that

17  motion?

18     THE COURT:  No, I might have a little more time to

19  check some law.  Do you have some law on it?

20     MR. HILL:  No, your Honor, not yet.  I haven't had

21  a chance.

22     THE COURT:  Do you have a copy of this motion,

23  state have a copy of this motion?

24     MR. MURPHY:  Yes, Judge, we do.

JIM01760

B-3

SA4

1    THE COURT: I don't know what the state's
2    intention, something about the defendant was known to
3    carry a .25 caliber and they saw him with a .25
4    caliber. When?

5    MR. HILL: Your Honor, this witness said they saw
6    him around Christmastime with a .25 caliber. There's
7    another witness who will testify and say he saw him
8    with a .25 caliber all the time. That's not relevant
9    to this case. There's no evidence, A, that this
10   victim died due to a gunshot wound of a .25 caliber.
11   It's my understanding the evidence will come out it
12   was a .22 caliber, and I don't see any relevance in a
13   .25 caliber except to be prejudicial.

14   MR. GAUGHAN: Your Honor, we have no intention --
15   the police reports make reference to one of the
16   witnesses having seen the defendant with a .25 caliber
17   gun around Christmastime. We have no intention of
18   referring to it or asking our witnesses about it.

19   THE COURT: I would say we would grant this
20   motion.

21   MR. GAUGHAN: We are not going to bring any
22   reference to the witnesses, what it says in the police
23   reports about the witness seeing him with a .25
24   caliber gun around Christmastime. There will be no

JIM01761

B-4

SA5

1    reference to that or any other .25 caliber gun.

2        Judge, I also have at this time two motions.

3    THE COURT: That motion of the defense will be

4    granted, just so it's on the record.

5        Do you have a motion?

6    MR. GAUGHAN: Yes, your Honor. At this time,

7    Judge, I have several motions in limine. The first

8    one would be one of the witnesses we believe the

9    defense intends to call is a person by the name of

10   Victor Ramos, who is a juvenile co-defendant in this

11   case.

12       We would have a motion in limine that the

13   defense be precluded from mentioning in their opening

14   statement, from referring in any manner throughout the

15   trial or from making any reference whatsoever to any

16   statements that Victor Ramos made to the police

17   through his testimony at Juvenile Court or anything

18   else, because it is rank hearsay and it is a prior

19   inconsistent statement that's inadmissible according

20   to the law.

21   THE COURT: Statements made to the police?

22   MR. GAUGHAN: And also testimony.

23   THE COURT: Outside the presence of the defendant

24   and the victim and so forth?

JIM01762

B-5

SA6

1    MR. GAUGHAN:  Yes.  And also, Judge, to his

2  testimony at Juvenile Court based on the fact that we

3  believe it's going to be a prior consistent statement

4  which is absolutely inadmissible.  According to the

5  law it's rank hearsay.

6    THE COURT:  If it's a prior consistent statement,

7  of course he cannot make it.  Do you understand?  Do

8  you have any objection to that?

9    MR. HILL:  No, I'm basically going to say what he

10  will testify to, he will testify to in court here.

11    THE COURT:  He's not going to testify concerning

12  any statements?

13    MR. HILL:  I'm not going to say what he said to

14  somebody else, I'm going to say what he's going to

15  testify here.

16    MR. GAUGHAN:  Judge, just so it's clear, I also

17  object to any questions such as, "Isn't this what you

18  told the police," or, "Didn't you testify to this

19  before."

20    MR. HILL:  I will only do that if you make some

21  insinuation that he's sitting there making a recent

22  fabrication.  Other than that, there's no problem.

23    THE COURT:  That will be granted.  Will you

24  instruct your witness also?

JIM01763

B-6

1    MR. HILL:  Okay.

2    MR. GAUGHAN:  Your Honor, we'd also have a motion

3  in limine that no reference be made at any point

4  throughout the trial to the defendant's denial to the

5  police when he was arrested because we believe that

6  that would also be a prior consistent statement as

7  well as, Judge, any references made about any juvenile

8  background of any witnesses that are testifying and

9  any arrests of any of the witnesses that did not

10  result in convictions.

11    THE COURT:  Can we take these one at a time?

12    MR. GAUGHAN:  Yes, Judge.

13    THE COURT:  Are you planning on having this

14  defendant's prior consistent statement that he denied

15  to the police?

16    MR. HILL:  Not at this point, no, your Honor.

17    THE COURT:  Well, at any point, unless the door

18  opens.

19    MR. HILL:  If they open the door, I'm going right

20  in it, your Honor.

21    THE COURT:  That will be granted on the basis of

22  the present set of circumstances.

23    What's your other one?

24    MR. GAUGHAN:  Judge, also that no reference be

JIM01764

B-7

1    made or anything be brought up about the juvenile

2    backgrounds of any witnesses testifying.  We believe

3    that's inadmissible.

4        THE COURT:  Both state and defense?

5        MR. GAUGHAN:  Yes.

6        THE COURT:  Any objection?

7        MR. HILL:  If I can have just a second.  No

8    problem.

9        THE COURT:  That applies to both the state and

10   defense.  That will be granted.

11       MR. GAUGHAN:  Also, your Honor, that no reference

12   be made or any questions asked regarding any arrests

13   of any witnesses that did not result in any

14   convictions.

15       THE COURT:  That's granted.

16       MR. HILL:  Your Honor, I hope that that doesn't

17   include any pending case.

18       THE COURT:  Pardon?

19       MR. HILL:  Any pending case, if he's charged with

20   an offense that's pending.

21       THE COURT:  Pending cases?

22       MR. GAUGHAN:  No, Judge, that's agreed.  It

23   doesn't include any pending cases.

24       THE COURT:  Well, that can be --

JIM01765

B-8

1      MR. GAUGHAN:   Thank you, your Honor.

2      THE COURT:   As far as any arrests which did not

3   result in convictions, that will be granted with the

4   exception to any pending cases which may -- any cases

5   pending against a witness if the question of motive to

6   testify is an issue.

7      MR. GAUGHAN:   And your Honor, we'd also have a

8   continuing motion to exclude all witnesses.

9      THE COURT:   Both state and defense have made the

10  motion to exclude all witnesses.   Any witnesses who

11  will be testifying in this case for the state or the

12  defense will be excluded from the courtroom or they

13  will not be permitted to testify.   Any witnesses

14  there?

15     MR. HILL:   Yes, there's one, your Honor.   She's

16  leaving.

17     THE COURT:   State see any witnesses of theirs in

18  the audience?

19     MR. MURPHY:   No.   Judge, to make sure, the mike

20  doesn't go all the way in the back, does it?

21     DEPUTY SHERIFF:   No.

22     THE COURT:   I guess we're ready to bring the jury

23  out.   Bring the jury out.

24

JIM01766

B-9

SA10

1          (The following proceedings were

2          within the presence and hearing

3          of the jury:)

4     THE COURT:  You may be seated.

5          Good morning, everybody.  Sorry we're getting

6     started a little late because I guess one of the

7     jurors had a car problem.  That happens.

8          Will you swear in this jury?

9          (Jurors sworn to try the issues.)

10    THE COURT:  Member of the jury, you have now been

11    selected and sworn as jurors in this case and your

12    verdict will decide the disputed issues of fact.

13         The court will decide all questions of law

14    that may arise.  You will receive instructions of the

15    law by the court at the close of the case.

16         From this point on, do not discuss this case

17    with anyone, including your family, your friends, or

18    even among yourselves until such time as you have

19    heard all the evidence, all the arguments of counsel,

20    and you have received the instructions on the law by

21    the court and you are actually back there

22    deliberating.

23         Avoid listening to any television or reading

24    any newspapers while this case is on.  I don't think

JIM01767

B-10

1   that's really going to be a problem at this point, I'm

2   sure it's not going to be, but if you were to

3   accidentally hear something about this case, just turn

4   off your TV or radio or put your fingers in your ears

5   or something.

6        Avoid visiting the scene of the occurrence

7   unless you are instructed to do so as a body by the

8   court.

9        Now, from time to time I will rule on the

10  evidence.  Do not refer from my rulings that I have

11  any opinion on the case.  If I sustain an objection to

12  a question or document, do not speculate as to what

13  the answer was or what the document was, just forget

14  about it entirely and don't draw any inferences from

15  that.

16       If you have any problem at all, do not

17  hesitate to bring it to the attention of the deputies.

18  They are here to serve you in any way they can.

19       Does anybody have a slight hearing problem

20  where they'd be a little more comfortable closer to

21  the witness?  Does anybody have medication problems

22  where they take their medication in intervals of less

23  than an hour and 15 minutes, say?  Okay.  Now,

24       Do not linger in the hallways where you can

JIM01768

B-11

1  possibly overhear discussions between the lawyers and

2  the various witnesses.  If anyone speaks to you, has

3  spoken to you, or attempts to influence you in any way

4  prior to your verdict, it's your absolute duty to

5  report that to the court.

6       All right.  We'll now begin with the opening

7  statement.  State ready?

8       MR. MURPHY:  Yes, we are, Judge.

9       THE COURT:  You may proceed.

10                    OPENING STATEMENT

11                    By Mr. Murphy:

12       Good morning, ladies and gentlemen.  Ladies

13  and gentlemen, in case you don't remember, my name is

14  John Murphy and my partner is Dave Gaughan, and we

15  represent the People of the State of Illinois in this

16  case, the People of the State of Illinois versus

17  Thaddeus Jiminez.  That is this individual right here,

18  the defendant.

19       Ladies and gentlemen, now is the time when

20  you are going to learn what this case is about and you

21  are going to learn that this is a case about a young

22  man who had the courage to tell a neighborhood

23  gangbanger not to flash gang signs in front of young

24  children, and that cost him his life.

JIM01769

B-12

SA13

1    accomplice, the co-defendant who is not on trial here

2    today and his name was Victor Ramos.

3         The evidence in this case is going to show,

4    ladies and gentlemen, that when Ramos and the

5    defendant approached Eric Morro, Ramos grabbed Morro

6    and threw him against a wall.

7         The defendant then took a handgun out from

8    his clothing, walked up to the victim, held the gun

9    right over the left side of his chest, pointed it at

10   his chest and fired one shot into his body.  And as

11   Eric Morro took his last steps toward the street, his

12   last steps in life, these two, Romo and this man right

13   here, fled into the night.

14        When the defendant in this case killed Eric

15   Morro, he was 13 years old, 13.  Why?  Why does a

16   13-year-old shoot down a person in cold blood?

17      MR. HILL:  Judge, objection, your Honor, that's

18   argumentative.

19      THE COURT:  I'll reserve my ruling, overruled.

20   I'll reserve it at this point.

21      MR. MURPHY:  Why does a 13-year-old walk up to a

22   person in a street and shoot him in cold blood?

23        Well, ladies and gentlemen, you're going to

24   learn that the defendant was a full-fledged member of

JIM01770

B-14

SA14

1   a street gang called the Simon City Royals.  He was

2   proud to be part of that gang and he was proud of his

3   gang.

4        You will learn, ladies and gentlemen, that

5   everyone who knew him, his friends, his acquaintances,

6   even the police officers, some police officers that

7   had contact with him, he let them know, he let them

8   know he was a gang member.  And he let them know that

9   he was a Simon City Royal.

10       And as you would expect, you might expect

11  gang members to do, earlier that day on February 3,

12  1994, he was flashing his gang signals.  He was

13  flashing his gang signals in the neighborhood, and

14  when he was doing that he was flashing them at a bus

15  and there were a number of young children in and

16  around the area where he was doing it.

17       Eric Morro happened to be there at the time,

18  and Eric Morro told him to take it somewhere else,

19  don't do that in front of the kids.  Take it somewhere

20  else.

21       And he took offense.  He took offense that

22  somebody told him to flash his gang symbols somewhere

23  else.  And he argued, he got upset, he argued with

24  Eric Morro and he threatened Eric Morro.  That's why

JIM01771

B-15

1  this murder occurred, ladies and gentlemen.  That's

2  what this case is about.

3         And in his haste, in his haste to kill Eric

4  Morro because he was insulted or his gang was

5  insulted, he was oblivious to the fact that there were

6  people on the street, that there were people on

7  Belmont who were standing there watching him when he

8  fired the gun, or he just didn't care.

9         Four people, ladies and gentlemen, were in

10 and around the area of the shooting when this

11 occurred.  Tina Elder, who will testify in this case,

12 was crossing Belmont Avenue from the south side to the

13 north side, and as she was crossing she observed the

14 shooting.

15        Sandra Elder, her mother, was walking just

16 behind her at the time of the shooting.  She also saw

17 it as well.

18        Phillip Torres, Phillip Torres lived by an

19 empty lot right next to where the shooting occurred,

20 and it just so happened that he happened to be looking

21 out his window and in fact had his head out the window

22 talking to Tina at the time that the shooting

23 occurred.  He had a bird's eye view of the defendant,

24 of the other offender with him, and of Eric Morro when

5

JIM01772

B-16

SA16

1    this occurred.

2    And Larry Tueffel. Larry Tueffel, a person

3    who was with Eric Morro, was right down there in the

4    street, right in the area where the shooting occurred.

5    And you will learn, ladies and gentlemen,

6    that three of these witnesses, three of these

7    witnesses identified this man right here, the

8    defendant, as the person who shot Eric Morro when they

9    viewed a lineup.

10    Eric Morro a person who managed for 19 years

11    of his life to avoid getting involved in gangs.

12    Ironically, he died as a result of a gang-motivated

13    shooting.

14    Ladies and gentlemen, during the course of

15    this trial, you are going to have a chance and a

16    unique opportunity to listen to eyewitnesses, to hear

17    eyewitnesses testify about what they heard and about

18    what they saw.

19    And we ask you, ladies and gentlemen, we ask

20    you listen to them carefully. Watch them when they

21    testify and picture in your minds the story, the image

22    that they are giving you when they testify here,

23    because if you do, you will reach the inescapable

24    conclusion that Thaddeus Jiminez committed a

JIM01773

B-17

SA17

1  cold-blooded murder on February 3, 1993, and that he

2  should be convicted.  Thank you.

3      THE COURT:  Thank you, counsel.  Counsel, Mr.

4  Hill?

5                    OPENING STATEMENT

6                    By Mr. Hill:

7          Ladies and gentlemen of the jury, I'm going

8  to tell you right off, right off the bat, Thaddeus

9  Jiminez did not shoot and kill Eric Morro.  In fact,

10 he wasn't even there.  And you will hear clearly.

11         Now, the state wanted to make you believe

12 that this is about gangs.  It's not.  There was an

13 incident that happened three hours earlier, but that's

14 not relevant to what happened at 6:25.

15         What happened at 6:25 was that Thaddeus, who

16 was 13 and in school, was at home, and you will hear

17 witnesses testify that he was at home, at home

18 playing, watching television, had been there since

19 4:30.

20         Now, they say that they have four

21 eyewitnesses.  One they say couldn't identify him, two

22 of them who gave other stories, who knew Thaddeus

23 before they talked to the police, and yet when they

24 talked to the police they didn't even mention

                                            JIM01774

                          B-18

                      SA18

1 Thaddeus.

2      And the other one who was outside did not

3 talk to the police for some time.  He said it happened

4 so fast and she was concerned with her kids.  But

5 there's going to be another witness here that's going

6 to tell you the truth, and that's Victor Ramos.

7      Victor was there.  Victor has been convicted

8 of this, and Victor is going to tell you that Thaddeus

9 was not there too.  He's going to tell you that

10 somebody named Juan Carlos Torres was the one who was

11 with him.  He's going to tell you that Juan Carlos

12 Torres is the one that shot Eric Morro, and that

13 Thaddeus was not there.

14      I'd ask you to have an open mind and listen

15 clearly to all of the evidence and judge the

16 credibility, but also remember that you made a

17 commitment to give Thaddeus and this court to judge

18 and be fair and impartial.

19      Don't be bulldozed and threatened into

20 finding him guilty because he might have been a member

21 of a gang.  We all have associations and we are not

22 guilty by association.

23      Make sure that they can prove him guilty

24 beyond a reasonable doubt, and if they can't you

**JIM01775**

B-19

SA19

1    promised you would sign a not guilty verdict, and they

2    can't because he wasn't there.

3         So at the end of this case I'm going to ask

4    you to do what you promised and that is to find him

5    not guilty.  Thank you.

6       THE COURT:  Thank you, counsel.

7       MR. GAUGHAN:  Your Honor, the people would call

8    Mary Morro.

9                          (Witness sworn.)

10      THE COURT:  You may proceed, counsel.

11        Keep your voice nice and loud so the jury can

12   hear you.  You may proceed.

13                    MARY MORRO,

14   a witness called on behalf of the People of the State

15   of Illinois, having been first duly sworn, was

16   examined and testified as follows:

17                  DIRECT EXAMINATION

18            By Mr. Gaughan:

19      Q  Ma'am, could you please state your name and

20   spell your name for the ladies and gentlemen of the

21   jury?

22      A  My name is Mary Morro, M-o-r-r-o.

23      Q  Ma'am, how old are you?

24      A  I'm 43.

JIM01776

B-20

1    Q  Do you have a family?

2    A  Yes.

3    Q  What people are in your family?

4    A  Nathan, Herbie, and there was Eric.

5    Q  Ma'am, I want to direct your attention back to

6    February of 1993.  Before February 3rd, when was the

7    last time you talked to your son Eric?

8    A  I talked to him a week before that.

9    Q  How old was he at that time?

10   A  He was 18.

11   Q  Did you talk to him on the phone?

12   A  Yes.

13   Q  How did he sound to you when you talked to him

14   on the phone?

15   A  He sounded fine.

16   Q  I want to direct your attention to February 4th

17   of 1993.  Did you receive a phone call?

18   A  Yes.

19   Q  What was the nature of that phone call?

20   A  I had to go identify his body.

21   Q  Ma'am, I'm going to show you what I have marked

22   as People's Exhibit Number 1 for purposes of

23   identification.  Do you recognize what that photograph

24   is?

JIM01777

B-21

1      A   Yes.

2      Q   What is that photograph?

3      A   That was his eighth grade graduation.

4      Q   Does that photograph accurately show how Eric

5   looked when he was in eighth grade?

6      A   Yes.

7      Q   Miss Morro, after you received the phone call,

8   did you go to the county morgue?

9      A   Yes.

10     MR. GAUGHAN:  Your Honor, at this time the people

11   would proceed by way of stipulation.

12     THE COURT:  Would you explain to the jury what a

13   stipulation is?

14     MR. GAUGHAN:  Ladies and gentlemen, a stipulation

15   is the agreement between the parties, the state's

16   attorneys and the defense, that if a particular

17   witness were asked certain questions, she would give

18   the testimony.  It's agreed between the parties that

19   that's the testimony she would give, as if she was

20   actually being asked the questions.

21          It would be stipulated by and between the

22   parties, ladies and gentlemen, the People of the State

23   of Illinois, State's Attorney's Office, through the

24   State's Attorney Jack O'Malley and his assistants,

JIM01778

B-22

SA22

1    John Murphy and David Gaughan, and through the defense

2    that if Miss Morro were shown the picture of People's

3    Exhibit Number 2, she would identify that picture as

4    her son, Eric Morro, as he appeared when she went to

5    the county morgue on February 4th of 1993 and

6    identified his body.  So stipulated?

7        MR. HILL:  Yes, so stipulated.

8        MR. GAUGHAN:  Q  Miss Morro, was your son Eric a

9    gang member?

10       A  No, he wasn't.

11       MR. GAUGHAN:  I have no further questions, your

12   Honor.

13       THE COURT:  Cross examination?

14       MR. HILL:  No questions, your Honor.

15       THE COURT:  You will be excused, ma'am.

16                              (Witness excused.)

17       THE COURT:  You can remain in the courtroom.

18                              (Witness sworn.)

19       THE COURT:  Ma'am, keep your voice nice and loud

20   so the jury can hear you.  You may proceed.

21                   TINA ELDER,

22   a witness called on behalf of the People of the State

23   of Illinois, having been first duly sworn, was

24   examined and testified as follows:

                                        JIM01779

                              B-23


SA23

1                    DIRECT EXAMINATION

2                    By Mr. Gaughan:

3       Q   Tina, in a nice loud voice, will you please

4    introduce yourself to the ladies and gentlemen of the

5    jury?

6       A   Tina Elder.

7       Q   Spell your last name.

8       A   E-l-d-e-r.

9       Q   Tina, how old are you?

10      A   22.

11      Q   Do you have any children?

12      A   Two.

13      Q   How old are your children?

14      A   Six and 18 months.

15      Q   Tina, I want to direct your attention back to

16   February 3rd of 1993 at about 6:15, 6:30 in the

17   evening.  Did you have occasion to be in the area of

18   3018 West Belmont?

19      A   Yes, I was.

20      Q   Why were you in that area?

21      A   Visiting my mother.

22      Q   Where was your mother?

23      A   At Wally's Lounge.

24      Q   Where is Wally's Lounge located?

JIM01780

B-24

1     A   3018 Belmont.

2     Q   Is it 3017?

3     A   Yes.

4     Q   Across the street from 3018?

5     A   Correct.

6     Q   Does she work at Wally's?

7     A   No.

8     Q   Did you actually go into Wally's?

9     A   Yes, I did.

10    Q   Did you see your mother?

11    A   Yes, I did.

12    Q   How long were you in the bar?

13    A   For about five minutes.

14    Q   Did you have anything to drink?

15    A   No, I didn't.

16    Q   Why did you go into the bar to see your mother?

17    A   To get money from my mother.

18    Q   Tina, after you went in the bar and you came

19    out of the bar, what happened?

20    A   I was walking across the street and my mom was

21    talking to Phillip Torres.

22    THE COURT:  Keep your voice up.

23    THE WITNESS:  I was talking to Phillip Torres out

24    the window.

JIM01781

B-25

1     MR. GAUGHAN:   Q  Let me stop you for one minute.

2  Where was Phillip Torres when you were talking to him?

3     A  In his window.

4     Q  Where did Phillip Torres live?

5     A  3018 Belmont.

6     Q  3012?

7     A  3012.

8     Q  Was it right across the street from the bar?

9     A  Yes.

10    Q  What window was he talking to you out of?

11    A  Out of the third floor window.

12    Q  As you were talking to him, what happened?

13    A  My mom called my name because I had forgotten

14  my radio in the bar and I looked, I turned my head and

15  I saw Eric.

16    Q  Let me stop you for one minute.  When your mom

17  called your name, where was she?

18    A  In the middle of the street.

19    Q  After your mom called your name, what did you

20  see?

21    A  Eric struggling with somebody.

22    Q  Who was Eric?

23    A  A friend.

24    Q  Would that be Eric Morro?

JIM01782

B-26

1     A  Eric Morro, yes.

2     Q  Who did you see him struggling with?

3     A  With a kid in a Duke's jacket.

4     THE COURT:  I'm sorry?

5     THE WITNESS:  A kid in a Duke's jacket.

6     MR. GAUGHAN:   Q  Do you see that kid in the Duke's

7  jacket today in court that you saw on the street

8  struggling with Eric Morro?

9     A  Yes.

10     Q  Could you please identify him for the ladies

11  and gentlemen of the jury?

12     A  Right over there.

13     Q  Could you point out something he's wearing?

14     A  Pardon me?

15     Q  Point out something he's wearing.

16     A  The brown jacket.

17     MR. GAUGHAN:  Your Honor, I'd like it to be

18  indicated for the ladies and gentlemen of the jury

19  that Tina Elder has identified the defendant, Thaddeus

20  Jiminez.

21     THE COURT:  For my clarification and perhaps for

22  the jury, what kind of a jacket was it?

23     THE WITNESS:  Brown.

24     THE COURT:  A Duke's jacket?

JIM01783

B-27

1      THE WITNESS:  The Duke's jacket.

2      THE COURT:  What's a Duke's jacket?

3      THE WITNESS:  A starter jacket.

4      MR. GAUGHAN:  Q  You mean the Duke basketball

5  team, Duke College basketball team?

6      A  Yes.

7      Q  Now, when you saw the guy in the Duke's jacket

8  struggling with Eric, who else was there?

9      A  Larry.

10      Q  Who is Larry?

11      A  Eric's friend.

12      Q  Do you know what Larry's last name is?

13      A  Tueffel.

14      Q  Was there anybody else out there?

15      A  Yeah, another kid wearing dark clothes.

16      Q  Did you recognize who that person was?

17      A  No, I didn't.

18      Q  Were you with anybody, Tina?

19      A  My daughter.

20      Q  How old was your daughter at that time?

21      A  Four.

22      Q  Now, you said that the kid in the Duke's jacket

23  was struggling with Eric.  Where were they at when

24  they were struggling?

JIM01784

B-28

SA28

1      A   By the curb.

2      Q   In front of what building?

3      A   Honey Baked Ham.

4      Q   Can you describe for the ladies and gentlemen

5   of the jury exactly what you saw when you saw the

6   defendant struggling with Eric Morro?

7      A   I saw Eric struggling with the kid in the

8   Duke's jacket.

9      THE COURT:  You have to keep your voice a little

10  louder.

11     THE WITNESS:  I saw the kid struggling with Eric

12  in the Duke's jacket and then the kid in the dark

13  clothes.

14     MR. GAUGHAN:  Q   Let me stop you for a minute.

15  When you say the kid struggling, are you referring to

16  the defendant who you identified?

17     A   Yes.

18     Q   When he was struggling with Eric, what was the

19  kid in the dark clothes doing?

20     A   He grabbed Eric's arm and pushed him up against

21  the wall.

22     Q   Would that be the wall of the Honey Baked Ham?

23     A   Honey Baked Ham.

24     Q   Do you know where Larry was at this time?

1    A  No, I don't.

2    Q  After the kid with the dark clothes pushed Eric

3  up against the wall, what happened?

4    A  The kid in the Duke's jacket put the gun on his

5  chest and shot him.

6    Q  Who did he shoot?

7    A  Eric.

8    Q  Tina, when the kid in the Duke's jacket shot

9  Eric, where was your mother?

10    A  In the middle of the street.

11    Q  Where was your little 4-year-old daughter?

12    A  Right next to me.

13    Q  After you saw the kid in the Duke's jacket

14  shoot Eric, what did you do?

15    A  I was telling my daughter get up the stairs,

16  get up the stairs.

17    Q  Get up the stairs where?

18    A  To go up in Phil's.

19    Q  Where was Phil at?

20    A  Running down the stairs at that time.

21    Q  Where was Phil at when the actual shot

22  happened?

23    A  In the window.

24    MR. GAUGHAN:  May I approach the witness, your

JIM01786

B-30

SA30

1    Honor?

2         THE COURT:  You may.

3         MR. GAUGHAN:  Showing counsel a series of

4    photographs.

5              (Exhibits proffered to counsel.)

6         MR. GAUGHAN:  Q  Tina, I'm going to show you a

7    series of photographs and I'm going to ask you to

8    identify those.  People's Exhibit Number 3 for

9    identification, what does that photograph depict?

10        A  Honey Baked Ham and half of the lot.

11        Q  Is this the Honey Baked Ham where you saw the

12   defendant shoot Eric?

13        A  Yes.

14        THE COURT:  What was the picture?

15        MR. GAUGHAN:  Honey Baked Ham.

16        THE COURT:  What's Honey Baked Ham?

17        THE WITNESS:  It's a ham place.

18        THE COURT:  That's the store?

19        THE WITNESS:  Yes, it's like a meat market sort of

20   place.

21        THE COURT:  Is this where the shooting allegedly

22   took place?

23        THE WITNESS:  Yes.

24        THE COURT:  Okay.  Be a little more clear so the

JIM01787

B-31

SA31

1    jury understands what we're looking at.  Because I

2    don't know, I assume they don't know.

3        MR. GAUGHAN:  Q  What part of the Honey Baked Ham

4    store does that photograph depict?

5        A  The shutters, a wall.

6        Q  Were the shutters down when the defendant shot

7    Eric?

8        A  Yes.

9        Q  Does this photograph depict where Eric was

10   pushed up against the wall?

11       A  Yes.

12       Q  Could you please take a pen and put a circle

13   where Eric was when he got shot?

14       A  (Indicating.)

15       Q  Does this photograph show where anybody else

16   was standing?  Speak up.

17       A  Yes, the kid in the dark clothing.  Want me to

18   mark that too?

19       Q  Where was the kid in the dark clothing?  Put a

20   D for that.

21       A  Next to Eric.  Okay.

22       Q  I'm going to show you what's been marked as

23   People's Exhibit Number 4 for identification.  What

24   does that photograph depict?

                                              JIM01788

                        B-32

SA32

1    A   Honey Baked Ham.

2    Q   What's in the background of that photograph?

3    A   The lot and Phil's.

4    THE COURT:  What?

5    THE WITNESS:  The lot, the the empty lot and

6    Phil's.

7    THE COURT:  The lot and Phil's?

8    MR. GAUGHAN:  Q   Tina, I'm going to show you a

9    picture of People's Exhibit Number 5 for

10   identification.  What does that photograph depict?

11   A   Honey Baked Ham.

12   Q   Is that the front of the building where the

13   defendant shot Eric Morro?

14   A   Yes.

15   Q   Tina, I'd like to show you People's Exhibit

16   Number 6 for purposes of identification.  What does

17   that photograph depict?

18   A   Belmont Avenue, empty lot, Phil's.

19   Q   Does it show the window that Phil was looking

20   out of when you were talking to him?

21   A   Yes.

22   Q   And is that the top window of the building?

23   A   Correct.

24   THE COURT:  Will you mark that?

JIM01789

B-33

1      MR. GAUGHAN:  Q  Could you put a big circle around

2   the window Phil was looking out of?

3      A  (Indicating.)

4      Q  I'm going to show you People's Exhibit Number 7

5   for purposes of identification.  What does that

6   photograph depict?

7      A  The street, Belmont.

8      Q  What specific buildings are depicted in that

9   photograph?

10      A  Phil's, the empty lot, Honey Baked Ham.

11      Q  Tina, do all these photographs accurately show

12   the way Belmont Avenue, the Honey Baked Ham, and

13   Phil's or the way that area looked back in February of

14   1993?

15      A  No, it's different.

16      Q  How is it different?

17      A  Phil's is redone and the yellow poles of the

18   lot were not there.

19      Q  Tina, the following day, on February 4th of

20   1993, did you have occasion to go to the police

21   station located at Grand and Central?

22      A  Yes.

23      Q  And at about 10:00 o'clock in the morning, did

24   you do anything at that police station?

JIM01790

B-34

SA34

1      A   Yeah, I looked at a lineup.

2      Q   When you looked at the lineup, what did the

3   police say to you before you looked at the lineup?

4      A   That they would like me to come in and look at

5   a lineup.

6      Q   Did you in fact look at a lineup?

7      A   Yes, I did.

8      Q   When you looked at that lineup, did you

9   identify anybody?

10     A   Yes, I did.

11     Q   Who did you identify?

12     A   Him sitting right there.

13     Q   I'm sorry?

14     A   Him sitting right there.

15     Q   When you say him sitting right there, who are

16   you referring to?  Please point to him.

17     A   (Indicating.)  Him.

18     Q   The defendant?

19     A   Yes.

20     Q   Tina, I'm going to show you what I have marked

21   as People's Exhibit Number 8 for purposes of

22   identification.  Do you recognize what that photograph

23   is?

24     A   The lineup.

JIM01791

B-35

SA35

1    Q   Who did you pick out in that lineup?

2    A   Him.

3    Q   You're pointing to somebody?

4    A   The kid that shot Eric.

5    Q   Is that the second person over from the left?

6    A   Yeah.

7    THE COURT:  Are you going to mark that?

8    MR. GAUGHAN:   Q   Put an X over his head.

9    A   (Indicating.)

10   Q   I'm going to show you what's been marked as

11   People's Exhibit Number 9 for identification.  Do you

12   recognize what that photograph is?

13   A   Yes.

14   Q   What's that a photograph of?

15   A   The shooter.

16   Q   When you say the shooter, are you referring to

17   the shooter, the person who shot Eric Morro on

18   February 3rd?

19   A   Yes.

20   Q   Do those pictures accurately depict the way the

21   shooter looked when you viewed him on February 4th of

22   1993?

23   A   Besides he had a jacket on.

24   MR. GAUGHAN:  Your Honor, I'd like to ask the

JIM01792

B-36

SA36

1    witness to step down from the stand.

2        Q   (By Mr. Gaughan)   Tina, would a diagram of the

3    area help you in explaining your testimony to the

4    ladies and gentlemen of the jury?

5        A   Yes.

6        THE COURT:   Is that an exhibit number?

7        MR. GAUGHAN:   Judge, this will be People's Exhibit

8    Number 10 for purposes of identification.

9        Q   (By Mr. Gaughan)   Tina, could you please step

10   down here for the ladies and gentlemen of the jury?

11       First, Tina, I'd like you to point out on

12   this diagram where the bar is at that you went to see

13   your mother.

14       A   Right here.

15       Q   I'd like you to point out where the Honey

16   Baked --

17       THE COURT:   Sometimes you're too close, all the

18   jurors can't see it.   That's awfully close.   If the

19   jurors can't see it, let us know.

20       MR. GAUGHAN:   Q   Tina, could you please point out

21   where Wally's bar is where you went to see your

22   mother?

23       A   Right there.

24       Q   Could you please write Wally's in there.

JIM01793

B-37

SA37

1       A   (Indicating.)

2       Q   And could you point out on this diagram where

3   the Honey Baked Ham is at?

4       A   (Indicating.)

5       Q   Above that could you please write Honey Baked

6   Ham or H.B. something to identify it?

7       A   (Indicating.)

8       Q   Next to the Honey Baked Ham is that the vacant

9   lot you were referring to?

10      A   Yes.

11      Q   That's already marked?

12      A   Yes.

13      Q   What's the building to the right of the vacant

14  lot?

15      A   Phil's.

16      Q   Above that could you write Phil's?

17      A   (Indicating.)

18      Q   Tina, first I'd like you to point out on the

19  diagram where Victor Morro was, excuse me Eric Morro

20  was when the defendant shot him?

21      A   (Indicating.)

22      Q   I'd like you to take a black sticker and put on

23  that diagram where Eric Morro was when he got shot.

24      A   (Indicating.)

JIM01794

B-38

SA38

1     Q  And Tina, I'd like you to point out for the

2   ladies and gentlemen of the jury on this diagram where

3   the defendant Thaddeus Jiminez was when he shot Victor

4   Morro.

5     A  Right here.

6     Q  Could you please take a blue sticker and put

7   that on the diagram?

8     A  (Indicating.)

9     Q  Tina, could you please point out for the ladies

10  and gentlemen of the jury where Victor Ramos was when

11  the defendant, Thaddeus Jiminez, shot Eric Morro?

12    A  Right beside him.

13    Q  Could you please take a red sticker and put

14  that on this diagram?

15    A  (Indicating.)

16    Q  Tina, I'd ask you now to point out for the

17  ladies and gentlemen of the jury where you were

18  standing when you saw the defendant, Thaddeus Jiminez,

19  shoot Eric Morro?

20    A  Right here.

21    Q  Please take a green sticker and put that there.

22    A  (Indicating.)

23    Q  Now, could you please point out for the ladies

24  and gentlemen of the jury where Phil was when you were

1     talking to him when the defendant shot Eric Morro?

2         A   Up in the window here.

3         Q   Would that be the third floor window of his

4     building?

5         A   Correct.

6         Q   And when he was talking to you, what was he

7     doing when he was talking to you?

8         A   Looking down.

9         Q   Was the window open?

10        A   Yes, he was hanging out the window.

11        Q   Now, when the defendant, Thaddeus Jiminez, shot

12    Eric Morro, where was your mother standing?

13        A   In the middle of Belmont.

14        Q   Could you just point out where that was at?

15        A   Right here.

16        Q   Do you know where Larry Tueffel was at that

17    time?

18        A   No, I don't.

19        Q   You can have a seat again.  Thank you, Tina.

20            Tina, this person you identified in court

21    today, the defendant, Thaddeus Jiminez, did you know

22    him before February 3rd of 1993?

23        A   No.

24        Q   Did you know Eric Morro?

JIM01796

B-40

SA40

1    A   Yes.

2    Q   Was Eric Morro in a gang?

3    A   No.

4    MR. GAUGHAN:  I have no further questions, Judge.

5    THE COURT:  Cross examination.

6                    CROSS EXAMINATION

7                    By Mr. Hill:

8    Q   Miss Elders, you said on February 4th the

9    police contacted you?

10   A   Yes.

11   Q   And they contacted you and told you that they

12   wanted you to view a lineup, is that correct?

13   A   Correct.

14   Q   And they informed you that they felt that they

15   had the person, is that right?

16   A   I don't remember.

17   Q   But you wouldn't have been going to view a

18   lineup for any other reason, would you?

19   MR. MURPHY:  Objection, form of the question.

20   THE COURT:  Sustained as to the suggestion, that

21   the police suggested.

22   MR. HILL:  Q   When they contacted you and asked

23   you to view a lineup, you knew it was in regards --

24   A   I knew what it was in regards to, yes.

                                        JIM01797

                        B-41

SA41

1    Q  And they gave you the indication that they

2  might have the person, is that right?

3    A  I guess.

4    Q  Did they pick you up?

5    A  No.

6    Q  You drove?

7    A  My mother drove me.

8    Q  Now, you talked to your mother that evening

9  after the incident, is that right?

10    A  Yeah, at the hospital.

11    Q  And she informed you she had talked to the

12  police?

13    A  Yes.

14    Q  She talked to the police?

15    A  I don't know if she talked to the police.  I

16  know the police were at the hospital, but I don't know

17  if she talked to them.

18    Q  You didn't talk to the police, did you?

19    A  No, I didn't.

20    Q  First time that you talked to the police or the

21  first time that you had any contact, direct contact

22  with the police was at ten o'clock that next morning,

23  is that right?

24    A  Well, they called me.

JIM01798

B-42

1    Q   That was the first time you had any contact,

2  correct?

3    A   Correct.

4    Q   Now, this happened at 6:25?

5    A   Correct.

6    Q   And you were at the hospital?

7    A   Yes.

8    Q   And the police were at the hospital?

9    A   Yes.

10    Q   Did you tell the police that you knew something

11  about it then?

12    A   No, I came later.

13    THE COURT:  Let her answer the question.

14    THE WITNESS:  I came to the hospital later.

15    MR. HILL:  Q   You came later, but the police were

16  there, right?

17    A   Right.

18    Q   Did you tell the police then that you knew

19  something about this?

20    A   I did not talk to the police, I was very sick.

21    Q   Now, did you tell -- did you call -- what time

22  did you leave the hospital?

23    A   It was late, it was at night.

24    Q   I'm sorry?

JIM01799

B-43

SA43

1      A  It was night.  I'm sorry, I don't know what

2  time it was.

3      Q  What time did you wake up the next morning?

4      A  About 5:00 o'clock in the morning.

5      Q  5:00 o'clock?  Now, in between 5:00 o'clock and

6  10:00 o'clock, did you call the police and tell them

7  that you had some evidence regarding this?

8      A  No, I didn't, because the police called me.

9      Q  They called you at 5:00 o'clock?

10     A  Somewhere in between there, yes.

11     Q  Somewhere in between what five and ten or five

12  and six?

13     A  About five and seven, I'd say.

14     THE COURT:  Five?

15     THE WITNESS:  A.M.

16     THE COURT:  From 5:00 o'clock to 7:00 o'clock?

17     THE WITNESS:  Somewhere in between there, your

18  Honor.

19     MR. HILL:  Q  Now, what time -- you woke up on

20  your own, right?

21     A  Correct.

22     Q  Now, did you look -- you got to the police

23  station about ten o'clock?

24     A  Ten o'clock.

JIM01800

B-44

SA44

10

1     Q   Now, you said that Eric was a good friend of

2  yours?

3     A   Yes.

4     Q   In fact, your mother and Eric lived in the same

5  building, isn't that right?

6     A   Yes.

7     Q   So you knew Eric a long time?

8     A   Very long time.

9     Q   Now, that night when you left Wally's, you came

10  across the street?

11    A   Correct.

12    Q   Were you going to your car?

13    A   Correct.

14    Q   Was your car parked toward Honey Baked or was

15  it parked on the other side of Phil's?

16    A   It was in the middle where like where my dot is

17  on the thing, that's where my car was.

18    Q   So you were standing right at your car, is that

19  right?

20    A   Right.

21    Q   And Phil stuck his head out the window?

22    A   Right.

23    Q   Did Phil stick his head out of the front window

24  or the side window?

JIM01801

B-45

1      THE COURT:  Saw who?

2      MR. HILL:  Thaddeus, Thaddeus Jiminez.

3      THE COURT:  Make sure the jury knows T.J. is, for

4   the record, Thaddeus.

5      MR. HILL:  Q  Now, you said that you know Phil

6   Torres?

7      A  Yes.

8      Q  And do you know that he has a cousin by the

9   name of Carlos Juan Torres?

10      A  No.

11      Q  Now, when you went to view the lineup, did you

12   look at -- in Exhibit 8 there were five people in that

13   lineup, is that right?

14      A  Yes.

15      Q  And when you went, you looked at all five

16   people first, didn't you?

17      A  Yes.

18      Q  And thought about it, right?

19      A  I didn't have to think.

20      Q  But you looked at all five?

21      A  Yes.

22      Q  Now, the person you say shot, that person was

23   left-handed, the gun was in his left hand?

24      A  I'm pretty sure, yes.

JIM01802

B-48

SA46

1    Q  And she was active and you were having a

2  conversation with Phil, is that right?

3    A  Uh huh.

4    Q  And the next thing you know is you saw a

5  scuffle, is that right?

6    A  Correct.

7    Q  And part of that scuffle was that Eric took a

8  swing at one of the gentlemen, is that right?

9    A  Correct.

10    Q  And after Eric took a swing, there was a shot,

11  right?

12    A  Correct.

13    Q  And it happened real fast, right?

14    A  Yes.

15    Q  And then they took off, right?

16    A  I guess, yes.

17    Q  When you heard the shot, you grabbed your

18  child, right?

19    A  Yes.

20    Q  And started pushing her up towards the stairs

21  this way, right?

22    A  Yes.

23    Q  Now, you never saw T.J. before, had you?

24    A  No.

JIM01803

B-47

1       Q   I'm sorry?

2       A   I think so, yes.

3       Q   You think.  Are you sure or not?  Hello.

4       A   I'm thinking.  No, it was in his right hand.

5       Q   Do you recall testifying about this matter

6  before?

7       A   Yes.

8       Q   And do you recall being -- if I could have just

9  a second.  Do you recall being asked this question and

10  giving this answer?  Page 69, line 10.  Do you recall

11  being asked this on May 7, 1993.

12          "Think back on what you saw that evening.

13      Can you envision in your mind the individual who

14      fired the gun holding the gun up against Mr.

15      Morro's chest?  Do you have a picture of that in

16      your mind?  His left hand.  So he had the gun in

17      his left hand?"

18          Do you recall being asked that?

19      A   Yeah, I recall that.

20      MR. MURPHY:  Objection.

21      MR. HILL:  Q   Do you recall being asked his left

22  hand?

23      A   Yes.

24      Q   Was that your answer then?

JIM01804

B-49

SA48

1    A  Yes.

2    Q  So the gun was in his left hand, is that

3  correct?

4    A  Yeah.

5    Q  As you think back about it now?

6    A  Yes.

7    Q  And you gave that answer back on May 7, 1993?

8    A  Yes.

9    Q  If I can have a second, your Honor.

10       Now, you knew Larry Tueffel too, right?

11    A  Yes.

12    Q  And when you first saw him, he was with Eric,

13  is that right?

14    A  Correct.

15    Q  And you knew Phil pretty well too, is that

16  right?

17    A  Correct.

18    Q  And in fact, when you heard the shot you felt

19  so comfortable that you were trying to run up to

20  Phil's with the kids, is that right?

21    A  I told my daughter to go upstairs.

22    MR. HILL:  If I can have just a minute.

23       No further questions.

24    THE COURT:  Redirect?

JIM01805

B-50

SA49

1                    REDIRECT EXAMINATION

2                        By Mr. Gaughan:

3      Q   Tina, when you were asked that question when

4  you testified in Juvenile Court, you were asked that

5  by the defense lawyer, correct?

6      MR. HILL:  Judge, I would object.

7      THE COURT:  Overruled.

8      THE WITNESS:  Is that Carmen.

9      MR. GAUGHAN:  Q  The lawyer for the co-defendant,

10  correct?

11     A   Yes.

12     Q   And before he asked you that question, he asked

13  you -- this is page 68, counsel.

14     MR. HILL:  I'm sorry?

15     MR. GAUGHAN:  Q  Page 68.  He asked you the

16  question:

17          "Okay, and what, by the way, what hand was he

18      holding the gun with?"

19          Do you recall being asked that?

20     A   Not really.

21     Q   Do you recall giving the answer, "I don't

22  know?"

23     A   Yes, I remember that.

24     Q   And then do you recall him asking you:

                                        JIM01806
                        B-51

SA50

1        "Well, can you demonstrate if you think back

2    and remember what hand the individual who had the

3    gun, what hand he was holding it in?"

4    A  Yeah.

5    Q  And then you said, "No, I don't."  And then it

6    was on the third time after the defense lawyer, that

7    was when he asked you the question thinking back about

8    envisioning it, isn't that correct?

9    A  Uh huh.

10   Q  As you sit here today, as you testify, are you

11   sure which hand he had the gun in?

12   A  Not really sure.

13   Q  Now, you didn't talk to the police at the

14   hospital, right?

15   A  No.

16   Q  You talked to your mother, correct?

17   A  Yes.

18   Q  And you knew that your mother had given the

19   police your name as a witness.

20   MR. HILL:  Objection to what she knew regarding

21   her mother.

22   THE COURT:  She said she saw her mother talking to

23   the police at the hospital.

24   MR. HILL:  That was not the question, your Honor.

**JIM01807**

B-52

SA51

1          THE COURT:  Read the question back.

2                              (Record read.)

3          MR. HILL:  That's hearsay.

4          THE COURT:  Sustained as to that question.

5          MR. GAUGHAN:  Q  Well, the police called you the

6     next day, right?

7          A  Yes.

8          Q  When you went in to view the lineup, did you

9     talk to anybody about who was in the lineup?

10         A  No.

11         Q  Did anybody till you who to pick out in the

12    lineup?

13         A  No.

14         Q  Did you view that lineup alone, by yourself,

15    with the police standing next to you?

16       . A  Yes.

17         Q  Were any of the other witnesses to this case

18    present when you picked out the defendant as the

19    person?

20         MR. HILL:  Judge, I would object.  This is beyond

21    the scope.

22         THE COURT:  Overruled.  Not beyond the scope,

23    overruled.

24         MR. GAUGHAN:  Q  Tina, was anybody else present in

JIM01808

B-53

SA52

1    that room in the lineup when you picked out the

2    defendant as the person who shot Eric Morro?

3        A   Just the police.

4        Q   Did they say anything to you about who it was?

5        A   No.

6        Q   Eric was a good friend of yours, right?

7        A   Very good.

8        Q   And when you said you were sick, you didn't

9    talk to the police, you were sick, why were you sick?

10       A   Because Eric was killed.

11       MR. GAUGHAN:   I have no further questions, your

12   Honor.

13       THE COURT:   Redirect?

14                    RECROSS EXAMINATION

15                    By Mr. Hill:

16       Q   When you said -- when you testified last time

17   you testified under oath, right?

18       A   Correct.

19       Q   To tell the truth, right?

20       A   Right.

21       Q   When you told them finally it was in the left

22   hand, that was the truth as you recall it, is that

23   right?

24       A   That's what I think, yes.

JIM01809

B-54

SA53

1    MR. HILL:  Thank you.  No further questions.

2    MR. GAUGHAN:  No further questions, your Honor.

3    THE COURT:  Thank you, you will be excused.

4                        (Witness excused.)

5    THE COURT:  Well, it's 12:30 and I guess it's time

6    for lunch.

7         I always tell the jury that now that you are

8    officials jurors, lunch is on the house, it's free,

9    and when you eat it you will know why it's free.  Once

10   in awhile they tell me it's fair.  Lots of luck.  See

11   you back here about 1:30.

12                   (The following proceedings were

13                   outside the presence and hearing

14                   of the jury:)

15   MR. HILL:  Judge, I'd like to make -- I didn't

16   want to make it during his opening and we discussed

17   this during the motion in limine, but I'd like to

18   reiterate my continuous motion regarding the gang

19   stuff, as well as I'd like to make a motion for a new

20   trial -- a motion for mistrial based on the

21   insinuation and the highly inflammatory evidence

22   regarding the gang information during the opening

23   statement.

24   THE COURT:  Gang?

JIM01810

B-55

SA54

1     MR. HILL:  Yes.

2     THE COURT:  Reference to gangs?

3     MR. HILL:  Reference to gangs.

4     THE COURT:  I'm assuming the state is going to be

5 in a position to prove it, or if not, you can bring

6 that, certainly bring it up in your closing argument

7 and I will consider your motion at that time.  At this

8 point I can't.  I expect them to prove it or they

9 shouldn't have made it, but your motion, your

10 continuous objection to the motion will be noted.

11     MR. HILL:  Okay, your Honor.  Thank you very much.

12           (A recess was taken, after which

13           the following proceedings were

14           outside the presence and hearing

15           of the jury:)

16     THE COURT:  Are we ready for the jury?  Bring the

17 jury out.

18           (The following proceedings were

19           within the presence and hearing

20           of the jury:)

21     THE COURT:  14 out of 14, we didn't lose anybody.

22 How was lunch?

23     Ready to go?

24     MR. MURPHY:  Yes, we are, Judge.

JIM01811

B-56

1      THE COURT:  Next witness.

2      MR. MURPHY:  Judge, the people call Phillip

3  Torres.

4                              (Witness sworn.)

5      THE COURT:  Keep your voice nice and loud.

6                      PHILLIP TORRES,

7  a witness called on behalf of the People of the State

8  of Illinois, having been first duly sworn, was

9  examined and testified as follows:

10                    DIRECT EXAMINATION

11                    By Mr. Murphy:

12     Q  Would you please state your name and spell your

13  last name for the court reporter?

14     A  Phillip Torres, last name T-o-r-r-e-s.

15     Q  And Phil, what area do you live in?

16     A  Chicagoland.

17     Q  And Phil, who do you live with?

18     A  My wife, two kids, and one on the way.

19     Q  Phillip, are you working now?

20     A  No, sir.  I get disability.

21     Q  Phillip, I want you to think back to the date

22  of February 3, 1993.  Do you remember that day?

23     A  Yes.

24     Q  And where were you living at that time?

JIM01812

B-57

1    A  3012 West Belmont.

2    Q  That would be on the north side of Belmont

3  Avenue, is that correct?

4    A  Correct.

5    Q  How far down were you from Sacramento?

6    A  Half a block, if that.

7    Q  And where did you live at that address, was

8  that a house or was that an apartment building?

9    A  Apartment building.

10    Q  Where in that apartment building did you live?

11    A  On the third floor in the attic.

12    Q  And Phil, did you have any windows that were

13  adjacent to Belmont Avenue?

14    A  Yes.

15    Q  How many?

16    A  Three.

17    Q  Now, Phil, on the date of February 3, 1993, a

18  little before 6:30 in the evening, do you remember

19  where you were at?

20    A  Yes, I was looking out my front room window.

21    Q  So you were in your apartment, is that right?

22    A  Correct.

23    Q  And what window were you looking out?

24    A  My front room window.

**JIM01813**

B-58

SA57

1      Q  I'm sorry, let me ask the question another way.

2  Which street does that window face?

3      A  On Belmont Avenue.

4      Q  And as you were looking out your front window,

5  did you see anybody out in the street?

6      A  Yes, I did.

7      Q  Who did you see?

8      A  Mrs. Elder and Tina Elder coming from the bar

9  across the street.

10     Q  Now, where is that apartment, the apartment

11  that you were in at that time in relation to the bar

12  across the street?

13     A  Almost directly across the street.

14     Q  The bar that was across the street, what's the

15  name of that?

16     A  Wally's.

17     Q  Now, when you say you were out, you were

18  looking out your window, can you describe to the

19  ladies and gentlemen of the jury what you mean?

20     A  I was leaning out the window, half from here

21  out the window.

22     Q  Phillip, this was in February, is that right?

23     A  Right.

24     Q  Why were you leaning out the window that far

JIM01814

B-59

1   during that time of the year?

2       A   Just looking.

3       Q   Why was that?

4       A   I seen Tina and her ma coming from the bar

5   across the street.   Their son was upstairs at my

6   house.

7       Q   Who is that?

8       A   Johnny Elder.

9       Q   What did you say, if anything, when you saw

10  Tina and her mom coming out of the bar across the

11  street?

12      A   I do not remember exactly what I was talking

13  about.

14      Q   Who did you talk to?

15      A   Tina.

16      Q   When you talked to Tina, where was she at?

17      A   Coming towards my house.

18      Q   What street -- was she on the street or off the

19  street?

20      A   Probably right in the middle of the street.

21      Q   And was she walking toward you as you were

22  talking to her?

23      A   Yes.

24      Q   Where was her mother?

JIM01815

B-60

1     A   Still in the bar.

2     Q   And at some point did her mother come out of

3   the bar after Tina had come out?

4     A   Yes.

5     Q   While you were talking to Tina, did you see

6   anybody else on the street on Belmont Avenue?

7     A   Yes, I did.

8     Q   Who did you see?

9     A   I seen Eric and Larry walking eastbound on my

10   side of the street coming towards my apartment

11   building.

12     Q   So they would be on the sidewalk directly

13   underneath your window, would that -- not directly

14   underneath but that sidewalk, is that right?

15     A   Yes.

16     Q   And would they be on your right or on your left

17   as you were looking out the window?

18     A   To my right.

19     Q   Now, you said Eric.  Who is Eric?

20     A   Eric Morro.

21     Q   Did you know Eric Morro at that time?

22     A   Yes, I did.

23     Q   How well did you know Eric Morro?

24     A   Many years.

JIM01816

B-61

SA60

1    Q   Approximately how many years did you know him,

2  as best you can estimate?

3    A   Eight.

4    Q   Now, you also said that Eric Morro was with

5  somebody named Larry, is that right?

6    A   Yes.

7    Q   What's Larry's full name, do you know?

8    A   Larry Trumbull.

9    Q   Would it be Tueffel?

10    A   Tueffel, yes.

11    Q   Did you know Larry Tueffel at that time?

12    A   Yes, I did.

13    Q   How long had you known Larry Tueffel?

14    A   Couple years.

15    Q   In addition to Larry and Eric, did you see

16  anybody else out in the street?

17    A   Yes, I did.

18    Q   Who did you see?

19    A   I seen this guy in the suit, brown suit.

20  MR. MURPHY:  May the record reflect the witness

21  has pointed to the defendant, Thaddeus Jiminez.

22  THE COURT:  All right.

23  MR. MURPHY:   Q  Did you see anybody else with the

24  guy you pointed out in the brown suit?

JIM01817

B-62

1      A   Yes.

2      Q   Who was that?

3      A   Hispanic, dark clothes.

4      Q   Where did you see these two guys?

5      A   Coming from Whipple.

6      Q   And were they together or were they walking

7   separately?

8      A   They were together.

9      Q   Did you know -- the guy you just pointed out in

10  the courtroom here today, the fellow with the brown

11  suit, did you know him before February 3, 1993?

12     A   Yes, I did.

13     Q   How did you know him?

14     A   He was at my mother's apartment one night.

15     Q   And was he there with a large group of people?

16     A   Yes.

17     Q   Was he there at your invite or was he there

18  with somebody else?

19     A   With my stepbrother.

20     Q   And had you seen him other times besides that

21  night?

22     A   Yes.

23     Q   Would that be around the neighborhood?

24     A   Yes.

JIM01818

B-63

1      Q  Did you know his name or did you know him by

2  any name on February 3, 1993?

3      A  Yes, T.J.

4      Q  When you saw T.J. walking down the street, did

5  you see him wearing anything?

6      A  Yes, he was wearing a Duke jacket.

7      Q  That's the University of Duke?

8      A  I believe so.

9      Q  Phil, when you saw the defendant walking down

10  the street with this other individual, did you

11  recognize the other individual that he was with?

12      A  No, I did not.

13      Q  Had you seen that person, to your knowledge,

14  ever before around your area?

15      A  No, I did not.

16      Q  What happened then?

17      A  I was continuing talking to Tina and her

18  mother, then I looked to my right and I see the

19  Hispanic kid grab Eric and throw him up against the

20  shutters of Honey Baked Ham.

21      Q  Now, the Hispanic kid, is that the kid that was

22  with T.J?

23      A  Yes, it was.

24      Q  And I'm going to ask you, Phil, if you would,

JIM01819

B-64

1   to step down from the witness stand and as best you

2   can, if I were Eric, would you please show the ladies

3   and gentlemen of the jury how the Hispanic kid threw

4   him against the wall?

5       A  Eric was like this, and he spun him like that

6   and pushed him up against the wall.

7       MR. MURPHY:  For the record, Judge, the witness

8   has placed both of his hands on my right arm and moved

9   me from approximately a 45 degree angle over into the

10  wall.

11      THE COURT:  Okay.

12      MR. MURPHY:  Q  You can sit back down.  Phil,

13  after you saw the Hispanic kid throw Eric up against

14  the wall, could you tell us what you saw next?

15      A  The Hispanic kid stepped into the street off

16  the sidewalk, then I seen T.J. take his hand and put

17  it up against Eric's chest, the front of his chest.

18      Q  And when you saw T.J. put his hand up against

19  the front of Eric's chest, did you see or hear

20  anything at that time?

21      A  Yes, I heard one shot.

22      Q  And when you heard that shot, where was T.J.'s

23  hand?

24      A  Right on Eric's chest.

JIM01820

B-65

1    Q  After you heard that shot, what did you see

2  happening?

3    A  T.J. and the Hispanic kid with the dark clothes

4  turned around and run back westbound around the corner

5  of Whipple.

6    Q  Did they run down Belmont?

7    A  Yes.

8    Q  When they ran down Belmont, were they running

9  straight or were they running together?

10    A  I believe they were running together.

11    Q  What else did you see?

12    A  I seen Eric walking towards my front of my

13  house.

14    Q  How was he walking?

15    A  Just walking and he fell right there in Sandy's

16  arms, Sandy Elder.

17    Q  Where did he fall in Sandy's arms?

18    A  Right there by the curb, right by the green

19  pole light pole by my front door.

20    Q  Phil, I didn't ask you this.  The area where

21  Eric was thrown against the wall, what wall was he

22  thrown against?

23    A  Honey Baked Hams.

24    Q  Where is the Honey Baked Ham store in relation

JIM01821

B-66

1    to your apartment?

2        A  There's an empty lot to the right of my

3    apartment and, then Honey Baked Ham is right there.  I

4    believe it's 3018.

5        Q  So your building, between your building and the

6    Honey Baked Ham store is an empty lot, is that

7    correct?

8        A  Correct.

9        Q  This occurred right in front of the Honey Baked

10   Ham store, is that correct?

11       A  Correct.

12       Q  Now, when you refer to the wall, what exactly

13   was it that Eric was thrown against?

14       A  Some shutters, they have come down to protect

15   the glass.  They've been having problems with --

16       MR. HILL:  Objection to what they've been having,

17   your Honor.

18       MR. MURPHY:  Q  I'll ask him another question.

19   That shutter was like a wall, is that correct?

20       A  Correct.

21       Q  Now, after you saw Eric fall into Sandy's arms,

22   what did you do?

23       A  I went downstairs, ran downstairs.

24       Q  What happened when you went downstairs?

JIM01822

B-67

SA66

1     A  He was laying there in Sandy's arms.

2     Q  And was Eric taken away in an ambulance a short

3  time later?

4     A  Yes, he was.

5     Q  And after -- in addition to the ambulance

6  arriving, did the police also come to the scene?

7     A  Yes, they did.

8     Q  Now, Phil, after the police arrived, were you

9  placed anywhere or did you go anywhere?

10    A  Yes, I was in the police car.

11    Q  When you were in the police car, was there

12  anybody else in the car with you?

13    A  Yes, there was.

14    Q  Who was that?

15    A  Larry.

16    Q  And did you and Larry have any conversation

17  while you were in the back of the police car?

18    A  Yes.

19    Q  What did you say to Larry, if anything?

20    A  I said this was T.J.

21    Q  And when you told Larry that this was T.J.,

22  were you talking about the shooter?

23    A  Yes.

24    Q  And what did Larry say?

JIM01823

B-68

1    A  He said no, it wasn't.

2    Q  When Larry told you that, what did you do?

3    A  I thought maybe it wasn't.

4    Q  And did you talk to the police sometime after

5    that?

6    A  Yes.

7    Q  Did you name T.J. as the shooter when you

8    talked to the police?

9    A  Yes, I did.

10   Q  Well, let me rephrase the question.  While you

11   were at the scene, did you talk to the police?

12   A  Yes.

13   Q  And when you talked to the police at the scene

14   that night, did you tell the police that T.J. was the

15   shooter?

16   A  No, I didn't.

17   Q  Why didn't you tell the police that T.J. was

18   the shooter at that time?

19   A  Because Larry was trying to --

20   MR. HILL:  Objection to what Larry was trying,

21   your Honor.

22   THE COURT:  As to the word trying, I'll sustain

23   the objection.

24   MR. MURPHY:  Q  Can you answer the question, Phil?

JIM01824

B-69

SA68

1  Why didn't you tell the police that T.J. was the

2  shooter when you talked to them right after it

3  occurred?

4      A  Because Larry was saying --

5      MR. HILL:  Objection to what Larry was, your

6  Honor.

7      MR. MURPHY:  Goes to state of mind.

8      THE COURT:  What Larry was is not objectionable.

9  I don't know what Larry was means.  I'll reserve if I

10  hear the answer.  Larry was what?

11      THE WITNESS:  He was trying to throw me off,

12  saying it was not T.J.

13      MR. HILL:  Objection.

14      THE COURT:  Sustain the objection, instruct the

15  jury to disregard.

16      MR. MURPHY:  Q  You didn't tell the police that

17  T.J. was the shooter, is that right, at that time?

18      A  Right, at that time.

19      Q  Now, after talking to the police at the scene,

20  did something happen later that night?

21      A  Yes.

22      Q  What happened?

23      A  I went to my mother's house at 3000 West

24  Belmont, which is right on the corner of Sacramento.

JIM01825

B-70

1   and Belmont above a restaurant.

2       Q   What happened then?

3       A   I started talking about it, the jacket, and my

4   brother and sister had said that T.J. has this jacket.

5       MR. HILL:  Objection to what his brother and

6   sister said.

7       THE COURT:  Objection sustained, jury is

8   instructed to disregard it.

9       MR. MURPHY:  Q   Your brother and sister said

10  something to you, is that right, Phil?

11      A   Yes, they did.

12      Q   After that said that to you --

13      THE COURT:  I told the jury to disregard it.

14      MR. MURPHY:  I'm not asking what he said, I'm

15  asking what he did in response to whatever they said

16  to him.

17      THE COURT:  As long as you don't bring out what

18  they said.

19      MR. MURPHY:  Q   Without indicating, Phil, anymore

20  about what they said, after they said something to

21  you, what did you do?

22      A   I called called the police.

23      Q   Approximately what time did you call the

24  police?

JIM01826

B-71

SA70

1    A   I believe it was about one in the morning.

2    Q   And when you called the police, what did you

3  tell them?

4    A   That I know it was T.J.

5    Q   This was one in the morning, this is just after

6  midnight that same night, is that correct?

7    A   Correct.

8    Q   After you told the police that you believe it

9  was T.J. what happened?

10    A   I believe they went to his house.

11    Q   And at some point were you called back, were

12  you called to the police station?

13    A   Yes.

14    Q   When was that?

15    A   Later the next morning, I believe.

16    Q   Would that have been at sometime before ten

17  o'clock in the morning or near ten o'clock in the

18  morning?

19    A   If I remember correctly, yes.

20    Q   And when you got to the police station, could

21  you describe what happened?

22    A   They had me look at a lineup.

23    Q   How many persons were in that lineup?

24    A   I believe five.

JIM01827

B-72

SA71

1     Q   When you viewed that lineup, did you recognize

2   anybody?

3     A   Yes, I did.

4     Q   Who did you recognize?

5     A   T.J.

6     Q   When you saw T.J. what did you do?

7     A   Said, "That's him."

8     Q   Is that the same person you identified here in

9   court?

10     A   Yes.

11     MR. MURPHY:  May I approach the witness, Judge?

12     THE COURT:  You may.

13     MR. MURPHY:  Q   Phil, I'm going to show you a

14   photograph, first what's marked People's Exhibit

15   Number 7.  Do you recognize what that's a photograph

16   of?

17     A   Yes.

18     Q   What's shown in that photo?

19     A   My house I used to live at, Honey Baked Ham,

20   Belmont Avenue.

21     Q   And the photographer would be standing on the

22   south side of Belmont Avenue taking that photograph,

23   is that correct?

24     A   Correct.

JIM01828

B-73

1      Q  And the photographer would actually be down

2   toward Whipple on the west of your apartment building

3   and west of the Honey Baked Ham store, is that

4   correct?

5      A  Correct.

6      Q  And that photograph shows the store and your

7   apartment, and what does it show in the middle between

8   the two buildings?

9      A  An empty lot.

10     Q  Also shows Belmont in the front, is that

11  correct?

12     A  Correct.

13     Q  Now, I'm also going to show you what's been

14  marked as People's Exhibit Number 6.  Do you recognize

15  that?

16     A  Yes.

17     Q  What is that?

18     A  This is my apartment building.

19     Q  And that's a close-up of your apartment

20  building, is that correct?

21     A  Yes.

22     Q  And again, the photographer is across the

23  street and to the west of your building, is that

24  right?

JIM01829

B-74

SA73

1          A   Correct.

2          Q   Now, these two photographs, People's Exhibits

3     Number 7 and Number 6, do they show the way your

4     apartment building appeared on the date of February 3,

5     1993?

6          A   No, it ain't.

7          Q   What's different?

8          A   It is fixed up.

9          Q   And other than the fact that it's fixed up, it

10    shows the position of the apartment building relative

11    to the other buildings in the street, is that correct?

12         A   Correct.

13         Q   Now, with respect to People's Exhibit Number 6,

14    you see an area circled here on the photograph?

15         A   Yes.

16         Q   What does that show?

17         A   It shows my front room window.

18         Q   And is that the -- other than the fact that the

19    building has been remodeled, does that show the

20    approximate area you were in when you viewed the

21    shooting on February 3, 1993?

22         A   Exactly.

23         Q   I'm also going to show you what's marked as

24    People's Exhibit Number 4.  Do you recognize what that

JIM01830

B-75

SA74

1    is?

2        A   Yes.

3        Q   What is that?

4        A   This is Belmont Avenue, Honey Baked Hams.

5        Q   And also People's Exhibit Number 5, do you

6    recognize what that is?

7        A   Yes.

8        Q   What is that?

9        A   This is Honey Baked Hams, this is the shutters

10   that Eric was thrown up against.

11       Q   What I'm going to ask you to do is take my pen

12   and look at People's Exhibit Number 4.  Does that show

13   the building that you were in at the time, where you

14   were living on February 3, 1993?

15       A   Yes.

16       Q   What I want you to do is circle that building

17   with this pen.

18       A   (Indicating.)

19       Q   I'm also showing you what has been marked as

20   People's Exhibit Number -- what is marked as People's

21   Exhibit Number 8.  Do you recognize that?

22       A   Yes, I do.

23       Q   What do you recognize that to be?

24       A   The lineup.

JIM01831

B-76

SA75

1    Q   Now, how many individuals stood in the lineup

2  that you viewed?

3    A   Five.

4    Q   And from the left, where was the position that

5  T.J. was in?

6    A   The second person.

7    Q   And that's the person you identified, the

8  person who was in the second position from the left,

9  is that correct?

10    A   Correct.

11    Q   Showing you People's Exhibit Number 9, do you

12  recognize that?

13    A   Yes.

14    Q   What is that?

15    A   This is T.J.

16    Q   That's a close-up shot of him, is that correct?

17    A   Correct.

18    Q   Did everything you testify to take place in the

19  County of Cook, State of Illinois, Phil?

20    A   Yes, it does.

21    Q   Your Honor, I would ask the witness be allowed

22  to step down from the witness stand and approach

23  People's Exhibit Number 10.  Phil, would you step

24  down?

JIM01832

B-77

SA76

1       A  Yes, sir.

2       Q  Phil, do you recognize what People's Exhibit

3  Number 10 is?

4       A  Yes.

5       THE COURT:  I don't think the entire jury can see

6  it.

7       MR. MURPHY:  Q  Phil, I'm going to ask you to step

8  right here where everyone can hear and you can still

9  see as well.  What is that?

10      A  This is my apartment building, this is the

11  vacant lot, this is Honey Baked Hams.

12      Q  What about this address here, 3017 Belmont?

13      A  This is the bar Wally's, almost right across

14  the street from my house.

15      Q  Now, this is, in fact it's marked -- this is

16  Belmont Avenue, is that correct?

17      A  Correct.

18      Q  Belmont Avenue runs east and west, is that

19  correct?

20      A  Correct.

21      Q  And this is Sacramento?

22      A  Runs north and south.

23      Q  And this is Whipple, which also runs north and

24  south, is that correct?

JIM01833

B-78

SA77

1      A   Correct.

2      Q   And according to this diagram, which direction

3   would north be?

4      A   Right here.

5      Q   If fact, there's an arrow pointing north up, is

6   that correct?

7      A   Right.

8      Q   Now, the apartment building that you lived in,

9   you pointed out as 3012?

10     A   3012, yes.

11     Q   And I'm going to ask you to take a yellow

12   sticker and please mark as best you can the area where

13   you would be relative to this diagram at the time that

14   you heard the shot being fired?

15     A   I would put it right up here.

16     Q   Let me stop you for a moment, if I may.

17   Assuming this is the front of the building and this is

18   the rear of the building, where were you at?

19     A   Here.

20     Q   Now, at the time the shot was fired, where was

21   Eric Morro at?

22     A   Right here.

23     Q   And where was T.J. at?

24     A   Right next to him.

1    Q  Where was the other individual that was with
2  T.J.?
3    A  Right here about in the street.
4    Q  Where was Tina at at the time the shot was
5  fired?
6    A  Right over there in front of my house down by
7  the doorway.
8    Q  Where was her mother, Sandra?
9    A  Right there by the curb.
10    Q  She was a distance away from Tina?
11    A  Right.
12  MR. MURPHY:  I have no further questions.
13  THE COURT:  Cross examination.
14  MR. MURPHY:  Judge, I'm sorry, I have no further
15  questions on the exhibit.  I do have a few additional.
16    Q  (By Mr. Murphy)  Phil, did you know, you
17  testified already that you knew the defendant, is that
18  correct?
19    A  Correct.
20    Q  You knew him as T.J?
21    A  Correct.
22    Q  Did you know whether or not he belonged to any
23  gang?
24    A  Yes, I do.

JIM01835

B-80

SA79

1    Q   What gang did you know that he belonged to?

2    A   Simon City Royals.

3    Q   How did you know that?

4    A   Seen him representing, hanging around with

5    other gang members, through my brother who knows he's

6    a Royal.

7    Q   And you said you have seen him representing, is

8    that correct?

9    A   Yes.

10   Q   Do you know how Simon City Royals represent?

11   A   They cross their fingers, making like an R.

12   Q   Had you seen him represent in that manner,

13   Phil?

14   A   Yes, I have.

15   Q   And Phil, you also testified that you knew

16   Larry Tueffel, is that correct?

17   A   Yes, correct.

18   Q   On February 3, 1993, did you know whether or

19   not he belonged to a gang?

20   A   Yes.

21   Q   What gang did he belong to?

22   A   At the time I believe he was a Simon City

23   Royal.

24   Q   That's the same gang that Thaddeus, T.J.

JIM01836

B-81

1    belonged to, is that right?

2        A   Right.

3        Q   Now, Phil, do you know a person, did you ever

4    hear of a person named Carlos Juan Torres or Juan

5    Carlos Torres?

6        A   No, sir, I don't.

7        Q   Your last name is Torres, right?

8        A   Yes.

9        Q   Is he any relation to you?

10       A   No, he's not.

11       Q   Now, Phil, you have previously been convicted

12   of the offense of theft.  In fact, on October 18,

13   1979, you were convicted of theft, is that right?

14       A   I believe so, yes.

15       Q   And also on September 14, 1993, you were

16   convicted of the offense of burglary, is that correct?

17       A   I believe that is correct.

18       Q   And Phil, isn't it also true that you now have

19   a burglary case pending?

20       A   Yes, it is.

21       Q   Where is that pending?

22       A   In Skokie.

23       Q   And Phil, has the State's Attorney's Office

24   indicated to you in any way, shape, or form that we

JIM01837

B-82

SA81

1   would do anything for you on the burglary case in

2   exchange for your testimony in this case?

3        A   No, sir.

4        MR. MURPHY:   I have no further questions, Judge.

5        THE COURT:   Cross examination.

6                     CROSS EXAMINATION

7                     By Mr. Hill:

8        Q   Mr. Torres?

9        A   Yes, sir.

10       Q   You're an addict, aren't you?

11       A   No, I'm not.

12       Q   You use drugs?

13       A   I have, yes.

14       Q   In fact, when you got convicted on that

15  burglary, they put you in the drug program called

16  TASC, right?

17       MR. MURPHY:   Objection.

18       THE COURT:   Sustained.

19       MR. HILL:   Your Honor, it goes to his addiction.

20       THE COURT:   1993, counsel.

21       MR. HILL:   1993 when this incident happened.

22       THE COURT:   I ruled, counsel.

23       MR. HILL:   Q   You used drugs in 1993, isn't that

24  correct?

JIM01838

B-83

SA82

1      A   I believe I have, yes.

2      Q   In fact, when the judge sentenced you, she

3   sentenced you to a program to deal with drugs addicts,

4   isn't that right?

5      MR. GAUGHAN:  Objection.

6      THE WITNESS:  No, sir.

7      THE COURT:  Let him answer, overruled.

8      MR. HILL:  Q   Did she sentence you to TASC?

9      A   No, sir.

10     MR. HILL:  Judge, I'd ask for a sidebar.

11                    (The following proceedings were

12                     outside the presence and hearing

13                     of the jury:)

14     MR. HILL:  We tender a rap sheet of Mr. Torres

15   where he was convicted of burglary on September 14,

16   1993, in which he was put on the TASC program, which

17   is the program --

18     THE COURT:  That's what it reads, but it's not a

19   certified copy.

20     MR. MURPHY:  We are objecting.  It's inappropriate

21   for defense to go into the sentence.

22     MR. HILL:  No, it's not.  I'm going to argue it

23   goes to his credibility.

24     THE COURT:  I'll let it in.

JIM01839

B-84

SA83

1        MR. GAUGHAN:  He has not laid the foundation to

2   bring in that this man is an addict.  Even if he is an

3   addict, he has to lay a proper foundation and he

4   hasn't done it.

5        THE COURT:  He's asked whether he was assigned to

6   TASC and he said no.  Whether he was or wasn't, I

7   don't remember.

8        MS. BURKE:  Can I just say this is proper cross

9   examination?

10       THE COURT:  I'm not complaining about that.

11                      (The following proceedings were

12                       within the presence and hearing

13                       of the jury:)

14       MR. HILL:  Q  Your first conviction was for theft?

15       A  I believe so.

16       Q  Now, in 1993 September, your conviction was for

17   burglary, is that right?

18       A  I believe so.

19       Q  And you pled and this happened after this

20   incident, isn't that correct?  Didn't you pick up this

21   offense, the first one after this incident?

22       A  I do not remember.

23       MR. MURPHY:  Objection, Judge.

24       THE COURT:  What's your objection?

JIM01840

B-85

1        MR. MURPHY:  It's not relevant.

2        MR. HILL:  Yes, it is, your Honor, and I can tie

3   it up.

4        THE COURT:  I'll let the question go.  Overruled.

5        MR. HILL:  Q  This incident happened in February

6   of '93, right?

7        A  Right.

8        Q  You pled guilty to burglary in September '93,

9   isn't that right?

10       MR. MURPHY:  Objection, asked and answered.

11       THE COURT:  Well, no, I'll overrule it.  I don't

12   know if he knows.  Let him answer the question.

13       THE WITNESS:  I do not remember.

14       MR. HILL:  Q  You don't remember when you pled

15   guilty?

16       THE COURT:  You're asking him the month?

17       MR. HILL:  No, the year.

18       MR. MURPHY:  He's already answered the question.

19       MR. HILL:  Q  Do you know what year you pled

20   guilty to burglary?

21       A  No, I don't.

22       Q  Do you know what month you pled guilty?

23       THE COURT:  If he doesn't know the year --

24       MR. HILL:  Maybe he does.

**JIM01841**

B-86

SA85

1       THE WITNESS:  No, I do not.

2       MR. MURPHY:  Objection.

3       THE COURT:  Sustained as to counsel's side

4   remarks.

5       MR. HILL:  Q  Now, but you do know that you pled

6   guilty?

7       A  Yes.

8       Q  Huh?

9       A  Yes.

10      Q  Now, you have another burglary now pending,

11  right?

12      A  Yes.

13      Q  And you're on probation for the other one,

14  right?

15      A  No, I'm not on probation.

16      Q  You're not on probation?

17      A  No, I'm not.

18      MR. MURPHY:  Objection to sentencing.

19      MR. HILL:  It's relevant and I have a certified on

20  it.

21      THE COURT:  Counsel, keep in mind that he is a

22  layman, not a lawyer, so be more specific when you're

23  asking these questions.  I don't know if he

24  understands legal terminology.

JIM01842

B-87

SA86

1      MR. HILL:  Q  Do you have to go on the first one,

2   do you have to go see a probation officer?

3      A  No, I do not.

4      Q  They did put you on probation?

5      A  No.

6      Q  Did you get any jail time?

7      A  No.

8      Q  Did you tell them you were a witness in a

9   homicide case and that's why you didn't get any jail

10  time or probation?

11     A  No.

12     Q  Now, do you know that burglary carries a

13  sentence of 3 to 7 years?

14     A  No, I do not.

15     Q  You now have another burglary pending, right?

16     THE COURT:  Asked and answered, counsel.

17     MR. HILL:  Q  You know that carries 3 to 7, isn't

18  that correct?

19     A  Correct.

20     Q  And isn't it a fact that you told the state's

21  attorney that you were a witness in a murder case and

22  he told you if you say the right things that that one

23  would go away?

24     A  No, I did not.

JIM01843

B-88

SA87

1    MR. MURPHY:  Objection.

2    THE COURT:  Sustained.

3    MR. MURPHY:  I would ask he be admonished.  He has

4  no information like that.

5    THE COURT:  Jury will be instructed, unless the

6  defense has got proof of that.  Don't just make a

7  comment without any proof or standing.

8        The jury will be instructed to disregard it

9  until such time as defense is ready to indicate he has

10  evidence of that.

11    MR. HILL:  Q  You said in '93 you did drugs, is

12  that correct?

13    A  Yes.

14    Q  What kind of drugs?

15    A  Marijuana.

16    Q  Any other drugs?

17    A  No.

18    Q  No P.C?

19    A  No.

20    Q  Now, is Calvin Cosmen your brother?

21    A  He's my stepbrother.

22    Q  And that's the brother whose house you were

23  over?

24    A  I was at my mother's house.

JIM01844

B-89

SA88

1    Q   Was he there too?

2    A   Yes.

3    Q   And Calvin was also convicted of burglary with

4    you, right?

5    MR. MURPHY:  Objection.

6    THE COURT:  Sustained, and the jury will be

7    instructed -- sidebar, counsel.

8                    (The following proceedings were

9                    outside the presence and hearing

10                   of the jury:)

11   THE COURT:  Counsel, if you're going to dirty this

12   up and ask these wild questions, I'm going to hold you

13   in contempt.  What's his brother got to do with it?

14   MR. HILL:  He said he talked to his brother and

15   sister.

16   THE COURT:  So what?

17   MR. HILL:  So it's fair ground.

18   THE COURT:  No, it certainly isn't, and I'm

19   cautioning you once.  That's once.

20                   (The following proceedings were

21                   within the presence and hearing

22                   of the jury:)

23   THE COURT:  Jury will be instructed to disregard

24   the last comments of counsel.

JIM01845

B-90

SA89

1    MR. HILL:  Q  Now, Mr. Torres, you said that that

2  night you talked to the police, is that correct?

3    A  Correct.

4    Q  And they asked you if you talked to either

5  Officer Whitman or Ryan, isn't that right?

6    A  I do not remember their names.

7    Q  And you told them basically what happened,

8  isn't that correct?

9    A  Yes.

10    Q  And you also gave them a description of the

11  offenders, isn't that correct?

12    A  Yes.

13    Q  Now, isn't it correct that you told them, let's

14  see, one offender was a male, right?

15    A  Yes.

16    Q  Would you say Hispanic?

17    A  Yes.

18    Q  Five-four to five-five?

19    MR. MURPHY:  Your Honor, I'm going to object at

20  this point.  Now counsel is reading from the police

21  report.

22    MR. HILL:  No, I'm not.  I'm looking straight at

23  him.

24    MR. MURPHY:  He's reading a description given by

JIM01846

B-91

1  Larry Tueffel, not this witness.

2     MR. HILL:  He's listed as a witness in the general

3  offense case report.

4     THE COURT:  Let me see the report.

5              (The following proceedings were

6              outside the presence and hearing

7              of the jury:)

8     MR. HILL:  He lists under here a description.

9     THE COURT:  Come here, counsel.  Where?

10    MR. HILL:  Says gathered up witnesses, and he's

11 answering.

12    THE COURT:  Wait.  If you want to ask him what

13 description he gave, you can do that.

14    MR. HILL:  I can ask him direct questions.

15    THE COURT:  Don't read this report.  When the

16 report said gathered up witnesses --

17    MR. HILL:  Can we go into chambers?

18    THE COURT:  No.  Gathered up witnesses,

19 description of offender, then there's a description.

20 Doesn't say who gave that description, and don't put

21 in the jury's mind that this witness gave this

22 description unless you know he did.  If you want to

23 ask him what description he gave, fine, but you're not

24 going to poison the jury's mind.

                              JIM01847

                        B-92

1      MR. HILL:  Can we go in chambers, your Honor,

2  because I'd like to argue this.

3      THE COURT:  Not at this point.

4                    (The following proceedings were

5                    within the presence and hearing

6                    of the jury:)

7      THE COURT:  Objection sustained.  Jury will be

8  instructed to disregard it.

9      MR. HILL:  Q  You gave the police officer a

10  description, sir?

11     A  A description of the shooter?

12     Q  Of the offenders, yes, sir.

13     A  Yes.

14     Q  And in fact, you told them one offender had a

15  purple jacket, isn't that right?

16     A  I did not say purple, blue and white.

17     Q  With yellow letters?

18     A  No.

19     Q  Did you say one of them had -- one of them had

20  a Georgetown jacket, did you say that?

21     THE COURT:  A what?

22     MR. HILL:  Q  Georgetown jacket, Georgetown, it's

23  a university.

24     A  I might have.

JIM01848

B-93

1     Q   Now, you say you knew T.J?

2     A   Yes.

3     Q   He had been to your mother's house?

4     A   Yes.

5     Q   But when you talked to the police, did you tell

6     them the offender was T.J. when you first talked to

7     them?

8     A   No.

9     Q   Did you tell them that the offender had been to

10    your mother's house?

11    A   Yes.

12    Q   You did when you first talked to them?

13    A   I believe so.

14    Q   Oh, when you first talked to them, you told

15    them the defendant had been in your mother's house?

16    A   He was there.

17    Q   Now, you also told them that the offender knew

18    your brother, isn't that right?

19    A   Yes.

20    Q   But you didn't tell them it was T.J?

21    A   Not at the time, no.

22    Q   Now, did you have an opportunity to talk to a

23    detective at 9:30?

24        THE COURT:  9:30 what day?

JIM01849

B-94

SA93

1     MR. HILL:  Q  9:30 February 3, 1993, at 9:30 p.m.

2     A  Yes.

3     Q  That was detective -- and at that time did you

4  tell the detective it was -- did you tell the

5  detective, did you give that detective a description

6  of the offenders?

7     A  I believe so.

8     Q  And at that time did you tell them it was T.J?

9     A  I don't recall, I don't remember.

10    Q  Did you tell them that the offender had been

11  over at your mother's house?

12    A  Yes.

13    Q  Did you tell them the offender knew your

14  brother?

15    A  Yes.

16    Q  Now, at one, you said 1:00 a.m. February 4th

17  you were at your brother's house?

18    A  My mother's house.

19    Q  Your mother's house?

20    A  Yes.

21    Q  Let's go back.  When you were in the car, you

22  say that Larry Tueffel was in there with you, right?

23    A  Yes.

24    Q  And at that time you told Larry that you

JIM01850

B-95

1    thought it was T.J., isn't that right?

2        A   Correct.

3        Q   And he said it wasn't, right?

4        A   Right.

5        Q   Now, that was before you had any conversation

6    with the police officer, is that right?

7        A   I do not remember.

8        Q   Now, it was before you had your second

9    conversation at 9:30, though, wasn't it?

10       A   I don't remember.

11       Q   Now, was Larry in the car -- was Larry with you

12   at 9:30?

13       THE COURT:  With the detective you're talking

14   about?

15       MR. HILL:  Yes, sir.

16       THE COURT:  In other words, was Larry with him

17   when he was talking to the detective?

18       MR. HILL:  Q  Yes, sir.

19       A   We were talking to the regular blue and whites.

20       Q   That was the first conversation, but I asked

21   you earlier about being with Larry, talking to the

22   detective at 9:30, and you said you had a conversation

23   with him.  I just asked you was Larry with you.

24       MR. GAUGHAN:  Judge, objection.  Where this

JIM01851

B-96

SA95

1   conversation took place might clarify, if he said it

2   was in the police station, I'm not even sure.

3       THE COURT:  I think he might be confused.  The

4   question is, so he knows what you're talking about,

5   you stop me if I'm wrong, when you were talking to the

6   detective at 9:30, was Larry with you at that time,

7   with the detective, is that it?

8       THE WITNESS:  Larry was in the police car in front

9   of my house with me.  I do not know exactly what time

10  it was.  We were in the police car, a blue and white

11  police car.

12      THE COURT:  That's not the time you were talking

13  with the detective that he's talking about?

14      THE WITNESS:  No.

15      MR. HILL:  Q  I asked when you were talking to the

16  detective,

17      A  At one o'clock in the morning?

18      Q  Before then.  Before you called him.  Was Larry

19  in the car, was Larry with you when you were talking

20  to the detectives the first time?

21      MR. GAUGHAN:  Judge, objection.

22      THE COURT:  Again, I'm going to sustain it,

23  counsel, until you lay out -- I can see that he's

24  confused and you're going to have to be more specific

JIM01852

1    as to where, when, how, and why because you're talking

2    about -- he's talking about one o'clock and you're

3    talking about one at 9:30 and there's a conversation

4    in the car, so you're going to have to be more

5    specific so he knows exactly when you're talking

6    about.

7        MR. HILL:   Q   The conversation you had in the car

8    was a short time after the incident happened, is that

9    correct?

10       A   Correct.

11       Q   So it was around 6:30 p.m., is that right?

12       A   Correct. --

13       Q   And that was with the, what you call --

14       A   Blue and whites.

15       Q   Blue and white?

16       A   Right, not detective.

17       Q   That was Officer Whitman and Officer Ryan.

18           Now, you had another conversation with a

19    detective?

20       A   Later that night.

21       Q   Later that night?  Did you have a

22    conversation -- when you say later that night, is that

23    the conversation you had when you called?

24       A   I believe so.

JIM01853

B-98

SA97

1    Q  Did you have a conversation with a detective

2  before you called at about 9:30?

3    A  I do not remember.

4    Q  Any time in between the time you were in the

5  car and at one o'clock when you called the detectives,

6  was Larry Tueffel with you anymore?

7    A  No.

8    MR. HILL:  Judge, can I have a sidebar for a

9  second?

10    THE COURT:  Okay.

11                 (The following proceedings were

12                  outside the presence and hearing

13                  of the jury:)

14    MR. HILL:  Judge, with all due respect, I differ

15  from you totally as it relates to asking him regarding

16  his description.  I was not reading.  I have the right

17  to ask leading questions.

18        Now, if they say that that was not him, they

19  can bring the officer, but he was answering each

20  question that I asked and answering them clearly.  It

21  says witnesses, I don't have to bring a police

22  officer.  He was answering.  If he didn't give that

23  description, then I can't perfect my impeachment.

24    THE COURT:  You can ask him what description he

JIM01854

B-99

SA98

1   gave you, if he gave a description, but number one, I

2   think you readily know and this court's heard no --

3   that this guy has a little, he's a little, he's not

4   too -- he's not bright at all, he doesn't remember

5   everything.

6       You're asking me if you can read a

7   description contained in the police report that

8   someone gave, not him necessarily, that some witnesses

9   gave or a witness or some witness gave but not

10  necessarily him, he's liable to say yeah, no, I don't

11  remember because it doesn't say that in the police

12  report and I'm not going to let you suggest that he --

13  gave it because of his intelligence.

14      MR. HILL:  Can I respond to that?  You're making a

15  judgment and you're making a factual judgment

16  regarding his intelligence, and that is, any witness

17  that they put on is considered competent.  Now, are

18  you saying he's incompetent?

19      THE COURT:  No, I'm just saying, you're saying and

20  you gave the police officer a description and you told

21  him that he was wearing a Georgetown jacket.  Then

22  you're saying then you told him.  Why don't you ask

23  him what description he gave, if he remembers.  Say

24  did you tell him.  You're telling him you did tell

JIM01855

B-100

SA99

1  him.

2      MR. GAUGHAN:  Can I interject?  Counsel did ask

3  him, "Didn't you tell the police that he was wearing a

4  gold and black jacket?"  He asked him the question.

5  He denied it.  If he proves up the impeachment, let

6  him prove up the impeachment.

7      MR. HILL:  That's not a problem.

8      MR. GAUGHAN:  He did ask him.

9      THE COURT:  I'll let you ask the questions, but I

10 want to make sure I'm not going to let you plant --

11 You're giving the impression --

12      MR. HILL:  If he said no,

13      MR. GAUGHAN:  He did say no.

14      THE COURT:  Go ahead.  Let's get this out of the

15 way.

16      MR. MURPHY:  The other problem is, it's very

17 obvious to everybody in this witness we asked open

18 ended questions and his I.Q. is low.  It took counsel

19 ten minutes to ask him --

20      THE COURT:  I think the jury will notice that.

21              (The following proceedings were

22               within the presence and hearing

23               of the jury:)

24      MR. HILL:  If we can have a minute.

JIM01856

B-101

SA100

1      THE COURT:  Are you ready?

2      THE WITNESS:  Sure.

3      THE COURT:  Go ahead.

4      MR. HILL:  Q  You went to the lineup, is that

5   right?

6      A  Yes, sir.

7      Q  The police called you?

8      A  Yes.

9      Q  Told you to come view a lineup?

10     A  Yes.

11     Q  Now, T.J. was the only one in the lineup you

12   knew, is that right?

13     A  Correct.

14     Q  You didn't know any of the other four kids in

15   the lineup?

16     A  No, I did not.

17     Q  Now, you live on the third floor, is that

18   right?

19     A  Correct.

20     Q  And at the time this occurred, you were looking

21   down, is that right?

22     A  Correct.

23     Q  And in fact, you were having a conversation

24   with Tina, is that right?

JIM01857

B-102

SA101

1      A   Correct.

2      Q   And she was talking to you and you were talking

3  to her?

4      A   Yes.

5      Q   And then you saw out of your peripheral vision

6  something going on?

7      A   Yes.

8      Q   And you turned and you saw Eric up against the

9  wall?

10      A   I was looking back and forth.

11      Q   Now, then you saw Eric go up against the wall?

12      A   Right.

13      Q   Then you heard a shot or saw a shot?

14      A   Right, right.

15      Q   And then two people took off?

16      A   Right.

17      Q   It happened real quick?

18      A   Yes.

19      Q   Now, this Honey Baked Ham, the wall they were

20  up against was like this, right?

21      A   Correct.

22      Q   And your apartment was on the third floor, say

23  up here somewhere like up here?

24      A   Maybe up here.

JIM01858

B-103

SA102

1        Q   And it was even with that wall, right?

2        A   No, I'm up.

3        Q   You're higher up, but same level coming across?

4        A   Yes.

5        Q   And you say now when they ran, they ran back

6    toward Whipple, is that correct?

7        A   Correct.

8        Q   Never toward you, correct?

9        A   Right.

10       Q   Now, you said that Tina's son was up at your

11   house?

12       A   Tina's brother.

13       Q   If I can have just a second.  Now, do you know

14   anybody in the neighborhood by the name of Tuski,

15   T-u-s-k-i?

16       A   I do not believe I do.  Is this a nickname?

17       Q   Yes.

18       A   No, I don't.

19       Q   No, it's actually his real name.

20       A   Don't ring a bell.

21       Q   Do you know any other Simon City Royals?

22       A   Yes.

23       Q   Do you know an Asian man who is about six feet

24   and 23 years old?

JIM01859

B-104

1      THE COURT:  What kind of man.

2      MR. HILL:  Asian, A-s-i-a-n.

3      THE COURT:  Oh, Asian.

4      THE WITNESS:  Yeah.

5      MR. HILL:  Q  And that person is sort of a leader

6  of the Simon City Royals?

7      A  I do not who the leader is.

8      Q  He is not a -- he is about your age, though,

9  isn't he?

10     A  I do not know.

11     Q  Now, at one o'clock --

12     THE COURT:  A.M?

13     MR. HILL:  Q  A.M.  You said that you called the

14  police?

15     A  Yes.

16     Q  After talking to your brother?

17     A  Yes, and sister.

18     Q  Now, let me ask you, how long have you lived in

19  that neighborhood?

20     A  Probably ten years.

21     Q  Just one second.  You said you were convicted

22  of theft, burglary, and you got a burglary pending, is

23  that right?

24     A  Yes.

JIM01860

B-105

SA104

1      Q  Also in 1987 you were convicted of

2  manufacturing and delivering cannabis, isn't that

3  right, marijuana?

4      A  Yes.

5      Q  In '87?

6      A  I believe so.

7      MR. HILL:  Thank you, your Honor.

8      THE COURT:  Redirect?

9                      REDIRECT EXAMINATION

10                     By Mr. Murphy:

11     Q  Phil, I notice when you were testifying on

12  cross examination you were upset.  You want to be here

13  today?

14     A  No, I do not.

15     MR. HILL:  Judge, objection.

16     THE COURT:  Sustained.

17     MR. MURPHY:  In fact, are you here under subpoena.

18     MR. HILL:  Objection.

19     THE WITNESS:  Yes, I am.

20     THE COURT:  Overruled.

21     MR. HILL:  Beyond the scope.

22     MR. MURPHY:  Q  When you received the subpoena

23  from the State's Attorney's Office, what did you do?

24     A  I called up.

JIM01861

B-106

SA105

1        MR. HILL:  Objection, your Honor, this is beyond

2   the scope.  I have not asked him one thing about why

3   he is here and why he is not here.

4        THE COURT:  Overruled, counsel.

5        MR. MURPHY:  Q  What did you do when you received

6   the subpoena from the State's Attorney's Office, Phil?

7        A  I called up.

8        Q  And what did you say?

9        MR. HILL:  Objection, your Honor.

10       THE WITNESS:  I did not want to come here.

11       MR. HILL:  Objection.

12       MR. MURPHY:  Judge, it goes to explain the

13   witness's actions at the scene and here.

14       THE COURT:  I'm going to overrule it, but I assume

15   you're finished with this.

16       MR. MURPHY:  Q  Judge, I am.  I would also like to

17   explore an area at the scene as well.  Phil, now, I'm

18   going to take you back to the scene.  When you were

19   talking to the police officers at the scene initially,

20   did you want to talk to them?

21       A  No, I did not.

22       Q  What were you doing at the scene when the

23   police officers were trying to talk to you about what

24   you saw?  What did your do initially?

JIM01862

B-107

1     A  I did not want to do nothing.

2     Q  What did you try to do when the police officers

3  wanted you to stay at the scene?

4     A  I wanted to go home, back upstairs.

5     Q  And in fact you tried to go up to your

6  apartment a number of times and the police officers

7  made you stay, is that correct?

8     A  Correct.

9     Q  Why didn't you want to tell the police officers

10  at the scene what you saw?

11     A  I did not want to get involved.

12     Q  Why didn't you want to get involved?

13     MR. HILL:  Objection, your Honor.

14     THE COURT:  Overruled.

15     THE WITNESS:  Because I was worried about what was

16  going to happen if I testify or if I had to go to

17  court.

18     MR. MURPHY:  Q  Now, Phil, I'd like to just

19  clarify one point.  I'm not sure if you understood the

20  question or not.  Initially when you talked to the

21  police, you did not tell the police that you thought

22  T.J. was the shooter, is that right?

23     A  Right.

24     Q  And later when you talked to the police you

JIM01863

B-108

SA107

1    told them, in fact you're the person who told the

2    police that T.J. was the shooter, is that correct?

3        A    Correct.

4        Q    Now, you didn't tell anything to the police at

5    the scene about T.J. being over at your house because

6    you did not name T.J., would that be accurate to say?

7    Excuse me, at your mother's house, would that be

8    accurate?

9        A    Right.

10       Q    When is the first time you started telling the

11   police about how you knew T.J?

12       A    After I was there talking with my brother and

13   sister.

14       Q    So after you called the police and told the

15   police T.J.'s name is when you told the police about

16   how you knew T.J., is that accurate?

17       A    Yes.

18       Q    Did you tell them any of those things about how

19   you knew T.J. when you were in the police car at the

20   scene where the shooting occurred?

21       A    Yes.

22       Q    Let me rephrase the question.  Did you talk to

23   the police about T.J. at all while you were in the

24   police car at the scene?

JIM01864

B-109

1        A   No.

2        Q   Phil, do you understand my question?

3        A   No, I do not.

4        THE COURT:  He answered no.

5        MR. MURPHY:  Q  You didn't talk about T.J. at the

6    scene, is that right?

7        A   To Larry I did in the car.

8        Q   How about to the police, at the scene in the

9    police car?

10       A   I don't remember.

11       MR. MURPHY:  I have no further questions.

12       THE COURT:  Any further questions?

13       MR. HILL:  That's okay, your Honor.  No further

14    questions.

15       THE COURT:  No questions.  Thank you, sir.  You

16    will be excused.

17       THE WITNESS:  Thank you.

18                              (Witness excused.)

19       MR. HILL:  Judge, would you admonish him not to go

20    back and --

21       THE COURT:  Do not discuss your testimony with any

22    other witnesses.

23       THE WITNESS:  I will not.

24       MR. MURPHY:  Judge, for the record, we told each

JIM01865

B-110

SA109

1    of our witnesses after they testify they are not to

2    speak to the other witnesses.

3        THE COURT:  Is your next witness pretty long?

4    MR. MURPHY:  Yes, Judge.

5        THE COURT:  We'll take a short recess before we

6    get to the next witness.

7                         (A recess was taken, after which

8                          the following proceedings were

9                          within the presence and hearing

10                         of the jury:)

11       THE COURT:  Do you wish to proceed?

12       MR. GAUGHAN:  Your Honor, the people would call

13   Dr. Lifschultz of the Medical Examiner's Office.

14                         (Witness sworn.)

15                      BARRY LIFSCHULTZ,

16   a witness called on behalf of the People of the State

17   of Illinois, having been first duly sworn, was

18   examined and testified as follows:

19                      DIRECT EXAMINATION

20                      By Mr. Murphy:

21       Q  Sir, would you please state your name and spell

22   your last name for the court reporter?

23       A  My name is Dr. Barry Lifschultz, last name is

24   spelled L-i-f as in frank, s-c-h-u-l-t-z.

1      Q   By whom are you employed, sir?

2      A   I'm employed by the Cook County Medical

3   Examiner's Office.

4      Q   How long have you worked at the Cook County

5   Medical Examiner's Office?

6      A   I worked there since 1981.

7      Q   What is your position there, sir?

8      A   I'm a staff forensic pathologist.

9      Q   Could you tell the ladies and gentlemen of the

10   jury what your duties are as a staff forensic

11   pathologist?

12      A   Basically my duties are to assist in the

13   investigation of deaths which are either sudden and

14   unexpected or possibly violent, and I do that in three

15   main ways.  I consider the circumstances surrounding

16   the death, the available medical history, and then

17   probably most importantly, I perform examinations on

18   the people who have died in order to determine why

19   they died.

20      Q   Doctor, are you licensed to practice medicine

21   in the State of Illinois?

22      A   Yes, I am.

23      Q   When were you licensed?

24      A   I was licensed in 1978.

JIM01867

B-112

1       Q   Could you tell us about your educational

2   background?

3       A   Yes.   In 1972 I received a bachelor's degree

4   with honors from Harvard University in Cambridge,

5   Massachusetts.

6           Then in 1977 I received my M.D. from Loyola

7   University Medical School, which is in Maywood,

8   Illinois.

9           In 1981 I finished a four-year residency in

10  general anatomic pathology at Northwestern University

11  Medical School in Chicago.

12          And then in 1982 I finished a one-year

13  residency in forensic pathology at the Cook County

14  Medical Examiner's Office, and I have been employed

15  since that time there as a staff forensic pathologist.

16      Q   Doctor, do you specialize in any field?

17      A   Actually, my area of specialization is anatomic

18  pathology and my area of sub-specialty is forensic

19  pathology.

20      Q   Could you describe the difference between

21  anatomic pathology and forensic pathology?

22      A   Yes.   General anatomic pathology is basically

23  the study of diseases and injuries as those diseases

24  and injuries appear in the tissues of the body,

JIM01868

B-113

1  whether we use our naked eye or sometimes we use

2  perhaps a microscope.

3       Forensic pathology applies to principles of

4  general anatomic pathology to the investigation of

5  sudden and unexpected deaths or possibly violent

6  deaths.

7     Q  Doctor, are you board certified in any field?

8     A  Yes, I am.

9     Q  First, could you explain to the ladies and

10  gentlemen of the jury what it means to be board

11  certified?

12     A  Yes.  Board certification basically means that

13  the doctor has finished an accredited residency

14  program and then passed a comprehensive examination in

15  the field.

16     Q  What field are you board certified in?

17     A  In 1982 I was board certified in general

18  anatomic pathology, and in 1983 I was board certified

19  in forensic pathology.

20     Q  And have you published -- have you authored any

21  publications in any professional journals?

22     A  Yes, I have.

23     Q  How many?

24     A  At this time, I have 23 publications in books

JIM01869

B-114

1   and journals in the area of pathology.

2      Q   What is your most recent publication?

3      A   The most recent publication actually was a

4   review of gunshot wounds in Cook County in children

5   under ten years of age.

6      Q   Doctor, how many autopsies have you performed

7   during your career, as best you can estimate?

8      A   I perform over 3-- autopsies each year, and I

9   have been working at our office for over 13 years, so

10  I performed well over 3,000 autopsies.

11     Q   Could you describe for the ladies and gentlemen

12  of the jury what an autopsy is?

13     A   Yes.  An autopsy is, we perform them at our

14  office, first of all, consists of an examination of

15  the clothing that the person was wearing when they

16  died.  Then the body, if it's clothed, is carefully

17  undressed and all the external surfaces of the body

18  are examined for any evidence of disease or injury

19  that we can see.  And if we see something that we

20  think is important, we may document what we see not

21  only with notes but also pictures.

22          After the external examination of the body is

23  finished, then the body is carefully opened, both

24  lower part of the body and the head, and the internal

JIM01870

B-115

1   organs are again examined for any evidence of disease

2   or injury that we can see.

3        Also, when we do the internal examination, we

4   may take samples of the body fluids to do later

5   studies for drugs and poisons.

6        After the autopsy is completed, then I take

7   the notes that I have made and I turn them into a

8   dictated typewritten report, and then finally I sign

9   the death certificate which indicates what the cause

10  of the death was.

11       Q  And Doctor, how many times have you been

12  qualified as an expert in the field of anatomic

13  pathology?

14       A  I usually testify about once every month and I

15  have been working in our office for 13 years, so I

16  have been qualified well over a hundred times.

17       Q  And likewise, how many times have you been

18  qualified as an expert in the field of forensic

19  pathology?

20       A  Usually, I'm qualified in both anatomic and

21  forensic pathology when I testify.

22       MR. MURPHY:  Your Honor, at this time I would

23  offer Dr. Lifschultz as an expert in both fields.

24       THE COURT:  Any questions?

**JIM01871**

B-116

SA115

1        MS. BURKE:  We have no objection.

2        THE COURT:  Court will find the doctor qualified

3   to testify as an expert in his field.

4            You may proceed.

5        MR. MURPHY:  Q  Doctor, on the date of February 4,

6   1993, were you working as an assistant Cook County

7   medical examiner?

8        A  Yes, I was.

9        Q  And on that date, did you perform an autopsy on

10  the body of an Eric Morro?

11       A  Yes, I did.

12       Q  Could you describe what you found during the

13  course of that autopsy?

14       A  When we examined the body of Mr. Morro, we

15  found on the upper left chest in the area that I'm

16  pointing to a gunshot wound of entrance, and when we

17  did the autopsy, we traced the course of this wound

18  and the gunshot wound went through the skin of the

19  upper left chest, through the anterior or front chest

20  wall.  It then perforated a large high pressure blood

21  vessel called the aorta, which carries blood from the

22  heart throughout the body, and then finally beneath

23  the skin of the right upper back in the area that I'm

24  pointing to here we recovered from beneath the skin a

JIM01872

B-117

SA116

1    small caliber lead bullet.  The course of this wound

2    was from front to back and left to right.

3       Q  Doctor, if you would, as best you can, could

4    you on your own body show the ladies and gentlemen of

5    the jury how the bullet would have coursed through the

6    body?

7       A  Basically the entrance gunshot wound was here

8    on the left chest, and then it traveled through the

9    center part of the body, and then we recovered the

10   bullet from beneath the skin of the right back, so the

11   course was from front to back and then from left to

12   right and neither really up or down.

13      Q  Doctor, there was also a toxicological

14   examination performed on the body, is that correct?

15      A  Yes, there was.

16      Q  And that's typically done in every case the

17   Medical Examiner's Office handles as you described, is

18   that right?

19      A  Yes, in almost every case we do studies for

20   drugs and poisons.

21      Q  And based on that examination, there was no

22   alcohol or drugs found in the body of the victim, is

23   that correct, of Eric Morro?

24      A  We tested for cocaine, alcohol, and opiates,

JIM01873

B-118

SA117

1   which includes drugs like heroin, and we didn't find

2   any of those drugs in the system.

3       Q  Thank you.  For the record, Judge, I'm showing

4   to defense counsel various photographs which I'd like

5   to show the doctor as well and a bullet.

6           Doctor, first I'm going to show you what's

7   been marked as People's Exhibit Number 2.  Do you

8   recognize that?

9       A  Yes, I do.

10      Q  What do you recognize that to be?

11      A  This is a picture of the person who was

12  identified to me as Eric Morro.

13      Q  Also showing you what's been marked as People's

14  Exhibit Number 1, would you describe what's shown in

15  that photo?

16      A  Yes.  This is a picture of the front of Eric

17  Morro's body, and it shows a pictorial tattoo and it

18  shows the gunshot wound of the upper left chest that I

19  described.  It also shows just above the gunshot wound

20  some punctate or point-like hemorrhages into the skin.

21      Q  And Doctor, I'll talk about those injuries in a

22  few moments.  I'm also going to show you what's marked

23  as People's Exhibit Number 12.  Do you recognize what

24  that is, sir?

JIM01874

B-119

SA118

1      A   Yes, I do.

2      Q   What do you recognize that to be?

3      A   This is a picture that I had taken of the small

4   caliber lead bullet that was recovered from beneath

5   the skin of the right back of Mr. Morro.

6      Q   And finally, Doctor, I'll show you what is

7   marked as People's Exhibit Number, and I'll leave that

8   so you can look at that photo, I'm going to show you

9   what's marked as People's Exhibit Number 13.  Would

10  you please look at that and tell me if you recognize

11  what that is, sir?

12     A   This is the same bullet that's in the picture

13  that I had taken.

14     Q   And that's the bullet that was recovered from

15  the body of Eric Morro, is that correct?

16     A   Yes.

17     Q   And is that bullet in the same or substantially

18  the same condition, as best you can tell, as it was in

19  when you removed it from the body?

20     A   Yes, it is.  I can match it up with the picture

21  exactly.

22     Q   Thank you.  And Doctor, these photographs that

23  I'm showing you, People's Exhibits Number 2, Number

24  11, and Number 12, do these photographs truly and

JIM01875

B-120

SA119

1    accurately show the body of Eric Morro and the bullet,

2    the photograph of the bullet that was taken from his

3    body?

4        A  Yes, they do.

5        Q  Doctor, you talked briefly about some

6    additional injuries in addition to the entrance wound

7    on the body of Eric Morro, is that correct?

8        A  Yes.

9        Q  Can you describe those injuries to the ladies

10   and gentlemen of the jury?

11       A  Above the gunshot wound of entrance on the left

12   chest there was an area extending about three inches

13   away from the wound upwards of small pin-like

14   hemorrhages or areas of bleeding.

15       Q  What is the significance of those injuries?

16       A  These injuries are consistent with what we call

17   a powder tattooing, and powder tattooing is something

18   that we see in close range gunshot wounds.

19       Q  Could you tell the ladies and gentlemen of the

20   jury what a close rage gunshot wound is or injury is?

21       A  Basically a close rage gunshot wound for our

22   purposes is any gunshot wound from a distance of less

23   than about a foot and a half with a typical handgun.

24       Q  And Doctor, based on the injuries that you

JIM01876

B-121

SA120

1   found on the body of Eric Morro, would these injuries

2   be consistent with Eric Morro wearing clothing and the

3   gun being held up to his clothing in the area of his

4   left chest or being fired into the clothing at the

5   time that he was alive?

6       A   Yes, you could get findings just like this from

7   that.

8       MR. MURPHY:   Your Honor, I have no further

9   questions.

10      THE COURT:   Cross examination.

11      MR. MURPHY:   Q   Judge, I'm sorry, I do have one

12   additional question.   Doctor, based on your findings,

13   based on the examination that you performed, based on

14   your education, based on your experience, did you

15   determine the cause of death of Eric Morro?

16      A   Yes.

17      Q   What is the cause of death?

18      A   Eric Morro died as a result of a gunshot wound

19   of the chest.

20      MR. MURPHY:   Nothing further, Judge.

21                   CROSS EXAMINATION

22               By Ms. Burke:

23      Q   Doctor, just one question.   Mr. Morro was five

24   foot four, is that correct?

JIM01877

B-122

1        A   Yes.

2        Q   And weighed 176 pounds at the time of the exam?

3        A   Yes, those were the measurements I was given,

4    yes.

5        MS. BURKE:   Thank you, Doctor.   Nothing further,

6    Judge.

7        MR. MURPHY:   Nothing else.

8        THE COURT:   Thank you, sir.   You will be excused.

9        THE WITNESS:   Thank you, your Honor.

10                              (Witness excused.)

11       MR. GAUGHAN:   Your Honor, the people would call

12   Mr. Larry Tueffel.

13                              (Witness sworn.)

14       THE COURT:   Larry, I'm going to ask you to keep

15   your voice nice and loud so the jury will hear you,

16   all right?

17       THE WITNESS:   Okay.

18       THE COURT:   You may proceed.

19                         LAWRENCE TUEFFEL,

20   a witness called on behalf of the People of the State

21   of Illinois, having been first duly sworn, was

22   examined and testified as follows:

23

24

                                        JIM01878

                              B-123

DIRECT EXAMINATION.

By Mr. Gaughan:

1  Q  Larry, in a nice loud voice, would you please

2  state your name and spell your last name?

3  A  Lawrence Tueffel, T-u-e-f-f-e-l.

4  Q  Larry, I'm going to ask you to point over to

5  the individual sitting in the middle over here at this

6  table.  Do you know that person?

7  A  Yes.

8  Q  What's his name?

9  A  T.J.

10  Q  How do you know T.J?

11  A  From I used to be in a gang with him.

12  THE COURT:  What?

13  THE WITNESS:  I used to be in the gang with him.

14  MR. GAUGHAN:  Q  What gang did you used to be in

15  with him?

16  A  Simon City Royals.

17  Q  In February of 1993, were you in the Simon City

18  Royals with T.J?

19  A  Yes, sir.

20  THE COURT:  What date was that?

21  MR. GAUGHAN:  Back in February of '93.

22  THE COURT:  Keep your voice nice and loud.

JIM01879

B-124

SA123

1       MR. GAUGHAN:   Q  Larry, did you know a person by

2   the name of Eric Morro?

3       A  Yes, sir.

4       Q  How did you know Eric?

5       A  I knew him for about four years.  I used to

6   spend the night by his brother's house and that's how

7   I met him.

8       Q  I want to direct your attention specifically

9   back to February 3rd of 1993; a little after 6:00

10  o'clock in the evening.  Were you with Eric Morro?

11      A  Yes, sir.

12      Q  Where were you?

13      A  I was sitting on my porch by Whipple and he

14  came by my house and asked if I wanted to take a walk

15  with him to check to see if a friend was home.

16      Q  Did you take a walk with Eric?

17      A  Yes, sir.

18      Q  Where did you walk to?

19      A  Down Whipple to Albany, because he was supposed

20  to meet him right there on Albany Street.

21      Q  After you went over to check to see if the

22  friend was there, was the friend there?

23      A  No, sir.

24      Q  After you checked on the friend, where did you

JIM01880

B-125

SA124

1  go?

2      A  We went back towards -- through Whipple.

3      Q  I'm sorry?

4      A  We went back, we turned around and started

5  walking back towards Whipple, and then we hit Belmont

6  again.

7      Q  Did you actually get onto Whipple?

8      A  Yes, sir.

9      Q  You took Whipple up to Belmont?

10     A  Yes, sir.

11     Q  When you hit Belmont, which way did you walk on

12  Belmont?

13     A  Toward the lake, eastbound, towards Phil's.

14     Q  As you were walking eastbound on Belmont

15  towards Phil's, first of all, where is Phil's located?

16     A  It's right on Belmont and Sacramento.  There's

17  a lot and then his house is like the next.

18     Q  About in the middle of the block?

19     A  Yes, sir.

20     Q  As you were walking toward Phil's, did you see

21  anybody else out on the street?

22     A  Yes, sir.

23     Q  Who did you see?

24     A  I turned around and looked and I saw Victor and

JIM01881

B-126

SA125

1    T.J.

2        Q   When you say T.J., are you referring to the

3    defendant?

4        A   Yes, sir.

5        THE COURT:   And who else?

6        THE WITNESS:   And Victor Ramos.

7        MR. GAUGHAN:   Q   Did you know Victor?

8        A   Yes.

9        Q   How did you know Victor?

10       A   I used to go to school with him at Linne.

11       Q   Where?

12       A   Linne School, sir.

13       Q   Back in February of 1993, where were you going

14   to school?

15       A   Linne School, sir.

16       Q   What grade were you in?

17       A   I was in eighth grade.

18       Q   When you turned around and you first saw T.J.

19   and Victor, about how far away were they?

20       A   About 15, 20 feet away from us.

21       Q   Were you still with Eric at this time?

22       A   Yes, sir.

23       Q   About where on the block on Belmont were you

24   at?

JIM01882

B-127

```
 1        A   Right between the Honey Baked Ham shop and the
 2   lot, the open lot.
 3        Q   What happened when you saw the defendant and
 4   Victor?
 5        A   I turned around and I saw a gun come out of
 6   T.J.'s pocket.
 7        Q   Out of whose pocket?
 8        A   T.J.'s pocket.
 9        Q   What did the gun look like?
10        A   It was like a little .22, .25, I'd say, chrome.
11        Q   Chrome .22 or .25?
12        A   Yes, sir.
13        Q   Where did T.J. take the gun out from?
14        A   I think under his jacket.
15        Q   Where was Victor at this time?
16        A   By the side of him.
17        Q   Where was Eric?
18        A   Like right -- he was like right next to me.
19        Q   When T.J. took the gun out, did Eric say
20   anything?
21        A   Yes, sir.
22        Q   What did he say?
23        A   First Victor asked -- told him that he owed Leo
24   some money, and then Eric turned around and said,
```

JIM01883

B-128

SA127

1    "That's none of your business," and kept on walking.

2        Q   When this happened, what was T.J. doing?

3        A   Just standing there.

4        Q   Did he put the gun back away?

5        A   Yes, sir.

6        Q   Then what happened?

7        A   Then we kept on walking towards Phil's, and

8    then I turned around again and I saw the gun back out

9    and Victor pushed --

10       Q   Let me stop you for a minute.  What was T.J.

11   doing then?

12       A   He walked and then he had the gun back out when

13   I looked.

14       Q   What was he doing with his hands?

15       A   He had the gun in his hand.

16       Q   What was he doing with the other hand?

17       A   I don't know, sir, I'm not sure.

18       Q   After he took the gun out, what happened?

19       A   Then Victor pushed him up against the wall

20   towards Honey Baked Ham on the wall, and then Eric

21   tried to take a swing and he missed, and that's when

22   he put the gun to his chest and it fired off.

23       Q   Who put the gun to his chest?

24       A   T.J., sir.

JIM01884

B-129

SA128

1        Q   Now, throughout this whole time was T.J. saying

2   or doing anything?

3        A   No, sir.

4        Q   Larry, you're going to have to speak up.

5        A   Okay.

6        Q   Did T.J. ever make any gang signs?

7        A   He threw up one sign, sir.

8        Q   What was the sign?

9        A   Like this.

10       Q   I'm sorry, could you please stand up and

11   demonstrate for the ladies and gentlemen of the jury?

12       A   Like this.

13       Q   What does that mean?

14       A   Royals.

15       Q   Was that before or after he pulled out the gun

16   the second time?

17       A   That was before.

18       Q   Now, when T.J. took the gun and put it to

19   Eric's chest and fired it, where were you at?

20       A   I was by the side of the lot, the first pole.

21   There's like four poles and I was standing like by the

22   first pole by the lot.

23       THE COURT:  First what?

24       THE WITNESS:  The first pole by the lot, there's

JIM01885

B-130

SA129

1  four poles.  There's a vacant lot, there's four poles.

2  I was standing by the first one.

3      MR. GAUGHAN:  Q Larry, after T.J. shot Eric, what

4  did T.J. and Victor do?

5      A  They ran around the corner towards Whipple.

6      Q  Down Belmont?

7      A  Yes.  They turned around and ran, and I ran to

8  the vacant lot and I looked through the alley and you

9  could see straight past, you know, through the alley.

10     THE COURT:  You could see what?

11     THE WITNESS:  I looked, I ran through the vacant

12  lot and I looked and I saw them running toward the

13  alley, down the alley by Whipple.

14     MR. GAUGHAN:  Q  Larry, would the diagram help you

15  explain what directions you're talking about?

16     A  Yes, sir.

17     Q  I'm going to ask you to step down, Larry.

18         Where were you standing when T.J. shot Eric?

19     A  Right here.

20     Q  That's a vacant lot?

21     A  Yes, sir.

22     Q  I'm going to ask you to put an orange sticker

23  where you were standing.

24     A  Right here.

JIM01886

B-131

Q   And after he shot him, can you point on the
diagram which way the defendant T.J. and Victor ran?

A   They ran, turned around like this and ran to
the corner and near Whipple.

Q   Could you take this pen and draw a line with an
arrow the direction they ran?

A   (Indicating.)

Q   Is that also the direction they originally had
come from?

A   Yes.

Q   They were walking east on Belmont?

A   Yes, sir.

Q   After they shot, which way did you go?

A   I went through the vacant lot and I ran.   This
is the alley right here and I looked and I seen them.

Q   So there's another alley up here?

A   Yes.

Q   So let me put an arrow which way you ran.

A   I ran here through the vacant lot and I looked.

Q   Looked down the alley going here.   Put a line
where the alley is.

A   Right here, straight down.

Q   Then you saw them running down Whipple?

A   Yes, sir.

JIM01887

B-132

1      Q  Larry, you can have a seat again.

2         Larry, after you ran down the alley or

3 through the vacant lot and you looked down the alley,

4 did you go back up in front of the vacant lot where

5 Eric had been shot?

6      A  Yes, sir.

7      Q  And did an ambulance arrive?

8      A  Yes, sir.

9      Q  Did an ambulance take Eric away?

10     A  Yes, sir.

11     Q  Did the police then arrive?

12     A  Yes, sir.

13     Q  And were you put in a police car?

14     A  Yes, sir.

15     Q  At that time?  You were in the police car with

16 anybody else?

17     A  Yes, sir.

18     Q  Who were you in the police car with?

19     A  Phil.

20     Q  Would that be Phil Torres?

21     A  Yes, sir, Phil Torres.

22     Q  Did Phil say anything to you then?

23     A  Yes.

24     Q  What did he say?

JIM01888

B-133

SA132

1    A  He asked me was it T.J.

2    THE COURT:  He asked you what?

3    THE WITNESS:  He asked me if it was T.J.

4    MR. GAUGHAN:  Q  What did you tell him?

5    A  I told him no, it wasn't.

6    Q  Larry, why did you tell Phil that it wasn't

7  T.J?

8    A  Because I was scared.

9    Q  Why were you scared?

10    A  Because I lived right in the neighborhood and I

11  didn't want nothing to happen to my family or my

12  house.

13    Q  Why did you think something would happen to

14  your family or your house?

15    A  Because when you're in the gang, you're not

16  supposed to testify against somebody that's in the

17  gang with you.

18    Q  What do they call that?

19    A  Tricking on you.

20    Q  What happens if you trick on another gang

21  member, another guy in the Royals?

22    A  End up dead.

23    Q  I'm sorry?

24    A  You end up dead.

JIM01889

B-134

1    Q  As a matter of fact, Larry, you were subpoenaed

2  to testify in here for Wednesday of this week, is that

3  correct?

4    A  Yes, sir.

5    Q  And you didn't honor that subpoena, is that

6  correct?

7    A  Yes, sir.

8    Q  And on Thursday morning the state's attorney

9  investigator went out and personally picked you up and

10  brought you into this courtroom, correct?

11    A  Yes, sir.

12    Q  And when they brought you into the courtroom,

13  the judge put you in custody, is that correct?

14    A  Yes, sir.

15    Q  And he held you in custody until you testified,

16  is that correct?

17    A  Yes, sir.

18    Q  And you didn't want to come in here and testify

19  against T.J., did you?

20    A  No, sir.

21    Q  Larry, that evening after you were put in the

22  car, you were taken to the police station, right?

23    A  Yes, sir.

24    Q  And you gave the police a description, right?

JIM01890

B-135

SA134

1    A  Yes, sir.

2    Q  Did you give a description of T.J?

3    A  No.

4    Q  Why didn't you give a description of T.J?

5    A  Because I was scared, nervous.

6    Q  Did you give them a description that didn't

7  match T.J?

8    A  Yes, sir.

9    Q  Later on that night, after you were let go from

10  the police station, did you again talk to the police?

11    A  Yes, sir.

12    Q  Where was that at?

13    A  They came back to my house around 3:00, 3:30 in

14  the morning.

15    Q  Was it two detectives that came back to your

16  house?

17    A  Yes, sir, the same ones I talked to earlier.

18    Q  What happened when the detectives came back to

19  your house?

20    A  They picked me up and brang me back to the

21  station.

22    Q  Did they show you -- did you have a

23  conversation with them?

24    A  Yes, sir.

JIM01891

B-136

SA135

1    Q   What did they say to you?

2    A   They asked me the description and everything of

3    the person that shot.

4    Q   Did they tell you -- did they tell you anything

5    about what you had told the police earlier?

6    A   Yes, sir.

7    Q   What did they tell you?

8    A   That I was lying and they had other witnesses

9    that saw.

10   Q   And after they told you that you were lying,

11   did you tell them what really happened?

12   A   Yes, sir.

13   Q   What did you tell them?

14   A   That it was T.J.

15   Q   Did they ever tell you that it was T.J?

16   A   No, sir.

17   Q   You were also shown, do you remember being

18   shown a group of photographs?

19   A   Yes, sir.

20   Q   Where were you shown the group of photos?

21   A   Inside this one room.

22   Q   Okay.  That night you looked at a group of

23   photos, right?

24   A   Yes, sir.

JIM01892

B-137

1      Q   You also looked at a lineup?

2      A   Yes, sir.

3      Q   When you were shown the group of photos, where

4   were you at?

5      A   I was in the police station.

6      Q   You also, Larry, you also viewed a lineup,

7   correct?

8      A   Yes, sir.

9      Q   And you identified somebody in that lineup,

10   correct?

11      A   Yes, sir.

12      Q   This was about ten o'clock in the morning on

13   February 4th of 1993?

14      A   Yes, sir.

15      Q   Who did you pick out in the lineup?

16      A   T.J.

17      Q   Why did you pick T.J. out in the lineup?

18      A   Because that was the person that did it.

19      THE COURT:  What?

20      MR. GAUGHAN:  Q   I'm sorry, you're going to have

21   to speak up.

22      A   That was the person that did it.

23      Q   Did anybody tell you who to pick out?

24      A   No, sir.

JIM01893

B-138

SA137

1    Q   Who was in the room with you when you picked

2  out T.J?

3    A   Nobody, just me and the two officers.

4    Q   One moment, your Honor.

5        Larry, I'm going to show you what I have

6  marked as People's Exhibit Number 8 for purposes of

7  identification.  What does that photograph depict?

8    A   T.J.

9    Q   Is it a photograph of the lineup you viewed?

10   A   Yes, sir.

11   Q   That was on February 4th of 1993 at Grand and

12  Central police station about ten o'clock in the

13  morning?

14   A   Yes, sir.

15   Q   Where is T.J. pictured in that photograph?

16   A   Right here.

17   Q   Indicating, for the record, he's pointing out

18  the person second from left.  Is that who you picked

19  out when you viewed the lineup?

20   A   Yes, sir.

21   Q   I show you what's marked as People's Exhibit

22  Number 9 for purposes of identification.  What does

23  that photograph depict?

24   A   T.J.

JIM01894

B-139

SA138

1       Q   Is that the way T.J. looked when you picked him

2   out in the lineup on February 4th of 1993?

3       A   Yes, sir.

4       Q   Larry, was Eric Morro in a gang?

5       A   No, sir, never was.

6       Q   I'm sorry?

7       A   Never was, never was in nothing.

8       MR. GAUGHAN:  One moment, Judge.

9           I have no further questions.

10      THE COURT:  Cross-examine.

11                      CROSS EXAMINATION

12                   By Mr. Hill:

13      Q   Mr. Tueffel?

14      A   Yeah.

15      Q   You said that you told Torres -- Phillip Torres

16  told you in the police car that he thought it was,

17  thought it was T.J?

18      A   Yes, sir.

19      Q   Now, do you recall testifying on May 7, 1993,

20  regarding this matter, sir?  Do you recall testifying

21  May 27, 1993, in this matter?

22      A   Yes, sir.

23      Q   And you took an oath like you took today to

24  tell the truth?

JIM01895

B-140

SA139

1    A  No.

2    Q  I can't hear you?

3    A  No.

4    Q  You didn't take an oath?

5    A  No.

6    Q  Huh?

7    A  No.

8    Q  You testified in court and didn't take an oath?

9    A  Didn't take what?

10   Q  Did you tell the court on May 7, 1993, that you

11   would tell the truth?

12   A  Yes, sir.

13   Q  And do you recall being asked this question and

14   giving this answer?  "You didn't talk to Phillip

15   Torres," and your answer was no.  Do you recall that?

16   THE COURT:  Are you reading the exact question?

17   MR. HILL:  That was the exact question as it is

18   word for word, your Honor.

19   THE WITNESS:  I did talk to him.

20   MR. HILL:  Q  Do you recall being read that

21   question and giving that answer?

22   A  No.

23   Q  I can't hear you, I'm sorry?

24   A  No.

JIM01896

B-141

SA140

1      MR. MURPHY:  Your Honor, I'm going to object

2  because it's taken out of context.  If the Court, if

3  the attorney would read the question before, he'd

4  realize this question is taken out of context.

5      MR. HILL:  I read the question before.

6      THE COURT:  The question before, "Did you talk to

7  Phillip."

8      MR. HILL:  The question before.  Now, you also had

9  a conversation before --

10     THE COURT:  Wait.  Read the question before so

11  we'll know.

12     MR. HILL:  Q  That's what I'm reading right now,

13  your Honor.

14         "Now, you also had a conversation before the

15     police officer came back and talked to you the

16     second time, you had a conversation with Mr.

17     Torres, didn't you?"

18         Your answer was no.  Then the following

19  question:

20         "You didn't talk to Phillip Torres?

21         "No."

22         Now, were you read those questions and gave

23  those answers?

24     MR. GAUGHAN:  Objection, it's not impeaching.  It

JIM01897

B-142

SA141

1   refers to a different time.

2      THE COURT:  Let me see the transcript. .  It's a

3   simple thing to read.

4         Well, you're going to have to read the entire

5   transcript to get the conversation, because I'm not

6   quite sure.

7      MR. HILL:  Let me finish cross-examining him, not

8   on that, let me move on.

9      THE COURT:  Wait wait wait, counsel.  We are on

10  something I don't wish to get off at this time, but

11  the transcript said:

12        "But when the police originally talked to

13        you, you told them you didn't know them, is that

14        right."

15        Nodding head up and down.

16        "You lied to the police officer, right?

17  Right?

18        "Yes.

19        "In fact, you told the police officer someone

20        named Frankie.

21        "Yes.

22        "Now, also you had a conversation before the

23        police officer came back and talked to you the

24        second time.  You had a conversation with Mr.

JIM01898

B-143

SA142

1     Torres, didn't you?

2         "No."

3         Now, I don't know, I'm not sure and it's not

4     clear from here what conversation we are talking

5     about, a second time, and I don't know.

6         MR. HILL:  If I can examine.

7         THE COURT:  All right.  Here's your transcript.  I

8     don't know if the witness knows what you're talking

9     about, you're asking about.  The transcript indicates

10    there's two conversations.

11        MR. HILL:  Q  Okay, you talked to some police

12    officers right after the incident, is that correct?

13        A  Yes.

14        Q  Those were blue, in uniform, right?

15        A  Yes.

16        Q  And at that time you were in a police car,

17    right?

18        A  Yes.

19        Q  And at that time Phillip Torres was in there

20    too, right?

21        A  Yes, that's the only time I talked to him was

22    that night.

23        Q  Did you have another conversation with some

24    detectives about 9:30 that night?

JIM01899

B-144

SA143

1      A   Yes.

2      Q   Huh?

3      A   Yes.

4      Q   Did you have a conversation with Phillip at

5  that time?

6      A   No.

7      Q   Then you had another conversation with the

8  police officers at 3:30, is that right?

9      A   Yes.

10     Q   Now, the first time you talked to the police

11  officers, you gave them a description, right?

12     A   Yes.

13     Q   You gave them a description of one gentleman

14  wearing a blue and -- a purple jacket with gold

15  lettering, is that right?

16     A   Yes.

17     Q   And that's -- and you also gave a description

18  of another gentleman wearing a Georgetown jacket,

19  right?

20     A   Yes.

21     Q   And that was at about 6:30, right after this,

22  right?

23     A   Yes.

24     Q   When it was fresh in your mind, right?

JIM01900

B-145

1    A  Yeah.  I'm not really sure what time it was.

2    Q  Right after the incident?

3    A  Yes.

4    Q  Now, you had another conversation with a

5  detective at 9:30, right?

6    A  Yes.

7    Q  And in fact, at that time you also told them --

8  let's go back to the first one.  You also told them

9  that the person was male white, right?

10    MR. MURPHY:  Objection, which person?

11    MR. HILL:  The police officer.

12    THE COURT:  First conversation at 6:30.

13    MR. HILL:  First conversation, your Honor.

14    THE COURT:  Put it in the context.

15    MR. HILL:  Q  First conversation at 6:30 in the

16  police car you told them it was a male Hispanic,

17  right?

18    A  Yes.

19    MR. MURPHY:  Objection, Judge.  What's he

20  referring to, the shooter?

21    THE COURT:  I don't know.

22    MR. HILL:  The shooter.

23    THE COURT:  Well, what does it say?

24    MR. HILL:  I'm not looking at that.  I'm looking

JIM01901

B-146

SA145

1    at the description.

2         THE WITNESS:  Yes, I said the shooter.

3         MR. HILL:  Q  Male white, right?

4         A   No.

5         Q   What?

6         A   Male Hispanic.

7         Q   Male Hispanic, five-four to five-five?

8         A   Yes.

9         Q   13 to 14 years old?

10        A   That's what I remember.

11        Q   Curly black hair?

12        A   Yes.

13        Q   Wearing a purple jacket with yellow lettering,

14   right?

15        A   Yes.

16        Q   Baggy jeans, right?

17        A   I don't know about the jeans, sir.

18        Q   Now, the second offender you gave, you said

19   male white, right?

20        A   Yes.

21        Q   Or male Hispanic?

22        A   I'm not sure.

23        Q   13 years old, right?

24        MR. MURPHY:  Objection, Judge.

JIM01902

B-147

SA146

1          THE WITNESS:  I'm not sure.

2          THE COURT:  What's your objection?

3          MR. HILL:  Q  13 to 14, five-six to five-seven,

4     right?

5          A  Yes.

6          Q  Wearing a Georgetown jacket, right?

7          A  Yes.

8          Q  Now, you knew Thaddeus then, didn't you?

9          A  For about -- yeah.

10          Q  How long did you know him?

11          A  About a year or so.

12          Q  You didn't tell that officer at 6:30 it was

13     Thaddeus, did you?

14          A  No.

15          Q  Now, you also knew Victor, right?

16          A  Yes.

17          Q  Did you tell officer that you knew one of the

18     offenders from school that day named Victor?

19          A  Yes.

20          Q  You did?

21          A  Yes.

22          Q  Now, this is at 6:30?

23          A  Yes.

24          Q  Now, you were taken into custody on Wednesday

JIM01903

B-148

SA147

1    or Thursday?

2        A   Thursday.

3        Q   Yesterday?

4        A   Yes.

5        Q   Now, you said you were a member of the Simon

6    City Royals?

7        A   Yes.

8        Q   Are you still a member?

9        A   No.

10       Q   Now, in order to get out, you have to be

11   violated?

12       A   Yes.

13       Q   Can you speak up?

14       A   Yes.

15       Q   Violate is what, if you can explain to this

16   jury?

17       A   Get your V's out.

18       Q   I can't hear you, speak up.

19       A   They punch you.

20       Q   They punch you?

21       A   Yeah, like a violation out.

22       Q   How many people punch you to violate you out?

23       A   Like two, two at a time, two or three.

24       Q   How long?

JIM01904

B-149

SA148

1     A   About, I don't know, I'm not sure.

2     Q   I can't hear you?

3     A   I'm not sure, about three minutes.

4     Q   When were you violated out?

5     A   I didn't get violated out.

6     Q   You said you had a conversation with a

7   detective at 9:30, right, that evening?

8     A   Yes.

9     Q   9:30 on February 3, 1993, right?

10    A   Yes.

11    Q   And this was at the police station, right?

12    A   Yes.

13    Q   And you gave a description again, isn't that

14   correct?

15    A   Yes.

16    Q   And that description was a male Hispanic,

17   right?

18    A   Yes.

19    Q   His name was Frankie, right?

20    A   Yes.

21    Q   And his head was shaved, right?

22    A   Yes.

23    Q   With black spikes?

24    A   Yeah.

JIM01905

B-150

SA149

1      Q  On top, and he had a blue Georgetown jacket?

2      A  I said a dark.  I don't know what color it

3  really was, it was dark.

4      Q  Georgetown jacket?

5      A  Yes.

6      Q  Now, you said the other one was male white, 13

7  to 14, right?

8      A  What is this, the second time?

9      Q  The second time.

10     A  Yes.

11     Q  Shaved sides, right?

12     A  No.

13     Q  You didn't say shaved sides?

14     A  Not the second time when the police found out.

15     Q  You said curly top?

16     A  Yeah.

17     Q  And you said that he had a turquoise jacket

18  with yellow lettering this time, right?

19     A  Yeah.

20     Q  Now, that was at 9:30, right?

21     A  I'm not sure what time it was.

22     Q  That was at the police station, right?

23     A  Yes.

24     Q  Now, did you see Torres there at 9:30 at the

JIM01906

B-151

SA150

1    police station?

2        A  Torres?

3        Q  Phillip Torres.

4        A  No, sir.

5        Q  Now, you said at one or about 3:30 the police

6    came by your house?

7        A  I said around 3:30, yeah, in the morning.

8        Q  3:30 February 4, 1993?

9        A  Yes.

10       Q  They came to your house, right?

11       A  Yes.

12       Q  And they interviewed you, right?

13       A  Yes.

14       Q  And the first thing you told them, I'm sorry,

15   let's go back to 9:30 at the police station.  Did you

16   tell them it was Thaddeus then?

17       A  No.

18       Q  Did you tell them Victor was there?

19       A  Yes.

20       Q  You told them that at 9:30, okay.  Now, at 3:30

21   they came to your house, right?

22       A  Yes.

23       Q  And they asked you what happened, right?

24       A  Yes.

JIM01907

B-152

SA151

1    Q  And you told them basically the same thing that

2  you had told them at 6:30 on February 3rd, at 9:30

3  February 3rd, right?

4    A  Yes.

5    Q  And then in fact they told you what Phillip

6  Torres had told them and then you changed your story,

7  isn't that correct?

8    A  No, I changed my story after they told me there

9  was other witnesses that saw, that's when I told the

10  truth.

11    Q  Now, so you're saying previously you lied,

12  right?

13    A  Yes, I lied.

14    Q  So you had a habit of lying to the police, is

15  that correct?

16    A  No, I don't have a habit of lying to the

17  police.

18    MR. MURPHY:  Objection.

19    THE COURT:  Overruled.

20    MR. HILL:  Q  You lied to the police at 6:30?

21    A  Yeah, maybe I did.

22    MR. MURPHY:  Asked and answer.

23    MR. HILL:  Q  Maybe you did, maybe you didn't?

24    THE COURT:  Overruled.

JIM01908

B-153

1      THE WITNESS:  Yeah, I did.

2      MR. HILL:  Q  Before you said you did.  Did you

3  say maybe you did and maybe you didn't?

4      A  I said maybe I did.

5      Q  I can't hear you, sir.

6      A  Maybe I did.  Yes, I lied.

7      Q  You lied at 6:30?

8      A  Yes.

9      Q  Did you lie at 9:30?

10     A  Did I lie at 9:30?

11     Q  Yes, sir.

12     A  Yeah.

13     Q  I'm sorry, I can't hear you.

14     A  Yes.

15     Q  Huh?

16     A  Yes.

17     Q  You lied at 9:30?

18     A  Yes.

19     Q  You lied at 3:00 o'clock?

20     A  No.

21     Q  In the morning when they first asked you what

22  happened?

23     A  When they first asked me, yes, I did.

24     Q  Now, you said -- now, did they tell you -- they

JIM01909

B-154

SA153

1    didn't tell you what Phillip Torres said?

2        A   No.

3        Q   Did they tell you they talked to Phillip

4    Torres?

5        A   No, they didn't.  They just told me they had

6    witnesses, other witnesses.

7        Q   This was the detective, right?

8        A   Yes.

9        Q   Now, do you recall Page 25, gentlemen, do you

10   recall on May 7, 1993, saying you would tell the

11   truth?

12       A   I don't remember, sir.

13       Q   You don't remember testifying and saying that

14   you would tell the truth?

15       A   Yes, I do remember.

16       Q   You remember now?

17       A   Yeah.

18       MR. GAUGHAN:  I think if counsel referred to the

19   juvenile hearing instead of dates, the witness might

20   have a better chance of remembering.

21       THE COURT:  Just make sure he knows what you're

22   talking about, that's all.

23       MR. HILL:  I think he does.

24       THE COURT:  Just make it clear.

JIM01910

B-155

SA154

1      MR. HILL:   Q  Do you recall, "And why was it that

2  you decided to tell the detectives what happened."  Do

3  you recall being asked that question?

4      A  Yes.

5      Q  And do you recall giving this answer?  "Because

6  I found there was another witness and the detectives

7  told me that I wasn't telling them the story right the

8  first time and then," do you recall answering that

9  question and giving that answer?

10     A  No, sir.

11     Q  You don't?

12     MR. MURPHY:  Judge, I'm going to object.  That's

13  not impeaching, that's just what he testified to.

14     THE COURT:  Basically that's what he said.

15         He said the reason he told the truth is

16  because they said they had other witnesses that told a

17  different story.  You want me to have the court

18  reporter read that back?

19     MR. HILL:  No, I'm fine, your Honor.

20     Q  (By Mr. Hill)  Do you recall that today,

21  September 30, 1994, this morning, you were in the back

22  and I came back there?

23     A  Yes.

24     Q  And I told you that I was Thaddeus' lawyer?

JIM01911

B-156

SA155

1      A   Yes.

2      Q   And that I wanted to interview you?

3      A   Yes.

4      Q   And I asked you to tell me and I asked you, I

5   said do you mind telling me the truth?

6      A   Yes.

7      Q   And you told me no?

8      A   I told you I don't have to tell you anything.

9      Q   And I said I just wanted to know the truth and

10   you told me no, right?

11      MR. MURPHY:  Objection.

12      THE COURT:  Overruled.

13      MR. HILL:  Q  Huh?

14      A   What?

15      THE COURT:  What's the question?

16      MR. HILL:  Your Honor, I asked him, I said do you

17   mind telling me the truth, please.

18      THE WITNESS:  And I answered.  I said that I don't

19   have to tell you nothing.

20      MR. HILL:  Q  You have lied in the past.  Are you

21   lying today?

22      A   No.

23      MR. MURPHY:  Objection.

24      THE COURT:  Overruled.

JIM01912

B-157

1      THE WITNESS:  No, sir, I'm not.

2      MR. HILL:  Q  Oh, you said that day that Thaddeus

3   before all of this happened, that Thaddeus threw the

4   gang sign, right?

5      A  Yes.

6      Q  How did he throw it?  Show me again.

7      A  Like this.

8      Q  Now, when he threw that, did you tell the

9   police officer at 6:30 that somebody threw a gang

10  sign?

11     A  No.

12     Q  Did you tell them at 9:30 February 3, 1993,

13  somebody threw the gang sign?

14     A  No.

15     Q  Did you tell them during the first conversation

16  February 4, 1994, at 3:00 o'clock in the morning that

17  somebody threw the gang sign?

18     A  No, sir.

19     Q  Did you tell them on February 4, 1994, 1993, at

20  3:00 a.m. the second conversation you had with them

21  that somebody threw the gang sign?

22     A  Yes.

23     Q  You did?

24     A  Yes.

JIM01913

B-158

1        MR. HILL:  Thank you very much.

2                    REDIRECT EXAMINATION

3                    By Mr. Gaughan:

4        Q  Larry, you testified that you are not a Royal

5    any longer, right?

6        A  Yes.

7        Q  You also testified the gang never violated you?

8        A  Yes.

9        Q  You took yourself out of the Royals, correct?

10       A  They didn't want me in there anymore.

11       THE COURT:  I'm sorry, I can't hear you.

12       THE WITNESS:  They didn't want me in it no more

13   after what happened.

14       MR. GAUGHAN:  Q  After you talked to the police,

15   you told them the truth about what happened on

16   February 3rd, you weren't too popular with the Royals,

17   were you?

18       A  No, sir.

19       Q  How do the Royals view turning in another

20   Royal?

21       MR. HILL:  Objection, your Honor.

22       THE COURT:  I believe that was asked and answered.

23       MR. GAUGHAN:  Judge, I believe it goes to his

24   cross examination.  He started asking about being

                                    JIM01914

                    B-159

SA158

1    violated, why he's not a Royal.

2        THE COURT:  It did come up in cross.  I don't know

3    where you're going.  Ask it, go ahead.

4        MR. GAUGHAN:  Q  How do the Royals look at one of

5    their own turning in another Royal?

6        A  They don't like that.

7        Q  Was Victor Ramos a Royal?

8        A  No, sir.

9        Q  The first time you told the police that Victor

10   was the other offender with T.J. was the third time

11   you talked to the police?

12       A  Yes.

13       MR. HILL:  Judge, objection.  That was not the

14   examination, and furthermore I didn't -- that was not

15   the -- that was not what he said.

16       THE COURT:  Read the question back to me.

17                              (Record read.)

18       THE COURT:  I don't understand the question.  Can

19   you make that a little clearer?  I'm not quite sure.

20       MR. GAUGHAN:  Q  Okay, you talked to the police at

21   6:30?

22       A  Yes.

23       Q  You told them you didn't know either one of the

24   offenders?

JIM01915

B-160

SA159

1     A   Yes, sir.

2     Q   You talked to the police at 9:30, you told them

3   you didn't know either one of the offenders, right?

4     A   Yes.

5     Q   Then when you talked to the police for the

6   third time, whatever it was, 3:00 or 4:00 o'clock in

7   the morning, that was the first time you told the

8   police you knew either T.J. or the other offender,

9   right?

10    A   Yes.

11    MR. GAUGHAN:  I have no further questions.

12    MR. HILL:  Judge, if I may impose on the court

13  reporter, but I asked him those questions earlier and

14  he told me he did tell the police.

15    THE COURT:  What are you saying?

16    MR. HILL:  He said that he told the police at 6:30

17  it was Victor, he told them at 9:30 it was Victor, and

18  he told them in the first conversation it was Victor.

19  Now you're saying it wasn't, right?  She can read it

20  back.

21    MR. GAUGHAN:  If there's any impeachment, he can

22  prove it up with the police reports.

23    MR. HILL:  I want to if I can have her read back

24  my cross examination.

JIM01916

B-161

1    THE COURT:  Wait.  Counsel, you want the court

2  reporter to read it back?

3    MR. HILL:  Yes.

4    THE COURT REPORTER:  It will take me a few minutes

5  to find it.

6    MR. GAUGHAN:  We'll stipulate that he said it on

7  cross, I was just merely attempting to clarify it.  I

8  don't think he understood the question.

9    THE COURT:  Do you wish to stipulate?  What are

10  you stipulating to?

11    MR. GAUGHAN:  We will stipulate that on cross

12  examination when he was asked the questions at 6:30 at

13  9:30, he said that he did name Victor.  We'll

14  stipulate to that.

15    THE COURT:  He did name Victor?

16    MR. GAUGHAN:  I was merely attempting to clarify.

17  I don't think he understood.

18    THE COURT:  Fine, stipulate.

19                    RECROSS EXAMINATION

20                    By Mr. Hill:

21    Q  So on cross you said that you saw Victor and

22  then on redirect you said you didn't, is that correct?

23    A  Yes.

24    Q  Now, you said you're no longer a member of the

JIM01917

B-162

SA161

1    Simon City Royals?

2        A  No.

3        Q  Huh?

4        A  No.

5        Q  No, you're not?

6        A  No.

7        Q  Did you turn in your membership card?

8        A  No membership card.

9        MR. HILL:  Thank you.  No further questions.

10       MR. GAUGHAN:  No questions, Judge.

11       THE COURT:  Thank you, sir.  You're excused.

12                              (Witness excused.)

13       THE COURT:  Your next witness going to be lengthy?

14       MR. MURPHY:  Sandra Elder, Judge.

15       THE COURT:  All right.

16                         (Witness sworn.)

17                    SANDRA ELDER,

18   a witness called on behalf of the People of the State

19   of Illinois, having been first duly sworn, was

20   examined and testified as follows:

21                    DIRECT EXAMINATION

22                    By Mr. Murphy:

23       Q  Ma'am, would you please state your name and

24   spell your first and your last name for the court

                                        JIM01918

                              B-163

SA162

1    reporter?

2        A  My name is Sandra Elder, S-a-n-d-r-a

3    E-l-d-e-r.

4        Q  Ma'am, what area of the city do you live in?

5        A  I live on the northwest side.

6        Q  Who do you live with?

7        A  I live with my husband and my son John.

8        Q  Do you have any children?

9        A  Yes.

10       Q  How many children do you have?

11       A  Two, Tina and John.

12       Q  And Tina is not living in your house now?

13       A  No, she's not.

14       Q  Ma'am, are you employed?

15       A  Yes, I am.

16       Q  What is your occupation?

17       A  I'm a bar maid.

18       Q  I'd like to refer you back now, if I may, to

19   February 3, 1993.  Do you remember that date?

20       A  Yes, I do.

21       Q  Did you work on that day?

22       A  Yes, I did.

23       Q  What time did you get off of work?

24       A  I got off at 5:00 p.m.

JIM01919

B-164

SA163

1    Q  After you got off work at 5:00 o'clock, did you

2  go anywhere?

3    A  Yes, I went home first to change clothes and

4  then I went to pick my husband up at Wally's Lounge.

5    Q  Had you talked to your husband about meeting at

6  that location after you got off work?

7    A  Yes, we did.

8    Q  What time did you get to Wally's Lounge?

9    A  I got to Wally's Lounge around 6:00 o'clock.

10    Q  Where is Wally's Lounge located?

11    A  It's located at 3017 West Belmont.

12    Q  That would be on the south side of Belmont, is

13  that correct?

14    A  Yes.

15    Q  When you got to Wally's Lounge, did you go

16  inside?

17    A  Yes, I did.

18    Q  Who was in there?

19    A  My husband.

20    Q  What time did you get to Wally's Lounge?

21    A  It was around 6:00 o'clock.

22    Q  And after you got to Wally's Lounge and you met

23  your husband, what did you do?

24    A  I ordered a beer and had a beer.

JIM01920

B-165

1    Q  And while you were at Wally's Lounge, did

2    anybody else show up there?

3    A  Yes, my daughter Tina came in.

4    Q  How long after you got to Wally's Lounge did

5    Tina appear?

6    A  It was around 6:15 when she came in.

7    Q  Now, when Tina came into Wally's Lounge, did

8    you speak to her for a period of time?

9    A  Around five minutes.

10    Q  What happened then?

11    A  She had left the bar.

12    Q  When she left the bar, did you notice anything

13    in the bar?

14    A  Yes, she had left her car radio on the bar.

15    Q  What did you do when you noticed that she had

16    left the radio there?

17    A  I picked up the radio and ran out the door and

18    called for her that she had left the radio.

19    Q  When you got to the door of Wally's Lounge,

20    where was your daughter Tina at that time?

21    A  Tina was across the street on Belmont.

22    Q  What did you do?

23    A  I proceeded to cross the street.

24    Q  Now, as you were crossing Belmont, did you see

JIM01921

B-166

1    anybody else on Belmont Avenue?

2         A  Yes, I did.

3         Q  Who did you see?

4         A  I saw Larry Tueffel, Eric Morro, that young man

5    right there in the brown suit, and another young man

6    in a dark suit.

7         Q  In addition to that, did you see anybody else

8    outside that was not on the street?

9         A  I saw Phil Torres.

10        Q  Where was Phil Torres at?

11        A  He was in his window.

12        Q  Now, you testified that you saw Eric Morro and

13   you saw Larry Tueffel?

14        A  Yes, sir.

15        Q  What were they doing?

16        A  They were walking down Belmont Avenue.

17        Q  Which way?

18        A  They were going east.

19        Q  And you testified you also saw a person who you

20   identified here in court, is that correct?

21        A  Yes.

22        Q  For the record, the witness pointed to the

23   defendant, if the record may reflect.

24             When you saw the defendant, was he with

JIM01922

B-167

1    anybody or was he alone?

2        A   The defendant?

3        Q   Yes.

4        A   He was with another young man.

5        Q   And did you know the other young man that he

6    was with?

7        A   No, I did not, just seeing him from around the

8    neighborhood, I knew he was from the neighborhood.

9        Q   Could you describe the other young man that he

10   was with?

11       A   He was about 13 years old, maybe around five

12   foot five. He was wearing dark clothes.

13       Q   Now, Eric Morro, you knew him on February 3,

14   1993, is that right?

15       A   Yes, I have known Eric since he was two years

16   old.

17       Q   What was your relationship to him?

18       A   Eric had lived with me and my family for the

19   last two years.

20       Q   That was before he was killed?

21       A   Yes.

22       Q   And how would you characterize your

23   relationship with him?

24       A   I was like his stepmother.

JIM01923

B-168

SA167

1    Q  In fact, what did he call you?

2    A  He called me mom.

3    Q  And did you also know Larry Tueffel?

4    A  Yes, I did.

5    Q  And how did you know him at that time?

6    A  Just from the neighborhood.

7    Q  Ma'am, could you describe, as you were in the

8    middle of Belmont Avenue, could you describe what you

9    observed?

10    A  Okay, I observed that young man and the other

11    young man walking down the street.  The other young

12    man grabbed a hold of Eric Morro, flung him around.

13    Q  I'm going to stop you.  Could you describe the

14    way you saw him fling Eric Morro around?

15    A  Grabbed him by the right arm and flung him back

16    up against the wall of Honey Baked Ham.

17    Q  And where is Honey Baked Ham, where was Honey

18    Baked Ham in relation to where you were on the street?

19    A  We were about 25 feet, I was in the middle of

20    the street.

21    Q  You were about 25 feet from that location?

22    A  Yes.

23    Q  And after the young man placed or threw Eric

24    against the wall, what else happened?

JIM01924

B-169

1      A   This young man sitting right here went up to

2   Eric, put his hand inside his jacket and pulled

3   something out and went up to Eric and shot him.

4      Q   Now, could you describe what you saw this

5   person with the gun do?

6      A   He just pushed Eric up against the wall.

7      Q   I'm talking about the person with the gun.

8      A   The gun?

9      Q   Yes.

10     A   He just shot Eric.

11     Q   Where was the gun at when the gun was fired?

12     A   The gun was right up against Eric's chest.

13     Q   What part of his chest?

14     A   Right here.

15     MR. MURPHY:  For the record, Judge, the witness

16   pointed to the left center of the chest.

17     THE COURT:  All right.

18     MR. MURPHY:  Q   After the gun was fired, what

19   happened, ma'am?

20     A   Eric staggered up to me.  He says, "Ma, I've

21   been shot."

22     Q   Then what happened?

23     A   He fell in my arms.  I ripped his jacket open,

24   I seen the shot.  Someone ran and called the police

JIM01925

B-170

SA169

1  and the ambulance and they arrived.

2      Q  What did the two young men do the man who shot

3  Eric and the other man with him?

4      A  They ran.

5      Q  Where did they run?

6      A  I can't say I was tending to Eric.

7      Q  And did an ambulance arrive at sometime later

8  ma'am?

9      A  Yes.

10     Q  And where did Eric, where was Eric taken in the

11 ambulance?

12     A  Eric was taken to Illinois Masonic Medical

13 Center.

14     Q  And what did you do?

15     A  I stayed at the hospital, I called his mother,

16 just stayed there until someone came there to help.

17     Q  Mrs. Elder, did you talk to the police at the

18 hospital?

19     A  Yes, I did.

20     Q  And did you give police information about what

21 you saw and what occurred?

22     A  I gave them a brief description of what went

23 on.

24     Q  Did you also -- was your daughter Tina around

JIM01926

B-171

1   at the hospital?

2       A  Tina came to the hospital a short time later.

3       Q  Did she stay at the hospital?

4       A  Yes, she did.

5       Q  Was she there the whole time you were there?

6       A  I was the first one there, I was there alone

7   for quite awhile.

8       Q  Did Tina leave the hospital before you did?

9       A  I really don't remember, I think we all left

10  together.

11      Q  Did you talk to the police about your daughter

12  Tina?

13      A  Yes, I did.

14      Q  What did you tell the police about your

15  daughter Tina?

16      A  My daughter Tina was eight months pregnant at

17  the time, I was worried about her.  I said she was

18  right there when the shooting happened.

19      Q  And did you tell the police anything else about

20  your daughter Tina?

21      A  Not that I can recall.

22      Q  You gave the police your daughter Tina's

23  number, is that correct?

24      MR. HILL:  Objection, your Honor, leading.

JIM01927

B-172

SA171

1    MR. MURPHY:  She already testified to that.

2    MR. HILL:  No, she hasn't.

3    THE COURT:  I told them about Tina.  That's what

4    she testified.  I talked to police briefly at the

5    hospital, I told them briefly what happened, my

6    daughter Tina, I told them about Tina.  She was eight

7    months pregnant at the time.  Overruled.

8    MR. MURPHY:  Q  Did you tell the police anything

9    about what your daughter Tina witnessed?

10    THE COURT:  What the daughter Tina what?

11    MR. MURPHY:  Q  Witnessed.

12    A  I can't recall if I did or not.

13    Q  Did you give the police your daughter Tina's

14    name as a witness?

15    A  Yes, I did.

16    Q  And did you tell the police that they could

17    contact your daughter Tina at some future time?

18    A  Yes, I did.

19    Q  Did you say anything to the police about your

20    daughter's opportunity to view versus your opportunity

21    to view?

22    MR. HILL:  Objection.

23    THE WITNESS:  No.

24    THE COURT:  Sustained.

JIM01928

B-173

1        MR. MURPHY:   Q  Now, Sandra, after you talked to

2   the police that night, did you have any more contact

3   with the police later the next day?

4        A  Yes.  Sergeant Bogucki had called me the next

5   day that they had picked up some young men and that we

6   should come check them out in a lineup.

7        Q  Would that be Detective Bogucki?

8        A  Yes.

9        Q  Would that be the police station, Area 5 police

10  station?

11       A  Yes, on Grand and Central.

12       Q  Who went there?

13       A  Tina, Phil, and myself.

14       Q  And did you also see Larry Tueffel when you

15  were at the police station?

16       A  Larry was there, yes.

17       Q  And what happened when you were at the police

18  station, ma'am?

19       A  They put us in separate rooms.

20       Q  After they put you in separate rooms, can you

21  tell us what happened?

22       A  One by one we went in to view a lineup.

23       Q  There were how many people in that lineup?

24       A  I believe there were five.

JIM01929

B-174

1    Q  Did you view the lineup?

2    A  Yes, I did.

3    Q  When you viewed the lineup, were you alone or

4  were any other witnesses with you?

5    A  No, I was by myself.

6    Q  To your knowledge, did the other witnesses also

7  view the lineup separately?

8    A  To my knowledge, yes.

9    Q  When you viewed the lineup, did you recognize

10  anyone in the lineup?

11    A  Yes, I did.

12    Q  Who did you recognize?

13    A  There was two, another young man that looked

14  like the young man right there, him, and I picked out

15  two.

16    Q  You picked out two, is that correct?

17    A  Yes.

18    Q  When you picked out two, what did you tell the

19  police about the two that you picked out?

20    A  I just said they look so much alike that I just

21  pointed to the two of them.

22    Q  So you eliminated three and you got it down to

23  two, is that correct?

24    A  Yes.

JIM01930

B-175

SA174

1    Q   Was one of the individuals anybody that you see

2   in court today?

3    A   Yes.

4    Q   Which one is that?

5    A   The young man sitting right there.

6   MR. MURPHY:  For the record, Judge, the defendant.

7        May I approach the witness, Judge?

8   THE COURT:  You may.

9   MR. MURPHY:  For the record, I'm showing counsel a

10  photograph.

11            (Exhibit proffered to counsel.)

12   MR. MURPHY:  Q   Ma'am, I'm going to show you a

13  photograph, what's marked as People's Exhibit Number

14  14.  Could you describe for the ladies and gentlemen

15  of the jury what that photograph shows?

16    A   Okay, this is a photograph of Wally's Lounge,

17  this is the lounge that I was in.

18    Q   And that photograph is taken from the north

19  side of the street, from the opposite side of Wally's

20  Lounge on the north side of the street, is that

21  correct?

22    A   Correct.

23    Q   And that would be standing in the area of

24  approximately the lot that's across the street?

JIM01931

B-176

1      A   Yes.

2      Q   Ma'am, does that photograph show the area where

3  you were standing when you heard the shot and saw the

4  shot being fired?

5      A   I was standing right about here.

6      Q   What I'm going to ask you to do is take your

7  pen and place your initials in the area of the street

8  where you were.  Place them large, too, if you would.

9      A   (Indicating.)

10     Q   Now, what I'm going to do is show you what has

11  been marked as People's Exhibit Number 8.  Do you

12  recognize what is shown in that photo?

13     A   Yes, I do.

14     Q   What is that?

15     A   That's the two people that I picked out.

16     Q   Ma'am, that's actually a lineup of five

17  individuals, isn't that correct?

18     A   Right.

19     Q   And you testified that you picked out the

20  defendant, who was in the second position from the

21  left-hand side, is that correct?

22     A   Yes.

23     Q   And you picked out another individual, is that

24  correct?

JIM01932

B-177

1      A   Yes.

2      Q   Who was the other individual?

3      A   Second from the right-hand side.

4      Q   I'm going to ask you to place a circle over his

5   head?

6      A   (Indicating.)

7      Q   Now, ma'am, when you picked out these two

8   individuals, you indicated to the police that you

9   believed one of these two individuals was the shooter,

10  but you were not sure which one, is that correct?

11     A   Correct.

12     Q   You could not distinguish between either one of

13  those individuals as being the shooter, is that

14  correct?

15     A   Correct.

16     Q   I'm going to ask the witness be allowed to step

17  down and approach People's Exhibit Number 10.

18         Do you recognize People's Exhibit Number 10?

19     A   Yes, I do.

20     Q   What is that?

21     A   This is Belmont Avenue, the Honey Baked Ham,

22  the vacant lot, Wally's Lounge.

23     Q   Does that show -- you described Wally's Lounge

24  as right here, is that correct?

JIM01933

B-178

1     A   Yes.

2     Q   Does that also show the Honey Baked Ham store?

3     A   Yes, it does, 3018.

4     Q   And Phil's apartment at that time?

5     A   3012.

6     Q   And the vacant lot between them?

7     A   Yes.

8     Q   And ma'am, does that diagram show the area

9  where you were standing when Eric was shot?

10    A   Yes.

11    Q   I'm going to ask you to take this sticker and

12 please place it in the area of the street where you

13 were when you saw the shot being fired.

14    A   (Indicating.)

15    Q   Thank you, ma'am.  You can step back to the

16 witness stand.

17        Ma'am, this was at about 6:25 at night?

18    A   Yes.

19    Q   On February 3, 1993?

20    A   Yes.

21    Q   Was it light or dark outside?

22    A   It was light.

23    Q   And were there also street lights in the area?

24    A   Yeah, the street lights.

JIM01934

B-179

1    Q   Did you have any problem seeing?

2    A   No.

3    Q   In fact, Belmont is a major thoroughfare, is

4    that correct, ma'am?

5    A   Yes, it is, it's very well lit.

6    MR. MURPHY:  I have no further questions, Judge.

7    THE COURT:  Cross-examine.

8                    CROSS EXAMINATION

9                    By Mr. Hill:

10   Q   You came out of Wally's tavern?

11   A   Yes, I did.

12   Q   And you were in the middle of the street when

13   you saw Eric?

14   A   Yes, I was.

15   Q   And somebody pushed him up against a wall?

16   A   Yes.

17   Q   And then shot him?

18   A   Yes.

19   Q   And then ran?

20   A   Yes.

21   Q   And it took a very short time?

22   A   Took a very short time.

23   Q   Now, you talked to the police that night?

24   A   At the hospital.

JIM01935

1       Q  At the hospital?   Now, you then went to view

2  the lineup the next day?

3       A  Yes.

4       Q  And in that lineup were five gentlemen, right?

5       A  Yes.

6       Q  And you said that the shooter could have been

7  either one of the two people that you had picked out,

8  is that right?

9       A  Yes.

10      Q  If I can have just a second, your Honor.

11          Did you see Eric throw a punch before he was

12  shot?

13      A  I didn't hear you, could you speak up?

14      Q  Did you see Eric throw a punch before he was

15  shot?

16      A  No, I did not.

17      Q  Now, this is one of the people that you picked

18  out of the lineup that it could have been, is that

19  right?

20      A  Yes, it is.

21      Q  When the officer told you -- when you picked

22  him out, picked out the two gentlemen, you were

23  looking -- you said either one of those could be the

24  shooter, right?

JIM01936

B-181

1    A  Yes.

2    Q  You weren't talking about the other gentleman

3  who was with the shooter?

4    A  No.

5    Q  So the day after you weren't exactly sure

6  whether it was this gentleman or the other gentleman

7  in the lineup, is that right?

8    A  Correct.

9    Q  Now, Eric was like a child to you?

10   A  Yes, he was.

11   Q  He lived in your house?

12   A  Yes, he did.

13   Q  If I could have just a second, your Honor.

14      When the gentlemen started running, they ran

15  away from you, right?

16   A  Yes, they did.

17   Q  And when they were up against -- when they

18  threw Victor, when they threw Eric up against the

19  wall, their back was to you, right?

20   A  Yes.

21   Q  And when you first saw the incident, they had

22  already had Eric up against Honey Baked?

23   A  I seen the other young man turn him around.

24   MR. HILL:  Thank you very much.

JIM01937

B-182

SA181

THE COURT:  Any redirect?

MR. MURPHY:  Yes, Judge, I have a few questions.

REDIRECT EXAMINATION

By Mr. Murphy:

Q  Ma'am, prior to February 3, 1993, you did not know this individual right here, is that correct?

A  No, I did not.

MR. MURPHY:  For the record, Judge, I was pointing to the defendant.

THE COURT:  Okay.

MR. MURPHY:  Q  And you said at the point the shooting occurred his back was to you, is that right?

A  Yes.

Q  Had you seen him before the shooting occurred, was his back to you at all times?

A  No, he was walking down the street.

Q  So in response to that question, the defense lawyer asked you it was just at the time of the shooting, his back was to you?

A  Correct.

Q  And in fact, would it be also fair to say you were a little bit east of the area where the shooting occurred as well as being out on the street?

A  Correct.

JIM01938

B-183

SA182

1        Q   Now, you were asked a question about whether

2   you saw Eric throw a punch at anyone.  You were aware

3   that your daughter Tina saw Eric throw a punch?

4        A   Correct.

5        Q   But you did not see that, is that correct?

6        A   No.

7        Q   So you cannot say whether you saw a punch being

8   thrown or not?

9        A   Correct.

10       MR. HILL:  I would object to this, whether she's

11   aware of what Tina knows or not is not at issue.

12       THE COURT:  Sustained as to what Tina knows.  She

13   didn't see him throw a punch.

14       MR. MURPHY:  No further questions.

15       THE COURT:  Anything further?

16       MR. HILL:  No.

17       THE COURT:  Thank you, ma'am.  You will be

18   excused.

19                          (Witness excused.)

20       THE COURT:  Step up.

21         Let's take a short recess.

22

23

24

**JIM01939**

B-184

SA183

1          (A recess was taken, after which

2      the following proceedings were

3      within the presence and hearing

4      of the jury:)

5     MR. MURPHY:  Your Honor, the people call Officer

6   Lawrence Ryan.

7              (Witness sworn.)

8          LAWRENCE RYAN,

9   a witness called on behalf of the People of the State

10  of Illinois, having been first duly sworn, was

11  examined and testified as follows:

12  ———————————————— DIRECT EXAMINATION ————————————————

13          By Mr. Murphy:

14      Q  Sir, would you please state your name and spell

15  your last name for the court reporter?

16      A  Officer Lawrence Ryan, R-y-a-n.

17      Q  By whom are you employed?

18      A  Chicago Police Department.

19      Q  How long have you been a Chicago police

20  officer, sir?

21      A  22 years.

22      Q  Where are you presently assigned?

23      A  The 17th District.

24      Q  And what is your position?

JIM01940

B-185

1    A  Patrol officer.

2    Q  And how long have you been a patrol officer in

3    the 17th District, sir?

4    A  Almost 15 years, sir.

5    Q  During that 15-year period, have you come to

6    learn the neighborhood in and around the 17th

7    District?

8    A  Yes.

9    Q  Could you tell the ladies and gentlemen of the

10   jury, first of all, what are the borders of the 17th

11   District?

12   A  The 17th District extends from Belmont on the

13   south to Devon Avenue on the north, from the Chicago

14   River on the east to Cicero Avenue on the west.

15   Q  And in your years of working that district,

16   have you in fact learned the gang, certain gangs

17   operate in that area?

18   A  Yes, sir.

19   Q  Can you describe or tell us what gangs are

20   operating in that area, were operating on February 3,

21   1993?

22   A  Well, there's approximately 14 to 15 particular

23   gangs.  Are you referring to the gangs in the area of

24   the crime?

JIM01941

B-186

SA185

1      Q  Well, let me refer you, then, to be more

2  specific, in the area of Sacramento and Belmont.  Do

3  you know what gangs were operating around there?

4      A  Yes, sir, three particular gangs.

5      Q  What gangs?

6      A  The Simon City Royals, Maniac Latin Disciples,

7  and the Spanish Cobras.

8      Q  And that area, Sacramento and Belmont, that

9  corner and the area around there, what particular gang

10  control that area, if any?

11      A  That's considered controlled by the Simon City

12  Royals.

13      Q  And was that area controlled by the Simon City

14  Royals on February 3, 1993?

15      A  Yes, sir, has so for many years.

16      Q  Officer Ryan, on February 3, 1993,

17  approximately 6:30 in the evening, did you respond to

18  a call?

19      A  Yes, sir, I did.

20      Q  What was the nature of that call, sir?

21      A  The call was a man shot at Belmont and

22  Sacramento.

23      Q  Where did you go?

24      A  Went to the area, proceeded eastbound on

B-187

JIM01942

1    Belmont Avenue to the area of just west of Sacramento

2    Boulevard.

3        Q   When you arrived there, what did you see?

4        A   Saw a large crowd of people gathered around

5    what appeared to be a male white laying by the curb on

6    the sidewalk being cradled by a female white.

7        Q   Could you describe the scene, sir?

8        A   It was rather chaotic.  As I said, the

9    gentleman was lying on the -- half on the sidewalk,

10   half on the curb.  He was limp, he was ashen, and

11   looked like there was a problem.

12       Q   Did he exhibit any signs of life at that time?

13       A   Not that I could tell, no, sir.

14       Q   What did you do, sir?

15       A   I immediately summoned a Fire Department

16   ambulance and called for assistance.

17       Q   While you were at the scene, Officer Ryan, did

18   you search for any bullets or shell casings?

19       A   No, sir, I did not.

20       Q   Other officers did, though, is that correct?

21       A   Yes, sir, they did.

22       Q   And in fact, none were recovered?

23       A   No, sir, they were not.

24       Q   Officer Ryan, did you also interview a couple

JIM01943

B-188

1    of witnesses at that location?

2        A  Yes, sir, I attempted to.

3        Q  What were the names of those witnesses?

4        A  Larry Tueffel and Phillip Torres.

5        Q  Could you describe the demeanor of Larry

6    Tueffel when you interviewed him, sir?

7        A  Larry Tueffel was -- I would describe him as

8    evasive, extremely tense, frightened, uncooperative.

9        Q  And were you able to get Larry Tueffel to talk

10   initially?

11       A  Yes, sir.  Initially, no, sir, I was not.

12       Q  And at some point was he willing to talk to

13   you?

14       A  Yes, sir, when I got him a little bit away from

15   the crowd and got him by myself, I was able to obtain

16   some information.

17       Q  Did he give you certain information about the

18   two individuals who committed this crime?

19       A  Yes, sir, he did.

20       Q  And you documented that in your police report,

21   is that correct?

22       A  Yes, sir, I did.

23       Q  Now, when you were receiving this information

24   from Larry Tueffel, how would you describe his manner

JIM01944

B-189

SA188

1  as he was giving it to you?

2      A  Well, as I say, he was rather evasive.  I

3  wouldn't say vague, but he was fumbling back and

4  forth.  He was changing, maybe this, maybe that.  It

5  was somewhat difficult to pin him down as to a

6  description.

7      Q  And what was your opinion of the information he

8  was giving you at that time?

9      MR. HILL:  Objection, your Honor.

10     THE COURT:  Overruled, he may answer.

11     MR. HILL:  His opinion?

12     THE COURT:  As to the truthfulness, is that what

13  you're saying?

14     MR. HILL:  Yes.

15     MR. MURPHY:  Judge, as to the truthfulness, yes.

16     THE COURT:  He may answer.

17     MR. HILL:  Judge, I'd object.

18     THE COURT:  It's for the jury to make a decision

19  based on the testimony they hear.  Overruled.

20     THE WITNESS:  Counsel, you're referring to my gut

21  feeling as a police officer?

22     MR. MURPHY:  Q  Yes.

23     A  I didn't think he was telling the truth, that's

24  why I think he was being so evasive.

JIM01945

B-190

1      Q   However, the information he gave you you placed

2   in your police report, is that correct?

3      A   Yes, sir.

4      Q   And in fact, that's because that's what he told

5   you?

6      A   Yes, sir.

7      Q   And that in fact forms the descriptions that

8   are noted in that original case report that you

9   prepared, is that correct?

10      A   Yes, sir, that is correct.

11      Q   And that information came from Larry Tueffel,

12   is that right?

13      A   Yes, sir.

14      Q   Now, did you also interview a Phillip Torres?

15      A   I attempted to.

16      Q   And when you say you attempted to, what do you

17   mean?

18      A   He was scared to death.

19      Q   I'm sorry?

20      A   He was scared to death to talk to me.

21      Q   What happened when you tried to talk to him?

22      A   Well, he more or less threw his arms up in the

23   arm and just kept ranting and raving, "I don't want

24   anything to do with it, I want out of here," and tried

JIM01946

B-191

SA190

1    to basically walk away from me.

2        Q  In fact, did he try and on more than one

3    occasion?

4        A  Several times.

5        Q  What happened when he did that?

6        A  I went and got him.

7        Q  And at some point did Larry Tueffel talk to

8    other police officers?

9        A  Yes, sir.

10       Q  I'm sorry, Phillip Torres, did he talk to other

11   police officers?

12       A  Yes, sir.

13       Q  And after you conducted the initial

14   investigation at the scene, did you then turn this

15   over as would be normal procedure to the detectives?

16       A  Yes, sir, I did.

17   MR. MURPHY:  No further questions, Judge.

18   THE COURT:  Cross-examine.

19                    CROSS EXAMINATION

20                    By Mr. Hill:

21       Q  Officer Ryan, you list in your police report

22   three witnesses, Sandra Elders, Larry Tueffel, and

23   Phillip Torres, isn't that correct?

24       A  Yes, sir, that is correct.

JIM01947

B-192

15

1    Q  And then you go -- you wrote a report, right?

2    A  Yes, sir.

3    Q  And that report is actually about four pages

4  long, isn't that correct?

5    A  I believe it's close to that, counsel.

6    Q  You said that Mr. Torres -- and you wrote this

7  right after the incident about that time, right?

8    A  Pretty close, yes.

9    Q  Anywhere in there do you write about Phillip

10 Torres not wanting to talk to you?

11   A  No, sir.

12   Q  Nowhere in here?

13   A  No, sir.

14   Q  And how long have you been on the force?

15   A  Too long, 22 years.

16   Q  And you wrote a number of forms?

17   A  Thousands.

18   Q  And you can do a supplemental, right,

19 supplemental report on something that you forgot or

20 something?

21   A  Can I?

22   Q  Yes.

23   A  Certainly I can.

24   Q  At any time, right?

JIM01948

B-193

SA192

1    A  I can.

2    Q  Have you done a supplemental report to say that

3  Mr. Torres didn't want to talk to you at the time?

4    A  No, sir.  You see, I'm the preliminary

5  investigator on the case, so normally a supplemental

6  report would be handled by the detectives.  Now, if we

7  were to find some property later we think was

8  connected to the case and had to inventory it, of

9  course we would enter a supplemental report, but in

10  this case usually not.

11    Q  So your answer to that question did you do a

12  supplemental in this case is no?

13    A  No, sir, I did not.

14    Q  Thank you.  Now, you said that you didn't think

15  Mr. Tueffel was truthful, is that correct?

16    A  That's correct.

17    Q  Anywhere in this four pages did you write that?

18    A  Did I write that?  No, sir.

19    Q  Did you do a supplemental as it relates to

20  that?

21    A  No, sir, I did not.

22    Q  And you're the initial paper officer, right?

23    A  Yes, sir.

24    Q  And other officers base their action on your

JIM01949

B-194

SA193

1    initial report, isn't that right?

2        A   In what way, counsel?  I don't understand.

3        Q   The information that you obtain, you then pass

4    it on to the investigating detective?

5        A   They obtain my report, yes, sir.

6        Q   And the initial reactions are based on your

7    report?

8        A   Initial reaction, sure.

9        Q   Now, in fact you wrote descriptions of the

10   offenders in your report, right?

11       A   Yes, sir.

12       Q   And you said one offender had an a purple

13   jacket with gold lettering?

14       A   I said -- no, Mr. Tueffel said that.  I related

15   what Mr. Tueffel told me in the report.

16       Q   And the other offender had a blue Georgetown

17   starter jacket, is that right?

18       A   Yes, sir, that's what I was told.

19       Q   Now, in your report you put down a description

20   of offenders, is that correct?

21       A   That's what I was told, yes, sir.

22       Q   In here you don't list who told you what, when,

23   and how, do you?

24       A   We normally do that, counsel, by witness Number

JIM01950

B-195

SA194

1, Witness Number 2, Witness Number 3.  I believe I

have Mr. Tueffel as Witness Number 1.

    Q  Did you do that here?

    A  Yes, sir, I have Witness Number 1.

    Q  Would you take a look and see?

    A  Sure.

    Q  Did you do it there?

    A  Yes, I have Mr. Tueffel Number 1.

    Q  Where you write the description, do you put

down who told you what?

    A  Yes, sir, I have Witness Number 1 stated.

    Q  Where?

    A  Right here, sir?

    A  That's w-i-t period, an abbreviation for

witness.

    Q  Witness 1 stated that he and the victim were

confronted.  Does that go with the description or does

that go with what happened?

    A  I'm confused by the question, counsel.

    Q  I said where you have the description of the

offenders, does it state which witness you obtained

that description from?

    A  Oh, I see what you're asking.

    Q  Thank you?

JIM01951

B-196

SA195

1     A  Okay, no.  The description of the offenders is

2  given out solely -- it's not said that the description

3  was obtained from Witness Number 1, if that's what

4  you're clarifying, no.

5     Q  Or Witness Number 2 or 3?

6     A  Correct.

7     Q  Now, Witness Number 1 where you write the

8  offense down is given by Larry Tueffel, right, what

9  happened?

10     A  Yes, sir.

11     Q  Did he tell you that somebody threw up a gang

12  sign?

13     A  Threw up a gang sign?

14     Q  Yes.

15     A  I don't believe he did.

16     Q  Would anything refresh your recollection?

17     A  Possibly.  When you say threw up a gang sign --

18     Q  Gave one.

19     A  A hand sign?

20     Q  Yes.

21     A  No.

22     Q  Now, did he tell you that he knew any of the

23  offenders?

24     A  No, sir.

JIM01952

B-197

1     Q  But your gut reaction was you wouldn't trust

2  him, would you?

3     MR. MURPHY:  Objection.

4     MR. GAUGHAN:  Objection.

5     THE COURT:  Sustained.

6     MR. HILL:  Judge, they asked about his opinion and

7  I'm asking too.

8     THE COURT:  Counsel didn't have anything about

9  trusted him.  He didn't believe him.  Use the words as

10  used by the officer.

11     MR. HILL:  Q  Your opinion, in your opinion would

12  you trust him as an officer?

13     MR. GAUGHAN:  Objection.

14     THE COURT:  Sustained.  If you want to ask him if

15  he believed him, you can ask him.  Might be similar in

16  nature, I suppose.  I don't want the jury to say I

17  think he said one thing.

18     MR. HILL:  I'm asking him a whole other question.

19     THE COURT:  Ask him the question.

20     MR. HILL:  Q  In your opinion, would you trust

21  him?

22     MR. GAUGHAN:  Objection.

23     THE COURT:  Overruled.  Answer it.

24     THE WITNESS:  Yes or no answer?

JIM01953

B-198

1    MR. HILL:  Q  Yes, sir.

2    A  No.

3    MR. HILL:  Thank you.  No further questions.

4              REDIRECT EXAMINATION

5              By Mr. Murphy:

6    Q  Would you expect a member of the Simon City

7    Royals to implicate another member of the Simon City

8    Royals?

9    MR. HILL:  Objection, your Honor, I didn't ask

10   him --

11   THE COURT:  Overruled, it's invited comment.

12   MR. MURPHY:  Q  As an experienced officer who

13   works that area, is it your experience that one member

14   of the Simon City Royals street gang will implicate

15   another member of the Simon City Royals street gang in

16   a murder?

17   A  Not likely, counsel.

18   MR. MURPHY:  No further questions, Judge.

19   THE COURT:  Any more questions?

20   MR. HILL:  No, your Honor.

21   THE COURT:  Next witness.  Thank you, sir.  You're

22   excused.

23   MR. GAUGHAN:  Judge, the people would call Donna

24   Cosmen.

JIM01954

B-199

SA198

1                          (Witness sworn.)

2      THE COURT:  Keep your voice nice and loud so

3  everybody can hear you.

4          You may proceed. .

5                     DONNA COSMEN,

6  a witness called on behalf of the People of the State

7  of Illinois, having been first duly sworn, was

8  examined and testified as follows:

9                     DIRECT EXAMINATION

10          By Mr. Gaughan:

11      Q  Ma'am, could you please state your name and

12  spell your name for the ladies and gentlemen of the

13  jury?

14      A  Donna Cosmen, C-o-s-m-e-n.

15      Q  Miss Cosmen, how old are you?

16      A. 24.

17      Q  Do you have any children?

18      A  Three.

19      Q  What are their ages?

20      A  Five, two, and six months.

21      Q  Miss Cosmen, I want to direct your attention

22  back to February of 1993.  Where were you living at

23  that time?

24      A  3000 West Belmont.

JIM01955

B-200

SA199

1    Q  Is that on the corner of Belmont and

2  Sacramento?

3    A  Yes.

4    Q  Do you know a person by the name of Thaddeus

5  Jiminez?

6    A  Yes.

7    Q  Do you see him in court today?

8    A  Yes.

9    Q  Please identify him?

10    A  The one in the brown sitting with the suit.

11    Q  You're going to have to speak up.

12    A  The one in the brown sitting with the suit with

13  his hands folded.

14    MR. GAUGHAN:  Indicating, for the record, the

15  in-court identification of the defendant, Thaddeus

16  Jiminez.

17    THE COURT:  All right.

18    MR. GAUGHAN:  Q  Donna, on February 3, 1993, did

19  you see the defendant at all?

20    A  Yes.

21    Q  About what time of the day did you see him?

22    A  I saw him at 12:00 and then I saw him again at

23  2:30, 3:00 o'clock.

24    Q  When you saw him at 12:00 o'clock, where did

JIM01956

B-201

SA200

1    you see him at?

2        A   Out front of my house, 3000 West Belmont.

3        Q   3000 West Belmont, corner of Belmont and

4    Sacramento.   What happened when you saw him at twelve?

5        A   He called me down and told me to come down and

6    he showed me a little .22 or .25 silver, and I went

7    right back upstairs.

8        Q   Silver what?

9        A   A little gun.

10       Q   Now, you said you saw him again about 3:00

11   o'clock in the afternoon, 3:30?

12       A   Yes.

13       Q   Who were you with when you saw him at 3:00 or

14   3:30?

15       A   Me, my brother Shawn, Eric, and my friend Tammy

16   and my two kids.

17       Q   Shawn, Eric?

18       A   And my friend Tammy.

19       Q   And two of your kids?

20       A   Yes.

21       Q   When you say Eric, are you referring to Eric

22   Morro?

23       A   Eric Morro.

24       Q   Shawn is your brother, Shawn Cosmen?

JIM01957

B-202

SA201

1       A  Yes.

2       Q  Where did you see the defendant, Thaddeus

3    Jiminez, when you saw him about 3:00, 3:30?

4       A  He came from around the corner.

5       Q  Where were you at that time with Eric, Shawn,

6    and Tammy?

7       A  Standing out front.

8       Q  Again, on the corner of Belmont and Sacramento?

9       A  Yes.

10       Q  And what happened when you saw the defendant

11    that time?

12       A  He came -- we were on our way to the park.  He

13    came around the corner screaming Royals.

14       Q  Let me stop you for a minute.  Which corner did

15    he come around?

16       A  From Sacramento onto Belmont.

17       Q  What was he doing when he came around the

18    corner?

19       A  He was representing gang-banging signs to the

20    school bus.

21       THE COURT:  He was what?

22       THE WITNESS:  Representing to the school buses

23    that were coming.

24       THE COURT:  Representing, what do you mean by

JIM01958

B-203

SA202

1    representing?

2        THE WITNESS:  Representing his gang, Royals.

3        MR. GAUGHAN:  Q  You said to the school bus?

4        A  Yes.

5        Q  Where was the school bus?

6        A  Coming from down Belmont.

7        Q  You were putting up your hands.  Could you

8    describe exactly, could you do it again?  How was he

9    representing?

10       A  Like this.

11       Q  Judge, indicating, for the record, the witness

12   is raising her right hand, she's got her two fingers

13   crossed.

14       A  The right one over the left.

15       Q  What does that stand for?

16       A  Royals.

17       Q  What was he saying as he was doing that?

18       A  He kept on saying Royals, Royals, and then Eric

19   Morro asked him if he could walk down a little bit,

20   there was kids out here, and he was telling Eric, "Oh,

21   you got yours coming," and cussing at him and

22   swearing, and then he walked away a little bit.

23       Q  Let me stop you.  Who walked away a little bit?

24       A  T.J.

                                    JIM01959

                        B-204

                    SA203

1    Q    When T.J. walked away a little bit, what

2    happened?

3    A    Then we decided to walk to the park.

4    Q    What park were you walking to?

5    A    Elston playlot.

6    Q    Where is that located in relation to Belmont

7    and Sacramento?

8    A    We cut up Whipple, it's on Elston and Troy.

9    Q    How many blocks is it from Belmont and

10   Sacramento?

11   A    Like a lot of blocks, like seven or six.

12   Q    Six or seven blocks? You said that you and

13   Eric and Shawn and Tammy decided to go to the park,

14   then, after he walked away a little bit?

15   A    Yes.

16   Q    Did you start to walk to the park?

17   A    Yes.

18   Q    What street did you walk down?

19   A    We walked down Belmont to Whipple and then

20   turned right.

21   Q    You were walking west on Belmont?

22   A    Yes.

23   Q    As you were walking west on Belmont, was T.J.

24   doing anything?

JIM01960

1      A  Yes, he was still representing.

2      Q  Did he walk away from you, towards you?

3      A  Yes, he was walking in front of us and then he

4  followed us to the park.

5      Q  When you say he followed you to the park, which

6  way did you guys walk when you walked to the park?

7      A  Down Whipple.

8      Q  When you were walking down Whipple, was he

9  behind you then?

10     A  Yes, on the other side.

11     Q  What was he doing as he was walking behind you?

12     A  Just yelling.

13     Q  What was he yelling?

14     A  Telling Eric he got something coming.

15  THE COURT:  What?

16  THE WITNESS:  Telling Eric Morro that he got

17  something coming.

18     MR. GAUGHAN:  Q  Was he still representing?

19     A  Well, no, but he kept walking.  When he got to

20  the park, he kept on, you know, representing, and my

21  kids were out there.

22     Q  You kids were out there?

23     A  Uh huh.

24     MR. GAUGHAN:  Can I have one moment, your Honor?

JIM01961

B-206

1          THE COURT:  All right.  I have no further

2     questions, your Honor.

3                         CROSS EXAMINATION

4                    By Ms. Burke:

5          Q  Donna, you're related to Phillip Torres, are

6     you not?

7          A  Yes.

8          Q  In fact, he's your brother?

9          A  My stepbrother.

10         Q  And you know Larry Tueffel?

11         A  Yeah.

12         Q  You know him from the neighborhood?

13         A  Yeah.

14         Q  Now, Donna, the incident that you have just

15    been describing for us, with respect to the gang signs

16    and the interchange between Eric Morro and Thaddeus

17    Jiminez, that occurred several hours prior to; in

18    other words, before Eric Morro in fact was killed,

19    correct?

20         A  Yes.

21         MS. BURKE:  Nothing further, Judge.

22         MR. GAUGHAN:  No further questions, your Honor.

23         THE COURT:  Thank you, ma'am.  You're excused.

24                         (Witness excused.)

                                        JIM01962

                              B-207

                          SA206

1    MR. GAUGHAN:  Your Honor, the people would call

2  Mr. Shawn Cosmen.

3                          (Witness sworn.)

4    THE COURT:  Shawn, keep your voice nice and loud

5  so we can hear you.

6    THE WITNESS:  Okay.

7                  SHAWN COSMEN,

8  a witness called on behalf of the People of the State

9  of Illinois, having been first duly sworn, was

10  examined and testified as follows:

11                  DIRECT EXAMINATION

12              By Mr. Gaughan:

13    Q  Shawn, could you please state your name and

14  spell your first and last name for the court reporter?

15    A  Shawn Cosmen, S-h-a-w-n  C-o-s-m-e-n.

16    Q  Mr. Cosmen, how old are you?

17    A  17.

18    Q  I want to direct your attention back to

19  February 3rd of 1993.  Where were you living at that

20  time?

21    A  3000 West Belmont.

22    Q  Is that the corner of Belmont and Sacramento?

23    A  Yes, it is.

24    Q  Who did you live there with?

JIM01963

B-208

```
 1        A   My mom.

 2        Q   On February 3rd, do you know a person by the

 3   name of Thaddeus Jiminez?

 4        A   Who?

 5        Q   Thaddeus Jiminez, T.J.

 6        A   Yes.

 7        Q   Do you see him in court today?

 8        A   Yes.

 9        Q   Please identify him?

10        A   Sitting in the middle.

11        Q   In the middle?

12        A   Yes.

13        MR. GAUGHAN:  Indicating, for the record, the

14   in-court identification of the defendant, Thaddeus

15   Jiminez.

16        THE COURT:  All right.

17        MR. GAUGHAN:  Q  Shawn, on February 3rd of 1993,

18   did you see the defendant, Thaddeus Jiminez, around

19   3:00 o'clock in the afternoon?

20        A   Yes, I did.

21        Q   Where did you see him?

22        A   In front of my house.

23        Q   On Belmont and Sacramento?

24        A   Yes.
```

JIM01964

B-209

1    Q   Who were you with?

2    A   My sister, Eric, and my sister's friend and her

3    four kids.

4    Q   Now, would that be Eric Morro?

5    A   Yes.

6    Q   When you were with Eric and your sister and her

7    friend and the kids, what happened when you saw the

8    defendant?

9    A   He was out front and the school bus went by and

10   he was screaming, "Royals Royals," and Eric told him

11   to take his gang banging stuff somewhere else, and

12   then he goes, "Oh fucking pussy," this and that.

13   Q   I'm sorry, you're going to have to speak up.

14   A   Then he started swearing to Eric, "You'll get

15   your ass beat."

16   Q   Let me stop you for a minute, Shawn.  What

17   exactly did the defendant say?

18   A   He goes, "Oh, fucking pussy," and then he

19   walked down some and then we started to go around the

20   corner to the park, and then he came by, behind us and

21   said, "You'll get yours, you'll get yours, you prick,"

22   this and that.

23   Q   I'm going to stop you again now.  You said that

24   Eric told him to stop his gang banging stuff?

JIM01965

B-210

1    A  Yes.

2    Q  What exactly was the defendant doing that Eric

3  told him to stop his gang banging stuff?

4    A  Throwing gang signs up to the school bus.

5    Q  Can you describe to the ladies and gentlemen of

6  the jury what kind of signs he was throwing up?

7    A  Throwing up like this to the school bus.

8    Q  Indicating, for the record, that Mr. Cosmen is

9  holding up both hands with his two fingers crossed,

10  the two end fingers down and the thumb over and shaped

11  like an R.  Was he saying anything as he was throwing

12  up the signs?

13    A  Royals, Royals.

14    Q  After Eric told him to take his gang banging

15  someplace else, that there was kids around, what

16  happened?

17    A  He walked like a couple spaces down.

18    Q  When you say he, are you referring to the

19  defendant?

20    A  Yes, he walked a couple ways that way, towards

21  west on Belmont and we walked east.  We went north

22  down Sacramento.

23    Q  Did you go back over to Whipple, then?

24    A  No, we kept onto School Street and then we went

JIM01966

B-211

1  down School west again to Troy, and he came behind us

2  and then was telling Eric, "You'll get yours, you'll

3  get yours," and then Eric goes, "I don't got time."

4  We kept walking, and like a half an hour passed, he

5  passed the park and then when we got back --

6      Q   What did he do when he came by the park?

7      A   Nothing, he just drove by, and when we got back

8  on Belmont he was nowhere around, and then I left to

9  the school yard and all of a sudden they were there

10  picking me up at the school yard saying that I did the

11  shooting.

12      Q   When you say the park, what park are you

13  referring to?

14      A   Elston playlot.

15      Q   You left the Elston playlot, right away?

16      A   Yes.

17      Q   Later on, about 7:00 o'clock you said the

18  police came by and told you about the shooting, right?

19      A   Yes.

20      Q   Then they brought you back to where the

21  shooting had taken place?

22      A   Yes.

23      Q   You weren't there when the shooting took place?

24      A   No.

JIM01967

B-212

1      Q  When they brought you back, you weren't

2   identified and they released you, right?

3      A  No.

4      MR. HILL:  Objection, your Honor.

5      THE COURT:  I didn't hear the question.  Repeat

6   the question.

7      MR. GAUGHAN:  Q  When they brought you back --

8      THE COURT:  She can read it.

9                          (Record read.)

10     MR. HILL:  He can't make that determination.

11     THE COURT:  Pardon?

12     MR. HILL:  The witness can't make that

13  determination.

14     THE COURT:  Strike it as they didn't identify him

15  but they released him.

16     MR. GAUGHAN:  Q  You went back, Shawn, when the

17  police took you back to the scene, they took you back

18  to the scene and then they let you go, right?

19     A  Yes.

20     MR. GAUGHAN:  I have no further questions.

21     THE COURT:  Cross examination.

22                    CROSS EXAMINATION

23                    By Ms. Burke:

24     Q  Shawn, you're related to Phillip Torres, are

JIM01968

B-213

SA212

1   you not?

2       A   Yes.

3       Q   And how are you related?

4       A   We are not really brothers, but we are step

5   brothers.

6       Q   Step brothers?

7       A   Yes.

8       Q   Now, the incident that you have just been

9   relating to us involving gang representation, that

10  incident occurred several hours before Eric Morro in

11  fact was found dead, right?

12      A   Yes.

13      Q   Now, you said, just said that you yourself were

14  actually a suspect in this case originally, right?

15      MR. GAUGHAN:   Objection.

16      MS. BURKE:   Q   Isn't that what you just told us a

17  few moments ago?

18      THE COURT:   He didn't say he was a suspect.

19      MS. BURKE:   Q   They originally picked you up and

20  questioned you about this case?

21      A   Yeah.

22      Q   So for a short time?

23      A   No, because they said that somebody with a

24  Georgetown jacket, and at that time I had a Georgetown

1   jacket on.

2      Q  So you were in fact questioned about this case,

3   right?

4      A  Yeah.

5      Q  Because there was a possibility that you might

6   fit the description?

7      A  Yeah.

8      Q  So for a short time you were a suspect in this

9   case for a short time?

10     MR. GAUGHAN:  Objection.

11     THE COURT:  Sustained.  How would he know that?

12  The police could tell you if he was a suspect.  Did

13  they tell you you were a suspect?

14     THE WITNESS:  No.

15     MS. BURKE:  Q  Well, they questioned you about the

16  case, right?

17     A  No, they just asked me if I did it and I go,

18  "Did what?"

19     Q  Which was questioning you about the case.  You

20  were asked questions?

21     A  Yes.

22     Q  About this case?

23     A  Not about -- they came in the school yard, they

24  got me, they go, "Whose Georgetown jacket?"  I go,

JIM01970

B-215

SA214

1   "Mine."  They go, "Well, did you do the shooting on

2   Belmont?"  I go, "What shooting?"  And they go, "Right

3   down the street."  I go, "No, I've been here since

4   4:30, 5:00 o'clock," and they go, "Oh, you're a liar,"

5   this and that.  They put me in the car, they took me

6   over there, and Phil and Larry goes, "No, that's not

7   him," and they let me go with my mom.

8        MS. BURKE:  Can I have one moment, Judge?

9        Q  (By Ms. Burke)  Larry, Shawn, this is not the

10  first time that you have been in court in a courtroom?

11       MR. MURPHY:  Objection.

12       THE COURT:  Sustained.

13       MR. MURPHY:  Ask for a sidebar.

14       MS. BURKE:  Q  In fact, you were arrested --

15       MR. MURPHY:  Objection, Judge,

16       THE COURT:  Let's have a sidebar.

17                   (The following proceedings were

18                    outside the presence and hearing

19                    of the jury:)

20       MS. BURKE:  Pending cases were exempted from that

21  specific motion.  Here's the pending case.  That's

22  just what I'm leading up to.  I'm merely laying a

23  foundation for the pending case.

24       MR. MURPHY:  How do you know that's a pending

                                        JIM01971
                          B-216

1    case, have you checked it out?  It's an arrest from

2    August 6th.

3        MS. BURKE:  I'm going to ask him.

4        THE COURT:  Either you know or you don't know.

5        MS. BURKE:  If I had been tendered this sooner

6    than this morning --

7        MR. MURPHY:  You could have asked us instead of

8    asking in front of the jury.

9        THE COURT:  Wait wait, if you're just guessing,

10   I'm not going to permit it.

11       MS. BURKE:  I'll ask the witness.  He will know if

12   it's pending or not.

13       THE COURT:  We are not going to test the case by

14   asking the witness that.

15       MS. BURKE:  The information I have is that --

16       THE COURT:  It's your duty and responsibility to

17   have to check them out before trial, not during trial.

18       MS. BURKE:  Can you give me one moment?  I do have

19   some further information, I can double check on this.

20           Judge, I did do a computer check on this and

21   that's what are my notes are pertaining to, but the

22   computer is not clear, the exact disposition of this

23   case, so I did attempt to find out.  I checked it

24   every way I could.

JIM01972

B-217

```
1       THE COURT:  Could very well be gone, misdemeanor

2   case.

3       MS. BURKE:  Judge, what's the harm in asking?

4       THE COURT:  You're tainting him.  It's like saying

5   you were arrested.

6       MS. BURKE:  I'll ask him, he will know if the case

7   was resolved.

8       THE COURT:  I'm not going to permit unless you

9   know.

10      MS. BURKE:  I made attempts to find out.

11      MR. MURPHY:  Certainly didn't ask us.

12      MS. BURKE:  This is what was given to me, it's the

13  states obligation to give more than an incomplete

14  record.

15      MS. BURKE:  They could have checked too.  It's

16  their obligation to do so.  They are supposed to give

17  me --

18      THE COURT:  It's your obligation to do whatever

19  you have to.

20      MS. BURKE:  I did all that I could do.

21      THE COURT:  I'm not going to permit it.

22      MS. BURKE:  I don't have the powers of the state's

23  attorneys.

24
```

JIM01973

B-218

SA217

```
 1                    (The following proceedings were

 2                    within the presence and hearing

 3                    of the jury:)

 4       THE COURT:  Objection sustained.  Proceed.

 5       MR. MURPHY:  We would ask ask that be stricken.

 6       THE COURT:  It will be stricken, jury will be

 7  instructed to disregard it.

 8       MS. BURKE:  Q  Shawn, Georgetown jackets, that's a

 9  starter jacket?

10       A  Yes.

11       Q  That jacket is very distinctive from, different

12  from a Duke jacket, is it not?

13       A  Yes.

14       Q  You have seen a Duke's jacket?

15       A  Yes.

16       Q  And that has a symbol?

17       A  Of a devil.

18       Q  A devil on the back?

19       A  Yes.

20       Q  Georgetown jacket?

21       A  Got a dog.

22       Q  What?

23       A  A dog.

24       Q  A dog on the back?
```

JIM01974

B-219

```
1        A   Yes.
2        MS. BURKE:  Nothing further, Judge.
3        MR. GAUGHAN:  No questions, your Honor.
4        THE COURT:  Thank you, sir.  You will be excused
5              It's ten after five.  Time to go home.
6              Monday morning, 9:30 a.m.  See you then and
7   we'll start to wind this up.  Have a safe trip home,
8   everybody, and have a nice weekend.
9                        (The following proceedings were
10                        outside the presence and hearing
11                        of the jury:)
12       MR. GAUGHAN:  Your Honor, I just want to make sure
13   our objection was based, number one, on the form of
14   the question which was, "Were you ever arrested," and
15   number two, I want the record to be clear that the
16   case that counsel was referring to is a misdemeanor
17   criminal trespass to land, and the question was had
18   you ever been arrested.  There was a clear motion in
19   limine that there was to be no questions about
20   arrests.
21       THE COURT:  I don't --
22       MR. GAUGHAN:  And that's all she was referring to
23   was an arrest.
24       THE COURT:  I have ruled.
```

JIM01975

B-220



1    (A continuance was taken to

2    October 3, 1994.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM01976

B-221

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS  } ss
COUNTY OF COOK

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . . VOLUME (THREE) OF (SIX) VOLUMES CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 94-4358

in a certain cause . . . . . . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . pending in said Court, between The People of the State of Illinois. . . . . . . . . . . . . . . WERE . . . . . . . . . . . . . . . . . . ., Plaintiffs and THADDEUS JIMENEZ . . . . . . . . . . . . . . . . WAS . . . . . . . . . . . . . . . . . . ., Defendant . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago
In said County, . . . . . . . . . . . . . . . . MARCH 23 . . . . . , 19 95



*Aurelia Pucinski*
Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JIM01977

SA221

STATE OF ILLINOIS    )
                     )    SS:
COUNTY OF COOK       )


    I, JEANNE RATHBUN, Official Court Reporter of the
Circuit Court of Cook County, County Department-
Criminal Division, do hereby certify that I reported
in shorthand the proceedings had on the trial in the
above-entitled cause; that I thereafter transcribed
into typewriting the above Report of Proceedings,
which I hereby certify is a true and correct
transcript of the proceedings had upon the trial of
the defendant before the Honorable CHRISTY BERKOS,
Judge of this court.




                        *Jeanne Rathbun*
                  Official Court Reporter of the
                  Circuit Court of Cook County,
                  Criminal Division.




JIM01978

B-222

# 94-4358

FILED APPEAL

JIM01979

Crim. Div. No. 94-B

*93 CR 14710*

Transcript of Record

Appeal

to

APPELLATE
FIRST

Court of Illinois

District

Circuit Court No. _____ 93 CR 14710 _____

Trial Judge _____ CHRISTY S. BERKOS _____

Reviewing Court No. _____ 94-4358 _____

THE PEOPLE OF THE STATE OF ILLINOIS

## vs.

THADDEUS JIMENEZ

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

VOLUME FOUR OF SIX VOLUMES

REPORT OF PROCEEDINGS, ONLY

**AURELIA PUCINSKI**

**Clerk of Court**

Per _____ AP/GL _____

**Deputy**

JIM01545

SA224

1   STATE OF ILLINOIS )
                      )
2   COUNTY OF C O O K )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
4           COUNTY DEPARTMENT – CRIMINAL DIVISION

    THE PEOPLE OF THE      )
5   STATE OF ILLINOIS,     )
                           )
6                          )   Indictment No. 93-14710
                           )   CHARGE: MURDER
7           vs.            )
                           )
8   THADDEUS JIMENEZ       )

9                   REPORT OF PROCEEDINGS

10  had at the hearing of the above-entitled cause, before
    the Honorable CHRISTY S. BERKOS, Judge of said Court
11  on the 3rd day of October, A. D., 1994, and a jury.

12          APPEARANCES:

13

14                      HONORABLE JACK O'MALLEY,
                        State's Attorney of Cook County,
15                      by:
                        MR. JOHN MURPHY & MR. DAVID
16                      GAUGHAN,
                        Assistant State's Attorneys,
17                      on behalf of the People;

18                      MS. RITA FRY,
                        Public Defender of Cook County,
19                      by:
                        MR. KENDALL HILL & MS. CYNTHIA
20                      BURKE,
                        Assistant Public Defenders,
21                      on behalf of the Defendant,
                        Thaddeus Jimenez.

22
    Helen M. Hackney
23  Official Court Reporter
    2650 South California
24  Chicago, Illinois 60608

                        JIM01546

FILED

MAR 22 1995

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

C1

SA225

I N D E X

Jury Trial
October 12, 1994

Pages  C1 through C210

| LIST OF WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| Detective Jerome Bogucki | C7 | C24 | C33 | C36 |
| Officer Dwyer | C38 | | | |
| Officer Hladczuk | C44 | | | |
| Elizabeth Heatley | C48 | C78 | C82 | C83 |
| Officer Galligan | C96 | C106 | | |
| Lorraine Dooley | C118 | C130 | C157 | |
| Donna Whitley | C158 | C161 | C172 | |
| C173 | | | | |
| Angela Jimenez | C174 | C178 | | |
| Edward Mendrys | C187 | C191 | C196 | |
| Victoria Jimenez | C198 | C206 | | |

State rests...........................................C109

JIM01547

C2

SA226

1          THE CLERK:  Thaddeus Jimenez, Sheet 6.

2          MR. HILL:  Before you bring the jury out there was

3     an issue regarding a letter.

4          THE COURT:  That's right.

5          MR. MURPHY:  That would be one of the witnesses we

6     would call if the Court grants our motion.

7          THE COURT:  I will hear argument on it.

8          MR. MURPHY:  Your Honor, it's the State's position

9     that the defendant made a number of statements in the

10    letters.  The Court had an opportunity to review the

11    letters from the defendant threaten one of the

12    witnesses.

13              The defendant says, "I hear the Royals

14    are looking for Larry.  You see I got connections in

15    and out of jail."  Another one where the defendant

16    makes a comment about Larry Tueffel being killed,

17    numerous comments about his desire for Larry to be

18    killed and he hopes the Royals go and locate Larry

19    Tueffel and kill him.

20              It's the State's position these

21    statements made by the defendant and the letters he

22    sent to his girl friend, Elizabeth Heatley, who is

23    prepared to testify are admissions indicating

24    conscious evidence of guilt.

JIM01548

C3

SA227

1          Your Honor, for that we cite the case of

2   People versus Lyle Bennett, which the Court asked case

3   law that could be found, 3 Ill 2d 357.  This is a case

4   from 1954.  In that particular case which is still

5   good law the state's attorney was interviewing the

6   defendant.  The defendant denied making an

7   admission -- excuse me -- denied the crime that he was

8   being questioned about.

9          However, when the state's attorney told

10  him a co-offender told the state's attorney the

11  defendant had sold him the stuff the defendant stated

12  he would take care of the co-defendant when he got out

13  on bond.  In that case the Court allowed that to come

14  in.

15      THE COURT:  That written letter?

16      MR. MURPHY:  Oral statement made by the state's

17  attorney.  In that case the Court allowed that

18  statement to be admitted into evidence in the

19  defendant's trial.  And Judge, without going into the

20  facts of other cases I would like to cite a number of

21  other cases.  People versus Goodman, which can be

22  found at 371 NE 2d 186.  The official cite is an Ill

23  App 3rd 294, 1977 case.  People versus Smith, which

24  can be found at, Judge -- I'm sorry unofficial cite,

JIM01549

C4

1    northeastern cite 79 NE 2d 512, a 1972 case.  People

2    versus Martin, which could found at 112 Ill App 3d

3    486, 445 NE 2d 795.  That is a 1983 case.

4            Based on those cases and based on our

5    argument this is an admission of conscious evidence of

6    guilt the State's position is the various statements

7    made regarding threats to a witness, Larry Tueffel,

8    should be admitted into evidence in this case.

9        THE COURT:  Defense?

10       MR. HILL:    These letters came after the fact

11   after he's in custody.  These letters went to a third

12   party.  They were not intended to go to a Larry

13   Tueffel, who is a witness.  This went to his

14   girlfriend.  These are letters he wrote to a

15   girlfriend, your Honor, and they are highly

16   inflammatory and prejudicial and not probative to the

17   issue of whether or not Thaddeus Jimenez was there

18   February 23rd at 6:30 p.m.

19           I don't see any value in letting the

20   letters in except to prejudice the case, make it seem

21   like he is some bad guy who has some control.  Larry

22   Tueffel never testified he saw, heard, or seen any of

23   these letters.  This issue about being threatened was

24   never communicated to him in any manner.

JIM01550

C5

SA229

1      THE COURT:  The question is being communicated to

2    the witness.  These are statements of the defendant as

3    I read them.  I remember he wanted someone else -- was

4    it Charlie or somebody  -- was ordered to kill him

5    because he would testify against him and why hasn't

6    he; he is a pussy.  It just takes a second to pull the

7    trigger.  These are statements of this defendant in

8    his letters.

9           There's no question in my mind as the

10   receiver of those letters will testify she has the

11   envelopes and what have you.  There's no question the

12   defendant obviously wrote them.  They will be

13   admissible, his own admissions against his own

14   interest.  It will be admitted.

15          I have checked law on it.  There's no

16   question they would be admissible under the law.  With

17   that do you want to proceed with the trial?

18      MR. MURPHY:  Yes.

19      THE COURT:  State's next witness?

20

21              (Whereupon, the following
              proceedings were conducted within
22            the presence and hearing of the
              jury.)
23

24

JIM01551

C6

1      THE COURT: Good morning, everyone. A little bit

2  of a late start. It wasn't anyone's fault. It was

3  just that we couldn't get the necessary people here.

4  So we had to wait until now. Means you lost about an

5  hour and a half or so. We will make it up along the

6  lines here.

7      THE COURT: State ready with their next witness?

8      MR. MURPHY: Yes, your Honor. People call

9  Detective Jerome Bogucki.

10     THE COURT: Please, stand, raise your right hand.

11                    (witness sworn.)

12

13  D E T E C T I V E    J E R O M E    B O G U C K I,

14  the witness herein, called as a witness on behalf of

15  the People of the State of Illinois, having been first

16  duly sworn, was examined and testified as follows:

17

18                    DIRECT EXAMINATION

19                    BY

20                    MR. MURPHY:

21

22     Q    Could you state your name and spell your last

23  name?

24     A    Detective Jerome B-like boy-o-g-u-c-k-i.

JIM01552

1     Q    By whom are you employed, sir?

2     A    Chicago Police Department Area Five Violent

3    Crimes.

4     Q    How long have you been a police officer?

5     A    Approximately 18 years.

6     Q    And, how long have you been a detective with

7    Chicago Police Department?

8     A    Approximately 14 years.

9     Q    Detective Bogucki, could you describe what

10    your duties are as a detective in Violent Crimes?

11     A    Well, respond to serious violent crimes

12    usually after they have occurred and conduct the

13    investigation in -- further investigation into that

14    particular crime.

15     Q    And Detective Bogucki, you testified you work

16    in what's called Area Five Violent Crimes; is that

17    correct?

18     A    Yes.

19     Q    What is Area Five?

20     A    Area Five is composed of five districts, and

21    there are five areas in the city where we're one of

22    the five areas.  The districts are 16, 17th District,

23    25th District, 14th District and 15th District.

24     Q    In fact, there's 25 districts in the city and

JIM01553

C8

1    five areas. Each area has five districts?

2    A    I believe it works out that way.

3    Q    Now, could you tell the Ladies and Gentlemen

4    of the jury the borders for Area Five?

5    A    On the west it will be O'Hare Airport. On

6    the north it would be the neighborhood of Sawganash.

7    On the south at one point is Roosevelt Road. At

8    another point it's Division Street. On the east it

9    would be the river in Chicago.

10    Q    Would the area Sacramento and Belmont be

11    within the boundaries of Area Five?

12    A    Yes.

13    Q    Detective Bogucki, I would like to direct

14    your attention to the date February 3, 1993. On that

15    day were you on duty?

16    A    Yes.

17    Q    Who were you working with?

18    A    At that time I was working alone.

19    Q    And were you assigned to a case on that date

20    with any other detectives?

21    A    Yes.

22    Q    Who were you assigned with?

23    A    Detective Montilla and Detective Later,

24    Detective Sanders. Detective Mahon had a small part.

JIM01554

C9

SA233

1    Q    Detective Bogucki, is it accurate that you

2    were assigned to the investigation of a shooting death

3    of Eric Morro which occurred on that day during the

4    evening hours near Sacramento and Belmont?

5    A    Yes.

6    Q    Approximately what time did you receive that

7    assignment?

8    A    I got that assignment at about 7:30 p.m.

9    Q    That would have been approximately an hour

10    after the shooting?

11    A    Yes.

12    Q    What did you do initially?

13    A    Initially I went to Illinois Masonic

14    Hospital.

15    Q    Who did you talk to?

16    A    Two 17th District officers, Ryan and Whiteman

17    also one witness, Sandra Elder.

18    Q    When you spoke to Sandra Elder did you learn

19    the existence another witness?

20    A    Yes, her daughter, Tina Elder.

21    Q    In addition, were you also aware of the

22    existence two other witnesses who were not at the

23    hospital?

24    A    Yes.

JIM01555

C10

1          Q      Who was that?

2          A      Two subjects, Larry Tueffel and another,

3     Phillip Torres.

4          Q      What did you do after you finished at the

5     hospital?

6          A      After I finished at the hospital I went to

7     the scene of the incident to try and canvass, look for

8     additional witnesses.

9          Q      At this point in the investigation,

10    detective, were you looking for a named offender or

11    offenders?

12         A      No, I was not.

13         Q      At some point did you receive information

14    which caused you to look for a named offender?

15         A      Yes.

16         Q      Could you describe what happened?

17         A      At approximately one clock in the morning I

18    received a phone call in my office from Phillip

19    Torres.  Phillip Torres told me --

20         MR. HILL:    Objection to what Phillip Torres told

21    him.

22         THE COURT:  Sustained.

23         MR. MURPHY:  Q    Did Phillip Torres and you have

24    a conversation at that time on the telephone?

JIM01556

C11

SA235

1          THE WITNESS:  A    Yes.

2      Q    After you spoke to him on the telephone where

3  did you go?

4      A    I went to approximately 3800 West Belmont to

5  meet with Phillip Torres.

6      Q    Did you do that?

7      A    Yes, I did.

8      Q    Did you have a conversation with Phillip

9  Torres at that location?

10      A    Yes.

11      Q    After you spoke to Phillip Torres were you

12  looking for anyone as suspects in this case?

13      A    Yes.  I was looking for a 13-or 14-year old

14  by the name -- went by the name of TJ.

15      Q    And approximately what time did you speak to

16  Phillip Torres?

17      A    I spoke to him in person at about two in the

18  morning.

19      Q    What did you do in your attempts to locate

20  the suspect named TJ?

21      A    Talked to several people in the neighborhood

22  and learned an address.

23      Q    And, when you learned that address what did

24  you do?

JIM01557

C12

1      A    I went to that address, got another detective

2  with me, and I believe there was a couple of 17th

3  District officers also.

4      Q    Who is the other detective?

5      A    Detective Mack Sanders.

6      Q    And, in addition to him you said there were

7  other uniformed police officers or uniformed police

8  officers went with you?

9      A    Yes.

10     Q    When you arrived at the defendant's home or

11  address you had been given what did you do?

12     A    I knocked on the door.  The door was answered

13  by a woman who identified herself as Gloria Makowski.

14          We asked if there was a subject named TJ

15  that lived there.  And she said, "Yes.  That's my

16  grandson."  She allowed us entry.  If I am not

17  mistaken she woke up someone that was sleeping on the

18  couch and said this is TJ.

19          At this point we told TJ that he was

20  under arrest and he should get dressed and come with

21  us.

22     Q    Do you see that person who was identified as

23  TJ to you and the person you placed under arrest in

24  court today?

JIM01558

C13

SA237

1    A    Yes, I do.

2    Q    Could you, please, point to him indicate an

3 article of clothing?

4    A    Young man wearing black suit and tie.

5    MR. MURPHY:    May the record reflect in court

6 identification of defendant, your Honor?

7    THE COURT:  All right.

8    MR. MURPHY:  Q    And at the time you placed the

9 defendant under arrest when he left with you did you

10 allow him to put on any clothing?

11    THE WITNESS:  A    Yes.

12    Q    What clothing did he put on?

13    A    Just before walking out the door he put on a

14 three-quarter length blue and white Duke sports or

15 starter-type jacket.

16    Q    And, did he wear that to the police station?

17    A    Yes, he did.

18    Q    After you arrived back at the police station

19 that would be Area Five Violent Crimes?

20    A    Yes.

21    Q    Where is the located?

22    A    5555 West Grand Avenue.

23    Q    Could you describe to the Ladies and

24 Gentlemen of the jury how your investigation

JIM01559

C14

1   proceeded?

2      MR. HILL:  Well --

3      MR. MURPHY:  Q   Let me rephrase the question and

4   ask you another.  At some point during this

5   investigation did you conduct what is known as a

6   lineup?

7      THE WITNESS:  A.   Yes, I did.

8      Q   Could you tell the Ladies and Gentlemen of

9   the jury what a lineup is?

10     A   A lineup is -- it's done in order to show

11   witnesses or a victim a particular subject so they may

12   be able to identify or not identify that person.

13        We conduct that lineup using the subject

14   of the lineup.  Plus we try to have at least four

15   fillers or what we call fillers with that subject.

16        In Area Five we have a lineup facility

17   which includes adjoining rooms.  In between the two

18   rooms is a piece of glass is what we call a one-way

19   glass, which in one room you can see through it in the

20   other room.  The -- whoever was looking at the glass

21   would see a mirror.

22        The subjects of the lineup would be

23   placed in the section -- the adjoining room that had

24   the mirror image, and the people looking that would

JIM01560

C15

1    look at a lineup would be on the other adjoining room

2    that you could see through the glass.

3              Oftentimes these people, the subjects of

4    the lineup, would be asked to do several turning

5    motions in front of the glass so people could observe

6    them.

7        Q    What time did the lineup procedures begin

8    with respect do this case?

9        A    Approximately 10 a.m. in the morning.

10       Q    And, do you recall the names of the witnesses

11   who viewed the lineup?

12       A    Yes, I do.

13       Q    Who were they?

14       A    Tina Elder, Phillip Torres, Sandra Elder, and

15   Larry Tueffel.

16       Q    Aside from the defendant how many other

17   people stood in this lineup?

18       A    Four others.

19       Q    When the four witnesses, Tina Elder, Phillip

20   Torres, Sandra Elder, and Larry Tueffel, viewed the

21   lineup did they view the lineup together or

22   separately?

23       A    Each viewed the lineup separately and they

24   were kept separated until all lineups were completed.

JIM01561

C16

SA240

1     Q     So they were separated before and after they

2     viewed the lineup at the police station?

3     A     They were separated after.

4     Q     Okay.

5              Now who is the first of the four

6     witnesses to view the lineup?

7     A     That would have been Tina Elder.

8     Q     When she viewed the lineup could you describe

9     what happened?

10    A     She positively identified had --

11    MR. HILL:  Objection, your Honor.

12    THE COURT:  Overruled.

13    THE WITNESS:     She positively identified Thaddeus

14    Jimenez as the person that shot the victim in this

15    case.

16    MR. MURPHY:  Q     That's the same person you

17    identified in court as the person you placed under

18    arrest earlier that day; is that correct?

19    THE WITNESS:  A     That is correct.

20    Q     Who viewed the lineup second?

21    A     Next was Phillip Torres.

22    Q     When he viewed the lineup what did he do?

23    A     He positively identified Thaddeus Jimenez as

24    the person that put his hands up to the victim's chest

JIM01562

C17

SA241

1    at which time -- at the same time that he heard a

2    shooting off.

3        Q    Who viewed the lineup third?

4        A    That was Sandra Elder.

5        Q    And when she viewed the lineup what did she

6    indicate?

7        A    She picked out two subjects in the lineup,

8    number two and number four, and said either one of

9    those could possibly have been the shooter in the

10   case, but she couldn't be positive.

11       Q    What happened after Sandra Elder viewed the

12   lineup?

13       A    We had Larry Tueffel view the lineup.

14       Q    When he viewed the lineup what happened?

15       A    He stated that Thaddeus Jimenez was the

16   person he knew to be TJ and the person that shot the

17   victim.

18       Q    I'm going to show you what has been

19   previously marked as People's Exhibit Number 8.

20   Detective Bogucki, do you recognize what that is a

21   photo of?

22       A    Yes.  This is a photo of the lineup in the

23   positions that the participants were on that day.

24   Thaddeus Jimenez.

JIM01563

1      Q     Could you tell the ladies and gentlemen of

2   the jury what position was the defendant in?

3      A     Two position.  That would be the second from

4   the left as they are facing you.

5      Q     How did it come he was placed in that

6   particular position?

7      A     When we run a lineup -- well, he was allowed

8   the choose his own position in the lineup.

9      Q     So he chose that position?

10     A     Yes.

11     Q     The four other individuals in this lineup,

12  where do they come from?

13     A     We got the assistance of the school car from

14  Prosser High School and got four volunteers for the

15  lineup.

16     Q     These were high school kids who came over to

17  stand in the lineup at the request of the police

18  department; is that correct?

19     A     That is correct.

20     Q     Now, does that photograph show the other

21  individual that Sandra Elder said she thought could

22  possibly be the shooter?

23     A     Yes.

24     Q     What position is that person in?

JIM01564

C19

SA243

1    A    It would be the 4th position from the left.

2    Q    That would be the person with the circle over

3  his head; is that correct?

4    A    That is correct.

5    Q    Thank you.

6         Now, after the defendant was identified

7  in the lineup could you describe what happened with

8  respect to him?

9    A    He was charged with murder.

10    Q    Now, Detective Bogucki, this did not end your

11  work in this investigation; is that correct?

12    A    That is correct.

13    Q    I would like to direct your attention now to

14  February 10th, 1993.  On that particular date could

15  you describe what happened?

16    A    A second subject was arrested and charged

17  with murder in this -- in regards to this case.

18    Q    Could you describe what happened on that day

19  with respect to the arrest?

20    A    On that day Larry Tueffel had viewed photos.

21  I'm not certain that it was that day that he viewed

22  photos, but it was some time before the arrest that

23  Larry Tueffel had viewed photos and he stated that --

24    MR. HILL:  Objection to what he stated, your

JIM01565

C20

SA244

1    Honor.

2         THE COURT:  Sustained.

3         MR. MURPHY:  Q    How many photos did you show

4    Larry Tueffel?

5         THE WITNESS:  A   Five photos.

6         Q    When you showed him the five photos was any

7    of those particular photos picked out?

8         A    Yes.

9         Q    Which one?

10        A    A subject named Victor Romo.

11        Q    And, when that photo was picked out what did

12   you do?

13        A    We started to look for Victor Romo.

14        Q    On February 10, 1993, was Victor Romo placed

15   under arrest?

16        A    Yes, he was.

17        Q    After Victor Romo was placed under arrest was

18   he also charged with first degree murder?

19        A    Yes, he was.

20        Q    Detective, if I may clarify.  Were the photos

21   shown to Larry Tueffel before or arrest the arrest do

22   you recall?

23        A    I believe it would have been before I

24   believe, but I'm not positive.

JIM01566

C21

SA245

1     Q     Are you sure?

2     A     I'm not positive about that, no.

3     Q     Detective, I will show you what has been

4  marked as People's Exhibit Number 22A, B, C, D and E.

5  Do you recognize these five photos?

6     A     These would have been the photos that we

7  showed to Larry Tueffel.

8     Q     And, which photo did Larry Tueffel select as

9  the photo showing the other offender in this case?

10     A     It would be the E position.

11     Q     For the record the witness has selected

12  photograph 22A.

13                    That would be a photograph of who?

14     A     That would be Victor Romo.

15     Q     I'm going to show you what is marked as

16  People's Exhibit Number 23, which I will mark at this

17  time.  Before I ask you about this photograph, I'm

18  going to ask you to describe a blue Duke jacket which

19  the defendant put on before he left his home to go

20  with you in the police station; is that correct?

21     A     Yes.

22     Q     Was that jacket recovered?

23     A     Yes, it was.

24     Q     Well, and, did you take a photograph of that

JIM01567

C22

1    jacket showing the photograph as it appeared on

2    Thaddeus Jimenez?

3        A    Yes.

4        Q    I would like you to look at the photograph,

5    please, and describe what it is?

6        A    This is a three-quarter blue and white Duke

7    jacket.

8        Q    And does that photograph truly and accurately

9    show the way the defendant appeared as he was wearing

10   that jacket which he wore to the police station?

11       A    Yes.

12       Q    On February 3rd and 4th when you were doing

13   this investigation did you have Victor Romo's name at

14   that time?

15       A    No.

16       Q    What information did you have about the other

17   offender who was with the shooter during your

18   investigation up to that point?

19       A    I had information that Larry Tueffel had

20   previously gone to school with the other offender.

21       Q    When you spoke with Larry Tueffel was he able

22   to tell you the name Victor Romo?

23       A    No, he could not.

24       Q    What did he tell you?

JIM01568

C23

SA247

1    MR. HILL:  Objection, your Honor.

2    THE COURT:  Sustained.

3    MR. MURPHY:  Q    Did he indicate whether or not

4  he knew the other offender?

5    THE WITNESS: A    Yes.

6    MR. MURPHY:  No further questions, Judge.

7    THE COURT:  Cross-examination?

8

9                    CROSS-EXAMINATION

10                    BY

11                    MR. HILL:

12

13    Q    Detective, that lineup that happened on

14  February 4th, did Sandra, Tina and Phillip Torres come

15  together to your knowledge?

16    A.   I can't say that one way or another for sure.

17    Q    Now, you said you went to the hospital and

18  you talked to Sandra; is that correct?

19    A.   That is correct.

20    Q    And then you left there and you went to the

21  scene?

22    A    Yes.

23    Q    And, you also had a conversation at about

24  9:30 at the police station with Phillip Torres and

JIM01569

C24

SA248

1    Larry Tueffel; isn't that correct?

2        A    That is correct.

3        Q    In fact, you were told you were given a

4    description then; isn't that correct?

5        A    Yes.

6        Q    And, the description was that -- and you also

7    were given a name by Larry Tueffel; isn't that right?

8        A    Not at this point, no.

9        Q    You weren't given Frankie?

10       A    No.  Not that I recall.

11       Q    Okay.

12            You were told that one gentleman had a

13   purple jacket with yellow lettering; is that right?

14       A    That's what Larry Tueffel told me.

15       Q    He also told you the other gentleman had a

16   Georgetown jacket; is that right?

17       A    Yes.

18       Q    Neither -- during that conversation neither

19   gentlemen told you they knew either of the two

20   offenders; is that right?

21       A    That is correct.

22       Q    Now, when you arrested Thaddeus he was at his

23   house?

24       A    Yes.  Well, I don't know where he was staying

JIM01570

C25

1    at the time, but it was his grandmother's house.

2         Q    He didn't resist, did he?

3    MR. GAUGHAN:  Objection.

4    THE COURT:  Overruled.

5    THE WITNESS:  No, he did not.

6    MR. HILL:   Q    And, in fact he told you he was 13

7    years old?

8         THE WITNESS:  A    Yes.  At some point he told us

9    that.

10        Q    And he went to what school?

11        A    I -- there were several schools involved with

12   them.  I'm not sure which one he was currently going

13   to.

14        Q    Is it Hans or Hons?  Did you write it down?

15        A    I believe that was one of the schools he had

16   gone to.

17        Q    Is a closed campus?

18        A    I have no idea.

19        Q    Do you know what a closed campus is?

20        A    I'm not into grammar schools.

21        Q    I didn't say you were.  I'm asking you to

22   answer yes or no.

23        A    No, I don't.

24        Q    Thank you.  You said you had a conversation

JIM01571

C26

SA250

1    with Larry and Phillip at the police station at 9:30,

2    right?

3        A    Yes.

4        Q    You continued on your investigation?

5        A    After those conversations I started doing

6    paperwork.

7        Q    Okay.

8             Now, and you did some -- you did some

9    notes of those conversations in your handwriting?

10       A    I probably did.

11       Q    And, you said you are not -- you were not

12   sure whether or not Larry told you it was Frankie?

13       A    I don't recall that.

14       Q    Would anything refresh your recollection?

15       A    Possibly could.

16       Q    Could you take a look at this?

17            What is that?

18       A    That says Frankie under a description.

19       Q    What is it?

20       A    This is what we call a general progress

21   report, and actually what it is is it's note paper for

22   us to take notes on.

23       Q    Is that your handwriting?

24       A    Yes, it is.

JIM01572

C27

1     Q    Okay.

2           That's your handwriting of your

3  conversation with Larry Tueffel?

4     A    Yes.

5     Q    And in fact he did tell you that it was

6  Frankie, right?

7     A    At this point he must have, yes.

8     Q    Now, you said you had a conversation with a

9  Larry -- with a Phillip Torres at about one clock; is

10  that right?

11     A    I actually -- by the time I got there it was

12  about two o'clock in the morning.

13     Q    Okay.

14           About two o'clock?

15     A    On the 4th.

16     Q    His half brother and half sister were there,

17  do you know?

18     A    There were other people there.  I don't know

19  of the relationship.

20     Q    Who they were?

21     A    Right.

22     Q    Go ahead.

23     A    I could recall who some of them were.  I

24  don't know their relationship to him.

JIM01573

C28

SA252

1    had told you; isn't that right?

2        A    That is right.

3        Q    You told him that Phillip had all of a sudden

4    said that -- Phillip had said earlier at two clock

5    a.m. that the person who did it was TJ, right?

6        A    Yes.

7        Q    When you told him that, he then said, yes, it

8    was TJ; right?

9        A    Yes.

10       Q    Did he then say -- if I can have just a

11   second.

12                Did he then say also the other offender

13   went to -- went to -- he knew the other offender,

14   Victor Romo?  Did he tell you that at that time?

15       A    He stated that he knew the other offender

16   from the -- I believe he said from the Linne School

17   when both of them had gone to that school.

18       Q    He told you that.  You wrote notes or you

19   wrote a report of your conversation with Larry Tueffel

20   at that time, didn't you?

21       A    Yes.

22       Q    That would be in your supplemental report;

23   isn't that right?

24       A    Yes.

JIM01574

C30

SA253

1     Q     Okay.

2           And you wrote that supplemental report

3     February 4th, 1992; is that right?

4     A     Yes.

5     Q     Okay.

6           And that report consisted of about eight

7     pages?

8     A     Probably.

9     Q     And, you wrote it when it was fresh; is that

10    right?

11    A     I would have to look at it to see what time I

12    actually wrote it.

13          As far as the time goes it's not on

14    there.

15    Q     Okay.

16          But you wrote it?

17    A     It says 4, February.

18    Q     Okay.

19          In that it has -- in that is embodied

20    the conversation which you had with Larry Tueffel

21    around three or four a.m. on February 4th; is that

22    right?

23    A     I believe it should be.

24    Q     In there is there anywhere that it mentions

JIM01575

C31

1  he told you that Victor Romo -- he knew the other

2  offender?

3      THE COURT:  Are we talking -- he gave counsel --

4  just so it clear in my mind you said did he ever say

5  that it was Victor Romo or --

6      MR. HILL:  Q   Did he say he knew the other

7  offender.

8      THE COURT:  That's two different things.

9      MR. HILL:  He said he didn't know a name but he

10  told him he knew the other offender.

11      THE COURT:  Ask the question.

12      MR. HILL:  Q   Okay.

13          Anywhere embodied in that report do you

14  say Larry Tueffel said he told you that he knew the

15  other offender?

16      THE WITNESS:  A   I know what I mean.  Totally

17  knew him?  I don't know exactly what you mean knew

18  him.  By name?

19      Q   Nope.

20      A   Okay.

21      Q   Anywhere in that did he say that he knew the

22  offender, the other offender?

23      A   It doesn't say that that I can see.

24      Q   I'm sorry.

                                    JIM01576

C32

SA255

1       A    I say it does not say that that I can see in

2  this report.

3       Q    Nowhere in your report does it say that Larry

4  Tueffel knew the other offender; is that right?

5       A    Didn't say that in the report, no.

6       Q    And it was only after you told him what

7  Phillip Torres said that he said that TJ was involved;

8  isn't that correct?

9       MR. MURPHY:  Objection.

10      THE WITNESS:    That is correct.

11      THE COURT:    I'm sorry?

12      MR. MURPHY:  Asked and answered.

13      THE COURT:  You may answer it again.

14      THE WITNESS:    Yes.

15      MR. HILL:  No further questions.

16      THE COURT:  Redirect?

17

18              REDIRECT EXAMINATION

19              BY

20              MR. MURPHY:

21

22      Q    Detective, is your report still in front of

23  you?

24      A    No.

                                        JIM01577

                        C33

1          Q     Again, showing you Defendant's Exhibit

2     number?

3          MR. HILL:     Number One.

4          MR. MURPHY:  Defendant's Number One.

5          THE COURT:  Are you calling that Defendant's

6     Exhibit One?  Okay.

7          MR. MURPHY:  Q  The supplemental report you

8     prepared.  Do you make reference to the fact in your

9     report to the conversation you had with Larry Tueffel

10    during the early morning hours after you told him what

11    Torres had told you?

12         THE WITNESS:  A   Yes.

13         Q     And, in your report you make reference to the

14    fact that Larry Tueffel did not know the other

15    offender's name.  You note that in there?

16         A    I see it now in a different place.

17         Q    And, what does your report say with respect

18    to that?

19         A    (No response)

20         Q    I will refer you to the bottom of Page 6.  Do

21    you indicate a sentence there with respect to Larry

22    Tueffel not knowing the name of the second offender?

23         MR. HILL:  Objection, your Honor.  That's not what

24    it says.

JIM01578

1        THE COURT:  He should read it.

2        MR. HILL:  Let him read.

3        THE COURT:  Read it exactly as it is.

4        THE WITNESS:    Tueffel stated that he did not

5    know the second offender.

6        MR. MURPHY:  Thank you.

7        THE COURT:  Did not know?

8        THE WITNESS:    Tueffel stated he did not know the

9    second offender.

10        MR. MURPHY:  Q    Now did you prepare that report?

11        THE WITNESS:  A    Yes.

12        Q    What is the significance of that entry in

13    your report?  What is the significance of that

14    sentence?

15        A    He didn't know the name of the other

16    offender.

17        Q    And he did tell you he knew who he was but he

18    couldn't give you his name; is that correct?

19        A    Yes.

20        Q    The first time that that came up that he knew

21    who this other person was but couldn't give you his

22    name was when you had told him what Torres told you

23    about TJ being the shooter; is that correct?

24        A    Yes.

JIM01579

C35

SA258

1    Q    Up to that point the descriptions that you

2  had received of the shooter and another individual who

3  was with the shooter were inaccurate; is that correct?

4    A    Yes.

5    Q    And those descriptions were received from

6  Larry Tueffel; is that correct?

7    A    That is correct.

8  MR. MURPHY:  Nothing further, Judge.

9  THE COURT:  Recross?

10

11                   RECROSS-EXAMINATION

12                        BY

13                   MR. HILL:

14

15    Q    How long have you been on the force?

16    A    Eighteen years.

17    Q    You have done a number of reports?

18    A    Yes, I have.

19    Q    Testified a number of times?

20    A    Yes.

21    Q    And, you realize the significance -- the

22  reports do have some significance, don't they?

23    A    As summaries, yes.

24    Q    As summaries to help other officers as well

JIM01580

C36

1   as refresh yourself, right?

2       A    Yes.

3       Q    And, as a summary you put that which you

4   sometimes -- most times you put that which is

5   important in there, isn't that right?

6       A    Try to.

7       Q    Okay.

8            Is there anywhere in that report that

9   you put that Larry Tueffel said that he knew the other

10  offender?

11      A    I didn't see it written there, no.

12      Q    Do you want to take a look to make sure

13  whether it's there or not?

14      A    I looked twice already.  I did not see it.

15      Q    So the answer is no?

16      A    That is correct.

17      Q    Now, is there anywhere in this report that

18  says that he couldn't give you the other offender's

19  name?

20      A    No.  It doesn't specifically say.

21      Q    In fact it specifically says that Tueffel

22  stated that he did not know the second offender.

23  Isn't that what it specifically states?

24      A    Yes.

JIM01581

C37

1        MR. HILL:    Thank you.  No further questions.

2        MR. MURPHY:  No questions.  Thank you, Officer.

3    You may step down.

4        THE COURT:  Your next witness?

5        MR. GAUGHAN:    At this time People would call

6    Officer Dwyer.

7        THE CLERK:  Please, stand and raise your right

8    hand.

9                    (witness sworn.)

10       THE CLERK:  You may be seated.

11       THE COURT:  Proceed.

12

13        Y O U T H    O F F I C E R    D W Y E R,

14    the witness herein, called as a witness on behalf of

15    the People of the State of Illinois, having been first

16    duly sworn, was examined and testified as follows:

17

18                    DIRECT EXAMINATION

19                    BY

20                    MR.

21

22        Q    Could you, please, state your name, your star

23    number, and your current assignment for the Ladies and

24    Gentlemen of the jury?

JIM01582

C38

SA261

1          A     Youth Officer Dwyer, Star 2300, Area Five

2     Youth.

3          Q     I want to direct your attention back to

4     February 1992, what was you assignment?

5          A     Also Area Five Youth.

6          Q     Specifically on February 19, 1992, at

7     approximately 11:30 in the evening did you have

8     occasion to be at the 17th District police station?

9          A     Yes, I did.

10          Q     Officer, did you have occasion to have a

11     conversation with a person by the name of Thaddeus

12     Jimenez?

13          A     Yes.

14          Q     Do you see that individual in court today?

15          A     Sitting in the black suit to my left.

16          Q     Indicating for the record, your Honor,

17     in-court identification of defendant, Thaddeus

18     Jimenez.

19          THE COURT:  Your position is youth officer?

20          THE WITNESS:   Yes, your Honor.

21          THE COURT:  Okay.

22          MR. GAUGHAN:    Q   Officer, with regard to your

23     conversation with Thaddeus Jimenez did he state

24     anything to you regarding any gang affiliation?

JIM01583

C39

SA262

1     THE WITNESS:  A   He was a long time member of

2   the Simon City Royals.

3     Q    Okay.

4          Officer, I want to direct your attention

5   now to February 20th.

6     MR. HILL:   Could I have a sidebar?

7     THE COURT:  All right.

8

9               (Whereupon, there was a sidebar

                  discussion had outside the

10             hearing of the jury.)

11

12    THE COURT:  Judge, I would object to her -- I

13  would object to her testimony, your Honor.  This is

14  why I made the motion in limine regarding her earlier

15  about bringing in the officer.

16         She testified she talked to him in 1992

17  and he told her he was a Simon City Royal.  This

18  implies other crimes as well as not relevant to the

19  date in question.

20     MR. GAUGHAN:  I thought we handled this on the

21  record before we started.

22     THE COURT:  Yeah.  I can't recall.  The question

23  the State says he's a gang member.  You say he isn't.

24     MR. HILL:  I didn't say he wasn't.

JIM01584

C40

1    THE COURT:  Not gang related?

2    MR. HILL:    This implies not only gang related

3    but implies that he's involved in other crimes.  She

4    testified the first incident happened in 1992.  This

5    happened in '93.

6    MR. GAUGHAN:  We handled the motion in limine

7    before trial started.  Counsel made his argument.

8    Part of our theory is gang motivated killing, and part

9    of that is to prove up he's a gang member.

10    THE COURT:  This is February '92?

11    MR. HILL:    She said February '92.  This happened

12    in '93.  This is not related.  It implies --

13    MR. MURPHY:  This officer -- first all this

14    officer is not testifying he committed any crime.

15    MR. GAUGHAN:  Just a conversation.

16    MR. MURPHY:  She is testifying to gang membership

17    which is the motive.  The fact he's a member for a

18    period of time goes to motive showing he is a member

19    of the gang.

20    THE COURT:  It's not an indication of other

21    crimes.

22    MR. HILL:    It has all the earmarks.  All it

23    has -- only thing it doesn't have is spell it out who

24    she is, who she works for, and where her conversation

JIM01585

C41

SA264

1    occurs.  All implies another crime.

2       THE COURT:  I can't agree with you.  No mention of

3    a crime.

4       MS. BURKE:  How else would he get in the police

5    station?   There's no testimony that he voluntarily

6    went there for some kind of a meeting.  This means he

7    is under arrest for something.

8       THE COURT:  Doesn't necessarily mean that.  A

9    witness.  Could be a witness.  Overruled.

10           You may proceed.

11                   (Whereupon, the following
                     proceedings were conducted within
12                   the presence and hearing of the
                     jury.)
13

14    MR. MURPHY:  Q    Directing your attention to

15    February 20, 1992, at about five clock in the evening

16    were you working at Area Five Youth again?

17       THE WITNESS:  A    Yes, I was.

18       Q    And, at about five o'clock that evening did

19    you have occasion to be at the 17th District police

20    station?

21       A    It was probably closer to 5:30.

22       Q    5:30?

23       A    Yes.

24       Q    At about 5:30 on February did you again have

JIM01586

C42

1   an occasion to have a conversation with the defendant

2   Thaddeus Jimenez who you have previously identified?

3       A    Yes.

4       Q    At that time, officer, did he state anything

5   to you regarding his gang affiliation?

6       A    That he was a long time member of the Simon

7   City Royals.

8       MR. GAUGHAN:    I have no further questions.

9       THE COURT:  Cross-examination?

10      MR. HILL:    If I could have just a second, Judge.

11              No further questions -- no questions

12      THE COURT:  Thank you.  You are excused.

13      THE WITNESS:    You are welcome.

14      THE COURT:  Next witness?

15      MR. GAUGHAN:  People would call Officer Hladczuk.

16      THE CLERK:  Please, stand and raise your right

17  hand.

18      (witness sworn.)

19      THE CLERK:  You may be seated.

20      THE COURT:  You may proceed.

21

22

23

24

JIM01587

C43

SA266

1          O F F I C E R   H L A D C Z U K,

2      the witness herein, called as a witness on behalf of

3      the People of the State of Illinois, having been first

4      duly sworn, was examined and testified as follows:

5

6                          DIRECT EXAMINATION

7                          BY

8                          MR. GAUGHAN:

9

10         Q      Could you, please, state your name and spell

11     you last name for the Ladies and Gentlemen of the

12     jury?

13         A      Officer Ned Hladzuk, H-l-a-d-z-u-k, Badge

14     4215, Special Operations.

15         Q      Officer, special operations where?

16         A      Chicago Police Department.

17         Q      I want to direct your attention to March 15,

18     1992, what was your assignment?

19         A      I was working a two-man car in uniform.

20         Q      Patrol officer?

21         A      Yes.

22         Q      On that date at about two o'clock in the

23     afternoon, did you have occasion to be in the area of

24     3618 West Belmont in Chicago, Cook County, Illinois?

                                            JIM01588

1      A    Yes, I was.

2      Q    Do you see anybody in court today you had a

3   conversation were on that date?

4      A    Yes, I do.

5      Q    Would you, please, identify that person?

6      A    Defendant wearing the black suit.

7      MR. GAUGHAN:    Indicating for the record, your

8   Honor, in-court identification of defendant, Thaddeus

9   Jimenez.

10         Q    At that time, officer, when you had a

11  conversation with the defendant what, if anything, did

12  he state to you regarding his gang affiliation?

13     MR. HILL:    Judge, I would object.  This is

14  leading.

15     MR. GAUGHAN:  I could get into the fact.

16     THE COURT:  Sustained.

17     MR. HILL:    Judge, did you hear that extra

18  comment?  I ask for a sidebar.

19     THE COURT:  Wait, wait, wait, a moment before

20  anybody jumps up.  I didn't hear it.  Let's talk about

21  it.

22

23

24

JIM01589

C45

(Whereupon, there was a sidebar
discussion had outside the
hearing of the jury.)

MR. HILL:    If my client was I can get into the
fact.

MR. GAUGHAN:  How am I supposed to get into that
without leading?  I have to lead.

THE COURT:  I thought he said something horrible.

MR. HILL:   That is facts, talking a police
officer.

MR. GAUGHAN:  Am I supposed to lay a foundation?
That's the one thing you don't want.

MR. HILL:    I'm saying if we are making extra
comments this will go longer.

THE COURT:  I don't like comments like that, and I
will instruct the State not to do it.  You know better
than that.

MR. MURPHY:  I would point out for the record this
is going on all day Friday with the defense,
especially Mr. Hill.

THE COURT:  I'm well aware it's been going on
throughout the case by the defense as well.  You have
done it quite a few times, couple times.  I told you
I don't like that from either side.  Follow the

JIM01590

1    evidence.

2        MR. GAUGHAN:    If I ask an open-ended question I

3    have a risk of him getting into the crime.  How will I

4    do it without leading?

5        MR. HILL:  Okay.

6        THE COURT:  Go ahead.

7

8                        (Whereupon, the following
                         proceedings were conducted within
9                        the presence and hearing of the
                         jury.)
10

11

12        MR. GAUGHAN:  Q    Officer, at that time what did

13    the defendant state to you, if anything, regarding

14    gang affiliation?

15        THE WITNESS:  A  He stated he belonged to Simon

16    City Royals Street Gang.

17        MR. GAUGHAN:  I have no further questions.

18        THE COURT:  Any questions?

19        MR. HILL:  No.

20        MR. GAUGHAN:  Nothing further.

21        THE COURT:  You may be excused officer.

22        MR. MURPHY:  People call Elizabeth Heatley, Judge.

23        THE COURT:  Please, stand.  Raise your right hand.

24                        (witness sworn.)

JIM01591

C47

SA270

1    THE COURT:  Ma'am, keep your voice up nice and

2    loud so the jury can hear you, all right?  You may

3    proceed.

4

5         E L I Z A B E T H    H E A T L E Y

6    the witness herein, called as a witness on behalf of

7    the People of the State of Illinois, having been first

8    duly sworn, was examined and testified as follows:

9

10                  DIRECT EXAMINATION

11                        BY

12                   MR. MURPHY:

13

14    Q    Would you, please, state your name?

15    A    Elizabeth Heatley.

16    Q    Spell your last name.

17    A    H-e-a-t-l-e-y.

18    Q    Elizabeth, how old are you?

19    A    Fifteen.

20    Q    And what area of city do you live in?

21    A    Addison and Kedzie.

22    Q    Elizabeth, who do you live with?

23    A    My mom, dad, and my sister.

24    Q    How old is your sister?

JIM01592

C48

SA271

1      A      18.

2      Q      Elizabeth, do you go to school?

3      A      Yes.

4      Q      Where are you going to school now?

5      A      Resurrection High School.

6      Q      What level are you in high school?

7      A      Sophomore.

8      Q      You're at the beginning of your sophomore

9   year now; is that right?

10      A      Yes.

11      Q      Elizabeth, do you know a person by the name

12   of Thaddeus Jimenez?

13      A      Yes.

14      Q      Do you see him in court today?

15      A      Yes.

16      Q      Could you, please, point to him, indicate an

17   article of clothing.

18      A      Article of clothing?

19      Q      Tell me what he is wearing.

20      A      Suit and a tie and a shirt.

21      MR. MURPHY:     May the record reflect in-court

22   identification of defendant?

23      THE COURT:  It may.

24      MR. MURPHY:  Q     Elizabeth, when did you meet the

JIM01593

C49

SA272

1   defendant?

2       THE WITNESS:  A    August of 1992.

3       Q    And, what was your relationship with him?

4       A    He was my boyfriend.

5       Q    And, Elizabeth, how old were you when you and

6   Thaddeus were boyfriend and girlfriend?

7       A    It was off and on until about a week before

8   he was arrested.

9       Q    And, that would have been up to about

10  February of 1993?

11      A    Yes.

12      Q    Elizabeth, when you and him were going out

13  together how often would you see him?

14      A    When we would see each other it would be

15  about three or four times during the week.

16      Q    And did you know where he lived when you were

17  going out with him?

18      A    Yes.  He said he lived with his grandmother

19  on Belmont and Central Park.

20      Q    When you were going out with him during that

21  period of time, Elizabeth, did you know whether he

22  belonged to a gang?

23      A    Yes.

24      Q    And how do you know that?

JIM01594

C50

1    A    Because we would sit in the park and cars

2    would drive by and they would throw up their gang

3    signs through from the cars, and he would carve their

4    sign in the bench in the park.

5    Q    What gang did you know the defendant,

6    Thaddeus Jimenez, to belong to?

7    A    The Royals.

8    Q    Would that be known as the Simon City Royals

9    also?

10    A    Yes.

11    Q    You said when cars would go by and you were

12    with him and friends in the park they would throw up

13    gang signs?

14    A    Yes.

15    Q    Who?

16    A    Him and his friends.

17    Q    Could you show us how, the gang signs you saw

18    him and his friends throw up at the cars that passed

19    by for the record?

20         For the record the witness is holding

21    her hands up.  Index finger, and middle finger are

22    crossed.  Is that the same as they showed?

23    A    Yes.

24    Q    You also said that he would carve his gang

JIM01595

C51

SA274

1    sign in benches in the parks; is that right?

2        A    Yes.

3        MR. HILL:    Objection.

4        THE COURT:  Humm?

5        MR. HILL:    Objection to that.

6        THE COURT:  Pardon?

7        MR. HILL:  Objection to this.

8        THE COURT:  Did she say that?  I didn't catch

9    that.

10       MR. MURPHY:  Yes.  I can ask an open-ended

11   question.

12       THE COURT:  Why don't you?  I will sustain as to

13   form.

14       MR. HILL:  I would even object to the substance of

15   this.

16       THE COURT:  I will have to hear it before I can

17   rule on it.

18       MR. MURPHY:  Q    Elizabeth, in addition to the

19   fact that you saw Thaddeus and his friends throwing up

20   gang signs what other reason do you know he was a

21   member of the Simon City Royals?

22       THE WITNESS:  A   Carving the letter R in benches.

23       Q   Did you see him do that more than once?

24       A   I couldn't say if I did or not.

JIM01596

C52

```
 1        Q    Do you remember one occasion?

 2        A    One, yes.

 3        Q    Okay.

 4        MR. HILL:    Objection, your Honor.

 5        THE COURT:  Overruled.

 6        MR. MURPHY:  Q    Elizabeth, did you know whether

 7   or not the defendant had a position in the gang?

 8        THE WITNESS:  A    Well, he said he had a high --

 9        MR. HILL:  Objection to what he said, your Honor.

10        THE COURT:  Overruled.  His statements are

11   admissible in court.

12        A    He said he had a higher rank over the other

13   Pee Wee Royals, but I'm not sure exactly what the rank

14   was.

15        Q    When did he tell you that?

16        A    A few weeks after I had met him in August.

17        Q    That would be August of 1992?

18        A    Yes.

19        Q    And, where did he tell you -- where were you

20   at when he told you that?

21        A     In the Elston play lot.

22        Q    Do you know who was there at that time?

23        A    A few of his friends.  Not sure exactly which

24   friends but a few of them.
```

JIM01597

C53

1    Q    Were they part of the conversation?

2    A    No.

3    Q    Where did the conversation take place?

4    A    On the park bench.

5    Q    Do you remember approximately what time that

6    conversation occurred?

7    A    Between 3:30 and 9 p.m.

8    Q    You really don't remember the time?

9    A    No.

10   Q    Do you know it was some time after you got

11   out of school that day?

12   A    Yes.

13   Q    Elizabeth, after February 3rd, 1993, did you

14   continue to communicate with Thaddeus?

15   A    Yes.

16   Q    How did you communicate with him then?

17   A    Through letters.

18   Q    And during that time period after -- during

19   the time after February 3rd, 1993, did he send you a

20   number of letters?

21   A    Yes.

22   Q    Approximately how many?

23   A    11.

24   Q    How would you receive those letters?

JIM01598

C54

1        A    Through the mail or his mother brought two of

2    the letters to my house.

3        MR. GAUGHAN:    Your Honor, at this time I would

4    have a number of exhibits which I would like to show

5    the witness.  We have previously tendered these to

6    defense.

7        THE COURT:  All right.

8        MR. GAUGHAN:  I will show them to defense again.

9             May I approach?

10        THE COURT:  You may.

11        MR. MURPHY:  Q  Elizabeth, first I will show you

12    what is marked as People's Exhibit Number 15A.  I want

13    you to look at the envelope and the letter itself.  Do

14    you recognize what that is?

15        THE WITNESS:  A    Yes.

16        Q    What is that?

17        A    It's a letter addressed to me from TJ.

18        Q    And what is the date that you either

19    received that letter or he sent it?

20        A    February 26th.

21        Q    How do you know that?

22        A    (No response)

23        Q    That's the date on it stamped by the Post

24    Office; is that correct?

JIM01599

C55

SA278

1      A    Yes.

2      Q    And, how do you know that TJ sent you that

3    letter?

4      A    From the address and his signature.

5      Q    Now, I want you to look at the second page of

6    the letter, and do you see a signature at the bottom

7    of that letter or name at the bottom of the letter?

8      A    Yes.

9      Q    What is the name?

10     A    Thaddeus Jimenez.

11     Q    That's the defendant's name; is that correct?

12     A    Yes.

13     Q    That's how you knew him?

14     A    I knew him as TJ.  In the letter he told me

15    his real name.

16     Q    Did he sign the letter in addition to signing

17    it Thaddeus Jimenez, did he sign the letter with any

18    other name?

19     A    Yes.

20     Q    What is that?

21     A    TJ.

22     Q    You said you knew from the address; is that

23    correct?

24     A    Yes.

JIM01600

C56

1        Q     You knew, without indicating what the address

2   was, you knew the defendant was at this address which

3   was indicated on the envelope; is that correct?

4        A     Yes.

5        Q     In addition to the address that's on the

6   envelope there's an address for you to send

7   correspondence to him; is that correct?

8        A     Yes.

9        Q     Is this the same address on the envelope?

10       A     Yes.

11       Q     Is that letter in the same or substantially

12  the same condition it was in when you received it?

13       A     Yes.

14       Q     The envelope as well?

15       A     Yes.

16       Q     And, Elizabeth showing you what's marked as

17  People's Exhibit Number 15B.  That is a photocopy of

18  the letter and the envelope; is that correct?

19       A     Yes.

20       Q     And that's an accurate copy?

21       A     Yes.

22       Q     Now, I'm going to show you what's marked as

23  People's Exhibit Number 16A.  Do you recognize what

24  that is?

                                              JIM01601

1      A     Yes.

2      Q     What is that?

3      A     A letter from TJ.

4      Q     What date -- what is the date of that letter?

5      A     March 22nd, '93.

6      Q     And, that was placed on the letter; is that

7   correct?

8      A     Yes.

9      Q     And, how do you know that that is from TJ?

10     A     The address and his signature.

11     Q     What is the signature at the end of the

12  letter?

13     A     TJ.

14     Q     I'm also showing you what is marked as

15  People's Exhibit Number 16B.  Do you know what that

16  is?

17     A     Yes.

18     Q     What is that?

19     A     A letter from TJ.

20     Q     That's the copy of 16A; is that right?

21     A     Yes.

22     Q     And, I'm going to ask you to compare the copy

23  with the original.  Is it the same?

24     A     Yes.

1      Q      Okay.

2              I'm also going to show you what's marked

3      as People's Exhibit Number 17A.  Do you recognize what

4      that is?

5      A      Yes.

6      Q      What is that?

7      A      A letter from TJ.

8      Q      That's again all these are envelopes and

9      letters; is that correct?

10     A      Yes.

11     Q      And how do you know -- what is the date of

12     that letter?

13     A      March 22nd, '93.

14     Q      The same date as the previous letter; is that

15     right?

16     A      Yes.

17     Q      In that particular letter how do you know

18     it's from TJ?

19     A      The address and writing from all these

20     letters so far are the same handwriting, and

21     signatures are the same.

22     Q      Is the signature at the end of this letter?

23     A      TJ.

24     Q      In addition do you recognize anything else on

JIM01603

C59

1    the back of this letter?

2        A    It says PHR.

3        Q    Showing you what's marked as People's Exhibit

4    Number 17B.  Is that a copy of the same letter you

5    just looked at?

6        A    Yes.

7        Q    That's the copy of the envelope as well; is

8    that correct?

9        A    Yes.

10       Q    And, now I'm going to show you what's marked

11   as People's Exhibit Number 18A.  Do you recognize what

12   that is?

13       A    Yes.

14       Q    What is that?

15       A    A letter from TJ.

16       Q    And, how do you know that that is a letter

17   from TJ?

18       A    The writing and his signature.

19       Q    Now, in the upper left-hand corner of

20   envelope what does it say?

21       A    PHR.

22       Q    That's the same symbol on the last letter; is

23   that correct?

24       A    Yes.

JIM01604

C60

SA283

1        Q    How is the letter signed?

2        A    TJ.

3        Q    In this particular -- this particular letter

4    do you recognize the lettering at the bottom of this

5    letter?

6        A    Yes.

7        Q    And, could you describe what that lettering

8    says?

9        A    PHR.

10        Q    That particular writing would that be like a

11    Gothic type of writing?

12        A    Yes.

13        Q    And, do you recognize those types of letters?

14        A    Yes.

15        Q    What do you recognize those types of letters

16    as being?

17        A    That was the R that he would carve into the

18    bench.

19        Q    What was it?

20        A    The R he would carve into the bench for

21    Royals.

22        THE COURT:  Oh.

23        MR. MURPHY:  Q    The R he carved into the bench

24    was like the R on that letter?

JIM01605

C61

1      THE WITNESS:    A  Yes.

2          Q    Showing you People's Exhibit Number 18B.

3   That is a copy of the same letter?

4          A    Yes.

5          Q    Now, I'm going to show you what's marked as

6   People's Exhibit Number 19A.  Do you recognize what

7   that is?

8          A    Yes.

9          Q    What is that?

10         A    A letter from TJ.

11         Q    What is the date of that letter?

12         A    April 19th, 1993.

13         Q    That you got that from the envelope the post

14  office placed on it when it was mailed?

15         A    Yes.

16         Q    How do you know that is from TJ?

17         A    The address and his signature.

18         Q    What is the signature?

19         A    TJ.

20         Q    Is the address on envelope the same address

21  that's on all the other envelopes that you received

22  from him?

23         A    Yes.

24         Q    Now, I'm going to show you what's marked as

JIM01606

C62

SA285

1    People's Exhibit Number 19B.  That is a copy of that

2    same letter?

3        A    Yes.

4        Q    Showing you what's marked as People's Exhibit

5    Number 20A.  What is that?

6        A    A letter from TJ.

7        Q    Do you recognize -- can you tell us the date

8    of that letter?

9        A    May 1st, 1993.

10       Q    And that's the date that was placed on the

11   letter by the writer; is that correct?

12       A    Yes.

13       Q    Is a Post Office -- a date stamped on there?

14       A    May 3rd, 1993.

15       Q    How do you know that is from TJ?

16       A    Signature and writing.

17       Q    Placed on by the Post Office?

18       A    Signature and writing.

19       Q    What is the signature at the end of the

20   letter?

21       A    TJ.

22       Q    And in the upper left-hand corner of the

23   envelope this came in what does it say?

24       A    Shorty.

JIM01607

1     Q     Do you know TJ by any other name other than

2     TJ?

3     A     Yeah.  His friends used to call him Shorty I

4     guess for a nickname.

5     Q     Did you see him called Shorty in your

6     presence?

7     A     Yes.

8     Q     And, I'm going to show you People's Exhibit

9     Number 20B.  That is a copy of the letter you just

10     looked at?

11     A     Yes.

12     Q     And the envelope that is with it?

13     A     Yes.

14     Q     Now, Elizabeth, these letters I have showed

15     you, 15 through 20?

16     A     Yep.

17     Q     The original letters, Petitioner's Exhibit

18     Number 15A, 15B, 15C -- excuse me -- 15A, 16A, 17A,

19     18A, 19A and 20A, those are all the letters you

20     received from the defendant, Thaddeus Jimenez?

21     A     Yes, I did.

22     Q     And, the other exhibits, the copies, are they

23     true and accurate copies of those letters?

24     A     Yes.

JIM01608

C64

## **<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that on January 18, 2013, I electronically filed the attached with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


                                       s/ Jonathon D. Byrer
                                     JONATHON D. BYRER, Attorney