No. 12-2779

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

THADDEUS JIMENEZ,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 09-cv-08081
The Honorable Matthew F. Kennelly, District Judge, Presiding

**SUPPLEMENTAL APPENDIX
VOLUME 4 OF 5**

STEPHEN R. PATTON
Corporation Counsel
  of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, Illinois 60602
(312) 744-0746

BENNA RUTH SOLOMON
  Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
  Chief Assistant Corporation Counsel
JONATHON D. BYRER
  Assistant Corporation Counsel
Of Counsel

# TABLE OF CONTENTS OF SUPPLEMENTAL APPENDIX

**Volume 1**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
      Report of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 1

**Volume 2**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
      Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . SA 288

**Volume 3**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 575

**Volume 4**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . SA 841

**Volume 5**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
      Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . SA 1106

1  here to begin with and it is hard for Mr. Murphy to get

2  him here, I had to threaten the father with being held

3  in contempt if he did not cooperate by getting Romo

4  here, I will let him testify after Cosmen out of order.

5  I will tell the jurors it is out of order.

6      MR. JOHN MURPHY:  Judge, under the

7  circumstances we do not have an objection.

8      THE COURT:  Let me tell you gentlemen one

9  more thing.  I think there is going to be a full moon

10  tonight for sure.  The judges, all of the judges in the

11  building have to be downstairs at 3:30 for about 15, 20

12  minutes for a photograph.  I will do that and come back,

13  but let's hear from Cosmen.  When we come back, we will

14  hear from what's his name?  Enrique Romo?

15      MR. CHARLES MURPHY:  No.  Victor Romo.

16      THE COURT:  Victor Romo and then we will hear

17  from Miss Heatley.  I will give the jurors that

18  instruction before she testifies as I just read to you

19  if that is okay with both Mr. Murphys.

20          State?

21      MR. JOHN MURPHY:  Judge, we have no problem

22  with that.

23      THE COURT:  If someone will prepare this so

24  it's ultimately given to the jurors later on as well.

C - 5

73

JIM02397

1          MR. JOHN MURPHY: Yes, judge. We would be

2    happy to have it prepared.

3          THE COURT: Let's bring them out. I will

4    apologize, tell them it's my fault, and go on from here.

5               (The following proceedings occurred

6                in the presence of the jury:)

7          THE COURT: Let me apologize for the start.

8    As you probably noticed when we were walking through, I

9    was conducting a trial during my lunch break so I did

10   not even get a chance to break for lunch. You at least

11   got to break for lunch in a manner of speaking.

12          We are back and the State has a witness now

13   and I think there is going to be a full moon tonight,

14   but anyway after this witness testifies, at 3:30 I have

15   got to be downstairs. Once every two or three years

16   they take the pictures of the judges in the criminal

17   court. That may take 15 or 20 minutes. I will then be

18   back up, but we will hear the witness now. We will then

19   take a break.

20          I will also -- We will take it up at that

21   time so let's, proceed now.

22          MR. GAUGHAN: Your Honor, the People would

23   call Shawn Cosmen.

24          THE COURT: I want the ladies and gentlemen

1   of the jury to know that all the lawyers were available.

2   The defendant was available.  He was here.  It was just

3   that it was my fault.  I started a trial that took

4   longer than I thought so don't blame the lawyers.  When

5   they come back to the building, tell them you were

6   before Judge John Smith, and they will understand.

7             (Witness sworn.)

8             THE COURT:  Thank you very much.  Have a

9   seat.  Keep your voice up.  Wait until the questions are

10  finished before you start answering them, and talk to

11  the 14 people over there in that wooden box to your

12  right.

13            Go ahead please.

14            SHAWN COSMEN,

15  called as a witness on behalf of the People of the State

16  of Illinois, having been first duly sworn, was examined

17  and testified as follows:

18            DIRECT EXAMINATION

19            BY MR. GAUGHAN:

20       Q    Shawn, would you please introduce yourself to

21  the ladies and gentlemen of the jury?

22       A    I'm Shawn Cosmen, S-h-a-w-n --

23       Q    Shawn, you have to speak up a little bit.

24       A    Shawn Cosmen, S-h-a-w-n C-o-s-m-e-n.


C. _7

75

JIM02399

1      Q     Shawn, how old are you?

2      A     Twenty.

3      Q     I want to direct your attention back to

4  February 3rd, 1993.  At that time did you know a person

5  by the name of TJ?

6      A     Yes.

7      Q     Do you see TJ in court today?

8      A     Sitting right at the table there.

9      THE COURT:  What is he wearing at this point?

10      THE WITNESS:  A blue suit with glasses.

11      THE COURT:  Indicating Thaddeus Jimenez.

12      MR. GAUGHAN:  Q.  Shawn, back on

13  February 3rd, 1993, where were you living?

14      A     3000 West Belmont.

15      Q     Is that the corner of Belmont and Sacramento?

16      A     Yes.  It is.

17      Q     I want to direct your attention to roughly

18  3:00 o'clock that afternoon?

19      A     We were standing --

20      Q     Pardon me?

21      THE COURT:  Let him finish the question,

22  Shawn.

23      MR. GAUGHAN:  Q.  About 3:00 o'clock that

24  afternoon, did anything happen on the corner of Belmont

C 8 76        JIM02400

1    and Sacramento regarding the defendant, TJ?

2         A     Yes.

3         Q     Was that out on the corner of Belmont and

4    Sacramento?

5         A     Yes.

6         Q     Who else was out on the corner at that time?

7         A     Me, my sister, her friend, her four kids, and

8    Eric Morro.

9         Q     What happened at that time regarding the

10   defendant?

11        A     The school bus went by, and he screamed

12   Royals and --

13        Q     I will stop you for one minute.  When you say

14   school bus, what age kids were on the school bus?

15        A     Like eighth grade kids, grammar school.

16        Q     When the school bus went by, did the

17   defendant do anything?

18        A     He threw up Royals.

19        Q     When you say he threw up Royals, could you

20   describe for the ladies and gentlemen of the jury

21   exactly what he did?

22        A     He threw up Royals like that.

23              MR. GAUGHAN:  Indicating for the record the

24   witness has his hand up with --

C.  9

77

JIM02401

1          THE WITNESS:  The two fingers crossed and the

2    thumb up.

3          THE COURT:  Thumb up, first two fingers

4    straight out, and then the bottom two fingers down --

5          THE WITNESS:  Crossed like that.

6          THE COURT:  Top two fingers are crossed, the

7    thumb up, and the bottom two fingers are curled up to

8    the hand.

9          THE WITNESS:  Yes.

10          THE COURT:  All right.

11          MR. GAUGHAN:   Q.  What does that signify

12    with the fingers crossed and the thumb up?

13     A     Royals.

14     Q     Was he saying anything when he was throwing

15    up his hand in that fashion?

16     A     Royals.  He was saying Royals.

17     Q     Who was he saying that to?

18     A     The school bus, the kids on the school bus.

19     Q     At that time what happened with regards to

20    Eric Morro?

21     A     Eric told him if he can take it somewhere

22    else because of the kids being out front, and then he

23    told Eric, oh, you'll get yours, and then he walked a

24    couple -- like a couple of doors down and then we -- he

C .10-

78

JIM02402

SA846

1    was going west on Belmont and then we went east and

2    turned the corner going north on Sacramento.

3        Q      Let me stop you for a minute.  When he said,

4    you'll get yours, did he say anything else to Eric?

5        A      Not right then.

6        Q      Which way did -- You said that you started

7    walking away?

8        A      Yeah.  We started to walk towards Sacramento

9    east, going east down Belmont.

10       Q      What happened when you started walking east

11   down Belmont?

12       A      He stood right on Belmont and like on the

13   west side --

14       Q      When you say he, who are you referring to

15   again?

16       A      TJ.

17       Q      When he stood on the west side, what did he

18   do at that time?

19       A      He just stood there for a minute, and then

20   when we got around the corner, he come behind Eric.

21       Q      When he came behind Eric, what did he say?

22       A      He's saying, you'll get yours, prick, and

23   then that's when he left.

24       Q      After he left, what did you do?

```
 1      A     We went to the Elston play lot.

 2      Q     Did you see TJ again at all that day?

 3      A     In a car.

 4      Q     What happened?

 5      A     He just passed the park, and that is when we

 6   left the park.

 7      Q     How long after the incident happened at

 8   Belmont and Sacramento did he pass by in the car?

 9      A     Like twenty minutes.

10      Q     Now, Shawn, later on that evening did you

11   learn that Eric had been shot?

12      A     I didn't know nothing about it.

13      Q     Later though did you learn that?

14      A     Yeah.

15      Q     How did you learn that?

16      A     By my brothers and --

17      Q     About 7:00 o'clock that evening, where were

18   you at?

19      A     I was playing -- The police picked me up from

20   the schoolyard when I was playing basketball.

21      Q     What happened when the police picked you up?

22      A     They said that, whose Georgetown jacket.  I

23   said, mine.  They said, did you do a shooting.  I said,

24   no.  They said, you're lying, come with us.
```

C 12
80

JIM02404

1    Q    Where did you go?

2    A    To -- I forget the address on Belmont,

3    3012 Belmont where the shooting was.  I do not know the

4    address there.

5    Q    After that, did they -- did they let you go

6    at that time?

7    A    Yeah.  After Larry and Phil said that ain't

8    him.

9    Q    Did you know Eric Morro back on February of

10    1993?

11    A    Yes.

12    Q    How did you know Eric?

13    A    I knew him since I was little.

14    Q    Was he a good friend of yours?

15    A    Yeah.  He grew up with the family.

16    Q    With your family?

17    A    Yes.

18    MR. GAUGHAN:  May I have one moment, judge?

19    THE COURT:  Sure.

20    MR. GAUGHAN:   Q.   I want to direct you to

21    the corner of Belmont and Sacramento where the defendant

22    was throwing up the gang signs and Eric told him to take

23    it someplace else.

24    Do you recall if the defendant used any other

1    profanities or obscenities?

2    A    He said -- He was swearing at him.

3    Q    I want you to use the exact language that you

4    recall the defendant using?

5    A    He said, fucking pussy, you'll get yours, you

6    damn liar, and kept on from there.

7         MR. GAUGHAN:  I have nothing further.

8         THE COURT:  Mr. Charles Murphy.

9              CROSS EXAMINATION

10             BY MR. CHARLES MURPHY:

11   Q    Mr. Cosmen, you testified, if I understood

12   you correctly, that at about 3:00 o'clock in the

13   afternoon you saw my client and he was flashing a gang

14   sign, is that right?

15   A    Yes.

16   Q    You weren't alone, were you?

17   A    No.

18   Q    Your sister was there?

19   A    Yes.

20   Q    Miss Hunter was there?

21   A    Miss Hunter?

22   Q    Was there another person there with you?

23   A    Yes.

24   Q    Who was that?

C. 14
82

JIM02406

SA850

```
1        A        Tammy Copland.

2        Q        What was the last name?

3        A        Copland.

4        Q        Is your sister here today?

5        A        No.

6        Q        Where is your sister today?

7        A        In Cleveland, Ohio.

8        Q        You have said that police officers came and

9   picked you up from a play lot and took you back to the

10  scene of the shooting, is that correct?

11       A        Yes.   Schoolyard.

12       Q        You had a Georgetown starter jacket, is that

13  correct?

14       A        Yes.

15       Q        Is that a blue-and-white jacket?

16       A        It was gray and blue.

17       Q        When they brought you back to the scene of

18  the shooting after they told you that you were a liar

19  when you denied that you were involved, the people who

20  they presented you to were -- were Larry Tueffel --

21       A        Yes.

22       Q        -- and your stepbrother, Phillip Torres?

23       A        Yes.

24       Q        That is when you found out, wasn't it, that
```

C 15
83

JIM02407

1 Eric Morro had been shot?

2      A      The only thing I knew was the shooting, and

3 then I didn't know who was shot until they come back and

4 said Eric passed away at the hospital.  That is when I

5 found out it was Eric.

6      Q      When?

7      A      That same night, but it was after -- I got

8 there when he was -- no one was there, just the police

9 taking information.  I did not know who was shot.

10     Q      Did you ask?

11     A      Yeah.  After I got out of the police car.

12     Q      Did anyone tell you?

13     A      Yeah.  My ma.

14     Q      Right there?

15     A      Not right there.  Upstairs when I went up in

16 my house.

17     Q      Where was your house?

18     A      3000 West Belmont.

19     Q      When your mom told you that, did you go back

20 downstairs and tell the police that earlier that day

21 your friend, Eric Morro, had been threatened by

22 Thaddeus Jimenez?  Did you do that?

23     A      I talked to a detective that come in my house

24 later on that night.

C -- 16
84

JIM02408

SA852

```
 1      Q     Did you go back downstairs and tell the --

 2      A     I --

 3      Q     Listen to my question.

 4            Did you go back downstairs after you spoke to

 5      your mother and tell the police there at 3012 or

 6      3018 West Belmont that you had been present earlier in

 7      the day when Thaddeus Jimenez had threatened Eric Morro?

 8      Did you do that?

 9      A     No.

10      Q     Was your address at that time 3000 West

11      Belmont?

12      A     Yes.  It was.

13      Q     You were living what, three doors away from

14      Phillip Torres?

15      A     Yes.

16      Q     Did you see Phillip Torres again that evening

17      at about 9:00 o'clock?

18      A     No.

19      Q     When did you see him that night?

20      A     About 11:00.

21      Q     You spoke to him?

22      A     He was up in my house.

23      Q     Your sister was there?

24      A     Yes.
```

C _ 17

85

1          Q      Was it after you spoke with Phil Torres along

2     with your sister that you then for the first time spoke

3     to police investigators and told police investigators

4     that my client had threatened Eric?

5          A      Right.

6                 MR. CHARLES MURPHY:  I have nothing else.

7                 THE COURT:  Anything else, Mr. Gaughan?

8                 MR. GAUGHAN:  Your Honor, I have no further

9     questions.

10                THE COURT:  You can step down, Mr. Cosmen.

11    Thanks a lot.

12                     (Witness excused.)

13                THE COURT:  May I see the lawyers for a

14    second?

15                     (Proceedings occurred out of the

16                      hearing of the jury and the court

17                      reporter.)

18                     (The following proceedings occurred

19                      in the hearing of the jury:)

20                     (Witness sworn.)

21                THE COURT:  Have a seat.  Keep your voice up

22    and wait until the attorneys finish the question before

23    you start answering.

24                THE WITNESS:  Yes, sir.



                    C _ 18
                       8 6                          JIM02410


                        SA854

1              THE COURT:  Thank you.

2              Go ahead, Mr. Gaughan.

3                   YOUTH OFFICER DWYER,

4   called as a witness on behalf of the People of the State

5   of Illinois, having been first duly sworn, was examined

6   and testified as follows:

7                   DIRECT EXAMINATION

8                   BY MR. GAUGHAN:

9       Q     Officer, could you please introduce yourself

10  to the ladies and gentlemen of the jury?

11      A     Youth Officer Dwyer, Chicago Police

12  Department, Area 5 youth.

13      Q     Would you just briefly describe to the ladies

14  and gentlemen of the jury what a youth officer is?

15      A     We process all juveniles arrested for any

16  offense in the City of Chicago, decide whether they are

17  handled at a station adjustment level, referred to

18  juvenile court or detained, and in some cases referred

19  to adult court.

20      Q     Now, Officer Dwyer, I want to direct your

21  attention to February 19th of 1992 at approximately

22  11:30 in the evening.  Did you have occasion to be at

23  the 17th District Police Station?

24      A     I did.

C 19 87

JIM02411

1       Q       And at that time did you have a conversation

2    with a person by the name of Thaddeus Jimenez?

3       A       I did.

4       Q       Do you see Thaddeus Jimenez in court today?

5       A       Sitting at that table with the short hair and

6    eyeglasses.

7               THE COURT:  Indicating, for the record,

8    Thaddeus Jimenez.

9               MR. GAUGHAN:    Q.  Officer Dwyer, with regard

10   to your conversation with the defendant on that day, did

11   he make any indication to you regarding any kind of gang

12   affiliation?

13      A       He said he was a long-time member of the

14   Simon City Royals.

15      Q       Officer, again I want to direct your

16   attention to the following day, February 20th of 1992.

17   Did you again have occasion at about 5:00 o'clock in the

18   evening or 5:30 to be at the 17th District Police

19   Station?

20      A       I did.

21      Q       Again on February 20th, 1992, did you again

22   at that time have occasion to have a conversation with

23   the defendant, Thaddeus Jimenez?

24      A       Yes.  I did.

c  20   88                    JIM02412

SA856

1     Q      Pursuant to that conversation, again just

2   directing your attention to any kind of gang

3   affiliation, did he say anything to you at that time?

4     A      Again he said he was a long-time member of

5   the Simon City Royals.

6              MR. GAUGHAN:  I have nothing further, your

7   Honor.

8              THE COURT:  Mr. Murphy?

9              MR. CHARLES MURPHY:  Nothing.

10             THE COURT:  You can step down, Officer Dwyer.

11   Thank you.

12                (Witness excused.)

13             MR. JOHN MURPHY:  Your Honor, may we

14   approach?

15             THE COURT:  Sure.

16                (Proceedings occurred out of the

17                 hearing of the jury and the court

18                 reporter.)

19                (The following proceedings occurred

20                 in the hearing of the jury:)

21             THE COURT:  Ladies and gentlemen, rather than

22   wasting any of your time by just breaking now until I

23   have to go downstairs at 3:25, we are going to hear

24   another witness, but I want to explain this regarding

C .21.

8 9

JIM02413

1   him.

2            This witness is a witness that is going to be

3   called in the defendant's case.  The reason he's being

4   called now is because of scheduling problems.  It would

5   be difficult for us -- for the parties to have the

6   witness available in the defendant's presentation of

7   their case.  So the parties have agreed that the defense

8   could call its witness out of order.

9            There will still be witnesses by the State

10  after this witness.  This is a witness in the

11  defendant's case, but he's merely being heard out of

12  order.  You can consider the testimony as it was

13  presented in the proper order.

14           Mr. Murphy.

15           (Witness sworn.)

16           THE COURT:  Thank you very much.  Have a

17  seat.  Keep your voice up nice and loud please and wait

18  until the attorneys finish the entire question before

19  you start to answer.  If you do not do that, you will

20  both be talking at the same time.

21           Go ahead please.

22

23

24

C  22.
—      9 0                    JIM02414

SA858

1                    VICTOR MANUEL ROMO,

2    called as a witness on behalf of the People of the State

3    of Illinois, having been first duly sworn, was examined

4    and testified as follows:

5                        DIRECT EXAMINATION

6                    BY MR. CHARLES MURPHY:

7        Q      Please state your name and spell your last

8    name.

9        A      Victor Manuel Romo, R-o-m-o.

10       Q      Mr. Romo, how old are you?

11       A      Seventeen.

12       Q      Mr. Romo, are you the same Victor Romo that

13   was convicted in a juvenile court proceeding for the

14   first-degree murder of Eric Morro?

15       A      Yes.

16       Q      Am I correct that you were arrested on

17   February 10th, 1993?

18       A      I believe so.  I am not sure of the exact

19   date.

20       Q      I want to direct your attention back to

21   February 3rd, 1993, the day that Mr. Morro was shot, and

22   I am going to specifically direct your attention to the

23   evening hours at about 6:30 P.M.

24              Do you recall if at about 6:30 P.M. you were

1    in the vicinity of Belmont and Sacramento?

2        A    I was there.  Exact times, I don't remember.

3    It's too long ago.

4        Q    Do you recall being at that -- near that

5    intersection though at the time that Mr. Morro was shot?

6        A    What intersection was that again?

7        Q    Near the intersection of Belmont and

8    Sacramento.

9        A    Yeah.  Near there, yeah.

10       Q    Were you east or west of the intersection?

11       A    I was west.

12       Q    Do you know where the Honeybaked Ham Company

13   is located?

14       A    More or less, yeah.

15       Q    Is that the vicinity that you're talking

16   about?

17       A    I believe so.

18       Q    Who were you with?

19       A    I was with a friend of mine named Carlos.

20       Q    Does he have a last name?

21       A    Torres.

22       Q    Where had the two of you come from?

23       A    From around the same neighborhood as my

24   school.

C   24        9 2                          JIM02416

SA860

1        Q      Where would that be?

2        A      That would be -- The school's name is Riley.

3   The exact --

4               THE COURT:  Mr. Romo, please keep your voice

5   up.  Talk to those people there.

6               THE WITNESS:  I don't know the exact streets.

7   It was past Kimball going west.

8               MR. CHARLES MURPHY:   Q.  Approximately how

9   far away from the intersection of Sacramento and Belmont

10  was the school?

11       A      About eight to ten blocks, city blocks.

12       Q      Back on February 3rd, 1993, how old were you,

13  12 or 13?

14       A      I was 12.

15       Q      How old was Mr. Torres?

16       A      I believe 12 or 13, somewhere around there.

17       Q      What time had you met with Mr. Torres that

18  day?

19       A      I don't know the exact time.  I know it was

20  after school, but I can't give you no exact time.

21       Q      Can you approximate?

22       A      I got out of school at 2:30.  By the time I

23  got home and went to Burger King, it had to have been --

24  between 3:30, 4:30, somewhere between there.

C   25

93

```
 1       Q       Where did the two of you meet at?

 2       A       At Burger King.

 3       Q       Where is the Burger King?

 4       A       On Western -- not Western.  By California and

 5   Belmont.

 6       Q       Did you have something to eat there?

 7       A       Yeah.  I did.

 8       Q       When you left, where did you go?

 9       A       By my school.

10       Q       How long did you stay in the area of your

11   school?

12       A       I don't know.  Around -- I couldn't even tell

13   you.  I was there for around 45 minutes, something like

14   that.  I ain't too sure.

15       Q       Did the two of you then leave the school area

16   together?

17       A       Yes.

18       Q       Were you on foot?

19       A       Yeah.

20       Q       Where did you go to when you left school?

21       A       We weren't exactly at school.  We were

22   walking around the neighborhood, and then started

23   walking back.

24       Q       As you were walking, did you get to Belmont
```

C  26.

94

JIM02418

```
 1   Avenue?

 2        A      Yeah.

 3        Q      As you were on Belmont Avenue, what direction

 4   were you headed in, east or west?

 5        A      East.

 6        Q      Towards the lake?

 7        A      Right.

 8        Q      When you got by the Honeybaked Ham Company,

 9   did something happen?

10        A      Right.

11        Q      What happened?

12        A      Carlos, he asked -- There was two people --

13               THE COURT:  Wait, Mr. Romo, please.  Keep

14   your voice up.  It is important that the people hear

15   what you're saying.

16               THE WITNESS:  Well Carlos went to ask

17   Eric Morro something and then --

18               MR. CHARLES MURPHY:   Q.  What did he say?

19   Do you recall?

20        A      I don't exactly remember, no.

21        Q      If you do not recall the exact words, do you

22   recall what the topic was when he spoke?

23        A      I don't remember.  Something I guess that he

24   got rowdy because he started getting into an argument.
```

1       Q       Who got rowdy?

2       A       Well both Eric Morro and Carlos.

3       Q       What happened then?

4       A       From what I remember, he had -- he got to the

5   point where it boiled up that Eric Morro went around to

6   swing at him.  That is before he got -- because at the

7   time he was no bigger than me.  I was -- We were both --

8   Both me and Carlos were small so I just took off after I

9   seen him swung.

10      Q       Who swung?

11      A       Eric Morro.

12      Q       As you took off, did you hear anything?

13      A       Yeah.  Once I got by -- across the street, I

14   heard a gunshot right as I was turning the corner.

15      Q       Did you see the gun?

16      A       No.  I didn't see it.

17      Q       Did you know who had fired the gun at that

18   time?

19      A       At that time?

20      Q       Yes.

21      A       No.

22      Q       Where did you run to?

23      A       My destination or which way did I run?

24      Q       When you began to run, what direction did you

1  run?

2      A      I ran it would be westward.

3      Q      On Belmont?

4      A      Right.

5      Q      As you ran westward on Belmont, ultimately

6  did you make either a left or a right off of Belmont?

7      A      I made a left turn.

8      Q      When you made the left turn, were you then

9  heading south?

10     A      Right.

11     Q      Where did you go to?  What was your

12  destination?

13     A      My home.

14     Q      How far was your home from that intersection

15  at Belmont and Sacramento?

16     A      From Belmont and Sacramento --

17     Q      Yes.

18     A      -- it was two blocks south.

19     Q      Did you run directly to your home?

20     A      Not as towards a straight line, but I mean

21  that was my destination that I was going to.  I went

22  back first and turned the corner, but, yes, that is

23  where I was headed to.

24     Q      Did you find out sometime that day if anyone

C 29      9 7                JIM02421

SA865

1    had gotten shot?

2         A     Yes.

3         Q     How did you find out?

4         A     Because I asked my sister to go find out who

5    got shot.  I thought it was Carlos that got shot.

6         Q     She relayed information to you that it was

7    not Carlos who was shot but it was Eric, didn't she?

8         A     Right.

9         Q     When you found out that Eric had gotten shot,

10   did you go to the police and tell them anything that you

11   knew about this?

12        A     No.  I stayed home.  I was scared.  I wanted

13   nothing to do with it.

14        Q     The police came to you on the 10th day of

15   February and arrested you, didn't they?

16        A     I don't know what day it was, but, yes, they

17   did come to my house and arrest me.

18        Q     Between the day of the shooting,

19   February 3rd, and the day that you got arrested, which

20   was about a week later, did you and your father have an

21   occasion to meet with Juan Carlos Torres?

22        A     Yes.

23        Q     When did you meet?

24        A     I don't the day, but I had told my father and

c 30 98

JIM02422

1    he had wanted to talk to him.

2        Q    Did your father talk to him?

3        A    Yeah.

4        Q    Where?

5        A    From where --

6            MR. GAUGHAN:  Objection.

7            THE COURT:  If he was there, he knows, he can

8    answer it.

9            MR. JOHN MURPHY:  We would object based on

10    foundation.

11            THE COURT:  Try and lay a better foundation

12    as to when it was if you can.

13            MR. CHARLES MURPHY:    Q.  Do you recall how

14    many days after that shooting it was that the meeting

15    took place?

16        A    I don't remember, but I mean it was between

17    the time that I got arrested and the incident happened.

18        Q    Where did the meeting take place?

19        A    That's not a restaurant.  I believe it was

20    the Golden Nugget I think.

21        Q    I am looking for a yes or no answer.  Did

22    your father speak with Mr. Torres that day?

23            MR. JOHN MURPHY:  Objection.

24            THE COURT:  He can answer that yes or no.  He

C 31

JIM02423

SA867

1   is not asking for the conversation.

2              MR. JOHN MURPHY:  Judge, that is not the

3   objection because there is still a foundational aspect

4   of this missing.

5              THE COURT:  You can ask if this witness was

6   present so he knows if his father spoke to him or not.

7              MR. JOHN MURPHY:  Thank you.

8              MR. CHARLES MURPHY:   Q.  Were you in the

9   restaurant when the meeting took place?

10      A      We all ate together, yeah, but they had a

11   conversation a part that I wasn't a part of if that's

12   what you're trying to get to.

13      Q      Were you in the restaurant though when your

14   father was having a conversation with Mr. -- young

15   Mr. Torres?

16      A      We were --

17      Q      I am not asking you if you were seated with

18   him.  I am asking you if you were in the restaurant.

19      A      Which conversation are you talking about?

20      Q      The conversation between your father and

21   Mr. Torres.

22      A      Be more specific please.

23      Q      Did your father have a conversation with

24   Mr. Torres in the restaurant?

C .32
190                        JIM02424

```
 1      A      Yeah.

 2      Q      Were you in the restaurant?

 3      A      Yes.

 4      Q      What color hair did Mr. Torres have?

 5      A      Dark colored hair, dark brown or black.

 6      Q      Was it straight or curly?

 7      A      Curly.

 8      Q      Do you have any idea where Mr. Torres is

 9 today?

10      A      No.

11      Q      Mr. Romo, you and I met for the first time

12 Monday of this week, did we not?

13      A      Yes.

14      Q      I put a subpoena in your hand, Monday, didn't

15 I?

16      A      Right.

17      Q      Is that the reason you're here?

18      A      Yes.

19             MR. CHARLES MURPHY:  I have nothing else of

20 Mr. Romo.

21             THE COURT:  All right.  Go ahead for a few

22 minutes.  We will break at 25 after.  I will run

23 downstairs and run back up.

24             Go ahead.
```

```
 1                    CROSS EXAMINATION

 2                    MR. JOHN MURPHY:

 3        Q    Mr. Romo, this is not the first time that you

 4    have ever testified on behalf of Mr. Jimenez in a

 5    proceeding in this building, is that correct?

 6        A    That's correct.

 7        Q    In fact, you testified in September of 1994,

 8    on behalf of Mr. Jimenez, didn't you?

 9        A    I testified for him.  I don't know the exact

10    date.

11        Q    Mr. Romo, you testified that you were

12    convicted of the first-degree murder of Eric Morro, is

13    that correct?

14        A    That's correct.

15        Q    You were not convicted in this building

16    though, were you?

17        A    Right.

18        Q    You were convicted in juvenile court, isn't

19    that right?

20        A    Right.

21        Q    Now you testified that you were out on the

22    street with this other person who you have named as Juan

23    Carlos Torres, is that correct?

24        A    Right.
```

102

JIM02426

1    Q    Or Carlos Torres and you testified that you

2    and he happened to by chance run across Eric Morro, is

3    that right?

4    A    Right.

5    Q    And Larry Tueffel or Tueffel?

6    A    Right.

7    Q    And you testified that at the time that you

8    were speaking to Eric Morro that an argument developed

9    between Eric Morro and Carlos Torres, is that right?

10    A    That's right.

11    Q    Now it's your testimony that you never knew

12    whether or not either anybody out there on the street

13    had a gun, is that right?

14    A    That's right.

15    Q    And it is your testimony that when the shot

16    was -- you actually ran away from the area where this

17    discussion was or argument was taking place before the

18    shot was fired, is that right?

19    A    Yes.  That's right.

20    Q    How far away were you from the area when the

21    shot was fired?

22    A    I can't tell you in feet or none of that, but

23    I mean I'd say it's a pretty big distance from --

24    Q    Well let me rephrase the question.  They were

C  35
_    103                    JIM02427

1   in front of the Honeybaked Ham store, is that right?

2        A    I --

3        Q    Is that where the discussion was taking place

4   and the argument?

5        A    I guess somewhere around there.  I mean I

6   wasn't -- I wasn't too intent to where everything was.

7   I knew somewhere around there.

8        Q    Was it on Belmont Avenue?

9        A    Yeah, Belmont.

10       Q    Was it east or west of Whipple?  Do you know

11  directions?

12       A    Yes.  I know directions, but I mean I ain't

13  that well on streets, but I could tell you it was west

14  of Sacramento.

15       Q    Did you hear the shot go off?

16       A    Yes.

17       Q    Were you able to see the area where the

18  discussion was taking place when the shot went off?

19       A    No.

20       Q    How long had you been running before the shot

21  went off?

22       A    Seconds.

23       Q    Had you turned the corner when the shot went

24  off?

C  36
—  104

JIM02428

1     A     No.  Not yet.

2     Q     Were you still on Belmont Avenue when the

3  shot went off?

4     A     Yes.

5     Q     You didn't turn around to look to see what

6  happened when the shot went off?

7     A     No.

8     Q     That is the extent of your involvement in the

9  incident that occurred on February 3rd, 1993, is that

10  what your testimony is here today, sir?

11     A     Excuse me?  Can you repeat that?

12     Q     That is the extent of your involvement in

13  this incident, is that correct?

14     A     Besides the fact that I've been tried and

15  convicted for it, yeah.

16     Q     You never struck Eric Morro?

17     A     No.

18     Q     You never said anything to him on the street?

19     A     I seen him before in the neighborhood, but I

20  mean --

21          THE COURT:  He means that night.

22          MR. JOHN MURPHY:  I'm talking about that --

23          THE WITNESS:  Oh, no, no.

24          MR. JOHN MURPHY:  Q.  You just stood there

C 37
105

JIM02429

SA873

1    and when it started to get physical, you ran, is that

2    correct?

3         A     That's correct.

4         Q     It is your testimony that the only physical

5    act that was taken by anybody was by Eric Morro, is that

6    right?

7         A     That I seen.  I mean if stuff that happened

8    when I turned around between him and Carlos --

9         Q     That's what I'm asking.

10        A     There might have been something else, but

11   that I seen --

12        Q     The only one you saw was Eric Morro --

13        A     Yes.

14        Q     -- who was actually throwing a punch, is that

15   right?

16        A     Right.

17        Q     When you fled, you fled alone, is that right?

18        A     Right.

19        Q     You never fled with Juan Carlos Torres or

20   anybody else when you ran down the street, is that

21   right?

22        A     Yeah.  That's right.

23        Q     What direction did you take when you ran away

24   from this?

C - 38
106

JIM02430

1       A       Ran in many directions, but the first one

2    from them was away from me going westward.

3       Q       After you -- When you ran west, did you go in

4    any other direction or did you go down any other street?

5       A       I turned left and then made a left all the

6    way to my house.

7                MR. JOHN MURPHY:  May I ask that the witness

8    be allowed to step down from the witness stand?

9                THE COURT:  Sure.  You may step down,

10   Mr. Romo.

11                   (Witness stepped down.)

12                MR. JOHN MURPHY:   Q.  Do you recognize what

13   this is a diagram of?  Could you step to the side?

14                Do you recognize this as being Belmont

15   Avenue?

16      A       Right.

17      Q       Do you recognize this as Sacramento?

18      A       Right.

19      Q       Do you recognize this as Whipple?

20      A       Uh-huh.

21      Q       Do you recognize the Honeybaked Ham here at

22   3018?

23      A       Yeah.

24                THE COURT:  Speak up please.

```
 1              Go ahead.
 2              MR. JOHN MURPHY:   Q.   Could you show the
 3   area to the ladies and gentlemen of the jury where the
 4   altercation occurred between Eric Morro and the person
 5   you said was Juan Carlos Torres?
 6        A     Somewhere around here.
 7        Q     Which direction did you run after you said
 8   Eric Morro threw the punch?
 9        A     Ran this way.
10        Q     Would you show everyone on the diagram?
11        A     He turned --
12        Q     Could you show with your finger the path he
13   took on the diagram until you go out of that diagram?
14        A     Turned right here down this street, and then
15   I ran home.
16              MR. JOHN MURPHY:  For the record, judge, the
17   witness moved his finger across Belmont in a westerly
18   direction and then moved it in a southerly direction
19   down Whipple.
20              THE COURT:  Very good.
21              MR. JOHN MURPHY:   Q.  Did you go down
22   Whipple Street going south?
23        A     Yes.
24        Q     By the way, while we're looking at this
```

C  40

108

JIM02432

SA876

1    diagram, where did you live at the time?

2        A        I lived -- it would be Belmont like around

3    right here, on Nelson.

4        Q        What was your address?

5        A        2970 West Nelson.

6        Q        How far did you live from Belmont and

7    Sacramento?

8        A        Two blocks.

9        Q        Were you familiar with the gang called the

10    Simon City Royals at that time?

11        A        I knew they were there from the neighborhood.

12    I wasn't familiar with them.

13        Q        Were they active in that area in February of

14    1993?

15        A        More that way, yeah.

16        Q        Did you belong to the Simon City Royals?

17        A        No.

18        Q        Did you belong to any gang?

19        A        No.

20        Q        Would you have a seat please?

21        A        Sure.

22                THE COURT:  Mr. John Murphy, do you

23    contemplate a lot more.

24                MR. JOHN MURPHY:  If I could look at my notes

1  for a moment.  I understand your situation.

2         THE COURT:  We can resume after if necessary.

3  I just wanted to ask you.

4         MR. JOHN MURPHY:  Q.  Do you know why

5  Eric Morro swung at Juan Carlos Torres?

6    A    I don't know what exactly was his intent.  I

7  heard other stuff that he used to be on drugs, but

8  that's just rumors.  I don't know if there is anything

9  to back it up or anything.

10    Q    You think he was on drugs that day?  Is that

11  the reason that you think he swung at him?

12    A    I don't know what was the reason.  Probably

13  because, you know, he felt he had to be defensive,

14  somebody approaching him like that.

15         MR. JOHN MURPHY:  For the record, this is

16  marked as People's Exhibit 22.  I have shown it to

17  counsel.

18         THE COURT:  All right.

19         MR. JOHN MURPHY:  Q.  Is this a Polaroid

20  picture of you as you appeared around the time that this

21  occurred?

22    A    I guess, yeah.

23    Q    That is you in the picture, isn't it?

24    A    Uh-huh.

c  42   110                    JIM02434

1      Q      That is a picture that was taken on

2   February 10th, 1993?

3      A      I don't know.  I guess.

4      Q      Was your picture taken at the police station?

5      A      Yeah.

6      Q      And how would you describe your hair in that

7   picture, the appearance of your hair?

8      A      Not combed.  It was dark.

9      Q      Would you say it's curly?  Would that be

10  accurate to say?

11     A      No.  I don't have curly hair.

12     Q      Is it curly in that picture?

13     A      No.

14     Q      Does this truly and accurately show the way

15  you appeared on that day?

16     A      Well I guess if it was taken --

17            MR. JOHN MURPHY:  I know there is a time

18  constraint.  I would ask that this be published to the

19  jury when we resume.

20            THE COURT:  Any objection, Mr. Charles Murphy

21  to the photograph?

22            MR. CHARLES MURPHY:  Not to its introduction

23  but the publication.  I have a few questions.

24            THE COURT:  If you finish your questioning,

C. 43
111

JIM02435

SA879

1    then Mr. Chuck Murphy can finish his redirect and then

2    you can pose your questions.  Then you can show the

3    pictures.

4            MR. JOHN MURPHY:  No further questions.

5                    REDIRECT EXAMINATION

6            BY MR. CHARLES MURPHY:

7    Q    Counsel said to you that this is not the

8    first time that you testified on my client's behalf, and

9    you testified on his behalf sometime in 1994, right?

10    A    Uh-huh, yes.

11    Q    But when you testified at your own trial, you

12    were testifying for yourself, weren't you?

13    A    Yes.

14    Q    And that was in May of 1993, wasn't it?

15    A    I guess.

16    Q    When you testified at your own trial in May

17    of 1993, did you tell the judge who you were with?

18            MR. JOHN MURPHY:  Objection.  Beyond the

19    scope.

20            THE COURT:  On that basis overruled, but the

21    objection is sustained.

22            MR. CHARLES MURPHY:   Q.  When you testified

23    in juvenile court at your own trial, you did tell the

24    judge who you were with, didn't you?

C. 44
112                     JIM02436

```
1       A       Yes.

2               MR. JOHN MURPHY:  Objection.

3               THE COURT:  He has already answered the

4   question, yes.  Overruled.

5               MR. CHARLES MURPHY:   Q.  You weren't

6   testifying at your own trial for my client because he

7   was not on trial with you, was he?

8               MR. JOHN MURPHY:  Objection.

9               THE COURT:  He can answer that part.

10  Overruled.

11              THE WITNESS:  Yes.  He was not on trial with

12  me.

13              MR. CHARLES MURPHY:   Q.  Did you know my

14  client on February 3rd, 1993?  I am talking about

15  Thaddeus Jimenez.  Did you know him?

16      A       No.

17      Q       On the day of the shooting when you were with

18  Mr. Torres, what color jacket did he have on?

19      A       Did who have on?

20      Q       Torres.

21      A       Black.

22      Q       What color jacket did you have on?

23      A       Dark blue one.

24              MR. CHARLES MURPHY:  Nothing else.
```

1          THE COURT:  Mr. John Murphy.

2              RECROSS EXAMINATION

3            BY MR. JOHN MURPHY:

4      Q     At the time that you went to trial in

5  juvenile court, where were you being housed?

6      A     In the Audy Home, 1100 South Hamilton.

7      Q     Where was the defendant, Thaddeus Jimenez,

8  being housed?

9      A     At the time I think at the Audy Home too.

10     Q     Did you ever hear the term "peewee" being

11  used in reference to gang members?

12     A     Peewee?

13     Q     Yes.

14     A     It is a nickname, yeah.

15     Q     What does "peewee" mean?

16     A     It depends.  It don't mean nothing.  It is a

17  nickname a person takes on.

18     Q     Have you ever heard the term "shorty" being

19  used in reference to gang members?

20     A     That's a name also.  I mean --

21     Q     Would "peewee" and "shorty" be terms used to

22  refer to younger members of a gang?

23     A     If somebody chooses to use that word, I

24  guess.

C- 46
114                    JIM02438

SA882

```
1       Q       Do you know?  Have you heard "peewee" or

2    "shorty" being used to refer to younger members of a

3    gang?

4       A       No.

5       Q       You have never heard those terms?

6       A       Nicknames.  I never heard of some general.

7       Q       Do you know whether or not Thaddeus Jimenez,

8    the defendant, had any rank in the Simon City Royals

9    even at the age of 13 in 1993 among the peewees?

10      A       No.

11              MR. JOHN MURPHY:  No further questions.

12              THE COURT:  Mr. Charles Murphy.

13                      REDIRECT EXAMINATION

14              BY MR. CHARLES MURPHY:

15      Q       To the best of your recollection, when is the

16   first time you ever laid eyes on my client?

17      A       When they put us in the same section in the

18   Audy Home.

19      Q       Who did that?

20      A       The counselor I guess.

21      Q       You had nothing to do with it, did you?

22      A       No.  I just came out of medical isolation,

23   and they changed my section because there was no room in

24   any other one.
```

C -- 47
115

JIM02439

1    Q    How long had you been in custody at least

2   approximately when they did that, when they moved you?

3    A    I would say about a month or two.

4         MR. CHARLES MURPHY:  Nothing else.

5         MR. JOHN MURPHY:  No further questions.

6         THE COURT:  Thank you, Mr. Romo.  You may

7   step down.  You're excused.

8              (Witness excused.)

9         THE COURT:  Ladies and gentlemen, you're

10  excused also.  I think we can get it done ten minutes to

11  4:00.

12         The lawyer can publish the photograph to you

13  when we come back rather than doing it now.

14              (A recess was taken.)

15              (The following proceedings occurred

16              in the presence of the jury:)

17         THE COURT:  The State can proceed with their

18  next witness.

19         MR. JOHN MURPHY:  Judge, just before the

20  break, we asked to publish the photograph.

21         THE COURT:  Sure.  I'm sorry.  You can do

22  that now.

23         MR. JOHN MURPHY:  Thank you.

24              (Exhibit published.)

1          MR. JOHN MURPHY:  All the jurors have seen

2     the photograph.

3          THE COURT:  State can call their next witness

4     please.

5          MR. JOHN MURPHY:  People wall

6     Officer Haldczuk.

7               (Witness sworn.)

8          THE COURT:  Thank you very much.  Have a

9     seat.  Keep your voice up, talk to the 14 jurors to your

10    right, and wait until the questions are done before you

11    start answering them.  Thank you.

12                    OFFICER HALDCZUK,

13    called as a witness on behalf of the People of the State

14    of Illinois, having been first duly sworn, was examined

15    and testified as follows:

16               DIRECT EXAMINATION

17               BY MR. GAUGHAN:

18    Q    Officer, could you please introduce yourself

19    to the ladies and gentlemen of the jury?

20    A    Officer Haldczuk, H-a-l-d-c-z-u-k, Badge

21    4215, Special Operations, Chicago Police Department.

22         MR. CHARLES MURPHY:  Judge, I am requesting a

23    sidebar.

24         THE COURT:  With the reporter or without?

C  49
117

JIM02441

SA885

1          MR. CHARLES MURPHY:  With.

2          THE COURT:  Okay.

3              (The following proceedings occurred

4              out of the hearing of the jury:)

5          MR. CHARLES MURPHY:  I confess being

6    middle-aged and my recollection may be wrong, but I

7    believe this is another officer who is going to testify

8    that he met with my client and my client told him he was

9    in a gang.

10          Is that correct?

11          MR. GAUGHAN:  That is correct.

12          MR. CHARLES MURPHY:  We have already had one

13   youth officer testify that she met with my client on two

14   separate occasions in a police station.  They weren't at

15   a party together.  The jurors are not going to infer

16   that.

17          I have not argued nor will I ever argue that

18   my client was not in a gang.  They are going to get into

19   evidence now those letters which clearly, strongly

20   indicate that my client was a Simon City Royal, but what

21   we are getting into now is proof, proof of other crimes

22   like my client was in the police custody for other

23   unrelated matters.  I would ask you not to let this

24   officer testify.

1          THE COURT:  When is he going to testify that

2   he supposedly talked to Jimenez?

3          MR. GAUGHAN:  March 15th, 1992, that he

4   basically had a conversation with him on the street and

5   the details of what it was about and that Jimenez told

6   him he was a Simon City Royal.

7          THE COURT:  I can tell the jurors that they

8   are not to infer from the fact that Mr. Jimenez spoke

9   with the police that he was under investigation or in

10  custody for an offense.  I think they have a right to

11  present evidence about this gang stuff.

12          MR. CHARLES MURPHY:  He is going to say he

13  spoke to him on the street?

14          MR. GAUGHAN:  Yes.

15          MR. CHARLES MURPHY:  Don't say that.

16          THE COURT:  Do you want me to do it for the

17  last witness?

18          MR. CHARLES MURPHY:  Yes.

19          THE COURT:  After this witness testifies, I

20  will remind the jurors that the previous witness, Dwyer,

21  who testified essentially the same thing, not to infer

22  from any contact that he had with Mr. Jimenez that he

23  was under arrest, in custody for any crimes at that

24  time.

JIM02443

1          MR. JOHN MURPHY:  Okay, judge.

2               (The following proceedings occurred

3               in the hearing of the jury:)

4          THE COURT:  Go ahead please, Mr. State's

5     Attorney.

6          MR. GAUGHAN:    Q.  Officer, how long have you

7     been a Chicago police officer?

8          A     Twenty-nine years.

9          Q     I want to direct your attention back to

10    March 15th, 1992.  In what capacity were you working

11    with the Chicago Police Department at that time?

12         A     Patrol officer, marked car.

13         Q     Specifically on March 15th, 1992, at about

14    2:00 o'clock in the afternoon, did you have an occasion

15    to be in the area of 3618 West Belmont in Chicago, Cook

16    County, Illinois?

17         A     Yes.

18         Q     At that time did you have a conversation with

19    an individual?

20         A     Yes.  I did.

21         Q     Do you see that individual in court today?

22         A     Yes.  I do.

23         Q     Please identify him.

24         A     The defendant wearing the suit.

1    MR. GAUGHAN:  Indicating, for the record, the

2 in-court identification of Thaddeus Jimenez.

3    THE COURT:  Okay.

4    MR. GAUGHAN:  Q.  Officer, at that time when

5 you had the conversation with the defendant, Thaddeus

6 Jimenez, did he indicate to you anything regarding any

7 kind of gang affiliation?

8    A    Yes.  He did.

9    Q    What did he indicate to you?

10    A    Simon City Royal street gang.

11    Q    That he was a member?

12    A    Yes.

13    MR. GAUGHAN:  Nothing further, judge.

14    THE COURT:  Mr. Charles Murphy.

15    MR. CHARLES MURPHY:  I have nothing else.

16    THE COURT:  You can step down.  Thank you

17 very much, sir.

18         (Witness excused.)

19    THE COURT:  Ladies and gentlemen, I should

20 have told you this before when Officer Dwyer testified

21 regarding contacts she had with Thaddeus Jimenez

22 allegedly on February 19th and February 20th, 1992.

23    You are not to infer or speculate that

24 Jimenez was in custody or under arrest or charged with

C  53

121

JIM02445

SA889

```
 1    any crime at that time.

 2              Call your next witness.

 3              MR. JOHN MURPHY:  The People would call

 4    Elizabeth Heatley.

 5              (Witness sworn.)

 6              THE COURT:  Please be seated.  Keep your vice

 7    up nice and loud.

 8                   ELIZABETH HEATLEY,

 9    called as a witness on behalf of the People of the State

10    of Illinois, having been first duly sworn, was examined

11    and testified as follows:

12                   DIRECT EXAMINATION

13              BY MR. JOHN MURPHY:

14    Q    Would you please state your name and spell

15    your last name for the court reporter?

16    A    Elizabeth Heatley, H-e-a-t-l-e-y.

17    Q    Elizabeth, how old are you?

18    A    Eighteen.

19    Q    What area do you live in?

20    A    Addison and Kedzie.

21    Q    Who do you live with?

22    A    My mom and my dad.

23    Q    Elizabeth, are you employed?

24    A    Yes.
```

1    Q    How are you employed?

2    A    I work for HUD, housing development for the

3  elderly and disabled.

4    Q    Elizabeth, I would like to take you back to

5  the time period of 1993, particularly the months between

6  February and October of 1993.  During that time, were

7  you going to school?

8    A    Yes.

9    Q    Where did you go to school?

10    A    I went to Resurrection High School.

11    Q    Would you have gone from one grade level to

12  another in that summer period of 1993?

13    A    Yeah.

14    Q    When you finished in the spring of 1993, what

15  year were you finishing at Resurrection High School?

16    A    Freshman?

17    Q    Okay.  It's been awhile.

18    A    I do not remember that far back.

19    Q    You think you were finishing your freshman

20  year going into sophomore year?

21    A    Yeah.

22    Q    Did you know a person by the name of

23  Thaddeus Jimenez?

24    A    Yes.

```
1        Q       Do you see him in court today?

2        A       Yes.

3        Q       Could you please point to him and indicate

4   what he is wearing?

5        A       A tie, a suit, and a handkerchief in the

6   pocket.

7                THE COURT:  Indicating for the record

8   Thaddeus Jimenez.

9                MR. JOHN MURPHY:   Q.  When did you have

10  first meet him?

11       A       August of 1992.

12       Q       Between August of 1992 and February of 1993,

13  how would you characterize your relationship?

14       A       He was my boy friend.

15       Q       How often did you see him during that time

16  period?

17       A       It was about three or four times a week.

18               THE COURT:  How old were you back then?

19               THE WITNESS:  I was -- 12?

20               THE COURT:  Okay.

21               MR. JOHN MURPHY:   Q.  And, Elizabeth, did

22  you know where Thaddeus lived during that time?

23       A       Yeah.  He said he had lived with his

24  grandmother at Belmont and Central.
```

1    Q    Do you know whether or not or did you know at

2  that time whether or not he belonged to any gang?

3    A    Yes.

4    Q    What gang was that?

5    A    Simon City Royals.

6    Q    How did you know that?

7    A    Well he used to represent the gang to cars

8  that would drive by, and he used to carve the -- an R in

9  the benches at the park.

10    Q    When you say he represented, could you

11  describe -- did you see him represent?

12    A    Yes.

13    Q    Could you describe how he represented?

14    A    He would throw up the gang signs and yell to

15  the cars, Royals.

16    Q    Would you please demonstrate that to everyone

17  here in the courtroom?

18    A    It was this gang sign, and then he would say

19  Royals to the cars.

20    Q    How are you holding your fingers?

21    A    The two -- my index finger and pointer finger

22  are crossed.

23    Q    What is that supposed to symbolize?

24    A    It's an R.

1      Q      You said he used to carve gang signs on

2  benches?

3      A      Yes.

4      Q      What signs did he carve?

5      A      An R.

6      Q      Did he ever tell you whether or not he had

7  any position in the Royals when you were going out with

8  him?

9      A      He had said he was of higher rank in the

10 Peewee Royals than his friends.

11     Q      Now you use the term peewee.  What is a

12 Peewee Royal?

13     A      It's the younger Royals than the older ones.

14 You know, there's the Royals, and then the Peewee Royals

15 which are the younger ones.

16     Q      Have you ever heard the Peewee Royals

17 referred to by any other name?

18     A      Yes.

19     Q      What is that?

20     A      Shorties.

21     Q      After February 3rd, 1993, did you continue to

22 see Thaddeus Jimenez, the defendant?

23     A      That is when he was arrested.

24     Q      Okay.  Exactly.

C   58
126

JIM02450

SA894

1        Let me ask you this.  Did you continue to

2   communicate with him after that?

3        A    Yes.

4        Q    How did you communicate with him?

5        A    Through letters.

6        THE COURT:  Before you ask the next series of

7   questions, your next question, the evidence that is

8   being presented at this point, ladies and gentlemen, is

9   presented for a limited purpose.

10       This evidence is being received that the

11  defendant has been involved in conduct other than that

12  charged in the indictment.  This evidence is being

13  received on the limited issue of the defendant's

14  consciousness of guilt of the incident offense charged,

15  and it is for you to determine whether the defendant was

16  involved in that conduct, and, if so, what weight should

17  be given to this evidence on the issue of his

18  consciousness of guilt.

19       Go ahead, Mr. John Murphy.

20       MR. JOHN MURPHY:  Thank you, judge.

21       Q    Between February of 1993 and October of 1993,

22  did you ever receive any letters from the defendant?

23       A    Yes.

24       Q    Approximately how many?

C  59
127

JIM02451

SA895

1       A      There was eleven.

2       Q      When you received letters, how would you

3   receive them?

4       A      Through the mail, and his mother had brought

5   me two of them.

6       Q      Now I am going to show you, and counsel I

7   believe you had an opportunity to view these.

8               For the record, I am again showing to counsel

9   what has been marked People's Exhibits 16 through 21,

10  your Honor, group exhibit.

11              THE COURT:  Okay.

12              MR. JOHN MURPHY:  May I approach?

13              THE COURT:  Sure.

14              MR. JOHN MURPHY:  Q.  Elizabeth, what I would

15  ask you to do, if you would, is look through each of

16  these, People's Exhibit Numbers 16, 17, 18, 19, 20, and

17  21.

18              Do you recognize these?

19      A      Yes.

20      Q      What do you recognize those to be?

21      A      Letters from TJ to me.

22      Q      Before you testified here in court, did you

23  have an opportunity to examine those letters?

24      A      Yes.

```
 1       Q        How do you recognize those letters?

 2       A        From the return address and the signature at

 3    the bottom.

 4       Q        Where there is a return address, what is the

 5    return address?

 6       A        Section 3-J hundred (sic) South Hamilton,

 7    Chicago, Illinois, 60612, Thaddeus Jimenez.

 8       Q        Is there a name on each of the letters?

 9       A        Yes.

10       Q        What is the name -- Withdraw that question.

11                Can you describe what name you saw on those

12    letters?

13       A        It's mostly TJ.

14       Q        Is it always TJ, or is it anything else?

15       A        It's something else in a couple of the

16    letters.

17       Q        And what else?

18       A        It was Master.

19       Q        Did he ever sign any of the letters

20    Thaddeus Jimenez?

21       A        He -- He signed one of them Thaddeus Jimenez.

22       Q        Are those -- You're looking at a total of six

23    letters now, is that right?

24       A        Yes.
```

C  61

129

JIM02453

1      Q      Are these letters -- Other than the fact that

2    there are stickers on them, evidence stickers on them,

3    are they in the same or substantially the same condition

4    that they were in when you -- after you opened them and

5    read them?

6      A    Yes.

7            MR. JOHN MURPHY:  Your Honor, at this time I

8    would ask that the witness be allowed to publish the

9    letters to the jury one at a time with my questioning.

10           THE COURT:  All right.

11           Mr. Charles Murphy, your position about

12   publishing them at this point?

13           MR. CHARLES MURPHY:  Judge, it would be my

14   position that if the proper foundation is laid that the

15   jurors at their leisure be permitted to look at them.

16           THE COURT:  They ultimately most likely will

17   do that also, but I will let the State publish the

18   letters at this point.

19           What that really means, ladies and gentlemen,

20   as I told you before about photographs, in this case it

21   means that the witness will read the letters to you as

22   opposed to you reading them to yourselves at this point.

23           MR. JOHN MURPHY:   Q.  Elizabeth, I would

24   like you to look at what you have in front of you now,

C   62                          JIM02454

130

SA898

1  first marked as People's Group Exhibit 16.

2          Before I get into this, each of these

3  actually is a letter and an envelope that the letter was

4  in, is that right?

5      A   Yes.

6      Q   Now starting with People's Exhibit Number 16,

7  could you look at the envelope and please read what is

8  on the envelope and where the writing is on the

9  envelope?

10     A   Up in the upper left-hand corner it says

11  Section 3-J hundred South Hamilton, Chicago, Illinois,

12  60612, Thaddeus Jimenez, and in the middle it's

13  addressed to me, Elizabeth Heatley.  I do not have to

14  say my address, do I?

15         THE COURT:  You can continue without that.

16         MR. JOHN MURPHY:   Q.  You can skip that

17  part.

18     A   Then it's my address.

19         In the upper right-hand corner is the

20  postmark which is February 26, 1993, and it's got a

21  stamp.

22     Q   Now if you would please read the letter in

23  its entirety?

24     A   Okay.

1          (Reading.)

2          Dear Liz: How are you, babe? Well I'm okay,

3    but I feel lonely without you. When you wrote me and

4    said you thought I never think about you, well you're

5    wrong. Everyday when I was at home all I did was talk

6    about you. Now I'm sitting here just thinking about all

7    those days I could have spent with you, but I was either

8    too busy or too lazy.

9          When, if I get out, I promise you you will be

10   with -- I will be with you almost everyday, and if I

11   ain't with you, I'll -- I will make it up to you.

12          So what's going on by your house? I hope

13   you're not with any other guys. Tell everyone, that

14   means Laurie, Charlie, and your friends I said hello.

15   If you don't want Laurie to write me, just tell her I

16   said not to.

17          So I hear the Royals are looking for Larry.

18   You see I got connections in and out of jail. Everyday

19   I look at your school picture and just think of what I

20   missed out on. I hope you'll be there for me when I get

21   out. Over.

22          I got your other letter, and the reason

23   you're getting my letters slowly is because I'm mailing

24   them to you and you're giving yours to my mom.


C- 64
132

JIM02456

SA900

1    Oh, yeah.  Don't tell Charlie, Danny, or

2 Laurie my real name.  I'm still a little mad you have it

3 because I'm not ashamed of it, but no one knows it, not

4 even my best friend.  I just feel safer with TJ even if

5 it is my nickname.

6    Would you stop talking about Amanda?  She's a

7 lying bitch.  I wouldn't touch that ho with a fifty foot

8 pole, and if you think I'm lying, well then, fuck you,

9 but if you believe me, thank you.

10    I'm writing you from school just thinking

11 about you.  So you found a picture of me from school?

12 Well do I look cute or what?

13    Well I'm going upstairs now because school is

14 over.  Remember these three words, I love you.  Well got

15 to go now.  See you.  Love TJ.

16    PS here is my real name just in case you need

17 to write in here.  Thaddeus Jimenez, 1100 South

18 Hamilton, Section 3-J, Chicago, Illinois 60612.

19    (End reading.)

20  Q  That is the letter -- That is all of People's

21 Exhibit Number 16, is that right, the envelope and the

22 letter?

23  A  Yes.

24  Q  Now I would like you to move on to People's

C  65  **133**    **JIM02457**

1    Exhibit 17.  Could you please read the envelope as well?

2        A      Up in the upper left-hand corner it says

3    Master TJ, 1100 South Hamilton, Chicago, Illinois,

4    60612, and the middle it's addressed to me, Elizabeth

5    Heatley, and my address and there was no postmark or

6    stamp.

7        Q      Was this letter received by you by mail, or

8    did you receive it another way?

9        A      From his mother.

10       Q      If you would, please read the letter starting

11   at the top.

12       A      Okay.  It's dated 3-22-93.

13              (Reading.)

14              Dear Liz:  How's life?  Fine I hope.  Well

15   I'm doing all right.  I have a confession to make.

16   Don't tell no one, not even Laurie.  I'm not in Indiana.

17   I'm still in jail.  I just told my mom to tell everyone

18   I'm out to see if anyone comes to my house trying to

19   fuck with me.  I'm still at the same jail and in the

20   same section.  So if you would, please write me at

21   1100 South Hamilton, Chicago, Illinois, 60612,

22   Section 3-J.

23              Yesterday I got your letter.  I didn't even

24   think you would write me again.  So do you still think I

1  went out with Amanda?  She's a liar.

2        Oh, yeah.  Tell Laurie I said hi.  Did she

3  write me yet?  If she did, tell her to give it to you

4  and you mail it, not her because I don't want anyone to

5  know that I'm in here still.

6        When I get out, I will take care of Larry,

7  that pussy assed Mark, and for Nelson, you had better

8  not go out with him -- go out with any other boys,

9  especially Nelson.

10        God, I miss you.  Every night I think about

11  you and tell all my friends about -- and I even show

12  your picture off.  I love to brag about you.  I ain't

13  got no picture of myself for you to show off.  Call my

14  mom and ask her for one, and who's Lovanda.  I do not

15  remember any Lovanda and I was never fat.

16        I miss you.  I love you.  I miss you.  I love

17  you.  Don't mean to leave you, but I have to.  So love

18  you and miss you.  See you.  Love TJ.

19        PS I love you.  PSS I miss you.  XOXOXO and

20  then W period B period A period S period A period P.

21        (End reading.)

22  Q    Do you know what those initials -- letters

23  stand for?

24  A    It's write back as soon as possible.

JIM02459

SA903

1        Q        I would like you to -- That is the extent of

2   People's Group Exhibit 17?

3        A        Yes.

4        Q        Now I would like you, if you would, to read

5   the envelope, People's Exhibit Number 18?

6        A        TJ-Little Shorty, 1100 South Hamilton,

7   Chicago, Illinois, 60612.  It's addressed to me, my

8   address, and there's no postmark or stamp.

9        Q        How did you receive this envelope?

10       A        That was another one that his mother had

11   brought to me.

12       Q        Would you please read the letter itself?

13       A        It's dated 3-22-93.

14                (Reading.)

15                Dear Liz.  Hey, sexy, how are you?  It's me

16   again just saying I love you very, very much, and that

17   is why I'm writing you again.

18                I wrote quite a few letters today to my

19   family and then I wrote to you, but it didn't seem good

20   enough so I wrote another one.

21                I'm sitting here in my room listening to

22   Whitney Houston.  I will always love you, just thinking

23   about you.

24                Today I got into a fight with a Royal because

1    he got pissed because I told him I dropped out and fuck

2    the Royals so we went at it.  Of course, I won, but

3    forget about that shit.  It don't mean much to me.

4         So how's your mom doing?  God I miss you so

5    bad.  I could just blow up.

6         So Danny tried to hook up with Larry, huh?  I

7    got something special for him.  And for Larry, you had

8    better see him while you can, because he won't be living

9    very long.  On second thought stay away from him.  He's

10   bad news.  The Royals are supposed to be looking for

11   him.  It looks like I'll have to kill him myself since

12   the Royals won't.  He's lucky he's living now, but I

13   told my cousin not to kill because he's my problem, and

14   as soon as I get out, Danny's pussy ass will be going to

15   Larry's wake.

16        You know the rules.  If you shoot, you shoot

17   to kill, but watch for mice or you'll pay the price, but

18   don't worry.  I won't get caught.  Freedom means too

19   much to me.

20        So do you know any other pretty girls?  Not

21   for me but for my little cousin.  His name is Bob.  He

22   has dark brown hair, pushed back, with brown eyes.  He's

23   half white and half Mexican just like me.  Tell your

24   friends about him.

1          Well it's 5:40, and we're going to gym now so

2    I'll write when I come back.

3          It's 6:27.  I just got back from gym.  I got

4    into another fight just a few minutes ago downstairs in

5    the gym.  Some fuck head got mad because he lost in

6    basketball and called me a white bitch so I called him a

7    nigger so we fought.  To be honest, I didn't win this

8    one.  They broke it up before the fight ended.

9          Well it's time to end this letter because I

10   have to write my godfather.  So I'll be expecting a

11   letter from you in a couple of days.  Bye.  Love, TJ.

12          PS don't be mad that I'm still locked up.

13   I'll be out soon.  PSS I love you.  XOXOXOXOXOXO.

14          (End reading.)

15   Q    That is the end of the letter, is that right?

16   A    Yes.

17   Q    Now if you could read the envelope which is

18   part of People's Group Exhibit 19.

19   A    In the upper left-hand corner it says PHR and

20   it's addressed to me and it's post marked April 21st,

21   1993, and it's got a stamp.

22   Q    Do you know what PHR stands for?

23   A    No.  I don't.

24   Q    Would you please read the letter in its

C  70
—  138                          JIM02462

SA906

1    entirety?

2         A      It's dated 4-15-93:

3              (Reading.)

4         Dear Liz:  How are you, babe?  Fine.  I hope.

5    How has life been treating you?  I'm doing all right.  I

6    think so.

7         I received your letter yesterday, and I thank

8    you for it.  So let's start this letter off by saying I

9    love you very, very much and I always will, and don't

10   worry, I swear to you on the holy Bible I'm only writing

11   my family and that's it.  I swear.

12        So did you find out what PHR means?  No.  I

13   don't mean peace, honor, Royals.  I told you before I

14   ain't in that gang shit any more, but you got some of it

15   right.  I'll never tell.  Ha ha ha.

16        There's only one thing that I won't -- I want

17   to make -- I want to make me say what it means and

18   you're the only girl I want it from, but I have to wait

19   until I get out to get it anyway so don't even worry

20   about it, unless you make me a promise to give me what I

21   want and I'm pretty damn sure you know what that is so

22   it's up to you.

23        So how did it go at your overnight school

24   trip?  Oh, I forgot.  It's in May.  My fault.  You had

1  better not even talk to another boy or else.

2          So do you like my new writing?  I decided to

3  change my handwriting.  It got kind of boring.

4          Danny now says that Larry didn't get shot,

5  huh.  I think Danny is lying this time because my mom

6  told me that she heard something like Larry getting

7  shot.  If he did, good for him, but if he didn't, I will

8  be out soon.

9          I just can't wait until I get out.  I'm going

10 straight to your house for my birthday present.  God I

11 miss you so much.  Every night I look at your picture,

12 and I can't believe you're mine and you are.  I must be

13 a real fine looking boy/man to have someone so precious,

14 beautiful, kind, and soft hearted like you, but I do

15 have the looks.  Ha ha ha.

16          Oh, yeah.  The other day me and my section

17 went outside to play softball, not really outside but at

18 1100 South Hamilton.  There's a real big yard in the

19 middle of the building.  There's no way to escape, but

20 at least I smelled the fresh air.  We might go back out

21 there this week if the weather is good for it, but I

22 doubt it.

23          So when is your birthday?  If I am not out in

24 time for it, I just want to say happy birthday,

C  72

140

JIM02464

1   sweetheart.  I will give you a real special gift.  It's

2   real big and only I have it, if you know what I mean.

3   Ha ha ha.  It's name is he-man, ha ha ha.

4           Let's talk about me.  In here I get treated

5   like a king.  I get anything I want, even weed.  All you

6   need is money, an in.  In here I have a lot of it.  You

7   can do anything with money.

8           For example, on Sundays I give one of the

9   guards that works here $10, and he brings me a whole

10  bunch of food from McDonald's and he lets me sneak in

11  money and squares and he even gives me a light for my

12  squares or I buy -- other's candy from kids in school

13  but my main target is weed.

14          In school I buy dime bags.  I buy one on

15  Thursday and two on Monday.  Then I can do whatever I

16  want.  I roll nine joints out of three dime bags.  I

17  give one to the guard.  Then I give one for three big

18  bags of chips.  Then I give two for someone's breakfast,

19  lunch, and dinner.  Then I give two for three candy

20  bars, three pops, and a bottle of Miller.  With the

21  other three, I gamble one in cards.  I usually lose.

22  With the other two, I keep for myself.  I smoke a half

23  of one every night like I'm about to do right after this

24  letter.  So you see what I can do with some money.  I'm

1    even rolling in jail.

2            In a way it is going to be hard leaving all

3    that I have behind, but then again I'll be very happy to

4    leave this shit hole.

5            Well, Liz, I hope this letter found you

6    interesting.  I hope to see you soon also.  Well this

7    letter is going to end so see you later and goodbye for

8    now.  Love you, sweetie.  Love always, your master, TJ.

9    L-L-L and then it's got W/B/A/S/A/P, XOXOXOXO S/S/S.

10           PS I really do love you and never forget PHR.

11           (End reading.)

12       Q    Do you know what the letters LLL stand for

13   that you just read?

14       A    No.

15       Q    Do you know what the letters SSS stand for

16   that you read?

17       A    No.

18       Q    There was a reference in the last letter that

19   you read to a person by the name of Danny?

20       A    Yes.

21       Q    Did you know a Danny?

22       A    Yes.

23       Q    Who is Danny?

24       A    Danny Coronet.  He was also one of the Shorty

JIM02466

```
 1   Royals.

 2        Q     Now I'm going to ask you to look at what's

 3   been marked as People's Group Exhibit 20.  First if you

 4   would again look at the envelope and just identify what

 5   is on the envelope.

 6        A     In the upper left-hand corner it says

 7   Master-T, 1100 South Hamilton, Chicago, Illinois, 60612.

 8   It's addressed to me, and it's postmarked April 19th,

 9   1993, and has a stamp.

10        Q     If you would start reading the letter as well

11   in its entirety.

12        A     Okay.

13              (Reading.)

14              Dear Liz:  How are you, honey?  Fine I hope.

15   How have you been treating your freedom?  Well I'm doing

16   all right over here.  So what you been up to lately?  I

17   got your letter today, and I thank you for writing me

18   once again.

19              Oh, yeah, I didn't tell you my mom -- tell my

20   mom to lie to you.  I told her to say I was out of jail

21   to everyone just to see if anyone comes looking for me

22   and to see if anyone tries to light me up like they did

23   Larry.  He deserved it, and my birthday is March 5th.  I

24   spent it in here.  I'm 14.  Life sucks, huh?
```

1          And no -- And one more thing.  My next court

2    date is the 29th of this month.

3          I love the picture you sent me.  Wrong colors

4    but you look hot, and I like your bozo pants.  I always

5    liked real big pants like the kind you wear.  I just

6    like to mess around with you.  When I got out, I have to

7    show you a little something or should I say a big

8    something, if you know what I mean.  Ha ha.

9          This letter is kind of sloppy because I'm not

10   used to writing in pen.

11         Oh, yeah, I never got my ass kicked.  Who

12   told you that?

13         Well I really do miss you very much so don't

14   think I don't, okay?  I do get phone calls, but I call

15   my mom.  I'll call you Saturday on the 17th.  Make sure

16   you're up because we usually make calls really early,

17   around 8:00.  That might not be early for you, but on

18   Saturday it's very early to me.

19         When I call you, you had better have the days

20   your mom, sisters, and dad ain't home written down on a

21   paper so when I get out I could run over to your house

22   and then give -- could give -- then you could give me my

23   birthday present, if you know what I mean.

24         Shit, I got to get out of here.  I miss beer.

JIM02468

1   I miss weed.  I miss girls.  Ha ha, but most of all, I

2   miss my freedom.

3           When I first opened your letter, I looked at

4   your picture and sniffed it.  It smelled like your

5   perfume you always wear.  I love that smell, and it

6   reminded me of the last time I seen you.  You were all

7   fancied up.  You know you do have a great body and you

8   always look hot, but you're mine so don't be showing

9   your body any more.  I mean don't be looking all hot and

10  shit.  I get jealous easy.

11          Well that's all I have to say for now except

12  that I love you very, very much, and I hope to be

13  hearing from you soon.  See you later, honey, and

14  remember PHR for now.  I love you.  Love TJ, XOXOXO, TJ

15  and Liz forever.  PS PHR means dash dash dash dash comma

16  dash dash dash comma dash dash dash dash.  Ha ha.  I'll

17  never tell.

18              (End Reading.)

19      Q       Finally the last letter, Elizabeth, which has

20  been marked as People's 21.  Before you get into the

21  letter, could you read the envelope, the outside of the

22  envelope?

23      A       Up in the left-hand corner it says Shorty.

24  It is addressed to me, and it's postmarked May 3rd,

c  77
—  145

1    1993.

2        Q       Now if you would, starting on the first page

3    of the letter, read it its entirety?

4        A       It is dated 5-1-93.

5                (Reading.)

6                Dear Liz:  What's up, girl?  Nothing much

7    over here.  So how's life been treating you?  I'm doing

8    all right I guess.

9                So how come you haven't wrote me a letter

10   lately?  Is it something I said, or is it because

11   there's someone new in your life, someone like Nelson?

12   I just want to know why you haven't wrote me lately.

13               So did my mom tell you that the State changed

14   my court date?  They changed it to May 10th.  So when

15   you get this letter, it should be May 6th.

16               Three more Royals came on my section today.

17   So now there's probably going to be a lot of shit going

18·  down.

19               Oh, yeah.  They told me that Larry did not

20   get shot, and he's still testifying against me.  So on

21   the 10th I want you to call my grandmother's house to

22   see what happened.  Here is the number, 583-279 (sic).

23               The reason why I gave you my grandma's number

24   is because my mom broke her phone and she ain't got a

1  new one yet.

2          God I hope I get out soon.  I pray every

3  night that I get out.  I want you to pray for me too.

4  It could help me.

5          Tomorrow is visiting day, and my mom is going

6  to bring me a whole lot of shit.  She's going to bring

7  me some of those little hand-held video games and a

8  little nurf basketball rim with the new -- with the two

9  suction cups to hold it up and it has that sponge ball.

10          I admit it.  I still have a little kid in me.

11  My mom ain't even supposed to bring that -- this shit

12  up, but she sneaks it up.

13          She also (sic) going to bring me some new

14  clothes for court.  She's bringing me a new cross colors

15  pants and a white turtle neck and she's buying me some

16  new shoes for court too.  She just brought me a pair

17  about three weeks ago.

18          Oh, this Saturday on the 8th I am going to

19  call John's baw (phonetic).  I don't if you remember him

20  (sic), but he is the only Royal -- the one Royal who

21  drives a motorcycle and lives on Kedzie.  I am going to

22  tell him to stop Larry from going to court in any way he

23  has to, even if he has to kill him.  It won't mean

24  anything to me, and it only takes the pull of a trigger.

1          And when/if you write back to me, what is

2    going on with Danny and them?

3          Well, babe, I'm sorry this letter is short,

4    but I have to take a shower now.  So I love you and miss

5    you a whole lot.  Love always, your master, TJ.

6.         PS I have wet dreams about you, ha ha ha ha.

7    PSS I'm only joking, but I do think -- think about in

8    similar ways (sic).  XOXOXOXOXO.

9              (End Reading.)

10   Q    Elizabeth, you have just read the outside of

11   the envelopes and the contents of six letters, is that

12   correct?

13   A    Yes.

14   Q    You, in fact, did receive a total of eleven

15   letters though as you testified, is that right?

16   A    Yes.

17   Q    Elizabeth, obviously you kept those letters

18   after you received them, is that right?

19   A    Yes.

20   Q    Can you tell the ladies and gentlemen of the

21   jury how did those letters get into the possession of

22   the state's attorney's office?  Can you describe what

23   happened?

24   A    My mother had read them, and she decided that

1   it was -- we had to turn them over because of what was

2   said in them.

3        Q       So the letters were turned over to who?

4        A       To Detective Schaulk or --

5        Q       Was that a detective with the Chicago Police

6   Department?

7        A       Yes.

8                MR. JOHN MURPHY:  I have no further

9   questions.

10               THE COURT:  Mr. Charles Murphy.

11                    CROSS EXAMINATION

12               BY MR. CHARLES MURPHY:

13       Q       Miss Heatley, if you know, were those

14   telephone conversations that came out of the Audy Home

15   tape recorded by the authorities?

16       A       Do I know?

17               MR. GAUGHAN:  Objection.

18               THE COURT:  If she knows, she can answer it.

19               THE WITNESS:  I didn't know that.

20               MR. CHARLES MURPHY:   Q.  In one of the

21   letters that you just read that you still have in front

22   of you -- You do still have the letters then, don't you?

23       A       Yes.

24       Q       One of them is dated the 15th day of April,

1    1993, is that correct?

2         A    Yes.

3         Q    It is in that letter where TJ is describing

4    to you how well he's living in the jail and he talks

5    about having a guard get him food from McDonald's, he

6    talks about having the guard light his cigarettes as

7    well as having the guard get him weed?

8         A    Uh-huh.  Yes.

9         Q    He also wrote a letter to you on

10   October 23rd, 1993, did he not?  You do not have that in

11   front of you?

12        A    Yes.  He did.

13        Q    Do you recall if he did?

14        A    Yes.  He did.

15        Q    I have just marked this is as Defendant's

16   Exhibit Number 5, Miss Heatley.  It appears to be

17   another letter that's addressed to you, correct?

18        A    Yes.

19        Q    And the return is to TJ, is that correct?

20        A    It is from TJ, yes.

21        Q    It is dated October 23rd?

22        A    Yes.

23        Q    Does this appear to be a letter that you have

24   seen before that I am showing to you right now?

1      A      Yes.  I have seen it before.

2      Q      I am going to direct your attention to I

3   guess it would be the third page of the letter and the

4   beginning of the second paragraph, okay?

5      A      Okay.

6      Q      I ask you to read that out loud to the jury

7   and --

8             MR. GAUGHAN:  Objection, your Honor.

9             THE COURT:  Overruled.

10            MR. CHARLES MURPHY:    Q.    To where it ends

11  on the following page?

12            MR. GAUGHAN:  May I ask for a sidebar?

13            THE COURT:  Overruled.

14            THE WITNESS:  Up to here?

15            MR. CHARLES MURPHY:    Q.  Yes.

16     A      And as for drugs, it's impossible to sneak

17  drugs up here so how could someone sell me reefer?

18            Anyways I've been reading books about reefer

19  and I decided never to use drugs again and just in case

20  you don't know we have to take drug tests every three

21  weeks and just to let you know if they found drugs in my

22  system, I'll catch a drug case.  So the drug tip is also

23  out of mine (sic).

24            I just told you all that bullshit about

C   83

151

JIM02475

1  smoking and selling weed just to make you think I was

2  doing pretty straight up in here.  You know, taking care

3  of business, but like I said before, no more drugs for

4  me.  I haven't smoked weed in ten months.  I was just

5  lying before -- like before.

6            (End Reading.)

7       Q    Would I be correct that at least

8  approximately as of the time that you received that

9  letter he had been in custody for ten weeks, is that

10 right?

11      A    Yes.

12      Q    What he was telling you in this letter of

13 October 23rd is that he lied to you in the letter of

14 April 15th about what he was doing in the jail to

15 entertain himself, is that correct?

16           MR. GAUGHAN:  Objection.

17           THE COURT:  Overruled.

18           THE WITNESS:  Yes.

19           MR. CHARLES MURPHY:   Q.  In the letters that

20 you were reading when the prosecution was asking you

21 questions, there were some references in there to a

22 person by the name of Larry, is that right?

23      A    Yes.

24      Q    Is Larry someone that you knew?

C  84
—  152

JIM02476

```
1     A     Yes.

2     Q     Larry whom?

3     A     Larry Tueffel.

4     Q     Was Larry a friend of your back then in 1993?

5     A     Yes.  He was.

6     Q     I'm sure that you didn't want to see any harm

7  come his way, is that correct?

8     A     That's correct.

9     Q     When you would receive letters from my client

10 that mentioned Larry and the suggestion that Royals were

11 looking for him --

12    A     Yes.

13    Q     -- did you tell Larry that you had received

14 letters from my client that indicated that he was going

15 to get hurt?

16    A     No.  After TJ was arrested, I had no contact

17 with him any more.

18    Q     Did you know where he was and who he was?

19    A     Where he lived?

20    Q     Did you know where he was or where he went to

21 school?

22    A     No.

23    Q     When you were receiving -- By the way, at

24 some point in time your mother read the letters that the
```

1    prosecution has shown you as well as the letter that I

2    have showed you, is that right?

3        A       Yes.

4        Q       How did your mother happen to read them?

5        A       My sisters had opened them before I got them

6    and showed them to my mother.

7        Q       So you had received all eleven letters, is

8    that correct, before ultimately the letters were turned

9    over to the state's attorney?

10       A       Only nine were turned over.

11       Q       So it would have been at least October 23rd,

12   would it not, until the letters were turned over?

13       A       Nine of the letters were turned over in June.

14       Q       Would I be correct that the reason that you

15   did not do anything with the letters when you received

16   them initially is because you had no reason in the world

17   to believe that he meant anything that he said in the

18   letters?

19               MR. GAUGHAN:  Objection.

20               MR. CHARLES MURPHY:   Q.  Is that why you

21   didn't turn them over?

22               THE COURT:  Overruled.

23               THE WITNESS:  That is why I didn't turn them

24   over.

C  86  154                              JIM02478

1          MR. CHARLES MURPHY:    Q.  And you knew my

2    client very well.  You were his girl friend then, is

3    that correct?

4          A      I didn't know him very well.

5          Q      You were his girl friend, is that correct?

6          A      I was his girl friend.

7          Q      You are aware, are you not, Miss Heatley,

8    that Mr. Tueffel since February 3rd, 1993, through

9    today's date has never been injured in any manner,

10   shape, or form as a result of his being a witness in

11   this case?  You do know that, don't you?

12         A      No.

13         Q      Finally in any of the eleven letters that you

14   received, in any of them at all, did my client ever

15   state that he had any involvement in the shooting death

16   of Eric Morro?

17         A      No.

18         Q      These letters that my client wrote to you are

19   as personal I guess as letters can be.  Would you agree

20   with that?

21         A      Yes.

22         Q      These letters were intended for your eyes

23   only, were they not?

24         A      Yes.

C 87    155                    JIM02479

SA923

1      Q    In none of the eleven letters that you

2   received that were intended for your eyes only did my

3   client ask you to do anything inappropriate or even

4   communicate with a witness?  He never asked you to do

5   that, did he?

6      A    No.

7      Q    In one of the letters that you read, my

8   client referred to the fact that he had spread a rumor

9   that he was in Indiana, is that right?

10     A    Yes.

11     Q    And that was the grossest of exaggerations.

12  He was at the Audy Home, wasn't he?

13     A    Yes.

14          MR. CHARLES MURPHY:  I have nothing else of

15  this witness.

16          THE COURT:  Mr. John Murphy.

17                REDIRECT EXAMINATION

18            BY MR. JOHN MURPHY:

19     Q    Elizabeth, you testified that all eleven

20  letters were not turned over at one time, is that right?

21     A    Yes.

22     Q    You testified that nine letters were turned

23  over earlier before too, is that right?

24     A    Yes.

C  88
                                        JIM02480

1      Q      When were the nine letters turned over to the

2   police?

3      A      June 11th of 1993.

4      Q      The letter that you just read at the request

5   of Mr. Jimenez's attorney was dated October 23rd, 1993,

6   is that right?

7      A      Yes.

8      Q      And in that letter that was dated

9   approximately four-and-a-half months after you turned

10  over the letters to the police, the defendant denied to

11  you a number of the things that he said had occurred

12  inside of the juvenile -- inside of the juvenile

13  detention center of the Audy Home, is that right?

14     A      Yes.

15     Q      This was one of the two letters that was

16  turned over by your family at a later date?

17     A      Yes.

18     Q      When you read that letter just a few moments

19  ago dated October 23rd, 1993, you just read one section

20  of the letter?  You did not read the whole letter in its

21  entirety, did you?

22     A      Correct.

23            MR. JOHN MURPHY:  No further questions.

24            THE COURT:  Mr. Charles Murphy.

C   89

157

JIM02481

```
 1                    RECROSS EXAMINATION
 2                 BY MR. CHARLES MURPHY:
 3        Q     Would I be correct in assuming that you never
 4   informed TJ that any letter that you had ever sent to
 5   him was being turned over to the state's attorney's
 6   office?  You did not tell him that, did you?
 7        A     No.
 8        Q     Your mother didn't tell him that?
 9        A     No.
10              MR. CHARLES MURPHY:  Nothing else.
11              THE COURT:  Anything else, Mr. John Murphy?
12              MR. JOHN MURPHY:  I have no further
13   questions.
14              THE COURT:  Thank you, young lady.  You may
15   step down.
16              (Witness excused.)
17              (Further proceedings were reported by
18              Official Court Reporter Paul O'Connor.)
19
20
21
22
23
24
```

C  90
— 158

JIM02482

```
 1          IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
 2

 3          I, Christina F. Basis, Official Court

 4   Reporter for the Circuit Court of Cook County, County

 5   Department-Criminal Division, do hereby certify that I

 6   reported in shorthand the proceedings had on the hearing

 7   in the above-entitled cause; that I thereafter

 8   transcribed the foregoing into typewriting, which I

 9   hereby certify to be a true and accurate transcript

10   of the proceedings had before the Honorable

11   STANLEY SACKS, judge of said court.

12                         _____

13                         Christina F. Basis

14

15

16

17

18

19

20

21

22

23

24
```

```
 1            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                  COUNTY DEPARTMENT-CRIMINAL DIVISION
 2

 3    THE PEOPLE OF THE STATE OF    )
      ILLINOIS,                     )
 4                                  )
              Plaintiff,            )
 5                                  )
      vs.                           )    No. 93 CR 14710
 6                                  )
      THADDEUS JIMENEZ,             )    Charge:  Murder
 7                                  )
              Defendant.            )
 8    ------------------------------)
```

 9                    PARTIAL REPORT OF PROCEEDINGS had

10    at the hearing of the above-entitled cause before the

11    Honorable STANLEY SACKS, judge of said Court, on the

12    6th day of November, 1997, at the hour of 4:40 p.m.

13

14        PRESENT:

15            HON. RICHARD A. DEVINE
              State's Attorney of Cook County, by
16            MR. JOHN MURPHY and
              MR. DAVID GAUGHAN
17                Assistant State's Attorney
                  Appearing on behalf of the Plaintiff;
18

19

20            MR. CHARLES MURPHY
                  Appearing on behalf of the Defendant.
21

22
      Paul W. O'Connor
23    Official Court Reporter
      Circuit Court of Cook County
24    County Department


                      D-1    (Supp.)


                      160                 JIM02484


                      SA928

1        (Whereupon, reporter C. Basis was

2        relieved and proceedings continued

3        uninterrupted)

4        THE COURT:  The jurors might have thought

5   they were getting off easy tonight.  We have a little

6   bit more for you.  So hopefully if we do a little bit

7   more tonight, I mean a little bit more, two things

8   will be accomplished by that.  We may be able to

9   finish the case tomorrow if we go a little bit more

10   tonight.  And I may get a chance to miss my computer

11   class, but we will deal with that later.

12        State's position Mr. John Murphy and

13   Mr. Gaughan?

14        MR. GAUGHAN:  Your Honor, with the admission

15   of People's Exhibits Nos. 1 through 22, the people

16   would respectfully rest their first degree murder case

17   against Thaddeus Jimenez for murder of Eric Morro at

18   this time.

19        THE COURT:  Ladies and gentlemen, what that

20   means basically is you have heard all the evidence

21   you're going to hear.  That's going to be presented on

22   behalf of the state.  In their case in chief.

23        You have already heard one witness in

24   the defendant's case, that was Mr. Morro testified

D-3    (Supp.)

161            JIM02485

SA929

1   earlier today.  That was out of order for scheduling

2   purposes.

3              MR. J. MURPHY:  Victor Romo.

4              THE COURT:  I'm sorry, I didn't mean to say

5   that, my mistake.  Who testified, Victor Romo who

6   testified today because of scheduling problems.

7                   So the -- at this time defense has the

8   opportunity, they are not required to do so of course,

9   but to submit additional evidence if they wish.

10             MR. C. MURPHY:  We have some evidence.

11             THE COURT:  Okay.  Please be seated, keep

12  your voice up nice and loud and don't start answering

13  the question until it's completely finished.

14             THE WITNESS:  Yes, sir.

15             (Witness sworn)

16                   DONNA WHITLEY,

17  called as a witness herein, having been first duly

18  sworn, was examined upon oral interrogatories and

19  testified as follows:

20             <u>DIRECT EXAMINATION</u>

21             by Mr. Murphy:

22  Q.   Miss, would you state your name?

23  A.   Donna Whitley, W-h-i-t-l-e-y.

24  Q.   Miss Whitley, do you know my client Thaddeus

D-4    (Supp.)

162                              JIM02486

1    Jimenez?

2        A.    Yes, I do.

3        Q.    Do you know any other member of his family?

4        A.    Yes I do.  I know his mother Vickie, his

5    uncles Joey, his aunts Denise, his aunt Donna.  I know

6    his whole family basically.

7        Q.    Is Mr. Jimenez' mother a close friend of

8    yours?

9        A.    We are friends, we are good friends.

10        Q.    How long have you known her?

11        A.    About since '92, '91.

12        Q.    What do you do for a living?

13        A.    I'm a carpenter.

14        Q.    And do you live in the Chicago area?

15        A.    I live in Mount Prospect.

16        Q.    I want to direct your attention back to

17    February 3, 1993.

18            Did you have an occasion to go over to

19    Vickie Jimenez' home?

20        A.    Yes.

21        Q.    Vickie is his mother, is that right?

22        A.    Yes, it is.

23        Q.    Where were they living at that time?

24        A.    On Belmont.

D-5    (Supp.)

163

JIM02487

SA931

1      Q.    Do you recall what hundred?

2      A.    3600 west, 3618.

3      Q.    Why did you happen to go over to that

4  particular day, February 3?

5      A.    We used to meet every other Wednesday.  A

6  group of friends, to go out.  It's like just a routine

7  thing that we did.

8      Q.    Approximately what time would you have

9  arrived at the Jimenez residence?

10     A.    I got there about five minutes to 5:00.

11     Q.    Where had you just come from?

12     A.    My house, which is on LaCrosse.  And

13  Armitage.

14     Q.    That's where you lived at that time?

15     A.    Yes, yes.

16     Q.    How did you get to the Jimenez residence

17  that evening?

18     A.    I took a bus.

19     Q.    Had you taken a bus previously from your

20  house where you lived then to the Jimenez residence

21  before that day?

22     A.    No, because I had a car before.  That's the

23  first time I took a bus, CTA.

24     Q.    You said that you went there that particular

D-6    (Supp.)

164

JIM02488

SA932

1    evening because a group of you were getting together

2    to go out.

3              Who was going to be meeting at the

4    Jimenez residence that night in order to go out?

5         A.    It was me, and his mother Vickie, and

6    another friend Monroe, and --

7         Q.    Is Monroe a man or woman?

8         A.    A man.

9         Q.    Do you have any idea what Monroe's first or

10   last name is?

11        A.    Monroe is his first name.  I don't know his

12   last name.

13        Q.    When you got -- by the way, 3618 where

14   Jimenez family lived, is that a house or an apartment?

15        A.    It's a -- it's like a two-flat.

16        Q.    When you got there, was my client there?

17        A.    Yes.

18        Q.    Was his mother there?

19        A.    Yes.

20        Q.    Were there other adults who were present in

21   the residence other than my client's mother?

22        A.    Yes.

23        Q.    Can you recall who some those people were?

24        A.    Donna, his aunt.  Gloria, his aunt.

D-7    (Supp.)

165

1       Q.   Go ahead?

2       A.   Joey his uncle.  Edward, a friend.  No

3   relation.  And Lorraine a friend, no relation.  A lot

4   of grandkids, the small ones.

5       Q.   You already said my client's mother was

6   there when you were there and that my client was

7   there.

8                  What was he doing when you got there?

9       A.   Playing a -- the video games.

10      Q.   What part of the house was he playing video

11  games in?

12      A.   When you walk in, you walk into the living

13  room, he was sitting on the couch playing right there

14  when you walk in.  In the living room.

15      Q.   How long did you remain at 3618 before you

16  left?

17      A.   I left about a quarter to 7:00.

18      Q.   And did you leave alone or with someone

19  else?

20      A.   No, we got a cab.  I left with Vickie.  We

21  called a cab, the cab came about quarter to 7:00.

22      Q.   Was it just the two of you who left, you and

23  Vickie?

24      A.   And the cab, yes.


                    D-8   (Supp.)


                    166                    JIM02490


                    SA934

```
 1        Q.   Was there anyone else; where was Monroe by

 2   the way?

 3        A.   Monroe came with us.  I'm sorry, Monroe left

 4   with us in the cab.  Me, Vickie and Monroe.

 5        Q.   When you left, was TJ still in the house?

 6        A.   He was still playing the games.

 7        Q.   During the period of time that you were in

 8   the residence and you said it was about 5:00 o'clock

 9   when you got there and about quarter to 7:00, is that

10   what you just said when you left?

11        A.   Yes, sir.

12        Q.   Did you see him leave the residence?

13        A.   No.

14        Q.   When did you find out that he had been

15   arrested and charged in conjunction with a murder?

16        A.   The next day.

17        Q.   Was it in the morning, or mid day or the

18   evening when you learned?

19        A.   Afternoon.

20        Q.   Who informed you?

21        A.   His mother, Vickie.

22             MR. C. MURPHY:  I have nothing else at this

23   time.

24             THE COURT:  Okay.  Mr. Gaughan?
```

D-9    (Supp.)

JIM02491

SA935

1    <u>CROSS EXAMINATION</u>

2              by Mr. Gaughan:

3       Q.   Miss Whitley, you testified you left the

4    apartment about 7:00 o'clock that evening with his

5    mother and Monroe?

6              MR. C. MURPHY:  Objection, I thought she

7    said it was quarter to 7:00.

8              THE WITNESS:  A   No, it was about quarter

9    to 7:00 when we left because the cab came.

10              MR. GAUGHAN:  Q   About quarter to 7:00,

11    7:00 o'clock, so quarter to 7:00.

12              Now, where did you go with Monroe and

13    his mother?

14       A.   We went to Carol's Pub, on Clark and Leland.

15       Q.   What time did you stay at Carol's Pub to?

16       A.   About an hour and a half or so.

17       Q.   Did you stay out late that night?

18       A.   I left earlier, because I had to work the

19    next day.

20       Q.   Let me ask you this:  You said the following

21    day you learned that TJ had been charged with murder,

22    right?

23       A.   His mother told me that, right.  Yeah.

24       Q.   That was on February 4 of 1993, Thursday

D-10   (Supp.)

168

JIM02492

SA936

1   after this happened, right?

2       A.   Yeah.

3       Q.   Did his mother call up and tell you?

4       A.   Yes she did.

5       Q.   Do you remember what time that was?

6       A.   It was in the afternoon.  I don't remember

7   the time, tell you the truth.

8       Q.   So it was in the afternoon the following

9   day?

10      A.   Uh-huh.

11      Q.   And you learned that he had been charged for

12  murder that he supposedly committed the night before?

13      A.   Correct.

14      Q.   At that time you knew that you had been in

15  that house with him, right?

16      A.   Correct.

17      Q.   Now, so immediately you got in your car or

18  got on the bus and went to the police station and told

19  them that no, he couldn't have done it, you saw him in

20  the house at the time the murder was supposed to be

21  committed; you didn't do that, did you?

22      A.   No.

23      Q.   And you never got on the phone and called

24  the police station and said my God, what are you


D-11  (Supp.)


– 169

1    doing, you got the wrong kid.  I know he didn't do it,

2    I saw him in the house.  I was with him.

3              You never did that, did you?

4    A.    No.

5    Q.    So you knew he was charged with murder, for

6    a crime he committed when he was in the same house as

7    you, and you never got on the phone and told anybody,

8    is that correct?

9              MR. C. MURPHY:  Objection to the form of the

10   question.

11             THE COURT:  To that particular question,

12   sustained.

13             MR. GAUGHAN:  Q   You never called the

14   police, correct?

15             THE WITNESS:  A   No.

16   Q.    You talked to his mother, right?

17   A.    Yes.

18   Q.    That was the following day?

19   A.    Yes.

20   Q.    As a matter of fact, his mother pretty good

21   friends with you, right?

22   A.    We are good friends, yeah.

23   Q.    Good enough friends where at least at that

24   time you would get together every other Wednesday?

D-12   (Supp.)

170

JIM02494

SA938

```
 1        A.    Every other Wednesday.

 2        Q.    And in fact that was a group that would get

 3   together that used to live in the same building

 4   together, right?

 5        A.    Yes, correct.

 6        Q.    So you lived for a time in the same building

 7   with Thaddeus Jimenez' mother, correct?

 8        A.    We lived in the same building.

 9        Q.    In fact Thaddeus Jimenez used to stay in

10   that building when his mother lived there, too?

11        A.    That's when I first met him.

12        Q.    You knew TJ from when he lived in the same

13   building with you, not in same apartment, but the same

14   building?

15        A.    Saw him with his mother, yeah.

16        Q.    You testified that Donna was also in the

17   apartment?

18        A.    Who?

19        Q.    I believe you said Donna, correct?

20        A.    Donna, that's --

21        Q.    What's Donna's last name?

22        A.    Makowski I believe, or Jimenez, I don't

23   know.

24        Q.    Makowski or Jimenez?
```

D-13    (Supp.)

171

JIM02495

SA939

```
 1        A.    Jimenez.  I'm not sure of the last name.

 2        Q.    Would that be Thaddeus' mother's sister

 3   or --

 4        A.    It's his mother's sister, yes.

 5        Q.    So the defendant's aunt?

 6        A.    Correct.

 7        Q.    On his mother's side?

 8        A.    Correct.

 9        Q.    And Gloria, you testified was also there?

10        A.    That's another aunt.

11        Q.    What's Gloria's last name?

12        A.    Makowski.

13        Q.    That would again be Thaddeus Jimenez'

14   mother's sister, correct?

15        A.    Correct.

16        Q.    Then you testified that there was a

17   Lorraine?

18        A.    Lorraine.

19        Q.    What's Lorraine's last name?

20        A.    I don't know.

21        Q.    How did you get down to court today?

22        A.    Today?

23        Q.    Uh-huh.

24        A.    I got a ride with a friend.
```

D-14   (Supp.)

172                          JIM02496

```
1        Q.   With who?

2        A.   A friend.

3        Q.   Do you still live in the same area?

4        A.   No.

5        Q.   What's the friend's name you drove down

6   with?

7        A.   Bennie.

8        Q.   What time did you get down here this

9   morning?

10       A.   I have been here since 9:30.

11            MR. C. MURPHY:  Objection to relevance.

12            THE COURT:  Overruled.  Next question.

13            MR. GAUGHAN:  Q   Have you been here with

14   the defendant's mother most of the day?

15            THE WITNESS:  A   I've been all over the

16   building.

17       Q.   Just hanging out at 26th and California all

18   over the building?

19            MR. C. MURPHY:  Objection.

20            THE COURT:  Sustained.  I wanted to advise

21   the jurors to wait till they get to testify, there is

22   nothing improper waiting around the building.  Next

23   question.

24            MR. GAUGHAN:  Q   Were you waiting around
```

D-15  (Supp.)

SA941

1    the building with the defendant's mother?

2            THE WITNESS:  A   I saw her earlier, but

3    most of the day, no.

4            MR. GAUGHAN:  I have no further questions,

5    judge.

6            THE COURT:  Mr. Charles Murphy.

7                REDIRECT EXAMINATION

8                by Mr. C. Murphy:

9        Q.   Counsel's just asked you if you went to a

10   police station to tell the -- a police officer that

11   you knew in essence that TJ was innocent, asked that

12   question, right?

13       A.   Yes, sir.

14       Q.   Did you go to court to tell a judge what you

15   knew?

16       A.   Yes, sir.

17       Q.   How long after my client's arrested did you

18   go to court to tell a judge about what you knew?

19       A.   Immediately.

20       Q.   I understand what you said immediate, but

21   give us a time frame, what do you mean?

22       A.   As soon as I found out, I mean as soon as

23   they told me.

24       Q.   Did you go to juvenile court?

                    D-16   (Supp.)

                    174                    JIM02498

                    SA942

1       A.    I went to court, yes.

2       Q.    Juvenile court?

3       A.    Yes.

4             MR. C. MURPHY:  I have nothing else.

5             THE COURT:  Mr. Gaughan?

6             MR. GAUGHAN:  One moment judge.

7                    RECROSS EXAMINATION

8                    by Mr. Gaughan:

9       Q.    When did you go to juvenile court?

10      A.    I went to court the last time that you did

11   this.

12      Q.    That would have been September of 1994,

13   right?

14      A.    I don't really recall when it was.

15      Q.    Did you go to juvenile court or did you come

16   down to 26th and California?

17      A.    I went to here.

18      Q.    This building, right, 26th and California?

19      A.    Right.

20      Q.    And that was in another proceeding in front

21   of a different judge in this building, right?

22      A.    Correct.

23      Q.    And that would have been on September 30, of

24   1994, correct?


                    D-17   (Supp.)

                                        JIM02499

                    175

1       A.   It was -- I don't remember the date.

2       Q.   In any event, it was the last time we did

3  this down in this building, is what you said?

4       A.   Correct, correct.

5       Q.   Which wasn't right after you got arrested,

6  you got arrested February 3 of -- or you found out

7  February 4 of 1993, right?

8       A.   Uh-huh.

9       Q.   And it was over a year and a half or yeah,

10 over a year and a half that you came down to this

11 building and testified before a judge, right?

12      A.   I don't know the period in between.  I went

13 through the court procedures.

14      Q.   But when you came down and told a judge, it

15 was over a year and a half, right?

16      A.   Well, I don't remember the time.  I guess it

17 would be.

18      Q.   So it wasn't right after this happened?

19      A.   I'm not sure if I understand your question.

20      Q.   In other words, Mr. Murphy asked you, he

21 said that you went right away and told a judge that

22 defendant was with you.

23           That's -- and you answered yes,

24 correct?

D-18   (Supp.)

176

JIM02500

1        A.    Okay.  I went to court before.  For this.   I

2    didn't go to the police station because to me that

3    would have been -- done absolutely no good.

4        Q.    Let me rephrase the question.  When he said

5    you went to court right away after he was arrested and

6    told a judge that the defendant was in the same

7    apartment as you when this murder happened --

8        A.    No, defendant was not in the same apartment

9    as me when the murder happened.  I lived somewhere

10   totally different.

11       Q.    I mean the apartment that you were in, not

12   where you lived.

13       A.    Okay.

14       Q.    Now he said that you went to a judge and

15   told him right away.

16             The time you testified in court, you

17   are referring to the time you came down to this

18   building, is that correct?

19       A.    Uh-huh.

20       Q.    That's the time you're talking about?

21       A.    This is the period, yes.

22       Q.    That was in September of 1994, right?

23       A.    I guess.  I don't remember the date.

24       Q.    Do you remember if it was a week after this

D-19  (Supp.)

177                    JIM02501

SA945

1    happened?

2        A.    It was a few months, you know, after.  The

3    trial was.

4        Q.    It was the trial though, right?

5        A.    The trial, yes.

6            MR. GAUGHAN:  I have nothing further, judge.

7            MR. C. MURPHY:  I have nothing.

8            THE COURT:  You can step down, Miss

9    Whitley.  Thank you very much.  Let me see you quickly

10   for a second, see where we are.

11               (Discussion had off the record).

12           THE COURT:  Okay.  After speaking with the

13   attorneys, we are basically in this posture:  There is

14   additional witnesses, few more additional witnesses

15   but it's 5 after 5:00.  We are going to most likely,

16   it's not written in stone, but most likely we are

17   going to finish the case tomorrow.  Tomorrow, I said

18   it earlier, couple days.

19               You walk through here and see me doing

20   cases while you're going to lunch.  Tomorrow as a

21   light day as far as other things I have got to do.

22   Which have nothing to do with this case, with Thaddeus

23   Jimenez.  I have no other things particularly to do

24   tomorrow.


                        D-20   (Supp.)


                        178                    JIM02502


                        SA946

1          So tomorrow, if you are here, and ready

2    to rock and roll by 10:30, we can rock and roll at

3    10:30.  That way we can hopefully if all the witnesses

4    that come in are supposed to be here and I don't

5    foresee any problem with that, we should be able to

6    finish the case come tomorrow.

7          There is also a possibility of a slight

8    snafu, but I wouldn't assume it's going to happen in

9    this particular case.  So we will see you tomorrow

10   morning, 10:15, we will start at 10:30.  Today we

11   started late because I had other stuff to do which

12   need not concern you, tomorrow that won't be the

13   problem.

14         Do not discuss the case in the interim,

15   do not form opinions about the case till it's proper

16   to do that.  Do not let anybody attempt to talk to you

17   about the case.  We will see you 10:15, start at

18   10:30, hopefully we can finish the case tomorrow.

19              (Whereupon, the following

20              proceedings were held out of the

21              presence of the jury).

22         THE COURT:  We can put the defendant's

23   motion for directed verdict on the record at this

24   point.

D-21  (Supp.)

179                    JIM02503

SA947

1          MR. C. MURPHY:  Yes, I am moving for

2     directed verdict, waiving argument.

3          THE COURT:  The motion is denied.  Standard

4     I believe is accepting the evidence in the light most

5     favorable to the state, could a rational jury

6     determine the facts beyond a reasonable doubt.

7     Against Thaddeus Jimenez.  And I believe they

8     certainly can do that.  The witnesses and

9     circumstantial evidence, so the motion for directed

10    verdict is denied.

11          Matter order of court till tomorrow

12    morning, start at 10:30.

13          Mr. John Murphy, did you want to put

14    anything on record on the discussion we had off the

15    record before about the bringing in the state's

16    attorney, something about discovery tendered to the

17    public defender back in juvenile court?

18          MR. J. MURPHY:  No judge.

19          THE COURT:  10:30 tomorrow, see you then.

20

21               (Whereupon, proceedings were

22               adjourned)

23

24


D-22  (Supp.)


180                        JIM02504


SA948

```
 1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT-CRIMINAL DIVISION
 2

 3

 4              I, PAUL W. O'CONNOR, an Official

 5   Court Reporter for the Circuit Court of Cook County,

 6   County Department/Criminal Division, do hereby certify

 7   that I reported in shorthand the proceedings had at

 8   the hearing in the above-entitled cause; that I

 9   hereafter caused the foregoing to be transcribed into

10   typewriting, which I hereby certify to be a true and

11   accurate transcript of the proceedings had before the

12   Honorable STANLEY SACKS, Judge of said court.

13

14

15                        _____
16                             Official Court Reporter

17   Lic. No. 084-002955

18

19   Dated this  3rd   day

20   of        September , 1998.

21

22

23

24
```

D-23  (Supp.)

JIM02505

SA949

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

*Office # 872*

FILED
OCT 2 8 1998
AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

THE PEOPLE OF THE
STATE OF ILLINOIS

)
)
)
)

vs.                              )        No. *93-14710*

*Thaddeus
Jimenez*

)
)
)
)

REPORT OF COMPLIANCE

*✗ Supplemental ✗*

I, Thomas G. McEnery, Supervisor of the Official Court

Reporters of the Circuit Court of Cook County, County

Department-Criminal Division, do hereby state that on

the *28* day of *October* A.D. 199*8*, the original

Report of Proceedings was filed with the Clerk of the

Criminal Division.

_____        _____
                               Thomas G. McEnery
                               Supervisor

Received by _____
            Deputy Clerk, Criminal Division        *02*

*Pages 180*

182

JIM02506

SA950

(Rev. 2/18/93) CCCR-56

STATE OF ILLINOIS  }
COUNTY OF COOK    } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of A ONE VOLUME SUPPLEMENTAL RECORD CONSISTING OF THE REPORT OF PROCEEDINGS.  NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 98-0247.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . . . . . . LATELY . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between
The People of the State of Illinois . . . . . . . . . WERE . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and
. . . . . . . . . . . . . . . . . THADDEUS JIMENEZ . . . . . . . . . . . WAS . . . . . . . . . . Defendant . . . . .

Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, . . . . . . . . . NOVEMBER  9 . ., 19  98

. . . . . Aurelia Pucinski . . . . .
Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

183                                    JIM02507

SA951

98-0247

FILED
APPELLATE COURT

JUL 01 1999

GILBERT S. MARCHMAN
CLERK

JIM02508

$S$

JIM03130

CCCR-310

# Transcript of Record
## Appeal
## to

APPELLATE _____ **Court of Illinois**

FIRST _____ **District**

**Circuit Court No.** _____ 93 CR 14710 _____

**Trial Judge** _____ STANLEY SACKS _____

**Reviewing Court No.** _____ 98-0247 _____

_____ THE PEOPLE OF THE STATE OF ILLINOIS _____

### vs.

_____ THADDEUS JIMÉNEZ _____

# from
# CIRCUIT COURT
## of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

VOLUME FOUR OF SIX VOLUMES

REPORT OF PROCEEDINGS, ONLY

**AURELIA PUCINSKI**

**Clerk of Court**

Per _____ AP/GL _____

**Deputy**

JIM03131

```
1    STATE OF ILLINOIS    )
                          )   SS:
2    COUNTY OF COOK       )

3            IN THE CIRCUIT COURT OF COOK COUNTY
                COUNTY DEPARTMENT-CRIMINAL DIVISION
4
     THE PEOPLE OF THE    )
5    STATE OF ILLINOIS    )
                          )
6                         )   Indictment No. 93 14710
            VS            )
7                         )   Charge:  Murder
                          )
8    THADDEUS JIMENEZ     )

9              REPORT OF PROCEEDINGS
```

10          BE IT REMEMBERED that on the 7th day of

11   November A.D., 1997, this cause came on for trial

12   before the Honorable STANLEY SACKS, Judge of said

13   court, and a jury, upon the indictment herein, the

14   defendant having entered a plea of not guilty.

15          APPEARANCES:

16                 HON. RICHARD DEVINE,
                   State's Attorney of Cook County, by
17                 MESSRS. JOHN MURPHY and
                   DAVID GAUGHAN,
18                 Assistant State's Attorneys,
                      appeared for the People;
19
                   MR. CHARLES MURPHY,
20                    appeared for the Defendant.

21

22

23   Brenda D. Hayes, CSR
     Official Court Reporter
     2650 S. California
24   Chicago, Illinois  60608

FILED

JUN 3 0 1998

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

JIM03132

SA955

Need
to add
FRDX +
FRCX

JIM03133

```
 1                        I N D E X

 2

 3      Date of Hearing:  11-7-97

 4      Page Numbers:  S-1 - S-134

 5                      PROCEEDINGS

 6              Page    DX      CX      RDX     RCX

 7      Victoria Jimenez    S-5     S-12    S-19
        Jerome Bogucki      S-22    S-37    S-46    S-51
 8                          FRDX    FRCX
                            S-52    S-53
 9                          S-54

10      Lawrence Ryan       S-55    S-59    S-62
        Edward Mendrys      S-95    S-99    S-106
11      Angela Jimenez      S-108   S-112   S-116   S-118
        Jerome Bogucki      S-124   S-126
12      Elizabeth Heatley   S-127

13

14

15

16

17

18

19

20

21

22

23

24
                                        JIM03134
```

S-2

SA957

1         THE CLERK:  People versus Thaddeus Jimenez.

2         THE COURT:  The defendant, Thaddeus Jimenez,

3    is here, his attorney and both state's attorneys are

4    here.

5         Before we bring out the jurors I just

6    want to make a couple comments for those people in the

7    audience who are here regarding the case of Thaddeus

8    Jimenez on either side, those being for the young man

9    who was killed, Mr. Morro, or those here on behalf of

10   the person who is accused, Mr. Jimenez.

11        It's been brought to my attention, I'm

12   not making this an accusatory comment, that certain

13   things may have occurred yesterday after court was

14   over with for the day or even perhaps before that

15   time, perhaps some commentary between certain people

16   on one side or the other of the case towards the

17   people on the other side of the case.

18        I'm sure everybody out there can act

19   like ladies and gentlemen and hopefully will do that

20   for the balance of this case, which if all goes well

21   may be over with today.  If anybody acts

22   inappropriately towards any witnesses or members of

23   either family in this case or does anything which

24   could be construed as a threat or an improper comment

JIM03135

S-3

SA958

1    of any sort and it's brought to my attention in the

2    proper fashion, if after a hearing that person is

3    found to have acted improperly or contemptuously in

4    any fashion by attempting to arguably criticize or

5    intimidate any witnesses or family members on either

6    side the court will deal with that appropriately.

7              And I will just remind anybody out there

8    there is plenty of room in the County Jail for anybody

9    that wants to go.

10              Bring out the jury.

11                        (The following proceedings

12                         were had in the presence and

13                         hearing of the jury:)

14         THE COURT:  You can all be seated.  Again it

15    must be like a broken record.  Sorry for starting

16    late.  The defense may proceed with their next

17    witness, if you wish, Mr. Charles Murphy.

18                        (Witness sworn.)

19         THE COURT:  Please be seated.  Keep your

20    voice up.  Talk to the people over there to your right

21    in the jury box and wait until the attorney finishes

22    the question before you start answering it.  If you

23    start talking and they're not finished talking you'll

24    both be talking at the same time.  Go ahead,

                                        **JIM03136**

                          S-4

1    Mr. Murphy.

2         MR. CHARLES MURPHY:  Thank you.

3              VICTORIA JIMENEZ,

4    called as a witness on behalf of the defendant, having

5    been first duly sworn, was examined and testified as

6    follows:

7              DIRECT EXAMINATION

8         BY MR. CHARLES MURPHY:

9    Q    Madam Witness, will you state your name and

10   spell your last name.

11   A    Victoria Jimenez, J-i-m-e-n-e-z.

12   Q    Are you my client's mother?

13   A    Yes, I am.

14   Q    Miss Jimenez, I want to direct your attention

15   back to February 3, 1993 in the afternoon hours, do

16   you recall at about 4:30 in the afternoon where you

17   were?

18   A    Yes, I do.

19   Q    And where were you?

20   A    At my mother's house.

21   Q    Where did she live at that time?

22   A    3618 West Belmont.

23   Q    Did you live there as well or did you live

24   somewhere else?

JIM03137

S-5

SA960

1     A    I lived somewhere else.

2     Q    Where is that?

3     A    On Berteau and Kimball.

4     Q    At about 4:30 in the afternoon did you have

5   an occasion to see your son?

6     A    Yes, I did.

7     Q    And were you there first or was he there

8   first?

9     A    I was there first.

10    Q    Was it then at 4:30 that he came in?

11    A    Right.

12    Q    How long did you stay in the apartment, your

13  mother's apartment, before you left that evening?

14    A    About a quarter to 7:00.

15    Q    At about quarter to 7:00 where did you go?

16    A    Me and two of my friends went to meet some

17  other friends at a lounge.

18    Q    What lounge did you go to?

19    A    Carol's Pub.

20    Q    Who were the other two friends that you left

21  with to go to the lounge with?

22    A    Donna Whitley and Everlie Monroe.

23    Q    Donna Whitley, was that the same young lady

24  who was here in the courthouse yesterday?

JIM03138

S-6

SA961

1    A    Yes.

2    Q    How did you get to the lounge?

3    A    Took a cab.

4    Q    At the time that you left, which you just

5    said was about quarter to 7:00, was your son, T. J.,

6    home?

7    A    Yes, he was.

8    Q    During the period of time you've just

9    mentioned between 4:30 or so in the afternoon and the

10    time you left in the cab did your son leave your

11    mother's house?

12    A    No, he did not.

13    Q    What was your son doing during that period of

14    time between 4:30 and about quarter to 7:00 when you

15    left?

16    A    Playing Nintendo.

17    Q    Where was he playing Nintendo at?

18    A    In my mom's living room.

19    Q    Was he playing Nintendo by himself or was it

20    a game he was playing with some other kids?

21    A    He was playing with my nephew, Bobby.

22    Q    At the time that you left your mother's

23    house, obviously you've just said your son was there,

24    who else was there?

JIM03139

S-7

SA962

```
1        A     My sister, Glor, my sister, Donna, Donna

2   Whitley, Monroe, my brother, Joe, my brother, Kermit,

3   a few of my nieces and nephews, little ones, T. J.,

4   Bobby, Cheech, Chester.

5        Q     Was your mom there?

6        A     Huh?

7        Q     Was your mom there?

8        A     She came there.

9        Q     Was she there when you left?

10       A     Yeah.

11       Q     You said that you left to go to a lounge, how

12  long did you stay there?

13       A     Until about quarter after 9:00.

14       Q     And at quarter after 9:00 where did you go?

15       A     I took a cab because I had to work for my mom

16  that night at 10:00.

17       Q     Where did you have to work at?

18       A     Austin and Belmont.

19       Q     What kind of work did you do?

20       A     Waitressing.

21       Q     What shift did you work?

22       A     10:00 at night until 6:00 in the morning.

23       Q     When you got off at 6:00 o'clock in the

24  morning where did you go?
```

JIM03140

S-8

1      A    To my mom's.

2      Q    When you went to your mom's house sometime

3    after 6:00 a.m. did you know as you were heading to

4    her house that your son was in custody?

5      A    No, I didn't.

6      Q    Did you find out when you got there?

7      A    Yes, I did.

8      Q    When you found out that your son was in

9    custody what did you do?   I'm not asking you what you

10   said, I'm asking you what you did.

11     A    I called the detective that had left the card

12   with my mom.

13     Q    Do you remember the name of the detective

14   that left the card?

15     A    Detective Jerry Bogucki.

16     Q    At least initially when you made the

17   telephone call were you successful in getting through

18   to him, yes or no?

19     A    In the first try?

20     Q    Yeah.

21     A    No.

22     Q    How many tries did it take?

23     A    Five to seven.

24     Q    And where were you making the calls from?

JIM03141

S-9

1    A    My mom's telephone.

2    Q    Can you give us an estimate, at least

3    time-wise, as to when it was you were finally able to

4    get through to Detective Jerry Bogucki?

5    A    I got in the house no later than 6:30, I

6    started immediately.  I finally got maybe to talk to

7    him about 10:00 o'clock.

8    Q    After you spoke to him at about 10:00 o'clock

9    what did you do?

10    A    The conversation --

11    Q    Did you go anywhere?

12    A    To the police station.

13    Q    How did you get there?

14    A    In a cab.

15    Q    When you got to the police station -- By the

16    way, which one did you go to, where is it located?

17    A    5555 Grand, Grand and Central.

18    Q    When you got there were you told whether or

19    not your son was there, still there I should say?

20    A    They said I had just missed him.

21    Q    Did you have an occasion when you got to the

22    police station, even though you didn't see your son,

23    did you have an occasion to speak with Detective

24    Bogucki?

JIM03142

S-10

1      A    The first time I remember meeting Detective

2  Bogucki was at the Juvenile Detention Center.

3      Q    But you did speak to him on the phone?

4      A    Yes, I did.

5      Q    When was it to the best of your recollection

6  that you found out that your son was being charged

7  with a homicide that had taken place on February 3rd

8  at about 6:25 p.m.?

9      A    It was somewhere closer to the late morning

10  or afternoon because I kept asking him to tell me what

11  time it would happen, he would not tell me nothing.

12      Q    Was it he who ultimately told you what your

13  son was charged with and when the homicide had taken

14  place, meaning Mr. Bogucki?

15      A    Right.  So then finally --

16          THE COURT:  There's no question right now,

17  Miss Jimenez.  Thank you.

18          THE WITNESS:  I'm sorry.

19          MR. CHARLES MURPHY:  I have nothing else of

20  Miss Jimenez.

21          THE COURT:  Okay.

22

23

24

JIM03143

S-11

CROSS-EXAMINATION

BY MR. JOHN MURPHY:

 Q    Ma'am, you said you were at 3618 West Belmont
on February 3, 1993 during the evening hours; is that
right?

 A    Yeah.

 Q    Now, do you remember seeing -- I'm sure you
remember seeing Donna Whitley there; is that right?

 A    Yeah.

 Q    Approximately what time did she arrive?

 A    After T. J. came home, so I'd say close to
5:00 o'clock.

 Q    Okay.  And you gave the names of a number of
people who were inside that apartment.  What I'd like
you to do, if you would, is go through that more
slowly.  Indicate the names of each of the persons you
remember being in the apartment and indicate the
relationship that they are or were to either you or
Thaddeus Jimenez, your son?

 A    Okay.  There was me, okay, my sister Glori,
my sister, Donna, my brother, Joe, my brother, Kermit,
my daughter, Angela, Everlie, Donna, Denise.  Denise
was there because her boys was there.

 Q    What's her relationship?

JIM03144

S-12

SA967

1      A    She's my sister also.

2      Q    Is that everybody?

3      A    And a bunch of little kids, my nieces and

4    nephews.  There's Seventeen of them.

5      Q    These are the children of the various adults

6    who were there?

7      A    Yes.

8      Q    Did your son live at 3618 West Belmont?

9      A    No.

10     Q    Where did he live?

11     A    He lived with me at Kimball and Berteau.

12     Q    Now, you testified you went out with Donna

13   Whitley; is that right?

14     A    That's correct.

15     Q    What time did you say you went out with her

16   at?

17     A    It was real close to 7:00 o'clock, about

18   quarter to because we were supposed to meet other

19   people at 7:00 o'clock and we were running late.

20     Q    This was part of a regular thing you had with

21   Donna and your other girlfriend; is that right?

22     A    Me and Donna and Monroe.

23     Q    And Monroe.  Excuse me.  How often did you go

24   out together?

JIM03145

S-13

SA968

1    A    Twice a month.

2    Q    And you go out drinking together, is that

3  what the occasion typically was?

4    A    Not always drinking.

5    Q    What was the occasion that night?

6    A    We were going to go meet some other friends.

7  It was supposed to be a Wednesday that we weren't

8  supposed to go but we were going.  We all went to the

9  bar to meet everybody.  We only shot pool for a while

10  because I had to be at work so I couldn't say.

11         THE COURT:  Miss Jimenez, I know you're

12  probably nervous but just slow down a little bit,

13  please.

14         THE WITNESS:  Okay.

15  BY MR. JOHN MURPHY:

16    Q    You went to a bar and you shot pool for a

17  while?

18    A    Uh-huh.

19    Q    How long did you shoot pool at the bar?

20    A    I played two games.

21    Q    How late were you out that night?

22    A    Until about quarter after 9:00.

23    Q    You testified you worked later; is that

24  right?

                                        JIM03146

                      S-14

1          A     I was filling in for my mother.

2          Q     That was not your regular job?

3          A     That was my job but not my shift.

4          Q     Okay. Now, you testified that you spoke to a

5     detective the next day; is that right?

6          A     Uh-huh.

7          Q     That was Detective Bogucki?

8          A     Yes.

9          Q     Approximately what time was that at?

10         A     That I finally reached him?

11         Q     Yeah, that you spoke to him?

12         A     About 10:00 o'clock.

13         Q     And was that -- At 10:00 o'clock was that

14    when you told him that you were with your son?

15         A     Yes.

16         Q     And you said to him my son couldn't have done

17    this, he was with me the night before; is that right?

18         A     I kept trying to ask him what time this was

19    supposed to have happened.

20         Q     Did you learn from him that it occurred when

21    you were with him, at the time you were with him?

22         A     Yeah.

23         Q     And did you then tell -- That's when you told

24    the detective that my son couldn't have done this

JIM03147

S-15

SA970

1    because I was with him or something to that effect; is

2    that right?

3        A    I told him it was impossible my son could

4    have done this.

5        Q    Did you tell him why?

6        A    Yes, because he was home or by my mom.

7        Q    Now, despite the fact that Thaddeus is your

8    son you would never lie for him, would you?

9        A    No.

10       Q    You would never try to do anything to help

11   your son avoid being convicted of the offense of

12   murder, would you?

13       A    Not if he committed it.

14       Q    In fact -- If in fact he committed the murder

15   you would want the truth to be known, wouldn't you?

16       A    Yes.

17       Q    Okay.  Well, let me ask you this, ma'am, do

18   you know Elizabeth Heatley?

19       A    Yes, I do.

20       Q    How do you know Elizabeth Heatley?

21       A    I met her after they took my son into

22   custody.

23       Q    And in fact Elizabeth Heatley after -- Well,

24   did you meet Elizabeth Heatley before they took your

                                                  JIM03148
                          S-16

SA971

1   son into custody?

2       A    No, I did not.

3       Q    Did you ever deliver any letters to her for

4   him?

5       A    Yes, I did.

6       Q    So you had met her before then; is that

7   right?

8       A    No.  After he was in custody he gave me the

9   letters to bring to her.

10      Q    I'm sorry.  That's right.  Excuse me.  I

11  stand corrected.

12                Now, you knew that Elizabeth Heatley was

13  your son's girlfriend; is that right?

14      A    Yes.

15      Q    And I'm going to refer you to late October or

16  early November of 1993, the same year that your son

17  was arrested, do you remember having a telephone

18  conversation with Elizabeth Heatley?

19      A    Yeah.

20      Q    And in that conversation that you had with

21  her did you talk to her about the letters that you

22  had -- that either your son had sent to her by mail or

23  that you delivered to her?

24      A    Yes, I did.

JIM03149

S-17

1      Q     And in that conversation did you tell

2    Elizabeth Heatley that you were going to send a police

3    officer to her house?

4      A     No, I wasn't sending no police.

5      Q     I'm not asking you what you were going to do.

6      A     No, I did not.

7      Q     Did you tell Elizabeth Heatley that you were

8    going to send a police officer to her house?

9      A     No.

10     Q     Did you tell Elizabeth Heatley you were going

11   to send a police officer to her house because her

12   sisters and her mother shouldn't be reading her mail?

13     A     That's not what I said.

14     Q     Did you tell her that because she turned the

15   letters in that she must be a gang -- must be in a

16   gang or her boyfriend must be in a gang?

17     A     No, I did not.

18     Q     Ma'am, what is your maiden name?

19     A     Makowski, M-a-k-o-w-s-k-i.

20     Q     And do you ever go by the name of Zuziak?

21     A     That's on my birth certificate but I was

22   baptized Makowski.

23     Q     Now, ma'am, I'd like you -- Do you ever go by

24   the name of Jones?

JIM03150

S-18

SA973

1      A    No.

2      Q    I'd like to refer you back to the date of

3   December 28, 1993, on that date did you speak to a

4   Chicago police officer by the name of Valle and tell

5   him that your name was Vickie Jones?

6      A    Never in my life.

7      Q    Or Victoria Jones?

8      A    Never.

9           MR. JOHN MURPHY:  Your Honor, I have no

10  further questions.

11          THE COURT:  Mr. Murphy.

12          MR. CHARLES MURPHY:  Thank you.

13                    REDIRECT EXAMINATION

14               BY MR. CHARLES MURPHY:

15     Q    Mrs. Jimenez, do you know a person whose name

16  is Edward Mendrys?

17     A    Yes, I do.

18     Q    On February 3rd of 1993 did you see him that

19  day?

20     A    Yes.

21          MR. JOHN MURPHY:  Objection.  Leading.

22          THE COURT:  Overruled.

23

24

JIM03151

S-19

SA974

BY MR. CHARLES MURPHY:

    Q    Did you see him that day?

    A    Yes.

    Q    Where did you see him?

    A    He was at my mom's house.

    Q    What time did you see him at your mom's house?

    A    He came at maybe like an hour before I left, like 6:00 o'clock.

    Q    Was he there when you left?

    A    Yeah.

    Q    Counsel was just asking you a few questions and one of your responses was that's not what I said. He was talking to you about a telephone conversation you had with Elizabeth Heatley.  Okay?

    A    Uh-huh.

    Q    What did you say?

    A    I asked her why did she want to hurt T. J. so bad and give those letters.  T. J. was just saying it because he was hurt because she broke up with him, that was his first love, why did she want to hurt him so bad, what did he ever do that she would want to do this to him and she cried to me on the phone and said --

JIM03152

S-20

1          MR. JOHN MURPHY:  Objection to what she said,

2     judge.

3          THE COURT:  Overruled.

4          MR. JOHN MURPHY:  I'll withdraw it.

5          THE WITNESS:  She cried and said that she's

6     not the one who gave the police the letters, that her

7     mother had took them in.  And I told her that you know

8     that there's a federal law that nobody is supposed to

9     open somebody else's mail, that's what I said about

10    it.

11         MR. CHARLES MURPHY:  I have nothing further.

12         THE COURT:  Mr. John Murphy.

13         MR. JOHN MURPHY:  Your Honor, no further

14    questions.

15         THE COURT:  You can step down, Mrs. Jimenez.

16         THE WITNESS:  Thank you.

17         THE COURT:  Thank you.

18                         (Witness excused.

19                         (Witness sworn.)

20         THE COURT:  Please be seated.  Keep your

21    voice up.

22

23

24

JIM03153

S-21

SA976

1                        JEROME BOGUCKI,

2    called as a witness on behalf of the defendant, having

3    been first duly sworn, was examined and testified as

4    follows:

5                        DIRECT EXAMINATION

6                    BY MR. CHARLES MURPHY:

7        Q    Sir, you're the same Detective Gerald Bogucki

8    who testified previously in this these proceedings?

9        A    Jerome.

10       Q    I'm sorry.  Forgive me.

11               Sir, as a result of your assignment to

12   the homicide investigation of Eric Morro did you have

13   an occasion to speak with a young man who you came to

14   know as Larry Tueffel?

15       A    Yes, I did.

16       Q    The first time that you spoke with

17   Mr. Tueffel do you remember where it was?

18       A    Yes.

19       Q    Where?

20       A    It was in an interview room in the Area Five

21   office.

22       Q    And about what time of day or night would

23   that have been?

24       A    Approximately 9:30 at night.

JIM03154

S-22

SA977

1      Q    That was on February 3rd?

2      A    Yes.

3      Q    Am I correct that at least when you spoke to

4   him at 9:30 in the evening on February 3rd he was not

5   telling you that he knew the names of anyone who was

6   involved in the homicide of Mr. Morro; is that

7   correct?

8      A    No; that's not accurate.

9      Q    At 9:30?

10     A    At 9:30, correct.

11     Q    At 9:30 in the evening, detective, what name

12   did he provide to you as being involved -- Excuse me.

13            Did he give you the name of my client at

14   9:30 in the evening?

15     A    No, he did not.

16     Q    Did he give you the name of some other

17   person, Frankie?

18     A    Yes, he did.

19     Q    You did have an occasion to speak to him --

20   And by the way, that fella Frankie, the name he gave

21   you, he was designated as being the person who did the

22   shooting by Larry; is that correct?

23         MR. JOHN MURPHY:  Objection.

24         THE COURT:  Overruled.

JIM03155

S-23

1          THE WITNESS:  Yes, that's the name he used as

2     the shooter.

3     BY MR. CHARLES MURPHY:

4          Q     You had an occasion, did you not, to speak to

5     him in the early morning hours of February 4th back at

6     Area Five?

7          A     No.

8          Q     Did you speak with him again in the early

9     morning hours of February 4th?

10         A     Yes.

11         Q     When you spoke to him the next time where did

12    you talk to him at?

13         A     At his home.

14         Q     Did you have him or did you ask him to repeat

15    the information that he had regarding this homicide to

16    you when you spoke to him at his home?

17         A     Yes.  I asked him again tell me what

18    happened.

19         Q     Did he essentially give you the same story

20    that he had given to you earlier at about 9:30 on

21    February 3rd?

22         A     He got part of the way through it and I

23    stopped him.

24         Q     When you stopped him did you tell him what

JIM03156

S-24

SA979

1  you had been told by a person by the name of Phil

2  Torres?

3      A    Eventually, yes.

4      Q    When you stopped him -- Well, when you

5  stopped him is that the time you told him what Torres

6  had told you?

7      A    No, not immediately there.

8      Q    When did you tell him what Torres had told

9  you?

10     A    After I had told him that I thought he was

11  lying and that there were witnesses that said other

12  things, Phil told us what happened, and there was

13  silence on his part and then I asked him it was T. J.,

14  wasn't it, and he told me yes.

15     Q    If I could characterize what you just said,

16  detective. You didn't tell him the details of what

17  Phil Torres told you, you just told him that you had

18  talked to Phil Torres, is that what you're saying?

19     A    Yes.

20     Q    Detective, you had occasion to prepare a case

21  report in conjunction with your investigation of the

22  death of Mr. Morro, a supplementary report, did you

23  not?

24     A    Yes.

JIM03157

S-25

SA980

1    Q    It's eight pages in length, isn't it?

2    A    I believe so.

3         MR. CHARLES MURPHY:  Judge, may I approach

4    the witness?

5         THE COURT:  Sure.

6    BY MR. CHARLES MURPHY:

7    Q    I've got eight pages that I'm going to bring

8    to your attention, detective, even though there's a

9    lot of other pages that are stapled together here.  Am

10   I correct that those eight pages, Defendant's Exhibit

11   No. 6 for identification, are photocopies of the

12   supplementary report that you prepared in conjunction

13   with your involvement with this case?

14   A    Yes.  This is one of those reports.

15   Q    I'm going to direct your attention to one of

16   the pages, it's designated page six; is that correct?

17   A    Yes.

18   Q    If you permit me to read over your shoulder,

19   detective.  I'm directing your attention to the first

20   paragraph from the bottom of page six.  By the way,

21   you prepared this, did you not?

22   A    Yes, I did.

23   Q    Does your report say the following in regard

24   to your early morning conversation with Larry Tueffel:

JIM03158

S-26

SA981

1    "The reporting detective then informed Tueffel of what

2    Torres had said," is that what it says?

3        A    Yes.

4        Q    Did you inform him what Torres had said?

5        A    Yes, I did.

6        Q    And Torres is the person who told you that my

7    client was involved in the shooting; is that correct?

8        A    Yes.

9        Q    Torres is also the same person who when you

10    first spoke had told you he did not know who the

11    shooter was; is that also correct?

12        A    That is correct.

13        Q    Detective, you also had an occasion to speak

14    with an occurrence witness whose name was Sandra

15    Elder, did you not?

16        A    Yes.

17        Q    And do you recall when it was you first spoke

18    to her?

19        A    Yes. That was approximately 8:30 in the

20    evening at Illinois Masonic Hospital.

21        Q    Undoubtedly at that time you asked her to

22    provide you with information that she might have

23    concerning the offenders; is that correct?

24        A    Yes.

JIM03159

S-27

1     Q     And at that time you had no suspects in mind

2     and you weren't looking for anyone, were you?

3     A     Other than what had been on the original case

4     report by Officers Ryan and Whiteman.

5     Q     My question is a little more specific than

6     that.  Were you looking for a specific individual or

7     specific individuals at that time?

8     A     No.  We were not looking for anybody specific

9     at that time.

10     Q     Did you ask Sandra if she could provide you

11     with a description of the individual who was the

12     shooter in this case?

13     A     Yes.

14     Q     When you spoke to her at the hospital did she

15     tell you that the shooter's hairstyle was that of

16     being one of Jeri Curls, did she tell you that?

17     A     Short Jeri Curls.  I wrote down Jeri Curls.

18     I know she said curls.

19     Q     Would I also be correct that you were

20     interested in a clothing description as well?

21     A     Whatever could be provided, yes.

22     Q     Did she tell you that the person who had the

23     gun was wearing a Duke starter jacket or a Duke

24     jacket, did she tell you that?

JIM03160

S-28

SA983

1        A    I don't recall.  I don't recall her knowing
2   who had the gun.

3        Q    Did she tell you that she saw anyone wearing
4   a blue -- Excuse me.

5             Did she tell you she saw anyone wearing
6   a Duke jacket?

7        A    She did not mention Duke jacket, no.

8        Q    She gave you partial descriptions of two
9   offenders; is that right?

10       A    Yes.

11       Q    One was in its entirety five five, a hundred
12  and twenty; is that correct?

13       A    Yes.

14       Q    Was that the description that she gave to you
15  of the person that did not have a gun?

16       A    To my recollection she did not know who had a
17  gun.

18       Q    The second person that she described did she
19  say that he had on a blue nylon jacket that was
20  waist-length?

21       A    That's what she said at the time, yes.

22       Q    That's the person who had the Jeri Curls she
23  told you?

24       A    That was the person with the short curls,

JIM03161

S-29

SA984

1    yes.

2         Q    When you spoke to her at the hospital -- By

3    the way, did you speak to her a second time that

4    night, meaning February 3rd?

5         A    No, I did not.

6         Q    Was the next time you spoke to her at a

7    lineup?

8         A    Just previous to the lineup, yes.

9         Q    Am I correct though that when you spoke to

10   her at the hospital she did not inform you that she

11   had seen either of the offenders in that neighborhood

12   about five times prior to the night of the shooting,

13   she didn't tell you that, did she?

14        A    She did not tell me that.

15             MR. JOHN MURPHY:  Objection, judge.

16             THE COURT:  Overruled.

17   BY MR. CHARLES MURPHY:

18        Q    When you spoke with Larry Tueffel at his

19   home, and this would have been in the early morning

20   hours of February 5th, did he tell you that he knew

21   the name of the second offender to be Victor?

22        A    Yes, he did.  If I could clarify that?

23        Q    There's no question pending.

24             THE COURT:  You can clarify when the State

JIM03162

S-30

1    questions you if you like.  Go ahead, Mr. Murphy.

2              MR. CHARLES MURPHY:  Thank you.

3    BY MR. CHARLES MURPHY:

4        Q    Detective, I'm going to show you the same

5    page of the same supplementary report I showed you

6    just a minute ago.  The last paragraph on that page

7    it's headed Larry Tueffel, correct?

8        A    Yes.

9        Q    And that paragraph or that narrative deals

10   with the conversation that you had with him in the

11   early morning hours of February 4th, doesn't it?

12       A    Yes.

13       Q    The last sentence on that page that you wrote

14   attributable to Tueffel, does it say Tueffel stated

15   that he did not know the offender?

16       A    It states exactly Tueffel stated that he did

17   not know the second offender.

18       Q    That's what it says, correct?

19       A    That's what it says, yes.

20       Q    Does the name Victor appear on that page

21   anywhere?

22       A    No, it does not.

23       Q    How about the next page?

24       A    No, it does not.

JIM03163

S-31

SA986

1          Q    How about anywhere in that eight page

2    supplementary report does the name Victor Romo or

3    Victor appear?

4          A    Not in that report, no.

5          THE COURT:  Did you include in that

6    information --

7               THE COURT:  Are you okay?

8          UNIDENTIFIED JUROR:  May I be excused?  I

9    have to go to the washroom.

10         THE COURT:  Sure.  We're not going to make

11   you sit there.  Does anybody else feel like they have

12   to go to a break or should we just let the one juror

13   go?  All right.  We'll let the one juror go for a

14   moment or two.

15                    (A brief recess was taken.)

16         THE COURT:  Are you Okay?  Are you all set,

17   sir?

18         UNIDENTIFIED JUROR:  Thank you.

19         THE COURT:  Go ahead, Mr. Murphy.  Sorry

20   about that.

21   BY MR. CHARLES MURPHY:

22        Q    I think my last question to you, detective,

23   was anywhere in the eight page supplementary report

24   did you include the name Victor?

                                        JIM03164

                    S-32

1      A     No, I did not.

2      Q     When you spoke with Larry Tueffel, whether it

3  be on February 3rd or on February 4th in the early

4  morning hours, did he tell you that he knew who the

5  second offender was because he'd seen him around the

6  school that he went to, did he tell you that?

7      A     Yes, he did.

8      Q     In regard to that same supplementary report,

9  which is eight pages in length, did you include any

10  information in that report that you were informed by

11  Larry Tueffel that the second offender had been seen

12  by him around his school, is that in here?

13      A     It's not in there, no.

14      Q     Did you ever take as a result of Tueffel

15  telling you that he knew who the second person was

16  because he had seen him around his school like you

17  just said he told you, did you take Tueffel to his

18  school to look for Victor?

19      A     No, I did not.

20      Q     Detective, I'm going to show you something

21  that I've previously marked Defendant's Exhibit 3 for

22  identification.  I believe I had shown it to you

23  previously.  This is a general progress report; is

24  that correct?

JIM03165

S-33

1      A     These are notes that I took on this case.

2      Q     Now, general progress reports are notes that

3   are taken as an investigation is ongoing to assist not

4   only yourself but other officers who would get

5   involved in the investigation; is that right?

6      A     Frankly it's on an individual basis and in

7   this case it would be to assist me.

8      Q     In the event though that an investigation was

9   ongoing the significance of those notes would be, one

10  of the things I should say, is there's no repetition,

11  officers don't go out and keep doing the same things,

12  interviewing the same witnesses, that's one advantage

13  of keeping those notes, is it not?

14     A     That could be, yes.

15     Q     Another advantage of keeping those notes is

16  you prepare your supplementary report, at least in

17  part, predicated upon the notes you had taken; is that

18  correct?

19     A     Well, these assist in remembering.

20     Q     Sure.  Now, that GPR or general progress

21  report that you have in front of you, is that the GPR

22  or progress notes that you took as a result of your

23  conversation with Larry Tueffel?

24     A     This is the notes taken as to the original

JIM03166

S-34

SA989

1    interview with Larry Tueffel.

2        Q    There's no mention of the name Victor

3    anywhere in that general progress report that's

4    attributable to Larry Tueffel, is there?

5        A    No.

6        Q    There's no mention in that general progress

7    report that either of the two offenders in this case

8    were known to him as a result of his seeing him in

9    school or around school, that's not there, is it?

10        A    The only mention of his school is in regards

11    to the person he called Frankie.

12        Q    Well, it is your handwriting maybe that's why

13    I don't see it.  Can you point out to me where it says

14    anything about school?

15        A    It says right here Room 203, Frankie,

16    thirteen to fourteen years old.

17        Q    Is Frankie the person that he purportedly

18    told you was the person that had the gun?

19        A    Yes.

20        Q    So in describing the second person, at least

21    it's mentioned in this report whose not named Frankie,

22    that would be a person that he described as being --

23    He gave a description but there's no name; is that

24    correct?

JIM03167

S-35

1      A    That is correct.

2      Q    When you spoke with Larry the first time that

3  was at the hospital; is that right?

4      A    No.

5      Q    When is the first time you spoke with him?

6      A    In the Area Five office.

7      Q    What time would that have been,

8  approximately?

9      A    About 9:30 p.m.

10      Q    At the time that you spoke to him at 9:30

11  p.m. would you have had access to either the report

12  with the notes of the beat officers in this case to

13  include notes of Officer Ryan?

14      A    I had the original case report that they had

15  written.

16      Q    As a result of having access to the case

17  report that Officer Ryan had prepared when you spoke

18  to Larry at Area Five at about 9:30 did you know that

19  Larry had at least said to Officer Ryan that a person

20  by the name of Victor was involved in this?

21      A    No.

22          MR. JOHN MURPHY:  Objection, judge.

23          THE COURT:  He's already answered the

24  question so overruled.  Next question.

JIM03168

S-36

1          MR. CHARLES MURPHY:  I have no further

2     questions of the witness.

3          THE COURT:  All right.  State.

4                    CROSS-EXAMINATION

5                  BY MR. JOHN MURPHY:

6     Q     Detective, in a number of places in your

7     report you use the letters M/WH?

8     A     Yes, I do.

9     Q     And does that stand for male white?

10    A     No, it doesn't.

11    Q     What does it stand for?

12    A     Male white Hispanic.

13    Q     Did you use that abbreviation in reference to

14    the described offenders at different times in your

15    case report?

16    A     Yes, I did.

17    Q     And also in your general progress reports?

18    A     Yes, I did.

19    Q     Now, I'd like to refer you back to your

20    supplemental report.  Do you remember when counsel

21    showed you the line regarding your conversation with

22    Larry Tueffel that read the reporting detective then

23    informed Tueffel of what Torres had said, do you

24    remember that?

JIM03169

S-37

SA992

1    A    Yes.

2    Q    What did you mean when you put that in your

3 report, what does that mean?

4    A    Well, I let him know that Torres was telling

5 me the truth.

6    Q    Okay.

7    A    And I let him know eventually that he said

8 T. J. did it.

9        MR. CHARLES MURPHY:  Objection, your Honor.

10       THE COURT:  To what portion, Mr. Murphy?

11       MR. CHARLES MURPHY:  To the officer rendering

12 his opinion in this case.

13       THE COURT:  Yes.  The jurors are admonished

14 about this, the jurors are the ultimate triers of fact

15 in this case.  Whether the witness is telling the

16 truth or not is not for the police to determine, it's

17 for the jurors to determine.  Next question.

18 BY MR. JOHN MURPHY:

19    Q    You told him the name T. J.; is that right?

20    A    Yes.

21    Q    And then his account to you changed; is that

22 correct?

23    A    Yes.

24    Q    Now, when his account of what occurred

JIM03170

S-38

SA993

1    changed did it -- in terms of the way this shooting

2    occurred did it change or did it change only with

3    respect to the identity of the shooter?

4         A    Pretty much just the identity.

5         Q    Otherwise the account was consistent; is that

6    correct?

7         A    Other than words, some few words spoken that

8    he had given in his original account.

9         Q    Okay.  And also the identity of the other

10   individual; is that correct?

11        A    Yes.

12        Q    Now, when you first spoke to Larry Tueffel he

13   gave you what you later learned to be inaccurate

14   information; isn't that correct?

15        A    Yes.

16        Q    Regarding who the offenders were?

17             MR. CHARLES MURPHY:  Objection.

18             THE COURT:  Again, ladies and gentlemen,

19   objection sustained.  The jurors in this case

20   determine the credibility of all the witnesses in this

21   case, not the police department.  Next question.

22             MR. JOHN MURPHY:  Thank you, judge.

23

24

JIM03171

S-39

SA994

1    BY MR. JOHN MURPHY:

2        Q    When you first spoke to Larry Tueffel he told

3    you that one of the offenders yelled Triangle Killers,

4    is that correct, this is the initial conversation

5    before you went to his house and spoke to him at the

6    police station around 9:30?

7        A    Yes, someone said that, according to his

8    first story.

9        Q    And he also told you that he believed that

10   the offenders were members of a rival gang called the

11   Triangle Brothers; is that right?

12       A    That's what he said, yes.

13       Q    And this rival gang was from the area of

14   Brandt Park, Barry and California; is that right?

15       A    Are you asking me do I know of that gang?

16       Q    No.  Did he tell you those things in that

17   conversation, in the conversations you had with him at

18   9:30 or approximately 9:30 at the area on the date of

19   February 3, 1993?

20       A    Yes, he did.

21       Q    And he also gave you descriptions of two

22   offenders?

23       A    Yes.

24       Q    And one of the descriptions was a male white

JIM03172

S-40

SA995

1    Hispanic, thirteen to fourteen years old by the name

2    of Frankie whose head was shaved with black spikes on

3    top who was foot five foot three, a hundred pounds,

4    had a blue three-quarter length Georgetown jacket and

5    also had an earring on an ear; is that correct?

6        A    Yes.

7        Q    Do you remember the exact description or

8    would anything refresh your memory?

9        A    For the most part I do.

10       Q    Okay.  And the other description that he gave

11   you for the other offender was a male white Hispanic,

12   thirteen to fourteen years old, shaved sides, curly

13   top, five foot two or three, a hundred ten pounds,

14   clean shaven, with a turquoise jacket with yellow

15   lettering and jeans; is that correct?

16       A    Yes.

17       Q    And he also told you that the individual

18   Frankie he believed was in Room 203 at a school?

19       A    At the Linne School, yes.

20       Q    Okay.  Now, the information that you had

21   received initially from Larry Tueffel regarding the

22   offenders you used that information and continued your

23   investigation; is that correct?

24       A    Yes.

JIM03173

S-41

1    Q    And that resulted in you going to -- back to

2    Larry Tueffel's house later that evening on

3    February 4th?

4    A    Yes.

5    Q    After speaking to Phil Torres?

6    A    Correct.

7    Q    And after speaking to Larry Tueffel was the

8    information -- the information about the offenders in

9    this offense changed; is that correct?

10    A    Yes.

11    Q    And did he tell you why it changed?

12    A    Yes.

13    THE COURT:  No.  Overruled.  I think he

14    testified to himself supposedly.  Overruled.

15    BY MR. JOHN MURPHY:

16    Q    Why did it change?  What did he tell you the

17    reason was he was changing his description of the

18    offenders?

19    A    He stated that the person that did the

20    shooting was in the same gang that he was and he

21    feared for his own safety as well as that of his

22    family.

23    Q    Now, he also told you the name Victor; is

24    that correct?

1     A     Yes, he did.

2     Q     Did he tell you where Victor went to school?

3     A     He said -- First of all he said he thought

4  his name was Victor and he said that it was someone

5  that was in his school in a grade lower than him.  He

6  had seen him but he did not know him.

7     Q     And that was in regard to the person who was

8  not the shooter?

9     A     Correct.

10    Q     Now, you testified and you were asked

11 questions on Cross-Examination that you did not place

12 the information about Victor or the fact that Victor

13 went to school in your report; is that right?

14    A     Yes.

15    Q     Why was that?

16    A     I felt it was better left to a future date.

17    Q     Okay.  Now, at the time, detective, you were

18 aware -- Strike that.

19           You also testified that you interviewed

20 Sandra Elder at the hospital; is that right?

21    A     Yes.

22    Q     Approximately what time was that

23 conversation?

24    A     About 8:30 in the evening.

JIM03175

S-43

1    Q    And she gave you an account of what she saw

2    and what she heard; is that right?

3    A    Yes.

4    Q    And the description that she gave you was of

5    two male white Hispanics thirteen to fourteen years

6    old?

7    A    Yes.

8    Q    One being -- having a blue nylon jacket that

9    was waist-length?

10    A    Yes.

11    Q    And by the way, that description she gave you

12    of the jacket how did that compare with the jacket

13    that was recovered from the defendant's house?

14        MR. CHARLES MURPHY:   Objection.

15        THE COURT:   I think there's a photograph

16    where the jury will determine how it compared or not.

17    Sustained.

18    BY MR. JOHN MURPHY:

19    Q    That person that was wearing that jacket was

20    five five, five six, a hundred twenty pounds and you

21    indicated in your report Jeri Curls; is that right?

22    A    That's what I have there, yes.

23    Q    Did she use the word Jerri Curls?

24    A    She said curls.

JIM03176

S-44

SA999

1    Q    Now, you testified that Victor Romo was also

2    arrested in this offense; is that right?

3    A    Yes, he was.

4    Q    How would you describe his hair?

5         MR. CHARLES MURPHY:  Objection.  There's a

6    picture of him.

7         THE COURT:  It's not clear when this

8    happened.  So overruled.

9    BY MR. JOHN MURPHY:

10   Q    How would you describe the way his hair

11   appeared on the date you arrested him on February 10,

12   1993?

13   A    Short, dark, curly.

14   Q    How would you describe Sandra Elder's

15   demeanor when you interviewed her in the hospital?

16   A    Rather upset.

17        MR. JOHN MURPHY:  I have no further

18   questions.

19        MR. CHARLES MURPHY:  May I have the picture

20   of Mr. Romo.

21

22

23

24

JIM03177

S-45

SA1000

1        REDIRECT EXAMINATION

2        BY MR. CHARLES MURPHY:

3        Q    Detective, this was marked People's Exhibit

4    22 for identification, this is a Polaroid photograph

5    that was previously identified as being that of

6    Mr. Victor Romo, do you agree?

7        A    Yes, I do.

8        Q    Was that photograph taken of him at the time

9    of his arrest on February 10th?

10       A    I believe it was, yes.

11       Q    That photograph truly and accurately depicts

12   or portrays the way he looked when you first met him

13   on that date?

14       A    Yes.

15       Q    I'd ask that this photograph be republished

16   to the jurors at this time.

17           THE COURT:  Okay.

18   BY MR. CHARLES MURPHY:

19       Q    And that's the photograph that depicts him

20   with the short curly hair; is that correct, sir?

21       A    Yes, it does.

22       Q    Detective, you also just said when the

23   prosecutor was asking you some questions that when you

24   spoke with Sandra Elder she told you that one of the

JIM03178

S-46

SA1001

1  offenders had curly hair, correct?

2      A    Yes.

3      Q    But you wrote down Jeri Curls in regard to

4  the description she purportedly gave you in your

5  report, your general progress report, didn't you?

6      A    That's what I wrote, yes.

7      Q    When was it in these last four and a half

8  years that you decided that you had incorrectly

9  written down what she told you, when did you realize

10 that?

11     A    I don't know that I -- that it is incorrect.

12 It was my interpretation.  I don't know exactly why I

13 wrote that down except out of habit.

14     Q    How about if that's what she said to you, is

15 that a suggestion that might be consistent with

16 reality, the witness tells you something, you're a

17 police detective and you write it down as accurately

18 as you can?

19     A    She said curls.

20     Q    When did you decide that she said curls and

21 not Jeri Curls?

22     A    I'm sorry?

23     Q    When did you decide she said curls and not

24 Jeri Curls as you have written it in your report?

JIM03179

S-47

1      A   When did I decide that?

2      Q   Yeah?

3      A   I didn't have to make a decision, counsel.

4      Q   Why didn't you write down curls instead of

5  Jeri Curls.

6          MR. GAUGHAN:  Objection.  Asked and answered.

7          THE COURT:  Overruled.  He can answer it

8  again.

9          THE WITNESS:  I don't know exactly why.  I

10 believe it was out of habit.

11 BY MR. CHARLES MURPHY:

12     Q   You say also when the prosecutor was asking

13 you questions that the reason you didn't record the

14 name of Victor in your supplementary report is you

15 thought it was best to not put it in your reports at

16 that time until some unspecified future date; is that

17 essentially what you said.

18     A   That was the decision that I made at the

19 time, yes.

20     Q   So now you had information allegedly from an

21 occurrence witness who provides you with at least a

22 first name of a suspect and you think it's best not to

23 put it in a supplementary report, right?

24     A   At that time that's what I felt, yes.

JIM03180

S-48

SA1003

```
 1        Q    Well, how about putting it in your general

 2   progress report, your notes, how about putting the

 3   name in your general progress report?

 4        A    I didn't have any trouble remembering that,

 5   counsel.

 6        Q    And, of course, if something were to happen

 7   to you and a new investigator takes over the case then

 8   they wouldn't know about it because you never wrote it

 9   down anywhere; is that correct?

10        A    I had other people with me.

11        Q    Whom?

12        A    Detective Sanders.

13        Q    And did he make a note and write that down

14   somewhere?

15        A    I don't know if he did or not.

16        Q    Is it something that you do frequently as a

17   matter of course that you make decisions during the

18   course of an investigation when you get the name of a

19   suspect, the name of a suspect, that you don't write

20   it down, do you do that routinely?

21             MR. JOHN MURPHY:  Objection.  Judge.

22             THE COURT:  Overruled.

23             THE WITNESS:  Could you repeat that question?

24             MR. CHARLES MURPHY:  Yes.
```

JIM03181

S-49

SA1004

1    BY MR. CHARLES MURPHY:

2        Q    Do you routinely fail to report the name of a

3    suspect when it's provided to you by an occurrence

4    witness, do you do that frequently?

5        A    I do everything on a case-by-case basis,

6    counsel.

7        Q    Tell me the name of another murder

8    investigation that you've ever been involved in that

9    you got the name of a suspect from an occurrence

10   witness that you didn't write it down, tell me?

11       A    I can't think of anything offhand.

12       Q    At least in your supplementary report on page

13   six, the bottom paragraph, which you just told us

14   deals with your conversation with Tueffel in the early

15   morning hours, the second suspect, the person who's

16   not my client, according to Tueffel, you described him

17   as a male white Hispanic in this report, that's it,

18   right, the second person, male -- M/WH?

19       A    Yes.

20            MR. CHARLES MURPHY:  I have nothing else.

21            THE COURT:  Okay.  Mr. John Murphy.

22

23

24

                                    JIM03182

                         S-50

SA1005

1           RECROSS-EXAMINATION

2       BY MR. JOHN MURPHY:

3       Q    Detective, you had received a description

4  from Larry Tueffel of the shooter as being a person

5  named Frankie, you confronted him with information you

6  received from Phil Torres, you even told him that Phil

7  Torres told you that the name was T. J., at that point

8  Larry Tueffel then for the first time says to you,

9  okay, the shooter was T. J.; is that correct?

10      A    That is correct.

11      Q    He then tells you inconsistently with the

12  description that he had given previously regarding the

13  other offender that the person who was with this

14  person T. J. was a person named Victor who -- and he

15  knew where he went to school; is that correct?

16      A    He thought his name was Victor and he did see

17  him at school in a different grade.

18      Q    And in that particular context you made the

19  decision not to record the information that he gave

20  you in your report; is that correct?

21      A    Not until I could verify it.

22      MR. JOHN MURPHY:  No further questions.

23

24

JIM03183

S-51

SA1006

1           FURTHER REDIRECT EXAMINATION

2              BY MR. CHARLES MURPHY:

3       Q     So when did you take Larry over to the school

4    to verify it?

5       A     Before I could get to that, whatever the

6    reason may be --

7       Q     When did you take Larry over to the school to

8    verify it?

9       A     I did not take Larry, I already told you

10   that.

11      Q     Victor was arrested on the 10th day of

12   February; is that correct?

13      A     The first contact I had with Victor was on

14   the 8th of February.

15      Q     Victor was arrested on the 10th day of

16   February; is that correct?

17      A     That is correct.

18      Q     In regard to the changes that counsel was

19   just alluding to that Larry made when you told him

20   what Phil Torres had told you, did he change the

21   clothing description of the shooter?

22      A     Yes.

23      Q     Well, you said the first time that you were

24   asked questions about whether or not he made any

JIM03184

S-52

1    changes in the story other than the identity of the

2    shooter, you said no, I heard you say that, didn't I?

3        A    Well, I considered the description as to the

4    identity of the shooter.

5        Q    Well, he told you that the shooter was a

6    person that was wearing a blue three-quarter

7    Georgetown jacket, didn't he?

8            MR. JOHN MURPHY:  Objection.  When?

9            THE COURT:  Clarify what conversation then

10   you can ask him the question.

11   BY MR. CHARLES MURPHY:

12       Q    When you first spoke to him; is that correct?

13       A    The 9:30 conversation at the Area Five office

14   he said that, yes.

15           MR. CHARLES MURPHY:  Nothing else.

16           THE COURT:  Okay.

17              FURTHER RECROSS-EXAMINATION

18               BY MR. JOHN MURPHY:

19       Q    And after, when you spoke to him the second

20   time and he told you the offender was T. J., what

21   description did he give of the jacket then?

22       A    He said it was a three-quarter length starter

23   coat with a Duke insignia.

24       Q    Had you told him that information?

JIM03185

S-53

SA1008

1      A    No, I didn't.

2      Q    And had you arrested the defendant yet?

3      A    No, I didn't.

4           MR. JOHN MURPHY:  No further questions.

5                FURTHER REDIRECT EXAMINATION

6                BY MR. CHARLES MURPHY:

7      Q    I want to understand this, detective, you

8  told him, meaning Tueffel, what Phil Torres had told

9  you and then he parroted it back to you --

10          MR. JOHN MURPHY:  Objection.

11 BY MR. CHARLES MURPHY:

12     Q    -- is that what he did?

13          THE COURT:  He can answer the question if he

14 understands what he's being asked.

15          THE WITNESS:  If I understand what you're

16 saying, counsel, I already stated that he was told

17 specifically or I told him in the way specifically I

18 asked him it was T. J., wasn't it, and before that I

19 said Phil Torres told us something different than what

20 you said.

21 BY MR. CHARLES MURPHY:

22     Q    And that's different from what your report

23 says when it says the detective then informed Tueffel

24 of what Torres had said, period, is that what the

1    report says?

2            MR. JOHN MURPHY:  Objection.

3            THE COURT:  I think the jurors have heard all

4    these questions before.  Sustained.

5            MR. CHARLES MURPHY:  I have nothing else.

6            THE COURT:  Anything else, Mr. John Murphy?

7            MR. JOHN MURPHY:  No, your Honor.

8            THE COURT:  You can step down.  Thank you.

9                            (Witness excused.)

10                           (Witness sworn.)

11           THE COURT:  Consider yourself under oath from

12   the other day.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Keep your voice up, please.

15                      LAWRENCE RYAN,

16   called as a witness on behalf of the defendant, having

17   been first duly sworn, was examined and testified as

18   follows:

19                    DIRECT EXAMINATION

20               MR. CHARLES MURPHY:

21      Q    Sir, you're Officer Ryan; is that correct?

22      A    Yes, sir, that's correct.

23      Q    Again, Officer Ryan, you were the beat

24   officer or part of the team of two beat officers, the

                                    JIM03187
                        S-55

SA1010

1    first to arrive at the scene of the shooting at 3012

2    West Belmont on February 3rd at about 6:30 in the

3    evening?

4         A    3018, yes, sir.

5         Q    Did you ever have an occasion as a result of

6    your arrival at the scene to meet with and speak to a

7    person who identified herself as Sandra Elder?

8         A    As far as -- Briefly.  She was with the

9    victim.

10        Q    Did a person who you came to know as being

11   Sandra Elder ever tell you that the shooter in this

12   case was a person that she had seen in the

13   neighborhood approximately five times prior to the

14   night of the shooting?

15        A    No, sir, she did not.

16        Q    Did you ever speak to her a second time that

17   evening?

18        A    In the hospital.

19        Q    When you spoke to her the second time in the

20   hospital did she provide you with information that she

21   had seen the person who was the shooter in the

22   incident in the neighborhood before maybe as many as

23   five times?

24        A    No, sir, she did not.

JIM03188

S-56

1    Q    In your report that you prepared in

2    conjunction with your involvement in this

3    investigation there's descriptive information of the

4    two offenders; is that correct?

5    A    Yes, sir.

6    Q    At least in regard to the person described as

7    the shooter your report says he was described as

8    having curly hair; is that right?

9    A    I believe so.  I'm not sure.

10    Q    This is Defendant's Exhibit No. 1 for

11    identification again, Officer Ryan, it's two pages.

12    A    Yes, sir.

13    Q    That's a copy of your case report, your

14    general offense report; is that right?

15    A    Yes, sir, that's correct.

16    Q    On the second page there's a narrative, is

17    there not?

18    A    Yes, sir, it is.

19    Q    Read it to yourself.  I'm going to ask you

20    again if that information is contained there?

21    A    Okay.

22    Q    Am I correct that your report contains

23    descriptive information as to the shooter, that he had

24    curly hair?

JIM03189

S-57

SA1012

1    A    Yes, sir, curly black hair.

2    Q    Who told you that?

3    A    I believe it was Larry Tueffel.

4    Q    When you spoke with Sandra Elder did she --

5    at the hospital or at the scene did she inform you

6    that the offender who had the gun was wearing a Duke

7    jacket?

8    A    No, sir, she did not.

9    Q    How many times did you speak with Phil Torres

10   that night?

11   A    One time.

12   Q    Was that just at the scene?

13   A    Yes, sir, that's correct.

14   Q    When you spoke to him at the scene that night

15   did he tell you although he didn't know the name of

16   the shooter he knew that person from his mom's house

17   because he had seen him over there in the past?

18   A    From his mom's house?

19   Q    Yes.

20   A    No, sir.

21        MR. CHARLES MURPHY:  Your Honor, I think

22   there would be a stipulation at this time in regard to

23   prior testimony.

24        THE COURT:  Do you have --

JIM03190

S-58

SA1013

1          MR. CHARLES MURPHY:  I'd like to do it right

2    now.

3          THE COURT:  Do you have any other questions

4    of this witness?

5          MR. CHARLES MURPHY:  Yes.

6          THE COURT:  Then finish with that first and

7    we'll go from there.

8          MR. CHARLES MURPHY:  Your Honor, I have no

9    further questions at this time.

10          THE COURT:  All right.  State.

11                    CROSS-EXAMINATION

12               BY MR. JOHN MURPHY:

13    Q     Officer Ryan, do you remember the exact

14    descriptions that you noted in the case report of the

15    two offenders?

16    A     By heart, counsel?

17    Q     Right.

18    A     Honestly, no.  It's been a long time.

19    Q     Would looking at the case report refresh your

20    memory?

21    A     Probably, sir.

22          MR. JOHN MURPHY:  May I approach, judge?

23          THE COURT:  Sure.

24

JIM03191

1   BY MR. JOHN MURPHY:

2       Q    Showing you a copy of what's been marked as

3   Defense Exhibit No. 1.  Would you look at your case

4   report.  Counsel would you have an objection to him

5   looking at the case report while he reads the

6   description?

7           MR. CHARLES MURPHY:  No.

8   BY MR. JOHN MURPHY:

9       Q    Officer Ryan, would you please read the two

10  descriptions, the descriptions that were given of the

11  two offenders to you as you noted on your case report?

12      A    I have description of offender number one I

13  have as the shooter a male white Hispanic, five foot

14  five -- I'm sorry.  -- five foot four to five foot

15  five, thirteen to fourteen years of age, curly black

16  hair, wearing a purple jacket with yellow lettering

17  and/or numbers on the back.

18      Q    And what is the description of the other

19  offender?

20      A    I'm sorry.  There's more on that, counsel.

21      Q    Excuse me.

22      A    I have a semicolon there.  Baggy blue jeans,

23  armed with a small caliber silver handgun.

24      Q    And what is the description of the second

JIM03192

S-60

SA1015

1    offender?

2        A    The second offender is described as a male

3    white Hispanic, thirteen to fourteen years of age,

4    five foot six to five foot seven, partially shaved

5    black hair, wearing blue Georgetown starter jacket.

6        Q    Now, you testified previously -- Thank you,

7    officer. -- that that information came from primarily

8    from Larry Tueffel; is that correct?

9        A    Yes, sir.

10        Q    And that information came from Larry Tueffel

11    at what location?

12        A    On the scene.

13        Q    You testified you spoke to Sandra Elder

14    briefly at the scene; is that right?

15        A    I wouldn't exactly call it spoke to her.  We

16    were trying to get who the victim was.  It wasn't as

17    far as any description or anything like that, we did

18    briefly speak to her.

19        Q    And you also spoke to her at the hospital?

20        A    Yes, sir.

21        Q    When you spoke to her at the hospital were

22    you speaking to her at that time for purposes of

23    gathering information for your case report?

24        A    No, sir.  Mostly small talk.

JIM03193

S-61

SA1016

1      Q    At that particular time this case had been

2    handed over to the detectives; is that correct?

3      A    Yes, sir.

4      Q    Had you asked her information about

5    descriptions of the offenders when you were speaking

6    to her at the hospital?

7      A    No, sir.

8           MR. JOHN MURPHY:  No fur questions, your

9    Honor.

10                  REDIRECT EXAMINATION

11              BY MR. CHARLES MURPHY:

12     Q    Did she volunteer descriptive information to

13   you about one of the offenders?

14     A    No, sir.

15          MR. JOHN MURPHY:  Objection.

16          THE COURT:  Overruled.  He was asked if he

17   asked her the questions, did she volunteer anything.

18   Overruled.

19   BY MR. CHARLES MURPHY:

20     Q    Did she volunteer any information concerning

21   her knowledge of either of the offenders to you,

22   either on the street or in the hospital?

23     A    No, sir, she did not.

24          MR. CHARLES MURPHY:  I have nothing else.

                                    JIM03194

                    S-62

1          MR. JOHN MURPHY:  No questions, your Honor.

2          THE COURT:  All right.  You can stand down.

3     Thank you.

4                    (Witness excused.)

5          MR. JOHN MURPHY:  Judge, may we approach the

6     bench?

7          THE COURT:  Sure.

8                    (A discussion was had between

9                     the court and counsel off

10                    the record out of the

11                    hearing of the jury and

12                    the court reporter.)

13         THE COURT:  Okay.  Ladies and gentlemen,

14    we're in the proverbial home stretch.  So you have

15    until 1:30 to enjoy most likely or possibly your last

16    lunch on the county and cherish it, it may be a while

17    before you get another lunch on the county again.

18                When you come back at 1:30 we'll have

19    additional witnesses and hopefully we'll finish today.

20    As I mentioned before there's always a possibility

21    that won't happen but hopefully that won't be the

22    situation, we'll finish this afternoon.

23                Do not discuss the case during the break

24    with anybody, amongst yourselves, allow anybody to

JIM03195

S-63

SA1018

1    talk about the case.  Do not form or express any

2    opinions until I tell you the proper time to do that.

3    We'll see you at 1:30 and we'll take it from there.

4                        (A luncheon recess was taken.)

5         THE COURT:  Everybody is here, the defendant,

6    his attorney, both state's attorneys.

7              I showed a letter to the lawyers which

8    one of the jurors wrote, I was given it by the sheriff

9    after the jurors had left for lunch and I want the

10   lawyers input.  You both had a chance to look at it so

11   we can put the letter in the record, but what does the

12   State suggest, if anything, the court do regarding

13   this letter, Mr. Gaughan?

14        MR. GAUGHAN:  Judge, I would suggest that we

15   bring the juror out and inquire in more detail as to

16   what happened.  I also suggest this be done outside

17   the public's presence in case the person who did this

18   is out there.

19        THE COURT:  We'll do it in chambers, if we do

20   it.  What's your suggestion, Mr. Murphy, Charles

21   Murphy?

22        MR. CHARLES MURPHY:  There are all sorts of

23   possibilities that are contained in there.  She's

24   uncomfortable.  If she wasn't uncomfortable she would

                                        JIM03196
                        S-64

SA1019

1   not have written the note.  My suggestion is if the

2   state's attorney's office wants to conduct an

3   investigation regarding jury tampering that's

4   something they're entitled to.  With regards to this

5   jury my suggestion is let her go.

6          THE COURT:  The letter doesn't indicate

7   necessarily she couldn't be fair.  It doesn't indicate

8   she's necessarily frightened because the way the

9   wording is phrased here it says I'm afraid I don't

10  know what to do.  It doesn't say I'm afraid, I don't

11  know what to do.

12         MR. GAUGHAN:  It also doesn't indicate

13  whether she said anything to the other jurors.

14         THE COURT:  Well, I don't think that's the

15  case.  We'll bring the court reporter back into

16  chambers and we'll ask the sheriff to get this

17  particular juror, Miss Sia, and we'll conduct a voir

18  dire of her in chambers and see where that leads us,

19  if anywhere.

20             Mr. Murphy, under the circumstances your

21  client has a right to be present for all these

22  proceedings.  Are you willing to waive his appearance

23  for this discussion or do you want him present?

24         MR. CHARLES MURPHY:  I'll waive it.

JIM03197

S-65

SA1020

1    THE COURT:  Okay.  You can take Jimenez back

2    and then after you take him back then ask Miss Sia to

3    step out, the juror, and the court reporter and all of

4    us will go back in chambers and discuss it.

5              The record will reflect we're in

6    chambers with the attorneys for the State and

7    Mr. Charles Murphy for the defendant, Mr. Jimenez.

8    The defendant's appearance was waived for this

9    purpose.

10             Your name is Maritza, your last name is

11   Sia, S-i-a?

12             JUROR SIA:  S-i-a.

13             THE COURT:  And your first name is

14   M-a-r-i-t-z-a?

15             JUROR SIA:  Yes.  Correct.

16             THE COURT:  The sheriff gave me a note which

17   is obviously addressed to me referring to some things

18   I'd like to ask you about at this particular moment.

19   In the letter you indicate that it says during our

20   trial I saw a relative to Thaddeus, who is T. J., I

21   saw her at my second part-time job.  Who do you

22   believe you're referring to by that?

23             JUROR SIA:  Well, there's a lady out there, I

24   don't know her name correctly, but she talks to my

JIM03198

S-66

SA1021

1    aunt and I noticed her right now when I was out there.

2           THE COURT:  Your aunt is who, ma'am?

3           JUROR SIA:  My aunt is Carmen.  I work at a

4    Laundromat on weekends and she goes there a lot.

5           THE COURT:  The lady that's in the audience,

6    do you have any idea who she is?

7           JUROR SIA:  Well, I don't know her name real

8    good but I see her all the time and since I see her on

9    that side I believe she's relatives to them or

10   friends.

11          THE COURT:  But you don't know whether that's

12   the case or not, correct?

13          JUROR SIA:  I don't know for sure she's a

14   relative.  I don't know why I put that.

15          THE COURT:  And you say this person

16   supposedly approached your aunt at your second

17   part-time job?

18          JUROR SIA:  Yes.  They talk.

19          THE COURT:  Did your aunt relay any

20   information to you as to what this person supposedly

21   told her?

22          JUROR SIA:  No.  No.

23          THE COURT:  And you said your aunt is your

24   supervisor at this second part-time job?

JIM03199

S-67

SA1022

1          JUROR SIA:  Yes.

2          THE COURT:  Nothing has occurred from your

3    aunt to you about this person talking to your aunt,

4    has it?

5          JUROR SIA:  No.  My aunt doesn't even know

6    I'm here.

7          THE COURT:  When was it that this person

8    supposedly was at your aunt's place of business, the

9    same place you work at?

10         JUROR SIA:  She walks through there all the

11   time.  I mean my grandmother lives across the street

12   and I see her.

13         THE COURT:  Where do you live at

14   approximately?  I don't want your exact address but

15   where do you live around?

16         JUROR SIA:  Well, I live in Elmwood Park but

17   I take care of my grandmother on Chicago.

18         THE COURT:  Where is your second part-time

19   job?

20         JUROR SIA:  On Chicago.

21         THE COURT:  Chicago Avenue near where?

22         JUROR SIA:  Damen and Chicago.

23         THE COURT:  When was it that you were at this

24   place of work where you saw the person that you say

                                        JIM03200

                    S-68

1    you've seen in court?

2              JUROR SIA:  Sunday.  She's sitting outside.

3              THE COURT:  Last Sunday?

4              JUROR SIA:  The Sunday that passed.

5              THE COURT:  You weren't even a juror on this

6    case until this week, correct?

7              JUROR SIA:  Right.

8              THE COURT:  Is there anything about that that

9    would cause you to think you couldn't be fair to both

10   sides at this stage in the proceedings?

11             JUROR SIA:  I'm scared.  I see her all the

12   time.

13             THE COURT:  You don't know what connection,

14   if any, she might have to Thaddeus Jimenez; is that

15   correct?  I mean it's a public courtroom is what I'm

16   trying to say.  People could sit anywhere they want to

17   out there in the audience.

18             JUROR SIA:  I see her out there with his

19   family.

20             THE COURT:  No one has approached you in any

21   fashion regarding this case?

22             JUROR SIA:  No.

23             THE COURT:  No one has made any effort to

24   contact you or suggest to you what you should or

                                        JIM03201

                        S-69

                SA1024

1    should not do if you were a juror in the case?

2              JUROR SIA:  No.

3              THE COURT:  Do you have any reason to think

4    at this point then, Miss Sia, if you remain on the

5    jury to the conclusion of the case that you couldn't

6    be fair to both the State and Mr. Jimenez?

7              JUROR SIA:  I don't understand.

8              THE COURT:  In other words, if you stayed on

9    the jury is there any reason you could think of why

10   you could not be fair to both sides at this time?

11             JUROR SIA:  I'm nervous.

12             THE COURT:  What are you nervous about in

13   particular, ma'am?

14             JUROR SIA:  Well, I'm nervous because I don't

15   know.  I mean I don't know what could happen to me.

16   She sees me over there.  How about if, you know, I

17   have trouble coming to me at my job.  I walk through

18   there constantly.

19             THE COURT:  Is the person that you're

20   referring to, is she out there now today?

21             JUROR SIA:  Yes, she's out there today,

22   that's how I noticed her.

23             THE COURT:  That person never made any effort

24   to approach you in any fashion?

JIM03202

S-70

SA1025

1       JUROR SIA:  No.

2       THE COURT:  Never made any effort to say

3   anything to you as you were taken back and forth to

4   lunch or during recess when you walked through the

5   courtroom?

6       JUROR SIA:  She just looked at me.

7       THE COURT:  So is it basically just kind of

8   speculation on your part that there's some connection

9   there with her and anybody that might be here in the

10  interest of Thaddeus Jimenez?

11      JUROR SIA:  I can't say that.  I don't know.

12  I don't know how the people think or -- you know.

13      THE COURT:  Well, whatever it is that you put

14  down in this letter I take it is it fair to say you

15  have not discussed this with the other jurors?

16      JUROR SIA:  No.

17      THE COURT:  By no you mean it's fair to say

18  you have not discussed it with them?

19      JUROR SIA:  No.

20      THE COURT:  Just so I'm clear since I put the

21  question the way I tell lawyers not to put it, you

22  have not discussed this with the other jurors?

23      JUROR SIA:  No.  I just told the sheriff.

24      THE COURT:  Mr. John Murphy, anything you'd

JIM03203

S-71

SA1026

1    like to ask Miss Sia?

2          MR. JOHN MURPHY:  No, your Honor.

3          THE COURT:  Mr. Charles Murphy?

4          MR. CHARLES MURPHY:  No, judge.

5          THE COURT:  Do this, Miss Sia, go back in the

6    jury room but do not discuss what we talked about with

7    any of the other jurors.

8          JUROR SIA:  Okay.

9          THE COURT:  Miss Sheriff, you can take her

10   back -- Before you go back let me ask you this

11   question, whatever your perception is of the person

12   out there as to how she might or might not be involved

13   in this case at all, does it make you feel

14   uncomfortable to remain as a juror on this case?

15         JUROR SIA:  Yes.  Yes, it does.

16         THE COURT:  Tell me why in your own words why

17   you say that?

18         JUROR SIA:  I don't want to say it because I

19   can't judge people but I'm afraid.

20         THE COURT:  Okay.

21         JUROR SIA:  And it's because I see this

22   person all the time.  You know, I walk with my

23   daughter, I'm not going to, you know --

24         THE COURT:  You mean before this?

JIM03204

S-72

1          JUROR SIA:  I see her a lot, that's why I

2   noticed her.

3          THE COURT:  You've seen her before you were

4   here on this case you mean?

5          JUROR SIA:  Yes.  Uh-huh.

6          THE COURT:  In the neighborhood where you

7   live at?

8          JUROR SIA:  Where my aunt, where I work at,

9   you know.

10          THE COURT:  Okay.  You can step back.

11          MR. JOHN MURPHY:  No questions, judge.

12          THE COURT:  You can step back.  Thank you

13   very much.  Miss Sia, do not discuss the case with the

14   jurors.  Please do not discuss what you talked about

15   with us with the other jurors.  Actually hold on

16   before we do that.

17          Miss Sia, under the circumstances I

18   think you could be fair and impartial but I wouldn't

19   want someone to have to sit up on a jury in a serious

20   case who feels uncomfortable to the point where as I

21   saw you a few minutes ago you were in tears basically

22   concerning this, you're still crying somewhat now, and

23   the lawyers have agreed you could be excused, but when

24   you go back to get your property or whatever else you

JIM03205

S-73

SA1028

1    have back there in the jury room absolutely do not

2    discuss anything we've talked about in here or this

3    letter with the other jurors that are back there.  All

4    right?

5              JUROR SIA:  I won't.

6              THE COURT:  Okay.  Do you have anything back

7    in the jury room?

8              JUROR SIA:  No, I don't.  This is all I have.

9              THE COURT:  Any problem with her leaving,

10   Mr. Charles Murphy?

11             MR. CHARLES MURPHY:  No.

12             THE COURT:  Mr. John Murphy?

13             MR. JOHN MURPHY:  No, your Honor.

14             JUROR SIA:  I'm truly sorry but --

15             THE COURT:  Miss Sia, we appreciate your

16   willingness to be with us.  We understand.  You're

17   free to go.  The sheriff will escort you to the doors

18   of the building.  If you have a car we'll get you all

19   the way to the parking lot.

20             JUROR SIA:  Appreciate it.

21             THE COURT:  All right.  Take her to the

22   parking lot.  Hopefully we'll see you again.  Don't

23   beg off a future case because of what might have

24   occurred that frightened you in this one.  Every case

JIM03206

S-74

1   is different.  Okay?

2          JUROR SIA:  Yeah.  See like right now I'm

3   going to walk out and, you know, I'm pretty sure she's

4   going to see me walk out.

5          THE COURT:  Miss Sheriff, you'll escort this

6   lady as far as she needs to be escorted.

7          JUROR SIA:  Thank you.

8                  (Juror excused.)

9          THE COURT:  The parties have agreed this lady

10  should be excused.  I'll just tell the other jurors

11  when they come out that one of the other jurors has

12  been excused, they need not concern themselves with

13  the reason why that occurred.  Any problem with that,

14  Mr. Charles Murphy?

15         MR. CHARLES MURPHY:  No.

16         THE COURT:  John Murphy?

17         MR. JOHN MURPHY:  No, judge.

18         THE COURT:  Do you have any other

19  suggestions?

20         MR. CHARLES MURPHY:  That's what I was just

21  thinking.

22         THE COURT:  Because they're going to know

23  she's not there.

24         MR. CHARLES MURPHY:  I know.  You have to

JIM03207

S-75

SA1030

1    tell them something, I agree.  I guess a neutral

2    statement is the best.

3         THE COURT:  I'll just tell them, I think it

4    is neutral, otherwise they might start speculating

5    about stuff, I'll just tell them Miss Sia has been

6    excused, they need not concern themselves with the

7    reasons for that and we'll proceed with the trial.

8         MR. CHARLES MURPHY:  Then we have

9    Mr. Kolarik.

10        THE COURT:  Whoever the first alternate is

11   just takes her place.

12        MR. CHARLES MURPHY:  You might want to tell

13   him that now.

14        THE COURT:  That he's the first alternate,

15   Kolarik?

16        MR. JOHN MURPHY:  Judge, that's my

17   recollection.

18        THE COURT:  I'll look at my notes.  I think

19   you're right.  I'll tell the first alternate he merely

20   replaces her.

21        THE COURT:  We have the stipulations and then

22   what else?

23        MR. JOHN MURPHY:  We agree to the transcript,

24   it's just a question of whether the foundation was

JIM03208

S-76

SA1031

1    laid for admissibility of those particular sections of

2    the transcript.

3            MR. CHARLES MURPHY:  Do you want to do it in

4    here?

5            THE COURT:  Well, probably for this we should

6    get back to Mr. Jimenez again.

7            Thaddeus Jimenez is here, his attorney,

8    Charles Murphy, is here and the state's attorneys John

9    Murphy and David Gaughan are present.  Mr. Charles

10   Murphy.

11           MR. CHARLES MURPHY:  Judge, with regard to

12   those stipulations here's where we're at, we do have

13   an agreement as to several of the prior statements

14   given by witnesses, we're not going to obviously

15   discuss those.

16           THE COURT:  Right.

17           MR. CHARLES MURPHY:  First of all, judge, in

18   regard to the testimony of Mr. Phillip Torres when he

19   was testifying I asked him questions concerning prior

20   testimony given at the first trial on September 30,

21   1994.  I read to him excerpts from page ninety-four.

22   I think where we're at, judge, in terms of what the

23   dispute is as to whether or not the witness admitted

24   giving this prior testimony or if he didn't remember

                                        JIM03209
                        S-77

SA1032

1    it and then tried to explain.

2                   Now, the excerpt is this though:

3                   "Now you say you knew T. J.?

4                   Yes.

5                   He had been to your mother's house?

6                   Yes.

7                   When you talked to the police did you

8                   tell them the offender was T. J. when

9                   you first talked to them?

10                  No.

11                  Did you tell them the offender had been

12                  to your mother's house?

13                  Yes.

14                  You did when you first talked to them?

15                  I believe so.

16                  Oh, when you first talked to them you

17                  told them the defendant had been in

18                  your mother's house?

19                  He was there.

20                  Now, you also told them the offender

21                  knew your brother; isn't that right?

22                  Yes.

23                  But you didn't tell them it was T. J.?

24                  Not at that time, no."

JIM03210

S-78

SA1033

1          The significance -- That's the end of
2   the quote.
3          THE COURT:  Is this the transcript of when he
4   testified initially in '94?
5          MR. CHARLES MURPHY:  Yes.
6          THE COURT:  Okay.
7          MR. CHARLES MURPHY:  My recollection of what
8   the witness responded when I confronted him with the
9   what I believe is a prior inconsistent statement is
10  that he said that he did tell the police that my
11  client had been seen either at his mother's house or
12  around his mother's house but he denied he told it to
13  the police when he first spoke to them and, of course,
14  he first spoke to them at 6:30, that would be the
15  impeaching aspect of the prior testimony that he gave.
16         THE COURT:  So you're asking me what, if I
17  recall specifically what he said the other day?
18         MR. CHARLES MURPHY:  The prosecution -- They
19  can state their position.
20         THE COURT:  Okay.  What's the prosecution's
21  position, that Torres acknowledged he made the
22  previous answer?
23         MR. GAUGHAN:  Yes, judge.
24         THE COURT:  I honestly don't recall.  If he

JIM03211
S-79

SA1034

1    made the -- I don't see what the major problem is

2    anyway.  If he admitted giving the answers the jurors

3    have heard them so it wouldn't hurt to remind them

4    that's what he said.  If there's some confusion based

5    on what the defense claims maybe he didn't acknowledge

6    it altogether and if he denied making it then they're

7    going to hear it based on a prior inconsistent

8    statement.  So what's the major problem with that?

9        MR. JOHN MURPHY:  The problem is it comes in

10   under the guise that it's impeachment along with other

11   transcripts that will come in which will clearly be

12   impeaching witnesses.

13       THE COURT:  Well, it's impeached in any

14   event, whether he admitted saying it or whether it's

15   established from some other source that he said it.

16   So it's impeachment either way.

17       MR. GAUGHAN:  It draws double attention to

18   it.  I mean if a witness acknowledges making a prior

19   statement then there's no right to come back and have

20   that statement read again, read again, you know, in

21   front of the jury.

22       THE COURT:  Let me ask this, the State will

23   not object that Mr. Murphy argues he was asked those

24   questions and gave those answers then?

                              JIM03212

                          S-80

1          MR. GAUGHAN:  No.

2          MR. JOHN MURPHY:  No.

3          THE COURT:  The State is acknowledging

4    according to their version, and they will not object

5    to you saying that he was asked those questions and

6    gave those answers.

7          MR. CHARLES MURPHY:  I'm understanding though

8    they are not going to object to my making the argument

9    but does that also mean that the prosecution is going

10   to be saying that there was no impeachment in it?

11         THE COURT:  They can always argue it's not

12   impeaching.

13         MR. CHARLES MURPHY:  Then I want to use the

14   exact words, that is my position, from the prior

15   transcript.

16         THE COURT:  What they're saying is they agree

17   that he was asked those questions and gave the

18   answers.

19         MR. CHARLES MURPHY:  If that flies in the

20   face of the recollection of the jurors as to what he

21   said or denied then there's a problem with that.  It

22   is my recollection that what he said was is that,

23   yeah, I told them that he had been at my mom's house

24   but not initially.  What he said on the witness stand

JIM03213

S-81

SA1036

1    is he said it at some later time in the day.

2        THE COURT:  All right.  I'll let you read it

3    again then, okay?  Rather than making a big fuss over

4    that one particular point you can read it again.  If

5    they heard it once it's not going to add much to hear

6    it a second time.

7            Let's move on to something else.  You

8    can read that portion again, tell the jurors he was

9    asked the questions and gave the answers at a previous

10   hearing.  Okay.  What else?

11       MR. CHARLES MURPHY:  Judge, now we need your

12   Honor --

13       THE COURT:  Is this the same thing basically

14   whether Tueffel was asked certain questions, gave

15   certain answers at a previous hearing or trial or some

16   proceeding and you both have a dispute whether he

17   acknowledged giving these questions and answers or

18   whether he acknowledged giving them, is that the

19   dispute?

20       MR. CHARLES MURPHY:  Yes.

21       THE COURT:  The defense can read them again.

22   Jurors ninety percent of the time forget about

23   impeachment anyway, whether it was asked before.  They

24   wouldn't remember from yesterday whether someone was

JIM03214

S-82

SA1037

1    asked questions four years ago and gave certain

2    answers. The defense can read those again rather than

3    make a big dispute about it. Otherwise you have to

4    get the transcript and see what the witness said

5    before.

6        MR. GAUGHAN: That's fine, judge.

7        THE COURT: What else, Mr. Murphy?

8        MR. CHARLES MURPHY: We have the same issue

9    as to --

10        THE COURT: Whatever transcripts you have the

11    State is agreeing those were the questions and

12    answers. You can indicate that on a previous occasion

13    the witness gave those -- was asked the questions and

14    gave the answers. If the jurors heard them yesterday

15    or the day before they'll merely hear them again

16    today. If they didn't hear them they'll hear them for

17    the first time.

18        Okay. What else, Mr. Charles Murphy?

19        MR. CHARLES MURPHY: That's it.

20        THE COURT: All right. After you read the

21    stipulation what else do you propose to do?

22        MR. CHARLES MURPHY: I have some live

23    testimony.

24        THE COURT: How many live people? All the

1    people here are alive.  You have two more witnesses?

2            MR. CHARLES MURPHY:  Two.

3            THE COURT:  And then the State may have a

4    couple witnesses in rebuttal?

5            MR. JOHN MURPHY:  We have two in rebuttal.

6            THE COURT:  Okay.  Take him back until 2:00

7    o'clock.  Bring him out at 2:00 o'clock then we're

8    going to get to the trial at 2:00.  Okay.

9                         (Other cases were called

10                          and heard.)

11           THE CLERK:  Thaddeus Jimenez.

12           MR. CHARLES MURPHY:  Judge, there's an issue

13   you are going to have to address outside the presence

14   of the jury.  It's my belief that the prosecution

15   would seek to introduce in the form of rebuttal

16   testimony -- agreed upon testimony that Victoria

17   Jimenez, my client's mother, at some point or occasion

18   gave the name of Victoria Jones.

19               As you may recall she denied that she

20   ever did it.  The issue, of course, is a collateral

21   issue.  She denied she had previously used an alias

22   and it's my understanding of the law that a collateral

23   matter such as that, the impeachment, if it exists,

24   can't be perfected.

                                        JIM03216

                        S-84

SA1039

1        THE COURT: What does the State propose to do

2   about that, she may have used the name Victoria Jones

3   at one time?

4        MR. JOHN MURPHY: Judge, I'm a little puzzled

5   by the very last comment that counsel made because

6   it's my understanding that we have an agreement with

7   respect --

8        THE COURT: He's saying he's agreeing to

9   stipulate to the evidence eventually but he's

10  objecting to it coming in. Is that what you're

11  saying, Mr. Murphy?

12       MR. CHARLES MURPHY: Yes.

13       THE COURT: Okay.

14       MR. JOHN MURPHY: With respect to that issue

15  though it goes to the credibility of the witness,

16  judge. She lied about her name, that is a proper

17  subject for the jury to consider.

18       THE COURT: What do you have to show that she

19  supposedly lied about her name?

20       MR. JOHN MURPHY: There would be a

21  stipulation. I anticipate that if Officer Valle,

22  V-a-l-l-e, of the Nineteenth District were called as a

23  witness in this case he would testify that on the date

24  of December 28, 1993 he had a conversation with an

JIM03217

S-85

SA1040

1    individual who he would identify as the defendant's

2    mother and he would testify that when he asked her her

3    name she identified herself as Victoria Jones.  When

4    she was asked that question, judge, on Direct

5    Examination she denied making that statement or using

6    that name.

7         THE COURT:  I guess if I were the defense I

8    would probably object.  I think it's admissible but I

9    think it's more argument to argue about, that they

10   want to make a big fuss about the fact she used a

11   different name on some occasion, how it might affect

12   her credibility, Victoria Jones versus Mrs. Jimenez.

13   What I'm saying is I think it's more beneficial for

14   the defense if they want to trivialize that little

15   piece of stuff that she used a different name on one

16   occasion.

17        MR. CHARLES MURPHY:  If I have to I'll put

18   her back on because I inquired of her, I'll tell you

19   what she's going to say.

20        THE COURT:  She already said she never used

21   it.

22        MR. CHARLES MURPHY:  I know.  This is a DUI.

23   What happened is she was in an accident and once she

24   was in the accident she was taken unconscious to a

JIM03218

S-86

SA1041

1    hospital where she received extensive surgery.  She

2    had surgery to prepare a lung as well as her heart, an

3    artery in her heart.  So wherever the name Jones came

4    from she doesn't know.  She was comatose.

5           THE COURT:  Is that officer here who is going

6    to say that or what?  Mr. John Murphy, is the police

7    officer here that's going to say that?

8           MR. JOHN MURPHY:  No, judge he's not.  Can I

9    have a moment, judge?

10          THE COURT:  Yes.  Sure.

11          MR. JOHN MURPHY:  Judge, although this is an

12   arrest on a warrant for DUI in light of the fact that

13   we do believe it is trivial considering the

14   circumstances we face here we're not going to pursue

15   this further.

16          THE COURT:  You've got a guy on trial for

17   murder.  If his mother used the name Jones on one

18   occasion is insignificant particularly.  The State

19   will withdraw the request.  What else, Mr. Charles

20   Murphy, anything?

21          MR. CHARLES MURPHY:  No.

22          THE COURT:  Okay.  Let's bring them out.

23                        (The following proceedings

24                         were had in the presence and

                                           JIM03219
                        S-87

1                    hearing of the jury:)

2          THE COURT:  You can all be seated, please.

3    Thank you.  As you probably can tell there's only

4    thirteen of you here now and there were fourteen

5    before lunch.  You need not concern yourselves with

6    the reason why the other jury, Miss Sia is no longer a

7    member of this jury.  Mr. Kolarik, you are now a

8    member of the jury.

9              Defense, proceed.

10         MR. CHARLES MURPHY:  Ladies and gentlemen,

11   there will be several stipulations that have been

12   entered into by the parties for your consideration.

13   The first stipulation would be that if called to

14   testify a person, a female, would identify herself as

15   Jeanne Rathbun, R-a-t-h-b-u-n, and she would say that

16   she is and was an official court reporter employed by

17   the Circuit Court of Cook County in the Criminal

18   Division.

19             She would testify that she was assigned

20   in this building on September 30th of 1994 to take

21   down shorthand notes of the testimony given in the

22   case entitled the People versus Thaddeus Jimenez.

23             She would testify that she was present

24   in open court when an individual who identified

JIM03220

S-88

1     himself as Larry Tueffel testified and she took down

2     shorthand notes of his testimony.  She would

3     additionally testify that she had an occasion to

4     transcribe the shorthand notes into transcription form

5     and I would show her what would be marked Defendant's

6     Exhibit No. 7 for identification and she would further

7     testify that it is a true and accurate transcription

8     of the shorthand notes that she took of part of the

9     testimony of Mr. Larry Tueffel.

10                    She would testify that in pertinent part

11    the transcript reads as follows:

12         "Q    Now you also knew Victor, right?

13         "A    Yes.

14         "Q    Did you tell officers that you knew

15               one of the offenders from school that

16               day named Victor?

17         "A    Yes.

18         "Q    You did?

19         "A    Yes.

20         "Q    Now this is at 6:30?

21         "A    Yes."

22                    She would further testify that she took

23    additional shorthand notes of the testimony of the

24    same witness, Mr. Larry Tueffel, and again made a

                                        JIM03221

                              S-89

1    transcription of those shorthand notes.  She would

2    then identify Defendant's Exhibit No. 8 for

3    identification as being a true and accurate

4    transcription of additional pertinent testimony of the

5    testimony of Mr. Larry Tueffel.  In part it would

6    read:

7             "Q   Now, you said -- Now, did they tell

8                  you -- They didn't tell you what Phillip

9                  Torres said?

10            "A   No.

11            "Q   Did they tell you they talked to Phillip

12                  Torres?

13            "A   No, they didn't.  They just told me they

14                  had witnesses, other witnesses.

15            "Q   This was the detective, right?

16            "A   Yes."

17         Miss Rathbun would further testify on

18    that same date she was again present in open court

19    during the testimony of an individual who identified

20    himself as Phillip Torres.  She had occasion to

21    transcribe from her shorthand notes a portion of the

22    testimony of Mr. Phillip Torres.  She would identify

23    Defendant's Exhibit No. 9 as being a true and accurate

24    transcription of that portion of the testimony offered

JIM03222

S-90

1    by Mr. Torres and she would read it to you as follows:

2        "Q    Now, you say you knew T. J.?

3        "A    Yes.

4        "Q    He had been to your mother's house?

5        "A    Yes.

6        "Q    But when you talked to the police did

7            you tell them the offender was T. J.

8            when you first talked to them?

9        "A    No.

10       "Q    Did you tell them that the offender had

11           been to your mother's house?

12       "A    Yes.

13       "Q    You did when you first talked to them?

14       "A    I believe so.

15       "Q    Oh, when you first talked to them you

16           told them the defendant had to be to

17           your mother's house?

18       "A    He was there.

19       "Q    You also told them that the offender

20           knew your brother; isn't that right?

21       "A    Yes.

22       "Q    But you didn't tell them it was T. J.?

23       "A    Not at that time, no."

24           Additionally if called to testify

JIM03223

S-91

SA1046

1    another court reporter would identify herself as

2    Susan Sychta, S-y-c-h-t-a, she would testify that she

3    too is a certified shorthand reporter, she was a

4    licensed shorthand reporter employed by the County of

5    Cook and she was employed on May 7th of 1993 working

6    at the Juvenile Court here in Cook County and she was

7    taking down the shorthand notes in the testimony of

8    the matter of the case entitled in the interest of

9    Victor Romo:

10             She would testify she had an occasion to

11    take her shorthand notes and transcribe them into

12    transcription form and she would then identify

13    Defendant's Exhibit No. 10 for identification as being

14    a true and accurate transcription of a portion of the

15    testimony that was given during those proceedings by

16    Mr. Larry Tueffel and in part that transcription would

17    read as follows:

18             "Q    And you say he took a swing at T. J.; is

19                   that right?

20             "A    Yes.

21             "Q    And where was T. J. standing when he

22                   took that swing at him?

23             "A    In front of him.

24             "Q    In front of him?

JIM03224

S-92

SA1047

1       "A    Yeah."

2             Additionally during that same testimony

3       that was being offered by Mr. Larry Tueffel she also

4       made an additional transcription which is Defendant's

5       Exhibit No. 11 for identification, which is an

6       additional transcription of Mr. Tueffel's testimony.

7       In pertinent part she would say it truly and

8       accurately represents the notes she had taken on that

9       date and at that time and she would read the

10      transcription as follows:

11            "Q    And then you indicated -- Well Strike

12                  that.   What happened then?

13            "A    Eric took a swing to try to knock the

14                  gun out of T. J.'s hand."

15            And finally Miss Sychta would say again

16      during the testimony of the same witness, Mr. Larry

17      Tueffel, she had an occasion to transcribe an

18      additional portion of his testimony.  She would tell

19      you here in open court that the transcription, No. 11

20      for the defendant, is a true and accurate

21      transcription of those notes and in pertinent part it

22      says:

23            "Q    Now, did you have an occasion to talk to

24                  Phillip Torres about what happened out

                                        JIM03225
                          S-93

```
 1              there in the street?
 2        "A   No.
 3        "Q   You've never talked to him?
 4        "A   Oh, yeah.
 5        "Q   When did you talk to him?
 6        "A   About when we were in the station
 7              together.
 8        "Q   That was the same day that things
 9              happened?
10        "A   Yeah.
11        "Q   Was that before you gave your statement
12              to the police?
13        "A   No.  I think it was after."
14              Would that testimony be so stipulated?
15        MR. GAUGHAN:  So stipulated.
16        THE COURT:  Ladies and gentlemen, again a
17   stipulation is an agreement by the parties as to what
18   a particular witness would testify to.  This
19   alleviates the necessity of actually calling the
20   witnesses into open court since the parties agree
21   that's what the witnesses would say.  You could
22   consider this testimony in the same manner as you
23   would the testimony of any other witness.
24        Mr. Murphy, Charles Murphy.
```

JIM03226

S-94

```
 1          MR. CHARLES MURPHY:  Thank you.

 2                      (Witness sworn.)

 3          THE COURT:  Please be seated.  Keep your

 4    voice up nice and loud.

 5                      EDWARD MENDRYS,

 6    called as a witness on behalf of the defendant, having

 7    been first duly sworn, was examined and testified as

 8    follows:

 9                    DIRECT EXAMINATION

10                BY MR. CHARLES MURPHY:

11        Q    Mr. Witness, will you state your name and

12    spell your last name?

13        A    Edward Mendrys, M-e-n-d-r-y-s.

14        Q    Mr. Mendrys, how old are you?

15        A    Twenty-three.

16        Q    Mr. Mendrys, do you know my client, Thaddeus

17    Jimenez, who is seated over here?

18        A    Yes, I do.

19        Q    I want to direct your attention -- By the

20    way, where do you live now?

21        A    Bloomington, Illinois.

22        Q    How long have you lived there?

23        A    Two and a half years off and on.

24        Q    What do you do for a living?
```

JIM03227

S-95

SA1050

1       A       Construction worker.

2       Q       I want to direct your attention back to

3   February 3, 1993.  In the afternoon hours do you

4   recall where you were about 5:00 o'clock p.m.?

5       A       5:00 o'clock p.m.?

6       Q       Yes.

7       A       I was on the bus on my way to his

8   grandmother's house.

9       Q       How is it that you happened to be going to

10   his grandmother's house?

11       A       I was just dropping by for a visit.  My

12   sister was dating his cousin.

13       Q       Your sister's name is what?

14       A       Lorraine.

15       Q       His cousin, meaning T. J.'s cousin, is what?

16       A       Chester.

17       Q       About what time did you arrive at his,

18   meaning T. J.'s grandmother's house?

19       A       6:05.

20       Q       How is it that you know that?

21       A       I looked at the clock on the microwave when I

22   got there.

23       Q       Why?

24       A       I needed to know what time it was.

JIM03228

S-96

SA1051

1     Q    When you got there at 6:05 tell the ladies

2  and gentlemen of the jury who was present at the

3  Makowski residence?

4     A    There was his grandmother, his mom, his Aunt

5  Donna, his Aunt Glor.

6     Q    Did you say Glor?

7     A    His Aunt Gloria.

8     Q    Go ahead.

9     A    Monroe was there, Donna Whitley, my sister

10  was there, his cousin, Chester, him, Angela, his

11  sister, and a couple of the younger kids running

12  around.

13     Q    Once you got there how long did you stay

14  there?

15     A    Until about midnight.

16     Q    And at midnight where did you go?

17     A    I went home.

18     Q    During the period of time you were there did

19  you notice whether or not T. J. left the house?

20     A    He did not leave the house.

21     Q    Did you and he do anything together that

22  evening?

23     A    Yes, we did.

24     Q    What was that?

JIM03229

S-97

1        A.    I helped him with his homework that evening.

2        Q     And where within the house did you help him

3   with his homework?

4        A     In the hallway staircase.

5        Q     Is that outside the front door?

6        A     Yes -- It's a hallway that's inside the

7   building.  There's two entrances, one for the

8   building, one for the apartment.

9        Q     Why did you go into the hallway?

10       A     For quiet.  There was a lot of people in the

11  house.

12       Q     How long did you help him do homework?

13       A     Forty-five minutes, an hour.

14       Q     What period of time would we be talking about

15  during the evening?

16       A     About 6:30, 6:40 to about 7:30 maybe.

17       Q     Sometime after February 3rd did you find out

18  that Thaddeus Jimenez had been arrested for a murder?

19       A     Yes, I did.

20       Q     When was it that you found that out?

21       A.    I found out the next day when I came over.

22       Q     About what time the next day was that?

23       A     I got there probably 10:30, 11:00.

24       Q     In the morning or the evening?

JIM03230

S-98

1          A    In the morning.

2               MR. CHARLES MURPHY:  I have nothing else of

3    the witness.

4               THE COURT:  All right.

5               MR. GAUGHAN:  One moment, judge.

6               THE COURT:  Sure.

7                    CROSS-EXAMINATION

8                    BY MR. GAUGHAN:

9          Q    Mr. Mendrys, you say the following day you

10   got to the grandmother's house at about 10:30 in the

11   morning?

12         A    Yes.

13         Q    Do you recall testifying in a courtroom down

14   at this building back on October 3rd of 1994 in front

15   of Judge Berkos?

16         A    Yes, I do.

17         Q    Do you recall that?

18              THE COURT:  Please, gentlemen, keep your

19   voices up.  Go ahead.

20   BY MR. GAUGHAN:

21         Q    And do you recall being asked this question

22   and giving this answer --

23              MR. CHARLES MURPHY:  Page?

24              MR. GAUGHAN:  Page one ninety-two.

                                        JIM03231
                        S-99

1    BY MR. GAUGHAN:

2        Q    Do you recall being asked this question and

3    giving this answer:

4                    "When did you first learn the defendant

5                    had been arrested for murder?

6                    The evening of the next day when I came

7                    over."

8                    Do you recall being asked that question

9    and giving that answer?

10       A    I remember the question.

11       Q    Do you remember giving that answer?

12       A    Not really.  I remember it was around noon

13   when I got there.

14       Q    Excuse me?

15       A    It was around close to noon when I got there.

16       Q    Now you're saying it was around noon, does

17   that mean you want to change your testimony from about

18   thirty seconds ago that you got there at 10:00 or

19   10:30?

20       A    I said 10:30, 11:00

21       Q    10:30, 11:00?

22       A    Yes.

23       Q    Now you're saying noon?

24       A    About that time.

1              MR. CHARLES MURPHY:  Objection.

2              THE COURT:  Overruled.  His answer is about

3    that time.  Next question.

4    BY MR. GAUGHAN:

5        Q    Okay.  Now, back to my original question, do

6    you remember or not giving the answer to the question

7    I just asked you, the evening of the next day when I

8    came over, do you remember that yes or no?

9        A    No, I don't.

10       Q    Do you consider 10:30 or 11:00 or noon to be

11   the evening?

12       A    Kind of when I get up very early, you know.

13       Q    So you consider 10:30, 11:00 o'clock, noon to

14   be the evening; is that your testimony?

15       A    No.  How do you mean evening?

16       Q    I'm asking you do you consider 10:30, 11:00

17   o'clock, 12:00 o'clock to be the evening, I'm asking

18   you if you consider that the evening?

19       A    No, sir.

20       Q    Only sometimes when you get up early?

21       A    And go to sleep late.  Go to sleep early, get

22   up early, yes.

23       Q    Then it becomes the evening?

24       A    Yeah.

JIM03233

S-101

SA1056

1      Q    Now, whether or not it was 10:30, 11:00 or

2   the evening that you learned the following day that

3   Thaddeus had been arrested for a murder that he

4   committed while you were tutoring him, because you

5   knew that you immediately went down to the police

6   station; isn't that correct?

7      A    No, sir.

8      Q    You didn't immediately go down to the police

9   station and tell the police he couldn't have done it

10  because he was with you?

11     A    No, sir.

12     Q    And you didn't pick up the phone, dial the

13  police and tell them, no, he couldn't have done it, I

14  was tutoring him when this murder was committed, you

15  didn't do that, did you?

16     A    No, sir.

17     Q    And as a matter of fact you didn't do that at

18  all, ever, did you?

19     A    Yes, I did.

20     Q    You called the police?

21     A    No, I didn't call the police but I went to

22  let them know that I was there with him.

23     Q    You went to the police?

24     A    Not to the police but to his original first

JIM03234

S-102

1  trial.

2     Q    Right.  You mean you testified back on

3  October 4th of 1994?

4     A    No.  I mean when he was in the Juvenile

5  Detention when the trial first started.

6     Q    Let me ask you the question again.  Other

7  than coming into a courtroom did you ever contact the

8  police after this happened to tell them that he

9  couldn't have done it because he was with you?

10    A    No, sir.

11    Q    Now, you're pretty good friends with the

12 Jimenezes, right?

13    A    Yes, you could say that.

14    Q    I mean good enough friends where you were

15 there on February 3rd?

16    A    Yes.

17    Q    And you were going back again the following

18 day?

19    A    Yes.

20    Q    Your sister was dating his cousin was it?

21    A    Yes.

22    Q    Incidentally what were you tutoring the

23 defendant in that night?

24    A    I believe it was his math and social studies.

JIM03235

S-103

1    Q    Where did you go to school at the time?

2    A    I wasn't.

3    Q    Where did you graduate from?

4    A    I didn't.  I got my GED a couple months ago.

5    Q    You got your GED a couple months ago?

6    A    Last October.

7    Q    Last October.  So back in February of 1993

8    when you were tutoring the defendant you didn't have a

9    high school diploma?

10   A    No, I didn't.

11   Q    What subjects were you helping him in?

12   A    Math and social studies.

13   Q    Incidentally back in February of 1993 you

14   were aware that the defendant was a member of the

15   Simon City Royals; isn't that correct?

16   A    Yes, I was.

17   Q    And you were aware that he wore a Duke

18   basketball jacket back at that time, correct?

19   A    Yes, sir.

20        MR. GAUGHAN:  Can I have one moment, judge?

21        THE COURT:  Sure.

22

23

24

JIM03236

S-104

1    BY MR. GAUGHAN:

2        Q    Mr. Mendrys, exactly what time was it that

3    you were tutoring the defendant?

4        A    About 6:30, 6:40.

5        Q    And you said you were tutoring him in social

6    studies and math was it?

7        A    Yes, sir.

8        Q    What kind of math were you helping him with?

9        A    It had to be like pre-algerbra, just math

10   problems.

11       Q    It had to be or it was?

12       A    I'm not sure what kind of math he was

13   studying but it was his math homework that I was

14   helping him with.

15       Q    You don't remember if you were helping him

16   with addition, subtraction, multiplication or

17   division?

18       A    No, sir.

19       Q    What was the topic in social studies you were

20   tutoring the defendant in?

21       A    I do not recall.

22       Q    But you do remember exactly that it was 6:30

23   or 6:40 that you were sitting in the hallway with him

24   tutoring him, correct?

JIM03237

S-105

1      A    Yes, sir.

2      Q    And the only other time you've testified in

3  this matter was back on the date that I was referring

4  to earlier, October 4th of 1994; is that correct?

5      A    Yes, sir.

6      MR. GAUGHAN:  I have nothing further, judge.

7      THE COURT:  Mr. Charles Murphy.

8               REDIRECT EXAMINATION

9            BY MR. CHARLES MURPHY:

10     Q    Mr. Mendrys, in February of '93 how old were

11  you?  You're twenty-three now; is that correct?

12     A    I was just turning twenty.

13     Q    What grade was he in, meaning T. J.?

14     A    He was a freshman or in eighth grade.

15     Q    Back in '93 could you add, subtract, multiply

16  and divide?

17     A    Did I?

18     Q    Yeah.  Can you?

19     A    Yeah.

20     Q    Is that the kind of stuff you were helping

21  him with?

22     A    I don't recall.

23     Q    All right.  You said that on

24  Cross-Examination the only time you testified

JIM03238

S-106

SA1061

1    previously was back in 1994 at his first trial, is

2    that what you just said?

3        A    Yes, sir.

4        Q    But did you go to a courtroom before then for

5    the purposes of testifying in regard to your knowledge

6    of his whereabouts on February 3rd?

7        A    Yes, sir.

8        Q    Where did you go to do that?

9        A    Down at the Juvenile Dentention Center.

10       Q    How long or at least approximately how long

11   after his arrest did you go to the Juvenile Detention

12   facility to testify?

13       A    It was a couple weeks after when they

14   started.

15       Q    Did you go down there alone with the intent

16   to testify about your knowledge of his whereabouts?

17       A    No.    There was a lot of people with us.

18       Q    Like whom?

19       A    The other witnesses, a lot of people that

20   were at the house.

21       Q    For whatever reason were any of the witnesses

22   called to testify at that hearing?

23       A    No, sir.

24            MR. CHARLES MURPHY:  I have nothing else.

JIM03239

S-107

```
 1            THE COURT:  Mr. Gaughan, anything else?

 2            MR. GAUGHAN:  One moment, judge.  Judge, I

 3     have no further questions.

 4            THE COURT:  All right.  You can step down.

 5     Thank you.

 6                          (Witness excused.)

 7                          (Witness sworn.)

 8            THE COURT:  Keep your voice up nice and loud,

 9     ma'am.  Speak towards the jurors over there to your

10     right.  Go ahead, Mr. Murphy.

11                    ANGELA JIMENEZ,

12     called as a witness on behalf of the defendant, having

13     been first duly sworn, was examined and testified as

14     follows:

15                 DIRECT EXAMINATION

16            BY MR. CHARLES MURPHY:

17     Q    Miss, would you state your name?

18     A    Angela Jimenez.

19     Q    Are you my client's sister?

20     A    Yes.

21     Q    How old are you, Angela?

22     A    Twenty-two.

23     Q    Where do you live now?

24     A    3618 West Belmont.
```

JIM03240

S-108

```
 1        Q    You live there with someone else?

 2        A    Yes, my boyfriend.

 3        Q    Whose house or apartment --

 4             THE COURT:  Keep your voice up.  What did you

 5   say?

 6             THE WITNESS:  With my boyfriend.

 7             THE COURT:  Okay.  Fine.  Keep your voice up.

 8   BY MR. CHARLES MURPHY:

 9        Q    Whose apartment is that?

10        A    My boyfriend's.

11        Q    Which floor do you live on?

12        A    The third floor.

13        Q    Directing your attention back to February 3rd

14   of 1993, in the afternoon hours of that day do you

15   recall where you were?

16        A    I was at my grandmother's house.

17        Q    When had you gotten to your grandmother's

18   house?

19        A    The day before.

20        Q    February 2nd?

21        A    Yes.

22        Q    When you got there on February 2nd did you

23   stay the night?

24        A    Yes, I did.
```

JIM03241

S-109

1     Q     Did you stay the night of February 3rd?

2     A     No.

3     Q     How long were you at your grandmother's

4     apartment on February 3rd, until what time?

5     A     Until 11:00, about 11:00 o'clock at night.

6     Q     Do you recall if your brother, T. J., had

7     occasion to come into the house sometime in the

8     afternoon?

9     A     Yes, he did.

10    Q     About what time?

11    A     About 4:00, 4:30, somewhere around there.

12    Q     From that time when he arrived, whether it be

13    4:00 or 4:30 until the time you left at 11:00 o'clock

14    that night did you see your brother leave the house?

15    A     No.  Except he left the house, yes, the

16    apartment.

17    Q     What did he do?

18    A     He went into the hallway.

19    Q     And what did he do in the hallway?

20    A     He was doing his homework.

21    Q     Alone?

22    A     No, with Edward.

23    Q     Is that Edward Mendrys?

24    A     Yes.

JIM03242

S-110

1      Q    Is that the gentleman who was in the hallway

2   a short time ago?

3      A    Yes.

4      Q    Can you name some of the adults that were

5   present in the afternoon hours, I'm not talking about

6   the morning, in the afternoon hours, let's say between

7   4:00 o'clock and 8:00 o'clock at night in your

8   grandmother's apartment?

9      A    My Aunt Glor, my Aunt Denise, my mother, my

10  Uncle Kermit, my Uncle Joe, my Aunt Donna, Donna

11  Whitley.

12     Q    Are those two different people?

13     A    Yes.  One is my aunt, one is my mother's

14  friend.  And Monroe and I'm not sure of who else was

15  there.  People were always there.

16     Q    When you left your grandmother's apartment at

17  about 11:00 o'clock at night what was your brother

18  doing and I'm speaking of Thaddeus?

19     A    He was laying down, getting ready to go to

20  sleep.

21          MR. CHARLES MURPHY:  I have nothing else of

22  the witness.

23          THE COURT:  All right.  Mr. Murphy.

24          MR. JOHN MURPHY:  Yes, judge.

JIM03243

S-111

SA1066

1                    CROSS-EXAMINATION

2              BY MR. JOHN MURPHY:

3        Q    Ma'am, you testified that you are the

4    defendant's brother --

5        A    Sister.

6        Q    Sister.  Excuse me.  Is that correct?

7        A    Yes.

8        Q    And when did you learn that your brother was

9    charged with committing a murder?

10       A    The next day, the next morning.

11       Q    When the next day?

12       A    In the morning, about between 7:00 and 7:30.

13       Q    And when did you learn that your brother was

14   charged with committing a murder during the time that

15   you were with him?

16       A    About -- I don't know.  Maybe a week later,

17   couple days.  When my mother found out I found out.

18       Q    Would that have been that morning then?

19       A    No, not that morning.  I just knew that they

20   took him for murder.

21       Q    Okay.  So it would have been a couple days

22   later?

23       A    Well, maybe that evening -- The next day when

24   my mother talked to the cops probably when he said the

                                        JIM03244

                        S-112

                        SA1067

1    time that the murder had been committed.

2       Q    Okay.  So somebody -- You're saying here that

3    somebody told your mother the time the next day?

4       A    Maybe.  I'm not sure.  I said maybe a week.

5    I'm not sure.  I don't remember.

6       Q    All right.  Do you remember then when you

7    learned, if not your mother?

8       A    No.  I learned the same time my mother told

9    me.  The only thing I can tell you is that I do

10   actually remember is when my mother came and told me

11   that night they had took my brother for murder.  I

12   wasn't aware of the time of the murder that was

13   supposed to have happened or that did happen.  Sorry.

14      Q    Had you learned within a week of the time the

15   murder occurred?

16      A    Yes.

17      Q    The time that in fact it occurred is the time

18   he was in fact with you?

19      A    Uh-huh.

20      Q    And at any time after you learned that your

21   brother had committed a murder when he was with you

22   did you ever go to the police department and tell them

23   that, no, this is a mistake, he was with me?

24      A    Well, I called the police.

JIM03245

S-113

SA1068

1    Q    When did you call the police?

2    A    The next day.  The same day I found out I

3    called the police.

4    Q    You don't know what day that was?

5    A    It was February 4th.

6    Q    Okay.  So you found out on February -- Now

7    you're saying this is the day you just found out about

8    the murder, right?

9    A    Okay.  I'm sorry.  Please repeat the

10   question.

11   Q    Did you call the police on February 4th?

12   A    Yes, we did.

13   Q    What did you say to the police on February

14   4th?

15   A    I was wondering what was going on with my

16   brother.  I was trying to find out what was happening.

17   Q    Okay.  Did you call the police another time?

18   A    No.

19   Q    So you never called the police to say you

20   guys -- you made a mistake, my brother was with me at

21   the time that this murder occurred; is that right?

22   A    Yes.

23   Q    Did you ever come into the state attorney's

24   office and ask to speak to an assistant state's

JIM03246

S-114

SA1069

```
 1    attorney and say, hey, there's a mistake here?
 2        A    No.
 3        Q    You never did that?
 4        A    No.
 5        Q    The very first time that you ever testified
 6    on behalf of your brother was in October of 1994;
 7    isn't that correct?
 8        A    I believe, if that's the date.  I'm not sure.
 9        Q    You don't remember the exact date?
10        A    No, I don't.
11        Q    You do remember though that it was October of
12    1994?
13        A    I can't remember.  I don't know.
14        Q    Was it in the fall of 1994?
15        A    I don't know.  I don't remember when I
16    testified to say it.
17        Q    Was it 1994?
18        A    Yes, probably.
19        Q    It was some time that year?
20        A    Yeah.  When his trial started it was the
21    first time that I testified.
22        Q    You don't know the date, you don't know the
23    month, but you remember it was '94?
24        A    Well, if that's when his trial was then
```

JIM03247

S-115

1    that's when I testified.  That's the first time I ever

2    said that he was with me was when his trial started.

3        Q    Are you not sure of the year either then?

4             MR. CHARLES MURPHY:  Objection, judge.

5             THE COURT:  All right.  Sustained.

6             MR. JOHN MURPHY:  No further questions,

7    judge.

8                    REDIRECT EXAMINATION

9                    BY MR. CHARLES MURPHY:

10       Q    Shortly after your brother was arrested did

11    you learn he was at The Audy Home?

12       A    Yes.

13       Q    Did you ever go to Juvenile Court?

14            MR. JOHN MURPHY:  Your Honor -- Withdrawn

15            THE COURT:  Finish the question, Mr. Murphy.

16    BY MR. CHARLES MURPHY:

17       Q    Did you ever go to Juvenile Court shortly

18    after your brother's arrest to go to a court

19    proceeding?

20            MR. JOHN MURPHY:  Objection.  Leading.

21            THE COURT:  It is slightly but overruled.

22            THE WITNESS:  Yes.

23

24

                                            JIM03248

                        S-116


                        SA1071

1    BY MR. CHARLES MURPHY:

2        Q    Approximately how long had your brother been

3    in custody when you went with the intention of

4    testifying at a court proceeding in Juvenile Court?

5        A    About a week.

6        Q    Were you the only person who went there?

7        A    No.

8        Q    Who accompanied you down there to Juvenile

9    Court with the intent to testify?

10       A    Edward, I believe Monroe was there.

11   Practically everybody that was in my grandmother's

12   house at the time was there to say that he was with us

13   at the time.

14       Q    Were you called to testify at the Juvenile

15   Court hearing?

16       A    No.

17       Q    Did you ever even go in the courtroom?

18       A    No.  We weren't allowed in.

19           MR. CHARLES MURPHY:  I have nothing else.

20           THE COURT:  All right.  Mr. John Murphy.

21

22

23

24

JIM03249

S-117

SA1072

1        RECROSS-EXAMINATION

2        BY MR. JOHN MURPHY:

3        Q    The only hearing that was conducted where

4    witnesses testified regarding your brother didn't

5    begin until May of 1993; isn't that correct?

6        A    I don't know.

7        Q    Well, did you go to the hearings for your

8    brother?

9        A    Yes, I did.

10       Q    Do you remember approximately when the

11   hearings were in Juvenile Court regarding your

12   brother?

13       A    It was right after he was arrested that the

14   hearings started.

15       Q    Are you saying the hearings started in

16   February of 1993?

17       A    No, I'm not saying it started.  I'm just

18   saying that's when I went to court but we didn't get

19   to go in the courtroom.  I mean in the room we were

20   allowed but not in the --

21       Q    I understand.  But what I'm asking you though

22   is you said you went to the hearing for your brother;

23   is that right?

24       A    Yes, I did.

**JIM03250**

S-118

SA1073

1       Q    I'm asking you when the hearings started for

2  your brother in Juvenile Court, do you remember the

3  first date in which there was a hearing in which

4  witnesses testified?

5       A    We didn't testify in Juvenile.

6       Q    I'm not asking you if you testified.  What

7  I'm asking you is when is the first date that hearings

8  started in Juvenile Court regarding your brother?

9       A    I guess when he got arrested the first time

10  he went to court.  I'm sorry.  I don't understand your

11  question.  I'm not getting it.

12       Q    Did you go to all the court dates for your

13  brother in Juvenile Court?

14       A    Yes.

15       Q    Were you ever in court when witnesses

16  testified at a hearing in Juvenile Court regarding

17  your brother?

18       A    No.

19       Q    And you never testified on behalf of your

20  brother?

21       A    Not in Juvenile Court, no.

22       MR. JOHN MURPHY:  I have no further

23  questions.

24       MR. CHARLES MURPHY:  I have no questions.

JIM03251

S-119

1        THE COURT:  You may step down, Miss Jimenez.

2    Thank you.

3                        (Witness excused.)

4        MR. CHARLES MURPHY:  May I have a side bar?

5        THE COURT:  Sure.

6                        (A discussion was had between

7                         the court and counsel off

8                         the record out of the hearing

9                         of the jury and the court

10                        reporter.)

11        THE COURT:  There will be a short pause for a

12    good cause, ten minutes, no more, no less.  Do not

13    discuss the case during the break.  We'll call you

14    back in ten minutes.

15                        (A brief recess was taken.)

16        THE COURT:  Thaddeus Jimenez is present, his

17    attorney, both states attorneys are here.  Mr. Murphy,

18    what do you propose to do when the jurors come out,

19    Charles Murphy?

20        MR. CHARLES MURPHY:  Judge, my client and I

21    have conferred.  My client, while he agreed with my

22    suggestion, I didn't bulldoze him, he agrees with me

23    it's in his best interest not to testify.

24        THE COURT:  Mr. Jimenez, will you step up for

**JIM03252**

S-120

1    a second, please.  You're how old, young man?

2         THE DEFENDANT:  Eighteen.

3         THE COURT:  How far have you gone in school?

4         THE DEFENDANT:  I got my GED.

5         THE COURT:  That's while you've been in

6    custody basically?

7         THE DEFENDANT:  Yes, sir.

8         THE COURT:  Your lawyer indicates you will

9    not be testifying in this case; is that correct?

10         THE DEFENDANT:  Yes, that's correct.

11         THE COURT:  You have a Constitutional Right

12    to remain silent and not testify in this case, do you

13    understand that?

14         THE DEFENDANT:  Yes, I do.

15         THE COURT:  You also have a right to testify

16    in your own defense if you'd like to do that as well,

17    do you understand that also?

18         THE DEFENDANT:  Yes, I do.

19         THE COURT:  You have a right to remain silent

20    and not testify in your behalf.  Do you understand

21    that, Mr. Jimenez?

22         THE DEFENDANT:  Yes.

23         THE COURT:  You also have a right to testify

24    in your own defense if you would like to do that as

1    well, do you understand that also?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Your lawyer, Mr. Murphy, is an

4    excellent lawyer, he can give you advice, he can give

5    you a suggestion, he can give you his viewpoint as to

6    whether you testify or not.  The only decision that

7    counts in that regard is yours, do you understand

8    that?

9            THE DEFENDANT:  Yes, I do.

10           THE COURT:  Is it your decision that you do

11   not wish to testify?

12           THE DEFENDANT:  Yes, it is.

13           THE COURT:  Has anybody used any force or

14   threats or done anything to you physically or any

15   other way to cause you not to testify?

16           THE DEFENDANT:  No.

17           THE COURT:  Has anybody made any promise to

18   you of any kind to cause you not to testify?

19           THE DEFENDANT:  No.

20           THE COURT:  Are you choosing not to testify

21   freely and voluntarily on your part?

22           THE DEFENDANT:  Yes.

23           THE COURT:  You can be seated.  Thank you.

24               Mr. Charles Murphy, can I take it from

JIM03254

S-122

SA1077

1   that when the jury comes out you propose to rest in

2   your defense case?

3            MR. CHARLS MURPHY:  I do.

4            THE COURT:  Mr. John Murphy, what do you

5   propose to do at that time?

6            MR. JOHN MURPHY:  Judge, we have two brief

7   witnesses in rebuttal.

8            THE COURT:  Okay.  Let's do that then we'll

9   go from there.  Let's bring out at this point the

10   thirteen jurors.

11                         (The following proceedings

12                          were had in the presence and

13                          hearing of the jury:)

14            THE COURT:  You can be seated, folks.  Thank

15   you very much.

16            Mr. Charles Murphy, what is your

17   position at this stage?

18            MR. CHARLES MURPHY:  Judge, at this time the

19   defendant would rest.

20            THE COURT:  Ladies and gentlemen, the defense

21   rests their case.  At this point the State has the

22   opportunity, if they choose to do so, to present

23   evidence in rebuttal.

24            Mr. John Murphy, what's your pleasure?

JIM03255

S-123

1          MR. JOHN MURPHY:  Your Honor, the People

2     would call Detective Jerome Bogucki.

3          THE COURT:  Okay.  You're still under oath

4     from earlier today.  Go ahead, please.

5                     JEROME BOGUCKI,

6     called as a witness on behalf of the People of the

7     State of Illinois, having been previously duly sworn,

8     was examined and testified as follows:

9                     DIRECT EXAMINATION

10                    BY MR. GAUGHAN:

11         Q    Detective Bogucki, you're the same detective

12    that testified earlier in this matter; is that

13    correct?

14         A    That is correct.

15         Q    I want to direct your attention specifically

16    to the morning after the murder of Eric Morro, did you

17    have a phone conversation with Victoria Jimenez, the

18    defendant's mother?

19         A    Yes.

20         Q    Approximately what time did this conversation

21    take place?

22         A    It was sometime between 5:00 and 7:00 in the

23    morning.

24         Q    Did she phone you?

                                        JIM03256

                         S-124


                    SA1079

1    A    Yes.

2    Q    At that time what did you inform her?

3    A    I informed her that later on that morning

4    there would be lineups and that I could give her

5    particulars of the case if she came in and talked to

6    me in person.

7    Q    And in fact did she come down to Area Five

8    that day?

9    A    Yes.

10    Q    What time did she come down to Area Five?

11    A    Approximately noon.

12    Q    When she came down to Area Five did you have

13    a conversation with her?

14    A    Yes, I did.

15    Q    And did you inform her of the particulars of

16    this crime being that it happened the night before

17    about 6:30 in the area of Belmont and Sacramento?

18    A    Yes, I did.

19    Q    And when you informed her that the murder the

20    defendant was in custody for happened the previous

21    evening on February 3rd, around 6:30 in the evening in

22    the area of Belmont and Sacramento did she at that

23    time tell you that the defendant was at home with her?

24    A    No, she did not.

JIM03257

1      Q    Did she provide you with any other names of

2    witnesses who could say that the defendant was at home

3    with her?

4      A    No, she did not.

5           MR. GAUGHAN:  Nothing further, judge.

6           THE COURT:  Okay.

7                    CROSS-EXAMINATION

8                    BY MR. CHARLES MURPHY:

9      Q    Detective, when you spoke with Mrs. Jimenez

10   was that at Area Five; is that right?

11     A    Yes, it was.

12     Q    That was what, a little before noon?

13     A    It was around noon.  It could have been a

14   little before, a little after.

15     Q    Would it be an accurate statement in terms of

16   what her emotional state was to say that she was

17   distraught?

18     A    Somewhat, yes.

19     Q    Was she emphatic in her conversation with you

20   that her son could not have committed this crime?

21     A    She did say that.

22          MR. CHARLES MURPHY:  I have nothing else.

23          THE COURT:  Any Redirect?

24          MR. GAUGHAN:  No questions, your Honor.

                                      JIM03258
                         S-126

SA1081

1          THE COURT:  Thank you.  Step down.  Thank

2     you.

3                         (Witness excused.)

4          MR. JOHN MURPHY:  Your Honor, the last

5     witness the State would call in rebuttal is Elizabeth

6     Heatley.

7          THE COURT:  Okay.  Miss Heatley, you're still

8     under oath from yesterday.

9          THE WITNESS:  Yes.

10                    ELIZABETH HEATLEY,

11    called as a witness on behalf of the People of the

12    State of Illinois, having been previously duly sworn,

13    was examined and testified as follows:

14                    DIRECT EXAMINATION

15               BY MR. JOHN MURPHY:

16    Q    Elizabeth, do you know Victoria Jimenez?

17    A    Yes.

18    Q    How do you know her?

19    A    She is T. J.'s mother.

20    Q    What name do you know her by?

21    A    By Victoria.  I didn't know her by Jimenez.

22    It was some other last name.

23    Q    Was it Makowski?

24    A    Yes.

JIM03259

S-127

SA1082

1      Q    Now, I'd like to ask you to think back to

2  late October or early November of 1993, do you

3  remember during that time period ever having a

4  telephone conversation with Victoria Jimenez or

5  Makowski?

6      A    Yes.

7      Q    And did she call you or did you call her?

8      A    She called me.

9      Q    What was the topic of the conversation?

10     A    About the letters that I had received from

11  T. J.

12     Q    And during that conversation did she tell you

13  that she was going to send an officer to your house

14  because your sisters and mothers -- your sisters and

15  mother should not be reading your mail?

16     A    Yes.

17          MR. CHARLES MURPHY:  Objection.  Relevance.

18          THE COURT:  Overruled.

19  BY MR. JOHN MURPHY:

20     Q    Did she tell you that because you turned in

21  the letter you must be in a gang or your boyfriend at

22  that time must be in a gang?

23     A    Yes.

24          MR. JOHN MURPHY:  No further questions.

JIM03260

S-128

SA1083

1          MR. CHARLES MURPHY:  Another objection as to

2     relevance.

3          THE COURT:  All right.  Overruled.  Any

4     questions?

5          MR. CHARLES MURPHY:  No.

6          THE COURT:  All right.  You can step down.

7     Thank you.

8                    (Witness excused.)

9          THE COURT:  Mr. John Murphy, what's the

10    State's position at this time?

11         MR. JOHN MURPHY:  Your Honor, at this time

12    the People would rest in rebuttal.

13         THE COURT:  Mr. Charles Murphy, anything in

14    surrebuttal?

15         MR. CHARLES MURPHY:  No.

16         THE COURT:  What that means, ladies and

17    gentlemen of the jury, you've heard all the evidence

18    in this case.  Let me see what the lawyers' pleasure

19    is.  It's ten after 3:00.

20          Ladies and gentlemen, the snafu I

21    mentioned before has not come up but it's ten after

22    3:00, in considering the significance of this case to

23    both sides it probably wouldn't be appropriate to make

24    the lawyers argue after 3:00 o'clock on a Friday

JIM03261

1    afternoon and it probably wouldn't be appropriate to

2    make you wait around either until the arguments were

3    done, which might be after 5:00, and then start

4    deliberating a significant case of this magnitude late

5    on a Friday afternoon, early on a Friday evening.

6              So I think it's more appropriate, even

7    though I don't like to do this, to make you come back

8    Monday only for the closing arguments, the

9    instructions by me and your verdict.  That leaves

10   three things left, the arguments by the attorneys, the

11   instructions by me and then you determining the one

12   sole thing I told you about before we started the

13   trial, the one question, whether the State was able to

14   convince you beyond a reasonable doubt that the

15   defendant, Thaddeus Jimenez, is guilty as charged in

16   the indictment.

17             So what I decided to do is this, I hope

18   if it's not too inconvenient, if it is you'll let me

19   know, but this is my thought at this point, every time

20   I've said we'll start at a certain time we've never

21   really done that because as you go out to lunch you

22   see me doing other things, I'm trying cases during

23   lunch to avoid making you wait around longer than you

24   have to wait around, so I'm going to make this

JIM03262

S-130

SA1085

1  suggestion and I know we can do it because if you

2  don't object it can be accomplished.

3          The lawyers and I have kicked around

4  this thought just in a conference a moment ago of

5  starting the closing arguments before I start my call.

6  I usually start my regular call at 9:30, that

7  sometimes takes an hour, hour and a half.  Sometimes

8  it drags on to two hours or longer than that

9  occasionally, so that means we never usually get to it

10 no matter what I say, 10:30 or 11:00, we never get to

11 you before 11:30 or so.  Unless it's a tremendous

12 inconvenience to come this early I'm going to say we

13 can start the case before I start my other call, that

14 would mean everybody else that comes in thereafter

15 will basically have to wait for you rather than you

16 waiting for them.

17          So I'm going to suggest, and if anybody

18 has a problem with getting here by that time let me

19 know, if anybody doesn't have a problem I'm going to

20 suggest we start closing arguments on this case Monday

21 morning at 9:00 o'clock.  Does anybody have any

22 problem with getting here early enough to start at

23 9:00?  There's no response.  I'll take it that nobody

24 does have that problem.

JIM03263

S-131

SA1086

1          You can leave your notebooks and pens

2     and things where they're at, we'll collect them for

3     you, we'll keep them for you over the weekend.

4          Now that the evidence is done it's

5     particularly important, I'm sure you followed these

6     instructions up until now anyhow, now that the

7     evidence is completely finished it's very important

8     you do not discuss the case with anybody, you do not

9     let anybody attempt to talk to you about the case, you

10    do not talk to each other about the case as you're

11    walking to and from the parking lot -- to the parking

12    lot at this point, you do not discuss the case prior

13    to the time I tell you Monday morning after the

14    instructions and arguments, that's the proper time to

15    do that.

16          Even though you've heard all the

17    evidence do not form or express any opinions about the

18    evidence until I tell you it's the proper time to do

19    that, which will be after the closing arguments and

20    the instructions on this case Monday morning.  So

21    until then leave the case here.  You can resume

22    thinking about it and deciding it on Monday morning.

23          So having heard no objection we'll do it

24    this way.  I have to be here anyway at 8:30 for

JIM03264

S-132

SA1087

1    something Monday morning and, therefore, we will start

2    9:00 a.m. with closing arguments.  Whatever comes in

3    after that it waits for you this time.

4                    So enjoy your weekend.  Watch the Bears,

5    if you have enough stomach to do that.  We'll see you

6    Monday morning.  We'll start at 9:00 o'clock so be

7    here a little bit before.  Thank you very much.

8                              (The above entitled matter

9                               was continued to

10                              November 10, 1997.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03265

```
 1    STATE OF ILLINOIS)
                        )         SS:
 2    COUNTY OF C O O K)

 3              IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
 4

 5              I, BRENDA D. HAYES, Official Court

 6    Reporter for the Circuit Court of Cook County, Cook

 7    Judicial Circuit of Illinois, do hereby certify that

 8    I reported stenographically the proceedings had on

 9    the trial in the above entitled cause; that I

10    thereafter transcribed said trial into

11    typewriting, which I hereby certify to be a

12    true and accurate transcript of the proceedings

13    had before the Honorable STANLEY J. SACKS, Judge of

14    said court.

15

16

17

18

19

20              OFFICIAL COURT REPORTER

21

22

23

24
                                              JIM03266
```

S-134

(Rev. 2/18/93) CCCR-56

STATE OF ILLINOIS }
COUNTY OF COOK } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of . VOLUME ( FOUR ) OF (SIX) VOLUMES CONSISTING OF THE REPORT OF PROCEEDIGNS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 98-0247

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

in a certain cause . . . . . . . . LATELY . . . . . . . . . . . . . . . . pending in said Court, between

The People of the State of Illinois. . . . WERE . . . . . . . . . . . . . ., Plaintiffs and

THADDEUS JIMENEZ . . . . . . . . . . . . WAS . . . . . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI,

Clerk of the court, and the Seal thereof, at Chicago

In said County, . . . . . . . . . . JULY 8 . . . . . . . ., 19 . . 98

*Aurelia Pucinski /pg*

Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JIM03267

SA1090

JIM03268

CCCR-310

# Transcript of Record
## Appeal
## to

APPELLATE _____  **Court of Illinois**

FIRST _____  **District**


**Circuit Court No.** _____ 93 CR 14710 _____

**Trial Judge** _____ STANLEY SACKS _____

**Reviewing Court No.** _____ 98–0247 _____


_____ THE PEOPLE OF THE STATE OF ILLINOIS _____

**VS.**

_____ THADDEUS JIMENEZ _____

# from
# CIRCUIT COURT
## of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

VOLUME FIVE OF SIX VOLUMES

REPORT OF PROCEEDINGS, ONLY

**AURELIA PUCINSKI**

**Clerk of Court**

Per _____ AP/GL _____

**Deputy**

JIM03269.

```
 1    STATE OF ILLINOIS    )
                           )    SS:
 2    COUNTY OF COOK       )

 3              IN THE CIRCUIT COURT OF COOK COUNTY
                COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
      THE PEOPLE OF THE    )
 5    STATE OF ILLINOIS    )
                           )
 6                         )    Indictment No. 93 14710
              VS           )
 7                         )    Charge:  Murder
                           )
 8    THADDEUS JIMENEZ     )

 9                   REPORT OF PROCEEDINGS

10              BE IT REMEMBERED that on the 10th day of

11    November A.D., 1997, this cause came on for trial

12    before the Honorable STANLEY SACKS, Judge of said

13    court, and a jury, upon the indictment herein, the

14    defendant having entered a plea of not guilty.

15              APPEARANCES:

16                   HON. RICHARD DALEY,
                     State's Attorney of Cook County, by
17                   MESSRS. JOHN MURPHY and
                     DAVID GAUGHAN,
18                   Assistant State's Attorneys,
                         appeared for the People;
19
                     MR. CHARLES MURPHY,
20                       appeared for the Defendant.

21

22                                   FILED
      Brenda D. Hayes, CSR
23    Official Court Reporter         JUN 3 0 1998
      2650 S. California
24    Chicago, Illinois  60608       AURELIA PUCINSKI
                                    CLERK OF CIRCUIT COURT
```

JIM03270

SA1093

1                                I N D E X

2

3          Date of Hearing:   11-10-97

4          Page Numbers:   T-1 - T-143

5                            PROCEEDINGS

6                          Page    DX      CX      RDX       RCX

7     Closing Arguments
      State                   T-7
8     Defense                 T-19
      State                   T-47
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                                    JIM03271

                            T-2

1          THE CLERK:  Thaddeus Jimenez.

2          THE COURT:  The State is here, both state's

3     attorneys, Mr. Gaughan, Mr. John Murphy, Mr. Charles

4     Murphy for the defendant.  Thaddeus Jimenez, is here.

5               State ready over there to argue this

6     morning?

7          MR. GAUGHAN:  Yes, judge.

8          THE COURT:  Defense ready to argue?

9          MR. CHARLES MURPHY:  Yes.

10         THE COURT:  All right.  Let's get it on.

11    Bring them out, Miss Dozier.

12                              (The following proceedings

13                               were had in the presence and

14                               hearing of the jury:)

15         THE COURT:  Please be seated, folks.  We

16    started as close to what I said as I hoped.  It's five

17    after 9:00.  You've heard all the evidence in the case

18    of People versus Thaddeus Jimenez but the trial has

19    not ended.  At this time the attorneys have the

20    opportunity of making final arguments to you.  First

21    the State, then the defense, then the State has a

22    chance to respond to the defense arguments.

23              What the lawyers tell you in argument is

24    not evidence, should not be considered by you as

JIM03272

T-3

1    evidence.  The lawyers are permitted to draw

2    reasonable inferences from the evidence.

3         After you've heard the arguments I'll

4    instruct you on what the law is that applies to this

5.   particular case, you will then retire to the jury room

6    to consider what your verdict will be.  Before the

7    attorneys step up I'd just like to make a couple of

8    additional comments and then the lawyers can make

9    their closing arguments to you.

10        During the course of this trial you've

11   had the opportunity to watch and listen to three

12   excellent lawyers.  You've heard from a total of

13   seventeen witnesses, some of whom have testified more

14   than once.  There were various stipulations during the

15   course of the trial, thirty-four exhibits were marked

16   and received in evidence in the case, twenty-two of

17   which will be available to you to use during

18   deliberations on a verdict in this case.  You will not

19   be receiving the physical pieces of paper which

20   comprise any police reports.

21        During the course of the closing

22   arguments by the attorneys you may hear one or the

23   other object and say that's not what the witness said

24   or that's not the evidence.  That's why there are

JIM03273

T-4

1    twelve of you to consider what the evidence in the

2    case was, that's why you had the opportunity, if you

3    choose to exercise it, to take notes during the course

4    of this trial.  Only the twelve of you decide what the

5    facts were in this particular case on February 3, 1993

6    insofar as they might or might not apply to Thaddeus

7    Jimenez.

8            The lawyers make the arguments to you, I

9    will tell you what the law is that applies to the

10   facts but the only people that determine what the

11   facts are are the twelve of you.  During the course of

12   the arguments by the attorneys one or the other may

13   say that's not what the witness said and the lawyer

14   will probably tell you in advance that you have to use

15   your own collective memories of what the witnesses

16   testified to.

17           Sometimes the lawyers may make a

18   statement, which you find is not what the witness

19   said.  They are not doing that purposely to attempt to

20   mislead you.  Their memories have the same frailties

21   as anybody else's memory.  They're making their best

22   effort to recall what the witnesses said so they can

23   make their arguments to you.

24           Any statement made by a lawyer that is

JIM03274

T-5

SA1097

1  not based on the evidence will be disregarded by you.

2  You should use your own recollection of the evidence.

3  Again I remind you that what the lawyers say during

4  arguments is not evidence.

5       If during the course of the closing

6  arguments one or the other attorney refers to what the

7  law is that applies in this case they can argue what

8  the law is but arguments of the attorneys are not to

9  be taken as statements of what the law is.

10      Instructions on what the law is will

11  come from me after the final arguments have been

12  completed.  Also the attorneys should not make any

13  effort to convey their personal opinions on what the

14  facts in this case are.  The only personal opinions of

15  what the facts are in this case that count are the

16  twelve of your personal opinions of what the facts

17  are.

18      Also, and I'm sure this won't happen

19  since you've had a chance to see three excellent

20  lawyers during the course of this trial, the lawyers

21  should not make any comments which should be taken

22  personally by the attorneys on the other side of the

23  case.  I'm sure they won't do that and if they do

24  you'll certainly disregard that.

JIM03275

T-6

1          Having said that and prefaced that by

2    the comments I felt were appropriate to make the State

3    may make the opening of their closing arguments.

4    Mr. Gaughan, go ahead, please.

5          MR. GAUGHAN:  May it please the court.

6    Chuck.  John.  Mr. Gaughan.

7          MR. CHARLES MURPHY:  Mr. Gaughan.

8                    CLOSING ARGUMENT

9                    BY MR. GAUGHAN:

10         Ladies and gentlemen of the jury, in his

11   opening statement the defense got up here and thanked

12   you from the judge, from John and I, from the

13   defendant's side, and I've got to be perfectly frank

14   with you, I really don't think you deserve to be

15   thanked.  You're here to do a job.  You're here to

16   perform the only duty required of an American citizen

17   other than paying taxes.

18         There is one person though over the last

19   week that has been conspicuously left absent from this

20   case and that person isn't here to thank you today, so

21   I will thank you on behalf of him.  That person is

22   Eric Morro.

23         It seems that over the last week

24   everybody else has been on trial in this case,

JIM03276

T-7

1   witnesses whose only crime because they happen to be

2   out on the street when this man, right here, took a

3   gun and placed it to the chest of Eric Morro and fired

4   that gun.  And why did he take that gun and do it?

5   Because Eric Morro had the gall, ladies and gentlemen

6   of the jury, the gall to tell him to take his

7   gangbanging stuff someplace else away from little

8   kids, to take his gangbanging stuff away from a school

9   bus full of kids.

10          Ladies and gentlemen of the jury, the

11  judge is going to instruct you on the law in this

12  case.  He's going to instruct you that to sustain the

13  charge of first degree murder the State must prove the

14  following propositions:  That the defendant performed

15  the acts which caused the death of Eric Morro and that

16  when the defendant did so he intended to kill or do

17  great bodily harm to Eric Morro or he knew that his

18  acts would cause death to Eric Morro or he knew that

19  his acts created a strong probability of death or

20  great bodily harm to Eric Morro.

21          From the start of the case I think it's

22  been agreed that the only issue in this case is who

23  done it.  The law is pretty clear, you take a gun, you

24  put it to somebody's chest, you fire it, it's murder.

JIM03277

T-8

1   The only question here is did we prove, as the judge

2   has said on several occasions, beyond a reasonable

3   doubt that this little gangbanger right here pulled

4   that trigger.

5         I submit to you, ladies and gentlemen of

6   the jury, that we have proved it beyond a reasonable

7   doubt. And the way you know we proved it beyond a

8   reasonable doubt is by the four courageous witnesses

9   that walked into this courtroom, sat on this stand

10   right here, looked at that little Simon City Royal and

11   identified him as the man that pulled that trigger.

12         Larry Tueffel, a person who at the time

13   back in February of 1993 was in the same gang as him,

14   Larry Tueffel, who told you from that stand that he

15   was scared, Larry Tueffel who initially misled the

16   police but then later when the police went back and

17   when he thought about it and he realized his duty to

18   his friend, Eric Morro, that he realized that

19   misleading the police didn't keep the police from

20   eventually finding the killer in this case. He told

21   the police, yeah, it was T. J.

22         He went down, viewed a lineup of five

23   people, ladies and gentlemen, five people. That's the

24   lineup. 10:00 o'clock the next morning, not five

JIM03278

T-9

1   years later, 10:00 o'clock the next morning he walked

2   into Area Five, Violent Crimes, he looked at him and

3   four other people and he said, yes, this man right

4   here is the person who pulled the trigger.  Larry

5   Tueffel, who he told you he was scared, Larry Tueffel

6   who put his life at risk by identifying a fellow Simon

7   City Royal.  Larry Tueffel.

8           These, ladies and gentlemen, are the

9   defendant's words, these words show you his guilt:

10  "On this Saturday, on the 8th, I'm going to call John

11  Spaw.  I don't know if you remember him but he is the

12  one Royal who drives a motorcycle and lives on Kedzie.

13  I'm going to tell him to stop Larry from going to

14  court in any way he has to, even if he has to kill

15  him.  It won't mean a thing to me and it only takes

16  the pull of a trigger."

17          It only takes the pull of a trigger.

18  That is all it took for him on February 3rd of 1993

19  was the pull of a trigger.  And why?  Because as John

20  told you in his opening statement, this pride filled

21  Simon City Royal, his ego was bruised.  His pride was

22  hurt because somebody had the nerve to tell him to

23  take his gangbanging stuff somewhere else.

24          So as John told you in that opening

JIM03279

T-10

1  statement that pride turned to rage, a rage which

2  eventually fueled whatever it is inside of him that

3  fueled him to take that gun and place it on the chest

4  of Eric Morro and kill him in cold blood.  His words

5  tell you that those witnesses are telling you the

6  truth.

7          What else do you have besides Larry

8  Tueffel?  You have Mr. Torres.  Mr. Torres that night

9  when this first happens was sitting in a police car

10  with Larry Tueffel.  He initially doesn't tell the

11  police it was T. J.  Ask yourself why.  Ask yourself.

12  Put yourself, if it's possible, in that world.  You

13  witnessed a murder, you're sitting in the police car

14  with the killer's gangbanging friend, with somebody in

15  the same gang as the guy you just witnessed take a

16  gun, place it to the chest of a young man and pull

17  that trigger.

18          We're not here to judge the morality of

19  if it's ever okay to lie.  We're not here to judge

20  whether Mr. Torres had a right to do that but I submit

21  to you, ladies and gentlemen of the jury, that the

22  fear of God was in him.  I submit to you, ladies and

23  gentlemen, that it's perfectly reasonable after

24  witnessing a murder and sitting in a police car with

JIM03280

T-11

SA1103

1  the gangbanger's friend in the same gang, I submit to
2  you that most people would do the same thing, that
3  they wouldn't right away come forward, that it's
4  perfectly reasonable to do that, not only reasonable,
5  it's natural.
6          What do you think is going through
7  Torres' head?  What do you think he's thinking when
8  he's sitting in that police car?  He's thinking to
9  himself, man, I got the -- somebody in the same gang
10  is the killer sitting next to me and I'm supposed to
11  tell the police what happened?  But what does he do
12  later on that evening within hours?  He tells the
13  police, yeah, it was T. J.  It was T. J.
14          What else do you have?  Tina Elder, Tina
15  Elder who goes down to the police station the
16  following morning, who is eight months pregnant when
17  she witnesses her friend get murdered in cold blood,
18  who within hours goes down to the police station and
19  picks him out of a lineup.  And, ladies and gentlemen,
20  when you go back into that jury room look at that
21  lineup.  Take a close look at that lineup, at the five
22  people in that lineup.
23          She walks down, she had never seen him
24  before, she had no ax to grind against him.  Stop and

JIM03281

T-12

SA1104

1  think what is the motivation of a person in that

2  situation.  A person in that situation has one motive

3  and that motive is to get the person who did the

4  killing, to identify the right person.  Stop and think

5  about it.  Eric Morro was her friend.  If she's

6  identifying the wrong person that means she's letting

7  the real killer walk free.

8          She's got one motive in this case, one

9  motive, and that's to identify the person who did it

10  and that's what she did.  What did Sandra Elder tell

11  you?  Sandra narrows it down to two people.  Take a

12  close look at the two people she narrows it down to.

13  When you go back into the jury room take a close look

14  at it.  Those two people could pass as brothers.

15          What is Sandra Elder's motivation in

16  this case?  She witnessed a young man get killed who

17  she told you on the stand was like a stepson to her,

18  like a stepson who had been around her house since he

19  was a little kid who she watched grow up.  What is her

20  motivation other than to identify the person who did

21  it, than to get the person who killed someone very

22  close to her?  And again like Tina if she's going

23  after the wrong guy or somehow wants the wrong guy

24  that means she's letting the real killer of somebody

JIM03282

T-13

## **CERTIFICATE OF SERVICE**

     I hereby certify that on January 18, 2013, I electronically filed the attached with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


     s/ Jonathon D. Byrer
     JONATHON D. BYRER, Attorney