No. 12-2779

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

THADDEUS JIMENEZ,

Plaintiff-Appellee,

v.

CITY OF CHICAGO, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 09-cv-08081
The Honorable Matthew F. Kennelly, District Judge, Presiding

## SUPPLEMENTAL APPENDIX
## VOLUME 5 OF 5

STEPHEN R. PATTON
Corporation Counsel
 of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, Illinois 60602
(312) 744-0746

BENNA RUTH SOLOMON
 Deputy Corporation Counsel
MYRIAM ZRECZNY KASPER
 Chief Assistant Corporation Counsel
JONATHON D. BYRER
 Assistant Corporation Counsel
Of Counsel

# TABLE OF CONTENTS OF SUPPLEMENTAL APPENDIX

**Volume 1**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
    Report of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 1

**Volume 2**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1994),
    Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 288

**Volume 3**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
    Report of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 575

**Volume 4**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
    Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 841

**Volume 5**

*People v. Jimenez*, No. 93 CR 14710 (Ill. Cir. Ct. 1997),
    Report of Proceedings (continued) . . . . . . . . . . . . . . . . . . . . . . . . . . . SA 1106

1   very close to her go.

2           What do you have on the other side?  On

3   the other side you've got a series of alibi witnesses

4   and let's take a look at that.  There's -- I mean

5   sitting in this courtroom listening to the defense

6   case I mean it was like he was trying to paint a

7   Norman Rockwell picture.  This nice young man, I don't

8   know if you're familiar with it, there's actually a

9   painting, a young man, it's a classic, Norman

10  Rockwell, American classic, and it's got this -- in

11  the painting it's got this student studying by like

12  one of those lantern type lamps, you could tell it was

13  late at night, studying into the night, half eaten

14  apple on the table.  The whole gist of the picture is

15  here's this young man who is trying to make a better

16  life for himself.

17          So what does the defense paint for you?

18  What they paint for you, ladies and gentlemen of the

19  jury, is a young gangbanger's dream.  Here is this

20  little Simon City Royal at home in the hallway being

21  tutored by a high school drop out.  That was an all

22  American family, right?  Do you believe for a second

23  that Thaddeus Jimenez, Thaddeus Jimenez, who wrote

24  those letters, it only takes the pull of a trigger,

JIM03283

T-14

1    that he was home that night studying?  Not a chance.

2    That's a nice little touch added for you to make you

3    think that he's just this poor little kid, this poor

4    little kid yanked off the street.

5              I didn't do anything.  I was home

6    studying.  I was being tutored by my high school

7    drop out friend.  Ask my mom, my mom who doesn't tell

8    the police that her son was home with her, his sister

9    who doesn't run down to the police station the

10   following day and say, no, T. J. was with me.  All the

11   friends, they marched in here, none of whom went down

12   to the police and said, no, he couldn't have done it,

13   he was with me.  Stop and think about that.

14             Stop and think about what any person

15   would do if somebody in their family was wrongly

16   accused of murder and they knew that their brother,

17   their son or friend couldn't have done it because he

18   was home with them.  They'd be marching down to that

19   police station, they would be knocking down the doors.

20   If the detectives weren't talking to them they would

21   be asking to talk to supervisors, they would be doing

22   everything in their power to let them know that, no,

23   he couldn't have done it, he was home with us, anybody

24   would, anybody in their right mind.

JIM03284

T-15

1        Your kid was with you and now he's

2   accused of murder.  Your brother, the police come to

3   the house, grab your brother, accused of a murder when

4   he was sitting home watching TV or doing whatever with

5   you, with anybody.  I don't care what walk of life

6   you're from, I don't care what economic class,

7   education class, anything, anybody in that situation

8   would be down at the police station and they would be

9   raising holy hell.

10        There is no way anyone would let that

11  happen to somebody in their family if it was true, if

12  it was true.  The reason they didn't do that is

13  because they're lying to you.  They walked in their

14  and they're trying to save his butt and they lied to

15  you through their teeth and when you go back to that

16  jury room I ask you to think about that, if it was

17  family or a friend of yours who was with you when a

18  murder was committed what would your reaction have

19  been, what would anybody's reaction be?  Not to wait a

20  year and a half before you go to court and testify.

21        You heard from them.  Back in September

22  or October of '94, over a year and a half after was

23  the first time they walked in and testified.  They

24  didn't go to the police the next day or a week later,

JIM03285

T-16

SA1108

1   they didn't do it because it didn't happen.  That

2   against four witnesses, not one, not two, not three

3   but four people who witnessed this crime with no ax to

4   grind against the defendant, absolutely zero.

5          There's been nothing shown anywhere

6   because there is nothing that they would have any

7   motivation whatsoever to pin this case on him.  "You

8   know the rules.  If you shoot, you shoot to kill.  But

9   watch for mice or you will pay the price.  But don't

10  worry, I won't get caught."  Listen to that again.

11  "You know the rules.  If you shoot, you shoot to kill.

12  But watch for mice or you'll pay the price.  But don't

13  worry, I won't get caught."

14         Ladies and gentlemen, of the jury, he

15  lives by a different set of rules.  He lives by his

16  gang rules.  He lives by a set of rules that places

17  absolutely zero value on human life, a set of rules

18  that tells him you mess with me I'll kill you.  You

19  tell me to take my gangbanging stuff someplace else,

20  I'll kill you.  Those are his rules.

21         After we're all done the defense argues,

22  John argues, Judge Sacks is going to instruct you as

23  to a different set of rules, he's going to read you

24  the law and you're going to follow those rules.

JIM03286

T-17

1  Ladies and gentlemen of the jury, in following those
2  rules send a message to this man right here that in a
3  civilized society we live by the rules of laws.  Send
4  a message to him that, no, we do place value on human
5  life.

6       Send a message to him that his
7  gangbanging crap is not going to be tolerated, that
8  Eric Morro was right, that he shouldn't be out there
9  shooting off his gang signs and when somebody tells
10 him to take it someplace else he doesn't have the
11 right to take a human life.

12       If you look at the witnesses, ladies and
13 gentlemen of the jury, I submit to you, and you follow
14 the law as instructed by Judge Sacks, you look at
15 Sandra, Tina, Phil, Larry, all of whom performed a
16 very, very courageous act coming in here and
17 testifying and getting up on that stand and telling
18 you what happened, I submit, ladies and gentlemen,
19 that when you look at the evidence and you follow that
20 law you will have no choice but to find the defendant
21 guilty of the first degree murder of Eric Morro and
22 you should find him guilty and you should send a
23 message to him that we live under rule of law, not his
24 gang street crap.  Send a message to him that you're

JIM03287

T-18

1    not going to tolerate it.

2            THE COURT:   Thank you, Mr. Gaughan.

3    Mr. Charles Murphy.

4                    CLOSING ARGUMENTS

5                BY MR. CHARLES MURPHY:

6            Mr. Gaughan.  Mr. Murphy.  T. J.

7    Judge Sacks.

8            Good morning again, ladies and

9    gentlemen.  I submit to you that it would be best, it

10   would be wonderful, if you were somehow empowered as a

11   jury to undue things such as bring someone back to

12   life.  You're not so empowered.  There is absolutely,

13   positively no question, no debate, whether or not what

14   happened to Eric Morro was not only a crime, it was

15   horrible.  It should never happen.

16           You are not, ladies and gentlemen, to

17   act -- to carry out your function as jurors like

18   vigilantes or like avenging angels.  Your function is

19   entirely different.  Your function is to in a rather

20   dispassionate fashion, as best as you can, put aside

21   your prejudice, if you have any, put aside emotion and

22   be analytical.  Justice is served, of course, if you

23   do those things.

24           The suggestion seems to be, the

                                          JIM03288

                        T-19

1   undercurrent of the argument you just heard, that the

2   only way justice can be done is for you to go back

3   there, rush to judgment and convict my client.  Ladies

4   and gentlemen, I asked a question of each of you

5   during the jury selection process and I asked you

6   if -- I should say the judge asked you in my behalf if

7   you would be prejudiced by the fact that you would

8   hear testimony during the course of the trial that my

9   client belonged to a gang and each of you said no.

10  I'm reminding you of that.

11       My client is not on trial as a result of

12  the fact that when he was thirteen years of age he was

13  a Simon City Royal.  It's an important factor as to

14  why he's sitting over there but nonetheless each of

15  you said you would not be swayed by that fact and I

16  trust that you won't be.

17       I did ask each of you before you were

18  selected as a juror as to whether or not you would

19  give additional weight or credibility to the testimony

20  of a police officer simply because he was a police

21  officer.  Each of you said that you would not.  I'm

22  reminding you of that right now.

23       Mr. Gaughan in his argument frequently

24  referred to my client as a gangbanger, he kept saying

JIM03289

T-20

SA1112

1   it.  It's an apparent transparent attempt to inflame

2   your emotion.  What are the facts in this case?  The

3   central figure from the defense position is a person

4   by the name of Phillip Torres in this case.  I'll take

5   it step by step for you so you'll understand his

6   significance, his role, and what he did and why he did

7   it and whether or not you should put credibility in

8   what he says.

9              I would ask you not to do the following:

10  Don't transpose or transplant, if you will, your own

11  sense of ethics or morality into either Mr. Torres for

12  that matter or Larry Tueffel because I would assume

13  your own sense of ethics and morality would be much

14  better, much greater, much higher than theirs.  You

15  would hope that when you see someone who's been a

16  friend of yours, at least that's what he said, I'm

17  speaking of Phillip Torres, for eight years shot down

18  in the street in front of you at a minimum it would

19  anger you.  I asked him that question when he

20  testified.  He said, no, it didn't.  He's either a

21  liar when he says it didn't anger him or he's the

22  coldest fish I've ever come across.  It has to be one

23  or the other.

24             He said to you though -- He admitted to

JIM03290

T-21

SA1113

1    you that he's a liar.  He admitted to you that he's a

2    liar when he said I didn't come up with the name T. J.

3    right away nonetheless I knew T. J.  So he's admitting

4    to you that he's a liar when he says that.  When does

5    he start telling you the truth?  The prosecution's

6    twist on that is he starts telling the truth when he

7    says it's my client.  He says that at least initially.

8    He's placed in a squad car with Larry Tueffel and he

9    says that Tueffel tells him that he's wrong, it

10   couldn't be T. J., it was wasn't T. J. and he,

11   therefore, talks him out of reality with that

12   suggestion.

13        He got up here and he told you the

14   reason he didn't identify my client initially was

15   because he was afraid.  Nonetheless he admitted when

16   he first talked to the police investigator he didn't

17   say anything about being afraid.  What he did tell him

18   was, well, Larry Tueffel told me I was wrong.  That is

19   the lame explanation that he gave initially as to why

20   he was unable to provide the police investigators my

21   client's name, Tueffel talked him out of it.

22        In addition to that Larry Tueffel

23   testifies, he testified here in this courtroom that he

24   was sitting in the squad car with Phillip Torres and

JIM03291

T-22

SA1114

1   they had a little discussion then.  Well, you recall

2   the stipulation when I was reading to you from his

3   testimony at a prior trial one of those stipulations

4   was that he testified at the prior trial that his

5   first conversation with Phillip Torres wasn't in a

6   squad car, it was at the police station and it was

7   after he gave his statement, that's what he said at my

8   client's first trial.  He comes here and he's now

9   changing it, he's trying to change reality.  That's

10  serious business.

11          Undoubtedly you folks noticed that when

12  Victor Romo testified, that's the young man who was

13  convicted in Juvenile Court, he said the person he was

14  with, the person that he left at the scene of the

15  shooting, his name was Juan Carlos Torres.  Torres,

16  the same surname, the same last name as Phillip.

17  That's going to be important.

18          Mr. Gaughan didn't mention Victor.  I

19  would imagine that the suggestion will be when I sit

20  down, so I'm going to address it before I sit down, is

21  that when Victor Romo came here he had nothing to lose

22  by saying it wasn't my client, it was some other guy,

23  Juan Carlos Torres.  That argument, that suggestion

24  might have some merit but for the following, you know

JIM03292

T-23

1   that he testified at my client's first trial in 1994.

2   You know that he testified at his own trial, which was

3   in May of 1993.  And you heard no impeachment of

4   Victor Romo from the prosecution concerning

5   discrepancies that he gave in the past as contrasted

6   with what he said in this courtroom.  It's a safe bet,

7   ladies and gentlemen, that he named -- Victor Romo

8   named Mr. Torres, Juan Carlos Torres, as being the

9   person he was with the night Mr. Morro was shot.

10              But let's back it up even further, even

11  further.  You know that at some point shortly after

12  the homicide took place Romo talked with his own

13  father.  Now, he was a twelve year old child when this

14  event took place, a grammar school kid, undoubtedly

15  scared to death.  He demonstrated to you his own

16  motivation concerning his own self-preservation.  He

17  said that he began to run from the scene prior to the

18  shot being fired, you all heard him say that.  And you

19  know how much different that was from the other

20  testimony from other occurrence witnesses.  Yes, he's

21  demonstrated to you his desire to preserve himself.

22              What's his motivation to preserve him?

23  Well, there is none.  First of all he told you he

24  didn't even know my client when Mr. Morro was shot and

JIM03293

T-24

1    he met him sometime later, a couple months after the

2    shooting in the Audy Home, but he told you he talked

3    with his father shortly after it took place.   One

4    would think a little boy, a twelve year old boy who is

5    in a lot of trouble, although he may be willing to lie

6    to his dad about what he did has no reason to lie to

7    his dad about someone else.   As a matter of fact if

8    you're a little twelve year old boy and you're scared

9    to death and you're talking to your dad about the

10   shooting you will try and foist it off onto someone

11   else but you'd tell him who the someone else was.

12        And what did Romo's dad do after he

13   speaks with his son?   He in turn goes and he speaks

14   with Juan Carlos Torres in a restaurant.   They weren't

15   talking about the Bears prognosis for the future.

16   They were talking about the event that took place on

17   February 3rd, they had to have been.

18        You know that Mr. Romo, young Mr. Romo,

19   got arrested on the tenth day of February, seven days

20   after the shooting took place and I asked the

21   detective if after you arrested young Mr. Romo did you

22   then go look for Juan Carlos Torres.   He said yes.   I

23   wonder what the source of that information was as to

24   why he went looking for him.   The point, ladies and

JIM03294

T-25

SA1117

1  gentlemen, is this, Victor Romo has been consistent

2  from his father, to the police --

3      MR. GAUGHAN:  Objection.

4      THE COURT:  The jurors have heard the

5  evidence, they'll recall what the witnesses said.

6  Overrule.

7      MR. CHARLES MURPHY:  -- In two prior trials,

8  his own and my client's, in saying he was with a young

9  man who's name was Juan Carlos Torres.

10     Ladies and gentlemen, you're not going

11  to get a definition in these instructions as to what a

12  reasonable doubt is.  You're going to give it whatever

13  meaning, whatever life you choose.  I submit to you

14  that the testimony of Victor Romo constitutes a

15  reasonable doubt, a substantial doubt, an incredible

16  doubt as to my client's involvement in the shooting.

17     Victor Romo had no reason to help my

18  client, cover for my client, none.  He's the one that

19  told you that the young man, Juan Carlos Torres, had

20  black curly hair.  That's important too.  He told you

21  that Juan Carlos Torres was a little older than him.

22  He also told you he was a youngster like him.  I

23  believe he said that he was thirteen with curly hair.

24  That's important.

JIM03295

T-26

1    The power of suggestion can be rather

2    dramatic and we've seen several demonstrations of it

3    during the course of this trial in an effort to bring

4    home a point.  Detective Bogucki told you when he

5    testified in this case that Victor Romo when he saw

6    him at the police station had curly hair and then you

7    saw the photograph that was passed around, in fact

8    you've seen this twice.  He said this is a photograph

9    of a young man with curly hair, of course, you'll

10    decide that for yourself.

11    I'm suggesting to you it's a photograph

12    of a young man with straight hair.  You even saw the

13    kid sitting there on the witness stand, he's seventeen

14    now.  He doesn't have curly hair.  Why is that

15    important, curly hair?  Because initially when the

16    investigation first began the shooter was described as

17    having curly hair as well as certain other aspects to

18    his appearance, but curly hair.

19    Detective Bogucki wrote down in his

20    general progress report that he was told by Sandra

21    Elder that the shooter had Jeri Curls.  He has decided

22    four and a half years later that that's not what she

23    said, she merely said curly.  All right.  Take it

24    whichever way you like.  The shooter had curly hair.

JIM03296

T-27

SA1119

1    When these events were fresh and they happened quickly

2    then indeed here's what the description was, either

3    Jeri Curls or curly hair for the shooter. That's not

4    him.

5             You've seen the photograph of him in the

6    lineup. He doesn't have curly hair. He doesn't have

7    wavy hair. So who were they describing? Someone

8    else? Juan Carlos Torres. I asked Detective Bogucki

9    when he found this young man if he took a photograph

10   of him. He said no. I suppose, I wasn't there, you

11   weren't there either, I suppose he asked Mr. Torres if

12   he was involved in this and Torres said, no, I wasn't.

13   The detective told him to have a nice day and he left.

14            MR. GAUGHAN: Objection.

15            THE COURT: Overruled. If the jurors didn't

16   hear it they won't consider it. Overruled.

17            MR. CHARLES MURPHY: It would have been a

18   smart or a good thing, a proper thing to do if you're

19   a detective and you're acting in a dispassionate

20   fashion like Jack Webb did in Dragnet, you're just

21   trying to get the facts, if you would take a

22   photograph of this young man and show it to some

23   occurrence witnesses, I'm speaking of Tina Elder and

24   Sandra Elder, at least -- who had not yet admitted

JIM03297

T-28

1    that they were not liars to you like Mr. Tueffel and

2    Mr. Torres, show it to them, let them look, let them

3    see. But, no, that's not what he did.

4         I guess Detective Bogucki didn't notice

5    that Juan Carlos Torres had the same last time name as

6    Phillip Torres, the person who lied to you, the person

7    who you now know previously was convicted of selling

8    drugs. Possession with the intent to deliver, that

9    means he was selling drugs. He is not a credible

10   person by definition. He's a convicted felon.

11        He's a person that had been lying to you

12   and he told other lies when he testified during the

13   course of the proceedings such as he told you that

14   initially at 6:30 in the evening he told the police

15   investigator that he knew the person who did the

16   shooting, he just didn't know his name, and the reason

17   that he knew him is because he had seen him by his

18   mother's house. That is the testimony he gave at my

19   client's first trial.

20        I asked Detective Bogucki and I asked

21   Officer Ryan if they had any suspects in mind as a

22   result of their initial investigation, talking to --

23   Who are they talking to? Tueffel and Torres. And

24   they didn't. He denied that he made that testimony,

JIM03298

T-29

1   I'm speaking of Torres, at the first trial but he was

2   impeached with the stipulation that that's exactly was

3   he said at the first trial.  It's different.

4         I suppose, ladies and gentlemen, that

5   it's not important in this particular case because

6   some witnesses saw Eric take a swing, others didn't,

7   that's not the important thing in this case because

8   he, of course, is dead, that is important.  The next

9   thing concerning what's important is who did it.

10        You know from Tina's testimony that this

11   incident took place very quickly and that's

12   significant.  She said to you that it took about two

13   to three seconds and she was a distance of about

14   forty-five feet away from approximately that witness

15   stand to the exterior door to the courtroom,

16   artificial lighting, an exciting event to be sure, it

17   happened quickly.  Can mistakes in identification be

18   made when an event takes place that quickly?

19        The artificial lighting that we're

20   talking about, is that the same kind of lighting that

21   major league baseball players play under?  No.  Can

22   you read a book in it?  No.  It's dim.  So here's her

23   opportunity, she's underneath the window looking up,

24   talking with Torres and she hears something, something

JIM03299

T-30

1   off to her left.  She turns, one, two, three.  That's

2   it.  That's her opportunity at best to see the face of

3   the guy with the gun.  That's it.

4         What did her mother say?  She was in the

5   middle of the street, she was stopped by the traffic

6   that was coming by on Belmont, she was coming towards

7   her daughter, she was speaking to her daughter.  She

8   told you that she turned and what she saw was person

9   number two push Eric up against the wall and then the

10   person with the gun stepped in front of him and fired

11   a shot.  And I asked her was his back to you?  Yes.

12   Was her opportunity to make this observation limited

13   in the extreme?  Yes, it was.

14         Chronologically what transpires is this:

15   Mr. Tueffel, who knows my client, does not tell police

16   investigators that my client was involved in this.  He

17   comes to court, he says that my client was involved in

18   it.  Well, he's admitting that he's a liar.

19         At about 1:00 o'clock in the morning

20   Phillip Torres contacts the detectives in this case.

21   He has now gotten religion and he wants to tell them

22   that my client was involved.  Now, here's the

23   chronology and here's the background.  Juan Carlos

24   Torres is involved in this.  It is not merely a

JIM03300

T-31

1    coincidence that Mr. Torres has the same surname as

2    Phil Torres.  He's thinking if they catch the other

3    kid, that's Victor Romo, and he talks he's going to

4    hurt a family member of mine because he's going to say

5    it was Juan Carlos Torres --

6         MR. JOHN MURPHY:  Objection.

7         THE COURT:  Again, if the jurors heard the

8    evidence they'll consider it, if they didn't hear it

9    they won't consider it.  Overruled.

10        MR. CHARLES MURPHY:  So now he places a

11   telephone call.  He knows my client from the

12   neighborhood, the thirteen-year-old.  I finally was

13   able to get out of the mouth of the testimony of

14   Sandra Elder that she purportedly had seen my client

15   before in the neighborhood and she said about five

16   times.  Because it's so important that you understand

17   they, meaning Mr. Torres, Sandra Elder and Tina Elder,

18   all went to the lineup together, in their own personal

19   car.  They went together, that's critical.

20             It is absolutely correct that Tina Elder

21   and Sandra Elder wanted and do want to see the person

22   who shot and killed Eric Morro brought to justice but

23   it's also equally true that they want to help.  They

24   want to think they can help.  They want to think that

JIM03301

T-32

1    the testimony that they're giving is in the

2    metaphysical sense all true.  The power of suggestion

3    can be very, very compelling.

4              It was suggested to you, as I just

5    pointed out by Detective Bogucki that this is a

6    photograph of a young man who has curly hair.  That's

7    preposterous.  Detective Bogucki, he sought to

8    buttress the testimony of Larry Tueffel.  He had made

9    supplementary reports, he had made general progress

10   reports.  Here's what happens, Larry Tueffel denies

11   when he testifies that he is told by any police

12   officer what Phillip Torres had said before he changed

13   his story.  So I put Detective Bogucki on the witness

14   stand to ask him some questions about his own

15   supplementary report and the language that he wrote

16   down in it.  I quoted it to him.

17             Doesn't it say, I asked him, that the

18   reporting detective then informed Tueffel of what

19   Torres had said?  Yes, that's what it says, but that's

20   not what he did he says.  He said all I asked him was

21   T. J. did it, didn't he?  He also sought to buttress

22   the testimony of Tueffel by contradicting his on

23   report the second time on the same page.

24             Larry Tueffel told you that he

JIM03302

T-33

1   recognized the second person.  He named him as being

2   Victor and he told the detectives about it right away,

3   yet in the report that was prepared by Detective

4   Bogucki he admitted that the second person was merely

5   described as a male white Hispanic.  He decided, he

6   told you, that he was not going to include the

7   significant information in his supplementary report

8   for reasons that are absolutely unknown to any of us.

9            His job is to record the information as

10  he gets it and he chooses not to include it.  I asked

11  him, all right, if you didn't put it in your

12  supplementary report did you write it down on the

13  general progress notes, did you at least do that?  And

14  Tueffel told you a kid by the name of victor who he

15  knew from school was involved?  He said, no, I didn't

16  do that either.

17            I asked him did you take Larry Tueffel,

18  if this was truthful information, did you take Larry

19  Tueffel back to the school, the Linne School any time

20  between the 3rd day of February and the 5th day of

21  February to go look for this kid who he says he knew

22  from school?  No, he didn't.  A good detective would

23  have done just that.  He didn't have a second suspect

24  in custody and if he was told by Larry Tueffel where

JIM03303

T-34

1   the second suspect could be found then he would be out

2   there looking for him at the Linne School with Larry

3   Tueffel, but he didn't do it. I wonder if that's

4   truthful.

5          In regard to the initial descriptions

6   that were given by individuals who wanted to help

7   desperately then -- an individual I should say who

8   wanted desperately to help then, who still does,

9   Sandra Elder. She told you that she informed the

10  initial beat officers, that was Officer Ryan and

11  Officer Whiteman, that the gunman, that suspect, is

12  someone she had seen in the area about five times

13  before.

14         Now Officer Ryan testified that he said,

15  no, she didn't tell him that but he also said that he

16  didn't ask her. Well, I don't understand the

17  significance of that response because she said he's

18  the person she told. I also asked Bogucki did Sandra

19  Elder tell you that she had seen the person who is the

20  shooter in the neighborhood before. He said no.

21  That's important information. It didn't occur.

22         I asked Sandra Elder if she described

23  the gunman as having curly hair or Jeri Curls. She

24  said that she had not. She had. The progress reports

JIM03304

T-35

SA1127

1   that were taken by Detective Bogucki before my client

2   was arrested indicated that she said exactly that, he

3   had curly hair, in fact Jeri Curls.

4           In addition I asked Sandra if she knew

5   what a Duke starter jacket was. She said that she

6   did. I asked her if she described the shooter or the

7   offender as wearing a Duke starter jacket or a Duke

8   coat. She said she had. You know what the

9   description was that was given by her. It was a blue

10   nylon waist-length jacket, that's what it was. She

11   didn't say a Duke coat. She didn't say curly hair.

12           She's trying, when she goes to the

13   lineup, to describe -- to pick out someone from the

14   lineup who she essentially saw the back of his head

15   because after the single shot was fired the two men

16   ran and they ran away from her, not toward her.

17           The power of suggestion. This is a

18   photo of a man with curly hair? No, it isn't. Yet it

19   was suggested to you from the witness stand and other

20   suggestions could easily have been made and I submit

21   to you they were made in the lineup by Phillip Torres

22   in an effort to cover for someone. He took advantage

23   of two people who wanted to help desperately, Sandra

24   and Tina Elder.

JIM03305

T-36

SA1128

1              My client, when he was thirteen and

2      hanging around Sacramento and Belmont apparently

3      thought he was being cool doing this crap.  He set

4      himself up for this.  Sandra knew who he was, she had

5      seen him.  Tina is her daughter.  Phil Torres lives

6      right there at the corner.  Tina has been his friend

7      for twenty years.  My client hangs out on that corner.

8      By the time they get to the lineup it's now my client

9      and the Duke starter jacket.  That is information that

10     was not provided initially by Sandra Elder.  That is

11     not information --

12             MR. GAUGHAN:  Objection.

13             THE COURT:  Again the jurors heard the

14     evidence, they'll recall what the witness testified

15     to.  Overruled.

16             MR. CHARLES MURPHY:  The notes that are taken

17     from her description are a blue nylon jacket,

18     waist-length.  That's what it was.  The ride to the

19     police station the topic of discussion was who did it.

20     Now, it's a Duke jacket and now it's my client.

21             The person who had the reason to lie, to

22     make it up, to fabricate it, the person who saw from

23     the third floor window someone that he knew, not my

24     client, shoot Eric Morro, the suggestion, it was

                                   JIM03306

                            T-37

1    bought, it was bought by two people who wanted to help

2    but two people who did not have a good opportunity to

3    observe, who saw something happen in an instant, who

4    saw something happen that was quite exciting to be

5    sure, it was dramatic, but it happened in an instant,

6    artificial lighting.

7         You were told by Officer Ryan that he

8    spoke at the scene to Tueffel and he spoke with Phil

9    Torres and he told you that they essentially said the

10   same things in their descriptive information other

11   than the fact one guy said it was a purple coat and

12   the other guy said it was blue, that's what he said.

13   And then in Redirect Examination the prosecution asked

14   him what the descriptive information was from those

15   two men: Number one, the shooter, five four, five

16   five, male white Hispanic, thirteen to fourteen, curly

17   black hair, wearing a purple jacket with yellow

18   lettering.

19        Well, if Officer Ryan's recollection is

20   correct as to what the dispute was between these two

21   men then I guess that's all accurate information

22   except he left out the word blue, but the word Duke

23   doesn't appear here and whatever color jacket it was

24   that the shooter was wearing, whether it be purple or

                                        JIM03307

                            T-38

1    blue, apparently both these men described it as having

2    yellow lettering.

3          The coat that my client wore in the

4    lineup is a Duke coat and it's blue and it's white.

5    So Mr. Torres and Mr. Tueffel initially both said the

6    offender had curly black hair and you know that Sandra

7    Elder told Detective Bogucki the first time that she

8    talked with him the shooter had Jeri Curls or curly

9    hair.  Whoever they're talking about, they're not

10   talking about him.

11         There was other impeachment that I read

12   to you in the stipulation regarding prior different

13   testimony given by both Mr. Tueffel and Mr. Torres.

14   It would be an appropriate thing for me to do, to

15   concede that at least as to immaterial or irrelevant

16   aspects of their testimony after four and a half years

17   they might make some mistakes yet when the mistakes

18   are so significant, so dramatic, can we attribute it

19   to merely a passage of time?

20         For example Tueffel said at this trial

21   that Eric Morro took a swing at the person who turns

22   out to be Victor Romo.  When he testified at Victor

23   Romo's trial, you know by way of stipulation from the

24   court reporter's notes he said that he swung at my

JIM03308

T-39

1     client.  That's different.  It's important, not a

2     small insignificant detail.

3            He told you, meaning Larry Tueffel, that

4     my client had a gun in his hand at the time that

5     Victor Romo was bringing up the topic about money that

6     was owed to this person Leo, whoever he might be, yet

7     Tina Elder told you that when she turned and she

8     looked to her left the man who she identified as being

9     my client didn't have anything in his hand and she

10     told you she could see his hands.

11            Giving Tina the benefit of the doubt it

12     happened quickly, but so quickly that it does

13     significantly impair her ability to accurately make an

14     identification.  Yes, she wanted to help, so did her

15     mother and they unfortunately drove down to the police

16     station in the same car with Phillip Torres before

17     they saw my client in the lineup, my client who

18     doesn't have curly hair, my client who is wearing a

19     jacket that is not purple, that doesn't have yellow

20     lettering.

21            This young man, Victor Romo, in all

22     likelihood merely demonstrated his inclination for

23     self-preservation by trying to take himself out, but,

24     ladies and gentlemen, there is no inclination of

JIM03309

T-40

1    self-preservation for him to take my client out,

2    someone that he didn't even know.

3          It is very apparent I suggest to you

4    that Victor Romo has been consistent all throughout

5    this investigation from the time he talked to his

6    dad --

7          MR. GAUGHAN:  Objection.

8          THE COURT:  Again the jurors heard the

9    evidence, they'll recall what the witnesses testified

10   to.  Go ahead, please.

11         MR. CHARLES MURPHY:  Thank you.  The young

12   man told you from the witness stand that he talked to

13   his father and that he and his father went to a

14   restaurant where Juan Carlos Torres was, that's what

15   the testimony was.  Then the testimony that he gets

16   arrested and he talks to the detective, then the

17   detective tells you he goes looking for Juan Carlos

18   Torres and then Victor Romo tells you, he testifies at

19   his own trial, he tells you, he testified at my

20   client's first trial, he testifies at this trial, he

21   says it's Juan Carlos Torres.

22         If it's Juan Carlos Torres of course a

23   terrible injustice can occur if my client is convicted

24   of this crime.  Follow the law.  You said that you

JIM03310

T-41

SA1133

1   would.  It is not a technicality in our system of

2   government that the prosecution have the burden of

3   proof beyond a reasonable doubt.  The concept is a

4   simple one.  The concept is this, innocent people

5   should not be convicted of crimes because it's a

6   terrible injustice for it to occur.  That's what our

7   system is about.  It's important.  It's not a

8   technicality.

9           There is ample doubt in the facts of

10   this case, significant doubt in the facts of this case

11   about my client's guilt.  To so readily dismiss the

12   alibi witnesses as being liars is not to give any

13   credit at all to those people who told you that they

14   had testified on prior occasions yet they weren't

15   impeached with any inconsistent statements they had

16   given in the past.

17           If you can imagine if you were unjustly

18   arrested this morning at 5:00 a.m. and taken down to a

19   police station for a murder that was committed

20   somewhere in the city at 6:30 last night, God help you

21   if your alibi witnesses are going to be family

22   members.  You may well have been home last night and

23   you couldn't have committed the crime but God help you

24   if that's who was there with you, family and/or

JIM03311

T-42

1    friends.

2    Mr. Gaughan alluded to the letters that

3    my client had sent out to his then girlfriend, letters

4    that clearly were designed for her eyes only and they

5    are, according to the prosecution, indicative of my

6    client's guilty frame of mind. These are letters

7    don't forget that were written by a thirteen-year-old

8    for the eyes only of his then girlfriend.

9    He wrote in one of the letters an

10   incredible tale. He speaks of having marijuana

11   available to him in the Audy Home, that he's bribing

12   some correctional officer over there by giving him one

13   marijuana cigarette and he also gets to drink beer

14   while he's sitting there in the Audy Home and he also

15   gets food from outside. It's in the letters too.

16   I asked Elizabeth to read to you a

17   section from the letter my client had written to her

18   on October 23rd and she read it to you. Let me remind

19   you what it was that she read, it's an admission by my

20   client that he's exaggerating. "As for drugs it's

21   impossible to sneak drugs up here. So how can someone

22   sell me reefer. Anyway I've been reading books about

23   reefer and I decided never to use drugs again. And

24   just in case you don't know we have to take drug tests

JIM03312

T-43

SA1135

1  every three weeks and just to let you know if they

2  found drugs in my system I'll catch a drug case.  So

3  the drug tip is also out of mind.  I just told you all

4  that bullshit about smoking and selling reefer just to

5  make you think I was really pretty straight up in

6  here, taking care of business.  Like I said before, no

7  more drugs for me.  I haven't smoked weed in ten

8  months.  I was just lying like before.

9              If someone had in fact tried to hurt

10 Larry Tueffel that would be corroborative of this crap

11 in the letter but that never happened.  Mr. Gaughan

12 read a passage to you where my client says in the

13 letter about a guy whose name is John Spaw, the guy on

14 the motorcycle, and he's going to call him on the

15 phone and ask him to do away with Larry.  Well, he

16 might as well confess to the warden.  Penal

17 institutions have pay phones, they are monitored and

18 listened to.

19       MR. JOHN MURPHY:  Objection.

20       THE COURT:  The jurors will only consider the

21 evidence that they heard.  If they didn't hear it they

22 won't consider it.  Overruled.  Go ahead.

23       MR. CHARLES MURPHY:  No person by the name of

24 John ever did anything to Larry Tueffel or attempt to

JIM03313

T-44

SA1136

1    do anything to Larry Tueffel.  My client, of course,

2    knew that his then girlfriend knew Larry.  There is no

3    indication, there's no suggestion at all in these

4    letters, any one of them, that Elizabeth should go

5    talk to Larry in his behalf and tell him stay away

6    from court.  It's not there.  There is no admission by

7    my client at any time in any letter that he had

8    anything to do with the shooting of Eric Morro.

9            It would be the understatement of the

10   year I suppose for me to suggest to you that my client

11   was disappointed in Larry Tueffel.  It doesn't make a

12   damn bit of difference you understand if you're guilty

13   as hell or as innocent as the driven snow to be angry

14   with Larry Tueffel under the circumstances.  Obviously

15   if you're guilty he's someone that you knew, someone

16   that you were a gangbanger with.  You're angry with

17   him for that reason.  Alternatively if he's coming to

18   court and he's lying against you you're just as mad

19   with him for the very same reason, but only he's

20   lying.

21           These letters are not indicative of what

22   the prosecution wants you to glean from or take out.

23   If my client is homicidal, Tueffel has got to be dead,

24   Sandra has got to be dead, Tina has got to be dead

JIM03314

T-45

1    they've all got to go.  The only person he was

2    displeased with, and surely he was, is Larry Tueffel.

3    It's just as reasonable for you to glean from that is

4    he's angry with Tueffel, someone he knows is lying.

5         A lie, of course, will get a life of its

6    own.  Once you tell it it keeps on going.  It would

7    have been much better had Detective Bogucki not told

8    Larry Tueffel what Phillip Torres had told him, that

9    would have been much nicer.  It's clear that Tueffel

10   is a liar, he admitted it to you.  It's clear Torres

11   is a liar, he admitted it to you.  What is the truth?

12        You came here last Tuesday with your

13   heads held high concerning what you were going to do

14   if you were selected as a juror.  You may not have

15   wanted to be selected but you got selected and you're

16   going to be leaving here at the conclusion of this

17   case wanting to feel the same way.  I would suggest to

18   you that you should be as conscientious in the

19   performance of your duties as you would want some

20   stranger to be who sat in judgment of one of your own

21   if those circumstances would ever come to pass.  Be

22   that conscientious.

23        Yes, ladies and gentlemen, justice can

24   be served by signing a not guilty verdict when the

JIM03315

T-46

SA1138

1  evidence is so unclear and on the other hand the

2  witness who has never been impeached in terms of his

3  inconsistencies, unlike the State's witnesses,

4  Mr. Torres and Mr. Tueffel, Victor Romo has been

5  consistent in telling you who he was with, a curly

6  haired teen-ager whose name was Juan Carlos Torres.

7  I'd ask you to go back there to deliberate and then

8  come back out here and sign a not guilty verdict.

9  Justice will have been served.

10      THE COURT:  Thank you, Mr. Charles Murphy.

11  Mr. John Murphy.

12      MR. JOHN MURPHY:  Thank you, your Honor.

13          CLOSING ARGUMENTS

14      BY MR. JOHN MURPHY:

15      Ladies and gentlemen, we agree with the

16  defendant when he says to you that you should consider

17  this evidence dispassionately, that you should not

18  rush to judgment and we would encourage you to look at

19  all the evidence in this case and consider all the

20  evidence you heard in this trial.  Do that.  We want

21  you to do that.

22      And we elicited evidence in this case,

23  brought it to your attention that there was -- the

24  fact that the defendant was a member of the Simon City

JIM03316

T-47

SA1139

1    Royals, a member of a street gang in the City of

2    Chicago, and that wasn't brought out to make him look

3    bad or to dirty him up.  That was brought out because

4    it served two purposes in this case.  Number one, it

5    was the motive for why the crime occurred, that was

6    the reason he shot Eric Morro.  And it became more

7    important later in this case because it became the

8    conduit under which he tried to eliminate and kill one

9    of the witnesses in this case, when he tried to use

10   the Simon City Royals when he was in custody in jail

11   to do his bidding for him.  That's why gang membership

12   in this case is important, not just to dirty him up

13   and make him look like a bad guy.

14           Let's talk about those letters, ladies

15   and gentlemen.  These are letters that the defendant

16   sent to one of the people he cared about most,

17   Elizabeth Heatley, a person he confided in.  And those

18   letters are written in his own words and his own

19   printing and they're critical in this case, they're

20   critical because they go to a very important factor in

21   consideration for you and that is called consciousness

22   of guilt, consciousness of guilt.

23           And you'll be instructed by Judge Sacks

24   what consciousness of guilt is.  And you will be able

JIM03317

T-48

1  to consider those letters, ladies and gentlemen, as

2  they relate to his involvement in the murder of Eric

3  Morro.

4        What does a person who is wrongfully

5  accused of a murder say?  What does a person who is

6  wrongfully accused of a murder say to someone to whom

7  he has an intimate relationship or with whom he has an

8  intimate relationship?  What does a person who is

9  wrongfully accused of a murder say to someone with

10  whom he has an intimate relationship shortly after he

11  is arrested, shortly after he is charged and while he

12  is in custody?

13        You would expect, ladies and gentlemen,

14  emotions like surprise, shock, disbelief.  Did you

15  sense any of those emotions or find any of those

16  emotions in the letters that he wrote?  Did you find

17  those emotions that you would expect from a person who

18  did not commit a murder?  You would expect in those

19  letters to hear questions to somebody who he confided

20  in, for her ears only, questions like why am I here?

21  What's this about?  Why are people saying I did it?

22  Why is my friend, Larry Tueffel, my fellow gang

23  member, saying I did it?  But you don't hear those

24  questions.  You don't see those questions.

JIM03318

T-49

SA1141

1          Look at those letters, read those

2    letters.  There's nothing like that in the letters he

3    wrote in the months after he was charged while he was

4    in custody.  Anger?  Absolutely understandable,

5    absolutely understandable if he didn't commit the

6    crime that he's charged with, but anger is one thing.

7    What the defendant expressed in his letters went way,

8    way beyond anger.

9          I'd like to go through the excerpts of

10   some of those letters, ladies and gentlemen, because

11   what you heard in this trial was the letters in their

12   totality, in their entirety.  What I'd like to do, if

13   I can, is indicate to you the excerpts that relate to

14   what he thought of Larry Tueffel and what he thought

15   of this case and while I go through those excerpts two

16   things I'd ask you to consider and one is in response

17   to a comment that the defense made.  They said, well,

18   all the witnesses in this case should be dead if what

19   he said in there is true.

20          Larry Tueffel, he should be dead, Sandra

21   Elder she should be dead.  But you know what, ladies

22   and gentlemen?  There is a little corroboration for

23   Larry Tueffel.  And Larry Tueffel told you, and this

24   was in response to questions on Cross-Examination by

JIM03319

T-50

1    Mr. Murphy, that he had been chased while he was out

2    there on the street.  So there is some corroboration

3    here that the Royals were acting on his behalf, but

4    when you consider those letters the focus is on him,

5    not whether people were willing to do or not do what

6    he wanted, on what he wanted, the focus is on him and

7    his state of mind.  Consciousness of guilt.

8         And the other thing we'd ask you to

9    consider and it's a question I'll pose to you, when

10   you hear these excerpts I pose this question, are

11   these the comments of an angry man who is in custody

12   wrongfully charged with a murder or are these the

13   comments of a killer who wants to eliminate a witness,

14   the only witness he knows to the murder he committed

15   even if it means killing him.

16        The February letter of 1993:  "So I hear

17   the Royals are looking for Larry.  You see I got

18   connections in and out of jail."  Right there he

19   admits that he is the person who contacted the Royals

20   and he's trying to make this happen.

21        The March letter of 1993:  "So Danny

22   tried to hook you up with Larry.  I got something

23   special for him and for Larry.  You better see him

24   while you can because he won't be living very long.

JIM03320

T-51

1    On second thought stay away from him.  He's bad news.

2    The Royals are supposed to be looking for him.  It

3    looks like I'll have to kill him myself since the

4    Royals won't.  He's lucky he's living now but as I

5    told my cousin -- but I told my cousin not to kill him

6    because he's my problem.  As soon as I get out Danny's

7    pussy ass will be going to Larry's wake.  You know the

8    rules, if you shoot, shoot to kill.  But watch for

9    mice or you'll pay the price.  But don't worry, I

10   won't get caught."  Three times he refers to the death

11   of Larry Tueffel.

12       .. Another letter from April of 1993:

13   "Danny now says that Larry didn't get shot.  I think

14   that Danny is lying because this time mom told me she

15   heard something like Larry getting shot.  If he did,

16   good for him, but if he didn't I'll be out soon."  He

17   thinks he's dead now and he's expressing his

18   satisfaction over the fact that Larry Tueffel is dead.

19       Another letter from April:  "Oh, yeah, I

20   didn't get to tell my mom, I didn't tell my mom to lie

21   to you," and you is underlined.  "I told her to say I

22   was out of jail to see if everyone just -- out of jail

23   to everyone just to see if anyone come looking for me

24   and see if anyone tries to light me up like they did

JIM03321

T-52

SA1144

1  Larry.  He deserved it."

2         May, 1993, the last letter that you

3  heard when she testified on Direct:  "Oh, yeah, they

4  told me that Larry did not get shot and he's still

5  testifying against me.  So on the 20th I want you to

6  call my grandmother's house and see what happened.

7  Here's the number, 583-2279.  The reason why I gave

8  you my grandma's number is because my mom broke her

9  phone and she ain't got a new one yet."

10         And later in the same letter:  "On this

11  Saturday, on the 8th, I'm going to call John Spaw.  I

12  don't know -- I don't if you remember him but he's the

13  one Royal who drives the motorcycle and lives on

14  Kedzie.  I'm going to tell him to stop Larry from

15  coming to court in any way he has to, even if he has

16  to kill him.  It won't mean anything to me and it only

17  takes the pull of a trigger."  That's pretty chilling

18  stuff.

19         And at one point during

20  Cross-Examination the question posed to Elizabeth

21  Heatley was, well, he didn't say that he killed Eric

22  Morro, did he, in those letters?  No, he didn't say

23  that in those letters.  But he doesn't have to admit

24  in those letters, ladies and gentlemen, that he killed

JIM03322

T-53

SA1145

1    Eric Morro for these statements to be used as evidence

2    of consciousness of guilt because that's what they

3    are.

4                What is enough for consciousness of

5    guilt, ladies and gentlemen?  Is it enough that he

6    just wanted to stop Larry Tueffel from coming into

7    court?  Is it enough that he wanted to stop him from

8    coming into court and that he wanted him dead?  Is it

9    enough that he wanted to stop Larry Tueffel from

10   coming to court and that he contacted other members of

11   the Simon City Royals to stop him so that he would in

12   fact kill him?

13               Is it enough that the defendant wanted

14   to stop Larry Tueffel from coming to court, that he

15   expressed satisfaction when he believed that he had

16   been killed?  Is it enough, ladies and gentlemen, that

17   the defendant wanted to stop Larry Tueffel from coming

18   to court so badly that when he thought members of the

19   Simon City Royals would not do his bidding that he

20   would have to kill him himself when he got out?

21               He wanted to stop Larry Tueffel from

22   coming to court.  He wanted him dead.  He wanted the

23   Simon City Royals to kill him.  He believed the Simon

24   City Royals had killed him at one point.  When he

JIM03323

T-54

SA1146

1    learned they hadn't he wanted to kill him himself when

2    he got out.

3              Now, the defense said to you he was just

4    writing to his girlfriend, he was just writing to his

5    girlfriend.  Are we to assume here that he was trying

6    to impress his girlfriend?  Is that the spin that's

7    put on this by the defense?

8              Well, how do you impress your

9    girlfriend?  Flowers?  Dinner?  Treating her with

10   great respect, good conversation, telling her about

11   trying to kill a witness to a murder you committed,

12   which one of the above doesn't fit?  Which one of the

13   above?  And if he's trying to impress his girlfriend

14   and these are just words to show her what a big guy he

15   is, why does he go through the trouble of giving her

16   his grandmother's phone number to call to confirm

17   whether or not John Spaw is dead -- Excuse me.

18   -- Larry Tueffel is dead.  He goes an extra step

19   because he wants to find out what's going on because

20   he really believed that Larry Tueffel was going to be

21   killed and he wanted him to be killed.

22             Murdering a witness, if that isn't

23   evidence of consciousness of guilt then what is, what

24   is?  The defendant in this case has reduced this case

JIM03324

T-55

1    to a simple question and Mr. Gaughan made reference to

2    it earlier as did Mr. Murphy earlier in this trial and

3    that is it's a whodunit.  Was the defendant

4    responsible for what occurred on February 3, 1993 and

5    if that is true, if we are to assume that the defense

6    in this case is correct then there's two inescapable

7    conclusions that can be drawn, that is either the

8    witnesses in this case are mistaken and/or there's a

9    conspiracy to set up the defendant for a murder that

10   he did not commit.

11           Well, let's look at those two

12   possibilities and see what we have here.  The

13   witnesses are mistaken about him being here, either

14   some of them or all of them.  Well, we've got

15   witnesses in this case, four witnesses from different

16   walks of life.  Larry Tueffel, a member of the same

17   gang the defendant was in in 1993, Phil Torres a

18   person who is convicted of a felony, a person who was

19   or is a user of marijuana, Sandra Elder and Tina Elder

20   a mother and a daughter not on the fringe of trouble

21   like Phil and Larry.  Really these witnesses are a

22   cross section of the people from the area where this

23   crime occurred at Sacramento and Belmont in February

24   of 1993 and they had all different relationships with

JIM03325

T-56

1    the defendant.

2          One was a fellow gang member, another

3    knew him well enough to know him by name, a third had

4    seen him a few times around the neighborhood but

5    didn't know him and a fourth had never seen him at all

6    and they all were given a chance to view the lineup,

7    and interestingly enough they all picked him out.  And

8    some obviously knew who he was and was it just to

9    confirm he's the person who did this like Phil and

10   Larry and then others it was more of a test like Tina.

11         Tina looks at five people, and we can

12   talk up and down about the lighting, we can talk up

13   and down about looking at the back of his head.  Well,

14   actually he was coming towards the victim first before

15   the shooting occurred and then he ran the opposite

16   direction, but the fact is she picked him out out of

17   five people.  A person who does not know him picked

18   him out.

19         So we've got three identifications,

20   Phil, Larry, Tina and we've got a fourth in which

21   Sandra gets it down to two people.  So what are we to

22   assume here, that this is a case of mistaken identity?

23   He must be one of the unluckiest guys in the world,

24   that's what it must be because all these people are

JIM03326

T-57

SA1149

1    either -- And we'll get into the conspiracy aspect.

2    If they're not conspiring to convict him or identify

3    him then they're all ironically just mistaken and they

4    happen to pick him out as the person who is the

5    shooter in this case.

6         But if it's not a case of mistaken

7    identify then the other alternative, if you're to

8    believe what the defense is telling you here, is this

9    is some kind of conspiracy and there were some

10   references to that in this particular case, some

11   references by the defense that as they went to the

12   police station, Phil and Sandra Elder, that somehow

13   something would have happened that would have caused

14   that to occur and that's kind of curious because

15   particularly with respect to Tina, Tina doesn't even

16   know this guy, doesn't even know what he looks like,

17   that somehow she could be told something in a car and

18   she would then be able to go in and recognize who this

19   person is among five other individuals who are

20   standing in the lineup.

21        But the idea is that in fact the

22   witnesses in this conspiracy were intentionally lying,

23   intentionally trying to set up the defendant for this

24   murder.  Well, first, ladies and gentlemen, what is

JIM03327

T-58

SA1150

1  the motive?  What is the motive to frame the

2  defendant?  Now, we hear in the closing in this

3  particular case that somehow we're supposed to assume

4  that because Juan Carlos Torres, who they claim is the

5  person who committed this crime, has the same last

6  name that Phil Torres does that they're related and

7  we're supposed to go through all the maneuvering and

8  speculation and think that therefore if we assume

9  that's true that Phil would want to cover up and that

10  if Phil would want to cover up for him then he would

11  be able to persuade these other three witnesses, the

12  gang member, the mother, the daughter, some of them

13  who know him and some of them who don't, to all lie to

14  protect somebody who we don't even know is really

15  related to him.  It's absurd, it ridiculous.  It's not

16  evidence.  There's no evidence.

17      Phil Torres told you, because he brought

18  it up in opening, he's not related to this person Juan

19  Carlos Torres.  The name Torres is a common name, it's

20  like Jones, it's like Smith, it's like Murphy, there's

21  a lot of them around.  But more importantly, ladies

22  and gentlemen, there is no evidence that any of the

23  other witnesses in this case had any motive, any

24  motive to want to implicate the defendant.

JIM03328

T-59

SA1151

1          Sandra, Tina, Larry Tueffel what motive,

2   what ax do they have to grind with him that they would

3   falsely accuse him of a crime, falsely accuse him of a

4   murder?  And if this is a conspiracy, if this is a

5   conspiracy, consider the relationships they had to

6   Eric.  They all knew Eric.  Larry and Phil knew him on

7   the street, although there's no evidence they were

8   close to him at all, but more importantly Tina and

9   Sandra knew him well, they loved him.  He lived in

10  their home.  He called Sandra mom, she was like his

11  second mom.  Tina was like his sister.

12          And Dave mentioned this before, but why

13  if they thought somebody else killed Eric Morro or if

14  they weren't even sure if he was the guy why would

15  they come in here and testify that he was the guy who

16  did it?  Why would Tina do that?  Why would Tina

17  identify him in court?

18          But if this is a conspiracy, and I made

19  reference to this before, how does Tina pick him out?

20  How does she pick him out?  Are the police part of it?

21  Were they going to give her hints as to who the person

22  is because she's able to pick him out or was Tina

23  lying about a relationship with him?  And there's

24  absolutely no evidence of that at all, none.  But if

JIM03329

T-60

SA1152

1    she's lying about a relationship to the defendant, in

2    fact she knows him better than she says, if that's the

3    case then wouldn't you expect if she knows him that

4    well that her mom would know him as well and be able

5    to pick him out in the lineup as she did?

6         Because you know what, ladies and

7    gentlemen?  Ironically in this case, and maybe

8    thankfully in this case, something happened when

9    Sandra Elder viewed the lineup, she could not pick the

10   defendant out.  She could not pick him out and that's

11   important for a number of reasons in retrospect, one

12   is it blows this conspiracy thing right out of the

13   water because if this is a conspiracy mom should be

14   picking him out too but she's not.  She's being

15   honest, she's looking at that lineup and she can't

16   say.  And if mom and Tina know this guy or have the

17   ability to pick him out from some preexisting

18   relationship how come mom can't do it?

19        And it shows the integrity of the lineup

20   procedure and process.  And you know, ladies and

21   gentlemen, if this is a conspiracy, if this is a

22   conspiracy to falsely implicate the defendant of all

23   people why would you pick out a local gang member?  I

24   mean if you're going to pick somebody out pick out a

JIM03330

T-61

1    patsy.  Don't pick out a local gang member when you're

2    living in the neighborhood.

3         And is this also a conspiracy to

4    implicate Victor Romo?  I mean there's no doubt Romo

5    admits he's there, he said that when he testified and

6    we know that because Larry Tueffel is the only witness

7    who said that he saw him there.  And the defense makes

8    a big deal about when Victor Romo's name came up, but

9    the fact is we know Victor Romo was there because he

10   said he was there.

11        But you know what, ladies and gentlemen?

12   Victor Romo denied he was involved, he denied he was

13   involved in the killing.  Are all the eyewitnesses

14   lying about that too?  What is the motive for them to

15   say that the other person who was with the defendant

16   struck Eric Morro?  They don't even know him.  Sandra

17   doesn't know him.  Tina doesn't know him.  Phil Torres

18   doesn't know him.  What is their motive?  It's a big

19   conspiracy.  That's nonsense.  Or coincidentally,

20   ironically it's just a big mistake and he

21   unfortunately was identified.

22        Well, ladies and gentlemen, none of

23   those are true.  He was out there, he did the killing,

24   he was identified by witnesses as it happens in many

JIM03331

T-62

SA1154

1    cases. Now, the defendant -- And they talked about

2    him in closing, put a lot of stock in Victor Romo, the

3    testimony of Victor Romo, Mr. Fix It Romo. He comes

4    in and he tries to take everyone off the hook. He's

5    not arrested first of all, ladies and gentlemen, until

6    seven days after this occurs. And you heard

7    Detective Bogucki say he was looking for him and went

8    to his house two days earlier. So he has time, he's

9    out there on the street, he knows that the police are

10    looking for him and he knows that his day is coming.

11          The defendant makes a big deal of his

12    father, of Victor Romo's father. Well, if he's so

13    important where is he?

14          MR. CHARLES MURPHY: Objection. Objection.

15          THE COURT: The objection will be sustained.

16    The jury is to disregard that comment, where is he.

17    Each side can call whatever witnesses they wish. Go

18    ahead, Mr. Murphy.

19          MR. JOHN MURPHY: I'm not trying to shift the

20    burden here, ladies and gentlemen. We're not trying

21    to shift the burden in this particular case but

22    there's no evidence here about anything regarding

23    victor Romo's father, anything.

24          MR. CHARLES MURPHY: Objection again.

JIM03332

T-63

1    THE COURT:  The jurors have heard the

2  evidence.  I sustained the previous objection.  Go

3  ahead, Mr. Murphy.

4    MR. JOHN MURPHY:  There's no evidence about

5  what he heard.

6    MR. CHARLES MURPHY:  Objection, your Honor.

7    THE COURT:  Overruled.  Go ahead.

8    MR. JOHN MURPHY:  Contrary to the

9  implications the defense wants you to make with

10  respect to Victor Romo's father there are three

11  reasons, ladies and gentlemen, when you consider the

12  testimony of Victor Romo that what he said in this

13  courtroom was an out and out pack of lies.  Number

14  one, the story doesn't make sense.  Despite the fact

15  he's standing right in a group just before the

16  shooting occurred he tells you he doesn't know what

17  the conversation is about.  That's pretty interesting

18  because in reality he's the person who initiated the

19  conversation.  He's the one who starts talking about

20  Leo, owing Leo money, to distract the victim before

21  the shooting occurred, trying to protect himself.

22    He tells you that he didn't know or he

23  was surprised or it seemed unusual that Eric would

24  just up and hit Juan Carlos Torres, the person he said

JIM03333

T-64

1   he was with and he even tried to give you some

2   explanation by saying something about drugs, which we

3   know isn't true because the medical examiner testified

4   there were no drugs or anything in his system like

5   that, but the reason he says that is because he is the

6   person who shoved Eric into the wall which resulted in

7   the swing.  So in his attempt to take himself out he's

8   left with for some reason I can't understand or

9   explain he just up and swung at the person I was with,

10  Juan Carlos Torres.

11          He testifies that he runs away from

12  Honey Baked Ham, he fled, and he kept going.  He never

13  called for help.  He never even, though he thought his

14  friend had been shot, he never did anything to help

15  him.  That doesn't make since.  But what we know in

16  reality is he was just involved in the murder of Eric

17  Morro and he fled just like offenders do flee from

18  crimes that they're involved in.

19          Reason number two that Victor Romo is

20  lying and lied here in this court, he won't admit the

21  truth about his role in this killing.  He won't admit

22  his involvement.  He claims that he knew nothing of

23  the gun which the person who was with him had.  He

24  claims he wasn't even there when the shot went off.

JIM03334

T-65

SA1157

1    And we're to assume, well, he testified before, he

2    testified consistently.  Well, you know what ladies

3    and gentlemen?  You saw him walk up here in this

4    courtroom, you saw him walk up here in street clothes.

5    His case was over.  What is his motive to take himself

6    out now when he testified here in this trial?  What is

7    it?  But he continues to try to take himself out.

8           Reason number three, he doesn't want to

9    implicate the guy he's with because that's part of his

10   role in this case, take himself out and take out the

11   other guy.  Juan Carlos Torres is a straw man, he's a

12   person who was built up to be knocked down.

13           You know, when Romo testified, and at

14   first it seemed striking that he would come in here,

15   he didn't testify that Juan Carlos Torres, this person

16   he claims he was with, committed the murder, he didn't

17   say that.  What he did was he tried to give him a

18   self-defense.  He said we walked up, the guy hits him,

19   Eric Morro is eighteen years old, this is a young guy,

20   Juan Carlos Torres is twelve or thirteen, whatever age

21   he was, that he pulls a gun in response and shoots.

22   He's trying to give him a self-defense, which is

23   totally inconsistent with the evidence in this case.

24           The defendant puts a lot of stock in

JIM03335

T-66

1    Victor Romo, puts a lot of stock in his testimony, but

2    where is the reliability?  Are we supposed to believe

3    what he told you?  Does the oath mean anything to him?

4    His account doesn't make sense.  He takes himself out

5    and continues to try and take himself out even when he

6    has no reason to later.

7         He takes the defendant out, puts

8    somebody else in and then takes that person out,

9    that's Victor Romo.  How much truth is there in his

10   testimony?  And while we're on the subject let's talk

11   about curly hair.  You look at that picture and if you

12   can say looking at that picture that Victor Romo

13   didn't have curly hair I submit that it's impossible

14   looking at that picture.

15        Larry Tueffel when he described the

16   offenders in this case in the initial stages of the

17   investigation told you this was fiction, he made up

18   people, he made up people to protect the gang member,

19   the fellow gang member he was with.

20        Sandra Elder; Sandra Elder was in a

21   hospital, she was upset, perhaps the detective

22   misunderstood her but the point is there is somebody

23   out there with curly hair, so it's not out of the

24   blue.

JIM03336

T-67

SA1159

1    And Phil Torres, and this came out in

2  Cross-Examination of Mr. Murphy, testified the

3  individual had spiked hair, which is consistent with

4  the way he looked with the side cuts and the hair on

5  top.  And the defense comes back to you when Victor

6  Romo testified and said you had a chance to see him

7  when he testified here.  He didn't have curly hair.

8  Well, you know, his head was shaved.  So what does

9  that tell you?  That doesn't tell you anything.

10    The defendant wants you to believe that

11  Juan Carlos Torres is the person who committed this

12  crime, not him.  And, ladies and gentlemen, I'm not

13  trying to shift the burden when I pose this question

14  to you but where is he?  Where is he?  The defendant

15  and us, we're equals in this courtroom, we have the

16  same subpoena power.  Torres was not involved in this

17  crime.  The defense is bringing Torres into this case,

18  not us.  Bring him on if you think he did it.

19    How convenient it is to point the finger

20  at a person who is not here.  When you consider the

21  testimony of the alibi witnesses in this case, when

22  you consider the testimony of the eyewitnesses in this

23  case clearly either one group is either lying or what

24  they said is not true.  And there's fundamental

**JIM03337**

T-68

1    differences between these witnesses as groups. One of

2    the differences is the time between the event that

3    they say they're testifying about and the time that

4    they came forward to describe it in any meaningful

5    kind of way.

6          In this particular case the eyewitnesses

7    acted like witnesses. As much as you want to jump up

8    and down about Larry Tueffel he acted like a witness

9    who is a member of the same gang. He didn't want to

10   get involved. Larry Ryan talked about that when he

11   testified, he was trying to walk away, and then he

12   lied to protect his fellow gang member.

13         Phil Torres, and you have heard his

14   demeanor described, I can't recall what the exact word

15   was, nervous, he tried to walk away a number of times.

16   Officer Ryan said he had to bring him back. He acted

17   like a witness nonetheless.

18         Sandra Elder gave her name to the

19   police, went to the hospital with somebody she cared

20   about and talked to him. And Tina Elder let it be

21   known that she was a witness and came in and viewed

22   that lineup. And each of these people were

23   interviewed and they gave accounts of what they saw

24   and those accounts were documented before they had

                                        **JIM03338**

                        T-69


SA1161

1    time to fabricate and make things up together as a

2    group.

3         Now, what we have on the other side are

4    the alibi witnesses, the alibi witnesses.  The first

5    time any of them testified in court was approximately

6    a year and a half later.  Between that time none of

7    them went to the police station.  Mom said she went to

8    the police station and told the police officer,

9    Detective Bogucki, but you heard him testify although

10   she did talk to him she never said word one about the

11   fact that she was with her son, that he was

12   supposedly -- at the time he was supposedly with her.

13        And the other witnesses in any

14   meaningful way what they had to say could not be

15   tested until a year and a half later and they never

16   went to a police station, never came to the state's

17   attorney's office, never did anything as Dave said you

18   would expect them to do.  I don't care if they're

19   family members, ladies and gentlemen, fine.  But you

20   know what, ladies and gentlemen?  They didn't do the

21   other things, the other things that you would expect

22   the alibi witnesses to do.

23        And another thing that reflects on the

24   testimony particularly of the mother of the defendant

JIM03339

T-70

SA1162

1   in this case, an alibi witness who was offered to show

2   where he was, and that is the conversation she had

3   with Elizabeth Heatley, the conversation she had with

4   Elizabeth Heatley in late October or early November.

5   This is a woman who says that she wants the truth to

6   be known.  This is a woman who is testifying on behalf

7   of her son and yet she told Elizabeth Heatley

8   something about violating the law because letters were

9   turned over.

10         MR. CHARLES MURPHY:  Objection.  That's not

11   what she said.

12         THE COURT:  Again, the jurors have heard the

13   evidence, there's twelve of them, they've got their

14   notebooks, they'll recall what the witnesses testified

15   to.  Overruled.  If they didn't hear it they won't

16   consider it.  Go ahead.

17         MR. JOHH MURPHY:  Ladies and gentlemen,

18   you've heard the testimony.  You heard what Elizabeth

19   Heatley said the mother told her when she talked on

20   the phone and what she told her about you must be

21   involved in a gang because what she was trying to do

22   those months later was protect her son and try to

23   cover up the statements that he made in those letters.

24         The defendant makes much of the

JIM03340

T-71

SA1163

1   impeachment that he described in this case.  Well,

2   ladies and gentlemen, let's talk about the

3   impeachment.  A lot of the impeachment in this case

4   came as result of the statements that were made by

5   Larry Tueffel.  Larry Tueffel deliberately misled the

6   police, he deliberately made up fictional characters

7   which he described to the police, and there's no

8   question about that, there was never any question from

9   the beginning of this trial when he got up there on

10  the witness stand he said that right off the bat but

11  nonetheless the paper was there based on what he said

12  and a lot of questions came as a result of that.

13       Phil Torres did not tell the police that

14  he knew who this person was right off the bat, and

15  that's something we also talked about.  Phil Torres

16  saw the other gang member saying he's not the person,

17  the person who is down the street closer to him, but

18  within a matter of hours Phil Torres did call the

19  police and gave him the name but nonetheless the

20  paperwork as a result of what Phil Torres did not do

21  had already been created.

22       It's not surprising in situations

23  like -- with witnesses like Larry Tueffel and Phil

24  Torres did what they did and said what they said in

JIM03341

T-72

1    the early stage of this investigation.  These are the

2    people that live in that neighborhood.

3            The defendant also says you should find

4    him not guilty because of the other impeachment in

5    this case.  And we agree, we agree that the witnesses

6    did not testify consistently time and time and time

7    again.  They didn't say exactly the same things time

8    after time, after time, but does that mean they're

9    lying?  Does that mean they're not telling you the

10   truth about being out there on the street, about

11   seeing what they saw, about their identification of

12   the defendant as the person who pulled the trigger?

13           Four eyewitnesses in this case, ladies

14   and gentlemen, four.  And let's look at the chronology

15   of events that occur.  February 3, 1993, the killing

16   occurred, on that day and on the next day they talked

17   to the police, one set of statements.

18           Three months later, May of 1993 some

19   testify in Juvenile Court.  A year and seven months

20   later, September of 1994, they testify again in a

21   court in this building and four years and nine months

22   later they testify again in this courtroom.  Almost

23   five years later they testify.  Let me ask you all a

24   question.  Take an event in this trial, the testimony

JIM03342

T-73

1    of Phil Torres, if I asked each of you to

2    individually, not together but individually, to

3    describe what Phil Torres said would everything that

4    you say be identical to one another?  Absolutely not.

5    Absolutely not.  Because people focus on different

6    things and the differences between you as you sit here

7    and them, those people who testified, is they were out

8    in the street living their lives, they weren't

9    anticipating or waiting for something to happen they

10   were going to have to go to court and think about,

11   unlike you who were sitting there waiting for the next

12   witness to hear what's going to be said.

13          Let me take it a step further.  If we

14   were to take four, any four jurors, and ask you to

15   come back, come back three months from now and tell us

16   what Phil Torres said, not knowing you were going to

17   be coming back but come back and testify or tell us

18   what he said, do you think what you said three months

19   from now would be identical to what you would say

20   today?

21          And if we were to ask you to come back a

22   year and seven months from now and again do the same

23   thing or to come back four years and nine months from

24   now and again do the same thing do you think that your

**JIM03343**

T-74

SA1166

1    account would be perfectly consistent time after time,

2    after time?  Absolutely not.

3            The fact that people may have forgotten

4    some of what occurred, that's human nature.  The fact

5    that people may have filled in some of the details,

6    that's human nature because we've got people coming in

7    here almost five years later trying to tell you about

8    an event that they saw in 1993.

9            Let's contrast that with the defendant's

10   witnesses, the alibi witnesses.  Did you get the

11   impression when you heard their testimony, ladies and

12   gentlemen, there was some kind of script?  Donna

13   Whitley, she remembered on February 3, 1993 that at

14   4:55 p.m., 4:55, she got off the bus to go to the

15   defendant's house and she remembered at 6:45 p.m. that

16   she left to go out with the defendant's mother and

17   another person.  She didn't remember when she came to

18   court when Mr. Gaughan was asking her.  She couldn't

19   remember whether it was in Juvenile Court right

20   afterwards or whether she went to adult court but she

21   remembered the times, 4:55 and 6:45, almost five years

22   ago.

23           Victoria Jimenez, the mother, 4:30 the

24   defendant came in, 6:45 she left.  Edward Mendrys,

JIM03344

T-75

SA1167

1    6:05 he got to the house.  He remembers they were

2    studying math and social studies.  He doesn't remember

3    anything about what they were studying, the subjects,

4    but he remembers math and social studies.  Angela,

5    4:00 o'clock to 4:30 he arrived.  These people are

6    giving you specific times that they say they

7    remembered five years ago almost.  Does that sound

8    like it's scripted or what?

9              You have to evaluate that and that's why

10   bias is important, that's why their bias is important,

11   they remember details like that and yet some of them

12   don't remember when they went to court.  Angela didn't

13   remember what month she went to court but she

14   remembers 4:00 or 4:30 on February 3, 1993.  But you

15   know what, ladies and gentlemen?  These witnesses are

16   like all witnesses in criminal cases in this respect

17   and there's one constant and that is the defendant,

18   the defendant is the person who selects his witnesses.

19             We didn't select the witnesses in this

20   case, the defendant did.  He made that decision who

21   his witnesses would be when he pulled the gun, pointed

22   the gun at Eric Morro and pulled the trigger on

23   February 3, 1993 on Sacramento and Belmont.  These

24   people are a slice of life on Sacramento and Belmont

JIM03345

T-76

SA1168

1    that's what they are.  They're not professionals,

2    they're regular people.  They're people from that

3    neighborhood.  They're not professional witnesses.

4           They came in here and they told you as

5    best they could what they saw and what they heard as

6    they have before, but he comes to you and says find

7    him not guilty, find him not guilty because of that.

8    What we have presented in this case, ladies and

9    gentlemen, is four eyewitnesses, three have identified

10   the defendant as the person who pulled the trigger.

11   Three of the four described his jacket.  Sandra

12   described it as blue.  Phil described it as blue and

13   white.  Larry described it as blue and white after he

14   was confronted with the fact that it was T. J. that

15   was the offender and that was corroborated when the

16   police went to his house later and found the blue and

17   white Duke jacket.

18          Their descriptions of the way the crime

19   occurred was corroborated by the medical examiner.

20   They all said that the gun was on or close to the

21   chest of Eric Morro and the medical examiner said that

22   based on his examination of the body there was

23   evidence of close range firing.  And their

24   descriptions of the offender, the defendant, as the

JIM03346

T-77

SA1169

1    person who pulled the trigger was corroborated by the

2    letters he sent which showed the consciousness of

3    guilt.

4            In conclusion, ladies and gentlemen,

5    killers come in all shapes and sizes and ages.  In

6    this particular case we have a defendant who is

7    thirteen years old at the time of the crime going on

8    thirty, but in this case you had unique insight into

9    the heart, the soul and mind of a stone cold killer

10   because that's what he is.  And in those letters you

11   could easily understand why the defendant could kill

12   so easily, why life means so little to him.  The

13   witnesses have testified, you have the letters, you

14   have the evidence, we ask you to find the defendant

15   guilty.

16           THE COURT:  Thank you, Mr. Murphy.

17           Members of the jury, the evidence and

18   arguments in this case have been completed.  I now

19   will instruct you as to the law.

20           The law that applies to the case is

21   stated in these instructions and it is your duty to

22   follow all of them.  You must not single out certain

23   instructions and disregard others.

24           It is your duty to determine the facts

JIM03347

T-78

1   and to determine them only from the evidence in this

2   case.  You are to apply the law to the facts and in

3   this way decide the case.

4          Neither sympathy nor prejudice should

5   influence you.

6          From time to time it has been the duty

7   of the court to rule on the admissibility of evidence.

8   You should not concern yourselves with the reasons for

9   these rulings.  You should disregard questions and

10  exhibits which were withdrawn or to which objections

11  were sustained.

12          Any evidence that was received for a

13  limited purpose should not be considered by you for

14  any other purpose.

15          You should disregard testimony and

16  exhibits which the court has refused or stricken.

17          The testimony which you should consider

18  consists only of the testimony of the witnesses and

19  the exhibits which the court has received.

20          You should consider all the evidence in

21  the light of your own observations and experience in

22  life.

23          Neither by these instructions nor any

24  ruling or remark which I have made do I mean to

JIM03348

T-79

1    indicate any opinion as to the facts or as to what

2    your verdicts should be.

3              Faithful performance by you of your

4    duties as jurors is vital to the administration of

5    justice.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03349

T-80

1          Only you are the judges of the

2  believability of the witnesses and of the weight to be

3  given to the testimony of each of them.  In

4  considering the testimony of any witness you may take

5  into account his ability and opportunity to observe,

6  his memory, his manner while testifying, any interest,

7  bias or prejudice he may have and the reasonableness

8  of his testimony considered in the light of all the

9  evidence in the case.

JIM03350

T-81

1    Opening statements are made by the
2 attorneys to acquaint you with the facts they expect
3 to prove.  Closing arguments are made by the attorneys
4 to discuss the facts and circumstances in the case and
5 should be confined to the evidence and to reasonable
6 inferences to be drawn from the evidence.  Neither
7 opening statements nor closing arguments are evidence
8 and any statement or argument made by the attorneys
9 which is not based on the evidence should be
10 disregarded.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

JIM03351

T-82

1          Those of you who took notes during trial

2     may use your notes to refresh your memory during jury

3     deliberation.

4          Each juror is to rely on his or her

5     recollection of evidence.  Just because a juror has

6     taken notes does not necessarily mean that his or her

7     recollection of the evidence is any better or more

8     accurate than the recollection of a juror who did not

9     take notes.

10         When you are discharged from further

11    service in this case your notes will be collected by

12    the deputy and destroyed.  Throughout that process

13    your notes will remain confidential and no one will be

14    allowed to see them.

15

16

17

18

19

20

21

22

23

24

JIM03352

T-83

1          The defendant is charged with the

2     offense of first degree murder.  The defendant has

3     pleaded not guilty.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03353

T-84

1          The indictment in this case is the

2     formal method of accusing the defendant of an offense

3     and placing him on trial.  It is not any evidence

4     against the defendant and does not create any

5     inference of guilt.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03354

T-85

1        The defendant is presumed innocent of

2    the charge against him.  This presumption remains with

3    him throughout every stage of the trial and during

4    deliberations on the verdict and is not overcome

5    unless from all the evidence in this case you are

6    convinced beyond a reasonable doubt that he is guilty.

7        The State has the burden of proving the

8    guilt of the defendant beyond a reasonable doubt, and

9    this burden remains on the State throughout the case.

10    The defendant is not required to prove his innocence.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03355

T-86

1     Circumstantial evidence is the proof of

2  facts or circumstances which give rise to a reasonable

3  inference of other facts which tend to show the guilt

4  or innocence of the defendant.  Circumstantial

5  evidence should be considered by you together with all

6  the other evidence in the case in arriving at your

7  verdict.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03356

T-87

1          The believability of a witness may be

2     challenged by evidence that on some former occasion he

3     made a statement that was not consistent with his

4     testimony in this case.  Evidence of this kind

5     ordinarily would be considered by you only for the

6     limited purpose of deciding the weight to be given the

7     testimony you heard from the witness in this

8     courtroom.

9          However, you may consider a witness's

10    earlier inconsistent statement as evidence without

11    this limitation when the statement was made under oath

12    at a proceeding or the witness acknowledged under oath

13    that he made this statement.

14         It is for you to determine whether the

15    witness made the earlier statement and, if so, what

16    weight should be given to that earlier statement.  In

17    determining the weight to be given to an earlier

18    statement you should consider all the circumstances

19    under which it was made.

20

21

22

23

24

JIM03357

T-88

SA1180

1          Evidence that a witness has been

2    convicted of an offense may be considered by you only

3    as it may affect the believability of the witness.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03358

T-89

1          Evidence has been received that the

2     defendant has been involved in conduct other than that

3     charged in the indictment.

4          This evidence has been received on the

5     issue of the defendant's consciousness of guilt and

6     may be considered by you only for that limited

7     purpose.

8          It is for you to determine whether the

9     defendant was involved in that conduct and, if so,

10    what weight should be given to this evidence on the

11    issue of the defendant's consciousness of guilt.

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03359

T-90

1          When you weigh the identification

2     testimony of a witness you should consider all the

3     facts and circumstances in evidence, including, but

4     not limited to the following:

5          The opportunity the witness had to view

6     the offender at the time of the offense;

7                    or

8          The witness's degree of attention at the

9     time of the offense;

10                   or

11         The witness's earlier description of the

12    offender;

13                   or

14         The level of certainty shown by the

15    witness confronting the defendant;

16                   or

17         The length of time between the offense

18    and the identification confrontation.

19

20

21

22

23

24

JIM03360

T-91

1          A person commits the offense of first

2     degree murder when he kills an individual -- Let me

3     start that again.

4          A person commits the offense of first

5     degree murder when he kills an individual if, in

6     performing the acts which caused the death,

7               he intends to kill or do great bodily

8     harm to that individual;

9                         or

10              he knows such acts would cause death to

11    that individual;

12                        or

13              he knows that such acts create a strong

14    probability of death or great bodily harm to that

15    individual.

16

17

18

19

20

21

22

23

24

JIM03361

T-92

1      To sustain the charge of first degree

2  murder the State must prove the following

3  propositions:

4      First:  That the defendant performed the acts

5  which caused the death of Eric Morro; and

6      Second:  That when the defendant did so he

7  intended to kill or do great bodily harm to Eric

8  Morro;

9                    or

10     he knew his acts would cause death to

11  Eric Morro;

12 - - - - - - - - - - - - - or - - - - - - - - - -

13     he knew that his acts created a strong

14  probability of death or great bodily harm to Eric

15  Morro.

16     If you find from your consideration of

17  all the evidence that each one of these propositions

18  has been proved beyond a reasonable doubt, you should

19  find the defendant guilty.

20     If you find from your consideration of

21  all the evidence that any one of these propositions

22  has not been proved beyond a reasonable doubt, you

23  should find the defendant not guilty.

24

JIM03362

T-93

SA1185

1       When you retire to the jury room you

2   will first elect one of your members as your

3   foreperson.  He or she will preside during

4   deliberations on your verdict.

5       Your agreement upon a verdict must be

6   unanimous.  Your verdict must be in writing and signed

7   by all of you, including your foreperson.

8       The defendant is charged with the

9   offense of first degree murder.  You will receive two

10  forms of verdicts.  You will be provided with both a

11  not guilty and guilty form of verdict.  From these two

12  verdict forms you should select the one verdict form

13  that reflects your verdict and sign it as I have

14  stated.  Do not write on the other verdict form.  Sign

15  only one verdict form.  The verdict forms read as

16  follows:

17

18

19

20

21

22

23

24

JIM03363

T-94



1          We, the jury, find the defendant,

2     Thaddeus Jimenez, not guilty of first degree murder.

3     There's a line for the signature of the foreperson,

4     eleven lines for the other jurors.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03364

T-95

1      We, the jury, find the defendant,

2  Thaddeus Jimenez, guilty of first degree murder.

3  Again a line for the signature of the foreperson,

4  eleven lines underneath that for the other eleven

5  jurors.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03365

T-96

1          When you go back to the jury room to

2     deliberate you'll be given a copy of the instructions

3     that I just read to you, you'll also be given the

4     various exhibits which we determined you should have

5     back there for your deliberations. Whenever it is

6     that you reach a verdict you can knock on the door and

7     let the sheriff know, if there's a buzzer back there

8     you can do the same thing.

9          I'm not attempting to encourage

10    questions or discourage questions. If it happens

11    during the course of deliberations you have a question

12    you think we can perhaps answer for you put it on

13    something, on a piece of paper, the sheriff will

14    direct it to me, I'll discuss it with the attorneys

15    and see if we can answer the question.

16          As I said before I'm not trying to

17    encourage questions or discourage them, if you happen

18    to have any we'll deal with them if there are any.

19          Will the sheriffs please stand and raise

20    your right hands.

21               (Deputy sheriffs sworn.)

22          The one alternate, if you would step

23    down, ma'am, you can go back and get your belongings

24    and step back out here, please.

JIM03366

T-97

1             Do you have everything now?

2        ALTERNATE JUROR:  Yes.

3        THE COURT:  Miss Dozier, you can take them

4  back.  We'll bring them back the instructions and

5  exhibits in a few minutes.

6                (Jury excused to deliberate

7                  upon its verdict.)

8        THE COURT:  The court is going to take a ten

9  minutes recess -- Never mind.  We'll do it now.

10       MR. CHARLES MURPHY:  Judge, I strongly

11  suggest to this court reversible error, if there is a

12  conviction, took place in the State's closing

13  argument.  What I'm referring to is the incredibly

14  improper reference to the fact that Ezequiel Romo, the

15  father of Victor Romo, didn't testify in these

16  proceedings.

17         You will undoubtedly recall, sir, that

18  the reason he didn't come to this courtroom and

19  testify is because in essence the prosecution was

20  successful in persuading you in keeping him off the

21  witness stand, that's the reason.

22         Judge, if you were to agree with me that

23  this could be reversible error, if we can change it

24  around slightly and look to the instances where a

JIM03367

T-98

1    defense attorney would inappropriately stand up in

2    closing argument and say, well, you didn't hear any

3    evidence about the gun being recovered as a result of

4    a successful motion to quash and suppress or if the

5    defense attorney said, well, you didn't hear anything

6    about my client's confession when that's a result of a

7    successful motion to suppress that invites a fair and

8    appropriate response by the prosecution in rebuttal to

9    it whether or not any such testimony was heard at the

10   trial.

11        I'm suggesting to the court that the

12   jurors be brought back out and that I be given the

13   opportunity now to make a fair and appropriate

14   response to that incredibly improper argument that the

15   jurors should take some sort of adverse reflection or

16   inference as a result of Mr. Victor Romo's father not

17   being in this courtroom.

18        THE COURT:  I think there was an objection

19   made and sustained at the time the argument was made

20   by Mr. John Murphy at the time.  The jurors were

21   properly instructed that the State has the burden of

22   proof beyond a reasonable doubt.  The defendant is not

23   required to prove his innocence.  They were told that

24   numerous times before trial, even during trial

JIM03368

T-99

1    occasionally and finally just a few minutes ago and

2    the request to have them called back out for

3    additional rebuttal -- surrebuttal argument by the

4    defense is denied.

5         MR. JOHN MURPHY:  Judge, may I put something

6    on the record at this point?

7         THE COURT:  Yes.

8         MR. JOHN MURPHY:  Your Honor, first of all

9    the court, as I understand, did not rule that the

10   father could not testify.  The court ruled that the

11   contents of the conversation could not be directed to

12   Mr. Torres.  The defense could have called the father.

13   What the defense did in this particular case was

14   intimate to this jury that a conversation -- not only

15   intimated, indicated a conversation occurred and

16   intimated what the conversation was about in his

17   closing argument.  I believe this is invited comment.

18        THE COURT:  I think Mr. Charles Murphy

19   suggested what the conversation was between Torres,

20   not Phil Torres, the other Torres, and the father by

21   going into it numerous times as to what happened

22   thereafter, which is proper to do, but the clear

23   import from that is that Torres told the father

24   something that the jurors did not get to hear based on

JIM03369

T-100

1.   my previous ruling, which I think is still correct.

2.         The defense's motion to bring the jurors

3.   back out for additional surrebuttal argument is

4.   respectfully denied.  Anything else?

5.         MR. CHARLES MURPHY:  Yes.  In regard to the

6.   exhibits that are going back.

7.         THE COURT:  Yes?

8.         MR. CHARLES MURPHY:  I had suggested when we

9.   were last here Friday without the court reporter that

10.   the exhibit that I used, which was the October 23rd

11.   letter, be confined to the --

12.         THE COURT:  Right.

13.         MR. CHARLES MURPHY:  As a result of the

14.   argument the prosecution made to the jurors that none

15.   of the letters to my client indicated his innocence in

16.   any fashion, well, in the balance of that same letter

17.   there is such an indication so I now want the entire

18.   letter to go back.

19.         THE COURT:  All right.  The whole thing, the

20.   letter will go back.  What is it, exhibit number

21.   something for the State, the October '93 letter?

22.         MR. CHARLES MURPHY:  October 23rd.

23.         THE COURT:  We'll go over the instructions

24.   when I come out.  I've be out here since 9:00 o'clock

JIM03370

T-101

1    straight.  The court is in recess until 11:30.

2                    (A brief recess was taken.)

3        THE CLERK:  People versus Jimenez.

4        THE COURT:  In the case of Thaddeus Jimenez

5    at 11:50, give or take a minute or two, the jury wrote

6    a question, certainly less than earth shattering

7    significance.  Judge, can we order out for food?  It

8    merely says foreman.  I think that's -- The lawyers

9    have agreed it's okay.  Correct, State?

10        MR. JOHN MURPHY:  Yes.

11        THE COURT:  Correct, defense?

12        MR. CHARLES MURPHY:  Yes.

13        THE COURT:  I'll merely put down yes and I'll

14    send the note back.

15                    (Other cases were called

16                     and heard.)

17        THE CLERK:  Thaddeus Jimenez.

18        THE COURT:  This is the instructions.  We

19    went over these Friday afternoon in chambers but we

20    didn't get a chance, since it was late, to put the

21    discussion about the instructions on the record, so we

22    can do that at this point.  I'll just go over the

23    State's instructions and then the defense instructions

24    and each side can tell me their position about it

                                JIM03371

                        T-102

1    again and I'll indicate my ruling on it again.

2              People's Instruction No. 1 is I.P.I

3    1.01, there's no objection to that, right, Mr. Murphy?

4              MR. CHARLES MURPHY:  That's right.

5              THE COURT:  People's Instruction 2, I.P.I

6    1.02, no objection to that either?

7              MR. CHARLES MURPHY:  That's correct.

8              THE COURT:  People's Instruction No. 3, which

9    is I.P.I. 1.03, no objection to that either?

10             MR. CHARLES MURPHY:  Correct.

11             THE COURT:  People's Instruction No. 4,

12    I.P.I. 1.05, there's no objection to that either,

13    correct?

14             MR. CHARLES MURPHY:  Correct.

15             THE COURT:  People's Instruction No. 5,

16    I.P.I. 2.01, there was an objection because it only

17    includes the crime of first degree murder and you

18    would offer an instruction, which we'll talk about

19    later, on second degree murder.  So you objected to

20    that particular instruction?

21             MR. CHARLES MURPHY:  Yes.

22             THE COURT:  That instruction, No. 5, I.P.I.

23    2.01 is given over the defense objection.  As the

24    court indicated in the conference the court sees no

                                        JIM03372

                        T-103

1    basis in this case for any second degree murder

2    instructions.

3           People's Instruction No. 6, I.P.I. 2.02,

4    there was no objection to that, correct, Mr. Murphy?

5           MR. CHARLES MURPHY:  That's correct.

6           MR. GAUGHAN:  Judge, also I would indicate on

7    that one there was two different versions of the

8    I.P.I., we gave the version the defense wanted.

9           Okay.  People's Instruction No. 7 is

10   I.P.I. 2.03, presumption of innocence, burden of

11   proof, there was no objection to that, correct,

12   Mr. Murphy?

13          MR. CHARLES MURPHY:  Yes.

14          THE COURT:  People's Instruction No. 8,

15   circumstantial evidence, I.P.I. 3.02, there was no

16   objection to that correct, Mr. Murphy?

17          MR. CHARLES MURPHY:  That's correct.

18          THE COURT:  People's Instruction No. 9 is

19   I.P.I. 3.11.  The defense objected to the second part

20   about the statement made at prior proceedings which

21   could be considered as substantive evidence, correct,

22   Charles?

23          MR. CHARLES MURPHY:  Right.

24          THE COURT:  I don't like informality but

JIM03373

T-104

1    since we have Mr. John Murphy for the State and

2    Charles Murphy for the defense I'll call the lawyers

3    by their first name if I have to distinguish between

4    the two Mr. Murphys.

5         There is evidence of prior statements by

6    the witness under oath which could be considered as

7    substantive evidence and that instruction in my

8    opinion is a proper instruction.

9         The next one actually in the order which

10   I read them is the defendant's instruction, we'll come

11   back to that.  There was no objection to it anyhow.

12   It's Defendant's Instruction No. 2, which is I.P.I.

13   3.12, evidence of a prior conviction, that applied to

14   Phillip Torres and it was given.  There is no basis to

15   object but we can put it on the record when we get to

16   the defendant's instructions anyway.

17        People's Instruction No. 10 is the

18   modified I.P.I. 3.14, which is an instruction dealing

19   with all those letters from the Juvenile Detention

20   Center which was evidence arguably for the jury to

21   decide, evidence of consciousness of guilt.  There was

22   no objection to that was there, Charles?

23        MR. CHARLES MURPHY:  No, there was not.

24        THE COURT:  People's Instruction No. 11,

JIM03374

T-105

SA1197

1     I.P.I. 3.15, the circumstances of identification,

2     there was an objection to that, correct, Charles?

3          MR. CHARLES MURPHY:  Yes.

4          THE COURT:  That was given over objection, at

5     least as to two of the witnesses whose testimony would

6     show did not know the alleged offender before

7     February 3, 1993 or at least there was some evidence

8     they didn't know.  It talks about the circumstances of

9     identification, which is a proper instruction, at

10    least as to those two particular witnesses, so that

11    instruction will be given over objection or was given

12    over objection.

13          People's Instruction No. 12 is I.P.I.

14    7.01-A, there's no objection to that, correct,

15    Charles?

16          MR. CHARLES MURPHY:  Correct.

17          THE COURT:  People's Instruction No. 13 is

18    I.P.I. 7.02-A, that was given.  There is no objection

19    to that either, correct, Mr. Charles Murphy?

20          MR. CHARLES MURPHY:  Correct.

21          MR. GAUGHAN:  We gave the defense version of

22    that.

23          THE COURT:  Right.  We'll get to those.

24          People's Instruction No. 14 is I.P.I.

JIM03375

T-106

SA1198

1    26.01, that's the closing instruction, that was given

2    over objection because the defense believes it should

3    have been three verdict forms, guilty of murder in the

4    first degree, guilty of murder in the second degree or

5    not guilty.  So defense objection to People's

6    Instruction No. 14 and that was given over objection.

7    The court doesn't feel there's any evidence of second

8    degree murder in this case.

9         And the final two instructions are

10   I.P.I. 26.02, which is People's Instruction No. 15 and

11   I.P.I. 26.05, which is instruction 16 for the People,

12   those are merely the verdict forms of guilty and not

13   guilty of first degree murder.  So to the extent that

14   it doesn't include a second degree there would be an

15   objection to those basically but they'll be covered in

16   the defense instructions.

17        Defendant's Instruction No. 1 is I.P.I.

18   2.01-A, that's the instruction which tells the jurors

19   what the defendant is charged with.  In this case the

20   defense offers it with the -- not the lesser included

21   offense but the lesser mitigated offense of second

22   degree murder.  Mr. Charles Murphy, you can make your

23   record regarding that.  The court doesn't feel, as I

24   said in chambers last week, there is any evidence of

JIM03376

T-107

SA1199

1    second degree murder in this case but you can make

2    your record in that regard.

3        MR. CHARLES MURPHY:   Judge, in regard to the

4    actions taken by some person, whether it be my client

5    or not, was that a swing was taken by the victim

6    directed towards the person who was describe as the

7    shooter and it was after that took place that the shot

8    was fired.   It's our position, judge, that when Eric

9    Morro took the swing that he took on a public way at

10   another individual he was attempting to commit the

11   offense of aggravated battery, by that I mean he was

12   attempting to commit a battery on a public way and

13   aggravated battery on a public way is a forcible

14   felony.

15        Although it may have been improper for

16   the person that the swing was directed toward to use

17   deadly force I believe, judge, that it substantially

18   mitigates the actions of the person who is described

19   as the shooter that a second degree option should have

20   been provided to the trier of fact.

21        Alternatively, judge, we're of the

22   position that because of the size of my client at the

23   time of the offense in comparison to the size of the

24   victim that that thought that deadly force was

JIM03377

T-108

SA1200

1  necessary to successfully defend himself from serious

2  bodily harm could easily have entered into his mind.

3  There was an alternative suggestion I

4  made Friday afternoon and that's that the person

5  described as the shooter acted under a sudden and

6  intense passion.  In essence, judge, there was a

7  physical confrontation, a fight was taking place and

8  under those circumstances, judge, that also could be

9  construed as a mitigating factor that would permit the

10  trier of fact to conclude it was a second degree

11  murder that occurred and not a first degree murder and

12  that was our position.

13  THE COURT:  Mr. John Murphy or Mr. Gaughan,

14  do you want to briefly respond to that?

15  MR. GAUGHAN:  Very briefly, judge.  It's our

16  position all the evidence in this case indicates there

17  should not have been a second degree instruction.

18  From the beginning the defendant and Victor Romo

19  instigated this whole encounter.  They followed the

20  victim in the case along with Larry Tueffel, they

21  called after them, they asked them about money, they

22  walked up to them, there was the initial push by

23  Victor Romo, the defendant's codefendant, and

24  everything about this was they instigated it.

JIM03378

T-109

SA1201

1          Even if as Mr. Murphy indicated there

2     was one witness that turned and at the point she

3     looked Eric Morro was taking a swing at that point,

4     it's our position that she just picked up on the

5     events happening at the point that the victim was

6     swinging, not that he threw the first punch, and even

7     if you were to infer that based on her testimony you

8     could say that he threw the first punch there is no

9     way that based on that taking a punch that missed

10    there's any way that there could be in terms of the

11    unreasonable belief that there could be an

12    unreasonable belief that you're justified in the use

13    of deadly force.

14          And in terms of sudden and intense

15    passion there is no way that someone who swung and

16    missed is acting under sudden and intense passion to

17    pull out a gun and shoot someone.  It's our position

18    that there is actually zero evidence in this case of

19    second degree murder, on top of that the defendant

20    said he wasn't there.

21          THE COURT:  Anything else you want to add to

22    that, Mr. Charles Murphy?

23          MR. CHARLES MURPHY:  No.

24          THE COURT:  All right.  Regarding the issue

JIM03379

T-110

SA1202

1    of second degree murder, logically it might be a

2    difficult argument to make that the defendant wasn't

3    there, but if he was there in second degree murder the

4    question is legally can he make the argument.  Legally

5    one can argue anything if there's any basis of

6    evidence for but in my opinion there is no basis in

7    the evidence in this case for any instruction about

8    second degree murder.

9              The evidence taken in any light

10   favorable to Mr. Jimenez doesn't indicate in my

11   opinion any evidence of unreasonable belief in

12   self-defense or provocation based on sudden and

13   intense passion, which would lower the grade of the

14   offense from first degree murder to second degree

15   murder if the jury determines he was the one that was

16   there with Romo.

17             The evidence in any light was that the

18   person may have taken a swing at the person who the

19   evidence would seem to suggest is Thaddeus Jimenez.  I

20   mean of the two if they believe he was there, the

21   jurors could conclude maybe it was Jimenez who was

22   swung at but totally that would not justify the

23   totally disproportionate use of force used against

24   Eric Morro when after the punch was supposedly thrown

JIM03380

T-111

SA1203

1   at Jimenez, if it was thrown at him or the person that

2   the defense suggested might have been Torres, whoever

3   it was, that that would in any fashion fall within the

4   gambit of self-defense.

5           The person Morro was then pushed up

6   against the building and the person with the gun

7   walked up to him and put the gun right up on his chest

8   and fired.  There's no basis for any self-defense

9   there whatsoever and the court doesn't believe any

10  person could under those circumstances even

11  unreasonably believe that the use of force of the

12  magnitude used in this case would have been justified,

13  that is to put a gun up to a guy's chest for merely

14  taking a swing at you, if he did, and fire the gun

15  right on top of the guy.  So there's no basis in my

16  opinion for any instruction about second degree murder

17  based on what's referred to occasionally as imperfect

18  self-defense.

19          There's also no basis for a second

20  degree murder instruction based on the theory of

21  sudden and intense passion where someone merely takes

22  a swing at someone, the alleged person who takes the

23  swing is totally unarmed, and I don't believe that

24  would create in the mind, I think the phrasing is

JIM03381

T-112

SA1204

1    someone who -- Let me find it first.  That would

2    create sudden and intense passion in a reasonable

3    person merely if somebody takes a swing at him, I

4    don't believe any reasonable person under those

5    circumstances could get to the point where they could

6    walk up to someone, even assuming it was Jimenez for

7    the sake of argument, and put a gun on the guy's chest

8    and shoot him and then afterward claim he was acting

9    in sudden and intense passion caused by provocation by

10    the deceased.

11          The phrasing is serious provocation is

12    conduct sufficient to incite an intense passion in a

13    reasonable person.  I don't see how any reasonable

14    person could believe under the circumstances that they

15    would get to the point of sudden and intense passion

16    merely because the guy might have taken a swing at him

17    and missed such as would authorize the use of an

18    instruction about second degree murder based on sudden

19    and intense passion.

20          So both theories of second degree murder

21    in my opinion don't apply at all in this case.  I

22    realize the defense only has to establish some

23    evidence to that effect.  I don't think they've even

24    gotten to that point.

JIM03382

T-113

1              1 was refused.  2 was given, that was an

2    instruction about the prior conviction, that was

3    I.P.I. 3.12, that was talking about Torres's

4    conviction for possession of marijuana with intent to

5    deliver.

6              3 I think we covered, even though we

7    didn't argue it specifically.  Defense Instruction 3,

8    that's the imperfect self-defense instruction which

9    would authorize an instruction for second degree

10   murder.  I've already commented, I don't think that

11   applies at all in this case to Mr. Jimenez or Torres

12   or anybody else under those circumstances.

13             Defendant's Instruction No. 4 is an

14   issues instruction which you would give if you had

15   first degree murder and second degree murder.

16        MR. JOHN MURPHY:  Your Honor, may I interrupt

17   the court?  With respect to this instruction at the

18   time we did the informal instructions conference the

19   language that was reflected in this instruction --

20        THE COURT:  Which one are we talking about

21   now?

22        MR. JOHN MURPHY:  This is No. 4, Defense

23   No. 4, related to the unreasonable belief.  In that

24   instructions conference, formal conference, Mr. Murphy

JIM03383

T-114

```
 1   indicated he would like the other mental state as

 2   well.  We prepared an instruction, 7.06, using both

 3   mental states and I have them available if the defense

 4   wants to offer that instead in view of the fact he is

 5   asking for both elements of second degree.

 6           THE COURT:  Okay.  The court already ruled.

 7   In my opinion there is no evidence of second degree

 8   murder under either theory, imperfect self-defense or

 9   provocation, serious provocation.  So we can add in to

10   Defendant's Instruction No. 4, so the record is clear,

11   that's being offered with both the imperfect

12   self-defense as a mitigating circumstance and the

13   sudden and intense passion.  The court believes

14   neither one of them applies.

15           Defendant's Instruction No. 5, we talked

16   about it in essence, although not directly.  It's the

17   definition of self-defense.  The court doesn't believe

18   there's any issue of self-defense in this case in the

19   slightest, so that instruction will be refused.

20           Instruction No. 6 for the defense is a

21   closing instruction which has verdict forms for first

22   degree murder, second degree murder, and not guilty.

23   This entire discussion about second degree murder in

24   any form precludes in my opinion any issue as to
```

JIM03384

T-115

SA1207

1    instructions about second degree murder.

2           And then thereafter 7 and 8, 7 is the

3    guilty verdict form for the second degree murder.

4    Without being unduly redundant that's not appropriate.

5    In my opinion there is no second degree murder in this

6    case.

7           8 is the mitigating circumstance of

8    sudden and intense passion.  We've already talked

9    about that in essence in talking about second degree

10   murder, so that's not appropriate.  I think that

11   covers it.

12           The defense did not offer any

13   instruction about the defendant's failure to testify,

14   which is their prerogative, so that's not before me at

15   this point.

16           There is nothing else I don't believe at

17   this point, is there, gentlemen?

18           MR.  CHARLES MURPHY:  No.

19           THE COURT:  We'll just wait while the jurors

20   have their called-in for lunch.

21                   (Other cases were called

22                    and heard.)

23           THE CLERK:  Thaddeus Jimenez.

24           THE COURT:  Thaddeus Jimenez is here, his

JIM03385

T-116

1    attorney, Charles Murphy, is here.  The jurors had a

2    question at approximately it looks like almost 1:00

3    o'clock, it's now approximately twenty minutes to

4    2:00.  The question in essence -- The state's

5    attorneys aren't here but they participated in a phone

6    conversation where they were able to hear what I was

7    saying to them and Mr. Murphy's responses and they

8    could participate in the conference, it was a

9    conference call basically is what I was trying to

10   think of.

11        The question the jurors wrote out is

12   what is Victor's status?  Was he convicted?  Is he out

13   now, with the word now underlined?  Is he facing

14   future charges?  Was he a gang member?  Was Phil

15   Torres a gang member?  I think both parties have

16   agreed that the only way to answer those questions are

17   basically -- Some of those they already heard but I

18   think it would emphasize some things if I were to tell

19   them.  The parties agreed I think that the answer

20   should be the law requires the jury to render the

21   verdict on the evidence and instructions already

22   given.  Please continue to deliberate.  Is that okay

23   with you, Mr. Charles Murphy?

24        MR. CHARLES MURPHY:  Yes.

JIM03386

T-117

SA1209

1    A.    Yes, I do.

2    Q.    Could you please point to him, indicate what

3  he's wearing?

4    A.    He's the gentleman to the left of Mr. Murphy

5  wearing the tan suit.

6    THE COURT: All right.  Thaddeus Jiminez in the

7  Cook County Jail jump suit.  Okay.

8    MR. JOHN MURPHY:

9    Q.    Mr. Ford, at or near the conclusion of the

10 sentencing hearing, were you in the courtroom?

11   A.    I was.

12   Q.    And could you describe what you saw?

13   A.    While I was sitting in the front row and

14 after the sentencing by Judge Berkos, I watched Mr.

15 Jiminez.  You and Mr. Gaughan were having a

16 conversation.  Mr. Jiminez began to -- was beginning

17 to get ushered back into the lockup area of that

18 courtroom.

19   Q.    I'm going to stop you for a moment if I may.

20          At the time that the defendant was being

21 ushered out of the courtroom, where was Mr. Gaughan

22 and I seated?

23   A.    You were seated at the counsel table closest

24 to the door which would have exited into the hallway

W-53

JIM03507

SA1210

1  outside of courtroom 400.

2      Q.   And where had Mr. Jiminez been before he was

3  being ushered -- before he was ushered out of the

4  courtroom?

5      A.   He was at counsel table which would have been

6  to my right closet to the courtroom itself.

7      Q.   Can you describe what you saw as he was being

8  ushered out of the courtroom?

9      A.   I noticed as the deputies were trying to

10  usher him out, he was -- kind of kept moving toward

11  the direction of the table where you and Mr. Gaughan

12  were sitting.  As that happened, he -- he began to

13  look at you and used some profanity.  And began to

14  actually kind of move very quickly, almost run toward

15  you, raise his right fist into the air.  Was only

16  tackled the sheriff as he was perhaps one or two feet

17  away from the table where you and Mr. Gaughan were

18  sitting.

19      Q.   And could you demonstrate for Judge Sacks,

20  the position that he took just before he was tackled

21  by the sheriffs?

22      A.   Just prior to the time he was stopped by the

23  sheriffs, he had his right hand raised and he was

24  coming down on Mr. Gaughan and Mr. Murphy as they were

W-54

JIM03508

1    sitting there at counsel table.

2    MR. JOHN MURPHY: May the record reflect the

3    witness has held his right hand in a clenched fist and

4    held it above his right shoulder and head area.

5    THE COURT: All right.

6    MR. JOHN MURPHY:

7    Q.   You testified that the defendant was tackled

8    by the sheriff, is that correct?

9    A.   That's correct.

10   Q.   What happened then?

11   A.   Well, he began to resist a great deal,

12   continued to use profanity.  And he was physically

13   removed from the courtroom literally almost kicking

14   and screaming.

15   Q.   At the time that the defendant had his fist

16   raised, clenched in the direction of Mr. Gaughan and

17   myself, what were you doing?

18   A.   Well, you 2 had been in a conversation with

19   one another and I don't think anyone had noticed --

20   you never even, I don't think, got out of your chair.

21   I was out of my chair and through the door as this was

22   happening.

23   Q.   We were both seated at the time?

24   A.   Yes.

W-55

JIM03509

1        MR. JOHN MURPHY: No further questions.

2        THE COURT: All right.  Mr.  Charles Murphy.

3        MR. CHARLES MURPHY: Thank you.

4                    CROSS EXAMINATION

5                    BY MR. CHARLES MURPHY:

6        Q.   Mr. Ford, am I correct that Mr. Jiminez never

7   actually swung at either Mr. Gaughan or Mr. Murphy?

8        A.   He raised his fists to swing.  He never

9   executed the swing.

10       Q.   But he never swung?

11       A.   He never executed it, no.

12       Q.   Am I also correct just moments before this

13   incident took place, he was sentenced to 50 years in

14   the Illinois Department of Corrections?

15       A.   That's true.

16       MR. CHARLES MURPHY: I have nothing else.

17       THE COURT: Okay.  Anything else?

18                    REDIRECT EXAMINATION

19                    BY MR. JOHN MURPHY.

20       Q.   Mr. Ford, why didn't the defendant swing?

21       A.   He was --

22       Q.   At Mr. Gaughan and myself?

23       A.   From the moment he walked away from the bench

24   to the moment was tackled, he was going directly

JIM03510

1          THE COURT:  The State said that was okay with

2     them.  So I'll merely send the note back and tell the

3     jurors not to destroy the note.  Okay.  I'll call you

4     back whenever they're ready to say anything other than

5     that.

6

7                    (The jury continued to

8                     deliberate on its verdict

9                     during which this reporter

10                    was relieved by Court

11                    Reporter Jamie Brown.)

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03387

T-118

```
1   STATE OF ILLINOIS )
                      ) SS.
2   COUNTY OF C O O K )

3           IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
4
    THE PEOPLE OF THE    )
5   STATE OF ILLINOIS    )
                         )   Case No. 93-14710
6       -vs-             )
                         )   Charge:  Murder
7   THADDEUS JIMENEZ     )

8

9                   JURY TRIAL

10      REPORT OF PROCEEDINGS of the trial before the

11  Honorable STANLEY J. SACKS, on the 10th day of

12  November, 1997.

13  ─────────────────────────────────────────────
            APPEARANCES:
14
            HONORABLE RICHARD A. DEVINE,
15              State's Attorney of Cook County, by
            MR. JOHN MURPHY and
16          MR. DAVID GAUGHAN,
                Assistant State's Attorneys,
17              for the People of the State of
                Illinois;
18
            MR. CHARLES MURPHY,
19              for the Defendant.

20

21  Jamie F. Brown, CSR, Lic. #084-1665
    Official Court Reporter
22  2650 South California Avenue
    Chicago, Illinois 60608
23

24
```

JIM03388

U 1

```
 1          THE CLERK:  Thaddeus Jimenez.

 2                          (In chambers.)

 3          THE COURT:  All right.  Let me get the question

 4   on Jimenez. All right.  The case of Thaddeus

 5   Jimenez. The defendant is here.  His attorney Mr.

 6   Murphy, Charles Murphy and the state's attorneys are

 7   both here.

 8          A question came out at 4:50 p.m. By the

 9   time we got everyone together, plus I have a jury in

10   the box for questioning on voir dire on another

11   case, it took until now.  It's ten after, quarter

12   after five.

13          All right. It reads, can we get a copy of

14   the stipulation of one Jeanne Rathbun.  I guess one

15   of the court reporters. Then it says if not,

16   underlined, at Larry Tuffow's house in the early

17   morning hours of 2/4 it says 97.  I'm sure it's

18   meant to say 2/4/93, did Detective B period tell

19   Larry Tuffow that it was Phil who said it was TJ, or

20   did he tell him what Phil said without revealing

21   source of information. Signed by the foreperson.

22          Okay. State, any suggestion how to answer

23   those questions?  Copy of the stipulation of Jeanne

24   Rathbun or answer to the question about -- to the
```

U 3

JIM03389

SA1216

1    question about what happened with Larry Tuffow and

2    Detective B on February 4 most likely '93 I am sure

3    it means.

4        MR. GAUGHAN:  I say continue to deliberate.

5        THE COURT:  Mr. Charles Murphy?

6        MR. CHARLES MURPHY:  In regards to the first

7    request that they make, that could relatively easily

8    be complied with because what I did is I read

9    portions of the transcript that she had made.

10       THE COURT:  But isn't the transcript just the

11   same as a witness testifying?  Isn't it just like a

12   witness testifying when you say a person will

13   stipulate that that's what somebody else -- so

14   that's the same thing as asking what somebody

15   testified to?

16       MR. CHARLES MURPHY:  I understand that.  Giving

17   the transcript to the jury is discretionary, one of

18   the things that --

19       THE COURT:  Giving a transcript of someone who

20   testified at trial is discretionary.  I realize

21   they're not asking for a transcript of somebody that

22   testified at trial.  They're asking for the

23   stipulation as to what Jeanne Rathbun said, which is

24   really asking us to repeat to them what Jeanne

U 4                          JIM03390

SA1217

1   Rathbun said. She didn't say it personally, but she

2   said it by stipulation.  It's the same thing as if

3   she was here.

4      MR. CHARLES MURPHY:  If she was here she would

5   have read from the transcript because she would have

6   had no independent knowledge as to what the

7   testimony was some four years ago. But that's how

8   she would have done it.  I would have had her mark

9   -- or I would have marked it as an exhibit, laid

10   the foundation and then had her read from it.

11      MR. GAUGHAN:  And she wouldn't -- and they

12   wouldn't be --

13      MR. GAUGHAN:  It's past recollection recorded.

14      THE COURT:  It's the same thing as asking what

15   a witness -- what did a witness say.

16      MR. GAUGHAN:  If we called her in and she

17   testified.

18      THE COURT:  They're merely asking can we get a

19   copy of the stipulation of Jeanne Rathbun. What it

20   actually means is can we get the testimony of Jeanne

21   Rathbun.

22      MR. GAUGHAN:  The transcript.

23      THE COURT:  And we don't have the testimony of

24   Jeanne Rathbun.

U 5                    JIM03391

SA1218

1          MR. CHARLES MURPHY:  Well, I have -- I do have

2     the transcript. That's what I have.

3          MR. JOHN MURPHY:  Judge, we would object.

4          THE COURT:  No. I can't --

5          MR. JOHN MURPHY:  It's like publishing an

6     exhibit.

7          THE COURT:  It's like answering a question for

8     them, what did Jeanne Rathbun say.

9          MR. CHARLES MURPHY:  Except for the following

10    proviso. She would have no independent recollection

11    of the events.  Her recollection, her testimony

12    would have been compliant to the transcript. That's

13

14         THE COURT:  That may be the case.  But it's

15    still asking me to do the same thing, tell us what

16    Jeanne Rathbun said. It's just like saying what did

17    Detective B say about the conversation with Larry

18    Tuffow about what Phil Torres said. It's just asking

19    the same thing but in a slightly different way, what

20    did Jeanne Rathbun say.

21         MR. CHARLES MURPHY:  I -- obviously I look at

22    it differently than what you're suggesting.

23    However, in view of the fact that their request can

24    so readily be complied with, I have got a photocopy

U 6                    JIM03392

SA1219

1    of the transcript.  No court reporter has to type up

2    a word of testimony.

3         THE COURT:  I understand what you're saying.  I

4    don't -- but I don't think it's any different than

5    them merely saying what did Jeanne Rathbun say, what

6    did Detective B testify to concerning the

7    conversation between him and Larry Tuffow about

8    Phillip Torres.

9              I would answer essentially the same as the

10   last question or a couple of questions about what

11   somebody said or what the evidence was by saying you

12   have the exhibits.  The law requires the jury to

13   attempt to reach a verdict based on the evidence and

14   exhibits.  The instructions you have received

15   already.  Please review.  Please review the evidence

16   and review your notes and continue to deliberate.

17             I can't answer the one question because

18   it's in effect telling them what somebody said.

19   They have to recall what somebody said on their

20   own.  At this point what Jeanne Rathbun said by

21   stipulation is no different than what Jeanne Rathbun

22   would have said if she were here.

23   MR. CHARLES MURPHY:  Well, also another side to

24   this, and that is, for example, the second part of

1  the question.

2      THE COURT:  About what their conversation was.

3      MR. CHARLES MURPHY:  Yes. That is in dispute.

4  Of course, that would be, and I presume for your

5  Honor to try and resolve that dispuate for their

6  benefit, but there's no dispute as to what Jeanne

7  Rathbun's testimony or transcript I should say

8  said.  There's none. It was agreed upon.  It's a

9  ture and accurate rendition of the testimony the

10  witness said on a prior occasion.

11      THE COURT:  I think it's a distinction without

12  a difference, which you're suggesting because

13  something is stipulated to that I can read it back

14  to them if they ask a question as to what somebody

15  said. It's still what somebody said. And it's still

16  telling them what Jeanne Rathbun said, whether it's

17  by stipulation or in person.

18          So I'm not going to give them a copy of

19  the stipulation of Jeanne Rathbun because it's

20  merely reading them back testimony of what she

21  said.  If they have a transcript of what there is,

22  no court reporter here today who was here when those

23  stipulations were done because today is Monday.

24  Those stipulations would have been done on Friday if

U 8                    JIM03394

SA1221

1    I recall correctly.  So the court reporter that's

2    here wasn't here Friday.  I don't recall.  Or the

3    one that was here earlier today was here Friday, but

4    she's not here anymore.  It's academic even if she

5    was here.

6         MR. CHARLES MURPHY:  Judge, your reasoning

7    right there I really don't understand because you

8    seem to suggest, I'm not trying to be difficult, but

9    you're seeming to suggest --

10        THE COURT:  I didn't suggest you were.

11        MR. CHARLES MURPHY:  If she were still here,

12   then it is possible we could get her to type up the

13   stipulated testimony of Jeanne Rathbun.  But we

14   already stipulated to the testimony in transcription

15   form.

16        THE COURT:  I think you're reading more into

17   what I said than what I said.  They're asking for

18   the testimony of Jeanne Rathbun, whatever her name

19   is. And they have heard the testimony of Jeanne

20   Rathbun.  I'll let them recall it on their own, let

21   them look at their notes, kick it around and recall

22   what she said.

23            All right. My response will be the law

24   requires the jury to reach its verdict on the

U 9                                    JIM03395

SA1222

1  evidence and instructions already given. Please use

2  your collective memories, review your notes, if any,

3  and continue to deliberate.

4       MR. GAUGHAN:  That's fine with us.

5       THE COURT:  Take Mr. Jimenez back please. Okay.

6       MR. CHARLES MURPHY:  Have you given any thought

7  at all, everything else being equal, how long you're

8  going to let them delierate tonight?

9       THE COURT:  Nine, 9:30.

10      MR. CHARLES MURPHY:  It's been a long day.

11      THE COURT:  It's been a long trial. What's the

12  rush?

13      MR. CHARLES MURPHY:  Nothing. I thought you

14  might ask them at some point in time.

15      THE COURT:  No, I'm not going to go in and ask

16  them.  If they send out a note that they can't reach

17  a verdict or they don't think they can do so

18  tonight, we will kick it around.  I'm not going to

19  ask them in one or two more hours. It's 5:20. I'll

20  let them stay out to 9:30 or so.  If they don't

21  reach a verdict, they can go to the Holiday Inn for

22  the night.

23      MR. CHARLES MURPHY:  Would you consider letting

24  them go home?

U 10                    JIM03396

SA1223

1          THE COURT: I might. We will take it up if we

2     get to that point.

3                              (Recess taken.)

4                              (Change of Reporters.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2    STATE OF ILLINOIS )
                      )   SS.
3    COUNTY OF C O O K )

4

5

6         I, JAMIE F. BROWN, CSR, Official Court Reporter

7    for the Circuit Court of Cook County, Illinois

8    Judicial Circuit of Illinois, do hereby certify that

9    I reported in shorthand the proceedings had on the

10   trial in the above-entitled cause; that I thereafter

11   caused the foregoing to be transcribed, which I

12   hereby certify to be a true and accurate transcript

13   of the proceedings had before the Honorable STANLEY

14   J. SACKS, Judge of said court.

15

16

17                     _____
                       Official Court Reporter
18                     License #084-1665

19

20

21   Dated this 20th day

22   of May, 1998.

23

24

1      THE CLERK:  Thaddeus Jimenez.

2      THE COURT:  The defendant, Thaddeus Jimenez,

3  is here, his attorney, Mr. Murphy, and Mr. Gaughan and

4  Mr. John Murphy are here for the State.  It's five

5  after 8:00, give or take a few minutes.

6      About ten minutes to 8:00 the jurors

7  sent out another note.  "We are at a stalemate as to

8  whether or not there was sufficient light to identify

9  the subject, (defendant)," it's misspelled, but the

10  next sentence, "Is it possible for us to view the

11  scene?"  It's signed by the foreperson.

12      The State can respond first.  What kind

13  of answer can you give to a question like that,

14  viewing the scene, Belmont and whatever it is?

15      MR. JOHN MURPHY:  Judge, the biggest concern

16  we have at this point is this incident occurred almost

17  five years ago.  We don't know if the lighting at this

18  time is the same or even similar to what the lighting

19  was at that time.

20      THE COURT:  There's also the other situation

21  that Phillip Torres said his house has been remodeled

22  since that time so there's a difference in the way his

23  building would have looked, it might affect what you

24  could see from that building now as apposed to what

JIM03399

T-119

SA1226

1    you could have seen back in February of 1993.  But

2    even assuming the buildings haven't changed we're in

3    November of 1997 and it's now about five after 8:00.

4              The question is would the lighting

5    conditions be the same or approximately the same on a

6    November night almost five years later as they would

7    have been on a February night at 6:30, give or take a

8    few minutes, in February of 1993 versus November of

9    1997.  I don't think going there now would really

10   assist the jurors in any way.  It might show them what

11   the street looked like but as far as what the lighting

12   conditions were, I don't think it would help in that

13   regard anyway at all.

14             Mr. Charles Murphy, what do you think?

15        MR. CHARLES MURPHY:  In regard to what Phil

16   Torres said it was my understanding that he was

17   talking about changes that were cosmetic in nature,

18   not an addition.

19             THE COURT:  Perhaps.  Okay.

20        MR. CHARLES MURPHY:  In regard to

21   specifically attempting to go back and take a look at

22   the scene as it was I would only suggest the

23   following, because of the lateness of the hour tonight

24   we couldn't find out the answer to the question.  The

JIM03400

T-120

SA1227

1    question I think that should be answered is do we have

2    the same number of streetlights at that intersection

3    now as there were on February 3rd of 1993.

4           THE COURT:  How could we even answer that?

5           MR. CHARLES MURPHY:  Now that I think about

6    it tomorrow is probably going to be a governmental

7    holiday at The Bureau of Streets and San --

8           THE COURT:  I don't know necessarily even if

9    we knew that it was the same number of lights back in

10   February of '93 versus in November of '97 whether or

11   not even knowing that would assist the jurors in what

12   the lighting conditions were.  There still could have

13   been five streetlights hypothetically back then.  I

14   don't recall what the evidence was about the

15   streetlights at this point, but hypothetically it was

16   five streetlights back then and it's five streetlights

17   even now, the question still is we're talking about a

18   November night after 8:00 o'clock versus a February

19   night at 6:30, so would the lighting condition be the

20   same?  We're talking almost five years later.

21          MR. JOHN MURPHY:  Judge, I would add to that

22   even if we were able to determine the public lighting,

23   what we don't know is what changed with respect to the

24   private businesses, the lighting from those businesses

JIM03401

T-121

1    as well.

2         THE COURT:  There was testimony about the

3    Honey Baked Ham store or that building or whatever it

4    was at that location.

5         MR. JOHN MURPHY:  Yes.

6         THE COURT:  I don't think there's any way to

7    reconstruct what the lighting was for the jurors

8    almost five years later.

9              They've indicated in their question

10   "We're at a stalemate as to whether or not there was

11   sufficient light to identify the subject,

12   (the defendant.)"  I don't know.  Just off the top of

13   my head if they're at a stalemate they should reach an

14   appropriate decision as to what that stalemate means,

15   but as far as telling them what the lighting

16   conditions were or going to the scene, I don't see how

17   we can assist them almost five years later, a

18   different time, a different time of the year and this

19   length of time later.

20        MR. CHARLES MURPHY:  I've heard very clearly

21   everything that you've said, sir.  My suggestion is

22   that they be taken out there so they can take a look

23   for themselves.  This is a jury that sent out a number

24   of questions in an effort to obtain information.

JIM03402

T-122

SA1229

1   Obviously they're debating long and hard.  They've

2   been going at it for almost nine hours now.  I think

3   it would probably be best if they had an opportunity

4   to take a look.

5           THE COURT:  Well, if it would assist them in

6   some fashion.  I can't really fathom how it would

7   assist them because we're talking about a scene which

8   easily could have changed as far as businesses or

9   other buildings in the area since February of 1993.

10  We're in November of '97, we're almost two hours

11  difference in time as to what time the incident took

12  place, 6:30 at night on February 3, '93.  It's now,

13  give or take, ten after 8:00 on November 12th of 1997.

14          So the question, they're talking about

15  the lighting conditions, I don't see how going there

16  tonight even if we were able to get a bus and go out

17  there, I have no problem with doing that if we could

18  get it accomplished, but I don't see how it would

19  assist them because the lighting conditions at this

20  time of the year, this time of the night, with

21  possibly even likely changes in the way buildings were

22  set up, I don't see how going out there even tonight

23  would assist them at all.  They would see it's dark

24  out tonight, but it wouldn't necessarily mean it was

JIM03403

T-123

SA1230

1   the same lighting conditions as in February of '93.

2       MR. CHARLES MURPHY:  Judge, I have been to

3   the scene.  The two businesses that are closest to

4   where the shooting took place at the Honey Baked Ham

5   Company, that's a business that was closed, that is

6   what the testimony was, but in any event it has no

7   marquee, there's just a plain sign there, stenciling

8   in the window.

9       The other businesses across the street

10  is that tavern, Wally's, and it has a prominent beer

11  sign above the front entrance.  Those are the only two

12  businesses.

13      THE COURT:  And then what do you just suggest

14  if we did go, and I'm not inclined to do that, would

15  we just let them walk around the neighborhood because

16  the people were at different vantage points.  One

17  person was up on the third floor, Torres.  The Elder

18  mother, whatever her name was, Sandra Elder, she was

19  like in the middle of the street crossing, cars

20  blocked her path for a moment or two.  The daughter,

21  Tina, I'm not sure exactly where she was at at the

22  time and as far as Larry Tueffel he was, according to

23  him, at the scene where the actual shooting took

24  place.

JIM03404

T-124

1          The question appears, maybe I'm reading
2     more into it than there is, I don't know, but it
3     appears to apply to the two witnesses other than
4     Tueffel -- at least other than Tueffel.  It may or may
5     not apply to Torres or the other witnesses, the Elder
6     mother and daughter.
7          I'm trying to be fair to both sides, in
8     particular the defendant, who has a significant case
9     against him.  I don't think going out there tonight
10    would assist the jurors in any fashion five years
11    later, different time, different time of the year with
12    possible changes in the lighting.
13         We don't know what the lighting was back
14    then.  We don't know what the lighting is now.  We
15    just know what the witnesses said, that there were
16    streetlights illuminating the area, to what extent
17    apparently that's the jurors difficulty.  If they have
18    difficulty with the evidence then they should reach
19    the appropriate verdict based on that, but going out
20    there tonight I don't see how it would assist them.
21         If I thought it would assist the jury in
22    any fashion to see what it looked like tonight in
23    November of '97 I would do it.  I just don't see how
24    it could assist them at this point five years later.

JIM03405

T-125

SA1232

1    The conditions would not be the same and it would be

2    pure speculation on their part to speculate that the

3    lighting conditions tonight would be the same as they

4    were back in February of '93.

5            It just seems to me if they have a

6    question like this they should reach a verdict what

7    seems to suggest this question implies if they weren't

8    necessarily able to see the person, but that's a

9    question for the jury to decide.  They're talking

10   about the lighting conditions.  Going there tonight I

11   don't think would assist them, if anything it would be

12   more confusing.  They've heard the evidence about the

13   lighting conditions and I wish there was some way to

14   help them, but I don't think going out there would do

15   it.

16           So I would answer in something other

17   than just the usual, you know, you've heard the

18   evidence and go back and deliberate.  I can add in

19   something, if both sides can agree, along the lines of

20   we're not able to reconstruct for you at this time

21   what the lighting conditions would be back in February

22   of 1993.  Review your notes, review the testimony and

23   continue to deliberate.

24           Mr. Charles Murphy, your request that I

JIM03406

T-126

1   follow the jurors' suggestion is not -- not suggestion

2   but their question, is it possible to view the scene,

3   I won't adopt that as far as going to the scene of the

4   shooting in February of '93.  I might be willing, if

5   it's appropriately phrased, to put in something other

6   than the usual stock answer, you've heard the

7   evidence, you've got the instructions, continue to

8   deliberate.

9        MR. CHARLES MURPHY:  My suggestion is the

10  stock answer.

11       THE COURT:  The State believes the same thing

12  then?

13       MR. JOHN MURPHY:  Judge, actually we would

14  prefer to see the answer along the line you initially

15  indicated, which is that the scene can't be

16  reconstructed.  The concern I've got, I think that's a

17  very legitimate question, and perhaps in different

18  circumstances this could be achieved.  I think the

19  jury is entitled to the answer to the question rather

20  than it's just not going to happen and I think your

21  response is more -- your initial response more

22  accurately reflects the reason why we can't go out to

23  the scene and it tells the jury that.

24       THE COURT:  All right.  Let me mull that over

JIM03407

T-127

SA1234

1    for a second.  I'm just putting in the normal part

2    first, the stock part, as we refer to it, and I'll

3    determine if there's anything to be added to it.

4             What I've indicated really so far is

5    what the parties refer to as the "stock" or normal

6    answer to a question involving a factual scenario,

7    which I think applies here about the lighting, going

8    to the scene.  "The law requires the jury to reached

9    its verdict on the evidence and instructions already

10   given.  Please review your notes, if any.  Use your

11   collective memories and continue your deliberations."

12            I'm willing to consider adding something

13   else into it, Mr. Charles Murphy, if you think I can

14   do that fairly to both sides, if you don't I'll just

15   leave it the way it is.

16            MR. CHARLES MURPHY:  I ask you to leave it

17   the way it is because given additional information,

18   which we don't have at our fingertips such as hard

19   facts that the same number of streetlights were

20   present today as there were at that time, the same

21   kind of lighting is used to illuminate the street in

22   those same streetlights, then we could almost

23   virtually recreate the lighting that was there the

24   night of the shooting because clearly, judge, the sun

JIM03408

T-128

SA1235

1    had long set at 6:30 p.m. on the night of February 3rd

2    and once it's dark, it's dark.  We almost really could

3    recreate it.  So I'm asking you not to indicate to

4    them in any fashion that we couldn't.

5              THE COURT:  Okay.  I'll leave it the way it

6    is then without any reference to possible recreation

7    or lack of recreation.  Okay.  You can take it back

8    and just tell them to hold onto the note.

9              It's almost 8:15.  I would propose if

10   they haven't reached any verdict by 9:30 we'll let

11   them spend the night at the Holiday Inn or wherever

12   they take them or decide to proceed in some other

13   fashion.

14              Under the new Supreme Court Rules they

15   don't have to be sequestered, although I would be very

16   reluctant in a murder case with no alternate jurors at

17   this point, with just the twelve jurors that are in

18   there, to let the jurors go home until Wednesday.  So

19   we'll take up the issue if we get to it, but I would

20   be very reluctant to let the jurors go home, mull

21   around with their families, friends, et cetera, until

22   Wednesday with the possibility that something could

23   occur with one of the jurors.

24              It's certainly within my discretion to

JIM03409

T-129

SA1236

1    do that but this case has already been tried once

2    where Mr. Jimenez was found guilty at a previous

3    trial, this is the second trial and I would hate to

4    have the case tried a third time merely because

5    something could have occurred with a juror that was

6    allowed to go home on a murder case when the jurors

7    could have been kept intact without even any risk or

8    minimal risk of something occurring which would cause

9    the case to have to be tried a third time.

10         I have no quarrel with whatever verdict

11   the jury comes back with but I would hate to see the

12   case tried for the third time. If something comes up

13   and a juror has to be excused that only leaves us with

14   eleven jurors at that point and certainly Mr. Jimenez

15   would not have to agree nor would I even suggest or

16   remotely suggest that he would consider being tried by

17   a jury of less than twelve.

18         So I feel reluctant to let the jurors go

19   home.  It's within my discretion to do that but I have

20   a very sincere reluctance to allow that to happen, but

21   it's only 8:15 or so, so at this point that's in the

22   nature of academics.  If we get to 9:30 and they still

23   haven't reached a verdict we'll decide what to do with

24   them at that point, but I think that's a reasonable

JIM03410

T-130

SA1237

1   time.  They've been out since ten after 11:00.  9:30

2   will make it, give or take, ten hours or so, ten and a

3   half hours or so, that will be enough deliberations

4   for one day.  Then I'll hear your arguments at that

5   point.  You can mull it over in the meantime about

6   what your position would be about where the jurors

7   should go tonight if they don't reach a verdict by

8   that time.  Okay.

9                    (A recess was taken.)

10                  THE COURT:  The defendant Thaddeus Jimenez is

11  here, his attorney, Mr. Charles Murphy, is present,

12  Mr. David Gaughan and Mr. John Murphy are here for the

13  State.

14                  Give or take a couple minutes, it's

15  approximately quarter after 9:00.  That clock is a

16  little bit fast, maybe it's eighteen minutes after.

17  The jurors have been deliberating since 11:15 this

18  morning, so give or take a minute or two it's ten

19  hours that they've been out.  I think it's long enough

20  for them for today, ten hours deliberations.  They've

21  had lunch in that time and something for dinner but

22  it's still quite a long time.

23                  Any suggestions, State?  I think they're

24  through deliberating for today.  Any suggestion what I

JIM03411

T-131

SA1238

1    should do concerning where they spend this evening,

2    that is at home or that is someplace on the County?

3          MR. GAUGHAN:  Judge, I think it should be

4    someplace on the County.  Twelve people, it's been ten

5    hours of deliberations, I'd hate to lose a juror

6    overnight if you send them home.

7          THE COURT:  Mr. Charles Murphy, what do you

8    say?

9          MR. CHARLES MURPHY:  My early experience, of

10    course, is I cut my teeth right here in this building,

11    I became accustom to the fact jurors, once they began

12    deliberations, stayed here, they continued to

13    deliberate and were held somewhere together in a local

14    hotel.

15          I found the first time I tried a jury

16    trial in Federal Court it was just so refreshing and

17    indeed I thought it was enlightening to send the

18    people back to their own beds and their own families.

19    In terms of concerns, judge, concern number one, this

20    case has not received any publicity, there hasn't been

21    a reporter in the courtroom during the course of the

22    trial, so that's not a concern.

23          They don't have a change of clothing

24    with them, they don't even have a toothbrush with

JIM03412

T-132

1    them.  If someone is going to get sick, judge,

2    overnight they're going to get sick whether it be at

3    their own house or sick at the hotel that you send

4    them to.  I urge you, in all that is civil, to send

5    them home.

6            THE COURT:  Well, I don't recall when the new

7    Supreme Court Rule went into effect, it was either May

8    of this year or July of this year which leaves it up

9    to the discretion of the court at this point.  It used

10   to be once a jury began deliberations they had to

11   remain intact, they could not be split up and allowed

12   to go home.  The Supreme Court changed that in either

13   May or July of this year to say it's discretionary

14   with the court as to whether or not they could go home

15   or whether or not they should be sequestered at a

16   hotel or some other facility on the County until the

17   next day.

18            I agree that there has been no publicity

19   whatever about the case of Thaddeus Jimenez, it's just

20   one of a number of many murders that happened in

21   February of 1993, but the problem I foresee and, of

22   course, it is always nice to sleep in your own bed if

23   you have the opportunity to do that, but this is a

24   case that we all know was tried once already, I

JIM03413

T-133

1  believe it was 1994.  This will be the -- This is the

2  second time the case is being tried.  We're not

3  talking about a case that is insignificant, it's a

4  significant case from the defendant's point of view.

5  It's also a significant case from the State's point of

6  view.

7          Yesterday -- Not yesterday.  Friday we

8  had two alternates, one of whom is no longer with us

9  because of various reasons, which are in the record

10  that need not concern us at this point.  The second

11  alternate was excused when this jury went out to

12  deliberate today at 11:15 this morning and if the

13  jurors were at home, and I certainly don't want to be

14  an ogre about it and send some people someplace they

15  may not really want to go to, but if we send the

16  jurors home there is certainly more of a possibility

17  or a likelihood that by Wednesday, which will be the

18  next court date since ordinarily there is no court on

19  Veterans Day, which is tomorrow, something may very

20  well occur which would cause one of the twelve jurors

21  to become unavailable.  I'm not talking about

22  sickness, it could be anything that could cause

23  someone not to be available, then the case would be

24  left with only eleven jurors or perhaps less than

JIM03414

T-134

SA1241

1    eleven.

2              And the defendant certainly is not

3    required, could not be required, to accept a verdict

4    of less than twelve and then that would in essence

5    mean if something did occur, and I think there's

6    always more of a likelihood if people are not kept

7    together, not sequestered, while it's inconvenient

8    it's more likely that something might under those

9    circumstances and if something were to occur under

10   those circumstances that would mean that the case of

11   Thaddeus Jimenez, and it's not healthy for anybody,

12   he's been tried once already, tried a second time now,

13   and it would require the case to be tried for a third

14   time when the simple expediency, although maybe

15   slightly inconvenient for some of the jurors, the

16   expedient way to proceed is to keep the jurors

17   together and even though it's inconvenient for them

18   it's just as inconvenient for us because I would have

19   to come back tomorrow, people are off ordinarily

20   tomorrow, unfortunately I don't know who the reporter

21   is going to find to come in tomorrow but she'll have

22   to find someone to come in tomorrow, and we'll have to

23   resume deliberations tomorrow.

24              I feel very uncomfortable letting a jury

JIM03415

T-135

1    go home after ten hours of deliberations to come back

2    in two days, in effect Wednesday, to resume

3    deliberations on a murder case. If it was something

4    less than that I might be willing to consider it but

5    we're talking about a significant case from both sides

6    vantage point, from the system itself's vantage point

7    in that the case would have to be tried for the third

8.   time if something were to happen between now and

9    Wednesday.

10             And when people are not kept together in

11   a jury scenario the more time they're not together the

12   more likely something is possible that could happen.

13   We lost one juror already Friday and we're left with

14   no alternates at this point, maybe that could have

15   been avoided if I would have thought about it in

16   advance, but I didn't do that, so we're left with just

17   twelve jurors at this point.

18             I'm going to have the jurors

19   sequestered. Miss Reporter, I'm not sure how I can

20.  put this to you, you've been so patient with us Friday

21   and again today you're with us, who is going to be

22   able to come in tomorrow, which is ordinarily a

23   holiday?

24             THE COURT REPORTER:  Me.

JIM03416

T-136

SA1243

1    THE COURT:  You?  I don't know what else I

2  can tell you.  I feel very apologetic towards the

3  court reporter as well, but under the circumstances

4  some things work out that way.

5    MR. CHARLES MURPHY:  Judge Sacks, my

6  suggestion to you about sending them home, I guess I

7  didn't make myself clear, was that you send them home

8  to bring them back tomorrow, not Wednesday.

9    THE COURT:  Let me ask you a question,

10  Mr. Murphy, you can mull it over for a moment or two,

11  if I were to consider your posture of doing that,

12  letting them go home and come back tomorrow morning,

13  in the hypothetical sense, and it's purely

14  hypothetical, we don't know at this point what, if

15  anything might occur, if hypothetically one of the

16  jurors, something comes up with one juror, and that

17  juror is not able to come back for whatever reason,

18  are you willing to consider proceeding with a verdict

19  of less than twelve?

20    MR. CHARLES MURPHY:  Only if the conditions

21  were that the juror could never come back.  I mean if

22  the problem was a day or two later then I would still

23  be insisting that it be a verdict by twelve people.

24    THE COURT:  State, have any comments about

JIM03417

T-137

SA1244

1   that?  I thought Mr. Murphy's viewpoint was they would

2   come back on Wednesday.  He clarified that, I was

3   wrong about that.  What is the State's position

4   regarding that, the same?

5       MR. GAUGHAN:  Judge, our position is the

6   same.  I was assuming either way we would be coming

7   back tomorrow.  Our position is the same.  I don't

8   think at this stage after the time and effort put in

9   for both sides it's worth the risk of this jury not

10  being able to finish up through the deliberations.

11      THE COURT:  Let me take an another look at

12  that Supreme Court Rule and see what it basically

13  says.  I know it's in my discretion.  I want to see if

14  it has any commentary along with it, their viewpoint.

15  Just give me a second.  It's on my desk.

16      Maybe they'll reach a verdict while I'm

17  reading this rule out loud.  Supreme Court Rule 436

18  went into effect July 1st of this year.  It reads:

19  "Part A, in criminal cases either before or after

20  submission of the cause to the jury for determination

21  the trial court may, in its discretion, keep the jury

22  together in the charge of an officer of the court or

23  the court may allow the jurors to separate temporarily

24  outside the presence of the court officer overnight,

JIM03418

T-138

1   on weekends, on holidays or in emergencies.

2            "Paragraph B, the jurors shall, whether

3   permitted to separate or kept in charge of officers be

4   admonished by the trial court that it is their duty,

5   one, not to converse with anyone else on any subject

6   connected with the trial until they are discharged,

7   not to knowingly read or listen to outside comments or

8   news accounts or procedures until they are discharged.

9   Three, not to discuss among themselves any subject

10  connected with the trial or form or express any

11  opinion on the cause until it is submitted to them for

12  their deliberation.  And, four, not to view the place

13  where the offense was allegedly committed."

14           The committee comments to that indicate

15  "This proposed rule was intended to allow jurors to go

16  home for an evening, weekend, holiday or emergency and

17  dispense with the need to accommodate the jurors in a

18  hotel overnight even if the cause has been submitted

19  to them for final deliberation.

20           "The code of criminal procedure

21  presently requires 'an officer of the court to keep

22  jurors together and prevent conversation between the

23  jurors and others,' after final submission of the

24  cause to the jury for determination.  This proposed

JIM03419

T-139

SA1246

1  rule provides that in appropriate cases jurors may

2  separate temporarily after being admonished with

3  regard to their duties, it does away with the blanket

4  requirement that they are -- that they be sequestered

5  and guarded."

6       Basically it doesn't add a lot of

7  guidance.  It still says what I said before, that it's

8  a question of discretion for the trial court as to

9  whether or not the jurors are sequestered together or

10  allowed to go home.  And also only as far as any

11  guidance, the committee comments says this proposed

12  rule provides that in appropriate cases.  I guess

13  that's the rub, what's an appropriate case, and that's

14  up to the court to decide.

15       I still feel, and I really would rather

16  it didn't have to turn out this way, I just feel

17  uncomfortable letting a jury that deliberated for ten

18  hours go home and then come back with the possibility

19  that something occurs between when they go home and

20  when they come back and they're not together that that

21  would mean we would have somewhat less than twelve

22  jurors and in all likelihood it would mean we would

23  have to try the case for the third time.

24       The simple expediency in my opinion of

JIM03420

T-140

SA1247

1    keeping them sequestered overnight outweighs the

2    inconvenience to the jurors of perhaps not sleeping in

3    their own bed.  I've had jurors that have been

4    sequestered on other cases who indicated when they did

5    come back that the food and lodging was excellent and

6    in one case they even wanted to go back a second night

7    even after they reached their verdict as it was.

8            So I'm going to have the jurors

9    sequestered for the night.  I just feel uncomfortable

10   in a murder case that's been tried once already with

11   taking unnecessary risk that it would have to be tried

12   possibly for the third time, that wouldn't be

13   beneficial health-wise or emotional-wise for anybody

14   involved in this case at all.

15           So I'm merely going to have the sheriff

16   go back and tell the jurors to cease their

17   deliberations, that they're going to be going to the

18   hotel for the night, and that the sheriff will make

19   arrangements to contact their families for them and

20   we'll see them back here tomorrow morning at 10:00

21   o'clock.

22           MR. CHARLES MURPHY:  Judge, would it be

23   possible for my client to briefly visit with his

24   mother?

JIM03421

T-141

```
1    STATE OF ILLINOIS)
                     )         SS:
2    COUNTY OF C O O K)

3            IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION
4

5            I, BRENDA D. HAYES, Official Court

6    Reporter for the Circuit Court of Cook County, Cook

7    Judicial Circuit of Illinois, do hereby certify that

8    I reported stenographically the proceedings had on

9    the trial in the above entitled cause; that I

10   thereafter transcribed said trial into

11   typewriting, which I hereby certify to be a

12   true and accurate transcript of the proceedings

13   had before the Honorable STANLEY SACKS, Judge of

14   said court.

15

16

17

18

19

20             OFFICIAL COURT REPORTER

21

22

23

24
```

JIM03422

T-143

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS  } ss
COUNTY OF COOK

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true, perfect and complete copy of ..... VOLUME ( FIVE ) OF (SIX) VOLUMES CONSISTING OF THE REPORT OF PROCEEDIGNS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 98-0247

........................................................................

........................................................................

........................................................................

........................................................................

in a certain cause ..............LATELY................ pending in said Court, between
...................................WERE
The People of the State of Illinois.................................., Plaintiffs and
THADDEUS JIMENEZ                     WAS
.........................................................., Defendant. ....



Witness:  AURELIA PUCINSKI,
Clerk of the court, and the Seal thereof, at Chicago
In said County, ...............JULY 8............, 19 . 98 .

*Aurelia Pucinski*
Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JIM03423

SA1250

JIM03424

CCCR-310

# Transcript of Record
# Appeal
# to

APPELLATE ——— **Court of Illinois**

FIRST ——— **District**

**Circuit Court No.** ___93 CR 14710___

**Trial Judge** ___STANLEY SACKS___

**Reviewing Court No.** ___98-0247___

THE PEOPLE OF THE STATE OF ILLINOIS

**vs.**

THADDEUS JIMENEZ

# from
# CIRCUIT COURT
# of
# COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

VOLUME SIX OF SIX VOLUMES

REPORT OF PROCEEDINGS, ONLY

**AURELIA PUCINSKI**

**Clerk of Court**

Per ___AP/GL___

**Deputy**

JIM03425

1    STATE OF ILLINOIS )
                      )   SS:
2    COUNTY OF COOK   )

3            IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION
4
     THE PEOPLE OF THE )
5    STATE OF ILLINOIS )
                       )
6                      )   Indictment No. 93 14710
                       )
         VS            )
7                      )   Charge:  Murder
                       )
8    THADDEUS JIMENEZ  )

9              REPORT OF PROCEEDINGS

10       BE IT REMEMBERED that on the 11th day of

11   November A.D., 1997, this cause came on for trial

12   before the Honorable STANLEY SACKS, Judge of said

13   court, and a jury, upon the indictment herein, the

14   defendant having entered a plea of not guilty.

15       APPEARANCES:

16           HON. RICHARD DEVINE,
             State's Attorney of Cook County, by
17           MESSRS. JOHN MURPHY and
             DAVID GAUGHAN,
18           Assistant State's Attorneys,
                 appeared for the People;
19
             MR. CHARLES MURPHY,
20               appeared for the Defendant.

21

22                                    FILED

23   Brenda D. Hayes, CSR            JUN 3 0 1998
     Official Court Reporter
     2650 S. California              AURELIA PUCINSKI
24   Chicago, Illinois  60608       CLERK OF CIRCUIT COURT

                                        JIM03426

1

<u>I N D E X</u>

2

3    Date of Hearing:  11-11-98

4    Page Numbers:  TT-1 - TT-19

5                    <u>PROCEEDINGS</u>

6                    <u>Page</u>    <u>DX</u>    <u>CX</u>    <u>RDX</u>    <u>RCX</u>

7    Verdict         TT-12

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JIM03427

TT-2

SA1254

1               I N D E X

2       Date of Proceedings: December 10, 1998

3                   Continuance

4              Pages V 1 to V 9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

V 2                    JIM03428

SA1255

```
 1   Date of Hearing:  12-18-97

 2   Page No.  1-W to 82-W

 3

 4                          I-N-D-E-X

 5

 6   Motions for new trial --------------------------   3

 7

 8   LIST OF WITNESSES        DX     CX

 9   Nicholas Ford            51     56

10   Mary Morro               57

11

12   SENTENCING ------------------------------------   70

13

14

15

16

17

18

19

20

21

22

23

24
```

W-2

JIM03429

SA1256

1          <u>I N D E X; Pgs. X-1 to X-10;1/8/98</u>

2                    <u>DIRECT   CROSS   REDIRECT   RECROSS</u>

3     Motion to Reduce Sentence;

4     Motion Denied;  Pg. X-7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                        X-10

JIM03430

1          THE COURT:  The case of Thaddeus Jimenez.

2     The defendant is here, his attorney, Mr. Charles

3     Murphy is here.  Mr. Gaughan and Mr. John Murphy are

4     here for the State.

5          This most recent note at 10:30,

6     obviously we can do that, they want some coffee and

7     juice.  The sheriff will make reasonable efforts to

8     get that for them.

9          One of the things they wrote out last

10    night about ten minutes to 5:00, and I was thinking

11    about it as I was driving home and also this morning,

12    part of what they asked for, can we get a copy of the

13    stipulation one regarding Jeanne Rathbun.

14          I indicated last night after talking

15    with the lawyers the general response, the law

16    requires the jury to reach its verdict on the evidence

17    and instructions already given.  Please use your

18    collective memory.  Review your notes, if any, and

19    continue to deliberate.

20          Mr. Charles Murphy, Miss Jeanne Rathbun

21    is the court reporter, correct?

22          MR. CHARLES MURPHY:  Yes.

23          THE COURT:  What was stipulation number one?

24    Was there more than one stipulation regarding her?

JIM03431

TT-3

1          MR. CHARLS MURPHY:  Yes.

2          THE COURT:  What is the one referred to as

3    stipulation number one?  Based on the context of the

4    balance of the note it appears to be something that

5    perhaps Larry Tueffel testified to at a previous

6    hearing.

7          MR. CHARLES MURPHY:  I'm hesitant to say that

8    I clearly remember what stipulation is number one.

9    I've got those materials in my car.

10         THE COURT:  Miss Hayes, do you have your

11   notes from Friday of last week, November 7th?

12         THE COURT REPORTER:  Yes, judge.

13         THE COURT:  Can you look at your notes and

14   see what Jeanne Rathbun -- there was a stipulation

15   about regarding a conversation about Larry Tueffel or

16   a conversation with Larry Tueffel maybe.  While she's

17   doing that -- Before you start doing that, let me stay

18   on the record for a second, were there other

19   stipulations regarding what Jeanne Rathbun would say,

20   Mr. Charles Murphy?

21         MR. CHARLES MURPHY:  That is my recollection

22         THE COURT:  Do you recall what they were?

23         MR. CHARLES MURPHY:  No, I don't.

24         THE COURT:  Does the State recall at this

JIM03432

TT-4

SA1259

1    point?

2              MR. JOHN MURPHY:  No, judge.

3              MR. GAUGHAN:  I don't recall what they were.

4    I do recall, judge, I'm not certain of this, I believe

5    we had an objection that some of those stipulations

6    were not impeaching and your Honor indicated at that

7    time it didn't matter, you're just going to let it in.

8              THE COURT:  I'm not quite sure I put it like

9    it didn't matter.  I probably said it's a question for

10   the jury to decide whether it's impeachment or not.

11   Does the State recall what the stipulation --

12             MR. GAUGHAN:  No, judge, I don't.

13             THE COURT:  -- referred to as one might have

14   been?

15             MR. JOHN MURPHY:  Judge, our file is on the

16   other side.

17             THE COURT:  I'm not suggesting that if I was

18   wrong about not letting the jury have the transcript

19   of Miss Rathbun, whatever one they're referring to,

20   that would be any kind of error or any significance in

21   the case, but since the jury has been deliberating

22   this long apparently there's something that they're

23   concerned about or interested in knowing about and I

24   would at this point, if Mr. Charles Murphy still wants

                                          JIM03433

                        TT-5

                        SA1260

1    me to read the transcript of whatever the stipulation

2    was, if we can determine what it is particularly, I

3    would do that at this point.

4         MR. GAUGHAN:  Judge, may I respond before you

5    make that ruling?

6         THE COURT:  Sure.

7         MR. GAUGHAN:  Judge, at this stage of the

8    proceeding this jury has sent out at least a half a

9    dozen questions.  Your Honor answered the questions at

10   that time in what I believe was an appropriate manner.

11   Now, the following day, to pick out one of those

12   questions, answer it and send it back would unduly

13   highlight that particular testimony and I think at

14   this stage especially it would be absolutely improper.

15   After the jury has been deliberating after each

16   question has been answered, one question is being

17   picked out to be answered without them requesting that

18   information.

19        THE COURT:  But the point of the matter is,

20   Mr. Gaughan, what I'm saying is if the court was wrong

21   it should not go to the defendant's detriment.  If the

22   court was wrong, and looking back I may have been,

23   what they're asking for is what Jeanne Rathbun

24   testified to.  That is within the court's discretion,

JIM03434

TT-6

SA1261

1    as the court could always order something to be read

2    back, what somebody said.  If I was incorrect last

3    night I don't see any reason to compound the error by

4    not reading to them now, if that's what they wanted to

5    know.

6         MR. GAUGHAN:  Judge, I don't believe you were

7    incorrect.  I believe it's within your discretion

8    whether or not to send back a transcript.  You acted

9    within your discretion.  Now the following day to just

10   on your own, without them re-requesting it, send it

11   back I think adds undue highlight to that particular

12   information.

13        THE COURT:  I don't think it adds any undue

14   highlight to anything.  I'm saying if I was wrong, and

15   thinking back I may have been, that's what the purpose

16   of erasers are on pencils, if someone thinks they may

17   have been wrong, I don't think even if I was wrong,

18   which I'm saying I might very well have been about not

19   reading it back to them last night, it would not be

20   any error of significance as far as if they come back

21   and say guilty later on to say they didn't have that

22   transcript, because they were told to review their

23   notes and things of that nature, but we have the same

24   court reporter, Miss Hayes, who was here Friday, she

JIM03435

TT-7

1    has her notes and I don't see any harm to either side,

2    particularly the State at this point, since they're

3    objecting about it, to read that back to them.

4            They requested information at 4:50

5    yesterday afternoon, they got the note back indicating

6    really nothing much of significance at 5:20.  They

7    weren't sequestered until 9:15 or 9:20 last night and

8    then they just came back this morning at 9:35, so they

9    still are deliberating.  I don't think it's a

10   detriment to the State's case.

11           If the court makes a ruling on a

12   particular issue and determines that the court may

13   have been wrong, we have a man on trial for a murder

14   here, a significant case, it's not going to be the

15   kind of issue that would cause reversal even if I was

16   wrong.  In fairness to the defendant I feel if that's

17   a question the jurors wanted to know if we can answer

18   it for them we'll answer it for them.

19           The problem is, Mr. Charles Murphy, you

20   don't have your transcripts or notes or anything up

21   here?

22       MR. CHARLES MURPHY:  Correct.  I could be

23   standing back in your courtroom in ten minutes with

24   them.

JIM03436

TT-8

1          THE COURT:  Let's see what Miss Hayes has

2     regarding various stipulations, if any, regarding

3     Jeanne Rathbun first from Friday.

4          MR. CHARLES MURPHY:  Judge, I would ask you

5     to initiate a dialog with the foreman of the jury in

6     regards to exactly what it is they want.

7          THE COURT:  Right.  I'd have to call them out

8     to ask them that obviously, but let's see what

9     Miss Hayes has.

10          MR. GAUGHAN:  The question indicates the

11     first stipulation, correct?

12          THE COURT:  Well, there's a one after that.

13     The question says:  Can we get a copy of the

14     stipulation and there's just a letter or the number

15     one after it.  So let's see what Miss Hayes has for

16     that particular one regarding Jeanne Rathbun.

17                         (A brief recess was taken.)

18          THE COURT:  The State will agree since

19     there's only one reporter we have no one to transcribe

20     Miss Hayes' testimony today.  The State and the

21     defense both agree we can have her just read it into

22     the record.

23          MR. JOHN MURPHY:  Yes, judge, that's fine.

24          MR. CHARLES MURPHY:  Yes.

JIM03437

TT-9

1                    (The following proceedings

2                    were had in the presence and

3                    hearing of the jury:)

4          THE COURT:  You can all be seated, ladies and

5     gentlemen.

6              The reason I asked that you be brought

7     out, last night if you recall, approximately ten

8     minutes to 5:00, give or take a few minutes, you had

9     written out a question, a portion of which was can we

10    get a copy of stipulation one, Jeanne Rathbun.  The

11    court reporter who was present on Friday, February

12    7th, when that testimony was given by stipulation as

13    to what Jeanne Rathbun would testify to was not

14    present yesterday afternoon, that's the lady that's

15    here today, Miss Hayes, there was another reporter who

16    was filling in for her so I could not answer that

17    question in any fashion at all yesterday when you

18    asked the question.

19              So at this point we have the court

20    reporter who was present on November 7th when that

21    stipulation of Jeanne Rathbun was given into the

22    record and my question is does the jury or any of the

23    jurors feel at this point they would still like to

24    have that portion of the record read back to them?

JIM03438

TT-10

1    The stipulation regarding Jeanne Rathbun, what she

2    would testify to, she was the court reporter.

3                        (An affirmative response was

4                        given.)

5        THE COURT:  All right.  We'll have that read

6    back.  The other question I have for the jurors then,

7    the stipulation included what two individuals, that

8    being Phillip Torres and Larry Tueffel had said on a

9    prior occasion where Jeanne Rathbun was the court

10   reporter in a prior proceeding.  Do the jurors want

11   the court reporter to read back both that testimony of

12   Phillip Torres in the previous hearing and Larry

13   Tueffel or just one or the other?

14                        (Jurors answered both.)

15       THE COURT:  Both?  Okay.

16           The parties have agreed, the usual

17   circumstances -- There's only one court reporter here.

18   Ordinarily when the court reporter reads back her

19   notes to a jury another court reporter takes down what

20   she's saying.  Today being a holiday Miss Hayes is the

21   only court reporter available, so she will not be able

22   to take down her own conversation or reading back with

23   you but the parties agree we can proceed in this

24   fashion since there's no other court reporters

JIM03439

TT-11

SA1266

1    available.

2              So, Miss Hayes, if you could go back to

3    that portion of your transcription and read back the

4    testimony of Jeanne Rathbun from November 7th of this

5    year.

6                        (The record was read by

7                        the court reporter.)

8              THE COURT:  Okay.  The jurors are excused

9    again and we'll see you when you're ready.

10                       (The jury continued to

11                       deliberate upon its verdict.)

12             THE COURT:  The sheriff at approximately

13   twenty after 12:00 advised me the jurors reached a

14   verdict.  It's give or take about twenty-five minutes

15   to 1:00 by the time I got the respective parties

16   together.  Everybody is here, the defendant, Thaddeus

17   Jimenez, his attorney, Mr. Charles Murphy, and

18   Mr. Gaughan and Mr. John Murphy for the State.

19             So it's been a long wait.  Let's see

20   what they have to say.  You can bring them out.

21                       (The following proceedings

22                       were had in the presence and

23                       hearing of the jury:)

24

JIM03440

TT-12

SA1267

1           THE COURT:  Okay.  You can all be seated,

2    please.  Thank you very much.  Mr. Foreman, has the

3    jury reached a verdict?

4           THE FOREPERSON:  Yes, we have, your Honor.

5           THE COURT:  Would you hand it to the sheriff,

6    please.  Miss Dozier, just give it to the clerk.

7    Miss Clerk, check it over, see if it's signed by the

8    foreperson and the eleven other jurors and it appears

9    to be in proper form.

10          THE CLERK:  Yes, your Honor, it is.

11          THE COURT:  All right.  Before I read the

12   verdict there are people here on both sides of the

13   case in the audience, those from the family of

14   Mr. Morro, those from the family of Thaddeus Jimenez.

15   I'm sure everybody out there will act like ladies and

16   gentlemen regardless of what the verdict is.

17          The verdict reads as follows:  We, the

18   jury, find the defendant, Thaddeus Jimenez, guilty of

19   first degree murder.

20          Mr. Charles Murphy, would you like for

21   me to poll the jurors?

22      MR. CHARLES MURPHY:  Yes.  Ladies and

23   gentlemen, what that means, the term polling the

24   jurors, I will ask each of you twelve the same

JIM03441

TT-13

SA1268

1    question, the question is in essence was this your

2    verdict when you signed it and is it your verdict now.

3    If it was your verdict when you signed it and it's

4    still your verdict now your answer would be yes to

5    that question, if it's something else you'll tell us.

6            Helen Buie, was this and is this your

7    verdict?

8            JUROR BUIE:  Yes.

9            THE COURT:  Lisa Leavitt, was this and is

10   this your verdict?

11           JUROR LEAVITT:  Yes.

12           THE COURT:  Michael Juricek, was this and is

13   this your verdict?

14           JUROR JURICEK:  Yes.

15           THE COURT:  Maura O'Reilly, was this and is

16   this your verdict?

17           JUROR O'REILLY:  Yes.

18           THE COURT:  Julia Olsta, was this and is this

19   your verdict?

20           JUROR OLSTA:  Yes.

21           THE COURT:  Henry Kleinmark, was this and is

22   this your verdict?

23           JUROR KLEINMARK:  Yes.

24           THE COURT:  Joe Garza, was this and is this

JIM03442

TT-14

SA1269

1    your verdict?

2            JUROR GARZA:  Yes.

3            THE COURT:  Thomas O'Callahan, was this and

4    is this your verdict?

5            JUROR O'CALLAHAN:  Yes.

6            THE COURT:  Gregory Klein, was this and is

7    this your verdict?

8            JUROR KLEIN:  Yes.

9            THE COURT:  Lynette Lilly, was this and is

10   this your verdict?

11           JUROR LILLY:  Yes.

12           THE COURT:  June Campbell, was this and is

13   this your verdict?

14           JUROR CAMPBELL:  Yes.

15           THE COURT:  Michael Kolarik, was this and is

16   this your verdict?

17           JUROR KOLARIK:  Yes.

18           THE COURT:  Okay.  The jurors have been

19   polled.  Ladies and gentlemen, we appreciate the time

20   you've given to this case, obviously it was not an

21   easy decision for you to make.  You spent a lot of

22   time on it and you were conscientious in that task.

23   We appreciate the time you've been with us for the

24   last five or six days overall and even last night that

JIM03443

TT-15

1    you had to spend away from home.  The system

2    appreciates your service on this case.

3              Now that the case is over with you can

4    talk to anybody about the case if you'd like or not

5    talk to anybody if you don't want to, that decision is

6    up to each one of you individually as far as whether

7    you want to talk about the case or not.

8              Now that the case is over with you'll be

9    free to go, you'll be escorted back to your cars if

10   you'd like.  You probably would not be called back for

11   additional jury service for at least one year from

12   now.  If you'll wait back in the jury room just for a

13   few minutes, I know it's been a long arduous last

14   couple of days, but I've got certificates of jury

15   service for you from the Chief Judge of the Circuit

16   Court, Donald O'Connell, signed by him, signed by

17   Thomas Fitzgerald, presiding judge of the Criminal

18   Division, who I work for basically, and myself,

19   acknowledging your service on the case.

20             We realize it's not much to give you for

21   all the time you've spent but it's the best we can do.

22   So if you go back to the jury room, get your things to

23   together, I'll be back to give these to you in a few

24   minutes and you can be on your way.  Thank you very

**JIM03444**

TT-16

1    much.

2                        (Jurors excused.)

3                THE COURT:  Judgment will be entered on the

4    jury's verdict of guilty of first degree murder of

5    Eric Morro.  The matter will be put over for

6    post-trial motions, if any, and sentencing, if we get

7    to that point.  Mr. Charles Murphy, it usually takes

8    approximately three to four weeks for a Presentence

9    Investigation to be accomplished.  So is the week of

10   December 8th through the 12th possible for you,

11   sometime during that week?

12               MR. CHARLES MURPHY:  The 10th is.

13               THE COURT:  Order of court December 10th.

14   There will be a Presentence Investigation ordered,

15   it's in the nature of academics, Mr. Jimenez has been

16   in custody the entire time since February of '93.

17   Bond will be revoked, in any event just to be on the

18   safe side.  He's been convicted by a jury of first

19   degree murder.

20               MR. JOHN MURPHY:  Judge, just as a courtesy

21   to the court, whatever date this goes forward for

22   sentencing, if in fact the sentencing hearing is

23   conducted on that day, we anticipate calling a large

24   number of witnesses on the date of the sentencing

                                        JIM03445

                        TT-17

1    hearing, in fact it will probably be somewhere in the

2    range of approximately twenty witnesses. I would just

3    let the court know that as a courtesy for scheduling

4    purposes.

5         THE COURT: Mr. Murphy, Charles Murphy that

6    is, that being the case would it be possible we can

7    make it December 9th instead of December 10th?

8         MR. CHARLES MURPHY: I have a case in Skokie.

9         THE COURT: We'll leave it for the 10th,

10   we'll manage it somehow or another. Mr. Jimenez,

11   you've been a gentleman all the way through this, I

12   appreciate that. If your mother and sister are out

13   there I'll give you a chance to spend some time with

14   them before they take you back to jail. You can

15   handcuff him to the chair in the jury box. Let him

16   see his mother and sister for a few minutes.

17

18

19

20            (The above entitled matter

21            was continued to

22            December 10, 1997.)

23

24

JIM03446

TT-18

SA1273

1    STATE OF ILLINOIS)
                      )    SS:
2    COUNTY OF C O O K)

3              IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION

4

5              I, BRENDA D. HAYES, Official Court

6    Reporter for the Circuit Court of Cook County, Cook

7    Judicial Circuit of Illinois, do hereby certify that

8    I reported stenographically the proceedings had on

9    the trial in the above entitled cause; that I

10   thereafter transcribed said trial into

11   typewriting, which I hereby certify to be a

12   true and accurate transcript of the proceedings

13   had before the Honorable STANLEY SACKS, Judge of

14   said court.

15

16

17

18

19              _____

20              OFFICIAL COURT REPORTER

21

22

23

24

                                        JIM03447

                    TT-19

SA1274

```
 1   STATE OF ILLINOIS )
                       ) SS.
 2   COUNTY OF C O O K )

 3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
     THE PEOPLE OF THE   )
 5   STATE OF ILLINOIS   )
                         )   Case No. 93-14710
 6       -vs-            )
                         )   Charge:  Murder
 7   THADDEUS JIMENEZ    )

 8

 9                    CONTINUANCE

10       REPORT OF PROCEEDINGS of the hearing before the

11   Honorable STANLEY J. SACKS, on the 10th day of

12   December, 1998.

13

14            APPEARANCES:

15       HONORABLE RICHARD A. DEVINE,
              State's Attorney of Cook County, by
16       MR. JOHN MURPHY and
         MR. DAVID GAUGHAN,
17            Assistant State's Attorneys,
              for the People of the State of
18            Illinois;

19       MR. CHARLES MURPHY,
              for the Defendant.

20

21
     Jamie F. Brown, CSR, Lic. #084-1665
22   Official Court Reporter
     2650 South California Avenue
23   Chicago, Illinois 60608

24
```

V 1

JIM03448

SA1275

1        THE CLERK:  Thaddeus Jimenez.

2        THE COURT:  All right. You're Thaddeus Jimenez?

3        THE DEFENDANT:  Yes, I am.

4        THE COURT:  All right. Charles Murphy for the

5    defendant. John Murphy for the State and David

6    Gaughan for the State as well. Correct?

7        MR. GAUGHAN:  That's correct.

8        MR. JOHN MURPHY:  Yes, your Honor.

9        THE COURT:  Matter would be up today -- is up

10   today I should say for post-trial motions and for,

11   if we get past that stage, for sentencing.

12          Mr. Charles Murphy.

13       MR. MURPHY:  I was going to file a post-trial

14   motion.

15       THE COURT:  Motion for new trial filed as to

16   Thaddeus Jimenez.

17       MR. JOHN MURPHY:  We acknowledge receipt.

18       THE COURT:  State has a copy as well.

19       MR. CHARLES MURPHY:  Judge, we have looked at

20   your calendar and the 18th, next week, is a good

21   date for us.

22       THE COURT:  I'll try and do it with regard to

23   what I have at the time because the matter's been

24   tried.  Actually this is the second time it's been

V 3                              JIM03449

SA1276

1    tried.  So we should get it resolved expeditiously.

2    I have some other things that day, but we will get

3    it done that day.

4         Mr. John Murphy for the State.

5    MR. JOHN MURPHY:  Yes, your Honor.

6    THE COURT:  How many witnesses, if any, if we

7    get past the motion for new trial, if we go to

8    sentencing hearing, how many witnesses, if any, does

9    the State propose they're calling?

10   MR. JOHN MURPHY:  Judge, we have spoken to

11   counsel and at one time we anticipated calling in

12   excess of twenty witnesses.  However, these

13   witnesses testified at the previous sentencing

14   hearing.  Counsel has agreed to stipulate that this

15   testimony would be the same.

16        So what we have proposed is that we would

17   present to the Court a transcript of their

18   testimony. And in view of that, it would appear now

19   that we probably will call at the most four

20   witnesses, possibly as few as two.

21   THE COURT:  Okay. Let me ask then if Thursday

22   December 18 is a date you have agreed upon, which is

23   fine, could we start earlier than my regular call?

24   That way you wouldn't have to wait until I dispose

V 4                    JIM03450

SA1277

1   of everything else.  If we start at nine o'clock on

2   the 18th and get it done before we start anything

3   else, how, Mr. Charles Murphy, how does that sound?

4       MR. CHARLES MURPHY:  Fine.

5       THE COURT:  As far as the transcripts, I'll be

6   more than happy to read them between now and then.

7   So I will have a couple of days to read it.  And I

8   don't know what Mr. Charles Murphy's position is

9   about admission of those.  But what I'm told I'll

10  read them.  If there's an objection made to them, if

11  I decide I shouldn't consider it, I will just

12  disregard it.

13      MR. CHARLES MURPHY:  Very good.

14      THE COURT:  That way I'll have them read.

15      MR. CHARLES MURPHY:  Judge, the State has the

16  transcript of the witnesses that have previously

17  testified.  Nonetheless I would assume the same

18  courtesy would be extended to me if I --

19      THE COURT:  I'll read whatever witnesses were

20  called in mitigation and aggravation on the original

21  sentencing for Thaddeus Jimenez, and then I'll hear

22  whatever live witnesses either side wants to

23  present. And I am not presupposing anything.  That's

24  merely on the argument for new trial.

V 5                    JIM03451

SA1278

1    MR. JOHN MURPHY:  Actually I do have

2  photocopies.

3    THE COURT:  Hold on one second.

4    MR. JOHN MURPHY:  We do have photocopies of

5  those witnesses, the testimony of those witnesses.

6  However, it's up in my office.  I'll obtain that

7  today and I'll deliver the further set of

8  transcripts.

9    THE COURT:  I'll read them between now and

10  December 18. It doesn't really matter at this

11  point.  I'm on trial starting at eleven.  I can make

12  it order of Court, or if you agree it can be by

13  agreement.  It doesn't matter.

14    MR. CHARLES MURPHY:  By agreement is fine.

15    THE COURT:  By agreement 12/18 for a hearing on

16  a motion for new trial and then sentencing if we get

17  to that stage.

18    MR. JOHN MURPHY:  Judge, I apologize to the

19  Court.  There is another matter I didn't bring up.

20    THE COURT:  What's that?

21    MR. JOHN MURPHY:  We spoke to counsel also

22  regarding certain disciplinary tickets that were

23  issued to the defendant while in the Department of

24  Corrections. It's my understanding that there would

V 6                    JIM03452

SA1279

1    be a stipulation as to the foundation for those

2    records and that there would be no necessity to put

3    the witness on.  It's also me understanding that

4    there would be no objection if the records were

5    disciplinary and the records were provided to the

6    Court and there was a stipulation with respect to

7    those records on the date of the sentencing hearing.

8        THE COURT:  Mr. Charles Murphy, is that

9    correct?

10       MR. CHARLES MURPHY:  They're not going to have

11   any difficulty from me in terms of establishing the

12   chain of custody.  The position we have is that

13   they're not relevant.

14       THE COURT:  Again with the same caveat.  I'll

15   read them.  If you make an objection, if I determine

16   your objections are properly made, I just won't

17   consider them. That will save me the trouble of

18   reading them afterwards.  I will read them between

19   now and December 18 and I'll determine if they're

20   admissible or not.  If not, they're not.  I'll

21   disregard them.

22       MR. CHARLES MURPHY:  Thank you.

23

24

V 7                                JIM03453

SA1280

1        THE COURT:  December 18 nine o'clock.  I'll be

2    here.

3                          (A continuance

4                          was taken to December 18,

5                          1997.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

V 8                          JIM03454

```
 1

 2   STATE OF ILLINOIS )
                      )   SS.
 3   COUNTY OF C O O K )

 4

 5

 6        I, JAMIE F. BROWN, CSR, Official Court Reporter

 7   for the Circuit Court of Cook County, Illinois

 8   Judicial Circuit of Illinois, do hereby certify that

 9   I reported in shorthand the proceedings had on the

10   hearing in the above-entitled cause; that I

11   thereafter caused the foregoing to be transcribed,

12   which I hereby certify to be a true and accurate

13   transcript of the proceedings had before the

14   Honorable STANLEY J. SACKS, Judge of said court.

15

16
                         _____
17                        Official Court Reporter
                          License #084-1665
18

19

20

21   Dated this 20th day

22   of May, 1998.

23

24
```

V 9                                    JIM03455

SA1282

```
 1   STATE OF ILLINOIS )
                       )  SS:
 2   COUNTY OF COOK    )

 3
                    IN THE CIRCUIT COURT OF COOK COUNTY
 4                  COUNTY DEPARTMENT-CRIMINAL DIVISION

 5

 6   THE PEOPLE OF THE   )
     STATE OF ILLINOIS   )
 7                       )
                         )  Indictment No.  93 CR 14710
 8        vs             )
                         )  Before: JUDGE STANLEY SACKS
 9                       )
     THADDEUS JIMINEZ    )  Thursday, December 18, 1997.
10                       )

11
     Court having reconvened pursuant to adjournment.
12

13   APPEARANCES:

14
                       HON. RICHARD A. DEVINE,
15                     State's Attorney of Cook County, by
                       MR. JOHN MURPHY and
16                     MR. DAVID GAUGHAN,
                       Assistant State's Attorneys,
17                     appeared on behalf of the People;

18
                       MR. CHARLES MURPHY,
19                     appeared on behalf of the Defendant;

20

21
     Annette W. Washington
22   Official Court Reporter
     2650 South California
23   Chicago, Illinois 60608

24
```

W-1

JIM03456

SA1283

```
 1        THE COURT: All right.  Case of Thaddeus Jiminez.
 2   The defendant is here.  His attorney, Charles Murphy
 3   is present.  John Murphy and David Gaughan for the
 4   State.
 5              It would be nice, gentlemen, when the
 6   court says 9:00 o'clock we start at 9:00 o'clock.  It
 7   applies to both sides.  I was here, court reporter was
 8   here, Mr. Jiminez was here.  State was late and then
 9   Mr. Murphy Charles went downstairs for some reason.
10              In any event, we're ready to start now.
11        MR. JOHN MURPHY: We apologize, Judge.
12        THE COURT: All right.  Mr. Charles Murphy, go
13   ahead.  There's a motion for new trial pending.  I
14   have read it.  Any portion of the approximate 20
15   paragraphs, you feel free to say.
16        MR. CHARLES MURPHY: Judge, it has occurred to me
17   in a case such as this where the jurors deliberate
18   over a period of two days for a total, according to my
19   chronometer of about 13 hours and 15 minutes, it's
20   apparent that they were having difficulty resolving
21   the factual issues that they had to resolve in order
22   to come back with a verdict.  If that indeed is the
23   case, then also has occurred to me that if error took
24   place during the course of the trial concerning
```

W-3

JIM03457

1    evidentiary matters or instruction matters, that kind

2    of error could have tipped the balance in a different

3    direction.

4              The matters that I have set forth in the

5    written motion that we contend were errors that took

6    place during the course of the trial, I'm suggesting

7    to the court that many of them alone, would constitute

8    reversible error.  Cumulatively, I believe, your

9    Honor, they also constitute reversible error.

10             I argued at great length in a pretrial

11   motion, as well as the prosecution, concerning the

12   admissibility of the testimony -- I'm going to close

13   that if you don't mind.

14   THE COURT: Yes.  Please.

15   MR. CHARLES MURPHY:  What I was just about to

16   allude to is the admissibility of the testimony of Mr.

17   Ezekiel Romo.  Mr. Romo, undoubtedly, as this court

18   recalls, is an individual who surreptitiously tape

19   recorded a conversation he had with Juan Carlos

20   Torres.  Mr. Torres is the same individual that young

21   Mr. Romo testified he was with.  And that he was the

22   person who was armed with a gun, not my client at the

23   time that Mr. Morro was fatally wounded.

24             The corroborative aspect of that father,

W-4

JIM03458

SA1285

1    Mr. Ezekiel Romo's testimony was significant, at least
2    from the -- the petitioner, the defendant, I should
3    say, point of view for a couple of reasons. One is
4    it, of course, takes the gun out of his hand. That's
5    the obvious reason. But in terms of the reliability
6    of the tape recorded conversation, it had the effect
7    of the impact of telling Mr. Ezekiel Romo that the
8    very things his own son was telling him about his own
9    involvement were true.

10    When Victor Romo told his father at the
11    time of the shooting he was some great distance away
12    from the shooting, and that he did not know that Mr.
13    Juan Carlos Torres had a gun, those matters were
14    disputed by Juan Carlos Torres when he spoke with
15    Ezekiel Romo. Not only was the conversation tape
16    recorded, but in addition to that, in terms of its
17    reliability, it disappointed Ezekiel Romo to find out
18    that his own son had lied to him about his own
19    possible involvement.

20    The significance of that, Judge, is I
21    think it enhances the reliability of the conversation
22    that Mr. Romo had with Juan Carlos Torres.

23    Ultimately, the court made a
24    determination that that conversation did not

W-5

JIM03459

1    constitute an admission against penal interest by Juan

2    Carlos Torres.  And I believe, if my recollection is

3    correct, that was the factual basis, thus the legal

4    basis upon which the court prevented us from

5    presenting the testimony of Mr. Ezekiel Romo

6    concerning that conversation.

7                However, Judge, in comparing or

8    contrasting, if you will, the testimony that was

9    adduced at the time of trial, the jurors did hear the

10   testimony of Victor Romo.  And the jurors did hear the

11   testimony of Tina Elder.  Collectively, that

12   testimony was that the person who is the shooter did

13   not have a gun in his hand when the dispute, at least

14   the initiated, when the swing was taken by Eric Morro

15   at the person who wound up pulling the gun and firing

16   that single shot.  They agreed that that what's

17   transpired.

18                At the conclusion of all of the evidence

19   in the case, I have requested that the jurors be

20   permitted to deliberate on a murder in the second

21   degree as a possible finding or possible verdict they

22   could reach predicated upon the evidence that was

23   heard.  The court made a determination that whoever

24   the shooter was, that testimony that I was arguing

W-6

JIM03460

SA1287

1   would support a second degree finding, could never

2   support such a finding.  And rather merely reflected

3   or indicated that whoever the shooter was that

4   committed the offense of first degree murder.

5          We take the position, Judge, that that

6   testimony virtually mirrors the testimony that could

7   have been heard if Mr. Ezekiel Romo had been permitted

8   to testify about what he was told by Juan Carlos

9   Torres he did.  We're of the opinion and thus we

10   suggest to the court that that testimony, if it can be

11   characterized on the one hand as only being first

12   degree murder type testimony, then it should have been

13   permitted that same kind of testimony, it should have

14   been permitted to be introduced through the testimony

15   of Mr. Ezekiel Romo.

16          We're of the position that to

17   characterize it on the one hand as being not an

18   admission against penal interest if Mr. Ezekiel Romo

19   is going to testify to it, but on the other hand, to

20   say it's only first degree murder type of testimony,

21   thus a second degree murder instruction can't be given

22   in support of it or in furtherance of it, we feel is

23   inconsistent.

24          At the conclusion of the evidence, the

W-7

JIM03461

SA1288

1    parties were, of course, arguing to the jury their
2    respective opinions as to what the evidence proved in
3    this case.  At the time that the prosecution was
4    giving its closing rebuttal argument, a reference was
5    made to the fact that and adverse inference could be
6    drawn from the fact that the defendant did not call
7    Ezekiel Romo to testify.  I remember I felt like I was
8    coming right out of my skin because I couldn't believe
9    the prosecution was making that argument.  It was only
10   predicated upon their persuading this court that Mr.
11   Ezekiel Romo's testimony should not be heard that he
12   wasn't called.  I had the man under subpoena.  I
13   wanted to call him.  The court ruled that his
14   testimony concerning that conversation with Juan
15   Carlos Torres would not be heard by the jurors.
16            In taking a look at some precedent in
17   this State, case of People versus Moya, M-o-y-a, 1988
18   decision cited at 175 Illinois Appellate 3rd, 22.  In
19   that case, like this case, the prosecutors stood up in
20   the closing rebuttal argument and suggested to the
21   jurors that an adverse inference could be drawn due to
22   the fact that the defendant in that case, did not call
23   his own mother to support his alibi testimony.  Yet it
24   was the same prosecutor who made that argument in that

W-8

JIM03462

SA1289

1  case who prevented the defendant from submitting

2  evidence to be heard by the jurors as to why his

3  mother was unavailable to testify.  That was deemed to

4  be reversible error in and of itself.

5              In another case, People versus Wills

6  cited at 151 Illinois Appellate 3rd, 418.  It's

7  another reversal predicated upon improper argument by

8  prosecution.  In that case, the court stated

9  "Furthermore, the test for permissibility of comment

10  on a defendant's failure to produce witnesses is not

11  merely whether the witness is more accessible to the

12  defendant than he is to the state.  It must be clear

13  that the witness was readily accessible to the defense

14  and not equally accessible to the prosecution".

15              The suggestion to those jurors that

16  Ezekiel Romo wasn't called by the defense because he

17  would not have supported the testimony of his own son

18  was outrageous.  Indeed, he would have supported the

19  testimony of his own son.  I was stuck with the

20  situation where it was this closing rebuttal argument

21  by the prosecution.  I wasn't permitted to get up and

22  make any further comment, rebuttal to it.  I remember

23  I suggested to the court that even after the jurors

24  were sent back to begin their deliberations you summon

W-9

JIM03463

SA1290

1   them back into the courtroom and either permit me to

2   make a fair, appropriate comment in regard to the

3   argument that was made by the prosecution.  And I also

4   think if that was not appropriate from your point of

5   view, that the court inform the jurors as to what the

6   facts were and why that witness wasn't called.

7       THE COURT:  Are you suggesting that I should have

8   told the jurors why certain witnesses were not allowed

9   to testify or why witnesses didn't testify?

10      MR. CHARLES MURPHY: I am talking about one

11  witness.  I'm talking about Ezekiel Romo.  That's the

12  witness.

13      THE COURT: All right.  Let's limit it to him.

14  You're suggesting I should have told the jurors

15  something about Ezekiel Romo.

16      MR. CHARLES MURPHY: Either, Judge, permit me to

17  have done so or in the alternative yourself.

18      THE COURT: All right.  Go ahead.

19      MR. CHARLES MURPHY: In a close case and again,

20  Judge, I believe that this was a difficult case for

21  the jurors to decide --

22      THE COURT: Let me interject for a second.

23  Certainly was a difficult case for the jurors to

24  decide.  They had a young man, Morro, who was -- I

W-10

JIM03464

SA1291

1  have forgotten exactly.  15 or 16 when he was killed.

2  And the --

3      MR. CHARLES MURPHY: I believe he was 18.

4      THE COURT: 18.  All right.  And the defendant

5  Thaddeus Jiminez was only thirteen years old at the

6  time of this murder.  So they had a very young man who

7  was -- had a lot at stake and the jurors were

8  obviously taking their job seriously.  Go ahead.

9      MR. CHARLES MURPHY: Yes, Judge.  I agree.  That

10  they did take it seriously.  My argument to the court,

11  though, is that that was error.  And in a close case,

12  error should not be deemed to be harmless error.

13          It was significant that the defendant be

14  able to not only argue, but establish the credibility

15  of the testimony of Victor Romo.  And the best way for

16  the defendant to have done that would have been

17  through the testimony of Victor Romo's father.  But

18  then, for the prosecution to argue to the jurors that

19  the reason that Victor Romo's father wasn't called is

20  an adverse inference could be drawn from the fact he

21  wasn't called, is to suggest to the jurors that he

22  wouldn't have testified consistent with his son.  And

23  the only reason that man didn't testify is because of

24  the motion in limine the prosecution prevailed on.

W-11

JIM03465

SA1292

1   That's the only reason.

2            Additionally, Judge, we feel that the

3   letters that my client had sent to his then girl

4   friend from the Audy Home concerning his personal

5   opinions about varying topics, as well as his opinion

6   of his former friend Larry Tueffel, should not have

7   been permitted to be introduced.

8       THE COURT: They were somewhat more than just his

9   opinions.  Letters indicated his intention if and when

10  he got out as to what he would do to Larry Tueffel,

11  for testifying against him.  More than just his

12  opinion that he did not like Larry Tueffel.

13      MR. CHARLES MURPHY: I understand that, Judge.

14  Nonetheless, your Honor, my client was in custody.  No

15  threats were ever conveyed to Larry Tueffel, in my

16  client's behalf.  No one made any effort to harm Larry

17  Tueffel.

18            Indeed, Judge, in those very same

19  letters, there's was a reference by my client as to

20  what his lifestyle was in the Audy Home.

21      THE COURT: You were able to argue to the jurors

22  that some of the stuff he told his girl friend, he was

23  13, his girl friend was around 12 at the time.  Some

24  of the things he wrote to her from the Audy Home were

W-12

JIM03466

1  merely puffing on his part.  They were not accurate

2  accounts of what went on in the Audy Home.  Made some

3  statements of being able to get marijuana and how he

4  was able to convey to the guards there what he wanted

5  to do and they allowed him to do certain things,

6  something like that.  And you argued to the jurors

7  that that portion of his letters which eventually

8  changed in later letters was merely puffing and,

9  therefore, what he said about his viewpoint about

10  Larry Tueffel was also basically puffing.  You argued

11  that to the jurors, correct?

12       MR. CHARLES MURPHY: Indeed I did argue that to the

13  jurors.

14       THE COURT:  Isn't that a factual determination

15  whether or not that is evidence of consciousness of

16  guilt on his part, the letters from the Audy Home to

17  his girl friend conveying the fact that when he gets

18  out, if and when he does get out, what he was going to

19  do regarding Larry Tueffel.  What the Simon City

20  Royals, indicative gang stuff from the jail -- not the

21  jail.  The Audy Home.  Juvenile Detention facility.

22  The jury was instructed that was evidence they could

23  consider on the limited issue of evidence of

24  consciousness of guilt on Thaddeus Jiminez's part.

W-13

JIM03467

SA1294

1    MR. CHARLES MURPHY: We're of the opinion, Judge,

2    that that evidence was like a power keg. In view of

3    the fact there was no admission by my client in any of

4    those letters in his involvement in this case. In

5    addition to the fact that so many of the things he

6    wrote and discussed in his letters to his then girl

7    friend were so silly. In view of the fact he had, in

8    those letters, guards at the Audy Home acting as his

9    waiters. Going out getting him food, getting him

10    beer, getting him marijuana.

11    THE COURT: You ably argued that he was puffing

12    about that. Just telling the girl friend who he was

13    trying to impress. He's 13. She was 12. Girl friend

14    boyfriend. He's trying to impress her as to what he

15    can do. Big man at the jail the fact so in fact he

16    writes those letters and you argued ably to the jury

17    he was puffing. He was trying to impress the girl

18    friend as to what he could do. But he also -- jurors

19    could also determine based on some things said in

20    those letters that they showed is true. The letters,

21    none of which admitted that Thaddeus Jiminez shot Eric

22    Morro, but the letters were offered and I believe are

23    admissible to show evidence of consciousness of guilt

24    on his part.

W-14

JIM03468

1          The defendant obviously, whatever a
2    defendant says, could have some incriminating or
3    damaging effect to it.  And if he says it, that's his
4    choice to say it.  His choice to write the letters to
5    his girl friend from the detention facility suggesting
6    about Larry Tueffel, talking about this stuff with the
7    Simon City Royals and their drawing the gang pictures
8    and all that stuff.  He made the choice to do that so
9    I don't see how you can complain now that it's
10   prejudicial when it's evidence of conscious of guilt.
11        MR. CHARLES MURPHY: That's where the dispute
12   arises between the court and defendant, Judge.
13        THE COURT: All right.  Reasonable minds can differ
14   perhaps.
15        MR. CHARLES MURPHY: For all of the reasons I have
16   suggested, both in the written motion, as well as
17   those matters I have discussed this morning here in
18   the courtroom, Judge, I'm asking you to reconsider the
19   verdict that was returned by the jurors and grant us a
20   new trial.
21        THE COURT: Thank you Mr. Murphy.  Mr. John Murphy.
22        MR. JOHN MURPHY: Yes, Judge.  With respect to the
23   number of the allegations that are made in the motion,
24   I believe they were argued extensively during the

W-15

JIM03469

SA1296

1   course of the trial.  And I would rely on the

2   arguments that were made at that time.  However, there

3   are 3 points in particular that I'd like to respond

4   to.  And that's points 25, 26 and 27 in the motion for

5   new trial.

6              Those points are directed to the closing

7   argument that was made.  And specifically, directed to

8   the argument that I made to the jury.  Your Honor,

9   it's ironic that I stand here today and face the

10  allegation that the defendant makes in this motion.

11  In light of the arguments that he made to this jury

12  prior to my argument.

13             I would ask this court to consider the

14  context in which those arguments were made based on

15  the arguments that the defense made to the jury.  I'm

16  specifically referring to the closing argument that

17  the defendant made.  I would point out to the court

18  that prior to the time that the argument was made in

19  rebuttal, at least prior to the defense's argument, we

20  had no intention whatsoever of referring at all to

21  Ezekiel Romo until the defense made their closing

22  argument.  We have obtained a copy of the closing

23  argument made by the defense.  And what I'd like to do

24  is just read a few selected portions of that argument

W-16

JIM03470

SA1297

1    to the court in order to establish the context under

2    which our argument was made in response.

3        THE COURT: Very well.

4        MR. JOHN MURPHY: In reading that to the court,

5    what I would ask the court to recall is 2 rulings that

6    this court made. One regarding a prior -- prior

7    consistent statements of Victor Romo. And the court

8    granted our motion precluding any reference to the

9    prior consistent statements that Victor Romo made.

10       THE COURT: Victor Romo is the kid that said he was

11   there with someone else who was not Jiminez.

12       MR. JOHN MURPHY: That's correct, Judge. And we

13   made a motion with respect to his prior consistent

14   statements which included a custodial statement to the

15   police. Also prior statements that were made in court

16   in his trial and in the prior trial in this case.

17              Further, Judge, we'd ask the court to

18   consider another pretrial ruling you made. That's in

19   regard to the alleged third party admission by Juan

20   Carlos Torres. And specifically recalling the basis

21   of that motion. The basis was it was not reliable.

22   Whether Ezekiel Romo testified or anybody else

23   testified, it did not make a difference because it was

24   not reliable and there should be no reference to that

W-17

JIM03471

SA1298

1    statement on that basis.

2                What I'd like to do if I could is read

3    these arguments and I'd ask the court to consider how

4    the defense weaved evidence of the prior consistent

5    statement of Victor Romo and the alleged third party

6    admission by Juan Carlos Torres in his closing

7    argument, in fact in violation of this court's

8    pretrial ruling.

9                This is on my copy, page 8.  "But he"

10   referring to Victor Romo, "Told you that he talked

11   with his father shortly after it took place.  One

12   would think a little boy, a twelve year old boy who is

13   in a lot of trouble, although he may be willing to lie

14   to his dad about what he did, has no reason to lie to

15   his dad about someone else.  As a matter of fact, if

16   you're a little 12 year old boy and you're scared to

17   death and you're talking to your dad, about the

18   shooting you will try and foist it off and someone

19   else, but you'd tell him who the someone else was.

20   And what did Romo's dad do after he speaks with his

21   son.  He, in turn, goes and he speaks with Juan Carlos

22   Torres at a restaurant.  They weren't talking about

23   the bears prognosis for the future.  They were talking

24   about the event that took place on February 3rd.  They

W-18

JIM03472

SA1299

1    had to have been.

2              You know that Mr. Romo, young Mr. Romo

3    got arrested on the 10th day of February, 7 days after

4    the shooting took place. And I asked the detective if

5    he -- if after you arrested young Mr. Romo, did you go

6    look for Juan Carlos Torres. He said yes. I wonder

7    what the source of that information was as to why he

8    went looking for him. The point, ladies and

9    gentlemen, is Victor Romo has been consistent, from

10   his father, to the police. Mr. Gaughan: Objection.

11   The Court:  The ladies and gentlemen have heard the

12   evidence. They recall what the witnesses said.

13   Overruled. Mr. Charles Murphy. In 2 prior trials,

14   his own and my client's in saying that he was with a

15   young man whose name was Juan Carlos Torres".

16             Moving on, Judge, to another portion of

17   the defense argument. Page 24 in my transcript. "It

18   is very apparent and I suggest to you, that Victor

19   Romo has been consistent all throughout this

20   investigation from the time he talked to his dad. Mr.

21   Gaughan: Objection. The Court: Again, the jurors

22   have heard the evidence. They will recall what the

23   witnesses have testified to. Go ahead, please. Mr.

24   Charles Murphy: Thank you. The young man told you

W-19

JIM03473

1   from the witness stand that he talked to his father

2   and that he and his father went to a restaurant where

3   Juan Carlos Torres was.  That's what the testimony

4   was.  Then the testimony that he gets arrested and he

5   talks to the detective.  Then the detective tells you

6   that he goes looking for Juan Carlos Torres.  Then

7   Victor Romo tells you that he testified in his own

8   trial.  He tells you that he testified at my client's

9   first trial.  He testified at this trial.  He says

10  it's Juan Carlos Torres".

11           And then, Judge, moving on to the last

12  excerpt from the argument.  And this is actually the

13  concluding argument that the defense made to the jury.

14  Last words.  "Victor Romo has been consistent in

15  telling you who he was with.  A curly haired teenager

16  whose name was Juan Carlos Torres.  I'd ask you to go

17  back there and deliberate then come back out here and

18  sign a not guilty verdict.  Justice will have been

19  served".

20           Those are the arguments that the defense

21  made to the jury in this case.  What the defense did

22  was weave evidence regarding the prior consistent

23  statements of Victor Romo and the third party

24  statement of Juan Carlos Torres together to make that

W-20

JIM03474

SA1301

1  the main thrust of the defense theory in this case.

2  The only problem with that, Judge, or at least one of

3  the theories of this case.  The only problem with that

4  is, Judge, that was in violation of this court's

5  order.

6          This court ordered that there would be

7  no evidence of the prior consistent statements of

8  Victor Romo.  This court ordered that the third party

9  statement of Juan Carlos Torres to Ezekiel Romo was

10  not admissible based upon reliability.  And what the

11  defense did, nonetheless, is just argue to the jury

12  that in fact it occurred.  Told the jury in closing

13  argument that Juan Carlos Torres made a third party

14  statement admission to Ezekiel Romo.  And weave that

15  in with the prior consistent statements of Victor

16  Romo.

17          Not only is it a violation of the

18  court's pretrial orders, but the argument was not

19  based on the evidence.  Because there was no evidence

20  in this record to support those arguments.

21          Now, the defendant in his motion for new

22  trial alleges that in the rebuttal argument that the

23  State misled the jury as to what the testimony of

24  Ezekiel Romo would have been if he were called by the

W-21

JIM03475

SA1302

1    defense.   They also state and -- and credibly
2    suggested that Ezekiel Romo could not or would not
3    corroborate his son's testimony.  Well, Judge, that's
4    just not true.   That's not what the state, what I
5    argued to the jury.  What I argued to the jury was is
6    there was no evidence.   There was no evidence
7    regarding Juan Carlos Torres' statement to Ezekiel
8    Romo.   And that's the situation that I was confronted
9    with.   Not anticipating having to deal with this issue
10   at all, but having to respond to the arguments that
11   were made by the defense.
12              And in that context, I would ask this
13   court to consider those arguments.   And I submit to
14   the court, that they were invited comments and merely
15   the attempt was on -- and response was to just point
16   out to the jury that in fact there was no evidence and
17   they should not consider the defendant's argument as
18   evidence.
19              With respect to the other points, as I
20   have already stated, Judge, I believe there were
21   arguments made extensively during the course of the
22   trial and we'd rely on those arguments.
23       THE COURT:  Mr. Charles Murphy, it's your motion.
24   You get to response next to last.


                              W-22


                                                  JIM03476


                         SA1303

1    MR. CHARLES MURPHY: In reading to you excerpts of

2  my closing arguments, I believe there's two times that

3  the prosecution objected to my argument.  Undoubtedly

4  you noted at that time you overruled both of those

5  objections.

6            In terms of reviewing now what I said,

7  even though at the time I said it, apparently this

8  court did not feel it was inappropriate, was not

9  predicated or based upon the evidence adduced during

10  the trial.

11            Undoubtedly you will recall that Victor

12  Romo did testify that he had testified at his own

13  trial in juvenile court.  And he had testified

14  previously at my client's trial.  That was in the

15  record.  That's evidence that was heard by the jurors.

16  I think it's quite proper argument to suggest to the

17  jurors that if this is a recent fabrication, we'd have

18  heard about it in terms of the impeachment of that

19  particular witness.

20            But what I didn't do, I did not ask

21  Victor Romo consistent with the order you had made in

22  a pretrial basis what is it that you said to your

23  father when you spoke to him.  I did not ask him what

24  did you say when you testified at your own trial about

W-23

JIM03477

SA1304

1  who the shooter was.  I didn't ask him what did you

2  say about who the shooter was at my client's first

3  trial.  I didn't do it.

4          I can't even begin to recall how many

5  times I have been confronted with the situation where

6  a police officer has testified that he has spoken to a

7  witness who is unavailable and as a result of that

8  conversation that he has had, he then makes his next

9  move and goes looking for the defendant.  That has

10  been deemed to be by the courts of review in this

11  state, proper evidence to adduce for the trier of

12  fact.  Even despite the fact it so strongly suggests

13  that what was said was evidence or statement that

14  implicated the defendant in the case.

15          But in this particular case, Judge, it

16  was undisputed evidence that young Victor Romo spoke

17  with his father.  After he spoke with his father, his

18  father then had a meeting conversation with Juan

19  Carlos Torres.  That was proper evidence.  What was

20  improper was to suggest to the jurors that the reason

21  that Mr. Romo Senior wasn't called to testify is he

22  would not have testified consistent with his son's

23  version of the facts.  That's what was wrong because

24  he would have.

W-24

JIM03478

SA1305

1    THE COURT: All right. Thank you. I'm not going
2  to comment on each one of the 28 paragraphs in this
3  motion. As I said before, I have read it.
4           As far as paragraphs 1 and 2, those are
5  merely accurate statements of what occurred. Thaddeus
6  Jiminez is the petitioner in the case. He was found
7  guilty of the murder of Eric Morro by a jury
8  approximately a month or so ago.
9           As far as paragraph 3 is concerned, the
10  jurors heard the evidence. They heard the defendant's
11  mother and the other witness or two that testified to
12  an alibi. They heard the state witnesses, two of
13  which I think that knew Mr. Jiminez before the night
14  of this murder in February of '93. One young lady who
15  lives in the area with her mother indicated that
16  Thaddeus Jiminez is the person she saw across the
17  street with Morro and Tueffel and some other people.
18  And then, the mother of that girl who indicated that
19  she wasn't sure it was Jiminez, or could have been
20  Jiminez or one other person in the lineup. She
21  narrowed it down to 2, but there were 3 other people
22  who said Thaddeus Jiminez is one of the people across
23  the street where the shooting of Eric Morrow took
24  place.

W-25

JIM03479

SA1306

1          Those were factual questions for the
2   jury to determine.  Whether or not they were convinced
3   beyond a reasonable doubt that the witnesses who had
4   given statements earlier not  identifying Thaddeus
5   Jiminez were truthful when they said Jiminez is the
6   person who shot Eric Morro, or whether or not there
7   was a reasonable doubt created by the testimony of the
8   mother, one of her girl friends and another person, I
9   believe, who indicated that Thaddeus Jiminez is some
10  place other than where the shoot took place.  That was
11  for the jurors to decide.  They determined, after
12  deliberating as Mr. Charles Murphy said for a long
13  period of time, that Thaddeus Jiminez was the young
14  man who shot Eric Morro.
15          The defense suggests it was a close
16  case.  The jurors heard the evidence.  They determined
17  after lengthy deliberation time that Thaddeus Jiminez
18  is the man, the boy, who shot Eric Morro back on
19  February 3rd and 4th of 1993.  The length of the
20  deliberations shows the jurors were conscientious.
21  You wouldn't expect them to go back there and rush to
22  a judgment in a case where you have a person who is 17
23  or 18 who is murdered and someone on trial who was 13
24  at the time.  I think that conscientious juries take

W-26

JIM03480

SA1307

1    their time, discuss the issues, hash out the

2    disagreeing points then go on from there and attempt

3    to reach a verdict.  It's not easy sitting where the

4    jurors sit.  And it's not easy sitting up here either.

5              In any given case, whatever a jury does,

6    that's what the jury does.  If the jury would have

7    come back with a not guilty on Thaddeus Jiminez, I

8    would have had no problem with that.  Jury came back

9    with a guilty, I have no problem with that either

10   because I wasn't deciding the case.  The jurors were.

11   And they were convinced beyond a reasonable doubt

12   based on all the evidence in the case, pro and con

13   that Thaddeus Jiminez shot the boy on February 3rd or

14   4, 1993.

15             As far as the paragraphs 4 and 5 and  6

16   and 7 dealing with the issue about jury selection, all

17   that is in the record.  I'm not going to take up the

18   time to rehash that.

19             As far as the paragraphs dealing with

20   testimony -- would have been the testimony concerning

21   an alleged third party admission or confession by Juan

22   Carlos Torres, court was faced with 3 excellent

23   lawyers on this case who presented arguments regarding

24   the admissibility of that conversation which was

W-27

JIM03481

SA1308

1    recorded by the father of Romo.  That being Ezekiel

2    Romo, the father.  And there was lengthy arguments.

3    Both sides presented case law.  The court did its own

4    research on the subject.  And the court determined

5    that the purported third party confession of Juan

6    Carlos Torres was not reliable.  Should not be

7    something the jurors should hear.

8              So Juan Carlos Torres was not available

9    for cross examination.  The statement was essentially

10   leading pretty much all him doing is saying yes, sir

11   and no to various questions.  Basically exculpatory

12   taking not only himself out, but taking everybody out

13   who was theoretically involved in the case, that being

14   the other boy named Romo.  Also taking out Thaddeus

15   Jiminez as well.

16             Court considered the arguments of the

17   attorneys, what the court believed the law was on that

18   issue declaration against penal interest.  And the

19   court made the call the evidence was not reliable in

20   this courts opinion.

21             One thing the court never claims is

22   infallibility.  I made a decision the best I could at

23   the time based on the evidence and the law I perceived

24   was applied in the case.  And I think that was a

                          W-28

JIM03482

SA1309

1  correct decision.  If I'm shown to be wrong, I'm shown

2  to be wrong.  I don't think I was.  But I'm not

3  infallible, as I said before.

4          Regarding the letters, I commented on

5  that before when I sort of rudely interrupted Mr.

6  Charles Murphy during his arguments.  That the letter

7  sent by Thaddeus Jiminez to the -- his girl friend,

8  it's hard for me to fathom talking about someone 13

9  writing letters to his girl friend who is 12 from the

10  jail basically.  But that is what Thaddeus Jiminez

11  did.  He wrote various letters to his girl friend

12  which unfortunately, for Jiminez the girl's mother

13  eventually found and they were turned over to the

14  police or whatever.

15          And the letters basically indicated

16  Jiminez's obvious disdain for Larry Tueffel.

17  Jiminez's viewpoint as to whether the Simon City

18  Royals or he or combination of both would take care of

19  business regarding Larry Tueffel when Thaddeus Jiminez

20  got out, whenever that might be.  And I think those

21  letters clearly establish evidence of consciousness of

22  guilt on his part.  The defense ably argued that the

23  letters may have merely just been puffing on his part.

24  That he didn't really mean what he said about killing

W-29

JIM03483

1   Tueffel when he got out or if and when he got out; or

2   having the Simon City Royals do it.  But the jurors

3   could have also determined that those letters

4   evidenced a consciousness of guilt on his part for the

5   murder of Mr. Morro.

6          The defense in paragraph D, large

7   paragraph 16, subparagraph E says the lack of

8   credibility of these ramblings of a 13 year old author

9   of these letters was reflected in the descriptions of

10  his beer drinking, pot smoking life style at the Audy

11  Home.  Well, again, that was something for the jurors

12  to kick around back there.  And whether they did or

13  not, I don't know.  But the defense ably argued to the

14  jury that Jiminez was merely puffing.  That that stuff

15  wasn't true.  He didn't have any ability to get

16  marijuana, drink or tell the guards what to do for him

17  at the Audy Home.  He was just puffing to try to

18  impress his twelve year old girl friend at time.  But

19  they could have also determined that those letters

20  evidenced a conscious of guilt on his part.

21          As far as subparagraph E, I don't think

22  there's any undue prejudice.  Probative value of the

23  letters outweighed the possible prejudicial effect.

24  The defendant chose to write the letters.  Probably

W-30

JIM03484

SA1311

1  thought that the girl friend, such as it is, a 12 year

2  old girl, that the girl friend would not have turned

3  the letters over to anybody. But unfortunately for

4  Jiminez, they wound up in the hands of the police and

5  state's attorneys eventually.

6       And the letters, while I did agree did

7  not come right out and say I killed Eric Morro, they

8  did basically indicate some evidence for the jurors to

9  determine it showed evidence of conscious of guilt on

10  his part.

11       As far as the other comments or

12  arguments, I should say, dealing with the issue of

13  second degree murder, whether or not instructions

14  should have been given about that, that goes basically

15  through paragraphs 17 through and including

16  approximately 23 or 24. They are interwoven arguments

17  about the instruction about second degree murder not

18  having been given. That's one thing I feel fairly

19  comfortable with. There's no evidence in this case in

20  my opinion, whatsoever of any second degree murder in

21  behalf of Thaddeus Jiminez. Either the jury could

22  have found they weren't convinced he was the boy that

23  shot Mr. Morro or they were convinced beyond a

24  reasonable doubt that he shot and killed him on

W-31

JIM03485

1   February 3rd and 4th of 1993. I didn't see any

2   evidence then, nor do I see any now that the shooting

3   would have constituted second degree murder on the

4   basis that the -- on the assumption that is that

5   Jiminez was the shooter and the jurors found that he

6   was.

7            Regarding again, paragraph 28, which

8   says the jurors were out for a long time. That's

9   true. They were out for a long time. 13 hours and

10  fifteen minutes, according to the defense motion,

11  probably about that time. I have no reason to dispute

12  the figures. It doesn't necessarily reflect what

13  would be a quote unquote close case. The jurors

14  unanimously reached a verdict. Unanimously by 12

15  jurors that they were convinced beyond a reasonable

16  doubt that Thaddeus Jiminez referred to as T. J. was

17  the fellah who shot Mr. Morro on February 3rd and 4th

18  of 1993.

19           To me it could also easily reflect a

20  serious concern on their part that they made a correct

21  decision. They would not want to, as some lawyer in

22  Los Angeles said a while back, rush to judgment. And

23  they did not rush to judgment. They considered the

24  case, reached a verdict that turned out adversely to

W-32

JIM03486

SA1313

1    Thaddeus Jiminez.  But that's the way system works.

2    He opted for 12 jurors to hear the case.  They heard

3    the case.  They were convinced after hearing excellent

4    lawyering on both sides.  Excellent closing arguments

5    on both sides that the state had proven the case and

6    that's the situation we have to deal with at this

7    particular time.

8           Any other thing I did not specifically

9    comment on was not left out purposefully.  I believe I

10   ruled on various other things which were in the motion

11   at the time they came up, so there's no need for me to

12   cover those at this particular time.

13          The defendant was tried by a jury of his

14   peers, all of whom were asked specifically before the

15   trial itself in voir dire would the fact there was any

16   purported gang involvement in this case effect their

17   ability to be fair and impartial.  They all said they

18   -- it would not and they reached their decision.  And

19   that's a decision, at this point, Thaddeus Jiminez is

20   basically going to have to live with.

21          The motion for new trial as to Thaddeus

22   Jiminez is denied.  What's the next step.  The hearing

23   in aggravation mitigation Mr. John Murphy.

24   MR. JOHN MURPHY: Judge, there was a presentence

W-33

JIM03487

SA1314

1    report given to the parties on the last date.

2         THE COURT: Okay.  I have read it.  Mr. Charles

3    Murphy, is there anything about that presentence

4    investigation report you think was factually

5    inaccurate.

6         MR. CHARLES MURPHY: No.

7         THE COURT: Mr. John Murphy.

8         MR. JOHN MURPHY: No.  However, we'd ask leave to

9    supplement that report.

10        THE COURT: All right.  I would also point out that

11   the parties have given me certain documents which I

12   have read.  When we get to the issue of what parts, if

13   any or all I'm going to consider, I will let you know.

14   But what was given to me were transcripts of testimony

15   from November of 1994 of witnesses who the state

16   called in aggravation before then Judge Berkos who

17   heard this case the first time.  Also, there were a

18   couple of defense witnesses also who testified in

19   November of '94.

20             There's also forensic psychological

21   evaluation reports which were tendered by the defense

22   which I have read concerning Thaddeus Jiminez.

23   There's a psychological assessment from the department

24   of Clinical Services of the Cook County Juvenile

W-34

JIM03488

```
 1    Court.  And there were also a couple of articles
 2    basically which Thaddeus Jiminez wrote while in
 3    custody for a paper from the Juvenile Detention Center
 4    showing ability on his part if he chose to do so, to
 5    do things constructively other than run around with
 6    that silly gang stuff.
 7              Also, the State supplied and I have read
 8    all through these again a number of times, Illinois
 9    Department of Corrections record which are basically
10    disciplinary reports of Jiminez while he was in
11    custody, both in the Juvenile Detention Center
12    awaiting trial subsequently in the juvenile -- the
13    youth commission before being ultimately transferred
14    to the Department of Corrections Adult facility.  And
15    that's all before the case ultimately came back for a
16    second trial.  So, I have read all those things.  And
17    then, when the -- the sides let me know what they are
18    offering and I will then tell you what parts if any or
19    all I'm going to consider.
20              What does the State want to supplement
21    your presentence investigation with?
22    MR. JOHN MURPHY:  Judge, we would seek leave to
23    supplement the presentence report with a 2 page
24    document which is known as a Juvenile Criminal
```

W-35

JIM03489

SA1316

1    History, which is kept by the Chicago Police

2    Department which lists the arrests, the determinations

3    by the police department as to whether or not there

4    was a station adjustment.  And also, whether or not

5    there was referral on some of the cases as well.

6        THE COURT: Before I even look at them, what's your

7    position about that, Mr. Charles Murphy.

8        MR. CHARLES MURPHY: I believe they are accurate.

9        THE COURT: Okay.  What's your position regarding

10   whether they are admissible or what value I should

11   give to them, if any.

12       MR. CHARLES MURPHY: Judge, to the best of my

13   knowledge, they are admissible.

14       THE COURT: All right.  Anything else Mr. John

15   Murphy, as far as documents you want me to look at.

16       MR. JOHN MURPHY: Yes, your Honor.

17           Your Honor, in addition, the People

18   would provide the court with 4 certified findings from

19   juvenile court with respect to the defendant.

20           One on case number 92 J 16124 on a

21   finding on a criminal trespass to vehicle.  Another on

22   a case number 92 J 19110 on a finding on a charge of

23   burglary.  A third on a finding in which a supervision

24   sentence was imposed on a case number 91 J 4849 in

W-36

JIM03490

1   juvenile court on a battery.  Finally on a finding on

2   case number 92 J 12872, also case in which supervision

3   was imposed on a criminal damage to property.

4      THE COURT: All right.

5      MR. CHARLES MURPHY: Judge Sacks, I'm sorry.

6      THE COURT: Go ahead.

7      MR. CHARLES MURPHY: I thought when you asked that

8   question that you had in your hands the very document

9   that Mr. Murphy is alluding to now.

10     THE COURT: No.  What I have in my hands is the --

11   are 2 pieces of paper talking about primarily station

12   adjustments.  A few indications of referring or the

13   adjudications, whatever those refer to.

14     MR. CHARLES MURPHY: Judge, it's our position those

15   should not be referred to.

16     THE COURT: I'll tell you my position in a moment.

17   The delinquency finding trespass to vehicle on first

18   case, what was the result?  What happened to that?

19   What was the disposition I mean.

20     MR. JOHN MURPHY: Judge, the case was continued to

21   December 11th for disposition and the case was closed.

22     THE COURT: So what happened?  What was the

23   disposition.

24     MR. JOHN MURPHY: Judge, it was just a finding.

W-37

JIM03491

SA1318

1      THE COURT: Okay.  What about the burglary in the

2  second case.

3      MR. JOHN MURPHY: Judge, the case was continued

4  again for disposition on February 16, 1993 and then

5  the case was closed.

6      THE COURT:  Okay.  That's because ultimately he

7  was in custody on the murder by that time, correct,

8  February of '93?

9      MR. JOHN MURPHY: February -- actually, that's

10  correct, Judge.  It was actually closed on July 6th of

11  '93.

12      THE COURT: All right.  But there's four findings,

13  however.

14      MR. JOHN MURPHY: Yes.  That's correct.

15      THE COURT:  Criminal trespass, burglary, battery

16  and criminal damage to property.

17      MR. JOHN MURPHY: That's correct, Judge.

18      THE COURT: Okay.  The adjudications are

19  admissible.  We'll talking about the station

20  adjustments and stuff like that in a moment.  Mr.

21  John Murphy, anything else?

22      MR. JOHN MURPHY: No, your Honor.

23      THE COURT: Any live witnesses or anything you want

24  me to hear.

W-38

JIM03492

SA1319

```
 1      MR. JOHN MURPHY: Judge, we do have 2 live
 2  witnesses.  So the record is clear, the court was
 3  provided transcripts.  There would be a stipulation
 4  between the parties --
 5      THE COURT: Let me interject.  The stipulation is
 6  if those witnesses were called again to testify, they
 7  would say that.  There's no stipulation as to their
 8  admissibility, correct Mr. Charles Murphy?
 9      MR. CHARLES MURPHY: Yes.
10      THE COURT:  Go ahead.
11      MR. JOHN MURPHY: I believe the stipulation would
12  also stand with respect to the disciplinary reports
13  which are made part of the record at this time.
14      THE COURT: Correct.  Mr. Charles Murphy, you're
15  not agreeing to consider them, but you're merely
16  agreeing if those reports were made and if I decided
17  to consider them, the State will not have to bring in
18  witnesses from the Department of Corrections?
19      MR. CHARLES MURPHY: Yes.
20      THE COURT: Okay.  Let me rule on this first, then
21  the State can call whoever they would like thereafter.
22              As far as the testimony of the hearing
23  before Judge Berkos back in November of '94, who
24  presided over the first trial of Thaddeus Jiminez, the
```

W-39

JIM03493

1  court reviewed that testimony on a couple of

2  occasions.  And hearsay is admissible as far as the

3  sentencing hearing.  The court determines that its

4  reliability should be considered by the trier of --

5  sentencing court determine the appropriate penalty.

6  I'll comment on those particular points now as to what

7  things I'm going to consider or not consider.

8              May 28, 1990, testimony of Officer

9  Evangelista about the defendant and another guy taking

10  the officer's son's bike, that will be considered.

11  The officer himself saw Jiminez pass the house with

12  another guy.  And he saw Jiminez riding the bike a

13  short time later after it was taken from his little

14  son.  So there's some corroboration to the fact that

15  Jiminez took the boy's bike.  That's was in May of

16  1990.  Jiminez would have been how old then?  About

17  11?

18       MR. CHARLES MURPHY: 10.

19       THE COURT: 10?  The June 6th testimony of Officer

20  Pete Romon, R-o-m-o-n, about the defendant allegedly

21  biting some lady or lighting firecrackers.  The court

22  will not consider that testimony of Officer Romon.

23  Clearly hearsay.  No evidence to corroborate that one

24  way or the other and the court will not consider that.


W-40

JIM03494

SA1321

1              Testimony of Officer Richard Jones from
2    December 7th about a disturbance supposedly at a pizza
3    place and some guys having their hats thrown off or
4    something by Jiminez and some other guys.  I won't
5    credit that either.  No corroboration to that hearsay
6    statement by these various individuals.  Court will
7    consider the testimony by Officer David Eshoo,
8    E-s-h-o-o, regarding the criminal damage to property
9    at the school that Jiminez attended.  Criminal damage
10   to property, the school that Jiminez attended November
11   15, 1991.  Regarding Jiminez scratching gang signals
12   on the desk.  Officer testified before Judge Berkos
13   that he saw the gang insignia or what he believed to
14   be gang stuff on the desk which corroborates to some
15   extent the hearsay statement of the principal or the
16   person who reported that incident.
17             The Court will accept the testimony of
18   Officer Barron, B-a-r-r-o-n, regarding January 10,
19   1992, where the defendant was a observed by Officer
20   Barron driving a car, stopped the vehicle and the
21   defendant said it was his grandmother's car.  He was
22   taking it out for a joyride.  So the officer saw him
23   in the car.  Defendant acknowledged he was driving the
24   car at time in January of 1992.  Jiminez may have been

W-41

JIM03495

SA1322

1    what 11, 12, Mr. Charles Murphy.

2         MR. CHARLES MURPHY: 12.

3         THE COURT: 12. Officer Barron also observed Mr.

4    Jiminez in a vehicle on January 16, 1992, as a

5    passenger. The car had been reported stolen.

6    Steering column was peeled. There was no key in the

7    car. There were other people in the car also. The

8    court considered that as criminal trespass, there

9    being a steering column peeled no car -- no keys in

10   the car. Car reported stolen. There is some evidence

11   to corroborate the hearsay declarant that the car was

12   a stolen vehicle.

13              Regarding Officer Fitzgerald from

14   February 17th to February 29, 1992, there is evidence

15   in this record based on Officer Fitzgerald's testimony

16   and also that of Officer Callahan, that -- and also

17   Officer Dwyer, Maritta Dwyer, that the defendant

18   indicated that he had shot a B.B. gun at a building

19   which hit the -- a couple of people inside. And

20   basically, he knew one of the people that he shot with

21   the B.B. gun. Also did that because it was just

22   target practice or fun, basically. So the court will

23   consider that for what value it adds. There is

24   corroboration based on the statements of Jiminez that

W-42

JIM03496

SA1323

1  that's what occurred.

2              Officer Schnoor, S-c-h-n-o-o-r,

3  regarding an incident of April 30, 1992, that the --

4  he observed the defendant and another guy getting out

5  of a 1979 Oldsmobile Toronado from the front seat with

6  various tools in their hand.  Mr. Aquino, came down

7  and said it was his car and the tools were his.

8  Schnoor gives some credence to the hearsay statement

9  of Aquino because he observed the defendant -- the

10  defendant, Jiminez, and another guy with the tools

11  getting out of the man's car.

12              The court will not consider the

13  testimony of Officer Schnoor from an incident of

14  October 18th, the same year regarding a burglary of

15  the Linay, L-i-n-a-y School.  The officer did not see

16  Jiminez with any items recovered in that burglary.

17  Did not see him commit the burglary and there's no

18  corroboration to the hearsay statements of the school

19  personnel that Jiminez committed a burglary of the

20  school on that date, so I won't consider that.

21              Officer Losczyk, L-o-s-c-z-y-k, arrested

22  the defendant on May 8, 1992, pursuant to a warrant

23  apparently for something and recovered a 22 caliber

24  starter gun.  Court will not credit that.  I don't

W-43

JIM03497

1  believe it's illegal to possess a starters gun.  And

2  even if he was under age, I'm not going to hold that

3  against him as far as aggravation is concerned.

4           Officer Morrisette testified to an

5  incident of June 7, 1992, regarding a criminal damage

6  to vehicle.  He didn't see the incident.  The witness

7  stated to the police what Jiminez supposedly did is

8  clearly hearsay.  No evidence to corroborate it in the

9  slightest, I'll not consider that incident.  Officer

10  Bukowski, B-u-k-o-w-s-k-i talked about an incident of

11  June 22nd where the defendant was charged -- was

12  arrested at least for stealing a stereo from a car.

13  According to Officer Bukowski, the defendant admitted

14  stealing the stereo from the car, so that hearsay

15  allegation, combined with his admissions to stealing a

16  stereo would be allowed.  It will be admissible in

17  aggravation.

18           There is an incident of July 18, '92

19  when Officer Day, D-a-y observed the defendant and

20  some other guys throwing rocks or bricks or bottles or

21  something at a building.  He testified he saw the

22  defendant throw something.  He couldn't be sure

23  exactly what it was, but saw the defendant throw

24  something at the building.  And the defendant and the

W-44

JIM03498

SA1325

1   other guys were slogans, Royals, Folks, that type of

2   garbage stuff that goes on out there.  That will be

3   admissible for aggravation for whatever it adds to the

4   case.

5            Officer Wilbon, W-i-l-b-o-n, testified

6   about an incident of August 8, 1992, where the

7   defendant was a passenger in a car which had been

8   reported stolen and that there were several other

9   youthful fellas in the car with him.  Steering column

10  was peeled which would tend to corroborate that the

11  car was in fact stolen.  There was also evidence from

12  that officer that when they went to court, when the

13  case was over with, the defendant supposedly gave him

14  the one finger salute.  I'm not going to consider

15  that.  That's insignificant, assuming he did it.

16           Officer Tagliere, T-a-g-l-i-e-r-e, March

17  10, 1990.  Defendant would have been 11, at that time,

18  approximately.  Officer did not see the defendant

19  commit any acts.  And that is supposedly throwing

20  bottles at the building.  He didn't see that.  The

21  declarant would be a hearsay declarant and I'm not

22  going to allow that or consider that.

23           Officer Rizzario July 20, '90.  I will

24  allow that because the witness in that case indicated

W-45

JIM03499

1    that they knew or he knew, I should say, Thaddeus

2    Jiminez so it wasn't a allegation by a total stranger

3    about someone taking a bike and the defendant trying

4    to sell it to somebody.  So that will be admissible

5    for what aggravating factor or aggravating

6    circumstance it might add to the case.

7              Officer Weitzman, February 5, 1991,

8    defendant supposedly threw a rock at a teacher who

9    disciplined him the day before.  I'll admit that for

10    what value it might have as far as aggravation.

11    Teacher knew Jiminez so it wasn't an allegation by a

12    total stranger, so I'll consider for what value it

13    has.

14              Officer Christopher Adams from December

15    15, '89.  Defendant supposedly arrested for

16    shoplifting Zayre's Department Store.  Officer didn't

17    see that.  Was reported to him by people in the store

18    who didn't know Jiminez.  I'm not going to consider

19    that.

20              Officer Halabczuk, H-a-l-a-b-c-z-u-k,

21    March 15, 1992.  Defendant admitted stealing a car.

22    I'll consider that.  And he also indicated he was a

23    Simon City Royal which is undisputed.  Apparently

24    takes great pride in that.

W-46

JIM03500

1              Also testify from a Dennis Grady.

2    So those are about the various contacts with Mr.

3    Jiminez and the police.  I have indicated which ones

4    I'll consider.

5              There was a Dennis Grady who testified

6    also sentencing hearing who indicated that he spoke to

7    Jiminez and Jiminez said something about he would kill

8    the father of the guy that was on the case with him if

9    the guy said he was the shooter.  I'll consider that.

10   Basically that's what I'll consider from him.

11             There was an administrative assistance

12   from the detention center, Ron Oldaker, O-l-d-a-k-e-r,

13   who testified to the various violation reports,

14   disciplinary things regarding Jiminez at the detention

15   center.  I'll consider those, but I won't place a

16   great deal of weight on them.  The witness ultimately

17   said that Jiminez was not really a major problem in

18   the detention center.  On occasion he was

19   disrespectful but basically, out of all the incident

20   reports he got that the witness testified to, he only

21   considered 2 of them of any significance.  One was a

22   fight with some other guy and another one was where a

23   bunch of other guys kind of got together and concerned

24   that the Audy Home about something happening which

W-47

JIM03501

SA1328

1  apparently nothing did happen. A group disturbance

2  supposedly. So that's what I'll consider for the

3  State's position.

4         Defense also had me read and I did read

5  the testimony of Willie Baldwin, a classroom teacher

6  at the Audy Home who indicated that Jiminez

7  scholastically was very good at the school.

8  Respectful to authorities. He took pride in his

9  schoolwork and was a very capable individual, which

10 even makes this case much more difficult. Much more

11 sad that it didn't have to have turn out this way for

12 Thaddeus Jiminez.

13        The chaplain at the Audy Home, David

14 Kelly, testified Mr. Jiminez was very capable. He

15 helped publish a newsletter, a couple of copies are

16 here which I have read, at the Audy Home. I have

17 taken that into consideration.

18        State also offered, I inadvertently

19 forgot. Department of Corrections disciplinary

20 records indicating that from the time he wound up in

21 the youth commission, until the case -- until he was

22 transferred to the adult prison, that there were 39

23 disciplinary tickets for Thaddeus Jiminez ranging from

24 all kinds of different things, many of which were

W-48

JIM03502

SA1329

1   typical gang nonsense that Jiminez is so fond of

2   getting involved with.  Others were for

3   insubordination of officials and things of that

4   nature.  I'll consider those, give whatever

5   appropriate weight I think they might have.

6               Disciplinary proceeding, the Department

7   of Corrections Juvenile, the record reflects you have

8   a right to contest the charges or you have a right to

9   admit the charges.  Certain times are taken away from

10  the credit, so Jiminez had a right to contest those

11  various allegations, many of which he admitted to.

12  Some of which were found to be proven out after a

13  hearing.  And to the extent they add to the case I'll

14  consider those for that limited purpose.

15              That's all the stuff I think everybody

16  has given me.  And I have also indicated before that I

17  have considered the forensic psychological evaluation

18  report tendered by the defense regarding Jiminez by

19  clinical psychologist Graciela, G-r-a-c-i-e-l-a,

20  Diale-Bal, D-i-a-l-e-B-a-l talking about Thaddeus

21  Jiminez.  Also psychological assessment prepared by

22  the Cook County Juvenile Court regarding Thaddeus

23  Jiminez by consulting psychologist Heather Francek,

24  F-r-a-n-c-e-k.  I have read those and I have read the

W-49

JIM03503

SA1330

1  2 little articles that Jiminez wrote when he was in

2  custody at the detention center.

3          So, I have read all these things.  I'll

4  give whatever appropriate weight I think they are

5  entitled to.

6      MR. CHARLES MURPHY: Judge, there's one other

7  matter.

8      THE COURT: Yes.

9      MR. CHARLES MURPHY: Response to a subpoena I sent

10 to the Cook County Department of Corrections

11 concerning any possible disciplinary infractions

12 committed by my client since he was returned from the

13 Department of Corrections --

14      THE COURT: Since he's been here in the jail you

15 mean.

16     MR. CHARLES MURPHY: Yes.  And the response is that

17 there are none.

18     THE COURT: Okay.

19     MR. CHARLES MURPHY: That's contained in that

20 packet.

21     THE COURT: I'll consider those.  While he's been

22 back in the County from the penitentiary awaiting

23 pretrial, he's been doing all right.

24          Now Mr. John Murphy you have whatever

W-50

JIM03504

SA1331

1    live witnesses you want to present.

2         MR. JOHN MURPHY: Thank you, Judge.

3         THE COURT: I'm sorry.  As far as all those station

4    adjustments, I'm not going to consider any of those.

5    I was a judge at Juvenile Court for 4 years.  Station

6    adjustment doesn't mean anything to me.  Merely means

7    they picked him up, the police talked to him and

8    there's no significance.  Go ahead.

9         MR. JOHN MURPHY: Your Honor, State calls Nicholas

10   Ford.

11        THE COURT: All right.

12                  NICHOLAS FORD,

13   called as a witness on behalf of the People of the

14   State of Illinois, having been first duly sworn, was

15   examined and testified as follows:

16                  DIRECT EXAMINATION

17                  BY MR. JOHN MURPHY:

18        Q.   Sir, would you please state your name, spell

19   your first and last name.

20        A.   First name is Nicholas, N-i-c-h-o-l-a-s, last

21   name is Ford, F-o-r-d.

22        Q.   And by whom are you employed?

23        A.   Cook County State's Attorneys Office.

24        Q.   And how long have you been with the State's

W-51

JIM03505

SA1332

1    Attorneys Office?

2        A.    Almost ten years.

3        Q.    I'd like to direct your attention back to the

4    date of November 22, 1994.  Were you employed as an

5    Assistant State's Attorney on that date?

6        A.    I was.

7        Q.    Do you recall whether or not you were in

8    court room 404 on that particular date in this

9    building?

10       A.    I was.

11       Q.    And why were you in the courtroom, at that

12   time?

13       A.    I had been involved in some of the

14   preliminary stages of the prosecution of a defendant

15   named Thaddeus Jiminez.  I was aware the case.  Had

16   come to fruition.  And I had come back to watch the

17   sentencing.

18       Q.    Did you in fact watch the sentencing hearing?

19       A.    I did.

20       Q.    At the -- while you were watching the

21   sentencing hearing, did you see Thaddeus Jiminez in

22   court?

23       A.    Yes.

24       Q.    Do you see him here in court today?

W-52

JIM03506

SA1333

1    toward you and Mr. Gaughan and his fists was raised to

2    attack you.

3        Q.    And was he able to swing?

4        A.    No.  He was tackled before he could swing.

5        MR. JOHN MURPHY: No further questions.

6        THE COURT: Mr. Charles Murphy, anything else?

7        MR. CHARLES MURPHY: No.

8        THE COURT: You can step down.

9                          (Witness excused)

10       THE COURT: You're Mrs. Morro, correct?

11       MS. MORRO:  Yes.

12       THE COURT: Raise your right hand.

13                    MARY MORRO,

14   called as a witness on behalf of the People of the

15   State of Illinois, having been first duly sworn, was

16   examined and testified as follows:

17                 DIRECT EXAMINATION

18                 BY MR. GAUGHAN:

19       Q.    Miss Morro, you testified earlier in the

20   trial, is that correct?

21       A.    Yes.

22       Q.    You're the mother of Eric Morro?

23       A.    Yes, I am.

24       Q.    Miss Morro, after the last trial, did you, in

                      W-57

                                    JIM03511

                   SA1334

1   conjunction with the State's Attorney's Office prepare

2   a statement stating the impact this crime has had on

3   you?

4       A.   Yes, I have.

5       Q.   I see you have a document in front of you.

6   Is that a copy of that statement?

7       A.   Yes.

8       Q.   I'm going to ask that that be marked People's

9   Exhibit number one, Judge.

10      THE COURT: All right.

11      MR. GAUGHAN: And I would ask Miss Morro be allowed

12   to read that to the court.

13      THE COURT:  Okay.  You can read it, ma'am.  Wait.

14   State have a copy.  I can read along with her.

15      MR. GAUGHAN: Judge I believe there's one in the

16   court file.  When the clerk comes out, I'll see if he

17   can find it.  Go ahead please.

18      THE WITNESS: I am Eric's mother and I feel that I

19   have to speak on Eric's behalf since he is no longer

20   here to speak for himself.

21           Thanks to the defendant's action, I feel

22   that the defendant should get the maximum sentence

23   allowed under the law.  The gangs in the city have to

24   realize that they can't just take away someone's life

W-58

JIM03512

SA1335

1    any time they feel like it.

2              The defendant joined the gang on his own

3    free will.  He took my sons life on his own free will.

4    They have to be shown that they have to pay for their

5    actions to the fullest extent of the law.

6              The law has to be made tougher and

7    stricter so guns are not so easy available to these

8    people.  I don't think that the defendant should have

9    the right to ever walk the street again, to be able to

10   get married and have children of his own.  I don't

11   want him to have any kind of a life since he took the

12   life of my son, Eric.

13             Please give him the maximum sentence so

14   he can't get out any sooner than someone -- so he

15   can't hurt somebody else's child.  And Sunday was my

16   son's birthday.

17        THE COURT: Mrs. Morro, how old was your son back

18   in February of '93 when he was killed.

19        THE WITNESS: When he died he was 18.

20        THE COURT: 18.  Okay.  Anything else Mr. Gaughan?

21        MR. GAUGHAN: No, Judge.  Thank you Miss Morro.

22        THE COURT: I assume there's no questions Mr.

23   Charles Murphy.

24        MR. CHARLES MURPHY: You're correct.


                         W-59

JIM03513

1        THE COURT: All right.

2        MR. GAUGHAN: I'll tender another copy to the

3    court.

4        THE COURT: All right.  Anything else as far as

5    witnesses Mr. John Murphy.

6        MR. JOHN MURPHY: No, your Honor.  At this time

7    we'd rest in aggravation.

8        THE COURT: Mr. Charles Murphy.

9        MR. CHARLES MURPHY: No live witnesses.

10       THE COURT: All right.  Mr. Jiminez, anything you

11   wanted to say before I determine what penalty to

12   impose.

13       THE WITNESS:  No, sir.

14       THE COURT: No?  Okay.  State can argue.

15       MR. JOHN MURPHY: Your Honor, during the course of

16   this trial, you have heard and I'm sure you will hear

17   again that the defendant was thirteen years old when

18   he killed Eric Morro.  But this defendant is not like

19   any 13 year old offender that has come into this

20   system.  He has accumulated an unbelievable record of

21   criminal conduct.

22              In that context, I'd like to cite to you

23   a few cases which I would ask you consider.  I'd like

24   to cite to the court Syllogy versus Peters 905 F 2nd,

W-60

1  986, 7th Circuit, 1990 case which stands for the
2  proposition that uncharged conduct can be considered
3  by the court in aggravation.  Also, People versus
4  Raynaldo Hudson, 157 Illinois 2nd, 401, 626 North
5  Eastern 2nd, 161.  And People versus Lawrence Jackson,
6  145 Illinois 2nd, 43 582 Northeastern 2nd, 125, 1991
7  decision which stands for the proposition that
8  dismissed charges or cases which are nolle prossed or
9  dismissed or SOL'd can be considered by the court in
10  aggravation.

11        And finally, People versus Larry Scott,
12  148 Illinois 2nd, 479, 594 Northeastern 2nd, 217, 1992
13  which stand for the proposition that acquitted conduct
14  can be considered in aggravation.

15        These cases are all death penalty cases,
16  Judge, in which this evidence was considered by the
17  court and deemed to be proper.

18        Now, if the court looked at one or even
19  2 or even 3 of these criminal acts standing alone,
20  they may not be significant.  But together, they
21  provide a crystal clear picture of what this defendant
22  is about.  Conduct like breaking into, stealing cars
23  repeatedly.  Stealing bikes, including stealing from a
24  child the age of five years old.  Threatening others

W-61

JIM03515

SA1338

1  assaulting others and hurting others including

2  throwing a rock at a school official after she

3  disciplined him.  2 separate incidents of shooting 2

4  men in the back and then shooting a woman in the back

5  with a B.B. gun.  A record of criminal conduct for

6  someone 3 to 4 times older than the defendant which

7  would be extensive.  But for a defendant who is

8  thirteen years old this record is shocking, it's

9  frightening and it's outrageous.

10           The defendant, before he was arrested on

11  this murder, was a one person crime waive.  With that

12  record, it can't be too surprising that the defendant

13  would take a human life.  What is surprising, however,

14  is how cruelly and how casually and efficiently he did

15  that.  He walked up to Eric.  He got his accomplice to

16  distract him.  He placed a gun over his chest and he

17  pulled the trigger.  One shot.  No fuss, no muss.

18  Mission accomplished.

19           What is surprising is the reason that he

20  felt he had to take a human life.  Eric took a stand

21  earlier that day, your Honor.  No gangs around

22  children.  And for that, he paid the ultimate price in

23  losing his life.

24           What is surprising about this murder,

W-62

JIM03516

SA1339

1    Judge, and for that matter, the other criminal acts of

2    the defendant is his response to what he does.  No

3    real sorrow.  No real regret.  No real remorse.

4                  As the probation officer noted, the

5    remorse he feels is for himself when he thinks he is

6    going to go to jail.  What he does instead of

7    accepting responsibility for his acts is to lash out

8    at those he blames for the predicament he finds

9    himself in.  He tells probation officer after he just

10   testified in his transfer hearing, "Get the fuck away

11   from me".  He attacks the state's attorneys in the

12   courtroom after he's just sentenced.

13                  What he also does is attempt to

14   eliminate evidence and eliminate witnesses who he

15   perceives will hurt him.  He announces in the juvenile

16   temporary detention center that the -- his

17   accomplice's father is going to be killed if his

18   accomplice says he pulled the trigger.

19                  He makes multiple and repeated efforts

20   to try to kill Larry Tueffel, a witness he knows --

21        MR. CHARLES MURPHY: Objection.  Objection.

22        THE COURT:  That part will be sustained.  There

23   were no efforts to kill Tueffel.  Just his viewpoint

24   it would get done if he got out.


                              W-63

                                        JIM03517



                         SA1340

1    MR. JOHN MURPHY: Well, Judge, I would submit to

2  this court, that at least in the letters he sent he

3  indicated that he had asked Larry Tueffel be killed.

4  And he fully expected that he was killed and he

5  believed that he had been killed pursuant to his

6  request.

7              And the jail records, Judge.  The jail

8  records tell us much about the defendant.  First it

9  tells us that he lied.  He lied in his presentence

10  report when he told the probation officer that after

11  this crime, he was no longer gang involved.  And

12  specifically I'll refer the court's attention to page

13  6 of the presentence report under the heading

14  companions and community involvement where the

15  "Defendant says Thaddeus started his involvement,

16  referring to gang involvement, at age 13.  And

17  voluntarily left the organization after the instant

18  offense".

19              We know that's a lie, Judge.  We know

20  that's a lie from the jail records which show repeated

21  gang activity.  And we also know it's a lie from the

22  letters he sent, as well.  But the jail records are

23  more important for other reasons, Judge.  What they

24  show us is that the defendant continues to be involved

W-64

JIM03518

SA1341

1    in the same kind of conduct that he was involved in in

2    the street and in the jail.  In a restrictive

3    environment.  They establish that he doesn't care and

4    that he is what he is.  Whether he's in custody or out

5    of custody.

6              Now, the defendant will probably argue

7    to you, Judge, that after he was transferred to the

8    adult facility there are no disciplinary reports.  And

9    perhaps he's changed.  I submit to this court all that

10   means is that he's with the big boys.  He's a little

11   fish in big water.  And at that point, it becomes a

12   matter of self preservation.

13             Your Honor, when you consider the

14   sentence in this case, we believe that although the

15   defendant was given a sentence of 50 years initially,

16   that this court can impose the maximum sentence which

17   is 60 years.  Because this court has before you -- you

18   have before you more aggravation than Judge Berkos did

19   when he imposed sentence three years ago.  And we'd

20   submit to the court when you consider in his -- in

21   totality the defendant's criminal conduct out of the

22   jail, his conduct in the jail, the fact that he cold

23   bloodedly executed a man on the street because he took

24   a stand against gangs.  When you consider all that

W-65

JIM03519

1  together we believe, your Honor, that a sentence of 60

2  years is appropriate in these circumstances.  And we'd

3  ask that you impose that sentence.

4      THE COURT: Thank you.  Mr. Charles Murphy.

5      MR. CHARLES MURPHY:  The matters that counsel was

6  alluding to prior to my client's arrest in this murder

7  in comparison, at least are trifling, in comparison.

8          Despite the fact that my client, as he

9  sits here today is eighteen years of age, you're about

10 to impose a sentence for an act that was performed by

11 a 13 year old.  I trust that this court will not

12 dispute that people who are 13 should be treated

13 differently for acts that they perform than you would

14 treat someone who is substantially older and had

15 substantially more experience in life.

16          One of the problems with being a kid at

17 13.  And 13 qualifies as being a kid, is that you

18 don't think out consequences.  It's immaturity.  It's

19 consistent with chronology.  The fact you don't have a

20 life experience.  One of the things that's consistent

21 with getting maturity is that you come to recognize

22 and realize there's consequences to actions.  And you

23 begin for the first time maybe to start thinking

24 things out.

W-66

JIM03520

1          The act that was performed that

2    you're about to sentence my client for was an act that

3    was performed I suggest to this court, without thought

4    of consequence.  Without regard to it.  Without

5    understanding it, without appreciating the

6    consequences.  Your Honor is not an avenging angel.

7    There's nothing you can do to bring Eric Morro back to

8    this world.  There's really nothing you can do to

9    patch the broken heart of his mother.

10          Mr.  Murphy was stressing to the court

11   that my client's behavior, since he's been

12   incarcerated is indicative of the fact that I guess

13   he's incorrigible or should almost never be released

14   back into society.  He has no rehabilitative

15   prospects.

16          Looking at what's happened to my client

17   in more recent times, I think is informative because

18   in more recent times, he has not been the target of

19   disciplinary actions taken either at the Cook County

20   Department of Corrections or for that matter, in the

21   Illinois Department of Corrections where he was

22   transferred right around his 17th birthday.

23          In addition to that, my client since he

24   was incarcerated, first of all had to finish grammar

W-67

JIM03521

1  school which he did.  Subsequent to that, he obtained

2  his GED.  And I do have at least a glimpse, Judge as

3  to what's going on in his heart and his mind by taking

4  look at the 2 articles that he authored because when

5  he authored them, he wasn't writing to you.  I mean I

6  happen to select them, pick them out because I think

7  they are indicative of the fact that my client is a

8  living breathing and even thinking human being.

9           The fact that my client had a father

10 that abandoned him and his mother and his sister

11 probably was a very influential thing in his life.

12 One of the reports that you have in front of you, the

13 psychological evaluation, it's reflected in the

14 opinion of the examiner that that was a significant

15 thing in his life.  I can imagine that it was.  His

16 mother apparently was unable even though she was

17 trying to control the -- the child who was so damned

18 angry at his other parent, he did look out for and at

19 least felt that psychologically or emotionally I guess

20 it is, that being a Simon City Royal would give him

21 some support, some sense of family that maybe he felt

22 he was entitled to have.  That's a mistake in judgment

23 because he didn't get that support from the Simon City

24 Royals.  He is now 18.  His prospects for

W-68

JIM03522

SA1345

1   rehabilitation predicated upon the change in his

2   behavior in most recent times is indicative of the

3   fact that he's quite capable of rehabilitation.  He

4   has already taken those steps himself.

5            He hasn't had a life in the true sense

6   of the word or the phrase I should say.  He has been

7   locked up in one jail or another since he's been

8   thirteen years of age.  Of course, at some point in

9   his life he is looking forward to the opportunity to

10  be free.  He is looking forward to the opportunity to

11  be productive.  There are 13 year olds, Judge, who

12  have committed the same act my client has been found

13  guilty of who weren't transferred to the adult system.

14  I'm talking about murder.

15           My client was transferred to the adult

16  system.  And since that 50 year sentence was imposed

17  and I suggest it was too egregious then, you at least

18  have the benefit of seeing that since that happened,

19  he has matured.  That he is doing the right thing.

20  That he is trying to make sure that upon his release,

21  he has some skills he can utilize to support himself.

22  I can only magazine what it must be like to hear a

23  judge say when you're a child, I sentence you to 50

24  years in the Illinois Department of Corrections.  I

W-69

JIM03523

SA1346

1    can only imagine.  He might as well have said, I

2    suppose from my client's point of view, deputy, take

3    him outside and shoot him.

4             In any event, he has regrouped.  He is

5    now eighteen years of age.  He is not a 13 year old

6    child anymore.  He does better understand

7    consequences.  He's more capable of thinking out

8    things much better than a 13 year old typically can.

9    And in his case did.

10            I would ask you seriously consider,

11    Judge, not only sentencing my client to less than the

12    50 year sentence that was previously imposed

13    predicated upon the information that you now have, the

14    passage of time and what he's done since then and

15    sentence my client to a dramatically lower sentence

16    than was imposed at the prior sentencing hearing.

17    THE COURT:  State want to make a brief response?

18    You're not required to.  You don't have to.  If you'd

19    like to, you can.

20    MR. JOHN MURPHY: No, your Honor.  No further

21    argument.

22    THE COURT: I read in the paper about every few

23    days the people who want to be a judge.  I wonder why.

24    It's a great job but it has tremendous

W-70

JIM03524

SA1347

1    responsibilities.  There are days, especially days
2    like this one that are not particularly enjoyable.  I
3    enjoy what I do.  I try to do my best at it, but in
4    the days like this, that's not particularly enjoyable.
5    It's not fun, I can assure everybody here, it's not
6    fun sending a young guy to the penitentiary.
7              Defendant Jiminez was only 13 at the
8    time of this crime.  But he was a very sophisticated
9    13.  Even at the age of 13 he's already got a girl
10   friend.  He has chosen the path he wanted to take.
11   From listening to this case, I can walk down the hall
12   if I wanted to do so.  I don't think I would do it.
13   And throw up the Simon City Royal gang sign just like
14   Thaddeus Jiminez would throw it up.
15             Why did Eric Morro get killed in
16   February of 1993.  Because he had the audacity to tell
17   Thaddeus Jiminez when Jiminez was flashing the gang
18   signs at the bus with kids on it, take that gang
19   banging stuff out of here.  There's kids on the bus.
20   And the jurors determined that Jiminez was the person,
21   Jiminez then said to Morro something about "I'll see
22   you later you little pussy" or something to that
23   effect.  Pardon the language.  And unfortunately, Eric
24   Morro, he did see him later.  And later on was that

JIM03525

1   night, he put the gun right up on the boys chest and
2   he shot him.
3          I have said this before.  Other lawyers
4   have heard me say it.  And they probably think it's
5   rather trite.  Jiminez probably thinks it's trite now.
6   I don't send people to the penitentiary.  All I do is
7   sign the order.  It's what a person does on the street
8   that gets him there.  When you go out and kill
9   somebody for no reason, other than the fact a guy told
10  you take that gang banging stuff out of here, that's
11  not the motivation to kill somebody.
12         For some reason, at the age of even 11
13  or 12, Jiminez got involved in this gang nonsense
14  Simon City Royals and gang signs.  Flashing the gang
15  signs.  And then, even since he's been in custody,
16  maybe not lately, but even as recently as November --
17  September of 1996, first of all he goes into the
18  juvenile portion of the Department of Corrections in
19  1994 late in the year.  December.  Within a month or 2
20  after he's sentenced, actually less than that,
21  probably because he was sentenced in November of '94,
22  gang activity two days.  Take it further.  November
23  2nd, '95, gang disturbance.  Gang activity.  30 days.
24  This is after he's already under a sentence at that

                          W-72

1    point by Judge Berkos of 50 years.  November 9th gang

2    activity, 4 days.  Goes a little further than that.

3    You know, insolence of authorities, this and that.

4              Gambling.  I'm not a moralist.  If he

5    wanted to gamble, that's fine.  He gambled on February

6    3rd, 93 or 4 when he decided to shoot the boy.  He

7    gambled he might not get caught but he lost that bet.

8    June of '96 intimidation, 15 days confinement.  June

9    28, '96, gang activity, intimidation, two days

10   confinement.  June 29th, '96 intimidation, threats.

11   Two days confinement.  There are a lot of others.

12   We're just talking about the ones with this gang

13   stuff.  August 22, '96 gang activity, 3 days

14   confinement.  August 23rd, '96, assault, 30 days

15   confinement.  September 11, '96 gang activity, 5 days.

16   So recently as September of '96 while in custody at

17   the Juvenile Department of Corrections, awaiting

18   transfer to the adult penitentiary, he's still

19   involved with this stuff.  Gang stuff.  Maybe that's

20   the way Jiminez wanted to live his life, throwing up

21   the gang signs, being out there doing that kind of

22   stuff.  But look where it got him.  He's 18 now.  He's

23   been in custody five years already.  From the age of

24   13.  He's now 18.  He's been locked up ever since

W-73

JIM03527

1   1993.

2              I have read all these materials.  I take

3   this job pretty seriously.  It didn't have to turn out

4   this way for Thaddeus Jiminez.  Things were -- he had

5   the capability, if he wanted to use it, to do a lot

6   better than running around throwing up the Simon City

7   Royal gang signs, flashing the gang signs, yelling at

8   buses.  Simon City Royals.  Pardon the language.  All

9   that bull shit.

10             Didn't have to turn out that way for

11  Thaddeus Jiminez.  He had the capability, based on the

12  classroom teacher at the Audy Home who said that

13  Jiminez was a very capable kid.  He does his work well

14  in class.  He is respectful of authority, at least in

15  a classroom setting he was.  He takes pride in his

16  school work.

17             chaplain at the Audy Home said he helped

18  publish a newsletter.  You read those two newsletters

19  attached to the presentence investigation materials

20  tendered to me, you will see Thaddeus Jiminez had the

21  capability of doing well in life if he wanted to do

22  that.  But Thaddeus Jiminez chose to take the path

23  that he wanted to take.

24             He has no father and that's unfortunate.

W-74

JIM03528

1  The father was around for a little while. He wasn't

2  around much. But he was raised by his mother who did

3  the best she could with him. Reading these materials,

4  even at one point she told the probation officer I

5  don't know how to handle Thaddeus. I'm not sure what

6  to do with him. And maybe he took his solace in, you

7  know, hanging out with the homeboys. Throwing up the

8  Simon City Royals gang stuff. That's how he took his

9  solace from not having his father around. Having a

10  mother who did the best with him. Worked, tried to

11  support his sister and the other people.

12      But it's not any kind of justification

13  for murder. You can feel sorry for Thaddeus Jiminez

14  to some extent about the way he came up, the choices

15  he made, but for a 13 year old, he was pretty mature

16  basically back in 1993. He made mature decisions at

17  that particular time. Some guy offended him by saying

18  take that gang banging stuff out of here, so Jiminez

19  made a choice. I'm going to shoot the guy. Most 13

20  year olds probably wouldn't react like that but

21  Thaddeus Jiminez decided that's how he was going to

22  react. He saw the guy later on that night as he did

23  see him on Belmont Avenue in Chicago and he walked up

24  to the guy and he shot him. As simple as that.

W-75

JIM03529

1          It always amazes me sitting up here
2     since February I've heard 21 murder trials in this
3     courtroom, since February of this year.  So that's
4     over 2 a month.  And many of them have been motivated,
5     at least in part by this gang stuff.  I don't honestly
6     see what these guys see in it, to tell you the truth.
7     You hang with the guys, you do things with the guys.
8     And then, Thaddeus Jiminez, look where it got him.  He
9     was so proud of the Simon City Royals.  Take pride to
10    be flashing the gang signs to people on a bus then
11    someone says take that gang banging stuff out of here.
12    There's kids on the bus.  He was so offended by that
13    he decided to kill a boy, 18 year old for no reason
14    whatsoever except that the boy said to him "Take that
15    gang banging stuff out of here".  In Chicago I guess
16    life is pretty cheap.
17          The defendant has basically not shown
18    any indication of being anything other than what the
19    evidence in this case has shown and what his conduct
20    before the murder and to a large extent after the
21    murder when he was already in custody in the juvenile
22    detention facility, also in custody at the Juvenile
23    Department of Corrections.  And also those letters
24    about what he was going to do if and when he got out

W-76

JIM03530

1    to Larry Tueffel, the one who testified against him

2    was also a fellow Simon City Royal.  It showed even

3    way back then that Thaddeus Jiminez had the capability

4    of murder and that was evidence by what he did to Eric

5    Morro.

6              I also would point out, as I said before

7    I take no pleasure in sending someone to the

8    penitentiary for a long period of time.  Because as I

9    said, also what the person does on the street is what

10   gets them there.  What Jiminez did on February 3rd,

11   4th of '93 to Eric Morro is what will get him there.

12             Court has considered all the materials

13   submitted by both sides in this particular case.  I

14   can appreciate the mother's viewpoint, the mother of

15   Eric Morro that she feels the defendant is basically

16   worthless, should be sentenced to the maximum sentence

17   of imprisonment that I can sentence him to which would

18   be 60 years in the Department of Corrections.

19   Probably the hardest part about being a judge is this

20   part.  Deciding what the appropriate penalty is.  I

21   use the word "appropriate" in quotation marks because

22   you never know if it was appropriate or not.  You do

23   the best you can.  You hope you did the right thing.

24             Court has indicated earlier it wasn't

W-77

JIM03531

SA1354

1  going to consider certain things that were brought up
2  at the initial sentencing hearing before Judge Berkos.
3  That doesn't mean I disagree with him legally.  Just
4  means I feel they should not be considered by me as
5  far as what sentence to give to Mr. Thaddeus Jiminez.
6         Jiminez is going to get out some day.
7  That's not a question if he's going to get out.  The
8  only question is when.  And he's got plenty of time to
9  think about that gang banging nonsense of his for the
10 next number of years while he's away.  It's too bad
11 because it a real tragedy.  You have one boy 18 who is
12 dead.  One boy who is now 18 been in custody for five
13 years.  Going back to the penitentiary for a while.
14 You a mother, Mrs. Morro who lost a son because he's
15 dead.  And you have a mother Mrs. Jiminez who has
16 basically lost her son because he's going to be away
17 and all she can do is see him on visiting days, except
18 she has one benefit that Mrs. Morro doesn't.  At least
19 she can see him on visiting days while he's alive.
20 Mrs. Morro can just go to the cemetery and see the
21 tombstone about Eric Morro who decided to take a stand
22 against this gang nonsense.  And as a result of that,
23 he got killed at the age of 18.  He certainly deserved
24 a better fate than that, I would imagine.

W-78

JIM03532

SA1355

1          The court has considered all the factors
2   in aggravation mitigation.  Read the presentence
3   investigation.  All the other things that were
4   submitted to me by both sides.  And the arguments of
5   very able attorneys on both sides.  When you have 2
6   judges hearing basically the same case sometimes one
7   evaluates it one way, one evaluates it another way.  I
8   think we can both agree, Judge Berkos and I agree this
9   is a senseless brutal murder that didn't have to
10  happen.  And should not have happened.
11         As to weighing the factors in
12  aggravation mitigation, there maybe some difference of
13  opinion about how he weighed it how I weigh them or
14  any judge weighs them.  Court determines that the
15  appropriate sentence regarding the defendant, Thaddeus
16  Jiminez, a term of imprisonment of 45 years in the
17  Department of Corrections.
18         Defendant has been in custody since
19  February 4, 1993 entitled to credit towards that
20  sentence.  All time spent in custody continuously from
21  February 4, 1993.
22         Mr. Jiminez, you have a right to appeal
23  the jury's verdict of guilty of murder in the first
24  degree.  You also have a right to appeal the sentence

W-79

JIM03533

SA1356

1  of term of imprisonment of 45 years in the Department

2  of Corrections, as long as you do so within 30 days of

3  today's date.  If you cannot afford to pay for a

4  lawyer, copy of the transcript, I'll supply you with a

5  lawyer and transcript free.

6      MR. CHARLES MURPHY: Sir, would you appoint the

7  Illinois Appellate Defender's Office.

8      THE COURT: Sure.  Mr. Jiminez, on a sentence like

9  that, since the murder happened in February of 1993,

10  you will get day for day credit which means on a 45

11  years sentence you will do approximately 22 and a half

12  calendars inside.  You have done 5 of that already.

13  Approximately 17 or 18 years you will be back out on

14  the street again.  You will still be a young man at

15  that time.  Only 35 or 36 years old when you get out,

16  assuming you can survive that gang nonsense in the

17  penitentiary for the next 17 or 18 years.

18          You will have the one luxury Eric Morro

19  doesn't have.  You will be getting out some day so

20  hopefully while you're away, you might skip that

21  Royals gang signs, all that BS and try changing your

22  lifestyle once you're away so when up get out, you can

23  at least give your mother some years of pleasure when

24  she sees you as a free person.  Good luck.  Take him

W-80

JIM03534

SA1357

1  back.

2      MR. CHARLES MURPHY: Judge, could there be a stay

3  of mitt.  There's a couple of things that I need to

4  do.  My knowledge -- my now understanding of the law,

5  to preserve the sentencing issue that I have got to

6  present a written motion to the court to reconsider.

7      THE COURT: I think that's true.  Stay of mittimus

8  until when.

9      MR. CHARLES MURPHY: May I have one second.

10      THE COURT: I'm not going to add up the days Mr.

11  Clerk.  Credit for time spent in custody since

12  February 4, 1993.

13      MR. CHARLES MURPHY: Can we come back on January

14  8th.

15      THE COURT: All right.  Stay of mittimus January

16  8th.  Make a note on the papers not to be shipped out

17  until at least that date.  Take Jiminez back.  I'll

18  come back out at 11:00 o'clock.  I need about a ten

19  minute break.

20                    (Whereupon the above-entitled cause

21                    was continued to the 8th day of

22                    January, A. D. 1998)

23

24


W-81

JIM03535


SA1358

```
 1   STATE OF ILLINOIS  )
 2                      )  SS:
 3   COUNTY OF COOK     )
 4
 5
 6              I, ANNETTE W. WASHINGTON, Official Court
 7   Reporter of the Circuit Court of Cook County, County
 8   Department-Criminal Division, do hereby certify that I
 9   reported in shorthand the proceedings had in the
10   above-entitled cause, that I thereafter caused to be
11   transcribed into typewriting the above Report of
12   Proceedings, which I hereby certify is a true and
13   correct transcript of the proceedings had before the
14   Honorable STANLEY SACKS, Judge of said Court.
15
16
17
18
19                          Official Court Reporter of the
20                          Circuit Court of Cook County
21
22
23
24
```

W-82

JIM03536

SA1359

```
 1

 2    STATE OF ILLINOIS )
                        )  SS.
 3    COUNTY OF C O O K )

 4            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
 5
      THE PEOPLE OF THE  )
 6    STATE OF ILLINOIS  )
                         )  Case No. 93-CR-14710
 7         VS            )
                         )  Before JUDGE STANLEY J. SACKS
 8    THADDEUS JIMENEZ   )
                            Jan. 88, 1998
 9                          9:30 a.m.

10         Court convened pursuant to continuance.

11         Present:

12             HONORABLE RICHARD A. DEVINE,
                   State's Attorney of Cook County, by
13             Mr. Marshall Libert,
                   Assistant State's Attorney,
14                 appeared for the People;

15
               Mr. Charles Murphy,
16                 appeared for the Defendant.

17

18

19

20

21

22    Patrick J. Flannery, CSR
      Official Court Reporter,
23    License No. 084-001220
      2650 S. California, Room 4C02
24    Chicago, IL  60608
```

X-1

JIM03537

1        THE COURT:  Sheet 1, Thaddeus Jimenez.

2             Is the mother out there?  Step in for a

3    minute, Miss Makowski.  You can step up, Ma'am.

4             Miss Makowski, were you waiting for Mr.

5    Murphy this morning?

6        MRS. MAKOWSKI:  Yes.

7        THE COURT:  You expect him.  I think the jail

8    sentence your son out already, even though I ordered

9    stay of mitt, the people at the jail don't know how

10   to read so they can't send him out from the jail.

11            If he is there the sheriff will call over

12   get him or, if he is not there, I want someone tell

13   me why he was sent out contrary to my order to keep

14   him here until at least today.

15            If he is not there, have somebody come from

16   the jail tell me yes not there like a supervisor.

17   Supervisor of what I don't know, but somebody.

18            We will call you you back when your son's

19   lawyer gets here.

20                      (Whereupon, there was a recess

21                       had in the above-entitled

22                       cause, after which the

23                       following proceedings were had:)

24       THE CLERK:  Now you can bring out Thaddeuz

X-2

JIM03538

SA1361

1    Jimenez.  They had him here.  Attorney Charles Murphy

2    also here.  Mr. Murphy.

3        MR. MURPHY:  Judge, I'd asked after sentencing

4    that you hold the case on call until today's date so

5    I could file a motion which I have entitled motion to

6    reduce sentence.  I gave the original to the clerk.

7        THE COURT:  I have copy.

8        MR. MURPHY:  I will stand on the motion.  I have

9    no argument.

10        MR. LIBERT:  Acknowledge receipt of the motion,

11    Judge.  Object to the motion.  Ask that the sentence

12    stand.

13        THE COURT:  Before we get to that, it is not

14    often you got very nice note, I am are very

15    impressed, from the mother of Thaddeus Jimenez

16    especially after he's been found guilty by a jury and

17    I sentenced her son to a term of 45 years in the

18    Department of Corrections for murder.

19        The note basically says Dear Judge Sacks, I

20    do first want to wish you and your family very

21    healthy happy new year.  I also want to thank you

22    (not for the 45 years), giving me a minute here and

23    there with my son.

24        I was raised to appreciate, be gratefull

X-3

JIM03539

1  which I am.  I just felt you had to know how much it

2  meant to have that loved one in your armed just for a

3  few minutes.

4          Please continue to do this for other

5  families.  It is very important.  I will not go into

6  my personal feelings about "our system, the State, et

7  cetera.  I know the Lord knows, I just want you to

8  know by you allowing that shows you are human.  That

9  is nice to know.

10          I thank you are very much for that.  I

11  thank you for every moment you gave me with T J.

12          Sincerely, Victoria Jimenez.  May God bless

13  you and yours.

14          Miss Jimenez, I appreciate the note.

15          The defendant was found guilty by a jury of

16  murder in this case.  At the time of the murder Mr.

17  Jimenez was only 13 years old.  He is now 18.

18          This case was tried for the second time.

19  So basically over the course of years 4 years.  They

20  all felt that he was guilty of murder of a person

21  who, how old was the boy killed.

22      MR. MURPHY:  19.

23      THE COURT:  19.  And original trial he was found

24  guilty of murder in that case, sentenced to more time

X-4

JIM03540

1    than I give him in this case.

2         Defendant's record for 13 year old at the

3    time of the murder was horrendous.  Even after he was

4    in custody after being sentenced on murder sentence

5    first time before he came back on appeal he still was

6    involved with all this nonsense in the penitentiary

7    about the Simon City Royals and gang stuff, all

8    that.

9         That is unfortunately what got Thaddeus

10   Jimenez here.  I don't take cases personal.  I have

11   nothing against Mr. Jimenez.

12        Jury found him guilty of killing a guy for

13   the simple reason guy told him, take that gang

14   banging stuff out of here.

15        According to what the jury heard he saw the

16   guy later that night walked up to him put a gun in

17   his chest shot him.

18        Sentence I gave him 45 years, less than he

19   got after the first trial.  I consider the fact that

20   some of the things that the previous Judge considered

21   I have did not consider.  So that is why he got

22   lesser sentence.

23        Thaddeus Jimenez is 18 now?

24        THE DEFENDANT:

X-5

JIM03541

1       A.   Yes, sir.

2            THE COURT:  He was 13 at the time of the

3       murder.  He's been in custody give or take about 5

4       years.  He is still going to be a young man once he

5       gets out, even if the case isn't reversed again for

6       any reason.

7                 He is 18, on 45 year sentence he will do 22

8       years give or take.  He's done 5 or 5 already,

9       another 16 or 17 years assuming nothing happens on

10      appeal he will be out.  If he does 16 years probably

11      34 or 35 when he gets out.

12                It is a sad situation.  He has a nice

13      mother and nice family, but that gang nonsense gets

14      you in trouble all the time.  I sit up here every day

15      and see this B S throwing up the signs of Simon City

16      Royals, Latin Kings, all the other B S stuff.  I know

17      that stuff better than these guys know it.  It is a

18      real tragedy.

19                I think the sentence is fair, less than he

20      got the first time.  He is still a young guy.  He

21      will do the time hopefully be out still be young

22      man.

23                I just hope over the years Mr. Jimenez has

24      a way he can find some better way to spend time than

                              X-6

JIM03542

1    throwing up that Simony City Royals gang signs

2    talking about the gang B S until he gets out.

3            Motion to reduce sentence denied.

4            Mr. Murphy, you asked last time about the

5    State appellate defender.

6        MR. MURPHY:  Yes.

7        THE COURT:  State appellate defendant will be

8    appointed for purpose of appeal for Thaddeus

9    Jimenez.

10           How can I refuse after all this time.  Miss

11   Jimenez, you can come back in see him one last time.

12   Don't make it any harder on yourself or him.  Give

13   him a hug and a kiss.

14       MRS. MAKOWSKI:  Thank you.

15       THE COURT:  T J, one more hug and case and you

16   have to go back.

17               (Short pause.)

18       THE COURT:  Thaddeus, leave that gang stuff

19   alone once you go down there.  Good luck to you.

20       MR. MURPHY:  Good day.

21       THE CLERK:  Mitt to issue?

22       THE COURT:  Mitt to issue.

23                       (Which were all of the

24                        proceedings had in the

                          X-7

JIM03543

1              above-entitled cause.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

X-8

JIM03544

1

2    STATE OF ILLINOIS )
                       )  SS.
3    COUNTY OF C O O K )

4

5

6        I, PATRICK J. FLANNERY, CSR, Official Court

7    Reporter, license No. 084-001220, for the Circuit

8    Court of Cook County, Illinois, Criminal Division, do

9    hereby certify that I reported in machine shorthand

10   the proceedings had on the motion in the

11   above-entitled cause; that I thereafter caused the

12   foregoing to be transcribed, which I hereby certify

13   to be a true and accurate report of proceedings had

14   before the Honorable Stanley J. Sacks, Judge of said

15   court.

16

17

18   _____
     Official Court Reporter

19

20

     Dated this 2nd day
21   of June, 1998.

22

23

24


                        X-9

                                        JIM03545



                        SA1368

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT CRIMINAL DIVISION

OFF. 600

THE PEOPLE OF THE )
STATE OF ILLINOIS )
)
vs. )          NO. 93-14710
)
Thaddeus Jimenez )
)
)

REPORT OF COMPLIANCE

I, Thomas G. McEnery, Supervisor of the Official Court Reporters

of the Circuit Court of Cook County, County Department, Criminal Division,

do hereby state that on the  30  day of  June  A.D. 1998

the original Report of Proceedings ~~and the copy (five)~~ in the above entitled

cause were filed with the Clerk of the Criminal Division.

Copy To S.A.D.

_Thomas McEnery_            DS

Thomas G. McEnery,
Supervisor

Received by _____  MS

Deputy Clerk, Criminal Division

FILED
JUN 3 0 1998
AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

1,023 PAGES

JIM03546

SA1369

(Rev. 2/18/93)  CCCR-56

STATE OF ILLINOIS }
COUNTY OF COOK } ss

I, AURELIA PUCINSKI, Clerk of the Circuit Court of
Cook County, in said County and State, and Keeper of the Records and Seal thereof, do hereby certify the
above and foregoing to be a true, perfect and complete copy of . . VOLUME ( SIX ) OF (SIX) VOLUMES
CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT
TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 98-0247

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                                        LATELY
in a certain cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pending in said Court, between
                                        WERE
The People of the State of Illinois . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., Plaintiffs and
THADDEUS JIMENEZ . . . . . . . . . . . . . . . .        WAS        . . . . . . . ., Defendant. . . .

Witness:  AURELIA PUCINSKI
Clerk of the court, and the Seal thereof, at Chicago
In said County, . . . . . . . . . . . . . . JULY 8 . . . . . . . ., 19 . . 98



*Aurelia Pucinski* / pe

Clerk

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

JIM03547

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2013, I electronically filed the attached with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


s/ Jonathon D. Byrer
JONATHON D. BYRER, Attorney