In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2779

THADDEUS JIMENEZ,

*Plaintiff-Appellee,*

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 08081 — **Matthew F. Kennelly**, *Judge.*

ARGUED JUNE 5, 2013 — DECIDED October 7, 2013

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* When he was fifteen years old, plaintiff Thaddeus Jimenez was convicted of a murder he did not commit. He spent sixteen years in prison before he was exonerated. Jimenez then filed this lawsuit under 42 U.S.C. § 1983 and state law against the City of Chicago and a former Chicago police detective, Jerome Bogucki, for violating his constitutional right to due process of law and for malicious prosecution. In January 2012, a jury found for Jimenez and awarded him $25 million in compensatory damages. The

district court denied the defendants' motions for a new trial and for judgment as a matter of law. *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 653–54 (N.D. Ill. 2012). Defendants now appeal. We affirm the judgment in favor of Jimenez.

I.   *Factual and Procedural Background*

The following facts reflect the evidence in the light most favorable to Jimenez, the non-moving party who won the jury verdict. Further factual details are set forth in the district court's order denying the defendants' post-trial motions.

In February 1993, Victor Romo and another boy encountered Eric Morro on a street in Chicago. The boy with Romo shot and killed Morro. Romo always identified the shooter as Juan Carlos Torres. Larry Tueffel, a friend of Morro's, was present at the shooting, and Tina Elder and Phil Torres were close by.

Detective Bogucki investigated the murder. Bogucki used coercive tactics to convince Tueffel and Phil Torres to falsely identify Jimenez as the shooter. Bogucki also tainted the testimony of other witnesses. For example, he arranged for Elder to see a picture of Morro's corpse next to a picture of Jimenez before she was shown a line-up and identified Jimenez as the shooter. Bogucki also knew that Jimenez owned a blue and white Duke University jacket, so he planted with the witnesses the idea that the shooter was wearing that color and style of jacket.

Jimenez was fifteen years old in October 1994 when he was tried as an adult for the murder of Morro. Tueffel, Elder, and Torres all testified that Jimenez was the shooter. Romo, who

No. 12-2779                                                    3

had been with the shooter, testified that Juan Carlos Torres was the shooter. Jimenez was convicted and sentenced to fifty years in prison. For reasons unrelated to this appeal, his conviction was overturned and he was retried in 1997. The same witnesses testified at his second trial and gave essentially the same testimony. Jimenez was again convicted and sentenced, this time for forty-five years.

Years passed, and Tueffel was in a mental health facility after being diagnosed with paranoid schizophrenia. In 2006, he was contacted by an investigator working for the Northwestern University Center on Wrongful Convictions. Tueffel volunteered that Jimenez was innocent. Using Tueffel's statements, investigators then confronted Elder about her identification of Jimenez. She disclosed that her identification of Jimenez in the lineup had been tainted because she had been shown his picture just before she identified him. In 2008, the investigators convinced the Cook County State's Attorney to reopen the case. State investigators discovered more evidence indicating Jimenez's innocence. Then, in May 2009, the State's Attorney and Jimenez's lawyers sought to vacate his conviction. A judge of the Circuit Court of Cook County did so, and Jimenez was later granted a certificate of innocence.

Jimenez filed a complaint against the City of Chicago and Detective Bogucki. The case went to trial against Bogucki on two counts alleging federal claims under 42 U.S.C. §1983 for deprivation of due process and conspiracy to do so and a state law claim for malicious prosecution, and against the City of Chicago for direct liability or indemnification for any judgment against Bogucki. The jury found for Jimenez on all claims. The defendants moved for a new trial under Federal Rule of Civil

4                                                              No. 12-2779

Procedure 59 and judgment as a matter of law under Rule 50. The district court denied both motions.

The defendants have appealed, arguing that the district court erred in denying their post-trial motions and raising an evidentiary issue. They argue that the district court erred during jury selection by granting Jimenez's *Batson* challenge to a peremptory strike and by failing to give a jury instruction limiting the due process violations the jury could consider. Defendants also argue they are entitled to judgment as a matter of law under Rule 50 because Jimenez failed to prove his due process claim with sufficient evidence by not entering into evidence the complete transcripts of each of his state criminal trials. Finally, defendants argue that admitting one expert's testimony on reasonable police practices in murder investigations was a reversible error that warrants a new trial. We reject all of these challenges to the verdict.[1]

II.  *The Batson Issue*

During jury selection, the defendants used two of their three peremptory strikes against the only two African-American jurors in the venire. Jimenez challenged the strikes of both under *Batson v. Kentucky*, 476 U.S. 79 (1986), which held

---

[1]  In exchange for dismissal of Jimenez's punitive damages claim, Bogucki stipulated on the record after the jury's verdict that his actions had violated Jimenez's constitutional rights and that the verdict was "correct in every way." Tr. 2980. Jimenez argues that Bogucki's stipulation forecloses any arguments the defendants might make on appeal. We disagree. The context of the stipulation makes plain that the parties still expected this appeal. The stipulation did not waive any arguments that Bogucki or defense counsel have made before this court.

unconstitutional the use of peremptory challenges based on race. The district judge sustained Jimenez's objection to one juror, concluding that defense counsel's stated reasons for striking juror S.M. were not credible. See *United States v. Rutledge*, 648 F.3d 555, 556–57 (7th Cir. 2011) (*Batson* "requires the district court to make a finding of fact regarding the prosecutor's credibility after the prosecutor has offered a race-neutral reason for the strike"). The judge explained that the defense had failed to strike a similarly situated white juror, which undermined the credibility of counsel's stated reasons for the strike of S.M.. The defendants had not tried to challenge S.M. for cause.

The defendants argue that the district court erred and that the error was compounded when the court did not give them another chance to exercise an additional peremptory strike to replace the one they lost. Defendants face a steep climb on the merits of this argument. See *Rice v. Collins*, 546 U.S. 333, 338 (2006) ("On direct appeal in federal court, the credibility findings a trial court makes in a *Batson* inquiry are reviewed for clear error."). We do not reach the merits of the argument, however. There was no reversible error because the defendants have not shown that a biased juror sat on the jury. Even if the district court might have erred in sustaining Jimenez's *Batson* challenge, which we do not decide, any error would have been harmless.

This question is governed by two decisions of the Supreme Court, *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), and *Rivera v. Illinois*, 556 U.S. 148 (2009). In *Martinez-Salazar*, a criminal defendant was forced to use one of his peremptory challenges to cure the trial court's erroneous denial of a

challenge for cause. He was entitled to exercise peremptory challenges pursuant to Federal Rule of Criminal Procedure 24(b), but the Court held that the loss of one of his peremptories did not impair his rights under that rule. "[A] principal reason for peremptories," the Court explained, is "to help secure the constitutional guarantee of trial by an impartial jury." *Martinez-Salazar*, 528 U.S. at 316. Having "received precisely what federal law provided," and having been tried "by a jury on which no biased juror sat," Martinez-Salazar could not "tenably assert any violation of his … right to due process." *Id*. at 307, 317.

The Court extended this principle to a trial court's error in sustaining a *Batson* challenge in *Rivera v. Illinois*, 556 U.S. 148 (2009). Rivera, a state criminal defendant, appealed the state trial court's rejection of his peremptory strike of a Hispanic juror who then sat on the jury that convicted him. The Supreme Court of Illinois found that the record failed to support a *Batson* challenge against that juror and that the trial court should have allowed Rivera's peremptory strike. See 556 U.S. at 155, citing *State v. Rivera*, 879 N.E.2d 876, 884 (Ill. 2007). The state court found, however, that because Rivera could not show that a biased juror sat on his jury, the trial court's error in sustaining the *Batson* challenge was harmless. *Id*. at 155–56, citing *Rivera*, 879 N.E.2d at 887, 890–91.

The Supreme Court of the United States affirmed, following *Martinez-Salazar* and holding that the erroneous denial of a peremptory challenge does not require automatic reversal of a defendant's conviction as a matter of federal law. *Id*. at 156. Instead, errors are to be assessed by inquiring whether the jury that actually decided the case was qualified and impartial. See

No. 12-2779                                                    7

*id*. at 157–59; *Martinez-Salazar*, 528 U.S. at 316–17; see also *Ross v. Oklahoma*, 487 U.S. 81, 91 (1988) (failure of trial court to remove juror for cause, with the result that defendant had to use a peremptory challenge to remove the juror, did not deprive defendant of right to impartial jury even though error changed composition of jury); *United States v. Polichemi*, 219 F.3d 698, 705–06 (7th Cir. 2000). Under *Martinez-Salazar* and *Rivera*, therefore, unless the defendants can show that a biased or otherwise unqualified juror sat on the jury that rendered the verdict against them, any error in granting Jimenez's *Batson* challenge would have been harmless.

The defendants actually concede this point as a matter of federal constitutional law. They argue, though, that we should apply a different standard and reverse on the basis of the federal statutes and rules providing peremptory challenges. The defendants also argue that the application of harmless error analysis in this circuit is "evolving." We are not persuaded on either point.

First, we agree with the Eighth and Ninth Circuits that an error in sustaining a *Batson* challenge in a federal civil trial is subject to harmless error analysis under *Martinez-Salazar* and *Rivera*. See *Avichail v. St. John's Mercy Health System*, 686 F.3d 548, 552–53 (8th Cir. 2012); *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 709 F.3d 872, 880 (9th Cir. 2013). In federal civil cases, peremptory challenges are provided by 28 U.S.C. §1870, which provides each side in a civil case three peremptory challenges. (Federal Rule of Civil Procedure 47(b) instructs courts to comply with §1870.) The fact that peremptory challenges in civil cases are based on a statute does not distinguish them from the right to peremptory challenges

in the criminal context, which are granted by Federal Rule of Criminal Procedure 24(b). See *Martinez-Salazar*, 528 U.S. at 311 ("[U]nlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension."). There is no constitutional right to a peremptory challenge. Rather, peremptory challenges are one time-honored means to protect the constitutional right to an impartial jury. *Martinez-Salazar* and *Rivera* cannot be distinguished based on the legal source of the right to exercise peremptory challenges, and a possible error in administering peremptory challenges that did not deny an impartial jury does not warrant a new trial.[2]

Second, defendants argue that our circuit's case law is "evolving" on the issue of errors in handling peremptory challenges. The defendants rely on *United States v. Patterson*, 215 F.3d 776 (7th Cir. 2000), vacated in part on other grounds, *Patterson v. United States*, 531 U.S. 1033 (2000), and *United States v. Harbin*, 250 F.3d 532 (7th Cir. 2001). *Patterson* dealt

---

[2] The defendants also try to distinguish *Martinez-Salazar* and *Rivera* on a different basis. They argue that the defendants in *Martinez-Salazar* and *Rivera* "did not lose the use of a peremptory; each used every allotted challenge to remove a juror." Reply Br. at 22. We are not persuaded. Rivera struck a juror, the court erroneously denied his *Batson* challenge, and the juror sat on Rivera's jury. *Rivera*, 556 U.S. at 152. Effectively, Rivera lost his strike. Martinez-Salazar had to use a peremptory challenge to strike a juror who should have been struck for cause, also effecting what could be deemed a forfeiture of that peremptory challenge. *Martinez-Salazar*, 528 U.S. at 309. We need not decide here the extent of a district court's discretion to deny the culprit a replacement peremptory challenge after sustaining a *Batson* challenge. See generally, *e.g.*, *United States v. Walker*, 490 F.3d 1282, 1294–95 (11th Cir. 2007).

No. 12-2779                                                    9

with the loss of a peremptory challenge due to a misunderstanding about which jurors would be designated as alternates. But the impartiality of the jury that was eventually seated was not called into question, "which makes it hard to see why there is any real problem." 215 F.3d at 779. We applied harmless error review and rejected the defendants' claim that they lost substantial rights. *Id.* at 781–82. Because the jury that was seated was impartial, the defendants had not been harmed and a new trial was not warranted. At the same time, though, we left open the possibility that "an exceptionally confused jury-selection process" might affect a substantial right. *Id*. at 782.

The next year, *Harbin* presented just such an "exceptionally confused" scenario. In the middle of a trial, a district judge permitted the prosecution to exercise a left-over peremptory challenge. We reversed, holding that "the error was serious enough to effect a shift in the total balance of advantages in favor of the prosecution." *Harbin*, 250 F.3d at 547. We found it was unfair to allow one party "unilateral, discretionary control over the composition of the jury mid-trial." *Id*. at 547.

*Patterson* and *Harbin* offer no help for the defendants here. The jury selection process employed in this trial was straightforward and did not offer either side a strategic advantage. Without a showing that a biased juror was seated, any error in the jury selection process in the Jimenez trial could have been an error only in "a technical sense." *Harbin*, 250 F.3d at 549.

The defendants have not attempted to show that a biased juror sat on their jury or the sort of harm presented in *Harbin*. Without such a showing, we must presume that they received

a fair trial. Defendants are not entitled to a new trial based on district court's handling of the *Batson* challenge.

III.   *Jury Instruction on the Brady Claim*

In *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that the accused in a criminal case has a due process right to have the prosecution disclose material exculpatory evidence, including evidence that impeaches the credibility of prosecution witnesses. Jimenez's core claim in this case is that Detective Bogucki deliberately violated his rights under *Brady* and its progeny by concealing exculpatory evidence.

The defendants argue that the district court erred by refusing to give an instruction that would have limited the jury's consideration of Jimenez's due process *Brady* claim to five pieces of evidence. Although this argument is framed primarily as a challenge to the jury instructions, the defendants also contend that in closing arguments, Jimenez asserted that ten *Brady* violations had occurred in the course of the Morro murder investigation. Defendants say they had no prior notice of six of them. Neither argument warrants a new trial.

Where the jury instructions provided by the trial court were an accurate statement of the law, our "review of jury instructions is limited." *Knox v. State of Indiana*, 93 F.3d 1327, 1332 (7th Cir. 1996). If the instructions were deficient, we ask whether the jury was confused or misled by the instructions. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374–75 (7th Cir. 2000). Even if we believe that the jury was confused or misled, we would need to find that the defendants were prejudiced before ordering a new trial. *Id.*; see also *Boyd v. Illinois State Police*,

No. 12-2779                                              11

384 F.3d 888, 894 (7th Cir. 2004) (standard of review is "a liberal one: we look at jury instructions only to determine if taken as a whole they were sufficient correctly to inform the jury of the applicable law. Even if the instruction contains errors or misguides the jury, the error is reversible only if a litigant is prejudiced.") (quotation omitted).

The defendants do not argue that the due process instruction given by the district court was an incorrect statement of the law.[3] They argue that it was too broad

---

[3] The district court provided the jury with the following instruction on Jimenez's due process *Brady* claim:

> The plaintiff's first claim is that the defendant violated his constitutional right to due process of law.

> To succeed on this claim, the plaintiff must prove both of the following things by a preponderance of the evidence:

> 1.    The defendant concealed material exculpatory and/or impeachment evidence from prosecutors.
> 2.    As a result, the plaintiff was damaged.

> A law enforcement officer is obligated to turn over to the prosecutors handling the case material exculpatory and impeachment evidence that is not otherwise available through the exercise of due diligence. Exculpatory or impeachment evidence is not considered to have been concealed if it was disclosed in time for the defendant in the criminal case to make use of it at his criminal trial.

> "Exculpatory" evidence is evidence that would tend to show that the accused person is not guilty of the crime charged.

(continued...)

because, without the defendants' proposed limiting instruction, the jury was permitted to consider potential *Brady* violations that had not been raised by the parties at the summary judgment stage of the case.[4]

We find no error. Nothing prevented the jury from deciding the case on evidence that had not been used to support or oppose an earlier summary judgment motion. "Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion." *Ortiz v. Jordan*, — U.S. —, —, 131 S. Ct. 884, 890 (2011); *Chemetall GmbH v. ZR Energy, Inc.*, 320 F.3d 714, 718 (7th Cir. 2003) ("Once the trial has taken place, our focus is on the

---

[3] (...continued)

> "Impeachment" evidence is evidence that would undermine the credibility of a prosecution witness who testifies at the criminal trial.

> Exculpatory and impeachment evidence is "material" if it has a reasonable likelihood of affecting the outcome of the criminal case.

Dkt. 287 at 12.

[4] The defendants contend that only the following "categories" of evidence were considered by the district court at summary judgment: (1) that Bogucki failed to disclose that he coerced Larry Tueffel to identify Jimenez; (2) that Phil Torres "never told police he saw Jimenez shoot [Morro];" (3) that Tina Elder saw Jimenez's photo before identifying him in the line-up; (4) that police induced witnesses to give false testimony that the shooter was wearing a Duke jacket; and (5) that police possessed certain physical evidence, including a handwritten note, a photo of Jimenez, and an evidence inventory list. Def. Br. at 71. The district court granted summary judgment for the defendants on the last of these theories.

No. 12-2779                                                      13

evidence actually admitted and not on the earlier summary judgment record."). So long as the evidence supporting these theories was properly admitted, nothing warranted a jury instruction that would have prevented the jury from considering that evidence in resolving Jimenez's due process claim. We find no error in the district court's denial of the defendants' proposed limiting instruction.

In the alternative, the defendants argue that if the district court's refusal to give a limiting instruction was not error, they were not given appropriate notice of several *Brady* theories that Jimenez raised for the first time in closing argument.[5] The defendants did not object to these "new" theories at trial, however, and we see no error in any event. Contrary to the defendants' contention, these *Brady* theories were not stand-alone due process claims, and they certainly did not require Jimenez to amend his complaint in the middle of trial to add such factual detail to the pleadings. Defendants have not shown that they were unfairly blindsided or that Jimenez's trial evidence contradicted his discovery responses. Since the supposedly new arguments were based on properly admitted evidence, Jimenez's counsel was entitled to argue the effect of the evidence in closing.

---

[5]  These theories included: (1) the involvement of Morro's friend in the investigation; (2) that Bogucki did not record the contemporaneous version of events when he stopped taking notes of his interview with Tina Elder; (3) that Bogucki's notes of his interviews with Phillip Torres were of two separate interviews; (4) the anonymous phone call that identified Victor Romo; (5) the omission of times and dates in Bogucki's general progress reports; and (6) that Jimenez's Duke jacket was not tested and then "disappeared." Def. Br. at 72–73.

IV.    *The Criminal Trial Transcripts*

The defendants argue next that they are entitled to judgment as a matter of law on Jimenez's *Brady* claims because he did not put into evidence the entire transcripts of his original criminal trials. Without the transcripts, defendants argue, the trial evidence was not sufficient to support the jury's verdict and the verdict should be reversed. We reject this argument based on both waiver and the merits.

First, the defendants never raised this issue before the district court, either at trial or in their post-trial Rule 50 motion for judgment as a matter of law. The issue therefore may not be used to reverse the judgment on appeal. See *Ortiz v. Jordan*, — U.S. at —, 131 S. Ct. at 892 (absent Rule 50 motion, appellate court was "powerless" to review sufficiency of trial evidence), quoting *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404–05 (2006) (finding forfeiture of a claim on appeal that was not presented in either the Rule 50(a) or Rule 50(b) motion). Whether the trial evidence was sufficient to support the jury's verdict without the full criminal trial transcripts is a matter that had to be raised before the trial court in the first instance.[6]

Second, even if we could review the argument *de novo*, it would still fail on the merits. The defendants argue that Jimenez was required to put the entire transcripts of his two

---

[6] In response to Jimenez's waiver argument, the defendants state: "Nor do we challenge the sufficiency of the evidence such as would require a predicate motion under Fed. R. Civ. P. 50." Reply Br. at 44 n.18. This perfunctory assertion in a footnote in a reply brief is unexplained and is not consistent with the defense argument on the merits.

criminal trials before the jury. The defendants do not specify whether this burden would have required Jimenez to force the jury to listen to a reading of all 1,370 pages or to use some other procedure. The absence of specificity is telling.

The defendants base this argument on language in *United States v. Agurs*:

> The proper standard of materiality [of an alleged *Brady* omission] must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. *This means that the omission must be evaluated in the context of the entire record.*

427 U.S. 97, 112 (1976) (emphasis added); Def. Br. at 80, also citing *Woolley v. Rednour*, 702 F.3d 411, 426 (7th Cir. 2012) (evaluating post-conviction claim of prejudicial ineffective assistance of counsel under *Agurs* materiality standard).

*Agurs* shows that the materiality of *Brady* evidence depends on its context within the criminal investigation. But *Agurs* did not establish a rule that the plaintiff in a civil case alleging a *Brady* violation must force-feed the jury the original criminal trial in its entirety. The criminal transcripts were relevant but not necessary evidence of Jimenez's due process *Brady* claim so long as he met his burden by other means. The district court did not err by denying the defendants' post-trial motion for judgment as a matter of law on Jimenez's *Brady* claims.

V. *Expert Testimony*

Finally, we address the defendants' contention that the district court erred by permitting Jimenez to offer the testimony of Gregg McCrary, an expert on police practices. McCrary testified in some detail about reasonable practices for police investigations and how the investigation of the murder of Eric Morro departed from those practices, depending in large part on how the jury resolved conflicting evidence about the investigation. McCrary's testimony tended to show that the errors in defendants' handling of the investigation were so severe and numerous as to support an inference of deliberate wrongdoing in violation of the Constitution.

Defendants contend that McCrary's testimony regarding reasonable police investigatory practices amounted to legal conclusions that were not admissible under Federal Rule of Evidence 702. They also argue that McCrary's testimony impermissibly opined on the credibility of other witnesses. We find no reversible error.

A. *Forfeiture*

Jimenez responds that the defendants have forfeited these arguments because they did not object to McCrary's testimony on either of these grounds at trial. "If the district court admits the contested evidence, the opponent must make a timely objection or motion to strike, 'stating the specific ground of objection, if the specific ground was not apparent from the context[.]'" *Germano v. Int'l Profit Ass'n, Inc.*, 544 F.3d 798, 801 (7th Cir. 2008), quoting prior language in Fed. R. Evid. 103(a)(1). The defendants counter that their Rule 702 objection was preserved by a pre-trial motion *in limine* and that once the

judge ruled on their motion, any further objection would have been an unnecessary exception to the judge's ruling. See Fed. R. Civ. P. 46. We conclude that the defendants failed to preserve the arguments they are now making on appeal regarding McCrary's testimony.

The defendants argued in their motion *in limine* that McCrary's testimony would be improper because the jury would be able to determine for itself the steps and procedures involved in a "reasonable and prudent" police investigation, and McCrary's testimony on those issues would not be based on specialized knowledge and thus would not assist the jury. Dkt. 206 at 5–6 (quoting McCrary's proposed testimony). That argument was very different from the arguments that defendants make on appeal. In this court the defendants argue that McCrary should not have been permitted to testify regarding reasonable police practices because "reasonableness" is a legal conclusion, and experts should not provide legal opinions. Def. Br. at 58–62. The different arguments in the motion *in limine* were not sufficient to preserve the new argument.

Nor were the arguments in the motion sufficient to preserve the argument on appeal that McCrary should have been prevented from testifying regarding the credibility of the other witnesses. In their motion *in limine*, the defendants argued that McCrary should not be permitted to testify because his opinions hinged on his evaluation of the credibility of the witnesses to the Morro murder. Dkt. 206 at 3–5. That argument was different from the argument the defendants raise on appeal—that McCrary testified regarding the credibility of the witnesses' *trial* testimony. Def. Br. at 64

(McCrary's testimony "directly touched upon a matter firmly beyond any expert's competence: the credibility of several key trial witnesses."). This appellate argument also was not preserved by the motion *in limine*.

Because the defendants failed to object to McCrary's testimony on either of these bases at trial, we must consider whether there was a "plain error" under Federal Rule of Evidence 103(e). We have explained: "Plain error review of a forfeited evidentiary issue in a civil case is available only under extraordinary circumstances when the party seeking review can demonstrate that: (1) exceptional circumstances exist; (2) substantial rights are affected; and (3) a miscarriage of justice will occur if plain error review is not applied." *Estate of Moreland v. Dieter*, 395 F.3d 747, 756 (7th Cir. 2005), citing *Stringel v. Methodist Hosp. of Ind., Inc.*, 89 F.3d 415, 421 (7th Cir. 1996).

The defendants have not cleared this high bar. The defendants argue at length that McCrary's disputed testimony affected their substantial rights. Def. Br. at 62–70. But the bulk of their argument depends on comparing McCrary's "lengthy and purposeful" testimony with the "weaknesses" of Jimenez's claims—in other words, re-weighing the evidence while drawing all inferences in the defendants' favor. We may not do so. Moreover, the defendants have not addressed the other two elements needed for plain error review—exceptional circumstances and a miscarriage of justice. The defendants' arguments concerning their substantial rights will not rescue them from forfeiture without such a showing.

No. 12-2779                                                    19

B.  *The Merits of Defendants' Challenges*

Even if defendants had not forfeited these objections, though, defendants' arguments against McCrary's testimony fail on the merits. When an objection is made properly, a district court's decision admitting evidence is reviewed for an abuse of discretion. *Griffin v. Foley*, 542 F.3d 209, 217 (7th Cir. 2008).

1.  *Testimony Regarding "Reasonableness"*

Federal Rule of Evidence 702(a) permits a witness qualified as an expert to testify regarding his or her opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence. As a general rule, accordingly, an expert may not offer legal opinions.[7]

---

[7] There are some exceptions to this general rule, including some issues of legal malpractice and patent law. See, *e.g.*, *American Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1461 (7th Cir. 1996) (in legal malpractice case under Indiana law, expert testimony is normally required to show standard of care); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995) (court had discretion to adopt, take guidance from, ignore, or reject expert legal opinions regarding patent construction), aff'd, 517 U.S. 370 (1996); *Applegate v. United States*, 35 Fed. Cl. 406, 424–25 (Fed. Cl. 1996) (expert testimony reaching legal conclusions may be admissible where the testimony concerns state law or a technical provision peculiar to industry) (internal quotation omitted); *Barth v. Reagan*, 564 N.E.2d 1196, 1199–1200 (Ill. 1990) (in legal malpractice case under Illinois law, standard of care

(continued...)

The defendants argue that McCrary's testimony regarding reasonable police practices was intertwined with probable cause, a legal standard, and thus McCrary should not have been permitted to testify on the subject. We disagree. McCrary did not offer any opinion at trial as to probable cause at any stage of the investigation of Morro's murder or the prosecution of Jiminez. He testified only about reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures.

We recognize that McCrary's opinions had direct implications for applying legal standards such as probable cause and, even more to the point, whether Bogucki deliberately failed to comply with his obligations under *Brady v. Maryland* and the Due Process Clause of the Fourteenth Amendment. That's why his testimony was relevant.[8]

When an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is "limited to describing sound professional standards and identifying departures from them." *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997); see also *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (commenting that expert's

---

[7] (...continued)

ordinarily must be established through expert testimony).

[8] Plaintiff tried this case on the theory that Bogucki acted deliberately to violate his constitutional rights. The case therefore does not present any question about reckless conduct. See generally *Slade v. Board of School Dirs. of City of Milwaukee*, 702 F.3d 1027, 1029–30 (7th Cir. 2012); *Archie v. City of Racine*, 847 F.2d 1211, 1219–20 (7th Cir. 1988) (en banc).

testimony could be relevant to jury in determining whether officers deviated from reasonable police practices). That's exactly what McCrary did here. The district court drew the line properly so that McCrary's testimony did not stray into impermissible territory.

In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful. Liability for constitutional torts is more limited in scope than common law tort liability. Negligence is not sufficient. *Daniels v. Williams*, 474 U.S. 327 (1986). Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights. See, *e.g.*, *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."), citing *Estate of Cole v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996); *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."). These cited cases dealt with medical treatment, but the same principle extends to police investigations.

McCrary testified about the steps a reasonable police investigator would have taken to solve the Morro murder, as well as the information that a reasonable police investigator would have taken into account as the investigation progressed. He did not try to resolve conflicts in the testimony of different witnesses. He also did not offer an opinion regarding whether the police had probable cause to arrest Jimenez. He did point out ways in which evidence from other witnesses indicated that Bogucki and his police colleagues departed from reasonable investigation methods. The effect of his testimony depended on how the jury resolved conflicts among the testimony of other witnesses. We must assume the jury resolved those conflicts in favor of plaintiff Jimenez, of course. McCrary's testimony thus would have helped the jury conclude that the departures from reasonable police practices were so important, severe, and numerous that they supported an inference that Bogucki acted deliberately to violate Jimenez's rights. Such use of McCrary's testimony would not transform it into an impermissible legal opinion. Thus, even if defendants had not forfeited their objections, we would find no error in admitting McCrary's testimony, much less plain error or an abuse of discretion.

## 2. *Testimony Regarding Credibility*

The defendants also contend that McCrary impermissibly testified regarding the credibility of the other trial witnesses. The defendants also forfeited this argument, as noted, but it too would fail on the merits. Whether expert testimony regarding witness perception, memory, reliability, and deception could assist a properly-instructed jury in its task of evaluating trial testimony is controversial. Compare, *e.g.,*

No. 12-2779                                                    23

*United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999) ("the credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses."), with *Hall*, 165 F.3d at 1118 (Easterbrook, J., concurring in judgment) ("Jurors who *think* they understand how memory works may be mistaken, and if these mistakes influence their evaluation of testimony then they may convict innocent persons. … That a subject is within daily experience does not mean that jurors know it *correctly*.") (emphasis in original). As important as this controversy is, we need not address it here because McCrary simply did not testify regarding the credibility of other trial witnesses.

McCrary offered a few observations on credibility, but they were limited to proper discussions of the evidence that Bogucki received in the investigation. First, McCrary noted that one witness had given Bogucki two inconsistent versions of the events at two different times in the investigation. He explained that a reasonable officer would have realized that both of her stories "can't be true" and would have tried to resolve the conflicts. That point is hard to dispute and certainly did not invade the province of the jury.

McCrary also testified that a reasonable officer would have taken very seriously Victor Romo's statement that he was present when Morro was shot and that the shooter was Juan Carlos Torres, not Jimenez. McCrary explained that Romo's statement amounted to a voluntary confession that he was present at the scene of the murder with the person he said was the shooter, which would make Romo himself at least a suspect in the murder, at the very least as an accomplice. See Tr.

1627–28, 1630, 1635. McCrary did not testify that Romo had been telling the truth, but he explained that Romo's statement had strong indications of credibility so that a reasonable police investigator would have taken it seriously—it was a voluntary statement against Romo's own interests, for it implicated him in a very serious crime. We see nothing improper about that testimony. See *Nunez v. BNSF Railway Co.*, No.12-3018, — F.3d —, —, 2013 WL 4829259, at *3 (7th Cir. Sept. 11, 2013) (expert could not testify as to whether another witness was telling the truth, but could testify about implications if he was).

McCrary did not tell the jury whether to believe what any witnesses had said during the civil trial. He told the jury what a reasonable police investigator should have done when presented with these conflicting and/or inculpatory statements during the murder investigation. This was within the bounds of proper testimony for a police practices expert. Thus, even if the argument had not been forfeited, we would find no error, let alone a plain error or an abuse of discretion.

We find no reversible error, so the judgment of the district court is AFFIRMED.